# KLAYMAN LAW GROUP
### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.

7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

Tel: 561-558-5336

Via Federal Express

August 21, 2020

U.S. District Court for the Northern District of Texas
Office of the Clerk
1100 Commerce Street, Room 1452
Dallas, TX 75242



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 4 2020

CLERK, U.S. DISTRICT COURT
By_____
Deputy

3· 20·mc - 43

**Re:** __Order of the District of Columbia Court of Appeals__

To Whom it May Concern:

I am enclosing a copy of an order of the District of Columbia Court of Appeals of June 11, 2020, which continues to be legally challenged (see enclosed petition for rehearing en banc), which purports to suspend me from the practice of law in the District of Columbia for 90 days.

Should this honorable Court consider any reciprocal discipline, I respectfully request due process and a hearing, with right of counsel, as this twelve year old proceeding is not only substantively flawed as demonstrated by distinguished but and now sadly deceased ethics and constitutional law scholar Professor Ronald Rotunda, but also time barred and/or subject to laches in many if not most jurisdictions. Professor Rotunda's legal opinion is attached to the enclosed petition for rehearing and I urge the Court to read and digest it, as well as the petition itself, which sets forth the reasons why reciprocal discipline is not warranted.

Finally, please disclose if you have received any ex parte communications from the District of Columbia Bar Disciplinary Counsel, who as set forth in my petition is very partisan. If so, please provide any such ex parte communications to me at the above address.

Please contact me with any questions.

Thank you for your professional courtesy.

Sincerely,

Larry Klayman, Esq.

*Notice:   This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-0100

IN RE LARRY KLAYMAN

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-48-08)

FILED
District of Columbia
Court of Appeals

*Julio A. Castillo*
Julio Castillo
Clerk of Court

(Argued September 17, 2019                    Decided June 11, 2020)

*Stephen A. Bogorad*, with whom *John Thorpe Richards, Jr.*, was on the brief, for respondent.

*H. Clay Smith, III*, Assistant Disciplinary Counsel, with whom *Elizabeth A. Herman*, Deputy Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility (the "Board") has

recommended that this court suspend respondent Larry Klayman from the practice

of law for ninety days based on his representation of three clients in violation of Rule

1.9 (conflict-of-interest) of the District of Columbia Rules of Professional Conduct

(or its Florida equivalent).   In this matter, the Office of Disciplinary Counsel

("Disciplinary Counsel") takes exception to the Board's report and recommendation on three grounds. First, Disciplinary Counsel challenges the Board's rejection of the finding by Hearing Committee Number Nine (the "Hearing Committee") that Mr. Klayman violated District of Columbia Rule of Professional Conduct 8.4(d). Second, Disciplinary Counsel takes exception to the Board's rejection of the Hearing Committee's finding that Mr. Klayman gave false testimony and made false representations to the Hearing Committee. Finally, Disciplinary Counsel takes exception to the Board's recommendation that we impose a ninety-day suspension without a requirement that Mr. Klayman prove his fitness before being reinstated. For the reasons that follow, we accept the Board's recommendations.

## I.

The Board adopted most of the factual findings of the Hearing Committee, including as to the following, a summary regarding the three matters that underlie this disciplinary matter. Mr. Klayman founded Judicial Watch and served as its in-house general counsel from its inception in 1994 until 2003. During Mr. Klayman's tenure at Judicial Watch, Sandra Cobas served as the director of Judicial Watch's Miami Regional Office. She complained to Judicial Watch about her employment

conditions, alleging that she was subject to a hostile work environment during several weeks in 2003. As general counsel, Mr. Klayman provided legal advice to Judicial Watch concerning Cobas's claims. After both Mr. Klayman and Ms. Cobas had ended their employment with Judicial Watch, Ms. Cobas filed a complaint against Judicial Watch in a Florida state court, making the same hostile-work-environment allegations. The Florida trial court granted a motion to dismiss the case (calling the complaint "'silly and vindictive'"). Thereafter, without seeking consent from Judicial Watch, Mr. Klayman entered an appearance on Ms. Cobas's behalf and filed a motion requesting that the trial court vacate its order of dismissal. When the motion was denied, Mr. Klayman filed a notice of appeal on Ms. Cobas's behalf and, later, a brief in a Florida appellate court, but the appellate court affirmed the dismissal.

In 2002, while still employed by Judicial Watch, Mr. Klayman solicited a donation from Louise Benson as part of a campaign to raise funds to purchase a building for the organization. Klayman was acting as both chairman and general counsel of Judicial Watch when he solicited this donation from Benson. Ms. Benson committed to donate $50,000 to the building fund, and thereafter paid $15,000 towards that pledge. Judicial Watch did not purchase a building. In 2006, after Mr. Klayman had left Judicial Watch, he and Ms. Benson filed a lawsuit against Judicial

Watch in federal court, where they were represented by attorney Daniel Dugan. Ultimately, the federal district court dismissed Ms. Benson's claims (but not Mr. Klayman's claims) on jurisdictional grounds. Shortly thereafter, Ms. Benson sued Judicial Watch in the Superior Court of the District of Columbia, alleging *inter alia* unjust enrichment and seeking a return of her donation. Initially, she was represented in that suit by Mr. Dugan. Eventually, and without seeking consent from Judicial Watch, Mr. Klayman entered an appearance in the case as co-counsel for Ms. Benson. Judicial Watch requested that Klayman withdraw, stating that he organized the fundraising effort that was at the center of Ms. Benson's complaint while he was Judicial Watch's attorney, and noting that Ms. Benson had identified him as a fact witness. When Mr. Klayman did not withdraw, Judicial Watch moved to disqualify him. The motion for disqualification was never decided, as the parties stipulated to the dismissal of the case.

In 2001, while Mr. Klayman was still employed by Judicial Watch, Judicial Watch and Peter Paul entered into a representation agreement, and a modification thereto, under which Judicial Watch agreed to evaluate legal issues emanating from Mr. Paul's fundraising activities during the election campaign for the New York State Senate in 2000 and to represent him in connection with an investigation into alleged criminal securities law violations and possible civil litigation stemming from

those fundraising activities.    Mr. Klayman drafted, edited, and approved the representation agreement and modification and authorized the signing of both documents as Judicial Watch's chairman and general counsel.  Judicial Watch later represented Mr. Paul in a civil lawsuit brought in California state court.  Following Mr. Klayman's departure from Judicial Watch, Judicial Watch withdrew from the representation.    Thereafter, Mr. Paul sued Judicial Watch in the United States District Court for the District of Columbia alleging, among other theories, that Judicial Watch breached its representation agreement with him.  While Mr. Paul initially was represented by Mr. Dugan, Mr. Klayman entered an appearance in the case without seeking Judicial Watch's consent.  Judicial Watch moved to disqualify Mr. Klayman.    The district court (the Honorable Royce Lamberth) granted the motion to disqualify, finding that Mr. Klayman's representation of Mr. Paul violated Rule 1.9.  The court found that Mr. Klayman was representing the plaintiff "in a matter directly arising from an agreement he signed in his capacity as [g]eneral [c]ounsel for the current defendant" and that Mr. Klayman's representation of Mr. Paul was "the very type of 'changing of sides in the matter' forbidden by Rule 1.9."

The Hearing Committee found that Mr. Klayman violated Rule 1.9 (or its Florida equivalent) in all three matters and violated Rule 8.4(d) in the Paul matter. It also found that Mr. Klayman gave false testimony before the Hearing Committee

and that his disciplinary history in Florida in connection with an unrelated matter was another aggravating factor. On the basis of all the foregoing, the Hearing Committee recommended that Mr. Klayman be suspended for ninety days, with reinstatement contingent upon a showing of his fitness to practice law. The Board, by contrast, recommended that Klayman be suspended for ninety days with no fitness requirement. The Board disagreed with the Hearing Committee's finding that Disciplinary Counsel proved a violation of Rule 8.4(d) and with its finding that Mr. Klayman provided false testimony.

Before this court, neither Mr. Klayman nor Disciplinary Counsel takes issue with the finding that Mr. Klayman violated Rule 1.9 or its Florida equivalent in the matters described above, and we therefore need not address that finding. Rather, as the Board did, we adopt the vast majority of the Hearing Committee's thorough analysis. However, as noted above, Disciplinary Counsel takes exception to the Board's findings regarding Rule 8.4(d) and false testimony, and to the Board's recommended sanction insofar as it omits a fitness requirement. We discuss these matters below.

**II.**

Disciplinary Counsel has the burden of proving a violation of the Rules of Professional Conduct by clear and convincing evidence. *In re Speights*, 173 A.3d 96, 99 n.3 (D.C. 2017). "When reviewing a recommended disciplinary sanction against an attorney, this court must accept the Board's findings of fact if they are supported by substantial evidence." *In re Sneed*, 673 A.2d 591, 593 (D.C. 1996). The Board "has the power to make its own factual findings" but "must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (internal quotation marks and emphasis omitted). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990). "[T]he Board and this court owe no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and thus are reviewed *de novo*." *Bradley*, 70 A.3d at 1194. "Whether [a] respondent gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." *Id.* "[T]his court usually adopts the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted[.]'" *Sneed*, 673 A.2d at 593.

## III.

Rule 8.4(d) establishes that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice[.]" *Id.* For conduct to violate Rule 8.4(d), the conduct must be improper, "bear directly upon the judicial process," and "taint the judicial process in more than a *de minimis* way." *In re Carter*, 11 A.3d 1219, 1224 (D.C. 2011) (internal quotation marks omitted).

Disciplinary Counsel asserts that the "Board erred by overturning the Hearing Committee's conclusion that Mr. Klayman violated Rule 8.4(d) when he appeared on behalf of [Mr.] Paul with a 'clear conflict of interest' and litigated against disqualification for the second time." The Board cited a number of reasons for rejecting the Hearing Committee's conclusion, including its longstanding "concern[]" about the scope of Rule 8.4(d) in litigation-related disciplinary matters" and its view that any Rule 8.4(d) violation would be "derivative of the conflict[-]of[-]interest finding." But the Board primarily followed this court's lead in considering the views of the judge who presided over the litigation in which the disqualification motion was filed. *See In re White*, 11 A.3d 1226, 1232 (D.C. 2011). The Board found it "extra significan[t]" that Judge Lamberth, though he granted the motion to disqualify

Mr. Klayman, found "'a legitimate debate about [Mr. Klayman's] conduct'" and further found that Mr. Paul was a needy client who could not otherwise have afforded legal services.   In light of the "extraordinary situation" of Judge Lamberth's "supportive testimony" to the Hearing Committee, the Board was unable to conclude that Mr. Klayman's "behavior sufficiently tainted the judicial process to a degree adequate to sustain the Rule 8.4(d) charge."[1]  We accept the Board's reasoning and agree that no Rule 8.4(d) violation was proven by clear and convincing evidence.

## IV.

Before the Hearing Committee, Mr. Klayman testified, "I believed that Mr. Dug[]an had given the advice of counsel that I could do this [i.e., represent Ms. Benson], otherwise he [Dugan] wouldn't have prepared the pleading" opposing the motion to disqualify Mr. Klayman based on Rule 1.9." The Hearing Committee found that this testimony was false, as was Mr. Klayman's testimony that Mr. Dugan "was the one who prepared the response to that disqualification motion."

---

[1]  The Board noted that in *White*, by contrast, Judge Lamberth concluded that White's conduct had tainted the proceedings; specifically, "[t]he entire litigation was disrupted and delayed while the [d]istrict [c]ourt dealt with the motion to disqualify[,]" and the court had to strike an entire deposition because of White's presence. *Id.* at 1232.

Disciplinary Counsel contends that this court should defer to the Hearing Committee's false-testimony findings as supported by substantial record evidence.

The Board found that Disciplinary Counsel failed to prove by clear and convincing evidence that Mr. Klayman gave false testimony. The Board observed that the Hearing Committee had relied almost entirely on Mr. Dugan's testimony that he did not endorse Mr. Klayman's appearance in the Benson matter. The Board reasoned, however, that the forcefulness of Mr. Dugan's testimony was undercut by his repeated inability to recall the substance of key conversations that took place between him and Mr. Klayman eight years earlier. In addition, the Board cited prior, "apparently inconsistent" statements that Mr. Dugan had made about the matter (e.g., Mr. Dugan's apparent statement to Judicial Watch's counsel, referred to in Judicial Watch's memorandum in support of its motion to disqualify, that there was "no ethical issue arising from" Mr. Klayman's representation of Ms. Benson).

The Board's description of Mr. Dugan's "diminished recollection" of his discussions with Mr. Klayman about the latter's entry of his appearance in the Benson matter, and about Judicial Watch's demand that Mr. Klayman withdraw from the representation, is supported by the record. Further, while the Hearing Committee reasoned that Mr. Klayman "cannot have inferred" that Mr. Dugan

blessed his entry of appearance in the Benson matter from Mr. Dugan's filing of the opposition to the motion to disqualify since Mr. Dugan "did not write the opposition[,]" Mr. Dugan acknowledged that his associate may have edited the draft opposition before it was filed, acknowledged that he (Dugan) did *sign* the opposition, and testified that he would not have done so if he had thought that it was frivolous or thought it violated any ethics or pleadings rules. Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to *believe* that Mr. Dugan had given the advice of counsel. We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection. Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely.

## V.

In explaining its sanction recommendation, the Hearing Committee found that Mr. Klayman's misconduct was aggravated by his prior discipline in Florida and his denial of responsibility as to the underlying conduct. He received a public reprimand in that jurisdiction after he failed to timely pay the full amount ($5,000) he had agreed to repay to a former client after mediation to resolve a fee dispute. The Board gave this matter little weight because of Mr. Klayman's explanation that a serious

car accident had rendered him unable to work at full capacity and caused him "significant financial difficulties" that affected his ability to pay. We accept that evaluation.

We also accept the Board's conclusion that Disciplinary Counsel did not show that a fitness requirement is warranted in this case. To be sure, Disciplinary Counsel proved that Mr. Klayman flagrantly violated Rule 1.9 on three occasions. His misconduct was not isolated, and, it appears, he acted vindictively and "motivated by animus toward Judicial Watch" (with which he had developed an acrimonious relationship). We agree with the Board and the Hearing Committee that his misconduct was intentional rather than inadvertent or innocent. We also readily agree with the Board that his misconduct — involving a "switch[ing of] sides" that strikes at the integrity of the legal profession — deserves the serious sanction of a ninety-day suspension. Nevertheless, we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically. *In re Adams*, 191 A.3d 1114, 1120 (D.C. 2018). Accordingly, we decline to impose a fitness requirement. We do, however, concur with Disciplinary Counsel's original recommendation that Mr. Klayman be ordered to complete a continuing legal education ("CLE") course on conflicts of interest.

Wherefore, effective thirty days after entry of this order, Mr. Klayman is suspended from the practice of law. The period of suspension is ninety days, commencing after he has filed the affidavit required by D.C. Bar R. XI, § 14(g). Before reinstatement, he must also complete a CLE course on conflicts of interest.[2]

*So ordered.*

---

[2] The pending motion by his counsel to withdraw is hereby granted.

## IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

In the Matter of:

**LARRY E. KLAYMAN, ESQ.**

Respondent.

A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)

**No. 18-BG-0100**
**Board Docket No. 13-BD-84**
**BDN: 48-08**

## RESPONDENT LARRY KLAYMAN'S PETITION FOR REHEARING EN BANC OF COURT'S ORDER OF JUNE 11, 2020

Dated: July 13, 2020

Respectfully submitted,

/s/ Larry Klayman

Larry Klayman, Esq.
2020 Pennsylvania Ave NW
Suite 800
Washington DC 20006
Tel: 561-558-5336
leklayman@gmail.com

*Respondent Pro Se and Of Record*

## TABLE OF CONTENTS

I. Introduction....................................................................................................1

II. Legal Standards of Review ..............................................................................7

III. Discussion .....................................................................................................7

    A. The Findings of an Intentional and Vindictive Violation of Rule 1.9 Require Either Withdrawal or Modification, As They Are in Error.......7

    B. This Honorable Court Should Clarify What If Any Action Out of Necessity Was Permissible Under the Admittedly "Extraordinary Situation" Thrust Upon Respondent with Regard to Mrs. Benson, Mr. Paul and Mrs. Cobas...................................................................................9

IV. Conclusion ..................................................................................................11

## TABLE OF AUTHORITIES

*Gamez v. State Bar of Tex.,* 765 S.W.2d 827, 833 (Tex. App. 1988) .......................5

*Newton v. United States*, 613 A.2d 332 (D.C. 1992) .................................................7

*Rich v. United States*, 357 A.2d 421 (D.C. 1976) ......................................................7

*Robinson v. United States*, 456 A.2d 848 (D.C. 1983)) .............................................1

## RESPONDENT LARRY KLAYMAN'S PETITION FOR REHEARING EN BANC OF COURT'S ORDER OF JUNE 11, 2020

Respondent, Larry Klayman, hereby respectfully moves for rehearing en banc pursuant to Rule 35 of the District of Columbia Court of Appeals, and he does so in his capacity as a *pro se* litigant and counsel of record. The purpose of this petition for rehearing is to correct certain material errors under the extraordinary situation and circumstances of this case. Mr. Klayman had previously moved for rehearing from the panel pursuant to Rule 40 of the District of Columbia Court of Appeals, but this was denied without any explanation or analysis in a *per curiam* opinion dated July 6, 2020. Exhibit 5.

Although it may be natural for individuals, including judges, to be hesitant about reviewing their own findings, which likely caused the *per curiam* opinion on July 6, 2020, the matters at stake here are of "exceptional importance," *Robinson v. United States*, 456 A.2d 848, 851 (D.C. 1983), that they simply must be addressed substantively. Full en banc consideration is therefore necessary. This Petition implicates how the District of Columbia Bar as a whole renders discipline, which directly affects thousands of attorneys. Simply allowing for gross misstatements of fact to remain on the record severely prejudices the abilities and reputations of attorneys who are licensed in the District of Columbia and are necessary to practice law and make a living.

## I.    INTRODUCTION.

Mr. Larry Klayman ("Respondent" or "Mr. Klayman") has continuously been a member in good standing of the District of Columbia Bar (the "Bar") since his induction before this honorable Court on December 22, 1980, nearly forty (40) years ago. He has also continuously been a member in good standing of The Florida Bar since December 7, 1977, for nearly forty-three (43) years. *See* Respondent's Hearing Exhibits 2, 3, 26 (hereinafter "R's. Ex.") Respondent

1

is also a former trial attorney in the Antitrust Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly, as well the founder and former Chairman of Judicial Watch, a not-for-profit organization that, when Mr. Klayman ran it, sought to promote ethics in government and the legal profession as a whole. *See* Trial Transcript (hereinafter "Trial Tr."), Jan. 27, 2016 at 324:14-15; *see* Respondent's Proposed Findings of Facts (hereafter "RPFOF") at ¶¶ 84, 88; *see also* Stipulation of Facts (hereinafter "SOF") at 2. Respondent, following his U.S. Senate candidacy, also founded Freedom Watch, where he is currently chairman and general counsel.

Respondent conceived of and served as chairman and general counsel since Judicial Watch's inception in July of 1994 and remained in that capacity until September of 2003, when he voluntarily left Judicial Watch, pursuant to the terms of his severance agreement, to run for the U.S. Senate in Florida. Trial Tr., Jan. 27, 2016 at 329:8-13 at 89.

While campaigning in Florida for his U.S. Senate run, Respondent discovered that the current president of Judicial Watch, Tom Fitton (hereinafter "Fitton"), along with the other directors, had fraudulently misrepresented to donors that Judicial Watch was actively pursuing the purchase of a building with donor funds. RPFOF at ¶¶ 52, 84, SOF at 15. Respondent also discovered that Judicial Watch, under Fitton's non-lawyer direction, had misappropriated donor funds, had abandoned clients such as Peter Paul who in large part wound up doing ten (10) years in prison as a result, and had vindictively fired and harassed most of the executive staff that Respondent had hired. RPFOF at ¶ 99. Fitton, again a non-lawyer, who Mr. Klayman near the time he was leaving had also learned, falsely represented that he had graduated from George Washington University when Respondent had hired him as his assistant, apparently feared that persons loyal to Respondent would somehow challenge or undermine his taking control of

2

Judicial Watch after Respondent left. With regard to the misappropriation of donor funds to buy a building, to this day Judicial Watch has not bought a building but instead converted the donors' funds, many of whom have since died (the average age of a donor is about 74 years old), as over seventeen (17) years has elapsed. *See* www.judicialwatch.org and Judicial Watch's 990 tax return for 2019.

In light of this egregious misconduct after Respondent left, particularly by Fitton, and Judicial Watch's Director of Litigation, Paul Orfanedes, who is a licensed District of Columbia lawyer and is required to know and act ethically, out of necessity and out of conscience, as testified to by the well-respected and distinguished legal ethics expert Professor Ronald Rotunda, when Mrs. Benson, Mr. Paul and Mr. Cobas could not afford legal counsel, Respondent assisted these persons harmed by Fitton, Orfanedes and the "new" non-lawyer director Christopher Farrell of Judicial Watch. In so doing, Respondent did not intentionally violate any of the District of Columbia Rules of Professional Conduct of the Bar, nor intentionally violate the ethics rules of The Florida Bar. Outlining Respondent's ethical intentions, Professor Rotunda found: "[f]urther establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson". *See* Exhibit 1 to this Petition, which is the same as R's. Ex. 5 (Expert Rotunda's Opinion Letter of June 3, 2014) at 3.

It is not that Respondent lacks an appreciation or respect for the findings of this honorable Court or his ethical obligations under the District of Columbia Code of Professional Conduct which he takes seriously; rather, at the time after he left Judicial Watch, Respondent thought he was doing the right thing in each instance, particularly as someone who had conceived of and founded Judicial Watch to in effect be complementary to the Bar. Specifically,

<div align="center">3</div>

Professor Rotunda, based on the facts of why and how Respondent came to assist three persons, Mrs. Benson, Mr. Paul, and Mrs. Cobas, gave his expert opinion in a letter which was subsequently entered into evidence, along with his compelling sworn testimony at Trial Tr., Jan. 27, 2016 at 496:18-607:12 at the hearing before the Ad Hoc Hearing Committee (hereinafter "AHHC"), attested to following:

> I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline. In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul and Louis Benson.

. . . .

> In applying these principles, it is reasonable and understandable that Mr. Klayman believed that he had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that 'neglect of client matters is a serious violation of the obligation of diligence.' Nor there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch."

> (In fact, the specification of charges did not allege any violation of confidences).

. . . .

> Faced with the dilemma of either representing Cobas, Paul and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman (in the Paul case) because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused . . . [t]he situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul and Benson.

4

*See* Exhibit 1 to this Petition, which is the same as R's. Ex. 5 (Expert Rotunda's Opinion Letter of June 3, 2014) at 1, 2, 3 respectively[1].

The purpose of this petition for rehearing en banc is not to relitigate the issues that led to this honorable Court's Order of June 11, 2020, but to correct two (2) material errors which are not supported by clear and convincing evidence, contained therein and on the record, as well as to bring to the Court's attention that Respondent has already fulfilled the requirement that he take a course in conflicts of interests, something which his prior counsel had proffered would occur but which they neglected to confirm with a supplemental filing to their brief, or make mention of at oral argument. Thus, Respondent respectfully requests that a modified order reflect this fact as well. *See* Exhibit 2 – Proof of Mr. Klayman's taking of a conflict of interest and several other ethics courses.

First, as testified to by Professor Rotunda and Mr. Klayman himself, Respondent did not intentionally violate Rule 1.9 and he did not seek to assist Mrs. Benson, Mr. Paul or Mrs. Cobas out of vindictiveness toward Judicial Watch. Indeed, as set forth in the record, Respondent previously had to sue Judicial Watch over Fitton's and the organization's vindictiveness toward Mr. Klayman, which continues to this day. Judicial Watch lost a defamation case brought by Respondent where the jury awarded both compensatory and punitive damages. *See* RPFOF at ¶¶ 62, 63; *see also* Trial Tr., Jan. 26, 2016 at 96:2-10. A copy of the jury verdict and court judgment finding Judicial Watch liable for maliciously defaming Mr. Klayman is attached as Exhibit 3 hereto; *see also* R's. Ex. 22, 23. And, there is no credible, much more clear and convincing

---

[1] Furthermore, with regard to the statute of limitations issue, in addition to the authority set forth and cited by Professor Rotunda, Texas also employs and enforces a four-year statute of limitations for bar disciplinary cases. *Gamez v. State Bar of Tex.,* 765 S.W.2d 827, 833 (Tex. App.—San Antonio 1988, writ denied)

evidence in the record, showing that Respondent intentionally violated Rule 1.9, as he thought he had an ethical and moral obligation at the time to assist Mrs. Benson, Mr. Paul and Mrs. Cobas when they could not afford counsel to seek redress for the wrongs caused by Fitton and the other directors of Judicial Watch. Quite apart what he felt was his obligation as the founder of an ethics organization, Judicial Watch, to protect Mrs. Benson, Mr. Paul and Mrs. Cobas, Mr. Klayman also felt at the time that he had a right to protect his own interests, as Mr. Paul, having been abandoned by non-lawyer Fitton and Judicial Watch, had threatened legal action after Mr. Klayman voluntarily left Judicial Watch to run for the U.S. Senate and did not understand that Respondent had played no role in the abandonment.

As a result, with complete respect for this Court and the Bar in general, of which Respondent has been a proud member of for almost forty-one (41) years, Respondent seeks a rehearing en banc to remove the following findings materially in error from its June 11, 2020 Order, as they will cause damage to his reputation and will undoubtedly be used by adversaries, including but not limited to Fitton and Judicial Watch, and others, against him and his current and future clients. In this regard, Respondent respectfully requests that this honorable Court take judicial notice of ongoing litigation which seeks to remedy more vindictive defamation by Fitton, calculated to harm Mr. Klayman, whereby convicted felon Roger Stone revealed that Fitton has been publishing that Respondent was ousted from Judicial Watch because of a sexual harassment complaint. When put under oath, Fitton had to finally admit that this was not true. *See* Exhibit 4 – Attached excerpt of Fitton testimony in *Klayman v. Fitton*, 1:19-cv-20544 (S.D. Fla). Thus, the opposite is true; Fitton, the non-lawyer who filed the bar complaint over twelve and one-half (12 ½) years ago on January 23, 2008, is the one who has been vindictive toward Mr. Klayman. As a

6

result, Respondent has had to seek legal redress to protect himself and his family for a concerted course of conduct that continues to this day.

Specially, these findings of this honorable Court that must therefore respectfully be modified or withdrawn occur at page 12 of the June 11, 2020 Order:

> "His (Mr. Klayman's) misconduct was not isolated and, it appears, he acted vindictively and 'motivated by animus toward Judicial Watch' (with which he had developed an acrimonious relationship.) We agree with the Board and the Hearing Committee that his misconduct was intentional rather than inadvertent or innocent."

June 11, 2020 Order at 12.

## II.    LEGAL STANDARDS OF REVIEW.

As ruled by this honorable Court, "[w]e start with a premise, bottomed on necessity, that courts generally take care to avoid inadvertent or mistaken orders. Nonetheless, some instances will arise." *Newton v. United States*, 613 A.2d 332, 334 (D.C. 1992). When the need arises, "we reiterate and rely upon the rationale that a trial court has 'inherent power to correct its record so as to reflect the truth and insure that justice be served.'" *Id.*; *see also Rich v. United States*, 357 A.2d 421, 423 (D.C. 1976) ("...the court's actions were justified based on its inherent power to correct its record so as to reflect the truth and insure that justice be served.").

## III.   DISCUSSION.

### A.    The Findings of an Intentional and Vindictive Violation of Rule 1.9 Require Either Withdrawal or Modification, As They Are in Error.

Underscoring that the findings that Respondent acted intentionally and vindictively require withdrawal or modification at a minimum, in the interests of accuracy and fundamental fairness, is the Court's own June 11, 2020 Order which is inherently contradictory, suggesting that the intentional and vindictive findings were simply borrowed, without delving into the record, from the original recommendation of the AHHC and the Board, which likely also

adopted these "findings" without much, if any, scrutiny of the record. This dovetails with the panel's denial without explanation of the previously filed petition for rehearing before it, which, along with the speed that it issued its order of summary per curiam affirmance creates a strong presumption that a thorough review of the record was not undertaken. Exhibit 5.

For instance, with regard to the only time that a court or any judicial body ruled that Mr. Klayman had a conflict of interest, as occurred for the first time in the case concerning Mr. Paul before Judge Royce C. Lamberth, this honorable Court found in its June 11, 2020 Order:

> But the Board primarily followed this court's (Judge Lamberth's) lead in considering the views of the judge who presided over the litigation in which the disqualification motion was filed. *See* In re White, 11 A.3rd 1226, 1232 (D.C. 2011). The Board found it "extra-significan(t)" that Judge Lamberth, though he granted the motion to disqualify Mr. Klayman, found a 'legitimate debate about (Mr. Klayman's) conduct' and further found that Paul was a needy client who otherwise could not have afforded legal services. In light of the 'extraordinary situation' of Judge Lamberth's 'supportive testimony' to the Hearing Committee, the Board was unable to conclude that Mr. Klayman's 'behavior sufficiently tainted the judicial process . . ."

June 11, 2020 Order at 8-9. Importantly, the disqualification ruling of Judge Lamberth was the first confirmed indication of a conflict of interest and at that point Respondent ceased representation of not just Mr. Paul, but also ceased any legal efforts on behalf of the other two victims of Fitton and Judicial Watch, Mrs. Cobas and Mrs. Benson.

Thus, by this Court's own reasoning, Respondent did not act intentionally and certainly not vindictively. In this regard, Respondent respectfully requests that this honorable Court thoroughly review the hearing testimony and exhibits pertinent to not only ethics expert Professor Rotunda, but also Judge Lamberth and Respondent himself, found at Trial Transcript pages 496 to 607 for Professor Rotunda, pages 656 to 661 for Judge Lamberth, and pages 318 to 420 for Mr. Klayman.

**B.** **This Honorable Court Should Clarify What, If Any, Action Out of Necessity Was Permissible Under the Admittedly "Extraordinary Situation" Thrust Upon Respondent with Regard to Mrs. Benson, Mr. Paul and Mrs. Cobas.**

As set forth in Subsection A., this honorable Court, following Judge Lamberth's analysis and lead, ruled that the situation presented to Mr. Klayman over the misconduct of Fitton and the other Judicial Watch directors an "extraordinary situation." Legal ethics expert Rotunda came to the same conclusion in his letter opinion of June 2, 2014, and as reflected in his sworn hearing testimony, both of which are in evidence. Indeed, Professor Rotunda, one of the top legal experts in professional ethics in the nation at the time (regrettably he since tragically died), observed: "[t]he situation involving these particular clients (Paul, Benson and Cobas) provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch . . ." Exhibit 1 at 3.

In fact, Respondent had suggested to Bar Disciplinary Counsel that both parties obtain an advisory opinion from the Bar before proceeding further with the complaint first filed by Fitton on January 23, 2008, over twelve and a half (12 ½) years ago from today, and years after the alleged ethical infractions, in apparent retaliation for Respondent pursing litigation which ultimately led to a jury verdict and judgment against Judicial Watch for malicious defamation. *See* R's. Ex. 22, 23 attached hereto as Exhibit 3. Bar Disciplinary Counsel refused to follow this suggestion.

It thus would seem prudent for this honorable Court to provide guidance to members of the Bar, particularly those who are practicing public interest law at non-profit ethics organizations such as Judicial Watch, where donor monies are being misused and misappropriated, to have direction from this esteemed judicial body over how to proceed under

these sorts of "extraordinary situations and circumstances," where the former head of an organization founded to promote ethics finds himself between the proverbial rock and the hard place and where he or she feels she owes an ethical and moral duty to former clients, donors and employees.

Moreover, and again as Professor Rotunda pointed out, most jurisdictions would never have allowed a matter such as this to proceed after a delay by Bar Disciplinary Counsel for over six (6) years, as the equitable doctrine of laches should otherwise apply. It is not enough that lawyer Dugan's memory, however flawed, faded into near oblivion, but during this time period, evidence is not just forgotten but also lost and misplaced. The Court should thus respectfully address what is a continuing issue with Bar Disciplinary Counsel, where its counsel frequently pull old complaints out of their hat for whatever reason, sometimes ironically out of their own political vindictiveness in this polarized age of Donald Trump, years after the alleged violations occurred. This Bar should follow the precedent of most other state bars in not allowing this abuse to continue and the Court should speak clearly about this "extraordinary situation and circumstances" to provide oversight and guidance to Bar Disciplinary Counsel and its prosecutors. Indeed, until recently, the Bar's website, which was modified for some unexplained reason under its new leadership, pledged:

> In this capacity, the Office of Disciplinary Counsel has a dual function: to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints.

Thus, both complainants and members of this distinguished Bar have a recognized right to be treated fairly and impartially, without regard to a member's politics or other characteristics, for lack of better words.

///

## IV. CONCLUSION.

For all of these compelling reasons, in this extraordinary situation and circumstances, this honorable Court en banc must respectfully withdraw or modify the materially erroneous findings with regard to the alleged intentional and vindictive motives of Respondent, which are inaccurate and which conflict with the Court's and Judge Lamberth's own reasoning as set forth clearly in this esteemed judicial body's Order of June 11, 2020. This is respectfully required as a matter of due process and even more importantly, fundamental fairness, as the June 11, 2020 Order, if left uncorrected, will unduly be used by adversaries, including but not limited to Fitton and Judicial Watch, and an "unfriendly"2 Bar Disciplinary Counsel, to harm Mr. Klayman and his clients in other future legal and potentially other ethics proceedings.

Respondent, whatever his strong conservative and legal advocacy and support of our 45th president, has been a member in good standing of this Bar continuously for nearly forty-one (41) years, and he should, particularly with regard to a disciplinary proceeding which is now twelve and one-half (12 ½) years old, be accorded serious consideration to have the record corrected. Moreover, precedent and guidance by the honorable Court is necessary to prevent Bar Disciplinary Counsel inordinate delay and prejudice to members of this esteemed Bar in the

---

2 Under the new Bar Disciplinary Counsel leadership following the retirement of Wallace Shipp, the "approach" towards Respondent, Mr. Klayman, changed markedly. During negotiated discipline in this matter under Wallace Shipp, for instance, the Office of Bar Disciplinary Counsel not only proposed but also agreed only to a public censure. When that was not accepted by the AHHC, it proposed a three (3) month suspension with a two (2) month probation. However, under the new leadership following Mr. Shipp's retirement, the new Bar Disciplinary Counsel has apparently delegated authority to Deputy Bar Counsel Julia Porter, herself under internal ethics review concerning her conduct in a disciplinary proceeding, *In re John Symkowicz*, 14-BG-0884, involving John and J.P. Szymkowicz (which lasted over thirteen (13) years), and Office of Bar Disciplinary Counsel changed its tune. It then, going against the Report and Recommendation of the Board of Professional Responsibility, wanted a reinstatement provision to be imposed on Mr. Klayman, which would have effectively removed him from the practice of law, given that he is almost sixty-nine (69) years old. The Office of Bar Disciplinary Counsel's antipathy towards Respondent has continued unabated.

11

future, which delay and resulting prejudice is not consistent   with other respected bars throughout the nation. Presently, Bar Disciplinary Counsel and on occasion some Ad Hoc Hearing chairs and members act with regard to respondents they do not like for apparent political or other reasons,   as if they are above ethics and the law, particularly since the Board of Professional Responsibility has, without valid legislative basis and authority, shielded them by giving  them immunity.

Respondent respectfully requests  oral argument on this important petition for rehearing en banc, given the extraordinary circumstances at issue.

Dated:  July 13, 2020                             Respectfully submitted,

/s/ Larry Klayman

_____

Larry Klayman, Esq.
2020 Pennsylvania Ave, N.W.
Suite 800
Washington DC 20006
Tel: 561-558-5336
leklayman@gmail.com

*Respondent Pro Se and Of Record*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was  filed electronically and served to all parties and counsel of record via the Court's e-service protocols on July 13, 2020

/s/ Larry Klayman
Larry Klayman, Esq.

12

# EXHIBIT 1



**CHAPMAN** | **FOWLER SCHOOL OF LAW**
**UNIVERSITY**

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq. (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda. I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review. I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States. It has been the most widely used since I coauthored the first edition in 1976. In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume. State and federal courts at every level have cited my treatises and articles over 1000 times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline. In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

1

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them, and chose to uphold his duty to these clients. District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law." Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012). In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation. When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas. No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978). See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

2

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed. The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman. If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years. D.C. Code § 12-301 *et seq*. "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id*. Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.*, 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id*.

3

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights. Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.*, 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar*, 17 Cal. 3d. 1, 6 (Cal. 1976). *Kelson* is directly on point. Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served. It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable. One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer. Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.*, No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification. Judge Lamberth took "note of Paul's

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.

Sincerely,

*[signature]*

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence

**RONALD D. ROTUNDA**                                    May 2, 2014
Email: rrotunda@chapman.edu          Home Page 🏠 http://www1.chapman.edu/~rrotunda

**Office Address:**

> Chapman University
> Dale E. Fowler School of Law
> Room 406
> One University Drive
> Orange, CA 92866-1005
> ☎:    (714) 228-2698
> Fax:   (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

| | | |
|---|---|---|
| **Legal:** | HARVARD LAW SCHOOL | (1967- 1970) |
| | Harvard Law Review, volumes 82 & 83 | |
| | J.D., 1970 Magna Cum Laude | |
| **College:** | HARVARD COLLEGE | (1963- 1967) |
| | A.B., 1967 Magna Cum Laude in Government | |

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times*, picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

## LIST OF PUBLICATIONS:

### BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

    1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

    1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

    1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

    1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

    1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

    1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

    1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

    1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW:   CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE:  LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW: PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law:  Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

  2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

  2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

  2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**ARTICLES:**

*The "Liberal" Label:  Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:  An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:  A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies:  Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases:  Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information:  The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time:  Can the E.R.A. Be Saved*, 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox:  What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW
JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW
BULLETIN, Mar. 5, 1988 at 2, 14 *(Part I)*; Mar. 16, 1988 at 2, 14 *(Part II)*; Mar. 17, 1988
at 2, 10 *(Part III)*.

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988),
reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS
LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4,
1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in,
25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND
MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988),
reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1
MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12,
1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE
RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court: A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26,
1988).

*Client Fraud: Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*,
1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW
QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15
(1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989),
reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989)
(Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised?*, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights*, 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right*, 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions:  An Historical Review of the Supreme Court Nominations Process,* 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000,  http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000,  http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
(2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
(2007).

*Rudy    Thinks    FAST*,    THE    AMERICAN    SPECTATOR,    January    25,    2008,
http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
(Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15, 2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30, 2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510 (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010, http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010, http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2, http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21, http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010, http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010,    http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice    O'Connor's    Robo    Call    Apology*,    AOL    NEWS,    Oct.    28,    2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 McGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011,  http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară*, REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training*, 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over: This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

## Other Activities:

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
    CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

> Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

> Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

# EXHIBIT 2

# UNIFORM CERTIFICATE OF ATTENDANCE

This certificate should be filed with the appropriate MCLE Board(s) or
Commission(s) within 30 days of activity

Sponsor: **District of Columbia Bar**

Activity Title: **Identifying and Dealing with Ethical Conflicts of Interest**

Date: **10/12/2017**

Location: **On-Demand/Webcast**

State Activity Number: (for those states
designating program numbers)

This program is eligible for a total of __**2.0**__ CLE credit hours based on a 60-minute hour

__**2.0**__ CLE credit hours based on a 50-minute hour

Of this total __**0.0**__ CLE credit hour(s) of this program is/are devoted to
instruction in ethics/professionalism *(Based on 60-Min.Hr.)*

__**0.0**__ CLE credit hour(s) of this program is/are devoted to
instruction in ethics/professionalism *(Based on 50-Min.Hr.)*

**Note: Introductory remarks, keynote addresses, business meetings, breaks, receptions, etc. are not to
be included in the computation of credit.**

## TO BE COMPLETED BY ATTORNEY

By signing below, I certify that I attended the activity described above and am entitled to
claim __4.0__ CLE credit hours, including __4.0__ Ethics credits.

_Lecy Klayman_
Attorney Name (Print)

_D.C. Bar No. 334581_
**Membership, Registration or Supreme Court Number**

_[signature]_
Attorney Signature

_6/25/20_
Date

_District of Columbia_
State where credits are to be registered

**Note: Complete a certificate for each state in which you are required to file. Rules for CLE in some
states require the provider to file attendance with the regulator as a service to lawyers. Please confirm
jurisdictional reporting requirements with the provider or state regulator.**

Acknowledged By:
_Naomi McMillon_
Sponsor Representative

# UNIFORM CERTIFICATE OF ATTENDANCE

This certificate should be filed with the appropriate MCLE Board(s) or
Commission(s) within 30 days of activity

**Sponsor:** **District of Columbia Bar**

**Activity Title:** **Ethics and Pro Bono: Remaining Ethical While Doing Good**

**Date:** **7/9/2019**

**Location:** **Washington, D.C. / On-Demand**

**State Activity Number:**
(for those states designating program numbers)

| | | |
|---|---|---|
| This program is eligible for a total of | 2.0 | CLE credit hours based on a 60-minute hour |
| | 2.0 | CLE credit hours based on a 50-minute hour |
| Of this total | 2.0 | CLE credit hour(s) of this program is/are devoted to instruction in ethics/professionalism *(Based on 60-Min Hr)* |
| | 2.0 | CLE credit hour(s) of this program is/are devoted to instruction in ethics/professionalism *(Based on 50-Min Hr)* |

**Note: Introductory remarks, keynote addresses, business meetings, breaks, receptions, etc. are not to be included in the computation of credit.**

---

## TO BE COMPLETED BY ATTORNEY

By signing below, I certify that I attended the activity described above and am entitled to claim ___2___ CLE credit hours, including ___2___ Ethics credits.

*Larry Elliot Klayman*
Attorney Name (Print)

*FL Bar # 246220*
Membership, Registration or Supreme Court Number

Attorney Signature

*9/21/19*
Date

*Florida*
State where credits are to be registered

---

**Note: Complete a certificate for each state in which you are required to file. Rules for CLE in some states require the provider to file attendance with the regulator as a service to lawyers. Please confirm jurisdictional reporting requirements with the provider or state regulator.**

Acknowledged By:

*Theresa Ironiss*
Sponsor Representative

# M Gmail

Dina James <daj142182@gmail.com>

---

## PA CLE CERTIFICATE #41440-556500-473

1 message

---

**ACCESS MCLE** <email@accessmcle.com>
To: daj142182@gmail.com

Mon, Jul 10, 2017 at 10:55 AM

CERTIFICATE OF COMPLETION FOR PENNSYLVANIA CLE

PROVIDER NAME: ACCESS MCLE, LLC
PROVIDER INFO: PA CLE BOARD ACCREDITED PROVIDER #9310

---

Access MCLE Activity #473 -
ETHICS: Representation from Start to Finish

COMPLETION DATE: 7/10/2017 1:55p EST
  STUDY FORMAT: Distance Learning (Online)

  CLE CREDIT: 1 Hour Ethics

Attorney Name: KLAYMAN, LARRY
 PA Lawyer ID: 54628

By electronic signature below, I have certified that I completed the activity described above and am entitled to claim the
amount of CLE credits listed.

Signature: LARRY KLAYMAN    Date: 7/10/2017
   ~~~~~~~~~~~~~~~~    ~~~~~~~~~~

---

REMINDER TO PENNSYLVANIA ATTORNEYS:
Within 30 days, Access MCLE will automatically report to the Supreme Court of Pennsylvania CLE Board your completion
of this course.

You may verify completed CLE credits online at: https://www.pacle.org/crc/MyPACLE.asp

For additional information please contact your CERTIFYING PROVIDER:

ACCESS MCLE, LLC
5150 Fair Oaks Blvd, Ste 101-161
Carmichael, CA 95608
Tel: (916) 550-6253
Fax: (916) 550-6888
www.accessmcle.com

---

This message was sent to daj142182@gmail.com

 **Gmail**

**Dina James <daj142182@gmail.com>**

---

## PA CLE CERTIFICATE #41440-556438-552

1 message

---

**ACCESS MCLE** <email@accessmcle.com>
To: daj142182@gmail.com

Fri, Jul 7, 2017 at 1:24 PM

CERTIFICATE OF COMPLETION FOR PENNSYLVANIA CLE

PROVIDER NAME:  ACCESS MCLE, LLC
PROVIDER INFO:  PA CLE BOARD ACCREDITED PROVIDER #9310

------------------------------------------------------
   Access MCLE Activity #552 -
   ETHICS: Rules Governing Client Relationships

   COMPLETION DATE: 7/7/2017 4:24p EST
    STUDY FORMAT: Distance Learning (Online)

    CLE CREDIT: 1 Hour Ethics

   Attorney Name: KLAYMAN, LARRY
   PA Lawyer ID: 54628

By electronic signature below, I have certified that I completed the activity described above and am entitled to claim the amount of CLE credits listed.

Signature: LARRY KLAYMAN    Date: 7/7/2017
    ~~~~~~~~~~~~~~~      ~~~~~~~~~~~

------------------------------------------------------
REMINDER TO PENNSYLVANIA ATTORNEYS:
Within 30 days, Access MCLE will automatically report to the Supreme Court of Pennsylvania CLE Board your completion of this course.

You may verify completed CLE credits online at: https://www.pacle.org/crc/MyPACLE.asp

For additional information please contact your CERTIFYING PROVIDER:

ACCESS MCLE, LLC
5150 Fair Oaks Blvd, Ste 101-161
Carmichael, CA 95608
Tel: (916) 550-6253
Fax: (916) 550-6888
www.accessmcle.com

------------------------------------
This message was sent to daj142182@gmail.com

 **Gmail**

Dina James <daj142182@gmail.com>

---

# PA CLE CERTIFICATE #41440-556286-553
1 message

---

**ACCESS MCLE** <email@accessmcle.com>                    Thu, Jul 6, 2017 at 5:13 PM
To: daj142182@gmail.com

CERTIFICATE OF COMPLETION FOR PENNSYLVANIA CLE

PROVIDER NAME:  ACCESS MCLE, LLC
PROVIDER INFO:  PA CLE BOARD ACCREDITED PROVIDER #9310

---

Access MCLE Activity #553 -
ETHICS: Conflicts of Interest for the Business Attorney

COMPLETION DATE: 7/6/2017 8:12p EST
  STUDY FORMAT: Distance Learning (Online)

  CLE CREDIT: 1 Hour Ethics

Attorney Name: KLAYMAN, LARRY
  PA Lawyer ID: 54628

By electronic signature below, I have certified that I completed the activity described above and am entitled to claim the amount of CLE credits listed.

Signature: LARRY KLAYMAN     Date: 7/6/2017
~~~~~~~~~~~~~~~~~     ~~~~~~~~~~~

---

REMINDER TO PENNSYLVANIA ATTORNEYS:
Within 30 days, Access MCLE will automatically report to the Supreme Court of Pennsylvania CLE Board your completion of this course.

You may verify completed CLE credits online at: https://www.pacle.org/crc/MyPACLE.asp

For additional information please contact your CERTIFYING PROVIDER:

ACCESS MCLE, LLC
5150 Fair Oaks Blvd, Ste 101-161
Carmichael, CA 95608
Tel: (916) 550-6253
Fax: (916) 550-6888
www.accessmcle.com

---

This message was sent to daj142182@gmail.com

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 13-20610-CIV-ALTONAGA**

**LARRY KLAYMAN,**

      Plaintiff,

v.

**JUDICIAL WATCH, INC.,**

      Defendant.

_____/

## <u>Verdict Form</u>

We, the jury, unanimously find as follows:

1.    Do you find from a preponderance of the evidence that Plaintiff Larry Klayman was defamed by Defendant Judicial Watch?

       Yes ✓    No _____

(If your answer is "yes," proceed to the next question.  If the answer is "no," sign the verdict form.)

2.    Do you find from a preponderance of the evidence that Plaintiff Larry Klayman should be awarded compensatory damages against Defendant Judicial Watch?

       Yes ✓    No _____

If your answer is "Yes,"

       in what amount: $ 156,000.⁰⁰____.

(If your answer is "yes," skip question 3 and proceed to question 4.  If your answer is "no," proceed to question 3.).

3.     Do you find from a preponderance of the evidence that Plaintiff Larry Klayman should be awarded nominal damages against Defendant Judicial Watch?

    Yes _____   No __✓__

If your answer is "Yes,"

    in what amount: $ __N/A__ .

(Proceed to question 4.).

4.     Under the circumstances of this case, state whether you find by clear and convincing evidence that punitive damages are warranted against Defendant Judicial Watch:

    Yes __✓__   No _____

If your answer is "Yes,"

    in what amount: $ 25,000.00 .


So say we all this 10 day of June, 2014.


_____
                Foreperson

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-20610-CIV-ALTONAGA

**LARRY KLAYMAN,**

     Plaintiff,

v.

**JUDICIAL WATCH, INC.,**

     Defendant.

_____/

### FINAL JUDGMENT

**THIS CAUSE** came for trial before the Court and a jury, United States District Judge, Cecilia M. Altonaga, presiding, and the issues having been duly tried and the jury having duly rendered its verdict on June 10, 2014, it is

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, Larry Klayman, and against Defendant, Judicial Watch Inc., in the amount of **$156,000.00** for compensatory damages and **$25,000.00** for punitive damages, totaling **$181,000.00**, for which sum let execution issue. Requests for costs and attorneys' fees shall not be submitted until after any post-trial motions are decided or an appeal is concluded, whichever occurs later. This judgment shall bear interest at the rate as prescribed by 28 U.S.C. section 1961, and shall be enforceable as prescribed by 28 U.S.C. sections 2001–2007, 28 U.S.C. sections 3001–3308, and Federal Rule of Civil Procedure 69(a). The Clerk shall mark this case closed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2014.

                                          _____

                                          **CECILIA M. ALTONAGA**
                                          **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# EXHIBIT 4



**Planet Depos**
We Make It *Happen*

# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of Thomas J. Fitton                     1 (1 to 4)

Conducted on June 6, 2019

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF FLORIDA
 3
 4  LARRY KLAYMAN,           *
 5        Plaintiff,         *
 6     vs.                   *  Civil Action
 7  THOMAS FITTON,          *  No. 1:19-cv-20544
 8        Defendant.        *
 9
10
11
12     Videotaped Deposition of THOMAS J. FITTON
13               Washington, D.C.
14            Thursday, June 6, 2019
15                  3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

**Page 2**

```
 1        Videotaped Deposition of THOMAS J. FITTON,
 2  held at the offices of:
 3
 4     Planet Depos
 5     Suite 950
 6     1100 Connecticut Avenue, Northwest
 7     Washington, D.C.  20036
 8     (888) 433-3767
 9
10
11
12        Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1           A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF PRO SE:
 4     LARRY KLAYMAN, ESQUIRE
 5     Klayman Law Group, P.A.
 6     Suite 345
 7     2020 Pennsylvania Avenue, Northwest
 8     Washington, D.C.  20006
 9     (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14     RICHARD W. DRISCOLL, ESQUIRE
15     Driscoll & Seltzer
16     Suite 610
17     300 North Washington Street
18     Alexandria, Virginia  22314
19     (703) 822-5001
20
21
22
23
24
25
```

**Page 4**

```
 1  ON BEHALF OF THE DEFENDANT:
 2     KATIE M. MERWIN, ESQUIRE
 3     Cole, Scott & Kissane, P.A.
 4     Suite 120
 5     222 Lakeview Avenue
 6     West Palm Beach, Florida  33401
 7     (561) 383-9206
 8     (Present via Telephone.)
 9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41

1    MR. KLAYMAN: Certify it.
2    Q So as President of Judicial Watch you
3 would have known for sure that this Complaint had
4 been filed, correct?
5    MR. DRISCOLL: Objection to form.
6    A Well, the press release indicates it was
7 filed and I recall we sued about the raid, yes.
8    Q And you gave interviews about suing in the
9 raid, correct, in the media?
10   A I don't remember.
11   Q Turn to the last page, page five.
12      The Complaint is signed by James F
13 Peterson, correct?
14   A His name is on the last page of the
15 Complaint as a signatory.
16   Q He is an attorney at Judicial Watch,
17 correct?
18   A Yes.
19   Q Now, Mr. Peterson had contact with Roger
20 Stone over the issue of the raid on his house, did
21 he not?
22   A Not that I'm aware of.
23      MR. DRISCOLL: Objection to form.
24   Q You're saying you don't know one way or
25 the other?

42

1    A I don't believe he has. I said I would
2 know if he had.
3    Q How would you know if you couldn't even
4 identify the Complaint?
5    A Another abusive harassing question.
6      MR. DRISCOLL: It's a foundation question.
7 You can go ahead and answer it.
8      How would you know if he had contacted
9 Roger Stone?
10     MR. KLAYMAN: Or if Roger Stone contacted
11 him.
12   A Is it privileged?
13     MR. DRISCOLL: That's an interesting
14 question. The fact of the communication would not
15 be. The contents of it would be.
16   A How I would know is my question of whether
17 it's privileged or not.
18     MR. DRISCOLL: No, I'm going to allow you
19 to answer that one.
20   A How I would know about what my attorneys
21 are doing or Judicial Watch's attorneys are doing?
22     MR. DRISCOLL: Yeah, and you're not
23 disclosing a communication. You're just
24 describing a process.
25   A Typically that type of communication would

43

1 have been disclosed to me.
2    Q But you don't know for sure that
3 Mr. Peterson didn't have contact with Roger Stone?
4      MR. DRISCOLL: Objection to form.
5    A I'm confident there was no such contact.
6    Q You have told Mr. Peterson in the past,
7 have you not, that I was ousted from Judicial
8 Watch because of a sexual harassment complaint?
9      MR. DRISCOLL: Objection to form.
10 Mr. Peterson is an in-house counsel and I'm going
11 to direct the witness not to answer. That's an
12 attorney-client privilege.
13     MR. KLAYMAN: Certify it.
14   Q So you don't know whether or not
15 Mr. Peterson repeating what you had told him then
16 republished that to Roger Stone?
17     MR. DRISCOLL: The communications between
18 an in-house counsel and the President of the
19 corporation relating to legal advice and
20 assistance are privileged. He can't answer the
21 question about the contents of the communication
22 or derivative questions that would disclose the
23 content of the communication.
24     MR. KLAYMAN: That's the crux of the
25 lawsuit. That does not apply in this context.

44

1      MR. DRISCOLL: That doesn't waive the
2 privilege.
3    Q Are you saying that you never told anyone
4 at Judicial Watch that I was ousted because of a
5 sexual harassment complaint?
6      MR. DRISCOLL: Anyone other than the
7 attorneys?
8      MR. KLAYMAN: Anyone.
9      MR. DRISCOLL: No, I can't allow him to
10 answer that question.
11   Q Are you saying that you never told anyone
12 that I was -- regardless -- let's take attorneys
13 out of it.
14      Have you ever -- you have told other
15 people in addition to -- strike that.
16      You have told other people excluding
17 attorneys that I was ousted from Judicial Watch
18 because of a sexual harassment complaint?
19   A You have to ask the question again.
20     MR. KLAYMAN: Read it back, please.
21   A Please.
22     MR. KLAYMAN: Let me rephrase it.
23   Q I'm taking attorneys out of this question.
24 I'm saying you have told others who aren't
25 attorneys over the course of the last 16 years

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3      **A No, because that's not true. You weren't**
4  **ousted as a result of a sexual harassment**
5  **complaint.**
6      Q After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL: Objection to form. The
10 question invades the attorney-client privilege and
11 the attorney work product. I direct the witness
12 not to answer.
13     MR. KLAYMAN: Certify it.
14     Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge. Thank you.
18     Q Now, I turn your attention back to your
19 affidavit which is --
20     **A Exhibit 3.**
21     Q Exhibit 3. Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25     **A Uh-huh.**

46

1      Q Now, it doesn't say you didn't have a
2  communication with Roger Stone. It just says that
3  you have no recollection of having one, correct?
4      **A That's correct.**
5      Q Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9      MR. DRISCOLL: Just ask your question,
10 Larry.
11     Q So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15     **A I think the statement speaks for itself.**
16     Q You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20     **A The statement speaks for itself.**
21     Q Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3      **A Yeah.**
4      Q Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7      **A It says what it says.**
8      Q And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13     **A Yes.**
14     Q Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18     MR. DRISCOLL: Objection to form. The
19 document speaks for itself.
20     **A The document speaks for itself.**
21     Q If you don't want to explain it that's
22 fine.
23     **A You're mischaracterizing it.**
24     Q I do agree. It speaks for itself and
25 there's a lot of loopholes in it.

48

1      MR. DRISCOLL: Why don't you just ask him
2  the question. Did he ever --
3      MR. KLAYMAN: I will ask the questions
4  that I want to ask, Mr. --
5      MR. DRISCOLL: All right.
6      Q I want to turn to paragraph eight.
7      Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14     **A Yeah.**
15     Q Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19     MR. DRISCOLL: I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25     MR. KLAYMAN: That's not a basis to tell

# EXHIBIT 5

# District of Columbia
# Court of Appeals



F I L E D

JUL 06 2020

DISTRICT OF COLUMBIA
COURT OF APPEALS

**No. 18-BG-100**

IN RE LARRY KLAYMAN
A Suspended Member of the Bar of the
District of Columbia
Court of Appeals
Bar Registration No. 334581                       BDN: 48-08

BEFORE: Fisher, Thompson, and Beckwith, Associate Judges.

## O R D E R

On consideration of respondent's petition for rehearing, it is

ORDERED that respondent's petition for rehearing is denied.

## PER CURIAM

Copies e-served to:

Larry E. Klayman

James T. Phalen, Esquire
Executive Attorney
Board on Professional Responsibility

Hamilton P. Fox, III, Esquire
Disciplinary Counsel

oio

FedEx®
Express

ORIGIN ID:BZSA (310) 595-0800
LARRY KLAYMAN

2020 PENNSYLVANIA AVE.
SUITE 345
WASHINGTON, DC 20006
UNITED STATES US

SHIP DATE: 20AUG20
ACTWGT:
CAD: 105024589/INET4280

BILL SENDER

TO CLERK
US DISTRICT COURT NDTX
1100 COMMERCE STREET, ROOM 1452

DALLAS TX 75242
(214) 753-2200 REF
INV:
PO: DEPT:

FedEx Express

E

MON - 24 AUG 10:30A
PRIORITY OVERNIGHT

FedEx
TRK# 0201 7713 2077 4780

SE KIPA

75242
TX-US DFW

10:30A
NIGHT

5242
DFW

56B.2/7709/8765

RT 267
FZ
1
10:30 A
4780
08.24

8/20/2020

Do not ship liquids, blood, or clinical specimens in this packaging.