**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**In Re: Larry Klayman**

Case No.:  3:20-mc-00043-B

**RESPONSE TO NOTICE WITH REGARD T0 RECIPROCAL DISCIPLINE AND**
**STANDING ORDER FOR COUNSEL TO SHOW CAUSE**

Larry Klayman ("Mr. Klayman") hereby responds to the Court's Order of September 26,

2022 directing him to show cause as to why reciprocal discipline should not be imposed based on

*In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). As set forth below, reciprocal

discipline is completely unwarranted on numerous bases, perhaps none more so than the

incontrovertible fact that Texas law prevents and bars imposition of such discipline under its

statute of limitations.

Furthermore, Mr. Klayman also invokes Rule 83.8(h)(3) of this Court, which states that:

> If the member responds and, in whole or in part, opposes reciprocal discipline, the
> chief judge, or a district judge designated by the chief judge, must designate three
> district judges to hear the matter. The decision of a majority of the three-judge
> panel concerning the appropriate discipline shall be the final ruling of this court.

Thus, it is clear that this matter must be referred to a three-judge panel designated by the chief

judge in this Court.

Lastly, Mr. Klayman attaches hereto his Initial Brief and Petition for Rehearing En Banc

filed at the D.C. Court of Appeals, Exhibit 1, which contain his Proposed Findings of Fact and

Conclusions of Law presented to the Board on Professional Responsibility (the "Board"). Thus,

when Mr. Klayman cites a "PFF" in this response, he is referring to his Proposed Findings of

Fact. **Additionally, the three-judge panel respectively must request the record in this case**

1

from the Board, and may do so by contacting the clerk, Meghan Borrazas at mborrazas@dcbpr.org. The full record is necessary so that the three-judge panel has a full understanding of the facts and issues in this matter. Thus, Mr. Klayman respectfully requests that the three-judge panel carefully review these briefs and Proposed Findings, as well as the record, as they speak for themselves and show conclusively why no reciprocal discipline is warranted. Furthermore, a factual background of the underlying case is set forth in full in those briefs, which cannot be included herein since it would result in an extremely voluminous brief.

## I. THE SATAKI MATTER IS PRECLUDED UNDER TEXAS LAW AND ITS STATUTE OF LIMITATIONS

It is important recognize that the Sataki Matter involves events that occurred in 2010 – twelve (12) years ago. Even more egregiously, this matter was not even instituted until 2017 – seven (7) years after the fact a complaint had been filed by the complainant! This is shown in the Index to the Record, Exhibit 1, which shows that ODC's Specification of Charges – which is prepared prior to the matter being instituted, was prepared on July 20, 2017. Exhibit 1. And, the same Index shows that the Affidavit of Service of the Specification of Charges was dated September 29, 2017. Thus, there was a minimum seven-year delay before this case was even instituted. This delay is three years past the applicable Texas statute of limitations, as set forth below.

 During those seven (7) years, having had no contact from ODC, Mr. Klayman very reasonably believed that the Sataki Matter had been closed, particularly given the fact that the Complainant, Elham Sataki ("Ms. Sataki") had filed identical Complaints in Florida and Pennsylvania and they were summarily dismissed as being frivolous and meritless. PFF 43. Mr. Klayman therefore discarded his records pertaining to his representation of Ms. Sataki, as case

records need only be kept for five (5) years in the District of Columbia,[1] making his defense after the Sataki Matter was resurrected by ODC *sua sponte* subject to extreme prejudice. As just one example among many of this extreme prejudice, one need only look to the attached ethics opinion of Professor Ronald Rotunda, who would have testified in the case, but in the interim years he passed away, prejudicing Mr. Klayman further. See Exhibit 6, which is incorporated herein by reference. Another material and crucial witness, Arlene Aviera contracted terminal cancer during this egregious and time barred delay, as set forth in the attached briefs, and thus could not testify.

Further layering on the prejudice caused by ODC, the reason for the seven (7) year delay in even instituting the Sataki Matter was because the Complainant, Ms. Sataki had actually abandoned her Complaint and chosen not to proceed further with it. This is shown in a letter from ODC to Ms. Sataki dated July 7, 2011, where ODC sent to Ms. Sataki Mr. Klayman's responses to her allegations and advised her, "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." Exhibit 2. Despite the lack of response from Ms. Sataki, ODC did not close its case, but instead waited literally years, far beyond Texas's four year statute of limitations,  later to *sua sponte* resurrect the Sataki Matter, going so far as to use an investigator to literally hunt  Ms. Sataki down to persuade her to pursue her claims against Mr. Klayman. This is shown in an email from ODC's H. Clay Smith III to Kevin O'Connell stating:

> I am trying to locate a complainant that has dropped off the map. Ms. ElhSataki…. **She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she** filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll

---

[1] https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11

appreciate your efforts to locate her and to provide some reliable contact information. Exhibit 2 (emphasis added).

It is truly troubling that neither the Board nor the D.C. Court of Appeals cared that Ms. Sataki had made the choice to drop her Complaint against Mr. Klayman, and ODC still hired an investigator to hunt her down in 2014 to persuade her to move forward with her claims against Mr. Klayman. Still the case was not instituted until three years later in 2017. Exhibit 1. This conclusively shows that ODC's purpose here was not to get "justice" for the Complainant, but instead was to manipulate and use the Complainant to fulfill their own goal and agenda to try to remove Mr. Klayman from the practice of law due to his conservative public interest advocacy and litigation. No matter how many times Mr. Klayman brought this incontrovertible fact up during the pendency of the Sataki Matter, it fell on deaf years, as the Board and D.C. Court of Appeals showed themselves as unwilling to hold ODC accountable for unconscionable delay and any of the litany of egregious ethical violations that they committed. However, Mr. Klayman hopes that this jurisdiction, detached from the politics of the DC attorney disciplinary apparatus and what has become known as the Washington, D.C. swamp, will see just how unjust and time barred this behavior by ODC truly was.

All this goes to show that reciprocal discipline in the Sataki Matter must, at the outset, be denied due to the statute of limitations, and in particular due to the completely unjustified nature of the delay. It is clear that Texas imposes a four-year statute of limitations for attorney discipline matters. "Four Year Limitation Rule and Exceptions. No member shall be reprimanded, suspended, or disbarred *for misconduct occurring more than four (4) years prior to the time such allegation is brought to the attention of counsel*, except in cases in which disbarment or suspension is compulsory as provided herein. Limitations, however, will not run where fraud or concealment is involved until such misconduct is discovered or should have been

discovered by reasonable diligence by counsel. (emphasis added)." *Gamez v. State Bar of Tex.*, 765 S.W.2d 827, 833 (Tex. App. 1988). Texas is not the only state that applies statute of limitations or laches to attorney disciplinary matters, and in fact most jurisdictions do. *See e.g. The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001); *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012); *In Matter of Joseph*, 60 V.I. 540, 558- 59 (V.I. Feb. 11, 2014); *Hayes v. Alabama State Bar*; 719 So 2d 787, 791 (Ala. 1998). Exhibit 6.

Here, there was a seven-year delay in even presenting this case to the Board. This is nearly double the four-year limitation period allowed under Texas law. And, as set forth above, there was absolutely nothing justifiable about the delay in this matter. Thus, the Court must decline to impose reciprocal discipline on this basis and adhere to and honor the applicable Texas statute of limitations.

## II.   THE D.C. COURT OF APPEALS' SUSPENSION ORDER WAS BASED ON FRAUD AND DUE PROCESS AND OTHER VIOLATIONS

Mr. Klayman implores the Court to carefully review the attached briefs and Proposed Findings of Fact as they meticulously outline and detail the gross injustices, fraudulent conduct, and egregious misconduct by ODC and Ms. Sataki that resulted in the D.C. Court of Appeals' suspension order. Exhibit 1. Indeed, as set forth above, two sister jurisdictions in Florida and Pennsylvania took considered Ms. Sataki's Complaints against Mr. Klayman through neutral and unbiased eyes and summarily dismissed them as completely meritless and frivolous. PFF 43. This should tell the Court all it needs to know.

Regrettably, however, this is not what happened at the D.C. Court of Appeals, which effectively "rubber stamped," without itself delving into the record, a fatally flawed Board Report and Recommendation. In its Order, the D.C. Court of Appeals wrote, ""[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt

the Board's recommended sanction," "[w]e 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo…We need not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." Order at 2, 13, 18, 20.

If the D.C. Court of Appeals was going to ignore Mr. Klayman's facts, witnesses, and arguments – which it admittedly did - then why did it take nearly 20 months to issue a decision? If its intention was to rubber stamp the Report, it could have done so immediately. The only explanation is that the D.C. Court of Appeals was acting punitively and took advantage of the fact that Mr. Klayman had been "temporarily suspended" without due process - as Mr. Klayman was (1) denied his Sixth Amendment right to counsel of choice,  (2) denied a bona fide review of the record, (3) was provided with absolutely no facts or law explaining why he had been "temporarily suspended and (4) denied the right to even petition for rehearing en banc - since January of 2021 and thus wanted to extend Mr. Klayman's "temporary suspension" period. Even more, the Order is also factually and legally deficient, and does not contain **one record cite** to even attempt to justify its findings. This shows that there was no bona fide review of the record. The Order is wholly conclusory, which is the by-product of the Panel D.C. Court of Appeals deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony, and has resulted in a minimum thirty-eight (38) months total suspension, comprising a twenty month "temporary suspension" which occurred without even a hearing before the D.C. Court of Appeals, and an eighteen month actual suspension period tacked onto that, exceeding even the Boards' recommended suspension by about 20 months.

Mr. Klayman took the time and effort to have seven (7) material witnesses testify compellingly on his behalf, including Stanley Sporkin, Gloria Allred, Tim Shamble, Keya Dash, Joshua Ashley Klayman, Ronald Rotunda, and himself. It is incomprehensible that at every single level of this proceeding, the testimony provided by these witnesses was simply ignored and given no weight, despite the fact that it was all uncontroverted testimony based on personal contemporaneous knowledge. Yet, Ms. Sataki – ODC's only material witness, who was thoroughly impeached  - was just taken at her word. This simply makes no sense. Even though the D.C. Court of Appeals, was forced to acknowledge yet still downplayed the sworn testimony of the Honorable Stanley Sporkin, a distinguished retired federal judge, former Chief Counsel of the Central Intelligence and head of Enforcement at the Securities and Exchange Commission, who while being in bad health and in a wheel chair,  for which he later died, took it upon himself to travel to the hearing to testify on Mr. Klayman's behalf without being subpoenaed. Judge Sporkin testified under oath that over many years, Mr. Klayman had appeared in cases before him and came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF188. Order at 6-7. And, as importantly, during Mr. Klayman's representation of Ms. Sataki Judge Sporkin testified that had discussed Mr. Klayman's case strategy with Mr. Klayman and agreed with it. *Id*. at 7, PFF 191. While the panel is forced to concede this, it accords Judge Sporkin's learned testimony no weight at all, as it obviously did not comport with its apparent predetermined mindset and objective to effectively remove Mr. Klayman from the practice of law.

Given the frankly unbelievable injustice after injustice set forth above, it is crucial for Mr. Klayman to provide some real-world context and a highly likely explanation as to how and why the D.C. attorney disciplinary apparatus has acted in this manner.  It is indisputable that our

society has become more and more politically and ideologically polarized and people more and more dogmatic in their beliefs. Either you are a friend or a foe. There is no longer a middle ground. Nowhere is this more evident than in the District of Columbia, and this type of combative mentality has regrettably infected the leftist D.C. attorney disciplinary apparatus, where attorneys such as Mr. Klayman who are conservative  public interest advocates are no longer welcome as members of the D.C. bar and have instead become targets.  Mr. Klayman understands that this is a bold statement, but it is one that is completely supported by objectively verifiable facts.

At the hearing committee level, Mr. Klayman was faced with a "stacked deck" in the form of a biased and skewed Ad Hoc Hearing Committee (hereafter "AHHC"), which included even an avowed proud communist and ideological foe of Mr. Klayman, Michael Tigar. *See* Board Docket No. 151, *Respondent's Notice and Motion to Review Record Material Which Will Aid Disposition*. It did not matter to the AHHC that Mr. Klayman presented seven (7) material witnesses that conclusively refuted every single one of ODC's manufactured arguments and ODC only had one (1) material witness – Ms. Sataki – who was impeached repeatedly as set forth below. Then, at the Board level, presiding over this matter was Matthew Kaiser, who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported.[2] This unsurprisingly resulted in a fatally flawed and skewed Report from the Board which gave absolutely no credence to any of Mr. Klayman's witnesses, legal arguments, or even uncontroverted facts. Then, at the D.C. Court of Appeals, as set forth above,

---

[2] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

the judges simply "rubber stamped" the Board's Report with little to no consideration of Mr. Klayman's witnesses, legal arguments and uncontroverted facts.

Supporting Mr. Klayman's assertion that this entire disciplinarily proceeding has been politically and ideologically based and not facts based is the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[3] over remarks she made on cable news, against former Trump Attorney General William Barr[4] (the complaint was outrageously and incredibly filed by all prior presidents of the bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[5] and Josh Hawley[6] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani[7] over his representation of President Trump, to name just a few. To the contrary, when a complaint was filed against fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by

---

[3] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html
[4] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag
[5] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/
[6] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions
[7] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[8]

Then, as the final "nail in the coffin," the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the D.C. attorney discipline apparatus to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, despite him literally being a convicted felon. Attached hereto as <u>Exhibit 1</u> is an article detailing this debacle and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

On the other hand, Mr. Klayman was "temporarily suspended" without a hearing and due process for twenty months, while the D.C. Court of Appeals dragged its feet, and then suspended an incredible eighteen (18) months as a result of completely manufactured ethical "violations," and no showing of dishonesty, and of course, no criminal conviction. The difference in treatment

---

[8] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

here is truly mind-boggling, and what's even worse is that the D.C. attorney disciplinary apparatus, having conferred itself with "absolute immunity," believes that it is above the law and therefore can and will continue to engage in this type of conduct.

This is why it is so important for the Court, if this matter is not summarily dismissed as time barred, which it must by law be, to now conduct a truly independent and thorough review of the record, as shown in Mr. Klayman's briefs and Proposed Findings of Fact. They conclusively show how and why each and every single "ethical violation" was either completely meritless, tainted by fraud and other egregious misconduct, or both, as set forth below.

### A.    There Was No Failure to Abide By Ms. Sataki's Decisions Concerning the Objectives of Representation

Chief among the alleged ethical violations manufactured by ODC and "rubber stamped" by the Board and the D.C. Court of Appeals was a purported failure to abide by Ms. Sataki's decisions regarding the use of publicity in her case. As the record conclusively showed, this was absolutely not the case, as Ms. Sataki agreed to the use of publicity at the time – which she even admitted at the Hearing, and then personally participated in publicizing her case at the time and even after the fact.

First and foremost, at the Hearing in this matter, Ms. Sataki herself was forced to admit that she had approved and agreed with the use of publicity:

Q: **Did you ultimately agree with Mr. Klayman about the publicity?**

 A**: I did.** Tr. 775. *See* Exhibit 3 (Transcript Excerpts)

Mr. Klayman also provided testimony from numerous witnesses who showed that Ms. Sataki's belated claim was false. Chief among these witnesses was Tim Shamble ("Mr. Shamble"), Ms. Sataki's union representative who worked closely with Mr. Klayman's in his representation Ms. Sataki. This means that Mr. Shamble was deeply involved in Mr. Klayman's representation and

therefore had contemporaneous personal knowledge of the intricate details of the events in question. The record is indisputably shows that Mr. Shamble, Mr. Klayman, and Ms. Sataki at the time discussed strategy all together and as a group decided that the use of publicity would be beneficial to help Ms. Sataki achieve her desired outcome. PFF 128, 166, 167. And, even more, as the final straw which shows the egregious error by the D.C. Court of Appeals is the undisputed fact that Ms. Sataki personally participated with Mr. Shamble in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. PFF 24.

Mr. Shamble also testified as to why he believed the use of publicity was a good strategy. He testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. PFF 23. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 892-893. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a subcomponent, has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. PFF 7.

Furthermore, Mr. Klayman also provided the same uncontroverted testimony that the use of publicity was discussed and approved as a group. "So that was the reason for the publicity.

She agreed to it, Tim agreed to it, and there will be other witness(es) that will testify in this proceeding that she agreed to the publicity." PFF 50, Tr. 980.

Even further buttressing the testimony of Mr. Shamble and Mr. Klayman were numerous other witnesses who had contemporaneous personal knowledge. This included Keya Dash - *see* PFF 91 ("Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer - PFF 180 ("Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524.). Furthermore, and again, she testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

Lastly, and as even more clearly conclusive evidence that Ms. Sataki at all times not only approved of publicity, but also that she went out of her way to personally publicize her case is the fact that Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her, against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[9]  The video, which is in Ms. Sataki's native

---

[9] https://www.youtube.com/watch?v=e3g5f61muZ4

language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. <u>Exhibit 4</u>. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. <u>Exhibit 4</u>. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America
> Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.
> This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.
> Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.
> When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.
> The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.
> The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."
> Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the

dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Unsurprisingly, Ms. Sataki did not disclose this to the AD Hoc Hearing Committee ("AHHC") and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level, and the D.C. Court of Appeals refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. What would be wrong with trying to get to the truth, that is unless this does not comport with the predetermined narrative? This "do not evil, hear no evil, and see no evil" approach and apparent mindset of the panel does not serve the interests of justice.

The second, and even more baffling alleged violation concerned the fact that the *Bivens* lawsuit filed on behalf of Ms. Sataki named Hillary Clinton as a Defendant – a fact that the D.C.

attorney discipline apparatus took great umbrage at every step of the way. Completely ignored is the fact that Ms. Clinton was on the Voice of America's Board of Governors at the time, meaning that she was clearly a properly named Defendant. Even more egregious is the fact that the *Bivens* Complaint also named a personal friend of Mr. Klayman, the conservative Blanquita Collum, as a Defendant. PFF 95. This conclusively shows that Mr. Klayman had no political goal in mind and was simply trying to obtain an optimal result for his client. Unsurprisingly, this fact was completely ignored.

In any event, based on the foregoing, it is more than abundantly clear that the primary alleged ethical violation found by the D.C. Court of Appeals was completely unsupported by the record.

## B.      There Was no Conflict of Interest

Another primary "ethical violation" manufactured by ODC and then "rubber stamped" was based on Mr. Klayman's "emotional interest" in Ms. Sataki – which was then twisted by ODC and the Board as a conflict-of-interest violation.

This was a truly bizarre turn, as "emotional interest" is simply not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this.

Thus, ODC and the Board had to disingenuously strain to manufacture an ethical violation and settled on an alleged conflict of interest. However, the record clearly reflects that when Ms. Sataki had become more than self-centered and abusive during the course of Mr., Klayman's representation, even asking Mr. Klayman to buy her a car, PFF 62, Mr. Klayman

realized that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why Mr. Klayman took Ms. Sataki to Gloria Allred and Tim Shea. PFF 78. However, despite this, it was Ms. Sataki who instructed Mr. Klayman to continue representing her. Thus, even if the "emotional interest" at issue could possibly constitute a conflict of interest violation, it is uncontroverted that she would have waived any such violation by asking Mr. Klayman to continue to represent her. This was even admitted by the Board in its Report where it wrote Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation." Exhibit 5.

And, when ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it. ´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing….

> Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163, BCSX 38.

Exacerbating this already blatant and egregious violation, the D.C. Court of Appeals in an overt effort to smear Mr. Klayman, injected the non-existent premise of sexual harassment where not was ever alleged or testified to by even Ms. Sataki, that "Whether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she

did not share his feelings. D.C.C.A. Order at 20. The last part of this statement is  totally false and made up, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." What the record does show is that Mr. Klayman made it clear to Ms. Sataki that he did not want to be with her and did not want to be her boyfriend, which was contemporaneously recorded in emails. PFF 79. There was absolutely no allegation of sexual harassment of other sexual innuendo in the Specification of Charges or before the AHHC. This innuendo was inserted for no reason other than to smear Mr. Klayman and attempt to falsely and maliciously paint him as a sexual predator.

      **C.**    **Mr. Klayman Did Not Reveal Any Client Confidences**

As set forth above, notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, PFF 170, Tr. 775, PFF 91, PFF 24, is that she herself went on Iranian television to broadcast the same alleged confidential facts. Exhibit 4. Thus, it is incomprehensible how Mr. Klayman could possibly have been found to have revealed confidential information.

      **D.**    **Mr. Klayman Kept Ms. Sataki Informed Every Step of the Way**

One of the most non-sensical and bizarre findings of the D.C. Court of Appeals is that Mr. Klayman violated failed to obtain informed consent by filing a motion to disqualify the Honorably Colleen Kollar-Kotelly during the course of his representation of Ms. Sataki. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. PFF 66. What the record actually shows is that Ms. Sataki was "kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way." PFF 60.

      **E.**    **Absence of a Written Fee Agreement**

The D.C. Court of Appeals chose to sidestep this issue, probably because a myriad of emails from Mr. Klayman stated that he was representing Ms. Sataki free of charge. PFF 47, 74. The issue of the contingency only arose when Ms. Sataki became more abusive, rejected other counsel to represent her, but wanted to continue with Mr. Klayman as her lawyer. PFF 152

**F.      There Was No Failure to Cease Representation**

The record similarly shows that Mr. Klayman did not fail to cease representation of Ms. Sataki in a timely fashion. is Mr. Klayman did not take steps to litigate Ms. Sataki's case further and only acted to preserve Ms. Sataki's appellate rights. PFF 68. And it was good that Mr. Klayman did so, because Ms. Sataki filed a notice of appeal *pro se* only a few months later. PFF 67. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior reasons - then asked ODC to prosecute her sexual harassment claims! Tr. 489.

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. PFF 71. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, PFF 70, Tr. 1041, RX 21, before terminating all of Ms. Sataki's rights on appeal.

**G.      Ms. Sataki's Complete Lack of Credibility**

Unsurprisingly, the fact that Ms. Sataki was repeatedly impeached and repeatedly gave conflicting testimony was given no weight by the D.C. Court of Appeals, which brazenly wrote that "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." This shows that the D.C. Court of Appeals was no longer concerned with facts – a very problematic approach that resulted in a fatally flawed proceeding.

Indeed, the record shows that the entire representation agreement between Ms. Sataki and Mr. Klayman was premised on a big lie – that she had been sexually harassed and retaliated against by managers at VOA. The Office of Civil Rights conducted a thorough investigation and found that her allegations of sexual harassment were completely manufactured and false. PFF 155. Even more, Ms. Sataki lied about wanting Mr. Klayman to drop her cases – likely at the direction of ODC so that they could manufacture an ethical violation – when the record is clear that she herself filed a Notice of Appeal and then asked ODC for help in prosecuting her claims of sexual harassment years down the road. PFF 67, 155.  Ms. Sataki also lied about not wanting to publicize her cases – again certainly at the direction of ODC so that they could manufacture a claim – and was forced to admit that that she approved of publicizing her case, and personally participating in doing so. PFF 170, Tr. 775, PFF 91, PFF 24, Exhibit 4.  These are just a few of the numerous times that Ms. Sataki was completely and thoroughly impeached, which is set forth in full in Mr. Klayman's briefs. Exhibit 1. Given all of this, Mr. Klayman still cannot wrap his head around how the D.C. Court of Appeals felt it was proper for the Board to ignore the testimony of Mr. Klayman and his seven (7) material unimpeached witnesses in favor of the Complainant, Ms. Sataki, who clearly has an aversion to the truth.

**H.    Numerous Due Process and Other Violations Have Pervaded This Matter**

As set forth above, Mr. Klayman had already been subject to a completely unconstitutional "temporary suspension" since January of 2021—that is twenty (20) months—before the D.C. Court of Appeals finally issued its fatally flawed September 15, 2022 order suspending him for a further eighteen (18) months, with a reinstatement provision that could take additional years to conclude, which taken together could end Mr. Klayman's practice of law in the District of Columbia. This flies in the face of logic. Mr. Klayman has already been

"temporarily" suspended for longer than the new suspension period, yet was not allowed to count his "temporary" suspension as time served. And, there was absolutely no reason for the D.C. Court of Appeals to have dragged its feet for twenty (20) months when it was planning to simply "rubber stamp" the Board's Report, completely ignore Mr. Klayman's witnesses and testimony, the evidentiary record, and uncontroverted facts. It is clear that the only reason that the D.C. Court of Appeals took twenty (20) months to render a decision was because it had already instituted a "temporary suspension" on Mr. Klayman and was simply trying to punitively, maliciously, and vindictively extend that period as long as possible. When compared to the D.C. Court of Appeals' treatment of Kevin Clinesmith – a convicted felon who happens to be a anti-Trump and thus ideologically akin to the DC attorney disciplinary  apparatus, as set forth in detail above – there can be absolutely no doubt that the entire D.C. attorney disciplinary apparatus is openly engaging in selective prosecution based on its victims' political and ideological  beliefs. This is completely unacceptable, illegal, and unconstitutional misconduct.

Furthermore, the D.C. Court of Appeals have now imposed a reinstatement requirement even though in a recent earlier case this court had found, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically…. Accordingly, we decline to impose a fitness requirement.**" *In re Klayman,* 228 A.3d 713, 719 (D.C. 2020. And, in this case, as set forth above, Judge Sporkin testified on Mr. Klayman's behalf that Mr. Klayman had appeared in cases before him and came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF188. Order at 6-7.  Even more, not a single witness from ODC testified that Mr. Klayman was unfit to practice law. Given that this case was over 12 years old at the time of the final suspension order, the Panel's finding that somehow Mr. Klayman should be subject to reinstatement now, after an earlier recent

21

finding that he was fit to practice law – and never a finding of any dishonesty - makes no sense substantively, other than pure retaliation and an intention to effectively remove him from the practice of law in D.C. And, once again, compared to Kevin Clinesmith who literally committed a felony involving dishonesty and still was not given a reinstatement provision, the stench of extrajudicial bias and prejudice simply cannot be ignored.

In this regard, Mr. Klayman is in the process of preparing and applying for relief under D.C. Civil Rule 60 to set aside the D.C. Court of Appeals' completely erroneous and fatally flawed and fraudulently induced judgement of suspension. Mr. Klayman therefore respectfully requests that if the Panel here does not summarily decline to impose reciprocal discipline on the basis of statute of limitations or the substantive bases set forth herein, it at a minimum stay consideration until Mr. Klayman has had an opportunity to exhaust his avenues of relief.

## III.     CONCLUSION

Based on the foregoing, it is abundantly clear that no reciprocal discipline is warranted. Not only should reciprocal discipline be summarily denied clearly on the basis of the clear-cut Texas statute of limitations and laches, should the Court review the record, which it must respectfully do if it proceeds further,  it will also see that the purported "ethical violations" were manufactured and prejudiced by fraud and lack of  due process and other violations of Mr. Klayman's constitutional and other legal rights.

Mr. Klayman's membership in this honorable Court is very important to not just himself, but also his colleagues and his clients, and thus this matter is of utmost importance to prevent a manifest injustice.

Dated: October 11, 2022                                              Respectfully submitted,

 /s/ Larry Klayman
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
Email: leklayman@gmail.com

*Respondent Pro Se*

# EXHIBIT 1

# BOARD ON PROFESSIONAL RESPONSIBILITY

October 2, 2020

F I L E D

OCT 02 2020

DISTRICT OF COLUMBIA
COURT OF APPEALS

Julio A. Castillo, Esquire
Clerk, District of Columbia Court of Appeals
430 E Street, N.W.
Suite 209
Washington, D.C.  20001

20-BG-583

Matthew G. Kaiser
*Chair*

Lucy Pittman
*Vice Chair*

Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
Sara K. Blumenthal
Margaret M. Cassidy
Robert L. Walker
Mary C. Larkin
*Board Members*

James T. Phalen
*Executive Attorney*

Re:   <u>In the Matter of Larry E. Klayman</u>
      Board Docket No. 17-BD-063
      Bar Docket No. 2011-D028
      Bar Registration No. 334581

Dear Mr. Castillo:

Enclosed for filing with the Court of Appeals is the Board on Professional Responsibility's Report and Recommendation, the Index of Record and the record in the above matter.  The Board Report and Index of Record were served upon Respondent at the following address:

Mr. Larry E. Klayman
leklayman@gmail.com

Please contact the Office of the Executive Attorney if you have any questions.

Sincerely yours,

*James T Phalen*

James T. Phalen
Executive Attorney

Enclosures

cc (w/o encls.):  Mr. Larry E. Klayman

Henry Clay Smith, III, Esquire
Assistant Disciplinary Counsel



# BOARD ON PROFESSIONAL RESPONSIBILITY

October 2, 2020

I, James T. Phalen, Executive Attorney, Board on Professional Responsibility, do hereby certify that I am the official custodian of the records of the Board, and that the documents enumerated herein are the original papers or true copies thereof comprising the record of: *In the Matter of Larry E. Klayman*, Board Docket No. 17-BD-063, Disciplinary Docket No. 2011-D028, Bar Registration No. 334581.

Matthew G. Kaiser
*Chair*

Lucy Pittman
*Vice Chair*

Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
Sara K. Blumenthal
Margaret M. Cassidy
Robert L. Walker
Mary C. Larkin
*Board Members*

James T. Phalen
*Executive Attorney*

### INDEX OF RECORD

INDEX NO.

**REPORTS**

Report and Recommendation of the Board on Professional Responsibility    1.

Report and Recommendation of the Ad Hoc Hearing Committee    2.

**SPECIFICATION OF CHARGES & RESPONDENT'S ANSWER**

Specification of Charges, July 20, 2017    3.

Respondent's Answer and Affirmative Defenses to Specification of Charges, December 8, 2017    4.

**TRANSCRIPTS**

Pre-Hearing Transcript, December 19, 2017    5.

Telephonic Pre-Hearing Transcript, May 23, 2018    6.

Hearing Transcript, May 30, 2018    7.

Hearing Transcript, May 31, 2018    8.

Hearing Transcript, June 1, 2018    9.

Hearing Transcript, June 25, 2018    10.

Hearing Transcript, June 26, 2018    11.

Hearing Transcript, June 27, 2018    12.

Combined Transcript (Electronic Record Version Only)

## EXHIBITS

**Consolidated Disciplinary Counsel's Exhibits A-D, 1-54 & SX 1-38**:                    13.
- Disciplinary Counsel's Preliminary (1) List of Exhibits, March 5, 2018
- Disciplinary Counsel's List of Exhibits (A-D & 1-50), May 18, 2018
- Amended Disciplinary Counsel's List of Exhibits with Exhibit 51, May 25, 2018
- Disciplinary Counsel's Supplemental Exhibits (SX1-38), May 30, 2018
- Disciplinary Counsel's Corrected Exhibit 50, June 1, 2018
- Disciplinary Counsel's Exhibits 52 & 53, June 27, 2018
- Disciplinary Counsel's Evidence in Aggravation- Exhibit 54, July 11, 2018
- Disciplinary Counsel's Letter to Hearing Committee with Corrected DX 54, July 19, 2018

**Consolidated Respondent's Exhibits RX 1-30, RSX 1-6**:                    14.
- Respondent's Interim Preliminary Witness (Exhibit) List, May 3, 2018
- Respondent's Final Exhibit List and Exhibits (1-30), May 23, 2018
- Respondent's Exhibit RSX-1, June 1, 2018
- Respondent's Amended Final Exhibit List with RSX 1 & 2, June 22, 2018
- Respondent's Exhibits RSX 1-6, June 25, 2018
- Respondent's Redacted Exhibits 1-30, December 3, 2018
- Respondent's Exhibits 1-30 (Redacted and Numbered), April 9, 2019

Hearing Committee Exhibit HX 1- 6                    15.

## BRIEFS TO THE HEARING COMMITTEE

Disciplinary Counsel's Proposed Findings of Fact, Conclusions of Law, and                    16.
Recommendation as to Sanction, August 24, 2018

Respondent's Larry Klayman's Post-Hearing Brief and Proposed Findings of Fact and                    17.
Conclusions of Law, October 30, 2018

Disciplinary Counsel's Reply to Respondent Larry Klayman's Post Hearing Brief and                    18.
Proposed Findings of Fact and Conclusions of Law, November 13, 2018

Respondent's Surreply to DC's Reply to Respondent's Post Hearing Brief and                    19.
Proposed Findings of Fact and Conclusions of Law, November 20, 2018

## BRIEFS TO THE BOARD

Brief of Respondent Larry E. Klayman in Support of Exceptions to Hearing Committee Report and Recommendation, September 27, 2019 — 20.

Disciplinary Counsel's Brief in Support of the Hearing Committee's Report and in Opposition to the Exceptions Taken by Klayman to the Hearing Committee's Report and Recommendation, October 21, 2019 — 21.

Reply of Respondent Larry E. Klayman in Support of Exceptions to Hearing Committee Report and Recommendation, October 31, 2019 — 22.

## ADDITIONAL PLEADINGS

Affidavit of Service, September 29, 2017 — 23.

Respondent's Motion for Extension of Time to Specification of Charges (hereafter Complaint), October 11, 2017 — 24.

Disciplinary Counsel's Response to Respondent's Motion for Extension, October 12, 2017 — 25.

Hearing Committee Order, October 17, 2017 — 26.

Respondent Larry Klayman's Response to Order of the Hearing Chair, October 27, 2017 — 27.

Separate Statement of Disciplinary Counsel, October 27, 2017 — 28.

Hearing Committee Order, October 31, 2017 — 29.

Respondent's Unobjected to Motion for Short Ten-Day Extension of Time to Respond to Specification of Charges, November 28, 2017 — 30.

Hearing Committee Order, November 29, 2017 — 31.

Hearing Committee Order, January 4, 2018 — 32.

Respondent's Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera, February 15, 2018 — 33.

Respondent's Supplement to Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera, February 21, 2018 — 34.

Disciplinary Counsel's Opposition to Respondent's Motion to Notice and Have Issued
    Subpoenas Duces Tecum to Take the Deposition Elham Sataki and Arlene Aviera,
    February 23, 2018 ............ 35.

Disciplinary Counsel's Preliminary List of Witnesses, March 5, 2018 ............ 36.

Hearing Committee Order, March 9, 2018 ............ 37.

Respondent's Motion for Extension of Time to File Any Objections to Petitioner's
    Exhibits and List, March 16, 2018 ............ 38.

Hearing Committee Order, March 19, 2018 ............ 39.

Respondent's Objections to Petitioner's Hearing Exhibits, March 22, 2018 ............ 40.

Respondent's Preliminary Witness List, April 2, 2018 ............ 41.

Objections of Disciplinary Counsel to Respondent's Preliminary Witness List, April 6,
    2018 ............ 42.

Respondent's Motion to Compel and for Extension of Time and Other Relief, April
    18, 2018 ............ 43.

Disciplinary Counsel's Response to Respondent's Motion to Compel and for Extension
    of Time and Other Relief, April 25, 2018 ............ 44.

Respondent's Motion for Leave to File and Reply to Disciplinary Counsel's Response
    to Respondent's Motion to Compel and For Extension of Time and Other Relief,
    April 26, 2018 ............ 45.

Hearing Committee Order, April 30, 2018 ............ 46.

Motion for Modest Continuance and to Reschedule Hearing, May 2, 2018 ............ 47.

Hearing Committee Order, May 3, 2018 ............ 48.

Supplemental Privilege Log, May 7, 2018 ............ 49.

Hearing Committee Order, May 9, 2018 ............ 50.

Letter Disciplinary Counsel to Chair with Attached Documents Produced to
    Respondent, May 10, 2018 ............ 51.

Sworn Affidavit of Larry Klayman, Esq. in Response to Chair's Order of May 3, 2018,
    May 10, 2018 ............ 52.

Motion in Limine to Prohibit Testimony of Expert Witness, May 11, 2018                53.

Memorandum of Disciplinary Counsel Regarding the Production of Communication        54.
    Between Office of Disciplinary Counsel and its Expert Witness, May 11, 2018

Opposition of Disciplinary Counsel to Respondent's Motion for a Modest Continuance  55.
    and to Reschedule Hearing, May 11, 2018

Hearing Committee Order, May 11, 2018                                                56.

Supplemental Response to Disciplinary Counsel to Respondent's Motion for Modest      57.
    Continuance and to Reschedule Hearing, May 14, 2018

Respondent Larry Klayman's Second Supplement to Motion to Short Continuance of       58.
    the Hearing and Response to the Chair's Order of May 11, 2018, May 14, 2018

Respondent Larry Klayman's Third Supplement to Motion for Short Continuance of       59.
    the Hearing and Response to the Chair's Order of May 11, 2018, May 14, 2018

Hearing Committee Order, May 15, 2018                                                60.

Disciplinary Counsel's Response to Respondent Larry Klayman's Second Supplement      61.
    to Motion for Short Continuance of the Hearing and Response to the Chair's Order
    of May 11, 2018, May 15, 2018

Respondent's Larry Klayman's Fourth Supplement to Motion for Short Continuance of    62.
    the Hearing and Response to the Chair's Order of May 11, 2018, May 15, 2018

Motion for Extension of Time to File Hearing Exhibits, May 18, 2018                  63.

Disciplinary Counsel's List of Witnesses, May 18, 2018                               64.

Respondent's Supplement to Request for Continuance, May 21, 2018                     65.

Respondent's Larry Klayman Response to Response of D.C. to Respondent's Motion       66.
    for Extension of Time to File Hearing Exhibits, May 21, 2018

Disciplinary Counsel's Response to the Chair's Order of May 15, 2018, May 21, 2018   67.

Notice of Appearance, May 21, 2018                                                   68.

Respondent's Opposition to Motion In Limine to Prohibit Testimony of Expert          69.
    Witness, May 21, 2018

Response of Disciplinary Counsel to Respondent's Motion for Extension of Time to File Hearing Exhibits, May 21, 2018     70.

Final Witness List Subject to Possible Continuance of Hearing Dates, May 21, 2018     71.

Hearing Committee Order, May 21, 2018     72.

Hearing Committee Order, May 22, 2018     73.

Hearing Committee Order, May 22, 2018     74.

Disciplinary Counsel's Supplemental Response to the Chair's Order of May 15, 2018, May 22, 2018     75.

Respondent's Objections to Petitioner's Hearing Exhibits and Witness List, May 23, 2018     76.

Motion to Amend Disciplinary Counsel's Exhibits, May 24, 2018     77.

Hearing Committee Order, May 24, 2018     78.

Respondent's Notice That He May Need to Have Some Witnesses Appear by Remote Video Conference When He Presents His Case, May 24, 2018     79.

Hearing Committee Order, May 25, 2018     80.

Hearing Committee Order, May 25, 2018     81.

Respondent's Motion to Compel Production of Documents, June 11, 2018     82.

Opposition of Disciplinary Counsel to Respondent's Motion to Compel Production of Documents, June 12, 2018     83.

Respondent's Supplement to Motion to Compel Production of Documents, June 13, 2018     84.

Respondent's Motion for Leave to File Supplement and Reply to Petitioner's Response of June 12, 2018 to Respondent's Motion to Compel, June 14, 2018     85.

Hearing Committee Order, June 15, 2018     86.

Respondent's Renewed Motion to Have the Hearing Committee Order Production of Documents by Office of Bar Counsel and Complainant Sataki, June 20, 2018     87.

Hearing Committee Order, June 21, 2018     88.

Letter, Smith to Hearing Committee, apologizing for saying "Jesus Christ", June 28, 2018                                                                    89.

Hearing Committee Order, June 29, 2018                                                          90.

Motion of Disciplinary Counsel to Accept Evidence in Aggravation, June 29, 2018               91.

Hearing Committee Order, July 2, 2018                                                          92.

Respondent's Letter to Hearing Committee with Declaration Attached, July 5, 2018              93.

Respondent Larry Klayman's Memorandum of Points and Authorities Pursuant to the Hearing Chair and Committee's Order of July 2, 2018 And Motion to Slightly Exceed Page Limit, July 9, 2018                                                      94.

Hearing Committee Order, July 11, 2018                                                         95.

Respondent's Motion for Reconsideration of the Chair and Ad Hoc Hearing Committee's Order of July 10, 2018, July 17, 2018                                      96.

Respondent's Letter to Ad Hoc Hearing Committee, July 19, 2018                                97.

Hearing Committee Order, July 19, 2018                                                         98.

Disciplinary Counsel's Motion for Enlargement of Time to File, July 31, 2018                  99.

Respondent Larry Klayman's Response to Disciplinary Counsel's Motion for Enlargement of Time to File, August 1, 2018                                         100.

Hearing Committee Order, August 2, 2018                                                       101.

Praecipe from Respondent, August 22, 2018                                                     102.

Hearing Committee Order, September 27, 2018                                                   103.

Respondent Larry Klayman's Motion for Reciprocal Brief Extension of Time to File Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, October 2, 2018                                                              104.

Supplement to Respondent Larry Klayman's Motion for Reciprocal Brief Extension of Time to File Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, October 2, 2018                                              105.

Response of Disciplinary Counsel to Respondent Larry Klayman's Motion for Reciprocal Brief Extension of Time to File Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law and His Supplement Thereto, October 2, 2018 — 106.

Respondent Larry Klayman's Reply to Opposition to Motion for Reciprocal Brief Extension of Time to File Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, October 3, 2018 — 107.

Hearing Committee Order, October 4, 2018 — 108.

Respondent's Motion to Send and Serve Fedex Post Hearing Delivery to Board Office and Office of Disciplinary Counsel by Opening of Business at 9:00 a.m. this Monday, October 23, 2018 — 109.

Hearing Committee Order, October 23, 2018 — 110.

Letter, Smith to Klayman, October 24, 2018 — 111.

Correspondence, Respondent to Disciplinary Counsel (Sent by Email), October 24, 2018 — 112.

Hearing Committee Order, October 29, 2018 — 113.

Respondent's Motion to File Reciprocal Briefing of 70 Pages Inclusive of Appendix Containing Proposed Findings of Fact, October 30, 2018 — 114.

Motion for Leave to File Supplement to Respondent Larry Klayman's Post-Hearing Brief and Proposed Findings of Fact and Conclusions of Law, November 1, 2018 — 115.

Respondent's Notice of Intent to Move for Leave to File Surreply, November 15, 2018 — 116.

Hearing Committee Order, November 16, 2018 — 117.

Response of Disciplinary Counsel to Respondent's Motion for Leave to File Surreply, November 21, 2018 — 118.

Hearing Committee Order, November 21, 2018 — 119.

Respondent's Reply to Office of Bar Disciplinary Counsel's Response to Move for Leave to File Surreply, November 26, 2018 — 120.

Respondent's Notice of Compliance with Ad Hoc Hearing Committee's Order of November 21, 2018, November 28, 2018 — 121.

Hearing Committee Order, November 28, 2018 — 122.

Respondent Larry Klayman's Motion for Reconsideration in Part of Ad Hoc Hearing Committee's Order of November 28, 2018, November 30, 2018 — 123.

(Via Email) Respondent's Notice of Compliance with Ad Hoc Hearing Committee's Order of November 21, 2018, November 30, 2018 — 124.

Respondent Larry Klayman's Motion for Reconsideration in Part of Ad Hoc Hearing Committee's Order of November 21, 2018, December 3, 2018 — 125.

Respondent's Notice of Compliance with Ad Hoc Hearing Committee's Order of November 21, 2018, December 3, 2018 — 126.

Respondents Motion to Recommend Dismissal to Board of Professional Responsibility and to Terminate this Disciplinary Proceeding, December 6, 2018 — 127.

Response of Disciplinary Counsel to Respondent's Motion to Recommend Dismissal to Board of Professional Responsibility and Terminate this Disciplinary Proceeding, December 7, 2018 — 128.

Hearing Committee Order, December 11, 2018 — 129.

Respondent's Reply to Response to Motion to Recommend Dismissal to the Board of Professional Responsibility and Terminate this Disciplinary Proceeding, December 12, 2018 — 130.

Hearing Committee Order, December 13, 2018 — 131.

Respondent Larry Klayman's Motion to Follow-up on Inquiry Regarding Ethics Complaints Filed Against Kellyanne Conway and Justice Brett Kavanaugh, January 10, 2019 — 132.

Hearing Committee Order, January 18, 2019 — 133.

Hearing Committee Order, March 20, 2019 — 134.

Respondent Larry Klayman's Motion for Extension of Time and Request for Clarification, March 27, 2019 — 135.

Hearing Committee Order, March 27, 2019 — 136.

Hearing Committee Order, March 28, 2019 — 137.

Disciplinary Counsel's Response to the March 27, 2019 Order of the Ad Hoc Hearing Committee Regarding Possible Public Disclosures, April 3, 2019 — 138.

Respondent's Response to Order of March 27, 2019, April 3, 2019 — 139.

Respondent Larry Klayman's Motion for Leave to File Reply to Disciplinary Counsel's Response to the March 27, 2019 Order Of the Ad Hoc Hearing Committee Regarding Possible Public Disclosures, April 5, 2019 — 140.

Hearing Committee Order, April 9, 2019 — 141.

Hearing Committee Order, July 24, 2019 — 142.

Respondent's Notice of Exceptions to the Report and Recommendation of the Hearing Committee of July 24, 2019, July 31, 2019 — 143.

Letter, Smith to Phalen, August 1, 2019 — 144.

Unopposed Motion for Extension of Time, August 6, 2019 — 145.

Board Order, August 8, 2019 — 146.

Unopposed Motion for Enlargement of Word Limit, September 27, 2019 — 147.

Board Order, October 4, 2019 — 148.

Disciplinary Counsel's Motion to File Amended Certificate of Service, October 22, 2019 — 149.

Board Order, November 15, 2019 — 150.

Respondent's Notice and Motion to Review Record Material Which Will Aid Disposition, January 10, 2020 — 151.

Opposition of DC to Respondent's Notice and Motion to Review Record Material Which Will Aid Disposition, January 16, 2020 — 152.

Respondent's Reply to Disciplinary Counsel's Opposition to Notice and Motion to Review Record Material Which Will Aid Disposition, January 17, 2020 — 153.

Motion to Withdraw as Counsel, January 21, 2020 — 154.

Board Order, May 20, 2020 — 155.

Respondent Larry Klayman's Response to Board Order May 20, 2020, June 2, 2020 — 156.

Disciplinary Counsel's Motion to Strike Respondent's Response to Board Order May 20, 2020, June 5, 2020 — 156.

Respondent Larry Klayman's Opposition to Motion to Strike Response to Board Order of May 20, 2020, June 9, 2020 — 157.

Board Order, October 2, 2020 — 158.

_James T Phalen_

James T. Phalen
Executive Attorney

# BOARD ON PROFESSIONAL RESPONSIBILITY

October 2, 2020

Mr. Larry E. Klayman
leklayman@gmail.com

**Matthew G. Kaiser**
*Chair*

**Lucy Pittman**
*Vice Chair*

Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
Sara K. Blumenthal
Margaret M. Cassidy
Robert L. Walker
Mary C. Larkin
*Board Members*

James T. Phalen
*Executive Attorney*

Re:   In the Matter of Larry E. Klayman
Board Docket No. 17-BD-063
Disciplinary Docket No. 2011-D028
Bar Registration No. 334581

Dear Mr. Klayman:

Pursuant to D.C. Bar R. XI, § 7, we are serving herewith a copy of the Board on Professional Responsibility's recommendation to the Court in the above matter.

We also enclose a copy of the Index of Record that has been filed with the District of Columbia Court of Appeals. Please let us know if you think our list omits anything that should be a part of the record before the Court. We assume you have a copy of each of the items. If not, please let us know.

I draw to your attention D.C. Bar R. XI, § 9(h)(2), which states as follows:

(2)      Other than as provided in subsection (g) of this section, if no exceptions are filed to the Board's report, the Court will enter an order imposing the discipline recommended by the Board upon the expiration of the time permitted for filing exceptions

Sincerely yours,

*James T Phalen*

James T. Phalen
Executive Attorney

cc      Henry Clay Smith, III, Esquire
Assistant Disciplinary Counsel

Julio A. Castillo, Esquire
Clerk, District of Columbia Court of Appeals

*430 E Street NW, Suite 138, Washington, DC 20001 ■ 202-638-4290, FAX 202-638-4704*

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

    **LARRY E. KLAYMAN, ESQ.**

                              **No. 20-BG-583**

**Respondent.**                   **Board Docket No: 17-BD-063**
                                     **BDN: 2011-D028**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

---

## INITIAL BRIEF OF RESPONDENT LARRY KLAYMAN

_____

Dated:  February 8, 2021           Respectfully submitted,

                              /s/ Melissa Isaak
                              Melissa Isaak, Esq.
                              2815-B Zelda Road
                              Montgomery, AL 36106
                              Tel: 334-262-8200
                              Melissa@protectingmen.com

                              Counsel for Respondent

                              /s/ Larry Klayman
                              Larry Klayman
                              7050 W. Palmetto Park Road
                              Boca Raton, FL, 33433
                              Tel: 561-558-5336
                              leklayman@gmail.com

                              Co-Counsel Pro Se

# **TABLE OF CONTENTS**

STATEMENT OF ISSUES .........................................................1

STATEMENT OF THE CASE ......................................................1

STATEMENT OF UNDERLYING FACTS OF THE CASE IN CHIEF.................8

SUMMARY OF THE ARGUMENT ..................................................20

THE LAW ...........................................................................20

    The Temporary Suspension Order Must Be Vacated Immediately ............22

    Numerous Due Process Violations, Including Laches, Mandate
    Immediate Dismissal of the Charges Against Mr. Klayman.......................24

    There Was No Basis, Much Less Clear and Convincing Evidence, for the
    Finding that Mr. Klayman Had Committed Any Ethical Violation ............28

        "Emotional Interest" is Not An Ethical Violation ............................28

        Mr. Klayman Did Not Fail to Abide By Ms. Sataki's Decisions
        Concerning the Objectives of Representation....................................33

        Mr. Klayman Did Not Fail to Communicate With Ms. Sataki. .........42

        Mr. Klayman Did Not Disclose Any Client Secrets ..........................44

        Mr. Klayman Did Not Fail to Withdraw from Representation ..........46

        Ms. Sataki's Lack of Credibility Must Be Addressed .......................47

        The Hearing Committee and Board Exhibited Extreme Bias and
        Prejudice Towards Mr. Klayman, Which Must be Remedied ...........52

    The Board's Report Evidences the Fact that it Did Not Take the Time to
    Review the Record ......................................................................57

CONCLUSION ......................................................................63

## <u>TABLE OF AUTHORITIES</u>

*Coffin v. United States*, 156 U.S. 432 (1895)  ........................................................22

*Hayes v. Alabama State Bar*; 719 So 2d 787 (Ala. 1998)  .....................................27

*In re Grigsby*, 815 N.W.2d 836 (Minn. 2012) ......................................................27

*In Matter of Joseph*, 60 V.I. 540 (V.I. Feb. 11, 2014)...........................................27

*In re Vohra*, 68 A. 3d 766 (D.C. 2013) .................................................................28

*The Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1 1978) ...........................27

*The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001) .........................27

## STATEMENT OF ISSUES

1.     Should the District of Columbia Court of Appeals ("DCCA") not impose discipline on Respondent Larry Klayman ("Mr. Klayman") in this disciplinary proceeding?

2.     Should the DCCA withdraw interim suspension on Mr. Klayman while this matter is decided, as it is in contravention of Mr. Klayman's due process, equal protection, Sixth Amendment right to counsel and other rights?

## STATEMENT OF THE CASE

From the very outset of this proceeding coming before the DCCA, it more than appears that this Court has prejudged this matter, which has severely prejudiced and harmed not just Mr. Klayman but also his clients. This prejudgment is manifested by prima facie violations of many of Mr. Klayman's rights, including equal protection, due process, and Sixth Amendment right to counsel of choice during the temporary suspension phase of this proceeding.

First, even before this proceeding reached this Court, Mr. Klayman's due process, equal protection and other rights were ignored and violated. This is a very old – eleven (11) years to be exact -- disciplinary proceeding with a very voluminous record, which the Board on Professional Responsibility (the "Board") clearly never reviewed, given the numerous material errors contained in its Report and Recommendation (the "Board Report"). These material errors simply could not

1

have been possibly made had the record even been somewhat reviewed. This forced Mr. Klayman to file an "Emergency Motion for Reconsideration of Order of the Chair of the Board on Professional Responsibility and Motion to Stay Implementation of the Report and Recommendation of the Board of Professional Responsibility of October 2, 2020, Until the Board Conduct a Thorough and Bona Fide Review of the Entire Record in This Proceeding and Request for Internal Reviews" (the "Emergency Motion") as well as related supplements and motions. The Chairman of the Board, Matthew Kaiser ("Kaiser"), refused to address this, and simply sidestepped taking responsibility and then passed his responsibility on for this Court to deal with. With any real substantial discussion, and just a cursory denial, Kaiser stated:

> In any case before the Board, it is duty bound to 'review the findings and recommendations of Hearing Committees submitted to the Board, and to prepare and forward its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the Court.' D.C. Bar. R. XI, section 4(e)(7). As Respondent's Motion plainly seeks to petition to the Board to do that which it is mandated to do – and has done in the Board's report – it is denied as moot. App. 0123.

Furthermore, in the Emergency Motion, Mr. Klayman asked Kaiser if he and the Board had had *ex parte* communications with ODC and this Court on numerous occasions, which Kaiser refused to address. This creates the strong inference that ex parte communications have occurred, particularly over the temporary suspension order of January 7, 2021, as discussed below. How hard would it have

been, for instance, to simply say "no," if indeed there were to such ex parte communications?

Then, once this matter reached this Court, on October 19, 2020 the DCCA *sua sponte* issued an order to show cause as to why Mr. Klayman should not serve an interim suspension while this matter was being decided, which could take a considerable amount of additional time if a complete and thorough review of the record should ever take place, which it must. Thus, temporary interim discipline, particularly under these egregious and extraordinary circumstances, runs counter to perhaps the most fundamental and basic tenet of our judicial system – that an individual is to be provided due process and equal protection under the law, and thus presumed innocent until proven guilty. However, to the contrary, this Court has flipped fundamental constitutional rights on their head, finding Mr. Klayman guilty until he can prove himself innocent.

This is especially outrageous given the underlying facts of this disciplinary action, which, if indeed a thorough review of the record is ever undertaken, Mr. Klayman is confident would logically result in a final order of no suspension. The failure to undertake this review of the record severely prejudices not just Mr. Klayman, but also his clients. As just one example, his client, Laura Luhn has been severely prejudiced. App. 0037 – 0038. Other clients have terminated Mr. Klayman even on matters that are not before District of Columbia courts, as a

result of reading or hearing stories about the temporary discipline on the internet and elsewhere. In short, the  temporary suspension has been used strategically to harm Mr. Klayman's reputation, good will and standing with the courts before which he practices, as adversaries, "smelling blood," are using it to prejudice not just Mr. Klayman but also his clients' important interests.

 In sum, the issuance of an order to show cause on January 7, 2021,  shows that this Court has already prejudged this matter and essentially made up its mind about Mr. Klayman, regardless of what the underlying facts and law are.

Because of this, Mr. Klayman filed an extremely detailed response citing in great detail, with backup citations,  substantial evidence to the order to show cause, as well as a supplement, both of which showed why interim discipline was not warranted.  *See November 30, 2020 Response to Order to Show Cause and December 7, 2020 Supplement to Response to Order to Show Cause*. However, the Court appears to have ignored Mr. Klayman's submissions and chose instead to impose an interim suspension on January 7, 2021, while providing absolutely no legal or factual analysis as to how it came to this decision. This prevents Mr. Klayman from effectively challenging this order during the final phase of this appeal, as he has no idea why the Court chose to impose interim discipline.

Indeed, for this fundamental reason,  Mr. Klayman filed on January 11, 2021 a Emergency Motion to Vacate Order and Issue Ruing with Factual and Legal

4

Analysis with Established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights, but this was again summarily denied without any legal or factual analysis. An order temporarily suspending Mr. Klayman is akin to a preliminary injunction, which means that Mr. Klayman should have been entitled to factual findings and conclusions of law so that he knows what he needs to address in his actual briefs. *As set forth by analogy in* District of Columbia Rule of Civil Procedure 52 (a)(1):

> Unless expressly waived by all parties, in an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record or may appear in an opinion or a memorandum of decision filed by the court and are sufficient if they state the controlling factual and legal grounds of decision.

Part (a)(2) of this Rule with regard to analogous interlocutory injunctions mandates "In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action. Similarly, the Federal Rules of Civil Procedure are substantively the same as the District of Columbia Rules of Civil Procedure See Fed. R. Civ. P. 52(a)(1) – (2):

> (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58 (2)
> For an Interlocutory Injunction. In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

5

Mr. Klayman then attempted to file, pursuant to DCCA Rule 35, a Petition for Rehearing En Banc. However, Mr. Klayman was not even allowed to file this Petition, as it was rejected, apparently by the chief judge, this three judge panel and all of the judges of this Court, on January 25, 2021 as "invalid material" on the basis that the January 7, 2021 order was an interim suspension pending final disposition. App. 0039. However, nothing in DCCA Rule 35 prohibits the filing of a Petition for Rehearing En Banc to challenge an interim order. *See* DCCA Rule 35.

Thus, Respondent Larry Klayman's Resubmitted Emergency Petition for Rehearing En Banc to Vacate Three Judge Panel Per Curiam Order of January 7, 2021 and Reissue Order with Factual and Legal Analysis in Accordance with established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights was refiled to point out that Rule 35 did not prohibit en banc review, but it was apparently summarily rejected again. It appears, once again, that the Court was simply looking for a reason to continue to deny Mr. Klayman his due process and equal protection rights by not providing him with any required factual findings and conclusions of law, from which he could logically base his arguments against discipline during this final phase of the proceeding.

To make matters even worse, Mr. Klayman has, until recently, been denied his right to counsel under the Sixth Amendment to the Constitution. From the very

outset of this case in this Court, Mr. Klayman made it very clear that he wished to be represented by Melissa Isaak, Esq. pro hac vice. In this regard, Ms. Isaak first filed an application for *pro hac vice* admission on November 11, 2020 and it was not until January 21, 2021 that the Court finally directed the clerk to enter Ms. Isaak's appearance. *See Order of January 21, 2021 directing Clerk to enter the appearance of Melissa Isaak, Esq.* This is an egregious and unconscionable  over three-month delay, that is over nine (9) weeks, during which time  Mr. Klayman was denied his right to counsel of choice until after the Court had already imposed an interim suspension on him. *See Order of January 7, 2021.*

Lastly, Mr. Klayman has informed the Court on numerous occasions that he was not being served timely with orders from the Court, which has caused him prejudice. App. 0040 – 0044. As set forth in his Motion for Extension of Time of January 3, 2021, he did not learn of the briefing schedule order until sixteen (16) days after it had been issued. This is significant as he lost time to prepare for such a voluminous brief. Tellingly, the Court has even refused to address this simple matter, which can be easily fixed.

Regrettably, the numerosity and scope of these violations of Mr. Klayman's constitutional and other rights can only be seen as willful, given their frequency and magnitude.

All of this creates much more than a strong inference that the Court has prejudged the issues, notwithstanding the underlying facts of this disciplinary matter which are discussed further in detail below. This total breakdown of the disciplinary process requires this Court to remedy this clear wrong. Mr. Klayman thus respectfully requests that the Court immediately lift the temporary suspension and thoroughly review the record to prevent a further and at this point compounded miscarriage of justice.

## STATEMENT OF UNDERLYING FACTS OF THE CASE IN CHIEF

Mr. Klayman is a conservative legal activist and the founder of both Judicial Watch and Freedom Watch, as well as a former federal prosecutor and, as such, he gravitated to the Iranian freedom movement and its mission to effect regime change in the Islamic Republic of Iran. PFF 45. Mr. Klayman attended a freedom rally on the front lawn of the U.S. Capital during the late fall of 2010, when it appeared that dissidents in Iran appeared to be on the verge of overthrowing of the radical Supreme Leader and thus bringing freedom to the nation. PFF 45.

It was at this rally that Mr. Klayman encountered and briefly spoke with the complainant, Elham Sataki ("Ms. Sataki"), who was covering the event for the Persian News Network Division ("PNN") of Voice of America ("VOA"), whose headquarters was in Washington, D.C. PFF 45. After Mr. Klayman introduced himself to Ms. Sataki, who had concluded an interview, and told her about his pro-

freedom efforts, he left and descended the Capitol steps with one of his clients. PFF 45. Eventually, Mr. Klayman asked Ms. Sataki out in a personal capacity. PFF 46. On their  dinner date at Clydes restaurant in Georgetown, Ms. Sataki broke down in tears sobbing, grabbing Mr. Klayman's hand from across the table. She claimed to have been sexually harassed by a co-host at VOA's PNN and then retaliated against by mostly Iranian managers who had different views about Iran's leaders, as they were pro-regime. PFF 47. Sobbing and evoking sympathy from Mr. Klayman, Ms. Sataki explained that she was destitute. PFF 106. Mr. Klayman offered to help her out of friendship as she continued to sob. PFF 47.  They met again and Ms. Sataki told Mr. Klayman how her union president and representative at VOA, Mr. Tim Shamble ("Mr. Shamble") had also been trying to resolve the situation. PFF 2, 50.

Mr. Klayman had had prior experience in bringing sexual harassment and workplace retaliation cases over his long then 32 legal career in which he had continuously been a member in good standing of the District of Columbia Bar. PFF 40, 41. In addition, he had considerable experience in administrative law and litigating against the government.  PFF 40. But the agreed goal, when he met with Ms. Sataki and Mr. Shamble, was to try to settle matters amicably with VOA, and to achieve Ms. Sataki's expressly stated desire to be detailed out of the DC headquarters to Ms. Sataki's home in Los Angeles, where her friends and family

were. PFF 20, 48. This would take her away from the alleged harasser, Mehdi Falahati ("Mr. Falahati"), and her managers, who had been very critical of her work performance quite apart from her sexual harassment and retaliation claims. PFF 52, 115. Mr. Shamble warned that based on his considerable experience, VOA was very difficult to deal with and was anti-employee rights. PFF 15, 50. Indeed, he stressed that VOA had been rated as the worst agency in government by the General Accounting Office ("GAO"). PFF 16.

Nonetheless, Mr. Klayman, Ms. Sataki and Mr. Shamble began efforts to settle with VOA, but they were predictably met with a hostile reception, as Mr. Shamble had predicted based on his experience as union president. As a result of this hostile reception, Mr. Klayman, Ms. Sataki, and Mr. Shamble collectively decided to use -- as is routine and acceptable strategic practice in matters such as this where the is a political and intransigent government component --  public relations and lobbying with influential Senators and Congressmen to have them intervene and coax a settlement. PFF 128, 166. Ms. Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. PFF 11, 166. Indeed, a crucial piece of evidence in this proceeding is an email which Mr. Klayman sent to the LA Times, copying both Ms. Sataki and Mr. Shamble, attempting to arrange such an interview. PFF 11.

This was consistent with Ms. Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Ms. Sataki object, and there is no contemporaneous written record of any objection. PFF 167. To the contrary, at the hearing before the Ad Hoc Hearing Committee ("AHC") she was forced to admit on several occasions that she approved of this publicity. PFF 170. In addition, several key material witnesses also corroborated this. PFF 91, 182. In fact, Ms. Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill! PFF 24. Extensive efforts to lobby politicians were made, often with Ms. Sataki present, but always with her informed consent. PFF 27. However, this strategy was not successful as VOA and its Board of Governors ("BBG") dug in their heels. PFF 53.

When these efforts proved unsuccessful, it was decided by Ms. Sataki, Mr. Klayman and Mr. Shamble that hard-hitting legal action would be required, PFF 53, with the aim of "convincing" VOA and its decision-maker governors at the BBG to settle. PFF 54. Accordingly, not only was an Office of Civil Rights ("OCR") complaint filed, so was a *Bivens* action against all the individual governors on the BBG. It was agreed on by all three that holding the governors

personally responsible and at risk might strategically convince them to be reasonable and settle. PFF 54.

Named in the *Bivens* action, which was based on a violation of constitutional rights over sex discrimination among other grounds, was necessarily the titular head of BBG, Mrs. Hillary Clinton, who as secretary of state presided over BBG. PFF 26, 54. Putting friendship aside for the benefit of Ms. Sataki, Mr. Klayman's friend, Ms. Blanquita Collum, a prominent conservative radio talk show host and also a BBG governor, was also named, along with all of the other governors, both Democrat and Republican appointees. PFF 25. Mrs. Clinton was neither singled out nor admittedly did the *Bivens* complaint make any politically motivated attacks on her. PFF 26, 209. She was simply named as a matter of course along with the other governors. Importantly, Mr. Sataki, who knew that Mr. Klayman was conservative and an activist like herself when he offered and then agreed to legally represent her *pro bono,* expressly approved of this strategy. PFF 26.

There was considerable evidence adduced at the hearing that the singular goal was always to get Ms. Sataki transferred to Persian New Network ("PNN") Bureau at VOA in Los Angeles and not to recoup damages. PFF 54, 76, 107, For this fundamental reason, while Ms. Sataki gratuitously offered later that Mr. Klayman could take a percentage of any damage award, this was neither a consideration nor an offer important to him. PFF 54. Instead, it was out of what he

thought at the time was a deep friendship with and caring for Ms. Sataki, that he went to an enormous legal effort to get her back home to LA where she would feel secure, and not to make money. PFF 76. Indeed, Mr. Shamble testified that he never experienced any lawyer work as hard for a VOA employee than Mr. Klayman that he even recommended him to other broadcasters at VOA who had been allegedly discriminated against. PFF 6.

This was why when Ms. Sataki, having taken some leave to travel to LA for vacation, had an emotional breakdown when she was told by VOA that she would not be transferred to LA, and was instead being offered a post at the Central News Division ("Central News") in Washington. PFF 56, 109, she told Mr. Klayman in an unhinged state that she would commit suicide if she had to go back to DC – a constant theme of Ms. Sataki, who Mr. Klayman learned much later likes to use to induce and lure people into helping her by playing the victim - even before she met Mr. Klayman. PFF 109. Ms. Sataki thus instructed Mr. Klayman to continue to do all he could to get her to LA. PFF 109.

Mr. Klayman did not seek a romantic relationship as ODC falsely and conveniently claims, but had come to deeply care for and love Ms. Sataki and sympathized with her, as he himself had been going through hard personal time and understood and related to her claimed plight. PFF 49, 79. Even though Mr. Klayman was not in good financial shape himself, he put the interests of his friend

13

and client before his own. PFF 73. To this day, Mr. Klayman has never asked or brought any legal action to be paid back, even after Ms. Sataki vindictively filed a bar complaint against him when she did not get what she wanted at VOA's Office of Civil Rights ("OCR") or in court. PFF 77. Importantly, there is no allegation of sexual harassment in the Specification of Charges and Ms. Sataki has never filed suit on this basis. PFF 105. Nor has there been any malpractice claim filed by her or her surrogates, who prepared a supplemental bar complaint for her. PFF 136. Importantly, and of seminal importance,  this identical bar complaint was also sent simultaneously to The Florida Bar and the Pennsylvania Bar, both which found no violation of their rules of ethics, which are similar if not identical to this bar, and summarily dismissed the complaints long ago. PFF 43; Tr. 969-971, RX23, RX 30. This crucial and uncontested fact cannot and must not be overlooked!

Mr. Klayman, with Ms. Sataki's consent and knowledge - as he not only communicated orally with her and Mr. Shamble, but also routinely sent her pleadings - had also filed a motion for temporary restraining order and preliminary injunction, arguing under a landmark case styled *Wagner v. Taylor*, that the status quo should be preserved by ordering that Ms. Sataki be put back to work in the LA PNN Bureau while her administrative employment claims and the *Bivens* suit proceeded. PFF 68.

This *Bivens* case had unfortunately come to be assigned to a judge who Mr. Klayman had had great difficulty with in the past for other clients, the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), who is known to be highly partisan and to the far left.  PFF 55. For this reason, with Ms. Sataki's informed knowledge, Mr. Klayman moved to have the case transferred to another judge in the DC federal court, but this was not granted.

At the time, a retired federal judge who had sat on the federal court with Judge Kotelly, The Honorable Stanley Sporkin ("Judge Sporkin"), who Mr. Klayman had appeared before and who after the jurist's retirement he had come to know out of the courtroom, was consulted by Mr. Klayman, who told him at the time that it was a "chip shot" to have put Ms. Sataki back to work in LA. PFF 58.

However, as Mr. Klayman had feared, Judge Kotelly callously ruled against Ms. Sataki and her order showed serious factual and legal errors – indeed, about 14 pages of which he later included in a motion to disqualify the judge. PFF 65. Later, Mr. Klayman would give his public opinion, to which he is entitled – and which is common for lawyers to do - that there was no factual or legal basis for Judge Kotelly's rulings. PFF 59. He would also seek to disqualify Judge Kotelly on the basis of apparent bias and thus have her orders vacated so he would proceed for Ms. Sataki before another unbiased judge. PFF 65, 66.

But when learning of Judge Kotelly's decision, Ms. Sataki, perhaps showing more of her true "self-centered self," became very abusive of Mr. Klayman, despite all he had done to help her.  Mr. Klayman had seen this self-centered demeanor before as the legal and personal friendship relationships had gone forward. And because he cared deeply about and came to love Ms. Sataki, he took her abuse and disrespect to heart and wrote, as a human being, sad emails to her to try to get her to understand how much he cared about her. But this notwithstanding, Mr. Klayman also zealously and diligently continued to try to get Ms. Sataki a good broadcasting job in LA, with the use of his friendship and contacts with his close friend Ted Baehr, the head of Movieguide. PFF 63.

Seeing the difficulty in his legal relationship and friendship with Ms. Sataki, Mr. Klayman recommended that she seek other legal counsel, including Gloria Allred, the famed women's rights advocate, Mr. Klayman's friend and someone who Mr. Shamble has also recommended, attorney Tim Shea, who had had many cases before VOA. PFF 145.

It also got to this point when Ms. Sataki, taking advantage of Mr. Klayman's affection for her, asked Mr. Klayman, as she had throughout, for personal favors. Ms. Sataki, who had no credit, even asked Mr. Klayman to buy her a car, as hers had been repossessed due to her non-payment of monthly fees, and she claimed to want a cheaper one, albeit and incredibly a new Mercedes convertible,  to lower

monthly payments.  PFF 62. Thus, it became apparent to Mr. Klayman that the time had come to part ways with Ms. Sataki, but he still did not want to hurt her or her legal interests. In addition to the over $30,000.00 in expenses and the approximately $250,000 dollars in time -- if he had not been representing Ms. Sataki *pro bono* – Mr. Klayman went the extra mile and used his own monies to compensate her for the loss of her former salary at VOA, and assured her that 6 months tenancy at the apartment he had rented for her was pre-paid. PFF 118, 157.

In this period, after Judge Kotelly's ruling against Ms. Sataki, Mr. Klayman and Mr. Shamble tried repeatedly to communicate with Ms. Sataki, to advise her that only the first round of her case was lost – to put her back to work in LA at VOA—but that she could now move forward not just to seek a permanent injunction in the *Bivens* case, but also file a Title VII complaint in federal court once as the OCR of VOA had ruled against her with regard to her employment claims of sexual harassment and workplace retaliation by her managers, now that administrative remedies had been exhausted. PFF 5, 32, 132.  In this regard, Mr. Shamble sent communications to Ms. Sataki asking that she contact Mr. Klayman or himself, assuring her that none of her rights had been forfeited or lost. PFF 33. However, Ms. Sataki did not respond, but instead, apparently with the aid of non-lawyers who were giving her bad advice, incredulously communicated with VOA that she wanted to drop all of her civil cases. PFF 35. The letters which Ms. Sataki

claims to have sent, were either not sent to Mr. Klayman or were sent to wrong addresses and thus he did not receive them from her. PFF 69, 71,

Diligently and responsibly not wanting to see Ms. Sataki's legal rights lost while matters got sorted out, Mr. Klayman, again at his expense, filed a notice of appeal. PFF 72. And while Ms. Sataki has testified falsely that she wanted to drop the *Bivens* case, among other misleading and false testimony at the hearing, she herself, likely with the aid of her felon cousin Sam Razavi ("Mr. Razavi"), sent a notice of appeal to Judge Kotelly, which the judge placed in the case file and mailed to Mr. Klayman. PFF 67. This underscores that, as Mr. Klayman had suspected, Ms. Sataki did not want the dismissal of her cases and was getting bad advice from non-lawyers. He and Mr. Shamble had an ethical and legal duty to try to communicate directly with her and not rely on nonsensical letters obviously not written by Ms. Sataki, as they were in perfect English. PFF 70, 161.

Indeed, by way of comparison, in an email which Ms. Sataki later sent to Mr. Klayman, which falsely accused him of taking bribes to lose her case and disparaged his Judeo-Christian religious beliefs, among other outrageous and vicious insults and untruths, her lack of written English literacy comes through, as well as the other cruel and self-centered side of Ms. Sataki, which had been hidden from Mr. Klayman at the outset, but which emerged later on. BCSX 38. PFF 163.

All of this notwithstanding, the Office of Bar Disciplinary Counsel ("ODC") belatedly, and egregiously six years after Ms. Sataki had filed and abandoned her complaint, PFF 203, sought to resurrect it for its own biased strategic reasons, to incredibly argue that Mr. Klayman should be disbarred. The thrust of ODC's case is that Mr. Klayman should never have deeply cared for Ms. Sataki and that he never should have included Mrs. Clinton in the *Bivens* action. The fact that Mrs. Clinton was made an issue in  private lawsuit that did not single her out, but who Mr. Klayman had sued on several occasions in his public interest capacity at Judicial Watch and Freedom Watch, underscores the political nature of ODC's actions. It is no secret that ODC and the Board are managed by leftist pro-Clinton Democrats. A simple review of Federal Election Commission records of those at ODC,  and the donations and writings of Chairman Kaiser, bear this out.

The highly partisan nature of this entire proceeding is thus no basis upon which to recommend the "death sentence" of disbarment, much less any suspension, for an attorney – regardless of his public interest advocacy and political beliefs -- who has continuously been a member in good standing for almost 37 years.

Indeed, ultimately, Ms. Sataki admits that is still seeing a doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's representation. This shows that her mental and other alleged problems are not the result of Mr.

Klayman, but of her own. PFF 171.  As for Mr. Klayman, sadly the old adage applies that "no good deed goes unpunished," notwithstanding that it's not good to be a conservative pro-Trump white male in today's environment in the nation's capital in particular.

## SUMMARY OF THE ARGUMENT

There were no legal or factual bases to find that Mr. Klayman had committed any ethical violations, and the Board's Report, which is full of egregious errors, shows that the Board did not even review the record before issuing its Report, but instead literally "rubber-stamped" a biased Hearing Committee recommendation. Furthermore, interim discipline as set forth above is entirely unwarranted and contrary to the fundamental tenets of our judicial system.

## THE LAW

Mr. Klayman's compelling case for no discipline is three-fold. First, the temporary suspension order must be revoked immediately, as it has severely prejudiced Mr. Klayman and his clients already as it is being used against them, App. 0037 - 0038, and it contravenes the fundamental tenet that an individual is presumed "innocent until proven guilty. Second, this matter is so old that it should be dismissed on the basis of laches alone notwithstanding that was no basis for the Board to find in its Report that Mr. Klayman had committed any ethical violation.

Third, there was simply no requisite clear and convincing evidence of any misconduct period, and as such this proceed should be dismissed.[1]

Furthermore, Mr. Klayman respectfully requests again that the Court thoroughly review and digest his Proposed Findings of Fact, as well as his Counter-Findings of Fact, which were filed with the Board, but apparently never reviewed along with the record prior to issuing its Report. App. 0045 – 0077.

Lastly, at a bare minimum, if the charges against Mr. Klayman are not summarily dismissed by the Court, which they should be, this matter must be remanded to another unbiased Hearing Committee so that Mr. Klayman has a chance to receive a fair adjudication. Separately, an internal review must be conducted to determine how the Hearing Committee members were chosen and

---

[1] With regard to the fee agreement, the record is clear that Mr. Klayman and Ms. Sataki never agreed to any type of fee agreement, where Mr. Klayman would be entitled to a certain percentage of any recovery. Indeed as set forth above the goal was to have her relocated Los Angeles, where she could do broadcasting there for VOA in its offices in the federal building on Wilshire Boulevard, where she could be away from the alleged harasser and allegedly hostile management at VOA, an also have access to her doctors and psychologists. The only agreement that was made between Ms. Sataki and Mr. Klayman was that Mr. Klayman's representations was pro bono. This is shown in the record. "And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends." Mr. Klayman told Ms. Sataki he would legally represent her pro bono. Tr. 326-27, 976-977. Mr. Klayman has never received any money from Ms. Sataki, and has never asked her to pay him a single dollar. PFF 75. Tr. 1057. BCX 29. Mr. Klayman testified, "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066.

whether there were any improper *ex parte* communications with this Court, which Kaiser refused to address. App. 0123 - 0124.

## I.    The Temporary Suspension Order Must Be Vacated Immediately

The Court's October 19, 2020 order to show cause asks Mr. Klayman to show why the "court should not enter an order of suspension pending final action on the Board on Professional Responsibility's recommendation." Mr. Klayman filed an extremely detailed response and supplement, which showed conclusively that the Board's Report was rife with material errors and misstatements of material facts. Based on this, as it is clear that no discipline at all was warranted as there is simply no clear and convincing evidence of any ethics violation much less an even an interim order of temporary suspension.

The interim suspension order is clearly improper and unwarranted. Not only would this potentially lead to a longer suspension than recommended by the Board, should the Court adopt the Board's recommendation, it flies in the face of one of the basic tenets of the American legal system – that persons are entitled to a presumption of innocence and are therefore innocent until proven guilty. This is well-settled by the Supreme Court as early as 1895. *Coffin v. United States*, 156 U.S. 432 (1895).  Mr. Klayman is unaware of any case or other  authority that grants this Court authority to order him to show cause and impose interim discipline before the matter is even fully adjudicated with full constitutional due

22

process and equal protection rights, based on a simple non-final recommendation of the Board, which piggybacked on a biased, manifestly unjust and fatally flawed Hearing Committee recommendation.

To suspend Mr. Klayman now has  resulted in the misuse of state action to deny him his due process, equal protection and other constitutional rights, including right to counsel. Mr. Klayman has been now been severely prejudiced by an inability to practice law in the District of Columbia before any final finding of misconduct. Not only has  this already severely harmed Mr. Klayman, but worse the rights of his clients – both present and potential -- as well as his public interest, non-profit work, which requires the filing cases in the District of Columbia where public officials and government agencies reside and do business.

The Court must therefore adhere to the fundamental tenet that Mr. Klayman is innocent until proven guilty and allow this matter to run its fill course before any action, even temporary, is imposed.

Lastly, and equally important, in a recent opinion dated June 11, 2020 from this Court in disciplinary proceeding 18-BG-100, this Court recently made the finding that, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically…. Accordingly, we decline to impose a fitness requirement**." Nothing can change this recent  finding, especially where the Board has only issued a Report and Recommendation, and it is clear that the

Board did not even take the time to review the record, much more adhere to the legal standard of clear and convincing evidence to consider and if appropriate find violations of ethics rules. Under these extraordinary circumstances as well – especially in a matter which has going for nearly eleven (11) years -- it is clear that interim discipline is simply not warranted or just.

And, importantly, since this Court's June 11, 2020 order which found that that " we are not left with 'serious doubt' or "real skepticism" that Mr. Klayman can practice ethically --  just a few months ago --  nothing has changed. The interim temporary suspension order of January 7, 2021, must therefore be vacated immediately.

## II.    Numerous Due Process Violations, Including Laches, Mandate Immediate Dismissal of the Charges Against Mr. Klayman

This matter is now  going on eleven (11) years, that is over complete decade, and during this time period material witnesses like Professor Ronald Rotunda sadly died. Another important material witness, Ms. Sataki's psychologist Dr. Arlene Aviera, contracted serious if not terminable cancer, preventing her from testifying at the hearing. Ms. Aviera, if she had testified, would have been sympathetic to Mr. Klayman's difficulty in representing Ms. Sataki, notwithstanding her other related testimony. Moreover, her internal notes about her treatment of Ms. Sataki, if discovery had been allowed, would have been more than crucial. Indeed, as reflected on the record, it was Mr. Klayman who found and took Ms. Sataki to Dr.

Aviera, not just because she became his client, but because he cared for her. PFF # 110.

As evidence of how important Dr. Aviera's testimony would have been at the hearing, Ms. Sataki testified that she is still seeing a doctor to this day and is still on anxiety mediation – eight (8) years after Mr. Klayman's representation ended. This shows that her mental and other problems were not the result of Mr. Klayman, but her own. Tr. 201, PFF 171. Ms. Aviera's testimony would have been crucial in this regard, as she was the psychologist who treated Ms. Sataki at the time the events unfolded and would have been able to provide the Hearing Committee with the proper medical diagnosis and records to back it up. Instead, Ms. Sataki was free to simply vindictively blame all of her problems on Mr. Klayman because she did not get what she wanted, a job in the coveted LA PNN Bureau of VOA.

Early on in the case, given the extraordinary delay where memories had faded, documents been misplaced or lost and as  Respondent, given the enormous delay, believed that Ms. Sataki's complaint had been dismissed by ODC  as identical complaints had been dismissed by his other state bars in Florida and Pennsylvania, and where witnesses memories were likely to have faded, Mr. Klayman moved for discovery of both Ms. Sataki and Aviera based on the consequences and inherent prejudice caused by of this inordinate delay. The

motion was incredibly denied, with the Chair Mr. Fitch and Mr. Tigar, the two lawyer members of the Hearing Committee, disingenuously ruling that the issue of discovery could be raised again at the later hearing. Indeed, Mr. Klayman did so move again, after ODC, without proper notice, sandbagged Mr. Klayman by presenting on the first day of the hearing scores of new exhibits which had not been made available in the previous eight years, mostly consisting of Ms. Sataki's previously non-disclosed emails and other documents. Tr. 18. The Hearing Committee and Mr. Klayman were also informed for the first time by ODC that Dr. Aviera, who ODC had been listed as a witness, would not be present at the hearing to testify due to the terminal cancer she had contracted during the interminable intervening years. For these two compelling and extraordinary reasons, Respondent renewed his request for discovery of both Ms. Sataki and Aviera, the latter of which could have been taken by video conference. This renewed motion  was quickly and tersely denied. Tr. 133-137.

In the Board's Report, the Chairman and his Board seriously errored, again evidencing that a thorough, complete and full review of the record had not taken place before issuance of the Board Report on October 2, 2020. The Board found wrongly at page 28, for instance, "(with) respect to Dr. Aviera Respondent could have sought permission to depose her on grounds that he needed to preserve her testimony due to her illness. He did not." But this is exactly what Respondent had

done, not once but twice. This error is so glaring that it impeaches the accuracy and integrity of the entire Board Report.

In addition, most jurisdictions would have thrown this proceeding out on the basis of such an enormous delay alone. As Professor Rotunda observed:

> In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1 1978) (per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules… One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall disc line. The Court said, 'Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. RX 5.

Professional ethics expert Rotunda in the opinion he wrote before he died during the intervening years also convincingly cited numerous other cases that held that ODC should be subject to the principle of laches. App. 0127 - 0133. They include *The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001); *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012); *In Matter of Joseph*, 60 V.I. 540, 558- 59 (V.I. Feb. 11, 2014); *Hayes v. Alabama State Bar*; 719 So 2d 787, 791 (Ala. 1998). RX 5. As just

a few examples, Mr. Rotunda found that in Indiana Bar expressly limits the time to complete a disciplinary  investigation in its own rules: Limitation on time to complete investigation. Unless the Supreme Court permits additional time, any investigation into a grievance shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received…. If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed."

Indeed, the record is clear that Florida and Pennsylvania dismissed identical complaints very early on. PFF 43; Tr. 969-971, RX23, RX 30. The Board glaringly made no mention of this in its Report, showing that the record was definitely not reviewed and that. Mr. Kaiser and the rest of the Board just "rubber stamped" a biased and fatally flawed Hearing Committee recommendation.

## III. There Was No Basis, Much Less Clear and Convincing Evidence, for the Finding that Mr. Klayman Had Committed  Any Ethical Violations

Under Board Rule 11.5, charges against Mr. Klayman must be proved by "clear and convincing" evidence. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013). As set forth below, charges against Mr. Klayman must be dismissed because there is nothing even remotely close to "clear and convincing" evidence that Mr. Klayman had engaged in ethical misconduct.

### 1.    "Emotional Interest" is Not an Ethical Violation

The Board has come up with and manufactured out of "thin air" a novel if not bizarre non-existent ethical violation for Mr. Klayman dubbed "emotional interest." This is not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this.

To the extent that the Board strangely and disingenuously couches this as a conflict of interest violation, it is clear that Mr. Klayman had informed consent. This is admitted by the Board in its Report, where Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation." App. 0010. The Board then incredulously tries to find that Mr. Klayman did not believe that he could provide adequate representation to Ms. Sataki – a claim which is belied by the actual record in this matter. Indeed, testimony shows that Mr. Klayman throughout did everything he could to diligently represent Ms. Sataki. Likewise, he did everything possible to ensure that her legal rights were protected. The Board strained and stretched to find a violation where none existed, finding that Mr. Klayman's "emotional interest" somehow led to a lack of communication with Ms. Sataki. However, as set forth in *infra* section

29

II(A)(3), this is blatantly incorrect and Mr. Klayman kept Ms. Sataki apprised of everything going on in her case. Tr. 1011." PFF 60.

For instance, Tim Shamble ('Mr. Shamble"), Ms. Sataki's union representative and president of the union at VOA declared under oath that Mr. Klayman was "very diligent in attempting to represent Ms. Sataki, putting in many hours, and Mr. Klayman did not, to his knowledge, compromise any of Ms. Sataki's rights." PFF 3, RX 1, RX 5. Indeed, Mr. Shamble felt so strongly about Mr. Klayman's representation of Ms. Sataki that he referred Mr. Klayman to other VOA employees. PFF 6, RX 1, RX 5, Tr. 902. Mr. Shamble testified:

> I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Tr. 903-04.

Thus, the facts and the record show that despite any "emotional interest," Mr. Klayman was undeniably able to diligently and competently represent Ms. Sataki. In fact, he worked harder for Ms. Sataki because he cared about her.

Mr. Klayman also spent a huge amount of his personal time and expense to help Ms. Sataki, including paying for her moving expenses to Los Angeles as well as medical care, over $30,000 dollars in sum, and in fact this is to be commended. PFF 62, PFF 110, Tr. 348, Tr. 350. There is nothing wrong and unethical with doing this to try to help someone that he considered a close friend that he came to

30

care about at the time. Indeed, if anything it was Ms. Sataki who acted improperly due to "emotional interest," when she tried to have Mr. Klayman buy her a car, (which was a new Mercedes convertible no less), as she admitted at the hearing. Tr. 429, 432-35. PFF 62. At that point Mr. Klayman realized that Ms. Sataki was simply trying to take advantage of their friendship, and he therefore recommended to Ms. Sataki to have another attorney step in to represent Ms. Sataki, including his friend, Gloria Allred, who testified on Mr. Klayman's behalf at the hearing. PFF 78, Tr. 1079-1080. Mr. Klayman and Mr. Shamble also recommended attorney Tim Shea, who had worked cases against VOA before. PFF 145, Tr. 549-550. It is not Mr. Klayman's fault that Ms. Sataki did not hire the other attorneys who Mr. Klayman  had found and Mr. Shamble recommended for her. Mr. Klayman had no power over her choices.

When ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry  and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes, which was entered into evidence but conspicuously never even mentioned in the Board's Report, much like the dismissals years earlier by The Florida Bar and the Pennsylvania Bar. This email underscores the verbal and other abuse Mr. Klayman had experienced with Ms. Sataki throughout, as the victim she saw herself as she apparently caused her to believe that she had all

things coming to her, including a car, and explains the basis for many of his communications with her, since as a human being with feelings for her, he felt hurt. Ms. Sataki savagely wrote:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it. ´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed  my life to nothing….

> Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163, BCSX 38.

This shows that Mr. Klayman was simply stuck in a "heads I win, tails you lose situation" with Ms. Sataki. While he did everything he could to help her, Ms. Sataki would alternate between trying to use him to buy her a new car and to take other advantage or abusing him. Mr. Klayman still did everything he could, however, to protect Ms. Sataki's legal rights because it was the ethical thing to do. Mr. Klayman's sister, Joshua Ashley Klayman, Esq., who had interacted with Ms. Sataki socially with her boyfriend, testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

### 2.  Mr. Klayman Did Not Fail to Abide By Ms. Sataki's Decisions Concerning the Objectives of Representation

The Board's finding that Mr. Klayman had violated Rule 1.2 by failing to abide by Ms. Sataki's decisions concerning the objectives of the representation is flatly unsupported by the record.

The Board makes the unsupported finding that Ms. Sataki "intended to pursue her case with minimal publicity." This flies in the face of a litany of compelling record evidence submitted by Respondent, including testimony of Ms. Sataki herself! *See* PFF 170:

Importantly, even on questioning from ODC, Ms. Sataki admits that she agreed to the use of publicity to coax a settlement so she could be detailed to the LA bureau of VOA.

Q: **Did you ultimately agree with Mr. Klayman about the publicity?**

 A**: I did.** Tr. 775.

Mr. Klayman also provided testimony from numerous witnesses that shows that Ms. Sataki's belated claim was false.  This included Keya Dash - *see* PFF 91 ("Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer - PFF 180 ("Ms. Sataki openly

discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524.). Furthermore, and again,  she testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

Even further buttressing Mr. Klayman's strong argument is the compelling testimony of Mr. Shamble, who was Ms. Sataki's union representative and importantly the president of her union, as Mr. Shamble was representing Ms. Sataki along with Mr. Klayman. Mr. Shamble testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. PFF 23. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 892-893, RX 5. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a subcomponent, has been ranked the worst agency in

government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. RX 1, RX 5. PFF 7.

Perhaps as the final "nail in the coffin" for the Board's blatant error is the fact that Ms. Sataki personally participated in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1. PFF 24.

Furthermore, Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[2] The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. App. 0119 – 0122. To be certain of and confirm the content, Mr. Klayman also had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. App. 0122. Mr. Moslehi translates this "smoking gun" as follows:

---

[2] https://www.youtube.com/watch?v=e3g5f61muZ4

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham [Sataki]'s photo) former broadcaster of VOA.

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

36

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

This video can and should be viewed on YouTube at https://www.youtube.com/watch?v=e3g5f61muZ4.

Chairman Kaiser and his Board disingenuously and egregiously refused to consider this critical evidence in its order of October 2, 2020, found by a paralegal to Mr. Klayman's former counsel, Barbara Nichols. during the briefing process, and refused to allow it to be supplemented onto the record, despite its compelling

and extraordinary character and circumstances, which Kaiser admitted is the test to supplement the record. *See* Order of October 2, 2020. Nor would Kaiser and his Board even consider it. This extraordinary evidence definitively shows that Ms. Sataki perjured herself when she testified, having obviously been coached prior to the hearing to do so. In short, this was consistent with her admissions on cross examination, and contradicted her belated, contrived and false testimony that she did not want to use publicity in her case against VOA. This is another example of the Board's fundamentally flawed lack of due process, which severely prejudiced Mr. Klayman.

Thus, it was, frankly, impossible for the Board to make the finding  that "Ms. Sataki intended to pursue her case with minimal publicity" in good faith if it had actually reviewed the record and the hearing testimony of Mr. Shamble, Mr. Dash, Ms. Klayman, Mr. Klayman and even Ms. Sataki's own admissions, as well as taken note of this extraordinary duly discovered evidence. Such a blatant and egregious material error shows why Mr. Klayman was forced to file his Motion for Reconsideration and Notice of Record Material with the Board on Professional Responsibility.

Similarly, the Board's finding that Mr. Klayman had failed to abide by Ms. Sataki's wishes to dismiss the case in a July 30, 2010 email  is unsupported by the record, much less the requisite clear and convincing evidence. Indeed, Mr.

Klayman, on July 28, 2010, filed a notice of voluntary dismissal dismissing all but two of Ms. Sataki's claims PFF 68. The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. PFF 68. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief. PFF 68. Thus, the only actions that were taken in the BBG case after July 30, 2010 were to preserve Ms. Sataki's rights on appeal, whether they be exercised by Ms. Sataki herself or with the assistance of other counsel. PFF 78. In any event, Judge Kotelly ultimately dismissed the action. PFF 68.

And importantly but also overlooked was that Mr. Klayman further convincingly and credibly testified that it was highly unlikely that any correspondence that purportedly came from as Ms. Sataki actually did originate from her, given the literate English that was used. PFF 70, 161, 163. Mr. Klayman was familiar with Ms. Sataki's admittedly poor written English, which is exemplified in BCSX 38, the August 4, 2010 letter. The letter which was written to Danforth Austin and not Mr. Klayman, was tellingly and revealingly written in perfect English. Poor written English was one of the difficulties she had experienced with VOA supervisors. PFF 70, Tr. 1041, RX 21. Thus, where it was

39

clear that Ms. Sataki was not the one who wrote the August 4, 2010 letter, Mr. Klayman had, at a minimum, an ethical duty to speak with Ms. Sataki personally to confirm her wishes before taking actions to forego all of her legal rights, include appellate rights. In fact, as strong evidence that Ms. Sataki did not <u>actually</u> wish to terminate her litigation, she herself filed a notice of appeal, purportedly *pro se*, later that year. PFF 67, RSX 4, Tr. 1031.

Indeed, Mr. Shamble, who was working as Mr. Klayman's partner on behalf of Ms. Sataki,  testified as well that he also tried on numerous occasions to communicate with Ms. Sataki, but was rebuffed as well:

> Mr. Shamble declared under oath that communication became very difficult and nearly non-existent with Ms. Sataki. When he and Mr. Klayman would try to contact Ms. Sataki, we usually got no response, even for months. PFF 4; RX 1, RX 5.

These uncontroverted facts render the Board's finding that Mr. Klayman had failed to abide by Ms. Sataki's "wishes" to dismiss her cases blatantly incorrect and entirely unsupported by the record. Mr. Klayman simply did what any ethical lawyer would do in that situation, which is to ensure that his client did not lose her legal rights. Ms. Sataki could have still filed a civil rights complaint when the VOA Office of Civil Rights denied her administrative claims, finding in effect that she had not been truth to it. And, as set forth above, as conclusive evidence that Mr. Klayman did act pursuant to Ms. Sataki's wishes, Ms. Sataki herself filed a notice of appeal, purportedly *pro se*, later that year, which would not have been

possible without Mr. Klayman acting to protect her legal rights.  PFF 67 RSX 4,

Tr. 1031.

Indeed, if there was anyone who failed to abide by Ms. Sataki's wishes, it is

actually ODC, who, for its own motives,  literally hunted down Ms. Sataki years

after she had abandoned her complaint against Mr. Klayman, contrary to ODC's

own rules and policies that would render her complaint void, to get her to

participate. RX 27. As shown in PFF 169:

> Ms. Sataki had abandoned her complaint, but it was resurrected by ODC,
> despite two other bars having dismissed it many years earlier. In fact,
> internal correspondence of ODC reveals that it had to use private
> investigator Kevin O'Connell to try to hunt down Ms. Sataki. RX 27.
> The internal correspondence of ODC admits: I am trying to locate a
> complainant that has dropped off the map. Ms. Elham Sataki…. She
> filed a complaint vs. Larry Klayman in 2011. Her only correspondence
> with us was the ethical complaint that she filed. My letter to her dated
> 7/7/11 was not responded to, but was not returned by the USPS either. I
> recently tried to contact her by telephone, but her number is not in
> service. I'll appreciate your efforts to locate her and to provide some
> reliable contact information.

In sum, it was very difficult for Mr. Klayman to determine what

communications were coming from Ms. Sataki or those genuinely acting on her

behalf, as neither he nor Mr. Shamble could not get in contact with Ms. Sataki to

confirm her real wishes. Any attorney placed in this position is simply between "a

rock and a hard place," and Mr. Klayman simply thought it better to err on the side

of caution to ensure that Ms. Sataki's legal rights were ultimately protected, which

is any ethical lawyer's ultimate duty. In this situation, Mr. Klayman could also

have been later accused of malpractice and sued if he dismissed the actions based on a third party's communications. And, even seven (7) years later, when ODC resurrected Ms. Sataki's abandoned complaint, she still wanted to pursue her claims for alleged sexual harassment and workplace retaliation, claims which had been proven false by the Office of Civil Rights ("OCR"). PFF 155.

ODC has documents in is possession that show that when they contacted Ms. Sataki to revive her complaint against Mr. Klayman, she stated that she wanted to do so in order to have a reason to provide persons who asked why she was no longer working at VOA. Further,  she implored ODC to pursue her sexual harassment claims against VOA, which further shows that she had no desire to dismiss her claims. At the hearing, Ms. Sataki confirmed and thus conclusively admitted  this: "Q: That you wanted Bar Counsel to file a  sexual harassment case for you. You asked them that within the last year, against VOA. A: I asked if it's doable." Tr. 489. That this was tellingly omitted in the Hearing Committee recommendation that was "rubber stamped" by the Board is shocking!

### 3. Mr. Klayman Did Not Fail to Communicate with Ms. Sataki

The Board makes an incredibly unsupported finding, particularly by clear and convincing evidence, that Mr. Klayman had violated Rule 1.4(b), which mandates that an attorney "shall explain a matter to the extent reasonably

necessary to permit the client to make informed decisions regarding the representation."

What makes the Board's finding incredibly bizarre is that there is no allegation in its Report that Mr. Klayman failed to keep Ms. Sataki informed of how her cases were going. Importantly, this claim is not in the controlling Specification of Charges, and as set forth above, in any event, Mr. Klayman kept Ms. Sataki informed of her case every step of the way.

And again, there is also no mention of this supposed violation in the controlling Specification of Charges which also simply alleges that Mr. Klayman "failed to reasonably explain a matter to his client to permit her to make an informed decision regarding the representation." As set forth above, this itself is blatantly incorrect, but in any event, nothing in the Specification of Charges even mentions the novel "violation" that the Board created – speaking with a client outside of the scope of the professional representation as an attorney.

It is truly regrettable to say the least that Chairman Kaiser and the Board would strain to try to create an ethical violation here when one clearly does not exist. Indeed, what the record and evidence <u>does</u> show is that Ms. Sataki was "….kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011." PFF 60. The Board's finding here was in clear error, much

less even coming close to establishing the clear and convincing evidentiary factual and legal threshold for an ethics violation.

### 4.    Mr. Klayman Did Not Disclose Any Client Secrets

Hand in hand with the Board's incredibly strange and unsupported if not inexplicable finding without clear and convincing evidence that Mr. Klayman had failed to communicate with Ms. Sataki, is its finding that Ms. Sataki did not give informed consent for disclosure of certain "secrets" contained in articles that Mr. Klayman had written on Ms. Sataki's behalf. This is conclusively rebutted by Mr. Klayman's irrefutable and accurate Proposed Finding of Fact 24:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public – it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1.

How is it even remotely possible to come to the conclusion that Ms. Sataki did not consent to disclosure of these purported "secrets" when she herself was handing out the articles in question on Capitol Hill?! The only possible explanation, tongue in cheek, is that perhaps Ms. Sataki was blind or illiterate at the time and therefore unable to comprehend what she was handing out? There is nothing that supports

this in the record, much less rises to the high level of clear and convincing evidence.

Perhaps even more off base and frankly absurd is the fact that the Board expressly recognizes that Ms. Sataki was personally handing out these "secrets" on Capitol Hill, yet simply blithely and indifferently writes "[b]ecause we conclude that Respondent here violated Rule 1.4 and did not communicate appropriately with his client, we conclude that he did not and could not have obtained her informed consent to disclose her secrets." To put it mildly, this contrived "heads we win tails you lose" "Alice in Wonderland-like" construct, made without clear and convincing evidence, is nonsensical. Even, hypothetically, if Mr. Klayman had generally failed to communicate with Ms. Sataki (which is blatantly false and unsupported by the record), the Board has no rational basis to use this as a blanket and contrived  excuse to manufacture ethical violations. In other words, it must specifically analyze whether Mr. Klayman has communicated with Ms. Sataki <u>in this particular instance</u>. And, the Board would be hard pressed to make the finding that Mr. Klayman had failed to do so, when Ms. Sataki was personally handing out copies of her "secrets" to strangers on Capitol Hill. This egregious error by the Board was compounded by its turning a blind eye to and making a decision to not allow onto the record the newly discovered video documentary uncovered in 2019 of Ms. Sataki herself publicizing her own case and related and underlying so called

confidential "secrets." It is abundantly clear that if Ms. Sataki is personally making videos about her "secrets" and posting them online that they are not "secrets" at all!  Importantly, that the Board would not even grant Mr. Klayman's request to review the newly discovered video on a Persian television station which she made explaining in detail own plight in order to decide whether to supplement the record with extraordinary, compelling exculpatory newly discovered evidence puts the nail in the coffin of the phony claim that Respondent himself revealed confidences.

Lastly, it is important to point out that ODC alleged a violation of Rule 8.4 for conduct involving dishonesty and/or misrepresentation under this claim, but neither the Hearing Committee nor the Board found that Mr. Klayman had acted dishonestly.

### 5.   Mr. Klayman Did Not Fail to Withdraw From Representation

The finding by the Board that Mr. Klayman improperly failed to withdraw from representation  is, once again, completely unsupported by the record, much less clear and convincing evidence.  What the record does show, as set forth previously, is Mr. Klayman did not take steps to litigate the BBG case further after July 30, 2010 and only acted to preserve Ms. Sataki's appellate rights. PFF 68. And it was good that Mr. Klayman did so, because Ms. Sataki filed a notice of appeal *pro se* later on down the road. PFF 67. The Board simply states that Mr. Klayman "continued to file motions" without actually taking the time to look at the

substance of what was filed. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior reasons --  then asked ODC to prosecute her sexual harassment claims! Tr. 489. Again, case closed!

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. PFF 71. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, PFF 70, Tr. 1041, RX 21, before terminating all of Ms. Sataki's rights on appeal.

Thus, the record does show that Mr. Klayman did not substantively litigate any of Ms. Sataki's cases after he was terminated, and acted only to preserve her rights on appeal. This is competent, zealous representation, not ethical misconduct.

### 6.    Ms. Sataki's Lack of Credibility Must Be Addressed

Glaringly absent from the Board's Report is any discussion of Ms. Sataki's - ODC's one material witness's - credibility, or obvious lack thereof, as she was definitively  impeached numerous times at the hearing and on other occasions, not the least of which is her blatantly false testimony that she did not want publicity for her case, which is conclusively rebutted in the previous sections.

Mr. Klayman did not want to appear to be attacking Ms. Sataki personally, and even addressed this with the Hearing Committee at the hearing, who assured Mr. Klayman that he was entitled to vigorously defend himself:

Mr. Klayman: So, you know, that's where I stand. I appreciate you're going to allow me to give an aggressive defense, but I don't want to look like the bad guy. I never have. And that's the quandary I'm in as being Respondent, and my lawyer, and the witness, and I want to keep a good demeanor, but -- and stay calm, but, you know, I'm outraged by some of the things I heard and what has been done by Bar Counsel…..

Mr. Tigar: Well, I assume, Mr. Klayman, up here, the reason they have lawyers decide these cases, as well as the hearing officers is, this is not our first rodeo, and we have all been in cases in which public opinion has been against us and in which we have faced this terrible problem of cross-examining people who come on as sympathetic, such as in the capital case, victim impact witnesses. So, we understand the situation and I adopt the Chair's position. Nobody up here is opposed to the idea of a vigorous, effective cross-examination in your exercising your rights, and I think everybody up here can be trusted to  disregard whatever public attitudes may be circulating around out there, that may have led to some perceptions.  Tr. 231-233.

It appears, however, that he was sandbagged by Mr. Tigar and his  very deferential

colleague, Hearing Committee Chairman Anthony Fitch. However, now more than

ever, given the extremely high stakes, Mr. Klayman must also bring to the Court's

attention Ms. Sataki's lack of credibility.

The record shows a history of making false allegations, as set forth in PFF

147-150:

Ms. Sataki filed a complaint in Los Angeles Superior Court against the manager of the apartment, Dean Proper, and accused him of sexual harassment of her friend Jessica who was staying in the apartment in the second bedroom, as well as stealing Ms. Sataki's diamond ring. Tr. 506-512. RX 12. The Court ruled against her. Tr. 519.

Ms. Sataki falsely tries to justify the court's judgment against her by untruthfully claiming that the complaint was only meant to escape the payment of rent for the apartment. Tr. 520.

48

> In fact, the truth is that the court documents show "Judgment was entered, as stated below, on Day: 8/23/2011. Defendant does not owe plaintiff any money on plaintiffs' claim. And below it says contested. Tr. 521. RX 12.

Indeed, her claims of sexual harassment and workplace retaliation were also found by the OCR to be outright false. *See* PFF 155 ("The final determination finds that Ms. Sataki's factual claims of sexual harassment and workplace retaliation were not meritorious and thus false, as OCR had interviewed a number of witnesses. Tr. 635-640. RX 18.").

Ms. Sataki's claim that Mr. Klayman had "followed" her into the women's bathroom at the Luxe Hotel was also false. The record shows the following testimony:

> Q. The sentence here, "By the way, the Luxe Hotel, Hotel Luxe, renamed the women's restroom in my honor. It's now called the Klayman Room. I could now use it for client meetings." Is that a joke?
>
> A. That was a joke, yes.
>
> Q. Is that a joke because you had chased Ms. Sataki into the women's room?
>
> A. No, it's because she had ran into the women's room. I never went into the women's room. I was trying to see that she was alright. And you know, she was very emotional. She's been emotional before, and she's been emotional here, and she was emotional with others. And I was concerned about her. But I didn't go into the women's room. That was just a joke. Tr. 1467-1468.

Unsurprisingly, the Hearing Committee and Board failed to mention much less lend credence to Mr. Klayman's testimony and simply again adopted Ms. Sataki's

false statements. This is an egregious error that shows, once again, at a minimum, the record was not reviewed. Perhaps even more egregious is the possibility that the record here was reviewed but simply ignored in order to strain to find ethical violations, when no clear and convincing evidence was apparent and thus forthcoming.

Ultimately, it would appear that Ms. Sataki had become influenced by her felon cousin, Sam Razavi, who was convicted or gambling fraud in Las Vegas, Nevada, BCSX 36, 37; Tr. 737-39. PFF 162, and was pressured into making a non-meritorious complaint against Ms. Klayman. As set forth in Respondent's PFF 136:

> The idea of the supplemental complaint, BCX 23, came from Ms. Staunton and her cousin Sam Razavi ("Mr. Razavi"). Tr. 468-469. Neither of them are lawyers. Ms. Sataki admits that Ms. Staunton and Mr. Razavi prepared the supplemental complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544.

> Mr. Razavi was the person who threatened Mr. Klayman and it was discovered that he had pled guilty to and was convicted by the 2nd District Court of the State of Nevada, Washoe County, for conspiracy to commit fraudulent acts involving gaming. BCSX 36, 37; Tr. 737-39. PFF 162.

Further instances of Ms. Sataki making false statements on the record include, but are not limited to:

> (1)    Lying about the involvement of Kathleen Staunton in the preparation of the bar    complaint against Mr. Klayman. At the hearing, she claimed under oath that Ms. Staunton helped her prepare the complaint, along with Mr. Razavi. Tr. 469. Tr. 301, 307, 317, 468-72,

474-75, 544. However, after the hearing, Mr. Klayman contacted Congressman Dana Rohrabacher's office, where Ms. Staunton worked, and was told by the congressman's chief of staff, Rick Dykema that Ms. Staunton had no involvement in the preparation of the bar complaint, and did not have any knowledge of it. App. 0125 - 0126.

(2)     Lying about having her life ruined by Mr. Klayman, and everything being "on hold" due to Mr. Klayman, when in fact, she has been gainfully employed as a Persian broadcaster in Los Angeles making $62,000 per year at Andisheh Television. Tr.565-589.

(3)     Dishonesty and infidelity with and toward one of Ms. Sataki's four ex-husbands, who had filed a sworn affidavit in his divorce case for having caught her having sex with another man in their apartment just weeks after they were married. Tr. 377-382, PFF 123.

(4)     Ms. Sataki also filed a complaint in Los Angeles Superior Court against the wife of Zia Atabay, Attaby's wife having accused Ms. Sataki of having an affair with her husband who is the head of a prominent Persian television network where Ms. Sataki then worked. As a result, Mrs. Atabay was alleged to have keyed Ms. Sataki's car. However, Ms. Sataki also falsely testified that the court ruling proved she was not having an affair with Zia Atabay, the owner of NITV. Tr. 525-526. The Chair, Mr. Fitch, acknowledged that Mr. Klayman's elicited testimony goes to Ms. Sataki's overall credibility. Tr. 527-528. PFF 150. Mr. Keya Dash testified under oath that there was such an affair and it was widely known in the close knit Iranian community. PFF 96-97. Tr.1342.

These examples all go strongly toward a finding that Ms. Sataki lacked credibility, was prone to filing retaliatory and meritless complaints – including the bar complaint against Mr. Klayman -- and was receiving bad advice from her felon cousin, who had even threatened Mr. Klayman. PFF 162, Tr. 737-39. These should have been considered by the Board in its Report, and its failure to do so was an egregious error.

Lastly, Mr. Klayman reiterates that he was always hesitant, as an accused white male, about aggressively questioning Ms. Sataki, but was reassured by Mr. Tigar and Mr. Fitch that it would not be held against him. However, as shown in the Hearing Committee's Report, Mr. Klayman was sandbagged by Messrs. Tigar and Fitch over his strong cross examination of Ms. Sataki which destroyed her credibility.

> **7.    The Hearing Committee and Board Exhibited Extreme Bias and Prejudice Towards Mr. Klayman, Which Must Be Remedied**

Incredibly, one of the members of the Hearing Committee was Michael Tigar, an avowed and proud communist, and someone who is the ideological foe of Mr. Klayman, a staunch conservative and supporter of former President Trump. App. 0078 - 0104. To make matters worse, the Chair Anthony Fitch, while leftist but  perhaps  not a communist, appeared to be highly collegial with if not in awe of Mr. Tiger and acted in a manner that was overly deferential to him throughout the disciplinary process, looking to him repeatedly for "guidance."  To be perfectly clear, Mr. Klayman's Proposed Findings of Fact and Counter Findings of Fact, App. 0045 - 0077, underscore the fact that the Board and the Hearing Committee never thoroughly reviewed the record, although Mr. Klayman literally begged them to do so.

As set forth in detail below, the Board's Report contained numerous egregious errors that evidence a lack of attention and review of the record. To try to set the record straight and prevent a manifest injustice, Mr. Klayman was forced to file a Notice and Motion to Review Record Material Which Will Aid Disposition, which was summarily denied – and a Motion for Reconsideration of the Order of the Chair of the Board on Professional Responsibility and Motion to Stay (the "Motion for Reconsideration") with the Board, which included a rational and legitimate request that the Board thoroughly conduct a bona fide review of the entire record, which they tellingly refused to do. The Chairman Kaiser was notably disingenuous in denying the motions with no real analysis,  finding only "after the fact" that Mr. Klayman's motion was "moot" because he had filed his Notice of Exceptions. Mr. Klayman had previously filed his Motion for Reconsideration under an emergency basis and has asked the Board to stay proceedings until the Motion for Reconsideration had been decided, but then Chairman Kaiser and the Board did not act—and when it did passed the ball to this honorable Court, shirking and ignoring its duties and responsibilities to correct a multitude of material errors by undertaking  a bona fide review process. Notably, Chairman Kaiser waited until after the deadline for Mr. Klayman to file his Notice of Exceptions to deny Respondent's legitimate request, rather than issuing a stay as would have been just.

Given this refusal and failure to address the obvious clear errors, much less lack of clear and convincing evidence, in the Board Report, Mr. Klayman is forced to wonder if Chairman Kaiser and his Board, in addition to the Hearing Committee, was biased against him due to their conflicting political beliefs and advocacy.[3] Regrettably, this type of prejudice is not unusual and is frequently reality in today's world of Washington, D.C., where extreme political polarization has reached a critical mass. Mr. Klayman is a prominent conservative activist, a pro-Trump supporter and public interest attorney, whereas, for instance, a prominent member of the Hearing Committee Michael Tigar, and the Chair Anthony Fitch to a slightly lesser extent,  are the polar opposites who obviously detest all that Mr. Klayman stands for and advocates in his public interest and private legal capacity as founder of both Judicial Watch, Inc. and Freedom Watch, Inc.

---

[3] There is also a very apparent sentiment and approach of the D.C. Bar disciplinary apparatus that the mere act of a Respondent defending himself and not throwing him or herself on the "mercy of the Court"  subjects the attorney to a greater likelihood of being found "guilty" with  heightened sanctions.  This flies in the face of the basic tenets of the American judicial system, and the Board's own rules which state that it is ODC's duty to prove a violation by clear and convincing evidence. The mere filing of a specification of charges by ODC is not in any way evidence of ethical misconduct and a respondent who believes he did not act unethically should not be punished for defending himself to the fullest extent of the law.  In short, if a respondent feels and can support with facts and the law, as is true here, that he has done nothing unethical, he should not feel compelled to admit guilt and in effect throw himself on the mercy of the Court.

As for Mr. Tigar -- who a review of various transcripts during this proceeding will show that he was held in awe and accorded  great deference by Hearing Committee Chair Anthony Fitch --  he remains a proud communist to this day, as he recently penned renewed allegiance to Karl Marx in his latest book "Mythologies of State and Monopoly Power, which is endorsed by none other fellow renowned communist Angela Davis and convicted domestic terrorist Bernadine Dorhn, to name just a few radical leftists. App. 0078 - 0104. As a young lawyer, it is not in dispute that he was fired by former Justice William Brennan as his clerk over this, as reported in the landmark book by famed Washington Post investigative reporter and editor Bob Woodward. App. 0078 - 0104.

As for Chairman Kaiser, he is also an ideological foe[4] of Mr. Klayman, himself having written and had published articles in defense of Hillary Clinton's "honesty," but to the contrary vilified President Donald Trump,[5] who Mr. Klayman has strongly supported. App. 0105 - 0118. Mr. Klayman's associate also uncovered numerous political contributions on the Federal Election Commission website by

---

[4] The Hearing Committee exhibited great vitriol towards Mr. Klayman based simply on the fact that he had sued the Clintons in the past, but then disingenuously reduced the 36 recommended suspension based on Mr. Klayman's public interest advocacy, which shows their incredible bias and attempt to make themselves look "fair" when they were not. One at best can call this shameless "chutzpah" of the highest magnitude.

[5] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

Chairman Kaiser to Hillary Clinton and Barack Obama – who Mr. Klayman had sued in his public interest capacity at Judicial Watch and now Freedom Watch -- and most recently presidential candidate Joe Biden who Chairman Kaiser also contributed to, and a host of other leftist politicians.

While political contributions do not in and of themselves demonstrate bias, they can be cumulative circumstantial evidence of it, along with other indicia. It is clear that political beliefs should never influence  Hearing Committee and Board in matters of attorney discipline, but here it appears that they likely did --  given that a deluge irrefutable facts on the record   favor  the "acquittal" of Mr. Klayman, but were simply ignored and not even mentioned in the Hearing Committee recommendation and   Board Report. Interestingly, the highly leftist publication that Chairman Kaiser writes for, in which he vilified President Trump but ran interference for Hillary Clinton, "Above the Law,' recently wrote and published another article about Mr. Klayman, referring to him as a "nutbag" and suggested that he be disbarred.[6] The article asks and strongly suggest incredibly, "can we quarantine [Mr. Klayman's] law license?", suggesting that Mr. Klayman be

---

[6] Elizabeth Dye, *Nutbag Lawyer Larry Klayman Files $20 Trillion Suit Against China For Coronavirus 'Bioweapon'*, Above the Law, Mar. 19, 2020, available at: https://abovethelaw.com/2020/03/nutbag-lawyer-larry-klayman-files-20-trillion-suit-against-china-for-coronavirus-bioweapon/

removed from the practice of law, as has been the mission of ODC and apparently Mr. Tigar and the Hearing Committee.

In short, to ignore these indicia of bias and prejudice is simply not reality in today's world.

## II.    The Board's Report Evidences the Fact that it Did Not Take the Time to Review the Record

Upon reading the Board's Report, it was immediately evident to Mr. Klayman that the Board had failed to review and digest the record before issuing its Report, and accordingly Mr. Klayman respectfully requests that this Court now do so. In response, Kaiser disingenuously wrote:

> In any case before the Board, it is duty bound to 'review the findings and recommendations of Hearing Committees submitted to the Board, and to prepare and forward its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the Court.' D.C. Bar. R. XI, section 4(e)(7). As Respondent's Motion plainly seeks to petition to the Board to do that which it is mandated to do – and has done in the Board's Report – it is denied as moot. App. 0123 - 0124.

This statement by Kaiser evades a direct response to Mr. Klayman's legitimate request in two respects. First, he simply states that the Board did what "it is mandated to do," and then second says that this is reflected in the Board's Report. However, the problem with this non-response is that it the Board Report itself ignores Respondent's post hearing briefs and proposed findings which cite the actual record, and thus crucial and material uncontroverted facts, and reflects

that it simply adopted wholesale what was contained in the politically tainted and biased Committee recommendation. In short, the Board Report shows no evidence that the Board did as "it is mandated to do."

Conspicuously, the Board Report does not refer to a single witness's hearing testimony and related exhibits, seven (7) of whom testified for Mr. Klayman, refuting Ms. Sataki's allegations. Nor does it reflect her many admissions and impeached testimony.

To be absolutely clear, the hearing testimony of Ms. Sataki herself, if it had been reviewed, shows that she made many admissions in Mr. Klayman's favor and was impeached on numerous occasions on the truthfulness of her testimony, as set forth above. This too is detailed with great specificity in Respondent's proposed findings, all backed up with record cites to hearing testimony and supporting exhibits. App. 0045 – 0066.  To be frank, it is as if the Board's Report was written with a "do no evil, hear no evil and see no evil" predetermined mindset.

For example, at page 2 of the Board's Report which it appears was penned in whole or in large part by Chairman Kaiser since it dovetails and comports with his denial of Respondent's motions - which he gave short shrift and punted to this Court - he states:

> The Hearing Committee issued a lengthy, detailed and thoughtful
> report that determined that Respondent had violated a number of
> Rules of Professional Conduct by failing to effectively communicate
> with his client and to follow her instructions about the objectives of

the representation, representing her under a conflict of interest, and breaching his duties of confidentiality to her, among other Rule violations. But consent requires effective communication; here because Respondent was unable to effectively communicate with his client, he was unable to effectively obtain her consent.

For that reason, and as set out below, we agree that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6 (a)(3), 1.7(b)(4), and 1.16 (a)(3). We recommend a sanction of an 18-month suspension with a requirement that he demonstrate a fitness to practice law before he is reinstated.

In adopting the virtually the entire Committee recommendation, with effusive and gushing  praise for their "thoughtfulness," save for a brief mention of Professor Ronald Rotunda, a respected and renowned legal ethics expert, who had found that Mr. Klayman had not violated any of the above listed ethical rules but could not testify at the hearing since he had died during the unconscionable eight (8) year interim period after Ms. Sataki had filed her bar complaint, the Board's Report makes no mention of any of Mr. Klayman's material witnesses. App 0001 - 0034. These witnesses who refute Ms. Sataki's testimony and show her to be untruthful as a result of likely being coached by a hostile ODC whose admitted mission is to remove Mr. Klayman, no holds barred,  from the practice of law, include Timothy Shamble, Keya Dash, Gloria Allred, the Honorable Stanley Sporkin (who also gave Mr. Klayman a strong character reference, Ashley Klayman and importantly, Mr. Klayman himself.

The testimony and documentary exhibits that relate to Timothy Shamble, Ms. Sataki's union president, who was intimately involved as in effect Mr. Klayman's partner in representing her, are particularly material and probative of the fact that there was full disclosure and informed consent for Mr. Klayman's and Mr. Shamble's recommended course of action in first attempting to settle Ms. Sataki's sexual harassment and workplace retaliation claims with Voice of America ("VOA") and then Mr. Klayman undertaking litigation on her behalf. PFF #20, Tr. 890. Mr. Shamble's testimony and related documentary evidence is set forth in detail in Respondent's proposed findings as identified above, yet no mention at all is made of him in the Board's Report, underscoring that the Board took the Committee's recommendation, which hinged solely on Ms. Sataki's contrived, false and vindictive testimony, hook, line and sinker, without doing a thorough and complete review of the record.  It is this incorrectly claimed lack of communication and consent by Ms. Sataki, which Mr. Shamble and other witness testimony and related exhibits convincingly refute, upon which the Board's Report primarily hinges, itself misleadingly results in the Board "finding" a cavalcade of alleged rule violations by Mr. Klayman.

Mr. Shamble, as his testimony and documentary exhibits also establish and prove, was privy to the inability of even he, Ms. Sataki's union representative as head of the union at VOA, being able to communicate with Ms. Sataki over her

erratic and incomprehensible communications, made by persons who appeared not to be her,  to no longer purse her claims versus VOA. PFF #4, RX 1, RX 5. Like Mr. Klayman Mr. Shamble sought to keep Ms. Sataki's claims alive until he and Mr. Klayman could personally communicate with her and confirm what she desired to do.

In addition, as just one other example of the obvious fact that a thorough and complete review of the record was not conducted, was the testimony of Gloria Allred, the premier litigator of sexual harassment claims by abused women. The testimony of Ms. Allred, supporting Mr. Klayman's testimony, showed that when Mr. Klayman saw that there was a potential conflict of interest over his feelings for Ms. Sataki and her manipulative "diva request" that he buy her a car, as she was attempting to take advantage of these feelings, that he sought to refer her to Ms. Allred. But Ms. Sataki herself wanted Mr. Klayman to remain as her counsel. PFF# 172 – 177.

When ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, she struck back at Mr. Klayman, sending  him the below email, which was entered into evidence but never even mentioned in the Board's Report. This email underscores the verbal and other abuse Mr. Klayman had experienced with Ms. Sataki throughout and explains the basis for many of his communications with her, since as a human being  with feelings for her, he felt hurt. Ms. Sataki wrote:

I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it." Ms. Sataki also wrote: "And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing....

 Mr. Klayman are you happy now that you've completely destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163, BCSX 38.

If the Board had conducted a thorough and  complete review of the record, with the aid of Respondent's proposed findings of fact and post-hearing brief – which in great detail provided records cites for verification --  they would have seen that the alleged communication problems were not his primary doing. But in any event, when he saw that continued representation had become virtually impossible, he referred Ms. Sataki to Ms. Allred and another lawyer who handles VOA cases, Mr. Tim Shea. PFF # 36.

Despite this, it is Mr. Klayman who is vilified by both the Committee and now the Board's Report, with a career ending recommended sanction, since Mr. Klayman is now almost 70 years old, as the Board has recommended a reinstatement requirement which is tantamount to disbarment given the time it takes to litigate this.

Under these extraordinary circumstances, Chairman Kaiser and his Board were required, as is inherent and part and parcel to their own "professional responsibility," to undertake a thorough and complete review of the record, particularly given the inherent bias and prejudice of the Hearing Committee.

## **CONCLUSION**

As shown conclusively above, the bias and prejudice against Mr. Klayman, the due process, equal protection and Sixth Amendment violations, and the simple lack of clear and convincing evidence of any misconduct can support only one course of action by this Court – dismissal of this complaint in its entirety against Mr. Klayman. However, in the alternative, at a minimum, this matter must be remanded to a hearing before another Ad Hoc Hearing Committee not led by Messrs. Fitch and Tigar, Esq., so that Mr. Klayman will have a chance at a fair and unbiased proceeding. Furthermore, the Court must order an internal review to determine why and how a communist and another deferential ultra-leftist came to sit on the Hearing Committee charged with judging Mr. Klayman, a conservative public interest and pro-Trump advocate, as well as why the Board did not take any time to digest and review the record before issuing its Report, which it is mandated to do as part of its duties and professional responsibility. The Board cannot simply be allowed to ignore the record in order to create whatever finding and sanction which, for whatever reason, it desires.

Mr. Klayman had been a member continuously in good standing for several decades, and the hard work which gave rise to his undergraduate and juris doctor degrees and later law license, as well as subsequently  his distinguished and successful legal career for now almost forty-four (44) years as a public interest advocate and private practitioner,  should not and cannot be cavalierly taken away for political reasons, with regard to a bogus bar complaint and proceeding that are now about eleven (11) years old, and counting, App. 0677 (Klayman Biography). This is most particularly so when identical complaints had already been dismissed by two respected state bars, Florida and Pennsylvania, about nine (9) years ago.


Dated:  February 8, 2021                    Respectfully submitted,

                                            /s/ Melissa Isaak_____
                                            Melissa Isaak, Esq.
                                            2815-B Zelda Road
                                            Montgomery, AL 36106
                                            Tel: 334-262-8200
                                            Melissa@protectingmen.com

                                            Counsel for Respondent

                                            /s/ Larry Klayman_____
                                            Larry Klayman
                                            7050 W. Palmetto Park Road
                                            Boca Raton, FL, 33433
                                            Tel: 561-558-5336
                                            leklayman@gmail.com

                                            Co-Counsel Pro Se

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

**LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

**No. 20-BG-583
Board Docket No: 17-BD-063
BDN: 2011-D028**

---

## RESPONDENT LARRY KLAYMAN'S PETITION FOR REHEARING EN BANC

_____

Dated:  September 29, 2022

Respectfully submitted,

/s/ Melissa Isaak
Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
Tel: 334-262-8200
Melissa@protectingmen.com

Counsel for Respondent

/s/ Larry Klayman
Larry Klayman. Esq.
7050 W. Palmetto Park Road
Boca Raton, FL, 33433
Tel: 561-558-5336
leklayman@gmail.com

Co-Counsel Pro Se

## **INTRODUCTION**

On September 15, 2022, the three-judge panel (hereafter "the Panel") who presided over this case since October 2020, nearly 24 months ago, issued an order (the "Order"), devoid of even one actual record cite, suspending Respondent Larry Klayman ("Mr. Klayman") for another 18 months with a reinstatement requirement despite the fact that Mr. Klayman had already been temporarily suspended, without due process as set forth in prior pleadings, for 20 months. Altogether, this would make a grand total of 38 months, plus a reinstatement requirement that could take years to adjudicate, given the bias and past practices of the Office of Disciplinary Counsel ("ODC"), the Board on Professional Responsibility ("Board"). This unconscionable conduct creates more than a strong inference that the Panel acted to effectively end Mr. Klayman's legal career in the District of Columbia, a clear violation of the Panel's judicial oath of office. 28 U.S.C. § 453.

Perhaps most egregious is the fact that the Panel essentially adopted wholesale and rubber stamped the Report and Recommendation ("Report") of the Board, writing that "[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction," "[w]e 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo...We need

not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman. Order at 2, 13, 18, 20. If the Panel was going to ignore Mr. Klayman's facts, witnesses, and arguments, then why did it take nearly 20 months to issue a decision? If its intention was to rubber stamp the Report, it could have done so immediately. The only explanation is that the Panel was acting punitively and wanted to extend Mr. Klayman's "temporary suspension" period. Even more, the Order is also factually and legally deficient, and does not contain **one record cite** to even attempt to justify its findings. This shows that there was no bona fide review of the record, which is the same as when Mr. Klayman opposed temporary suspension and moved for rehearing. The Order is wholly conclusory, which is the by-product of the Panel deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony.

Evidencing its pre-determined mindset, the Panel writes at page 2 of the Order that "the evidence largely consisted of E.S.'s testimony but also included numerous documents, including written communications between E.S. and Mr. Klayman." Completely omitted is the fact that Mr. Klayman presented 7 distinguished and well-respected independent material witnesses, including himself, at the initial hearing, albeit before a biased and skewed Ad Hoc Hearing Committee (hereafter "AHHC"), in contrast to only Ms. Elham Sataki's

consistently false and impeached testimony. One witness in particular, Tim Shamble ("Mr. Shamble"), the president and representative of complainant Ms. Elham Sataki's ("Ms. Sataki") union at Voice of America, gave unimpeached and weighty testimony that Mr. Sataki had at every step of the legal representation been fully informed, had approved the use of publicity to try to coax a settlement with VOA, and then when that failed, approved of all of the litigation and publicity that had ensued. PFF 11, 53, 128. He also testified that he had never seen someone work as diligently for any client as Mr. Klayman, and he had recommended him to other VOA employees who needed legal representation concerning what has been ranked the worst agency in the federal government. PFF 6.

Even more, the Panel imposed a reinstatement requirement even though in a recent earlier case this court had found, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically…. Accordingly, we decline to impose a fitness requirement.**" *In re Klayman,* 228 A.3d 713, 719 (D.C. 2020). Given that this case was over 12 years old at the time of the final suspension order, the Panel's finding that somehow Mr. Klayman should be subject to reinstatement now, after an earlier recent finding that he was fit to practice law – and never a finding of any dishonesty - makes no sense substantively, other than pure retaliation and an intention to effectively remove him from the practice of law in D.C. Finally, the icing of the cake of the bias that

emanates from this case is that Ms. Sataki's identity is protected with reference to her as only E.S., while Mr. Klayman's name and reputation are dragged through the proverbial mud, underscoring gender and ideological bias as discussed below.

In light of how this Court has recently dealt with far more serious alleged violations of the District of Columbia Rules of Professional Conduct, and in particular the Kevin Clinesmith ("Clinesmith") matter – a Trump hater and Justice Department lawyer who pled guilty to a felony of falsifying an FBI affidavit which gave rise to the Russian collusion investigation of Trump but who "got off" with a slap on the wrist with no reinstatement requirement - it is clear that the Panel has condoned and engaged in selective prosecution of someone who has been a public advocate for conservative causes. *In re Clinesmith*, 258 A.3d 161 (D.C. 2021). In sum, the Order must be subject to a bona fide *en banc* review, not only for the benefit of Mr. Klayman, but to uphold the integrity of this Court, which has been called into serious question by the conduct of the Panel, as set forth above.

## <u>LEGAL ARGUMENT</u>

## A.    THE PANEL'S FACTUAL BACKGROUND IS UNSUPPORTED

There are at least two prominent factual and egregious errors in the recitation of facts by the panel. *First* involves that finding that Ms. Sataki "… explained her concerns about publicity to Mr. Klayman, he initially respected her wishes." Order at 3. This is completely untrue, as the record shows that Mr.

4

Klayman and Mr. Shamble, on Ms. Sataki's behalf, tried long and hard to settle Ms. Sataki's case with VOA management and only when the case did not quickly settle, did Ms. Sataki, along with Mr. Shamble and Mr. Klayman <u>all agreed</u> that adverse publicity for VOA could coax a settlement. PFF 170, Tr. 775, PFF 91, PFF 24 Thus, at all material times, Ms. Sataki agreed to the use of publicity and even herself distributed materials in this regard. PFF 24.  As the final "nail in the coffin," Ms. Sataki even went on Iranian television in Los Angeles, revealing intimate facts about herself and her legal efforts with VOA and in the courts. App. 0119 – 0122. Unsurprisingly, Ms. Sataki did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. That the Panel refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues. *See* Board Order of Oct. 2, 2020.

*Second,* with regard to allegations of Mr. Klayman wanting a romantic relationship - which demonstrably is not in the record and in fact he told her the contrary, PFF 79 - when it appeared to him that the attorney client relationship was suffering, he referred Ms. Sataki to famed woman's rights lawyer and friend Gloria Allred as well as a VOA experienced lawyer Tim Shea. PFF 78. But Ms. Sataki did not want other counsel and asked Mr. Klayman to remain her counsel. PFF 78.

This omission that Mr. Klayman told Ms. Sataki get other representation shows that the record was ignored by the Panel. PFF 36.

These falsities are exacerbated by the Panel's baseless assertion the Mr. Klayman "encouraged" Ms. Sataki to move to Los Angeles. The record – including Ms. Sataki's own testimony – shows Ms. Sataki demanded that Mr. Klayman get her to Los Angeles, under the threat of committing suicide. PFF 109. Tr. 981-92.

What also was ignored was Ms. Sataki's abusive behavior toward Mr. Klayman, even disparaging his religious beliefs as a messianic Jew, and accusing him of taking bribes to throw her case. PFF 163, BCSX 38.  It was behavior such as this which caused Mr. Klayman sadness as he did care for Ms. Sataki and why he referred her to other legal counsel. In addition to this, Ms. Sataki, attempting to take advantage of Mr. Klayman, asked him to buy her a new Mercedes. PFF 62.

Finally, the panel dismisses the testimony of the Honorable Stanley Sporkin, who while being in bad health, took it upon himself to travel and testify on Mr. Klayman's behalf. He testified under oath that Mr. Klayman had appeared in cases before him, and he came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF 188. And, as importantly, Judge Sporkin testified that had discussed Mr. Klayman's case strategy with Mr. Klayman and agreed with it. PFF 191. While the Panel was forced to concede this, they gave it zero weight, showing their outcome determinative  mindset.

## B.    THE PANEL'S PROCEDURAL BACKGROUND AND SECTION ON DELAY IS UNSUPPORTED BY THE RECORD

While having to admit that the ODC sat on a Complaint for 7 years, it still throws the book at Mr. Klayman despite the fact that under the policy of ODC, Ms. Sataki's complaint had long since been abandoned. PFF 169. Indeed, during the interim 7 years, both Florida and Pennsylvania had dismissed Ms. Sataki's identical complaint, PFF 43, and thus Mr. Klayman believed that the matter was no longer pending before ODC. As a result, he discarded records of the dismissals. It is well established that case records need only be kept for five years.[1] Importantly both Florida and Pennsylvania purge their filed after 5 years, and thus Mr. Klayman submitted proof of no disciplinary record as a result of Ms. Sataki's complaint, supporting the fact that the complaint was dismissed by these state bars. And, in this regard, laches is disregarded by the Panel, but it must be addressed since every other reputable bar association enforces this fundamental principle. It is unconscionable that a Complaint can sit for literally 7 years and be resurrected at ODC's pleasure to attempt to remove Mr. Klayman from the practice of law when it decides that his conservative public interest advocacy is not to its liking.

## C.    THE DELAY DID CAUSE SEVERE PREJUDICE

Summarily dismissing the prejudice caused by 12-year delay in this case, however wrongly, the Panel cavalierly wrote "[w]e agree that the delay in this case

---

[1] https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11

was very unfortunate." To brush off this delay again speaks volumes about the Panel's outcome determinative mindset and failure to adhere to its oath of office.

*First*, over the 7-year delay, thinking that the matter was over particularly given dismissals by state bars in Florida and Pennsylvania, Mr. Klayman discarded case records, including letters dismissing identical Sataki complaints.

*Second*, during the protracted saga, Professor Ronald Rotunda, the most renowned professional ethics expert, sadly passed away and only an initial letter he wrote to ODC arguing against an investigation, came into the record. RX 5. This letter was not, contrary to the false characterization of the panel, a formal expert opinion. Professor Rotunda's non-presence at the hearing before the AHHC prevented him from rebutting the testimony of ODC's "expert," Joel Bennett, among other relevant issues. Dr. Aviera, had she been able to testify and produce records, would have shown that Mr. Klayman, who himself paid for Ms. Sataki's consultations, was well intentioned and diligent in his legal representation, among other key issues.   But when Mr. Klayman had moved to depose Dr. Aviera early on in the case after it was instituted, the AHHC denied this reasonable request, along with a motion to depose Ms. Sataki. *See* <u>Motion to Notice and Have Issued</u> <u>Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene</u> <u>Aviera</u> [Dkt. 33]. The AHHC, then stated that Mr. Klayman could renew his motion at the hearing, and despite ODC showing up at the twelfth hour on the day

of the hearing with "new" documents from Ms. Sataki and Dr. Aviera, PFF 84, Mr. Klayman's renewed motion was quickly denied by a hostile AHHC. Tr. 18.

## D.      THERE WERE NO SERIOUS ETHICAL VIOLATIONS

The expressed modus operandi inherent in these proceedings is that a Respondent must confess to ethics violations to get a lesser sentence.  But when Mr. Klayman is only guilty of deeply caring about and loving his client and does everything in his power to try to help her and seeks along with her union representative, as a team, to protect and preserve her legal rights when she goes "AWOL," no good deed goes unturned. As for the Panel's "rubber stamped," unsupported, conclusory findings—with incredibly no record cites— Mr. Klayman attaches his proposed findings of fact and conclusions of law. Exhibit 1.

> **1.      Ms. Sataki Has No Credibility Based on Her Own Admissions and Impeached Testimony, and  OCR Investigative Findings that She Lied About Alleged Sexual Harassment and Workplace Retaliation.**

The Panel egregiously erred by not giving any weight to the countless times that Ms. Sataki lied and  was thoroughly impeached, including but not limited to (1) her claims of sexual harassment and workplace retaliation being found by the Office of Civil Rights ("OCR") to be outright false—thereby evidencing that she fraudulently induced Mr. Klayman into representing her, PFF 155; (2) lying about wanting Mr. Klayman to drop her cases, and then filing a notice of appeal and asking ODC to prosecute her claims, PFF 67, 155; (3) being forced to admit that

9

she approved of publicizing her case, and personally participating in doing so, and fraudulently concealing the fact that she went on Iranian television and gave an intimate interview about her and her case! PFF 170, Tr. 775, PFF 91, PFF 24, App. 0119 – 0122. These are just a few of the countless examples in the record.

### 2. Alleged Specific Rules Violations Are Manufactured Without Factual or Legal Bases

### i. Alleged Conflict of Interest

The panel writes, in an overt effort to smear Mr. Klayman, injecting the non-existent premise of sexual harassment which was never even alleged or testified to by Ms. Sataki, that "[w]hether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she did not share his feelings. Order at 20. The last part of this statement is totally false and made up, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." The record clearly reflects that when Ms. Sataki, who had become more than self-centered and abusive, while at the same time asking Mr. Klayman to buy her a car, PFF 62, that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why he took Ms. Sataki to lawyers Gloria Allred and Tim Shea. PFF 78. In any event, "emotional interest," and caring for a client is irrefutably **not** an

ethics violation under the District of Columbia Rules of Professional Conduct. Otherwise, a lawyer could not represent his spouse in a legal proceeding. This alleged violation is no more than biased, contrived, and completely manufactured rubbish, to be most diplomatic! Thus, there was no violation of Rule 1.7!

### ii.      Mr. Klayman Did Not Fail to Abide Ms. Sataki's Wishes

As the record confirms, Ms. Sataki's so-called wishes were adhered to at every step of the representation, including publicity. Things were handled quietly initially was because it was agreed that attempted settlement was the best course of action. Only when that failed was the use publicity discussed, and irrefutably agreed to by Ms. Sataki. PFF 170, Tr. 775, PFF 91, PFF 24. So too was the decision to file suit against VOA's Board of Governors, which included a friend of Mr. Klayman, Blanquita Collum, as well as Hillary Clinton. PFF 95. The AHHC made much of the fact that she was sued along with the rest of the Board under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), thus underscoring their leftist anti-conservative bias. And, as set forth above, there is no clear and convincing evidence in the  record that Mr. Klayman knew that Ms. Sataki allegedly wanted to dismiss her cases, which is clearly shown in the record. PFF 67 – 71. Most telling is that many years later, 7 to be exact, after ODC sent out its private investigator to hunt down Ms. Sataki she asked ODC if they could continue to litigate her claims! PFF 155. Thus, there was no violation of Rule 1.2.

11

### iii.        Mr. Klayman Did Not Reveal Client Confidences

Notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, PFF 170, Tr. 775, PFF 91, PFF 24, is that she herself went on Iranian television to broadcast the same alleged confidential facts. App.  0119 – 0122. Thus, there was no violation of Rule 1.6.

### iv.        Mr. Klayman Did Explain Matters to Ms. Sataki

One of the most non-sensical and bizarre findings of the Panel is that Mr. Klayman violated Rule 1.4(b) by filing a motion to disqualify Judge Kotelly. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. PFF 66. There was no violation of Rule 1.4

### v.        Absence of a Written Fee Agreement

The panel chose to sidestep this issue, probably because a myriad of emails from Mr. Klayman stated that he was representing Ms. Sataki free of charge. PFF 47, 74. The issue of the contingency only arose when Ms. Sataki became more abusive, rejected other counsel to represent her, but wanted to continue with Mr. Klayman as her lawyer. PFF 152. Thus, there was no violation of Rule 1.5(b).

### vi.        There Was No Failure to Cease Representation

As set forth above, Mr. Klayman simply chose to protect Ms. Sataki's legal rights, as she had a right of appeal from the OCR's findings that she had

manufactured her sexual harassment and workplace retaliation claims. PFF 72. This was the ethical thing to do, and thus, there was no violation of Rule 1.2.

## E.      SANCTION

As set forth above, it is irrefutable that Mr. Klayman has already egregiously served a "temporary" suspension of 20 months –longer than the ordered suspension of 18 months by the Panel. And, there was absolutely no reason for the Panel to take 20 months to issue its fatally flawed and completely conclusory Opinion if it was just going to adopt wholesale and rubber stamp the Board's Report in any event. This was just an intentional act to lengthen Mr. Klayman's suspension.

Furthermore, with regard to Mr. Klayman not filing an affidavit under D.C. Bar R. XI, § 9(g)(4), he made it clear that he was challenging the unconstitutional temporary suspension by the panel and indeed had instituted suit this regard as to its illegality. *Klayman v. Blackburne Rigsby et al*, 21-cv-409 (D.D.C.)   Most crucially, the Panel chose to overlook sworn statements by Mr. Klayman he had 100% complied with the temporary suspension order and did not represent clients in D.C. during this period, as he respected the temporary suspension order, however unconstitutional it was. *See* Post Hearing Brief, Ex. 10, <u>Exhibit 2</u>. The Panel thus puts form over substance, while this Court looked the other way when Clinesmith, a convicted lying felon and admitted leftist Trump hater, did not comply with this rule. *In re Clinesmith*, 258 A.3d 161 (D.C. 2021). In that case,

Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. Bar Disciplinary apparatus including this Court fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period, in stark contrast to the nearly 20 months that Mr. Klayman was "temporarily suspended"—the Court let Clinesmith off with "time served" in just seven (7) months, and of course with no reinstatement requirement.  In doing so, the Court adopted wholesale the skewed findings of the Board and Hearing Committee. This is particularly egregious in that "[t]he Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts." *Id*. This is completely non-sensical - how can a "serious crime" of falsifying evidence not involve moral turpitude? Of course, it appears the Court knew full well what it was doing, writing that "[t]his decision is non-precedential." *Id*. The Court would not want this preferential selective treatment to be afforded to those who hold differing political beliefs. Attached hereto is an article which discloses the Clinesmith whitewash by ODC, the Board, and ultimately this Court. Exhibit 3. The key difference, other than the fact that Clinesmith committed a felony over doctoring a false affidavit, which offense would ordinarily result in total

14

disbarment, is that Mr. Klayman is pro-Trump and a conservative activist, while Clinesmith is ideologically akin to the leftist and Democrat leadership of the DC Bar disciplinary apparatus. And, Mr. Klayman, unlike Clinesmith, has never been found to have been dishonest.

Lastly, a reinstatement provision is unjustified where in a recent case this Court found, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically.**" *In re Klayman,* 228 A.3d 713, 719 (D.C. 2020). Then there is the testimony of Judge Sporkin. And the acts complained of here are now over 12 years old, so to conjure up reinstatement in a case which any other reputable bar would have dismissed for laches is a travesty of justice.

## CONCLUSION

Based on the foregoing, there must be a full, bona fide *en banc* review of this case, as there has been a gross miscarriage of justice and fundamental fairness by the Panel. **Notwithstanding no clear and convincing evidence of serious ethics violations, Mr. Klayman should have been found to have done "time served," a more worthy "sentence" for him than occurred with the dishonest convicted felon Clinesmith**. In the interim, the Court must stay the patently flawed Order of the Panel. If this bona fide review does not occur, this matter will not end here, as Mr. Klayman will be forced to seek relief under D.C. Sup. Ct. Rule 60 and a petition for writ of mandamus before the Supreme Court.

Dated:  September 29, 2022                              Respectfully submitted,

/s/ Melissa Isaak
Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
Tel: 334-262-8200
Melissa@protectingmen.com

Counsel for Respondent

/s/ Larry Klayman
Larry Klayman. Esq.
7050 W. Palmetto Park Road
Boca Raton, FL, 33433
Tel: 561-558-5336
leklayman@gmail.com

Co-Counsel Pro Se


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

electronically and served through the court's ECF system to all counsel of record

or parties listed below on September 29, 2022.

/s/ Larry Klayman

# EXHIBIT 1

## APPENDIX – PROPOSED FINDINGS OF FACT

### Tim Shamble

1.      Mr. Shamble has been with VOA since 1996, and he is currently the local union president, AFG Local 1812, a title he has held since 2000. Tr. 881.

2.      Mr. Shamble was the union representative who was consulted by Ms. Sataki and Mr. Klayman with regard to Ms. Sataki's claims of workplace sexual harassment and workplace retaliation at VOA. RX 1, RX 5.

3.      Mr. Shamble declared under oath that Mr. Klayman was very diligent in attempting to represent Ms. Sataki, putting in many hours, and Mr. Klayman did not, to his knowledge, compromise any of Ms. Sataki's rights. RX 1, RX 5.

4.      Mr. Shamble declared under oath that communication became very difficult and nearly non-existent with Ms. Sataki. When he and Mr. Klayman would try to contact Ms. Sataki, we usually got no response, even for months.  RX 1, RX 5.

5.      Mr. Shamble declared under oath that during these periods of no communication from Ms. Sataki, Mr. Klayman attempted to protect Ms. Sataki's rights so that they would not be forfeited. It is Mr. Shamble's opinion that Mr. Klayman acted professionally and ethically by trying to protect Ms. Sataki's rights even after she would not communicate with him. RX 1, RX 5. Ms. Sataki admits that she knew Mr. Klayman and Mr. Shamble tried to reach her. Tr. 539.

6.      Mr. Shamble declared under oath that he had given Mr. Klayman's name and number as a reference to at least one other aggrieved VOA employees who requested the name of an aggressive attorney, as he was impressed by Mr. Klayman's willingness to doggedly defend Ms. Sataki under difficult circumstances. RX 1, RX 5. Tr. 902.

7.      Mr. Shamble declared under oath that the BBG, of which VOA is a subcomponent has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. RX 1, RX 5.

8.      Mr. Shamble declared under oath that it did not appear to him that Mr. Klayman was representing Ms. Sataki to promote his own interests, but rather to protect Ms. Sataki's. Mr. Klayman appeared very dedicated to Ms. Sataki's interests. RX 1, RX 5. "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Tr. 903-04.

9.      Mr. Shamble declared under oath that he was aware that public relations avenues were used to try to prod VOA into a settlement. RX 5. Tr. 892.

10.     Mr. Shamble declared under oath that he was present at at least one meeting between Mr. Klayman and Ms. Sataki where the use of public relations, such as press articles and news stories to describe and publicize the alleged harassment that Ms. Sataki had experienced at VOA was discussed.  The idea was that public relations could push BBG into a settlement given their track record of being difficult to settle with. RX 5.

11.      There is an email between Mr. Klayman, Ms. Sataki and two other VOA broadcasters who Mr. Klayman was also seeking to help, about an interview with the Los Angeles Times. RX 5. Tr. 906-07. Ms. Sataki admits she never sent anything back to Mr. Klayman or Ms. Shamble saying that she did not want to do the interview. Tr. 403.

12.     Mr. Shamble declared under oath that he was not aware that any public relations about Ms. Sataki's situation were anything but positive and complimentary about her. RX 5. Tr. 895.

13.     Mr. Shamble, in the course of his duties and responsibilities as local union president, met Ms. Sataki around 2009. Tr. 882-82. Ms. Sataki alleged to Mr. Shamble that her harasser was Mehdi Falahati ("Mr. Falahati"), who was the co-host. Tr. 883.

14.     At that time, Mr. Shamble observed that there were at least two factions at VOA – those who supported the Shah and those who support the mullahs – and that Ms. Sataki seemed to be with the pro-Shah faction. Tr. 883-84.

15.     VOA had a very difficult reputation for negotiating. Ms. Sataki knew this. Tr. 368.

> They are very hard-edged. We've won -- matter of fact, we've won several cases and they still don't knowledge it. If fact, we won a case where they have been illegally hiring non-citizens. We won that arbitration. They appealed that up to the FRA. They lost the FRA, then they appealed it to the Court of Appeals, and eventually had to withdraw their appeal, and they still won't abide by that decision. That's just an example of the type of management they are Tr. 884.

16.     A 2009 articled by Joe Davidson in The Washington Post discussing the Open-Ended Survey showed that "the Broadcasting Board of Governors is at the very bottom. Employees don't rank them very high." Tr. 885-86, RSX 3. They have "consistently been worst or next to worst throughout the federal government." Tr. 886-87.

17.     After meeting with Ms. Sataki, Mr. Shamble discussed how to proceed on her case, including filing a grievance or an EEO (aka OCR) complaint. Mr. Shamble contacted Labor Relations, but they were not willing to reach a fair settlement. Tr. 887. This was consistent with Mr. Shamble's experience dealing with VOA.

18.     Ms. Sataki wanted to move to Los Angeles to work. "One of the solutions that [Ms. Sataki] had filed was possibly working out of the Los Angeles Bureau, bureau of broadcasting." Tr. 888. Ms. Sataki felt a good solution was to work out of Los Angeles. "Yeah, she wanted to -- she thought that was a good solution to work out of Los Angeles." Tr. 892.

19.     Ms. Sataki, Mr. Klayman, and Mr. Shamble met on several occasions. Tr. 890.

20.     Mr. Shamble, Mr. Klayman, and Ms. Sataki agreed to try to settle Ms. Sataki's claims first before pursing litigation. Tr. 890.

21.     In attempting settlement, Mr. Shamble and Mr. Klayman met with the BBG and their general counsel, and the response was very negative. Tr. 891. This was consistent with Mr. Shamble's previous experience with them.

22.     The BBG offered to put Ms. Sataki in the Persian service or in Central News, but Ms. Sataki told them that she wasn't comfortable being around her alleged harasser or working strictly in English. Tr. 891-92. Tr. 916-17. RX25. Ms. Sataki declined this offer. Tr. 917.

23.     Based on Mr. Shamble's extensive experience, publicity was a helpful tool in dealing with an agency as notoriously difficult as VOA. "We've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 893.

24.     Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1.

25.     During the course of attempted settlement, Mr. Klayman and Mr. Shamble learned that "we were trying to settle it through a member of the Board of Governors by the name of Blanquita Collum." ("Ms. Collum"). Tr. 911. Ms. Collum was a friend of Mr. Klayman, and Mr. Shamble and Ms. Sataki were aware of this fact. Tr. 911, Tr. 389.

26.     Then Secretary of State Hillary Clinton was on the BBG at the time that Mr. Klayman and Mr. Shamble were trying to reach a settlement. Tr. 912, 388. Ms. Sataki admits that she was aware that Secretary of State Hillary Clinton was included as a defendant in the BBG *Bivens* action because Mrs. Clinton was at the time "the number one governor sitting over that board." Tr. 479, 481.

27.     Ms. Sataki was aware that Mr. Klayman and Mr. Shamble took actions with regard to congressmen and senators to try to get them to intercede. Tr. 454. They include John Boehner, Tom Coburn of Oklahoma, who was on the Foreign Affairs Committee at VOA, and John McCain. Tr. 912-14. During meetings with these Senators, Mr. Klayman and Mr. Shamble took press materials to give to them and Ms. Sataki did not object to this publicizing, even though she was aware that they were taking those meetings. Tr. 913-14.

28.     Mr. Shamble was aware of the fact that " when Ms. Sataki went out on leave to Los Angeles that she had a nervous breakdown, for lack of a better word, and went to see doctors?" Tr. 915. RX 24. Mr. Shamble asked for reasonable medical accommodation on behalf of Ms. Sataki, RX 26, which the agency denied. Tr. 916.

29.     Mr. Shamble was aware that Mr. Klayman filed a complaint with OCR on behalf of Ms. Sataki. Tr. 918. Mr. Shamble was troubled by the investigation conducted by OCR. Tr. 919, RX 17. "They seemed to be stalling coming to some sort of resolution, and that was blocking any further progress in the case… that there were witnesses [on Ms. Sataki's behalf] that were claiming they were being harassed." Tr. 919-20.

30.     Mr. Shamble wrote a letter to Lanny Breuer, Assistant Attorney General, Criminal Division of the Department of Justice about witness tampering. Tr. 920, RX 17. In response, Mr. Breuer referred Mr. Shamble to the Federal Bureau of Investigation. Tr. 921, RX 17.

31.     Mr. Shamble wrote a letter dated January 4, 2011 to Ms. Delia Johnson, the director of OCR asking that OCR some to some kind of conclusion and reach a final decision. Tr. 922, RX 18.  Ms. Johnson responded on January 5, 2011 informing that Mr. Shamble could proceed, before issuing a final finding denying Ms. Sataki relief. Tr. 922, RX 18.

32.     After a negative final decision from OCR, a complainant has the option to pursue a Title VII action in the courts. Tr. 923. RX 18.

33.     Upon receiving the final decision from OCR, Mr. Shamble and Mr. Klayman tried to contact Ms. Sataki to inform her that she had the option to pursue legal action in the courts and that none of her legal rights were forfeited. Tr. 924-27.

34.     Mr. Shamble testified that Ms. Sataki had his contact information and she could always contact him at any time. Tr. 927.

35.     Mr. Shamble was copied, but Mr. Klayman was not, on a letter from Ms. Sataki to Mr. Danforth Austin dated August 4, 2010. Tr. 928. RX 21. Mr. Shamble was not consulted by Ms. Sataki before the letter was sent to Mr. Austin. Tr. 928.

36.     Mr. Klayman asked Mr. Shamble for the name of another lawyer that might be able to help Ms. Sataki. Tr. 929. Mr. Shamble provided Mr. Klayman with Tim Shea's name. Tr. 929.

37.     Ms. Sataki did not contact Mr. Shamble until well after Mr. Klayman and Mr. Shamble had tried to contact her, and well after the January 23, 2011 email that was sent to her. Tr. 932.

38.     Mr. Shamble testified that the signature on the OCR Complaint appeared to be Ms. Sataki's signature. RX 20, Tr. 933.

39.     Mr. Shamble and Mr. Klayman had discussed being assigned Judge Kotelly in the court case against BBG and that Judge Kotelly "didn't have a very favorable opinion of [Mr. Klayman] or your politics or the way that you conduct your business." Tr. 934. Mr. Klayman informed Mr. Shamble that Judge Kotelly could be a problem in the case. Tr. 934-35.

**Larry Klayman**

40.    Mr. Klayman, a former lawyer at the Department of Justice, and the founder of both Judicial Watch and Freedom Watch and a private practitioner, has considerable experience in administrative law and litigation, such as OCR cases, and has handled employment cases throughout his career and in his private practice.  Tr. 947-963.

41.    Mr. Klayman has continuously been a member of good standing of The Florida Bar (for 41 years) as well as the District of Columbia Bar (36 years) and is presently inactive in Pennsylvania. Tr. 964. RX 22.

42.    The supplemental complaint of Ms. Sataki represents at paragraph C that identical complaints were filed in Pennsylvania and Florida. Tr. 968. BCX 23.

43.    Pennsylvania and Florida disciplinary records show that these identical complaints were dismissed by these bars many years ago, as Mr. Klayman has no disciplinary record in this regard. Tr. 969-971. RX23 (Florida); RX 30 (Pennsylvania).

44.    Mr. Klayman, thinking that the identical DC complaint had also dismissed, his records of the representation of Ms. Sataki were either discarded or lost, as Mr. Klayman was only notified six years after the supplemental complaint's filing that this matter was still active. Tr. 971.

45.    Mr. Klayman met Ms. Sataki in the fall of 2009 on the Capitol Mall. He was there with an Iranian client to attend a rally in support of Iranian freedom. Ms. Sataki was there broadcasting for VOA. After Mr. Klayman introduced himself, Ms. Sataki ran over to him and gave him her card with her personal cell phone number on it and asked him to call her. Tr. 323, 974-975.

46.    Mr. Klayman called Ms. Sataki and left a message. Eventually Ms. Sataki called back and they arranged to meet at Clyde's restaurant in Georgetown. Mr. Klayman got there first and when Ms. Sataki arrived she kissed Mr. Klayman on the cheek at the bar. Tr. 326. Mr. Klayman had asked Ms. Sataki to dinner in a personal capacity. Tr. 325, 976.

47.     After about five to ten minutes of getting personally acquainted, Mr. Sataki "broke down in tears and grabbed my hand and said, 'Larry, I really have big problems. I've been sexually harassed by my co-anchor, … she described it, Mehdi Falahati and before that I was unfairly criticized for my abilities and I need help. And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends."  Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr.  326-27, 976-977.

48.     Ms. Sataki admits that during their dinner she said that she wanted to be transferred to Los Angeles because she had spent a number of years there was was more comfortable there. Tr. 335.

49.     Mr. Klayman sympathized with Ms. Sataki as he too was going through a hard time in his life, both personally and financially. Tr. 978.

50.     Ms. Sataki then introduced Mr. Klayman to her union president and representative at VOA, Tim Shamble. He advised that VOA was very difficult to settle claims with, but that we would try. RX 1. Using publicity to try to coax a settlement was also discussed, and Ms. Sataki, Mr. Shamble and Mr. Klayman agreed up front to this. Tr. 979-980. RX 2.

51.     When settlement did not prove possible, Ms. Sataki authorized Mr. Klayman to file legal actions. Tr. 981.

52.     It was agreed that the objective of the legal actions would be to have Ms. Sataki detailed to the Los Angeles ("LA") Bureau of VOA, where there is a strong Persian component. She wanted to be out of the presence of the harasser and the managers who had retaliated against her and to be with family and friends in LA. Tr. 336.

53.     Mr. Klayman continued to try to settle for Ms. Sataki and along with Tim Shamble lobbied senators and congressmen to intervene. Tr. 983-986. He prepared complaints when settlement proved impossible. RX 2, RX 3.

54.     Mr. Klayman did not expect to ever be compensated for his time and expense, as the objective was to get Ms. Sataki detailed to LA and the complaint which he filed against the harasser, who had no money, was on principle.  Tr. 336. The *Bivens* case versus the Board of Governors ("BBG") of VOA was designed also to get Ms. Sataki to LA and by seeking to hold the governors, whose head was Secretary of State Hillary Clinton, personally and legally accountable to put pressure on them to agree. The employment complaint before OCR was also calculated for this purpose as well. A money recovery was not the goal, as even if successful it would be five to ten years down the line. Tr. 986-999. Ms. Sataki gratuitously "offered" 40% to Mr. Klayman via email on May 30, 2010, but this was never agreed to, and in any event not important to Mr. Klayman. BCSX 11.

55.     The case against the BBG was ultimately assigned to Judge Colleen Kollar Kotelly ("Judge Kotelly"), who was a Clinton appointee that Mr. Klayman had had difficulty with in the past. As Mr. Klayman had been a strong legal advocate in cases he brought against the Clintons at Judicial Watch, Judge Kotelly had demonstrated bias toward and against him and his conservative clients in the past, and both Ms. Sataki and he were conservatives. Judge Kotelly's confirmation had been strongly opposed by conservative interests.  Mr. Klayman advised Ms. Sataki and Mr. Shamble that this was potentially a problem. Tr. 1000-1002.

56.     Ms. Sataki while on leave to LA for a vacation, Tr. 338-39, got word that VOA would not transfer her there.

57.     Having Ms. Sataki in LA was also strategically necessary, as she had been living with a co-worker in the DC area, and had a reputation for affairs and promiscuity. It was thought that this could be used against her, however unfairly, since she was pursuing sexual harassment and retaliation complaints against co-workers at VOA. Tr. 1003-1004. Ms. Sataki admits that Mr. Klayman advised her in this regard.

58.     As predicted, Judge Kotelly given her dislike of Mr. Klayman, despite the compelling evidence of that Ms. Sataki needed a reasonable medical accommodation, without even a hearing, denied the motions for a temporary restraining order and preliminary injunction to put her back to work in LA away from the harasser. RX 3. At the time, Mr. Klayman had consulted with retired federal judge Stanley Sporkin who told him that he would have granted the relief to preserve the status quo if he had been the jurist on the case. He described the relief as a "chip shot." Tr. 1009-1010.

59.     Mr. Klayman then moved for reconsideration, as in his opinion there was no basis in fact or law for Judge Kotelly to deny preliminary relief. RX 3.

> And consequently there is no basis. And that just my opinion. I'm entitled to my opinion. There is no basis in law or fact. The Bar tries to make an issue of that, Bar Disciplinary Counsel. But lawyers say that all the time, there was no basis for the court to make a ruling. And there wasn't a hearing. Because without a hearing and just simply not considering her affidavits and considering the government, particularly when I had a polygraph that she passed and all that medical information, to me was exemplary of bias and prejudice. There was no other way to explain it in my mind, and there was no basis in law or fact. So that's what happened. Tr. 1011.

60.     Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011.

61.     Ms. Sataki blamed Mr. Klayman for Judge Kotelly's decision. She disparaged Mr. Klayman. Tr. 1020 to 1021.

62.     Ms. Sataki admits that she asked Mr. Klayman to buy her a cheaper car, as she had no credit. Tr. 429, 432-435. Ms. Sataki also asked Mr. Klayman to find her friend Kaveh a bankruptcy attorney and then berated him over who he found. Tr. 1021-22. Mr. Klayman paid for Ms. Sataki's moving expenses, including her car.

63.     Mr. Klayman had also tried to get Ms. Sataki a good paying and prestigious job as a broadcaster in LA. He took her to seek his friend, the chairman of Movieguide, Ted Baehr, who

tried to get her a job a CBN, which has a bureau in LA and which broadcasts in Farsi into Iran. She was introduced to Mark Woodland, and executive of CBN and an interview was set up. Tr. 1026-27, 713-714.

64.    But at that point, Ms. Sataki's (convicted felon) cousin, BCSX 36, with several different alias names including Sam Razavi intervened and …

> (a)pparently spoke to Mark Woodland and scared him off and said 'You know she's a Muslim? I don't have a problem with her working for you, but she has certain conditions' … that have to be met. You don't do that before you get an interview. It was clear that Sam didn't want her to be there, so Woodland got cold feet and backed off. Tr. 1027. BCSX 37. Tr. 721-724.

65.    Mr. Klayman filed a motion to disqualify Judge Kotelly to get her orders vacated once disqualified. In the motion to disqualify Judge Kotelly, Mr. Klayman attached about 14 pages of her factual errors as proof of her bias toward Ms. Sataki and Mr. Klayman. Tr. 1034. RX 3.

66.    Ms. Sataki knew about the motion to disqualify. Tr. 1166, 1170.

67.    While at the same time she was allegedly telling Mr. Klayman to drop all cases, Ms. Sataki sent in a notice of appeal to Judge Kotelly. RSX 4. Tr. 1031.

68.    Mr. Klayman, on July 28, 2018 filed a notice of voluntary dismissal dismissing all but two of Ms. Sataki's claims.[4] The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. This occurred before Ms. Sataki's purported July 30 email which only asked Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name." BCSX 21. Ms. Sataki asks Mr. Klayman to continue to pursue the "sexual harassment case against Medhi Falahati…and Ali Sajjadi and Susan Jackson…." BCSX 21. This email does not discuss publicity. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and

---

[4] *Sataki v. BBG*, 1:10-cv-00534, ECF No. 67. For clarification, the notice of voluntary dismiss filed on July 28, 2010 dismissed all but one of Ms. Sataki's claims, but that was done in error, which was corrected on August 6, 2010. ECF No. 68.

Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief, and therefore dismissed the action entirely.

69.     Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038. RX 21.

70.     The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21.

71.     Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong address at 2000 Pennsylvania Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8.

72.     Mr. Klayman filed a notice of appeal in the BBG case in the meantime to ensure that Ms. Sataki's legal rights were preserved. Tr. 1043-1044.

73.     Around this time a lot of mail was not getting to Mr. Klayman because he was moving around a lot and in "very bad financial shape." Tr. 1050-1051.

74.     With regard to the email of May 31, 2010, Mr. Klayman did not have a contingency fee arrangement with Ms. Sataki. He was clear that he was representing her pro bono. Mr. Klayman was only trying to impress on her the time that he had put in for her. Tr. 1056-1057; BCSX 12.

75.     Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057.

76.     Mr. Klayman testified that there here was no money in getting Ms. Sataki back to work in LA.  BCSX 19. Tr. 1061

> In fact, working as hard as I have to try to get you back at PNN, Persia News Network, gets me nothing, assuming I ever wanted a percentage of the damages we cold have won in court, which I never asked for." Tr. 1058-1059; Tr. 1063

77.     Mr. Klayman assured Ms. Sataki in email of November 21, 2010, that her rent was paid for as they both moved on. Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066.

78.     When Mr. Klayman realized that there could be the potential for a conflict of interest, he advised Ms. Sataki to get other legal counsel, such as Tim Shea, Gloria Allred or someone else. This comes out in a number of different communications. Tr. 1079-1080.

79.     Mr. Klayman testifies that he never wanted a sexual relationship with Ms. Sataki and never touched her. He told Ms. Sataki "I'm not your boyfriend. I don't want to be your boyfriend." Tr. 1080-1081.

80.     During a moment of emotional clarity, Ms. Sataki admits that Mr. Klayman is not her problem. Tr.  1083-1084; BCSX 3.

81.     Ms. Sataki's speaking falsely that she never wanted to do anything in court and implied that she did not want to be in LA and that was all Mr. Klayman's idea is likely what caused Kathleen Staunton to prepare the supplemental bar complaint, not that Ms. Staunton perceived that Ms. Sataki was scared of Mr. Klayman, as Ms. Sataki presented through uncorroborated hearsay testimony. Tr. 1086; BCSX 20.

82.     Mr. Klayman informed Ms. Sataki in an email that she has a right of appeal of Judge Kotelly's decision and Ms. Sataki responded by accusing Mr. Klayman of having been bribed and disparaged his Judeo-Christian beliefs and religion. She ended by saying, as is her victim's mentality, "I am nobody. Just a little girl that was retaliated against and harassment by some VOA employee, and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life." Tr. 1090-1091; BCSX 38.

83.     Mr. Klayman identified all the articles that he wrote, all of which were complementary of Ms. Sataki and which she approved. The articles did not reveal confidential information. The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. Only one article was written and published after Ms. Sataki claims to have "terminated" his representation on November 15, 2010.  Tr. 1199-1230. BCX 23-12, 23-14, 23-19, 23-22, 23-25, 23-27, 23-30, 23-33, 23-36, 23-41.

84.     Ms. Sataki had no credible explanation for her last minute production of emails, (including an email to Ms. Allred which Mr. Klayman had to later get from her), which was not timely pursuant to the Board's rules. Tr. 330.

85.     Chairman Fitch stated that the AHC will do a report to the Board "that will include a subsection that informs the Board if any prejudicial delay that we find…and why we recommend to the Board a finding of no prejudicial delay or no prejudicial delay." Tr. 1259-1259.

**Keya Dash**

86.     Mr. Dash declared under oath that he had personal knowledge of Mr. Klayman's efforts to represent Ms. Sataki with regard to her sexual harassment claims against VOA. RX 5.

87.     Mr. Klayman asked Mr. Dash as a friend to attempt to assist Ms. Sataki, as Mr. Dash had a family member who worked at VOA and Mr. Klayman was attempting to settle the sexual harassment claims before having to file an EEO and federal court complaint. RX 5.

88.     Mr. Dash declared under oath that he was present when Mr. Klayman and Ms. Sataki later met then Speaker of the House, John Boehner, and asked him to intervene on Ms. Sataki's behalf.

Mr. Boehner offered to help and Mr. Klayman and Ms. Sataki met with his staff in the Speaker's House Office to discuss this matter. RX 5.

89.    Mr. Dash declared that Mr. Klayman lobbied others on Capitol Hill for help. RX 5.

90.     Mr. Dash declared under oath that Mr. Klayman is a friend and that he has consulted with Mr. Klayman for his own legal matters. Mr. Dash was present with Mr. Klayman and Ms. Sataki on more than one occasion to discuss her case, and observed that Mr. Klayman always treated Ms. Sataki with respect and was not in any way involved in a romantic relationship with her, nor did he seek one. RX 5.

91.     Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use. RX 5.

92.    Mr. Dash's brother worked for VOA at the time that he and Mr. Klayman met. Tr. 1342.

93.    Based on his personal knowledge of VOA, Mr. Dash testified that it was very difficult to deal with in terms of settlement because it was "very bureaucratic, cavernous." Tr. 1344.

94.    Mr. Dash met Ms. Sataki on or around February of 2010. Tr. 1345.

95.    Mr. Dash met with Mr. Klayman and Ms. Sataki on another occasion at a French restaurant in Virginia. During the two meetings, Ms. Sataki publicized her situation to Mr. Dash and asked him for help. "Yes. She told me in depth her issues and she sought my assistance in talking to Blanquita Cullum, in particular, Richard Miniter, also, who is a journalist friend, and others whom I might know." Tr. 1348.

96.    Mr. Dash had reservations about helping Ms. Sataki based on her reputation.

    Well, her reputation was something of an opportunist who advances herself, and when
    she reaches the point of no return, alleges sexual discrimination, sexual harassment. This
    was something I had told [Mr. Klayman] at the time." Tr. 1348.

97.     The Persian community is very close-knit, so this kind of information is of the kind that one learns about families in Washington, D.C. Tr. 1349. Furthermore, Mr. Dash's family is a very prominent Persian family in the Washington, D.C. area. Tr. 1342.

98.     Despite these reservations, Mr. Dash decided to help Ms. Sataki, for the most part due to Mr. Klayman's urging him to do so. Tr. 1349-50.  Mr. Dash attempted to enlist the help of Ms. Cullum, a member of the BBG at VOA, and who employed his brother at VOA. Tr. 1350-51.

99.     Mr. Dash testified that in January, February, and March of 2010, he had observed that Ms. Sataki was "very distraught, very nervous, easily agitated, very concerned." Tr. 1357.

100.    Mr. Dash was aware that Mr. Klayman was "trying to get Mr. Miniter (a friend of both) to write a positive article, too, for settlement…." Tr. 1360.

101.    Mr. Dash received an email from Ms. Sataki on February 21, 2010 thanking him for his efforts. "This is Ellie Sataki. Thanks for the push with Blanquita." Tr. 1359.

102.    In terms of Mr. Klayman's efforts to to help Ms. Sataki, Mr. Dash believed that Mr. Klayman worked very hard for her and that Mr. Klayman had "always been very concerned with your own affairs, and you've always been very passionate about the Iranian freedom movement. And so you've always been known to support the Iranian community, and I took it as just another example of that." Tr. 1362.

### Elham Sataki

103.    Ms. Sataki had never met Mr. Klayman before, except on the Capitol Mall. Tr. 328.

104.    Ms. Sataki admits that she had shared intimate details about her situation with everyone, including Mr. Klayman that night. "… I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment and workplace retaliation), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added).

105.    Ms. Sataki concedes that in the eight years since she filed her bar complaint, she never filed a sexual harassment case against Mr. Klayman. Tr. 331.

106.    Ms. Sataki told Mr. Klayman that she had no money to pay for a lawyer and backs off  a a claim that she discussed offering him 40% of any recovery. Tr. 332-33.

107.    Ms. Sataki admits that the objective of Mr. Klayman's representation would be have her detailed or transferred to the LA Bureau of PNN to get out of the presence of her harasser and managers in DC.  "I said that I have written a proposal, yes, I'm trying to transfer myself to Los Angeles." Tr. 334.

108.    Ms. Sataki admits that the response of VOA was very negative in response to Mr. Shamble's and Mr. Klayman's request to have her transferred to LA. Tr. 343. Ms. Sataki then admits that she would not accept employment in the Central News Division at VOA Washington, D.C. Tr. 345.  Ms. Sataki admits that VOA threatened her if she did not go to the Central News Division and that if she did not show up they were going to cut off her salary and leave. Tr. 347.

109.    Ms. Sataki admits that "at that point" she got "very, very emotional and started crying uncontrollably." Tr. 347. Ms. Sataki threatened to commit suicide if she had to stay in Washington. Tr. 981-92. Ms. Sataki instructed Mr. Klayman to "get [her] back to LA." Tr. 346

110.    Mr. Klayman then suggested that Ms. Sataki see a psychologist and he then took her to two. Tr. 348. Mr. Klayman found Dr. Arlene Aviera for Ms. Sataki, who she began to see. Mr. Klayman paid for these sessions. Tr. 350. When Ms. Sataki sat down with Dr. Aviera and Mr. Klayman she began sobbing again when both explained her situation Tr. 350. Mr. Klayman was not present during those counseling sessions. Tr. 350.

111.    In and around this time period, Ms. Sataki admits that she, Mr. Shamble and Mr. Klayman discussed what should be done not to get her back to work at VOA in LA. Tr. 351.

112.    Ms. Sataki admits that it was decided by the three that if she could qualify to get a reasonable medical accommodation to be in LA, that Ms. Sataki could be detailed and move to LA. They submitted documentation from Dr. Aviera. Tr. 351-352.

113.    There are over 1 million Iranians in LA. Tr. 352.

114.    Ms. Sataki also admits that she needed to be detailed to LA because she was having a nervous breakdown. Tr. 354.

115.    Ms. Sataki also wanted to be in LA to escape alleged unfair and harsh criticism of her by her supervisors, such as Joy Wagner and Susan Jackson, who said that she had to work harder because she was beautiful and also criticized her for using, Kaveh, a man she cohabitated with, to do her packages, which gave her a bleeding ulcer. Tr. 342, 356-357.

116.    At this time Ms. Sataki was staying with her friends Nella and Abdi, a married couple, in LA. Tr. 360. She was only staying there temporarily and could not stay there forever. Tr. 361.

117.    Ms. Sataki found an apartment in LA and it was brand new and that Mr. Klayman paid for it because Ms. Sataki had no credit. Tr. 364. She was very comfortable anywhere in LA. *Id*.

118.    Mr. Klayman leased and prepaid the apartment for her. Tr. 365, Tr. 502-504. RX 16.

119.    Ms. Sataki admits that around that time we had to do something stronger than just sending documentation to VOA for a reasonable medical accommodation, particularly because Mr. Shamble was saying that these people are not reasonable. Tr. 366.

120.    One reason that VOA would not agree to the transfer to LA was because many of its Iranian broadcasters wanted to move there too.  Tr. 367.

121.    Ms. Sataki admits that at that point she, Mr. Klayman and Mr. Shamble sat down and discussed legal strategy, and that they collectively decided that they would have to bring lawsuits. Tr. 369.

122.    Ms. Sataki admits that Mr. Klayman expressed concerns about her cohabitating with Kaveh and rumors that she had had an affair with, Zia, the owner of NITV, an Iranian network in LA, when she worked there as a broadcaster before joining VOA, and that this could come up in discovery. Ms. Sataki admits that this was "out there" in the Iranian community. Tr. 371. Mr. Keya Dash corroborates this. Tr. 1348-49

123.    Another later concern of Mr. Klayman was that a former husband of Ms. Sataki had filed a sworn affidavit in his divorce case against her for having had cheated and had sex with another man in their apartment just weeks after they were married. Tr. 377-382.

124.    Before Mr. Klayman agreed to represent Ms. Sataki, she, with Mr. Shamble's assistance, had filed a complaint with VOA internally in the human resources department about the alleged harassment and retaliation by her managers. Tr. 384-385.

125.    The politics at VOA were taken into account in fashioning legal strategy. Tr.392. Mr. Falahati and Ms. Sataki's supervisor had been Mr. Sajadi, whose was in the pro-regime anti-Shah faction of VOA and his father a mullah who was an adviser to the Supreme leader Ayatollah Khomeini. Tr. 390. Mr. Klayman had represented other broadcasters at VOA who were retaliated against because they were in the pro-Shah faction. Tr. 391.

126.    Ms. Sataki admits that she sat down for many hours with Mr. Klayman to prepare legal complaints against Mr. Falahati and VOA. Tr. 393.

127.    Ms. Sataki and Mr. Klayman and Mr. Shamble also prepared an administrative complaint with the EEO, which is also known as OCR.  Tr. 394.

128.    Ms. Sataki admits that it was agreed in front of Mr. Shamble and with him that "we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA. Tr. 397. Ms. Sataki testified that she was aware and was informed that Mr. Klayman had written articles that were very favorable to her. Tr. 398.

129.    At that time, Ms. Sataki did not put anything in writing to Mr. Klayman not to write these favorable articles. Tr. 400.

130.    Ms. Sataki admits that Mr. Klayman advised her that Judge Kotelly "was a very difficult judge and that he had problem(s) with that judge. Tr. 408.

131.    Ms. Sataki admits that she was aware that Judge Kotelly ruled against her for a reasonable medical accommodation to LA. Tr. 415; RX 3. Ms. Sataki admits that Mr. Klayman sent Judge Kotelly's ruling to her but she can say whether she read it. Tr. 416, 418-19.

132.    Ms. Sataki admits that Mr. Klayman told her that we only lost the first phase of the case and that it was not over. Tr. 421-422.

133.    Ms. Sataki and Mr. Klayman met with Congressman Rohrabacher ("Mr. Rohrabacher") and his chief of staff, Kathleen Staunton ("Ms. Staunton") in their office. They said that he would help resolve matters with VOA to get her detailed to LA. Tr. 458, 462. This was the only time Mr. Klayman met Ms. Staunton. Tr. 467.

134.    Ms. Sataki never had any legal training and does not know how to cite cases. Tr. 461.

135.    After this initial meeting, Ms. Sataki had further contact with Ms. Staunton, but they met in restaurants and not in Mr. Rohrabacher's office. The meetings were not of a professional nature, implying that Ms. Staunton did not have authority from Mr. Rohrabacher to meet. Tr. 464

136.    The idea of the supplemental complaint, BCX 23, came from Ms. Staunton and her cousin Sam Razavi ("Mr. Razavi"). Tr. 468-469. Neither of them are lawyers. Ms. Sataki admits that Ms. Staunton and Mr. Razavi prepared the supplemental complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544.

137.    Ms. Sataki claims to have no knowledge where the supplemental complaint was prepared. Tr. 469-470.

138.   Ms. Sataki admits that Mr. Razavi helped prepare the supplemental complaint. *Id*. Ms. Sataki claims not to remember if Ms. Staunton and/or Sam Razavi advised her to get another lawyer at the time. Tr. 470-471.

139.   Ms. Sataki admits she never read the alleged rule violations cited in the supplemental complaint, and that she did not know who cited these alleged violations. Tr. 472-474.

140.   Ms. Sataki admits not knowing what she gave Ms. Staunton and Mr. Razavi to prepare the supplemental complaint. Tr. 475.

141.   Ms. Sataki has never talked to any of Mr. Klayman's clients. Tr. 481.

142.   After Ms. Sataki claims that after she "terminated" Mr. Klayman, she is forced to admit that "maybe six, seven, eight months later" she sought the assistance of other counsel. Tr. 484.

143.   An email sent by Mr. Shamble on Jan. 27, 2011 told Ms. Sataki that she should contact Mr. Klayman so she does not lose any of her legal rights due to the passage of time to appeal and move other cases forward. Tr. 485-486.

144.   Ms. Sataki admits that she did not see another lawyer in time to bring a Title VII sexual discrimination complaint in court after the ODC ruled against her. Tr. 487.

145.   Ms. Sataki admits that Mr. Klayman advised and told her to get another lawyer and that he recommended Tim Shea and Gloria Allred. Tr. 493. Tr. 546-548. Mr. Shamble also recommended Tim Shea. Tr. 549-550.

146.   Ms. Sataki admits to encountering Mr. Klayman and his chief of staff in LA about a year ago. Tr. 496.  She denies (falsely) having yelled this man ruined my life and he is a terrible person. Tr. 497. To the contrary, Mr. Klayman testified that Ms. Sataki screamed, ""This man ruined my life. This man's a terrible person," defaming Mr. Klayman before his staff. Tr. 1065.

147.   Ms. Sataki filed a complaint in Los Angeles Superior Court against the manager of the apartment, Dean Proper, and accused him of sexual harassment of her friend Jessica who was

staying in the apartment in the second bedroom, as well as stealing Ms. Sataki's diamond ring. Tr. 506-512. RX 12. The Court ruled against her. Tr. 519.

148.   Ms. Sataki falsely tries to justify the court's judgment against her by untruthfully claiming that the complaint was only meant to escape the payment of rent for the apartment. Tr. 520.

149.   In fact, the truth is that the court documents show "Judgment was entered, as stated below, on Day: 8/23/2011. Defendant does not owe plaintiff any money on plaintiffs' claim. And below it says contested. Tr. 521. RX 12.

150.   Ms. Sataki also filed a complaint in Los Angeles Superior Court against the wife of Zia Atabay, who she was accused of having an affair, over Mrs. Atabay having allegedly keyed her car. However, Ms. Sataki also falsely testified that the court ruling proved she was not having an affair with Zia Atabay, the owner of NITV. Tr. 525-526. The Chair, Mr. Fitch, acknowledges that Mr. Klayman's elicited testimony goes to Ms. Sataki's overall credibility. Tr. 527-528.

151.   Ms. Sataki admits that the handwriting on the original ODC complaint is not hers. Tr. 538.

152.   Ms. Sataki effectively admits that a contingency fee would only be put into effect if Mr. Klayman moved forward and stayed on as her counsel after he told her he wanted off the case for personality reasons. Tr. 557. "Q: But what I was talking about Ms. Sataki, is if I continued on, given the difficulty in our relationship, regardless of what the cause was, then I'm saying then I want 50 percent going forward, correct?" "A: Correct." Tr. 557.

153.   Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes $62,000 per year plus health insurance benefits. Tr. 620-21.

154.   The OCR final determination was sent to Ms. Sataki's address.  Tr. 635. RX 18.

155.     The final determination finds that Ms. Sataki's factual claims of sexual harassment and workplace retaliation were not meritorious and thus false, as OCR had interviewed a number of witnesses. Tr. 635-640. RX 18.

156.     Ms. Sataki is forced to admit that at all times she could have contacted Mr. Shamble and asked what was happening and that at all times she could have talked to Mr. Shamble about her cases if she did not want to communicate with Mr. Klayman. But she did not contact either of them. She only finally contacted Mr. Shamble later. Tr. 662.

157.     There is mail from Mr. Klayman to Ms. Sataki where Ms. Sataki is forced to admit that Mr. Klayman offered to pay and did pay her salary when she was cut off by VOA as she would not return to DC. The email asks for her account number so Mr. Klayman could wire funds to her. Tr. 663-664. BCSX 9.

158.     An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666. BCSX 10.

159.     An email was sent on August 5, 2010 from Mr. Klayman to Ms. Sataki referring to the letter prepared by Kathleen Staunton that was sent to VOA's Dan Austin. BCSX 26.  In this email, Mr. Klayman stresses that this letter to Austin is counterproductive (to dismiss her cases and that she was foolishly giving up.). Tr. 697-699

160.     Mr. Klayman wrote to Ms. Sataki in an email at Christmas on December 25, 2010 and wished her and her family well. Mr. Klayman wrote:

> Good morning. … This is my Christmas message of you and my friends Ellie. I wish you the very best. So does God. The column (wnd.com) explains how you are part of the most profound experience in my life. … Someone called me today and threatened me. I know you would not do this. Keep yourself well and believe, as this is stronger than any psychologist. God bless you and your family. Larry" BCSX 32. Tr. 729-730

161.     An email by Mr. Klayman was sent to Ms. Sataki on Jan. 14, 2011, in response to something that Mr. Klayman received that was sent by someone other than Ms. Sataki because it

was written in perfect English reads in part: "However, whatever your legal status, you must be in contact with Ms. Sataki. Please tell her to contact me or the union president … Tim Shamble, to bring her up to date on the legal matters." Tr. 733.  BCSX 34.

162.    Mr. Razavi was the person who threatened Mr. Klayman and it was discovered that he had pled guilty to and was convicted by the 2nd District Court of the State of Nevada, Washoe County, for conspiracy to commit fraudulent acts involving gaming. BCSX 36, 37; Tr. 737-39.

163.    On September 11, 2011, Ms. Sataki sent an email to Mr. Klayman saying:

> Mr. Klayman are you happy now that you've completely destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party.'" BCSX 38.

164.    Ms. Sataki had no evidence that Mr. Klayman was bribed. Tr. 741-742.

165.    Ms. Sataki disparages and mocks Mr. Klayman's Judeo-Christian beliefs and religion. BCSX 38.

166.    Ms. Sataki is forced to admit that she, Mr. Shamble and Mr. Klayman discussed the article "The Government War on a Freedom Loving Beauty. BCX 23-33. Further it was discussed that publicity would be used to further settlement. Tr. 758-759. Ms. Sataki conceded that "We talked about that, the fact that publicity always is going to help everybody. You always said that. Tr. 759.

167.    Ms. Sataki never told Mr. Shamble not to use publicity. Tr. 761-62.

168.    After Ms. Sataki filed her complaint, for three and one half years, she never had any contact with ODC. Tr.766.

169.    Ms. Sataki had abandoned her complaint, but it was resurrected by ODC, despite two other bars having dismissed it many years earlier. In fact, internal correspondence of ODC reveals that it had to use private investigator Kevin O'Connell to try to hunt down Ms. Sataki. RX 27. The internal correspondence of ODC admits:

I am trying to locate a complainant that has dropped off the map. Ms. Elham Sataki…. She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

170.    Importantly, even on questioning from ODC, Ms. Sataki admits that she agreed to the use of publicity to coax a settlement so she could be detailed to the LA bureau of VOA. "Q: Did you ultimately agree with Mr. Klayman about the publicity?" "A: I did." Tr. 775.

171.    Ms. Sataki is still seeing a doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's representation. This shows that her mental and other problems are not the result of Mr. Klayman, but of her own. Tr. 201.

**Gloria Allred**

172.    Ms. Gloria Allred's law firm, Allred Maroko and Goldberg "has been the leading private women's rights law firm in the United States for 42 years." Tr. 1098-99.

173.    On June 15, 2010, Mr. Klayman sent an email to Ms. Allred's to discuss her taking over Ms. Sataki's case. Tr. 1100, RSX 1.

174.    Ms. Allred testified that there may have been discussions prior to the June 15, 2010 email regarding her firm representing Ms. Sataki, "because you didn't give her last name" in the email. Tr. 1101. Ms. Allred testified that she believed there was a conference call between Mr. Klayman, Ms. Sataki, and herself to discuss whether she would represent Ms. Sataki. Tr. 1101.

175.    Ms. Allred's firm did not end up representing Ms. Sataki. Tr. 1103.

176.    On March 23, 2012, Ms. Sataki, playing the victim to again induce someone to help her, sent Ms. Allred an email that read:

Hi Gloria. My name is Elham Sataki. I'm watching you on CNN now. All my hope regarding my case died, and I'm on medication and go to my therapist every week just so I can stay alive for my mom. And I love my mom, the same way that you (sic) daughter loves you. My mom is a strong mom like you. I'm in LA and hope that I can have a

meeting with you regarding my Voice of America case. Larry Klayman was representing me in this case but completely destroyed it. You can Google and YouTube me. I just want you to know, if there is any hope left, I have emailed women's rights groups, but no answer." Tr. 1105-06. RSX 2.

177.   Ms. Allred sent an email on the same day responding to Ms. Sataki saying that her firm could not represent her. Tr. 1107, RSX 2.

**Joshua Ashley Klayman**

178.   Joshua Ashley Klayman ("Ms. Klayman") is Mr. Klayman's sister. Tr. 1521.

179.   Ms. Klayman met Ms. Sataki multiple times. "At the time I was dating someone in Los Angeles, so I was frequently flying over the weekend from Los Angeles to New York. [Mr. Klayman] lived in Pacific Palisades, and I met her at his house." Tr. 1524.

180.   Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524.

181.   Ms. Klayman testified that Ms. Sataki

…was very interested in trying to get a positive result and to pressure people into, you know, giving her that result. She certainly was publicizing everything to my then boyfriend and me, but I don't recall her explicitly saying, like, 'Yes, I,' you know -- however she was actively publicizing it to me. And she seemed very onboard with whatever the strategy was." Tr. 1525-26

182.   Mr. Klayman mentioned the strategy of trying to get publicity for Ms. Sataki's claims against VOA in front of Ms. Sataki and Ms. Klayman, and Ms. Sataki did not object to the strategy. Tr. 1526.

183.   Ms. Klayman believed that Mr. Klayman and Ms. Sataki were friends:

Not sure offhand how many in-person times, however she and Larry were friends. I mean, they were -- that's why she was over my boyfriend's house there. So, I frequently

64

had conversations either directly with her or through Larry and her saying hi to me or something like that. It wasn't that -- they were friends." Tr. 1526-27.

184.   During their numerous meetings between Mr. Klayman, Ms. Klayman, and Ms. Sataki, Mr. Klayman always discussed publicizing Ms. Sataki's case, and Ms. Sataki never objected. Tr. 1527.

185.   Ms. Klayman was unsure of what to think about Ms. Sataki, but thought that Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

186.   Ms. Klayman testified that she did not believe that Mr. Klayman was in love with Ms. Sataki." Tr. 1529.

### The Honorable Stanley Sporkin

187.   The Honorable Stanley Sporkin ("Judge Sporkin") received and undergraduate degree from Pennsylvania State University and a law degree from Yale Law School. He is a member of the District of Columbia Bar and is also a CPA. Tr. 1171.

188.   Mr. Klayman has appeared before Judge Sporkin on several occasions and has found Mr. Klayman to be honest and ethical. Tr. 1172.

189.   Judge Sporkin got to know Mr. Klayman even better after Mr. Klayman no longer had cases before him and he retired from the bench. Tr. 1173.

190.   Judge Sporkin, based on the facts of the case found it reasonable under *Wagner vs. Taylor* to have put her to work for VOA in LA. Tr. 1174, 1175.

191.   Judge Sporkin would have also accorded Ms. Sataki a preliminary injunction hearing before ruling on the *Wagner vs. Taylor* preliminary injunction motion to put Ms. Sataki back to work for VOA in LA. That would have been the fairest thing to do for all parties. *Id*.

### Legal Ethics Expert Professor Ronald Rotunda

192.     The late legal ethics expert Professor Ronald Rotunda ("Mr. Rotunda"), former Doy &

Dee Henley Chair and Distinguished Professor of Law at Chapman University School of Law

reviewed the instant complaint against Mr. Klayman.

193.     Despite the fact that the Complaint is dated October 20, 2011, Mr. Klayman only received

in on or around December 19, 2016, likely because ODC sent it to the wrong address (2000

Pennsylvania vs. the correct 2020 Pennsylvania). RX 5.

194.     Mr. Rotunda found that it was "very surprising" that the Complaint was filed in October of

2011 over alleged events that occurred in December of 2009 and shortly thereafter. Ms. Sataki had

made similar complaint to the Pennsylvania Bar and The Florida Bar, both of which were

dismissed years ago. RX 5.

195.     Mr. Rotunda found that established case lase shows that ODC is subject to the principle of

laches. Mr. Rotunda wrote:

> In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1 1978) (per curiam), the Florida
> supreme court threw out charges because the prosecutor because of the Bar's delay in
> violation of the Florida rules… One can summarize this case as the Bar delaying
> finalization of two cases (where the Bar was disappointed with the recommended
> discipline) because it was confident it would secure a conviction in a third case still in the
> pipeline in the hope of securing greater overall disc line. The Court said, 'Whatever other
> objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be
> free to withhold a referee 's report which it finds loo lenient until additional cases can be
> developed* against the affected attorney, in an effort to justify the more severe discipline
> which might be warranted by cumulative misconduct. The Bar's violation of the prompt
> filing requirement in this case, to allow a second grievance proceeding against Rubin to
> mature, is directly antithetical to the spirit and intent of the rule. In addition, it has
> inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of
> uncertainties, suspicions, and accusations for a period in excess of that which the rules
> were designed to tolerate. RX 5.

196.     Mr. Rotunda found numerous other cases that held that ODC should be subject to the

principle of laches. They include *The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001);

*In re Grigsby*, 815 N.W.2d 836 (Minn. 2012); *In Matter of Joseph*, 60 V.I. 540, 558- 59 (V.I. Feb.

11, 2014); *Hayes v. Alabama State Bar;* 719 So 2d 787, 791 (Ala. 1998). RX 5.

197.    Mr. Rotunda found that in Indiana Bar expressly limits the time to complete a disciplinary

investigation in its own rules:

> *Limitation on time to complete investigation*. Unless the Supreme Court permits
> additional time, any investigation into a grievance shall be completed and action on the
> grievance shall be taken within twelve (12) months from the date the grievance is
> received…. If the Disciplinary Commission does no file a Disciplinary Complaint within
> this time, the grievance shall be deemed dismissed." RX 5.

198.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.3. In

this regard, Mr. Rotunda wrote:

> Mr. Klayman told me that when he wrote to talked about the case it was only after his
> client's permission. She and Mr. Shamble thought that publicity would help her case by
> encouraging the Voice of America to settle rather than suffer bad publicity. RX 5.

199.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.5. In

this regard, Mr. Rotunda wrote:

> Mr. Klayman tells me that he did disclose the fee when they first talked about the case.
> The fee was zero - he did it as a pro bono matter. Several months later, when the case got
> more difficult than either of them expected, he told the client that he would have charge a
> fee. Or, of course, she would retain another lawyer and he could transfer the files to that
> other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She
> never signed a fee agreement because she was hard to contact and the case ended at her
> request. He never charged her any fee. RX 5.

200.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.6. In

this regard, Mr. Rotunda wrote

> Mr. Klayman has told me that he had her permission before he disclosed anything. She
> and her Union Representative, Mr. Shamble, thought that publicity would help her case,
> and she was probably right – although not pursuing an appeal undercut her case." RX 5.

201.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.7. In

this regard, Mr. Rotunda wrote:

> Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only
> motivation was to help her as a friend because she was in trouble and had other problems.
> He would be willing to disclose these other problems to you if Ms. Sataki waives her
> attorney-client privilege. After all; we do not want a situation where the OBC seeks to
> discipline Mr. Klayman in this case because he used what the OBC later claims is

information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver. RX 5.

202.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 3.3. In this regard, Mr. Rotunda wrote:

> Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if she wanted to appeal. Her complaint says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority. RX 5.

203.    Mr. Rotunda wrote, "I am troubled that the OBC [ODC] has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances.  The OBC has not even asserted that it learned something in the intervening years to justify reopening." RX 5.

### Joel Bennett

204.    Joel Bennett was proffered as an expert by ODC on employment matters. Tr. 793-800. Mr. Bennett has never testified for a respondent in a Board disciplinary proceeding. Tr.801,807. Instead, he is the paid "hired gun" of ODC. *Id*. He is paid by ODC at an hourly rate of $475.00. per hour. Tr. 808. In his 45 years of practice, he may have had only one case in any way related to VOA. It concerned Radio Free Europe. Tr. 804. Mr. Bennett has not had any contact with or proceedings with VOA's Office of Civil Rights for at least the last 10 years. Tr. 807.

205.    Mr. Bennett spent little time reviewing the voluminous pleadings in the cases which Mr. Klayman brought for Ms. Sataki. Tr. 812-813.

206.    Mr. Bennett's alleged focus was simply whether it was necessary to name Secretary of State Hillary Clinton in the *Bivens* complaint Mr. Klayman brought for Ms. Sataki against the Board of Governors of VOA. Tr. 813-814.

207.    Mr. Bennett on questioning from AHC member Mr. Tigar is forced to admit that it is reasonable judgment in a *Bivens*-type action to name agency employees or officials as defendants. Tr. 820.

> Q: MR. TIGAR: Alright. Would that be a reasonable judgment of a lawyer? Not necessarily you?
> A: Right.  Tr. 820.
> Q: MR. TIGAR: No, I'm talking about the individual harasser. I'm talking about individuals connected with the decision-making process?
> A: Oh, I've never seen that done. You could always sue the head of the agency.

208.    Mr. Bennett admits that when the head of an agency receives notice of misconduct and fails to take action, that one would be able to name that individual in a *Bivens* claim. He testifies, "I would think you'd have to show notice and failure to take action…." Tr. 825-826.

209.    Mr. Bennett admits that Mr. Klayman did not attack Mrs. Clinton in naming her in the *Bivens* action. Mr. Bennett testifies, "[i]n all of the hundreds of pages of exhibits, I do not recall any individual attack on Mrs. Clinton." Tr. 827.

210.    Mr. Bennett testifies that he was unaware that the Honorable Ellen Huvell had such a *Bivens* case concerning Voice of America and ruled that that case could proceed against the board of governors.  He admits that "[t]here are many different ways that lawyers litigate cases." Tr. 830- 832.

211.    Mr. Bennett was retained by ODC before this proceeding was even instituted by a Board member. Tr. 833, 835. The draft specification of charges sent to Mr. Bennett before Mr. Klayman was even notified by ODC that it was considering bringing charges against him, is different than the one which ultimately became operative in this proceeding. Tr. 835.

212.    Mr. Bennett was aware of neither the Supreme Court's position in *Ziglar vs. Abbasi* where John Ashcroft was named as a defendant, Tr. 839-840, nor the Fourth Circuit's ruling that former FBI Director Louis Freeh could be named as a defendant in a *Bivens* lawsuit. Tr. 840.

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**AD HOC HEARING COMMITTEE**

_____

In the Matter of:

     **LARRY E. KLAYMAN, ESQ.**

                                  **Board Docket No. 17- BD-063**

**Respondent.**                        **Bar Docket No. 2011-D028**

A Member of the Bar of the District of
  Columbia Court of Appeals

(Bar Registration No. 334581)

---

**MOTION FOR LEAVE TO FILE SUPPLEMENT TO RESPONDENT LARRY
KLAYMAN'S POST-HEARING BRIEF AND PROPOSED FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**

_____

     Respondent Larry Klayman ("Mr. Klayman") hereby moves for leave and submits the following supplement to his post hearing brief, given the Ad Hoc Hearing Committee ("AHC") order of October 29, 2018 where Mr. Klayman it asked him to "admit or deny, with explanation, with each of [ODC's] PFF's…."   In conjunction with this, Respondent Larry Klayman respectfully requests that the AHC also carefully review the findings of fact included in Respondent's post hearing brief and findings of fact and conclusions of law as they accurately set forth the hearing testimony and exhibits which show that there is "no clear and convincing" evidence to warrant a finding of an ethics violation and sanctions.

     This supplement was prepared as suggested by the AHC's order of October 29, 2018, to aid the AHC in its analysis of the evidence.

     Any proposed finding of fact by ODC which is not otherwise listed below is not subject to being admitted by Respondent.

**<u>RESPONSE TO ODC'S PROPOSED FINDINGS OF FACT</u>**

1

OPF #6 – Respondent introduced himself as a lawyer, and proposed that she cover another story involving Iran…They exchanged business cards **OPPOSED.**

Respondent's Fact -  After Mr. Klayman introduced himself, Ms. Sataki ran over to him and gave him her card with her personal cell phone number on it and asked him to call her. PPF 45.

OPF #8 –  Respondent invited Ms. Sataki to dinner to further discuss her problems at work. There, he also offered to help her career in the media and suggested she consider hiring Gloria Allred to represent her in connection with the VOA matter. **OPPOSED.**

Respondent's Fact - Mr. Klayman had asked Ms. Sataki to dinner in a personal capacity. Tr. 325, 976. PPF 46.  About five to ten minutes of getting personally acquainted, Mr. Sataki "broke down in tears and grabbed my hand and said, 'Larry, I really have big problems. I've been sexually harassed by my co-anchor, … she described it, Mehdi Falahati and before that I was unfairly criticized for my abilities and I need help. And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends.'"  Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr.  326-27, 332-33, 976-977. PPF 47.

OPF #9 – They agreed that Respondent would receive 40 percent of any recovery. **OPPOSED**

Respondent's Fact - Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr. 326-27, 332-33, 976-977. PPF 47, 74. Ms. Sataki told Mr. Klayman that she had no money to pay for a lawyer and backs off a claim that she discussed offering him 40% of any recovery. Tr. 332-33. PPF 106.

OPF #9 - They later agreed that Respondent would pay Ms. Sataki ' s expenses in connection with her move to Los Angeles, for which he would be reimbursed from any recovery over and above his contingency fee…. Respondent did not provide Ms. Sataki a written retainer agreement or any other document setting forth the basis of his fee, the expenses for which she would be responsible, or the scope of his representation. **OPPOSED.**

2

Respondent's Fact - Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066." PPF 77. An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666. BCSX 10." PPF 158.  Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PPF 75.

OPF # 10 - Ms. Sataki told Respondent that she wanted her case to be handled very quietly because she did not want anyone to know about the sexual harassment…. Respondent initially agreed to respect his client's wishes. **OPPOSED**.

Respondent's Fact – Ms. Sataki admits agreed to the use of publicity and even engaged in garnering and distributing publicity for her cases herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182.

OPF # 13 - Without a place to live or any income, Ms. Sataki was not prepared to move. Id. at 361. Nevertheless, she agreed to pursue Respondent's legal strategy of attempting to force the VOA to transfer her to Los Angeles. because Respondent assured her that it would be easy and could be accomplished within two weeks. **OPPOSED**.

Respondent' Fact - Ms. Sataki was the one who wanted to move to LA, her home town, and where her friends, family and physicians were located. It was mutually agreed that the goal of the representation was to have Ms. Sataki detailed to work in LA.  PPF 18, 48, 54, 76, 107.

OPF #14 - Respondent thereafter discussed with Ms. Sataki a strategy for publicizing her case. Tr. 772 (Sataki). Ms. Sataki told him she did not favor publicizing her case. Tr. 397 - 405. Respondent did not discuss the specific type of publicity he contemplated. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits to having agreed to the use of publicity and even engaged in garnering and distributing publicity for her case herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182. Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011. PPF 60.

OPF # 18 - Ms. Sataki resisted adding Ms. Clinton and other defendants because she believed it would "hurt [her] case "and she told Respondent the case was "getting too big." **OPPOSED**.

Respondent's Fact – Then Secretary of State Hillary Clinton was on the BBG at the time that Mr. Klayman and Mr. Shamble were trying to reach a settlement. Tr. 912, 388. Ms. Sataki admits that she was aware that Secretary of State Hillary Clinton was included as a defendant in the BBG *Bivens* action because Mrs. Clinton was at the time "the number one governor sitting over that board." Tr. 479, 481. PPF 26.

OPF # 18 – Proceeding against the PNS and VOA on behalf of Ms. Sataki did not require suing Ms. Clinton and the other members of the BBG. **OPPOSED**.

Respondent's Fact – ODC's own "expert" admits that it was within the reasonable judgment of the attorney to sue agency officials as defendants. PPF 207.

OPF # 19 – In April 20 10, Ms. Sataki became aware that Respondent was pursuing a romantic relations hip with her. **OPPOSED**.

Respondent's Fact – Respondent did not pursue a romantic relationship with Ms. Sataki. For instance, there is no evidence that Mr. Klayman claimed to be anything more than close friends with Ms. Sataki. Mr. Klayman has offered testimony by Mr. Dash that states that Mr. Klayman

never sought a romantic relationship with Ms. Sataki, and he did not seek a sexual relationship! RFF 90. Indeed, the testimony clearly supports this, as Mr. Klayman told Ms. Sataki, "I'm not your boyfriend. I don't want to be your boyfriend." RFF 79. This is corroborated by numerous material witnesses. PFF 79, 90, 186. Documents submitted by ODC where Mr. Klayman purportedly professes his "love" for Ms. Sataki could just as easily show platonic love. For instance, as set forth in ODC's FF 24, Mr. Klayman listed seven attributes of <u>friendship</u>, not romantic relationships. Bar Counsel Supplemental Exhibit ("BCSX") 1.

<u>OPF #32</u> - The article quoted Respondent discussing his client' s sexual harassment case and disclosing that she "suffers serious health problems" because of the stress created by the conflict. The article also promoted Respondent's autobiography '·WHORES: Why and How I Came to Fight the Establishment." DX 23 at 23-36. **OPPOSED**.

<u>Respondent's Fact</u> - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki with her consent.  Tr. 1199-1230. BCX 23-12, 23-14, 23-19, 23-22, 23-25, 23-27, 23-30, 23-33, 23-36, 23-41. PFF 83.

<u>OPF# 33</u> – Respondent recommended Ms. Sataki not accept the government's offer of accommodation. **OPPOSED**.

<u>Respondent's Fact</u> – Ms. Sataki herself admits that she would not accept employment at Central News. Ms. Sataki threatened to commit suicide if she had to stay in Washington. Tr. 981-92. Ms. Sataki instructed Mr. Klayman to "get [her] back to LA." Tr. 346. PFF 108. In addition, Ms. Sataki believed that she was being set up to be fired, as her English was poor and the Central News Division broadcast in English to other countries that she had no interest in as an Iranian.

PFF 22.

OPF# 41 – It also included a promotion for Respondent's autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 42-43. Ms. Sataki also reminded Respondent, "PLEASE always remember YOU WILL GET 40% WHEN YOU FINISH THE CASE…." Respondent wrote back to Ms. Sataki the next day, describing the time and expenses he had put into the representation and then escalating his demand for compensation: "So at this point I think 50 percent of any recovery is fair and that is what I require. " He also promised to send her a written retainer agreement.  **OPPOSED**.

Respondent's Fact: Ms. Sataki gratuitously "offered" 40% to Mr. Klayman via email on May 30, 2010, but this was never agreed to, and in any event not important to Mr. Klayman. BCSX 11. Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PFF 75.

OPF # 44 – Despite his previous promise to continue with financial support, on June I, 2010, Respondent wrote Ms. Sataki that he would have no further financial involvement in leasing her apartment.... **OPPOSED**.

Respondent's Fact - Mr. Klayman assured Ms. Sataki in email of November 21, 2010, that her rent was paid for as they both moved on. Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I

wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066. PFF 77.

OPF # 48 – Respondent's autobiography was promoted within the article. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 53 - Ms. Stanton asked Ms. Sataki if s he was "o.k. with [Respondent] because we get the vibe that you re afraid of him." Tr. 115. Ms. Sataki explained to Ms. Stanton that she was not o.k. because "by then [she] was completely mentally destroyed because of the rollercoaster [Respondent] was putting [her] through." **OPPOSED**.

Respondent's Fact - Ms. Sataki's speaking falsely that she never wanted to do anything in court and implied that she did not want to be in LA and that was all Mr. Klayman's idea is likely what caused Kathleen Staunton to prepare the supplemental bar complaint, not that Ms. Staunton perceived that Ms. Sataki was scared of Mr. Klayman, as Ms. Sataki stated through rank uncorroborated and unreliable hearsay testimony. Tr. 1086-88; BCSX 20. PFF 81.

OPF # 57 **-** The next day, Respondent again wrote Ms. Sataki, reporting that he had followed her instructions by dismissing all cases against VOA, but that he did not dismiss the case before Judge Koller-Kotelly involving her relocation to work in Los Angeles. **OPPOSED**.

Respondent's Fact - Mr. Klayman, on July 28, 2018 filed a notice of voluntary dismissal

dismissing all but two of Ms. Sataki's claims.[1] The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. This occurred before Ms. Sataki's purported July 30 email which only asked Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name." BCSX 21. Ms. Sataki asks Mr. Klayman to continue to pursue the "sexual harassment case against Medhi Falahati…and Ali Sajjadi and Susan Jackson…." BCSX 21. This email does not discuss publicity. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief, and therefore dismissed the action entirely. PFF 68.

OPF # 59 – The next day, Respondent wrote Ms. Sataki, acknowledging he had received a copy of her August 4, 2010 letter to Mr. Austin. **OPPOSED**.

Respondent's Fact – The August 4, 2010 letter to Mr. Austin was written in perfect English, in contrast to Ms. Sataki's poor written English. "The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.

OPF # 62 - Rather than answering Respondent's messages, Ms. Sataki filed a disciplinary complaint, reporting that she had terminated him as her attorney and wanted him to stop attempting to communicate with her. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits that the handwriting on the original ODC complaint is not hers and thus does not appear to have come from her. Tr. 538. PFF 151.

OPF # 63 - Throughout October, 20 10, WND published further articles written by Respondent

---

[1] *Sataki v. BBG*, 1:10-cv-00534, ECF No. 67. For clarification, the notice of voluntary dismissal filed on July 28, 2010 dismissed all but one of Ms. Sataki's claims, but that was done in error, which was corrected on August 6, 2010. ECF No. 68.

that described his representation of Ms. Sataki, linked to his previous articles, and promoted his autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 65 – Despite having been terminated by Ms. Sataki and directed to voluntarily dismiss the *Sataki v. BBG* civil action…. **OPPOSED.**

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038-39. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.  Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71.

OPF # 68 - On December 25, 20I0, WND published Respondent's article, which discussed his representation of his former client, Ms. Sataki, and falsely claimed, "[a]n ultra-leftist, pro-Clinton and ethically corrupt federal judge - Colleen Kollar-Kotelly - had just dishonestly denied, without factual or legal bases, my request for Elham to be put back to work at the Los Angeles office of VOA." DX 23 at 23 - 12. **OPPOSED**.

Respondent's Fact - Mr. Klayman providing his opinion about a jurist that he as counsel actually appeared before, was supported by about 14 pages of her factual errors. PFF 65.  That Judge

Kotelly would simply ignore her grave errors, despite the fact that they were meticulously laid out for her in detail, clearly evidences the extrajudicial bias and prejudice against Mr. Klayman (and Ms. Sataki) that he had experienced from Judge Kotelly again and again. Mr. Klayman, upon being assigned Judge Kotelly, warned both Mr. Shamble and Ms. Sataki that the assignment could raise serious problems. PFF 39, 130 Furthermore, Judge Sporkin told Mr. Klayman that it would have been a "chip shot" to grant the relief sought by Ms. Sataki in order to preserve the status quo, and that he personally would have ruled to put Ms. Sataki to work in LA. PFF 191.

OPF # 69 –He filed a Notice of Appeal on January 19, 2011, despite having been terminated by his client. **OPPOSED**.

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.  Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71. Mr. Klayman filed a notice of appeal in the BBG case in the meantime to ensure that Ms. Sataki's legal rights were preserved. Tr. 1043-1044. PFF 72. Ms. Sataki herself filed a notice of appeal, mooting out the false claim that she wanted the case dismissed.  RSX 4. Tr. 1031. Tr. 1031.

OPF # 70 – Ms. Sataki continued to suffer harm from the publicity Respondent inflicted on her through his legal strategy and public pronouncements. **OPPOSED**.

Respondent's Facts - Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes

$62,000 per year plus health insurance benefits. Tr. 620-21. PFF 153. Ms. Sataki is still seeing a

doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's

representation. This shows that her mental and other problems are not the result of Mr. Klayman,

but of her own. Tr. 201. PFF 171.

Dated:  October 31, 2018                                Respectfully submitted,


Larry Klayman, Esq.
c/o 2020 Pennsylvania Avenue #800
Washington, D.C. 20006
Tel: 310-595-0800
leklayman@gmail.com
D.C. Bar No.:  334581


Frederick J. Sujat, Esq.
1525 Windjammer Way
Hollywood, FL, 33019
Tel: 954-815-5221
fsujat@yahoo.com
D.C. Bar No: 214650


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by email and Federal Express
on October 31, 2018, on H. Clay Smith, III, Assistant Bar Disciplinary Counsel at 515 5th Street,
N.W., Building A, Room 117, Washington, D.C. 20001 and filed with the Board of Professional
Responsibility on that same date.


Larry Klayman, Esq.


11

EXHIBIT 2

## IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

In the Matter of:

**LARRY E. KLAYMAN, ESQ.**

Respondent.

**No. 20-BG-583**
**Board Docket No: 17-BD-063**
**BDN: 2011-D028**

**A Member of the Bar of the District of**
**Columbia Court of Appeals**
**(Bar Registration No. 334581)**

### DECLARATION AND AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby

swear and affirm as follows:

1.      I have not practiced law in the District of Columbia since the January 7, 2021

order of this Court issuing a temporary suspension.

SWORN TO UNDER PENALTY OF PERJURY JUNE 23, 2022

Larry Klayman

EXHIBIT 3

5/2/22, 5:43 PM     DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 169 of 771   PageID 901

# RealClear Investigations



# DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency

By Paul Sperry, RealClearInvestigations
December 16, 2021

DC Bar

A former senior FBI lawyer who falsified a surveillance document in the Trump-Russia investigation has been restored as a member in "good standing" by the District of Columbia Bar Association even though he has yet to finish serving out his probation as a convicted felon, according to disciplinary records obtained by RealClearInvestigations.



Kevin Clinesmith, convicted ex-FBI lawyer: Allowed to negotiate a light sentence.

**YouTube/Fox News**

The move is the latest in a series of exceptions the bar has made for Kevin Clinesmith, who pleaded guilty in August 2020 to doctoring an email used to justify a surveillance warrant targeting former Trump campaign adviser Carter Page.

Clinesmith was sentenced to 12 months probation last January. But the D.C. Bar did not seek his disbarment, as is customary after lawyers are convicted of serious crimes involving the administration of justice. In this case, it did not even initiate disciplinary proceedings against him until February of this year — five months after he pleaded guilty and four days after RealClearInvestigations first reported he had not been disciplined. After the negative publicity, the bar temporarily suspended Clinesmith pending a review and

hearing. Then in September, the court that oversees the bar and imposes sanctions agreed with its recommendation to let Clinesmith off suspension with time served; the bar, in turn, restored his status to "active member" in "good standing."

Before quietly making that decision, however, records indicate the bar did not check with his probation officer to see if he had violated the terms of his sentence or if he had completed the community service requirement of volunteering 400 hours.

To fulfill the terms of his probation, Clinesmith volunteered at Street Sense Media in Washington but stopped working at the nonprofit group last summer, which has not been previously reported. "I can confirm he was a volunteer here," Street Sense editorial director Eric Falquero told RCI, without elaborating about how many hours he worked. Clinesmith had helped edit and research articles for the weekly newspaper, which coaches the homeless on how to "sleep on the streets" and calls for a "universal living wage" and prison reform.

From the records, it also appears bar officials did not consult with the FBI's Inspection Division, which has been debriefing Clinesmith to determine if he was involved in any other surveillance abuses tied to Foreign Intelligence Surveillance Act warrants, in addition to the one used against Page. Clinesmith's cooperation was one of the conditions of the plea deal he struck with Special Counsel John Durham. If he fails to fully cooperate, including turning over any relevant materials or records in his possession, he could be subject to perjury or obstruction charges.

Clinesmith — who was assigned to some of the FBI's most sensitive and high-profile investigations — may still be in Durham's sights regarding others areas of his wide-ranging probe.

The scope of his mandate as special counsel is broader than commonly understood: In addition to examining the legal justification for the FBI's "Russiagate" probe, it also includes examining the bureau's handling of the inquiry into Hillary Clinton's use of an unsecured email server, which she set up in her basement to send and receive classified information, and her destruction of more than 30,000 subpoenaed emails she generated while running the State Department. As assistant FBI general counsel in the bureau's national security branch, Clinesmith played an instrumental role in that investigation, which was widely criticized by FBI and Justice Department veterans, along with ethics watchdogs, as fraught with suspicious irregularities.



John Durham, Trump-Russia special counsel: He may still have Clinesmith in his sights.

**Department of Justice via AP**

Clinesmith also worked on former Special Counsel Robert Mueller's probe into the 2016 Trump campaign as the key attorney linking his office to the FBI. He was the only headquarters lawyer assigned to Mueller. Durham's investigators are said to be looking into the Mueller team's actions as well.

The D.C. Bar's treatment of Clinesmith, a registered Democrat who sent anti-Trump rants to FBI colleagues after the Republican was elected, has raised questions from the start. Normally the bar automatically suspends the license of members who plead guilty to a felony. But in Clinesmith's case, it delayed suspending him on even an interim basis for several months and only acted after RCI revealed the break Clinesmith was given, records confirm.



It then allowed him to negotiate his fate, which is rarely done in any misconduct investigation, let alone one

5/2/22, 5:43 PM          DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 171 of 771   PageID 903



Hamilton "Phil" Fox: Disciplinary counsel who handled Clinesmith is a major donor to Democrats.

**Facebook/D.C. Bar**

involving a serious crime, according to a review of past cases. It also overlooked violations of its own rules: Clinesmith apparently broke the bar's rule requiring reporting his guilty plea "promptly" to the court — within 10 days of entering it — and failed to do so for five months, reveal transcripts of a July disciplinary hearing obtained by RCI.

"I did not see evidence that you informed the court," Rebecca Smith, the chairwoman of the D.C. Bar panel conducting the hearing, admonished Clinesmith.

"[T]hat was frankly just an error," Clinesmith's lawyer stepped in to explain.

Smith also scolded the bar's Office of Disciplinary Counsel for the "delay" in reporting the offense, since it negotiated the deal with Clinesmith, pointing out: "Disciplinary counsel did not report the plea to the court and initiate a disciplinary proceeding." Bill Ross, the assistant disciplinary counsel who represented the office at the hearing, argued Clinesmith shouldn't be held responsible and blamed the oversight on the COVID pandemic.

The Democrat-controlled panel, known as the Board on Professional Responsibility, nonetheless gave Clinesmith a pass, rubberstamping the light sentence he negotiated with the bar's chief prosecutor, Disciplinary Counsel Hamilton "Phil" Fox, while admitting it was "unusual." Federal Election Commission records show Fox, a former Watergate prosecutor, is a major donor to Democrats, including former President Obama. All three members of the board also are Democratic donors, FEC data reveal.

While the D.C. Bar delayed taking any action against Clinesmith, the Michigan Bar, where he is also licensed, automatically suspended him the day he pleaded guilty. And on Sept. 30, records show, the Michigan Bar's attorney discipline board suspended Clinesmith for two years, from the date of his guilty plea through Aug. 19, 2022, and fined him $1,037.

"[T]he panel found that respondent engaged in conduct that was prejudicial to the proper administration of justice [and] exposed the legal profession or the courts to obloquy, contempt, censure or reproach," the board ruled against Clinesmith, adding that his misconduct "was contrary to justice, ethics, honesty or good morals; violated the standards or rules of professional conduct adopted by the Supreme Court; and violated a criminal law of the United States."

Normally, bars arrange what's called "reciprocal discipline" for unethical attorneys licensed in their jurisdictions. But this was not done in the case of Clinesmith. The D.C. Bar decided to go much easier on the former FBI attorney, further raising suspicions the anti-Trump felon was given favorable treatment.

In making the bar's case not to strip Clinesmith of his license or effectively punish him going forward, Fox disregarded key findings by Durham about Clinesmith's intent to deceive the FISA court as a government attorney who held a position of trust.

Clinesmith confessed to creating a false document by changing the wording in a June 2017 CIA email to state Page was "not a source" for the CIA when in fact the agency had told Clinesmith and the FBI on multiple occasions Page had been providing information about Russia to it for years — a revelation that, if disclosed to the Foreign Intelligence Surveillance Court, would have undercut the FBI's case for electronically monitoring



Carter Page: FBI lawyer Clinesmith

under the same court on an unrelated... Page as a supposed Russian agent and something that Durham noted Clinesmith understood all too well.

misled the surveillance court when he falsified a document to say Page was "not a source" who had helped the CIA, when in fact he was.

**FNC**

Bar records show Fox simply took Clinesmith's word that he believed the change in wording was accurate and that in making it, he mistakenly took a "shortcut" to save time and had no intent to deceive the court or the case agents preparing the application for the warrant.

Durham demonstrated that Clinesmith certainly did intend to mislead the FISA court. "By his own words, it appears that the defendant falsified the email in order to conceal [Page's] former status as a source and to avoid making an embarrassing disclosure to the FISC," the special prosecutor asserted in his 20-page memo to the sentencing judge, in which he urged a prison term of up to six months for Clinesmith. "Such a disclosure would have drawn a strong and hostile response from the FISC for not disclosing it sooner [in earlier warrant applications]."

As proof of Clinesmith's intent to deceive, Durham cited an internal message Clinesmith sent the FBI agent preparing the application, who relied on Clinesmith to tell him what the CIA said about Page. "At least we don't have to have a terrible footnote" explaining that Page was a source for the CIA in the application, Clinesmith wrote.

The FBI lawyer also removed the initial email he sent to the CIA inquiring about Page's status as a source before forwarding the CIA email to another FBI agent, blinding him to the context of the exchange about Page.

Durham also noted that Clinesmith repeatedly changed his story after the Justice Department's watchdog first confronted him with the altered email during an internal 2019 investigation. What's more, he falsely claimed his CIA contact told him in phone calls that Page was not a source, conversations the contact swore never happened.

Fox also maintained that Clinesmith had no personal motive in forging the document. But Durham cited virulently anti-Trump political messages Clinesmith sent to other FBI employees after Trump won in 2016 – including a battle cry to "fight" Trump and his policies – and argued that his clear political bias may have led to his criminal misconduct.

"It is plausible that his strong political views and/or personal dislike of [Trump] made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty," Durham told U.S. District Judge Jeb Boasberg.



Boasberg, a Democrat appointed by President Obama, spared Clinesmith jail time and let him serve out his probation from home. Fox and the D.C. Bar sided with Boasberg, who accepted Clinesmith's claim he did not intentionally deceive the FISA court, which Boasberg happens to preside over, and even offered an excuse for his criminal conduct.

"My view of the evidence is that Mr. Clinesmith likely believed that what he said about Mr. Page was true," Boasberg said. "By altering the email, he was saving himself some work and taking an inappropriate shortcut."

Fox echoed the judge's reasoning in essentially letting Clinesmith off the hook. (The deal they struck, which the U.S. District Court of Appeals that oversees the bar

5/2/22, 5:43 PM    DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

Case 1:20-mc-00043-B   Document 30   Filed 10/11/22   Page 173 of 771   PageID 905

approved in September, called for a one-year suspension, but the suspension began retroactively in August 2020, which made it meaningless.)
Boasberg opined that Clinesmith had "already suffered" punishment by losing his FBI job and $150,000 salary.

But, Boasberg assumed, wrongly as it turned out, that Clinesmith also faced possible disbarment. "And who knows where his earnings go now," the judge sympathized. "He may be disbarred or suspended from the practice of law."

Anticipating such a punishment, Boasberg waived a recommended fine of up to $10,000, arguing that Clinesmith couldn't afford it. He also waived the regular drug testing usually required during probation, while returning Clinesmith's passport. And he gave his blessing to Clinesmith's request to serve out his probation as a volunteer journalist, before wishing him well: "Mr. Clinesmith, best of luck to you."

James E. "Jeb" Boasberg: Obama appointee spared Clinesmith jail time.
**DC District Court**

Fox did not respond to requests for comment. But he argued in a petition to the board that his deal with Clinesmith was "not unduly lenient," because it was comparable to sanctions imposed in similar cases. However, none of the cases he cited involved the FBI, Justice Department or FISA court. One case involved a lawyer who made false statements to obtain construction permits, while another made false statements to help a client become a naturalized citizen – a far cry from falsifying evidence to spy on an American citizen ...

Durham noted that in providing the legal support for a warrant application to the secret FISA court, Clinesmith had "a heightened duty of candor," since FISA targets do not have legal representation before the court.

He argued Clinesmith's offense was "a very serious crime with significant repercussions" and suggested it made him unfit to practice law.

"An attorney – particularly an attorney in the FBI's Office of General Counsel – is the last person that FBI agents or this court should expect to create a false document," Durham said.

The warrant Clinesmith helped obtain has since been deemed invalid and the surveillance of Page illegal. Never charged with a crime, Page is now suing the FBI and Justice Department for $75 million for violating his constitutional rights against improper searches and seizures.





Rudolph Giuliani, Trump lawyer: Facing bar discipline, even though he's not charged with a crime.

5/2/22, 5:43 PM                    DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 174 of 771   PageID 906

PBS

Michael Sussmann, ex-Hillary Clinton
lawyer: Not facing bar discipline,
despite being charged with a crime.

**perkinscoie.com**

Explaining the D.C. Bar's disciplinary process in a 2019
interview with Washington Lawyer magazine, Fox said
that "the lawyer has the burden of proving they are fit to
practice again. Have they accepted responsibility for
their conduct?" His office's website said a core function is
to "deter attorneys from engaging in misconduct."

In the same interview, Fox maintained that he tries to insulate his investigative decisions from political
bias. "I try to make sure our office is not used as a political tool," he said. "We don't want to be a political
tool for the Democrats or Republicans."

Bar records from the Clinesmith case show Fox suggested the now-discredited Trump-Russia "collusion"
investigation was "a legitimate and highly important investigation."

One longstanding member of the D.C. Bar with direct knowledge of Clinesmith's case before the bar
suspects its predominantly Democratic board went soft on him due to partisan politics. "The District of
Columbia is a very liberal bar," he said. "Basically, they went light on the him because he's also a
Democrat who hated Trump."

Meanwhile, the D.C. Bar has not initiated disciplinary proceedings against Michael Sussmann,
another Washington attorney charged by Durham. Records show Sussmann remains an "active member"
of the bar in "good standing," which also has not been previously reported. The former Hillary Clinton
campaign lawyer, who recently resigned from Washington-based Perkins Coie LLP, is accused of lying to
federal investigators about his client while passing off a report falsely linking Trump to the Kremlin.

While Sussmann has pleaded not guilty and has yet to face trial, criminal grand jury indictments usually
prompt disciplinary proceedings and interim suspensions.

Paul Kamenar of the National Legal and Policy Center, a government ethics watchdog, has called for the
disbarment of both Clinesmith and Sussmann. He noted that the D.C. Court of Appeals must
automatically disbar an attorney who commits a crime of moral turpitude, which includes crimes involving
the "administration of justice."

"Clinesmith pled guilty to a felony. The only appropriate sanction for committing a serious felony that also
interfered with the proper administration of justice and constituted misrepresentation, fraud and moral
turpitude, is disbarment," he said. "Anything less would minimize the seriousness of the misconduct" and
fail to deter other offenders.

Disciplinary Counsel Fox appears to go tougher on Republican bar members. For example, he recently
opened a formal investigation of former Trump attorney Rudy Giuliani, who records show Fox put under
"temporary disciplinary suspension" pending the outcome of the ethics probe, which is separate from the
one being conducted by the New York bar. In July, the New York Bar also suspended the former GOP
mayor on an interim basis.

Giuliani has not been convicted of a crime or even charged with one.

*This and all other original articles created by RealClearInvestigations may be republished for
free with attribution. (These terms do not apply to outside articles linked on the site.)*

*free with attribution. (These terms do not apply to outside articles linked on the site.)*

*We provide our stories for free but they are expensive to produce. Help us continue to publish distinctive journalism by making a contribution today to RealClearInvestigations.*

**Support RealClearInvestigations →**    

# In re Clinesmith

District of Columbia Court of Appeals

September 2, 2021, Decided

No. 21-BG-18

**Reporter**

2021 D.C. App. LEXIS 253 *; 258 A.3d 161; 2021 WL 4074424

IN RE KEVIN E. CLINESMITH, RESPONDENT. A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 984265).

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:  [*1]** (DDN 305-19).

**Judges:** Before GLICKMAN and DEAHL, Associate Judges, and NEBEKER, Senior Judge.

## Opinion

On Report and Recommendation of the Board on Professional Responsibility Hearing Committee Number Four Approving Petition for Negotiated Discipline

PER CURIAM: This decision is non-precedential. Please refer to D.C. Bar R. XI, § 12.1(d) regarding the appropriate citation of this opinion.

In this disciplinary matter, Hearing Committee Number Four (the Committee) recommends approval of an amended petition for negotiated attorney discipline. *See* D.C. Bar R. XI, § 12.1(c). The amended petition is based on Respondent's guilty plea to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(3) for his actions in modifying a document while employed by the Federal Bureau of Investigation (FBI) as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. The Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts. The Committee concluded that Respondent's misconduct violated Rule 8.4(b) and (c) of the District of

Columbia Rules of Professional Conduct. The Committee determined that the negotiated discipline of a one-year suspension nunc pro tunc to August 25, 2020—the date he self-reported his conviction **[*2]** to Disciplinary Counsel—was not unduly lenient.

Having reviewed the Committee's recommendation in accordance with our procedures in uncontested disciplinary cases, *see* D.C. Bar R. XI, § 12.1(d), we agree this case is appropriate for negotiated discipline and the proposed sanction is not unduly lenient or inconsistent with dispositions imposed for comparable professional misconduct. Accordingly, it is

ORDERED that Respondent Kevin E. Clinesmith is hereby suspended from the practice of law in the District of Columbia for one year nunc pro tunc to August 25, 2020.

*So ordered.*

---

**End of Document**

EXHIBIT 2



# OFFICE OF BAR COUNSEL

July 7, 2011

Wallace E. Shipp, Jr.
*Bar Counsel*

Elizabeth A. Herman
*Deputy Bar Counsel*

*Senior Assistant Bar Counsel*
Judith Lotherton
Gene Porter

*Assistant Bar Counsel*
Ross T. Buchholz
H. Clay Smith
Jennifer P. Lyman
Catherine L. Kello
Becky Neal
William R. Ross
H. Clay Smith, III
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom
Dolores Dorsainvil
Joseph C. Perry
Mary-Helen Perry

**CONFIDENTIAL**

Ms. Elham Sataki
16110 Ventura Boulevard
Encino, California 91436

       Re:    Klayman/Sataki
                 Bar Docket No. 2011-D028
                 Response due: July 15, 2011

Dear Ms. Sataki:

      Enclosed is a copy of the attorney's answer to your complaint in the above-referenced matter.

      If you disagree with any of the statements made by the attorney, or if you have any additional evidence, please provide us with your written reply on or before July 15, 2011.

      If we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations. If you have a question or need assistance in preparing your response, please call the undersigned at (202) 638-1501. Please refer to the above docket number in all correspondence and telephone calls.

                      Sincerely,

                      H. Clay Smith
                      Assistant Bar Counsel

Enclosure

HCS:act

**Clay Smith**

| | |
|---|---|
| **From:** | Kevin O'Connell |
| **Sent:** | Thursday, January 16, 2014 9:47 AM |
| **To:** | Clay Smith; Chuck Anderson |
| **Subject:** | RE: Project |

Stand by......

**From:** Clay Smith
**Sent:** Wednesday, January 15, 2014 3:10 PM
**To:** Chuck Anderson; Kevin O'Connell
**Subject:** Project

Gentlemen:

I am trying to locate a complainant that has dropped off the map.

Ms. Elham Sataki
16110 Ventura Blvd.
Encino, CA 91436
(818) 800-1441

She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number above is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

Thanks,

H. Clay Smith, III
Assistant Bar Counsel
Office of Bar Counsel
515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

(202) 638-1501



1

# EXHIBIT 3



RECEIVED

June 13, 2018

Board on Professional
Responsibility

**Date:** May 30, 2018

**Case:** In The Matter Of:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,            : Board Docket No.

LARRY E. KLAYMAN,            : 17-BD-063

          Respondent.    :

- - - - - - - - - - - - - - - X

          Wednesday, May 30, 2018

          Washington, DC


        HEARING


Reported by

   Kim M. Brantley, C.S.R.

In The Matter Of:  Larry E. Klayman
May 30, 2018

## Page 2

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:28 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10    AD HOC HEARING COMMITTEE:
11    WARREN ANTHONY FITCH, ESQUIRE
12    Chair
13    MS. MARY LARKIN
14    Public Member
15    MICHAEL TIGAR, ESQUIRE
16      Attorney Member
17
18  On behalf of the DC Attorney Disciplinary
19  System:
20    H. CLAY SMITH, III, ESQUIRE
21
22

## Page 4

1         I N D E X
2  OPENING STATEMENTS:           PAGE:
3  By Mr. Smith              36
4  By Mr Sujat               42
5  By Mr. Klayman                49
6
7  WITNESS:          DIRECT:
8  Ms. Elham Sataki       69
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 3

1  APPEARANCES CONTINUED:
2    On behalf of Respondent:
3      FREDERICK J. SUJAT, ESQUIRE
4      Law Office of Frederick J. Sujat
5      1525 Windjammer Way
6      Hollywood, Florida 33019
7      (954) 815-5221
8      Email: fsujat@yahoo.com
9  ALSO PRESENT:
10      LARRY E. KLAYMAN, ESQUIRE
11      Respondent
12
13
14
15
16
17
18
19
20
21
22

## Page 5

1       P R O C E E D I N G S
2    (In the Matter of Larry E. Klayman, Bar
3  Docket No. 2011-D028.)
4    CHAIRMAN FITCH:  This matter is before
5  a hearing committee pursuant to Rule XI of the DC
6  Court of Appeals governing attorney practice in
7  the District of Columbia.
8    I'm Tony Fitch.  I'm the Chair of this
9  ad hoc hearing committee.
10    I'd like to swear the court reporter at
11  this time, if I may.
12    (Court Reporter sworn.)
13    CHAIRMAN FITCH:  Let me ask the
14  members, other members of the hearing committee,
15  to introduce themselves, please.
16    MS. LARKIN:  Hi, I'm Mary Larkin.
17    MR. TIGAR:  Good morning.  I'm Michael
18  Tigar.
19    CHAIRMAN FITCH:  This hearing will be
20  an adversary proceeding to determine whether
21  discipline should be imposed on the Respondent.
22    All proceedings before the hearing

Page 6

1    committee are, by rule, open to the public.
2         In this proceeding the witnesses will
3    be examined under oath or affirmation.
4         May I have those present at counsel
5    table introduce themselves, please.
6         MR. SMITH:  Clay Smith, on behalf of
7    the Office of Disciplinary Counsel.
8         MR. SUJAT:  Good morning, your Honor.
9    My name is Frederick Sujat.
10        CHAIRMAN FITCH:  Counsel for --
11        MR. SUJAT:  Counsel for Mr. Klayman,
12   the Respondent.
13        CHAIRMAN FITCH:  We haven't previously
14   met.  It's nice to meet you.
15        MR. KLAYMAN:  And I'm Larry Klayman,
16   the Respondent, and currently serving in
17   transition to Mr. Sujat as co-counsel.  As your
18   Honor has noted on one of his orders, it's
19   perfectly ok.
20        CHAIRMAN FITCH:  We'll turn to
21   preliminary matters, if we may.  Putting aside for
22   just a moment any supplicant matters, I anticipate

Page 7

1    and hope that we'll go pretty close to 5:00
2    o'clock today, if that's of any help in people's
3    planning, and I could be tempted to go even
4    somewhat later.
5         If anyone has any problems with that,
6    one should not hesitate to speak up, and that will
7    simply be the end of that possibility.
8         Tomorrow I may need to leave a bit
9    early, and so that consideration is what underlies
10   my thought that I might want to go a little bit
11   later this evening, depending upon how the
12   evidence is flowing and how schedules are looking.
13        It's pleasantly cool in here right now.
14   It's a little muggy outside, I couldn't help but
15   notice.  I'm happy for things to be fairly
16   informal.  This room has at times gotten a bit
17   warm, and if counsel want to doff their coats,
18   that's perfectly all right.  We may do the same.
19        In fact I have no problem whatsoever
20   with business casual as well as business dress.
21   It's entirely up to the individuals.
22        Coffee and water and so on are

Page 8

1    perfectly ok on counsels' table.
2         I imagine this morning we'll take one
3    break.  But again, any time anybody wants to have
4    a break for one reason or another, stretch one's
5    legs for three minutes, or deal with some pressing
6    matter for a few minutes, just speak up.  It's
7    really not a problem whatsoever.
8         Even though I hope to take only one
9    break this morning, I myself tend toward a bit of
10   a late lunch, like shooting toward 1:00 o'clock.
11   It just makes the afternoon a little bit easier.
12        But again, it doesn't make any
13   difference to me whether we break at noon or break
14   at 12:30 or break at 1:00 or anything else.  I'm
15   open to hearing suggestions from anybody at the
16   appropriate time for any reason.
17        Mr. Smith, do you have any preliminary
18   matters?
19        MR. SMITH:  No, no preliminary matters
20   from Disciplinary Counsel.
21        CHAIRMAN FITCH:  Respondent's team,
22   preliminary matters?

Page 9

1         MR. KLAYMAN:  Yes, your Honor.
2    I'm introducing Mr. Sujat, but, because
3    we're in transition, I just met with Mr. Sujat for
4    the first time yesterday.  He lives in Florida.
5    I'm spending most of my time in California these
6    days, and consequently, because your Honor and the
7    hearing committee wanted to proceed this week with
8    Ms. Sataki, we would ask, you know, once the
9    petitioner presents its case, that there be time
10   for Mr. Sujat to be able to prepare with me to go
11   through all the different exhibits, which he
12   hasn't had a chance to do yet.
13        He has gone through the Specification
14   of Charges and preliminary matters, but we would
15   need time, and I would propose that this hearing
16   be reconvened at the time that we talked about in
17   July, July 2nd, to give him time.
18        I need time also to get Mr. Sporkin up
19   to speed, Judge Sporkin.  I have met with him, but
20   he needs time to digest all the documents.
21        There are allegations, based upon the
22   expert here, that, you know, I didn't have a

3  (Pages 6 to 9)

In The Matter Of:  Larry E. Klayman

May 30, 2018

Page 10

1   reasonable chance of winning this case, and also
2   dealing with other issues that we've gone through
3   before.  I'm not going to belabor that, but
4   consequently we need time, respectfully, for Mr.
5   Sujat to get up to speed, and consequently, for
6   that reason, we would ask that the hearing be
7   adjourned after they present their case and then
8   reconvened at a point that's mutually agreeable to
9   the different parties.
10      CHAIRMAN FITCH:  I think that
11  adjourning for a few days at the end of
12  Disciplinary Counsel's case is at least
13  tentatively anticipated probably by everybody, and
14  tentatively and implicitly -- maybe explicitly
15  anticipated as a possibility in the hearing
16  committee's order last week.
17      So, we will address that.  I think it's
18  probably best addressed say at the beginning, as I
19  mentioned in the order, at the beginning of Friday
20  afternoon's session where you will have had a
21  couple, two and a half days of proceedings.
22      We will have some idea where we are if

Page 11

1   we address it at the beginning of Friday
2   afternoon's session and then have -- by then
3   Disciplinary Counsel's case might be over with.  I
4   don't know.
5       But even if we proceed on Friday
6   afternoon addressing that issue, at the beginning
7   of Friday afternoon we will give everybody a
8   little time to have some noodling time over that,
9   even though other work will be going on as well.
10      So that's the way we're going to
11  proceed.
12      There probably won't be any need for
13  it, but there will be a rule on witnesses in this
14  matter, and it is entirely the obligation of
15  counsel to check and be sure that the rule on
16  witnesses is being complied with.
17      Mr. Smith, do you want to do an opening
18  statement?
19      MR. KLAYMAN:  Your Honor, may I raise a
20  few other things?
21      CHAIRMAN FITCH:  Oh, sure.
22      MR. KLAYMAN:  Ok.  This is a case which

Page 12

1   involves some issues of an allegation that I
2   sought a romantic relationship with the
3   complainant.
4       If I am compelled to do
5   cross-examination, I want to make it clear that
6   I'm serving as both a lawyer and as a Respondent
7   and as a witness.
8       I don't want to seem like I'm being
9   heavy handed, you know, in a case like this where
10  that issue is out there with a woman, which I
11  respect.  As I said, Gloria Allred is a friend of
12  mine.
13      So consequently, that's why we need the
14  additional time, in part, because I've got to get
15  Mr. Sujat up to speed, and I don't think, even
16  though this is a judge-tried case in a way, that
17  it puts me at a disadvantage in having to be very
18  assertive with Ms. Sataki, because I'm looking --
19  in terms of demeanor and everything else, and it
20  gets melded together.
21      So I would hope that we'd have more
22  time than just a few days after this case ends.

Page 13

1   If you can't do it until early July, you know,
2   when initially you were all free, then at least a
3   couple of weeks to regroup so I can go through
4   everything with him and get Mr. Sporkin up to
5   speed, Judge Sporkin up to speed, too.
6       As you know, regrettably, Professor
7   Rotunda died recently.  There is expert testimony
8   being provided by the petitioner here, and it's
9   important that I have my expert, as well.  It's
10  just a matter of fairness and due process.
11      Then there is another issue here is
12  that, the witness that's listed by Mr. Smith, the
13  petitioner, the investigator, Kevin O'Connor, I
14  have no idea what he's going to say, and all it
15  says is he's testifying with regard to publicity.
16      Any of his testimony is most likely
17  hearsay, rank hearsay.  He wasn't involved in this
18  matter.  What he allegedly learned he learned in
19  talking to people.
20      So I would request an opportunity to be
21  able to depose Mr. O'Connor to see where he's
22  going to testify to prevent unfair surprise,

4 (Pages 10 to 13)

Page 14

1  because I just don't know where he's going on
2  this.
3      So, those are some issues up front and
4  the hiatus would give me an opportunity to learn
5  more about what he's going to say so I can prepare
6  and Mr. Sujat can prepare.  Because we have no
7  idea what he's going to say.
8      The statement on the witness list says,
9  "Mr. O'Connell, an investigator employed by the
10  Office of Disciplinary Counsel, will testify about
11  his investigation and Respondent's published
12  articles concerning his representation of Ms.
13  Sataki."  I mean, that's all going to be hearsay
14  testimony, your Honor, and we don't know anything
15  about that testimony.  It just doesn't seem to
16  make sense that he'd be testifying about that.
17      So, we need that time, and it's
18  important, because, as I said, I retained Mr.
19  Sujat recently and I had been looking for counsel
20  and we had interim cases.  It wasn't that it was
21  delayed because I was looking for counsel, but I
22  needed to find somebody who, at low cost, could

Page 15

1  represent me, because I can't afford, you know,
2  $2- $350,000 in legal fees here.
3      So, that's very, very important.  I
4  wanted to stress that.
5      And then, of course, we'll have to,
6  based on the testimony, you know, schedule our
7  witnesses and such.
8      Your Honor has given us until Friday
9  with regard to remote testimony, and we'll comply
10  with that order and give you a motion on that.
11      So I just ask for flexibility here on
12  fairness and due process, and equal protection.
13      So, that's my suggestion, as that's
14  difficult -- as you know, I've been a lawyer for
15  40 years, been in good standing with the Bar for
16  that period of time, and other bars.  It's hard to
17  be co-counsel and a Respondent at the same time.
18  It creates an inherent conflict and, you know, I'm
19  appearing in two different roles, which can be
20  misinterpreted --
21      CHAIRMAN FITCH:  If I may --
22      MR. KLAYMAN:  If you know what I mean.

Page 16

1      CHAIRMAN FITCH:  If I may address these
2  points: with respect to your point about
3  cross-examination, I've determined, with a
4  reasonable degree of assurance, that there's no
5  one sitting behind this table with me who is a
6  shrinking violet, and I think we know that
7  cross-examination needs to be very explorative
8  many, many times.
9      Any kind of cross-examination, and I
10  speak as a former witness, can be unpleasant, and
11  some cross-examinations are more difficult for the
12  witness and for counsel than others.
13      So, you can rest assured that your
14  proper cross-examination, even if intensive, is
15  not going to be curtailed so long as it is
16  reasonable in length, and we certainly expect that
17  a good deal of latitude will be provided in that
18  regard.
19      With respect to the expert witness, I
20  think I've addressed that already.  We'll be able
21  to revisit that on Friday afternoon, or before, if
22  people want to.  Again, it's perfectly all right.

Page 17

1      With respect to the investigator's
2  testimony, we'll have to see what the investigator
3  has to say.  If it's hearsay, we'll have to take
4  that into consideration under the rules, but the
5  rules in large part prohibit me from excluding
6  hearsay testimony.
7      I didn't write the rules, I may not
8  like the rules, but that is the rule, broadly,
9  broadly speaking, and with possible exception of,
10  in some circumstances, what's provided for in
11  another rule, and I'm referring in particular to
12  Rule XI.3 and the possible effect of Rule XI.3, of
13  Rule VII.16(a).
14      With respect to remote testimony, we'll
15  get there when we get there on Friday.
16      It would be preferable to receive that
17  motion, if it is to be filed, before we adjourn on
18  Friday.  I'm not sure I can force you to do that,
19  given my order.  I should have thought about that
20  at the time, but in addition to receiving the
21  motion, all of us might want to hear more argument
22  on that motion, and you might want to comment on

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 18

1    that motion.
2           If we don't get that motion until after
3    we adjourn, we either come back on Monday, or we
4    have more argument.  So I have to leave that to
5    you.
6           I should have thought that out a little
7    bit more beforehand.  I apologize.
8           Mr. Smith, opening statement.
9           MR. SMITH:  Yes, but before I do that,
10   there was one preliminary matter I wanted to bring
11   to the hearing committee's attention.
12          Last Thursday afternoon I received from
13   my witness, Ms. Sataki, a compendium of emails
14   that I had not previously been given from her
15   which reflect what was taking place during the
16   course of the period in issue before us.  These
17   are emails that were exchanged between herself and
18   Mr. Klayman.
19          After my secretary had prepared them
20   and put them in one package Friday morning, I
21   emailed them to Respondent's counsel.  And, out of
22   a spirit of cooperation -- and certainly I'm sure

---

Page 19

1    that the Respondent and his counsel were
2    surprised, as I was, to receive these emails.
3    They are relevant to these proceedings, and I
4    guess I should ask the hearing committee for some
5    guidance with respect to whether or not these
6    documents may be received during our case in chief
7    or whether it's something that the committee wants
8    to think about.
9           But I have with me the emails that I
10   received, the cover letter at least, and our
11   transmittal of the documents to Respondent and his
12   counsel, forwarded to Respondent's counsel on
13   Friday.  I have taken copies and given them
14   supplemental exhibit numbers, and I'm sure that
15   Respondent has something to say about all that,
16   and, you know, I'd be happy to respond, but at
17   this point I do have copies of the cover email to
18   let him know if --
19          Do you need to see these?
20          CHAIRMAN FITCH:  Well, one thing
21   Respondent knows that I don't know is what
22   quantity of material we're talking about.

---

Page 20

1           MR. SMITH:  I have taken the liberty of
2    putting them together and we have selected 38 that
3    we would like to have introduced at some point.
4           Again these documents are email
5    exchanges between Respondent and Ms. Sataki, so he
6    presumably is aware of them as he authored many of
7    them.
8           Some of the documents that we received
9    were duplicative and, you know, were already part
10   of our exhibits, but there were others that were
11   clear copies of things that we had and others that
12   showed email exchange in place of some of the
13   conversations in context.
14          MR. KLAYMAN:  If I may respond.
15          CHAIRMAN FITCH:  You may of course.
16   But give me one minute.
17          (Brief pause.)
18          CHAIRMAN FITCH:  I'll hear from the
19   Respondent's team.
20          MR. KLAYMAN:  Your Honor, as we set
21   forth previously, we believed that we hadn't been
22   provided all of the documentation that Bar Counsel

---

Page 21

1    had or had access to timely, and this confirms it.
2    I'll get to what Mr. Smith is talking about now,
3    but before that he also sent to Mr. Sujat, late
4    last week, a thumb drive that contains
5    correspondence between me and Bar Counsel.
6           Now this case is eight years old.  As
7    I've said before a lot of information was
8    discarded or lost.  A lot of evidence was
9    discarded or lost.  And that's why I asked for all
10   these communications.  I thought the case had been
11   dismissed because both Florida and Pennsylvania
12   had dismissed it eight years ago, and didn't keep
13   that stuff.
14          We didn't get a thumb drive until last
15   Friday.  And then, knowing that I was in
16   California and I'm the one who is knowledgeable
17   about this case, not Mr. Sujat -- he hadn't been
18   even brought up to partial speed at that time --
19   it was sent to him.  So I didn't get it until
20   Saturday morning, and I haven't had a chance to
21   look at all of that stuff yet.
22          But these emails, to come in at the

---

Page 22

1  last minute.  And in fact Bar Counsel claims that
2  they got it on the 24th.  They could have filed a
3  motion last week in terms of having this material
4  used.  It catches us by surprise and I would ask
5  that it be excluded, because the witness lists
6  have been provided, the exhibit lists were
7  provided, the disks were provided.
8       To come in at this point with that
9  information, and particularly to try to use it
10  today, would be totally unfair and improper.
11       They never even filed a motion last
12  week with regard to it, to put you on notice,
13  rather than just coming in here and trying to
14  create a fait accompli that we've got all this
15  stuff.
16       Some of this stuff is highly
17  prejudicial, and some of it needs to be -- I need
18  to be able to object in advance, as we do with
19  exhibits as to whether it comes in.
20       So I would ask that it not be provided
21  to the hearing committee, but give me an
22  opportunity to go through it.

Page 23

1       We didn't get it until Friday of last
2  week.  This isn't fair.  And particularly in light
3  of the fact that we're now eight years into this
4  case, the evidence will show that, even after Ms.
5  Sataki filed her complaint in 2010, she didn't
6  communicate with Bar Counsel for three and a half,
7  four years, and in fact there are internal
8  policies in the letter that was given to her that
9  said that, "If we don't hear from you, we will
10  assume you're not proceeding with the case."
11       All of a sudden the case gets
12  resurrected from the dead in 2016 for what I've
13  maintained were improper reasons, generally to get
14  into here.
15       But this whole proceeding, the way it's
16  been handled by Bar Counsel, is just
17  inappropriate, and to spring this on everybody now
18  is inappropriate, and I would ask that this
19  information be excluded.  There were time periods
20  to present evidence and there were time periods to
21  be able to object.  I haven't had a chance to do
22  that.  And to just give it to the hearing

Page 24

1  committee now would be highly prejudicial.
2       And that's why I've also advocated
3  that, after they finish their case, based upon the
4  evidence that's before us now, that we take a
5  break and figure out what to do generally about
6  getting Mr. Sujat up to speed, about dealing with
7  this other stuff and how to proceed.  We need a
8  reasonable period of time to prepare.  And that's
9  only just.
10       You know, and again, I respect this
11  committee.  I respect the DC Bar.  I've been a
12  member in good standing continuously for
13  thirtysomething years, 38 years or so, but I need
14  an opportunity to defend myself, because these are
15  very heavy allegations that are not true.  I need
16  to be able to at least present my case with proper
17  preparation.
18       It's not right to spring this on at the
19  last minute like this, right before the hearing.
20  It also violates the rules, and it violates your
21  order, your Honor.
22       CHAIRMAN FITCH:  Mr. Smith, let me turn

Page 25

1  to the thumb drive issue first.
2       Was there anything in the thumb drive
3  that was not previously in your files?
4       MR. SMITH:  No, sir.
5       CHAIRMAN FITCH:  Mr. Klayman, I share
6  your concern about new group of documents, and I
7  certainly am not going to rule right now that they
8  are going to be admitted or heard.
9       As Mr. Tigar pointed out to me in Rule
10  VII.19 is applicable here, and whether to allow
11  the admission of or testimony about the group of
12  emails that we're now discussing is in the
13  discretion of the hearing committee chair, and, in
14  eventually exercising that discretion, this
15  hearing committee chair is going to consult with
16  the other two members of the hearing committee, as
17  well.
18       So, Mr. Smith, when you get to the
19  point where those documents might in your view
20  come into play in the natural course of things,
21  you need to give us a heads up and we'll discuss
22  it further.  For example, it might be that all

7  (Pages 22 to 25)

Page 26

1    those emails pertain to one or two areas of
2    concern.  You could sort of, if that's the case,
3    identify for yourself when those areas of concern
4    are being reached.
5         Speaking of areas of concern, I think I
6    did not address the investigator's testimony issue
7    that you raised, and there we'll have to see what
8    the investigator is going to testify about.  It
9    might be hearsay, it might not be hearsay.  We'll
10   just have to see.
11        MR. TIGAR:  May I add something, Mr.
12   Chair?
13        CHAIRMAN FITCH:  Yes.
14        MR. TIGAR:  With respect to the
15   investigator's testimony, some of those hearsay
16   issues of course are resolved, if we were using
17   the federal rules of evidence, by Rule 803,
18   Subdivision 8, and of course you'll have the
19   opportunity to test the credibility of any
20   declarants upon which you would rely in Rule 806,
21   if you were in federal court.
22        But I share with the Chair this concern

Page 27

1    that nobody at this proceeding should get
2    confronted with testimony that they can't
3    effectively challenge with cross-examination.
4         And Mr. Chair, with respect to the
5    belated production here, for whatever my vote is
6    going to be worth here, I'll be looking to the
7    balancing test under Federal Rule of Civil
8    Procedure 37, which deals with the obligation of a
9    party to make discovery and with the question of
10   the circumstances under which the sanction of
11   exclusion can be used, because the federal courts
12   take seriously the failure to make discovery in a
13   timely way.
14        CHAIRMAN FITCH:  And if I may add here,
15   that is usual guidance.  The dynamic here is
16   somewhat different because of the difference in
17   the evidentiary rules between the federal system
18   and this system.
19        MR. TIGAR:  Oh, yes, I understand that.
20   I mean, this is guidance, not control.
21        CHAIRMAN FITCH:  May I assume that the
22   gentleman who entered the room just now is not a

Page 28

1    potential witness?
2         Someone wanted to make a comment.
3         Mr. Klayman?
4         MR. KLAYMAN:  Yes.  This points to an
5    issue, to the gist of unfair surprise, but as Mr.
6    Tigar said, following accepted norms with respect
7    to pretrial procedure and discovery.
8         Now some of this material may actually
9    be helpful to me.  I haven't had a chance to take
10   a look at it.  But, on the other side of the coin,
11   you can't just come in on the day of trial and try
12   to jam this stuff forward.  And that's why I asked
13   that the hearing committee not look at it until I
14   have an opportunity to look at it --
15        CHAIRMAN FITCH:  No, we're not going
16   to.
17        MR. KLAYMAN:  -- and see what it is.
18        CHAIRMAN FITCH:  We're not going to.
19   We have not seen it.
20        MR. KLAYMAN:  And I don't understand
21   why, given the fact that we were doing this
22   transition, it was clear that Mr. Sujat was not

Page 29

1    going to be up to speed, why even the thumb drive
2    was sent to Florida rather than to me, at which
3    point I had to get it Saturday morning as I was
4    leaving to come here.
5         CHAIRMAN FITCH:  Well, he did enter an
6    appearance of counsel.
7         MR. KLAYMAN:  Yes.
8         CHAIRMAN FITCH:  But there's been --
9         MR. KLAYMAN:  That's the equity that
10   I'm talking about, the fairness.
11        CHAIRMAN FITCH:  The Respondent's team
12   has also made some observations this morning and
13   previously about the length of time in which this
14   case has been pending.
15        This committee has no jurisdiction over
16   why the case has taken as long as it has or the
17   reasons, if any, why it was brought.  That's a
18   matter purely for the Board.
19        This committee is obligated to
20   consider, as the evidence comes in, whether a
21   passage of length of time is affecting the
22   presentation of testimony because of lost memories

8  (Pages 26 to 29)

Page 30

1   or otherwise.  We're not allowed to rule upon
2   that, but we are obligated, required to report on
3   any observations that we have in that regard.
4         This is a legal question that, for us,
5   as in all the legal questions here, we make only
6   recommendations.  The Board makes the
7   determination.
8         But the Respondent's team absolutely is
9   entitled in its closing argument and/or in its
10  briefing to point out the ways, if any, in which
11  the passage of time or other circumstances have
12  affected the presentation of testimony.
13        I suppose, if those points are made,
14  Mr. Smith will do rebuttal on them.  We'll take it
15  under consideration and we'll make our report.
16        MR. KLAYMAN:  One other point here...
17        Your Honor is aware of my position that
18  this case was brought for an improper purpose.
19  I'm not going to belabor that.  It's not what I'm
20  talking about now.  But we have, sitting in the
21  room here today, Mr. James Peterson, who is from
22  my former group, Judicial Watch, who I've had a

Page 31

1   lot of contentious relationship wit over the last
2   14 years.  And, you know, I wonder how he learned
3   of this case going forward today.  It wasn't
4   something out there in the public domain.  How
5   Judicial Watch learned it, I have been very
6   contentious with them.
7         So that's another reason why
8   documentation which they may seek to use against
9   me in some way and other things that are being
10  said, there's an issue here.  And because we have
11  been at loggerheads.
12        I got a judgment against them in Miami
13  back in 2014, which is my home, in South Florida,
14  against them for malicious defamation, for
15  defaming me; $181,000, plus punitive -- including
16  punitive damages.
17        It's very hard to get that kind of a
18  judgment with a public figure.  I'm a public
19  figure.
20        So, this is -- you know, was Mr.
21  Peterson tipped off by Bar Counsel?  I mean, it's
22  not something which is generally out there, and

Page 32

1   this troubles me, and I'm concerned that they
2   could try to use things that Ms. Sataki said and
3   others say to try to harm me.
4         Mr. Peterson shows up at nearly every
5   case that I'm involved in for Freedom Watch, and I
6   believe it's an intimidation tactic, too.
7         I'm a big boy and I can defend myself.
8   And I believe in myself and what I do, being
9   ethical, but that's part of the problem I have
10  here with regard to the things that are going on
11  with Bar Counsel, including this last-minute
12  document thing.  And it confirms what I've said,
13  that I wasn't given all the documents.  It
14  confirms that.  Ok?
15        So I just raise these issues here.  You
16  know, I'm prepared to defend this on the merits,
17  but there are other things swirling around here
18  that I don't think completely meet your eye yet.
19        CHAIRMAN FITCH:  Well, with respect to
20  the -- if I may so call them, the "new emails,"
21  Mr. Smith will have to provide further explanation
22  than he has so far, either through the

Page 33

1   presentation of some evidence or through some
2   representations.
3         As to your question about this
4   gentleman -- I apologize.  I've forgotten his name
5   already --
6         MR. KLAYMAN:  Peterson.
7         CHAIRMAN FITCH:  That's beyond the ken
8   of this committee and I leave it to Mr. Smith -- I
9   have to leave it to Mr. Smith to deal with,
10  address, or not address the point that you raise.
11        If there's nothing further, how about
12  opening statements?
13        MR. SMITH:  And if I may comment on the
14  gentleman in the back, if I've met him before I
15  have no recollection of meeting him before, and if
16  the hearing committee sees fit and Respondent
17  insists upon it -- I mean, how he learned about
18  this hearing I would imagine is because these are
19  matters of public record.  But I have never spoken
20  to him about this matter and, if they want
21  something on the record about that, you know,
22  that's up to the hearing committee.

9  (Pages 30 to 33)

Page 34

1    But I just have to say, I don't -- I've
2  never met this gentleman before, at least I don't
3  recall ever having met this gentleman before, and
4  I certainly didn't notify him or Judicial Watch
5  that a hearing was taking place today.
6    MR. KLAYMAN:  And if I might add in
7  there, just briefly, there are other people in Bar
8  Counsel's office that may have: Deputy Bar
9  Counsel, Bar Counsel.
10   CHAIRMAN FITCH:  As I said, I have no
11 choice but to leave it to Mr. Smith and the Board.
12   MR KLAYMAN:  Let me add just one other
13 thing, just briefly, is that Bar Counsel, Hamilton
14 Fox, when I was going through severance
15 negotiations with Judicial Watch, was with
16 Sutherland, Asbill and Brennan, and Sutherland
17 Asbill and Brennan negotiated my severance
18 agreement.  Their partner, Herb Beller -- you may
19 know Mr. Beller -- and Mr. Hamilton Fox actually
20 defended a deposition that Judicial Watch had
21 noticed with regard to my dispute on breaching the
22 severance agreement.  I brought a case over that.

Page 35

1    So, you know, there is an involvement
2  here with Judicial Watch that unfortunately seems
3  to now be infecting this proceeding, which it
4  shouldn't, and it's not just Mr. Smith, whether he
5  talked to somebody, but did Bar Disciplinary
6  Counsel, Deputy Bar Disciplinary Counsel,
7  Elizabeth Herman, who signed the Specification of
8  Charges, who has shown hostility to me, or other
9  Deputy Bar Counsel Julia Porter has shown
10 hostility to me, doesn't mean that this wasn't
11 orchestrated in some way.
12   CHAIRMAN FITCH:  Again, that's the
13 business of the Board.  There's nothing I can do
14 about it one way or the other.
15   MR. TIGAR:  I would add that the
16 pendency of this proceeding and the date and place
17 where it's to be held is on the Bar website.
18 Anybody could find it.  It says "In Re: Larry
19 Klayman."
20   MR. KLAYMAN:  If you're looking for it,
21 yes.  I'm just saying -- I'm old enough, I'm 66,
22 I'm going to be 67 in July, that I -- sometimes

Page 36

1  two and two equals four, and that's what I'm
2  saying here.
3    I don't know if you read some of the
4  pleadings, but I've made -- it's been my
5  position --
6    CHAIRMAN FITCH:  It must be nice to be
7  a whipper snapper of 67.  I envy you.
8    MR. KLAYMAN:  Thanks, I know.  But it's
9  not that young.  I've been around a long time.  As
10 my grandmother used to say, "I wasn't born
11 yesterday."
12   OPENING STATEMENT BY DISCIPLINARY COUNSEL:
13     BY MR. SMITH:
14   MR. SMITH:  Good morning, members of
15 the committee.
16   You all have the read the Specification
17 of Charges in this case and you've also seen the
18 Bar exhibits that have been previously submitted,
19 so I think you have a pretty good idea of what
20 this case is about.
21   Ms. Sataki will testify that she
22 retained Respondent to represent her in an

Page 37

1  employment-related matter with her job at the
2  Voice of America.  She had wanted this case to be
3  prosecuted simply and quietly because of her
4  concerns that people in her community would take
5  allegations of sexual harassment a little stronger
6  than they might be perceived in other communities.
7    Respondent undertook this case and
8  attempted to kill a fly with a shotgun.  As you
9  have seen in some of the pleadings that have been
10 filed, this became a rather large and
11 unnecessarily complex litigation.
12   There were aspects of the case that had
13 nothing to do with Ms. Sataki's claim.  The
14 addition of Hillary Clinton was not a necessary
15 witness in this case, and, as I think it would
16 become obvious, the reason that Hillary Clinton
17 was identified as a witness was to give this case
18 a little more juice, to play into a narrative that
19 was unnecessary for the prosecution of this case
20 and that did not benefit Ms. Sataki at all.
21   During the course of the
22 representation, through no fault of her own, the

10  (Pages 34 to 37)

Page 38

1  Respondent began to have romantic feelings towards
2  her.  These feelings were not reciprocated.  But
3  during the course of the representation, the
4  desires of Mr. Klayman to have a personal
5  relationship with Ms. Sataki became more and more
6  obvious, more and more frustrating for Ms. Sataki,
7  more and more unbearable for Ms. Sataki.
8          She will testify about specific
9  instances where Mr. Klayman exhibited bouts of
10  jealousy, where Mr. Klayman berated her and where
11  Mr. Klayman humiliated her because of her
12  relationships that did not involve him.
13          The evidence will show that Ms. Sataki
14  became so frustrated with the continued pursuit of
15  her, a pursuit, by the way, which included Mr.
16  Klayman's attempt to recruit a psychologist who
17  was treating Ms. Sataki for the sexual harassment
18  she had suffered while at the Voice of America to
19  advocate on his behalf, to understand his emotions
20  towards her and his frustrations with her refusal
21  to have a more intimate relationship with him.
22          Ultimately Ms. Sataki grew tired of the

Page 39

1  courtship and wanted only to focus on her case.
2  When it became clear to her that the conflict
3  between Mr. Klayman's desires to have a courtship
4  with her and the objectives of proceeding with her
5  case were not working, she terminated the
6  representation.
7          Notwithstanding the termination of the
8  representation, Mr. Klayman continued to contact
9  Ms. Sataki, and I think the evidence will show
10  that those communications became darker.  They
11  became darker after it became clear that a
12  relationship between Respondent and Ms. Sataki was
13  not going to happen, was never going to happen,
14  and again, I think the evidence will show that the
15  relationship -- that the level of communications
16  became much darker and much more frustrating and
17  much more troubling to Ms. Sataki.
18          Also, after the representation had
19  ended, in addition to the continued communications
20  over her objections, Mr. Klayman continued to make
21  reference to a case that she had initially wanted
22  to be kept quiet.  This was manifested in

Page 40

1  publications in a periodical known as the World
2  Daily Net.  And in these articles, Mr. Klayman not
3  only talked about Ms. Sataki's case, but he talked
4  about it in the context of his professional
5  prowess and also in the context of his efforts to
6  sell a book that he had written.
7          One of the articles characterizes the
8  judge who had handled the Sataki matter, Colleen
9  Kollar-Kotelly, as being dishonest and having
10  ulterior motives in the disposition of his
11  prosecution of her claim.  He said that there were
12  no facts, no evidence or legal analysis which
13  supported the judge's decision.
14          The evidence will show that that was a
15  false statement, and we believe that that false
16  statement, which calls into question the integrity
17  of the judicial process, was dishonest and should
18  be viewed as such under the rules which prohibit
19  dishonesty in the District of Columbia.
20          That is what Disciplinary Counsel
21  intends to show during its case in chief.  If the
22  hearing committee has any questions, I'd be happy

Page 41

1  to entertain them.
2          CHAIRMAN FITCH:  I think there are no
3  questions.
4          I will venture an observation, that the
5  relevance of some of the anticipated evidence that
6  you listed doesn't leap right out at me.
7          MR. SMITH:  I'm sorry, I didn't hear
8  you.
9          CHAIRMAN FITCH:  It does not leap right
10  out at me.  I'll leave that for you to address.
11          MR. SMITH:  In what way?
12          CHAIRMAN FITCH:  But I think we want to
13  be careful in of course deducing in the
14  complaining witness' testimony that there's not an
15  undue emphasis on alleged improprieties by the
16  Respondent.
17          We'll get there as we go along.
18          MR. SMITH:  All right.  Thank you, your
19  Honor.
20          CHAIRMAN FITCH:  I don't want a soap
21  opera over the next few days.
22          Respondent's team, do you care to make

11  (Pages 38 to 41)

Page 42

1  an opening statement?

2  OPENING STATEMENT BY COUNSEL FOR RESPONDENT:

3  BY MR. SUJAT:

4  MR. SUJAT:  Good morning, your Honor,

5  and members of the committee.

6  CHAIRMAN FITCH:  Good morning again.

7  MR. SUJAT:  My name is Frederick John

8  Sujat.  I am appearing before the Board as counsel

9  for Mr. Larry Klayman, the Respondent in this

10  proceeding.

11  I do want to point out, I don't want to

12  be too repetitive, but I didn't have a lot of time

13  to prepare.  I was just brought into this within

14  the past week or so, and there's just voluminous

15  material that I have been going through and still

16  need to take a close look at that.

17  But I am doing the best I can.

18  MR. TIGAR:  Well, you were a military

19  JAG officer.

20  MR. SUJAT:  That's right.

21  MR. TIGAR:  It's been a lot of years

22  since I've tried a general court martial, but I

Page 43

1  think you'll do just fine.

2  MR. SUJAT:  Ok.  Thank you, sir.

3  Yes, in fact, I have been a member of

4  the Bar for many years.  I retired after 30 years

5  with the DC National Guard.  I've been with the DC

6  Bar since 1975.  And, you know, during my time in

7  the National Guard, I was a staff judge advocate

8  general.  That was basically like a general

9  counsel for the National Guard and I reported

10  directly to the commanding general.  In the

11  District of Columbia they call the head general

12  the commanding general.  All of the other

13  jurisdictions they are the adjutant general.

14  So, in any case, I've retired as a full

15  colonel, and, you know, I continue to practice

16  law.

17  I have known Mr. Klayman for some time

18  during my practice of law on international trade

19  matters, and I find him to be passionate about

20  free trade and promoting a level playing field for

21  all participants.

22  From my experience with Mr. Klayman,

Page 44

1  Mr. Klayman was respected by U.S. regulators,

2  foreign governments, and the many clients he

3  successfully represented in antidumping and

4  countervailing duty proceedings.

5  Mr. Klayman believes very strongly in

6  issues and he believes in his clients, and he

7  represents them zealously, from everything I can

8  see.

9  Now, in this matter the complainant

10  filed a complaint making various allegations

11  without any objective independent of the issues.

12  I think that's one of the basic issues here.  And

13  by the way, Mr. Klayman, after I'm done, will

14  spend a little bit of time, you know, backing up

15  what I'm saying here.

16  But from everything that I have been

17  able to see, Mr. Klayman provided zealous

18  representations of the complainant in her sexual

19  harassment claims against the Voice of America.

20  This was a very difficult entity I could see to

21  deal with.

22  Mr. Klayman did not receive any

Page 45

1  payments from Ms. Sataki and he provided

2  representation pro bono.  If there was any mention

3  or discussion of contingency fees in any of the

4  record, that was only perspective and was not

5  reduced to writing.

6  The key point here is that Mr. Klayman

7  was trying to get Ms. Sataki back to work.  I

8  mean, that was the basic objective and, again, Mr.

9  Klayman was passionate in his representation, and

10  he supported her claims and he just never left a

11  stone unturned.  I mean, he really worked very

12  hard at this as an attorney should.

13  Mr. Klayman even provided her with

14  financial assistance, but he steered clear of any

15  romantic involvement.  He certainly cared deeply

16  about her as a close friend, and, you know, I can

17  say Mr. Klayman is, you know, very, very strong

18  and supportive of his clients and unfortunately I

19  guess it got to a point where Ms. Sataki did not

20  appreciate his efforts and time on her behalf and

21  she was recommended to seek other counsel.  In

22  fact, Mr. Klayman provided names of counsel for

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 46

1  her to go to, but apparently she took no action.

2       When she asked Mr. Klayman and Mr.

3  Klayman became aware that she didn't want him to

4  represent her, he stopped the representation

5  immediately.

6       There was another issue that came up:

7  the use of the media.  Well, I mean, use of media

8  to pursue one's case has become the norm these

9  days.  I mean, you just turn on the nightly news

10  programs and the commentaries and you see this.

11       It was, you know, a strategy to use the

12  media to prod the Voice of America to settle this

13  case, and Ms. Sataki was supportive of these

14  efforts.

15       If you take a look at any of the

16  communications at issue, you could see that Mr.

17  Klayman said nothing harmful about her case, nor

18  anything harmful about her, in fact quite to the

19  contrary.  He was very supportive of her and

20  complimentary of her.

21       And this is corroborated by witnesses

22  of Respondent.  And I think this is really

---

Page 47

1  critical in this case, because there are a lot of

2  allegations that are unsupported and self-serving

3  from complainant.  But complainant has offer no,

4  that I've seen, contemporaneous witnesses the

5  activity and the actions involved, whereas Mr.

6  Klayman has those -- even eight years after this

7  happened, he has people that were actually

8  involved, you know, live witnesses, as to what was

9  going on.

10       So I think that really means a lot

11  here, when someone brings an action, you know,

12  like this, based upon, you know, basically just

13  self-serving statements.

14       You know, I don't want to get

15  religious, but, you know, I believe in the wisdom

16  of the Bible, and I know in the Bible you have to

17  have two witnesses to support allegations that she

18  made, and I don't see any such witnesses here for

19  Ms. Sataki.

20       And also this issue of conflict of, you

21  know, there just is so support for that.  Never

22  was there a conflict between Mr. Klayman's

---

Page 48

1  personal interests and the actions that he took in

2  her best interest.  And that was the key thing.

3  He was working in her best interest, not in his

4  interest at all, in getting the result that he was

5  seeking, and that is, you know, basically to get

6  her back to work and to right certain wrongs that

7  were done.

8       So, in my opinion, Larry did an

9  excellent job in representing her and he did it in

10  the best way he knew, the most effective way, and

11  it was clear that, you know, Ms. Sataki, as time

12  proceeded, as you can see from the evidence Ms.

13  Sataki became uncooperative and unresponsive.

14  This is shown by witnesses who were alive at the

15  time.  Her dissatisfaction and blame were not

16  supported by the facts and really should not be

17  given any weight.

18       In fact, you know, she, from what we

19  can see, continues to pursue her career as a

20  newscaster.

21       So, I just wanted to say that we ask

22  that this matter be dismissed, as it was promptly

---

Page 49

1  dismissed by the Pennsylvania and Florida bars.

2  Thank you.

3       Mr. Klayman.

4       OPENING STATEMENT ON BEHALF OF RESPONDENT:

5       BY MR. KLAYMAN:

6       MR. KLAYMAN:  Thank you, members of the

7  committee.

8       I'll be relatively brief because I'll

9  be testifying in this case, and of course I'm

10  wearing a lot of different hats here, which is

11  regrettable.

12       But I just want to give you an overview

13  here, and that is that I met Ms. Sataki because I

14  was representing many interests in the Iranian

15  community.  I believe in the Iranian freedom

16  movement.  Back in 2009 I had actually brought a

17  lawsuit against the regime for murdering Akbar

18  Mohammadi and torturing his brother, Manuchehr.

19  They were the leaders of the student movement to

20  try to overturn the regime and they were killed

21  and then tortured in an Iran prison.

22       I got to know others in the community

---

13  (Pages 46 to 49)

App.0147

Page 50

1  and went to a demonstration on Capitol Hill where
2  we were protesting for Iranian freedom.  It looked
3  like Iran could possibly change the regime at that
4  time, and Voice of America was going to be
5  possibly instrumental in that soon.
6       While I was there, there was a
7  newscaster, Ms. Sataki, who I learned was doing an
8  interview.  I went over to her, I told her a
9  little bit about the case, asked if VOA was
10  interested in covering it, and left.
11      As I was leaving, she ran over to me
12  and gave me her card with her personal phone
13  number on it, not Voice of America, but her cell
14  phone number, and said, "Please call me."
15      Later I called her and the relationship
16  began in a personal way.  We had invited her to
17  dinner at Clyde's in Georgetown, and during that
18  dinner she grabbed my hand and said, "Larry, I
19  have no money.  Can you help me?  I've been
20  sexually harassed."
21      And my heart went out to her.
22      The evidence will show that over the

Page 51

1  course of time I was going through a difficult
2  period in my life, too, and I sympathized with
3  that.  My heart went out to her.  And I started to
4  care about her later deeply.  And I did everything
5  I could to try to get her in a place where she
6  wouldn't feel like she was harassed.
7       And so, here's kind of the bottom line
8  here, which I'll testify to in depth, is that my
9  objective, because she didn't feel like she could
10  be in VOA headquarters over here with the alleged
11  harasser, was to get her back to work in the field
12  office of the Persian News Network at Voice of
13  America in Los Angeles.  On Wilshire Boulevard
14  there is a federal building.  They have an office
15  there.
16      Ms. Sataki had come from Los Angeles,
17  she -- although her English was not that good --
18  and I don't mean that in a negative way, but she
19  had actually escaped Iran with her family and went
20  to Sweden.  She's fluent in Swedish and Farci, not
21  as much in English.
22      So Los Angeles is the home of over a

Page 52

1  million Iranians.  People joke about it, they call
2  it "Tehrangeles," and so there that was the
3  logical place to try to get her to be situated.
4       At the beginning of the case, and
5  you're going to hear testimony, and this is what
6  Mr. Sujat is saying, is that we have actually
7  witnesses here, not just, you know, statements by
8  the litigants here, but we have actually
9  independent witnesses.  The union representative
10  and president of the AFL-CIO, Tim Shamble, will be
11  testifying.  And I immediately began working with
12  him, and he told me, he said, "This is a very
13  hostile agency.  It's been ranked the worst in
14  government."  He says, "They mistreat their
15  employees," and we became very close, Mr. Shamble
16  and I, and Ms. Sataki.  We had various meetings to
17  conduct strategy.
18      I tried to settle the case.  I didn't
19  want it to get into litigation, because I cared
20  about Ms. Sataki.  I didn't want there to be undue
21  litigation here for litigation's sake.  And it was
22  clear I was helping her as a friend.  I never

Page 53

1  asked for money.  This only came up at the end
2  when she proposed that I get 40 percent.  And I
3  said -- at that point we kind of cut it off, and
4  because -- then I recommended other counsel,
5  because I realized it was getting too personal.
6       I recommended to her Gloria Allred, who
7  is a friend of mine, and a lawyer named Tim Shea.
8       She didn't even ask me -- because I was
9  defraying some of the expenses.  She was bankrupt.
10  She had no money.  So to get her out of the
11  vicinity of DC, I actually used my own money and
12  rented an apartment for her -- she had the keys --
13  paid for moving expenses and tried to help her as
14  best I could.
15      I've never asked for anything in
16  exchange, to this day.  I've put out at least
17  $15,000 in my own money, and I've never, ever
18  asked for that back.  And testimony will bear that
19  out.
20      But here's what happened, and then I'll
21  move on.  We tried to negotiate a solution.  Voice
22  of America wouldn't put her back to work in Los

14  (Pages 50 to 53)

Page 54

1  Angeles.  She was out in Los Angeles on leave at
2  the time.  She had what appeared to be a nervous
3  breakdown, because she couldn't bear going back
4  there.  She was offered an opportunity to go to
5  the Central News Bureau, which is mostly dealing
6  with Arabic countries.  As you know Iranians are
7  Persians, generally, Kurds, Persians and others.
8  They're not Arabic.  She didn't want to go back to
9  work there.
10     The agency said, "Look, we'll make sure
11  that you're not in the same vicinity and that
12  you'll report to other people, not to this
13  newscaster that harassed you, you claimed."  She
14  didn't want to do that.  She had that opportunity.
15  She wanted to be in Los Angeles.
16     And that's where her physicians were.
17  So I found a psychologist for her, two of them.  I
18  got an apartment.  I rented it for her.  I paid
19  her moving costs.  And we then sought to litigate.
20  And the litigation that occurred until the
21  relationship ended was all equitable.  It was not
22  really going after damages.  My goal was just to

Page 55

1  get her out there.  I was representing her pro
2  bono.
3     And a lot of the cases that I
4  brought -- or the cases I brought were strategic
5  and to try to get a settlement, and so, too, were
6  the articles that I wrote.  And Mr. Shamble was
7  there.  He knows that she approved the publicity.
8  She's a newscaster.  She understands, you know,
9  the value of publicity.  And as we all live in
10  Washington, D.C., we know that positive publicity
11  can drive a case and can influence decision
12  makers.  It's an integral part of legal practice
13  these days.  So that's what that was about.
14     Now as far as Hillary Clinton -- and
15  this is why I say this case is being brought for a
16  purpose which is not transparent to this
17  committee -- Hillary Clinton happened to be the
18  head of the Board of Governors, the Secretary of
19  State.  There were no personal allegations with
20  regard to Hillary Clinton...
21     But there are those in Bar Counsel's
22  office, perhaps not Mr. Smith, who are politically

Page 56

1  different than me.  I've been out there and made
2  contributions to former presidents and
3  presidential candidates, and I am a figure who's a
4  public figure who has advocated for conservative
5  and Libertarian principals and other things like
6  that.  "I don't understand why Hillary Clinton is
7  even part of this."  She was head of the Board of
8  Governors.  Who else are you going to sue?  And
9  there are cases that say you can sue the Board of
10  Governors and name individuals.  There was a case
11  before Judge Huvelle in the federal court that
12  allowed a case to proceed in that regard.  I
13  researched that.
14     And I was trying by bringing the
15  so-called Bivens Act initially to say, "Hey, look,
16  this is what I've learned over the course of my
17  time."  Mr. Sujat knows that, because we were
18  working together on international trade matters.
19  We worked together in my law firm.  We had to make
20  it clear that if you made an illegal decision
21  against a client -- she was one of our clients --
22  that there was personal accountability.

Page 57

1  So I was trying to say to the Board of
2  Governors, "You have a personal responsibility
3  here in trying to get a settlement here."
4     Now that's important.  I'm not going to
5  belabor it further.
6     The evidence will show -- I've got
7  witnesses, including Mr. Shamble, Mr. Key Dash,
8  whose brother worked for Voice of America in the
9  accounting department, from a prominent Iranian
10  family here.  He will testify that he was present
11  and he saw that she approved the publicity.
12     Mr. Shamble with testify to that.  He
13  will prove that I acted properly towards her at
14  all times.
15     We even tried to lobby senators on
16  Capitol Hill: Senator McCain, Speaker of the House
17  Boehner, Senator Coburn.  Mr. Shamble was with me.
18  Ms. Sataki was aware of that.  We tried every way
19  to settle it.  Litigation was the last
20  alternative.
21     And the fact that this agency is the
22  worst in government and doesn't want to treat its

15  (Pages 54 to 57)

Page 58

1  employees fairly is not my fault.  I should not be
2  made the scapegoat because Ms. Sataki may be
3  unhappy that she's no longer with Voice of
4  America.
5         As far as Judge Kotelly is concerned,
6  I'm entitled to my viewpoint on whether there was
7  adequate evidence.  And you'll see from the
8  pleadings, and this is why Mr. Sujat needs to
9  review them, and Mr. Sporkin, too, in a deeper
10  way.
11         I asked Mr. Sporkin at the time, Judge
12  Sporkin, who had been retired, I said, "What would
13  you do, your Honor?"  And he said "Easy.  I'd put
14  her back to work in LA.  It's a chip shot."
15         There's a case called Wagner v. Taylor
16  where you want to preserve the status quo.  He can
17  bring a case in federal court while the EEO
18  complaint is pending, and we had filed an Equal
19  Opportunity Commission complaint to ask the
20  federal judge to preserve the status quo so
21  nobody's hurt.
22         In this case Ms. Sataki was not asking

Page 59

1  for the harasser to be removed from Voice of
2  America.  She was saying, "I'm willing to go to
3  Los Angeles.  That's how we'll solve this."
4         Judge Sporkin told me, "Larry, that's
5  an easy question."
6         Judge Kotelly, without giving us a
7  hearing, a preliminary injunction hearing on the
8  evidence, accepted everything the government had
9  written, meaning Voice of America, and dismissed
10  everything that -- we had affidavits from
11  psychologists, from Mr. Shamble, from others at
12  Voice of America.  Because I represented others at
13  Voice of America, too.  They were having problems
14  there, other broadcasters in the Persian News
15  Network.  And I had 17 pages when I moved for
16  reconsideration of Judge Kotelly of her factual
17  errors in the case.  So I was on firm ground with
18  that, and you'll see that in the evidence.
19         But here's the bottom line -- you'll
20  hear my testimony in depth, and Mr. Sujat needs to
21  get up to speed on that -- but when this case was
22  filed, back in 2010, and later supplemented, I'm

Page 60

1  not sure I ever even saw the supplement at the
2  time, but on that supplement it says that
3  simultaneous complaints were being filed with my
4  other two bars, Florida and Pennsylvania.  I
5  responded to all three at the same time.  Florida
6  and Pennsylvania ultimately were dismissed.  They
7  didn't find anything.
8         After those initial complaints, this
9  case sat for three, three and a half, maybe four
10  years in Bar Counsel's office.  Ms. Sataki hadn't
11  contacted anybody.  There are documents that are
12  part of my exhibits where Bar Counsel goes out to
13  try to find her.  But there's also a letter that
14  was sent that said, "If we don't hear from you, we
15  assume that you are abandoning the case, after,
16  you know, the initial complaint, if you don't
17  respond to what Mr. Klayman provides."
18         She abandoned it.  They brought it --
19  they resurrected this for their purposes, not for
20  hers.
21         The supplemental complaint is written
22  by someone who appears to have, not just a great

Page 61

1  command of English, if you look at the first
2  complaint and the supplemental complaint, it's
3  somebody who has some kind of legal knowledge.
4  It's not her.
5         And consequently, over the course of
6  time, when Judge Kotelly denied putting her back
7  to work when the EEO complaint was continuing
8  forward, it hadn't ripened into whether you could
9  file a Title VII action yet for sexual harassment,
10  we tried to contact Ms. Sataki, Mr. Shamble and I.
11  She was not communicative.  That's why I was
12  calling, was to say, "Hey, you still have rights.
13  Even though Kotelly didn't put you back to work,
14  Judge Kotelly, you have rights once the
15  administrative complaint is over to proceed."
16         The documentation showing alleged
17  termination earlier was sent to the wrong address,
18  assuming they were sent at all.  It wasn't my
19  address.  The address was wrong.  So I never got
20  that.  And even an email communication that will
21  be in the record didn't appear to come from Ms.
22  Sataki.  It wasn't in her way of talking and

16  (Pages 58 to 61)

Page 62

1  writing.  So Mr. Shamble and I had to confirm
2  whether she wanted to proceed or not.
3        And during that time period, the
4  evidence will show that I couldn't let her rights
5  lapse.  I would be committing malpractice.  So I
6  had to protect her and move forward.
7        I even filed a Notice of Appeal with
8  regard to Ms. Sataki's order, because even though
9  she was denied a preliminary injunction, there was
10  still a prayer to get permanent injunctive relief
11  under Wagner. Taylor to put her back to work in
12  Los Angeles.
13        So I did everything I could diligently.
14  Did I care about Ms. Sataki?  Yes.  Mr. Sujat said
15  I feel passionate about all my clients.  But yes,
16  I cared about her.
17        And I realized that when that became
18  too great when she actually asked me to go out and
19  buy her a car, I said, "This can't go forward,"
20  and I said, "You've got to go out and find another
21  lawyer."  And I gave her two names.
22        And that's where we are today.  And I

Page 63

1  don't understand why we're here, given all that's
2  going on and given the fact that the two bars have
3  dismissed this.
4        One of the things that isn't apparent,
5  and it deals with the other things I'm saying, and
6  I'm going to testify about this, and I hope to get
7  testimony from people in the Bar Counsel office,
8  there were statements made to me in the course of
9  this proceeding by Ms. Herman, "I don't like the
10  way you practice law."  This is not about how
11  Larry Klayman practices law.  It's about whether I
12  violated the Code of Professional Responsibility.
13  Maybe they do it differently, but there are other
14  ways to do it.
15        And Ms. Herman just happens to have
16  given to President Obama and other people, and
17  I've filed cases, against all presidents,
18  including the Bushes, and I don't know where that
19  motivation is.
20        I asked, "Did you ever meet with Ms.
21  Sataki," and she told me, in effect, "None of your
22  business."  She was the supervisor here, so it was

Page 64

1  claimed.
2        I asked, "Does it matter that two bars
3  dismissed it," and she said, "I can care less."
4        So that's why this case, and I don't
5  need to belabor it now, is very troubling to me.
6        And Mr. Smith was telling me, and I'll
7  testify to this, "Mr. Klayman, it's out of my
8  hands.  I'm not really in control here."
9        And there are other things that went
10  on.  I won't get into it now.
11        But I think what's really telling here
12  is that, when the complaints were filed, Ms.
13  Sataki wasn't communicative with them for three
14  and a half years, maybe four, between 2010, 2014,
15  when they went out to find her.  And then this
16  case languishes for now going on eight years, and
17  Professor Rotunda, who is going to be an expert,
18  too, he pointed out how there's authority that,
19  when cases are that old, if you revive them for
20  some strategic purpose, if you hang back, that
21  they're dismissed.  In fact Florida dismisses them
22  and other states dismissed them, too.  I realize

Page 65

1  that the Board has not reached that issue in its
2  existence.
3        But all the equities and the law and
4  the witnesses, as Mr. Sujat points out, bear out
5  what I'm saying.
6        We thank you for your time.  Thank you
7  for listening to me.  I wish that I didn't have to
8  get up here and do this opening statement and be a
9  witness at the same time, but this is the
10  situation we find ourselves in right now.
11        Thank you.
12        CHAIRMAN FITCH:  What do you anticipate
13  the evidence will show about the date of the
14  demonstration that you mentioned?  It must have
15  been 2009?
16        MR. KLAYMAN:  Around 2009, yeah.
17        CHAIRMAN FITCH:  Right.
18        MR. KLAYMAN:  And you know another -- I
19  represented other broadcasters, because there was
20  a division in that office, you'll hear my
21  testimony, in the Persian News Network, that was
22  being run by the son of an ayatollah in Tehran who

17  (Pages 62 to 65)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 66

1  was an advisor to Supreme Leader, and Ms. Sataki's
2  family was in the government of the Shah and other
3  broadcasters were pro-Shah.  So there was no
4  division there.  And what was being broadcast out
5  of Voice of America was viewed by these
6  broadcasters to be favorable towards the regime,
7  not towards the United States.
8      It was a very controversial situation,
9  and Ms. Sataki felt that she was being
10  discriminated against because her family was in
11  the government of the Shah.  That's why they fled
12  to Sweden.
13      So, it was part and parcel to my trying
14  to help the Iranian community, which I believed
15  in.  I believe in freedom, and I felt a number of
16  broadcasters there and other Iranians too tried to
17  win their freedom and to try to get justice for
18  what's been done to them if they protested.
19      So that's me.  That's who Larry Klayman
20  is.  I'm sure you know that I am a public interest
21  advocate as well as a private lawyer.  Thank you.
22      CHAIRMAN FITCH:  Mr. Smith, do you

---

Page 67

1  want to call your first witness now, or do you
2  want to take our morning break now?
3      MR. SMITH:  That is totally up to the
4  committee.  I'm prepared to bring my witness on
5  now.  If you guys would like a break, then I have
6  no problem with that.
7      CHAIRMAN FITCH:  Let's proceed for
8  maybe 20, 30 minutes, 'till you reach a transition
9  point.
10      (Brief pause.)
11      (Ms. Sataki on the witness stand.)
12      CHAIRMAN FITCH:  Good morning.
13      THE WITNESS:  Good morning.
14      CHAIRMAN FITCH:  Remain standing for
15  just one minute, please.
16      What is your full name.
17      THE WITNESS:  Elham Sataki.
18      CHAIRMAN FITCH:  I need to swear you in
19  as a witness.
20      Do you solemnly swear or affirm the
21  testimony you are about to give in this proceeding
22  will be the truth, the whole truth and nothing but

---

Page 68

1  the truth?
2      THE WITNESS:  Yes.
3      CHAIRMAN FITCH:  Please be seated.
4      And say something like "testing, one
5  two three, four, five."
6      THE WITNESS:  "Testing, one, two,
7  three, four, five."
8      CHAIRMAN FITCH:  You're going to need
9  to be very careful to stay close to the
10  microphones.  You can adjust them.
11      THE WITNESS:  Both of them or just one?
12      CHAIRMAN FITCH:  I think both of them.
13      THE WITNESS:  Ok.
14      CHAIRMAN FITCH:  And don't get offended
15  if I say, you know, or do like that (raise your
16  voice).  Ok?
17      Go ahead, Mr. Smith.
18
19
20
21
22

---

Page 69

1  Whereupon,
2      ELHAM SATAKI,
3  called as a witness by Disciplinary Counsel, and,
4  after having been first duly sworn, was examined
5  and testified as follows:
6  DIRECT EXAMINATION BY DISCIPLINARY COUNSEL
7      BY MR. SMITH:
8  Q.  Good morning, Ms. Sataki.
9  A.  Good morning.
10  Q.  Ms. Sataki, how old are you?
11  A.  Forty-seven.
12  Q.  Where do you currently reside?  Where
13  do you live?
14  A.  In Los Angeles.
15  Q.  Where are you from originally?
16  A.  From Iran.
17  Q.  How long did you live in Iran?
18  A.  Twelve years.
19  Q.  When you left Iran, where did you live?
20  A.  Sweden.
21  Q.  How long did you live in Sweden?
22  A.  Around 20, 15 years.

---

18  (Pages 66 to 69)

Page 70

1    Q.  Did you work while you were in Sweden?
2  Did you have a job while you were in Sweden?
3    A.  Most of the time I was in school, but,
4  yes, I worked, too, worked summer jobs and after
5  school I worked, yes.
6    Q.  What level of schooling did you finish
7  while you were in Sweden?
8    A.  College.
9    Q.  What college did you go to?
10   A.  The University of Stockholm.
11   Q.  What was your major?
12   A.  Psychology.
13   Q.  After you left Sweden, where did you
14 move?
15   A.  To the United States.
16     CHAIRMAN FITCH:  I didn't hear that.
17     THE WITNESS:  To United States.
18 BY MR. SMITH:
19   Q.  Once you arrived in the United States,
20 where did you live?
21   A.  I lived in different places, and
22 finally I settled down in Los Angeles first, but

Page 71

1  then I moved to Washington, D.C.
2    Q.  Did you attend school once you moved to
3  the United States?
4    A.  I went to a beauty school, yes, in
5  Texas.
6    Q.  What part of Texas?
7    A.  Houston.
8    Q.  What kind of training did you get
9  there?
10   A.  Cosmetology.
11   Q.  Now you said you moved to Los Angeles.
12 Were you employed while you were in Los Angeles?
13   A.  Yes.
14   Q.  What kind of jobs did you have there?
15   A.  I had both cosmetology job and I was
16 working for different TV channels.
17   Q.  What TV channels were you working for?
18   A.  I was working for Iran TV and also Jame
19 Jam TV.
20   Q.  What kind of work were you doing at
21 those TV stations?
22   A.  Co-hosting or anchoring.

Page 72

1    Q.  Co-hosting or anchoring what?
2    A.  Co-hosting programs, TV programs.  I
3  started with entertainment, then I went and
4  started doing more news and politics.
5    Q.  How long were you doing
6  broadcasting work in Los Angeles?
7    A.  In Los Angeles about six years.
8    Q.  There came a time that you moved to the
9  District of Columbia?
10   A.  Yes.
11   Q.  When was that?
12   A.  2007.
13   Q.  Did you have a job when you moved here?
14   A.  Yes.
15   Q.  Where were you working?
16   A.  Voice of America.
17   Q.  What were you doing at Voice of
18 America?
19   A.  I was working as an international
20 reporter, that was -- so I was either anchoring
21 for them or covering stories.  I would go out with
22 my producer and cameraman and cover stories.

Page 73

1    Q.  These are programs that were aired on
2  television?
3    A.  Yes.
4    Q.  Again what kind of stories did you
5  cover?
6    A.  Political issues, human rights,
7  students' rights, women's rights.
8    Q.  Did there come a time when you met Mr.
9  Klayman?
10   A.  Yes.
11   Q.  Do you recognize him in the courtroom
12 here today?
13   A.  Yes.
14   Q.  Can you point to him please?
15   A.  He's sitting right there (pointing).
16   Q.  Could you tell the committee how it was
17 that you came to meet Mr. Klayman?
18   A.  I was outside the Capitol covering the
19 story.  I was there with my cameraman.
20   Q.  Do you remember what the story was?
21   A.  It was a Persian congressman from Iran
22 that was there and didn't want to go back to Iran

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 74

1   and he was speaking, yes.  So I went there to see
2   if I can get an interview with him.
3       Q.   Do you remember about when that was?
4       A.   End of 2009, sometime in November
5   maybe.
6       Q.   Could you describe your interaction
7   with Mr. Klayman when you first met him.
8       A.   He came up to me and started talking to
9   me, and he said that he's doing something.  He's
10  involved with some story about Iran and something
11  with the flag.  I don't remember exactly what it
12  was.  And he gave me his business card, he took my
13  business card, and he wanted me to cover that
14  story.
15      Q.   Did you cover that story?
16      A.   No, I didn't.
17      Q.   Why not?
18      A.   Because I explained to him that my
19  executive producer would choose who is going to be
20  covering it.  I'm going to pass it on, his
21  business card, and explain to my executive
22  producer, then she is going to have to contact him

Page 75

1   and she sends outs the reporters.  It's not my
2   choice.
3       Q.   When you had that conversation, was
4   that when you met him on the steps of the Capitol,
5   or did you have that conversation at another time,
6   about your supervisor having to approve the story?
7       A.   Well, he called me at my desk at work
8   and he asked me, "Do you know who is going to be
9   covering it?  What's going on?  I want you to
10  cover it."
11          He wanted me to cover it because he
12  said that he saw me working, the first time he saw
13  me, and he likes the way I work and he wants me to
14  cover the story.
15      Q.   Did you have any other conversations
16  with him after that call that he made -- that came
17  to your desk?
18      A.   I did have -- I mean, we talked -- I
19  can't exactly remember what was the second
20  conversation.  I mean, the second or third
21  conversation I want to say was about this.  I
22  mean, that was the reason he would call me and get

Page 76

1   an update regarding that.  But then he just was
2   started talking about other things, too.
3       Q.   Now, you were having trouble at your
4   job, correct?
5       A.   Yes.
6       Q.   But you --
7           MR. SUJAT:  Your Honor, I object.
8   That's a leading question.
9           CHAIRMAN FITCH:  It is a leading
10  question.  I think it's a proper transition
11  question.
12  BY MR. SMITH:
13      Q.   What were the working conditions like
14  at your job for you at that time?
15      A.   I was going through a sexual harassment
16  that I had trouble at work.
17      Q.   Can you tell the committee about that
18  sexual harassment that you were experiencing.
19      A.   My co-anchor wanted to -- my co-host
20  wanted to date me or go out with me.  He kept
21  asking me out on coffee or drink, or dinner, or he
22  kept saying that -- and I wouldn't go.  And he

Page 77

1   would say to me things like, "You're behind.  You
2   can't catch up.  When we get together with other
3   people and talk over drinks about the program, you
4   are not there.  So that affects our program."  Or
5   he wanted to match his clothes with me.  And it
6   was constant him calling and asking me out,
7   constantly, constantly, on a daily basis, or he
8   would call or text me at home.  And it was going
9   on for months.
10          And finally he did something that
11  bothered me really bad, and I realized that,
12  because I'm not going out with him, he's trying to
13  get me in trouble with work.
14          So I went to my executive producer and
15  I told her that, "This is what's going on.  Could
16  you please help me, because I'm afraid that I'm
17  going to lose -- he's going to make -- just
18  because I'm not going out with him, he's going to
19  make trouble and I'm going to lose my position."
20      Q.   Did you seek legal counsel in
21  connection with that matter?
22      A.   No.  At that point it was just my

Page 78

1 executive producer, and it was between me and her
2 and then Delia Johnson, someone else that she took
3 me to.
4      So it was within VOA, and they were
5 trying to resolve the situation, but it ended up
6 surprising -- I mean, I was surprised one day.  I
7 went to work and they asked me to meet them, and I
8 was meeting with them, Alex, the chief, and
9 everybody was sitting there and they told me
10 they're going to remove me from co-hosting and
11 they're -- not that I'm doing a bad job or
12 anything, but they just think that it's better for
13 me to move to this other program.
14      So they moved me to this other program,
15 and the chief of the union, when he found out, he
16 got -- he told me, "From now on do not attend any
17 meeting without me, because they retaliated
18 against you, just because you talked about this
19 and told them that" -- because the guy that I had
20 problem with, he one day did something to me that
21 I was -- it was very, very upsetting to me, and
22 that was made -- that I went to them.

Page 79

1      So they basically separated us, but I
2 was the one who lost my position and he stayed at
3 his position.
4      Q.  Did there come a time that you did --
5      MR. TIGAR:  Excuse me...
6      What is the name of the union person
7 that you mentioned?
8      THE WITNESS:  Tim Shamble.
9      MR. TIGAR:  That's Mr. Shamble?
10      THE WITNESS:  Yes.
11      MR. TIGAR:  All right, thank you.
12 BY MR. SMITH:
13      Q.  Did there come a time that you did
14 consult with a lawyer about this problem that you
15 were having at work?
16      A.  Yes.  It was with Mr. Klayman.
17      Q.  Do you recall when it was that you had
18 the conversation with Mr. Klayman about this case?
19      A.  When he asked me why I can't cover the
20 story, why can't I go to the executive producer
21 and say that "Mr. Klayman, the person who has the
22 event, is requesting you and wants you to cover

Page 80

1 the story," I explained to him that I can't do
2 that, because I'm in a tough situation right now
3 with my bosses.
4      Q.  Ok.
5      A.  And when he asked me, I explained more
6 what's going on.  And plus that I guess he's an
7 attorney, so I explained to him and then -- and
8 see if I can somehow get some help.
9      Q.  Do you remember where you were when you
10 discussed the case with Mr. Klayman?
11      A.  I know we had dinner.  I don't remember
12 if the first time I talked to him regarding this
13 case was over the phone or the dinner.  I want to
14 say I think it was over the phone -- well, it was
15 over the phone, because I explained to him -- the
16 conversations was phone conversations, and that's
17 how he found out that I have trouble with work.
18      Q.  So what was the purpose of the dinner
19 that you were having with Mr. Klayman?
20      A.  We talked about my problem and then
21 also he told me about what he wanted to do and
22 also about that he can help me with other things

Page 81

1 like stories or documentaries or movies or stuff
2 like that.
3      Q.  And you said other things that he
4 wanted to do.  What were the other things that he
5 wanted to do?
6      A.  Like outside VOA work he can help me to
7 do other TV work, like we can make a documentary
8 and he can help me with the writing, and so on the
9 side I can start working with other TV work, or
10 like -- or a movie and that he was writing
11 something and I can help him with that, things
12 like that, that we can help each other as working
13 on television.
14      Q.  Did you have a conversation with him
15 about him representing you in this case?
16      A.  We first talked and he said that he
17 knows -- I'm trying to remember -- this attorney
18 in LA.  He said maybe she can help you.  And then
19 we decided that he can represent me.
20      Q.  Did you ever contact the attorney in
21 Los Angeles?
22      A.  We sent him an email.  Mr. Klayman

21  (Pages 78 to 81)

Page 82

1  helped me to send -- to send her an email.  I'm
2  trying to remember her name now.  She's always on
3  TV with this kind of cases.
4       I can't remember her name now.
5       Q.  Ok.  So, at this dinner that you --
6       A.  Gloria Allred.
7       Q.  Ok.  So at this dinner that you had
8  with Mr. Klayman, you discussed your case but you
9  did not hire him at that time?
10      A.  Right.
11      MR. KLAYMAN:  Leading, objection,
12 leading.  You gave her testimony.
13      CHAIRMAN FITCH:  I would be careful of
14 that, Mr. Smith.
15 BY MR. SMITH:
16      Q.  Did there come a time that you did hire
17 Mr. Klayman to be your lawyer in this matter?
18      A.  I think it was sometime in the
19 beginning of 2010, I want to say in January that
20 we talked about this and I started seriously
21 working on, yes, me hiring him.
22      In February I sent an email to Mr.

Page 83

1  Shamble with information about Mr. Klayman, that
2  he's going to be representing me.
3       Q.  Did you have a fee agreement with Mr.
4  Klayman?
5       A.  I'm sorry?
6       Q.  Did you have a fee agreement or
7  arrangement with Mr. Klayman?
8       A.  Well, we talked about that, at the end,
9  whatever it is, that it's going to be 40 percent
10 goes to him.
11      Q.  Ok, were --
12      A.  Which he later changed it to 50
13 percent.
14      Q.  Were there any other arrangements you
15 had with respect to the representation, financial
16 arrangements?
17      A.  Well, in the beginning when he -- when
18 I moved -- he moved me to Los Angeles and he paid
19 for everything.
20      Q.  Ok.  Was that part of the
21 representation agreement?
22      A.  Well, that's what he said, that he --

Page 84

1  because I told him that I can't afford moving to
2  LA, and he said he's going to pay for everything,
3  but then he gets his money back when he gets his
4  40 percent.  All that's going to be included
5  there, on top of that.
6       Q.  Did you ever have a writing from Mr.
7  Klayman reflecting the terms of this
8  attorney/client relationship?
9       A.  I don't understand the question.
10      Q.  Did Mr. Klayman give you a written
11 agreement, representation agreement?
12      A.  I don't believe so.  I don't know.  I
13 really don't know.
14      I know we had emails going back and
15 forth later regarding this, but I don't remember
16 that now.  I don't know.
17      In my mind I don't remember.
18      Q.  Let me ask you to look at what has been
19 marked in Bar Counsel's book of exhibits as
20 Exhibit Number 1.  It is the blue book before you.
21 I'll come over.
22

Page 85

1       CHAIRMAN FITCH:  What exhibit number?
2       MR. SMITH:  Bar Exhibit Number 1.  For
3  the record it is an Office of Bar Counsel
4  complaint form dated November 2nd, 2010.
5       (Witness peruses document.)
6  BY MR. SMITH:
7       Q.  Have you had a chance to look at this?
8       A.  Yes.
9       Q.  Did you mail this correspondence to the
10 Office of Disciplinary Counsel at or about --
11      MR. SUJAT:  A leading question.  I
12 object, your Honor.
13      MR. SMITH:  I'm laying a foundation to
14 introduce the document.
15      CHAIRMAN FITCH:  Overruled.
16 BY MR. SMITH:
17      Q.  Did you mail this letter to the Office
18 of Bar Counsel on or about November 2nd, 2010?
19      A.  Yes.
20      Q.  Was this your handwriting on the second
21 page of this document?
22      A.  No.

22  (Pages 82 to 85)

Page 86

1   Q.   Whose handwriting is that?
2   A.   The person who helped me writing this.
3   Q.   Who is that person?
4   A.   I don't remember now.
5   Q.   Before you sent this letter in --
6        CHAIRMAN FITCH:  What was the answer of
7   that question?
8        MR. SMITH:  She does not remember.
9        THE WITNESS:  I don't remember who
10  helped me writing it.
11  BY MR. SMITH:
12  Q.   Before you mailed this letter in, did
13  you read what was written here?
14  A.   Yes.
15  Q.   Did you talk to the person who was
16  writing this to tell them what was going on in
17  your case?
18  A.   Yes.
19  Q.   And you agree with everything that's
20  written down in here?
21  A.   Yes.
22  Q.   In the first sentence of the letter it

Page 87

1   says, "He does not represent me and he keeps
2   calling me and texting me."
3        Would you tell the hearing committee
4   briefly what you're referring to there.
5   A.   Well, I asked him, I told him that I
6   don't want to -- I don't want him to represent me
7   any more, but after I -- after I asked him not to
8   represent me any more, I don't want him to
9   represent me any more, he wouldn't stop calling,
10  texting and emailing me.  He would still calling,
11  texting, emailing me regarding the case, or
12  regarding other things.
13  Q.   I'd like to go back to the
14  representation when you first hired Mr. Klayman to
15  represent you in the matter.
16       What discussions did you have with Mr.
17  Klayman about how he was going to pursue your case
18  against Voice of America?
19  A.   Well, there was -- he told me that he's
20  going to try to settle with them and talk to them.
21       You know, I mean, it was so much legal
22  stuff that he would tell me that "I'm going to

Page 88

1   talk to this person and talk to that person," and,
2   you know, it was letters that he was sending in.
3   Q.   Have you ever had any legal training?
4   Have you ever had any legal training in the law?
5   A.   No.
6   Q.   Did you understand any of the legal
7   terms or conversations that Mr. Klayman was
8   telling you about how he was proceeding with your
9   case?
10       CHAIRMAN FITCH:  I'm going to strike
11  that question.  No foundation yet for that.
12       There is no foundation for -- there
13  hadn't been a discussion.
14       MR. SMITH:  Ok.
15  BY MR. SMITH:
16  Q.   What did you tell Mr. Klayman about how
17  you wanted to proceed in this case?
18  A.   Well, because it was a sexual
19  harassment case, and because of the community and
20  my background, I wanted it to be very quietly
21  handled.  I even, the first time when I went to my
22  executive producer and I told my executive

Page 89

1   producer what my co-host did to me, I asked him to
2   keep it off the record, because I didn't want
3   anybody to know.  I just needed help.
4        Because just -- the way it is, the
5   sexual harassment is just something that it's not
6   fun to be out there and everybody find out about
7   it, so.
8   Q.   Tell me about your community and how
9   they perceive, in the context of what you were
10  saying -- what is the --
11  A.   Well, regarding the sexual harassment
12  case, to this day they're still asking me "Was I
13  raped by Mr. Falahati"?  "How was I raped by Mr.
14  Falahati?"  "Where was I raped by Mr. Falahati?"
15  "What did he do?"
16       So sexual harassment, in the Persian
17  community, is rape.  It's the actual act of
18  intercourse and rape.
19       So to this day I have to answer all
20  those questions.
21  Q.   So describe for the committee the
22  conversation you had with Mr. Klayman about these

23  (Pages 86 to 89)

Page 90

1  concerns.
2      A.  That I want this to be handled as quiet
3  as possible, so nobody finds out.  And I did this
4  complaint because I -- I still wanted to keep my
5  image.  My image was just this person that -- I
6  didn't want it to change and I didn't want too
7  much talk regarding about my personal life.  I
8  wanted people to look at the Sataki that is
9  covering the stories and not know about my private
10  life.
11      Because I was not open about my private
12  life in front of the camera.  People would ask me,
13  I would never answer.  I would always leave it
14  without answer when they asked me about my private
15  life.
16      Q.  Did Mr. Klayman respond to you when you
17  said that you wanted to proceed with the case
18  quietly?
19      A.  Yes.  He did.  I mean, that's what he
20  was supposed to do in the beginning, yes.
21      Q.  He --
22      A.  But then it changed later.

Page 91

1      Q.  How did it change?
2      A.  He started writing articles, and so it
3  came out in the internet regarding the case.
4      Q.  Did you ever have conversations with
5  Mr. Klayman about publicizing your case?
6      A.  I did.  I asked him not to do it, but
7  then later I -- when he explained to me how much
8  it's going to help my case -- because he was going
9  back and forth with the people, the VOA management
10  and the stuff that he said that, "It's going to
11  take, say, no-brainer.  It's very easy.  It's only
12  going to take two weeks," or whatever, and it's
13  going to be easy, a task, like you said to me, he
14  said how easy it's going to be to transfer me from
15  DC to LA and work out of the LA office.
16      All of those stuff that I listen to him
17  because he's the attorney, he knows best, and none
18  of that happened.
19      So then he -- I mean, the complaint
20  from the person, the person -- the sexual
21  harassment person, my boss, his boss and all that,
22  it went up to Board of Governors and suing

Page 92

1  everybody, and the case got so big that all this
2  he said that it's just in my benefit.
3      So, I started listening to him.
4      May I add something?
5      Q.  Please.
6      CHAIRMAN FITCH:  Wait a minute.  With
7  respect to what?
8      MR. SMITH:  To the last question I
9  would imagine.
10      CHAIRMAN FITCH:  Do you have something
11  to add to your last answer?
12      THE WITNESS:  Yes.
13      CHAIRMAN FITCH:  That relates to that
14  question?
15      THE WITNESS:  Yes.
16      CHAIRMAN FITCH:  Go ahead.
17      THE WITNESS:  That the reason that I
18  didn't want this to get so huge and so public is
19  just the Persian community and how they react to
20  it.
21      Just to give you an example, after that
22  it got so public and everybody found out, they

Page 93

1  opened Facebook pages, fake Facebook pages under
2  my name with pornographic pictures in it, which,
3  together, with Mr. Klayman, we went to FBI to shut
4  it down.  But in there they were threatening me,
5  threatening my life and all that.
6      So that was one of the reasons that I
7  didn't -- I wanted to keep this case so private,
8  because I didn't want all this to get so huge and
9  so big and hit everywhere.
10      MR. KLAYMAN:  Objection, your Honor.  A
11  lot of that was hearsay.  No foundation.
12      MR. SMITH:  So, just --
13      CHAIRMAN FITCH:  Wait a minute.  Mr.
14  Klayman raises a perfectly good question.  I'm
15  trying to decide how to deal with this.
16      Give us a moment.
17      (Off-the-record discussion amongst
18  hearing committee members.)
19      CHAIRMAN FITCH:  I think that we are
20  going to strike that answer as hearsay.  That's
21  too far removed.
22      If you want to ask a different question

24  (Pages 90 to 93)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 94

1  about -- and maybe this is what she was saying,
2  about the effect on her, you may, if you want, if
3  any, you may if you want ask that question if I
4  think the possible effect on her has some
5  relevance potentially to something in this case,
6  some aspect of this case.
7          So I think that's where we stand on
8  this.
9          MR. SMITH:  If I might just make the
10 observation, with respect to hearsay, the Board's
11 rule does permit hearsay, that the testimony that
12 is elicited that may contain hearsay generally
13 goes to the weight but not admissibility.
14         I would also like to point out that Ms.
15 Sataki was speaking from her personal experience
16 and events that she actually participated in and
17 so I don't know that what she was saying was
18 necessarily hearsay.
19         But in any event, just to I guess
20 clarify it, as we move forward, that the Board's
21 rule permits hearsay.
22         CHAIRMAN FITCH:  Well, I understand

Page 95

1  that.  But there is also the other rule I referred
2  to, there's some discretion with respect to
3  hearsay.
4          But this is so removed.  I certainly
5  will accept testimony as to what she saw in this
6  regard, or what she heard -- and maybe what she
7  heard, not for the truth of it, but how it
8  affected her.
9          So why don't we march along that way.
10         MR. SMITH:  All right, thank you.
11         So at this point I would ask that the
12 committee not strike the testimony that she just
13 gave.  Just consider it and give it whatever
14 weight you feel is appropriate at the time that
15 you all are making your factual findings in this
16 case.
17         CHAIRMAN FITCH:  I'm inclined to strike
18 it as just too far afield.
19         MR. SMITH:  All right.
20         CHAIRMAN FITCH:  But I think that you
21 should continue, if you wish, to adduce the points
22 properly.

Page 96

1  BY MR. SMITH:
2      Q.   What is the effect of the publicity
3  that you feared going into this case?
4          MR. SUJAT:  I object, your Honor.
5          CHAIRMAN FITCH:  Yeah, I think that's
6  not an accurate foundation.
7          Did there come a time when you
8  observed -- did you see the articles, some or all
9  of the articles that Mr. Klayman is alleged to
10 have written and published?
11         Did you see those articles.
12         THE WITNESS:  I did, yes.  I saw the
13 articles.
14         CHAIRMAN FITCH:  How did that come
15 about that you saw the articles?
16         THE WITNESS:  He sent me the link.
17         CHAIRMAN FITCH:  "He"?
18         THE WITNESS:  Mr. Klayman sent me the
19 link of the articles.
20         CHAIRMAN FITCH:  Did there come a time
21 when you saw other written material referring to
22 or otherwise relating to those articles?

Page 97

1          THE WITNESS:  Yes.  It was other
2  internet articles or some --
3          CHAIRMAN FITCH:  Other what?
4          THE WITNESS:  Some Persian sites, they
5  translated the article and so they published it,
6  or some of the people published it on their
7  Facebooks and stuff like that.
8          CHAIRMAN FITCH:  What if anything was
9  your reaction to seeing, first of all, the
10 articles that Mr. Klayman is alleged to have
11 published?
12         THE WITNESS:  My reaction was just -- I
13 was thinking how that's going to all affect me, in
14 the big picture.  Now everybody knows and how it's
15 going to affect me.
16         CHAIRMAN FITCH:  What if anything was
17 your reaction to seeing other articles about the
18 alleged articles that you had referred to?
19         THE WITNESS:  My reaction?
20         CHAIRMAN FITCH:  Mm-hmm.
21         THE WITNESS:  It was just -- at that
22 point my concentration, everything, was just being

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 98

1   able to win the case and go back to work.  So I
2   was just thinking how all these are going to be
3   affected.  Is it going to be positive, like Mr.
4   Klayman told me, or is it going to backfire?
5         CHAIRMAN FITCH:  Did you see all of the
6   articles that Mr. Klayman is alleged to have
7   written and published at the same time, or did you
8   see them one by one or two by two over a period?
9         THE WITNESS:  I believe that as they
10  were coming out he would send me the link.
11        CHAIRMAN FITCH:  And did you have any
12  communications with Mr. Klayman about the articles
13  that you had seen in any given point in time?
14        THE WITNESS:  Yes.
15        CHAIRMAN FITCH:  What do you remember
16  about those communications?
17        THE WITNESS:  Well, in the beginning I
18  was completely against it.  But then when he
19  explained to me how it's going to help my case, I
20  said, "Ok.  We'll go forward."
21        Because he believed that that's going
22  to affect my case positively.  It's going to help

Page 99

1   my case.
2         CHAIRMAN FITCH:  Let me direct your
3   attention to the complaint.  The complaint is
4   dated -- it's Exhibit Number 1, which you probably
5   have still in front of you.  It's dated 11/2/10,
6   but there's a date above which may be a file stamp
7   of December 3, '10.
8         Do you recall with any more specificity
9   when you sent this to Mr. Smith's office?
10        THE WITNESS:  Exact date?
11        CHAIRMAN FITCH:  Do you think it was
12  before Thanksgiving or after Thanksgiving of that
13  year, for example?
14        If you don't know, you don't know.
15        THE WITNESS:  I don't remember.
16        CHAIRMAN FITCH:  There was an
17  assumption in my question.  Let me ask you a
18  question: did you, yourself, mail this complaint
19  to Disciplinary Counsel, or did someone else do so
20  on your behalf?
21        If you don't remember, just tell me.
22        THE WITNESS:  I don't remember.

Page 100

1         CHAIRMAN FITCH:  Ok.  And finally,
2   after the time that you filed this complaint, did
3   you have any communications with Mr. Klayman about
4   his alleged publication of these articles?
5         THE WITNESS:  No.
6         MR. TIGAR:  You mentioned Facebook
7   posts?
8         THE WITNESS:  Yes.
9         MR. TIGAR:  Did you see posts on
10  Facebook?
11        THE WITNESS:  Yes.
12        MR. TIGAR:  Were they posts that said
13  that you were posting it, or were there other
14  people that posted it?
15        THE WITNESS:  Well, it was a Facebook
16  under my name, my -- looked like it's my account,
17  but it wasn't.  So it made to look to public that
18  it's me.
19        MR. TIGAR:  On one or more of these
20  Facebook accounts -- let's call them the phony
21  Facebook accounts, alright, on one or more of
22  those there were pornographic pictures?

Page 101

1         THE WITNESS:  Yes.
2         MR. TIGAR:  What was the effect of that
3   on you?  What did that make you feel like?
4         THE WITNESS:  At first it scared -- I
5   mean, I know that there is no pornographic
6   pictures or videos of me, but at first it scared
7   me so much because I thought maybe they took my
8   face and put it on other body or so.  So that
9   scared me.
10        But when I actually looked at it and
11  saw that it was other people's pictures with my
12  name, but it was terrifying.  It was really bad.
13  It was bad, and then the messages I was getting
14  was really, really bad.
15        It was saying in details exactly how --
16  what they're going to do, piece by piece, with my
17  body.
18        So, the threatening part of it was very
19  scary.
20        MR. TIGAR:  Understood, ok.  Thank you
21  very much.  Take your time.
22        CHAIRMAN FITCH:  Mr. Smith?

26  (Pages 98 to 101)

Page 102

1  BY MR. SMITH:
2      Q.  I'd like to go back where I was trying
3  to go with my questions about the timeframe that
4  you were having discussions with Mr. Klayman about
5  publicity in the case.
6          CHAIRMAN FITCH:  About what?
7          MR. SMITH:  The timeframe when Mr.
8  Klayman and she were first having discussions
9  about publicity in her case.
10         CHAIRMAN FITCH:  First having
11  discussions about publicity in the case, ok.
12  BY MR. SMITH:
13     Q.  And you testified that there were
14  concerns that you had?
15     A.  Yes.
16     Q.  Would you please explain to the hearing
17  committee what those concerns were at that time
18  that you had when you were discussing publicity?
19         CHAIRMAN FITCH:  Now, "at that time,"
20  is this the time as the case, as the word was
21  getting underway and they were talking about
22  bringing the case, or is this at some other time

Page 103

1  later on?
2          MR. SMITH:  When they first had
3  discussions about publicity in the case.
4          CHAIRMAN FITCH:  Oh, ok.  Alright.
5  Because I just want the witness to be
6  clear that I was asking questions about later in
7  2010, and now Mr. Smith, quite properly, is asking
8  you about an earlier period, as the possibility of
9  doing something about the situation was being
10  discussed.
11         If I have ruined your memory of the
12  question, he'll ask it again.
13         THE WITNESS:  My concern was just
14  people -- everybody find out about this.  I
15  want -- I didn't want people to know that I have a
16  sexual harassment case going, that I complained
17  about my coworker, and what people is going to
18  say, how people are going to look at me.
19         And I just -- I didn't want people to
20  find out.
21         MR. TIGAR:  May I ask, when did you
22  first say that, or when did you first make that

Page 104

1  statement, that idea to Mr. Klayman?  When did you
2  first make that idea to Mr. Klayman?
3          THE WITNESS:  When he first told me
4  about let's -- he's going to write an article.
5          MR. TIGAR:  Now were these in the first
6  couple of meetings that you had that you described
7  that he called you at your office?
8          THE WITNESS:  No, this was later on in
9  the case after he communicated with the management
10  and we didn't get what we wanted and as the case
11  was going forward.
12         MR. TIGAR:  Can you put a date, an
13  approximate date on it?  Was it before or after
14  you talked to Mr. Shamble?
15         THE WITNESS:  After I talked to Mr.
16  Shamble.
17         MR. TIGAR:  Was it still in 2010 do you
18  think?
19         THE WITNESS:  Yes.
20         MR. TIGAR:  Alright.
21         THE WITNESS:  It was in the beginning
22  of 2010.

Page 105

1          MR. TIGAR:  Thank you.
2          THE WITNESS:  Sometime in the
3  beginning, sometime maybe -- maybe March.  I don't
4  know.
5          MR. TIGAR:  Ok.
6          THE WITNESS:  Or April, I don't know.
7  But the first six months.
8          MR. TIGAR:  Mm-hmm.
9  BY MR. SMITH:
10     Q.  Ms. Sataki, there came a time that you
11  stopped going to work at Voice of America?
12     A.  Yes.
13     Q.  Where were you living at the time?
14     A.  In DC.
15     Q.  There came a time that you moved from
16  DC to Los Angeles?
17     A.  Yes.
18     Q.  Could you tell the hearing committee
19  the circumstances of that move.
20     A.  Well, Mr. Klayman helped me with that
21  move.  He paid for my car and my -- to be moved to
22  California and also all my stuff to be moved, my

27  (Pages 102 to 105)

Page 106

1  furniture, everything, to be moved to California.
2      Q.  Whose decision was it that you should
3  move to California?
4          MR. KLAYMAN:  Objection, leading.
5          CHAIRMAN FITCH:  Overruled.
6  BY MR. SMITH:
7      Q.  You can answer the question.
8      A.  I asked him -- well, we talked about it
9  that the fact that there is an office, VOA has an
10 office in LA, and it would be great, and I told
11 him that I had written a proposal to VOA for them
12 to transfer me to LA and work from there.  And he
13 said, "Under the circumstances and everything
14 that's going on I can get you that transfer."
15     Q.  What were your financial
16 circumstances --
17         CHAIRMAN FITCH:  Now when in 2010 did
18 you move to Los Angeles?
19         THE WITNESS:  I think it was sometime
20 in April maybe.  I think.
21         CHAIRMAN FITCH:  No.
22         THE WITNESS:  Sometime there, end of

Page 107

1  April maybe.
2  BY MR. SMITH:
3      Q.  What were your financial circumstances
4  at the time that you moved?
5      A.  Paycheck to paycheck.  I was living
6  paycheck to paycheck to paycheck.
7          So if I missed one paycheck from VOA, I
8  do not have my car payment or rent or food.
9      Q.  So, how were you going to survive
10 financially under those circumstances?
11     A.  Well, I --
12         MR. SUJAT:  Your Honor, objection, a
13 leading question.
14         MR. SMITH:  What leading question?  I'm
15 not putting words in her mouth.  I just asked a
16 simple question.
17 BY MR. SMITH:
18     Q.  How were you going to survive?
19         MR. KLAYMAN:  Your Honor, there is no
20 foundation.  She said she was living paycheck to
21 paycheck --
22         CHAIRMAN FITCH:  Well, no, there most

Page 108

1  certainly is.  There's evidence.  I might believe
2  it, I might not believe it.  But there's certainly
3  a foundation.
4          So that objection is overruled.  The
5  question stands.
6          So you may answer the question.
7          THE WITNESS:  I thought the -- well, I
8  thought that I'm going to get my paychecks from
9  VOA during that time, and I didn't -- I thought
10 that -- I mean, I believed that Mr. Klayman was
11 going to help me and in a very short time I'm
12 going to be transferred to the LA office and just
13 work from there while the sexual harassment case
14 is being enrolled and resolved.
15         So I thought that I'm going to have my
16 paychecks from VOA.
17 BY MR. SMITH:
18     Q.  So Mr. Klayman was assisting you
19 financially when you moved to California?
20     A.  Yes, he was.
21         CHAIRMAN FITCH:  That's struck.
22

Page 109

1  BY MR. SMITH:
2      Q.  And can you describe what that
3  financial arrangement was, again, please?
4      A.  He paid for my car and all my stuff,
5  moved it to LA.
6          And also my credit was ruined.  I
7  didn't have credit, so I couldn't rent an
8  apartment, and he helped me rent an apartment and
9  he paid the apartment for me.
10     Q.  How much per month was that apartment?
11     A.  How much what?
12     Q.  How much money per month did the
13 apartment cost?
14     A.  I think it was 2,000 something, 2,000
15 something, I think.  I don't remember.  Or maybe
16 3,000.  Maybe it was 3,000, because you probably
17 remember much better than I do now.
18     Q.  Let me ask you to look at what has been
19 marked as Bar Exhibit Number 23.
20         CHAIRMAN FITCH:  Mr. Smith, why don't
21 we take a short break?
22         MR. SMITH:  Alright.

28  (Pages 106 to 109)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 110 | Page 112 |
|---|---|

**Page 110**

1   CHAIRMAN FITCH:  Would that be alright
2  with you?
3   MR. SMITH:  Yes.
4   CHAIRMAN FITCH:  Is about ten minutes
5  sensible?  Let's stand in recess for ten minutes,
6  which will be approximately 11:45.
7   (Recess taken.)
8   CHAIRMAN FITCH:  Mr. Smith, I think you
9  may resume.
10   MR. SMITH:  Thank you.
11  BY MR. SMITH:
12   Q.  Before I get into Bar Exhibit Number
13  23, Ms. Sataki, I'd like to -- and this question
14  may have already been answered, but out of an
15  abundance of caution and to protect the record,
16  I'd just like to ask the question.
17   With respect to the monies that Mr.
18  Klayman had paid for your -- given to you while
19  you were in Los Angeles -- that's the context of
20  the question -- did you have an understanding
21  about whether or not Mr. Klayman was going to be
22  reimbursed for that money that he was giving you

**Page 111**

1  in connection with your rent and other things?
2   MR. SUJAT:  Your Honor, I object.  It's
3  a very vague question.
4   CHAIRMAN FITCH:  I'm sorry, counsel, I
5  didn't hear the basis of your objection.
6   MR. SUJAT:  It's vague, not germane.
7   CHAIRMAN FITCH:  What?
8   MR. SUJAT:  It's a vague question, and
9  it needs more detail, more foundation.
10   CHAIRMAN FITCH:  Let's go with it and
11  we'll see what happens.  Overruled.
12   THE WITNESS:  Yes, the money was going
13  to be paid back to Mr. Klayman once we win the
14  case and he takes that money together with his 40
15  then later 50 percent that he said he was going to
16  take.
17  BY MR. SMITH:
18   Q.  Thank you.
19   A.  So that money was going to be -- so he
20  would take the money from that amount once we win
21  the case.
22   Q.  Thank you.

**Page 112**

1   Now have you had a chance to look at
2  what's been marked as Bar Exhibit Number 23?
3   A.  Yes.
4   Q.  That's your signature on the second
5  page, for the record, 23-3?
6   A.  Yes.
7   Q.  On the pages that have been marked 23-4
8  through 23-6, you've had a chance to look at
9  those?
10   A.  Yes.
11   Q.  Now, did you write this part of the
12  ethical complaint?
13   A.  Yes.
14   Q.  Was that your writing or did somebody
15  help you write that?
16   A.  I -- with the English I always need
17  help.
18   Q.  Ok.
19   A.  Someone to help me write it, yes.
20   Q.  So who helped you with this?
21   A.  I had -- I had my cousin and I had this
22  other lady that helped me.

**Page 113**

1   Q.  Who was the other lady that helped you?
2   A.  Katherine.
3   Q.  How did you come to know Katherine?
4   A.  I had met her one time when me and Mr.
5  Klayman, we went to her boss's office regarding my
6  case.  He wanted to meet with -- because he wanted
7  me to meet with him to help my case.
8   Q.  So how did Katherine come to help you
9  with writing this complaint?
10   A.  When we were in that office he -- she
11  later contacted -- well, once I was by myself in
12  the office for a moment, she talked to me and she
13  gave me her phone number.  She told me that -- she
14  asked me to call her, she wants to talk to me, and
15  she asked me if I'm ok.  I said, yes, and she said
16  that I -- "I have to talk to you.  You don't seem
17  ok."  So I called her.
18   Q.  And what did you all discuss?
19   A.  Mr. Klayman.
20   Q.  Tell the committee --
21   MR. KLAYMAN:  Your Honor, this is all
22  hearsay.

29  (Pages 110 to 113)

Page 114

1     CHAIRMAN FITCH:  She can recount --
2     MR. KLAYMAN:  We're getting into
3 hearsay.
4     CHAIRMAN FITCH:  No, we're not.  She's
5 going to recount what she said to Katherine and
6 what she remembers Katherine saying to her.
7     MR. KLAYMAN:  Well, that would be
8 hearsay what Katherine said to her.
9     CHAIRMAN FITCH:  Well, we'll see.
10 BY MR. SMITH:
11    Q.  Please.
12    A.  I --
13    Q.  What did you tell Katherine?
14    A.  Well, she told me that -- she was in
15 the office with Mr. Klayman and me and her boss.
16 I don't remember her boss's name right now.  And
17 what Katherine told me was that her secretary --
18    CHAIRMAN FITCH:  No, no --
19    THE WITNESS:  What I --
20    CHAIRMAN FITCH:  Right now he has asked
21 you what you said to her.
22    THE WITNESS:  What I said to her.

Page 115

1     She asked me if I'm ok, and I don't
2 seem ok, and "Is everything ok with Mr. Klayman,
3 because we get the vibe that you're afraid of
4 him."
5     And I explained to her why I'm not ok,
6 and I told her what's going on.
7 BY MR. SMITH:
8     Q.  And what was going on?  Very briefly,
9 what was going on?
10    A.  At that time he -- Mr. Klayman wanted
11 to have more than a client/attorney relationship
12 with me, and it was -- by then I was completely
13 mentally destroyed because of the roller coaster
14 he was putting me through, because it was for
15 months that he wanted to have a relationship with
16 me and me saying no, and it was ongoing and
17 ongoing and it wouldn't stop, and it was -- and so
18 many different ways that it was very, very, very
19 uncomfortable.
20    CHAIRMAN FITCH:  Now, when was this
21 telephone conversation with Katherine.
22    THE WITNESS:  Maybe sometime in June.

Page 116

1     CHAIRMAN FITCH:  Of?
2     THE WITNESS:  2010.  And I don't
3 remember exactly, 2010.  Sometimes I can't
4 remember.
5     CHAIRMAN FITCH:  I can't remember what
6 I had for dinner last night, but just do your
7 best.
8 BY MR. SMITH:
9     Q.  In looking at Page 23-2 of the
10 complaint, down at the bottom, go back to 23-2.
11    A.  Yes.
12    Q.  The date on this is October 20th, 2011.
13 Is that about the time that you submitted this
14 complaint to the Office of Disciplinary Counsel?
15    A.  Yes.
16    Q.  Ok.  Now this complaint is different
17 from the first complaint that you filed, is it
18 not?  It's a little more detailed?
19    A.  It's more detailed.
20    Q.  Before this complaint was filed, did
21 you participate in what was going to be in this
22 letter?

Page 117

1     A.  It's everything that I experienced.
2     Q.  And you explained this to Katherine?
3     A.  Yes.
4     Q.  Before it was submitted did you read it
5 to make sure that it reflected what was happening?
6     A.  Yes.
7     Q.  On 23-5, if you could look there, you
8 mention in the third paragraph that begins with
9 "adding insult to injury."
10    A.  Yes.
11    Q.  Read that to yourself, please.
12    (Witness reads document.)
13    A.  Yes.
14    Q.  When did you first notice that Mr.
15 Klayman was using the professional relationship as
16 an opportunity to pursue a personal relationship
17 with you?
18    MR. SUJAT:  Objection, your Honor.
19 This is a leading question.
20    CHAIRMAN FITCH:  I think I have to
21 sustain that objection.
22

Page 118

BY MR. SMITH:

Q.  Did there come a time when Mr. Klayman attempted to pursue a personal relationship with you?

A.  Yes.

Q.  Do you recall when that was?

A.  It was sometime in April.

Q.  April of?

A.  April, 2010.

Q.  Can you tell the hearing committee how you became aware of that.

A.  It started that he started getting upset why I'm not inviting him to the gatherings or to places that I go and I don't take him with me.  That made him upset.  And so I had arguments with him.  He would nonstop text or email, or phone calls, and talked to me that I talk about respect, that I'm not respecting him, and why I'm not taking him to the gatherings.

Then he explained his feelings to me and told me that he loves me and then he told me that he never loved anyone the way he loved me

Page 119

ever in his life and that nobody is going to love me the way he loved me, no other man can ever love me the way he loves me.

And so this was going on, and he -- and I through the whole time asked him to be my friend, but the most I can -- he's my attorney and the most I can do is a friendship, nothing more than friendship.  Then he would lecture me on a friendship, what a friendship is, and then he would put lines of emails that a friend wouldn't do this or a friend wouldn't do that, meaning that I would -- if I was a friend I would invite him to places that I go, or I would care more about what happens to him or what's going on with him in his life, so I'm not even acting as a friend.

So, I -- the reason I couldn't, even as a friend, take him anywhere was because of his body language or the way he would look at me.

I was in a sexual harassment case and I couldn't have my attorney in public acting in the body language and the eye contact the way that

Page 120

people are going to say that, "Oh, she's in a sexual harassment case, now she's having a" -- "look what kind of body language or how -- she has something going on with her attorney?"

So that would be -- so therefore I didn't want him anywhere with me.  And we actually -- can I give an example?

Q.  Yes.

A.  He -- there was a gathering, award evening, and I -- we went -- we went together, we went to that evening place.  The whole time he wanted me to meet with people that helps my case or helps me find a new job, and we went to that award evening, and the table that we sat, the way I sat, I sat with my face toward the stage and he was sitting next to me.  So basically I was turned toward the stage, and my back kind of toward him.  And during the evening I talked to other people and all that, and that upset him very much.

So, when we left the place and we were outside waiting on the valet parking for the car, he got very upset.  He got very, very upset.  He

Page 121

got -- there was no control on him.  He couldn't control himself.  He was arguing with me, arguing, arguing, and his body language.  He was making a scene that everybody could see.  And I did my best to control him, to calm him down, so people don't see, and wondering, "What's going on with Sataki and her attorney?  Why her attorney's acting like that and why is this body language?  What are they fighting about?"

So finally to calm him down, I said, "You either calm down and be quiet right now or I'm walking away."  And he got quiet.  So at that point the car came, the valet person brought the car, and we got into the car.  And in the car it was no stopping.  He was going on and on and on, talking, talking, talking, about all the different occasions that I didn't invite him or I don't care about him.  He cares about me so much, he gives me so much love, everything, I don't even give him friendship, and my back was toward him during the time that -- during the event that we were there -- and it was nonstop.  It was too that --

31  (Pages 118 to 121)

Page 122

1  "Why you were talking to that person?"  "Why
2  didn't you look at me?"  "Why didn't you talk to
3  me?"  "Why you're ashamed of me?"  "Why you're
4  ashamed of" -- "Why you so afraid that people are
5  going to think that I'm your boyfriend?"  "Why you
6  so scared of that?"   "You don't even treat me as
7  a friend."
8        So it was just going on so much, and
9  the next red light -- I knew the area.  The next
10 red light I opened the door and I ran out of the
11 car.  And I ran across the street because the car
12 was going this way, and I ran across the street.
13 I ran into the hotel.  It was a hotel, the Luxe
14 Hotel, and he turned around.  He parked the car.
15 He followed me into the hotel, and when I saw him
16 coming in, I ran into the ladies' bathroom.
17       He followed me to the ladies' bathroom
18 and the person, the receptionist came to the
19 ladies' bathroom, asked him to step out, because
20 he can't be in the ladies' bathroom.
21       She asked me if I'm ok.  I said yes.
22 She brought me -- she said, "Stay here.  I'm going

Page 123

1  to bring you some water."  She brought me some
2  water and she asked me if she should call the
3  police.  I said, "No, just please call me a taxi
4  and  I want to go home and I want to stay here
5  until he's gone, then call me a taxi and I leave."
6        And she said, ok.
7        So, he -- then she helped me and she
8  called a taxi, and the taxi came to the back of
9  the building and I left from the back door and
10 took the taxi home.
11       And this was just one example of so
12 many different occasions that, the roller coaster
13 that I had to go through with him all the time,
14 whether he was complaining why I'm not spending
15 time with my mom and him, whether I want him --
16       CHAIRMAN FITCH:  If I may interrupt,
17 beginning with the words, "this was just one
18 example," that becomes nonresponsive to this
19 particular question and that will be struck.
20       From, beginning with, "this is just one
21 example," for about three sentences or whatever it
22 will be.

Page 124

1        But I may ask another question, of
2  course.
3        MR. SUJAT:  Your Honor, I'd also like
4  to object if I could to the hearsay of what this
5  lady was -- she was reporting what the lady was
6  saying about the incident.  That was before this
7  point that you're making.
8        CHAIRMAN FITCH:  You're referring to --
9  to Katherine?
10       MR. SUJAT:  No, there was a lady that
11 came out with the glass of water.  Maybe the court
12 reporter can read it back.
13       THE WITNESS:  That was in the hotel.
14       CHAIRMAN FITCH:  In the hotel.
15       Overruled.
16 BY MR. SMITH:
17 Q.  Now, this incident at this movie event,
18 would you tell the hearing committee when that
19 was, approximately.
20 A.  Sometime in May.
21 Q.  Now, were you under a doctor's care
22 during the time that Mr. Klayman was representing

Page 125

1  you in the case?
2  A.  Yes.
3  Q.  Who were you seeing?
4  A.  Dr. Aviera and Dr. Long.
5  Q.  What was the purpose of these doctors?
6  A.  Mr. Klayman set me up with those
7  doctors to help me out with my -- for the sexual
8  harassment and the stage of what was going on.
9  Q.  What kind of medicine did Dr. Aviera
10 practice?
11 A.  It was actually -- oh, Dr. Aviera is a
12 psychologist.
13 Q.  How did she know?
14 A.  We had sessions.  We had twice or three
15 times a week sessions that she would help me.  It
16 started with the sexual harassment on my coworker,
17 but it went to Mr. Klayman and everything that I
18 had to deal with him on a daily basis.  She
19 started helping me with that.
20 Q.  Were you under medication at that time?
21 A.  Yes.
22 Q.  What kind of medication?

32 (Pages 122 to 125)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 126

1          A.  I was taking sleeping pills and I was
2     taking antianxiety and anti-depression.
3          Q.  Were these prescribed by your doctors?
4          A.  Yes.
5          Q.  Let me ask about Dr. Aviera.  Have you
6     spoken with her recently?
7          A.  A few months ago, yes.
8          Q.  Can you tell the hearing committee
9     anything that was going on in Dr. Aviera's life?
10         A.  Yes.  Unfortunately she's sick and --
11    stage four cancer, so she can't see patients any
12    more.  She told me --
13         MR. SUJAT:  Your Honor, I object.  This
14    is hearsay.
15         CHAIRMAN FITCH:  That's sustained.
16    BY MR. SMITH:
17         Q.  When was the last time you met with Mr.
18    Aviera?
19         A.  A few months ago.
20         Q.  Ok.
21         A.  A few months ago.  I don't remember
22    when.

---

Page 127

1          Q.  Was that a part of your treatment?
2          A.  Yes.
3          Q.  Did there come a time when she stopped
4     treating you?
5          A.  Yes.
6          Q.  When was that?
7          A.  As she got sicker and as she wouldn't
8     see patients, she couldn't see patients in her
9     office anymore.
10         Q.  So when was the last time that you saw
11    her?
12         A.  So the last time I didn't actually see
13    her.  I text messaged her, text messaged her, and she
14    said that --
15         MR. SUJAT:  Your Honor, this would be
16    hearsay about text messages.
17         MR. SMITH:  It's not for the truth of
18    the assertion, but certainly for the fact of what
19    Dr. Aviera told her.
20         CHAIRMAN FITCH:  I think that's right.
21    Go ahead.
22         THE WITNESS:  After I saw her in a

---

Page 128

1     session, it took a few months, then I texted her
2     and she answered me.  She explained to me that
3     she's very sick, but she only sees certain
4     patients over the phone from home.
5          And the last time I asked --
6          MR. SUJAT:  Your Honor, I'm object.
7     This is hearsay.
8          CHAIRMAN FITCH:  Overruled.
9          MR. SUJAT:  She's going into repeating
10    what she heard --
11         CHAIRMAN FITCH:  Overruled.  Go ahead.
12         THE WITNESS:  So, basically she's --
13    and the last time I texted her, unfortunately, I
14    haven't heard from her, and I hope she's ok.
15    BY MR. SMITH:
16         Q.  Let me ask you to look at what has been
17    marked as Bar Exhibit Number 24.
18         MR. TIGAR:  Did you say 24?
19         MR. SMITH:  Twenty-four.
20         MR. TIGAR:  Could I ask a question
21    about 23?
22         You had that in front of you just a

---

Page 129

1     moment ago.
2          THE WITNESS:  Yes.
3          MR. TIGAR:  Do you remember, there are
4     a number of things in there that are emails.  Now
5     do you remember receiving those at or about the
6     time of the various dates that they bear?
7          Was that question clear?
8          THE WITNESS:  The emails?
9          MR. TIGAR:  In other words, you
10    attached some emails that you say are from Mr.
11    Klayman?  Do you remember getting those from him?
12         THE WITNESS:  Yes.
13         MR. TIGAR:  Alright.
14
15         MR. TIGAR:  And 24 the witness has in
16    front of her now?
17         THE WITNESS:  Yes.
18         MR. TIGAR:  Did you receive that from
19    Mr. Klayman?
20         MR. SMITH:  Excuse me, I was going to
21    go into it.
22         MR. TIGAR:  You're going to do it ?

---

33  (Pages 126 to 129)

Page 130

1    Alright, that's probably better.
2         MR. SMITH:  Ok.
3         MR. TIGAR:  Sorry.
4         MR. SMITH:  And we will get back to the
5    emails in 23 as well, but thank you for that.
6         MR. TIGAR:  Mm-hmm.
7    BY MR. SMITH:
8         Q.  For the record, Bar Exhibit 24 is a
9    letter addressed to Arlene, and it is CC'd to
10   "Ellie" and it's dated April 7, 2010.
11        Have you seen this document prior to
12   today?
13        A.  Yes.
14        Q.  When did you first see this document,
15   if you recall?
16        A.  It was about the same time that he
17   emailed it to Dr. Aviera.
18        Q.  Who showed you a copy of this letter?
19        A.  Dr. Aviera.
20        Q.  Look at Bar Exhibit Number 25.
21        For the record it is a letter dated May
22   9th, 2010, and again addressed to "Arlene."

Page 131

1         Have you had a chance to look at that?
2         A.  Yes.
3         Q.  Other than today, do you recall the
4    first time you saw this letter?
5         A.  Probably about the same time, but I
6    didn't pay much attention because I knew about all
7    this.
8         But Dr. Aviera showed me the letter.
9         Q.  Ok, Dr. Aviera showed you the letter.
10        Did you have a conversation with Dr.
11   Aviera about either of the two letters, the April
12   letter or the May letter?
13        A.  I had conversation -- yes.
14        Q.  Ok.
15        A.  And emails.
16        Q.  With respect to the April letter, Bar
17   Exhibit Number 24 --
18        MR. KLAYMAN:  Your Honor I would object
19   to any testimony that gets into about what Dr.
20   Aviera said.
21        CHAIRMAN FITCH:  That gets into what?
22        MR. KLAYMAN:  That gets into what Dr.

Page 132

1    Aviera might have said.
2         CHAIRMAN FITCH:  Well, we have to take
3    it step by step I think.
4         I guess the pending question is --
5    BY MR. SMITH:
6         Q.  Did you have a conversation with Dr.
7    Aviera?
8         CHAIRMAN FITCH:  About?  The April
9    letter.
10        MR. SMITH:  About the April letter.
11        CHAIRMAN FITCH:  Or the letter that has
12   an April date at the top.  Ok.
13        THE WITNESS:  Yes.
14   BY MR. SMITH:
15        Q.  Can you tell the hearing committee
16   about that conversation.
17        MR. KLAYMAN:  Your Honor, objection,
18   hearsay.
19        She can testify what she said, but she
20   can't testify what Dr. Aviera said.  That would be
21   hearsay.
22        CHAIRMAN FITCH:  Well, given the

Page 133

1    relaxed rules of evidence, and because at least
2    she is here to be cross-examined, let's go down
3    that road and see what happens.
4         Overruled --
5         MR. KLAYMAN:  At this point, for the
6    record, as your Honor may recall, I had requested
7    to be able to depose Dr. Aviera.  That would have
8    alleviated this issue, and I was denied.
9         That's why I also needed her file,
10   because this is just selective things that are
11   being produced by Bar Counsel from her file, not
12   the whole file.
13        So this is a highly prejudicial area of
14   testimony for her to be testifying, A, without my
15   having discovery, which I requested early on, and
16   B without Dr. Aviera to testify.
17        MR. SMITH:  Disciplinary Counsel does
18   not have Dr. Aviera's file.  What we have is what
19   we have produced.
20        We have established that Dr. Aviera is
21   unavailable because of serious health concerns and
22   that's why she's not testifying here today, even

Page 134

1  remotely.
2       And the document does speak for itself.
3  Ms. Sataki, certainly who was a party to any
4  conversation she had with Dr. Aviera.  She recall
5  and can describe what it was that she was feeling
6  at the time, certainly, and what Dr. Aviera may
7  have said.
8       Again, because of the relaxed rules
9  here, everything that Ms. Sataki may say about Dr.
10 Aviera are statements that go to weight, not
11 admissibility.
12      MR. KLAYMAN:  First of all, if I may
13 respond to that, Mr. Smith is in part testifying
14 for himself on that.  It's clear that I wanted
15 discovery up front.
16      Relaxed rules does not mean that you
17 bring in testimony that can't be corroborated,
18 that can't be refuted in any way.
19      I as Respondent am being put in a Catch
20 22 situation: heads I win, tails I lose, not being
21 able to refute that.
22      So, again, this is much like the

Page 135

1  documents that were just produced after it was
2  told to me by Bar Counsel that they had produced
3  everything.  This is unfair surprise, and it's
4  completely contrary to any norms of litigation
5  practice, even before a hearing tribunal or even a
6  court.  It just doesn't work.  It doesn't fly.
7  It's not proper.
8       So relaxed rules does not mean that you
9  get to do whatever you want, and you get to do a
10 number on the Respondent and he doesn't get the
11 opportunity to know what the testimony is when he
12 reasonably requested discovery.
13      And the same thing with the
14 investigator, and the same thing with Ms. Sataki,
15 herself, because we're first learning today that
16 there is this person named Katherine from the VOA
17 who was preparing these ethics complaints.
18      Well, I was at odds with VOA, for her,
19 in making very strong statements about what VOA
20 had not done properly.
21      So all of this stuff, I should have had
22 the opportunity to take some discovery here, and

Page 136

1  I'm getting sandbagged and ambushed, as I was
2  going to be early on in this case.
3       It's not right, it's not proper and
4  it's not even ethical.
5       THE WITNESS:  I'm so sorry.
6       Katherine is not from VOA.
7       CHAIRMAN FITCH:  I think that argument
8  contains a number of elements, some of which are
9  apples, some of which are oranges.
10      We've done our best to apply the rules
11 of the Board, rules that do not favor depositions
12 and set up a compelling-need standard.
13      The other observation is that this
14 document, Number 24, has been in the exhibits from
15 the time that they were initially due in
16 preliminary form.
17      Mr. Smith, why don't you -- I'm not
18 convinced of what the relevance is of Dr. Aviera's
19 views.  I'm certainly going to hear what the
20 complaining witness, Ms. Sataki, said to Dr.
21 Aviera, and maybe what Ms. Sataki's reactions were
22 to Dr. Aviera's comments, if any.

Page 137

1  So why don't you proceed along those
2  lines, if you would.
3       MR. SMITH:  Thank you.
4  BY MR. SMITH:
5       Q.  So the question, Ms. Sataki, was, did
6  you have a conversation with Dr. Aviera concerning
7  this letter?
8       A.  Yes.
9       Q.  Can you share with the hearing
10 committee what that conversation was?
11      MR. KLAYMAN:  Your Honor, hearsay, ok?
12      She can say what she said, but she
13 can't testify to what Dr. Aviera said.
14      CHAIRMAN FITCH:  Yes, let's start off
15 with that, Mr. Smith.
16 BY MR. SMITH:
17      Q.  Alright.  What did you say to Dr.
18 Aviera once you became aware of this letter?
19      A.  I mean, I can't exactly remember.  It
20 was such along time, exact that day.  But I can
21 say that what I told Dr. Aviera was exactly what a
22 patient says to the psychologist, and everything

                              35  (Pages 134 to 137)

Page 138

1  that Mr. Klayman was doing to me and all and the
2  fact that he's explaining his love to me and all
3  that.
4       And I asked Dr. Aviera to have a
5  session with Mr. Klayman, together, and she
6  agreed, and I asked Mr. Klayman to come to the
7  office so the three of us can have -- can speak.
8       I don't remember exact, but I think
9  these are during that time, these letters are
10  during that time.  I do remember that before he
11  attended to that meeting at the Lincoln Center
12  that Dr. Aviera sent a letter about what he wants
13  to talk about and how he feels about the whole
14  thing, but we did have a session, the three of us
15  together, with Dr. Aviera.
16  BY MR. SMITH:
17       Q.  What was the purpose of that session?
18       A.  I wanted to explain to Mr. Klayman in
19  front of Dr. Aviera that he is only my attorney
20  and nothing but attorney, and he will never, ever
21  be anything but attorney, not even a friend.
22       And he was asking me, "Is it because

Page 139

1  I'm not Persian that I can't be your boyfriend?"
2  And I said, "If you were the last man on Earth you
3  can't be my boyfriend.  You are only my attorney
4  and handling my case."
5       I wanted to do that in front of Dr.
6  Aviera so I have a witness.
7       Q.  At your meeting with Dr. Aviera, did
8  you say those things?
9       A.  Yes, I did.
10       Q.  How were your remarks received by Mr.
11  Klayman?
12       A.  Mr. Klayman left the meeting halfway.
13  He left the meeting.  He kind of got upset and he
14  left and me and Dr. Aviera continued the session.
15       CHAIRMAN FITCH:  Am I correct in
16  understanding that there was in fact a meeting
17  among Dr. Aviera, Ms. Sataki and Mr. Klayman?
18       THE WITNESS:  Yes.
19       CHAIRMAN FITCH:  Thank you.
20  BY MR. SMITH:
21       Q.  So looking back at Bar Exhibit Number
22  25 --

Page 140

1       CHAIRMAN FITCH:  Madam witness, we had
2  a discussion earlier this morning that you were
3  not privy to, and it was about the all important
4  matter of scheduling and lunch.
5       We are inclined to go to about 1:00
6  p.m. if that's alright with you.  But if you're
7  getting bushed or anything, like anyone else here,
8  speak up.
9       THE WITNESS:  Thanks.
10       MR. TIGAR:  It's okay?
11       THE WITNESS:  Yes.
12  BY MR. SMITH:
13       Q.  If you could refer to Bar Exhibit
14  Number 25.
15       A.  Yes.
16       Q.  Do you recall whether this letter was
17  written before or after the meeting that you had
18  amongst you, Mr. Klayman and Dr. Aviera?
19       MR. KLAYMAN:  Your Honor, lacks
20  foundation.  There's no showing she ever saw the
21  letter, whatever it is.
22       CHAIRMAN FITCH:  Right now it's just a

Page 141

1  reference point of a date.
2       Overruled.
3       THE WITNESS:  What was the question?
4  I'm sorry.  Can I ask?
5  BY MR. SMITH:
6       Q.  My question to you was, this letter,
7  was it written before or after the meeting amongst
8  you, Mr. Klayman and Dr. Aviera?
9       A.  I can guess that it is more, but --
10       MR. KLAYMAN:  Your Honor, it calls for
11  speculation.
12       CHAIRMAN FITCH:  We're not going to
13  allow it.
14       THE WITNESS:  I don't, I don't -- I
15  can't remember.
16  BY MR. SMITH:
17       Q.  Let me ask you to look at Bar Exhibit
18  Number 26.  For the record, it is an email
19  correspondence dated Saturday the 8th of May,
20  2010, from Larry Klayman to Ellie Sataki.
21       (Witness peruses document.)
22       Q.  Do you remember getting this letter?

36 (Pages 138 to 141)

Page 142

1      A.  Yes.
2      Q.  What was your reaction when you got
3  this letter?
4      A.  At this point my reaction is the same
5  as all the other times that I -- I'm just upset,
6  hurt and angry that he can't concentrate on my
7  case and instead of concentrating on my case and
8  the fact that I'm jobless, career-less, and he's
9  still concentrating on his feelings for me, and
10  that was my reaction.
11      I begged him, I plead to him, I
12  screamed, I cried, begging him, "Please, please,
13  stay my attorney and focus on my case, not on me."
14      Q.  Did you ever have any romantic
15  interactions with Mr. Klayman?
16      A.  Absolutely not.
17      Q.  Did you ever have any physical contact
18  with Mr. Klayman, other than like a handshake?
19      A.  No.
20      Q.  Did Mr. Klayman ever attempt to kiss
21  you?
22      A.  One time when he -- they gave Mr.

Page 143

1  Falahati a disciplinary -- they asked him to stay
2  home for two weeks, and he had to stay home until
3  they resolved the case and see what's going on,
4  and investigate the case, my sexual harassment
5  case.  Mr. Klayman called me and he said, "We're
6  going to go celebrate.  We're winning.  You will
7  win the case.  This looks great."
8      So he took me out and he explained the
9  whole case to me, what happened, that now he's
10  going to be put at home and not come to the
11  office.  And he ordered champagne to celebrate
12  that, and we had dinner, and that is the time that
13  he got a little bit -- he got too close and he
14  tried to kiss me.
15      Q.  Can you describe what happened?
16      A.  Nothing happened, because nothing was
17  supposed to have happened.
18      I pushed him away and then I asked him
19  to, "Please let's stay on this case and continue
20  the way it is.  This is a good step.  I'm hoping
21  that it's going to continue this way."
22      Q.  Referring back to Bar Exhibit Number

Page 144

1  26.
2      Let me ask you to look at Bar Exhibit
3  Number 27.  For the record, it is a letter dated
4  July 30th, 2010, from Elham Sataki to Larry
5  Klayman.
6      CHAIRMAN FITCH:  You've moved in number
7  27.
8      MR. SMITH:  I'm making reference -- I
9  was asking -- I should move all these exhibits.
10      CHAIRMAN FITCH:  No, no, I wasn't
11  asking you to move that.  You'll be fine, don't
12  worry about it.
13      You were about to go to Exhibit 27?
14      MR. SMITH:  Yes.
15      CHAIRMAN FITCH:  May I ask a question
16  about Exhibit 26?
17      MR. SMITH:  Yes.
18      CHAIRMAN FITCH:  On Page 2 of that
19  exhibit, do you see how way down the page there
20  purports to be an email from Mr. Klayman to you,
21  Saturday, 8, May, 14:16.
22      THE WITNESS:  Yes, where he says that

Page 145

1  he wants someone else to take over the case, that
2  email?
3      MR. TIGAR:  Yes.
4      CHAIRMAN FITCH:  That's what I'm
5  referring to.  I'm not sure I asked you what he
6  was saying.
7      THE WITNESS:  Oh, I'm sorry.
8      CHAIRMAN FITCH:  But he does refer a
9  Tim Shea as someone who can take over the legal
10  representation, correct.
11      THE WITNESS:  Yes.
12      CHAIRMAN FITCH:  Did Mr. Shea call you
13  on Monday or Tuesday or Wednesday or whatever?
14      THE WITNESS:  I don't remember.
15      CHAIRMAN FITCH:  And did you make any
16  effort to contact Mr. Shea.
17      THE WITNESS:  I don't remember.
18      CHAIRMAN FITCH:  Ok.  Go ahead, Mr.
19  Smith.
20  BY MR. SMITH:
21      Q.  Ok, looking at Bar Exhibit Number 27,
22  please.  Did anyone help you write this letter?

37 (Pages 142 to 145)

```
                                                        Page 146
1    A.  Yes.
2    Q.  Who was that?
3    A.  Katherine.
4    Q.  What is Katherine's last name, if you
5  recall?
6    A.  I have it there.  I can't remember.
7  Styles -- she -- I don't remember her last name.
8    And --
9    A.  I have it in my notes.
10   Q.  With whom did Katherine work?
11   A.  She worked for a congressman that I met
12 through Mr. Klayman.  Mr. Klayman took me to that
13 congressman's office in California.  That's where
14 I met Katherine.
15   Q.  It was in California?
16   A.  Yes.
17   Q.  And you became friends with Katherine?
18   A.  Yes.
19   Q.  Before this letter was written to Mr.
20 Klayman, did you help prepare it?
21   A.  Yes.
22   Q.  Did you agree with everything that was
```

```
                                                        Page 147
1  in there?
2    A.  Of course, yes, absolutely.
3    Q.  Alright.  Take a look at paragraph
4  three of the letter.
5    A.  Yes.
6    Q.  Could you just read that to the hearing
7  committee?
8    A.  "I want to withdraw all the pending
9  lawsuits that are on my behalf and/or in my name.
10 I want only to follow a sexual harassment case
11 against Mr. Falahati as the main harasser and only
12 Alusat Jaffee (phon) and Susan Jackson as
13 Falahati's supporters.  They did so by not
14 pursuing my complaint and retaliating against me
15 in the work place."
16   Q.  At that point did you expect Mr.
17 Klayman to no longer be working on your cases?
18   A.  Yes.  I even asked him to let --
19       MR. KLAYMAN:  Objection, I'm sorry.
20       Several points of objection on it:
21 NUMBER one, that was a totally leading question;
22 number two, the document, itself, doesn't even say
```

```
                                                        Page 148
1  what that leading question suggests and elicits.
2        So I move to strike the question and
3  the answer.
4        CHAIRMAN FITCH:  I need the question
5  repeated.
6        THE COURT REPORTER:  "At that point did
7  you expect Mr. Klayman to no longer be working on
8  your cases?"
9        CHAIRMAN FITCH:  Overruled.
10 BY MR. SMITH:
11   Q.  Would you please look at the last
12 sentence on the second page of the letter.  If you
13 would read that for the hearing committee.
14   A.  "I know that you want the best for me,
15 but I also believe that my case has become a more
16 personal/political fight that you have with VOA or
17 that system in general."
18   Q.  Would you tell the hearing committee
19 what you meant by that.
20   A.  Mr. Klayman, during those months, he
21 had two concentrations: one, his love for me and
22 him pursuing me; two, this case became more --
```

```
                                                        Page 149
1        MR. KLAYMAN:  Objection, your Honor.
2  She can't -- she's speculating as to my frame of
3  mind, and that's an improper response and I ask
4  that it be stricken and for her not to testify for
5  me what's in my head.
6        CHAIRMAN FITCH:  I think on the first
7  point there's been adequate foundation laid for
8  her to tell us what her conclusion is.
9        On the second point, I think there has
10 not been an adequate foundation.  Her first point
11 being the emotional one and the second point being
12 other asserted purposes.
13       MR. SMITH:  Well, I think that the
14 foundation is set forth in the plain language of
15 her sentence, and I wanted her to explain to you
16 and for the record what she meant by, this became
17 more than a political/personal -- excuse me, that
18 "it became more of a personal/political fight,"
19 and from her perspective --
20       CHAIRMAN FITCH:  She can point to
21 tangible --
22       MR. SMITH:  Yes, as you --
```

38  (Pages 146 to 149)

Page 150

1 　　　　CHAIRMAN FITCH:  --indications.
2 　　　　MR. SMITH:  Yes, she was in the process
3 of doing that before the objection.
4 　　　　CHAIRMAN FITCH:  Well, I'm not so sure
5 of that.  But, at any rate, we all know where we
6 stand now.
7 　　　　MR. SMITH:  Alright.
8 　　　　THE WITNESS:   Well, my -- it became
9 more of a political fight for Mr. Klayman --
10 　　　　MR. KLAYMAN:  Same objection, your
11 Honor.
12 　　　　CHAIRMAN FITCH:  You said that in your
13 letter, in your email.  What was the basis for
14 saying that?
15 　　　　THE WITNESS:  Because he was talking
16 all the time about the different politicians that
17 he's meeting regarding my case and different
18 congressmen and the fact that he made the cases so
19 big and I'm suing everybody up to Hillary Clinton,
20 when I felt that -- I felt that this is me, little
21 Elham Sataki, here on this side and her attorney,
22 and everybody else on the other side together,

Page 151

1 because he put the whole VOA and everybody against
2 me, together, because he sued everybody.
3 　　　　So, the case became too big and too
4 huge and it didn't have to be that way.  I just
5 wanted it to be against the person who sexually
6 harassed me and the two supervisors.
7 　　　　CHAIRMAN FITCH:  Ok, Mr. Smith.  You
8 have her reasons for making that observation, and
9 Mr. Klayman can do with them what he wants to on
10 cross-examination and the committee members will
11 be convinced or not be convinced.
12 　　　　MR. SMITH:  Thank you.
13 BY MR. SMITH:
14 　　　　Q.  Please take a look at Bar Exhibit
15 Number 28.
16 　　　　CHAIRMAN FITCH:  May I ask a question,
17 Mr. Smith, of number 27, please?
18 　　　　MR. SMITH:  Yes.
19 　　　　CHAIRMAN FITCH:  Down the first page,
20 down at the bottom of 27-1, you wrote, "Why don't
21 you work" -- this is an email from you to Mr.
22 Klayman, correct?

Page 152

1 　　　　THE WITNESS:  Yes.
2 　　　　CHAIRMAN FITCH:  And you wrote, "Why
3 don't you work with a lawyer that Tim introduced
4 to you and let him do the negotiations?"
5 　　　　Who was that lawyer?
6 　　　　THE WITNESS:  The lawyer that Tim
7 Shamble introduced -- and also Mr. Klayman told me
8 that Tim Shamble introduced this lawyer, his name
9 was Tim, too, Tim Shea.
10 　　　　CHAIRMAN FITCH:  What was the name?
11 　　　　THE WITNESS:  Tim Shea, I believe.
12 　　　　CHAIRMAN FITCH:  Oh, it was Tim Shea.
13 I thought you told me --
14 　　　　THE WITNESS:  Tim Shea, S-h-e-a.
15 　　　　CHAIRMAN FITCH:  Oh, I thought you told
16 me a few minutes ago that you didn't remember.
17 　　　　THE WITNESS:  I didn't remember if I
18 contacted him or not, but I asked Mr. Klayman and
19 Tim Shamble to.
20 　　　　CHAIRMAN FITCH:  Ok, so did there come
21 a time when you met with Mr. Shea?
22 　　　　THE WITNESS:  I didn't meet with him,

Page 153

1 no.
2 　　　　CHAIRMAN FITCH:  Ok.
3 　　　　THE WITNESS:  I didn't meet with him.
4 　　　　CHAIRMAN FITCH:  How did you know that
5 Tim Shamble introduced Tim Shea to Mr. Klayman?
6 　　　　THE WITNESS:  Mr. Klayman told me.
7 　　　　CHAIRMAN FITCH:  Ok.  In the preceding
8 paragraph you wrote, "I want to withdraw all the
9 pending lawsuits that are on my behalf and/or in
10 my name.  I want only to follow a sexual
11 harassment case against Mehdi Falahati" -- close
12 enough.
13 　　　　THE WITNESS:  Yes.
14 　　　　CHAIRMAN FITCH:  What did you have in
15 mind when you said, "I want only to follow a
16 sexual harassment case"?  Did you have in mind
17 something that was already pending or some other
18 measure or step?
19 　　　　THE WITNESS:  I meant that I -- I don't
20 want, because he sued the Board of Governors and
21 all the others, and I meant that I don't want to
22 sue all these people.  I only want it limited to

39  (Pages 150 to 153)

|  | Page 154 |
|---|---|
| 1 | these three people. |
| 2 | CHAIRMAN FITCH:  And when you wrote |
| 3 | that second sentence, "I want only to follow a |
| 4 | sexual harassment case," I suggest to you there |
| 5 | are two possibilities: you had in mind some |
| 6 | specific case -- or three possibilities: you had |
| 7 | in mind some specific already pending case, or you |
| 8 | had in mind some possible other case, or you |
| 9 | didn't have any of that in mind, or you don't |
| 10 | remember. |
| 11 | THE WITNESS:  I don't remember.  I |
| 12 | don't think I have anything in mind. |
| 13 | CHAIRMAN FITCH:  Ok. |
| 14 | THE WITNESS:  It was just maybe the way |
| 15 | I -- the sentence, the way I wrote it. |
| 16 | CHAIRMAN FITCH:  I'm sorry, Mr. Smith. |
| 17 | Go ahead. |
| 18 | BY MR. SMITH: |
| 19 | Q.  Take a look at Bar Exhibit Number 28. |
| 20 | CHAIRMAN FITCH:   Well, let me go back, |
| 21 | I'm sorry. |
| 22 | You testified that Mr. Klayman had told |

|  | Page 156 |
|---|---|
| 1 | with Mr. Shea? |
| 2 | THE WITNESS:  No. |
| 3 | CHAIRMAN FITCH:  Try it again, Mr. |
| 4 | Smith.  Maybe I won't interrupt you this time. |
| 5 | MR. SMITH:  Oh, ok. |
| 6 | BY MR. SMITH: |
| 7 | Q.  Bar Exhibit Number 28.  For the record |
| 8 | this is a letter dated August 4th, 2010 addressed |
| 9 | to a Mr. Danforth Austin from Elham Sataki. |
| 10 | (Witness reads document.) |
| 11 | Q.  Did someone help you write this |
| 12 | particular letter? |
| 13 | A.  Yes. |
| 14 | Q.  Who is that? |
| 15 | A.  Kathleen. |
| 16 | Q.  And looking on Page 28.2, the paragraph |
| 17 | with the sentence that's kind of sitting there in |
| 18 | the middle that begins with, "I wish also"... |
| 19 | A.  Twenty-eight one? |
| 20 | Q.  Yeah -- no, 28-2. |
| 21 | A.  Twenty-eight dash two.  "I wish |
| 22 | also" -- |

|  | Page 155 |
|---|---|
| 1 | you that he had met or had communications with Mr. |
| 2 | Shea. |
| 3 | Is that right?  Is that what he told |
| 4 | you, or not? |
| 5 | THE WITNESS: He told me that, yes. |
| 6 | CHAIRMAN FITCH:  Ok.  Did he say that |
| 7 | he had met in person with Mr. Shea or telephone |
| 8 | conversation with Mr. Shea or emails, pigeons or |
| 9 | whatever? |
| 10 | THE WITNESS:  I don't know. |
| 11 | CHAIRMAN FITCH:  Ok.  Do you remember |
| 12 | whether he told you anything about the substance |
| 13 | of a Shea/Klayman communication? |
| 14 | THE WITNESS:  I just remember that he |
| 15 | said that he's not a good option to handle this |
| 16 | case. |
| 17 | MR. KLAYMAN:  Did he, Mr. Klayman, |
| 18 | tell you why he thought Mr. Shea was not a good |
| 19 | option? |
| 20 | THE WITNESS:  I don't remember. |
| 21 | CHAIRMAN FITCH:  Did Mr. Klayman ever |
| 22 | say anything to you about any other communications |

|  | Page 157 |
|---|---|
| 1 | Q.  If you could read into the record from |
| 2 | where it begins "I wish also." |
| 3 | A.  "I wish also to inform you that I have |
| 4 | instructed Larry Klayman to withdraw any and all |
| 5 | civil action that he may have filed in my name and |
| 6 | that he's no longer representing me." |
| 7 | Q.  Let me ask you to back up.  Who is |
| 8 | Danforth Austin? |
| 9 | A.  He was at that point the, I don't know, |
| 10 | higher decision for VOA, Voice of America, like |
| 11 | higher than the Persian News Network.  Yes, I |
| 12 | believe he was the chief of VOA at that time. |
| 13 | BY MR. SMITH: |
| 14 | Q.  And I guess to state the obvious, but |
| 15 | why did you send him this letter? |
| 16 | A.  Well, what exactly what it says here, |
| 17 | to inform them that I don't want the lawsuit |
| 18 | against everybody, the whole VOA, and also that |
| 19 | Mr. Klayman is not representing me any more. |
| 20 | MR. TIGAR:  Excuse my, may I ask you, |
| 21 | would you take a look at the letter.  It says at |
| 22 | the top, "A very important letter to Mr. Austin." |

40  (Pages 154 to 157)

Page 158

1    Now did you send a copy of this letter
2  to anyone, other than to Mr. Austin and to Mr.
3    THE WITNESS:  No, it could be that I
4  sent it to myself for my own record that I know
5  that what this is.
6    MR. TIGAR:  So you sent the letter --
7  as I understand, you sent the letter to Mr. Austin
8  by regular mail?
9    THE WITNESS:  I emailed it, plus I
10  mailed it, too.  I put it in the mail, in an
11  envelope and mailed it to him.
12    MR. TIGAR:  Did you send a copy to Mr.
13  Klayman?
14    THE WITNESS:  I don't remember.
15    MR. TIGAR:  Thank you.
16  BY MR. SMITH:
17    Q.  Let me ask you to take a look at Bar
18  Exhibit Number 29.
19    CHAIRMAN FITCH:  Here I go again, Mr.
20  Smith.
21    In Exhibit 28, where you said that you
22  instructed Mr. Klayman to "withdraw any and all

Page 159

1  civil actions that you may have found in my name,
2  what were you referring to there?
3    THE WITNESS:  Because at that point Mr.
4  Klayman had a lawsuit against everybody in VOA,
5  and the Board of Governors and up to Hillary
6  Clinton, and that's what I wanted.  I wanted to
7  withdraw all that.
8    CHAIRMAN FITCH:  That's a fair answer.
9  Let me ask a better question.
10    When you used the word "instructed," "I
11  have instructed Larry Klayman," what were you
12  referring to there?
13    THE WITNESS:  I asked him to do that.
14    CHAIRMAN FITCH:  Ok.  And did you ask
15  him verbally or in writing or both?
16    What exactly are you referring to
17  there, if you remember?
18    THE WITNESS:  I emailed to Mr. Klayman
19  and verbally asked him to do that.
20    CHAIRMAN FITCH:  Do you recall,
21  vis-a-vis the August 5th date on this letter --
22  the August 4th date on this letter, when you sent

Page 160

1  such an email to Mr. Klayman?
2    (Witness peruses document.)
3    THE WITNESS:  I don't remember exactly
4  what day.  I probably could go back to the emails
5  and check.
6    CHAIRMAN FITCH:  Well, we see something
7  about that, as Mr. Tigar reminded me in 27, which
8  was five days before your letter to Austin, and I
9  am curious as to whether there's anything else
10  that you have in mind when you said that?
11    THE WITNESS:  No.
12    CHAIRMAN FITCH:  Ok.  Now you also
13  said, on Page 28-2, "I have instructed Larry
14  Klayman that he is no longer representing me."
15    What are you referring to in the way of
16  an instruction or a statement there?
17    THE WITNESS:  I told Mr. Klayman, I told
18  him that I don't want him to represent me any
19  more.
20    CHAIRMAN FITCH:  Do you recall whether
21  you expressly, specifically, as you seem to be
22  indicating, did that on one occasion or more than

Page 161

1  one occasion?
2    THE WITNESS:  I'm sorry, I don't --
3    CHAIRMAN FITCH:  When you say in this
4  he letter that you instructed him -- that "he is
5  no longer representing me," do you recall when you
6  said that?
7    THE WITNESS:  It must be sometime in
8  July, end of July.  Sometime end of July.
9    CHAIRMAN FITCH:  Mr. Smith?
10  BY MR. SMITH:
11    Q.  Let me ask you to take a look at Bar
12  Exhibit Number 1 again, at Page 1-3.
13    MR. TIGAR:  I'm sorry, counsel, what's
14  the exhibit?
15    MR. SMITH:  Exhibit Number 1 at Page
16  1-3.
17  BY MR. SMITH:
18    Q.  Did someone help you write this letter?
19    A.  Yes.
20    Q.  Who was that?
21    A.  Katherine.
22    Q.  Can you read the first sentence in this

41 (Pages 158 to 161)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 162

1    letter, if you would, into the record.
2         CHAIRMAN FITCH:  Tell me again what
3    exhibit you have.
4         MR. SMITH:  One at Page 1-3.
5    BY MR. SMITH:
6         Q.  Can you read that first sentence into
7    the record, please.
8         A.  "Please be advised that effective
9    immediately your services are terminated
10   forthwith.  You are to provide no further legal
11   service on my behalf in any case whatsoever.
12        "Please provide me with a complete copy
13   of my file and complete all service rendered via
14   certified mail to my address above."
15        Q.  Now you had already sent him letters,
16   correspondence in July, terminating him?
17        A.  Yes.
18        Q.  Why did you send this letter --
19        CHAIRMAN FITCH:  That question is
20   struck.  I think that's an inaccurate
21   representation of what we've just heard about two
22   parts of that sentence.

Page 163

1         MR. SMITH:  Ok.
2         CHAIRMAN FITCH:  Just ask a question.
3    BY MR. SMITH:
4         Q.  Prior to this letter, had you
5    previously terminated Mr. Klayman from
6    representation?
7         A.  Yes.
8         Q.  When was that?
9         A.  Sometime end of July, 2010.
10        Q.  Why did you send him this letter, which
11   is, for the record, dated November 15th, 2010
12   terminating his services?
13        A.  Because he was still sending me emails
14   and text messages or phone calls about the case,
15   and he was acting like he is still representing
16   me.
17        MR. SMITH:  I have no further questions
18   along these lines.
19        I think this would be a good time for
20   us to take our 1:00 o'clock lunch, and then I can
21   resume after we return.
22        CHAIRMAN FITCH:  We certainly will

Page 164

1    resume after we return.  There are no Ping-Pong
2    tables here we are suggesting with taking
3    evidence.
4         It's 12:58.  Is that enough time?  We
5    stand in adjournment until 1:45.
6         MR. KLAYMAN:  I didn't hear when we
7    were going to resume.
8         CHAIRMAN FITCH:  1:45.
9         (Whereupon at 12:58 p.m. a luncheon
10   recess was taken.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 165

1    A F T E R N O O N   S E S S I O N
2         (Whereupon at 2:04 p.m. the hearing resumed.)
3         MR. KLAYMAN:  Your Honor, may I put
4    something on the record outside of the hearing of
5    the witness.
6         CHAIRMAN FITCH:  We are now back on the
7    record at approximately 2:03, more or less by
8    general compromise among counsel and others.
9         Mr. Klayman, do you have one or more
10   preliminary matters?
11        MR. KLAYMAN:  Some administrative
12   matters.
13        Your Honor, I apologize.  I have post
14   nasal drip and I didn't get, I forget what they
15   call it, that clears out your throat this morning.
16        CHAIRMAN FITCH:  Life will go on.
17        MR. KLAYMAN:  So I will --
18        CHAIRMAN FITCH:  Not a problem.  Life
19   will go on.
20        MR. KLAYMAN:  Just, in terms of
21   administration and how to proceed, is that last
22   week your Honor ordered that I file exhibits, my

42  (Pages 162 to 165)

Page 166

1  exhibits by 4:00 o'clock on Friday, which I did.
2  It was a big rush, not your fault, but I hadn't
3  gotten a lot of the documents back from Mr. Smith
4  until just a few days before that.
5      I had given to him when, I first
6  learned that this thing was still there, still
7  alive, all the pleadings that I had filed and the
8  file of Tim Shamble, and I gave him two boxes, ok,
9  of the stuff, about that high.  And you can see my
10 exhibit binders are pretty deep, because I wanted
11 the hearing committee to know how much work I had
12 done and how hard I had tried for Ms. Sataki, as
13 well as for the expert to say that what I filed
14 was viable and professional.
15     CHAIRMAN FITCH:  I do note, Mr.
16 Klayman, there's no charge here about lack of
17 zealousness.  There's no charge of lack of
18 competency.
19     MR. KLAYMAN:  I understand that.  There
20 was, actually.  In the beginning, when I first
21 talked to Mr. Smith, he said that's the only issue
22 in this case as to whether you abandoned the

Page 167

1  client and were not competent and zealous.  And
2  then when I satisfied him with that, then it
3  became something else, it became the publicity.
4  It became other things, like naming Hillary
5  Clinton.  I mean, it's like pulling a rabbit out
6  of a hat.
7      But the point I'm getting to is that --
8  and then I'll get to that in my testimony, is that
9  I put this together.  It was so quick to put it
10 together that we had FedEx put it together and
11 they shipped it out to Meghan Borrazas and the
12 clerk and it was filed.
13     But we had two copies that were made,
14 one for me to use and one for potentially the
15 witness.  You have copies.  And the one for the
16 witness got all jumbled, and when I went to pick
17 it up last Saturday, I saw that Federal Express
18 had really just made a -- shuffled it.  So I had
19 to have my only associate fix it yesterday, and he
20 was to FedEx it to me early today.  But it didn't
21 arrive in time for me to leave the hotel and come
22 here.

Page 168

1      So what I'm basically getting at is
2  that there's some questions I want to ask Ms.
3  Sataki, based upon my exhibits.  I don't have
4  another binder.  I just have one set.  But I would
5  respectfully ask, particularly in light of the
6  fact that Mr. Sujat is new to this case, and that
7  we have these administrative things, that after
8  the direct testimony concludes today, that I go
9  back to the hotel and get those binders and then
10 prepare with Mr. Sujat for the cross tomorrow,
11 that we take a break before I cross Ms. Sataki.
12     That would be more efficient, because
13 we will be able to go through the testimony in a
14 more orderly and correct way, and I'll have the
15 exhibit books that I don't have right now to use.
16 I just have one set.
17     So, that is my suggestion, and I ask
18 you to consider that, that once we stop with the
19 direct today, that we begin with the cross
20 tomorrow and then everything will be more
21 organized when I have the books.
22     Your Honor might remember, and again I

Page 169

1  don't fault you for this, but I had asked for
2  Friday to have more time to, you know, check it
3  and put it together.
4      CHAIRMAN FITCH:  You did.
5      MR. KLAYMAN:  Thank you.
6      CHAIRMAN FITCH:  Thoughts, Mr. Smith?
7      MR. SMITH:  I have no objection.
8      CHAIRMAN FITCH:  Have you finished your
9  direct with Ms. Sataki?
10     MR. SMITH:  No, I have not.
11     MR. TIGAR:  I'm sorry, I didn't hear
12 him.  He said he's not finished?
13     CHAIRMAN FITCH:  No, he's not finished.
14     MR. SMITH:  No, I'm not finished.
15     CHAIRMAN FITCH:  Well, then you should
16 resume your direct.
17     And we will take under advisement Mr.
18 Klayman's uncontested request.
19     (Witness Ms. Sataki resumes the stand.)
20     CHAIRMAN FITCH:  Ms. Sataki has
21 rejoined us.
22     And Ms. Sataki, as I'm required to do

43 (Pages 166 to 169)

Page 170

1  for every witness after every substantial break,
2  even one of just an hour or so, you are reminded
3  that you remain under oath.
4      THE WITNESS:  Yes, sir.
5      CHAIRMAN FITCH:  Mr. Smith.
6      MR. SMITH:  Thank you.
7      CHAIRMAN FITCH:  Mr. Smith is resuming
8  his direct examination.
9      CONTINUED DIRECT EXAMINATION
10      BY DISCIPLINARY COUNSEL
11      BY MR. SMITH:
12      Q.  Ms. Sataki, I wanted to refer you again
13  to your testimony in connection with Bar Exhibit
14  27.  For purposes of speeding things along, that
15  was the letter where you had asked Mr. Klayman to
16  withdraw all pending lawsuits on your behalf.
17      A.  Yes.
18      Q.  Could you tell the hearing committee
19  why it is that you decided to ask Mr. Klayman to
20  do that at that time.
21      A.  You mean that November 15?
22      Q.  No, no, no, no.

Page 171

1      A.  No, I'm sorry.
2      Q.  In July.  What was that July or May.
3      A.  Oh, the first time.
4      Q.  The May 30?
5      CHAIRMAN FITCH:  You're perfectly
6  welcome to take a minute to back and look at 27.
7      THE WITNESS:  Yes, sorry, I had the
8  November 15th in front of me.  That's why.
9  BY MR. SMITH:
10      Q.  Ok.
11      A.  Would you please repeat the question.
12      Q.  Could you explain to the hearing
13  committee, why was it that you decided at that
14  time to ask Mr. Klayman to withdraw from those
15  matters?
16      A.  It was in October, right?
17      Q.  No, May.
18      A.  It's in May?
19      Q.  May 30th?
20      CHAIRMAN FITCH:  No, no, no, no.  If
21  we're talking about Exhibit 27 --
22      MR. SMITH:  Yes.  July 30th -- I'm

Page 172

1  sorry.  July 30th, 27-1.
2      THE WITNESS:  Well, I wanted him to
3  stop -- one, like I said, he included some people
4  in the lawsuit that it made the lawsuit too big
5  and made all those people that were governors,
6  everybody, that came against -- in front of me and
7  me by myself.  I didn't think that that's good.
8      I didn't want that.  I just wanted the
9  person and the two people, supervisors, only that.
10  BY MR. SMITH:
11      Q.  Was there anything else?  Was there
12  another reason why you didn't want him involved in
13  your case?
14      A.  All together not involved in my case?
15      Yes, it was because he couldn't stay
16  professional.  He couldn't stay only as my
17  attorney, and he -- from end of April until this
18  time, I was in a roller coaster with him.  He
19  would represent me and then he would say that he
20  can't represent me.
21      I mean, as a matter of fact it was
22  himself the first time when he said that he cannot

Page 173

1  represent me any more because he is too
2  emotionally involved with me; he is in love with
3  me and I'm slamming the doors on his face, and
4  he's running on empty fuel, and he can't represent
5  me any more, and he's going to get a colleague,
6  somebody that works with him to work with me, or
7  even us not talk to each other and get a third
8  person in between us to go in between the two of
9  us.
10      So, all this stuff that I was going,
11  because it wasn't a -- I kept asking him, "Please,
12  stay professional."  But he couldn't.  He couldn't
13  cope with.  As soon as he would see or hear that
14  I'm talking to someone, that would be a problem
15  with him, and then he had to go investigate that
16  person or ask his FBI person to investigate that
17  person, whoever I'm talking to, why I'm talking to
18  that person.
19      So it was the whole time a roller
20  coaster, emotional roller coaster, and
21  psychologically I couldn't do it any more.
22      I couldn't -- at that point, the fact

44  (Pages 170 to 173)

| | Page 174 |
|---|---|
| 1 | that I'm becoming homeless, I'm losing my career, |
| 2 | my job, everything, my case, everything, it came |
| 3 | secondary.  Because I had to -- what was first was |
| 4 | that I had to rescue myself from Mr. Klayman that |
| 5 | is -- that is mentally abusing me by the words |
| 6 | that he is saying about me or the people around me |
| 7 | and constantly texting me, calling me, messaging |
| 8 | me.  Or when I'm supposed to meet with him, he |
| 9 | would get -- when I asked him that, "I meet with |
| 10 | you at the restaurant across the street," he would |
| 11 | get upset, why he's not allowed in my apartment? |
| 12 | I couldn't allow him in my apartment.  He would |
| 13 | show up on my doorstep, downstairs. |
| 14 | And I just had to set a stop at one |
| 15 | point that, even though that I was taking the |
| 16 | risk -- well, obviously 100 percent I took the |
| 17 | risk and I lost everything, but I had to -- |
| 18 | (Witness breaks down emotionally.) |
| 19 | THE WITNESS:  I had to put a stop on |
| 20 | his abusive relationship, the weight of -- |
| 21 | constantly the things he was saying, accusations |
| 22 | that, or putting me down, or when he asked me to |

| | Page 175 |
|---|---|
| 1 | go find a job and I find a job, "Oh, that person |
| 2 | wants to sleep with you.  That's why he gives you |
| 3 | a job." |
| 4 | I mean, that's so unprofessional, and |
| 5 | I -- I couldn't.  I had to stop it. |
| 6 | I knew at that point that I'm losing |
| 7 | everything.  But I had to stop -- I have to stop |
| 8 | it. |
| 9 | (Witness breaks down emotionally.) |
| 10 | MR. SMITH:  Could I -- |
| 11 | CHAIRMAN FITCH:  Absolutely.  Have the |
| 12 | witness take a deep breath and we'll proceed. |
| 13 | MR. SMITH:  Could we take just a few |
| 14 | minutes? |
| 15 | CHAIRMAN FITCH:  If the witness wants |
| 16 | to step outside, that's fine.  I think now is not |
| 17 | the time for a witness examining an attorney to |
| 18 | consult. |
| 19 | MR. SMITH:  I'm not going to consult. |
| 20 | I just want to give her some time alone, if that's |
| 21 | alright with you. |
| 22 | CHAIRMAN FITCH:  It is. |

| | Page 176 |
|---|---|
| 1 | (Witness exits courtroom.) |
| 2 | (Brief pause.) |
| 3 | (Ms. Sataki returns to the witness |
| 4 | stand.) |
| 5 | CHAIRMAN FITCH:  Go ahead, Mr. Smith. |
| 6 | BY MR. SMITH: |
| 7 | Q.  If you could look at Bar Exhibit Number |
| 8 | 23. |
| 9 | CHAIRMAN FITCH:  You got away from the |
| 10 | microphone there, Mr. Smith.  We're looking at |
| 11 | what number? |
| 12 | MR. SMITH:  Bar Exhibit 23. |
| 13 | CHAIRMAN FITCH:  Twenty-three. |
| 14 | BY MR. SMITH: |
| 15 | Q.  Could you tell me, if you would look at |
| 16 | what's marked at the bottom Pages 23-50 through |
| 17 | 23-54, four pages, five pages. |
| 18 | Ms. Sataki, what are these documents |
| 19 | that we're looking at now? |
| 20 | A.  Text messages. |
| 21 | Q.  And who are involved in these text |
| 22 | messages? |

| | Page 177 |
|---|---|
| 1 | A.  Mr. Klayman. |
| 2 | Q.  And?  Mr. Klayman and who else? |
| 3 | A.  And me. |
| 4 | MR. KLAYMAN:  Excuse me, what exhibit |
| 5 | is this?  I thought you said 24. |
| 6 | MR. SMITH:  Twenty-three. |
| 7 | CHAIRMAN FITCH:  It's Exhibit 23, |
| 8 | towards the end of the exhibit, starting Page 50 |
| 9 | to about 70. |
| 10 | BY MR. SMITH: |
| 11 | Q.  How did you acquire copies of these |
| 12 | text messages? |
| 13 | A.  I'm sorry? |
| 14 | Q.  How did you get copies of these text |
| 15 | messages? |
| 16 | MR. KLAYMAN:  Your Honor, I'm going to |
| 17 | object to this.  We have an objection on |
| 18 | authentication.  These are not actual text |
| 19 | messages.  They seem to be reprints of things |
| 20 | which -- I'm not even clear what they are, but I |
| 21 | have an objection on authenticity of this. |
| 22 | CHAIRMAN FITCH:  Well, she's gotten |

45 (Pages 174 to 177)

Page 178

1  pretty down that rule of authenticity by saying
2  they were text messages and they were text
3  messages between her and Mr. Klayman.
4        We may decide at some point that's
5  inaccurate, but right now it's perfect
6  authentication, as far as it goes.
7        MR. KLAYMAN:  Well, your Honor, in that
8  regard there's no linkage between this document
9  and text messages that were sent, nor was there
10  any testimony as to how these alleged messages
11  were taken off of a phone and put on a piece of
12  paper.
13        We don't know whether or not they
14  were -- they're genuine or whether they were not
15  genuine.
16        CHAIRMAN FITCH:  We're trying to
17  determine that.  I'll bet you a lot of money that
18  Mr. Smith is going to ask that question right now,
19  because either he was planning to do or you
20  reminded him to.
21        But one way or the other, so far so
22  good.  The objection as to authentication is

Page 179

1  overruled.
2  BY MR. SMITH:
3     Q.  Ms. Sataki --
4     A.  Yes.
5     Q.  Can you tell us how copies of these
6  text messages were made?
7     A.  When I asked how I can make a copy of
8  it, of that phone, and that -- the place I don't
9  remember at that time.  I think I was with
10  Verizon, and they helped me with it.
11     Q.  Mm-hmm.
12     A.  How to make copies of the text messages
13  from the phone.
14     Q.  And do you recall about when it was
15  that you asked Verizon to give you this
16  assistance?
17     A.  I don't remember exact date, no.  It
18  was that I still have that phone, so I could do
19  it.
20     Q.  And do these messages reflect --
21        CHAIRMAN FITCH:  Well, before you ask
22  that question, these messages may purport to be

Page 180

1  from a 2010 period.
2        When did you ask Verizon approximately?
3  2011, 2012, 2014, 2017?
4        THE WITNESS:  About maybe 2010 or
5  '11 -- I mean 2011 or so.  Around that time.
6  BY MR. SMITH:
7     Q.  If you look at Bar Exhibit 23-2 --
8     A.  23-2?
9     Q.  Yeah.  What is the date that you filed
10  this with the Office of Disciplinary Counsel, or
11  submitted it?
12        MR. KLAYMAN:  What exhibit is that?
13        MR. SMITH:  23-2.
14        THE WITNESS:  It's October 20th, 2011.
15  Is that that date?
16  BY MR. SMITH:
17     Q.  So does that refresh your recollection
18  at all as to when you may have asked Verizon to
19  assist you with getting copies of those text
20  messages?
21     A.  So it's about that time.  It's
22  around -- that's why 2010, 2011.  So it must be

Page 181

1  2011.
2     Q.  Do these messages, do they appear in
3  this document to accurately reflect text
4  conversations you were having with Mr. Klayman at
5  that time?
6     A.  Yes.
7        MR. KLAYMAN:  Objection, your Honor.
8  There are a number of purported communications,
9  and to ask the question which encompasses all of
10  them is overly broad and vague and not
11  sufficiently specific.
12        MR. SMITH:  I can certainly ask that
13  question --
14        CHAIRMAN FITCH:  After you had these
15  copies made, Ms. Sataki, did you review the
16  entries on the document?
17        THE WITNESS:  I'm sorry, I didn't
18  understand the question.
19        CHAIRMAN FITCH:  There are a bunch of
20  entries here.  By "entries," I mean the lines that
21  say something --
22        THE WITNESS:  The lines, ok.

46  (Pages 178 to 181)

Page 182

1    CHAIRMAN FITCH:  Did you review these
2  words after you had Verizon make this for you?
3    THE WITNESS:  Yes.
4    CHAIRMAN FITCH:  Did you find any
5  errors or anything that was inconsistent with your
6  memory while you reviewed these entries?
7    THE WITNESS:  I'm sorry, I don't
8  understand the question.  I apologize.  You
9  mean --
10    CHAIRMAN FITCH:  You told me that you
11  reviewed these entries.
12    THE WITNESS:  Uh-huh.
13    CHAIRMAN FITCH:  Speaking generally,
14  were there any instances in which, as you reviewed
15  these entries, do you recall now, did you spot any
16  errors that conflicted or anything that conflicted
17  with your recollection about these matters?
18    THE WITNESS:  You mean something that I
19  don't recognize?
20    CHAIRMAN FITCH:  Did you see any
21  mistakes here or anything that seemed to be wrong?
22    THE WITNESS:  No.

Page 183

1    CHAIRMAN FITCH:  Mr. Smith?
2  BY MR. SMITH:
3    Q.  Why did you include these emails with
4  your complaint, your ethical complaint?
5    MR. KLAYMAN:  Objection.  They're not
6  emails.  They're purported text messages.
7    MR. SMITH:  Excuse me, text messages.
8  Thank you.
9    THE WITNESS:  Because I wanted to show
10  how much text messages he sent me.  And also some
11  of them are from the time that I didn't want to
12  hear from him and he was still texting me, and
13  some of them I would even give the phone to my
14  friend to respond to him and say that, Ellie's --
15  "Ellie's sleeping" or "She's not feeling good" or
16  "She can't answer," so he would quit texting me.
17    So I would give my phone to my friend
18  to text him back and answer him, but still be
19  polite, because I didn't want to make him mad.
20    On 23-53, at the end of the page, you
21  can see my friend says, "Hi, Larry.  This is
22  Lollie (phon).  Ellie is with me and sick.  She

Page 184

1  wanted me to answer her phone and read her text
2  message.  So forgive me."
3    These are just to show with my
4  complaint -- I just wanted to show how it was a
5  constant, nonstop text messaging, and constant,
6  nonstop phone calls, and constant, nonstop emails
7  to me.
8    And it was not -- even if it's not
9  about the case, I didn't want any contact with him
10  if it wasn't about the case.  Or at some point I
11  didn't want to have any contact with him at all,
12  even about the case.  I didn't want that.
13  BY MR. SMITH:
14    Q.  Why is that?
15    A.  Because to him the whole thing was a
16  joke, and I mean, I was a toy for him.  But to me
17  this was my life that he was playing with.  He was
18  just -- he was making a joke out of that, "The
19  Hotel Luxe bathroom is going to be renamed to
20  Larry Klayman office from now on and he's going to
21  have his client meetings there."
22    That evening was very nerve-racking for

Page 185

1  me.  Unfortunately Dr. Aviera is not here to
2  testify to that.  But I had a session with Dr.
3  Aviera after that evening.  And for someone to
4  make a joke out of an incident like that, that it
5  got to point that I had to get out of his car and
6  run away.  That was big for me.  That was huge.
7    And there was a lot of other things,
8  too, that he would get upset.  As soon as he would
9  get upset, he would become another Larry Klayman.
10  He wasn't an attorney that I hired.  He was
11  another person.
12    Q.  What would upset him?
13    MR. KLAYMAN:  Objection, that puts
14  herself into my mental state.
15    CHAIRMAN FITCH:  Well, let's see if she
16  speculates or points to some circumstances.
17  Overruled.
18    THE WITNESS:  If I wouldn't answer his
19  feelings, his love, that would upset him.
20  BY MR. SMITH:
21    Q.  Are there any other examples?
22    A.  Yes.

47 (Pages 182 to 185)

Page 186

1    My brother was in town from Sweden with
2  his family and friends, and I didn't introduce Mr.
3  Klayman to my brother first when he got there, and
4  I just went up -- he came downstairs for me to
5  sign a paper, but I didn't have my brother stay
6  there with me to say hi to him.  That upset him.
7  I disrespected him, according to him, but I didn't
8  see any point in -- my attorney wants me to sign a
9  paper, and I'm in that area with my brother and
10  the family from Sweden.  I told them to go do what
11  their tourist stuff, and I catch up with them.  He
12  gets upset why I don't -- that upsets him.
13    Q.  Did he tell you why that upset him?
14    A.  I disrespected him and I'm not
15  including him in my life.
16    I'm going to a friend's house with my
17  mom and I'm not answering his call, or I'm not
18  calling him as he told me to call.  I had left my
19  phone at home or something.  And he gets upset why
20  I didn't somehow find his phone and call him from
21  there, that I'm probably trying to hide him
22  because I want to marry a rich -- I don't want the

Page 187

1  rich Persian people know that maybe I have a
2  relationship, any kind of relationship with him.
3    MR. KLAYMAN:  Objection.
4    THE WITNESS:  These are stuff that
5  would make him mad, angry, and it would put me on
6  roller coaster: want to represent me; cannot
7  represent me; is going to represent me; cannot
8  represent me.
9  BY MR. SMITH:
10    Q.  Ms. Sataki, I'm going to ask you to
11  look at, still within Bar Exhibit 23, 23-45.
12    CHAIRMAN FITCH:   Are you finished with
13  this particular --
14    MR. SMITH:  Yes.
15    CHAIRMAN FITCH:  -- set of entries?
16    MR. SMITH:  Yes.
17    CHAIRMAN FITCH:   Look at please,
18  ma'am, 23-50.  "Please call today, Mark Woodland,
19  of CBN.
20    It's about the fifth line from the top.
21  Do you know what CBN is?
22    THE WITNESS:  23-59.  It was a -- there

Page 188

1  was a time that he wanted me to work with this TV
2  station, TV channel, or radio, and it was a
3  Christian TV or radio station, and he also told
4  them that I'm a Muslim girl that just accepted
5  Christ in my life and he wanted me --
6    MR. KLAYMAN:  Objection, hearsay,
7  hearsay.
8    CHAIRMAN FITCH:  Objection.  You were
9  present.
10    THE WITNESS:  So he wanted me to work
11  for them.
12    CHAIRMAN FITCH:  First things first, I
13  asked you what CBN were.  I thought CBN was a
14  broadcast network.
15    Does that stand for Christian --
16    THE WITNESS:  Christian Broadcast
17  Network.
18    CHAIRMAN FITCH:  Do you know why Mr.
19  Klayman wanted you to contact Mr. Mark Woodland?
20    THE WITNESS:  To work for them.
21    CHAIRMAN FITCH:  You see about one,
22  two, three, four, five, six, seven, eight, nine

Page 189

1  lines from the bottom, "Meeting with Senator
2  McCain at 10:30 a.m. this morning."
3    Do you see that down there?
4    THE WITNESS:  Where it says --
5    CHAIRMAN FITCH:  Count up from the
6  bottom of this page.
7    THE WITNESS:  Ok.
8    CHAIRMAN FITCH:  One, two, three, four,
9  five, six, seven, eight -- nine lines up.  It
10  says, "Meeting with Senator McCain at 10:30 a.m.
11  this morning."
12    THE WITNESS:  Yes.
13    CHAIRMAN FITCH:  In addition to that
14  item, did Mr. Klayman tell you any other times
15  that he was meeting with Senator McCain or his
16  office people about your case?
17    THE WITNESS:  I don't remember.
18    CHAIRMAN FITCH:  And do you see only
19  four lines up he has written, "Seeing Gloria
20  Allred."
21    Do you see that?
22    THE WITNESS:  Yes, I do.

48  (Pages 186 to 189)

Page 190

1      CHAIRMAN FITCH:  Did you at any time
2  confer with Ms. Allred?
3      THE WITNESS:  No, I didn't.
4      CHAIRMAN FITCH:  Did Mr. Klayman tell
5  you anything more in addition to this that he was
6  going to discuss your case with Gloria Allred.
7      THE WITNESS:  Yes, he did.
8      CHAIRMAN FITCH:  Ok, so he told you on
9  at least one more occasion, other than this
10  occasion.
11      THE WITNESS:  In an email.
12      CHAIRMAN FITCH:  Ok.
13      THE WITNESS:  And he said she didn't
14  accept my case.
15      CHAIRMAN FITCH:  Look at the very top
16  of the next page.  Do you see a reference to Tony
17  Guido (phon)?
18      THE WITNESS:  Yes.
19      CHAIRMAN FITCH:  Do you know who "Tony
20  Guido, who has no legal identity," is?
21      THE WITNESS:  I do.  It's my friend.
22      CHAIRMAN FITCH:  Ok.  Look at the next

Page 191

1  page toward the bottom.  I'm on 23-52, four lines
2  up from the bottom: "Please call Kathleen if you
3  have not as yet."
4      Is Kathleen the same person who I
5  thought had the name of Katherine?
6      THE WITNESS:  Yes.
7      CHAIRMAN FITCH:  Ok.  And is Kathleen
8  the right spelling as far as you know or
9  pronunciation, or is it Katherine?
10      THE WITNESS:  It's Kathleen.
11      CHAIRMAN FITCH:  Kathleen, ok.
12      THE WITNESS:  Stasio.
13      CHAIRMAN FITCH:  And was it Mr. Klayman
14  who had originally put you together with Kathleen
15  and the Representatives District Office?
16      THE WITNESS:  Yes.
17      CHAIRMAN FITCH:  You may move on, Mr.
18  Smith.
19  BY MR. SMITH:
20      Q.   During the break, did you consult with
21  some notes concerning your memories about the
22  case?

Page 192

1      A.  On 23-2?
2      Q.  No, no.  I'm asking you during the
3  break, during the lunch period --
4      A.  Uh-huh.
5      Q.  -- did you have an opportunity to
6  consult with some of your notes about this case?
7      Do you recall looking at some notes
8  that you had made?
9      A.  Yes.
10      Q.  Ok.  In those notes were you able to
11  get the full name for Kathleen?  Do you recall the
12  full name for Kathleen?
13      A.  Yes.
14      Q.   And what is her full name or last name?
15      A.  I have it in my notes.  It's Stasio,
16  S-t- --
17      CHAIRMAN FITCH:  I think it's not so
18  terribly important.
19      Did you review your notes with respect
20  to any other information?
21      THE WITNESS:  No.  I was looking for
22  Kathleen's name, because Mr. Klayman said she was

Page 193

1  working for VOA, and she's not, and that's why I
2  was trying to find her email address and
3  everything.  And I have it in my notes, so I can
4  provide it to proof that she was not working for
5  VOA.
6      CHAIRMAN FITCH:  Well, I remember when
7  that was said in here.  I understand that.
8      Did you review your notes to try to
9  remember anything else that is in your notes?
10      THE WITNESS:  Not according to this, I
11  didn't exactly.  I have some notes to just kind
12  of put these events together, yes.
13  BY MR. SMITH:
14      Q.  Do you recall who Kathleen worked for,
15  who the congressman was?
16      A.  Congressman Rober (phon).  I looked at
17  it.  It's there.  I'm sorry.
18      CHAIRMAN FITCH:  I don't care who the
19  congress-person is.
20      MR. SMITH:  Alright.
21  BY MR. SMITH:
22      Q.  Let me ask you to look at --

49  (Pages 190 to 193)

Page 194

1  A.  Roper (phon) --
2      MR. KLAYMAN:  Your Honor, I can help
3  here, if it's helpful.
4      CHAIRMAN FITCH:  Alright, go ahead, Mr.
5  Smith.  Clear it up.
6      MR. KLAYMAN:  It's Rohrabacher, Dana
7  Rohrabacher, congressman from Orange County.
8  BY MR. SMITH:
9  Q.  Alright, if we could look at Bar
10  Exhibit 23-45.
11      MR. KLAYMAN:  I'm sorry, Mr. Smith, I
12  didn't hear that exhibit again.  I'm sorry.
13      MR. SMITH:  23-45.
14      THE WITNESS:  Yes.
15  BY MR. SMITH:
16  Q.  For the record, it is an email from
17  Larry Klayman to Elham Sataki dated June 21st,
18  2010.
19      Do you recall when you received this
20  email?
21  A.  Yes.
22  Q.  Can you tell the hearing committee --

Page 195

1      CHAIRMAN FITCH:  Now, wait a minute.
2  I'm not sure that we accept that representation as
3  a record.
4      I don't see anything about email here.
5  I hear posted June 11, 2010, and I see a title,
6  and I see a "By Larry Klayman," and above all that
7  I see a "Friday, 9/16/2011," which may or may not
8  be a printout date by somebody for some reason.
9      But that's all I see there.
10      MR. SMITH:  Alright.
11  BY MR. SMITH:
12  Q.  Ms. Sataki, looking at this document,
13  can you tell me who sent this document?
14  A.  Mr. Klayman.
15  Q.  Ok, and who was it sent to?
16  A.  To me.
17  Q.  And how was it sent?  By what medium?
18  A.  I received it as an email.
19  Q.  On what date does it appear to have
20  been sent?
21  A.  Monday, June 21st, 2010.
22  Q.  Thank you.

Page 196

1      Can you please tell the hearing
2  committee what this email meant to you?
3  A.  Again, the roller coaster that he was
4  putting me through, and the games that he was
5  playing, and the whole thing, my whole life, my
6  career, and my case was a game to him.  He just
7  felt like --
8      Honestly I have no idea what went
9  through his mind and why he would send this email.
10  I don't know.  But he did.  And it's just -- for a
11  person in my situation that have a no income, no
12  job, and everything is on the line, my attorney --
13  supposedly someone with my attorney's email
14  address sending me an email notifying me that my
15  attorney died last week.
16      This is what -- it meant to me, my
17  focus was only on my case and it was again another
18  way to drop me from tenth or twentieth floor and
19  think, "Oh, ok, I don't have anybody to represent
20  me."
21      I don't know.  I don't know why he sent
22  me this email.  I don't understand.

Page 197

1      CHAIRMAN FITCH:  Is it your testimony
2  that you have a recollection that this document
3  was emailed to you by Mr. Klayman?
4      THE WITNESS:  Yes, sir.
5      CHAIRMAN FITCH:  Ok.
6      THE WITNESS:  It was from his email
7  address, but in the text it says -- it's a third
8  person that is emailing me.
9      CHAIRMAN FITCH:  Ok, excuse me, wrong
10  page.
11  BY MR. SMITH:
12  Q.  Let me ask you to take a look at Bar
13  Exhibit Number 23 --
14      CHAIRMAN FITCH:  Let me clarify the
15  record that, in the last little exchange, I was
16  mistaken about the document being addressed -- and
17  Ms. Sataki I believe had before her the document
18  that Mr. Smith actually wanted her to address,
19  which is Exhibit 23-45, and that 23-45 has been
20  testified to by Ms. Sataki in that my observations
21  were erroneous with respect to this document,
22  because I was looking at another document.

Page 198

1      So, the last few questions the record
2   should show is that there was testimony about a
3   document that constitutes Exhibit 23-45.
4      THE WITNESS:  I just --
5      CHAIRMAN FITCH:  I think he wants to
6   ask you another question.
7   BY MR. SMITH:
8      Q.  Was there something else you wanted to
9   share about the exhibit we were just looking at?
10     A.  I just included this to show again a
11  pattern of the games that he was playing with me
12  during that time, the most difficult time in my
13  life, and this is what he was putting me through.
14     Q.  Now recently you sent me a compendium
15  of correspondence between Mr. Klayman and
16  yourself.
17     A.  Yes.
18     CHAIRMAN FITCH:  Have we reached the
19  point where these are the --
20     MR. SMITH:  I'm gust going to --
21     CHAIRMAN FITCH:  -- if I may say so the
22  "new" documents?

Page 199

1      MR. SMITH:  Yes, I'm going to ask about
2   the circumstances under which she came to find
3   them.
4      CHAIRMAN FITCH:  Go ahead.
5      MR. SMITH:  Alright.
6      CHAIRMAN FITCH:  In that respect.
7      MR. SMITH:  Alright.
8   BY MR. SMITH:
9      Q.  Under what circumstances was it that
10  you just got around to sending me that package of
11  emails that you recently sent to me?
12     A.  As you can see, this whole thing
13  happened eight years ago, and when I finally was
14  rescued from Mr. Klayman, I at that point I was
15  homeless, had no job, and I slept in my car two
16  nights, later on.  So my focus during the last
17  eight years was to recover, economically and with
18  a job.
19     And the only way that I could survive
20  and my doctors to help me not to take so much
21  medication, in a way maybe I think I just brushed
22  everything under the rug and put everything aside

Page 200

1   so I can survive.  Because otherwise there was a
2   time that I was, I wanted to take my life and
3   that's how I wanted to have revenge against Mr.
4   Falahati and Mr. Klayman, because I felt that
5   those two -- and -- and I had a Will and I had all
6   the evidence and the papers there, and once I
7   died, people are going to come and see what they
8   did to me.  Because I didn't have the strength to
9   do it and go through everything.  And I didn't for
10  the past years.
11     Then, once I decided that I'm not going
12  to kill myself, and I'm going to try to start --
13  live again, so I had to put this aside and work.
14     So I was working.  And for this hearing
15  I took my two weeks vacation out from work for
16  2018.  So that's when a few days ago, last week I
17  guess, I started going to a lot of -- at that time
18  it's not easy to relive everything.  Because I
19  didn't want to crash again in my life, I wouldn't
20  go through everything.  I put everything aside and
21  out of my mind.
22     But to get prepared for this hearing,

Page 201

1   because I forgot so much, it was such a long time
2   ago, so I started going through emails.  And I
3   actually had a bunch of emails unopened from Mr.
4   Klayman in the "History" of my emails, and the
5   only way I could do it was I got the time off.
6   Because I couldn't work and do this.  I knew that
7   I'm going to crash.  And I have a new doctor too
8   that is working with me, and I actually had to
9   increase the dose of my anxiety medication, and
10  that is when I went through all of those emails,
11  and I emailed you all the stuff that I did.
12     And I know it was late.  I apologize
13  for that.  But I had to somehow have the support
14  for not crashing and going to that dark hole again
15  in my life, that I was seven, eight years ago.
16     CHAIRMAN FITCH:  Is this part of your
17  examination the last subject matter of your direct
18  examination?
19     MR. SMITH:  Well, I don't know.  I
20  guess it depends on a few things, but there are
21  some more questions that I want to ask.
22     I'm not ready to wrap up at this

51 (Pages 198 to 201)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 202

1   moment, if that's your question.
2        CHAIRMAN FITCH:  No.  Maybe I didn't
3   make myself clear.
4        You want to introduce this group of
5   documents that you received in the past few days,
6   correct?
7        MR. SMITH:  Yes, that's correct.
8        CHAIRMAN FITCH:  And you want to
9   examine the witness, at least to authenticate the
10  documents and maybe to explain things in the
11  documents, correct?
12       MR. SMITH:  That's correct.
13       CHAIRMAN FITCH:  And there will come a
14  time, if permitted, that you will have finished --
15       MR. SMITH:  Yes.
16       CHAIRMAN FITCH:  -- those documents.
17  Ok.
18       Do you have other lines of direct
19  examination that you want to adduce?
20       MR. SMITH:  Well, I do want to follow
21  up on a few things, you know, that I think may
22  have been left unsaid.  But I think in terms of a

Page 203

1   subject matter, yes, that would be how I would
2   conclude my direct examination would be with
3   walking Ms. Sataki through these documents, which
4   I think corroborate a timeline of events which
5   she's testified to from memory.
6        CHAIRMAN FITCH:  Well, I think we have
7   here the interplay of Rule VII.16, and Rule XI.3.
8   VII.16 is titled "Disposition of Motions," but it
9   refers to all motions directly to the manner in
10  which the hearing is to be conducted.
11       Now, I think we're falling under that
12  rubric, because the time for submission of
13  exhibits has passed, and therefore you are, in
14  affect, moving for leave to introduce exhibits,
15  notwithstanding the passage of that deadline,
16  correct?
17       MR. SMITH:  That's correct.
18       CHAIRMAN FITCH:  The rule instructs
19  that the evidence, if oral, should be heard by the
20  hearing committee, and, if documentary, shall be
21  included in the record, and the hearing committee
22  shall include it its report for the Board a

Page 204

1   recommendation for disposing of the motion...
2        Except that if the hearing committee
3   determines that the evidence is privileged,
4   irrelevant or merely cumulative, the Chair may
5   exclude the evidence after allowing the opponent
6   to make a proffer on the record.
7        I think that one would not find this
8   evidence to be privileged, irrelevant or merely
9   cumulative.  We're not sure, because we haven't
10  seen the documents.
11       So, it appears that the documents will
12  at least get into the record.
13       The question is, where to go from
14  there?
15       I think that the Respondent's team must
16  be concerned that these documents, if admitted and
17  heard about, would be unduly prejudicial to him.
18  But I don't know how to address that conundrum,
19  because we're required to include the documents in
20  the record and give a recommendation to the Board.
21       I think one possibility, and then maybe
22  we'll take a break a little early, is to presume

Page 205

1   they're going to be in the record if the Chair,
2   with the advice of the other members, decides not
3   to receive evidence on them, we would leave them
4   in the record; we will not have seen them, at
5   least until after the hearing is over; and Mr.
6   Klayman will have the choice of whether to cross
7   examine all those documents or not to do so.
8   Because they are going to be in the record, I have
9   no choice under Rule VII.16, and I think that we
10  probably can't make a report without looking at
11  them.  Even if we could, the Board's going to look
12  at them, and the Board can find that certain
13  factual determinations, factual findings, findings
14  of fact, are in fact erroneous, and it's possible
15  that one or more of such instances could be
16  affected by one or more of these documents,
17  vis-a-vis some other documentary or verbal
18  evidence.
19       So that's where I'm leading right now,
20  thinking out loud as much as anything, and that's
21  why I really would like for you to wrap up the
22  other portions of your case, let us think about it

52  (Pages 202 to 205)

App.0186

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 206

1  a little bit.  You take a few minutes, Mr. Smith,
2  to think about the loose ends you want to tie up
3  with respect to the rest of your case, and the
4  committee will make a decision about whether to
5  proceed on the basis that I'm tentatively laying i
6  out and noodling it over, or some other basis.
7      Let's take a break.  Ten or fifteen
8  minutes will do you, Mr. Smith?
9      MR. SMITH:  Yes, I could actually like
10  to plow right ahead with -- I think I know what
11  loose ends I need to tie up.
12      CHAIRMAN FITCH:  Well, let's do that,
13  and then we'll take a break, and then I will hear
14  further from both of you.
15      MS. SMITH:  Ok, thank you.
16  BY MR. SMITH:
17      Q.  Ms. Sataki, you mentioned that you had
18  been under medication for anxiety.
19      A.  Yes.
20      Q.  Are you under medication right now
21  during your testimony.
22      A.  Not now, no.

Page 207

1      Q.  Thank you.
2      Let me ask you to take a look at Bar
3  Exhibit 23-47 and 48.
4      Can you describe for the hearing
5  committee what these -- well, first of all, who
6  authored this document?
7      A.  Mr. Klayman.
8      Q.  And who is it addressed to?
9      A.  To me.
10      Q.  What date was it delivered?
11      A.  August 1st, 2010.
12      Q.  By what medium did you receive this
13  document?
14      A.  Email.
15      Q.  Could you tell the hearing committee
16  what this document was conveying to you?
17      A.  It's --
18      CHAIRMAN FITCH:  Why don't we let the
19  document speak for itself.
20  BY MR. SMITH:
21      Q.  How did you feel upon receiving this
22  document?

Page 208

1      A.  I felt the same.  It was again -- every
2  time I would receive an email like that, I have to
3  think and see, what is it that make him upset
4  again now?  Is it the fact that I'm talking to
5  Tony Guido, or is it that -- what is it that
6  again?  It was basically a -- he would be ok when
7  I'm not in touch with anyone, or if I'm not -- if
8  I'm doing something he doesn't like, then he would
9  send me an email like that again.
10      Q.  Who was Tony Guido?
11      A.  It was my friend.  One of the people
12  that he had, his FBI friend to background check.
13      Mr. Klayman would have his FBI friend
14  background check --
15      MR. KLAYMAN:  Objection, your Honor,
16  lack of foundation.
17      CHAIRMAN FITCH:  No question pending.
18      MR. KLAYMAN:  I have no FBI friend.
19  There is no evidence.  Lacks foundation.
20  BY MR. SMITH:
21      Q.  Do you know why Mr. Guido was
22  investigated?

Page 209

1      A.  No.
2      MR. KLAYMAN:  Lacks foundation.  Same
3  objection.
4  BY MR. SMITH:
5      Q.  Let me ask you to take a look at Bar
6  Exhibit 23-8 and 23-9 --
7      CHAIRMAN FITCH:  Let me ask --
8      THE WITNESS:  The 23-48?
9      CHAIRMAN FITCH:  I'm sorry, how do you
10  know that Mr. Guido was investigated?
11      THE WITNESS:  Mr. Klayman told me that.
12      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13  BY MR. SMITH:
14      Q.  23-8 and nine.
15      A.  Oh, eight, I'm sorry.  I was on the
16  wrong page.
17      CHAIRMAN FITCH:  What number?
18      MR. SMITH:  Sorry, Bar Exhibit 23-8 and
19  nine.
20      CHAIRMAN FITCH:  No need to apologize.
21  It's my slowness, not yours.
22      THE WITNESS:  23-8.  That's an email

53  (Pages 206 to 209)

In The Matter Of:  Larry E. Klayman
May 30, 2018

|                           |                          |
|---------------------------|--------------------------|
| Page 210                  | Page 212                 |

**Page 210**

1  from Mr. Klayman to me.  Legal representation
2  agreement.
3  BY MR. SMITH:
4      Q.  Ok.  What is he proposing as his fee in
5  this agreement?
6      A.  250,000.
7      Q.  Well, in terms of recovery, if you look
8  at I guess the fourth sentence down.
9      A.  Yes, he says that he -- at this point,
10  for the time that he put down for my case, 40
11  percent is not enough, so he wants 50 percent.
12      Q.  Ok.  Your understanding about your fee
13  agreement had been what?
14          What was your understanding about the
15  terms of the fee agreement?
16      A.  At forty percent.
17      Q.  Alright.  And this email was sent -- I
18  don't see a date on Bar Exhibit 23-8, but at 23-9
19  there's a date there.
20      A.  Yes, I sent him an email, and that
21  upset him, so he sent me that email right after.
22      Q.  Ok.

**Page 211**

1      A.  So I sent him an email on May 30th,
2  2010, and then, this, the 23-8, is his answer to
3  my email.
4      Q.  Ok, thank you.
5      CHAIRMAN FITCH:  I note for the record
6  that the upper right-hand corner of Page 23-8
7  bears a date and a time, 2/23/11, 1:39 a.m.
8      MR. SMITH:  I don't know that that's
9  necessarily --
10      CHAIRMAN FITCH:  Well, that's going to
11  be my point.  Perhaps she can tell us whether or
12  not that's a typical format for her email
13  provider, which appears to be Yahoo.
14      THE WITNESS:  I can provide the date of
15  this.  I have it -- I can provide date and time
16  for 23-8 when that email was sent.  I have it.  I
17  have the whole email conversation, so I can
18  provide the date.
19      CHAIRMAN FITCH:  Is the date up there
20  that I just referred to, is that the date you
21  copied the document out onto paper?
22      THE WITNESS:  At the very top to the

**Page 212**

1  right?
2      CHAIRMAN FITCH:  Mm-hmm.
3      THE WITNESS:  Yes, that's when I copied
4  it.  It's --
5      CHAIRMAN FITCH:  Ok.
6      THE WITNESS:  -- from 2011, but the
7  email is from 2010.
8      MR. SMITH:  I have no more questions of
9  Ms. Sataki, pending the Chair's ruling on the
10  supplemental exhibits.
11      CHAIRMAN FITCH:  Understood.
12          In our roughly informal environment, if
13  a bolt of lightening reminds you of some other
14  points, we can accommodate either party.
15          Let's stand in recess until maybe 3:25,
16  please.
17          Are you gentlemen going to stay here
18  and work, or you're going to go somewhere else and
19  work or not work?
20      MR. KLAYMAN:  Before 3:25?
21      CHAIRMAN FITCH:  Between now and 3:25.
22      MR. KLAYMAN:  I mean we're going to

**Page 213**

1  walk outside I think.
2      CHAIRMAN FITCH:  Well, then we will
3  stay here and confer.  But if you want to work at
4  your desk, we're happy to go elsewhere.
5      MR. KLAYMAN:  Yes, I would say, your
6  Honor, again, particularly, in light of the
7  documents, and Mr. Sujat's recent representation,
8  we need sometime to deal with --
9      CHAIRMAN FITCH:  That's all I want to
10  know.  You're going to able to argue.
11          All I want to know right now is is it
12  more convenient for you to stay there or go
13  outside?
14      MR. KLAYMAN:  Yes, I understand.
15      CHAIRMAN FITCH:  And which is the
16  answer?  You want to stay there or you want to go
17  outside?
18      MR. KLAYMAN:  No, we'll go outside.
19      CHAIRMAN FITCH:  We'll stay here.
20      (Recess taken.)
21      CHAIRMAN FITCH:  If it's satisfactory
22  to everybody, we'll return to the record at about

54 (Pages 210 to 213)

App.0188

Page 214

1    3:26.
2            We've thought it through, and I'm
3    addressing the issue of the entry of the most
4    recently produced documents, which as I recall
5    were provided by Disciplinary Counsel to the
6    Respondent's team this past Friday afternoon.
7            We've thought through the issue as best
8    we can.  We have thought about the thinking out
9    loud proposal or idea, or notion that I had
10   surfaced.  We're still going to hear from the
11   parties, but I'll tell you ahead of time that,
12   given the requirements of the rule, I think we
13   have no alternative but to inspect the documents
14   overnight and determine first thing tomorrow
15   morning whether some or all of the documents will
16   come into evidence in the sense -- they're all
17   coming into the record, as we said, but coming
18   into evidence in the sense that Disciplinary
19   Counsel can adduce testimony if he wishes from the
20   witness about the documents and the contents
21   thereof.
22           This is again of these situations where

Page 215

1    you have to balance out things, but I think that,
2    if we decide the documents are unduly prejudicial,
3    we will be able not to let those documents at all
4    affect our deliberations in the case.
5            We think that it's possible, we'll
6    simply find out, that the documents will cover
7    much the same ground as has been covered before.
8            Indeed, Mr. Smith, I certainly think
9    it's possible that some or all of the documents
10   may be cumulative.  I mean, we've heard a good
11   deal of testimony about certain situations and
12   reactions and so on.  So you're going to need to
13   convince us that they're not cumulative.
14           All of that we can cover tomorrow
15   morning.  As I said, I'll willing to hear argument
16   this afternoon, but I'd just as soon not.  I'd
17   just as soon hear argument tomorrow morning.  But
18   if anybody wants to be heard this afternoon, we'll
19   do it.
20           We're inclined to adopt, go down the
21   road I just described, and if we do that, we will
22   either stand in recess for the rest of the

Page 216

1    afternoon, or, we could hear from another witness,
2    Mr. Smith.
3            MR. SMITH:  Well, my expert witness
4    needs a two-hour --
5            CHAIRMAN FITCH:  No, we thought that
6    was the case.
7            MR. SMITH:  And Mr. O'Connell, who had
8    been with us this morning, I'm not sure that he is
9    still here.
10           CHAIRMAN FITCH:  Ok.
11           MR. SMITH:  Because I anticipated that
12   we would be finishing up with Ms. Sataki today, so
13   I don't know if my witnesses are available now.
14           CHAIRMAN FITCH:  I'm not going to push
15   you on that.
16           I want you to be certain that the
17   testimony of those two witnesses is as efficient
18   as possible.  We've got tomorrow and we've got
19   Friday.  I guess we have Saturday, if need be.
20   We've got late Friday night.  But we're going to
21   get this current witness done.
22           MR. SMITH:  I can promise you that my

Page 217

1    examination of both Mr. Bennett and Mr. O'Connell
2    will be very short and sweet, and, to the extent
3    that there is an extension of their testimony, it
4    will be as a result of cross-examination or any
5    questions that the committee may have with them.
6            CHAIRMAN FITCH:  And we're going to
7    certainly allow a reasonable amount of extensive
8    cross-examination by Respondent's team, if they
9    wish.
10           We have noted that the testimony of the
11   complaining witness thus far amounts to less than
12   180 minutes, which is less than three hours.  I
13   think we'd be hard pressed to be persuaded that
14   there needs to be 15 hours.  I'd be hard pressed
15   to be persuaded that there needs to be nine hours.
16           Other than that, we'll see, but this
17   witness is out here this week.
18           You want to argue or make comments
19   right now, for the Respondent's team?
20           MR. KLAYMAN:  I will address it in the
21   morning in light of your comments.
22           CHAIRMAN FITCH:  I think that's ideal.

55 (Pages 214 to 217)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 218

1  THE WITNESS:  May I say something?

2  CHAIRMAN FITCH:  Well -- about

3  scheduling issues?

4  THE WITNESS:  No, about the last thing

5  that we left.

6  CHAIRMAN FITCH:  Pardon?

7  THE WITNESS:  The last item, right

8  before recess that we have -- we were talking

9  about 23-8.

10  MR. TIGAR:  Oh, 23-8.

11  CHAIRMAN FITCH:  Oh, 23-8, right.

12  Does your thought --

13  THE WITNESS:  It's not thought.  It's

14  just I wanted to ask you just to read that

15  sentence, only --

16  CHAIRMAN FITCH:  Well, I don't want to

17  hear that.  I want to hear if there is --

18  THE WITNESS:  Well, may I read it?

19  CHAIRMAN FITCH:  -- if there's some

20  administrative aspect or date aspect or so on.

21  But we have the document before us and --

22  THE WITNESS:  Ok.

---

Page 219

1  CHAIRMAN FITCH:  And I think that,

2  although there's no reason for you to know this,

3  Mr. Smith and Mr. Klayman, later in the case, as

4  they're doing their closing arguments, and as they

5  do their legal briefs, they will be, in effect

6  saying, "You three people need to read such and

7  such, such and such, and such and such."

8  So, anything that you and Mr. Smith

9  want us to read carefully will get read, or Mr.

10  Klayman --

11  THE WITNESS:  I'm sorry, I didn't mean

12  to be rude or ask you to read something.

13  CHAIRMAN FITCH:  No, no.

14  THE WITNESS:  I thought maybe I can

15  read it.

16  CHAIRMAN FITCH:  Perfectly sensible

17  suggestion, and careful witnesses are appreciated.

18  But I think that we don't have a question pending

19  right now.  I think the answer was complete

20  before.

21  So that's the way we're going to go on

22  that.

---

Page 220

1  THE WITNESS:  Ok.

2  MR. TIGAR:  We're going to need an

3  electronic copy exhibit of the exhibits in

4  question for our overnight --

5  MR. SMITH:  I had actually already put

6  together, as I had said, a copy of the exhibits

7  that I felt were relevant.

8  CHAIRMAN FITCH:  Have they been

9  digitized?

10  MR. SMITH:  I'll bet you that my

11  secretary has, but I can't -- if you give me --

12  MS. LARKIN:  Do you have hard copies?

13  CHAIRMAN FITCH:  Yes, he has them.

14  MR. TIGAR:  If they have, counsel,

15  would you please ask the Executive Attorney to

16  email us a copy.

17  MR. SMITH:  I have not given anybody

18  these documents, pending your ruling what to do.

19  CHAIRMAN FITCH:  You are going to give

20  them to me right now?

21  MR. SMITH:  Now I'm going to give them

22  to you and Respondent's counsel.

---

Page 221

1  MR. KLAYMAN:  May I interject one point

2  here.

3  CHAIRMAN FITCH:  Sure.

4  MR. KLAYMAN:  It appears that what Mr.

5  Smith has done is giving to you -- because he just

6  represented that they are only some of the

7  documents, that there are documents in there that

8  may be favorable -- I mean, I have taken a quick

9  glance at them -- to Respondent's case, ok.

10  Apparently he's pulled them out.  So, therefore

11  it's highly prejudicial if you look at them

12  tonight.

13  You know, I want a representation from

14  Mr. Smith that there are documents that you

15  removed that are not in this package.

16  MR. SMITH:  As I said, I selected the

17  documents that I felt were relevant to our case

18  and made copies of them and have made them

19  available to the parties.

20  Respondent and his counsel were given

21  copies of everything on last Friday, one day after

22  I had received them.

---

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 222

1    If there are documents that are not in
2 this compendium that he feels he would like to use
3 as exhibits in this case in the ordinary course of
4 examination, he's certainly free to do so.
5    But what I have done, for the
6 convenience of the hearing committee and for
7 purposes of Disciplinary Counsel's case in chief,
8 is put these together in an exhibit form so that
9 we could use them as we saw fit.
10    CHAIRMAN FITCH:  But you have otherwise
11 complied with the open and complete file rule?
12    MR. SMITH:  He has copies of
13 everything, and again, to the extent that there
14 are exhibits which he feels we should have put in,
15 or documents that he feels we should have put in
16 that are not included in the 38 with you, he is
17 certainly free to copy and make use of those
18 documents during cross-examination regarding his
19 case in chief.
20    CHAIRMAN FITCH:  If there's any
21 logistical problem there, I will impose upon Board
22 staff to assist.

Page 223

1    MR. KLAYMAN:  May I address something
2 without the presence of the witness here?
3    CHAIRMAN FITCH:  Ms. Sataki, we are
4 going to adjourn in a few minutes for the day to
5 deal with these always aggravating lawyer-like
6 problems.
7    Mr. Smith will notify you as to what
8 time you should return tomorrow, but presumptively
9 you should come back at 9:30.  There might be a
10 little bit of delay before you're called.  I'll
11 let and you Mr. Smith juggle those logistics.  But
12 I think we're going to start at 9:30.
13    And you should not discuss your
14 testimony with any other living human being
15 tonight --
16    THE WITNESS:  Yes, sir.
17    CHAIRMAN FITCH:  -- before probably
18 resuming tomorrow.
19    THE WITNESS:  Yes, sir.
20    CHAIRMAN FITCH:  We appreciate your
21 patience.
22    THE WITNESS:  Thank you.

Page 224

1    CHAIRMAN FITCH:  Have a good evening.
2    (Witness is excused.)
3    MR. KLAYMAN:  Your Honor, I reserve the
4 bulk of my argument for tomorrow morning.  I only
5 got a quick glance at these documents because they
6 were provided last Friday to me.
7    Mr. Smith could have certainly put the
8 Board on notice, the hearing committee on notice,
9 or even filed a motion or asked for consent to use
10 them, but he never did that, not even with Mr.
11 Sujat.  We had a conversation.
12    There are documents in here which deal
13 with her past -- and that's why I asked politely
14 to not have her here -- her past history with men.
15 And one of those documents that I was able to see
16 is an affidavit from her former husband --
17    MR. SMITH:  Before we go any further, I
18 don't know where he's going with this, other than
19 to try to color your view of the witness.  But, to
20 the extent that we're going to have full argument
21 about this tomorrow and about these documents and
22 whatever documents he wants or does not want in

Page 225

1 there, I think that's fair.
2    But if he's going to start bad-mouthing
3 the witness, you know, at this point, I mean, it's
4 --
5    MR. KLAYMAN:  I've been very polite.
6    CHAIRMAN FITCH:  Are you saying that the
7 documents -- are you, Mr. Klayman, saying that the
8 documents you just referred to are part of the
9 larger package in its entirety?
10    MR. KLAYMAN:  Yes, yes.
11    CHAIRMAN FITCH:  Or a part of the
12 proffered exhibits?
13    MR. KLAYMAN:  I might add throughout
14 this entire -- part of the larger package.
15 They're not in there.  He pulled them out.  I'm a
16 hundred percent certain.
17    CHAIRMAN FITCH:  Well, then why are we
18 addressing it?  Why do you want to bring those to
19 my attention?
20    MR. KLAYMAN:  Well, because they're
21 actually helpful to my case.
22    And, you know, I haven't in any way

57 (Pages 222 to 225)

Page 226

1   ever bad-mouthed Ms. Sataki.  The only thing I've
2   ever said was not in that vein throughout the
3   pleadings or anything else.
4        CHAIRMAN FITCH:  I know that.
5        MR. KLAYMAN:  And therefore it's okay
6   to come in here -- and let me be a little bit
7   emotional -- this is why I prefer not to represent
8   myself but Mr. Sujat to speed, and say from
9   my heart I'd be a little emotional.
10       But it's okay to smear me, but if I say
11  anything in response to my own defense, then
12  somehow I'm going to bad-mouth somebody.  I'm not
13  bad-mouthing anybody.
14       There's a document in there --
15       CHAIRMAN FITCH:  No one's saying that.
16       MR. KLAYMAN:  There's a document in
17  there from her husband, a sworn affidavit, that
18  two weeks after they were married he caught her in
19  bed with another man, in their house.  Ok?
20       She has problems with men, and it goes
21  way back.
22       CHAIRMAN FITCH:  So what?  That may

Page 227

1   very well adversely impact upon her credibility.
2        MR. KLAYMAN:  Well, that's what I'm
3   saying --
4        CHAIRMAN FITCH:  That sounds like good
5   news for you.
6        MR. KLAYMAN:  -- he removed that --
7        MR. SMITH:  You don't know what I've
8   removed, Larry Klayman -- Mr. Klayman.  I mean --
9        MR. KLAYMAN:  Did you remove it?
10       MR. SMITH:  Look, I know that I saw the
11  document, and if I deemed it a relevant document,
12  it's going to be in the compendium.  If I didn't
13  deem it relevant to my case, then I did not.
14       But you have the opportunity, you have
15  the documents.  So if you feel like you can use
16  it, you can put it in.
17       MR. TIGAR:  I think I hear what's being
18  said, and personally I'm not being helped by this
19  sidebar conversation.
20       Under rule of evidence 106, which is
21  the common-law rule of completeness, I will, and
22  I'm sure the committee will, "entertain the

Page 228

1   admissibility of any document not offered by the
2   other side, or any portion of a document not
3   offered by the other side that both ought in
4   fairness to be considered with it."
5        So, to that extent, I think you can be
6   reassured, if I'm understanding your argument
7   properly, that no evil will befall your situation
8   as a result of what we're going to do.
9        MR. KLAYMAN:  I understand you.
10       MR. TIGAR:  I would like an opportunity
11  to look at these things overnight so I can be more
12  comfortable on that.
13       MR. KLAYMAN:  I understand.
14       I just want to make it clear here, and
15  I'm standing here as the Respondent, the witness
16  and the counsel.  It's a position I don't really
17  want to be in.  That's why Mr. Sujat's here and we
18  need time for him to prepare.
19       But the reality is that all this stuff
20  is sprung on me at the last minute.  They opposed
21  my taking Dr. Aviera's deposition.  It's clear she
22  has some emotional issues here, to put it mildly.

Page 229

1   They opposed my taking her deposition.  She
2   herself said she didn't remember any of this stuff
3   until recently, didn't even open emails, yet I was
4   unable to take discovery, and they opposed that.
5        And then pulling the rug out from under
6   me at the last minute, they submit all this stuff
7   to y'all, and it's not even fair.  It's not only
8   unfair, it's not due process and equal protection.
9   I mean, we're eight years into the case.  She
10  can't remember things that she claims.
11       So this proceeding, through no fault of
12  your own, is out of control.  And it is near total
13  denial of due process.  And I'll argue that in
14  greater detail tomorrow, but for him to -- for Mr.
15  Smith to sit there and say, you know, "I can do
16  whatever I want" when he submits this stuff, on
17  the eve of trial, didn't even bother to tell Mr.
18  Sujat that he was going to produce them -- he
19  could have filed a motion when he got them on
20  Thursday, say, "I got these documents, I'm
21  moving.  Will you consent?"  He didn't do that.
22  But he sprung it on us today, and that's not right

58 (Pages 226 to 229)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 230

1  and it's not ethical.  It's not professional.
2       MR. SMITH:  May I --
3       CHAIRMAN FITCH:  Our understanding is
4  that the documents were provided last Friday.  It
5  is what it is.
6       With respect to the concern, if any,
7  for the complaining witness' reputation, emotional
8  reaction or anything else, other than being sure
9  that she or any other witness is not abused,
10  Respondent's primary concern and interest has to
11  be the Respondent's defense.  We understand that.
12       I once had a hearing in which the
13  Respondent kept saying essentially, "I'm pulling
14  my punches because I don't want to hurt so and
15  so."  And I finally told that Respondent, "Get
16  over it."
17       I'm only concerned about you defending
18  yourself, period.  I'll take care if need be of a
19  witness.  You take care of yourself.  And I think
20  that's where we are.
21       I have no concern whatsoever about a
22  good, hard hitting cross-examination.

Page 231

1       MR. KLAYMAN:  In today's environment,
2  your Honor, you know the -- and I believe in
3  women's rights.  Gloria Allred would not be my
4  friend.  I just had lunch with her two weeks ago.
5  The man is always at a disadvantage, nearly
6  always, with some exceptions, and consequently we
7  need time to prepare -- and I might add, on the
8  record, keep in mind there has never been a
9  lawsuit filed or any allegation of sexual
10  harassment or malpractice or anything.  And she
11  obviously had some advice through this Kathleen
12  Stanton, and I'll get into that in
13  cross-examination, and in my own testimony.  And
14  it's all kind of like I'm being ambushed without
15  even the opportunity to have --
16       And they opposed it, to get some
17  information after eight years, when documents were
18  lost, witnesses were disbursed, couldn't be found,
19  and then to do this on the eve of trial, it is
20  unethical, in and of itself.
21       So, you know, that's where I stand.  I
22  appreciate you're going to allow me to give an

Page 232

1  aggressive defense, but I don't want to look like
2  the bad guy.  I never have.  And that's the
3  quandary I'm in as being Respondent, and my
4  lawyer, and the witness, and I want to keep a good
5  demeanor, but -- and stay calm, but, you know, I'm
6  outraged by some of the things I heard and what
7  has been done by Bar Counsel.
8       And I'll be moving at the close of the
9  evidence to dismiss this case on a variety of
10  different grounds.  And I know there's some gray
11  in the area -- gray law in the area here about
12  that, but I do believe you have that authority,
13  you have that inherent authority.  And other bars
14  have done that.  And Professor Rotunda's opinion,
15  you have an opportunity to review it, may his soul
16  rest in peace, finds that law available in most
17  jurisdictions.
18       CHAIRMAN FITCH:  But he does not say
19  that he finds it available in this jurisdiction.
20       MR. KLAYMAN:  I don't think the issue
21  has been reached yet.
22       CHAIRMAN FITCH:  He does not say either

Page 233

1  way.
2       MR. KLAYMAN:  I don't think it's ever
3  been.  I may be my own advocate in a case as
4  egregious as this.
5       CHAIRMAN FITCH:  He's entitled to his
6  opinion.
7       Mr. Tigar, do you have an observation?
8       MR. TIGAR:  Well, I assume, Mr.
9  Klayman, up here, the reason they have lawyers
10  decide these cases, as well as the hearing
11  officers is, this is not our first rodeo, and we
12  have all been in cases in which public opinion has
13  been against us and in which we have faced this
14  terrible problem of cross-examining people who
15  come on as sympathetic, such as in the capital
16  case, victim impact witnesses.
17       So, we understand the situation and I
18  adopt the Chair's position.  Nobody up here is
19  opposed to the idea of a vigorous, effective
20  cross-examination in your exercising your rights,
21  and I think everybody up here can be trusted to
22  disregard whatever public attitudes may be

59  (Pages 230 to 233)

Page 234

1  circulating around out there, that may have led to
2  some perceptions.
3       CHAIRMAN FITCH:  We will stand in
4  adjournment until 9:30 tomorrow morning.
5       And, we are still on the record, I just
6  want counsel, all counsel to keep in mind of the
7  time and schedule that I mentioned earlier.
8       (Whereupon at 3:50 p.m., the hearing
9  was in recess until Thursday, June 31, at 9:30
10  a.m.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 235

1       CERTIFICATE OF NOTARY PUBLIC
2       I, KIM M. BRANTLEY, the officer before whom
3  the foregoing hearing was taken, do hereby,
4  certify that the proceedings were taken by me in
5  stenotype and thereafter reduced to typewriting
6  under my direction; that said hearing is a true
7  record of the proceedings; that I am neither
8  counsel for, related to, nor employed by any of
9  the parties to the action in which this hearing
10  was taken; and, further, that I am not a relative
11  or employee of any counsel or attorney employed by
12  the parties hereto, nor financially or otherwise
13  interested in the outcome of this action.
14
15       _____
        KIM M. BRANTLEY, C.S.R.
16       Notary Public in and for
        the District of Columbia
17
18
19
20  My commission expires: October 31, 2019
21
22

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 242 of 771   PageID 974
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 236

**A**

**a.m** 2:3 189:2,10
211:7 234:10
**abandoned** 60:18
166:22
**abandoning** 60:15
**able** 9:10 13:21
16:20 22:18 23:21
24:16 44:17 98:1
133:7 134:21
168:13 192:10
213:10 215:3
224:15
**absolutely** 30:8
142:16 147:2
175:11
**abundance** 110:15
**abused** 230:9
**abusing** 174:5
**abusive** 174:20
**accept** 95:5 190:14
195:2
**accepted** 28:6 59:8
188:4
**access** 21:1
**accommodate**
212:14
**accompli** 22:14
**account** 100:16
**accountability**
56:22
**accounting** 57:9
**accounts** 100:20,21
**accurate** 96:6
**accurately** 181:3
**accusations** 174:21
**acquire** 177:11
**act** 56:15 89:17
**acted** 57:13
**acting** 119:15,21
121:7 163:15
**action** 46:1 47:11
61:9 157:5 235:9
235:13
**actions** 47:5 48:1
159:1
**activity** 47:5
**actual** 89:17 177:18
**ad** 2:3,10 5:9
**add** 26:11 27:14
34:6,12 35:15
92:4,11 225:13
231:7
**adding** 117:9
**addition** 17:20
37:14 39:19

189:13 190:5
**additional** 12:14
**address** 10:17 11:1
16:1 26:6 33:10
33:10 41:10 61:17
61:19,19 162:14
193:2 196:14
197:7,18 204:18
217:20 223:1
**addressed** 10:18
16:20 130:9,22
156:8 197:16
207:8
**addressing** 11:6
214:3 225:18
**adduce** 95:21
202:19 214:19
**adequate** 58:7
149:7,10
**adjourn** 17:17 18:3
223:4
**adjourned** 10:7
**adjourning** 10:11
**adjournment** 164:5
234:4
**adjust** 68:10
**adjutant** 43:13
**administration**
165:21
**administrative**
61:15 165:11
168:7 218:20
**admissibility** 94:13
134:11 228:1
**admission** 25:11
**admitted** 25:8
204:16
**adopt** 215:20
233:18
**advance** 22:18
**adversary** 5:20
**adversely** 227:1
**advice** 205:2 231:11
**advised** 162:8
**advisement** 169:17
**advisor** 66:1
**advocate** 38:19
43:7 66:21 233:3
**advocated** 24:2
56:4
**affect** 97:13,15
98:22 203:14
215:4
**affidavit** 224:16
226:17
**affidavits** 59:10

**affirm** 67:20
**affirmation** 6:3
**afford** 15:1 84:1
**afield** 95:18
**AFL-CIO** 52:10
**afraid** 77:16 115:3
122:4
**afternoon** 8:11 11:6
11:7 16:21 18:12
214:6 215:16,18
216:1
**afternoon's** 10:20
11:2
**agency** 52:13 54:10
57:21
**aggravating** 223:5
**aggressive** 232:1
**ago** 21:12 126:7,19
126:21 129:1
152:16 199:13
200:16 201:2,15
231:4
**agree** 86:19 146:22
**agreeable** 10:8
**agreed** 138:6
**agreement** 34:18,22
83:3,6,21 84:11
84:11 210:2,5,13
210:15
**ahead** 68:17 92:16
127:21 128:11
145:18 154:17
176:5 194:4 199:4
206:10 209:12
214:11
**aired** 73:1
**Akbar** 49:17
**Alex** 78:8
**alive** 48:14 166:7
**allegation** 12:1
231:9
**allegations** 9:21
24:15 37:5 44:10
47:2,17 55:19
**alleged** 41:15 51:10
61:16 96:9 97:10
97:18 98:6 100:4
178:10
**allegedly** 13:18
**alleviated** 133:8
**allow** 25:10 141:13
174:12 217:7
231:22
**allowed** 30:1 56:12
174:11
**allowing** 204:5

**Allred** 12:11 53:6
82:6 189:20 190:2
190:6 231:3
**alright** 100:21
103:4 104:20
109:22 110:1
129:13 130:1
137:17 140:6
147:3 150:7
175:21 193:20
194:4,9 195:10
199:5,7 210:17
**alternative** 57:20
214:13
**Alusat** 147:12
**ambushed** 136:1
231:14
**America** 37:2 38:18
44:19 46:12 50:4
50:13 51:13 53:22
57:8 58:4 59:2,9
59:12,13 66:5
72:16,18 87:18
105:11 157:10
**amount** 111:20
217:7
**amounts** 217:11
**analysis** 40:12
**anchoring** 71:22
72:1,20
**and/or** 30:9 147:9
153:9
**Angeles** 51:13,16
51:22 54:1,1,15
59:3 62:12 69:14
70:22 71:11,12
72:6,7 81:21
83:18 105:16
106:18 110:19
**angry** 142:6 187:5
**answer** 86:6 89:19
90:13,14 92:11
93:20 106:7 108:6
148:3 159:8
183:16,18 184:1
185:18 211:2
213:16 219:19
**answered** 110:14
128:2
**answering** 186:17
**ANTHONY** 2:11
**anti-depression**
126:2
**antianxiety** 126:2
**anticipate** 6:22
65:12

**anticipated** 10:13
10:15 41:5 216:11
**antidumping** 44:3
**anxiety** 201:9
206:18
**anybody** 8:3,15
35:18 60:11 89:3
196:19 215:18
220:17 226:13
**anymore** 127:9
**apartment** 53:12
54:18 109:8,8,9
109:10,13 174:11
174:12
**apologize** 18:7 33:4
165:13 182:8
201:12 209:20
**apparent** 63:4
**apparently** 46:1
221:10
**Appeal** 62:7
**Appeals** 1:1 5:6
**appear** 61:21 181:2
195:19
**appearance** 29:6
**APPEARANCES**
2:9 3:1
**appeared** 54:2
**appearing** 15:19
42:8
**appears** 60:22
204:11 211:13
221:4
**apples** 136:9
**applicable** 25:10
**apply** 136:10
**appreciate** 45:20
223:20 231:22
**appreciated** 219:17
**appropriate** 8:16
95:14
**approve** 75:6
**approved** 55:7
57:11
**approximate**
104:13
**approximately**
110:6 124:19
165:7 180:2
**April** 105:6 106:20
107:1 118:7,8,9
130:10 131:11,16
132:8,10,12
172:17
**Arabic** 54:6,8
**area** 122:9 133:13

186:9 232:11,11
**areas** 26:1,3,5
**argue** 213:10
  217:18 229:13
**arguing** 121:2,2,3
**argument** 17:21
  18:4 30:9 136:7
  215:15,17 224:4
  224:20 228:6
**arguments** 118:15
  219:4
**Arlene** 130:9,22
**arrangement** 83:7
  109:3
**arrangements**
  83:14,16
**arrive** 167:21
**arrived** 70:19
**article** 97:5 104:4
**articles** 14:12 40:2
  40:7 55:6 91:2
  96:8,9,11,13,15
  96:19,22 97:2,10
  97:17,18 98:6,12
  100:4
**Asbill** 34:16,17
**ashamed** 122:3,4
**aside** 6:21 199:22
  200:13,20
**asked** 21:9 28:12
  46:2 50:9 53:1,15
  53:18 58:11 62:18
  63:20 64:2 75:8
  78:7 79:19 80:5
  87:5,7 89:1 90:14
  91:6 106:8 107:15
  113:14,15 114:20
  115:1 119:5
  122:19,21 123:2
  128:5 138:4,6
  143:1,18 145:5
  147:18 152:18
  159:13,19 169:1
  170:15 174:9,22
  179:7,15 180:18
  188:13 224:9,13
**asking** 58:22 76:21
  77:6 89:12 103:6
  103:7 138:22
  144:9,11 173:11
  192:2
**aspect** 94:6 218:20
  218:20
**aspects** 37:12
**asserted** 149:12
**assertion** 127:18

**assertive** 12:18
**assist** 180:19
  222:22
**assistance** 45:14
  179:16
**assisting** 108:18
**associate** 167:19
**assume** 23:10 27:21
  60:15 233:8
**assuming** 61:18
**assumption** 99:17
**assurance** 16:4
**assured** 16:13
**attached** 129:10
**attempt** 38:16
  142:20
**attempted** 37:8
  118:3
**attend** 71:2 78:16
**attended** 138:11
**attention** 18:11
  99:3 131:6 225:19
**attitudes** 233:22
**attorney** 2:16,18
  5:6 45:12 80:7
  81:17,20 91:17
  119:6,21 120:4
  121:7 138:19,20
  138:21 139:3
  142:13 150:21
  172:17 175:17
  185:10 186:8
  196:12,15 220:15
  235:11
**attorney's** 121:7
  196:13
**attorney/client** 84:8
**August** 156:8
  159:21,22 207:11
**Austin** 156:9 157:8
  157:22 158:2,7
  160:8
**authenticate** 202:9
**authentication**
  177:18 178:6,22
**authenticity** 177:21
  178:1
**authored** 20:6
  207:6
**authority** 64:18
  232:12,13
**available** 216:13
  221:19 232:16,19
**Aviera** 125:4,9,11
  126:5,18 127:19
  130:17,19 131:8,9

131:11,20 132:1,7
132:20 133:7,16
133:20 134:4,6,10
136:21 137:6,13
137:18,21 138:4
138:12,15,19
139:6,7,14,17
140:18 141:8
185:1,3
**Aviera's** 126:9
133:18 136:18,22
228:21
**award** 120:9,14
**aware** 20:6 30:17
46:3 57:18 118:11
137:18
**ayatollah** 65:22

_____

**B**

**B** 133:16
**back** 18:3 31:13
33:14 45:7 48:6
49:16 51:11 53:18
53:22 54:3,8
58:14 59:22 61:6
61:13 62:11 64:20
73:22 84:3,14
87:13 91:9 98:1
102:2 111:13
116:10 120:17
121:20 123:8,9
124:12 130:4
139:21 143:22
154:20 157:7
160:4 165:6 166:3
168:9 171:6
183:18 223:9
226:21
**backfire** 98:4
**background** 88:20
208:12,14
**backing** 44:14
**bad** 77:11 78:11
101:12,13,14
232:2
**bad-mouth** 226:12
**bad-mouthed** 226:1
**bad-mouthing**
225:2 226:13
**balance** 215:1
**balancing** 27:7
**bankrupt** 53:9
**Bar** 5:2 15:15 20:22
21:5 22:1 23:6,16
24:11 31:21 32:11
34:7,8,9,13 35:5,6

35:9,17 36:18
43:4,6 55:21
60:10,12 63:7
84:19 85:2,3,18
109:19 110:12
112:2 128:17
130:8,20 131:16
133:11 135:2
139:21 140:13
141:17 143:22
144:2 145:21
151:14 154:19
156:7 158:17
161:11 170:13
176:7,12 180:7
187:11 194:9
197:12 207:2
209:5,18 210:18
232:7
**bars** 15:16 49:1
60:4 63:2 64:2
232:13
**based** 9:21 15:6
24:3 47:12 168:3
**basic** 44:12 45:8
**basically** 43:8 47:12
48:5 79:1 120:16
128:12 168:1
208:6
**basis** 77:7 111:5
125:18 150:13
206:5,6
**bathroom** 122:16
122:17,19,20
184:19
**bear** 53:18 54:3
65:4 129:6
**bears** 211:7
**beauty** 71:4
**becoming** 174:1
**bed** 226:19
**befall** 228:7
**began** 38:1 50:16
52:11
**begged** 142:11
**begging** 142:12
**beginning** 10:18,19
11:1,6 52:4 82:19
83:17 90:20 98:17
104:21 105:3
123:17,20 166:20
**begins** 117:8 156:18
157:2
**behalf** 2:6,18 3:2
6:6 38:19 45:20
49:4 99:20 147:9

153:9 162:11
170:16
**belabor** 10:3 30:19
57:5 64:5
**belated** 27:5
**believe** 32:6,8 40:15
47:15 49:15 66:15
84:12 98:9 108:1
108:2 148:15
152:11 157:12
197:17 231:2
232:12
**believed** 20:21
66:14 98:21
108:10
**believes** 44:5,6
**Beller** 34:18,19
**benefit** 37:20 92:2
**Bennett** 217:1
**berated** 38:10
**best** 10:18 42:17
48:2,3,10 53:14
91:17 116:7 121:4
136:10 148:14
214:7
**bet** 178:17 220:10
**better** 78:12 109:17
130:1 159:9
**beyond** 33:7
**Bible** 47:16,16
**big** 32:7 92:1 93:9
97:14 150:19
151:3 166:2 172:4
185:6
**binder** 168:4
**binders** 166:10
168:9
**bit** 7:8,10,16 8:9,11
18:7 44:14 50:9
143:13 206:1
223:10 226:6
**Bivens** 56:15
**blame** 48:15
**blue** 84:20
**Board** 1:2,4 2:1
29:18 30:6 34:11
35:13 42:8 55:18
56:7,9 57:1 65:1
91:22 136:11
153:20 159:5
203:22 204:20
205:12 222:21
224:8
**Board's** 94:10,20
205:11
**body** 101:8,17

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 244 of 771   PageID 976
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  238

119:19,22 120:3
121:3,8
**Boehner** 57:17
**bolt** 212:13
**bono** 45:2 55:2
**book** 40:6 84:19,20
**books** 168:15,21
**born** 36:10
**Borrazas** 167:11
**boss** 91:21,21
116:15
**boss's** 113:5 114:16
**bosses** 80:3
**bother** 229:17
**bothered** 77:11
**bottom** 51:7 59:19
116:10 151:20
176:16 189:1,6
191:1,2
**Boulevard** 51:13
**bouts** 38:9
**boxes** 166:8
**boy** 32:7
**boyfriend** 122:5
139:1,3
**Brantley** 1:22 2:4
235:2,15
**breaching** 34:21
**break** 8:3,4,9,13,13
8:14 24:5 67:2,5
109:21 168:11
170:1 191:20
192:3 204:22
206:7,13
**breakdown** 54:3
**breaks** 174:18
175:9
**breath** 175:12
**Brennan** 34:16,17
**brief** 20:17 49:8
67:10 176:2
**briefing** 30:10
**briefly** 34:7,13 87:4
115:8
**briefs** 219:5
**bring** 18:10 58:17
67:4 123:1 134:17
225:18
**bringing** 56:14
102:22
**brings** 47:11
**broad** 181:10
**broadcast** 66:4
188:14,16
**broadcasters** 59:14
65:19 66:3,6,16

**broadcasting** 72:6
**broadly** 17:8,9
**brother** 49:18 57:8
186:1,3,5,9
**brought** 21:18
29:17 30:18 34:22
42:13 49:16 55:4
55:4,15 60:18
121:13 122:22
123:1
**brushed** 199:21
**building** 51:14
123:9
**bulk** 224:4
**bunch** 181:19 201:3
**Bureau** 54:5
**bushed** 140:7
**Bushes** 63:18
**business** 7:20,20
35:13 63:22 74:12
74:13,21
**buy** 62:19

**C**

**C** 5:1
**C.S.R** 1:22 2:4
235:15
**California** 9:5
21:16 105:22
106:1,3 108:19
146:13,15
**call** 32:20 43:11
50:14 52:1 67:1
75:16,22 77:8
100:20 113:14
123:2,3,5 145:12
165:15 186:17,18
186:20 187:18
191:2
**called** 50:15 58:15
69:3 75:7 104:7
113:17 123:8
143:5 223:10
**calling** 61:12 77:6
87:2,9,10 174:7
186:18
**calls** 40:16 118:17
141:10 163:14
184:6
**calm** 121:5,10,11
232:5
**camera** 90:12
**cameraman** 72:22
73:19
**cancer** 126:11
**candidates** 56:3

**capital** 233:15
**Capitol** 50:1 57:16
73:18 75:4
**car** 62:19 105:21
107:8 109:4
120:21 121:13,14
121:14,14 122:11
122:11,14 185:5
199:15
**card** 50:12 74:12,13
74:21
**care** 41:22 51:4
62:14 64:3 119:13
121:17 124:21
193:18 230:18,19
**cared** 45:15 52:19
62:16
**career** 48:19 174:1
196:6
**career-less** 142:8
**careful** 41:13 68:9
82:13 219:17
**carefully** 219:9
**cares** 121:18
**case** 9:9 10:1,7,12
11:3,22 12:9,16
12:22 19:6 21:6
21:10,17 23:4,10
23:11 24:3,16
26:2 29:14,16
30:18 31:3 32:5
34:22 36:17,20
37:2,7,12,15,17
37:19 39:1,5,21
40:3,21 43:14
46:8,13,17 47:1
49:9 50:9 52:4,18
55:11,15 56:10,12
58:15,17,22 59:17
59:21 60:9,15
64:4,16 79:18
80:10,13 81:15
82:8 86:17 87:11
87:17 88:9,17,19
89:12 90:17 91:3
91:5,8 92:1 93:7
94:5,6 95:16 96:3
98:1,19,22 99:1
102:5,9,11,20,22
103:3,16 104:9,10
108:13 111:14,21
120:2,12 125:1
136:2 139:4 142:7
142:7,13 143:3,4
143:5,7,9,19

145:1 147:10
148:15,22 150:17
151:3 153:11,16
154:4,6,7,8
155:16 162:11
163:14 166:22
168:6 172:13,14
174:2 184:9,10,12
189:16 190:6,14
191:22 192:6
196:6,17 205:22
206:3 210:10
215:4 216:6 219:3
221:9,17 222:3,7
222:19 225:21
227:13 229:9
232:9 233:3,16
**cases** 14:20 55:3,4
56:9 63:17 64:19
82:3 147:17 148:8
150:18 233:10,12
**casual** 7:20
**catch** 77:2 134:19
186:11
**catches** 22:4
**caught** 226:18
**caution** 110:15
**CBN** 187:19,21
188:13,13
**CC'd** 130:9
**celebrate** 143:6,11
**cell** 50:13
**Center** 138:11
**Central** 54:5
**certain** 48:6 128:3
205:12 215:11
216:16 225:16
**certainly** 16:16
18:22 25:7 34:4
45:15 95:4 108:1
108:2 127:18
134:3,6 136:19
163:22 181:12
215:8 217:7 222:4
222:17 224:7
**CERTIFICATE**
235:1
**certified** 162:14
**certify** 235:4
**chair** 2:12 5:8
25:13,15 26:12,22
27:4 204:4 205:1
**Chair's** 212:9
233:18
**CHAIRMAN** 5:4
5:13,19 6:10,13

6:20 8:21 10:10
11:21 15:21 16:1
19:20 20:15,18
24:22 25:5 26:13
27:14,21 28:15,18
29:5,8,11 32:19
33:7 34:10 35:12
36:6 41:2,9,12,20
42:6 65:12,17
66:22 67:7,12,14
67:18 68:3,8,12
68:14 70:16 76:9
82:13 85:1,15
86:6 88:10 92:6
92:10,13,16 93:13
93:19 94:22 95:17
95:20 96:5,14,17
96:20 97:3,8,16
97:20 98:5,11,15
99:2,11,16 100:1
101:22 102:6,10
102:19 103:4
106:5,17,21
107:22 108:21
109:20 110:1,4,8
111:4,7,10 114:1
114:4,9,18,20
115:20 116:1,5
117:20 123:16
124:8,14 126:15
127:20 128:8,11
131:21 132:2,8,11
132:22 136:7
137:14 139:15,19
140:1,22 141:12
144:6,10,15,18
145:4,8,12,15,18
148:4,9 149:6,20
150:1,4,12 151:7
151:16,19 152:2
152:10,12,15,20
153:2,4,7,14
154:2,13,16,20
156:6,11,21 156:3
158:19 159:8,14
159:20 160:6,12
160:20 161:3,9
162:2,19 163:2,22
164:8 165:6,16,18
166:15 169:4,6,8
169:13,15,20
170:5,7 171:5,20
175:11,15,22
176:5,9,13 177:7
177:22 178:16
179:21 181:14,19

Case 3:20-mc-00043-B    Document 30    Filed 10/11/22    Page 245 of 771    PageID 977
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 239

182:1,4,10,13,20
183:1 185:15
187:12,15,17
188:8,12,18,21
189:5,8,13,18
190:1,4,8,12,15
190:19,22 191:7
191:11,13,17
192:17 193:6,18
194:4 195:1 197:1
197:5,9,14 198:5
198:18,21 199:4,6
201:16 202:2,8,13
202:16 203:6,18
206:12 207:18
208:17 209:7,9,12
209:17,20 211:5
211:10,19 212:2,5
212:11,21 213:2,9
213:15,19,21
216:5,10,14 217:6
217:22 218:2,6,11
218:16,19 219:1
219:13,16 220:8
220:13,19 221:3
222:10,20 223:3
223:17,20 224:1
225:6,11,17 226:4
226:15,22 227:4
230:3 232:18,22
233:5 234:3
**challenge** 27:3
**champagne** 143:11
**chance** 9:12 10:1
21:20 23:21 28:9
85:7 112:1,8
131:1
**change** 50:3 90:6
91:1
**changed** 83:12
90:22
**channel** 188:2
**channels** 71:16,17
**characterizes** 40:7
**charge** 166:16,17
**Charges** 9:14 35:8
36:17
**check** 11:15 160:5
169:2 208:12,14
**chief** 19:6 40:21
78:8,15 157:12
222:7,19
**chip** 58:14
**choice** 34:11 75:2
205:6,9
**choose** 74:19

**Christ** 188:5
**Christian** 188:3,15
188:16
**circulating** 234:1
**circumstances**
17:10 27:10 30:11
105:19 106:13,16
107:3,10 185:16
199:2,9
**civil** 27:7 157:5
159:1
**claim** 37:13 40:11
**claimed** 54:13 64:1
**claims** 22:1 44:19
45:10 229:10
**clarify** 94:20
197:14
**Clay** 2:20 6:6
**clear** 12:5 20:11
28:22 39:2,11
45:14 48:11 52:22
56:20 103:6 129:7
134:14 177:20
194:5 202:3
228:14,21
**clears** 165:15
**clerk** 167:12
**client** 56:21 167:1
184:21
**client/attorney**
115:11
**clients** 44:2,6 45:18
56:21 62:15
**Clinton** 37:14,16
55:14,17,20 56:6
150:19 159:6
167:5
**close** 7:1 42:16
45:16 52:15 68:9
143:13 153:11
232:8
**closing** 30:9 219:4
**clothes** 77:5
**Clyde's** 50:17
**co-anchor** 76:19
**co-counsel** 6:17
15:17
**co-host** 76:19 89:1
**co-hosting** 71:22
72:1,2 78:10
**coaster** 115:13
123:12 172:18
173:20,20 187:6
196:3
**coats** 7:17
**Coburn** 57:17

**Code** 63:12
**coffee** 7:22 76:21
**coin** 28:10
**colleague** 173:5
**Colleen** 40:8
**college** 70:8,9
**colonel** 43:15
**color** 224:19
**Columbia** 1:1 2:6
5:7 40:19 43:11
72:9 235:16
**come** 18:3 21:22
22:8 25:20 28:11
29:4 51:16 61:21
73:8 79:4,13
82:16 84:21 96:7
96:14,20 113:3,8
118:2 127:3 138:6
143:10 152:20
167:21 200:7
202:13 214:16
223:9 226:6
233:15
**comes** 22:19 29:20
**comfortable** 228:12
**coming** 22:13 98:10
122:16 214:17,17
**command** 61:1
**commanding** 43:10
43:12
**commencing** 2:3
**comment** 17:22
28:2 33:13
**commentaries**
46:10
**comments** 136:22
217:18,21
**commission** 58:19
235:20
**committee** 2:4,10
5:5,9,14 6:1 9:7
19:4,7 22:21 24:1
24:11 25:13,15,16
28:13 29:15,19
33:8,16,22 36:15
40:22 42:5 49:7
55:17 67:4 73:16
76:17 87:3 89:21
93:18 95:12
102:17 105:18
113:20 118:10
124:18 126:8
132:15 137:10
147:7 148:13,18
151:10 166:11
170:18 171:13

194:22 196:2
203:20,21 204:2
206:4 207:5,15
217:5 222:6 224:8
227:22
**committee's** 10:16
18:11
**committing** 62:5
**common-law**
227:21
**communicate** 23:6
**communicated**
104:9
**communication**
61:20 155:13
**communications**
21:10 39:10,15,19
46:16 98:12,16
100:3 155:1,22
181:8
**communicative**
61:11 64:13
**communities** 37:6
**community** 37:4
49:15,22 66:14
88:19 89:8,17
92:19
**compelled** 12:4
**compelling-need**
136:12
**compendium** 18:13
198:14 222:2
227:12
**competency** 166:18
**competent** 167:1
**complainant** 12:3
44:9,18 47:3,3
**complained** 103:16
**complaining** 41:14
123:14 136:20
217:11 230:7
**complaint** 23:5
44:10 58:18,19
60:16,21 61:2,2,7
61:15 85:4 90:4
91:19 99:3,3,18
100:2 112:12
113:9 116:10,14
116:16,17,20
147:14 183:4,4
184:4
**complaints** 60:3,8
64:12 135:17
**complete** 162:12,13
219:19 222:11
**completely** 32:18

98:18 115:12
135:4
**completeness**
227:21
**complex** 37:11
**complied** 11:16
222:11
**complimentary**
46:20
**comply** 15:9
**compromise** 165:8
**concentrate** 142:6
**concentrating**
142:7,9
**concentration**
97:22
**concentrations**
148:21
**concern** 25:6 26:2,3
26:5,22 103:13
230:6,10,21
**concerned** 32:1
58:5 204:16
230:17
**concerning** 14:12
137:6 191:21
**concerns** 37:4 90:1
102:14,17 133:21
**conclude** 203:2
**concludes** 168:8
**conclusion** 149:8
**conditions** 76:13
**conduct** 52:17
**conducted** 203:10
**confer** 190:2 213:3
**confirm** 62:1
**confirms** 21:1 32:12
32:14
**conflict** 15:18 39:2
47:20,22
**conflicted** 182:16
182:16
**confronted** 27:2
**congress-person**
193:19
**congressman** 73:21
146:11 193:15,16
194:7
**congressman's**
146:13
**congressmen**
150:18
**connection** 77:21
111:1 170:13
**consent** 224:9
229:21

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 246 of 771   PageID 978
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  240

consequently 9:6
    10:4,5 12:13 61:5
    231:6
conservative 56:4
consider 29:20
    95:13 168:18
consideration 7:9
    17:4 30:15
considered 228:4
constant 77:6 184:5
    184:5,6
constantly 77:7,7
    174:7,21
constitutes 198:3
consult 25:15 79:14
    175:18,19 191:20
    192:6
contact 39:8 61:10
    74:22 81:20
    119:22 142:17
    145:16 184:9,11
    188:19
contacted 60:11
    113:11 152:18
contain 94:12
contains 21:4 136:8
contemporaneous
    47:4
contentious 31:1,6
contents 214:20
context 20:13 40:4
    40:5 89:9 110:19
contingency 45:3
continue 43:15
    95:21 143:19,21
continued 3:1 38:14
    39:8,19,20 139:14
    170:9
continues 48:19
continuing 61:7
continuously 24:12
contrary 46:19
    135:4
contributions 56:2
control 27:20 64:8
    121:1,2,5 229:12
controversial 66:8
conundrum 204:18
convenience 222:6
convenient 213:12
conversation 75:3,5
    75:20,21 79:18
    81:14 89:22
    115:21 131:10,13
    132:6,16 134:4
    137:6,10 155:8

211:17 224:11
    227:19
conversations
    20:13 75:15 80:16
    80:16 88:7 91:4
    181:4
conveying 207:16
convince 215:13
convinced 136:18
    151:11,11
cool 7:13
cooperation 18:22
cope 173:13
copied 211:21
    212:3
copies 19:13,17
    20:11 167:13,15
    177:11,14 179:5
    179:12 180:19
    181:15 220:12
    221:18,21 222:12
copy 130:18 158:1
    158:12 162:12
    179:7 220:3,6,16
    222:17
corner 211:6
correct 76:4 139:15
    145:10 151:22
    168:14 202:6,7,11
    202:12 203:16,17
correspondence
    21:5 85:9 141:19
    162:16 198:15
corroborate 203:4
corroborated 46:21
    134:17
cosmetology 71:10
    71:15
cost 14:22 109:13
costs 54:19
counsel 6:4,7,10,11
    7:17 8:20 11:15
    14:10,19,21 16:12
    18:21 19:1,12,12
    20:22 21:5 22:1
    23:6,16 29:6
    31:21 32:11 34:9
    34:9,13 35:6,6,9
    36:12 40:20 42:2
    42:8 43:9 45:21
    45:22 53:4 60:12
    63:7 69:3,6 77:20
    85:3,10,18 99:19
    111:4 116:14
    133:11,17 135:2
    161:13 165:8

170:10 180:10
    214:5,19 220:14
    220:22 221:20
    228:16 232:7
    234:6,6 235:8,11
Counsel's 10:12
    11:3 34:8 55:21
    60:10 84:19 222:7
counsels' 8:1
Count 189:5
countervailing 44:4
countries 54:6
County 194:7
couple 10:21 13:3
    104:6
course 15:5 18:16
    20:15 25:20 26:16
    26:18 37:21 38:3
    41:13 49:9 51:1
    56:16 61:5 63:8
    124:2 147:2 222:3
court 1:1 2:5 5:6,10
    5:12 26:21 42:22
    56:11 58:17
    124:11 135:6
    148:6
courtroom 73:11
    176:1
courts 27:11
courtship 39:1,3
cousin 112:21
cover 19:10,17
    72:22 73:5 74:13
    74:15 75:10,11,14
    79:19,22 215:6,14
covered 215:7
covering 50:10
    72:21 73:18 74:20
    75:9 90:9
coworker 103:17
    125:16
crash 200:19 201:7
crashing 201:14
create 22:14
creates 15:18
credibility 26:19
    227:1
credit 109:6,7
cried 142:12
critical 47:1
cross 168:10,11,19
    205:6
cross-examination
    12:5 16:3,7,9,14
    27:3 151:10 217:4
    217:8 222:18

230:22 231:13
    233:20
cross-examinations
    16:11
cross-examined
    133:2
cross-examining
    233:14
cumulative 204:4,9
    215:10,13
curious 160:9
current 216:21
currently 6:16
    69:12
curtailed 16:15
cut 53:3

_____

D

D 4:1 5:1
D.C 55:10 71:1
daily 40:2 77:7
    125:18
damages 31:16
    54:22
Dana 194:6
Danforth 156:9
    157:8
dark 201:14
darker 39:10,11,16
dash 57:7 156:21
date 35:16 65:13
    76:20 99:6,10
    104:12,13 116:12
    132:12 141:1
    159:21,22 179:17
    180:9,15 195:8,19
    207:10 210:18,19
    211:7,14,15,18,19
    211:20 218:20
dated 85:4 99:4,5
    130:10,21 141:19
    144:3 156:8
    163:11 194:17
dates 129:5
day 28:11 53:16
    78:6,20 89:12,19
    137:20 160:4
    221:21 223:4
days 9:6 10:11,21
    12:22 41:21 46:9
    55:13 160:8 166:4
    200:16 202:5
DC 1:9 2:2,18 5:5
    24:11 43:5,5
    53:11 91:15
    105:14,16

dead 23:12
deadline 203:15
deal 8:5 16:17 33:9
    44:21 93:15
    125:18 213:8
    215:11 223:5
    224:12
dealing 10:2 24:6
    54:5
deals 27:8 63:5
December 99:7
decide 93:15 178:4
    215:2 233:10
decided 81:19
    170:19 171:13
    200:11
decides 205:2
decision 40:13
    55:11 56:20 106:2
    157:10 206:4
declarants 26:20
deducing 41:13
deem 227:13
deemed 227:11
deep 166:10 175:12
deeper 58:9
deeply 45:15 51:4
defamation 31:14
defaming 31:15
defend 24:14 32:7
    32:16
defended 34:20
defending 230:17
defense 226:11
    230:11 232:1
defraying 53:9
degree 16:4
delay 223:10
delayed 14:21
Delia 78:2
deliberations 215:4
delivered 207:10
demeanor 12:19
    232:5
demonstration 50:1
    65:14
denial 229:13
denied 61:6 62:9
    133:8
department 57:9
depending 7:11
depends 201:20
depose 13:21 133:7
deposition 34:20
    228:21 229:1
depositions 136:11

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 247 of 771   PageID 979
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 241

**depth** 51:8 59:20
**Deputy** 34:8 35:6,9
**describe** 74:6 89:21
   109:2 134:5
   143:15 207:4
**described** 104:6
   215:21
**desires** 38:4 39:3
**desk** 75:7,17 213:4
**destroyed** 115:13
**detail** 111:9 229:14
**detailed** 116:18,19
**details** 101:15
**determination** 30:7
**determinations**
   205:13
**determine** 5:20
   178:17 214:14
**determined** 16:3
**determines** 204:3
**died** 13:7 196:15
   200:7
**difference** 8:13
   27:16
**different** 9:11 10:9
   15:19 27:16 49:10
   56:1 70:21 71:16
   93:22 115:18
   116:16 121:16
   123:12 150:16,17
   232:10
**differently** 63:13
**difficult** 15:14
   16:11 44:20 51:1
   198:12
**digest** 9:20
**digitized** 220:9
**diligently** 62:13
**dinner** 50:17,18
   76:21 80:11,13,18
   82:5,7 116:6
   143:12
**direct** 4:7 69:6 99:2
   168:8,19 169:9,16
   170:8,9 201:17
   202:18 203:2
**direction** 235:6
**directly** 43:10
   203:9
**disadvantage** 12:17
   231:5
**disbursed** 231:18
**discarded** 21:8,9
**disciplinary** 2:18
   6:7 8:20 10:12
   11:3 14:10 35:5,6

36:12 40:20 69:3
69:6 85:10 99:19
116:14 133:17
143:1 170:10
180:10 214:5,18
222:7
**discipline** 5:21
**discovery** 27:9,12
   28:7 133:15
   134:15 135:12,22
   229:4
**discretion** 25:13,14
   95:2
**discriminated**
   66:10
**discuss** 25:21
   113:18 190:6
   223:13
**discussed** 80:10
   82:8 103:10
**discussing** 25:12
   102:18
**discussion** 45:3
   88:13 93:17 140:2
**discussions** 87:16
   102:4,8,11 103:3
**dishonest** 40:9,17
**dishonesty** 40:19
**disks** 22:7
**dismiss** 232:9
**dismissed** 21:11,12
   48:22 49:1 59:9
   60:6 63:3 64:3,21
   64:22
**dismisses** 64:21
**disposing** 204:1
**disposition** 40:10
   203:8
**dispute** 34:21
**disregard** 233:22
**disrespected** 186:7
   186:14
**dissatisfaction**
   48:15
**District** 1:1 2:6 5:7
   40:19 43:11 72:9
   191:15 235:16
**division** 65:20 66:4
**Docket** 1:4 5:3
**doctor** 201:7
**doctor's** 124:21
**doctors** 125:5,7
   126:3 199:20
**document** 32:12
   85:5,14,21 117:12
   130:11,14 134:2

136:14 141:21
147:22 156:10
160:2 178:8 181:3
181:16 195:12,13
197:2,16,17,21,22
198:3 207:6,13,16
207:19,22 211:21
218:21 226:14,16
227:11,11 228:1,2
**documentaries** 81:1
**documentary** 81:7
   203:20 205:17
**documentation**
   20:22 31:8 61:16
**documents** 9:20
   19:6,11 20:4,8
   25:6,19 32:13
   60:11 135:1 166:3
   176:18 198:22
   202:5,10,11,16
   203:3 204:10,11
   204:16,19 205:7
   205:16 213:7
   214:4,13,15,20
   215:2,3,6,9
   220:18 221:7,7,14
   221:17 222:1,15
   222:18 224:5,12
   224:15,21,22
   225:7,8 227:15
   229:20 230:4
   231:17
**doff** 7:17
**doing** 28:21 42:17
   50:7 71:20 72:4,5
   72:17 74:9 78:11
   103:9 138:1 150:3
   208:8 219:4
**domain** 31:4
**door** 122:10 123:9
**doors** 173:3
**doorstep** 174:13
**dose** 201:9
**downstairs** 174:13
   186:4
**Dr** 125:4,4,9,11
   126:5,9 127:19
   130:17,19 131:8,9
   131:10,19,22
   132:6,20 133:7,16
   133:18,20 134:4,6
   134:9 136:18,20
   136:22 137:6,13
   137:17,21 138:4
   138:12,15,19
   139:5,7,14,17

140:18 141:8
185:1,2 228:21
**dress** 7:20
**drink** 76:21
**drinks** 77:3
**drip** 165:14
**drive** 21:4,14 25:1,2
   29:1 55:11
**drop** 196:18
**due** 13:10 15:12
   136:15 229:8,13
**duly** 69:4
**duplicative** 20:9
**duty** 44:4
**dynamic** 27:15

_____

**E**

**E** 1:5 2:2 3:10 4:1
   5:1,1,2 165:1,1
**earlier** 61:17 103:8
   140:2 234:7
**early** 7:9 13:1
   133:15 136:2
   167:20 204:22
**Earth** 139:2
**easier** 8:11
**easy** 58:13 59:5
   91:11,13,14
   200:18
**economically**
   199:17
**EEO** 58:17 61:7
**effect** 17:12 63:21
   94:2,4 96:2 101:2
   219:5
**effective** 48:10
   162:8 233:19
**effectively** 27:3
**efficient** 168:12
   216:17
**effort** 145:16
**efforts** 40:5 45:20
   46:14
**egregious** 233:4
**eight** 21:6,12 23:3
   47:6 64:16 188:22
   189:9 199:13,17
   201:15 209:15
   229:9 231:17
**either** 18:3 32:22
   72:20 121:11
   131:11 178:19
   212:14 215:22
   232:22
**electronic** 220:3
**elements** 136:8

**Elham** 4:8 67:17
   69:2 144:4 150:21
   156:9 194:17
**elicited** 94:12
**elicits** 148:1
**Elizabeth** 35:7
**Ellie** 130:10 141:20
   183:22
**Ellie's** 183:14,15
**email** 3:8 19:17
   20:4,12 61:20
   81:22 82:1,22
   118:16 141:18
   144:20 145:2
   150:13 151:21
   160:1 190:11
   193:2 194:16,20
   195:4,18 196:2,9
   196:13,14,22
   197:6 207:14
   208:2,9 209:22
   210:17,20,21
   211:1,3,12,16,17
   212:7 220:16
**emailed** 18:21
   130:17 158:9
   159:18 197:3
   201:11
**emailing** 87:10,11
   197:8
**emails** 18:13,17
   19:2,9 21:22
   25:12 26:1 32:20
   84:14 119:10
   129:4,8,10 130:5
   131:15 155:8
   160:4 163:13
   183:3,6 184:6
   199:11 201:2,3,4
   201:10 229:3
**emotional** 149:11
   173:20 226:7,9
   228:22 230:7
**emotionally** 173:2
   174:18 175:9
**emotions** 38:19
**emphasis** 41:15
**employed** 14:9
   71:12 235:8,11
**employee** 235:11
**employees** 52:15
   58:1
**employment-rela...**
   37:1
**empty** 173:4
**encompasses** 181:9

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 248 of 771   PageID 980
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  242

**ended** 39:19 54:21
  78:5
**ends** 12:22 206:2,11
**English** 51:17,21
  61:1 112:16
**enrolled** 108:14
**enter** 29:5
**entered** 27:22
**entertain** 41:1
  227:22
**entertainment** 72:3
**entire** 225:14
**entirely** 7:21 11:14
**entirety** 225:9
**entitled** 30:9 58:6
  233:5
**entity** 44:20
**entries** 181:16,20
  181:20 182:6,11
  182:15 187:15
**entry** 214:3
**envelope** 158:11
**environment**
  212:12 231:1
**envy** 36:7
**equal** 15:12 58:18
  229:8
**equals** 36:1
**equitable** 54:21
**equities** 65:3
**equity** 29:9
**erroneous** 197:21
  205:14
**errors** 59:17 182:5
  182:16
**escaped** 51:19
**ESQUIRE** 2:11,15
  2:20 3:3,10
**essentially** 230:13
**established** 133:20
**ethical** 32:9 112:12
  136:4 183:4 230:1
**ethics** 135:17
**eve** 229:17 231:19
**evening** 7:11
  120:10,11,14,18
  184:22 185:3
  224:1
**event** 79:22 94:19
  121:21 124:17
**events** 94:16 193:12
  203:4
**eventually** 25:14
**everybody** 10:13
  11:7 23:17 78:9
  89:6 92:1,22

97:14 103:14
  121:4 150:19,22
  151:1,2 157:18
  159:4 172:6
  213:22 233:21
**evidence** 7:12 21:8
  23:4,20 24:4
  26:17 29:20 33:1
  38:13 39:9,14
  40:12,14 41:5
  48:12 50:22 57:6
  58:7 59:8,18 62:4
  65:13 108:1 133:1
  164:3 200:6
  203:19 204:3,5,8
  205:3,18 208:19
  214:16,18 227:20
  232:9
**evidentiary** 27:17
**evil** 228:7
**exact** 99:10 137:20
  138:8 179:17
**exactly** 74:11 75:19
  101:15 116:3
  137:19,21 157:16
  159:16 160:3
  193:11
**examination** 69:6
  170:8,9 201:17,18
  202:19 203:2
  217:1 222:4
**examine** 202:9
  205:7
**examined** 6:3 69:4
**examining** 175:17
**example** 25:22
  92:21 99:13 120:7
  123:11,18,21
**examples** 185:21
**excellent** 48:9
**exception** 17:9
**exceptions** 231:6
**exchange** 20:12
  53:16 197:15
**exchanged** 18:17
**exchanges** 20:5
**exclude** 204:5
**excluded** 22:5
  23:19
**excluding** 17:5
**exclusion** 27:11
**excuse** 79:5 129:20
  149:17 157:20
  177:4 183:7 197:9
**excused** 224:2
**executive** 74:19,21

77:14 78:1 79:20
  88:22,22 220:15
**exercising** 25:14
  233:20
**exhibit** 19:14 22:6
  84:20 85:1,2 99:4
  109:19 110:12
  112:2 128:17
  130:8,20 131:17
  139:21 140:13
  141:17 143:22
  144:2,13,16,19
  145:21 151:14
  154:19 156:7
  158:18,21 161:12
  161:14,15 162:3
  166:10 168:15
  170:13 171:21
  176:7,12 177:4,7
  177:8 180:7,12
  187:11 194:10,12
  197:13,19 198:3,9
  207:3 209:6,18
  210:18 220:3
  222:8
**exhibited** 38:9
**exhibits** 9:11 20:10
  22:19 36:18 60:12
  84:19 136:14
  144:9 165:22
  166:1 168:3
  203:13,14 212:10
  220:3,6 222:3,14
  225:12
**existence** 65:2
**exits** 176:1
**expect** 16:16 147:16
  148:7
**expenses** 53:9,13
**experience** 43:22
  94:15
**experienced** 117:1
**experiencing** 76:18
**expert** 9:22 13:7,9
  16:19 64:17
  166:13 216:3
**expires** 235:20
**explain** 74:21
  102:16 138:18
  149:15 171:12
  202:10
**explained** 74:18
  80:1,5,7,15 91:7
  98:19 115:5 117:2
  118:20 128:2
  143:8

**explaining** 138:2
**explanation** 32:21
**explicitly** 10:14
**explorative** 16:7
**Express** 167:17
**expressly** 160:21
**extension** 217:3
**extensive** 217:7
**extent** 217:2 222:13
  224:20 228:5
**eye** 32:18 119:22

_____

         **F**

**F** 165:1
**face** 101:8 120:15
  173:3
**Facebook** 93:1,1
  100:6,10,15,20,21
**Facebooks** 97:7
**faced** 233:13
**fact** 7:19 22:1 23:3
  23:7 28:21 43:3
  45:22 46:18 48:18
  57:21 63:2 64:21
  106:9 127:18
  138:2 139:16
  142:8 150:18
  168:6 172:21
  173:22 205:14,14
  208:4
**facts** 40:12 48:16
**factual** 59:16 95:15
  205:13,13
**failure** 27:12
**fair** 23:2 159:8
  225:1 229:7
**fairly** 7:15 58:1
**fairness** 13:10
  15:12 29:10 228:4
**fait** 22:14
**fake** 93:1
**Falahati** 89:13,14
  89:14 143:1
  147:11 153:11
  200:4
**Falahati's** 147:13
**falling** 203:11
**false** 40:15,15
**family** 51:19 57:10
  66:2,10 186:2,10
**far** 32:22 55:14
  58:5 93:21 95:18
  178:6,21 191:8
  217:11
**Farci** 51:20
**fault** 37:22 58:1

166:2 169:1
  229:11
**favor** 136:11
**favorable** 66:6
  221:8
**FBI** 93:3 173:16
  208:12,13,18
**feared** 96:3
**February** 82:22
**federal** 26:17,21
  27:7,11,17 51:14
  56:11 58:17,20
  167:17
**FedEx** 167:10,20
**fee** 83:3,6 210:4,12
  210:15
**feel** 51:6,9 62:15
  95:14 101:3
  207:21 227:15
**feeling** 134:5
  183:15
**feelings** 38:1,2
  118:20 142:9
  185:19
**feels** 138:13 222:2
  222:14,15
**fees** 15:2 45:3
**felt** 66:9,15 150:20
  150:20 196:7
  200:4 208:1 220:7
  221:17
**field** 43:20 51:11
**fifteen** 206:7
**fifth** 187:20
**fight** 148:16 149:18
  150:9
**fighting** 121:9
**figure** 24:5 31:18
  31:19 56:3,4
**file** 61:9 99:6 133:9
  133:11,12,18
  162:13 165:22
  166:8 222:11
**filed** 17:17 22:2,11
  23:5 37:10 44:10
  58:18 59:22 60:3
  62:7 63:17 64:12
  100:2 116:17,20
  157:5 166:7,13
  167:12 180:9
  224:9 229:19
  231:9
**files** 25:3
**finally** 70:22 77:10
  100:1 121:10
  199:13 230:15

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 249 of 771   PageID 981
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  243

**financial** 45:14
83:15 106:15
107:3 109:3
**financially** 107:10
108:19 235:12
**find** 14:22 35:18
43:19 60:7,13
62:20 64:15 65:10
89:6 103:14,20
120:13 175:1,1
182:4 186:20
193:2 199:2 204:7
205:12 215:6
**findings** 95:15
205:13,13
**finds** 90:3 232:16
232:19
**fine** 43:1 144:11
175:16
**finish** 24:3 70:6
**finished** 169:8,12
169:13,14 187:12
202:14
**finishing** 216:12
**firm** 56:19 59:17
**first** 9:4 25:1 61:1
67:1 69:4 70:22
74:7 75:12 80:12
81:16 86:22 87:14
88:21 97:9 101:4
101:6 102:8,10
103:2,22,22 104:2
104:3,5 105:7
116:17 117:14
130:14 131:4
134:12 135:15
149:6,10 151:19
161:22 162:6
166:5,20 171:3
172:22 174:3
186:3 188:12,12
207:5 214:14
233:11
**fit** 33:16 222:9
**Fitch** 2:11 5:4,8,13
5:19 6:10,13,20
8:21 10:10 11:21
15:21 16:1 19:20
20:15,18 24:22
25:5 26:13 27:14
27:21 28:15,18
29:5,8,11 32:19
33:7 34:10 35:12
36:6 41:2,9,12,20
42:6 65:12,17
66:22 67:7,12,14

67:18 68:3,8,12
68:14 70:16 76:9
82:13 85:1,15
86:6 88:10 92:6
92:10,13,16 93:13
93:19 94:22 95:17
95:20 96:5,14,17
96:20 97:3,8,16
97:20 98:5,11,15
99:2,11,16 100:1
101:22 102:6,10
102:19 103:4
106:5,17,21
107:22 108:21
109:20 110:1,4,8
111:4,7,10 114:1
114:4,9,18,20
115:20 116:1,5
117:20 123:16
124:8,14 126:15
127:20 128:8,11
131:21 132:2,8,11
132:22 136:7
137:14 139:15,19
140:1,22 141:12
144:6,10,15,18
145:4,8,12,15,18
148:4,9 149:6,20
150:1,4,12 151:7
151:16,19 152:2
152:10,12,15,20
153:2,4,7,14
154:2,13,16,20
155:6,11,21 156:3
158:19 159:8,14
159:20 160:6,12
160:20 161:3,9
162:2,19 163:2,22
164:8 165:6,16,18
166:15 169:4,6,8
169:13,15,20
170:5,7 171:5,20
175:11,15,22
176:5,9,13 177:7
177:22 178:16
179:21 181:14,19
182:1,4,10,13,20
183:1 185:15
187:12,15,17
188:8,12,18,21
189:5,8,13,18
190:1,4,8,12,15
190:19,22 191:7
191:11,13,17
192:17 193:6,18
194:4 195:1 197:1

197:5,9,14 198:5
198:18,21 199:4,6
201:16 202:2,8,13
202:16 203:6,18
206:12 207:18
208:17 209:7,9,12
209:17,20 211:5
211:10,19 212:2,5
212:11,21 213:2,9
213:15,19,21
216:5,10,14 217:6
217:22 218:2,6,11
218:16,19 219:1
219:13,16 220:8
220:13,19 221:3
222:10,20 223:3
223:17,20 224:1
225:6,11,17 226:4
226:15,22 227:4
230:3 232:18,22
233:5 234:3
**five** 68:5,7 160:8
176:17 188:22
189:9
**fix** 167:19
**flag** 74:11
**fled** 66:11
**flexibility** 15:11
**floor** 196:18
**Florida** 3:6 9:4
21:11 29:2 31:13
49:1 60:4,5 64:21
**flowing** 7:12
**fluent** 51:20
**fly** 37:8 135:6
**focus** 39:1 142:13
196:17 199:16
**follow** 147:10
153:10,15 154:3
202:20
**followed** 122:15,17
**following** 28:6
**follows** 69:5
**food** 107:8
**force** 17:18
**foregoing** 235:3
**foreign** 44:2
**forget** 165:14
**forgive** 184:2
**forgot** 201:1
**forgotten** 33:4
**form** 85:4 136:16
222:8
**format** 211:12
**former** 16:10 30:22
56:2 224:16

**forth** 20:21 84:15
91:9 149:14
**forthwith** 162:10
**forty** 210:16
**Forty-seven** 69:11
**forward** 28:12 31:3
61:8 62:6,19
94:20 98:20
104:11
**forwarded** 19:12
**found** 54:17 78:15
80:17 92:22 159:1
231:18
**foundation** 85:13
88:11,12 93:11
96:6 107:20 108:3
111:9 140:20
149:7,10,14
208:16,19 209:2
**four** 23:7 36:1 60:9
64:14 68:5,7
126:11 176:17
188:22 189:8,19
191:1
**fourth** 210:8
**Fox** 34:14,19
**frame** 149:2
**Frederick** 3:3,4 6:9
42:7
**free** 13:2 43:20
222:4,17
**freedom** 32:5 49:15
50:2 66:15,17
**Friday** 10:19 11:1,5
11:7 15:8 16:21
17:15,18 18:20
19:13 21:15 23:1
166:1 169:2 195:7
214:6 216:19,20
221:21 224:6
230:4
**friend** 12:11 45:16
52:22 53:7 119:6
119:10,11,12,16
119:18 122:7
138:21 183:14,17
183:21 190:21
208:11,12,13,18
231:4
**friend's** 186:16
**friends** 146:17
186:2
**friendship** 119:7,8
119:9,9 121:20
**front** 14:3 90:12
99:5 128:22

129:16 134:15
138:19 139:5
171:8 172:6
**frustrated** 38:14
**frustrating** 38:6
39:16
**frustrations** 38:20
**fsujat@yahoo.com**
3:8
**fuel** 173:4
**full** 43:14 67:16
192:11,12,14
224:20
**fun** 89:6
**furniture** 106:1
**further** 25:22 32:21
33:11 57:5 162:10
163:17 206:14
224:17 235:10

---

**G**

**G** 5:1
**game** 196:6
**games** 196:4 198:11
**gathering** 120:9
**gatherings** 118:13
118:19
**general** 42:22 43:8
43:8,10,11,12,13
148:17 165:8
**generally** 23:13
24:5 31:22 54:7
94:12 182:13
**gentleman** 27:22
33:4,14 34:2,3
**gentlemen** 212:17
**genuine** 178:14,15
**Georgetown** 50:17
**germane** 111:6
**getting** 24:6 48:4
53:5 101:13
102:21 114:2
118:12 129:11
136:1 140:7
141:22 167:7
168:1 180:19
**girl** 188:4
**gist** 28:5
**give** 9:17 11:7 14:4
15:10 20:16 22:21
23:22 25:21 37:17
49:12 67:21 84:10
92:21 93:16 95:13
120:7 121:19
175:20 179:15
183:13,17 204:20

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 250 of 771   PageID 982
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  244

220:11,19,21
231:22
**given** 15:8 17:19
  18:14 19:13 23:8
  28:21 32:13 48:17
  63:1,2,16 98:13
  110:18 132:22
  166:5 214:12
  220:17 221:20
**gives** 121:18 175:2
**giving** 59:6 110:22
  221:5
**glance** 221:9 224:5
**glass** 124:11
**Gloria** 12:11 53:6
  82:6 189:19 190:6
  231:3
**go** 7:1,3,10 9:10
  13:3 22:22 41:17
  46:1 54:4,8 59:2
  62:18,19,20 68:17
  70:9 72:21 73:22
  76:20,22 79:20
  87:13 92:16 98:1
  98:20 102:2,3
  111:10 116:10
  118:14 119:13
  123:4,13 127:21
  128:11 129:21
  133:2 134:10
  140:5 143:6
  144:13 145:18
  154:17,20 158:19
  160:4 165:16,19
  168:8,13 173:8,15
  175:1 176:5
  186:10 194:4
  199:4 200:9,20
  204:13 209:12
  212:18 213:4,12
  213:16,18 215:20
  219:21 224:17
**goal** 54:22
**goes** 60:12 83:10
  94:13 178:6
  226:20
**going** 10:3 11:9,10
  13:14,22 14:1,5,7
  14:13 16:15 25:7
  25:8,15 26:8 27:6
  28:15,18 29:1
  30:19 31:3 32:10
  34:14 35:22 39:13
  39:13 42:15 47:9
  50:4 51:1 52:5
  54:3,22 56:8 57:4

63:2,6 64:16,17
68:8 74:19,20,22
75:8,9 76:15 77:8
77:12,15,17,17,18
77:18,19 78:10
80:6 83:2,9 84:2,4
84:14 86:16 87:17
87:20,22 88:10
91:8,8,10,12,13
91:14 93:20 96:3
97:13,15 98:2,3,4
98:19,21,22
101:16 103:16,17
103:18 104:4,11
105:11 106:14
107:9,18 108:8,11
108:12,15 110:21
111:12,15,19
114:5 115:6,8,9
116:21 119:1,4,14
120:1,4 121:6,15
122:5,8,12,22
125:8 126:9 128:9
129:20,22 136:2
136:19 141:12
143:3,6,10,21
164:7 173:5,10
175:19 177:16
178:18 184:19,20
186:16 187:7,10
190:6 198:20
199:1 200:7,11,12
200:17 201:2,7,14
205:1,8,11 211:10
212:17,18,22
213:10 214:10
215:12 216:14,20
217:6 219:21
220:2,19,21 223:4
223:12 224:18,20
225:2 226:12
227:12 228:8
229:18 231:22
**good** 5:17 6:8 15:15
  16:17 24:12 36:14
  36:19 42:4,6
  51:17 67:12,13
  69:8,9 93:14
  143:20 155:15,18
  163:19 172:7
  178:22 183:15
  215:10 224:1
  227:4 230:22
  232:4
**gotten** 7:16 166:3
  177:22

**governing** 5:6
**government** 52:14
  57:22 59:8 66:2
  66:11
**governments** 44:2
**governors** 55:18
  56:8,10 57:2
  91:22 153:20
  159:5 172:5
**grabbed** 50:18
**grandmother** 36:10
**gray** 232:10,11
**great** 60:22 62:18
  106:10 143:7
**greater** 229:14
**grew** 38:22
**ground** 59:17 215:7
**grounds** 232:10
**group** 25:6,11
  30:22 202:4
**Guard** 43:5,7,9
**guess** 19:4 45:19
  80:6 94:19 132:4
  141:9 157:14
  200:17 201:20
  210:8 216:19
**guidance** 19:5
  27:15,20
**Guido** 190:17,20
  208:5,10,21
  209:10
**gust** 198:20
**guy** 78:19 232:2
**guys** 67:5

──────────────
**H**
──────────────
**H** 2:20
**half** 10:21 23:6 60:9
  64:14
**halfway** 139:12
**Hamilton** 34:13,19
**hand** 50:18
**handed** 12:9
**handle** 155:15
**handled** 23:16 40:8
  88:21 90:2
**handling** 139:4
**hands** 64:8
**handshake** 142:18
**handwriting** 85:20
  86:1
**hang** 64:20
**happen** 39:13,13
**happened** 47:7
  53:20 55:17 91:18
  143:9,15,16,17

199:13
**happening** 117:5
**happens** 63:15
  111:11 119:14
  133:3
**happy** 7:15 19:16
  40:22 213:4
**harassed** 50:20
  51:6 54:13 151:6
**harasser** 51:11 59:1
  147:11
**harassment** 37:5
  38:17 44:19 61:9
  76:15,18 88:19
  89:5,11,16 91:21
  103:16 108:13
  119:20 120:2
  125:8,16 143:4
  147:10 153:11,16
  154:4 231:10
**hard** 15:16 31:17
  45:12 166:12
  217:13,14 220:12
  230:22
**harm** 32:3
**harmful** 46:17,18
**hat** 167:6
**hats** 49:10
**he'll** 103:12
**head** 43:11 55:18
  56:7 149:5
**headquarters** 51:10
**heads** 25:21 134:20
**health** 133:21
**hear** 17:21 20:18
  23:9 41:7 52:5
  59:20 60:14 65:20
  70:16 111:5
  136:19 164:6
  169:11 173:13
  183:12 194:12
  195:5 206:13
  214:10 215:15,17
  216:1 218:17,17
  227:17
**heard** 25:8 95:6,7
  128:10,14 162:21
  203:19 204:17
  215:10,18 232:6
**hearing** 1:11 2:1,3
  2:10 5:5,9,14,19
  5:22 8:15 9:7,15
  10:6,15 18:11
  19:4 22:21 23:22
  24:19 25:13,15,16
  28:13 33:16,18,22

34:5 40:22 59:7,7
87:3 93:18 102:16
105:18 118:10
124:18 126:8
132:15 135:5
137:9 147:6
148:13,18 165:2,4
166:11 170:18
171:12 194:22
196:1 200:14,22
203:10,20,21
204:2 205:5 207:4
207:15 222:6
224:8 230:12
233:10 234:8
235:3,6,9
**hearsay** 13:17,17
  14:13 17:3,6 26:9
  26:9,15 93:11,20
  94:10,11,12,18,21
  95:3 113:22 114:3
  114:8 124:4
  126:14 127:16
  128:7 132:18,21
  137:11 188:6,7
**heart** 50:21 51:3
  226:9
**heavy** 12:9 24:15
**held** 35:17
**help** 7:2,14 50:19
  53:13 66:14 77:16
  80:8,22 81:6,8,11
  81:12,18 89:3
  91:8 98:19,22
  108:11 112:15,17
  112:19 113:7,8
  125:7,15 145:22
  146:20 156:11
  161:18 194:2
  199:20
**helped** 82:1 86:2,10
  105:20 109:8
  112:20,22 113:1
  123:7 179:10
  227:18
**helpful** 28:9 194:3
  225:21
**helping** 52:22
  125:19
**helps** 120:12,13
**Herb** 34:18
**hereto** 235:12
**Herman** 35:7 63:9
  63:15
**hesitate** 7:6
**Hey** 56:15 61:12

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 251 of 771   PageID 983
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  245

**hi** 5:16 183:21
186:6
**hiatus** 14:4
**hide** 186:21
**high** 166:9
**higher** 157:10,11
**highly** 22:16 24:1
133:13 221:11
**Hill** 50:1 57:16
**Hillary** 37:14,16
55:14,17,20 56:6
150:19 159:5
167:4
**hire** 82:9,16
**hired** 87:14 185:10
**hiring** 82:21
**history** 201:4
224:14
**hit** 93:9
**hitting** 230:22
**hoc** 2:3,10 5:9
**hole** 201:14
**Hollywood** 3:6
**home** 31:13 51:22
77:8 123:4,10
128:4 143:2,2,10
186:19
**homeless** 174:1
199:15
**Honestly** 196:8
**Honor** 6:8,18 9:1,6
11:19 14:14 15:8
20:20 24:21 30:17
41:19 42:4 58:13
76:7 85:12 93:10
96:4 107:12,19
111:2 113:21
117:18 124:3
126:13 127:15
128:6 131:18
132:17 133:6
137:11 140:19
141:10 149:1
150:11 165:3,13
165:22 168:22
177:16 178:7
181:7 194:2
208:15 213:6
224:3 231:2
**hope** 7:1 8:8 12:21
63:6 128:14
**hoping** 143:20
**hostile** 52:13
**hostility** 35:8,10
**hotel** 122:13,13,14
122:15 124:13,14

167:21 168:9
184:19
**hour** 170:2
**hours** 217:12,14,15
**house** 57:16 186:16
226:19
**Houston** 71:7
**huge** 92:18 93:8
151:4 185:6
**human** 73:6 223:14
**humiliated** 38:11
**hundred** 225:16
**hurt** 58:21 142:6
230:14
**husband** 224:16
226:17
**Huvelle** 56:11

**I**

**idea** 10:22 13:14
14:7 36:19 104:1
104:2 196:8 214:9
233:19
**ideal** 217:22
**identified** 37:17
**identify** 26:3
**identity** 190:20
**III** 2:20
**illegal** 56:20
**image** 90:5,5
**imagine** 8:2 33:18
92:9
**immediately** 46:5
52:11 162:9
**impact** 227:1
233:16
**implicitly** 10:14
**important** 13:9
14:18 15:3 57:4
140:3 157:22
192:18
**impose** 222:21
**imposed** 5:21
**improper** 22:10
23:13 30:18 149:3
**improprieties** 41:15
**inaccurate** 162:20
178:5
**inappropriate**
23:17,18
**incident** 124:6,17
185:4
**inclined** 95:17
140:5 215:20
**include** 183:3
203:22 204:19

**included** 38:15 84:4
172:3 198:10
203:21 222:16
**including** 31:15
32:11 57:7 63:18
186:15
**income** 196:11
**inconsistent** 182:5
**increase** 201:9
**independent** 44:11
52:9
**indicating** 160:22
**indications** 150:1
**individuals** 7:21
56:10
**infecting** 35:3
**influence** 51:12
**inform** 157:3,17
**informal** 7:16
212:12
**information** 21:7
22:9 23:19 83:1
192:20 231:17
**inherent** 15:18
232:13
**initial** 60:8,16
**initially** 13:2 39:21
56:15 136:15
**injunction** 59:7
62:9
**injunctive** 62:10
**injury** 117:9
**insists** 33:17
**inspect** 214:13
**instances** 38:9
182:14 205:15
**instructed** 157:4
158:22 159:10,11
160:13 161:4
**instruction** 160:16
**instructs** 203:18
**instrumental** 50:5
**insult** 117:9
**integral** 55:12
**integrity** 40:16
**intends** 40:21
**intensive** 16:14
**interaction** 74:6
**interactions** 142:15
**intercourse** 89:18
**interest** 48:2,3,4
66:20 230:10
**interested** 50:10
235:13
**interests** 48:1 49:14
**interim** 14:20

**interject** 221:1
**internal** 23:7
**international** 43:18
56:18 72:19
**internet** 91:3 97:2
**interplay** 203:7
**interrupt** 123:16
156:4
**interview** 50:8 74:2
**intimate** 38:21
**intimidation** 32:6
**introduce** 5:15 6:5
85:14 186:2 202:4
203:14
**introduced** 20:3
152:3,7,8 153:5
**introducing** 9:2
**investigate** 143:4
173:15,16
**investigated** 208:22
209:10
**investigation** 14:11
**investigator** 13:13
14:9 17:2 26:8
135:14
**investigator's** 17:1
26:6,15
**invite** 119:12
121:17
**invited** 50:16
**inviting** 118:13
**involve** 38:12
**involved** 13:17 32:5
47:5,8 74:10
172:12,14 173:2
176:21
**involvement** 35:1
45:15
**involves** 12:1
**Iran** 49:21 50:3
51:19 69:16,17,19
71:18 73:21,22
74:10
**Iranian** 49:14,15
50:2 57:9 66:14
**Iranians** 52:1 54:6
66:16
**irrelevant** 204:4,8
**issue** 11:6 12:10
13:11 18:16 25:1
26:8 28:5 31:10
46:6,16 47:20
65:1 133:8 166:21
214:3,7 232:20
**issues** 10:2 12:1
14:3 26:16 32:15

44:6,11,12 73:6
218:3 228:22
**item** 189:14 218:7

**J**

**J** 3:3,4
**Jackson** 147:12
**Jaffee** 147:12
**JAG** 42:19
**jam** 28:12 71:19
**Jame** 71:18
**James** 30:21
**January** 82:19
**jealousy** 38:10
**job** 37:1 48:9 70:2
71:15 72:13 76:4
76:14 78:11
120:13 174:2
175:1,1,3 196:12
199:15,18
**jobless** 142:8
**jobs** 70:4 71:14
**John** 42:7
**Johnson** 78:2
**joke** 52:1 184:16,18
185:4
**judge** 9:19 13:5
40:8 43:7 56:11
58:5,11,20 59:4,6
59:16 61,6,14
**judge's** 40:13
**judge-tried** 12:16
**judgment** 31:12,18
**judicial** 30:22 31:5
34:4,15,20 35:2
40:17
**juggle** 223:11
**juice** 37:18
**Julia** 35:9
**July** 9:17,17 13:1
35:22 144:4 161:8
161:8,8 162:16
163:9 171:2,2,22
172:1
**jumbled** 167:16
**June** 115:22 194:17
195:5,21 234:9
**jurisdiction** 29:15
232:19
**jurisdictions** 43:13
232:17
**justice** 66:17

**K**

**Katherine** 113:2,3
113:8 114:5,6,8

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 252 of 771   PageID 984
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  246

114:13,17 115:21
117:2 124:9
135:16 136:6
146:3,10,14,17
161:21 191:5,9
**Katherine** 146:4
**Kathleen** 156:15
191:2,4,7,10,11
191:14 192:11,12
193:14 231:11
**Kathleen's** 192:22
**keep** 21:12 89:2
90:4 93:7 231:8
232:4 234:6
**keeps** 87:1
**ken** 33:7
**kept** 39:22 76:20,22
173:11 230:13
**Kevin** 13:13
**key** 45:6 48:2 57:7
**keys** 53:12
**kill** 37:8 200:12
**killed** 49:20
**Kim** 1:22 2:4 235:2
235:15
**kind** 16:9 31:17
51:7 53:3 61:3
71:8,14,20 73:4
82:3 120:3,17
125:9,22 139:13
156:17 187:2
193:11 231:14
**kiss** 142:20 143:14
**Klayman** 1:5 3:10
4:5 5:2 6:11,15,15
9:1 11:19,22
15:22 18:18 20:14
20:20 25:5 28:3,4
28:17,20 29:7,9
30:16 33:6 34:6
34:12 35:19,20
36:8 38:4,9,10,11
39:8,20 40:2 42:9
43:17,22 44:1,5
44:13,17,22 45:6
45:9,13,17,22
46:2,3,17 47:6
49:3,5,6 60:17
63:11 64:7 65:16
65:18 66:19 73:9
73:17 74:7 79:16
79:18,21 80:10,19
81:22 82:8,11,17
83:1,4,7 84:7,10
87:14,17 88:7,16
89:22 90:16 91:5

93:3,10,14 96:9
96:18 97:10 98:4
98:6,12 100:3
102:4,8 104:1,2
105:20 106:4
107:19 108:10,18
110:18,21 111:13
113:5,19,21 114:2
114:7,15 115:2,10
117:15 118:2
124:22 125:6,17
129:11,19 131:18
131:22 132:17
133:5 134:12
137:11 138:1,5,6
138:18 139:11,12
139:17 140:18,19
141:8,10,20
142:15,18,20
143:5 144:5,20
146:12,12,20
147:17,19 148:7
148:20 149:1
150:9,10 151:9,22
152:7,18 153:5,6
154:22 155:17,17
155:21 157:4,19
158:13,22 159:4
159:11,18 160:1
160:14,17 163:5
164:6 165:3,9,11
165:17,20 166:16
166:19 169:5
170:15,19 171:14
174:4 177:1,2,4
177:16 178:3,7
180:12 181:4,7
183:5 184:20
185:9,13 186:3
187:3 188:6,19
189:14 190:4
191:13 192:22
194:2,6,11,17
195:6,14 197:3
198:15 199:14
200:4 201:4 205:6
207:7 208:13,15
208:18 209:2,11
210:1 212:20,22
213:5,14,18
217:20 219:3,10
221:1,4 223:1
224:3 225:5,7,10
225:13,20 226:5
226:16 227:2,6,8
227:8,9 228:9,13

231:1 232:20
233:2,9
**Klayman's** 38:16
39:3 47:22 169:18
**knew** 48:10 122:9
131:6 175:6 201:6
**know** 9:8,22 11:4
12:9 13:1,6 14:1
14:14 15:1,6,14
15:18,22 16:6
19:16,18,21 20:9
24:10 31:2,20
32:16 33:21 34:19
35:1 36:3,8 43:6
43:15 44:14 45:16
45:17 46:11 47:8
47:11,12,14,15,16
47:21 48:5,11,18
49:22 52:7 54:6
55:8,10 60:16
63:18 65:18 66:20
68:15 75:8 80:11
84:12,13,14,16
87:21 88:2 89:3
90:9 94:17 99:14
99:14 101:5
103:15 105:4,6
113:3 125:13
135:11 148:14
150:5 153:4
155:10 157:9
158:4 166:11
169:2 178:13
187:1,21 188:18
190:19 191:8
196:10,21,21
201:12,19 202:21
204:18 206:10
208:21 209:10
211:8 213:10,11
216:13 219:2
221:13 224:18
225:3,22 226:4
227:7,10 229:15
231:2,21 232:5,10
**knowing** 21:15
**knowledge** 61:3
**knowledgeable**
21:16
**known** 40:1 43:17
**knows** 19:21 55:7
56:17 81:17 91:17
97:14
**Kollar-Kotelly** 40:9
**Kotelly** 58:5 59:6
59:16 61:6,13,14

**Kurds** 54:7

————————
**L**
————————
**LA** 58:14 81:18
84:2 91:15,15
106:10,12 108:12
109:5
**lack** 166:16,17
208:16
**lacks** 140:19 208:19
209:2
**ladies'** 122:16,17,19
122:20
**lady** 112:22 113:1
124:5,5,10
**laid** 149:7
**language** 119:19,22
120:3 121:3,8
149:14
**languishes** 64:16
**lapse** 62:5
**large** 17:5 37:10
**larger** 225:9,14
**Larkin** 2:13 5:16,16
220:12
**Larry** 1:5 3:10 5:2
6:15 35:18 42:9
48:8 50:18 59:4
63:11 66:19
141:20 144:4
157:4 159:11
160:13 183:21
184:20 185:9
194:17 195:6
227:8
**last-minute** 32:11
**late** 8:10 21:3
201:12 216:20
**latitude** 16:17
**law** 3:4 43:16,18
56:19 63:10,11
65:3 88:4 232:11
232:16
**lawsuit** 49:17
157:17 159:4
172:4,4 231:9
**lawsuits** 147:9
153:9 170:16
**lawyer** 12:6 15:14
53:7 62:21 66:21
79:14 82:17 152:3
152:5,6,8 232:4
**lawyer-like** 223:5
**lawyers** 233:9
**laying** 85:13 206:5
**Leader** 66:1

**leaders** 49:19
**leading** 76:8,9
82:11,12 85:11
106:4 107:13,14
117:19 147:21
148:1 205:19
**leap** 41:6,9
**learn** 14:4
**learned** 13:18,18
31:2,5 33:17 50:7
56:16 166:6
**learning** 135:15
**leave** 7:8 18:4 33:8
33:9 34:11 41:10
54:1 90:13 123:5
167:21 203:14
205:3
**leaving** 29:4 50:11
**lecture** 119:8
**led** 234:1
**left** 45:10 50:10
69:19 70:13
120:20 123:9
139:12,13,14
186:18 202:22
218:5
**legal** 15:2 30:4,5
40:12 55:12 61:3
77:20 87:21 88:3
88:4,6 145:9
162:10 190:20
210:1 219:5
**legs** 8:5
**length** 16:16 29:13
29:21
**let's** 67:7 100:20
104:4 110:5
111:10 133:2
137:14 143:19
185:15 206:7,12
212:15
**letter** 19:10 23:8
60:13 85:17 86:5
86:12,22 116:22
130:9,18,21 131:4
131:8,9,12,12,16
132:9,10,11 137:7
137:18 138:12
140:16,21 141:6
141:22 142:3
144:3 145:22
146:19 147:4
148:12 150:13
156:8,12 157:15
157:21,22 158:1,6
158:7 159:21,22

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 253 of 771   PageID 985
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  247

160:8 161:4,18
 162:1,18 163:4,10
 170:15
**letters** 88:2 131:11
 138:9 162:15
**level** 39:15 43:20
 70:6
**Libertarian** 56:5
**liberty** 20:1
**life** 51:2 90:7,10,12
 90:15 93:5 119:1
 119:15 126:9
 165:16,18 184:17
 186:15 188:5
 196:5 198:13
 200:2,19 201:15
**light** 23:2 122:9,10
 168:5 213:6
 217:21
**lightening** 212:13
**likes** 75:13
**limited** 153:22
**Lincoln** 138:11
**line** 51:7 59:19
 187:20 196:12
**lines** 119:10 137:2
 163:18 181:20,22
 189:1,9,19 191:1
 202:18
**link** 96:16,19 98:10
**linkage** 178:8
**list** 14:8
**listed** 13:12 41:6
**listen** 91:16
**listening** 65:7 92:3
**lists** 22:5,6
**litigants** 52:8
**litigate** 54:19
**litigation** 37:11
 52:19,21 54:20
 57:19 135:4
**litigation's** 52:21
**little** 7:10,14 8:11
 11:8 18:6 37:5,18
 44:14 50:9 116:18
 143:13 150:20
 197:15 204:22
 206:1 223:10
 226:6,9
**live** 47:8 55:9 69:13
 69:17,19,21 70:20
 200:13
**lived** 70:21
**lives** 9:4
**living** 105:13 107:5
 107:20 223:14

**lobby** 57:15
**loggerheads** 31:11
**logical** 52:3
**logistical** 222:21
**logistics** 223:11
**Lollie** 183:22
**long** 16:15 29:16
 36:9 69:17,21
 72:5 125:4 201:1
**longer** 58:3 147:17
 148:7 157:6
 160:14 161:5
**look** 21:21 28:10,13
 28:14 42:16 46:15
 54:10 56:15 61:1
 84:18 85:7 90:8
 100:17 103:18
 109:18 112:1,8
 117:7 119:19
 120:3 122:2
 128:16 130:20
 131:1 141:17
 144:2 147:3
 148:11 151:14
 154:19 157:21
 158:17 161:11
 171:6 176:7,15
 180:7 187:11,17
 190:15,22 193:22
 194:9 197:12
 205:11 207:2
 209:5 210:7
 221:11 227:10
 228:11 232:1
**looked** 50:2 100:16
 101:10 193:16
**looking** 7:12 12:18
 14:19,21 27:6
 35:20 116:9
 139:21 145:21
 156:16 176:10,19
 192:7,21 195:12
 197:22 198:9
 205:10
**looks** 143:7
**loose** 206:2,11
**Los** 51:13,16,22
 53:22 54:1,15
 59:3 62:12 69:14
 70:22 71:11,12
 72:6,7 81:21
 83:18 105:16
 106:18 110:19
**lose** 77:17,19
 134:20
**losing** 174:1 175:6

**lost** 21:8,9 29:22
 79:2 174:17
 231:18
**lot** 21:7,8 31:1
 42:12,21 47:1,10
 49:10 55:3 93:11
 166:3 178:17
 185:7 200:17
**loud** 205:20 214:9
**love** 119:1,2 121:19
 138:2 148:21
 173:2 185:19
**loved** 118:22,22
 119:2
**loves** 118:21 119:3
**low** 14:22
**lunch** 8:10 140:4
 163:20 192:3
 231:4
**luncheon** 164:9
**Luxe** 122:13 184:19

_____

**M**

**M** 1:22 2:4 235:2
 235:15
**ma'am** 187:18
**mad** 183:19 187:5
**Madam** 140:1
**mail** 85:9,17 99:18
 158:8,10 162:14
**mailed** 86:12
 158:10,11
**main** 147:11
**maintained** 23:13
**major** 70:11
**makers** 55:12
**making** 44:10 95:15
 121:3 124:7
 135:19 144:8
 151:8 184:18
**malicious** 31:14
**malpractice** 62:5
 231:10
**man** 119:2 139:2
 226:19 231:5
**management** 91:9
 104:9
**manifested** 39:22
**manner** 203:9
**Manuchehr** 49:18
**march** 95:9 105:3
**Mark** 187:18
 188:19
**marked** 84:19
 109:19 112:2,7
 128:17 176:16

**married** 226:18
**marry** 186:22
**martial** 42:22
**Mary** 2:13 5:16
**match** 77:5
**material** 19:22 22:3
 28:8 42:15 96:21
**matter** 1:4 5:2,4 8:6
 11:14 13:10,18
 18:10 29:18 33:20
 37:1 40:8 44:9
 48:22 64:2 77:21
 82:17 87:15 140:4
 172:21 201:17
 203:1
**matters** 6:21,22
 8:18,19,22 9:14
 33:19 43:19 56:18
 165:10,12 171:15
 182:17
**McCain** 57:16
 189:2,10,15
**mean** 14:13 15:22
 27:20 31:21 33:17
 35:10 45:8,11
 46:7,9 51:18
 75:18,20,22 78:6
 87:21 90:19 91:19
 101:5 108:10
 134:16 135:8
 137:19 167:5
 170:21 172:21
 175:4 180:5
 181:20 182:9,18
 184:16 212:22
 215:10 219:11
 221:8 225:3 227:8
 229:9
**meaning** 59:9
 119:11
**means** 47:10
**meant** 148:19
 149:16 153:19,21
 196:2,16
**measure** 153:18
**media** 46:7,7,12
**medication** 125:20
 125:22 199:21
 201:9 206:18,20
**medicine** 125:9
**medium** 195:17
 207:12
**meet** 6:14 32:18
 63:20 73:17 78:7
 113:6,7 120:12
 152:22 153:3

174:8,9
**meeting** 33:15 78:8
 78:17 138:11
 139:7,12,13,16
 140:17 141:7
 150:17 189:1,10
 189:15
**meetings** 52:16
 104:6 184:21
**Meghan** 167:11
**Mehdi** 153:11
**melded** 12:20
**member** 2:14,16
 24:12 43:3
**members** 5:14,14
 25:16 36:14 42:5
 49:6 93:18 151:10
 205:2
**memories** 29:22
 191:21
**memory** 103:11
 182:6 203:5
**men** 224:14 226:20
**mental** 185:14
**mentally** 115:13
 174:5
**mention** 45:2 117:8
**mentioned** 10:19
 65:14 79:7 100:6
 206:17 234:7
**merely** 204:4,8
**merits** 32:16
**message** 184:2
**messaged** 127:13,13
**messages** 101:13
 127:16 163:14
 176:20,22 177:12
 177:15,19 178:2,3
 178:9,10 179:6,12
 179:20,22 180:20
 181:2 183:6,7,10
**messaging** 174:7
 184:5
**met** 6:14 9:3,19
 33:14 34:2,3
 49:13 73:8 74:7
 75:4 113:4 126:17
 146:11,14 152:21
 155:1,7
**Miami** 31:12
**Michael** 2:15 5:17
**microphone** 176:10
**microphones** 68:10
**middle** 156:18
**mildly** 228:22
**military** 42:18

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 254 of 771   PageID 986
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  248

**million** 52:1
**mind** 84:17 149:3
    153:15,16 154:5,7
    154:8,9,12 160:10
    196:9 200:21
    231:8 234:6
**mine** 12:12 53:7
**minute** 20:16 22:1
    24:19 67:15 92:6
    93:13 171:6 195:1
    228:20 229:6
**minutes** 8:5,6 67:8
    110:4,5 152:16
    175:14 206:1,8
    217:12 223:4
**misinterpreted**
    15:20
**missed** 107:7
**mistaken** 197:16
**mistakes** 182:21
**mistreat** 52:14
**Mm-hmm** 97:20
    105:8 130:6
    179:11 212:2
**Mohammadi** 49:18
**mom** 123:15 186:17
**moment** 6:22 93:16
    113:12 129:1
    202:1
**Monday** 18:3
    145:13 195:21
**money** 50:19 53:1
    53:10,11,17 84:3
    109:12 110:22
    111:12,14,19,20
    178:17
**monies** 110:17
**month** 109:10,12
**months** 77:9 105:7
    115:15 126:7,19
    126:21 128:1
    148:20
**morning** 5:17 6:8
    8:2,9 18:20 21:20
    29:3,12 36:14
    42:4,6 67:2,12,13
    69:8,9 140:2
    165:15 189:2,11
    214:15 215:15,17
    216:8 217:21
    224:4 234:4
**motion** 15:10 17:17
    17:21,22 18:1,2
    22:3,11 204:1
    224:9 229:19
**motions** 203:8,9

**motivation** 63:19
**motives** 40:10
**mouth** 107:15
**move** 53:21 62:6
    70:14 78:13 94:20
    105:19,21 106:3
    106:18 144:9,11
    148:2 191:17
**moved** 59:15 71:1,2
    71:11 72:8,13
    78:14 83:18,18
    105:15,21,22
    106:1 107:4
    108:19 109:5
    144:6
**movement** 49:16,19
**movie** 81:10 124:17
**movies** 81:1
**moving** 53:13 54:19
    84:1 203:14
    229:21 232:8
**muggy** 7:14
**murdering** 49:17
**Muslim** 188:4
**mutually** 10:8

___

**N**

N 4:1 5:1 165:1,1,1
**name** 6:9 33:4 42:7
    56:10 67:16 79:6
    82:2,4 93:2
    100:16 101:12
    114:16 146:4,7
    147:9 152:8,10
    153:10 157:5
    159:1 191:5
    192:11,12,14,14
    192:22
**named** 53:7 135:16
**names** 45:22 62:21
**naming** 167:4
**narrative** 37:18
**nasal** 165:14
**National** 43:5,7,9
**natural** 25:20
**near** 229:12
**nearly** 32:4 231:5
**necessarily** 94:18
    211:9
**necessary** 37:14
**need** 7:8 9:15,18
    10:4 11:12 12:13
    14:17 19:19 22:17
    24:7,13,15 25:21
    42:16 64:5 67:18
    68:8 112:16 148:4

206:11 209:20
    213:8 215:12
    216:19 219:6
    220:2 228:18
    230:18 231:7
**needed** 14:22 89:3
    133:9
**needs** 9:20 16:7
    22:17 58:8 59:20
    111:9 216:4
    217:14,15
**negative** 51:18
**negotiate** 53:21
**negotiated** 34:17
**negotiations** 34:15
    152:4
**neither** 235:7
**nerve-racking**
    184:22
**nervous** 54:2
**Net** 40:2
**network** 51:12
    59:15 65:21
    157:11 188:14,17
**never** 22:11 33:19
    34:2 39:13 45:10
    47:21 52:22 53:15
    53:17 61:19 90:13
    118:22 138:20
    224:10 231:8
    232:2
**new** 25:6 32:20
    120:13 168:6
    198:22 201:7
**news** 46:9 51:12
    54:5 59:14 65:21
    72:4 157:11 227:5
**newscaster** 48:20
    50:7 54:13 55:8
**nice** 6:14 36:6
**night** 116:6 216:20
**nightly** 46:9
**nights** 199:16
**nine** 188:22 189:9
    209:14,19 217:15
**no-brainer** 91:11
**nobody's** 58:21
**nonresponsive**
    123:18
**nonstop** 118:16
    121:22 184:5,6,6
**noodling** 11:8 206:6
**noon** 8:13
**norm** 46:8
**norms** 28:6 135:4
**Notary** 2:5 235:1

235:16
**note** 166:15 211:5
**noted** 6:18 217:10
**notes** 146:9 191:21
    192:6,7,10,15,19
    193:3,8,9,11
**notice** 7:15 22:12
    62:7 117:14 224:8
    224:8
**noticed** 34:21
**notify** 34:4 223:7
**notifying** 196:14
**notion** 214:9
**notwithstanding**
    39:7 203:15
**November** 74:4
    85:4,18 163:11
    170:21 171:8
**number** 50:13,14
    66:15 84:20 85:1
    85:2 99:4 109:19
    110:12 112:2
    113:13 128:17
    129:4 130:20
    131:17 135:10
    136:8,14 139:21
    140:14 141:18
    143:22 144:3,6
    145:21 147:21,22
    151:15,17 154:19
    156:7 158:18
    161:12,15 176:7
    176:11 181:8
    197:13 209:17
**numbers** 19:14
**NW** 2:2

___

**O**

O 5:1 165:1,1,1
**o'clock** 7:2 8:10
    163:20 166:1
**O'Connell** 14:9
    216:7 217:1
**O'Connor** 13:13,21
**oath** 6:3 170:3
**Obama** 63:16
**object** 22:18 23:21
    76:7 85:12 96:4
    111:2 124:4
    126:13 128:6
    131:18 177:17
**objection** 82:11
    93:10 106:4
    107:12 108:4
    111:5 117:18,21
    132:17 147:19,20

149:1 150:3,10
    169:7 177:17,21
    178:22 181:7
    183:5 185:13
    187:3 188:6,8
    208:15 209:3
**objections** 39:20
**objective** 44:11
    45:8 51:9
**objectives** 39:4
**obligated** 29:19
    30:2
**obligation** 11:14
    27:8
**observation** 41:4
    94:10 136:13
    151:8 233:7
**observations** 29:12
    30:3 197:20
**observed** 96:8
**obvious** 37:16 38:6
    157:14
**obviously** 174:16
    231:11
**occasion** 160:22
    161:1 190:9,10
**occasions** 121:17
    123:12
**occurred** 54:20
**October** 116:12
    171:16 180:14
    235:20
**odds** 135:18
**Off-the-record**
    93:17
**offended** 68:14
**offer** 47:3
**offered** 54:4 228:1
    228:3
**office** 3:4 6:7 14:10
    34:8 51:12,14
    55:22 60:10 63:7
    65:20 85:3,10,17
    91:15 99:9 104:7
    106:9,10 108:12
    113:5,10,12
    114:15 116:14
    127:9 138:7
    143:11 146:13
    180:10 184:20
    189:16 191:15
**officer** 42:19 235:2
**officers** 233:11
**oh** 11:21 27:19
    103:4 120:1
    125:11 145:7

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 255 of 771   PageID 987
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 249

152:12,15 156:5
171:3 175:1
196:19 209:15
218:10,11
**ok** 6:19 8:1 11:22
32:14 43:2 68:13
68:16 80:4 82:5,7
83:11,20 88:14
98:20 100:1
101:20 102:11
103:4 105:5
112:18 113:15,17
115:1,2,2,5
116:16 122:21
123:6 126:20
128:14 130:2
131:9,14 132:12
137:11 145:18,21
151:7 152:20
153:2,7 154:13
155:6,11 156:5
159:14 160:12
163:1 166:8
171:10 181:22
189:7 190:8,12,22
191:7,11 192:10
195:15 196:19
197:5,9 202:17
206:15 208:6
210:4,12,22 211:4
212:5 216:10
218:22 220:1
221:9 226:19
**okay** 140:10 226:5
226:10
**old** 21:6 35:21
64:19 69:10
**once** 9:8 61:14
70:19 71:2 111:13
111:20 113:11
137:18 168:18
200:6,11 230:12
**one's** 8:4 46:8
226:15
**ongoing** 115:16,17
**open** 6:1 8:15 90:11
222:11 229:3
**opened** 93:1 122:10
**opening** 4:2 11:17
18:8 33:12 36:12
42:1,2 49:4 65:8
**opera** 41:21
**opinion** 48:8 232:14
233:6,12
**opponent** 204:5
**opportunity** 13:20

14:4 22:22 24:14
26:19 28:14 54:4
54:14 58:19
117:16 135:11,22
192:5 227:14
228:10 231:15
232:15
**opposed** 228:20
229:1,4 231:16
233:19
**option** 155:15,19
**oral** 203:19
**Orange** 194:7
**oranges** 136:9
**orchestrated** 35:11
**order** 10:16,19
15:10 17:19 24:21
62:8
**ordered** 143:11
165:22
**orderly** 168:14
**orders** 6:18
**ordinary** 222:3
**organized** 168:21
**originally** 69:15
191:14
**ought** 228:3
**outcome** 235:13
**outraged** 232:6
**outs** 75:1
**outside** 7:14 73:18
81:6 120:21 165:4
175:16 213:1,13
213:17,18
**overly** 181:10
**overnight** 214:14
220:4 228:11
**overruled** 85:15
106:5 108:4
111:11 124:15
128:8,11 133:4
141:2 148:9 179:1
185:17
**overturn** 49:20
**overview** 49:12

—————————————
          **P**
—————————————
**P** 5:1
**p.m** 140:6 164:9
165:2 234:8
**package** 18:20
199:10 221:15
225:9,14
**page** 4:2 85:21
112:5 116:9
144:18,19 148:12

151:19 156:16
160:13 161:12,15
162:4 177:8
183:20 189:6
190:16 191:1
197:10 209:16
211:6
**pages** 59:15 93:1,1
112:7 176:16,17
176:17
**paid** 53:13 54:18
83:18 105:21
109:4,9 110:18
111:13
**paper** 178:12 186:5
186:9 211:21
**papers** 200:6
**paragraph** 117:8
147:3 153:8
156:16
**parcel** 66:13
**Pardon** 218:6
**parked** 122:14
**parking** 120:21
**part** 12:14 17:5
20:9 32:9 55:12
56:7 60:12 66:13
71:6 83:20 101:18
112:11 127:1
134:13 201:16
225:8,11,14
**partial** 21:18
**participants** 43:21
**participate** 116:21
**participated** 94:16
**particular** 17:11
123:19 156:12
187:13
**particularly** 22:9
23:2 168:5 213:6
**parties** 2:7 10:9
214:11 221:19
235:9,12
**partner** 34:18
**parts** 162:22
**party** 27:9 134:3
212:14
**pass** 74:20
**passage** 29:21
30:11 203:15
**passed** 203:13
**passionate** 43:19
45:9 62:15
**patience** 223:21
**patient** 137:22
**patients** 126:11

127:8,8 128:4
**pattern** 198:11
**pause** 20:17 67:10
176:2
**pay** 84:2 131:6
**paycheck** 107:5,5,6
107:6,6,7,20,21
**paychecks** 108:8,16
**payment** 107:8
**payments** 45:1
**peace** 232:16
**pendency** 35:16
**pending** 29:14
58:18 132:4 147:8
153:9,17 154:7
170:16 208:17
212:9 219:18
220:18
**Pennsylvania** 21:11
49:1 60:4,6
**people** 13:19 16:22
34:7 37:4 47:7
52:1 54:12 63:7
63:16 77:3 90:8
90:12 91:9 97:6
100:14 103:14,15
103:17,18,19
120:1,12,18 121:5
122:4 153:22
154:1 172:3,5,9
174:6 187:1
189:16 200:7
208:11 219:6
233:14
**people's** 7:2 101:11
**perceive** 89:9
**perceived** 37:6
**percent** 53:2 83:9
83:13 84:4 111:15
174:16 210:11,11
210:16 225:16
**perceptions** 234:2
**perfect** 178:5
**perfectly** 6:19 7:18
8:1 16:22 93:14
171:5 219:16
**period** 15:16 18:16
24:8 51:2 62:3
98:8 103:8 180:1
192:3 230:18
**periodical** 40:1
**periods** 23:19,20
**permanent** 62:10
**permit** 94:11
**permits** 94:21
**permitted** 202:14

**Persian** 51:12 59:14
65:21 73:21 89:16
92:19 97:4 139:1
157:11 187:1
**Persians** 54:7,7
**person** 79:6,21 86:2
86:3,15 88:1,1
90:5 91:20,20,21
121:13 122:1,18
135:16 151:5
155:7 172:9 173:8
173:16,16,17,18
175:1 185:11
191:4 196:11
197:8
**personal** 38:4 48:1
50:12,16 53:5
55:19 56:22 57:2
90:7 94:15 117:16
118:3
**personal/political**
148:16 149:18
**personally** 227:18
**perspective** 45:4
149:19
**persuaded** 217:13
217:15
**pertain** 26:1
**peruses** 85:5 141:21
160:2
**Peterson** 30:21
31:21 32:4 33:6
**petitioner** 9:9 13:8
13:13
**phon** 147:12 183:22
190:17 193:16
194:1
**phone** 50:12,14
80:13,14,15,16
113:13 118:17
128:4 163:14
178:11 179:8,13
179:18 183:13,17
184:1,6 186:19,20
**phony** 100:20
**physical** 142:17
**physicians** 54:16
**pick** 167:16
**picture** 97:14
**pictures** 93:2
100:22 101:6,11
**piece** 101:16,16
178:11
**pigeons** 155:8
**pills** 126:1
**Ping-Pong** 164:1

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 256 of 771   PageID 988
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page  250

**place** 18:15 20:12
  34:5 35:16 51:5
  52:3 120:11,20
  147:15 179:8
**places** 70:21 118:14
  119:13
**plain** 149:14
**planning** 7:3
  178:19
**play** 25:20 37:18
**playing** 43:20
  184:17 196:5
  198:11
**plead** 142:11
**pleadings** 36:4 37:9
  58:8 166:7 226:3
**pleasantly** 7:13
**please** 5:15 6:5
  50:14 67:15 68:3
  73:14 77:16 92:5
  102:16 109:3
  114:11 117:11
  123:3 142:12,12
  143:19 145:22
  148:11 151:14,17
  162:7,8,12 171:11
  173:11 187:17,18
  191:2 196:1
  212:16 220:15
**plow** 206:10
**plus** 31:15 80:6
  158:9
**point** 10:8 16:2
  19:17 20:3 22:8
  25:19 29:3 30:10
  30:16 33:10 42:11
  45:6,19 53:3 67:9
  73:14 77:22 94:14
  95:11 97:22 98:13
  121:13 124:7
  133:5 141:1 142:4
  147:16 148:6
  149:7,9,10,11,20
  157:9 159:3 167:7
  173:22 174:15
  175:6 178:4
  184:10 185:5
  186:8 198:19
  199:14 210:9
  211:11 221:1
  225:3
**pointed** 25:9 64:18
**pointing** 73:15
**points** 16:2 28:4
  30:13 65:4 95:21
  147:20 185:16

212:14
**police** 123:3
**policies** 23:8
**polite** 183:19 225:5
**politely** 224:13
**political** 73:6 150:9
**political/personal**
  149:17
**politically** 55:22
**politicians** 150:16
**politics** 72:4
**pornographic** 93:2
  100:22 101:5
**Porter** 35:9
**portion** 228:2
**portions** 205:22
**position** 10:7 36:5
  77:19 79:2,3
  228:16 233:18
**positive** 55:10 98:3
**positively** 98:22
**possibilities** 154:5,6
**possibility** 7:7
  10:15 103:8
  204:21
**possible** 17:9,12
  90:3 94:4 154:8
  205:14 215:5,9
  216:18
**possibly** 50:3,5
**post** 165:13
**posted** 100:14
  195:5
**posting** 100:13
**posts** 100:7,9,12
**potential** 28:1
**potentially** 94:5
  167:14
**practice** 5:6 43:15
  43:18 55:12 63:10
  125:10 135:5
**practices** 63:11
**prayer** 62:10
**preceding** 153:7
**prefer** 226:7
**preferable** 17:16
**prejudicial** 22:17
  24:1 133:13
  204:17 215:2
  221:11
**preliminary** 6:21
  8:17,19,22 9:14
  18:10 59:7 62:9
  136:16 165:10
**preparation** 24:17
**prepare** 9:10 14:5,6

24:8 42:13 146:20
  168:10 228:18
  231:7
**prepared** 18:19
  32:16 67:4 200:22
**preparing** 135:17
**prescribed** 126:3
**presence** 223:2
**present** 2:6 3:9 6:4
  10:7 23:20 24:16
  57:10 188:9
**presentation** 29:22
  30:12 33:1
**presents** 9:9
**preserve** 58:16,20
**president** 52:10
  63:16
**presidential** 56:3
**presidents** 56:2
  63:17
**pressed** 217:13,14
**pressing** 8:5
**presumably** 20:6
**presume** 204:22
**presumptively**
  223:8
**pretrial** 28:7
**pretty** 7:1 36:19
  166:10 178:1
**prevent** 13:22
**previously** 6:13
  18:14 20:21 25:3
  29:13 36:18 163:5
**primary** 230:10
**principals** 56:5
**printout** 195:8
**prior** 130:11 163:4
**prison** 49:21
**private** 66:21 90:9
  90:11,14 93:7
**privileged** 204:3,8
**privy** 140:3
**pro** 45:2 55:1
**pro-Shah** 66:3
**probably** 10:13,18
  11:12 99:4 109:16
  130:1 131:5 160:4
  186:21 205:10
  223:17
**problem** 7:19 8:7
  32:9 67:6 78:20
  79:14 80:20
  165:18 173:14
  222:21 233:14
**problems** 7:5 59:13
  223:6 226:20

**procedure** 27:8
  28:7
**proceed** 9:7 11:5,11
  24:7 56:12 61:15
  62:2 67:7 88:17
  90:17 137:1
  165:21 175:12
  206:5
**proceeded** 48:12
**proceeding** 5:20 6:2
  23:10,15 27:1
  35:3,16 39:4
  42:10 63:9 67:21
  88:8 229:11
**proceedings** 5:22
  10:21 19:3 44:4
  235:4,7
**process** 13:10 15:12
  40:17 150:2 229:8
  229:13
**prod** 46:12
**produce** 229:18
**produced** 133:11
  133:19 135:1,2
  214:4
**producer** 72:22
  74:19,22 77:14
  78:1 79:20 88:22
  89:1
**production** 27:5
**professional** 1:2 2:1
  40:4 63:12 117:15
  166:14 172:16
  173:12 230:1
**Professor** 13:6
  64:17 232:14
**proffer** 204:6
**proffered** 225:12
**program** 77:3,4
  78:13,14
**programs** 46:10
  72:2,2 73:1
**prohibit** 17:5 40:18
**prominent** 57:9
**promise** 216:22
**promoting** 43:20
**promptly** 48:22
**pronunciation**
  191:9
**proof** 193:4
**proper** 16:14 24:16
  76:10 135:7 136:3
**properly** 57:13
  95:22 103:7
  135:20 228:7
**proposal** 106:11

214:9
**propose** 9:15
**proposed** 53:2
**proposing** 210:4
**prosecuted** 37:3
**prosecution** 37:19
  40:11
**protect** 62:6 110:15
**protection** 15:12
  229:8
**protested** 66:18
**protesting** 50:2
**prove** 57:13
**provide** 32:21
  162:10,12 193:4
  211:14,15,18
**provided** 13:8
  16:17 17:10 20:22
  22:6,7,7,20 44:17
  45:1,13,22 214:5
  224:6 230:4
**provider** 211:13
**provides** 60:17
**prowess** 40:5
**psychologically**
  173:21
**psychologist** 38:16
  54:17 125:12
  137:22
**psychologists** 59:11
**Psychology** 70:12
**public** 2:5,14 6:1
  31:4,18,18 33:19
  56:4 66:20 92:18
  92:22 100:17
  119:21 233:12,22
  235:1,16
**publication** 100:4
**publications** 40:1
**publicity** 13:15
  55:7,9,10 57:11
  96:2 102:5,9,11
  102:18 103:3
  167:3
**publicizing** 91:5
**published** 14:11
  96:10 97:5,6,11
  98:7
**pulled** 221:10
  225:15
**pulling** 167:5 229:5
  230:13
**punches** 230:14
**punitive** 31:15,16
**purely** 29:18
**purport** 179:22

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 257 of 771   PageID 989
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 251

**purported** 181:8
183:6
**purports** 144:20
**purpose** 30:18
55:16 64:20 80:18
125:5 138:17
**purposes** 60:19
149:12 170:14
222:7
**pursuant** 5:5
**pursue** 46:8 48:19
87:17 117:16
118:3
**pursuing** 147:14
148:22
**pursuit** 38:14,15
**push** 216:14
**pushed** 143:18
**put** 18:20 22:12
53:16,22 58:13
61:13 62:11 101:8
104:12 119:10
134:19 143:10
151:1 158:10
165:3 167:9,9,10
169:3 174:19
178:11 187:5
191:14 193:12
199:22 200:13,20
210:10 220:5
222:8,14,15 224:7
227:16 228:22
**puts** 12:17 185:13
**putting** 6:21 20:2
61:6 107:15
115:14 174:22
196:4 198:13

**Q**

**quandary** 232:3
**quantity** 19:22
**question** 27:9 30:4
33:3 40:16 59:5
76:8,10,11 84:9
85:11 86:7 88:11
92:8,14 93:14,22
94:3 99:17,18
103:12 106:7
107:13,14,16
108:5,6 110:13,16
110:20 111:3,8
117:19 123:19
124:1 128:20
129:7 132:4 137:5
141:3,6 144:15
147:21 148:1,2,4

151:16 159:9
162:19 163:2
171:11 178:18
179:22 181:9,13
181:18 182:8
198:6 202:1
204:13 208:17
219:18 220:4
**questions** 30:5
40:22 41:3 89:20
102:3 103:6
163:17 168:2
198:1 201:21
212:8 217:5
**quick** 167:9 221:8
224:5
**quiet** 39:22 90:2
121:11,12
**quietly** 37:3 88:20
90:18
**quit** 183:16
**quite** 46:18 103:7
**quo** 58:16,20

**R**

**R** 5:1 165:1
**rabbit** 167:5
**radio** 188:2,3
**raise** 11:19 32:15
33:10 68:15
**raised** 26:7
**raises** 93:14
**ran** 50:11 122:10
122:11,12,13,16
**rank** 13:17
**ranked** 52:13
**rape** 89:17,18
**raped** 89:13,13,14
**rate** 150:5
**reach** 67:8
**reached** 26:4 65:1
198:18 232:21
**react** 92:19
**reaction** 97:9,12,17
97:19 142:2,4,10
230:8
**reactions** 136:21
215:12
**read** 36:3,16 86:13
117:4,11 124:12
147:6 148:13
157:1 161:22
162:6 184:1
218:14,18 219:6,9
219:9,12,15
**reads** 117:12

156:10
**ready** 201:22
**reality** 228:19
**realize** 64:22
**realized** 53:5 62:17
77:11
**really** 8:7 45:11
46:22 47:10 48:16
54:22 64:8,11
77:11 84:13
101:12,14,14
167:18 205:21
228:16
**reason** 8:4,16 10:6
31:7 37:16 75:22
92:17 119:17
172:12 195:8
219:2 233:9
**reasonable** 10:1
16:4,16 24:8
217:7
**reasonably** 135:12
**reasons** 23:13 29:17
93:6 151:8
**reassured** 228:6
**rebuttal** 30:14
**recall** 34:3 79:17
99:8 118:6 130:15
131:3 133:6 134:4
140:16 146:5
159:20 160:20
161:5 179:14
182:15 192:7,11
193:14 194:19
214:4
**receive** 17:16 19:2
44:22 129:18
205:3 207:12
208:2
**received** 18:12 19:6
19:10 20:8 139:10
194:19 195:18
202:5 221:22
**receiving** 17:20
129:5 207:21
**receptionist** 122:18
**recess** 110:5,7
164:10 212:15
213:20 215:22
218:8 234:9
**reciprocated** 38:2
**recognize** 73:11
182:19
**recollection** 33:15
180:17 182:17
197:2

**recommendation**
204:1,20
**recommendations**
30:6
**recommended**
45:21 53:4,6
**reconsideration**
59:16
**reconvened** 9:16
10:8
**record** 33:19,21
45:4 61:21 85:3
89:2 110:15 112:5
130:8,21 133:6
141:18 144:3
149:16 156:7
157:1 158:4 162:1
162:7 163:11
165:4,7 194:16
195:3 197:15
198:1 203:21
204:6,12,20 205:1
205:4,8 211:5
213:22 214:17
231:8 234:5 235:7
**recount** 114:1,5
**recover** 199:17
**recovery** 210:7
**recruit** 38:16
**red** 122:9,10
**reduced** 45:5 235:5
**refer** 140:13 145:8
170:12
**reference** 39:21
141:1 144:8
190:16
**referred** 95:1 97:18
211:20 225:8
**referring** 17:11
87:4 96:21 124:8
143:22 145:5
159:2,12,16
160:15
**refers** 203:9
**reflect** 18:15 179:20
181:3
**reflected** 117:5
**reflecting** 84:7
**refresh** 180:17
**refusal** 38:20
**refute** 134:21
**refuted** 134:18
**regard** 13:15 15:9
16:18 22:12 30:3
32:10 34:21 55:20
56:12 62:8 95:6

178:8
**regarding** 76:1
80:12 84:15 87:11
87:12 89:11 90:7
91:3 113:5 150:17
222:18
**regime** 49:17,20
50:3 66:6
**regrettable** 49:11
**regrettably** 13:6
**regroup** 13:3
**regular** 158:8
**regulators** 44:1
**reimbursed** 110:22
**rejoined** 169:21
**related** 235:8
**relates** 92:13
**relating** 96:22
**relationship** 12:2
31:1 38:5,21
39:12,15 50:15
54:21 84:8 115:11
115:15 117:15,16
118:3 174:20
187:2,2
**relationships** 38:12
**relative** 235:10
**relatively** 49:8
**relaxed** 133:1 134:8
134:16 135:8
**relevance** 41:5 94:5
136:18
**relevant** 19:3 220:7
221:17 227:11,13
**relief** 62:10
**religious** 47:15
**relive** 200:18
**rely** 26:20
**remain** 67:14 170:3
**remarks** 139:10
**remember** 73:20
74:3,11 75:19
80:9,11 81:17
82:2,4 84:15,17
86:4,8,9 98:15
99:15,21,22
109:15,17 114:16
116:3,4,5 126:21
129:3,5,11 137:19
138:8,10 141:15
141:22 145:14,17
146:6,7 152:16,17
154:10,11 155:11
155:14,20 158:14
159:17 160:3
168:22 179:9,17

189:17 193:6,9
229:2,10
**remembers** 114:6
**reminded** 160:7
170:2 178:20
**reminds** 212:13
**remote** 15:9 17:14
**remotely** 134:1
**remove** 78:10 227:9
**removed** 59:1 93:21
95:4 221:15 227:6
227:8
**renamed** 184:19
**rendered** 162:13
**rent** 107:8 109:7,8
111:1
**rented** 53:12 54:18
**repeat** 171:11
**repeated** 148:5
**repeating** 128:9
**repetitive** 42:12
**report** 30:2,15
54:12 203:22
205:10
**reported** 1:21 43:9
**reporter** 2:5 5:10
5:12 72:20 124:12
148:6
**reporters** 75:1
**reporting** 124:5
**represent** 15:1
36:22 46:4 81:19
87:1,6,8,9,15
160:18 172:19,20
173:1,4 187:6,7,7
187:8 196:19
226:7
**representation**
14:12 37:22 38:3
39:6,8,18 45:2,9
46:4 83:15,21
84:11 87:14
145:10 162:21
163:6 195:2 210:1
213:7 221:13
**representations**
33:2 44:18
**representative** 52:9
**Representatives**
191:15
**represented** 44:3
59:12 65:19 221:6
**representing** 48:9
49:14 55:1 81:15
83:2 124:22 157:6
157:19 160:14

161:5 163:15
**represents** 44:7
**reprints** 177:19
**reputation** 230:7
**request** 13:20
169:18
**requested** 133:6,15
135:12
**requesting** 79:22
**required** 30:2
169:22 204:19
**requirements**
214:12
**rescue** 174:4
**rescued** 199:14
**researched** 56:13
**reserve** 224:3
**reside** 69:12
**resolve** 78:5
**resolved** 26:16
108:14 143:3
**respect** 12:11 16:2
16:19 17:1,14
19:5 24:10,11
26:14 27:4 28:6
32:19 83:15 92:7
94:10 95:2 110:17
118:18 131:16
192:19 197:21
199:6 206:3 230:6
**respected** 44:1
**respectfully** 10:4
168:5
**respecting** 118:18
**respective** 2:7
**respond** 19:16
20:14 60:17 90:16
134:13 183:14
**responded** 60:5
**Respondent** 1:6 3:2
3:11 5:21 6:12,16
12:6 15:17 19:1
19:11,15,21 20:5
33:16 36:22 37:7
38:1 39:12 41:16
42:2,9 46:22 49:4
134:19 135:10
221:20 228:15
230:13,15 232:3
**Respondent's** 8:21
14:11 18:21 19:12
20:19 29:11 30:8
41:22 204:15
214:6 217:8,19
220:22 221:9
230:10,11

**response** 149:3
226:11
**responsibility** 1:2
2:2 57:2 63:12
**rest** 16:13 206:3
215:22 232:16
**restaurant** 174:10
**result** 48:4 217:4
228:8
**resume** 110:9
163:21 164:1,7
169:16
**resumed** 165:2
**resumes** 169:19
**resuming** 170:7
223:18
**resurrected** 23:12
60:19
**retained** 14:18
36:22
**retaliated** 78:17
**retaliating** 147:14
**retired** 43:4,14
58:12
**return** 163:21
164:1 213:22
223:8
**returns** 176:3
**revenge** 200:3
**review** 58:9 181:15
182:1 192:19
193:8 232:15
**reviewed** 182:6,11
182:14
**revisit** 16:21
**revive** 64:19
**rich** 186:22 187:1
**right** 7:13,18 16:22
24:18,19 25:7
41:6,9,18 42:20
48:6 65:10,17
73:15 79:11 80:2
82:10 95:10,19
114:16,20 121:11
127:20 136:3
140:22 155:3
168:15 171:16
178:5,18 191:8
205:19 206:10,20
210:21 212:1
213:11 217:19
218:7,11 219:19
220:20 229:22
**right-hand** 211:6
**rights** 61:12,14
62:4 73:6,7,7

231:3 233:20
**ripened** 61:8
**risk** 174:16,17
**road** 133:3 215:21
**Rober** 193:16
**rodeo** 233:11
**Rohrabacher** 194:6
194:7
**roles** 15:19
**roller** 115:13
123:12 172:18
173:19,20 187:6
196:3
**romantic** 12:2 38:1
45:15 142:14
**room** 7:16 27:22
30:21
**Roper** 194:1
**Rotunda** 13:7 64:17
**Rotunda's** 232:14
**roughly** 212:12
**rubric** 203:12
**rude** 219:12
**rug** 199:22 229:5
**ruined** 103:11
109:6
**rule** 5:5 6:1 11:13
11:15 17:8,11,12
17:12,13 25:7,9
26:17,20 27:7
30:1 94:11,21
95:1 178:1 203:7
203:7,18 205:9
214:12 222:11
227:20,21
**rules** 17:4,5,7,8
24:20 26:17 27:17
40:18 133:1 134:8
134:16 135:8
136:10,11
**ruling** 212:9 220:18
**run** 65:22 185:6
**running** 173:4
**rush** 166:2

─────────────
**S**
─────────────
**S** 5:1 165:1,1,1
**S-h-e-a** 152:14
**S-t-** 192:16
**sake** 52:21
**sanction** 27:10
**sandbagged** 136:1
**sat** 60:9 120:14,15
120:15
**Sataki** 4:8 9:8 12:18
14:13 18:13 20:5

23:5 32:2 36:21
37:20 38:5,6,7,13
38:17,22 39:9,12
39:17 40:8 45:1,7
45:19 46:13 47:19
48:11,13 49:13
50:7 51:16 52:16
52:20 57:18 58:2
58:22 60:10 61:10
61:22 62:14 63:21
64:13 66:9 67:11
67:17 69:2,8,10
90:8 94:15 105:10
110:13 121:6
134:3,9 135:14
136:20 137:5
139:17 141:20
144:4 150:21
156:9 166:12
168:3,11 169:9,19
169:20,22 170:12
176:3,18 179:3
181:15 187:10
194:17 195:12
197:17,20 203:3
206:17 212:9
216:12 223:3
226:1
**Sataki's** 37:13 40:3
62:8 66:1 136:21
**satisfactory** 213:21
**satisfied** 167:2
**Saturday** 21:20
29:3 141:19
144:21 167:17
216:19
**saw** 57:11 60:1
75:12,12 95:5
96:12,15,21
101:11 122:15
127:10,22 131:4
140:20 167:17
222:9 227:10
**saying** 35:21 36:2
44:15 52:6 59:2
63:5 65:5 76:22
89:10 94:1,17
101:15 114:6
115:16 124:6
145:6 150:14
174:6,21 178:1
219:6 225:6,7
226:15 227:3
230:13
**says** 13:15 14:8
35:18 52:14 60:2

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 259 of 771   PageID 991
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 253

87:1 137:22
144:22 157:16,21
183:21 189:4,10
197:7 210:9
scapegoat 58:2
scared 101:4,6,9
122:6
scary 101:19
scene 121:4
schedule 15:6 234:7
schedules 7:12
scheduling 140:4
218:3
school 70:3,5 71:2,4
schooling 70:6
screamed 142:12
seated 68:3
second 75:19,20
85:20 112:4
148:12 149:9,11
154:3
secondary 174:3
secretary 18:19
55:18 114:17
220:11
see 13:21 17:2
19:19 26:7,10
28:17 44:8,17,20
46:10,16 47:18
48:12,19 58:7
59:18 74:1 80:8
96:8,11 98:5,8
100:9 111:11
114:9 121:4,6
126:11 127:8,8,12
130:14 133:3
143:3 144:19
160:6 166:9
173:13 182:20
183:21 185:15
186:8 188:21
189:3,18,21
190:16 195:4,5,6
195:7,9 199:12
200:7 208:3
210:18 217:16
224:15
seeing 97:9,17
125:3 189:19
seek 31:8 45:21
77:20
seeking 48:5
seen 28:19 36:17
37:9 47:4 98:13
130:11 204:10
205:4

sees 33:16 128:3
selected 20:2
221:16
selective 133:10
self-serving 47:2,13
sell 40:6
Senator 57:16,17
189:1,10,15
senators 57:15
send 82:1,1 98:10
157:15 158:1,12
162:18 163:10
196:9 208:9
sending 88:2
163:13 196:14
199:10
sends 75:1
sense 14:16 214:16
214:18
sensible 110:5
219:16
sent 21:3,19 29:2
60:14 61:17,18
81:22 82:22 86:5
96:16,18 99:9
138:12 158:4,6,7
159:22 162:15
178:9 183:10
195:13,15,17,20
196:21 198:14
199:11 210:17,20
210:21 211:1,16
sentence 86:22
148:12 149:15
154:3,15 156:17
161:22 162:6,22
210:8 218:15
sentences 123:21
separated 79:1
serious 133:21
seriously 27:12
82:20
service 162:11,13
services 162:9
163:12
serving 6:16 12:6
session 10:20 11:2
128:1 138:5,14,17
139:14 185:2
sessions 125:14,15
set 20:20 125:6
136:12 149:14
168:4,16 174:14
187:15
settle 46:12 52:18
57:19 87:20

settled 70:22
settlement 55:5
57:3
seven 188:22 189:9
201:15
severance 34:14,17
34:22
sexual 37:5 38:17
44:18 61:9 76:15
76:18 88:18 89:5
89:11,16 91:20
103:16 108:13
119:20 120:2
125:7,16 143:4
147:10 153:10,16
154:4 231:9
sexually 50:20
151:5
Shah 66:2,11
Shamble 52:10,15
55:6 57:7,12,17
59:11 61:10 62:1
79:8,9 83:1
104:14,16 152:7,8
152:19 153:5
166:8
share 25:5 26:22
137:9 198:9
Shea 53:7 145:9,12
145:16 152:9,11
152:12,14,21
153:5 155:2,7,8
155:18 156:1
Shea/Klayman
155:13
shipped 167:11
shooting 8:10
short 108:11 109:21
217:2
shot 58:14
shotgun 37:8
show 23:4 38:13
39:9,14 40:14,21
50:22 57:6 62:4
65:13 174:13
183:9 184:3,4
198:2,10
showed 20:12
130:18 131:8,9
showing 61:16
140:20
shown 35:8,9 48:14
shows 32:4
shrinking 16:6
shuffled 167:18
shut 93:3

sick 126:10 128:3
183:22
sicker 127:7
side 28:10 81:9
150:21,22 228:2,3
sidebar 227:19
sign 186:5,8
signature 112:4
signed 35:7
simple 107:16
simply 7:7 37:3
215:6
simultaneous 60:3
sir 25:4 43:2 170:4
197:4 223:16,19
sit 229:15
sites 97:4
sitting 16:5 30:20
73:15 78:9 120:16
156:17
situated 52:3
situation 65:10 66:8
78:5 80:2 103:9
134:20 196:11
228:7 233:17
situations 214:22
215:11
six 72:7 105:7
188:22 189:9
slamming 173:3
sleep 175:2
sleeping 126:1
183:15
slept 199:15
slowness 209:21
smear 226:10
Smith 2:20 4:3 6:6
6:6 8:17,19 11:17
13:12 18:8,9 20:1
21:2 24:22 25:4
25:18 30:14 32:21
33:8,9,13 34:11
35:4 36:13,14
41:7,11,18 55:22
64:6 66:22 67:3
68:17 69:7 70:18
76:12 79:12 82:14
82:15 85:2,6,13
85:16 86:8,11
88:14,15 92:8
93:12 94:9 95:10
95:19 96:1 101:22
102:1,7,12 103:2
103:7 105:9 106:6
107:2,14,17
108:17 109:1,20

109:22 110:3,8,10
110:11 111:17
114:10 115:7
116:8 118:1
124:16 126:16
127:17 128:15,19
129:17,20 130:2,4
130:7 132:5,10,14
133:17 134:13
136:17 137:3,4,15
137:16 138:16
139:20 140:12
141:5,16 144:8,14
144:17 145:19,20
148:10 149:13,22
150:2,7 151:7,12
151:13,17,18
154:16,18 156:4,5
156:6 157:13
158:16,20 161:9
161:10,15,17
162:4,5 163:1,3
163:17 166:3,21
169:6,7,10,14
170:5,6,7,11
171:9,22 172:10
175:10,13,19
176:5,6,10,12,14
177:6,10 178:18
179:2 180:6,13,16
181:12 183:1,2,7
184:13 185:20
187:9,14,16
191:18,19 193:13
193:20,21 194:5,8
194:11,13,15
195:10,11 197:11
197:18 198:7,20
199:1,5,7,8
201:19 202:7,12
202:15,20 203:17
206:1,8,9,15,16
207:20 208:20
209:4,12,13,18
210:3 211:8 212:8
215:8 216:2,3,7
216:11,22 219:3,8
220:5,10,17,21
221:5,14,16
222:12 223:7,11
224:7,17 227:7,10
229:15 230:2
Smith's 99:9
snapper 36:7
so-called 56:15
soap 41:20

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 260 of 771   PageID 992
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 254

solemnly 67:20
solution 53:21
solve 59:3
somebody 14:22
  35:5 61:3 112:14
  173:6 195:8
  226:12
somewhat 7:4
  27:16
son 65:22
soon 50:5 173:13
  185:8 215:16,17
sorry 41:7 83:5
  111:4 130:3 136:5
  141:4 145:7
  147:19 154:16,21
  161:2,13 169:11
  171:1,7 172:1
  177:13 181:17
  182:7 193:17
  194:11,12 209:9
  209:15,18 219:11
sort 26:2
sought 12:2 54:19
soul 232:15
sounds 227:4
South 31:13
speak 7:6 8:6 16:10
  134:2 138:7 140:8
  207:19
Speaker 57:16
speaking 17:9 26:5
  74:1 94:15 182:13
specific 38:8 154:6
  154:7 181:11
specifically 160:21
Specification 9:13
  35:7 36:16
specificity 99:8
speculates 185:16
speculating 149:2
speculation 141:11
speed 9:19 10:5
  12:15 13:5,5
  21:18 24:6 29:1
  59:21 226:8
speeding 170:14
spelling 191:8
spend 44:14
spending 9:5
  123:14
spirit 18:22
spoken 33:19 126:6
Sporkin 9:18,19
  13:4,5 58:9,11,12
  59:4

spot 182:15
spring 23:17 24:18
sprung 228:20
  229:22
staff 43:7 222:22
stage 120:15,17
  125:8 126:11
stamp 99:6
stand 67:11 94:7
  110:5 150:6 164:5
  169:19 176:4
  188:15 212:15
  215:22 231:21
  234:3
standard 136:12
standing 15:15
  24:12 67:14
  228:15
stands 108:5
Stanton 231:12
start 81:9 137:14
  200:12 223:12
  225:2
started 51:3 72:3,4
  74:8 76:2 82:20
  91:2 92:3 118:12
  118:12 125:16,19
  200:17 201:2
starting 177:8
Stasio 191:12
  192:15
state 55:19 157:14
  185:14
statement 11:18
  14:8 18:8 36:12
  40:15,16 42:1,2
  49:4 65:8 104:1
  160:16
statements 4:2
  33:12 47:13 52:7
  63:8 134:10
  135:19
states 64:22 66:7
  70:15,17,19 71:3
station 188:2,3
stations 71:21
status 58:16,20
stay 68:9 122:22
  123:4 142:13
  143:1,2,19 172:15
  172:16 173:12
  186:5 212:17
  213:3,12,16,19
  232:5
stayed 79:2
steered 45:14

stenotype 235:5
step 122:19 132:3,3
  143:20 153:18
  175:16
steps 75:4
Stockholm 70:10
stone 45:11
stop 87:9 115:17
  168:18 172:3
  174:14,19 175:5,7
  175:7
stopped 46:4
  105:11 127:3
stopping 121:15
stories 72:21,22
  73:4 81:1 90:9
story 73:19,20
  74:10,14,15 75:6
  75:14 79:20 80:1
strategic 55:4 64:20
strategy 46:11
  52:17
street 2:2 122:11,12
  174:10
strength 200:8
stress 15:4
stretch 8:4
stricken 149:4
strike 88:10 93:20
  95:12,17 148:2
strong 45:17 135:19
stronger 37:5
strongly 44:5
struck 108:21
  123:19 162:20
student 49:19
students' 73:7
stuff 21:13,21 22:15
  22:16 24:7 28:12
  81:1 87:22 91:10
  91:16 97:7 105:22
  109:4 135:21
  166:9 173:10
  186:11 187:4
  201:11 228:19
  229:2,6,16
Styles 146:7
Subdivision 26:18
subject 201:17
  203:1
submission 203:12
submit 229:6
submits 229:16
submitted 36:18
  116:13 117:4
  180:11

substance 155:12
substantial 170:1
successfully 44:3
sudden 23:11
sue 56:8,9 153:22
sued 151:2 153:20
suffered 38:18
sufficiently 181:11
suggest 154:4
suggesting 164:2
suggestion 15:13
  168:17 219:17
suggestions 8:15
suggests 148:1
suing 91:22 150:19
Sujat 3:3,4 4:4 6:8
  6:9,11,17 9:2,3,10
  10:5 12:15 14:6
  14:19 21:3,17
  24:6 28:22 42:3,4
  42:7,8,20 43:2
  52:6 56:17 58:8
  59:20 62:14 65:4
  76:7 85:11 96:4
  107:12 111:2,6,8
  117:18 124:3,10
  126:13 127:15
  128:6,9 168:6,10
  224:11 226:8
  229:18
Sujat's 213:7
  228:17
summer 70:4
supervisor 63:22
  75:6
supervisors 151:6
  172:9
supplement 60:1,2
supplemental 19:14
  60:21 61:2 212:10
supplemented
  59:22
supplicant 6:22
support 47:17,21
  201:13
supported 40:13
  45:10 48:16
supporters 147:13
supportive 45:18
  46:13,19
suppose 30:13
supposed 90:20
  143:17 174:8
supposedly 196:13
Supreme 66:1
sure 11:15,21 17:18

  18:22 19:14 54:10
  60:1 66:20 117:5
  145:5 150:4 195:2
  204:9 216:8 221:3
  227:22 230:8
surfaced 214:10
surprise 13:22 22:4
  28:5 135:3
surprised 19:2 78:6
surprising 78:6
survive 107:9,18
  199:19 200:1
Susan 147:12
sustain 117:21
sustained 126:15
Sutherland 34:16
  34:16
swear 5:10 67:18
  67:20
Sweden 51:20
  66:12 69:20,21
  70:1,2,7,13 186:1
  186:10
Swedish 51:20
sweet 217:2
swirling 32:17
sworn 5:12 69:4
  226:17
sympathetic 233:15
sympathized 51:2
system 2:19 27:17
  27:18 148:17

---

**T**

T 165:1
table 6:5 8:1 16:5
  120:14
tables 164:2
tactic 32:6
tails 134:20
take 8:2,8 17:3 24:4
  27:12 28:9 30:14
  37:4 42:16 46:15
  67:2 91:11,12
  101:21 109:21
  111:16,20 118:14
  119:18 132:2
  135:22 145:1,9
  147:3 151:14
  154:19 157:21
  158:17 161:11
  163:20 168:11
  169:17 171:6
  175:12,13 197:12
  199:20 200:2
  204:22 206:1,7,13

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 261 of 771   PageID 993
In The Matter Of: Larry E. Klayman
May 30, 2018

Page 255

207:2 209:5 229:4
230:18,19
**taken** 2:1 19:13
20:1 29:16 110:7
164:10 178:11
213:20 221:8
235:3,4,10
**takes** 111:14
**talk** 77:3 86:15
87:20 88:1,1 90:7
113:14,16 118:17
122:2 138:13
173:7
**talked** 9:16 35:5
40:3,3 75:18
78:18 80:12,20
81:16 82:20 83:8
104:14,15 106:8
113:12 118:17
120:18 166:21
**talking** 13:19 19:22
21:2 29:10 30:20
61:22 74:8 76:2
102:21 121:16,16
121:16 122:1
150:15 171:21
173:14,17,17
208:4 218:8
**tangible** 149:21
**task** 91:13
**taxi** 123:3,5,8,8,10
**Taylor** 58:15 62:11
**team** 8:21 20:19
29:11 30:8 41:22
204:15 214:6
217:8,19
**Tehran** 65:22
**Tehrangeles** 52:2
**telephone** 115:21
155:7
**television** 73:2
81:13
**tell** 73:16 76:17
86:16 87:3,22
88:16 89:8 99:21
105:18 113:20
114:13 118:10
124:18 126:8
132:15 148:18
149:8 155:18
162:2 170:18
176:15 179:5
186:13 189:14
190:4 194:22
195:13 196:1
207:15 211:11

214:11 229:17
**telling** 64:6,11 88:8
**tempted** 7:3
**ten** 110:4,5 206:7
**tend** 8:9
**tentatively** 10:13,14
206:5
**tenth** 196:18
**terminated** 39:5
162:9 163:5
**terminating** 162:16
163:12
**termination** 39:7
61:17
**terms** 12:19 22:3
84:7 88:7 165:20
202:22 210:7,15
**terrible** 233:14
**terribly** 192:18
**terrifying** 101:12
**test** 26:19 27:7
**testified** 69:5
102:13 154:22
197:20 203:5
**testify** 13:22 14:10
26:8 36:21 38:8
51:8 57:10,12
63:6 64:7 132:19
132:20 133:16
137:13 149:4
185:2
**testifying** 13:15
14:16 49:9 52:11
133:14,22 134:13
**testimony** 13:7,16
14:14,15 15:6,9
17:2,6,14 25:11
26:6,15 27:2
29:22 30:12 41:14
52:5 53:18 59:20
63:7 65:21 67:21
82:12 94:11 95:5
95:12 131:19
133:14 134:17
135:11 167:8
168:8,13 170:13
178:10 197:1
198:2 206:21
214:19 215:11
216:17 217:3,10
223:14 231:13
**testing** 68:4,6
**Texas** 71:5,6
**text** 77:8 118:16
127:13,13,16
163:14 176:20,21

177:12,14,18
178:2,2,9 179:6
179:12 180:19
181:3 183:6,7,10
183:18 184:1,5
197:7
**texted** 128:1,13
**texting** 87:2,10,11
174:7 183:12,16
**thank** 41:18 43:2
49:2,6 65:6,6,11
66:21 79:11 95:10
101:20 105:1
110:10 111:18,22
130:5 137:3
139:19 151:12
158:15 169:5
170:6 183:8
195:22 206:15
207:1 211:4
223:22
**Thanks** 36:8 140:9
**Thanksgiving**
99:12,12
**thereof** 214:21
**thing** 19:20 32:12
34:13 48:2 135:13
135:14 138:14
166:6 184:15
196:5 199:12
214:14 218:4
226:1
**things** 7:15 11:20
20:11 25:20 31:9
32:2,10,17 56:5
63:4,5 64:9 76:2
77:1 80:22 81:3,4
81:11 87:12 111:1
129:4 133:10
139:8 167:4 168:7
170:14 174:21
177:19 185:7
188:12 201:20
202:10,21 215:1
228:11 229:10
232:6
**think** 10:10,17
12:15 16:6,20
19:8 26:5 32:18
36:19 37:15 39:9
39:14 41:2,12
43:1 44:12 46:22
47:10 64:11 68:12
76:10 78:12 80:14
82:18 93:19 94:4
94:7 95:20 96:5

99:11 104:18
106:19,20 109:14
109:15 110:8
117:20 122:5
127:20 132:3
136:7 138:8 149:6
149:9,13 154:12
162:20 163:19
172:7 175:16
179:9 192:17
196:19 198:5
199:21 202:21,22
203:4,6,11 204:7
204:15,21 205:9
205:22 206:2,10
208:3 213:1
214:12 215:1,5,8
217:13,22 219:1
219:18,19 223:12
225:1 227:17
228:5 230:19
232:20 233:2,21
**thinking** 97:13 98:2
205:20 214:8
**third** 75:20 117:8
173:7 197:7
**thirtysomething**
24:13
**thought** 7:10 17:19
18:6 21:10 101:7
108:7,8,9,15
152:13,15 155:18
177:5 188:13
191:5 214:2,7,8
216:5 218:12,13
219:14
**Thoughts** 169:6
**threatening** 93:4,5
101:18
**three** 8:5 23:6 60:5
60:9,9 64:13 68:5
68:7 123:21
125:14 138:7,14
147:4 154:1,6
188:22 189:8
217:12 219:6
**throat** 165:15
**thumb** 21:4,14 25:1
25:2 29:1
**Thursday** 18:12
229:20 234:9
**tie** 206:2,11
**Tigar** 2:15 5:17,18
25:9 26:11,14
27:19 28:6 35:15
42:18,21 79:5,9

79:11 100:6,9,12
100:19 101:2,20
103:21 104:5,12
104:17,20 105:1,5
105:8 128:18,20
129:3,9,13,15,18
129:22 130:3,6
140:10 145:3
157:20 158:6,12
158:15 160:7
161:13 169:11
218:10 220:2,14
227:17 228:10
233:7,8
**till** 67:8
**Tim** 52:10 53:7
79:8 145:9 152:3
152:6,8,9,9,11,12
152:14,19 153:5,5
166:8
**time** 5:11 8:3,16 9:4
9:5,9,15,16,17,18
9:20 10:4 11:8,8
12:14,22 14:17
15:16,17 17:20
21:18 23:19,20
24:8 29:13,21
30:11 36:9 42:12
43:6,17 44:14
45:20 48:11,15
50:4 51:1 54:2
56:17 58:11 60:2
60:5 61:6 62:3
65:6,9 70:3 72:8
73:8 75:5,12
76:14 79:4,13
80:12 82:9,16
88:21 95:14 96:7
96:20 98:7,13
100:2 101:21
102:17,19,20,22
105:10,13,15
107:4 108:9,11
113:4 115:10
116:13 118:2
119:5 120:11
121:21 123:13,15
124:22 125:20
126:17 127:3,10
127:12 128:5,13
129:6 130:16
131:4,5 134:6
136:15 137:20
138:9,10 142:22
143:12 150:16
152:21 156:4

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 262 of 771   PageID 994
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 256

157:12 163:19
164:4 167:21
169:2 170:20
171:3,14 172:18
172:22 173:19
175:17,20 179:9
180:5,21 181:5
183:11 188:1
190:1 198:12,12
200:2,17 201:1,5
202:14 203:12
208:2 210:10
211:7,15 214:11
223:8 228:18
231:7 234:7
**timeframe** 102:3,7
**timeline** 203:4
**timely** 21:1 27:13
**times** 7:16 16:8
57:14 125:15
142:5 189:14
**tipped** 31:21
**tired** 38:22
**title** 61:9 195:5
**titled** 203:8
**today** 7:2 22:10
30:21 31:3 34:5
62:22 73:12
130:12 131:3
133:22 135:15
167:20 168:8,19
187:18 216:12
229:22
**today's** 231:1
**told** 50:8 52:12 59:4
63:21 77:15 78:9
78:16,19 80:21
84:1 87:5,19
88:22 98:4 104:3
106:10 113:13
114:14,17 115:6
118:21,21 126:12
127:19 135:2
137:21 152:7,13
152:15 153:6
154:22 155:3,5,12
160:17,17 182:10
186:10,18 188:3
190:8 209:11
230:15
**tomorrow** 7:8
168:10,20 214:14
215:14,17 216:18
223:8,18 224:4,21
229:14 234:4
**tonight** 221:12

223:15
**Tony** 5:8 190:16,19
208:5,10
**top** 84:5 132:12
157:22 187:20
190:15 211:22
**tortured** 49:21
**torturing** 49:18
**total** 229:12
**totally** 22:10 67:3
147:21
**touch** 208:7
**tough** 80:2
**tourist** 186:11
**town** 186:1
**toy** 184:16
**trade** 43:18,20
56:18
**training** 71:8 88:3,4
**transfer** 91:14
106:12,14
**transferred** 108:12
**transition** 6:17 9:3
28:22 67:8 76:10
**translated** 97:5
**transmittal** 19:11
**transparent** 55:16
**treat** 57:22 122:6
**treating** 38:17
127:4
**treatment** 127:1
**trial** 28:11 229:17
231:19
**tribunal** 135:5
**tried** 42:22 52:18
53:13,21 57:15,18
61:10 66:16
143:14 166:12
**trouble** 76:3,16
77:13,19 80:17
**troubles** 32:1
**troubling** 39:17
64:5
**true** 24:15 235:6
**trusted** 233:21
**truth** 67:22,22 68:1
95:7 127:17
**try** 22:9 28:11 32:2
32:3 49:20 51:5
52:3 55:5 60:13
66:17 87:20 156:3
193:8 200:12
224:19
**trying** 22:13 45:7
56:14 57:1,3
66:13 77:12 78:5

81:17 82:2 93:15
102:2 178:16
186:21 193:2
**Tuesday** 145:13
**turn** 6:20 24:22
46:9
**turned** 120:16
122:14
**TV** 71:16,17,18,19
71:21 72:2 81:7,9
82:3 188:1,2,3
**Twelve** 69:18
**twentieth** 196:18
**Twenty-eight**
156:19,21
**Twenty-four**
128:19
**Twenty-three**
176:13 177:6
**twice** 125:10
**two** 10:21 15:19
25:16 26:1 36:1,1
47:17 54:17 60:4
62:21 63:2 64:2
68:5,6 91:12 98:8
98:8 131:11 143:2
147:22 148:21,22
151:6 154:5
156:21 162:21
166:8 167:13
172:9 173:8
188:22 189:8
199:15 200:5,15
216:17 226:18
231:4
**two-hour** 216:4
**typewriting** 235:5
**typical** 211:12

**U**
**U.S** 44:1
**Uh-huh** 182:12
192:4
**ulterior** 40:10
**ultimately** 38:22
60:6
**unable** 229:4
**unavailable** 133:21
**unbearable** 38:7
**uncomfortable**
115:19
**uncontested** 169:18
**uncooperative**
48:13
**underlies** 7:9
**understand** 27:19

28:20 38:19 56:6
63:1 84:9 88:6
94:22 158:7
166:19 181:18
182:8 193:7
196:22 213:14
228:9,13 230:11
233:17
**understanding**
110:20 139:16
210:12,14 228:6
230:3
**understands** 55:8
**Understood** 101:20
212:11
**undertook** 37:7
**underway** 102:21
**undue** 41:15 52:20
**unduly** 204:17
215:2
**unethical** 231:20
**unfair** 13:22 22:10
28:5 135:3 229:8
**unfortunately** 35:2
45:18 126:10
128:13 185:1
**unhappy** 58:3
**union** 52:9 78:15
79:6
**United** 66:7 70:15
70:17,19 71:3
**University** 70:10
**unnecessarily** 37:11
**unnecessary** 37:19
**unopened** 201:3
**unpleasant** 16:10
**unprofessional**
175:4
**unresponsive** 48:13
**unsaid** 202:22
**unsupported** 47:2
**unturned** 45:11
**update** 76:1
**upper** 211:6
**upset** 118:13,15
120:19,22,22
139:13 142:5
174:11 185:8,9,12
185:19 186:6,12
186:13,19 208:3
210:21
**upsets** 186:12
**upsetting** 78:21
**use** 22:9 31:8 32:2
46:7,7,11 167:14
168:15 222:2,9,17

224:9 227:15
**usual** 27:15

**V**
**v** 58:15
**vacation** 200:15
**vague** 111:3,6,8
181:10
**valet** 120:21 121:13
**value** 55:9
**variety** 232:9
**various** 44:10 52:16
129:6
**vein** 226:2
**venture** 41:4
**verbal** 205:17
**verbally** 159:15,19
**Verizon** 179:10,15
180:2,18 182:2
215:1
**viable** 166:14
**vibe** 115:3
**vicinity** 53:11 54:11
**victim** 233:16
**videos** 101:6
**view** 25:19 224:19
**viewed** 40:18 66:5
**viewpoint** 58:6
**views** 136:19
**vigorous** 233:19
**VII** 61:9
**VII.16** 203:7,8
205:9
**VII.16(a)** 17:13
**VII.19** 25:10
**violated** 63:12
**violates** 24:20,20
**violet** 16:6
**vis-a-vis** 159:21
205:17
**VOA** 50:9 51:10
78:4 81:6 91:9
106:9,11 107:7
108:9,16 135:16
135:18,19 136:6
148:16 151:1
157:10,12,18
159:4 193:1,5
**voice** 37:2 38:18
44:19 46:12 50:4
50:13 51:12 53:21
57:8 58:3 59:1,9
59:12,13 66:5
68:16 72:16,17
87:18 105:11
157:10
**voluminous** 42:14

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 263 of 771   PageID 995
In The Matter Of: Larry E. Klayman
May 30, 2018

Page 257

**vote** 27:5

**W**

**Wagner** 58:15
  62:11
**wait** 92:6 93:13
  195:1
**waiting** 120:21
**walk** 213:1
**walking** 121:12
  203:3
**want** 7:10,17 11:17
  12:5,8 16:22
  17:21,22 33:20
  41:12,20 42:11,11
  46:3 47:14 49:12
  52:19,20 54:8,14
  57:22 58:16 67:1
  67:2 73:22 75:9
  75:21 80:13 82:19
  87:6,6,8 89:2 90:2
  90:6,6 92:18 93:8
  93:22 94:2,3
  103:5,15,15,19
  120:6 123:4,4,15
  135:9 147:8,10
  148:14 153:8,10
  153:15,20,21,22
  154:3 157:17
  160:18 168:2
  172:8,12 175:20
  183:11,19 184:9
  184:11,12 186:22
  186:22 187:6
  200:19 201:21
  202:4,8,19,20
  206:2 213:3,9,11
  213:16,16 216:16
  217:18 218:16,17
  219:9 221:13
  224:22 225:18
  228:14,17 229:16
  230:14 232:1,4
  234:6
**wanted** 9:7 15:4
  18:10 28:2 37:2
  39:1,21 48:21
  54:15 62:2 74:13
  75:11 76:19,20
  77:5 80:21 81:4,5
  88:17,20 90:4,8
  90:17 93:7 104:10
  113:6,6 115:10,15
  120:12 134:14
  138:18 139:5
  149:15 151:5

159:6,6 166:10
  170:12 172:2,8
  183:9 184:1,4
  188:1,5,10,19
  197:18 198:8
  200:2,3 218:14
**wants** 8:3 19:7
  75:13 79:22
  113:14 138:12
  145:1 151:9 175:2
  175:15 186:8
  198:5 210:11
  215:18 224:22
**warm** 7:17
**WARREN** 2:11
**Washington** 1:9 2:2
  55:10 71:1
**wasn't** 13:17 14:20
  31:3 32:13 35:10
  36:10 61:18,22
  64:13 100:17
  144:10 173:11
  184:10 185:10
**Watch** 30:22 31:5
  32:5 34:4,15,20
  35:2
**water** 7:22 123:1,2
  124:11
**way** 3:5 11:10
  12:16 23:15 27:13
  31:9 35:11,14
  38:15 41:11 44:13
  48:10,10 50:16
  51:18 57:18 58:10
  61:22 63:10 75:13
  89:4 95:9 118:22
  119:2,3,19,22
  120:14 122:12
  134:18 143:20,21
  144:19 151:4
  154:14,15 160:15
  168:14 178:21
  196:18 199:19,21
  201:5 219:21
  225:22 226:21
  233:1
**ways** 30:10 63:14
  115:18
**we'll** 6:20 7:1 8:2
  15:5,9 16:20 17:2
  17:3,14 25:21
  26:7,9 30:14,15
  41:17 54:10 59:3
  98:20 111:11
  114:9 175:12
  204:22 206:13

213:18,19,22
  215:5,18 217:16
**we're** 9:3 11:10
  19:22 23:3 25:12
  28:15,18 30:1
  63:1 114:2,4
  135:15 141:12
  143:5,6 171:21
  176:10,19 178:16
  203:11 204:9,19
  212:22 213:4
  214:10 215:20
  216:20 217:6
  219:21 220:2
  223:12 224:20
  228:8 229:9
**we've** 10:2 22:14
  136:10 162:21
  214:2,7 215:10
  216:18,18,20
**wearing** 49:10
**website** 35:17
**Wednesday** 1:8
  145:13
**week** 9:7 10:16 21:4
  22:3,12 23:2
  42:14 125:15
  165:22 196:15
  200:16 217:17
**weeks** 13:3 91:12
  143:2 200:15
  226:18 231:4
**weight** 48:17 94:13
  95:14 134:10
  174:20
**welcome** 171:6
**went** 50:1,8,21 51:3
  51:19 64:9,15
  71:4 72:3 74:1
  77:14 78:7,22
  88:21 91:22 93:3
  113:5 120:10,10
  120:11,13 125:17
  167:16 186:4
  196:8 201:10
**whatsoever** 7:19
  8:7 162:11 230:21
**whipper** 36:7
**willing** 59:2 215:15
**Wilshire** 51:13
**win** 66:17 98:1
  111:13,20 134:20
  143:7
**Windjammer** 3:5
**winning** 10:1 143:6
**wisdom** 47:15

**wish** 65:7 95:21
  156:18,21 157:2,3
  217:9
**wishes** 214:19
**wit** 31:1
**withdraw** 147:8
  153:8 157:4
  158:22 159:7
  170:16 171:14
**witness** 4:7 12:7
  13:12 14:8 16:10
  16:12,19 18:13
  22:5 28:1 37:15
  37:17 65:9 67:1,4
  67:11,13,17,19
  68:2,6,11,13 69:3
  70:17 79:8,10
  85:5 86:9 92:12
  92:15,17 96:12,16
  96:18 97:1,4,12
  97:19,21 98:9,14
  98:17 99:10,15,22
  100:5,8,11,15
  101:1,4 103:5,13
  104:3,8,15,19,21
  105:2,6 106:19,22
  108:7 111:12
  114:19,22 115:22
  116:2 117:12
  124:13 127:22
  128:12 129:2,8,12
  129:15 132:13
  136:5,20 139:6,18
  140:1,9,11 141:3
  141:14,21 144:22
  145:7,11,14,17
  150:8,15 152:1,6
  152:11,14,17,22
  153:3,6,13,19
  154:11,14 155:5
  155:10,14,20
  156:2,10 158:3,9
  158:14 159:3,13
  159:18 160:2,3,11
  160:17 161:2,7
  165:5 167:15,16
  169:19 170:1,4
  171:7 172:2
  174:18,19 175:9
  175:12,15,17
  176:1,3 180:4,14
  181:17,22 182:3,7
  182:12,18,22
  183:9 185:18
  187:4,22 188:10
  188:16,20 189:4,7

189:12,17,22
  190:3,7,11,13,18
  190:21 191:6,10
  191:12,16 192:21
  193:10 194:14
  197:4,6 198:4
  202:9 209:8,11,22
  211:14,22 212:3,6
  214:20 216:1,3,21
  217:11,17 218:1,4
  218:7,13,18,22
  219:11,14 220:1
  223:2,16,19,22
  224:2,19 225:3
  228:15 230:9,19
  232:4
**witness'** 41:14
  230:7
**witnesses** 6:2 11:13
  11:16 15:7 46:21
  47:4,8,17,18
  48:14 52:7,9 57:7
  65:4 216:13,17
  219:17 231:18
  233:16
**woman** 12:10
**women's** 73:7 231:3
**wonder** 31:2
**wondering** 121:6
**Woodland** 187:18
  188:19
**word** 102:20 159:10
**words** 107:15
  123:17 129:9
  174:5 182:2
**work** 11:9 45:7
  48:6 51:11 53:22
  54:9 58:14 61:7
  61:13 62:11 70:1
  71:20 72:6 75:7
  75:13 76:16 77:13
  78:7 79:15 80:17
  81:6,7,9 91:15
  98:1 105:11
  106:12 108:13
  135:6 146:10
  147:15 151:21
  152:3 166:11
  173:6 188:1,10,20
  200:13,15 201:6
  212:18,19,19
  213:3
**worked** 45:11 56:19
  57:8 70:4,4,5
  146:11 193:14
**working** 39:5 48:3

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 264 of 771   PageID 996
In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 258

52:11 56:18 71:16
71:17,18 72:15,19
75:12 76:13 81:9
81:12 82:21
147:17 148:7
193:1,4 200:14
201:8
**works** 173:6
**World** 40:1
**worry** 144:12
**worst** 52:13 57:22
**worth** 27:6
**wouldn't** 51:6
53:22 76:22 87:9
115:17 119:10,11
127:7 185:18
200:19
**wrap** 201:22 205:21
**write** 17:7 104:4
112:11,15,19
145:22 156:11
161:18
**writing** 45:5 62:1
81:8,10 84:6 86:2
86:10,16 91:2
112:14 113:9
159:15
**written** 40:6 59:9
60:21 84:10 86:13
86:20 96:10,21
98:7 106:11
140:17 141:7
146:19 189:19
**wrong** 61:17,19
182:21 197:9
209:16
**wrongs** 48:6
**wrote** 55:6 151:20
152:2 153:8 154:2
154:15

___ **X** ___

**X** 1:3,7 4:1
**XI** 5:5
**XI.3** 17:12,12 203:7

___ **Y** ___

**y'all** 229:7
**Yahoo** 211:13
**yeah** 65:16 96:5
156:20 180:9
**year** 99:13
**years** 15:15 21:6,12
23:3,7 24:13,13
31:2 42:21 43:4,4
47:6 60:10 64:14

64:16 69:18,22
72:7 199:13,17
200:10 201:15
229:9 231:17
**yesterday** 9:4 36:11
167:19
**young** 36:9

___ **Z** ___

**zealous** 44:17 167:1
**zealously** 44:7
**zealousness** 166:17

___ **0** ___

___ **1** ___

**1** 84:20 85:2 99:4
161:12,15
**1-3** 161:12,16 162:4
**1:00** 8:10,14 140:5
163:20
**1:39** 211:7
**1:45** 164:5,8
**10** 99:7
**10:30** 189:2,10
**100** 174:16
**106** 227:20
**11** 180:5 195:5
**11/2/10** 99:5
**11:45** 110:6
**12:30** 8:14
**12:58** 164:4,9
**14** 31:2
**14:16** 144:21
**15** 69:22 170:21
217:14
**15,000** 53:17
**1525** 3:5
**15th** 163:11 171:8
**17** 59:15
**17-BD-063** 1:5
**180** 217:12
**181,000** 31:15
**1975** 43:6
**1st** 207:11

___ **2** ___

**2** 144:18
**2-** 15:2
**2,000** 109:14,14
**2/23/11** 211:7
**2:03** 165:7
**2:04** 165:2
**20** 67:8 69:22
**2007** 72:12
**2009** 49:16 65:15

65:16 74:4
**2010** 23:5 59:22
64:14 82:19 85:4
85:18 103:7
104:17,22 106:17
116:2,3 118:9
130:10,22 141:20
144:4 156:8 163:9
163:11 180:1,4,22
194:18 195:5,21
207:11 211:2
212:7
**2011** 116:12 180:3
180:5,14,22 181:1
212:6
**2011-D028** 5:3
**2012** 180:3
**2014** 31:13 64:14
180:3
**2016** 23:12
**2017** 180:3
**2018** 1:8 200:16
**2019** 235:20
**20th** 116:12 180:14
**21st** 194:17 195:21
**22** 134:20
**23** 109:19 110:13
112:2 128:21
130:5 176:8,12
177:7 187:11
197:13
**23-2** 116:9,10 180:7
180:8,13 192:1
**23-3** 112:5
**23-4** 112:7
**23-45** 187:11
194:10,13 197:19
197:19 198:3
**23-47** 207:3
**23-48** 209:8
**23-5** 117:7
**23-50** 176:16
187:18
**23-52** 191:1
**23-53** 183:20
**23-54** 176:17
**23-59** 187:22
**23-6** 112:8
**23-8** 209:6,14,18,22
210:18 211:2,6,16
218:9,10,11
**23-9** 209:6 210:18
**24** 128:17,18
129:15 130:8
131:17 136:14
177:5

**24th** 22:2
**25** 130:20 139:22
140:14
**250,000** 210:6
**26** 141:18 144:1,16
**27** 144:3,7,13
145:21 151:17
160:7 170:14
171:6,21
**27-1** 151:20 172:1
**28** 151:15 154:19
156:7 158:21
**28-2** 156:20 160:13
**28.2** 156:16
**29** 158:18
**2nd** 9:17 85:4,18

___ **3** ___

**3** 99:7
**3,000** 109:16,16
**3:25** 212:15,20,21
**3:26** 214:1
**3:50** 234:8
**30** 1:8 43:4 67:8
171:4
**30th** 144:4 171:19
171:22 172:1
211:1
**31** 234:9 235:20
**33019** 3:6
**350,000** 15:2
**36** 4:3
**37** 27:8
**38** 20:2 24:13
222:16

___ **4** ___

**4:00** 166:1
**40** 15:15 53:2 83:9
84:4 111:14
210:10
**42** 4:4
**430** 2:2
**48** 207:3
**49** 4:5
**4th** 156:8 159:22

___ **5** ___

**5:00** 7:1
**50** 83:12 111:15
177:8 210:11
**5th** 159:21

___ **6** ___

**66** 35:21
**67** 35:22 36:7

**69** 4:8

___ **7** ___

**7** 130:10
**70** 177:9

___ **8** ___

**8** 26:18 144:21
**803** 26:17
**806** 26:20
**815-5221** 3:7
**8th** 141:19

___ **9** ___

**9/16/2011** 195:7
**9:28** 2:3
**9:30** 223:9,12 234:4
234:9
**954** 3:7
**9th** 130:22



**RECEIVED**

June 13, 2018

Board on Professional
Responsibility

**Date:** May 31, 2018

**Case:** In The Matter Of:  Larry E. Klayman



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 260

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,              : Board Docket No.

LARRY E. KLAYMAN,              : 17-BD-063

               Respondent.    :

- - - - - - - - - - - - - - - X

                    Thursday, May 31, 2018

                    Washington, DC


                    HEARING










Reported by

    Kim M. Brantley, C.S.R.

In The Matter Of:  Larry E. Klayman
May 31, 2018

| | Page 261 |
|---|---|
| 1 | Hearing, taken at the Board on Professional |
| 2 | Responsibility, 430 E Street, NW, Washington, DC, |
| 3 | commencing at 9:30 a.m., before the Ad Hoc Hearing |
| 4 | Committee, and before Kim M. Brantley, C.S.R., a |
| 5 | Court Reporter and Notary Public in and for the |
| 6 | District of Columbia, when were present on behalf |
| 7 | of the respective parties: |
| 8 | |
| 9 | APPEARANCES: |
| 10 | AD HOC HEARING COMMITTEE: |
| 11 | WARREN ANTHONY FITCH, ESQUIRE |
| 12 | Chair |
| 13 | MS. MARY LARKIN |
| 14 | Public Member |
| 15 | MICHAEL TIGAR, ESQUIRE |
| 16 | Attorney Member |
| 17 | |
| 18 | On behalf of the DC Attorney Disciplinary |
| 19 | System: |
| 20 | H. CLAY SMITH, III, ESQUIRE |
| 21 | |
| 22 | |

**Page 263**

I N D E X

| WITNESS: | DIRECT: | CROSS: |
|---|---|---|
| Ms. Elham Sataki | 292 | 322, 448 |
| Mr. Kevin O'Connell | 440 | 445 |

| | Page 262 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | On behalf of Respondent: |
| 3 | FREDERICK J. SUJAT, ESQUIRE |
| 4 | Law Office of Frederick J. Sujat |
| 5 | 1525 Windjammer Way |
| 6 | Hollywood, Florida 33019 |
| 7 | (954) 815-5221 |
| 8 | Email: fsujat@yahoo.com |
| 9 | ALSO PRESENT: |
| 10 | LARRY E. KLAYMAN, ESQUIRE |
| 11 | Respondent |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

**Page 264**

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | CHAIRMAN FITCH:  If everybody is |
| 3 | settled in and organized, I think we can go on the |
| 4 | record. |
| 5 | Good morning, we're reconvening pretty |
| 6 | promptly at 9:30 a.m., and I observe that all |
| 7 | counsel and parties are present and that all three |
| 8 | hearing committee members are present. |
| 9 | Are there any purely routine |
| 10 | administrative matters that need to be addressed? |
| 11 | Hearing none, the hearing committee has |
| 12 | pending before it Disciplinary Counsel's motion to |
| 13 | admit exhibits SX1 through SX38, and I'll be happy |
| 14 | to hear brief argument, if anybody wishes, on that |
| 15 | motion, it being Disciplinary Counsel's motion. |
| 16 | MR. SMITH:  Thank you.  Good morning. |
| 17 | CHAIRMAN FITCH:  Morning. |
| 18 | MR. SMITH:  I'll just reiterate what I |
| 19 | had said yesterday about the circumstances under |
| 20 | which we obtained those documents. |
| 21 | You heard the testimony of Ms. Sataki, |
| 22 | and to characterize it she had essentially pushed |

2 (Pages 261 to 264)

Page 265

1  this matter aside for a long time because it was
2  very painful for her to have to revisit the facts
3  and circumstances of what took place several years
4  ago between her and Mr. Klayman.
5      In preparation for the hearing,
6  however, she summoned up the courage to kind of
7  look into things and found a bunch of emails that
8  she had not even opened and started, you know,
9  digging into it and realized that there was a lot
10  more that she could share with the disciplinary
11  system I guess to corroborate her story, because
12  these are the things that she was looking at, you
13  know, to get ready for the hearing.
14      In addition to that I note that all of
15  the documents which are correspondence either
16  authored by or addressed to Mr. Klayman cannot
17  come as any sort of surprise, given that he was
18  either the author or the recipient of all of the
19  documents that we have put together as SX1 through
20  38. I believe that this information will help
21  inform the hearing committee of exactly what was
22  happening. It corroborates what Ms. Sataki was

Page 266

1  saying, that there are other emails which post
2  dated the termination of the relationship, which I
3  think are also relevant to her ethical complaint
4  to our office and for this committee's review.
5      CHAIRMAN FITCH: And Mr. Klayman is
6  approaching the podium.
7      MR. KLAYMAN: Yes, thank you, your
8  Honors. Good morning.
9      CHAIRMAN FITCH: Hello.
10      MR. KLAYMAN: I'll keep it relatively
11  brief, too, but also to the point -- again, I
12  apologize, I have a little post nasal drip every
13  morning.
14      CHAIRMAN FITCH: Not a problem.
15      MR. KLAYMAN: This case is eight years
16  old. It's approaching a new world indoor record,
17  and for Mr. Smith to come up here, and I'm not
18  personalizing this, and say that Ms. Sataki just
19  looked for these documents is very disingenuous,
20  because he had a duty and an obligation at the
21  outset to ask her what documents you have, and to
22  look for them.

Page 267

1      This is a case by Bar Counsel, not by
2  Ms. Sataki. And although Ms. Sataki, you know,
3  has written correspondence that you'll see that
4  she needs this to validate future employment, she
5  needs this because her life's been on hold for
6  eight years. Obviously this Bar proceeding is not
7  going to change the status quo, which is not my
8  fault, in any event. I did my best and I tried
9  extremely hard for her. You're going to see that
10  later today and throughout this hearing.
11      But you can't come in under the rules
12  at the last minute. These documents weren't
13  provided until 9:30 Friday. They weren't even
14  sent to me. And they were sent to Mr. Sujat. Mr.
15  Smith knows that I was in California; he was in
16  Florida. Why wouldn't you send them to me?
17      On top of that, there was a zip drive,
18  which contained my correspondence. Because, as
19  I've been telling the committee, they didn't
20  produce everything to me. That's proven to be
21  true, but what Mr. Smith has said in the past has
22  proven not to be true. They didn't produce

Page 268

1  everything to me.
2      He then produced a zip drive that he
3  had, which he claimed apparently he tried to have
4  delivered to a mail drop on Pennsylvania Avenue,
5  and then it sat around for weeks when it came
6  back. But yet he told you they had produced
7  everything.
8      And then on top of that, you know, of
9  course he had an opportunity, even last Friday
10  with Mr. Sujat -- Mr. Sujat will testify to say,
11  "I want to have these documents moved into
12  evidence. Will you consent?" He never said that.
13  He just said, "Here are the documents." He could
14  have filed a motion. He could have sought our
15  consent. Instead he comes in at the last minute
16  and tries to jam these into the hearing.
17      In light of everything else that has
18  gone on here, the delay, eight years -- four --
19  three and a half years Ms. Sataki, no one even
20  tried to contact her. She abandoned the case by
21  the policies of the Disciplinary Counsel, itself.
22  Because they give you a letter when they

3 (Pages 265 to 268)

Page 269

1  acknowledge opening an investigation.  I'm going
2  to show you that letter in the course of this
3  proceeding, make it an exhibit into evidence, that
4  if you don't contact the Bar promptly after that,
5  your case is considered to be abandoned.
6      They resurrected it after six years,
7  for their own strategic reasons, and we'll get
8  into that later, too.
9      So, this is all in an effort to deny
10 me, either intentionally or in a grossly negligent
11 fashion -- I believe intentionally -- my due
12 possess rights and equal protection rights, and to
13 not give me an opportunity.
14     As you know and as I've said, it's all
15 over the record, I thought this case was
16 dismissed.  Florida and Pennsylvania had dismissed
17 it.  I got rid of files.  I moved around.  I lost
18 files.  I had to recreate them.
19     So to say right now that Mr. Klayman's
20 had all this stuff, that's also very disingenuous,
21 at best.
22     Now the rules provide for at least ten

Page 270

1  days notice before a hearing, and that was not
2  given either.
3      So, your Honor, out of fairness and the
4  rules of this Board, which it has to live by --
5  and sometimes I get the feeling, and again I've
6  told you how I hate being my own lawyer here, I
7  think because sometimes I have to be aggressive,
8  and it's not the proceeding I want too be
9  aggressive in...
10     But they had an obligation to protect
11 me as well as to protect the interest of the Bar,
12 and they believe that they don't have to play by
13 the same rules that respondents have to play back
14 or I have to play by.
15     And they think, and I'm not saying
16 anything with you.  I have -- the hearing
17 committee and I know that you'll do a neutral and
18 fair proceeding here, at least as of right now.
19 But they think that they have you in their hip
20 pocket, that because it's so close here, it's so
21 incestuous in a way, that they can do whatever
22 they want and get away with it.  And that's just

Page 271

1  not the way it's supposed to be.  They think
2  they're above the law.
3      So I strongly urge this committee to
4  not allow this information on the record or into
5  evidence, not just because it's totally unfair and
6  there's due process rights.  It's not even a
7  question of what's in the documents, because I
8  read them.  Some of it is even helpful.  Most of
9  it is.
10     But this is not right and you cannot
11 have this kind of a proceeding, because it's
12 becoming an extreme example of abuse of process by
13 the Disciplinary Counsel, and therefore it should
14 all be excluded, if for no other reason than to
15 set rules that people have to live by.
16     I've had to live by them.  When I
17 wanted an extension, I asked for an extension, and
18 the Chair ruled.
19     But to slip it in at the last minute,
20 that's just slick, and frankly it's unethical, and
21 these documents should be excluded and not become
22 part of the record.

Page 272

1  Thank you.
2      CHAIRMAN FITCH:  Any rebuttal from the
3  movant?
4      MR. SMITH:  Well, I think Mr. Klayman
5  made a few mischaracterizations of how a lot of
6  these things took place.
7      I actually have, and I can submit it
8  later, a copy of the respective flash drive.  I
9  don't know that a lot of our response really goes
10 substantively to the question of whether or not
11 the documents that we have asked, the supplemental
12 exhibits be admitted or not, but because there are
13 certain representations made about Bar Counsel's
14 conduct with respect to discovery, because not
15 everything has been made available to the
16 committee.
17     I just wanted to share with you that on
18 May 24th we did send to Mr. Klayman's counsel a
19 copy of the flash drive that we had originally
20 sent to Mr. Klayman at his address on May 4th, as
21 we had represented in our motions.
22     On May 23rd we had received from the

4  (Pages 269 to 272)

Page 273

1  United States Postal Service the letter that we
2  had delivered to Mr. Klayman at his address on
3  Pennsylvania Avenue, and on the letter it had
4  "refused."
5      Immediately upon receiving that we sent
6  it to his counsel, because at that time he had
7  just entered his appearance.  We assumed that he
8  was counsel of record, that we should not be
9  communicating with Mr. Klayman, for no other
10 reason than that.
11     So we did send that information
12 immediately to his counsel, the flash drive.  We
13 sent it to him by Federal Express to make sure
14 that he would get it in a timely manner.
15     And so the same is true with respect to
16 our receiving the documents from Ms. Sataki on the
17 eve of this hearing, and I only say these things
18 because there are a lot of nefarious spins being
19 made, a lot of accusations being made about the
20 conduct, character and intent of Disciplinary
21 Counsel in proceeding with this case.
22     To that extent, it is a collateral

Page 274

1  issue, but the record is complete with these
2  accusations, and I felt that it was necessary to
3  get on the record to respond to that to let the
4  committee know that there is documentary evidence
5  which we can submit which will rebut the
6  accusations of impropriety and demonstrate that we
7  moved with all deliberate speed to make sure that
8  Respondent and his counsel were made aware of and
9  given copies of the documents which we had
10 represented that we would give them as soon as
11 possible.
12     And again I know that Respondent has
13 said that he failed to maintain a copy of his
14 documents throughout the years.  Well,
15 Disciplinary Counsel is not responsible for how
16 Mr. Klayman cared for his belongings and his
17 possessions, and, to the extent that we maintained
18 a file which contained things that he should have
19 been maintaining and made available to him, that I
20 think is in the spirit of fair play of exactly
21 what we're doing.
22     But again, at the end of the day, the

Page 275

1  person responsible for maintaining custody and
2  control of, you know, the correspondence that, you
3  know, we shared between us, and that he had access
4  to, and all the documents quite frankly that he is
5  claiming are somehow the product of unfair play,
6  again, you know, this is stuff that he has had a
7  direct hand in, and things that he -- if he did
8  not, he certainly could have if not should have
9  had copies of all these things and maintained
10 these things throughout the years.
11     You can't castigate and disparage
12 Disciplinary Counsel for, you know, good faith
13 efforts to get this information that he should
14 have had back to him.
15     CHAIRMAN FITCH:  Ok, Mr. Sujat, you
16 want to respond?
17     MR. KLAYMAN:  Mr. Sujat is going to
18 respond.
19     MR. SUJAT:  Can I speak as well?
20     CHAIRMAN FITCH:  Briefly.
21     MR. SUJAT:  I will be very brief.
22     I just wanted to point out some factual

Page 276

1  matters.  I don't want to get into a big
2  explanation, but simply to say that the new
3  evidence that was provided at the last minute came
4  to me by email on Friday, 9:30.  So, I just wanted
5  to let the Board know that it was May 25th that I
6  actually received it.
7      Also on the thumb drive, the thumb
8  drive was sent on Thursday, but it was sent by
9  FedEx, so I didn't get it until Friday, as well.
10 And then Friday I immediately went to the FedEx
11 and had it delivered overnight to Mr. Klayman for
12 the weekend, so that, you know, he would have it.
13     But, you know, this was all dropped on
14 us at the last minute.
15     And also I just want to say in terms of
16 keeping records... Usually lawyers keep records
17 for five years.  In this case we're talking about
18 it will be six years of waiting for the
19 proceedings.
20     That's it.
21     CHAIRMAN FITCH:  Each of the three
22 members of the hearing committee reviewed SX1

5 (Pages 273 to 276)

Page 277

1    through SX38.  Yesterday evening we each spent
2    about 45 minutes to an hour on reviewing the
3    documents for purposes of ruling on their
4    admissibility.
5         The documents frankly don't contain
6    anything new.  The themes in the documents and the
7    subject matters in the documents are those which
8    were covered in yesterday's evidentiary
9    proceedings.  And so the question arose whether
10   those documents were cumulative and therefore
11   subject to exclusion under the applicable rule.
12        The Disciplinary Counsel twice used the
13   word "corroborate," and the documents, perhaps
14   because they do in fact cover the same subject
15   matter, potentially, at least in Disciplinary
16   Counsel's view, support or corroborate in written
17   form the testimony of the complaining witness.
18   And so it certainly is not unusual in evidentiary
19   proceedings for documents to be adduced to
20   corroborate testimony.  Or visa versa, I suppose,
21   for that matter.
22        Indeed, I suppose if these documents

Page 278

1    had been available sooner, the form of examination
2    might well have taken marching the witness, the
3    complaining witness through the documents in a
4    chronological fashion, the manner in which they in
5    fact are arranged, starting in April and running
6    through the end of the year, and a tad further.
7         In addition, Mr. Klayman pointed out
8    that in fact the documents, "some," quote unquote,
9    or "most," quote unquote, are helpful to
10   Respondent.  So who knows what the answer to that
11   is.
12        Disciplinary Counsel presumably has
13   made a judgement that on the balance -- or perhaps
14   in their entirety -- the documents are helpful to
15   him, and that's a judgment that he's entitled to
16   make.
17        The Respondent's team may very well
18   find that the documents are helpful to any number
19   of their theories.
20        On balance we think that we are
21   required, under the rule, to admit the documents
22   and to proceed through the evidentiary case over

Page 279

1    the next period of time and to evaluate the
2    documents for their weight, if any, at the end of
3    the case, as we work our way through all the
4    evidence that we hear.
5         Now, Mr. Smith, the documents do
6    corroborate.  But I'm also correct that the
7    documents do not explore any new ground.  So I'm
8    admitting the documents, but I do not want to hear
9    repetitive testimony.  You had the opportunity to
10   bring out your themes, in some instances several
11   times, so you need to figure out -- you may not
12   want to ask any questions at all.  The documents
13   are in.  But I'm not going to let you walk her
14   through the documents.
15        We know, at least we have heard the
16   story, that you wish to present, the in theories.
17   It's perfectly sensible.  We may or may not agree
18   with them now.  Since we haven't reached any
19   decision, we're still hearing evidence, we may or
20   may not agree with you at the end of the hearing.
21   But we do know where your theories are.
22        Now you may have some new theories, and

Page 280

1    I suppose you may be able to adduce those,
2    although you did rest yesterday, subject to this
3    motion.  But we're not going to hear her repeat
4    testimony that she has already given.  That road
5    is taken.  There will be a lot of "asked and
6    answered."
7         Do you want to call your next witness?
8         MR. KLAYMAN:  Your Honor, may I raise
9    one procedural issue here?
10        CHAIRMAN FITCH:  I'm sorry?
11        MR. KLAYMAN:  May I raise one issue
12   that dovetails with your ruling here, just real
13   quick, if I may?
14        CHAIRMAN FITCH:  Go ahead.
15        MR. KLAYMAN:  Yes.
16        Yesterday I pointed out the likelihood,
17   because we hadn't had a chance to look at the
18   documents yet, that there were some documents that
19   were not provided.  They were incomplete.  Ms.
20   Sataki herself I believe testified at that she
21   didn't open everything.  And there are documents
22   in that package which talk about me trying to

6 (Pages 277 to 280)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 281 |
|---|
| 1 contact her, because I don't know whether she's |
| 2 the one that's communicating or not, and Mr. |
| 3 Shamble, as well. |
| 4       That person -- we don't have the |
| 5 document that was sent apparently to me or I |
| 6 learned of in some way with regard to how that |
| 7 person intended to proceed with the case or advise |
| 8 her or whoever. |
| 9       I'm responding to her, sending emails |
| 10 to her, you know, at the end of the package, |
| 11 saying, "I'm sending it to you, but you send it to |
| 12 this person."  It's probably this person Mehran |
| 13 Razavi, R-a-z-a-v-i, and this was the person who |
| 14 threatened me.  You'll hear that testimony.  I |
| 15 used to have the cell phone voicemail.  I don't |
| 16 have it any more, it's so long ago.  And that's |
| 17 why I checked out that number that called me and I |
| 18 found out that he was a convicted felon for fraud, |
| 19 gambling fraud in Las Vegas.  This is the person I |
| 20 was dealing with. |
| 21       We don't have his communication to me, |
| 22 but we have my response to him, and I'm sending |

| Page 283 |
|---|
| 1 that's why I took the actions I did in terms of |
| 2 trying to protect her rights until I could figure |
| 3 out what she really wanted to do, with informed |
| 4 consent, by not by some convicted felon in Las |
| 5 Vegas named Razavi. |
| 6       So that's the big issue here.  And, you |
| 7 know, at the appropriate time and the appropriate |
| 8 place, I leave it to your Honors how to proceed |
| 9 about that, but I will be questioning about these |
| 10 things. |
| 11       CHAIRMAN FITCH:  Well, that's at least |
| 12 the first appropriate place, you raise it here, |
| 13 after having highlighted it.  That's a |
| 14 consideration. |
| 15       Mr. Smith? |
| 16       MR. SMITH:  Alright -- |
| 17       CHAIRMAN FITCH:  You want a minute or |
| 18 so? |
| 19       MR. SMITH:  Yes, just give me a minute |
| 20 regarding the Chair's directions. |
| 21       CHAIRMAN FITCH:  Try to make it five |
| 22 minutes or less. |

| Page 282 |
|---|
| 1 this to Ms. Sataki, because I don't know what his |
| 2 email address is and he won't respond to my |
| 3 telephone calls, calling me back. |
| 4       So that's the problem with this, it's |
| 5 incomplete documentation.  And she herself |
| 6 admitted she didn't open all of it.  That's an |
| 7 issue that I throw out that I think we have to |
| 8 grapple with at some point throughout this |
| 9 hearing.  I will be questioning her about that, |
| 10 and I trust that Mr. Smith will not tip her off |
| 11 and coach her while she's on the stand here or at |
| 12 various meetings during breaks and lunch. |
| 13       But we have to find out all about that. |
| 14 Because that's really important.  Because I was |
| 15 getting instructions that were basically throwing |
| 16 everything I had done in the trash.  It didn't |
| 17 make any sense, that basically said that |
| 18 unilateral disarmament, and we hope for the best. |
| 19       I had an obligation to talk to Ms. |
| 20 Sataki about it directly and I was getting |
| 21 communicated to by somebody else, and that's why |
| 22 Mr. Shamble tried to get ahold of her, too, and |

| Page 284 |
|---|
| 1       MR. SMITH:  Alright. |
| 2       (Recess taken.) |
| 3       MR. SMITH:  I do have a housekeeping |
| 4 issue. |
| 5       It occurred to me when you had made |
| 6 your remarks about you were going to admit the |
| 7 documents SX1 through 36 and that I had not |
| 8 formally asked or moved in the admission of the |
| 9 documents that we had discussed yesterday with Ms. |
| 10 Sataki. |
| 11       CHAIRMAN FITCH:  Why don't we hold off |
| 12 moving documents in until the end of your case. |
| 13       MR. SMITH:  Alright.  Well, I know that |
| 14 there have been some questions about the |
| 15 authenticity, so in the event that there were |
| 16 going to be any objections to a specific document, |
| 17 I felt it was good while we still had Ms. Sataki |
| 18 on the stand to authenticate that which is not |
| 19 going to be consented to by the Respondent in |
| 20 connection with the additional documents. |
| 21       CHAIRMAN FITCH:  Well, I think you can |
| 22 certainly do that.  If you think you need to do |

7  (Pages 281 to 284)

App.0225

Page 285

1  every one of those...
2      MR. SMITH:  Well, I mean that really
3  depends on the Respondent.  That's why I wanted to
4  bring it up now before I brought Ms. Sataki back.
5      CHAIRMAN FITCH:  Well, I don't have Mr.
6  Klayman's objections.
7      MR. KLAYMAN:  I would propose the way
8  your Honor has proposed, that at the end we go
9  through.  It's more efficient.
10     CHAIRMAN FITCH:  But his concern is
11  that if you raise, later today or whenever, later
12  this morning, authenticity issues and the witness
13  has already gone, that he will not have
14  authenticated, potentially, some of the exhibits.
15  Then we'd be put in a position of having to decide
16  on the face of them whether they are authentic or
17  not.
18     So I think that's a reasonable
19  consideration.  I think Mr. Klayman -- can you
20  pull up his objections?
21     I think he has objected to the
22  authenticity, maybe all of the exhibits.  But we

Page 286

1  at least can get that before us.
2      I think what you need to do is tell her
3  to look at number 23-28, or number SX1, and say
4  "Did you write this email?"
5      MR. SMITH:  Well, with respect to
6  documents that were discussed yesterday, I'd like
7  to go through them now and find out from Mr.
8  Klayman objects to.
9      If he is going to consent to any of
10  them, then perhaps we can truncate this process
11  and, you know, I won't need to ask Ms. Sataki the
12  questions.  But at this point I think it would
13  just be perhaps more expedient if we know whether
14  Mr. Klayman is going to object to any of the
15  documents that were discussed yesterday and then
16  move forward to the ones today in the supplemental
17  exhibits that we have submitted.
18     MR. KLAYMAN:  Your Honor, he's going to
19  have an opportunity, Mr. Smith, to redirect Ms.
20  Sataki.  I would suggest that we do this after the
21  redirect and go through these documents.
22     It's premature now before I have a

Page 287

1  chance to elicit her testimony on any of these
2  documents for me to agree to anything.
3      CHAIRMAN FITCH:  It appears that --
4  keep scrolling.
5      It appears that there is an
6  authentication objection at least to DX1 -- and
7  there are some other objections, but DX1-28 and --
8      MR. TIGAR:  I think there's an
9  authentication objection, Mr. Chairman, to all of
10  the numbered exhibits one through 28.
11     CHAIRMAN FITCH:  I seem to be missing
12  Mr. Smith's exhibits -- oh, no, I'm not.
13     We have more than 28 exhibits in here,
14  and Mr. Klayman surely is going to have the right
15  and the opportunity to make his position clear on
16  those, as well.
17     So, Mr. Klayman has made a suggestion.
18  I'll leave it up to you, Mr. Smith.
19     MR. SMITH:  Well, again, my suggestion
20  is I think we did lay a foundation for the
21  authenticity of the documents in our examination
22  of Ms. Sataki, with respect to the documents that

Page 288

1  she testified to, for example Bar Exhibit 1, which
2  was the ethical complaint that she filed that's
3  dated November 2nd, 2010.
4      I would go through those documents now
5  that we have already had her testify to and
6  determine whether or not there's anything else we
7  need to do to satisfy Respondent about their
8  authenticity.
9      I'll move them in, and if he objects
10  and the hearing committee doesn't rule, then, you
11  know, we'll just deal with that.  But I'd like to
12  do that exercise now before I bring Ms. Sataki in.
13     MR. KLAYMAN:  Your Honor --
14     CHAIRMAN FITCH:  You're saying you're
15  going to address which documents now?
16     MR. SMITH:  All the documents that she
17  testified to yesterday, which actually weren't
18  that many.
19     CHAIRMAN FITCH:  Right.
20     MR. SMITH:  So if we could just go
21  through that now, and I actually think I may have
22  asked to move in Bar Exhibit Number 1 yesterday.

8 (Pages 285 to 288)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 289

1  I don't recall whether there was any discussion of
2  that at all.  But, again, if I might just go
3  through the few documents that I went through
4  yesterday.
5      MR. KLAYMAN:  Here's the problem, and
6  number one, and this is a good example of it, is
7  that she testified that that wasn't her
8  handwriting on that document.  So I've got to be
9  able to probe that.  I don't understand why --
10     CHAIRMAN FITCH:  Well, sure, you can
11  probe it.  No question of that.
12     MR. KLAYMAN:  So it may not be an
13  authentic document.
14     Ordinarily it's at the end of your
15  presentation, your examination that you move to
16  have the documents in.  It's not over yet.
17     CHAIRMAN FITCH:  Mr. Smith, it appears
18  to me that Mr. Klayman is saying that he objects
19  to the absence of authentication of Exhibit Number
20  1.
21     MR. SMITH:  Correct, and so --
22     CHAIRMAN FITCH:  I think that if he is

Page 290

1  going to object to all this, you need to go
2  through them with her.
3      MR. SMITH:  Well, I did yesterday, and
4  I remind you that she's the one who testified that
5  she did not write it herself, but that she did
6  read it, she agreed with it.
7      CHAIRMAN FITCH:  I have notes about
8  what was said about the documents covered
9  yesterday.  I have to leave it to you as to
10  whether you think you have adequately
11  authenticated them knowing that there are -- there
12  seem to be -- not "seem to be," there are
13  authentication objections.
14     MR. SMITH:  Yes, and that's why I
15  wanted to --
16     CHAIRMAN FITCH:  But I don't want you
17  to take more time moving them in right now.
18     Call her, and if you think you need to
19  authenticate something, authenticate it.  If there
20  are 50 you think you need to authenticate,
21  authenticate 50 of them.
22     I mean, Mr. Klayman has a perfect right

Page 291

1  to object to the authentication.
2      MR. SMITH:  He does --
3      CHAIRMAN FITCH:  And the only
4  constraint is that we lose this witness tomorrow
5  afternoon, evening, whatever, and that's when
6  cross-examination ends.  If Mr. Klayman wants to
7  use time for authentication issues, that's his
8  right, but we're not going beyond tomorrow night
9  with this witness.
10     (Brief pause.)
11     (Ms. Sataki returns to the witness
12  stand.)
13     CHAIRMAN FITCH:  Good morning.
14     THE WITNESS:  Thank you.  Morning.
15     CHAIRMAN FITCH:  As I said I would, I
16  remind you, Ms. Sataki, that you remain under
17  oath.  You remain under oath.
18     THE WITNESS:  Yes.
19     CHAIRMAN FITCH:  Mr. Smith...
20
21
22

Page 292

1      CONTINUED CROSS-EXAMINATION
2      BY DISCIPLINARY COUNSEL
3      BY MR. SMITH:
4  Q.  Morning, Ms. Sataki.
5  A.  Good morning.
6  Q.  I handed you a copy of what has been
7  previously marked as Supplemental Exhibit Number
8  31.  For the record it is an email which appears
9  to be dated October 24th, 2010 from Mr. Klayman to
10  you -- or excuse me -- October 19th --
11  A.  October --
12  Q.  Excuse me, October 19th, 2010, to Kevin
13  Sataki.
14  A.  Yes.
15  Q.  And above that is a forwarding message
16  suggesting that it was sent to you, for the
17  record.
18     I'll ask you to take a look at that
19  document, please.
20     MR. KLAYMAN:  Your Honor, that's not
21  the document on Exhibit 31.
22     MR. SMITH:  Supplemental Exhibit Number

9 (Pages 289 to 292)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| | Page 293 |
|---|---|

1  31, your Honor.

2  CHAIRMAN FITCH:  I'm sorry.

3  MS. LARKIN:  Supplemental Exhibit

4  Number 31.

5  THE WITNESS:  Yes.

6  BY MR. SMITH:

7  Q.  Do you recall receiving this document

8  on or about October 24th, 2010?

9  A.  Yes.

10  Q.  And who did you receive it from?

11  A.  My brother forwarded it to me.

12  Q.  What is the substance of the letter?

13  What is going on there?

14  MR. KLAYMAN:  Your Honor, objection.

15  There is no showing that her brother forwarded it

16  to her.

17  CHAIRMAN FITCH:  She has testified that

18  he did and we'll credit or not credit that

19  testimony.

20  BY MR. SMITH:

21  Q.  Let me ask you to look at the

22  forwarding message --

| | Page 294 |
|---|---|

1  MR. KLAYMAN:  Let me make a suggestion

2  if I may.

3  MR. SMITH:  Larry, please, please.

4  MR. KLAYMAN:  I'm trying to assist you.

5  Let me voir dire after each of these.

6  CHAIRMAN FITCH:  We will not be doing

7  that.

8  BY MR. SMITH:

9  Q.  If you could look in the middle of the

10  page where it says "forwarded message".

11  A.  Yes.

12  Q.  And who is the letter from?

13  A.  Mr. Klayman.

14  Q.  And who is it addressed to?

15  A.  To my brother, Kevin Sataki.

16  Q.  In other words, there is a forwarded

17  message in the middle of the page?

18  A.  It was to me.

19  Q.  Does that refresh your recollection as

20  to where you might have gotten a copy of this

21  letter from?

22  A.  Yes, my brother.  He emailed me or

| | Page 295 |
|---|---|

1  called me and told me there was a letter from Mr.

2  Klayman.

3  Q.  So you did hear about this letter from

4  your brother?

5  A.  Yes.

6  Q.  Have you had a chance to read the

7  letter?

8  A.  Yes.

9  Q.  Can you tell the hearing committee what

10  was going on in that letter, the communication.

11  A.  It was --

12  MR. KLAYMAN:  Your Honor, objection.

13  Your Honor asked him not to elicit testimony that

14  was cumulative.  Now he's getting into testimony.

15  He's back-dooring examination on these documents,

16  which I move to exclude.

17  MR. SMITH:  There has been absolutely

18  no testimony whatsoever about the substance of

19  what's in this letter.

20  CHAIRMAN FITCH:  Overruled.

21  THE WITNESS:  The letter is about -- to

22  my brother and it's about me not cooperating or me

| | Page 296 |
|---|---|

1  not meeting with the other people at CBN.  They

2  were offering me a job.

3  Also the letter is about that Mr.

4  Klayman is trying to get me a book deal, and it's

5  to my benefit, because it will kind of restart my

6  career, and the book deal is going to help me, and

7  both as a prestige and both money.

8  So it's about that, and plus that he is

9  explaining to my brother, that someone as my

10  manager talked to the CBN people regarding that,

11  if we're going to meet, Mr. Klayman shouldn't be

12  there.

13  MR. SMITH:  At this time --

14  MR. KLAYMAN:  Your Honor, wait.  I ask

15  for reconsideration.

16  Your Honor, my concern was just to get

17  authentication and you instructed Mr. Smith not to

18  get into testimony because --

19  CHAIRMAN FITCH:  No, no, no, no.  I

20  instructed him not to get into repetitive

21  testimony, to the extent possible.  I have

22  determined that this is not repetitive.

10  (Pages 293 to 296)

Page 297

1      Go ahead, Mr. Smith.
2  BY MR. SMITH:
3      Q.  Now what's the date of this letter,
4  this communication to you, Ms. Sataki?
5      A.  October 19th, 2010.
6      Q.  Had you still had an attorney/client
7  relationship with Mr. Klayman on this date?
8      A.  No.
9      Q.  Did you authorize him to discuss your
10 story with anyone at that point?
11     A.  No.
12     Q.  Thanks.  No further questions on this
13 particular document.
14     MR. SMITH:  At this point I will
15 attempt to elicit testimony that will authenticate
16 the documents that are forth in Disciplinary
17 Counsel's Supplemental Exhibits 1 through 38.
18     CHAIRMAN FITCH:  Or any others that you
19 are worried about, but go ahead.
20     MR. SMITH:  Alright.
21 BY MR. SMITH:
22     Q.  Ms. Sataki, can you look at the book of

Page 298

1  exhibits in front of you, Bar Exhibit Number 1.
2  We talked about this document yesterday.  Please
3  take your time.
4      Do you remember submitting this to the
5  Office of Disciplinary Counsel on or about
6  November 2nd, 2010?
7      A.  Yes.
8      Q.  Did you mail it to the Office of
9  Disciplinary Counsel?
10     A.  I don't remember exactly.  I would say
11 I did because usually that's what I was supposed
12 to do.
13     Q.  Ok.  Is this your signature on the
14 bottom of Page 1-2?
15     A.  Yes.
16     Q.  The details of the complaint above
17 that, did you write that personally or did someone
18 else write it?
19     A.  Someone else write it for me.
20     Q.  Did you read it before it was
21 submitted?
22     A.  Yes.

Page 299

1      Q.  And you agreed with what was said?
2      A.  Yes.
3      MR. SMITH:  Alright.  At this time I'd
4  like to move Bar Exhibit 1 into evidence.
5      MR. SUJAT:  Your Honor, again, these
6  are leading questions.
7      CHAIRMAN FITCH:  Yeah, but you didn't
8  object to them and they were just transitional
9  questions.
10     Objection or not to its admission?
11 He's moved in its admission.
12     MR. SUJAT:  I object to the questions.
13     CHAIRMAN FITCH:  I didn't ask you that.
14     He has moved it in.  He has moved for
15 the admission of Supplemental Exhibit Number 1.
16 Does the Respondent's team object or not object?
17     MR. SUJAT:  Object.
18     MR. KLAYMAN:  Yes, your Honor, we
19 strongly object to that.  I would like to be able
20 to voir dire on this.
21     CHAIRMAN FITCH:  That request is
22 denied.

Page 300

1      Every objection is considered to be a
2  strong objection.
3      Go ahead, Mr. Smith.
4  BY MR. SMITH:
5      Q.  Ms. Sataki, can you please turn to Bar
6  Exhibit Number 23.  I'll asking you to look at
7  what has been marked at the bottom of the page as
8  Bar numbers 23-2 through 23-72.
9      For the record, it is a document on the
10 letterhead of the Office of Disciplinary Counsel
11 dated October 20th, 2011.
12     Ms. Sataki, did you submit this
13 document to the Office of Disciplinary Counsel on
14 or about October 20th, 2011?
15     A.  Yes.
16     Q.  If you recall, how did you submit it to
17 us?
18     A.  I want to say that I was advised that I
19 have to mail it.
20     Q.  Ok.
21     A.  I mean, I don't remember exactly, but I
22 was getting advice at that time and I was supposed

11  (Pages 297 to 300)

Page 301

1  to mail everything certified mail.  So probably
2  that's how I do it.
3      Q.   Who is giving you that voice?
4      A.   Katherine.
5      Q.   If you look at pages 23-4 through 23-6.
6      CHAIRMAN FITCH:  Did you mean to say
7  -26 or just 26?
8      MR. SMITH:  Twenty-three, thank you.
9  Yes, 23-6.
10  BY MR. SMITH:
11     Q.   Did you write this or did someone else
12  type that up for you?
13     A.   I got help to type it.
14     Q.   Who helped you?
15     A.   Katherine did.
16     Q.   Ok, and did you read this before you
17  sent it to the Office of Disciplinary Counsel?
18     A.   Yes, it's not my word --
19     Q.   I'm sorry?
20     A.   Yes, we -- together we write this.  She
21  helped me with the English.
22     Q.   And you agreed with everything that was

Page 302

1  in there?
2      A.   Yes.
3      Q.   If you could look at the exhibits that
4  are in there.  Looking at 23-8 and 23-9 and 23-10,
5  just briefly, what are these documents?
6      A.   It's a letter from me to Mr. Klayman.
7      Q.   What date?  What date is that?
8      A.   That's May 30th, 2010.
9      Q.   Did you send that letter to Mr.
10  Klayman?
11     A.   Yes, I did, email.
12     Q.   On the first page, what is that?
13     A.   That's Mr. Klayman's email back to me.
14     Q.   Ok.  And you received that --
15     A.   The day after, on May 1st.
16     Q.   Through what medium?
17     A.   Email.
18     Q.   Can you look at pages 23-12 through
19  23-43?
20     (Witness peruses documents.)
21     A.   Yes.
22     Q.   Do you remember including this as part

Page 303

1  of the submissions you made to Disciplinary
2  Counsel accompanying your cover letter?
3      A.   Yes.
4      Q.   Do you remember how you got copies of
5  these documents?
6      A.   Email.
7      Q.   Through email?
8      A.   Through email.
9      CHAIRMAN FITCH:  When you say "email,"
10  you mean someone sent it to you, sent the
11  documents to you, or when you say "email" do you
12  mean going to a website?
13     THE WITNESS:  Mr. Klayman emailed it to
14  me.
15     CHAIRMAN FITCH:  Go ahead, Mr. Smith.
16  BY MR. SMITH:
17     Q.   Would you look at Page 23-45 of the
18  exhibit.  Can you tell the date of this exhibit?
19     A.   June 21st, 2010.
20     Q.   Do you know who authored this exhibit?
21     A.   I don't know.
22     Q.   Well --

Page 304

1      A.   I mean, it says that -- it looks like
2  it's a third party notifying me through Mr.
3  Klayman's email.
4      Q.   Did you receive this on or about June
5  21st of 2010?
6      A.   Yes.
7      Because at the bottom it says "add a
8  name," so it doesn't have a name, third party.
9      Q.   I understand.
10     Look at Bar Exhibit 23-47 and 48.
11     CHAIRMAN FITCH:  Say that again,
12  please.
13     MR. SMITH:  23-47 and 48.
14     CHAIRMAN FITCH:  Mm-hmm.
15  BY MR. SMITH:
16     Q.   Can you tell me, what is this document?
17     A.   I didn't want the things that -- that I
18  didn't like, and then he sent me an email and in
19  the email he's unhappy.
20     Q.   What date -- don't talk about what's in
21  the email.
22     What's the date of this email?

12  (Pages 301 to 304)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 305

1    A.  This email is August 1st, 2010.
2    Q.  Do you remember receiving it on or
3  about that date?
4    A.  Yes.
5    Q.  The next page, 23-48, was that part of
6  the email?
7    A.  Yes.
8    Q.  Thank you.
9        Can you look at Exhibits 23 through 50.
10  I actually believe you testified about this
11  yesterday.
12       Mr. Chair, I think you had a number of
13  questions, which I think I'd be repeating, so,
14  perhaps I won't ask the questions that you asked
15  about this particular group of documents
16  yesterday.
17       You had asked --
18       CHAIRMAN FITCH:  I think my questions
19  were about the contents of the document.
20       Why don't you ask her what it is and if
21  she received it.
22       MR. SMITH:  Alright.

---

Page 306

1  BY MR. SMITH:
2    Q.  Now could you describe for the hearing
3  committee what this collection of documents is
4  again?
5    A.  Text messages.
6    Q.  How did you receive a copy, this
7  particular copy of those text messages --
8       CHAIRMAN FITCH:  I'm incorrect.  She
9  testified as to how she obtained these.
10       When you move them in, I'm going to
11  allow them in.
12       MR. SMITH:  Alright.
13  BY MR. SMITH:
14    Q.  Look at Page 23-56.  Would you tell the
15  hearing committee, just describe what the document
16  is, not what's in it, but just what the document
17  is.
18    A.  It's me asking Mr. Klayman not to --
19    Q.  No, no, not what's in the document.
20       What's the date of the document?
21    A.  Oh, the date, I'm sorry.  The date is
22  November 15th, 2010.

---

Page 307

1    Q.  Ok, and did you participate in writing
2  this letter?
3    A.  Yes.
4    Q.  Did anyone help you write this letter?
5    A.  Yes.
6    Q.  Who was that?
7    A.  Katherine.
8    Q.  Did you send it out on or about
9  November 15th, 2010?
10    A.  Yes.
11    Q.  Looking at Bar Exhibit 23-58 through
12  23-72, take a look at that.
13       CHAIRMAN FITCH:  That's a pleading that
14  purports to be signed by Mr. Klayman.  No further
15  authentication is needed.
16       MR. SMITH:  Ok.
17       Then I hereby move into evidence Bar
18  Exhibit Number 23.
19       CHAIRMAN FITCH:  That's --
20       MR. KLAYMAN:  Objection on the grounds
21  previously stated.
22       CHAIRMAN FITCH:  Admitted.

---

Page 308

1       I note that, counting the separate
2  portions of that exhibit, plus number one -- one,
3  two, three, four, five, six, seven, eight, nine,
4  covered 10 items in --
5       MR. SMITH:  One exhibit.
6       CHAIRMAN FITCH:  Well, a little bit
7  less than that, 13 and 29 -- 16 minutes.  At that
8  rate we're likely to be at this for at least two
9  hours.  I think that Mr. Smith is not changing his
10  case, other than calling one less witness.
11       MR. SMITH:  I just have a few more
12  documents after this one.
13       CHAIRMAN FITCH:  Well, you authenticate
14  as you want to.  I'm simply observing that there
15  is a firm deadline on when cross-examination ends
16  and this is cutting into time for
17  cross-examination.
18       MR. SMITH:  I appreciate that --
19       CHAIRMAN FITCH:  It's not your fault.
20  I'm not addressing that to you, by any means.  I'm
21  addressing that and bringing that to the attention
22  of the Respondent's time.

---

13  (Pages 305 to 308)

App.0231

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 309

1    MR. KLAYMAN:  Let me make a suggestion,
2 your Honor.  I understand your concerns.  It was
3 not my intent to --
4    CHAIRMAN FITCH:  What's your solution?
5    MR. KLAYMAN:  Yeah, here's my solution,
6 ok.  It's better to have a solution than an
7 intent, it is indeed.
8    My solution is I have a real big
9 problem with these two exhibits, ok?  With other
10 exhibits I can go through with Mr. Smith at the
11 end of the day and maybe we can agree on a lot and
12 just have them come in.
13    CHAIRMAN FITCH:  That should have been
14 done a long time ago.  There are no stipulations
15 in this case.  There was apparent discussion of
16 exhibits and objections.  I hold each counsel
17 equally responsible for that.  I'm not happy with
18 either counsel, but we are where we are.
19    Mr. Smith, you said you had some
20 additional authentication concerns?
21    MR. KLAYMAN:  Your Honor, may I put on
22 the record --

Page 310

1    MR. TIGAR:  May I briefly add
2 something?
3    It would help if at the recess maybe
4 both sides could get something done.
5    MR. KLAYMAN:  Yeah.
6    MR. TIGAR:  Let me tell you how I
7 looked at these, alright?
8    Many of these documents are authentic
9 under Federal Rule of Evidence 901(b)(4), and
10 therefore they would be admissible here.
11    Many others, under 904(b)(1), have now
12 been identified by the witness as to authorship
13 and date.
14    The hearsay objections that were
15 interposed are mostly not really available because
16 they're not offered for the truth of the matter
17 asserted or that they are statements by Mr.
18 Klayman himself or they're records of regularly
19 conducted activity.
20    Of course the rules of evidence don't
21 apply to authentication decisions, which means
22 that the admission into evidence doesn't deprive

Page 311

1 the Respondent of the opportunity to come back and
2 attack the credibility, even of the foundational
3 evidence.
4    So, with that in mind, one hopes that,
5 perhaps at the recess, the parties can just hand
6 in a list and say, "We're not going to fight about
7 this any more."
8    MR. KLAYMAN:  Yeah, I think that's a
9 good suggestion.
10    MR. TIGAR:  Yes.
11    MR. KLAYMAN:  So we don't want to take
12 your time up unnecessarily.  We don't want to take
13 anybody's time up.
14    But Mr. Smith did have an opportunity
15 as he was going through them to say that's what he
16 was going to do yesterday.
17    And one other point with regard -- you
18 see, I have a really -- sorry for the of the word,
19 "strong objection," a very big objection to both
20 complaints, because it appears they were prepared
21 by someone else who is not a lawyer.  In fact Bar
22 Counsel should be looking into the unauthorized

Page 312

1 practice of law, and therefore they're void.
2 They're void legally and for public policy and
3 should not even be considered.  We have a serious
4 issue about the unauthorized practice of law by
5 Ms. Stanton and Mr. Razavi.
6    CHAIRMAN FITCH:  That objection is
7 heard and it's overruled.
8    We could take a recess now.
9    MR. SMITH:  I think that would be a
10 good idea.
11    CHAIRMAN FITCH:  If you counsel will
12 consult and go from there.
13    MR. SMITH:  Alright, thank you.
14    CHAIRMAN FITCH:  Keep in mind that,
15 even though we're not on the record, it's eating
16 into the hours available between now and tomorrow
17 evening.
18    We will stand in recess and the hearing
19 committee will slip away and let you folks have a
20 moderately convenient place to confer.  You'll be
21 able to find us either in the room or David can
22 call downstairs.

14  (Pages 309 to 312)

Page 313

1       MR. SMITH:  Ok.  And the witness will
2  be excused and can wait -- I guess you'll get the
3  little room over there.
4       THE WITNESS:  Yes.
5       CHAIRMAN FITCH:  That's ok.
6       (Recess taken.)
7       CHAIRMAN FITCH:  We are back on the
8  record at 10:44, and I understand that the parties
9  have some representations.
10       MR. KLAYMAN:  Yes, your Honor.  I've
11  gone through -- Mr. Smith gave me a list of what
12  he wants to have authenticated.  I will agree to
13  Exhibit 24, 25, 26, 27.
14       28, I object.  I need to do some voir
15  dire on 28.  I can do that during the cross.
16       I will agree to 29.
17       With regard to Supplemental Exhibits 1
18  through 39, I don't object to the authenticity of
19  the documents that are there, but I do object to
20  having them admitted into evidence under the rule
21  of completeness, as I previously argued.
22       So, we're trying to move this thing

Page 314

1  along in good faith.  I hope that helps.
2       CHAIRMAN FITCH:  I think it is helpful
3  and appreciated, and the other objection,
4  obviously, is preserved, as well as objection to
5  28, as I understand.
6       MR. KLAYMAN:  Yes, 28.
7       MR. SMITH:  Well, at this time, then, I
8  would like to move in Bar Exhibits 1, 23, 24, 25,
9  26, 27 and 29, as there do not appear to be any
10  objections to those.
11       CHAIRMAN FITCH:  They are --
12       MR. TIGAR:  I'm sorry, did you say 28,
13  as well?
14       CHAIRMAN FITCH:  No, he did not say 28.
15       MR. SMITH:  No.
16       MR. KLAYMAN:  I didn't look at 23.
17       CHAIRMAN FITCH:  23 is what we just had
18  examination on.
19       MR. KLAYMAN:  Yes, Honor.  I object to
20  the entry of that.  It's not an authentic
21  document, in my opinion, and it was written by
22  somebody else who was practicing law who is not a

Page 315

1  lawyer, and Bar Counsel should have investigated
2  this before this case went forward.
3       So I have a strong objection to that.
4       CHAIRMAN FITCH:  Well, I observe that
5  in this jurisdiction Bar Counsel does not have
6  jurisdiction over unauthorized practice of law.
7       They are admitted, specifically
8  specifics one, 23, 24, 25, 26, 27, 29 and SX1
9  through 39.
10       So that's where we are with respect to
11  exhibits.
12       MR. SMITH:  Alright.  And I will remove
13  the admission of Exhibit 28 after Ms. Sataki's
14  been voir dired --
15       CHAIRMAN FITCH:  That would be fine.
16       MR. SMITH:  -- by Mr. Klayman.
17       I wasn't thinking about it, but I was
18  just wondering if I have any more questions I want
19  to ask Ms. Sataki before I release her for cross,
20  and I don't think that I do.
21       So I think, to move things along, I
22  rest my direct examination at this time of Ms.

Page 316

1  Sataki with the right to redirect if we see fit.
2  I'll bring her back in for
3  cross-examination.
4       CHAIRMAN FITCH:  Thank you.
5       (Ms. Sataki resumes the witness stand.)
6       CHAIRMAN FITCH:  Good morning again,
7  Ms. Sataki.
8       The lawyers and hearing committee have
9  finished the administrative business that we had,
10  and Mr. Smith has notified us that he has
11  completed his direct examination or first round of
12  questioning of you.  Now Mr. Klayman and his team
13  have the right to ask you questions.
14       MR. KLAYMAN:  Your Honor, may I just
15  voir dire, and then, with your indulgence, go to
16  the restroom and then come back and get into the
17  cross itself, just get into this particular
18  document.
19       It will just take me two minutes.
20       CHAIRMAN FITCH:  Voir dire on number
21  28?
22       MR. KLAYMAN:  Yes, and then just go to

15 (Pages 313 to 316)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 317 |
|---|

1    the restroom real quick.

2         CHAIRMAN FITCH:  Ok.

3         VOIR DIRE ON BEHALF OF RESPONDENT:

4         BY MR. KLAYMAN:

5    Q.  Turning your attention to Exhibit 28,

6    Ms. Sataki -- how are you this morning?

7    A.  Ok.  Yes.

8    Q.  Yes.  Who wrote this document?

9    A.  I wrote it, with help.

10   Q.  Who helped you?

11   A.  Katherine helped me and my cousin

12   helped me.

13   Q.  What's the name of your cousin?

14   A.  Mehran Razavi.

15   Q.  Neither of those people are lawyers --

16        CHAIRMAN FITCH:  Spell that, please,

17   for the court reporter.

18        THE WITNESS:  M-e-h-r-a-n, last name is

19   R-a-z-a-v-i.

20   BY MR. KLAYMAN:

21   Q.  Mr. Razavi is not a lawyer, is he?

22   A.  No.

| Page 318 |
|---|

1    Q.  What does he do for a living?

2    A.  He's doing loan for people, in the loan

3    business.

4    Q.  You're aware that he was convicted of a

5    crime for fraudulent gaming in Las Vegas?

6    A.  No, I'm not.

7         MR. SMITH:  Objection.  I don't know

8    how that relates to the voir dire of the document.

9         CHAIRMAN FITCH:  It's tenuous, but

10   overruled.

11        MR. KLAYMAN:  I'll get back into it

12   later, your Honor, in the context of things.

13   BY MR. KLAYMAN:

14   Q.  With regard to Kathleen, her last name

15   is Stanton.  Is that her last name?

16   A.  Yes.

17   Q.  How is that spelled?

18   A.  I don't know how it's spelled.  I have

19   it in my paperwork.

20   Q.  She's not a lawyer, is she?

21   A.  She's not a lawyer.  I couldn't have a

22   lawyer help me with anything at that time.

| Page 319 |
|---|

1    Q.  That's not the question.  Please just

2    answer my question.

3         This document was never sent to me,

4    Larry Klayman, was it?

5    A.  I remember I tried to find an address

6    for you, and I don't remember what address,

7    whether it was in DC or California that I sent it,

8    but I don't know if it was correct address.  We

9    tried to find you.

10   Q.  You did that -- I'm sorry.

11   A.  Go ahead.

12   Q.  You did have my email address, didn't

13   you?

14   A.  I had your email address, yes.

15   Q.  So you could have emailed it to me?

16   A.  Yes.

17   Q.  But you didn't.

18   A.  I don't remember if I did or didn't.

19   Q.  There's no showing on this document

20   that you did, correct?

21   A.  Correct.

22        MR. KLAYMAN:  Your Honor, I object to

| Page 320 |
|---|

1    it on the basis that it's a document which is void

2    as having been committed by people who are not

3    lawyers and they're practicing as lawyers.

4         As far as its authenticity, I don't

5    know one way or the other whether it's authentic.

6    I never got it.

7         So I object.

8         CHAIRMAN FITCH:  The objection is

9    overruled and, upon Mr. Smith's standing motion,

10   Exhibit 28 is admitted into the record of this

11   case.

12        We will stand in a five-minute recess.

13        (Recess taken.)

14        MR. SMITH:  If I could ask the

15   committee one administrative issue if I may --

16        CHAIRMAN FITCH:  Wait just a minute.

17        We are back on the record at 11:00 a.m.

18   and Mr. Smith has an administrative issue.

19        MR. SMITH:  I don't know how long

20   cross-examination is going to go today, but one of

21   my witnesses, Mr. Kevin O'Connell, informed me

22   that he will not be available tomorrow.

16  (Pages 317 to 320)

App.0234

## Page 321

1    I anticipate my examination of him will
2 probably be no more than five or ten minutes,
3 maximum, and I can't imagine there will be a lot
4 of cross-examination based upon what his testimony
5 will be.
6    So, keeping in mind that the Chair
7 indicated yesterday that you might want to finish
8 up early today, I was hoping, even if Ms. Sataki's
9 cross-examination continues, that we could carve
10 out about a half an hour or so for Mr. O'Connell's
11 testimony, and then resume cross-examination
12 before the end of the day.
13    CHAIRMAN FITCH:  We will take Mr.
14 O'Connell at the beginning of the afternoon
15 session, after our approximately 45-minute to
16 one-hour lunch break.
17    MR. SMITH:  Thank you.
18    CHAIRMAN FITCH:  And Mr. Klayman is
19 entitled to cross examine the witness.
20    Go ahead, Mr. Klayman.
21
22

## Page 322

1    CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
2       BY MR. KLAYMAN:
3    Q.  Ms. Sataki, how are you today?
4    A.  Thank you.
5    Q.  Now I believe you testified that we
6 first met on Capitol Hill in front of the Capitol
7 during a demonstration for Iranian freedom,
8 correct?
9    A.  Correct.
10    Q.  You were there giving an interview or
11 doing an interview with someone, correct?
12    A.  Correct.
13    Q.  And I came over and introduced myself
14 and I said to you, "I represent Akbar Mohammadi
15 and his brother Manouchehr Mohammadi in a case
16 against the regime for having killed Akbar and
17 tortured Manouchehr, and would you be interested
18 in that, correct?
19    A.  Yes.
20    Q.  And it was a very brief conversation?
21    A.  Yes.
22    Q.  And I walked away.  I was with somebody

## Page 323

1 at the time, and I was walking down the Capitol
2 steps, correct?
3    A.  I don't remember the details, but, ok,
4 correct.
5    Because I was there working with my
6 cameraman.  I didn't pay attention to the details
7 about how you were walking or where.
8    Q.  And you ran after me and gave me your
9 card that had your personal cell phone number on
10 the back, correct?
11    A.  I didn't "run" after you.
12    You gave me your business card and you
13 said, "Do you have one?"  I said "no," and my
14 cameraman said, "I have your card."  And then I
15 gave you my card, yes.
16    Q.  And it had your personal cell phone
17 number on it --
18    A.  My personal cell phone number is -- was
19 always on my business cards, all of my cards.
20    Q.  And you then asked me to call you,
21 correct?
22    A.  You asked me to cover a story.  I said

## Page 324

1 you can call me at my office number, correct.
2    Q.  No, when you handed me the card, you
3 simply said "You can call me," correct?
4    A.  When -- I always, when someone approach
5 me regarding work, when you -- you asked me, you
6 wanted me to cover the event, and I said, "You can
7 call me at my office and we can talk about it, and
8 I have to talk to my executive producer about it,"
9 yes.
10    Q.  You just acknowledged that the
11 conversation was very brief.  That was longer than
12 any alleged conversation.
13    MR. SMITH:  Objection, mischaracterizes
14 the testimony.
15    CHAIRMAN FITCH:  The observation is
16 struck.
17    THE WITNESS:  Ok, the conversation was
18 very brief.  It was about me covering the story
19 that you wanted me to cover.
20 BY MR. KLAYMAN:
21    Q.  After that initial encounter, I called
22 you, correct?

17  (Pages 321 to 324)

Page 325

1      A.  Yes.
2      Q.  And I left a message on your cell
3   phone, correct?
4      A.  I don't remember if it was my cell
5   phone or desk, but correct.
6      Q.  Right.  And it took you a while to call
7   me back, correct?
8      A.  Yes.
9      Q.  And when you called me back, you told
10   me, "I've been having some problems.  Sorry I
11   didn't call you back sooner."
12      A.  Yes.
13      Q.  And when we talked on the phone, I
14   asked you if you'd like to have dinner sometime in
15   the future, and you said "yes," correct?
16      A.  Yes.
17      Q.  And I invited you to come to Clyde's
18   restaurant in Georgetown, correct?
19      A.  Yes.
20      Q.  That evening when you walked in, I had
21   a table and you were at the bar.  Do you remember?
22      A.  I don't remember --

Page 326

1      Q.  Initially.
2      A.  -- exactly, maybe.  Maybe I was waiting
3   for you at the bar.  I don't know.
4      Q.  And I came over to greet you and, in
5   terms of custom, you gave me a kiss on the cheek,
6   correct?
7      A.  I don't remember that.  If that is the
8   custom, you shake hand or give a hug or kiss or
9   not cheek.  I don't know.
10      If you say that is, I don't want to --
11   I don't know.
12      Q.  Ok, but you kissed me on the cheek --
13      A.  I kissed you on the!
14      Q.  Yes.
15      A.  No, not correct.
16      Q.  We then got our table and talked a
17   little bit.  Do you remember that?
18      A.  Yes.
19      Q.  The table was in the back of Clyde's,
20   not in the first part, in the bar area, but the
21   back, and we had a table for two, correct?
22      A.  Yes.

Page 327

1      Q.  And in the course of that conversation
2   you grabbed my hand and said, "Larry, I've got a
3   big problem," correct?
4      A.  Not correct.
5      Q.  And you started crying, correct?
6      A.  Maybe, yeah -- I don't remember, but
7   maybe.
8      Because at that time I was going
9   through that tough time and depression, so crying
10   was a part of my daily routine.
11      Q.  You weren't crying because of anything
12   I said or did at that time?
13      A.  No.
14      Q.  After you grabbed my hand and started
15   crying, you said, "Larry, I have no money.  I am
16   completely bankrupt.  And I have this legal
17   problem at Voice of America."
18      Do you remember that?
19      A.  I didn't say I don't -- no, it didn't
20   go that way.
21      I didn't grab your hand.  Definitely
22   not.  Absolutely not.

Page 328

1      And I -- we were talking, the
2   conversation -- within the conversation my problem
3   with VOA came up and I explained to you what's
4   going on there, and also I explained to you,
5   because you were an attorney, that I just found
6   out that someone did fraud on my credit card.  So
7   I was dealing with that.  And I explained that to
8   you.
9      Because you were an attorney, again, I
10   thought maybe you can give me some advice.  That's
11   why I shared that with you.
12      Q.  Now, you didn't really know me very
13   well at that time, did you?  In fact you never met
14   me before except on the mall in front of the
15   Capitol?
16      A.  Yes.
17      Q.  And you were sharing some very intimate
18   details with me that night, correct?
19      A.  That's not intimate.
20      Q.  Are you saying that -- well, let's back
21   up a little bit.
22      You were talking to me --

18  (Pages 325 to 328)

Page 329

1      A.  We talked over the phone before we met,
2  and I had already explained to you that I probably
3  cannot cover this story that you want me to cover
4  because my executive producer has to assign the
5  assignment to the reporters, and she most likely
6  is not going to do that.  And then I explained to
7  you why, because of my problem with VOA.
8          So we had all these conversations
9  already over the phone, and that went to the
10  dinner, when we had the conversation.
11         So I don't know why this conversation
12  was so intimate to you, because it was definitely
13  not intimate to me.  Everybody knew.  In that
14  case, I had intimate conversation with everybody.
15     Q.  You don't have any record of our having
16  a detailed conversation over the phone before I
17  invited you to dinner at Clyde's, do you?
18     A.  We had a detailed conversation over the
19  phone.  I explained to you about this.
20     Q.  You have records on other things, but
21  you don't have records on that, do you?
22     A.  On -- on what?

Page 330

1      Q.  On the conversation that you claim we
2  had --
3      A.  I didn't record our conversation.
4      Q.  -- that you claim we had in detail over
5  the phone?
6      A.  I didn't record our conversation.  The
7  record I have is the emails and text messages you
8  sent me.  But our phone conversations, I don't
9  have any of those records, otherwise I would have
10  had lots of phone conversations from you to me if
11  I had that records and recorded our conversations.
12     Q.  The communications that you submitted
13  to Bar Counsel here in this case, you submitted
14  them because they were favorable to you, correct?
15     A.  I just submitted all the evidence.
16     Q.  As you perceived them to be, ok?  You
17  perceived them to be favorable to you?
18     A.  I just submitted all the evidence.
19     Q.  But yet you don't have any record of
20  this conversation we had before you met me at
21  Clyde's?
22     MR. SMITH:  Argumentative.

Page 331

1      THE WITNESS:  Why would I have a record
2  of our conversation the first time I met you,
3  before you started sexually harassing me?  Why
4  would I -- I didn't know at that time that that's
5  what you going to do to me.
6      MR. KLAYMAN:  I move to strike that
7  comment as not responsive.
8      CHAIRMAN FITCH:  Well, we've had
9  argumentativeness both ways.
10         The question is struck and the answer
11  is struck.
12     MR. KLAYMAN:  Alright, well I'm going
13  to ask a follow-up question, your Honor.
14  BY MR. KLAYMAN:
15     Q.  Ms. Sataki, it's now been eight years.
16  You never filed a sexual harassment case against
17  me, did you?
18     A.  I filed this complaint, yes.
19     Q.  And the complaint makes no mention of
20  sexual harassment?
21     A.  Well, in all the evidence it shows that
22  you were sexually harassing me.

Page 332

1      Q.  Now, during that conversation, you then
2  told me, sobbing, what you claimed had happened to
3  you at Voice of America with your co-anchor, Mehdi
4  Falahati, correct?
5      A.  I was sobbing to every person who I was
6  talking at that time, because I was going through
7  a deep depression, and every time I talk about
8  that, I would cry.  That's just how it was.  Not
9  only with you, but with everybody.
10     Q.  And you asked me if I would help you,
11  correct?
12     A.  You offered me to help.
13     Q.  No, you asked me, correct?
14     A.  You offered me.
15     Q.  And I told you that I would help you as
16  a friend, did I not?
17     A.  You told me you help me, yes.
18     Q.  Yeah, and that you had no money, that I
19  would help you and not charge you, correct?
20     A.  Yes.  We talked about that.  At the end
21  you're going to get 40 percent.
22         I explained, I don't have any money to

19  (Pages 329 to 332)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 333

1  pay for a lawyer, but then you said that I -- we
2  can -- at the end, "because this is a strong case
3  and I'm going to help you with that," and we get
4  40 percent.  We talked about that.
5      Q.  It's not true that that 40 percent came
6  up at that time at that dinner.
7          It did not come up, did it?
8      A.  I don't remember.
9      Q.  Then why did you just say that?
10     A.  Well, we -- is it we're still talking
11 about that particular dinner?
12     Q.  Yes.
13     A.  Only?
14     Q.  Yes, at Clyde's.
15     A.  Ok.  Maybe it didn't, but definitely --
16 the percentage of it maybe didn't come up, but the
17 fact that, "We're going to definitely win,"
18 according to you, "that you have a strong case,"
19 and you're going to collect your money at the end,
20 that came up.
21     Q.  During that dinner I didn't get into
22 detail with you about what had happened or whether

Page 334

1  even you had a lawsuit that could be brought, or
2  anything to that effect, did I?  I just was
3  listening to you at that time, and I said I would
4  try to help you if you asked me.
5          That's all I said at dinner, correct?
6      A.  No.  We talked about this, too.  That
7  was why I met with you again.
8      Q.  And later we did meet and we went
9  through what happened, what you claimed happened
10 to you, correct?
11     A.  Exactly.
12     Q.  And you told me, did you not, that "My
13 goal is to get back to work out of the presence of
14 the alleged harasser, Falahati, and to go book to
15 work with the Persian news network in Los
16 Angeles."
17     A.  I said that I have written a proposal,
18 yes, and I'm trying to transfer myself to Los
19 Angeles.
20         I mentioned that to you, yes.
21     Q.  Yes, and your goal was to go back to
22 Los Angeles, because that's where you're from?

Page 335

1      A.  Well, I'm from -- I was raised in
2  Sweden.  I was born in Iran.  I mean, I'm from a
3  lot of different places before DC.
4      Q.  Yeah, when did you move to Los Angeles?
5      CHAIRMAN FITCH:  Let me stop there.
6          There was a question that asked in
7  general terms whether Ms. Sataki said her goal was
8  to be reemployed, and I don't think we got an
9  answer to that question.  We jumped ahead.
10     MR. KLAYMAN:  I'll ask it again.
11     CHAIRMAN FITCH:  We jumped ahead to LA.
12 BY MR. KLAYMAN:
13     Q.  You told me earlier your goal was to
14 get out of the presence -- I'll go through it
15 again -- get out of the presence of the alleged
16 harasser, Falahati, and be transferred to Los
17 Angeles, because you like Los Angeles a lot more
18 than Washington, D.C., you had spent many years
19 there, had family there, et cetera.
20         You did say that to me during that
21 dinner, right?
22     A.  Yes.

Page 336

1      Q.  And we really didn't discuss at that
2  dinner whether you could get damages for what had
3  happened to you?
4          The goal was to go back to LA and work
5  for Persia News Network, for Voice of America
6  there?
7      A.  Yes.
8      Q.  And I later met with you and we went
9  through a lot more detail, correct?
10     A.  Correct.
11     Q.  And at that time I agreed to try to
12 help you, and I told you that I wasn't going to
13 charge you for my legal services, that it was
14 being offered in friendship.
15     A.  Could you repeat yourself?
16     Q.  When we met I told you that I would try
17 to help you, that I wasn't going to charge you for
18 my legal services because it was offered in
19 friendship.
20     A.  Yes, you said that.
21     Q.  You had told me in the course of the
22 conversations that you were working with the

20  (Pages 333 to 336)

App.0238

In The Matter Of:  Larry E. Klayman
May 31, 2018

|  | Page 337 |
|---|---|

1  president of the union, your representative, Tim
2  Shamble, at VOA, before you met with me?
3  　　A.  Yes.
4  　　　CHAIRMAN FITCH:  Now we're talking
5  right at this point about the meeting, subsequent
6  meeting?
7  　　　MR. KLAYMAN:  Yes.
8  　　　CHAIRMAN FITCH:  Ok.
9  BY MR. KLAYMAN:
10  　　Q.  And that I should contact Mr. Shamble.
11  You told me to contact him?
12  　　A.  Yes.
13  　　Q.  And you're aware that I did contact
14  him, correct?
15  　　A.  Yes.
16  　　Q.  And we later had meetings with Mr.
17  Shamble?
18  　　A.  Yes.
19  　　Q.  And during those meetings, Mr. Shamble
20  explained how difficult it is to try to get Voice
21  of America to do anything that's positive for an
22  employee.

|  | Page 338 |
|---|---|

1  　　　Do you remember that?
2  　　A.  Yes.
3  　　Q.  That he said it's the worst -- it's
4  been ranked the worst agency in Washington, D.C.
5  by the General Accounting Office?
6  　　A.  Yes.
7  　　Q.  But that we would try to negotiate your
8  move from Voice of America in Washington, D.C. to
9  Los Angeles?
10  　　A.  Yes.
11  　　Q.  You're aware that we then sought to
12  negotiate that move, Mr. Shamble and I?
13  　　A.  Yes.
14  　　Q.  And we held some meetings with the
15  general counsel of Voice of America, someone named
16  Elmer Dorsey and other people to try to resolve it
17  amicably?
18  　　　Do you remember that?
19  　　A.  Yes.
20  　　Q.  Now around that time, you were going to
21  take some leave, were you not, some vacation time
22  I believe.  Correct my if I'm wrong --

|  | Page 339 |
|---|---|

1  　　A.  Yes.
2  　　Q.  To go to Los Angeles, correct?
3  　　A.  Yes.
4  　　　CHAIRMAN FITCH:  When one says, "around
5  that time," can we pin it down to a month?
6  　　　MR. KLAYMAN:  Early 2009.
7  　　　CHAIRMAN FITCH:  Or season.  Ok.
8  BY MR. KLAYMAN:
9  　　Q.  Correct?
10  　　A.  No.  Not early 2009.  Early 2010.
11  　　　MR. KLAYMAN:  Excuse me, I'm sorry.
12  　　　CHAIRMAN FITCH:  That sounds right.
13  　　　MR. KLAYMAN:  That was my mistake.
14  BY MR. KLAYMAN:
15  　　Q.  And you told Susan Jackson, who was one
16  of your supervisors, that you were going to LA for
17  personal reasons to see someone that you had a
18  love interest in, correct?
19  　　A.  No.
20  　　Q.  She's claimed that, though, hasn't
21  she?
22  　　A.  She has.  You said she has.  I don't

|  | Page 340 |
|---|---|

1  know.
2  　　Q.  Well, we're going to go through some
3  documents later.
4  　　A.  Ok.
5  　　Q.  I just want to get this out.
6  　　　And during that time --
7  　　A.  But, even if that's the case, on my
8  free time, on my leave, vacation, I go to see
9  whomever.  Why is that any business of Susan
10  Jackson or anybody at VOA?
11  　　　CHAIRMAN FITCH:  I think, Ms. Sataki,
12  think more carefully about the question he asks
13  and then answer that question rather than making
14  additional observations.
15  　　　If Mr. Smith wants to bring out
16  additional observations, he'll do so when it's his
17  turn.
18  　　　THE WITNESS:  Yes, sir.
19  　　　CHAIRMAN FITCH:  Again.
20  　　　And we'll strike that observation.
21  BY MR. KLAYMAN:
22  　　Q.  And during that time period, you're

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 341

1  aware that I had submitted documentation, Mr.
2  Shamble and I, to Voice of America, before you
3  went to Los Angeles on your leave, arguing that
4  you should be transferred there, correct?
5      A.  Yes.
6      Q.  And the reason was, primarily, that you
7  wanted to be out of the presence of the alleged
8  harasser, Mehdi Falahati.
9      A.  Yes.
10     Q.  You also could function doing your job
11 in Los Angeles.
12     A.  Yes.
13     Q.  In fact, you had maintained that Susan
14 Jackson and others at VOA had already told you,
15 even before this alleged harassment, that you
16 could go there periodically to do packages in the
17 LA office --
18     A.  Yes.
19     Q.  -- of PNN?
20     A.  Yes.
21     Q.  You are aware that they were making
22 allegations at the time, as well, that you didn't

Page 342

1  have the capability to do those packages on your
2  own.
3      Do you remember that?
4      A.  After we complained that that was
5  their -- yeah.  That's what they started, yes.
6      Q.  And they maintained that the person who
7  was helping you do those packets was someone by
8  the name of Kaveh, K-a-v-e-h, correct?
9      A.  Correct.
10     Q.  Kaveh worked at Voice of America?
11     A.  Correct.
12     Q.  What was his position?
13     A.  At the time he was just like me.  He
14 was making packages, doing packages, reporting,
15 cameraman, editor.
16     Q.  Now you actually were living with Kaveh
17 then in Roslyn, Virginia here, correct?
18     A.  Correct.
19     Q.  And at the time that you told me this,
20 I said, "This is not a good situation because
21 you're claiming that a coworker came on to you and
22 harassed you, and you're also living with a

Page 343

1  coworker," correct?
2      A.  I don't remember that, that you said
3  that.
4      Q.  I said, "I don't think that's good if
5  it ever came out," correct?
6      A.  Say that again.
7      Q.  Do you remember that?
8      A.  That you said it's good if everything
9  came out?
10     Q.  No, I said, "This could be a problem if
11 it comes out that you're living with Kaveh."  You
12 asked me to keep it secret, do you remember?
13     A.  It was -- yes.
14     Q.  And during the time that you were in
15 Los Angeles, I got a response from Voice of
16 America with regard to Mr. Shamble and my request
17 to have you transferred there, correct?
18     A.  Yes.
19     Q.  That response was very, very negative.
20 Do you remember that?
21     A.  Yes.
22     Q.  But it did offer you -- they said,

Page 344

1  "We're not transferring you to Los Angeles, but
2  you may work in the Central News Bureau and we'll
3  keep you away in the building from Mr. Falahati."
4      Do you remember that?
5      A.  Keeping you what?
6      Q.  "We'll separate you from Mr. Falahati,
7  and we'll have you work, we'll transfer you" --
8  this was their proposal -- "to another section of
9  Voice of America, which is called the Central News
10 Bureau, which broadcasts to Middle Eastern, Arabic
11 countries"?
12     A.  Yes, which is on the same floor and
13 same hallway, exactly same area.
14     Q.  They also said, "We'll make sure that
15 Mr. Falahati doesn't harass you again, as you've
16 alleged"?
17     A.  Yes.
18     Q.  And you didn't find that acceptable,
19 did you?
20     A.  We together, you as my attorney and me,
21 we didn't find that acceptable.  You were advising
22 me through the whole thing.

22 (Pages 341 to 344)

Page 345

1    Q.  You told me --
2    A.  And I was listening to you.
3    Q.  You told me, Ms. Sataki, you told me
4  that, "They broadcast in English and Arabic, and I
5  don't speak Arabic, that my English is not that
6  good.  And that, in any event, I don't have any
7  interest in Arabic countries.  I'm a Persian.  I'm
8  not an Arab."
9       You told me that?
10    A.  I don't recall that, but --
11    Q.  It makes sense though, right?
12    A.  I don't recall that.  Because Persia --
13  the Central News is in English only.  I don't know
14  why you would bring up the Arabic part of it.
15    Q.  But your English is not that good, is
16  it, and that's why you had people write complaints
17  for you?
18    A.  Yes, my English is not that good.  But
19  I was not hired by the Central News English side.
20  I was hired by the Persia News Network, which is
21  on the Farsi side.
22    Q.  The bottom line is you didn't want to

Page 346

1  work in that bureau, not just because Falahati was
2  in that area, but because that was not a country
3  that was your major interest, which was Iran?
4    A.  And I told you at that time that
5  they're trying to get me in trouble and retaliate,
6  because if they put me there and I can't do the
7  assignment that they want me to do, then they're
8  going to fire me.
9    Q.  You thought you were being set up, in
10  effect?
11    A.  Exactly, and I explained that to you
12  and you agreed with me.
13    Q.  But then you told me, "Larry, get me
14  back to LA," right?  "Get me to LA."
15    A.  I said, "Either back to my desk or LA.
16  I don't want to be at Central News.  Either to my
17  old position, to my desk, or LA."
18    Q.  And I tried that and Mr. Shamble and
19  VOA said, "No.  Here's the choice: work in Central
20  News Bureau, or, you know, you're not going to be
21  working at all," correct?
22    A.  Correct.

Page 347

1    Q.  And VOA in effect threatened you?
2  They said, "If you don't show up at a certain time
3  at the Central News Bureau, we're going to cut off
4  your salary, we're going to cut off your leave,
5  and we're going to do all that stuff."
6    A.  Yes.
7    Q.  Now, this upset -- you were in LA at
8  the time you found this out.  You were there on
9  leave, correct?
10    A.  Yes.
11    Q.  And I was there, too, at the time,
12  correct?
13    A.  Yes.
14    Q.  And at that point you got very, very
15  emotional and started crying uncontrollably.  Do
16  you remember that?
17    A.  Yes.
18    Q.  And shaking -- and shaking?
19    A.  Shaking, crying, yes.  I was shaking
20  and crying all day long, every day.  To everybody,
21  not only you, everybody, because I was depressed
22  at that time.  Not only you, everyone.

Page 348

1    Q.  I didn't ask you whether you told other
2  people.  I just asked you if you told me, and I
3  actually observed you in that state, correct?
4    A.  Yeah, because you were the one who told
5  me the news, that this is what's going on.
6    Q.  Yeah.
7    A.  So, of course, that was my first
8  reaction.
9    Q.  And I thought -- and I suggested at the
10  time that you go see a psychologist.  Do you
11  remember?
12    A.  Yes.
13    Q.  And I took you to two psychologists.
14  Do you remember that?
15    A.  Yes.
16    Q.  One had been recommended to me by my
17  Persian friend, Ben Kersangi (phon), remember, the
18  first one?
19    A.  I don't remember the details.  I just
20  remember you helped me to find two
21  psychologists -- one psychologist, one
22  psychiatrist, and I started seeing them.  Yes,

23 (Pages 345 to 348)

In The Matter Of:  Larry E. Klayman
May 31, 2018

|  | Page 349 |
|---|---|

1   sir.

2      Q.   And we decided not to use -- you

3   decided not to use that psychologist, and then I

4   found the name of another psychologist through a

5   former client of mine, Alice Elise.

6      Do you remember that?

7      A.  I don't remember.

8      Q.   You did meet Alice, though?  You

9   remember her?

10     A.  I remember my two -- at that point I

11   was very sick, so, I remember that I saw a few

12   doctors, yes.

13     Q.   Yes.  And I took you to see -- I got

14   the name of a psychologist from Alice, you

15   remember that, and then that psychologist, because

16   she was representing Alice -- because Alice had

17   been a sexual harassment victim, as well, I had

18   represented her -- represented that someone else

19   could perhaps help, you and that person was Arlene

20   Aviera.

21      Do you remember that?

22     A.  Yes.

|  | Page 350 |
|---|---|

1      Q.   And then I took you to Arlene Aviera?

2     A.  Yes.

3     Q.   I believe that we sat down with Arlene,

4   we'll call her Arlene, and you explained your

5   situation and started crying and sobbing again?

6     A.  Yes.

7     Q.   You remember that?

8     A.  Yes.

9     Q.   And I asked Arlene in front of you,

10   "Can you please help Elham."

11      Do you remember that?

12     A.  Yes.

13     Q.   And I said, "If she can't pay the fees,

14   Dr. Aviera, don't worry about it, I'll pay them."

15     A.  Yes.

16     Q.   You then began to see Dr. Aviera?

17     A.  I'm sorry, what?

18     Q.   You then set up a schedule to be

19   counseled by Dr. Aviera?

20     A.  Yes.

21     Q.   And I was not present during those

22   counseling sessions.  That was with you and Dr.

|  | Page 351 |
|---|---|

1   Aviera?

2     A.  You "were" present or "not present"?

3     Q.  Not.

4     A.  Not, yes.

5     Q.   And in and around this time period we

6   had discussions with Tim Shamble, your union

7   represent, president for the AFL-CIO, Voice of

8   America, as to what we now could do to get you

9   back to work in Los Angeles at the Persia News

10   Network.

11     A.  Yes.

12     Q.   And we decided that, if we could show

13   that you had a medical reason why you had to be in

14   Los Angeles, that we could qualify for a

15   reasonable medical accommodation move to Los

16   Angeles.

17     A.  Yes.

18     Q.   And therefore we submitted

19   documentation from Dr. Aviera, from the prior

20   psychologist that you saw, and also from a doctor

21   named Long, an internist, to Voice of America with

22   various documentation arguing that you needed to

|  | Page 352 |
|---|---|

1   be in Los Angeles because those were where your

2   physicians were, that's where your family was,

3   that's where your friends were, and besides, you

4   could do your work out of the Persia News Network

5   on Wilshire Boulevard at the federal building,

6   which was run by Voice of America.

7      Do you remember that?

8     A.  Yes.

9     Q.   One of the reasons why there is a

10   Persia News Network division in Los Angeles is

11   because Los Angeles has a very big Persian

12   population, correct?

13     A.  Correct.

14     Q.   You're aware of that, there's over one

15   million Persians, or Iranians, however you want to

16   say it?

17     A.  Yes.

18     Q.   Los Angeles.  And sometimes people joke

19   about it, they call Los Angeles "Tehrangeles"

20   rather than Los Angeles, because it's so heavily

21   populated.

22     A.  Correct.

24  (Pages 349 to 352)

Page 353

1    Q.   In fact, in Beverly Hills, California,
2  where I had my office at the time, is generally
3  highly populated, the stores and everything else,
4  with Persians who are very industrious and run
5  those stores, and own those stores?
6        You're aware of that?
7    A.   Yes.
8    Q.   You know the famous men's haberdashery
9  Bijan on Rodeo Drive, very famous, owned by
10  Mr. Bijan.
11    A.   Yes, I know that.
12    Q.   Did you ever work for him?
13    A.   No.
14    Q.   Did you ever ask to work for him?
15    A.   Did what?
16    Q.   Did you ever ask for a job there?
17    A.   Briefly we talked once when I was
18  living there and I went by his boutique and he was
19  standing outside his boutique.
20    Q.   Was that before or after I represented
21  you?
22    A.   Way before.

Page 354

1    Q.   Ok.  But you did work for a clothing
2  store out there, didn't you, at one time?
3    A.   Not clothing store.
4    Q.   Not Bijan but a different clothing
5  store.
6    A.   Not clothing store.  I was working for
7  Hermes perfume.
8    Q.   Hermes, H-e-r-m-e-s?
9    A.   Yes.
10    Q.   We tried for a reasonable medical
11  accommodation and we submitted all this
12  documentation, correct?
13    A.   Yes.
14    Q.   And we got sworn affidavits from Dr.
15  Aviera and the others as to your medical
16  condition?
17    A.   And Dr. Long, yes.
18    Q.   Yes.  We said that, you know, you also
19  needed to be there because, you know, you were
20  having a nervous breakdown, you had a bleeding
21  ulcer before when you were criticized unfairly at
22  Voice of America in Washington, that this was

Page 355

1  compounding that bleeding ulcer and that you were
2  on the verge of even thinking about killing
3  yourself.  Or it could happen.
4        Do you remember that?
5    A.   I had bleeding ulcer.  I wasn't going
6  to kill myself.  I ended up in the hospital
7  because of bleeding ulcer.
8    Q.   Ok, but you previously testified that,
9  you know, you felt that way after you were
10  harassed at Voice of America.
11        Do you remember that?
12    A.   When I had bleeding ulcer?
13    Q.   No.  The bleeding ulcer -- well, let's
14  back up.
15        The bleeding ulcer you claim resulted
16  from unfair criticism of you by Susan Jackson and
17  others at Voice of America --
18    A.   Joy Wagner, that day.  Yes, she yelled
19  at me.
20    Q.   Right.
21    A.   And she came and apologized later.
22        But --

Page 356

1    Q.   Go ahead.
2    A.   -- yes, the bleeding ulcer was because
3  of the way I was treated at VOA unfairly, yes.
4    Q.   You Joy Wagner was criticizing your
5  work?
6    A.   Not criticizing.  She accused me of
7  something that later on she came and apologized
8  because she realized that it was accusations and
9  not true.
10    Q.   At the time she criticized your work
11  and said somebody else is doing the packages --
12    A.   Yes.
13    Q.   -- that it was Kaveh, that your Farsi
14  is not very good, it's not literal.
15        Do you remember that?
16    A.   Yes.
17    Q.   And that, "You have to work harder.
18  You just can't get by on the fact that you're
19  beautiful."
20        Do you remember she said that, too?
21    A.   She said that to me?
22        (Mr. Klayman nods head in the

25  (Pages 353 to 356)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 357

1  affirmative.)
2      A.  Ok.
3      Q.  So all of these things together --
4      CHAIRMAN FITCH:  Is that answer a "yes"
5  or is that answer "I don't remember"?
6      THE WITNESS:  She said to me,
7  "Beautiful girls always have to work harder to
8  prove themself, so other people don't think that
9  they're in front of the camera because of their
10  face."
11  BY MR. KLAYMAN:
12      Q.  All of these things together, that
13  created the bleeding ulcer, you claim, correct?
14  Because you take things to heart.
15      A.  Yes.
16      Q.  And during this time period when you
17  were telling me all of this, it was clear to you
18  that I was sympathizing with you and wanted to
19  help you?
20      A.  Yes.
21      Q.  You ultimately, even after we
22  resubmitted all of this stuff that I'm talking

Page 358

1  about -- the medical statements and affidavits and
2  this and that -- they denied again you're being
3  transferred to LA?
4      A.  Yes.
5      Q.  And you told me, "Larry, I can't go
6  back there.  I'll kill myself if I go back there."
7      You said that, didn't you?
8      A.  I don't remember.  Maybe I said it.  I
9  don't remember.
10      Q.  And at that point I said to you,
11  "Ellie, I'll do whatever I can to help you, and
12  I've had a lot of experience dealing with
13  government agencies.  I've been a lawyer for so
14  many years.  I'll do my best, but I can't
15  guarantee any result, but it seems to me you have
16  a strong case."
17      A.  And you said, "I'm going to transfer
18  you within two weeks to LA."  I remember the
19  week -- exactly "two weeks," you said that.
20      Q.  Ok.
21      A.  You said, "That's going to be easy."
22      Q.  But you didn't --

Page 359

1      A.  "You have a case," you said.
2      Q.  Whether or not that's true or not,
3  which I refute, and I'll testify later, but --
4      MR. SMITH:  Objection, argumentative.
5  BY MR. KLAYMAN:
6      Q.  Whether or not that's true or not --
7      CHAIRMAN FITCH:  It's an understandable
8  situation when lawyer and Respondent are the same,
9  and I think Mr. Klayman has tread a pretty good
10  line so far.  He may have overstepped there a
11  little bit, but the war will go on.
12  BY MR. KLAYMAN:
13      Q.  So, you said to me, "I can't go back
14  there, Larry, you know.  It'll destroy me."
15  Correct?
16      A.  Correct.
17      Q.  And at that point you said to me, "I'd
18  like to get an apartment here and live here.  I
19  have nothing.  My family is not helping me.  Can
20  you help me get an apartment?"
21      A.  No, not correct.
22      Q.  In fact, you told me where you wanted

Page 360

1  to live.  You wanted to live in the valley, San
2  Fernando Valley, on Ventura Boulevard.
3      Remember you said, "That's where I want
4  to live and I lived there before in Sherman Oaks
5  and I loved that area and want" --
6      A.  You jumped ahead a little bit.  Can we
7  go back?
8      Q.  I ask the questions.  I'm going to --
9      CHAIRMAN FITCH:  No, that's a perfectly
10  fair point.  I take the answer to be that in the
11  period being discussed, immediately following the
12  VOA decision, that the witness believes that that
13  particular conversation did not take place at that
14  point in time.
15      MR. KLAYMAN:  Ok, well, I'll try to put
16  it in context.
17  BY MR. KLAYMAN:
18      Q.  At the time you were in LA you were
19  staying with your friend Nella (phon)?
20      A.  Yes.
21      Q.  And her husband Abdy?
22      A.  Yes.

26 (Pages 357 to 360)

Page 361

1        Q.  Nella is not Persian, Abdy is.  Nella
2    is Hispanic?
3        A.  She's Filipino.
4        Q.  Filipino, ok.
5            And therefore you needed a place to
6    stay.  You couldn't stay there forever?
7        A.  Not forever.  They were my friends.  I
8    could stay there temporarily.  Not forever.
9        Q.  So you told me you'd like to live in
10   the valley, in Sherman Oaks, and you told me, "I
11   like this apartment.  I've seen it in Sherman Oaks
12   on Ventura Boulevard."
13       A.  That is after you told me that, "We can
14   transfer you to LA," and I said, "I have an
15   apartment in DC.  I have to live there.  If I'm
16   not living there, I can't stay with Nella.  I have
17   to get my own place and I cannot afford my own
18   place in LA now, because I don't know what's
19   happening with the paycheck, if I don't go back to
20   my work in DC."
21       Q.  But you told me that you could never go
22   back there, that it would destroy you.

Page 362

1            You just testified to that, correct?
2        A.  Yes, but if I had no choice, I had to
3    go back.  I needed to have a job.
4            But you said that, "No, we can transfer
5    you to LA.  I know what I'm doing.  I'm setting up
6    your doctors, and once you are seeing your doctors
7    here in LA, they're going to have to agree that
8    you go see your doctors while you're working in
9    LA."
10           You explained that to me, how the legal
11   way works, and that's why you set up all my
12   doctors in LA, not in Washington, D.C.
13       Q.  You know that I was working very hard
14   for you.  You know that?
15       A.  Yes.
16       Q.  Ok.  And I didn't ask you to pay me,
17   correct?
18       A.  Correct.
19       Q.  And I then said, you know, "If you
20   really want that apartment there, Ellie, I'll try
21   to get the apartment for you, so you can stay here
22   and you don't have to be back in DC."

Page 363

1        A.  It wasn't that I -- "You really want
2    the apartment?"
3            We talked about that, after you said,
4    "I can get you transferred to LA, now that you
5    have your doctors set up in LA, so let's move you
6    to LA."
7            I told you that I can't afford moving
8    to LA because I don't have money.  You said,
9    "Ellie, I'll help you."
10           I had an apartment at that time in DC,
11   which I had commitment.  I couldn't just get up
12   and leave.  I had to give them notice in DC.  So I
13   couldn't just do it overnight, all of that.  I
14   explained all that to you, Mr. Klayman.
15           So, it was a strategy that we both were
16   going forward, you as my attorney, and me as a
17   client, that how this strategy is working is for
18   me being setting up with the doctors in LA and
19   then move to LA.
20           So, when all that happened, I found an
21   apartment that it was brand new and you don't pay
22   two months of rent and pay four months, and you

Page 364

1    get two months free, something like that.  And I
2    explained that to you, there is such a thing.
3    It's a good deal.
4        Q.  And that's where you wanted to be,
5    because a lot of Persians live around that area,
6    particularly Muslims --
7        A.  No, sir.  It was because that apartment
8    was two months free apartment.
9        Q.  Isn't it true, just as a general rule,
10   that you felt very comfortable there because that
11   was the Persian community generally in the valley
12   that was of Muslim decent and the Persian
13   community in Beverly Hills is of Jewish decent?
14       A.  The Persian community in LA is big.
15       Q.  Yeah.
16       A.  And for me -- Muslim, Jewish,
17   Christian -- there is no difference between that
18   for me.
19       Q.  Ok.  But I'm saying, you felt
20   comfortable there?
21       A.  I'm comfortable anywhere in LA.
22           If we had the same deal on Westwood or

27  (Pages 361 to 364)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 365

1  Beverly Hills or Santa Monica, anywhere, we could
2  have got that deal.
3       So, the only reason was because it was
4  a good deal for that apartment.  They were
5  offering two months free rent.
6       Q.  And I then leased that for you because
7  you had no credit, correct?
8       A.  Correct.
9       Q.  And I paid the four months advanced
10  rent and got you six months?
11       A.  Correct.
12       Q.  That was a two-bedroom apartment,
13  correct?
14       A.  Correct.
15       Q.  So, it's something that you wanted,
16  that apartment, correct, so you could have your
17  family and friends there, correct?
18       A.  The two-bedroom and one-bedroom, the
19  price was so close, but at that time -- I don't
20  remember exactly, but we said, "Ok, we get this."
21       Q.  But you wanted a two-bedroom and we got
22  that?

Page 366

1       A.  Ok, we got that.
2       Q.  Ok.
3       A.  Yes.
4       Q.  And in fact you got the keys.  I never
5  got the set of keys?
6       A.  Absolutely not.  Of course.  That was
7  given.
8       Q.  And I didn't ask you for the keys, did
9  I?
10       A.  No.
11       Q.  Now, around that time period, we
12  realized that we had to do something stronger than
13  just sending documentation in and asking for
14  them to be reasonable, correct?
15       A.  Correct.
16       Q.  Because, as Tim Shamble was saying,
17  these people are not reasonable.  They mistreat
18  their employees.  He's the union rep.
19       CHAIRMAN FITCH:  Do you recall what was
20  the first month of the lease on the apartment?
21       THE WITNESS:  I think it was April, if
22  I'm not mistaken.

Page 367

1       CHAIRMAN FITCH:  Fair enough.  Thank
2  you.
3       MR. KLAYMAN:  I'm going to introduce
4  something later.
5       CHAIRMAN FITCH:  I asked her.  That's
6  all.
7       MR. KLAYMAN:  No, it's fine, your
8  Honor, I'm glad you did.  But I'm just trying to
9  get the thing to flow here, then we'll go back.
10  BY MR. KLAYMAN:
11       Q.  One of the reasons, by the way, that
12  Voice of America didn't want to transfer you it
13  was believed is because a lot of people in the
14  Persia News Network in Washington wanted to be
15  transferred to LA, because of the weather and
16  because there's a nice Persian community there.
17       So, that was one of the reasons that
18  they denied you, because they said, "Well, we
19  can't set a precedent to send Elham Sataki there
20  when all these other people want to go there,
21  too."
22       A.  That is why you set up my doctors

Page 368

1  there, so we have a reason for why I have to be
2  transferred.
3       Q.  But you were aware of Voice of
4  America's general resistance to transfer people to
5  LA, generally, correct?
6       A.  No, not aware of it.
7       Because the manager, the editing
8  manager asked me to write a proposal, and I did,
9  and that proposal, they were looking at it and
10  they were considering it actually at the time.  It
11  wasn't approved, but they were looking at it to
12  see maybe.
13       And also that maybe if, not
14  transferring me, but me going back and forth and
15  spending more time in LA and doing interviews and
16  come back to DC.
17       There was a talk about all that.
18       Q.  Right.  But, going back to Mr. Shamble,
19  he said this is -- frankly he had told us in the
20  beginning that they're difficult?
21       A.  Yes, that they are difficult.  Yes.
22       Q.  They're difficult and it's hard to

28  (Pages 365 to 368)

Page 369

1   reason with them.
2       So you were aware of that all this
3   time, correct?
4       A.  Yes.  Yes.
5       Q.  At that point, you know, we sat down
6   and discussed legal strategy with Mr. Shamble and
7   you and me, correct?
8       A.  Correct.
9       Q.  And we decided that we have to file
10  some lawsuits, correct?
11      A.  Correct.
12      Q.  And you were aware at around that time
13  also that during the meetings that I had to try to
14  settle this case that they were very contentious,
15  that Tim Shamble was there, as well, but they were
16  very contentious from Voice of America's
17  perspective, kind of nasty, correct?
18      A.  Correct.
19      Q.  Was it not a positive to have you get
20  an apartment in LA and not go back and live with
21  Kaveh because Kaveh was one of your coworkers and
22  you were claiming that you were sexually harassed

Page 370

1   by a coworker?
2       I did say that to you, did I not?
3       A.  I didn't see your reason.
4       I mean, people can be working together
5   and be roommates.  There's no problem in that, and
6   if my co-anchor sexually harassed me, it had
7   nothing to do with Kaveh that I was roommate with.
8   I don't see why there is a problem there.
9       I didn't agree with you then either.
10      Q.  I wasn't talking about what my
11  perception would be but that they would perhaps
12  try to use that against you when discovery started
13  to occur in the litigation.  Because they would
14  find out.
15      A.  Well, at the same time I told you that
16  you can use it against them that Kaveh was witness
17  to all the phone calls and everything that he was
18  doing.  So, we could use Kaveh as the witness,
19  because he was my roommate, and Kaveh agreed to be
20  the witness.
21      So, we could use it in our benefit, and
22  I told you that at the time.

Page 371

1       Q.  Ms. Sataki, and I don't mean this to be
2   abrasive.  It's hard for me now because I'm a
3   lawyer and Respondent, in effect, defendant, but
4   it was also known in the Persian community, was it
5   not, that you had had an affair with someone by
6   the name of Zia of NITV in Los Angeles when you
7   were a broadcaster there.
8       A.  It wasn't known by Persian TV -- I mean
9   by Persian community.  It was something that was
10  said, but it was not true and it was proven that
11  it was not true.
12      Q.  And it was out there, correct?
13      A.  It was -- it came out there because I
14  got an interview with the prince of Iran and
15  someone said, "She slept with this person.  That's
16  how she got the interview."
17      But then we -- my boyfriend at the time
18  came.  We went -- and everything was clarified,
19  and the person who said it took it back and
20  apologized.
21      Q.  But in fact, you got into a fight --
22      CHAIRMAN FITCH:  What's the relevance

Page 372

1   --
2       MR. KLAYMAN:  Because --
3       CHAIRMAN FITCH:  -- of this discussion
4   about formulating legal strategy and maybe moving
5   toward a lawsuit?
6       MR. KLAYMAN:  Perception of -- let me
7   ask this question to clear it up.
8   BY MR. KLAYMAN:
9       Q.  If that was true, and I'm not saying it
10  was or it wasn't, that would have been another
11  relationship with a coworker --
12      A.  No.
13      Q.  -- having a relationship --
14      A.  It's not true.
15      Q.  -- with Zia, the owner of NITV?
16      A.  It's not true.
17      And I had proof of it.  I had people.
18  I had my boss.  Everybody.  That was not true,
19  definitely not true.
20      And that was completely behind me.
21  Everything was resolved.  I had witnesses.  And
22  the person who said it took it back.

29  (Pages 369 to 372)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 373 |
| --- |

1     And my boss at the time, that I was
2 working in Jame Jam, Mr. Bibiyan, he had those
3 people to come and apologize and everything was
4 clarified.
5     I don't know why that is even relevant
6 here.  I don't understand it.
7     CHAIRMAN FITCH:  I think I've heard
8 everything she could say, even though I was
9 speaking with her.
10     MR. KLAYMAN:  Ok.
11 BY MR. KLAYMAN:
12     Q.  There was, after that alleged -- or
13 during that alleged affair, the wife of Zia
14 actually keyed your car, do you remember?  Or you
15 keyed hers, one or the other?
16     MR. SMITH:  Objection, I mean, I think
17 we've gotten the flavor of where this is going and
18 I don't know that there is any relevance going
19 forward other than rumors and innuendo, which she
20 denied.
21     CHAIRMAN FITCH:  I think Mr. Klayman
22 has a theory or sub-theory that he thought he

| Page 374 |
| --- |

1 advised Ms. Sataki that some relationships with
2 VOA employees might be problematic in pursuit of
3 her employment goals.
4     She has denied the existence of one of
5 those relationships and that's where the record
6 stands.  I doubt that any further exploration of
7 that will --
8     MR. KLAYMAN:  I just have one question.
9     CHAIRMAN FITCH:  Sure.
10 BY MR. KLAYMAN:
11     Q.  You did have an issue with Zia's wife,
12 correct?
13     CHAIRMAN FITCH:  And how does that add
14 onto this?
15     MR. KLAYMAN:  I'll ask the next
16 question.
17 BY MR. KLAYMAN:
18     Q.  This resulted in court litigation?
19     A.  Yes.
20     That's why I said everything was
21 resolved on my behalf.  It was proven that what
22 she said was wrong and then in court actually they

| Page 375 |
| --- |

1 gave her -- me a restraining order against her and
2 then later on she said that she never said it.
3 Because I had --
4     When the time that she said that
5 supposedly I had an affair with her husband, my
6 boyfriend was there with me.  I was in DC for an
7 interview.
8     CHAIRMAN FITCH:  We don't need to --
9     THE WITNESS:  So everybody is
10 already -- but Mr. Klayman is going on --
11     CHAIRMAN FITCH:  Sir, we have in
12 evidence now --
13     MR. KLAYMAN:  Yeah.
14     CHAIRMAN FITCH:  -- for our
15 consideration one way or the other, that the
16 matter resulted in litigation and that litigation,
17 according to this witness, absolved her.
18     But we still have the situation of you
19 having concerns, you allege, about relationships
20 and their legal effect.
21     So why don't we move on now.
22     MR. KLAYMAN:  Ok.  It's with regret

| Page 376 |
| --- |

1 that I had to get into that.
2 BY MR. KLAYMAN:
3     Q.  Now, in fact, that was the basis of my
4 counseling you, one of the bases, you know, to --
5 even though you told me that you couldn't go back
6 to DC or it would destroy you, to get an apartment
7 in Los Angeles and to live in Los Angeles and
8 let's try to get you located there, because of the
9 perception that you had relationships with
10 coworkers, that was part of it?
11     MR. SMITH:  I don't understand the
12 question.  There were a lot of --
13     CHAIRMAN FITCH:  I think the question
14 doesn't add anything to the evidence already in
15 the record for our considerations.
16     And I think we're up to the point where
17 the evidence may show, at least the complaining
18 witness agrees, that the apartment was found, a
19 six-month lease was undertaken, with obligations
20 of two free and four months of lease.  Maybe the
21 lease was longer, but at least that's what payment
22 was made.  And there is information in the record

30  (Pages 373 to 376)

Page 377

1   as to what was the reason for doing that.
2        I note that the superior court action,
3   according to one of the exhibits, an allegation
4   was filed on March 1, which is obviously before
5   April 1, but maybe that is not a time confusion,
6   or maybe it doesn't make any difference.  But I do
7   note that.
8        MR. KLAYMAN:  Again, I don't like
9   asking these questions, your Honor, but I want to
10  put it in sequence here.  I'm not trying to --
11       CHAIRMAN FITCH:  Ask your question.
12  Move on.
13       MR. KLAYMAN:  -- to beat up on the
14  witness.  I'm trying to get the facts out.
15  BY MR. KLAYMAN:
16   Q.  How many times have you been married?
17       MR. SMITH:  Objection.
18       CHAIRMAN FITCH:  Objection sustained.
19  BY MR. KLAYMAN:
20   Q.  You were married to one guy who, where
21  there's documentation that Mr. Smith submitted,
22  earlier today, new documentation that you came up

Page 378

1   with late last week, where there's an affidavit of
2   a former husband who claims that a few weeks after
3   you were married, he walked into your dwelling and
4   found you with somebody else in bed.
5        CHAIRMAN FITCH:  Wait a minute.
6        MR. KLAYMAN:  There's documentation in
7   there, your Honor.
8        CHAIRMAN FITCH:  Right, it was
9   admitted.
10       MR. KLAYMAN:  Yes.  Bar Counsel
11  submitted it.
12       CHAIRMAN FITCH:  I don't see --
13       MR. KLAYMAN:  The question --
14       CHAIRMAN FITCH:  -- what it adds to
15  your theory about concerns for legal strategy.
16       MR. KLAYMAN:  One question.
17  BY MR. KLAYMAN:
18   Q.  Was that person Zia?
19       CHAIRMAN FITCH:  Was that person what?
20       THE WITNESS:  No.
21       CHAIRMAN FITCH:  I'm sorry, I didn't
22  hear the question.

Page 379

1   BY MR. KLAYMAN:
2    Q.  Was the person that your ex-husband
3   said he found you in bed with Zia?
4    A.  There was no person.
5        The ex-husband married me to get the
6   Green Card --
7        CHAIRMAN FITCH:  I still haven't --
8        THE WITNESS:  -- and I --
9        CHAIRMAN FITCH:  I still haven't heard
10  the question.  Was the last word in the question
11  "dead"?
12       MR. KLAYMAN:  No, it was not.
13  BY MR. KLAYMAN:
14   Q.  Was that person that your ex-husband
15  said he found you in bed with, a few weeks after
16  you were married, in your house --
17   A.  He didn't --
18       CHAIRMAN FITCH:  Madam, neither I nor
19  the court reporter can process or type down --
20       THE WITNESS:  I'm sorry.
21       CHAIRMAN FITCH:  More than one at a
22  time.

Page 380

1        Now, what is the question?  Mr. Klayman
2   has a right to put his question.
3        MR. KLAYMAN:  And they put it into
4   evidence, your Honor, Bar Counsel.
5   BY MR. KLAYMAN:
6    Q.  Was that person that your ex-husband
7   signed a sworn affidavit that's now part of the
8   record, the evidentiary record, that he came home
9   one day and found you in bed with another man, a
10  few weeks after you were married, was that Zia of
11  NITV?
12   A.  No.
13       MR. KLAYMAN:  That's helpful.  I regret
14  I ask these questions.
15  BY MR. KLAYMAN:
16   Q.  So, the bottom line is this, is it not,
17  Ms. Sataki: there was a concern, I mean, it was
18  common knowledge at VOA, whether true or not, that
19  these allegations were out there concerning you?
20   A.  Which means, if you had gone to court,
21  if you would have concentrated on my case, instead
22  of on me and my family and my friends, and we

31  (Pages 377 to 380)

Page 381

1    would have gone to court, we could have proved
2    that these documentations are false.
3          CHAIRMAN FITCH:  The only thing I'm
4    interested in, if I may rephrase this question...
5          Did you, at this period of time, it
6    seems to be the spring of 2010, did you have an
7    understanding that there were rumors at VOA that
8    you had romantic affairs with other VOA members,
9    employees.
10         THE WITNESS:  No, I was not worried
11   because I knew that's false.
12         CHAIRMAN FITCH:  I'm sorry?
13         THE WITNESS:  I was not worried about
14   it because I knew it was false.
15         CHAIRMAN FITCH:  I didn't ask you about
16   that.
17         I asked you, if you had an
18   understanding that those rumors were out there.
19         THE WITNESS:  I found out through Mr.
20   Klayman.
21         CHAIRMAN FITCH:  So the answer is yes.
22         Ok.  I think that is admissible,

Page 382

1    whatever it may be worth, in support of his
2    picture that he needs, in his view, to paint about
3    the various strategic difficulties and problems
4    and alternatives.
5          Not that he's charged, I might note,
6    with either incompetence or lack of zealousness,
7    but right now I'd like you just to proceed.
8          MR. KLAYMAN:  No one can ever say I'm
9    not zealous.
10         CHAIRMAN FITCH:  Fair enough.
11   BY MR. KLAYMAN:
12         Q.  Ms. Sataki, before you even applied for
13   a job at VOA, you were working at various Persian
14   news networks in the valley in LA as a
15   commentator, host, announcer, whatever?
16         A.  Yes.
17         Q.  And one of them was NITV, correct?
18         A.  I was working for Jame Jam, not NITV,
19   but some of my tapes was played in NITV studio,
20   yes.
21         Q.  In fact I guess there are tens of
22   Persian networks in Los Angeles, in the valley,

Page 383

1    Persian networks, radio networks, correct?
2          A.  Yes.
3          Q.  And therefore there's a lot of
4    employment opportunity there for someone such as
5    yourself.  In fact you took advantage of it before
6    you went to VOA?
7          A.  Yes.
8          Q.  In fact you promoted that on the
9    application to become a host or to get a job with
10   VOA that you had prior experience being a host and
11   an announcer and a reporter with Persian news
12   networks in Los Angeles?
13         A.  Yes.
14         Q.  Now getting back to our sitting down
15   about writing a complaint --
16         CHAIRMAN FITCH:  That strikes me as a
17   good transition point, and I appreciate you're
18   identifying it.
19         Why don't we take a ten-minute break.
20         MR. KLAYMAN:  Ok.
21         CHAIRMAN FITCH:  We will stand in
22   recess for about ten minutes, beginning here at

Page 384

1    high noon.
2          (Recess taken.)
3          CHAIRMAN FITCH:  We are returning to
4    Mr. Klayman's cross-examination at 12:08.
5    BY MR. KLAYMAN:
6          Q.  I just want to back up with one
7    question.
8          Ms. Sataki, you are aware, are you not,
9    you were aware at the time that when you made your
10   complaint that Mr. Falahati harassed you, and you
11   filed that yourself first, internally, he claimed
12   that you were coming on to him?
13         A.  He claimed what?
14         Q.  He claimed that you were coming on to
15   him, that you had actually made the advances and
16   had an interest in him?
17         A.  I did?
18         Q.  That he did.
19         Well, let me say it again.
20         The first thing that happened before I
21   even entered the scene, when Mr. Shamble was
22   there, is that you had filed a complaint with

Page 385

1 Voice of America internally with their human
2 resources department against Mr. Falahati.
3       A.   Yes.
4       Q.   You were aware that his response was
5 that you, I'm using slang, s-l-a-n-g, you had come
6 on to him, that you had had an interest in him,
7 not him in you?
8       A.   I don't remember that.
9       Q.   At the time that you filed that
10 administrative complaint -- internal complaint
11 rather, you also were being harassed by your
12 managers, you claimed, correct?
13      A.   Retaliated, yes.
14      Q.   And you were retaliated against, you
15 believed, as you told me, because your family
16 had -- and your dad in particular, had been in the
17 shah's government before you all fled to Sweden?
18      A.   Not because of that.
19           I told you I was retaliated because of
20 my filing the sexual harassment.  But there was in
21 VOA, at that time, it was two groups that was
22 working -- two or three groups that were Persians,

Page 386

1 about two hundred people, working for VOA, with
2 different political views.  And the person, my
3 managing editor, he was more left, and my
4 background from my family, they were more right.
5        So, and that was not only me and right,
6 it was the whole two hundred people, that
7 political view -- people had different political
8 views and it was a lot of fights between all of
9 them.
10
11       Q.   And it just so happened --
12           MR. TIGAR:  Excuse me, just to clarify,
13 when you say "more to the right," you mean those
14 folks would be more likely to support the Shah?
15           THE WITNESS:  Yes.
16           MR. TIGAR:  Alright.
17           THE WITNESS:  So my family more support
18 of the Shah, while the managing editor and the
19 person who wanted to go out with me, they were
20 more left.
21 BY MR. KLAYMAN:
22       Q.   And you were aware, having lived in

Page 387

1 this country for a while -- when did you come to
2 the United States?
3       A.   '99.
4       Q.   And in the course of your duties and
5 responsibilities working for Persian networks in
6 the valley and elsewhere you came to an
7 understanding that conservatives in this country
8 would be more supportive of the Shah, people on
9 the left would have been more supportive of
10 deposing the Shah during the time of Jimmy Carter,
11 our former president?
12      A.   Yes.
13      Q.   You were aware that the lawyer that you
14 asked to represent you is viewed as a conservative
15 activist?
16           MR. TIGAR:  I'm sorry, I didn't hear
17 that.
18 BY MR. KLAYMAN:
19      Q.   I'm sorry, you were aware that, at the
20 time I started helping you, you were aware that
21 Larry Klayman, as viewed in the community, was a
22 conservative, sympathetic to the Shah.

Page 388

1       A.   Ok?
2       Q.   Ok.  So we were both viewed as coming
3 from the right at Voice of America?
4       A.   Ok?
5       Q.   Now the Voice of America has a board of
6 governors.  You're aware of that?
7       A.   Yes.
8       Q.   And sitting on that board of governors
9 are both republicans and democrats.  Are you aware
10 of that?
11      A.   Yes.
12      Q.   And the head of Voice of America, the
13 head of the board of governors at the time, was
14 the Secretary of State of the United States, at
15 the time, Hillary Clinton?
16      A.   Yes.
17      Q.   Now, in fact one of the board of
18 governors at the time was someone named Blanquita
19 Cullum, who was at the time I told you a
20 conservative talk show host, active in republican
21 circles.
22      A.   Yes.

Page 389

1    Q.   And, we'll get to this a little bit
2    later, but actually you're aware I tried to lobby
3    Blanquita to resolve this, peacefully?
4        A.   Yes.
5        Q.   And Blanquita didn't want to deal with
6    it.
7        A.   Yes.
8        Q.   And the reason is, and the reason I
9    asks these questions, is that there was this very
10   controversial division in Persia News Network
11   between the pro-shah people and the pro-regime
12   people, correct?
13       A.   Correct.
14       Q.   And it was perceived by you and by
15   others that were to the right, as you put it, that
16   the news that was being broadcast into Iran at
17   that time, during the Obama administration, was
18   pro regime, favorable to the regime of Ayatollah
19   Khomeini?
20       A.   It was -- they were talking about it,
21   yes.  It was more because of the people that they
22   hired.

Page 390

1        Q.   Right.  And the supervisor of Mr.
2    Falahati was someone named Mr. Sajadi.  I'm
3    probably not pronouncing it right.
4        A.   Yes.
5        Q.   Sajadi, S-a-j-a-d-i.
6        A.   Yes.
7        Q.   And it was known that Mr. Sajadi was
8    one of the people on the left that was in favor of
9    broadcasting pro-Iranian content into Iran?
10       A.   Yes.
11       Q.   And it was also known that his father
12   at the time was an Ayatollah in Tehran who was an
13   advisor to the supreme leader, Ayatollah Khomeini?
14       A.   Yes.
15       Q.   And that was a very unusual situation,
16   was it not, in your opinion?
17       A.   Yes.
18       Q.   Why would Voice of America be
19   broadcasting, from your opinion and of the other
20   broadcasters, propaganda that was to prop up the
21   regime and Tehran, rather than take it down?
22   Correct?

Page 391

1        A.   Correct.
2        Q.   And you're aware in the course of the
3    time I represented you I also represented some
4    other broadcasters at Voice of America with regard
5    to work place discrimination, particularly over
6    this division of politics, that they felt they
7    were being retaliated against because they were
8    pro-Shah?
9        A.   Yes.
10       Q.   One of them was a friend of ours, Mr.
11   Chalangi, right?
12       A.   Yes.
13       Q.   How is that spelled?
14       A.   Mr. Chalangi, C-h-a-l-a-n-g-i.
15       Q.   So the bottom line -- I use the word
16   "bottom line" meaning the general issue here -- is
17   that there was a lot of politics swirling around
18   Voice of America at the time I was trying to get
19   you back to work in Los Angeles.
20       A.   Ok.
21       Q.   Yes?
22       A.   Yes.

Page 392

1        CHAIRMAN FITCH:  What was the -- read
2    me the question.  I missed the actual terminology.
3        THE COURT REPORTER:  "So the bottom
4    line -- I use the words 'bottom line' meaning the
5    general issue here -- is that there was a lot of
6    politics swirling around Voice of America at the
7    time I was trying to get you back to work in Los
8    Angeles."
9        MR. KLAYMAN:  She answered yes.
10       CHAIRMAN FITCH:  Yes.
11   BY MR. KLAYMAN:
12       Q.   So when we sat down to prepare legal
13   actions, we had to take that into account,
14   correct?
15       A.   You're advice was that, correct.
16       Q.   Yes, we had to understand the realities
17   of what we were dealing with at Voice of America?
18       A.   That was your advice, yes.
19       Q.   But you were aware there was this
20   political --
21       A.   Everybody were aware of it, yes.
22       Q.   So you were aware that the initial

34  (Pages 389 to 392)

Page 393

1  complaints that I drafted, that I actually sat
2  down with you, did I not, we met for many hours
3  going through and preparing complaints against
4  both Mr. Falahati and Voice of America aimed at
5  getting you back to work in Los Angeles.
6      A.  Yes.
7      Q.  Now you're aware that when the,
8  complaint that we prepared about Mr. Falahati, you
9  told me that you don't think he has much money,
10  that he wouldn't really be able to pay any damages
11  in the end.
12     A.  Yes.
13     Q.  But you just wanted to do this on
14  principal?
15     A.  Yes.
16     Q.  And I did it for you, correct?
17     A.  Yes.
18     Q.  And I filed it, correct?
19     A.  Yes.
20     Q.  We also prepared with Tim Shamble at
21  the time an administrative complaint with the EEO,
22  an EEO employment complaint.

Page 394

1      You remember that?
2      A.  Yes.
3      Q.  And you were aware that that had to run
4  its course inside EEO before you could then bring
5  a lawsuit in court.
6      In other words, there had to be first
7  an initial determination by EEO, and after that,
8  if it wasn't favorable, then we could bring a
9  lawsuit?
10     A.  Yes, again, I'm no lawyer.  When my
11  lawyer tells me that these are the procedure, I
12  say yes.
13     Q.  So we filed that complaint.
14     A.  Yes.
15     Q.  And Mr. Shamble helped us with that.
16     A.  Yes.
17     Q.  And we also filed a complaint against
18  the board of governors at VOA, and it was for
19  violation of your Constitutional rights of free
20  speech with association, that's First Amendment,
21  you weren't given due process under the Fifth
22  Amendment, and with regard to harassment under the

Page 395

1  Fourth Amendment -- I'm not going to get too
2  technical as a lawyer here.
3      But you're aware that I brought a case
4  for you like that, as a well?
5      A.  Yes.
6      Q.  And at the time I told you that, a lot
7  of what we're doing is tying to force them into a
8  settlement.  We were always trying to force them
9  into a settlement by raising the stakes for them,
10  correct?
11     A.  Yes.
12     Q.  And in addition to that, what could
13  sometimes influence -- what frequently influences
14  the government in this town is publicity, is to
15  get favorable publicity, because people in
16  administrative agencies and judges tend to react
17  to cases that are known and are out there for the
18  public to know about.
19     MR. SMITH:  I object to the form of the
20  question.  He's asking her opinion --
21     CHAIRMAN FITCH:  I understand your
22  objection.  I think it's marginally ok, a little

Page 396

1  discursive.
2      MR. SMITH:  Well, then he needs to lay
3  a foundation as to whether or not she understands
4  about publicity.
5      CHAIRMAN FITCH:  Well, his question is
6  whether she understood that or knew what.
7      MR. SMITH:  That wasn't his question.
8  He asked her if that was true, and I would just
9  ask that he lay a foundation.
10     MR. KLAYMAN:  I object to this speaking
11  objection, your Honor.
12     CHAIRMAN FITCH:  Well, that concern is
13  overruled, because it helps me to think through
14  things.
15     But anyway, I think your question is
16  ok.  You can repeat it, if we want to.
17     MR. KLAYMAN:  Can I have it read back?
18  Let's read it back.
19     THE COURT REPORTER:  "And in addition
20  to that, what could sometimes influence -- what
21  frequently influences the government in this town
22  is publicity, is to get favorable publicity,

35 (Pages 393 to 396)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 397

1  because people in administrative agencies and
2  judges tend to react to cases that are known and
3  are out there for the public to know about."
4  BY MR. KLAYMAN:
5      Q.  I told you that, right?
6      A.  You told me that and I responded that I
7  don't want it to be --
8          CHAIRMAN FITCH:  Ma'am --
9          THE WITNESS:  Yes?
10         CHAIRMAN FITCH:  I asked did he tell
11 you that.
12         THE WITNESS:  Yes, he told me that.
13         CHAIRMAN FITCH:  You said yes.
14         THE WITNESS:  Yes, he told me that.
15 BY MR. KLAYMAN:
16     Q.  And we talked about that in the
17 presence of Mr. Shamble as well, correct?
18     A.  Correct.
19     Q.  And that we agreed we would get some
20 positive publicity here to try to coerce VOA into
21 a favorable settlement so you could be in LA,
22 correct?

Page 398

1      A.  Correct.
2      Q.  And --
3      A.  But I didn't agree to do it.  You
4  explained all this to me.
5          CHAIRMAN FITCH:  Ok, that's his only
6  question.
7          THE WITNESS:  Ok.  Sorry.  I'm sorry.
8  BY MR. KLAYMAN:
9      Q.  You are aware that, and you testified
10 to this yesterday, that I believed that you had
11 agreed to that and I wrote articles that were very
12 favorable to you.
13         You're aware of that?
14     A.  Yes.
15     Q.  And I sent you copies of them at the
16 time.
17     A.  Yes.
18     Q.  Emailed them to you.
19     A.  Yes, you did.
20     Q.  And there's nothing in writing that
21 ever tells me at the time that you didn't want me
22 to do that, correct?

Page 399

1      A.  Not correct.
2      Q.  The only time that comes up --
3          CHAIRMAN FITCH:  Wait a minute.  The
4  problem with the question is "at that time" is
5  unclear.
6          Are you talking about before you filed
7  the superior court complaint on March 1, if that's
8  when it was filed?
9          MR. KLAYMAN:  Yes.
10         CHAIRMAN FITCH:  Or are you talking
11 about --
12         MR. KLAYMAN:  Yes, around the time
13 period of these filings of these complaints.
14         CHAIRMAN FITCH:  Ok.  And your
15 question is...
16 BY MR. KLAYMAN:
17     Q.  That I sent you copies of some of the
18 columns I had written that were very favorable to
19 you and you did not tell me that you didn't like
20 them or I shouldn't have done it.
21         CHAIRMAN FITCH:  Well, that's a
22 compound question.

Page 400

1          Did he send you copies of some articles
2  that he had written?
3          THE WITNESS:  Yes, he did.
4          CHAIRMAN FITCH:  Ok.  Go ahead.
5  BY MR. KLAYMAN:
6      Q.  At that time you did not tell me,
7  "Don't write any more."
8      A.  I did.
9      Q.  There's nothing in writing that you
10 presented to that effect at that time, did you?
11     A.  We talked to each other.  I explained
12 to you on the phone why I don't want articles out
13 there.
14     Q.  But you are aware that I copied you on
15 an email to Los Angeles Times where I was trying
16 to get an interview for you?
17         You're aware of that, I copied you on
18 that email with Mr. Shamble?
19     A.  I don't remember it, but, yes.  If you
20 say so, then that's correct.
21     Q.  Turn to Exhibit D, in the beginning of
22 your counsel's -- not your counsel's, but Bar

36  (Pages 397 to 400)

Page 401

1  Counsel's -- he's not really your counsel.
2       CHAIRMAN FITCH:  Exhibit what?
3       MR. KLAYMAN:  Exhibit D, Respondent's
4  Answer to Affirmative Defenses.
5       THE WITNESS:  Do I have it?
6       CHAIRMAN FITCH:  Mr. Klayman is
7  referring to Bar Counsel's book, which is that
8  book over there, the light blue cover (pointing).
9       THE WITNESS:  Yes.
10      CHAIRMAN FITCH:  And he wants you to
11  turn to --
12      MR. KLAYMAN:  Page D as in dog, 23,
13  D-23.
14  BY MR. KLAYMAN:
15      Q.  If you need some help, I can help you.
16      A.  No, that's ok.  Thank you.  D-23?
17      Q.  Mm-hmm.  Do you see that?  That's,
18  "Subject: LA Times," from Larry Klayman, with my
19  Gmail address.
20      A.  I --
21      Q.  D-23.
22      MR. KLAYMAN:  Can I help her, your

Page 402

1  Honor?
2       CHAIRMAN FITCH:  You may.
3       (Brief pause.)
4  BY MR. KLAYMAN:
5       Q.  Do you see that?  It's an email from
6  me, Larry Klayman, LEKlayman@gmail.com.  That's my
7  email address, right?  "Subject: LA Times," sent
8  June 10th, 2010, to TimShamble@verizon.net, and
9  EllieSataki@yahoo.com, to MahmonirRahimi@gmail.com
10  and to JohnGChalangi@gmail.com.
11      You see that?
12      A.  Yes.
13      Q.  And you see you're copied on it?
14      A.  Yes.
15      Q.  And it says, "Mr. Shamble, please call
16  Paul Richter of LA Times, DC Bureau.  He is the
17  top Iran reporter for the newspaper.  His number
18  is (202) 824-8300 and his email address is
19  PaulRichter@LATimes.com.  If we can get one
20  national story, this can help move things along.
21  Thanks.  Larry."
22      You see that?

Page 403

1       A.  Yes.
2       Q.  So I was copying you on that, correct?
3       A.  Correct.
4       Q.  And you never sent me back anything
5  saying, "Larry don't do this.  I don't want to
6  have an interview with the LA Times."
7       A.  Correct, I -- correct.
8       Q.  Now, I'm also copying Mahmonir Rahimi.
9  She also was someone, a contractor at Voice of
10  America, at the time, correct?
11      A.  Yes.
12      Q.  And she was having employment
13  difficulties.
14      A.  Yes.
15      Q.  Remember?
16      A.  Yes.
17      Q.  I was trying to help her out with that,
18  too.
19      A.  Yes.
20      Q.  And you're aware I never charging her
21  anything either.
22      A.  Yes.

Page 404

1       Q.  And the same thing for Mr. Chalangi who
2  was a broadcaster at Voice of America.
3       A.  Yes.
4       Q.  And I was trying to help him out
5  because he was being discriminated against, too,
6  right?
7       A.  Correct.
8       Q.  And you're aware I never charged him
9  anything?
10      A.  Correct.
11      Q.  So I was trying to help all of you,
12  correct?
13      A.  All of us lost our jobs.
14      Q.  Well, that was not my fault.
15      In fact all of those people were viewed
16  to be to the right, pro-Shah, correct?
17      MR. TIGAR:  I'm sorry, I didn't hear
18  the question.
19  BY MR. KLAYMAN:
20      Q.  All those people were viewed by
21  managers at Voice of America as being pro-Shah
22  regime, they were part of that political

Page 405

1  controversy.
2      Isn't that correct?
3      A.  Yes.  They can't fire people on their
4  political view.
5      Q.  Now, getting back to these lawsuits
6  that we talked about, one against Mr. Falahati,
7  who you knew did not have any money and could
8  never pay damages in any event, and then we filed
9  a case against the board of governors, naming all
10 of them, including Mrs. Clinton, and other board
11 of governors, including Blanquita Cullum who was
12 my friend, I did it for you, correct?
13     A.  You did it for me?
14     Q.  I was representing you.
15     A.  Unfortunately you're the one asking
16 questions and I have to just only say yes or no --
17     Q.  Right?
18     A.  -- and I can't explain the backgrounds.
19     Q.  You'll have an opportunity with Mr.
20 Smith if he wants to redirect.
21     I actually wound up bringing in a
22 friend of mine, Blanquita Cullum --

Page 406

1      A.  Did you get help?  Did you get anywhere
2  with it?
3      Q.  Fortunately I'm not on the witness
4  stand right now.  I will be later if you want to
5  stay.
6      CHAIRMAN FITCH:  Enough dialog.  Let's
7  have a question.
8      MR. KLAYMAN:  Ok.  I'm trying to put a
9  little humor in it.
10     CHAIRMAN FITCH:  I chuckled.
11 BY MR. KLAYMAN:
12     Q.  It's a fact that I really put myself on
13 line for you because I believed in you.  You
14 knew that I believed in you?
15     A.  You said that several times, yes.
16     Q.  Now, you are aware that I then amended
17 that complaint later to put in -- and I'm just
18 talking technical lawyer language here, to ask for
19 a temporary restraining order and a preliminary
20 injunction from the court, that you go to work in
21 Los Angeles while your EEO case was progressing
22 administratively at Voice of America.

Page 407

1      A.  Ok --
2      Q.  Are you aware of that?
3      A.  Yes.
4      Q.  And you may not remember the name of
5  the case, but maybe you do.  The name of the case,
6  it says that the federal court can actually
7  preserve the status quo while an administrative
8  employment action is going through the courts --
9  is going through the agency, it's called Wagner V.
10 Taylor.
11     Do you remember that?
12     A.  No.
13     Q.  Ok.  I then filed a whole bunch of
14 documents -- lawyers call them pleadings -- with
15 the court in that case against the board of
16 governors.  Actually it was case that I filed,
17 separate, to get you back to work in Los Angeles.
18     You remember that?
19     A.  Yes.
20     Q.  And I told you at the time that we had
21 drawn a very difficult judge that I had been in
22 front of in the past.

Page 408

1      You remember that?
2      A.  Yes, I remember that.
3      CHAIRMAN FITCH:  I'm sorry, what was
4  the answer?
5      THE WITNESS:  That it was a very
6  difficult judge, and that he had problem with that
7  judge.
8  BY MR. KLAYMAN:
9      Q.  And her name was Colleen
10 Kollar-Kotelly, correct?
11     A.  Correct, I remember that.
12     Q.  And I told you that I had had other
13 cases with her where I had difficulty, right?
14     A.  Yes.
15     Q.  And that what I perceived to be one of
16 the difficulties was, that Judge Kotelly is to the
17 left, far left, and her husband had represented
18 someone in the Monica Lewinsky investigation on
19 behalf of the president, Bill Clinton, and that I
20 had filed many lawsuits against Mr. Clinton during
21 his administration when I was at Judicial Watch.
22     Do you remember that, I told you that?

38  (Pages 405 to 408)

Page 409

1     A.  Yes.
2     Q.  And I also told you that, you know,
3  there's a possibility she might not like you
4  either, since you're conservative and to the
5  right.
6        Remember I told you that?
7     A.  No, I don't remember that.
8     Q.  Alright.
9     A.  Because I never announced --
10     I'm a reporter.  I never announce my
11  political views for anybody.  So, I can't go in
12  front of a judge and say, "I'm a conservative,"
13  "I'm a" -- I don't do that.
14     Q.  But you're aware that --
15     A.  That's --
16     Q.  You're aware from my background that
17  I've always been nonpartisan.  I've brought cases
18  against Republicans --
19     A.  Yes, but I didn't think that your
20  background was going to make -- be a problem for
21  my case.
22     Q.  But I just told you there was an issue

Page 410

1  there that you just acknowledged, correct?
2     A.  Yes.
3     Q.  For that reason, I filed pleadings to
4  try to get the case sent to another judge, Judge
5  John Roberts, who the case had initially been
6  assigned to, but then somehow it got reassigned to
7  Judge Kotelly.
8        You remember that?
9     A.  Yes.
10     Q.  But that request for reassignment was
11  denied by the court, correct?
12     A.  Yes.
13     Q.  Now, that notwithstanding, we tried to
14  do the best we could with Judge Kotelly.  You
15  remember that I filed a lot of different things
16  with her and argued that you should be put back to
17  work to preserve the status quo in Los Angeles.
18        You remember that?
19     A.  Yes.
20     Q.  Now you remember I also told you at the
21  time that I called what then was a friend of mine,
22  a former federal judge -- Stanley Sporkin is his

Page 411

1  name, he was not a judge any more, he had retired.
2  He was in private legal practice -- and I asked
3  him, "Judge Sporkin, what would you do under the
4  circumstances?  Would you put her back to work in
5  Los Angeles," and he said --
6        CHAIRMAN FITCH:  Well, we're getting a
7  little compound here.
8  BY MR. KLAYMAN:
9     Q.  You're aware that I raised that I'll --
10        MR. KLAYMAN:  I'll back up.  I'll break
11  it  down.  Good suggestion.
12  BY MR. KLAYMAN:
13     Q.  You're aware that I said I called a
14  retired federal judge, a friend of mine, whose
15  name is Stanley Sporkin --
16        CHAIRMAN FITCH:  That's enough right
17  there.
18        MR. KLAYMAN:  Ok.
19        CHAIRMAN FITCH:  Do you recall him
20  telling you that?
21        THE WITNESS:  I don't remember, no.
22

Page 412

1  BY MR. KLAYMAN:
2     Q.  Would it refresh your recollection if I
3  was to tell you that Judge Sporkin said that he
4  would have put you back to work.  It was a "chip
5  shot"?
6     A.  I'm sorry, what?
7     Q.  Would it refresh your recollection if I
8  told you that a judge friend of mine said, "I
9  would put Ms. Sataki back in work in LA.  It's
10  easy."
11     A.  During that time you said so many
12  things that, you probably said that, I don't
13  remember.  Because it was -- it was so many things
14  that you were --
15        CHAIRMAN FITCH:  You've answered the
16  question.  You don't remember.
17  BY MR. KLAYMAN:
18     Q.  Now, in submitting the various court
19  documents -- we call them pleadings -- to Judge
20  Kotelly, do you remember that I asked her for a
21  very quick, a very quick decision called a
22  temporary restraining order?  I wanted you to have

39  (Pages 409 to 412)

Page 413

1   it done quickly?
2       A.  I don't remember, but if you say you
3   did, then I'm sure you did.
4       CHAIRMAN FITCH:  No, just tell us
5   whether or not you remember.
6       THE WITNESS:  Ok, I don't remember.
7   I'm sorry.
8   BY MR. KLAYMAN:
9       Q.  You're aware that we prepared a lot of
10  different affidavits and pleadings from Dr.
11  Aviera, from Dr. Long.  We submitted stuff from
12  the first psychologist.  I prepared a long
13  affidavit with you about what had happened in
14  Voice of America.  I prepared a long affidavit
15  with Mr. Tim Shamble, the union rep.  We had a
16  sworn affidavit from Mahmonir Rahimi, R-a-h-i-m-i,
17  who we also identified who was asking issues, who
18  said she would testify for you.  She did.  And we
19  submitted all this stuff to Judge Kotelly.
20      You remember that, because we were
21  working on it together, right?
22      A.  Yes.

Page 414

1       Q.  And in fact you would come over to my
2   office in Los Angeles and we'd work on this stuff?
3       A.  Yes.
4       MR. TIGAR:  Excuse me.  Just so I can
5   get my head around these times --
6       MR. KLAYMAN:  Sure.
7       MR. TIGAR:  -- at the time of which
8   you're speaking, Ms. Sataki, were you living in
9   Los Angeles.
10      THE WITNESS:  Yes.
11      MR. TIGAR:  And so the conversations of
12  which you're speaking took place in Los Angeles --
13      MR. KLAYMAN:  Right, your Honor.
14      MR. TIGAR:  -- concerning the pending
15  case that was in the U.S. District Court in the
16  District of Columbia.
17      MR. KLAYMAN:  Yes.  As you know I'm a
18  licensed attorney.  That's why I'm here.
19      MR. TIGAR:  No, no, that's not the
20  question.  I was just trying to figure out where
21  everybody was.
22

Page 415

1   BY MR. KLAYMAN:
2       Q.  So we submitted all this stuff to
3   Kotelly, and you're aware that I asked her for an
4   evidentiary hearing where you could testify and
5   we'd bring everybody else in to testify.
6       Remember?
7       A.  Yes.
8       Q.  And she wouldn't give us that
9   evidentiary hearing.  Do you remember she wouldn't
10  give it to us?
11      A.  I don't remember, but --
12      Q.  Yeah.  And ultimately she made a
13  decision and ruled against you claiming that you
14  were not entitled for reasonable medical
15  accommodation to be back in Los Angeles.
16      Do you remember that?
17      A.  Yes.
18      Q.  And she accepted everything that VOA
19  said and nothing that you and our witnesses said.
20      CHAIRMAN FITCH:  That question is
21  struck.
22      MR. KLAYMAN:  Compound?

Page 416

1       CHAIRMAN FITCH:  That question is
2   struck.  The question is struck.
3       MR. KLAYMAN:  Ok, I'll rephrase it.
4   BY MR. KLAYMAN:
5       Q.  You are aware that Judge Kotelly making
6   that ruling accepted as truth everything that the
7   Voice of America witnesses were saying and did not
8   accept as truth what you were saying?
9       CHAIRMAN FITCH:  That question is
10  struck also.  She has no idea what Judge Kotelly
11  may have configured to herself.
12      MR. KLAYMAN:  I'll lay a foundation.
13  BY MR. KLAYMAN:
14      Q.  You did see the opinion of Judge
15  Kotelly, didn't you?  I sent it to you, remember.
16      A.  You sent so many emails at that time
17  in June, I was completely -- completely -- I can't
18  say I read it, no.
19      MR. TIGAR:  Excuse me, counsel, what is
20  the exhibit number of Judge Kotelly's opinion to
21  which you're referring, on anybody's exhibit list?
22      MR. KLAYMAN:  There are several.  In

App.0258

Page 417

1  the books of --
2       MR. TIGAR:  No, I'm talking about the
3  one to which you just referred.
4       MR. KLAYMAN:  I was going to tie that
5  back later.
6       MR. TIGAR:  You're going to get to it.
7       MR. KLAYMAN:  I was going to go through
8  it and say you're very clear what the hearing
9  committee should look at.  We'll do it
10  systematically.
11  BY MR. KLAYMAN:
12       Q.  You are aware that I did send you the
13  decision?
14       A.  I don't know.  You probably did.
15       Q.  And --
16       A.  If you say you did, I'm sure you did.
17       Q.  And I explained to you --
18       A.  Because I received so many emails from
19  you at that point during that time, I wasn't
20  honestly opening all of them any more.
21       Q.  You're aware that I was upset with that
22  decision because I felt that you should have had a

Page 418

1  hearing.  We should have brought the witnesses in
2  and had them testify like we're doing, you know,
3  now.
4       A.  During what date are we talking about
5  now?  Would you please tell me.
6       Q.  When Kotelly made her decision.
7       A.  Do you remember what date it was?
8  When was it?  May, June?  When was it?  About what
9  time?
10       Q.  In June, around there.
11       A.  Ok.
12       Q.  Ok.
13       A.  Ok.
14       Q.  Yeah.
15       CHAIRMAN FITCH:  The only question is,
16  did you understand that after Judge Kotelly
17  entered her ruling that Mr. Klayman was upset?
18       THE WITNESS:  No, I didn't understand
19  how he felt.
20  BY MR. KLAYMAN:
21       Q.  Do you remember I actually spoke with
22  you at the time and you were upset at me because

Page 419

1  we hadn't won that phase in the case?
2       A.  I was upset that we didn't win that
3  phase of the case, yes.
4       Q.  Yeah, and in fact you blamed me.
5       A.  Because you were concentrating on your
6  love for me instead of the court on a daily basis
7  and love letters to me.  So I was upset that you
8  didn't concentrate on our case enough.  That's why
9  we lost.
10       Q.  You just said you didn't read any
11  pleadings, so you don't know how I concentrated or
12  not with the court.
13       CHAIRMAN FITCH:  That's struck;
14  argumentative.
15  BY MR. KLAYMAN:
16       Q.  Now, there's nothing wrong, is there,
17  Ms. Sataki, for a husband to represent his wife in
18  a legal proceeding?
19       MR. SMITH:  Objection.
20       CHAIRMAN FITCH:  I don't see -- that's
21  sustained.
22

Page 420

1  BY MR. KLAYMAN:
2       Q.  There's nothing wrong with caring for
3  somebody, is there?
4       MR. SMITH:  Objection.
5       MR. KLAYMAN:  No, there's nothing --
6  that's part of the case, and I object to that
7  objection.
8       CHAIRMAN FITCH:  That question is too
9  general.
10       THE WITNESS:  The way you cared about
11  me --
12       CHAIRMAN FITCH:  No, question.  There's
13  no question.
14       THE WITNESS:  I'm sorry.
15  BY MR. KLAYMAN:
16       Q.  There's nothing wrong in a lawyer
17  caring about the wellbeing of his client, is
18  there?
19       CHAIRMAN FITCH:  She can't answer
20  questions like that.  Too general, too
21  speculative.
22

41 (Pages 417 to 420)

Page 421

BY MR. KLAYMAN:

Q.  But it's true you just said you didn't
read any of the stuff I sent you because you
didn't open it up.

A.  I didn't open some of your emails and I
opened some.  So I don't know which one -- I
couldn't tell now what I opened and what I didn't
open.

Q.  But you don't remember ever reading the
decisions of Judge Kotelly, do you?

A.  Yes.  I remember you telling me that,
yes.

Q.  And do you remember me telling you that
she made a number of factual and legal errors,
mistakes, in those rulings, over the phone?

A.  It's very vague.  I don't remember a
whole lot.

So, if you say that -- that's
probably.  I don't remember details from that.

Q.  And you remember my saying that this
was just the first phase, it wasn't over, that we
hadn't lost the case.  It's just that she didn't

Page 422

grant the temporary restraining order and
preliminary injunction that puts you back to work.

You remember that, right?

A.  Yes.

Q.  And in fact we had a request in the
complaint for a permanent injunction, which means
we could go further with more time, get testimony,
take discovery, and then revisit this issue later
after you being in Los Angeles.

Do you remember I said that?

A.  Yes.

Q.  So we hadn't lost the case, correct?
We just didn't win round one, right?

A.  I don't know.

Q.  But at that time you blamed me and you
were very, very upset and angry.

A.  Because you were texting, calling and
emailing me so much about your love that my case
was not important any more.  That's why I was
upset with you.

Q.  But you were upset at the result in
round one also, correct, according to your

Page 423

testimony?

A.  Of course I was upset.  Anybody would
be.

Q.  Ok.

A.  I was penniless at that time.  I needed
a job.

Q.  At that time I had, on your behalf,
prepaid rent and gotten you two free months for
your apartment at the Serrano on Ventura
Boulevard.  You had a place to live.

A.  Yes.

Q.  And as you testified yesterday I
actually paid to have your car sent here, correct?

A.  Yes.

Q.  That was a red Mercedes?

A.  Yes.

Q.  And you were also asking me during the
course of this time period to help your friend
Kaveh out, who needed to file for bankruptcy.

Do you remember that?

A.  I asked you -- no.  I asked you what I
should do, because I didn't file for bankruptcy.

Page 424

I asked should I do that or not.  I just asked you
that.

Q.  I'm not talking about you.  I'm talking
about -- you had no credit, right.

A.  I had no credit, yes.

Q.  But Kaveh -- K-a-v-e-h, for the court
reporter -- the friend, coworker that you had
lived with in Virginia, he was having financial
difficulties, and you asked me to find him a
lawyer that could do bankruptcy, correct?

A.  Correct.

Q.  And I did that and I never charged
Kaveh for my time, correct?

A.  That's something between you and Kaveh.
I asked you would you help him.  You said yes, but
whatever that is, please don't mix that with me.

It was your choice to either have any
communication with Kaveh or help him or not.  It
had nothing to do with me.

Q.  But you asked me --

A.  I only asked you do you know anybody,
could you refer anybody to him, would you help.

42 (Pages 421 to 424)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 425

1   You could have said no.
2       Q.  You asked me for a favor to help your
3   friend?
4       A.  No, I didn't ask you for a favor.  I
5   didn't say, "I'm asking you for a favor."  I just
6   said, "This is what's going on.  He needs an
7   attorney.  Can you refer someone or not?"
8       Q.  Didn't you use the phrase frequently,
9   "Will you do me a favor?"  Don't you say that
10  frequently?
11      A.  That you do me a favor?
12      Q.  Me or anybody else.  That's a phrase
13  that you used frequently, "Will you do me a
14  favor?"
15          CHAIRMAN FITCH:  And what's your
16  question about that?
17          MR. KLAYMAN:  That she uses that
18  phrase.
19          THE WITNESS:  Well, I mean, that's just
20  something that I sometimes -- like a lot of people
21  say, "to be honest with you," or "Would you do me
22  a favor?"

Page 426

1       That's just something that in
2   conversations you use.
3   BY MR. KLAYMAN:
4       Q.  Right.
5       A.  -- it has nothing to do with --
6       Q.  Well, do I not have a right, when you
7   ask me to do you a favor, to believe that I'm
8   doing you a favor?
9           MR. SMITH:  Objection to what she
10  thinks he has a right to have.
11          CHAIRMAN FITCH:  I'm going to overrule
12  that, out of an abundance of caution.
13          MR. KLAYMAN:  Can you read the question
14  back, please.
15          THE COURT REPORTER:  "Well, do I not
16  have a right, when you ask me to do you a favor,
17  that I believe that I'm doing you a favor?"
18          THE WITNESS:  No, you didn't do me a
19  favor.  I asked you if you know anybody, can you
20  talk to Kaveh, and you did.
21  BY MR. KLAYMAN:
22      Q.  So up to this point in time, Ms.

Page 427

1   Sataki, you're very unappreciative of anything
2   that I did for you.
3           CHAIRMAN FITCH:  I'll strike that.
4           THE WITNESS:  No, I was not.  Even in
5   an email --
6           MR. SMITH:  Don't answer that.
7           CHAIRMAN FITCH:  You don't need to
8   answer that.
9   BY MR. KLAYMAN:
10      Q.  Now, during around this time period,
11  you also asked me to go out and buy you a car, did
12  you not?
13      A.  No, I did not.
14          CHAIRMAN FITCH:  Now, we're talking
15  about the post TRO decision.
16          MR. KLAYMAN:  No, leading up to Judge
17  Kotelly's decision while she was in Los Angeles.
18          CHAIRMAN FITCH:  Well, you shifted back
19  in time --
20          MR. KLAYMAN:  Yeah.
21          CHAIRMAN FITCH:  Before you filed the
22  TRO, for example?

Page 428

1           MR. KLAYMAN:  In and around that time
2   period.
3           CHAIRMAN FITCH:  Ok, so --
4           MR. KLAYMAN:  In and around that time
5   period and thereafter.
6           CHAIRMAN FITCH:  I'll take a
7   representation from you, counsel, was the U.S.
8   District Court action filed on or about April 2nd?
9           MR. KLAYMAN:  I'll have to look, your
10  Honor.  I'm going to go through it systematically.
11          I'm just trying to get the general
12  narrative out there, then I'll go back.
13          CHAIRMAN FITCH:  What time period are
14  you asking her about now?
15          MR. KLAYMAN:  I'm asking the time she
16  moved to LA and I had paid for her car to be
17  transported LA.  Thereafter she wanted to buy a
18  new car and asked me to go with her to buy a new
19  car.
20  BY MR. KLAYMAN:
21      Q.  Correct?
22          CHAIRMAN FITCH:  Ok, we're talking

                    43  (Pages 425 to 428)

App.0261

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 429

1  spring of 2010.
2      THE WITNESS:  Maybe I asked you to -- I
3  don't remember that.  Maybe I asked you, because I
4  had no credit and that was --
5      CHAIRMAN FITCH:  Wait just a minute.
6  He may want to write down what you say.
7      THE WITNESS:  Yes, I'm sorry.
8      CHAIRMAN FITCH:  Go ahead.
9      MR. KLAYMAN:  I think she answered the
10  question.
11      CHAIRMAN FITCH:  Ok.
12  BY MR. KLAYMAN:
13      Q.  Now I'm going to show you what is
14  Respondent's Exhibit 9.  You have a binder from
15  me.  If you may turn to that.
16      (Brief pause.)
17      CHAIRMAN FITCH:  Mr. Klayman, are you
18  trying to find --
19      MR. KLAYMAN:  Yes -- my book fell
20  apart.  It's Exhibit 9.
21      CHAIRMAN FITCH:  It purports to be an
22  email exchange around 8, May, of 2010.  That's

Page 430

1  what I have.
2      MR. KLAYMAN:  Yes.
3      CHAIRMAN FITCH:  She's welcome to use
4  my copy.
5      MR. KLAYMAN:  Wait, oh, here it is.
6  It's Exhibit 9, Respondent's Exhibit 9.  Turn to
7  the third page.  I've got it.
8      MS. LARKIN:  Is this also Exhibit 26-1
9  in the Board book?
10      MR. KLAYMAN:  It probably is.  Yeah.
11  BY MR. KLAYMAN:
12      Q.  Turn I think to the third page.  This
13  is a memorandum that I wrote to Arlene Aviera,
14  correct?  That was the meeting that you testified
15  about that we were all going to meet together.
16      You see that?
17      A.  I'm reading this email from -- this
18  letter from Arlene.  Is that what you want
19  me to read?
20      Q.  Yes.
21      CHAIRMAN FITCH:  Yes.
22      (Witness reads document.)

Page 431

1      THE WITNESS:  So --
2      CHAIRMAN FITCH:  Well, ok.  You've read
3  it now, correct?  Now he has a question for you.
4  BY MR. KLAYMAN:
5      Q.  Yes.  Have you ever seen this before,
6  this memorandum?
7      A.  I don't remember it.  Maybe it was --
8      When is this date?  Do you know what
9  date?
10      CHAIRMAN FITCH:  You've answered his
11  question.  He asked you a question.  You said you
12  don't remember the memorandum.
13  BY MR. KLAYMAN:
14      Q.  There's a date on the top which is
15  April 7th, 2010 when it was sent by facsimile to
16  Arlene Aviera, the psychologist, when I sent it to
17  her.
18      CHAIRMAN FITCH:  I think we're waiting
19  for a question --
20      MR. KLAYMAN:  Yeah.
21      CHAIRMAN FITCH:  -- from you.
22

Page 432

1  BY MR. KLAYMAN:
2      Q.  Well, so you think you've seen this
3  before?
4      A.  Yes.
5      Q.  And in that second paragraph I write to
6  Dr. Aviera, "Last week I perceived her," meaning
7  you, "Ellie, to be very aggressive toward me when
8  a lawyer I got for Kaveh to handle the bankruptcy
9  did not behave correctly."
10      Remember that?  You blamed me about a
11  lawyer that I got for Kaveh?
12      A.  I don't remember exactly, but ok.
13      Q.  And then it says, "Despite all this,
14  today she asked me if I would go with her to buy a
15  car, which I'm happy to do when I have time (today
16  I could not).  I did not find this request -- I
17  did find this request a bit out of place at this
18  moment in time, given all that has gone on in the
19  last few days between us."
20      You see that?
21      A.  Yes.
22      Q.  Now, if we didn't have a close

44 (Pages 429 to 432)

| Page 433 | Page 435 |
|---|---|

**Page 433**

1  friendship or a personal relationship in addition
2  to a professional relationship, you wouldn't have
3  asked me to go buy you a car, would you?
4      A.  I definitely didn't ask you to buy me a
5  car.  Absolutely not!
6      Q.  Well, you were incapable of buying the
7  car yourself because you had no credit, correct?
8      A.  Correct.  But I didn't ask you to buy
9  me a car.  Definitely, absolutely not.
10     Q.  Well, if someone else was going to buy
11  you the car, then he would have gone with you,
12  correct?
13     A.  I didn't need a car.  I had my car.
14     Q.  But you were the one who wanted --
15     A.  Which I drove the same car for years
16  after, that red car that you mentioned.
17         CHAIRMAN FITCH:  Let him ask another
18  question.
19  BY MR. KLAYMAN:
20     Q.  I wasn't going to buy a car for me, was
21  I?
22     A.  I don't know.

**Page 435**

1      CHAIRMAN FITCH:  Alright, I think
2  you've told us why --
3      THE WITNESS:  So that's the only car
4  thing I remember.
5      I'm sorry.
6  BY MR. KLAYMAN:
7      Q.  You wanted a new car, didn't you?
8      A.  No.
9      Q.  You were looking at cars that day, were
10  you not?
11     A.  I was looking at cars.  I always look
12  at cars.
13     Q.  Now, let me ask you this: if --
14     A.  I didn't want a new car, no.
15     Q.  If we weren't --
16     A.  I was trying to make my payment go
17  lower.  That's why I was looking at cars.  If I
18  could trade my car in and make the payments lower
19  as I had money issues.  That way why I was looking
20  at cars.
21     Q.  Was I being -- you felt as if -- that
22  you could ask me to do anything and I would do it

| Page 434 | Page 436 |
|---|---|

**Page 434**

1      Q.  And in fact we did go to a Mercedes
2  dealership in Van Nuys, California not far from
3  where you live?
4      A.  Yes.  May I -- may I explain why?
5      CHAIRMAN FITCH:  Yes.
6      THE WITNESS:  Do you remember --
7  May I explain --
8      CHAIRMAN FITCH:  Yes.
9      THE WITNESS:  -- why we went?
10     CHAIRMAN FITCH:  Yes.
11     THE WITNESS:  They repoed my car, and
12  me, him and my brother, he -- he came with us,
13  because he's an attorney, and maybe, so, did they
14  have the right to come to my garage and tow my car
15  and take it or not.
16         So he came out there with us to help
17  us, as an attorney advisor.
18         But all he did, he made a big scene and
19  he threatened Van Nuys Keys Mercedes, that he's
20  gonna them, that this is not -- and he made a huge
21  scene and we walked out and he made everything
22  even worse.

**Page 436**

1  for you, correct, virtually anything?
2      A.  Not anything.
3      Q.  Right.
4      A.  Anything that had to do with -- as a
5  lawyer that could advise me.
6      Q.  If our relationship was simply that I
7  was going to try to help you come back to Los
8  Angeles and file lawsuits on your behalf if
9  necessary, that doesn't mean that you'd ask me to
10  help your friend Kaveh or to go with you to a car
11  agency?
12         MR. SMITH:  Objection as argumentative.
13  That not really even a question.
14         MR. KLAYMAN:  It isn't argumentative.
15  I'm asking.
16         CHAIRMAN FITCH:  Is that the whole
17  question?
18         MR. KLAYMAN:  Yeah.
19         CHAIRMAN FITCH:  Sustained.
20         MR. SMITH:  How is she supposed to get
21  inside his head?
22         CHAIRMAN FITCH:  Sustained.

45 (Pages 433 to 436)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 437 |
|---|

1      MR. KLAYMAN:  I'll ask it a different
2  way.
3  BY MR. KLAYMAN:
4      Q.  You felt that you could ask me to do
5  anything and I would do it for you?
6      A.  No.
7      Q.  My role --
8      A.  You said that.  That is your sentence.
9      You always wrote to me, texted me and
10  told me that, "You can ask me anything and I will
11  do that for you."
12      It's your sentence.  Not mine.
13      Q.  Assuming what you say is true, you
14  asked me to help Kaveh in my time, at my expense?
15      A.  I didn't ask you to help Kaveh.  I
16  asked you if you knew an attorney.
17      CHAIRMAN FITCH:  Asked and answered.
18      MR. KLAYMAN:  Ok.
19      This is a good breaking point, your
20  Honor.  It's 1:00 o'clock.
21      CHAIRMAN FITCH:  Sure.
22      We will stand in recess beginning here

| Page 438 |
|---|

1  at 1:01 until 2:00 p.m., at which time we will
2  interrupt this witness' testimony to take
3  testimony from a witness, Mr. O'Connell, who is
4  not available tomorrow.
5      MR. SMITH:  Thank you.
6      MR. KLAYMAN:  And we'll invoke the rule
7  for that.
8      CHAIRMAN FITCH:  I'm sorry?
9      MR. KLAYMAN:  We'll invoke the rule for
10  Ms. Sataki not to be here.
11      CHAIRMAN FITCH:  Oh, yeah, sure.  Sure.
12      You're reminded again not to discuss
13  your testimony with anybody else.  And in
14  addition, if you want to report a little bit later
15  than 1:00 o'clock, that would be --
16      THE WITNESS:  2:00 o'clock.
17      CHAIRMAN FITCH:  A little bit later
18  than 2:00 o'clock.  I think we would be taking
19  another witness from at least 2:00 to 2:15, but
20  not much longer.
21      (Whereupon at 1:03 p.m. a luncheon
22  recess was taken.)

| Page 439 |
|---|

1      A F T E R N O O N   S E S S I O N
2      (Whereupon at 1:58 p.m. the hearing
3  resumed.)
4      CHAIRMAN FITCH:  We are back on the
5  record at 1:58.
6      MR. KLAYMAN:  Yes, I just want to renew
7  my objections to the testimony of the
8  investigator, so it's clear on the record, in that
9  I requested discovery.  I have no idea what he's
10  going to say.  It's unfair surprise, for the
11  record.
12      CHAIRMAN FITCH:  The objection is noted
13  and preserved.
14      Mr. Smith, you can go ahead.
15      (Kevin O'Connell on the witness stand.)
16      CHAIRMAN FITCH:  Respondent's
17  cross-examination has been suspended as an
18  accommodation to Disciplinary Counsel putting on a
19  witness today who is unavailable tomorrow.
20      May I ask the witness to raise your
21  right hand.  Do you solemnly swear or affirm the
22  testimony you give in this matter will be the

| Page 440 |
|---|

1  truth and nothing but the truth?
2      THE WITNESS:  I do.
3      CHAIRMAN FITCH:  What is your full
4  name?
5      THE WITNESS:  Kevin E. O'Connell.
6      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
7  Whereupon,
8      KEVIN O'CONNELL
9  called as a witness on behalf of Disciplinary
10  Counsel, and, after having been first duly sworn,
11  was examined and testified as follows:
12      DIRECT EXAMINATION BY DISCIPLINARY COUNSEL:
13      BY MR. SMITH:
14      Q.  Good afternoon, Mr. O'Connell.
15      A.  Good afternoon.
16      Q.  Could you please tell the hearing
17  committee your occupation.
18      A.  I am an investigator with the Office of
19  Disciplinary Counsel.
20      Q.  Prior to joining the Office of
21  Disciplinary Counsel, did you attend any colleges
22  or universities?

46  (Pages 437 to 440)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 441

1      A.  I went to the University of Maryland.
2      Q.  Did you get a degree there?
3      A.  I got two degrees: one in English and
4  the other in accounting.
5      Q.  After you graduated from the University
6  of Maryland, with whom were you employed?
7      A.  The FBI.
8      Q.  That would be the Federal Bureau of
9  Investigation?
10     A.  Correct.
11     Q.  What did you do at the Federal Bureau
12  of Investigation?
13     A.  I was an investigator.  I worked mostly
14  white collar matters.
15     Q.  How long did you work with the FBI?
16     A.  Twenty-six years.
17     Q.  How long have you been working with the
18  Office of Disciplinary Counsel?
19     A.  Thirteen years.
20     Q.  Could you describe what your job
21  responsibilities are.
22     A.  I am basically there to assist the

Page 442

1  lawyers with whatever cases they have.  Whatever
2  things they may need done, I do.
3      Q.  Now, are you familiar with Disciplinary
4  Counsel's investigation of Mr. Larry Klayman?
5      A.  Yes.
6      Q.  Have you been asked to do any research
7  in connection with that investigation?
8      A.  Yes.
9      Q.  Could you tell the hearing committee
10  what that research was?
11     A.  You had asked me to do some online
12  research on the company World Net Daily.
13     Q.  What did your research entail?
14     A.  It's a website that was started I think
15  in May of 1997.  It's I guess a conservative
16  website that consists of opinion pieces and news.
17     Q.  In your research, did you learn what
18  the circulation is of readers of the World Net
19  Daily?
20     A.  They stated on the website that it's
21  five million views per month and 40 million pages
22  viewed per month.

Page 443

1      Q.  When did you first look into that
2  issue?
3      A.  Initially in February of 2015.
4      Q.  Have you looked at it recently?
5      A.  I looked at it yesterday.
6      Q.  Those numbers --
7      A.  The same numbers were there, yeah.
8      Q.  As part of the research, did you
9  determine whether or not there are any articles
10  that still appear on World Net Daily that refer to
11  Ms. Elham Sataki?
12     A.  Yes.  I believe there are two.
13     Q.  Do you remember who authored those
14  articles?
15     A.  I think Mr. Klayman authored one of
16  them.
17     Q.  Ok, let me show you what you actually
18  gave me yesterday, to refresh your recollection.
19     MR. SMITH:  I'll make this available to
20  everybody.
21     CHAIRMAN FITCH:  Did you tender --
22     MR. SMITH:  I'm showing him just to

Page 444

1  refresh his recollection.
2      THE WITNESS:  I apologize, there's two
3  authored by Mr. Klayman.
4      CHAIRMAN FITCH:  I see.
5  BY MR. SMITH:
6      Q.  Would you read into the record,
7  identify what the articles are, please.
8      A.  One is dated April the 23rd, 2010, and
9  the caption is "$150M case claims anti-freedom
10  bias at Voice of America."
11     The second one is dated June the 11th,
12  2010, and it's titled, "Cockroaches and judges."
13     Q.  Both of those articles reference are
14  with reference to Ms. Sataki?
15     A.  Yes.
16     Q.  Just to be clear, I might be repeating
17  myself, but these articles that you just
18  described, they're still available online?
19     A.  Yes, they were there yesterday.
20     MR. SMITH:  Ok, thank you.
21     I have no further questions.
22     MR. KLAYMAN:  Ok.

47  (Pages 441 to 444)

App.0265

## Page 445

1    CHAIRMAN FITCH:  Cross-examination.

2    CROSS-EXAMINATION ON BEHALF OF RESPONDENT:

3       BY MR. KLAYMAN:

4    Q.  Mr. O'Connor, you're not an expert in

5  the internet, are you?

6    A.  No.

7    Q.  You just happened to be looking online?

8    A.  Yes.

9    Q.  You're aware that once something is

10 placed on the internet, it really never gets off

11 the internet.

12   You're aware of that, based on your

13 experience?

14   A.  Well, I'm not an expert, but that's

15 what I hear, yes.

16   Q.  And that it even attempts to remove it

17 will not get it off the internet?

18   A.  I don't know.  I'm not an expert.

19   MR. KLAYMAN:  No further questions.

20   CHAIRMAN FITCH:  Any redirect?

21   MR. SMITH:  Nothing from Disciplinary

22 Counsel.

## Page 446

1    CHAIRMAN FITCH:  Thank you, sir.

2    (Witness Kevin O'Connell is excused.)

3    MR. SMITH:  I'll see if Ms. Sataki has

4  returned.

5    CHAIRMAN FITCH:  I thought I saw her

6  right around -- maybe back in the room.  I wasn't

7  sure if that door was locked or not.

8    (Brief pause.)

9    CHAIRMAN FITCH:  Yes?  No?

10   MR. SMITH:  She's here.  She's getting

11 herself together.

12   MR. KLAYMAN:  Your Honor, what time are

13 we leaving today?  I forgot.

14   CHAIRMAN FITCH:  Well, we'll break kind

15 of when there's a natural place to break

16 hopefully.  But 4:45'ish.

17   MR. SMITH:  While we're waiting for Ms.

18 Sataki to come in, if I can get some sense from

19 Respondent how -- it if we don't finish today with

20 the cross-examination of Ms. Sataki -- do you

21 believe you'll be finished with cross-examination?

22   MR. KLAYMAN:  No.

## Page 447

1    MR. SMITH:  About what time tomorrow do

2  you think you'll be finished?

3    MR. KLAYMAN:  I don't know.

4    MR. SMITH:  Because, again, I have a

5  witness that needs a two-hour window to get here

6  once he knows he's going to be testifying.

7    So, if, you know, I could get some

8  clarity on at that.

9    MR. KLAYMAN:  We don't have -- I don't

10 know.  It depends on when I start going through

11 very specific documents and everything.  I could

12 be all day tomorrow.

13   MR. SMITH:  I mean, in which case I

14 guess we can reconvene Monday with the testimony

15 of my expert.  I'd like to give him some knowledge

16 tonight, if at all possible.

17   CHAIRMAN FITCH:  Well, he's a lawyer.

18 He knows these things are uncertain, and we're

19 scheduled to discuss scheduling matters tomorrow

20 probably at 1:00 or 2:00 p.m.

21   But before somebody --

22   MR. SMITH:  If he's definitely not

## Page 448

1  going to be testifying tomorrow, then I would like

2  to let him know that, so if he had any plans to

3  get away...

4    CHAIRMAN FITCH:  Well, he's on call,

5  so.

6    MR. SMITH:  Yeah, he is.

7    CHAIRMAN FITCH:  So he'll have to go

8  with the flow.  We'll see.

9    MR. SMITH:  Ok.

10   (Ms. Elham Sataki returns to the

11 witness stand.)

12   CHAIRMAN FITCH:  Ms. Sataki has resumed

13 the stand, and she shall bear in mind that she is

14 still under oath.

15   THE WITNESS:  Yes.

16   CHAIRMAN FITCH:  And Mr. Klayman may

17 resume at his convenience.

18      CONTINUED CROSS-EXAMINATION

19      ON BEHALF OF RESPONDENT

20      BY MR. KLAYMAN:

21   Q.  Ms. Sataki, you're aware that I was

22 trying to resolve everything with VOA along with

Page 449

1   Mr. Shamble amicably, that we did lobbying of
2   senators and congressmen and others in trying to
3   resolve it amicably with VOA.
4        You're aware of that?
5   A.  Don't remember.
6   Q.  I call your attention to a particular
7   evening --
8        CHAIRMAN FITCH:  I'm sorry, I guess
9   it's my hearing.  I didn't understand the answer.
10       THE WITNESS:  I said I don't remember.
11  BY MR. KLAYMAN:
12  Q.  Do you remember having dinner with me
13  and Key Dash at Morton's restaurant one night?
14  A.  Vaguely.
15  Q.  On Connecticut Avenue?
16  A.  Vaguely.
17  Q.  Yes?
18  A.  Yes.  Vaguely, yes.
19  Q.  And we were sitting there, and sitting
20  across the table from us, at a different table,
21  was an individual by the name of John Boehner, who
22  I had told you was going to be the next Speaker of

Page 450

1   the House.
2   A.  Again, vaguely.  I remember -- not very
3   clear.  Vaguely, yes.
4   Q.  And you remember that I said to you,
5   "Let's go over and talk to Mr. Boehner, because
6   he's going to be a very powerful person soon in
7   the house, and maybe he can help us resolve your
8   desire to go back to Los Angeles and your
9   harassment case."
10       You remember that?
11  A.  Yes.
12  Q.  And I walked over with you to Mr.
13  Boehner, and I said, "John, how you doing?
14  Haven't seen you for a few years."
15       And he said, "Larry, how you doing?"
16       You remember that?
17  A.  No.
18  Q.  And then I introduced you.  And I said,
19  "This is my client, Elham Sataki.  She has a
20  problem with the Voice of America."  And I said to
21  you, "Ellie, please explain it to Congressman
22  Boehner, you know, in a relatively brief way."

Page 451

1        Do you remember that?
2   A.  I do, but vaguely.  Not exact.
3   Q.  And you explained to him your
4   situation, you wanted to go back to LA, correct?
5   A.  Vaguely.
6   Q.  And he then said to you -- he then
7   pulled a card out, a business card and said, "This
8   is my chief of staff.  Contact her.  We'll take
9   care of it."
10       You remember that?
11  A.  Again, I remember the whole evening,
12  but not in details, the way you ask me in details.
13  I can't answer the questions yes when you say
14  remember.
15       I can't say yes, I can't say no.  I'm
16  sorry.
17       THE WITNESS:  Because he's asking me in
18  details about an evening that I vaguely remember.
19       I remember such an evening exists, but
20  not in details like that.  I'm sorry.
21
22  BY MR. KLAYMAN:

Page 452

1   Q.  And you remember that the purpose
2   though was to go over and ask him for his help to
3   resolve it, resolve the matter with VOA.
4   A.  Yes.
5   Q.  And that he did give you a business
6   card and said "contact this person," have "you and
7   Larry contact this person"?
8   A.  I don't remember that part.
9   Q.  And after the conversation was over,
10  you remember he leaned over and gave you a kiss on
11  the cheek?
12  A.  I don't remember that part.
13  Q.  And we later did contact that person at
14  Mr. Boehner's office, Congressman Boehner, and we
15  went up there and met with him and asked for their
16  help to resolve the matter amicably with VOA.
17  A.  Again, I don't -- I don't -- it's such
18  a long time ago from the time that I was going
19  through a very tough time, so I can't -- my memory
20  from that time is very tough.  I'm sorry.
21  Q.  You do remember going up to Capitol
22  Hill and the Capitol and meeting with staff of

49 (Pages 449 to 452)

App.0267

In The Matter Of:  Larry E. Klayman
May 31, 2018

| | Page 453 |
|---|---|

1  then Speaker John Boehner?

2      A.  Not exactly.

3          I'm not saying that it didn't happen.

4  I just -- I don't have it right now in front of my

5  eyes that I can exactly say what happened.

6      Q.  You're aware that the Speaker of the

7  House of Representatives is the third most

8  powerful person in the United States government?

9  You're aware of that?

10     A.  Yes.

11     Q.  That if the president or vice president

12  dies --

13         MR. SMITH:  Objection.  I think she's

14  testified that she understands he's a powerful

15  man.  For God's sakes --

16         CHAIRMAN FITCH:  I'm going to let him

17  ask the question.

18  BY MR. KLAYMAN:

19     Q.  You're aware that if the president,

20  vice president die, he becomes the president?

21         CHAIRMAN FITCH:  I'm going to strike --

22  I sustain the objection.

| | Page 454 |
|---|---|

1          MR. KLAYMAN:  Just a little history.

2  BY MR. KLAYMAN:

3      Q.  But you know he's a very powerful

4  person, just generally?

5      A.  Yes, he's a very powerful person.

6      Q.  You are aware also that Mr. Shamble and

7  I approached, a U.S. senator by the name of Tom

8  Coburn from Oklahoma?

9      A.  I don't remember.

10     Q.  Does it refresh your recollection that

11  Mr. Coburn sat on a committee that oversaw the

12  Voice of America in the U.S. Senate?

13     A.  I don't remember.

14     Q.  You're aware that I also approached

15  Senator John McCain to help you?

16     A.  You mentioned that in your emails.

17     Q.  So therefore you're aware of it?

18     A.  Yes.

19     Q.  And you knew that Senator John McCain

20  had actually run for president himself in 2008?

21         You're aware of that?

22     A.  Yes.

| | Page 455 |
|---|---|

1      Q.  So he also was a very powerful person?

2      A.  Yes.

3      Q.  And you know that I asked him to help

4  you --

5      A.  Yes.

6      Q.  -- to resolve this.  Ok.

7      A.  Well, you said that you did.

8          I'm not -- I don't know if you did or

9  not.  That's what you said.

10     Q.  You are aware, also, that I approached

11  Senator Joe Lieberman to try to help you, a

12  democrat?

13     A.  I don't know.  I don't remember.

14     Q.  You have heard of Senator Joe

15  Lieberman, though, correct?

16     A.  Yes.

17     Q.  He also is a very powerful person on

18  Capitol Hill, or was.  You knew that?

19     A.  Yes.

20     Q.  You're aware that when we met with

21  these people we would give -- I would give them

22  copies of some of the favorable articles I wrote

| | Page 456 |
|---|---|

1  about you and what was happening in VOA with, not

2  just your case, but also other broadcasters who

3  had been allegedly discriminated against?

4          You're aware of that?

5      A.  Yes.

6      Q.  In addition to that lobbying, you are

7  aware that I also approached senator Dana,

8  D-a-n-a, Rohrbacher, R-o-h-r-b-a-c-h-e-r, correct?

9      A.  Correct.

10     Q.  And I told you that Congressman

11  Rohrbacher was from Orange County, California, not

12  far from where you were living at the apartment on

13  Ventura Boulevard.

14     A.  Correct.

15     Q.  That from California he might be

16  inclined to help you, in particular.

17     A.  Correct.

18     Q.  And I think you had some connection to

19  Orange County yourself, didn't you?  You have some

20  relatives there, friends?

21     A.  I knew someone in Orange County, yes.

22     Q.  And I also told you that Dana

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 457

1  Rohrbacher actually had been involved in Iranian
2  issues before we were going to go see him,
3  correct?
4      A.  Correct.
5      Q.  In fact, he had been trying to bring
6  about freedom in Iran all these years.
7      A.  Ok.
8      Q.  Do you remember that?
9      A.  No, I don't remember that.
10      Q.  And I told you that in fact actually he
11  had been a person that was involved in the
12  Iran-Contra investigation during the Reagan
13  administration?
14      A.  I don't remember.
15      Q.  He worked with Oliver North.  I told
16  you that.
17      A.  I don't remember.
18      Q.  Ok.  Now we went up to see congressman
19  Rohrbacher, didn't we?  I set up an appointment.
20  We sent up to see him?
21      A.  Yes.
22      CHAIRMAN FITCH:  I'm sorry, to whom

Page 458

1  does the pronoun "we" refer?
2      MR. KLAYMAN:  Her and I.  Ms. Sataki
3  and I.
4  BY MR. KLAYMAN:
5      Q.  We went up there one afternoon, right?
6      A.  Yes.
7      Q.  And we met Congressman Rohrbacher.
8      A.  Yes.
9      Q.  And he said he would help us, correct?
10      A.  Yes.
11      Q.  We also met Kathleen Stanton at that
12  time, correct?
13      A.  Correct.
14      Q.  She was his chief of staff in the
15  California office.
16      A.  Yes.
17      Q.  And we told Ms. Stanton and Congressman
18  Rohrbacher your story and why we needed help --
19      A.  Yes.
20      Q.  -- to get you back to LA.
21      A.  Yes.
22      Q.  And after we had these meetings, we

Page 459

1  were out in the hallway and Kathleen Stanton -- or
2  we'll call her Kathleen, you were calling her
3  that -- hugged you and said, "I feel you're like
4  my daughter.  I'll take care of you."
5      Do you remember that?
6      A.  Yes.
7      Q.  After that meeting occurred, you know
8  that I was trying to get them to do something to
9  intervene at VOA to get this matter resolved in
10  your favor.
11      A.  Yes.
12      Q.  Now you've previously testified that
13  Kathleen Stanton was the one who prepared the
14  supplemental complaint?
15      A.  Yes.
16      Q.  Which was Exhibit 23 of Bar Counsel's
17  exhibits.  It's already in evidence.  Would you
18  turn to Exhibit 23.
19      Are you there?
20      A.  Wait, 23?
21      Q.  Yes.
22      A.  Yes.

Page 460

1      Q.  Now this was filed, or at least it says
2  filed or received October 24th, 2011, and the
3  original Bar complaint, Exhibit 1, I believe, to
4  Bar Counsel's exhibits, was filed about a year
5  earlier on December 3rd, 2010.  It has a date of
6  11/2/2010, but there's a stamp of December 3rd on
7  the top.
8      You see there was a year between those
9  Bar complaints?
10      A.  I don't understand your question now.
11      Q.  There was a delay of a year between the
12  first complaint that you say you filed with the
13  Bar, Exhibit 1, and the second supplemental
14  complaint that you said you filed on October 24th,
15  2011, that Kathleen Stanton prepared for you, as
16  you testified.
17      You see that?
18      CHAIRMAN FITCH:  I'm not sure if she
19  has the other one in front of her.
20      MR. KLAYMAN:  It's in the same binder,
21  your Honor.
22      CHAIRMAN FITCH:  But we have seen the

51 (Pages 457 to 460)

Page 461

1    evidence for almost two days.
2    BY MR. KLAYMAN:
3        Q.  Let me turn first to Exhibit 23.
4            You've never had any legal training,
5    have you?
6        A.  No.
7        Q.  Ms. Sataki.  You wouldn't know how to
8    do a citation of a law case in proper form for
9    legal tribunals or courts, would you?
10       A.  No.
11       Q.  As you previously testified, your
12   English is not that good, correct?
13           CHAIRMAN FITCH:  Asked and answered.
14           MR. KLAYMAN:  Ok, that's fine.
15   BY MR. KLAYMAN:
16       Q.  Now, what were the circumstances of
17   your sitting down with Ms. Stanton to prepare the
18   attachment to the cover page of this supplemental
19   complaint, which is Exhibit 23?
20           I turn your attention to Page 24-4 of
21   this exhibit.
22       A.  I don't think we're on the same page.

Page 462

1    Is it this white -- is it this?  I'm not sure
2    which one is it.
3            MR. TIGAR:  Counsel, did you mean 23-4?
4            MR. KLAYMAN:  Yes.  What did I say?
5            MS. LARKIN:  Twenty-four.
6            MR. TIGAR:  You said 24.
7            MR. KLAYMAN:  I'm sorry.
8    BY MR. KLAYMAN:
9        Q.  Do you see that?
10       A.  Yes.
11       Q.  During that interim period, between
12   your first Bar complaint and the supplemental
13   complaint, and after the meeting that we had
14   Congressman Rohrbacher and Ms. Stanton, Ms.
15   Stanton told you that she could solve your issue
16   herself, didn't she?
17           She said, "I'll solve it."
18       A.  What do you mean --
19       Q.  "You don't need Mr. Klayman."
20       A.  I don't understand.
21       Q.  She told you, did she not, after we
22   first met her -- well, let me back up.

Page 463

1            After we first met her in the office
2    that day with me, and before that congressman, you
3    had later meetings with her or talked to her later
4    on the phone, correct?
5        A.  After the first time that we met in the
6    office, yes, I had conversations with her
7    afterwards.
8        Q.  Conversations, some of them were in
9    person?
10       A.  Yes.
11       Q.  You would visit her and she would visit
12   you?
13       A.  Yes.
14       Q.  Where did you visit her?
15       A.  We would meet up in restaurants.
16       Q.  Where were those restaurants?
17       A.  I don't remember.
18       Q.  Were they in Orange County or were they
19   down --
20       A.  I don't remember.
21       Q.  She started to take you under her wing
22   as her daughter, correct, as she said she would?

Page 464

1        A.  Yes.
2        Q.  These were personal meetings?
3        A.  Yes -- I don't understand the question.
4    What do you mean by "personal meetings"?
5        Q.  Well, if it had been a matter of
6    professional matters of the congressional office,
7    you would have met in the office, correct, not in
8    restaurants.
9        A.  No, it wasn't professional.  It was
10   personal.
11       Q.  Right.
12           And during those meetings she told you,
13   did she not, to the effect, "You don't need Larry
14   Klayman.  We can solve it.  Congressman and I can
15   solve this question for you"?
16       A.  No, she didn't say that.  Absolutely
17   not.
18       Q.  During those meetings you talked about
19   your situation with Voice of America sometimes,
20   didn't you?
21       A.  No.
22       Q.  Well, when was it that you talked with

                              52  (Pages 461 to 464)

Page 465

1  her about preparing this supplemental complaint,
2  which is Exhibit Number 3?
3      A.  I don't remember exact date.
4          We were talking over the phone a lot,
5  and we would visit each other, and she didn't want
6  to -- it wasn't about VOA.  She saw what's going
7  on with Mr. Klayman, and, from the body language,
8  the first time we were in the office, and she
9  approached me and she told me, "Something is
10  wrong.  Are you afraid of this man?"  That is how
11  the conversation started.
12         And that is why the first hug that she
13  gave me in the hallway and told me that I -- "I
14  feel that you are like my daughter."
15         Later on she said, "I felt that" -- "I
16  felt fear in your eyes, and the body language of
17  the two of you was not the right kind of body
18  language, that you're afraid of something.  What
19  is it?"
20         And I explained to her what it is.
21     Q.  In fact I was in the hallway at the
22  time, too, correct?

Page 466

1      A.  Yes.
2      Q.  And in fact Ms. Stanton is not a
3  psychologist or a psychiatrist, is she?
4      A.  She's not.  But --
5      Q.  And in fact, you don't know whether I
6  ever had --
7      A.  But her secretary, her secretary told
8  her that, too, and she --
9          MR. KLAYMAN:  Object and I move to
10  strike.
11         CHAIRMAN FITCH:  It's struck.
12         MR. KLAYMAN:  I move to strike the
13  whole thing as hearsay.
14         CHAIRMAN FITCH:  No, you asked her and
15  she told you.
16  BY MR. KLAYMAN:
17     Q.  But you're aware I never had much
18  contact with her after that, Ms. Stanton?
19     A.  I don't know.
20     Q.  In your presence I mean.  That was the
21  only time we ever met, in your presence?
22     A.  Yes.

Page 467

1      Q.  You're aware, you know, I was in
2  contact with her by the telephone, to try to get
3  the matter resolved with VOA, correct?
4          MR. SMITH:  I don't understand that
5  question, because there was kind of like a
6  testimony going on before --
7          MR. KLAYMAN:  I'll go back.
8  BY MR. KLAYMAN:
9      Q.  Are you aware that was the only time
10  that I met with Ms. Stanton in your presence was
11  that one day?
12     A.  In my presence, yes.
13     Q.  Yes.  And that the subsequent contact I
14  had with her was by phone trying to get your
15  situation with VOA resolved in their office?
16     A.  I don't know about that, but if you
17  say --
18     Q.  I told you that I was trying use them
19  to get it resolved.
20     A.  Yes, you told me that.
21     Q.  So you're telling me that Ms. Stanton
22  came up with that impression just in one meeting

Page 468

1  in the office?
2      A.  Yes.
3      Q.  How did the idea of a Bar complaint
4  against me come about?  You didn't suggest it to
5  her.  That was her idea, right?
6      A.  No, it was my idea.
7      Q.  What did you ask her to do?
8          CHAIRMAN FITCH:  I'm sorry, when you
9  say Bar complaint, are you referring to the first
10  one before?
11         MR. KLAYMAN:  Exhibit 23.
12         CHAIRMAN FITCH:  The supplemental.
13         MR. KLAYMAN:  Yeah, the supplemental.
14         CHAIRMAN FITCH:  So the question is,
15  how did the idea of filing this supplemental
16  complaint come about?
17         MR. KLAYMAN:  Let me rephrase the
18  question.
19  BY MR. KLAYMAN:
20     Q.  You say it was your idea, correct?
21     A.  Correct.  Ing this.
22         So, it was my cousin, it was Kathleen

53  (Pages 465 to 468)

Page 469

```
 1   and --
 2       Q.  Is that Sam Razavi?
 3       A.  Yes.
 4       Q.  The one who was convicted of fraud in
 5   Las Vegas?
 6       A.  I don't know anything about that.  It's
 7   you FBI-checking every single person that belongs
 8   to my -- that's my relatives or friends.
 9       Q.  Who is not a lawyer, is he?
10       A.  No, he's not.
11       Q.  Ms. Stanton is not a lawyer, correct?
12       A.  No.
13       Q.  Now, there were legal citations, Sataki
14   vs. Falahati, case number and everything, in the
15   supplemental complaint.
16           Did Ms. Stanton bring in a lawyer to
17   help with this complaint?
18       A.  I don't have knowledge.
19       Q.  Was there somebody in her office that
20   she was working with?
21       A.  No.
22       Q.  You prepared this complaint in her
```

Page 470

```
 1   office?
 2       A.  No.
 3       Q.  Where was it prepared?
 4       A.  I don't remember.
 5       Q.  Now this complaint's pretty
 6   important --
 7           CHAIRMAN FITCH:  Sorry, what was the
 8   answer?
 9           THE WITNESS:  I don't remember.
10           It could have been in a restaurant, in
11   a coffee shop or -- we never met in her office.
12   BY MR. KLAYMAN:
13       Q.  Sam Razavi has no legal training, does
14   he?
15       A.  No.
16       Q.  Now you say he prepared it, too?
17       A.  He helped me.
18       Q.  He's the one who called me and
19   threatened me, didn't he?
20       A.  Nobody ever threatened you.  You
21   called --
22           CHAIRMAN FITCH:  No, please.
```

Page 471

```
 1           THE WITNESS:  Ok.  I'm sorry.
 2   BY MR. KLAYMAN:
 3       Q.  Ms. Stanton advised you to get another
 4   lawyer at the time?
 5       A.  I don't remember.
 6       Q.  What was your response?
 7       A.  I don't remember.
 8       Q.  We'll call him Sam, Sam R., to make it
 9   easy.
10           He advised you to get another lawyer at
11   the time?
12       A.  I don't remember.
13       Q.  So basically they stepped into my role
14   as the lawyer in the case?
15           CHAIRMAN FITCH:  Objection sustained.
16   BY MR. KLAYMAN:
17       Q.  So you were then going to rely on them
18   for legal advice in the future.
19           CHAIRMAN FITCH:  Objection sustained.
20   BY MR. KLAYMAN:
21       Q.  Is that what you're saying?
22       A.  No.
```

Page 472

```
 1           CHAIRMAN FITCH:  Objection sustained.
 2           MR. KLAYMAN:  On what basis?
 3           CHAIRMAN FITCH:  You're asking for
 4   speculation.  I think if you ask it differently, I
 5   might let it in.
 6   BY MR. KLAYMAN:
 7       Q.  They told you they would help you with
 8   your legal matters, Ms. Stanton?
 9       A.  No, they didn't.
10           May I say what they were helping me
11   with?
12           CHAIRMAN FITCH:  No.
13           THE WITNESS:  No, ok.
14   BY MR. KLAYMAN:
15       Q.  At page Exhibit 23-6, you list a number
16   of alleged violations of the Rules of Professional
17   Conduct in the District of Columbia Bar.
18           Do you see that?
19           (Witness peruses document.)
20       Q.  You see that?
21       A.  Yes.
22       Q.  You've never reviewed the Rules of
```

54 (Pages 469 to 472)

Page 473

1   Professional Conduct for the District of Columbia
2   par, have you?  You've never seen them?
3       A.  If you mean these are rules, some of
4   these are my words.  I said that.
5       Q.  I'm talking about the actual -- it's a
6   simple question.
7           You've never actually read the Rules of
8   Professional Conduct of the District of Columbia
9   Bar, have you?
10      A.  I'm sorry, I don't understand the
11  question.  What is the question?
12          CHAIRMAN FITCH:  Have you ever picked
13  up a book --
14          THE WITNESS:  A law book?
15          CHAIRMAN FITCH:  No.  A book that has
16  the rules of the District of Columbia regarding
17  ethical obligations?
18          THE WITNESS:  No, sir.
19  BY MR. KLAYMAN:
20      Q.  So who was it who put these rules in
21  this supplemental complaint at Page 23-6?
22      A.  I don't remember.  I have different

Page 474

1   people.
2       Q.  Do you have somebody in addition to
3   your cousin Sam, in addition to Kathleen?
4       A.  No, it was the two of them, and then
5   they would call on their people if they needed
6   some help.  And I don't know who.  I don't know
7   the other people.
8           Sam probably would call someone and get
9   help, to help me.
10      Q.  Surely you must have asked Sam if he
11  was getting help.
12      A.  No, I didn't ask him.  All I needed was
13  to get help, so I didn't help him.
14      Q.  It's likely this Sam called a lawyer,
15  correct?
16      A.  I don't know --
17          CHAIRMAN FITCH:  This is all
18  speculation.  I'm not going to take into
19  consideration her speculations to you.  I'm not
20  going to allow speculative questions.
21
22  BY MR. KLAYMAN:

Page 475

1       Q.  Before Sam and Kathleen helped you
2   prepare this, you didn't give to them copies of
3   any court pleadings in the cases I filed for you,
4   had you?
5       A.  I don't remember what I gave them.  We
6   were looking at your emails and stuff together,
7   but I don't remember exactly what.
8       Q.  You're not aware of them having
9   knowledge of any of the documents I filed in the
10  various cases?
11      A.  I don't remember.  I don't know.  They
12  may, they may not.
13      Q.  The first sentence of this, "I believe
14  Larry Klayman ignored my wishes" -- this is Page
15  23-4 -- "and best interest in the cases where he
16  represented me.  He failed to competently and
17  diligently work on those cases, causing them to be
18  dismissed.  Using my cases to promote himself at
19  my expense, he failed to explain the terms of the
20  fee to me and unilaterally changed the amount of
21  his fee, and behaved so unprofessionally towards
22  me that I feared for my safety."

Page 476

1           You didn't write that, did you?
2       A.  I did.
3       Q.  That's not your English, is it?
4       A.  No, but I can say the words and they
5   can put it in right English.
6       Q.  Now, if you can't remember showing them
7   any documentation about my failure to diligently
8   and competently represent you, and if you can't
9   remember seeing pleadings yourself, which you
10  testified to, how are you able to make a statement
11  that I wasn't competent and diligent in working
12  for you?
13      A.  Could you repeat your question?
14          MR. KLAYMAN:  Can we repeat that.
15          THE WITNESS:  The last part of your
16  question, how do I remember what?
17          MR. KLAYMAN:  Yeah, let's just hear the
18  whole thing.
19          THE COURT REPORTER:  "Now, if you can't
20  remember showing them any documentation about my
21  failure to diligently and competently represent
22  you, and if you can't remember seeing pleadings

Page 477

1  yourself, which you testified to, how are you able
2  to make a statement that I wasn't competent and
3  diligent in working for you?"
4      THE WITNESS:  I haven't seen all the
5  documents, because of all the different emails
6  that I would get from him, so therefore I can't
7  say that I have seen every single documents.
8      But some of the documents that I've
9  seen, this is the conclusion I got from them.
10 BY MR. KLAYMAN:
11     Q.  But you're not a lawyer, correct?
12     A.  No, I'm not a lawyer.
13     Q.  So you're not qualified to assess
14 whether I acted competently for you and diligently
15 for you or not.
16     CHAIRMAN FITCH:  Objection sustained.
17     There's no competency or diligence
18 allegation in this case.
19     MR. KLAYMAN:  It deals with
20 truthfulness.
21     CHAIRMAN FITCH:  And you have had
22 opportunity, and will continue to have an

Page 478

1  opportunity, to try to establish points --
2      MR. KLAYMAN:  No, I --
3      CHAIRMAN FITCH:  -- you want to
4  establish, which go to the witness' credibility --
5      MR. KLAYMAN:  Correct.
6      CHAIRMAN FITCH:  -- but we're done with
7  competently and diligently.
8      MR. KLAYMAN:  Before we go on
9  further...
10 BY MR. KLAYMAN:
11     Q.  Let me go back to the first page of
12 this supplemental complaint, 23-2.
13     Is there anything that you had put on
14 that page which is incorrect?
15     A.  23-2?
16     Q.  Yes.  Is there anything on there which
17 is incorrect?
18     A.  It's the page of the addresses and
19 stuff?  Is that --
20     Q.  Yeah, the first page.
21     What I'm saying is, what's put there in
22 your view is accurate, correct, at the time you

Page 479

1  wrote it?
2      A.  You mean with the date and my name and
3  address?
4      Q.  No, you don't see anything on there
5  that's wrong, do you?  You don't see anything on
6  there that you put incorrectly, do you?
7      A.  No, I don't think so.
8      Q.  Now, let's go down to the bottom of
9  Page 23-4.
10     You are aware in the last paragraph
11 that Secretary of State Hillary Clinton was joined
12 as a defendant with other members of the board of
13 governors because she was the number one governor
14 sitting over that board, correct?
15     CHAIRMAN FITCH:  Compound question.
16     First, were you aware that Hillary
17 Clinton was named as a defendant?
18     THE WITNESS:  I was.
19     CHAIRMAN FITCH:  And the other part is,
20 do you have any understanding of why she was named
21 as a defendant?
22     THE WITNESS:  No.

Page 480

1  BY MR. KLAYMAN:
2      Q.  And the reason is is because you knew
3  that she was a --
4      A.  No, I didn't agree.
5      Q.  You knew that she --
6      A.  I thought that that's going to hurt my
7  case.
8      Because we were having too many people.
9  We have too many people in our case.  The case was
10 getting too big.  Remember I kept telling you
11 that, that it's getting -- the case is getting too
12 big?  We're almost suing the whole half of the
13 United States now, half of the government.
14 Remember I used to tell you that?
15     I said, "Let's just keep the case
16 small, the actual people, the boss and not get
17 everybody in."  And I thought that it's going to
18 hurt me more, getting half of the government
19 involved.
20     Q.  You've never actually litigated against
21 the government, have you?  You've never had a case
22 against the government?

56  (Pages 477 to 480)

Page 481

1    CHAIRMAN FITCH:  Argumentative.  We
2    know she's not a lawyer.
3    BY MR. KLAYMAN:
4       Q.   But you are aware that Hillary Clinton
5    sat on top of the board of governors at Voice of
6    America, in her official position.
7          You are aware of that?
8       A.   Yes.
9       Q.   Now turn to Page 3 -- 23-6 --
10      CHAIRMAN FITCH:  Say that again.
11   BY MR. KLAYMAN:
12      Q.   Page 23-6, second paragraph, third line
13   in, "Instead, the idea that I was being
14   represented is a ruse.  Mr. Klayman is a charlatan
15   who preys on his clients, exploiting them for his
16   own purposes."
17         Now, you never talked to any of my
18   other clients, have you?
19      A.   No.
20      Q.   So you have no way of knowing whether I
21   exploited them for my own purposes?
22      A.   I heard about one other client of yours

Page 482

1    and what you did.  Other people told me about
2    that.
3          I didn't directly talk to her, but
4    other people told me about that.
5       Q.   Then you said, "I'm convinced that Mr.
6    Klayman violated the Rules of Professional Conduct
7    during his representation of me."
8          Those are your words, right?
9       A.   Yes.
10      Q.   But, again, you've never read the Rules
11   of Professional Conduct, correct?
12      A.   Correct -- well, I -- I don't
13   understand it now.  What was --
14         Could you please explain yourself a
15   little bit more now?
16         I don't understand the question --
17      Q.   I don't have to.  I'm just asking
18   questions.
19      A.   -- and I don't understand where you're
20   going.
21      Q.   I don't have to.  In all due respect
22   and with all due courtesy, I don't have to

Page 483

1    explain.
2          CHAIRMAN FITCH:  No, no.
3          THE WITNESS:  Ok.
4          CHAIRMAN FITCH:  Mr. Smith is writing
5    down notes like crazy.  He has the right --
6          THE WITNESS:  Ok, I'm sorry.
7          CHAIRMAN FITCH:  -- to ask you to
8    elaborate on X, Y, Z, A, B, C.
9          THE WITNESS:  Ok.
10   BY MR. KLAYMAN:
11      Q.   Now you claim to have terminated me,
12   and we'll get into that with greater specificity
13   later.  But after you terminated me, did you seek
14   to hire another lawyer to represent you?
15      A.   No one would represent me after what
16   you did to the case.
17      Q.   I'm just asking you a question.
18         Did you contact a lawyer and ask them
19   to represent you after you claim you've terminated
20   me?
21      A.   Long after.
22      Q.   Who did you contact?

Page 484

1       A.   I don't remember.  A few attorneys to
2    take a look at the case.
3       Q.   And they told you that there was no
4    case to bring because the statute of limitations
5    had already run.
6          Do you know what a statute of
7    limitations is?
8       A.   They just told me -- you want me
9    exactly to tell you?
10         They didn't say anything like that.
11         Do you want me to tell you what they
12   told me?
13      Q.   No, I want you to answer my question.
14      A.   They didn't say anything like that to
15   me, no.
16      Q.   How long after you claimed to have
17   terminated me did you contact a lawyer?
18      A.   Maybe six, seven, eight months later,
19   or more, or less.  I don't remember.  I don't
20   remember the exact time.
21      Q.   I'm going to show you what has been
22   marked as Respondent's Exhibit Number 7.

57 (Pages 481 to 484)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 485

1      MR. KLAYMAN:  If you can take that up
2  for Ms. Sataki.
3      MR. SUJAT:  I'll take it up.  I have it
4  right here.
5  BY MR. KLAYMAN:
6      Q.  Do you see Respondent's Exhibit 7?
7      It's short so I'll read it.  It was
8  sent by Mr. Shamble on January 27th, 2011...
9      "Elham, Larry tells me that, since he
10  met the deadline to file for a final decision in
11  your OCR investigation, that's the EEO
12  investigation, of sexual harassment and
13  retaliation, and now that 180 days have passed
14  since your complaint was filed last year, you now
15  have the right to sue in federal court for sexual
16  harassment and retaliation.  Therefore, all your
17  rights were protected and your chance to address
18  them are in a different forum.
19      "Larry tells me that you are not
20  communicating with him.  He has told me that he
21  would like to discuss this with you, specifically
22  the fact that the federal judge, Kollar-Kotelly,

---

Page 486

1  would not order you to be allowed to go back to
2  work in Los Angeles, and had also ruled that your
3  sexual harassment and retaliation claims could not
4  be pursued before the 180-day period had elapsed.
5      "So there really were no deadlines
6  missed.  He can explain this in more detail than I
7  can, but he says you won't speak with him.
8      "He also tells me that the part of the
9  case involving your return to work was appealed to
10  the higher court.  He did this even though you
11  have not communicated with him in order to
12  preserve your rights, if you wish to pursue this.
13      "The appeal is still out there, but it
14  must be moved forward soon if you want to do so.
15      "I think you really ought to talk with
16  him just to get a better picture.  Tim."
17      Do you see that?
18      A.  Yes.
19      Q.  You got that email from Tim Shamble,
20  correct?
21      A.  Yes.
22      Q.  And you read it?

---

Page 487

1      A.  Yes.
2      Q.  But you didn't go to see another lawyer
3  in time to actually bring a lawsuit for sexual
4  harassment against VOA.
5      You waited six months and your time had
6  lapsed, correct?
7      A.  Correct, because you threatened to sue
8  me and everybody if I would have seen any other
9  lawyer.
10      MR. KLAYMAN:  Move to strike,
11  nonresponsive.  Calls for a yes or no.
12      CHAIRMAN FITCH:  Let me consult with
13  the committee members.  That was a close call.
14      (Off-the-record discussion between the
15  committee members.)
16      CHAIRMAN FITCH:  Let me hear it again.
17      MR. KLAYMAN:  Can you read the question
18  and response.
19      CHAIRMAN FITCH:  Question and answer.
20      THE COURT REPORTER:  "But you didn't go
21  to see another lawyer in time to actually bring a
22  sexual harassment lawsuit against VOA.

---

Page 488

1      "You waited six months and your time
2  had lapsed, correct?
3      "Answer: Correct, because you
4  threatened to sue me and everybody if I would have
5  seen any other lawyer."
6      MR. KLAYMAN:  Nonresponsive.
7      CHAIRMAN FITCH:  The motion to strike
8  is denied.
9  BY MR. KLAYMAN:
10      Q.  Now, you were also talking to Ms.
11  Stanton and cousin Sam and you talked to them
12  about going to see another lawyer?  Did they
13  recommend a lawyer for you?
14      A.  I don't remember.
15      Q.  In fact, there is correspondence that
16  you sent to Mr. Smith in the last year --
17      MR. KLAYMAN:  Which I've asked Mr.
18  Smith for several times, which I don't have, and
19  I'm going to ask him again.  I'd like it by
20  tomorrow morning.
21      CHAIRMAN FITCH:  That is struck.  Bring
22  that up later.

---

58  (Pages 485 to 488)

App.0276

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 489 |
| --- |

1         MR. KLAYMAN:  Ok.
2    BY MR. KLAYMAN:
3         Q.   That you wanted Bar Counsel to file a
4    sexual harassment case for you.  You asked them
5    that within the last year, against VOA.
6         A.   I asked if it's doable.
7         Q.   And you asked Bar Counsel to do it for
8    you, correct?
9         A.   I asked if it's doable.
10        I asked, once this is over, can I
11   take -- once I prove --
12        THE WITNESS:  Can I say exactly what
13   I -- I don't know.
14        Is it just yes or no, or I can say what
15   I asked?
16        I asked, once this is over, and so we
17   can prove and show why I couldn't have him as my
18   attorney any more, that he was not capable to work
19   as my attorney any more because he had more
20   interest, so, then is there any way that I can
21   pick the VOA case up, because then we can show
22   that I didn't fail to apply.  It was that I had

| Page 490 |
| --- |

1    this problem that I had to resolve before I go
2    back to VOA.
3    BY MR. KLAYMAN:
4         Q.   What did Bar Counsel tell you?
5         A.   He said he doesn't know.  He can't
6    advise me on that.
7         Q.   So you think that this case right now
8    that you're here on today is going to somehow
9    revive your sexual harassment claim against VOA?
10        A.   No, I don't think that.  It was just
11   asking I asked.  That's not why I'm here.
12        Q.   You also told Bar Counsel that you
13   wanted to pursue the case now because you wanted
14   to be able to say to future employers, or explain
15   to them, why your career had not gone as well as
16   you had wanted, correct?
17        A.   Correct.
18        Q.   So basically you want, as you testified
19   yesterday, revenge against me and Mr. Falahati to
20   explain why you're unhappy with your professional
21   and personal life?
22        A.   No, I did not say that.

| Page 491 |
| --- |

1         I said, when I was in a bad state of
2    mind, in a hole eight years ago, I was so angry
3    and hurt for what Mr. Klayman did and before.
4         So, in that state of mind, I was going
5    to take my life and then everybody would find out
6    what happened.
7         Because, to this day, I haven't been
8    able to tell anyone that -- anyone what Mr.
9    Klayman did to me and why I couldn't have him
10   represent me any more.
11        To this day, everybody's asking me,
12   "Did you wrongly accuse your coworker for sexual
13   harassment?  How come that he's still working
14   there and you're not?"  People are still wondering
15   why.
16        But I cannot go and say that my own
17   attorney that's representing me for a sexual
18   harassment case is suddenly falling in love with
19   me and cannot at all, as you said yourself,
20   several times, that "a car cannot run on empty
21   fuel" and you cannot represent me because you're
22   too in love with me and you're feelings are coming

| Page 492 |
| --- |

1    in the middle of this.
2         I can't say that, because it's -- I
3    always think what people are going to think and
4    say that, "So, her own lawyer now?"
5         So therefore, I wanted this to be
6    resolved here.
7    BY MR. KLAYMAN:
8         Q.   Over the lunch break you talked about
9    your testimony, not with Mr. Smith, but with some
10   other people, didn't you?
11        A.   Over what?
12        Q.   Over our lunch today, you talked about
13   your testimony, not with Mr. Smith, but with some
14   other people.
15        You talked with Sam?
16        A.   No, I didn't.
17        Q.   You talked with Kathleen?
18        A.   No, I didn't.
19        Q.   Now, assuming what you say is correct,
20   you're aware that I advised you --
21        A.   I didn't.  That is correct.
22        Q.   That's your opinion.

Page 493

1     A.  I'm under oath --
2         CHAIRMAN FITCH:  She stated as a fact,
3  Mr. Klayman --
4         MR. KLAYMAN:  Alright, fine.  I don't
5  mean to get into it.
6         CHAIRMAN FITCH:  -- what he did with
7  the adversary.
8         MR. KLAYMAN:  I don't mean to get into
9  it.
10  BY MR. KLAYMAN:
11     Q.  But you are aware that I told you to go
12  get another lawyer and I recommended Tim Shea and
13  Gloria Allred?
14     A.  Yes.
15     Q.  You're aware of that.
16     A.  But then you said -- you said, "He's
17  not capable."  I have the email that you sent me,
18  that you said "He's not capable.  He's not a good
19  attorney for this."
20         And also you said, again, in an email,
21  I have it, that you said that if I'm -- you and
22  Tim Shamble think that I have something going on

Page 494

1  under the table, that I'm agreeing with VOA to get
2  back at -- if that is the case then you put
3  hundreds of thousands of dollars in time and you
4  want the money back.  So --
5         MR. KLAYMAN:  I move to strike.
6  Nonresponsive, your Honor.  I mean, she's
7  obviously -- I mean, this is just a coaching
8  session.
9         CHAIRMAN FITCH:  It's going to be
10  sustained.  Your motion is sustained.
11         What is struck is the question and
12  answer in their entirety.  They came after
13  testimony by the complaining witness that
14  Respondent did recommend Tim Shea and Gloria
15  Allred.
16         MR. KLAYMAN:  Right.
17         CHAIRMAN FITCH:  But the next question
18  and answer are struck.
19  BY MR. KLAYMAN:
20     Q.  And you are aware that Gloria Allred is
21  the most prominent, famous lawyer for women in
22  sexual harassment cases in the United States?

Page 495

1     A.  Yes.
2     Q.  And you're aware that she's my friend?
3     A.  But you told me that she won't
4  represent me.  You emailed me that.
5     Q.  I just asked you whether you're aware
6  that she's my friend.
7     A.  Yes.
8     Q.  And that I asked her to represent you.
9     A.  Yes.
10     Q.  And you did have occasion to talk with
11  Ms. Allred with regard to possible representation,
12  correct?
13     A.  I'm sorry?
14     Q.  You did talk to her, yourself?
15     A.  Yes, I did.
16         Do you know want to know what she told
17  me?
18         THE WITNESS:  Can I tell the court what
19  she told me?
20         CHAIRMAN FITCH:  Well, that's up to him
21  right now.
22  BY MR. KLAYMAN:

Page 496

1     Q.  Yesterday you said you wanted revenge
2  against me.  Remember that?
3     A.  I just explained what I said yesterday.
4         Yes -- I didn't say I wanted revenge
5  against you.  I said I was in a dark place in my
6  life.  I was gonna take my life and die, and then
7  everybody would get their hands on all the emails
8  and all the evidence and then know what you did to
9  me.
10         Because I was not strong enough to face
11  everything.
12     Q.  And you remember --
13     A.  So I didn't say revenge.
14     Q.  You remember about a year ago I was
15  sitting in a cafe on the corner of Camden and
16  Wilshire Boulevard --
17     A.  Yes.
18     Q.  -- Camden and Brighton in Beverly
19  Hills.
20     A.  Yes.
21     Q.  And I was sitting there with someone
22  who is my chief of staff and you ran over in a

---

Page 497

1 really violent way --
2    A.  No.
3    Q.  -- and yelled --
4    A.  No.  Absolutely not!
5       CHAIRMAN FITCH:  Wait a minute.  Let
6 him finish his question and then you'll give your
7 full answer.
8       THE WITNESS:  I'm sorry, I'm sorry.
9 BY MR. KLAYMAN:
10   Q.  And yelled, "This man ruined my life.
11 He's a terrible person."
12      You said that to me and my chief of
13 staff.  You screamed it.
14      CHAIRMAN FITCH:  Answer the question
15 now.
16      THE WITNESS:  It's not correct.
17      CHAIRMAN FITCH:  Ok.
18      THE WITNESS:  I did go up to them and
19 talk to him, but that's not -- not the way he's
20 describing.
21
22 BY MR. KLAYMAN:

---

Page 498

1    Q.  And then it was clear that I didn't
2 even recognize you after all these years, correct?
3 I looked bewildered.
4       THE WITNESS:  That's his -- that's
5 not -- he knew exactly why.
6       CHAIRMAN FITCH:  I take it your answer
7 is that you don't know whether he was bewildered
8 or not?
9       THE WITNESS:  Exactly.  Thank you.
10 BY MR. KLAYMAN:
11   Q.  Now, when you ran up to me, what I do
12 remember, you had heavy makeup on.  Remember that?
13   A.  I have what?
14   Q.  Heavy makeup.
15      CHAIRMAN FITCH:  What's the relevance
16 of that?
17      MR. KLAYMAN:  I'm going to tie it up.
18      CHAIRMAN FITCH:  Tell me what the
19 relevance is.
20      THE WITNESS:  I don't remember that --
21      CHAIRMAN FITCH:  Now, woah.
22      Tell me what the relevance is.

---

Page 499

1       MR. KLAYMAN:  The relevance is that,
2 your Honor -- in all due respect, again, I'm in
3 the role of the lawyer and the Respondent,
4 correct?
5       CHAIRMAN FITCH:  That's fine.  Tell
6 me --
7       MR. KLAYMAN:  I wish I had a lawyer who
8 had time to elicit the facts --
9       CHAIRMAN FITCH:  Just tell me the
10 relevance.
11      MR. KLAYMAN:  She came in here trying
12 to look like a victim.  She's always very well
13 made up, very prim and proper.  She wants to be
14 the victim in front of you and look like --
15      CHAIRMAN FITCH:  I see no equation
16 between makeup and victimhood.
17      MR. KLAYMAN:  That's --
18      CHAIRMAN FITCH:  The question is not
19 permitted.
20      MR. KLAYMAN:  But you asked me to --
21      CHAIRMAN FITCH:  That's right, and
22 you've told me the relevance and it's not a

---

Page 500

1 convincing explanation.
2       MR. KLAYMAN:  She wants to look --
3       CHAIRMAN FITCH:  There is no connection
4 between makeup and victimhood.
5       MR. KLAYMAN:  I'm not saying that.
6       You see, look, you put me in this
7 role --
8       CHAIRMAN FITCH:  I didn't put you in --
9       MR. KLAYMAN:  You said I could be as
10 aggressive as I needed to be.
11      CHAIRMAN FITCH:  You don't need to be
12 that aggressive beyond the bounds of relevance.
13      MR. KLAYMAN:  It's not aggressive,
14 because --
15      All I'm trying to say is, in a nice
16 way -- and I didn't ask the question until you
17 asked me where I was coming from, and I was
18 truthful with you -- is that she wanted to look
19 down and out when she same in here.
20      Ok, so she's usually, from what I
21 remember and what I saw then, someone who, you
22 know, is totally -- looks as good as she possibly

---

61  (Pages 497 to 500)

App.0279

Page 501

1  can. I'm not saying she doesn't look good.
2       I'm just saying, she wanted to create
3  an impression somehow --
4       MR. SMITH:  That sounds like the stuff
5  of a closing argument.
6       CHAIRMAN FITCH:  Mr. Smith, I don't
7  need any --
8       MR. KLAYMAN:  But you asked me.
9       CHAIRMAN FITCH:  I did ask you, and you
10  told me, and it's not convincing.
11       MR. KLAYMAN:  Your Honor, I'm giving
12  you an honest answer.
13       I respect your ruling --
14       CHAIRMAN FITCH:  Alright.  Move on.
15       MR. KLAYMAN:  -- and I'm giving you an
16  honest answer.
17       CHAIRMAN FITCH:  Ok.
18       MR. KLAYMAN:  I could dodge around --
19       CHAIRMAN FITCH:  Move on.
20       MR. KLAYMAN:  -- it and be a
21  politician, but I --
22       CHAIRMAN FITCH:  Move on.

Page 502

1       MR. KLAYMAN:  Ok.  It's exactly why I
2  didn't want to have to do this examination.
3  BY MR. KLAYMAN:
4       Q.  I'm going to turn your attention to --
5       MR. KLAYMAN:  Your Honor, I apologize.
6  I'm just trying to find the exhibit.
7       CHAIRMAN FITCH:  It's alright.
8       MR. KLAYMAN:  And I really do -- I
9  don't want to get emotional here.  I just want
10  this to be a very easy-going examination,
11  honestly.
12  BY MR. KLAYMAN:
13       Q.  Turning your attention to Exhibit 16,
14  Respondent's Exhibit 16.
15       CHAIRMAN FITCH:  I think it's in this
16  book.  Madam?  (Indicating).
17  BY MR. KLAYMAN:
18       Q.  Before that I'm going to go back a
19  little bit.  You say that --
20       MR. TIGAR:  Counsel, I don't know that
21  the witness -- can I ask the witness, do you have
22  Respondent's Exhibit 1-6, 16?

Page 503

1       THE WITNESS:  Is this, I'm not --
2       CHAIRMAN FITCH:  No, in the white book,
3  Number 16.
4       MR. TIGAR:  It is the Serrano Encino
5  Residential --
6       CHAIRMAN FITCH:  Mr. Klayman wants to
7  go back to ask about something else.
8       MR. KLAYMAN:  Yeah, I'm gonna go back.
9  BY MR. KLAYMAN:
10       Q.  Ms. Sataki, you're aware that when I
11  started to receive communications from Sam,
12  whoever, with regard to the case -- we'll pinpoint
13  the times later -- that what I was saying is that,
14  if these people are going to be intervening in
15  legal affairs that I'm bringing for you, that I've
16  put in a lot of time, and not you would have to
17  pay me, but they should pay me for all the time if
18  they were going to mess up these cases.
19       MR. SMITH:  That's like one really long
20  complicated question that I don't quite
21  understand.
22       CHAIRMAN FITCH:  I'm sorry, Mr. Smith?

Page 504

1       MR. SMITH:  That's one long,
2  complicated question and I don't understand --
3       CHAIRMAN FITCH:  I don't understand it.
4  Sustained.
5       MR. KLAYMAN:  I'll withdraw it.  I'll
6  withdraw it.
7  BY MR. KLAYMAN:
8       Q.  Let's go back to 16.  That's the lease
9  agreement that I signed to rent the amount for you
10  on Ventura Boulevard, correct?  It was at the
11  Serrano Encino.
12       A.  Correct.
13       Q.  And it shows that I paid a security
14  deposit of $3,050, correct?
15       A.  Correct.
16       Q.  And four months of rent at $2,287.50?
17       A.  Correct.
18       Q.  And you were able to stay there two
19  months beyond the four, because we were getting --
20  you were getting or I was getting, since I'm the
21  lessee, two free months?
22       A.  Yes.

62  (Pages 501 to 504)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 505

1  Q.  Now, there came a point in time, and

2 I'll turn your attention to Exhibit 12, and I'll

3 see if I can find the pages for you.

4   (Brief pause.)

5  Q.  There came a point in time when you

6 actually brought a lawsuit against the apartment,

7 correct?

8  A.  Correct.

9  Q.  Correct?

10  A.  Yes.

11  Q.  I turn your attention to a page, which

12 is part of that exhibit, and I can find it for

13 you, the first page says SC100, Plaintiff's Claim

14 and Order to Go to Small Claims Court, filed July

15 13th, 2011.

16  MR. SMITH:  How far is the exhibit into

17 the --

18  MR. TIGAR:  I'm sorry, counsel, what

19 exhibit is this?

20  THE WITNESS:  This is not during the

21 time that he paid for the apartment.  This is

22 after, long after that.

---

Page 506

1  MR. KLAYMAN:  I didn't ask that

2 question.

3  CHAIRMAN FITCH:  We're going to let him

4 get to where we can understand.

5  MR. SMITH:  I'd like to be able to find

6 the document that he's referring to, as well,

7 because none of these --

8  CHAIRMAN FITCH:  Alright, we're in

9 Respondent's Exhibit 12.

10  MR. KLAYMAN:  I'll tell you how many

11 pages in it is.  One, two, three, four, five, six,

12 seven -- eight.  Eight pages into it.

13  MR. SMITH:  Alright.  Thank you.

14  CHAIRMAN FITCH:  Now, wait a minute.

15 My eighth page is a blank page.  You want me to

16 count the very first page as Page 1.

17  MR. KLAYMAN:  Maybe they put an extra

18 page in there.

19  CHAIRMAN FITCH:  One, two, three, four,

20 five, six, seven -- ok, ignore the blank page.

21 Eight.

22  MR. KLAYMAN:  Ok.

---

Page 507

1  CHAIRMAN FITCH:  And there is a file

2 stamp of October 1, 1998, correct?

3  MR. SMITH:  That's what I see.

4  CHAIRMAN FITCH:  Upper right-hand

5 corner.

6  MR. KLAYMAN:  I don't see that.  My

7 eyes are bad.

8  MR. SMITH:  Are you sure you're in the

9 same exhibit?

10  MR. KLAYMAN:  This is the page

11 (indicating).

12  MR. KLAYMAN:  Can I just show the page

13 I'm talking about.

14  CHAIRMAN FITCH:  You can show me the

15 page that you're talking about.

16  MR. KLAYMAN:  Yes, then we can key it

17 in for Ms. Sataki.

18  CHAIRMAN FITCH:  If you could bring it

19 a little closer for me.

20  MR. KLAYMAN:  Yes.

21  MR. SMITH:  I'd like to know where

22 we're at.

---

Page 508

1  MR. KLAYMAN:  Here.

2  CHAIRMAN FITCH:  He's going to show you

3 the page that he's interested in.

4  THE WITNESS:  Is it this one?  It looks

5 like this.

6  CHAIRMAN FITCH:  Hold on, just a

7 minute.

8  It's a page, is it not, Mr. Klayman,

9 that has SC100-A at the top left-hand corner?

10  MR. KLAYMAN:  Yes.

11  CHAIRMAN FITCH:  And the bottom, toward

12 the bottom left-hand corner 7/13/11?

13  MR. KLAYMAN:  Yes.

14  CHAIRMAN FITCH:  Ok.

15  MR. KLAYMAN:  And it purports to have

16 Ms. Sataki's signature.

17  CHAIRMAN FITCH:  Mr. Smith, it's kind

18 of toward the end, maybe 20 pages back from the

19 end.

20  MR. SMITH:  Ok.

21  CHAIRMAN FITCH:  That's a very rough

22 20, 25 maybe.  It's there.

---

63  (Pages 505 to 508)

Page 509

1     (Witness reads document.)
2   BY MR. KLAYMAN:
3     Q.  You see that?  That's your signature,
4   isn't it, Ms. Sataki?
5     A.  Yes.
6     Q.  This is the complaint you filed against
7   Serrano Encino Luxury Apartments and Dean Proper.
8     A.  Yes.
9     Q.  Who is Dean Proper?
10    A.  He was working in the office.
11    Q.  In the office at the apartment?
12    A.  Yes.
13    Q.  The rental office?
14    A.  Yes.
15    Q.  What were his duties and
16  responsibilities?
17    A.  I don't know exactly.
18    Because he was the manager there.  He
19  was signing the papers.  I don't know exactly his
20  title or his duties.
21
22  BY MR. KLAYMAN:

Page 510

1     Q.  Turn to the next page.  It says
2   "Declaration."
3     CHAIRMAN FITCH:  Mr. Smith, you're more
4   or less with us?
5     MR. SMITH:  Yes.
6     CHAIRMAN FITCH:  Thank you.
7   BY MR. KLAYMAN:
8     Q.  It says, "Declaration."  This is
9   something that you swore to, correct, under
10  penalties of perjury, looking at the bottom?
11    A.  Yes.
12    Q.  And it says, "From June 13th, 2011, to
13  June 26th, 2011 I was visiting my family in
14  Sweden.  Out of courtesy I notified Dean Proper,
15  the assistant property manager, of my absence just
16  before I left.  My friend Jessica was staying in
17  my apartment while I was in Sweden.
18    "On Wednesday, June 15th, at around
19  2:00 p.m., while Jessica was in the guest bedroom,
20  she hears the doorbell ring and, as she was half
21  naked laying in bed, it took some time to get up
22  and answer the door.

Page 511

1     "By the time she got out of the room to
2   answer the door, she was shocked, to say the
3   least, to see a man standing by the kitchen (Dean
4   Proper).
5     "She got scared and ran back to the
6   room and put something on and told the man, who
7   she knew was the assistant property manager, to
8   wait there.
9     "She went back after a few short
10  moments to see what the man wanted.  The man was
11  already out of the apartment and on his way to the
12  elevator when Jessica asked him, 'What do you
13  want?'  And he replied, 'I had a package for
14  Ellie.  Is she not home?'  She replied, 'No.  Why
15  don't you leave the package with me?'  And he
16  says, 'No, I have to give it to Ellie and leave.'
17    "He of course had no package with him
18  when he came to the apartment and was suddenly in
19  such a rush to get out of the apartment.
20    "He was told by Ellie just a few days
21  before she left that she was going to be visiting
22  family in Sweden.  So he very well knew that Ellie

Page 512

1   was not going to be home.
2     "In June 2010 my expensive ring
3   suddenly vanished from my apartment without any
4   reasonable explanation.  A police report was filed
5   but the ring was never found.
6     "A few times I felt like things had
7   shifted in my closet and again no reasonable
8   explanations until now.
9     "Mr. Dean Proper's visits are the only
10  explanation."
11    Did you write that?
12    A.  Yes.
13    Q.  Who helped you write it?  That's not in
14  your English.
15    A.  Me -- it doesn't matter.  Do I have to
16  tell you?
17    Q.  Yes, I'm asking the question.
18    CHAIRMAN FITCH:  What is --
19    MR. SMITH:  I'll going to have to ask
20  for a proffer as to relevance.
21    CHAIRMAN FITCH:  Well, I --
22    MR. SMITH:  It's a collateral issue.

64  (Pages 509 to 512)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 513

1    THE WITNESS:  It's a friend.  Can I
2  just say a friend.
3    CHAIRMAN FITCH:  Wait a minute.
4    I see the potential relevance of the
5  filing this action, as to the witness'
6  credibility.  Nothing else.  I don't see the
7  relevance of whatever the answer may be to that
8  question.
9    So the objection is sustained.
10    MR. KLAYMAN:  Ok.
11    CHAIRMAN FITCH:  You did testify, did
12  you not -- tell me if I'm wrong -- that you had
13  assistance in writing the complaint?
14    THE WITNESS:  Yes.
15    CHAIRMAN FITCH:  Ok.
16  BY MR. KLAYMAN:
17    Q.  Jessica did not help you write that
18  complaint, did she?
19    MR. SMITH:  Objection.  She just said
20  she had help writing the complaint.
21    CHAIRMAN FITCH:  I sustained that
22  objection.

---

Page 514

1    MR. SMITH:  Thank you.
2  BY MR. KLAYMAN:
3    Q.  These observations that you swore to
4  under oath, they're yours about somebody breaking
5  into apartment and in effect sexually harassing
6  somebody because they were naked in bed.
7    A.  No.  There is no --
8    CHAIRMAN FITCH:  You don't need to
9  answer that.  It speaks --
10    I am mistaken.  You may ask that
11  question again, and we'll get an answer.
12  BY MR. KLAYMAN:
13    Q.  This was your perception that Dean
14  Proper was sexually harassing Jessica, not
15  Jessica's.
16    A.  Absolutely not!
17    Q.  You testified --
18    A.  There was never anything filed or
19  anything said about sexual harassment.
20    Q.  But you're claiming that he broke in
21  effect because she was naked in bed?
22    CHAIRMAN FITCH:  That's not a fair

---

Page 515

1  reading of the wording.
2  BY MR. KLAYMAN:
3    Q.  Is that the implication?
4    CHAIRMAN FITCH:  No, it's not.
5    MR. SMITH:  Objection.
6    CHAIRMAN FITCH:  Objection sustained.
7  BY MR. KLAYMAN:
8    Q.  Now, you also mentioned that you're now
9  blaming Dean Proper for stealing your diamond
10  ring?
11    A.  I'm not.
12    Q.  It says, "Mr. Dean Proper's visits are
13  the only explanation."  The prior paragraph
14  claimed that your ring suddenly vanished?
15    A.  I said that, but I never blamed him
16  directly.  There was a question mark how my ring
17  vanished.  I don't know.
18    But usually you get a note if the
19  manager or anybody is entering your unit, and they
20  knew that I'm in Sweden.  So they didn't -- I
21  didn't get any email from the management, nor did
22  we get any note that anybody's entering the unit.

---

Page 516

1    So, when you're renting an apartment,
2  the building rules is that they notify you before
3  they enter your unit.
4    Q.  I'm going to read the last two
5  paragraphs again, just so --
6    MR. SMITH:  Objection.  This is a
7  collateral matter.
8    If we are going to try to find out if
9  Dean Proper is guilty of whatever, it's not going
10  to be resolved in this proceeding.  It's not going
11  to be resolved in cross-examination.
12    It's a waste of time, it's irrelevant,
13  and I have a strenuous objection to it.
14    MR. KLAYMAN:  I'm going to tie it up.
15    CHAIRMAN FITCH:  You're not going to
16  reread what has been 3read out loud and by one or
17  more of us up here.
18  BY MR. KLAYMAN:
19    Q.  The last two paragraphs, I'm not going
20  to reread them, what you are saying is that Dean
21  Proper is the only explanation for your ring
22  vanishing.

---

65  (Pages 513 to 516)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 517

1    CHAIRMAN FITCH:  Is that what you are
2  trying -- you may answer whether or not that's
3  what you were trying to say.
4    THE WITNESS:  No, that was not what I
5  was trying to say.
6    CHAIRMAN FITCH:  Why is that not what
7  you were trying to say?
8    THE WITNESS:  I was not trying to say
9  that is the only explanation.  I was not accusing
10  him that he definitely do it.
11    It was that he was not to enter my
12  unit.  That's it.  Not that he --
13  BY MR. KLAYMAN:
14    Q.  Does not the last line say that, that
15  Mr. Dean Proper's visits were the only
16  explanation?
17    A.  We never accused him and he never
18  complained about that.  Nothing like that ever
19  happened.
20    CHAIRMAN FITCH:  Well, Mr. Klayman has
21  a perfectly good question there.
22    When you said, "Mr. Dean Proper's

---

Page 518

1  visits are the only explanation," ok, you said
2  that, correct?  You wrote those seven or eight
3  words, correct, "Mr. Dean Proper's visits are the
4  only explanation"?
5    Do you see those words?
6    THE WITNESS:  Yes, I see that.
7    CHAIRMAN FITCH:  Ok, you wrote those
8  words?
9    THE WITNESS:  Yes.
10    CHAIRMAN FITCH:  Ok.
11    What does that refer to?  What does
12  that sentence refer to?
13    Does it refer to expensive rings
14  suddenly vanished, or does it refer to "things
15  being shifted in my closet"?
16    THE WITNESS:  It was just something
17  that we -- all together.  We didn't accuse him of
18  anything specially, and we never -- it was just
19  something that all together was written in there.
20    CHAIRMAN FITCH:  Then whom were you
21  accusing of what in this complaint?
22    THE WITNESS:  No, the complaint was

---

Page 519

1  just that he was not entering my unit without
2  notification, and only the certain things that
3  happened in the unit, we put it there.
4    CHAIRMAN FITCH:  We have that
5  testimony.  We'll judge its credibility.
6    Do you wish to bring out anything more
7  about how this case was ended?
8    MR. KLAYMAN:  Yes.
9  BY MR. KLAYMAN:
10    Q.  In fact the court ruled against you,
11  right?
12    A.  Yes.
13    Q.  And a judgment was entered for Dean
14  Proper and the apartment?
15    A.  It wasn't because of this.
16    CHAIRMAN FITCH:  Well --
17    THE WITNESS:  It wasn't because of
18  this.
19    It was about the rent.
20    CHAIRMAN FITCH:  About what?
21    THE WITNESS:  It was about the rent.
22  It wasn't because of I accused -- we accused him

---

Page 520

1  for the ring or we wanted the money for the ring
2  or anything like that.
3    It was about the rent, because we
4  wanted to terminate the rent right there and then
5  and move out, and they said "You have to stay
6  until the end of the agreement."  It was about
7  that.
8    Because of this incident, I just wanted
9  to terminate it and move out, but I lost the case,
10  so I had to pay and stay until the end of the
11  contract.
12    It was only about the rent.  It wasn't
13  about this.
14    CHAIRMAN FITCH:  Do you have any other
15  questions about this?
16    MR. KLAYMAN:  Yeah.
17  BY MR. KLAYMAN:
18    Q.  I'm going to turn your attention to
19  another page in this exhibit, which will clear
20  this up.
21    "Herein it states" --
22    MR. SMITH:  What are we looking at now?

---

66 (Pages 517 to 520)

Page 521

1  What exhibit?  You said you have another
2  document --
3      MR. KLAYMAN:  It's part of the same
4  exhibit.
5      MR. SMITH:  Alright, which page?
6      MR. KLAYMAN:  This is the court file.
7      CHAIRMAN FITCH:  He we know that, Mr.
8  Klayman.  Is it a few pages past where we were
9  before?
10     MR. KLAYMAN:  Yeah.  I'm showing him
11 where it is, and I'll show your Honor too.
12     (Brief pause.)
13     MR. KLAYMAN:  And I'll show you.
14     CHAIRMAN FITCH:  Is it after what we
15 were looking at before?
16     MR. KLAYMAN:  Yeah.
17     It says, "Judgment was entered, as
18 stated below, on Day:  8/23/2011.  Defendant does
19 not owe plaintiff any money on plaintiff's claim."
20     And below it says "contested."
21     CHAIRMAN FITCH:  Wait a minute.
22     It's a page that says "Judgment was

Page 523

1  examination, but we'll take a break first for ten
2  minutes here at 3:25.
3      MR. KLAYMAN:  Just a few more
4  questions.
5  BY MR. KLAYMAN:
6      Q.  There was a court hearing on this case
7  where you testified, the other side testified?
8      A.  Yes.
9      Q.  And the judge didn't believe your
10 testimony and believed the defendants?
11     MR. SMITH:  Objection.  Objection.
12     CHAIRMAN FITCH:  That's sustained.
13 We're going to take a break here.
14     MR. KLAYMAN:  Ok, we'll take a break.
15     (Recess taken.
16     CHAIRMAN FITCH:  I think we're back on
17 the record at 3:37.
18     MR. KLAYMAN:  Excuse me, ok.
19     CHAIRMAN FITCH:  Mr. Klayman, you were
20 going to say...?
21     MR. KLAYMAN:  I'm going to move Exhibit
22 12 into evidence, the portion that I had

Page 522

1  entered as stated below" date?
2      MR. KLAYMAN:  Yes.
3      CHAIRMAN FITCH:  And where does the
4  judgment appear?
5      MR. KLAYMAN:  Well, there's a finding
6  there, "Defendant does not owe plaintiff any money
7  on plaintiffs' claim."
8      CHAIRMAN FITCH:  Where is that?
9      MR. KLAYMAN:  Right below it.  The next
10 two pages.
11     CHAIRMAN FITCH:  Oh, this little print.
12     MR. KLAYMAN:  Yes.
13     CHAIRMAN FITCH:  "Does not owe
14 plaintiff any money."
15     MS. LARKIN:  Did you find it?
16     THE WITNESS:  I don't understand what
17 the question is and --
18     CHAIRMAN FITCH:  We're waiting for more
19 examination or testimony.  This document speaks
20 for itself for whatever value it may have to one
21 or two issues in this case.
22     We need to move on to other

Page 524

1  questioned her about, this claim against Dean
2  Proper and Serrano Apartments.
3      CHAIRMAN FITCH:  Mr. Smith?
4      MR. SMITH:  I believe it's a collateral
5  issue and I would object to it on that grounds.
6      CHAIRMAN FITCH:  We need to figure out
7  which particular pages we're talking about, but I
8  think your motion was clear enough for our
9  purposes and --
10     MR. KLAYMAN:  I can specify later.
11     CHAIRMAN FITCH:  -- those pages are
12 admitted.
13 BY MR. KLAYMAN:
14     Q.  Ms. Sataki, you had told me, long
15 before you brought this lawsuit against the
16 Serrano Apartments and Dean Proper, that there was
17 somebody in your apartment, a guy who you think
18 had stolen that ring.
19     A.  I never said a guy.  I never said that.
20     Q.  He was a boyfriend?
21     A.  No, I never said that.
22     You always assumed that.  It was your

67 (Pages 521 to 524)

Page 525

1     word, not mine.  So, these are your thoughts that
2     you are saying that I said it.
3        Q.  You actually also asked me to help you
4     file an insurance claim, did you not?
5        A.  No.
6        Q.  In fact I refused to do that, claiming
7     it would be fraudulent.  Do you remember that?
8        A.  No, I never did that.
9        Q.  Now, you've had other lawsuits in the
10    Superior Court of Los Angeles, have you not, that
11    you brought that you have filed?
12        A.  Other lawsuits?
13        Q.  Other cases, other complaints.  You
14    filed other complaints?
15        A.  Yes.
16        Q.  What other cases did you file,
17    complaints, in the courts of Los Angeles?
18        A.  One of them, it was against Zia
19    Atabay's wife, because she wrongly accused me of
20    something, and it was proven in court that what
21    she accused me of, and what you just said, and
22    VOA, that was --

Page 526

1        CHAIRMAN FITCH:  Ok, that's --
2        THE WITNESS:  That was one of them.
3        CHAIRMAN FITCH:  We've covered that and
4    we're not going further into that.
5        MR. KLAYMAN:  Let me ask one question
6    on that.
7        CHAIRMAN FITCH:  We've covered that.
8    We're not going further into that.
9        MR. KLAYMAN:  But that was not what the
10    finding was about, your Honor.
11        CHAIRMAN FITCH:  We have evidence that
12    she filed it.  Whatever she said earlier.  That's
13    it.
14    BY MR. KLAYMAN:
15        Q.  Do you have another one that you filed?
16        You filed at least five, didn't you?
17        A.  I don't remember.  Do you want to --
18        Q.  Yes.
19        A.  Ok.
20        CHAIRMAN FITCH:  Mr. Klayman --
21        THE WITNESS:  Why --
22        CHAIRMAN FITCH:  Mr. Klayman, as far as

Page 527

1    relevancy is concerned here, of all this line of
2    examination, you're not suggesting that the
3    results of those lawsuits say anything about her
4    credibility or honesty, are you?
5        MR. KLAYMAN:  Well, the last one --
6        CHAIRMAN FITCH:  Because lawsuits could
7    go -- I said, just the results.  Lawsuits could go
8    either way.
9        Go ahead, I'm sorry.
10        MR. KLAYMAN:  Well, lawsuits involve
11    weighing evidence, so, obviously the court in this
12    lawsuit over the credibility of the apartment and
13    Dean Proper, the judge believed the defendants and
14    not her.
15        That's what I'm saying.
16        THE WITNESS:  Jessica was my roommate
17    and I had to do that.  This is --
18        CHAIRMAN FITCH:  Ma'am, ma'am --
19        THE WITNESS:  I'm sorry.
20        MR. KLAYMAN:  It speaks for itself.
21        CHAIRMAN FITCH:  Thank you.
22        Mr. Smith has essentially a running

Page 528

1    collateral matter objection, and the results of
2    those lawsuits, the reasons for those results are
3    too speculative.
4        Now, how she handled the complaint and
5    what she said in her complaints and whether
6    they're internally consistent or contradicted by
7    other evidence, to some extent I'm willing to hear
8    that, because that goes to the overall credibility
9    of a witness.
10        MR. KLAYMAN:  What it deals with, your
11    Honor -- and I ask respectively for some latitude.
12        CHAIRMAN FITCH:  I've given you a great
13    deal of latitude.
14        MR. KLAYMAN:  I know you did.  I know
15    you did, and I appreciate that.  I'm not
16    criticizing you in any way.
17        But I had previously asked to take a
18    deposition and you said, well, we can deal with it
19    at the hearing, and that's why I'm appreciative of
20    you giving me some latitude here.
21        I would have liked to have gotten this
22    out sooner, because it appears that, from what I

68  (Pages 525 to 528)

Page 529

1  know, and I'm asking for more information, that
2  she has a pattern and practice of making false
3  claims against others when she doesn't get what
4  she wants.
5      That's the relevance.
6      CHAIRMAN FITCH:  That's arguably
7  relevant.
8      Falsity is not established by the
9  result of the lawsuit.  It's established by what's
10  said and what other evidence might affect one's
11  judgment of the accuracy or falsity or
12  truthfulness of the allegations.
13      Now we've heard of this lawsuit.  We've
14  talked with her about her complaint, so on and so
15  forth.  We heard about the lawsuit involving a
16  wife.
17      You may ask her specifically about
18  another lawsuit.
19      MR. KLAYMAN:  Yes, that's what I'm
20  doing.
21      CHAIRMAN FITCH:  Carefully, narrow the
22  question down.

Page 530

1      MR. KLAYMAN:  I'm trying to learn from
2  her -- I've been trying to get files from the
3  courthouse in Van Nuys.  Some of them were in the
4  basement, which flooded.  So I have my associate
5  up here today trying to get them.  But I wanted to
6  find out from her what other cases she filed,
7  because I know that there are at least five, from
8  what I understand, from the process service, legal
9  service that went out there to get them.  And some
10  of them were underwater, apparently.
11      CHAIRMAN FITCH:  I'm concerned that,
12  even for cross-examination, that you don't have,
13  in these other cases, a basis for pursuing --
14      MR. KLAYMAN:  I don't know unless I --
15      CHAIRMAN FITCH:  -- this because you
16  just said you haven't seen them.  They may be
17  underwater.
18      MR. KLAYMAN:  That's why I'm asking
19  questions here, and that's why I wanted to take
20  discovery of her.
21      MR. SMITH:  But this should not be
22  discovery.

Page 531

1      MR. KLAYMAN:  Well, it should be under
2  the circumstances of what --
3      CHAIRMAN FITCH:  That's right.  That's
4  entirely correct.
5      MR. KLAYMAN:  No.  What your Honor said
6  was that, "You can ask the questions at the
7  hearing and I will then hold it under" --
8      CHAIRMAN FITCH:  That's exactly what I
9  said.
10      MR. KLAYMAN:  I'm paraphrasing, "under
11  advisement and then I'll let you know whether I
12  will allow you to take more discovery" -- "or take
13  discovery."  I didn't have any.
14      So, I'm trying to figure out what cases
15  she filed.  It may be relevant or lead to relevant
16  evidence.  The rule is, as Mr. Tigar knows,
17  relevant or evidence that may lead to relevant
18  evidence, and I thank you for the latitude.
19      CHAIRMAN FITCH:  Mr. Smith?
20      MR. SMITH:  This is not discovery.
21  There is a disciplinary hearing to determine
22  whether or not Mr. Klayman engaged in unethical

Page 532

1  conduct, based upon the evidence that we have
2  before the Board.
3      If he wants to score some points and
4  attack Mrs. Sataki's credibility, he had plenty of
5  time to work on that.  He has known since the last
6  fall that this matter was petitioned for a
7  hearing.
8      So, if he just decided within the last
9  few weeks to try to conduct some discovery in Van
10  Nuys, California and they had a flood, that's not
11  on us.  That's on him.
12      But whatever defense he wants to mount,
13  if it's with respect to some collateral matters,
14  he's had plenty of time to get that together.  He
15  did not need a deposition with Ms. Sataki.  He
16  does not even need to waste our time now.
17      MR. KLAYMAN:  In all due respect -- and
18  I don't want to get into a fight with Mr. Smith,
19  because we've had some good decorum, under the
20  circumstances -- the fact that we are here today,
21  eight years later, is not my doing.  It's Bar
22  Counsel's doing.  And I did seek to get these

Page 533

1  documents earlier.  They have been underwater in
2  the basement of the Van Nuys Superior Courthouse.
3      So all I wanted to do was ask some
4  simple questions as to what other cases she filed,
5  because I can't get those documents.  And it
6  wasn't just in the last two weeks.
7      Mr. Smith has a tendency to say things
8  he doesn't know.
9      CHAIRMAN FITCH:  If she says, "Somebody
10 had a car accident and I filed a complaint," what
11 are you going to do with that?
12     MR. KLAYMAN:  Well, I don't know.  I'm
13 going to see if I can find the file.
14     But she may also say that I filed three
15 other sexual harassment cases against people, and
16 the last case comes dangerously close of accusing
17 this guy of breaking into the apartment because
18 the friend's naked.  There's a certain show of
19 paranoia here, your Honor.
20     CHAIRMAN FITCH:  That's why I let you
21 go into this one case, but I think it goes to
22 credibility, 108 or the other.  I'm not sure what

Page 534

1  else it goes to.
2      Now that we have that evidence, I'm not
3  sure what else there is to explore.
4      I guess -- I buy one point.
5      Have you filed any other --
6      Well, let me think about even the
7  relevance of that.
8      (Off-the-record discussion between
9  committee members.)
10     CHAIRMAN FITCH:  Have you filed any
11 other sexual harassment cases?
12     THE WITNESS:  No, sir.
13 BY MR. KLAYMAN:
14     Q.  Have you accused others of sexual
15 harassment?
16     A.  No.
17     MR. KLAYMAN:  Now, this, your Honor,
18 points out, as well, why I wanted the deposition,
19 at least the documents.  Because when I asked for
20 the deposition of Ms. Sataki I also asked for
21 documents, related documents, a subpoena duces
22 tecum.

Page 535

1      The same thing is true for Dr. Aviera,
2  because I wanted to get her whole file, because
3  all we got were little pieces of it that Mr. Smith
4  deemed he wanted to give us.
5      But this case that I just brought out
6  is extremely important, because it shows the
7  potential that there's a paranoia here, that
8  there's an emotional issue that she just blames
9  others.
10     CHAIRMAN FITCH:  We heard evidence on
11 that, Mr. Klayman.  The deposition issue ruling is
12 not going to be revisited.  I think you need to
13 move on to other issues, other charges in this
14 case.
15     MR. KLAYMAN:  May I see what other
16 cases that she filed?
17     CHAIRMAN FITCH:  No, sir.
18     MR. KLAYMAN:  Your Honor, I respect
19 your rulings, but let me just put this on the
20 record.
21     CHAIRMAN FITCH:  Sure.
22     MR. KLAYMAN:  I don't agree with them,

Page 536

1  but I respect them.
2      CHAIRMAN FITCH:  I understand that.
3      MR. KLAYMAN:  The reason the file of
4  Dr. Aviera is very important is because this
5  person seems to have an emotional problem, and --
6      CHAIRMAN FITCH:  I understand that.
7      MR. KLAYMAN:  You know, we've seen it
8  on the stand.  Yesterday she testified about me,
9  and it's the same reaction she is testifying or at
10 least dealing with in other issues.  She doesn't
11 seem to be stable.  Therefore, that's why I wanted
12 that file.
13     You just don't accuse people of
14 stealing a diamond ring and you don't accuse
15 people of breaking in because your friend is naked
16 in bed unless you have a problem.  And that's why
17 I needed that file.
18     THE WITNESS:  I did not accuse.  My
19 roommate --
20     CHAIRMAN FITCH:  Wait a minute.
21     But you've been allowed to do that
22 examination.  That is part of your theory, one of

Page 537

1  your theories.  I understand all that.  And we'll
2  evaluate that evidence when the time comes, but
3  we're done with other cases.
4        MR. KLAYMAN:  I respect your ruling.
5  BY MR. KLAYMAN:
6        Q.  I turn your attention back to Exhibit 1
7  of Bar Counsel's exhibits.  It happens to be
8  Exhibit 4 of Respondent's exhibits.
9        MS. LARKIN:  Excuse me, can you please
10  ask Mr. Smith to show her which exhibits he wants.
11        CHAIRMAN FITCH:  Yes, it will get us
12  moving more quickly.
13        MR. KLAYMAN:  Yes.
14        MS. LARKIN:  Thank you.
15        MR. KLAYMAN:  I was trying to be
16  courteous.
17  BY MR. KLAYMAN:
18        Q.  Ok, you see Exhibit 1 of Bar Counsel's
19  exhibits?
20        CHAIRMAN FITCH:  I think she has it in
21  front of her, yes.
22        THE WITNESS:  Yes.

Page 538

1  BY MR. KLAYMAN:
2        Q.  Ok.  You say this wasn't your
3  handwriting, that's what you testified to
4  yesterday, on this complaint, correct?
5        A.  Correct.
6        Q.  Whose handwriting was it?
7        CHAIRMAN FITCH:  Asked and answered.
8        MR. KLAYMAN:  Maybe she remembers at
9  this point.
10        CHAIRMAN FITCH:  Asked and answered.
11  BY MR. KLAYMAN:
12        Q.  Turn to 1-2.  It says, "He does not
13  represent me and he keeps calling me and texting
14  me.  He's called me many times off hours and I
15  keep telling him not to call me and text me.
16        "I told him I have terminated my
17  acceptance of my representation.  I have asked him
18  to stop communicating with me and all my
19  references.  I asked him not to represent me on
20  any interviews in any and all matters and I asked
21  him not to fax me, not to email me.
22        "He keeps calling, texting and emailing

Page 539

1  me and I want to stop him -- I want him to stop."
2        A.  Ok.
3        Q.  Yes, now you are aware, based upon
4  previous testimony this afternoon, that both Mr.
5  Shamble and I were trying to get ahold of you so
6  you wouldn't lose any of your legal rights,
7  correct?
8        A.  Correct.
9        Q.  Ok.  And that's why I was trying to get
10  ahold of you.
11        MR. SMITH:  Objection.
12        CHAIRMAN FITCH:  Sustained.
13  BY MR. KLAYMAN:
14        Q.  Now, turn to the next page.  This is a
15  letter which you claim was sent to me terminating
16  my services on or about November 15th, 2010.
17        That's the date that you claim you
18  terminated by services, correct?
19        A.  Correct.
20        Q.  Now look at the address there.  Klayman
21  Law Firm, 2000 Pennsylvania Avenue, Northwest,
22  Suite 345, Washington, D.C., 20006.

Page 540

1        Are you aware that's not my address?
2        A.  That was the only address I could find
3  of you.
4        Q.  You're aware that the address is
5  actually 2020 Pennsylvania Avenue, Northwest?
6        A.  So that was a mistake.
7        Q.  So, since you had the wrong address,
8  isn't it likely that I never got this letter, even
9  if you sent it?
10        MR. SMITH:  Objection.  About what she
11  knows is likely about, you know --
12        CHAIRMAN FITCH:  I think that's well
13  taken.  Sustained.
14  BY MR. KLAYMAN:
15        Q.  Based on your experience, when you
16  address something to the wrong place, the post
17  office doesn't have any place to deliver it,
18  correct, based on your experience in mailing
19  letters?
20        A.  I don't know if you received this
21  letter or not.  I don't know the -- I can't
22  remember if I emailed you the same letter or not.

71  (Pages 537 to 540)

Page 541

1  So I couldn't -- I couldn't answer that question.
2      Q.  I turn your attention to -- this is in
3  my book.  If Mr. Smith can assist here -- Exhibit
4  7 of Respondent's exhibits.
5      That's the document that I previously
6  showed you that was in the exhibit book of Mr.
7  Smith, Bar Counsel, correct?
8      That's where Mr. Shamble was trying to
9  get ahold of you, saying "You need to talk to your
10  lawyer, Larry Klayman, because you have rights
11  that should be pursued or you're going to lose
12  them," correct?
13      A.  Correct.
14      MR. KLAYMAN:  Your Honor, I move
15  Exhibit 7 into evidence.
16      CHAIRMAN FITCH:  It's admitted.
17      MR. SMITH:  No objection.
18  BY MR. KLAYMAN:
19      Q.  I turn your attention to Exhibit 8,
20  Respondent's Exhibit 8, and that's the same letter
21  I just showed you that was attached to your
22  original complaint, you purportedly write to me a

Page 542

1  letter on November 15th, 2010, to 2000
2  Pennsylvania Avenue.
3      Do you see that?
4      (Witness peruses document.)
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  That's the same letter I just had you
8  testify to, correct, about the wrong address?
9      A.  Yes.
10      MR. KLAYMAN:  Your Honor, I move this
11  into evidence, Exhibit 8, this page.  I'm going to
12  get to other ones.
13  BY MR. KLAYMAN:
14      Q.  Turn to the next page --
15      MR. SMITH:  No objection.
16      CHAIRMAN FITCH:  That letter is
17  admitted, that letter that purports to be
18  11/15/10.
19  BY MR. KLAYMAN:
20      Q.  Now the next page appears to be -- tell
21  me if I'm wrong, it's the same letter, but
22  addressed to a different place in different type

Page 543

1  set.
2      MR. SMITH:  What page are you looking
3  at?
4      MR. KLAYMAN:  It's the page after the
5  letter of November 15th, 2010.
6      CHAIRMAN FITCH:  The second page of
7  Exhibit RX --
8      MR. SMITH:  Is May 10th --
9      MR. KLAYMAN:  No, it's November 15th,
10  2010.
11      MR. SMITH:  That's not the next page in
12  my exhibit.
13      MR. KLAYMAN:  I believe it is, unless
14  it inadvertently was left out.
15      It's slightly different.  Let me get
16  into that.
17  BY MR. KLAYMAN:
18      Q.  This letter identified of November 15th
19  was addressed to 2001 Massachusetts Avenue,
20  correct?
21      A.  Yes.
22      Q.  The way it's written is somewhat

Page 544

1  different --
2      CHAIRMAN FITCH:  I'm sorry, doesn't it
3  say 201 on Mass Avenue?
4      MR. KLAYMAN:  What did I say, your
5  Honor?
6      CHAIRMAN FITCH:  I think you said
7  2001.
8      MR. KLAYMAN:  Oh, 201.
9  BY MR. KLAYMAN:
10      Q.  It's written in a different syntax,
11  between the two letters?
12      MR. SMITH:  I don't even know what
13  "syntax" means.
14      MR. KLAYMAN:  Well, I do, but it's a
15  different way of expressing some thoughts.
16      Alright, let me read the second one.
17  BY MR. KLAYMAN:
18      Q.  Let me just ask this: who helped you
19  write this letter?
20      A.  It's either Kathleen or Sam.
21      Q.  Sam Razavi?
22      A.  My cousin Sam, yes.

72 (Pages 541 to 544)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 545 | Page 547 |
|---|---|

**Page 545**

1   Q.   And it's addressed to 201 Massachusetts
2   Avenue, correct?
3       A.   Yes.
4       Q.   It of doesn't have an office suite on
5   this, does it?
6       A.   No.
7       Q.   You're aware that I never had an office
8   at 2001 Massachusetts Avenue?
9           MR. SMITH:  201.
10  BY MR. KLAYMAN:
11      Q.   201, I'm sorry.
12      A.   Again I'm not aware of it.  So I
13  thought -- unfortunately I got the wrong address.
14      Q.   So unfortunately it was never delivered
15  to me by the post office?
16      A.   I don't know that.
17          MR. SMITH:  Can I have an objection.
18          CHAIRMAN FITCH:  She doesn't know.
19  BY MR. KLAYMAN:
20      Q.   But based on your experience, if you
21  don't address something properly, it doesn't get
22  to the recipient?

**Page 546**

1       A.   You want my experience?
2           MR. SMITH:  Objection.
3           CHAIRMAN FITCH:  No.
4           Objection sustained to that form of
5   that question.
6           MR. KLAYMAN:  Your Honor, can I get a
7   response to that?
8           CHAIRMAN FITCH:  To what?
9           MR. KLAYMAN:  That if you don't address
10  a letter properly, I --
11          CHAIRMAN FITCH:  I sustained the
12  objection.
13          MR. KLAYMAN:  Ok.
14          I move this letter into evidence as
15  well.
16          MR. SMITH:  No objection.
17          CHAIRMAN FITCH:  It's admitted.
18  BY MR. KLAYMAN:
19      Q.   Turn to Exhibit 9.  That is an email of
20  May 8th, 2010 from Larry Klayman to you at your
21  email address.
22          You see that, right?

**Page 547**

1       A.   Yes.
2       Q.   And I state in the third paragraph,
3   "It's not healthy for you or me.  You will get
4   better representation with someone else like Tim
5   Shea who does not have an emotional conflict and
6   can keep his mind clear."
7           You see that?
8       A.   Yes.
9       Q.   So what I'm recommending is, because of
10  personality issues between us, it's better if you
11  get another lawyer, Tim Shea.
12          MR. SMITH:  Objection.
13  BY MR. KLAYMAN:
14      Q.   You understood that to mean that?
15          CHAIRMAN FITCH:  Overruled.  It speaks
16  for itself, but...
17  BY MR. KLAYMAN:
18      Q.   You understood me to mean that?
19          CHAIRMAN FITCH:  I'm sorry?
20          THE WITNESS:  I can only answer yes or
21  no on this?
22  BY MR. KLAYMAN:

**Page 548**

1       Q.   Yes.
2           CHAIRMAN FITCH:  What do you understand
3   his question to be?
4           THE WITNESS:  He says that he
5   recommended another attorney and -- he recommended
6   another attorney or Tim Shea.
7           CHAIRMAN FITCH:  I think we better
8   start over again, the question.
9           MR. KLAYMAN:  Could we read it back.
10          THE COURT REPORTER:  "So what I'm
11  recommending is, because of personality issues
12  between us, it's better if you get another lawyer,
13  Tim Shea."
14          THE WITNESS:  There wasn't a
15  personality issues.
16          It was him not being able to function
17  because he was so in love with me and too busy to
18  write love letters and be upset about me not
19  including him with my friends and family.
20          Tim Shea, yes, he did it in this email,
21  but in another email, which is provided, he said
22  Tim Shea is not a good attorney for this.

73 (Pages 545 to 548)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 549

1      CHAIRMAN FITCH:  Well, I have to strike
2   that answer as nonresponsive.
3      MR. KLAYMAN:  There's no question.
4      THE WITNESS:  Ok.
5      CHAIRMAN FITCH:  I have to strike that
6   answer as nonresponsive.
7      Do you or do you not --
8      You want present understanding or
9   understanding at the time?
10      MR. KLAYMAN:  Present understanding.
11      CHAIRMAN FITCH:  Do you or do you not
12   at the present time understand that when he said
13   in that third paragraph that he was suggesting a
14   change of counsel?
15      THE WITNESS:  Yes, I understand.
16   BY MR. KLAYMAN:
17      Q.  And turn to the next page, which is an
18   email of May 8th, 2010, sent on the same day as
19   the prior one, wherein I state, "Ellie, in case
20   you did not see my text this morning, I thought of
21   someone who can take over your legal
22   representation.  His name is Tim Shea.  Tim

Page 550

1   Shamble also knows him and he has experience for
2   clients for VOA/PNN, Persia News Network."
3      Do you see that?
4      A.  Yes.
5      Q.  And that in your present understanding,
6   I'm also recommending that you go talk to Tim Shea
7   to consider retaining him as counsel?
8      A.  Yes.  The date is May 8th, 2010.  Is
9   that the one you mean?
10      Q.  Yes.
11      MR. KLAYMAN:  Your Honor, I move both
12   of these into evidence.
13      MR. SMITH:  No objection.
14      CHAIRMAN FITCH:  Admitted.
15      MR. KLAYMAN:  The next page I
16   previously elicited testimony, but frankly I don't
17   remember whether I moved it into evidence -- this
18   is the page where it says -- and we elicited
19   testimony.  I don't want to waste time by going
20   over it, but just to identify, "Last week I
21   perceived her to be very aggressive toward me when
22   a lawyer I got" --

Page 551

1      CHAIRMAN FITCH:  Do you want to move it
2   into evidence?
3      MR. KLAYMAN:  Yes, I just want to move
4   it into evidence.
5      MR. SMITH:  No objection.
6      CHAIRMAN FITCH:  That is admitted.
7      MR. TIGAR:  He's doing it a piece at a
8   time.  Alright.
9      CHAIRMAN FITCH:  It's the third page on
10   Exhibit 9.
11      MR. TIGAR:  Alright.
12   BY MR. KLAYMAN:
13      Q.  I turn your attention to Exhibit 11.
14   It says, "Ellie, I put in about $250,000 of time
15   and expense just to have you detailed to Los
16   Angeles.  If you had not moved here, you likely
17   would be dead by now.
18      "This time and expense will not be
19   recuperated" --
20      MR. SMITH:  Point of order, we can't
21   have Mr. Klayman read all these documents --
22      MR. KLAYMAN:  I'm not reading them all.

Page 552

1      MR. SMITH:  -- into evidence.  If there
2   is a question he has for the witness based upon
3   the letter, I think that's fine, but he's already
4   read the letter a few times.
5      CHAIRMAN FITCH:  Mr. Smith, it's not
6   uncommon for a lawyer to read two or three
7   sentences of a document and say that it says that,
8   is it?
9      So, Mr. Klayman will be moderate in his
10   reading --
11      MR. KLAYMAN:  Yes.
12      CHAIRMAN FITCH:  -- we'll be alright.
13      Go ahead, Mr. Klayman.
14   BY MR. KLAYMAN:
15      Q.  Just those three sentences.
16      Now, I was telling you that what I had
17   done for you, up to that point in time, that I put
18   in about, if you calculated it, around $250,000 of
19   time and expense.
20      You understood that, correct?
21      CHAIRMAN FITCH:  Do you understand that
22   in his letter he was saying that he had devoted

---

74  (Pages 549 to 552)

Page 553

1    about $250,000 worth of time and expenses to your
2    matter, that he was saying that?
3         THE WITNESS:  Yes.
4         CHAIRMAN FITCH:  Did you understand
5    that he was suggesting a 50 percent contingency
6    fee?
7         MR. KLAYMAN:  No, I didn't ask that
8    question, your Honor.
9         CHAIRMAN FITCH:  Strike that.
10   BY MR. KLAYMAN:
11        Q.  You understood what I was saying is
12   that that's what I put in so far to get you back
13   to LA, correct?
14        A.  Correct.
15        Q.  At that point I hadn't moved forward in
16   trying to collect any damages for you, correct?
17   I was just trying to get you back to LA, correct?
18        CHAIRMAN FITCH:  What does this --
19        MR. KLAYMAN:  If I can ask the
20   question.
21        CHAIRMAN FITCH:  No, I have a question
22   first, about authentication.

Page 554

1    What date does this purport to be.
2         MR. KLAYMAN:  February 22nd, 2011.
3         CHAIRMAN FITCH:  Thank you.
4         MR. SMITH:  No, I don't think so.
5         MR. KLAYMAN:  It's on the top.
6         MR. SMITH:  I think that's the date we
7    had established because this document will be
8    authenticated through Ms. Sataki earlier and that
9    date was the date that she copied the document off
10   of her computer.
11        The testimony was that this letter was
12   actually -- because if you see on Page 2, the same
13   date is up there.
14        MR. KLAYMAN:  Your Honor, I'm asking
15   questions.
16        CHAIRMAN FITCH:  No, he has a right to
17   make representations.
18        MR. KLAYMAN:  Not in front of her.
19        MR. SMITH:  Well, she authenticated the
20   document.
21        MR. KLAYMAN:  But the subject we didn't
22   get into.

Page 555

1         CHAIRMAN FITCH:  Go ahead, Mr. Smith.
2         MR. KLAYMAN:  This is stuff she didn't
3    get into.
4         MR. SMITH:  So she testified that this
5    letter was part of her May 30th, 2010
6    communication with Mr. Klayman with the subject
7    line --
8         CHAIRMAN FITCH:  I think Mr. Smith
9    accurately represents the record.
10        MR. KLAYMAN:  We'll go back and look at
11   it, but I think that's not proper to be doing this
12   while I'm questioning.  It's a way of giving the
13   witness the answer.
14        CHAIRMAN FITCH:  Well, it's not proper
15   creating a confusing record.  You and I have an
16   obligation to try to clarify it.
17        MR. KLAYMAN:  Well, I didn't
18   intentionally do that.
19        CHAIRMAN FITCH:  I didn't say you did.
20        MR. KLAYMAN:  I don't know where the
21   date comes from.  So I'm asking.
22   BY MR. KLAYMAN:

Page 556

1         Q.  Now, up to the point whatever date is
2    the accurate date for this letter --
3         A.  Yes.
4         Q.  -- up to that point I had only been
5    trying to get you back to Los Angeles, correct?
6         A.  Correct.
7         Q.  And therefore, what I was saying is, if
8    I go further here, and because of our difficult
9    relationship, to be diplomatic, then I'm asking
10   for 50 percent, because it's so difficult to
11   represent you, for whatever reason?
12        A.  It's okay.  Fifty percent is fine.
13        Q.  Ok.
14        A.  It was fine with me.  No problem.
15        Q.  But we never got to that agreement, did
16   we, because at that point it was clear that I
17   wasn't going to be representing you any more, so
18   we never put it into writing, correct?
19        CHAIRMAN FITCH:  At what time?
20        MR. KLAYMAN:  In and around the time
21   this was written.
22        CHAIRMAN FITCH:  In 2010.

75 (Pages 553 to 556)

In The Matter Of:  Larry E. Klayman

May 31, 2018

| Page 557 |
| --- |

1          MR. SMITH:  May 30th, 2010.
2    BY MR. KLAYMAN:
3          Q.  All I'd been doing was trying to get
4    you back to LA.  There was no damages in it.
5          MR. SMITH:  Is there a question?
6          MR. KLAYMAN:  Yes.
7          CHAIRMAN FITCH:  I think there is.  Why
8    don't you ask it again.
9          MR. KLAYMAN:  Yeah, I'll ask it again,
10   break it up.
11   BY MR. KLAYMAN:
12         Q.  Up to that point in time -- well, you
13   already asked and answered that, so I won't get
14   into that.
15         But what I was talking about, Ms.
16   Sataki, is if I continued to represent you, given
17   the difficulty in our relationship, regardless of
18   what the cause was, then I'm saying then I want 50
19   percent going forward, correct?
20         A.  Correct.
21         Q.  But we never got to that point, because
22   representation ceased before I ever started to

| Page 558 |
| --- |

1    pursue any damage claims, correct?
2          CHAIRMAN FITCH:  I don't understand the
3    question --
4          THE WITNESS:  I don't understand it.
5    It's your letter.  You said this is
6    what you wanted.
7    BY MR. KLAYMAN:
8          Q.  Let me rephrase it.
9          You understood it to mean that what I
10   was saying is that, if I go forward on legal
11   representation to get damages, then I'm proposing
12   50 percent of any recovery, correct.
13         It's yes or no.
14         CHAIRMAN FITCH:  May I note that
15   there's an allegation that both of these actions
16   has been filed by this date.
17         MR. KLAYMAN:  I'll testify when I
18   testify during the case, but I'll give you a
19   proffer here, and that is that no action had been
20   taken to pursue damage claims up to that point in
21   time.  Ok?  That's the point I'm making.
22         CHAIRMAN FITCH:  The superior court --

| Page 559 |
| --- |

1          MR. KLAYMAN:  And I'm making the case
2    that the cases were filed for strategic reasons to
3    try to coerce in effect a settlement up to that
4    point in time.
5          So what I'm trying to say, your Honor,
6    and I'd like to get a response on this and her
7    understanding, is this is what it would be if I
8    had to go forward and make this into a case where
9    it is discovery and you're looking for damages,
10   and you went to trial, because at that time I
11   perceived that there was a difficulty in the
12   relationship, and I was recommending that she find
13   other counsel.  I didn't think that I could
14   continue to represent her any more.
15         So, it was prospected, and we never got
16   to the point, never agreeing on this to get a
17   contingent fee agreement in writing.  That's the
18   point I'm trying to make.
19         And I hate to have done that in front
20   of her, but you asked me, so I told you.
21         And that will be my testimony.
22         CHAIRMAN FITCH:  I note there is a case

| Page 560 |
| --- |

1    filed on April 2nd a month before this where there
2    are compensatory damages in excess of $100M, as
3    well as punitive damages.
4          MR. KLAYMAN:  That's right, but I
5    hadn't taken any action to --
6          CHAIRMAN FITCH:  No, that's not what
7    you said, Mr. Klayman.
8          What do you want to ask her about this
9    document?
10         MR. KLAYMAN:  Well, let me ask what I
11   said, and I'll testify under oath.
12   BY MR. KLAYMAN:
13         Q.  Is that these cases were filed in order
14   to coax a settlement --
15         CHAIRMAN FITCH:  Right, I've heard all
16   that.
17         MR. KLAYMAN:  At this point she claims
18   I was terminated or about to be terminated, she
19   claims.  And what I'm saying is that --
20         CHAIRMAN FITCH:  Well, wait a minute.
21   I'm not sure there is evidence of that.
22         MR. KLAYMAN:  I'll testify.

76  (Pages 557 to 560)

App.0294

Page 561

1    CHAIRMAN FITCH:  The termination letter
2  says November.
3    MR. KLAYMAN:  That's fine.  I'll
4  testify to it.
5    I just wanted to ask her questions, and
6  now it's regrettable that I had to put that on the
7  record in this fashion.
8  BY MR. KLAYMAN:
9    Q.  I turn your attention to Exhibit 13.
10    CHAIRMAN FITCH:  Do you want to move
11  RX11 into evidence?
12    MR. KLAYMAN:  Yes.
13    MR. SMITH:  No objection.
14    CHAIRMAN FITCH:  No objection.  It's
15  submitted.
16  BY MR. KLAYMAN:
17    Q.  Now this is a document which I've
18  submitted.  I took it off the internet, Ms.
19  Sataki, but I'm just going to ask you some
20  questions.
21    It shows that you did a special report
22  with Elham Sataki on weightlifting in 2017, a

Page 562

1  special report with Elham Sataki for N-I-A-C.
2    What is N-I-A-C?
3    A.  NIAC.
4    Q.  What does that stand for?
5    A.  National Iranian American Council.
6    Q.  That's a very prominent organization,
7  is it not?
8    A.  Yes.
9    Q.  And the bottom one, "Elham Sataki
10  reports on J-C-P-O-A 2017," what's that?
11    A.  What was the question, I'm sorry?
12    Q.  What is J-C-P-O-A?  It says, "Elham
13  Sataki supports J-C-P-O-A, in 2017."
14    A.  That's the agreement that Mr. Thump
15  didn't sign, the agreement between Iran.
16    Q.  So you've been doing broadcasting in
17  the last few years?
18    A.  This is my user channel and I'm doing
19  it on my free time with my cell phone camera.
20    It is not -- it's not -- I didn't get
21  paid for this and I'm not -- and I was not working
22  for any TV channel.

Page 563

1    This is on my day off.
2  BY MR. KLAYMAN:
3    Q.  I'll let the videos speak for
4  themselves that can be found on the internet, but
5  you have had employment since you and I stopped
6  working together, correct?
7    A.  Correct.
8    Q.  Where have you been employed?
9    A.  Andisheh TV.
10    Q.  That's one of the --
11    A.  Journals, yes.
12    Q.  Are you still employed there?
13    A.  No.
14    Q.  When did you first get employment after
15  our relationship ended?
16    A.  We never had a relationship.
17    Q.  I'm not talking about that way.  I mean
18  after I stopped representing you.
19    CHAIRMAN FITCH:  That's not your role
20  to admonish her.  Your role is to ask me to
21  admonish her.
22    What employment have you had beginning

Page 564

1  in January of 2011 until the present time?
2    THE WITNESS:  I have been working for a
3  skin care company.
4    CHAIRMAN FITCH:  I didn't --
5    THE WITNESS:  I have been working for a
6  skin care company, that's my main job, it's
7  cosmetics.  It's a cosmetic company out of New
8  York and I'm their rep in Los Angeles.
9    CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
10  BY MR. KLAYMAN:
11    Q.  Yes, now after I stopped representing
12  you, what was your first job after that?
13    A.  I was working for Andisheh TV in Los
14  Angeles.  It was a TV station.
15    Q.  As a television host?
16    A.  Yes.
17    Q.  And did you have a co-host?
18    A.  Yes.
19    Q.  Who was that?
20    A.  It was a girl, Leida (phon), and then
21  it was a guy, Asha (phon) later on, and then
22  another guy, Medhi, and then mainly I had a bunch

77 (Pages 561 to 564)

Page 565

1    of girls.
2        Q.   You were paid for that?
3        A.   Yes.
4        Q.   How long did you stay with Andisheh?
5        A.   I stayed with them maybe a year or two
6    and then I quit working there and then I started
7    working for them again for about a year, so.
8        Q.   For how long?
9        A.   About a year.
10       Q.   A year?
11       A.   Mm-hmm.
12       Q.   Why did you stop working with them and
13   then start again?
14       A.   Because of the money.  I couldn't
15   afford working for them.  I had to go get a better
16   job that pays more, because I couldn't afford to
17   pay my rent.
18       Q.   Between the first time that you left
19   and then when you came back to Andisheh, who were
20   you working for in that intermediary time period?
21       A.   For a cosmetic line.
22       Q.   What's the name of it?

Page 566

1        A.   3Lab.
2        Q.   How is that spelled?
3        A.   Number three, L-a-b.
4        Q.   What do they sell?
5        A.   Skin care.
6        Q.   So when you left Andisheh again for the
7    second time, did you go back to work for that
8    company?
9        A.   Yes, I was --
10       Q.   Or did you go somewhere else?
11       A.   I was working for the cosmetic company
12   throughout the whole time.  So I was holding two
13   jobs, both the TV and the cosmetic.
14       Q.   So the cosmetic company gave you a
15   raise after you left Andisheh for the second time
16   from what you had been making before?
17       A.   No.
18       Q.   What's your annual income?
19           CHAIRMAN FITCH:  What's the relevance
20   of that?
21           MR. KLAYMAN:  She claims, your Honor,
22   that I destroyed her life and that her life's been

Page 567

1    on hold for eight years.  That's in the record.
2    And obviously that's not the case.
3            CHAIRMAN FITCH:  I'm not sure why her
4    claim is relevant to the allegation -- to the
5    charges.
6            MR. KLAYMAN:  It deals with
7    credibility, because she's saying that her life's
8    been on hold, based on a Bar complaint, for eight
9    years.
10           Her life has not been on hold.  She's
11   doing broadcasting like she was doing before, and
12   she's making money with --
13           THE WITNESS:  I can't --
14           CHAIRMAN FITCH:  Woah, woah.
15           Mr. Smith?
16           MR. KLAYMAN:  And she's making money
17   with a professional that she had previously
18   testified that she was an expert in, or at least
19   involved in, when she worked for Hermes,
20   H-e-r-m-e-s.
21           So, obviously her life has continued
22   and she's not on hold and I didn't ruin her life,

Page 568

1    and she was doing broadcasting like she was doing
2    before.
3            CHAIRMAN FITCH:  You may be heard, Mr.
4    Smith.
5            MR. SMITH:  I mean, you know, if he
6    wants to open this can of worms, quite frankly,
7    I'm prepared to let him do it, and then during my
8    redirect we will have a much better non-discovery
9    type discussion about exactly what has happened in
10   Ms. Sataki's life as a result of her having lost
11   her job at the Voice of America because of her
12   unfortunate association with Mr. Klayman.
13           CHAIRMAN FITCH:  I can think of another
14   issue that may be relevant.
15           So I need to ask you to answer this
16   question of your salary at the present time.
17           THE WITNESS:  My salary at the present?
18           MR. KLAYMAN:  It may not be salary.  It
19   may be commission.  Income.
20           MR. SMITH:  I mean let her testify
21   about it.
22           THE WITNESS:  It's salary.  I'm making

78  (Pages 565 to 568)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 569 | Page 571 |
|---|---|

**Page 569**

1  $62,000 year.

2  MR. KLAYMAN:  Thank you.

3  CHAIRMAN FITCH:  Mm-hmm.

4  BY MR. KLAYMAN:

5  Q.  I turn your attention to Respondent's

6  Exhibit 17.

7  CHAIRMAN FITCH:  Did you say

8  Respondent's 17?

9  MR. KLAYMAN:  Yes.

10  BY MR. KLAYMAN:

11  Q.  This is a letter May 3rd, 2010 from the

12  American Federation of Government Employees, Local

13  1812, from Mr. Tim Shamble.

14  You've seen this letter before, haven't

15  you.  Take an opportunity and read it.

16  (Witness reads document.)

17  Q.  Tell me when you're done, Ms. Sataki,

18  please.

19  A.  Ok.

20  Q.  You've seen that letter before, have

21  you not?

22  A.  Yes.

**Page 570**

1  Q.  And in fact what it reflects is that

2  the Voice of America, the individuals there that

3  we were trying to negotiate with, were actually

4  threatening witnesses, correct?

5  A.  Correct.

6  Q.  So trying to deal with VOA was not an

7  easy matter, even by Mr. Shambles' analysis,

8  correct?

9  A.  Correct.

10  Q.  And therefore, what would be required

11  would be strong legal action to get them to change

12  their ways.

13  That's what --

14  MR. SMITH:  Objection.

15  BY MR. KLAYMAN:

16  Q.  That's what I told you, right?  Right?

17  A.  Could you repeat your question.  I

18  don't --

19  CHAIRMAN FITCH:  Did he tell you in the

20  context of this letter that strong legal action is

21  necessary?

22  THE WITNESS:  I don't remember.  I

**Page 571**

1  don't remember, and strong legal action or

2  whatever the standard, either what it means.

3  MR. KLAYMAN:  Well, let me rephrase it.

4  BY MR. KLAYMAN:

5  Q.  We had to be very forceful and bring

6  hard-hitting lawsuits against VOA because they

7  were being very, very aggressive with you and your

8  witnesses and other people who were similarly

9  situated?

10  A.  Yes, that's correct.

11  Q.  And that was a reason why we had to

12  name the board of governors in the complaint?

13  MR. SMITH:  Objection.

14  BY MR. KLAYMAN:

15  Q.  If you know.

16  CHAIRMAN FITCH:  Do you know why the

17  board of governors was named?

18  THE WITNESS:  No.

19  BY MR. KLAYMAN:

20  Q.  You are aware that I asked my friend,

21  Blanquita Cohen, on the board of governors, and I

22  informed you of that, that this whole thing had to

**Page 572**

1  be cleaned up.

2  You're aware that I lobbied her to do

3  that, correct?

4  CHAIRMAN FITCH:  Did he tell you that

5  he had lobbied this potentially sympathetic member

6  of the board of governors?

7  THE WITNESS:  Yes, he told me that he

8  did that.

9  BY MR. KLAYMAN:

10  Q.  And she didn't come to our help?

11  A.  Right.

12  Q.  So therefore we had to bring a very

13  hard-hitting lawsuit to try to force them, coerce

14  them into doing the right thing: putting you back

15  in Los Angeles, correct?

16  CHAIRMAN FITCH:  I think asked and

17  answered.

18  MR. KLAYMAN:  I move this document into

19  evidence, your Honor.

20  MR. SMITH:  No objection.

21  CHAIRMAN FITCH:  It is admitted.

22  MR. KLAYMAN:  Did you say "no

79 (Pages 569 to 572)

App.0297

Page 573

1  objection"?

2  MR. SMITH:  I said no objection.

3  BY MR. KLAYMAN:

4  Q.   There's another letter dated May 18th,

5  2010 behind that from the Criminal Division of the

6  U.S. Department of Justice to Mr. Shamble...

7  "Dear, Mr. Shamble, this response to

8  your letter dated May 3rd, 2010 regarding witness

9  tampering and obstruction of justice in the Voice

10  of America.  The Federal Bureau of investigation

11  is the investigative arm of the Depart of Justice

12  upon which we rely to conduct the initial fact

13  finding in federal criminal cases.

14  "Therefore, if you believe that a

15  criminal statute has been violated, you may

16  contact the Washington Field Office of the FBI at

17  601 4th Street, Northwest, Washington, D.C.,

18  20535.

19  "It will first determine whether a

20  federal investigation may be warranted and, if

21  appropriate, refer the matter to a United States

22  attorney for a final determination regarding legal

Page 574

1  action.

2  "You may also contact the FBI by

3  calling (202) 278-2000.  We trust this information

4  is helpful.

5  "Please do not hesitate to contact this

6  office if we may be of assistance with this or any

7  other matter.  Sincerely, Teely (phon) Rammam,

8  R-a-m-m-a-m, Principal Assistant Attorney General

9  and Chief of Staff," copies to Paul Kamer (phon)

10  Assistant Attorney General --

11  CHAIRMAN FITCH:  This strikes me as not

12  an efficient use of time.

13  MR. KLAYMAN:  Ok.

14  CHAIRMAN FITCH:  I doubt that you're

15  going to table this or anything significant about

16  CC'ing people.

17  BY MR. KLAYMAN:

18  Q.   In short it was a letter, previously

19  made a reference --

20  CHAIRMAN FITCH:  Question.

21

22  BY MR. KLAYMAN:

Page 575

1  Q.   Yes.  You previously testified that I

2  had the FBI investigate you, right?

3  A.   Not me, every guy or my cousin, or any

4  guys.  Not me.

5  Q.   There's no showing on any of the

6  documentation that I had the FBI investigate

7  anybody that you know, correct?

8  A.   I have the emails, correct, that you

9  said it to me, that you did.

10  Q.   What I told you was that the FBI was

11  asked to investigate the witness tampering in your

12  case, correct?

13  A.   Correct.

14  MR. KLAYMAN:  I move that document in

15  evidence, your Honor.

16  MR. SMITH:  No objection.

17  CHAIRMAN FITCH:  Page 3 of RX17 is also

18  admitted.

19  BY MR. KLAYMAN:

20  Q.   I turn your attention to Exhibit 18.

21  This is a letter to Ms. Delia Johnson, director

22  Office of Civil Rights, and Tim Shamble, your

Page 576

1  union rep that I was working with, you were

2  working with.

3  You can take an opportunity to read it.

4  I don't want to read it in the record because I

5  don't want to take up more time.

6  Take a look at it , read it, and tell

7  me -- just read it first.

8  (Witness reads document.)

9  CHAIRMAN FITCH:  Is your question

10  whether she's seen this letter before?

11  MR. KLAYMAN:  No, I'll get to that.

12  That's fine.

13  BY MR. KLAYMAN:

14  Q.   You've seen this letter before, haven't

15  you?

16  A.   I don't know about it.

17  Q.   What Mr. Shamble is asking is that OCR

18  issue -- yeah, OCR, that's civil rights, that's

19  the EEOC complaint that was filed, "It's your

20  decision.  Don't sit on it because you want to be

21  -- because Ms. Sataki wants to move forward with

22  her legal claims if that decision is not

Page 577

1  favorable."
2       That's what you take this letter to
3  mean?
4       A.  Did you ask your question?  I'm sorry.
5       MR. KLAYMAN:  Can we read it back.
6       CHAIRMAN FITCH:  At the bottom of the
7  letter on the left, you see there's a carbon copy
8  that purports to be a CC to you?
9       THE WITNESS:  At the bottom of -- are
10  we at the Delia Johnson letter?
11      CHAIRMAN FITCH:  Do you see that at the
12  bottom left of this document there purports to be
13  a CC to you, a copy to you?
14      THE WITNESS:  Oh, yes.
15      CHAIRMAN FITCH:  Ok.
16      THE WITNESS:  Yes, I saw it.
17      CHAIRMAN FITCH:  Just ask the question.
18  BY MR. KLAYMAN:
19      Q.  So you did get this letter?
20      A.  Yes --
21      CHAIRMAN FITCH:  She said she
22  doesn't --

Page 579

1  letter, did you have any knowledge that they were
2  pursuing avenues of relief on your behalf?
3       THE WITNESS:  No.
4       MR. KLAYMAN:  I would move this into
5  evidence, this letter.
6       MR. SMITH:  No objection.
7       CHAIRMAN FITCH:  Admitted.
8  BY MR. KLAYMAN:
9       Q.  Next letter from Delia Johnson to Mr.
10  Shamble, January 5th, 2011.  Take a moment to look
11  at that, Ms. Sataki, and tell me if you have seen
12  it in and around this time period, January 5th,
13  2011.  Or saw it?
14      (Witness reads document.)
15      A.  This was CC'd to me, too?
16      Q.  The letter speaks for itself.
17      I'm asking you whether you saw it in or
18  around January 5th, 2011.
19      A.  I probably had missed it.
20      MR. KLAYMAN:  I move this letter into
21  evidence, your Honor.
22      MR. SMITH:  No objection.

Page 578

1       THE WITNESS:  I don't remember, so.
2       CHAIRMAN FITCH:  She said she doesn't
3  remember.
4  BY MR. KLAYMAN:
5       Q.  But you understand it to mean Mr.
6  Shamble and I were trying to push OCR, Office of
7  Civil Rights --
8       MR. SMITH:  Objection to what she
9  understood.  She said she didn't remember getting
10  the letter.
11      CHAIRMAN FITCH:  She said she didn't
12  understand what was in the letter.
13      MR. KLAYMAN:  I can just ask the
14  question generally.
15      CHAIRMAN FITCH:  Did you understand in
16  early 2011 that Mr. Shamble and Mr. Klayman were
17  continuing to pursue possible claims on your
18  behalf?
19      THE WITNESS:  I see that it's CC'd to
20  me, but I don't remember that I saw this
21  particular email.
22      CHAIRMAN FITCH:  Leaving aside this

Page 580

1       CHAIRMAN FITCH:  It's admitted.
2       MR. KLAYMAN:  Your Honor, there's going
3  to be a lot of questions on this one here, so I'm
4  wondering if this might be an appropriate break
5  point for the day.
6       CHAIRMAN FITCH:  Ok.  When you say this
7  one here, you mean the rest of exhibit --
8       MR. KLAYMAN:  Well, the exhibit book,
9  but this particular exhibit that comes up inside
10  of 18, the March 25th, 2011 --
11      CHAIRMAN FITCH:  Ok, that's my only --
12      MR. KLAYMAN:  -- matter.  I have a lot
13  of questions on this.
14      CHAIRMAN FITCH:  Ok, we're going to
15  call it a day, Ms. Sataki.  Would you wait outside
16  in the -- is the door to that little room open, as
17  far as you know right now?
18      MR. SMITH:  Yes.
19      CHAIRMAN FITCH:  Would you wait in that
20  little room just for a minute.  We're going to
21  talk scheduling, so I may need to have you come --
22      THE WITNESS:  I come back in again?

81 (Pages 577 to 580)

Page 581

1    CHAIRMAN FITCH: We'll come out and get
2  you in a minute.
3    (Witness exits courtroom.)
4    How much cross-examination are you
5  going to have, Mr. Smith?
6    MR. SMITH: You mean redirect?
7    CHAIRMAN FITCH: That's a good point.
8    MR. SMITH: I guess it depends how much
9  more is brought out during cross.
10    Right now I don't anticipate it would
11  be more than 10, 15 minutes as it stands now.
12    CHAIRMAN FITCH: Ok. Because we're
13  going to reserve time for him to redirect
14  tomorrow, so --
15    MR. KLAYMAN: I'll be courteous in that
16  regard, your Honor. We have a lot to go through,
17  particularly since we have all these new
18  supplemental exhibits that have been admitted.
19    CHAIRMAN FITCH: Well, whatever. I
20  mean, there will come a time when I'll say thank
21  you very much -- I hope I don't have to do
22  that -- and give Mr. Smith the time that he

Page 582

1  estimates. If he estimates 20 minutes or 30
2  minutes, he's going to get 30 minutes. And
3  whether that occurs depends on how late we go
4  tomorrow. I'd like to stop at 5:00 p.m., but --
5    MR. KLAYMAN: I'll do my best, your
6  Honor.
7    CHAIRMAN FITCH: But these things have
8  gone later before, and I'm sure I can ruin the
9  court reporter's evening, so do we want to start
10  at 9:30 tomorrow. Or do we want to start earlier?
11    MR. KLAYMAN: 9:30 is fine. I can't
12  say for sure until we hear the answers, if I can
13  fit everything in tomorrow.
14    MR. SMITH: Is it safe for me to
15  release Mr. Bennett from testifying tomorrow?
16    MR. KLAYMAN: I wouldn't say that,
17  because we don't know how it's going to go.
18    CHAIRMAN FITCH: Well, say we finish up
19  here at 3:00 o'clock, is there any harm in having
20  Mr. Bennett --
21    CHAIRMAN FITCH: You're paying hotel
22  expenses and so on.

Page 583

1    MR. SMITH: He needs his two hours
2  window.
3    MR. KLAYMAN: Unless Bar Counsel wants
4  to pay mine, like they're paying Ms. Sataki's...
5    CHAIRMAN FITCH: You are directed to
6  leave him on call.
7    MR. SMITH: Alright.
8    CHAIRMAN FITCH: There being nothing
9  further that I know of in the way of
10  administrative matters, or evidentiary, we will
11  recess here at 4:37, and resume at 9:30 tomorrow
12  morning.
13    I note that, after the approximately
14  but slightly less than three hours of direct
15  examination of this witness, we've had four hours
16  of cross-examination so far of this witness.
17    MR. KLAYMAN: Your Honor, insofar -- I
18  understand and I appreciate the leeway, but to the
19  extent that -- she's my witness, too, so what I'm
20  trying to do is get in testimony that I would
21  elicit in my case, as well, for efficiency's sake.
22    CHAIRMAN FITCH: It's entirely common

Page 584

1  to accomplish both those purposes at one time.
2  That's fine.
3    MR. KLAYMAN: Although I don't know
4  what will come up, you know, if she's back in LA
5  and maybe remote testimony. But I'm not
6  suggesting that she be forced to come back here.
7    CHAIRMAN FITCH: We stand in
8  adjournment. Thank very much.
9    (Whereupon at 4:39 p.m. the hearing
10  stood in recess until Friday, June 1, 2018, at
11  9:30 a.m.)
12
13
14
15
16
17
18
19
20
21
22

82  (Pages 581 to 584)

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 348 of 771   PageID 1080
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 585

**A**

**a.m** 261:3 264:6
320:17 584:11
**abandoned** 268:20
269:5
**Abdy** 360:21 361:1
**able** 280:1 289:9
299:19 312:21
393:10 476:10
477:1 490:14
491:8 504:18
506:5 548:16
**abrasive** 371:2
**absence** 289:19
510:15
**absolutely** 295:17
327:22 366:6
433:5,9 464:16
497:4 514:16
**absolved** 375:17
**abundance** 426:12
**abuse** 271:12
**accept** 416:8
**acceptable** 344:18
344:21
**acceptance** 538:17
**accepted** 415:18
416:6
**access** 275:3
**accident** 533:10
**accommodation**
351:15 354:11
415:15 439:18
**accompanying**
303:2
**accomplish** 584:1
**account** 392:13
**accounting** 338:5
441:4
**accuracy** 529:11
**accurate** 478:22
556:2
**accurately** 555:9
**accusations** 273:19
274:2,6 356:8
**accuse** 491:12
518:17 536:13,14
536:18
**accused** 356:6
517:17 519:22,22
525:19,21 534:14
**accusing** 517:9
518:21 533:16
**acknowledge** 269:1
**acknowledged**
324:10 410:1

**acted** 477:14
**action** 377:2 407:8
428:8 513:5
558:19 560:5
570:11,20 571:1
574:1
**actions** 283:1
392:13 558:15
**active** 388:20
**activist** 387:15
**activity** 310:19
**actual** 392:2 473:5
480:16
**Ad** 261:3,10
**add** 304:7 310:1
374:13 376:14
**addition** 265:14
278:7 395:12
396:19 433:1
438:14 456:6
474:2,3
**additional** 284:20
309:20 340:14,16
**address** 272:20
273:2 282:2
288:15 319:5,6,8
319:12,14 401:19
402:7,18 479:3
485:17 539:20
540:1,2,4,7,16
542:8 545:13,21
546:9,21
**addressed** 264:10
265:16 294:14
542:22 543:19
545:1
**addresses** 478:18
**addressing** 308:20
308:21
**adds** 378:14
**adduce** 280:1
**adduced** 277:19
**adequately** 290:10
**adjournment** 584:8
**administration**
389:17 408:21
457:13
**administrative**
264:10 316:9
320:15,18 385:10
393:21 395:16
397:1 407:7
583:10
**administratively**
406:22
**admissibility** 277:4

**admissible** 310:10
381:22
**admission** 284:8
299:10,11,15
310:22 315:13
**admit** 264:13
278:21 284:6
**admitted** 272:12
282:6 307:22
313:20 315:7
320:10 378:9
524:12 541:16
542:17 546:17
550:14 551:6
572:21 575:18
579:7 580:1
581:18
**admitting** 279:8
**admonish** 563:20
563:21
**advanced** 365:9
**advances** 384:15
**advantage** 383:5
**adversary** 493:7
**advice** 300:22
328:10 392:15,18
471:18
**advise** 281:7 436:5
490:6
**advised** 300:18
374:1 471:3,10
492:20
**advisement** 531:11
**advising** 344:21
**advisor** 390:13
434:17
**affair** 371:5 373:13
375:5
**affairs** 381:8
503:15
**affect** 529:10
**affidavit** 378:1
380:7 413:13,14
413:16
**affidavits** 354:14
358:1 413:10
**affirm** 439:21
**affirmative** 357:1
401:4
**afford** 361:17 363:7
565:15,16
**AFL-CIO** 351:7
**afraid** 465:10,18
**afternoon** 291:5
321:14 440:14,15
458:5 539:4

**agencies** 358:13
395:16 397:1
**agency** 338:4 407:9
436:11
**aggressive** 270:7,9
432:7 500:10,12
500:13 550:21
571:7
**ago** 265:4 281:16
309:14 452:18
491:2 496:14
**agree** 279:17,20
287:2 309:11
313:12,16 362:7
370:9 398:3 480:4
535:22
**agreed** 290:6 299:1
301:22 336:11
346:12 370:19
397:19 398:11
**agreeing** 494:1
559:16
**agreement** 504:9
520:6 556:15
559:17 562:14,15
**agrees** 376:18
**ahead** 280:14 297:1
297:19 300:3
303:15 319:11
321:20 335:9,11
356:1 360:6 400:4
429:8 439:14
440:6 527:9
552:13 555:1
564:9
**ahold** 282:22 539:5
539:10 541:9
**aimed** 393:4
**Akbar** 322:14,16
**Alice** 349:5,8,14,16
349:16
**allegation** 377:3
477:18 558:15
567:4
**allegations** 341:22
380:19 529:12
**allege** 375:19
**alleged** 324:12
334:14 335:15
341:7,15 344:16
373:12,13 472:16
**allegedly** 456:3
**allow** 271:4 306:11
474:20 531:12
**allowed** 486:1
536:21

**Allred** 493:13
494:15,20 495:11
**alright** 283:16
284:1,13 297:20
299:3 305:22
306:12 310:7
312:13 315:12
331:12 386:16
409:8 435:1 493:4
501:14 502:7
506:8,13 521:5
544:16 551:8,11
552:12 583:7
**alternatives** 382:4
**amended** 406:16
**Amendment** 394:20
394:22 395:1
**America** 327:17
332:3 336:5
337:21 338:8,15
341:2 342:10
343:16 344:9
351:8,21 352:6
354:22 355:10,17
367:12 385:1
388:3,5,12 390:18
391:4,18 392:6,17
393:4 403:10
404:2,21 406:22
413:14 416:7
444:10 450:20
454:12 464:19
481:6 568:11
570:2 573:10
**America's** 368:4
369:16
**American** 562:5
569:12
**amicably** 338:17
449:1,3 452:16
**amount** 475:20
504:9
**analysis** 570:7
**Andisheh** 563:9
564:13 565:4,19
566:6,15
**Angeles** 334:16,19
334:22 335:4,17
335:17 338:9
339:2 341:3,11
343:15 344:1
351:9,14,16 352:1
352:10,11,18,19
352:20 371:6
376:7,7 382:22
383:12 391:19

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 349 of 771   PageID 1081
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 586

392:8 393:5
400:15 406:21
407:17 410:17
411:5 414:2,9,12
415:15 422:9
427:17 436:8
450:8 486:2
525:10,17 551:16
556:5 564:8,14
572:15
**angry** 422:16 491:2
**announce** 409:10
**announced** 409:9
**announcer** 382:15
383:11
**annual** 566:18
**answer** 278:10
319:2 331:10
335:9 340:13
357:4,5 360:10
381:21 401:4
408:4 420:19
427:6,8 449:9
451:13 470:8
484:13 487:19
488:3 494:12,18
497:7,14 498:6
501:12,16 510:22
511:2 513:7 514:9
514:11 517:2
541:1 547:20
549:2,6 555:13
568:15
**answered** 280:6
392:9 412:15
429:9 431:10
437:17 461:13
538:7,10 557:13
572:17
**answers** 582:12
**ANTHONY** 261:11
**anti-freedom** 444:9
**anticipate** 321:1
581:10
**anybody** 264:14
340:10 409:11
423:2 424:21,22
425:12 426:19
438:13 515:19
575:7
**anybody's** 311:13
416:21 515:22
**anyway** 396:15
**apart** 429:20
**apartment** 359:18
359:20 361:11,15

362:20,21 363:2
363:10,21 364:7,8
365:4,12,16
366:20 369:20
376:6,18 423:9
456:12 505:6,21
509:11 510:17
511:11,18,19
512:3 514:5 516:1
519:14 524:17
527:12 533:17
**Apartments** 509:7
524:2,16
**apologize** 266:12
373:3 444:2 502:5
**apologized** 355:21
356:7 371:20
**apparent** 309:15
**apparently** 268:3
281:5 530:10
**appeal** 486:13
**appealed** 486:9
**APPEALS** 260:1
**appear** 314:9
443:10 522:4
**appearance** 273:7
**APPEARANCES**
261:9 262:1
**appears** 287:3,5
289:17 292:8
311:20 528:22
542:20
**applicable** 277:11
**application** 383:9
**applied** 382:12
**apply** 310:21
489:22
**appointment**
457:19
**appreciate** 308:18
383:17 528:15
583:18
**appreciated** 314:3
**appreciative** 528:19
**approach** 324:4
**approached** 454:7
454:14 455:10
456:7 465:9
**approaching** 266:6
266:16
**appropriate** 283:7
283:7,12 573:21
580:4
**approved** 368:11
**approximately**
321:15 583:13

**April** 278:5 366:21
377:5 428:8
431:15 444:8
560:1
**Arab** 345:8
**Arabic** 344:10
345:4,5,7,14
**area** 326:20 344:13
346:2 360:5 364:5
**arguably** 529:6
**argued** 313:21
410:16
**arguing** 341:3
351:22
**argument** 264:14
501:5
**argumentative**
330:22 359:4
419:14 436:12,14
481:1
**argumentativeness**
331:9
**Arlene** 349:19
350:1,3,4,9
430:13,18 431:16
**arm** 573:11
**arose** 277:9
**arranged** 278:5
**articles** 398:11
400:1,12 443:9,14
444:7,13,17
455:22
**Asha** 564:21
**aside** 265:1 578:22
**asked** 271:17
272:11 280:5
284:8 288:22
295:13 305:14,17
323:20,22 324:5
325:14 332:10,13
334:4 335:6
343:12 348:2
350:9 367:5 368:8
381:17 387:14
396:8 397:10
411:2 412:20
415:3 423:21,21
424:1,1,9,15,20
424:21 425:2
426:19 427:11
428:18 429:2,3
431:11 432:14
433:3 437:14,16
437:17 442:6,11
452:15 455:3
461:13 466:14

474:10 488:17
489:4,6,7,9,10,15
489:16 490:11
495:5,8 499:20
500:17 501:8
511:12 525:3
528:17 534:19,20
538:7,10,17,19,20
557:13 559:20
571:20 572:16
575:11
**asking** 300:6
306:18 366:13
377:9 395:20
405:15 413:17
423:17 425:5
428:14,15 436:15
451:17 472:3
482:17 483:17
490:11 491:11
512:17 529:1
530:18 554:14
555:21 556:9
576:17 579:17
**asks** 340:12 389:9
**asserted** 310:17
**assess** 477:13
**assign** 329:4
**assigned** 410:6
**assignment** 329:5
346:7
**assist** 294:4 441:22
541:3
**assistance** 513:13
574:6
**assistant** 510:15
511:7 574:8,10
**associate** 530:4
**association** 394:20
568:12
**assumed** 273:7
524:22
**assuming** 437:13
492:19
**Atabay's** 525:19
**attached** 541:21
**attachment** 461:18
**attack** 311:2 532:4
**attempt** 297:15
**attempts** 445:16
**attend** 440:21
**attention** 308:21
317:5 323:6 449:6
461:20 502:4,13
505:2,11 520:18
537:6 541:2,19

551:13 561:9
569:5 575:20
**attorney** 261:16,18
328:5,9 344:20
363:16 414:18
425:7 434:13,17
437:16 489:18,19
491:17 493:19
548:5,6,22 573:22
574:8,10
**attorney/client**
297:6
**attorneys** 484:1
**August** 305:1
**authentic** 285:16
289:13 310:8
314:20 320:5
**authenticate** 284:18
290:19,19,20,21
297:15 308:13
**authenticated**
285:14 290:11
313:12 554:8,19
**authentication**
287:6,9 289:19
290:13 291:1,7
296:17 307:15
309:20 310:21
553:22
**authenticity** 284:15
285:12,22 287:21
288:8 313:18
320:4
**author** 265:18
**authored** 265:16
303:20 443:13,15
444:3
**authorize** 297:9
**authorship** 310:12
**available** 272:15
274:19 278:1
310:15 312:16
320:22 438:4
443:19 444:18
**Avenue** 268:4 273:3
449:15 539:21
540:5 542:2
543:19 544:3
545:2,8
**avenues** 579:2
**Aviera** 349:20
350:1,14,16,19
351:1,19 354:15
413:11 430:13
431:16 432:6
535:1 536:4

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 350 of 771   PageID 1082
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 587

**aware** 274:8 318:4
337:13 338:11
341:1,21 352:14
353:6 368:3,6
369:2,12 384:8,9
385:4 386:22
387:13,19,20
388:6,9 389:2
391:2 392:19,21
392:22 393:7
394:3 395:3 398:9
398:13 400:14,17
403:20 404:8
406:16 407:2
409:14,16 411:9
411:13 413:9
415:3 416:5
417:12,21 445:9
445:12 448:21
449:4 453:6,9,19
454:6,14,17,21
455:10,20 456:4,7
466:17 467:1,9
475:8 479:10,16
481:4,7 492:20
493:11,15 494:20
495:2,5 503:10
539:3 540:1,4
545:7,12 571:20
572:2
**Ayatollah** 389:18
390:12,13

**B**

**B** 483:8
**back** 268:6 270:13
275:14 282:3
285:4 302:13
311:1 313:7 316:2
316:16 318:11
320:17 323:10
325:7,9,11 326:19
326:21 328:20
334:13,21 336:4
346:14,15 351:9
355:14 358:6,6
359:13 360:7
361:19,22 362:3
362:22 367:9
368:14,16,18
369:20 371:19
372:22 376:5
383:14 384:6
391:19 392:7
393:5 396:17,18
403:4 405:5

407:17 410:16
411:4,10 412:4,9
415:15 417:5
422:2 426:14
427:18 428:12
436:7 439:4 446:6
450:8 451:4
458:20 462:22
467:7 478:11
486:1 490:2 494:2
494:4 502:18
503:7,8 504:8
508:18 511:5,9
523:16 537:6
548:9 553:12,17
555:10 556:5
557:4 565:19
566:7 572:14
577:5 580:22
584:4,6
**back-dooring**
295:15
**background** 386:4
409:16,20
**backgrounds**
405:18
**bad** 491:1 507:7
**balance** 278:13,20
**bankrupt** 327:16
**bankruptcy** 423:19
423:22 424:10
432:8
**bar** 267:1,6 269:4
270:11 272:13
288:1,22 298:1
299:4 300:5,8
304:10 307:11,17
311:21 314:8
315:1,5 325:21
326:3,20 330:13
378:10 380:4
400:22 401:7
459:16 460:3,4,9
460:13 462:12
468:3,9 472:17
473:9 489:3,7
490:4,12 532:21
537:7,18 541:7
567:8 583:3
**based** 321:4 445:12
532:1 539:3
540:15,18 545:20
552:2 567:8
**basement** 530:4
533:2
**bases** 376:4

**basically** 282:15,17
441:22 471:13
490:18
**basis** 320:1 376:3
419:6 472:2
530:13
**bear** 448:13
**beat** 377:13
**beautiful** 356:19
357:7
**becoming** 271:12
**bed** 378:4 379:3,15
380:9 510:21
514:6,21 536:16
**bedroom** 510:19
**began** 350:16
**beginning** 321:14
368:20 383:22
400:21 437:22
563:22
**behalf** 261:6,18
262:2 317:3 322:1
374:21 408:19
423:7 436:8 440:9
445:2 448:19
578:18 579:2
**behave** 432:9
**behaved** 475:21
**believe** 265:20
269:11 270:12
280:20 305:10
322:5 338:22
350:3 426:7,17
443:12 446:21
460:3 475:13
523:9 524:4
543:13 573:14
**believed** 367:13
385:15 398:10
406:13,14 523:10
527:13
**believes** 360:12
**belongings** 274:16
**belongs** 469:7
**Ben** 348:17
**benefit** 296:5
370:21
**Bennett** 582:15,20
**best** 267:8 269:21
282:18 358:14
410:14 475:15
582:5
**better** 309:6 486:16
547:4,10 548:7,12
565:15 568:8
**Beverly** 353:1

364:13 365:1
496:18
**bewildered** 498:3,7
**beyond** 291:8
500:12 504:19
**bias** 444:10
**Bibiyan** 373:2
**big** 276:1 283:6
309:8 311:19
327:3 352:11
364:14 434:18
480:10,12
**Bijan** 353:9,10
354:4
**Bill** 408:19
**binder** 429:14
460:20
**bit** 308:6 326:17
328:21 359:11
360:6 389:1
432:17 438:14,17
482:15 502:19
**blamed** 419:4
422:15 432:10
515:15
**blames** 535:8
**blaming** 515:9
**blank** 506:15,20
**Blanquita** 388:18
389:3,5 405:11,22
571:21
**bleeding** 354:20
355:1,5,7,12,13
355:15 356:2
357:13
**blue** 401:8
**board** 260:2,4
261:1 270:4 276:5
388:5,8,13,17
394:18 405:9,10
407:15 430:9
479:12,14 481:5
532:2 571:12,17
571:21 572:6
**body** 465:7,16,17
**Boehner** 449:21
450:5,13,22
452:14 453:1
**Boehner's** 452:14
**book** 296:4,6
297:22 334:14
401:7,8 429:19
430:9 473:13,14
473:15 502:16
503:2 541:3,6
580:8

**books** 417:1
**born** 335:2
**boss** 372:18 373:1
480:16
**bottom** 298:14
300:7 304:7
345:22 380:16
391:15,16 392:3,4
479:8 508:11,12
510:10 562:9
577:6,9,12
**Boulevard** 352:5
360:2 361:12
423:10 456:13
496:16 504:10
**bounds** 500:12
**boutique** 353:18,19
**boyfriend** 371:17
375:6 524:20
**brand** 363:21
**Brantley** 260:22
261:4
**break** 321:16
383:19 411:10
446:14,15 492:8
523:1,13,14
557:10 580:4
**breakdown** 354:20
**breaking** 437:19
514:4 533:17
536:15
**breaks** 282:12
**brief** 264:14 266:11
275:21 291:10
322:20 324:11,18
402:3 429:16
446:8 450:22
505:4 521:12
**briefly** 275:20
302:5 310:1
353:17
**Brighton** 496:18
**bring** 279:10 285:4
288:12 316:2
340:15 345:14
394:4,8 415:5
457:5 469:16
484:4 487:3,21
488:21 507:18
519:6 571:5
572:12
**bringing** 308:21
405:21 503:15
**broadcast** 345:4
389:16
**broadcaster** 371:7

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 351 of 771   PageID 1083
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 588

404:2
**broadcasters**
390:20 391:4
456:2
**broadcasting** 390:9
390:19 562:16
567:11 568:1
**broadcasts** 344:10
**broke** 514:20
**brother** 293:11,15
294:15,22 295:4
295:22 296:9
322:15 434:12
**brought** 285:4
334:1 395:3
409:17 418:1
505:6 524:15
525:11 535:5
581:9
**building** 344:3
352:5 516:2
**bunch** 265:7 407:13
564:22
**bureau** 344:2,10
346:1,20 347:3
402:16 441:8,11
573:10
**business** 316:9
318:3 323:12,19
340:9 451:7 452:5
**busy** 548:17
**buy** 427:11 428:17
428:18 432:14
433:3,4,8,10,20
534:4
**buying** 433:6

**C**

**C** 264:1 483:8
**C-h-a-l-a-n-g-i**
391:14
**C.S.R** 260:22 261:4
**cafe** 496:15
**calculated** 552:18
**California** 267:15
319:7 353:1 434:2
456:11,15 458:15
532:10
**call** 280:7 290:18
312:22 323:20
324:1,3,7 325:6
325:11 350:4
352:19 402:15
407:14 412:19
448:4 449:6 459:2
471:8 474:5,8

487:13 538:15
580:15 583:6
**called** 281:17 295:1
324:21 325:9
344:9 407:9
410:21 411:13
412:21 440:9
470:18,21 474:14
538:14
**calling** 282:3
308:10 422:17
459:2 538:13,22
574:3
**calls** 282:3 370:17
487:11
**Camden** 496:15,18
**camera** 357:9
562:19
**cameraman** 323:6
323:14 342:15
**capability** 342:1
**capable** 489:18
493:17,18
**Capitol** 322:6,6
323:1 328:15
452:21,22 455:18
**caption** 444:9
**car** 373:14 423:13
427:11 428:16,18
428:19 432:15
433:3,5,7,9,11,13
433:13,15,16,20
434:11,14 435:3,7
435:14,18 436:10
491:20 533:10
**carbon** 577:7
**card** 323:9,12,14,15
324:2 328:6 379:6
451:7,7 452:6
**cards** 323:19,19
**care** 451:9 459:4
564:3,6 566:5
**cared** 274:16
420:10
**career** 296:6 490:15
**carefully** 340:12
529:21
**caring** 420:2,17
**cars** 435:9,11,12,17
435:20
**Carter** 387:10
**carve** 321:9
**case** 266:15 267:1
268:20 269:5,15
273:21 276:17
278:22 279:3

281:7 284:12
308:10 309:15
315:2 320:11
322:15 329:14
330:13 331:16
333:2,18 340:7
358:16 359:1
369:14 380:21
395:3 405:9
406:21 407:5,5,15
407:16 409:21
410:4,5 414:15
419:1,3,8 420:6
421:22 422:12,18
444:9 447:13
450:9 456:2 461:8
469:14 471:14
477:18 480:7,9,9
480:11,15,21
483:16 484:2,4
486:9 489:4,21
490:7,13 491:18
494:2 503:12
519:7 520:9
522:21 523:6
533:16,21 535:5
535:14 549:19
558:18 559:1,8,22
567:2 575:12
583:21
**cases** 395:17 397:2
408:13 409:17
442:1 475:3,10,15
475:17,18 494:22
503:18 525:13,16
530:6,13 531:14
533:4,15 534:11
535:16 537:3
559:2 560:13
573:13
**castigate** 275:11
**cause** 557:18
**causing** 475:17
**caution** 426:12
**CBN** 296:1,10
**CC** 577:8,13
**CC'd** 578:19
579:15
**CC'ing** 574:16
**ceased** 557:22
**cell** 281:15 323:9,16
323:18 325:2,4
562:19
**Central** 344:2,9
345:13,19 346:16
346:19 347:3

**certain** 272:13
347:2 519:2
533:18
**certainly** 275:8
277:18 284:22
**certified** 301:1
**cetera** 335:19
**Chair** 261:12
271:18 305:12
321:6
**Chair's** 283:20
**Chairman** 264:2,17
266:5,9,14 272:2
275:15,20 276:21
280:10,14 283:11
283:17,21 284:11
284:21 285:5,10
287:3,9,11 288:14
288:19 289:10,17
289:22 290:7,16
291:3,13,15,19
293:2,17 294:6
295:20 296:19
297:18 299:7,13
299:21 301:6
303:9,15 304:11
304:14 305:18
306:8 307:13,19
307:22 308:6,13
308:19 309:4,13
312:6,11,14 313:5
313:7 314:2,11,14
314:17 315:4,15
316:4,6,20 317:2
317:16 318:9
320:8,16 321:13
321:18 324:15
331:8 335:5,11
337:4,8 339:4,7
339:12 340:11,19
357:4 359:7 360:9
366:19 367:1,5
371:22 372:3
373:7,21 374:9,13
375:8,11,14
376:13 377:11,18
378:5,8,12,14,19
378:21 379:7,9,18
379:21 381:3,12
381:15,21 382:10
383:16,21 384:3
392:1,10 395:21
396:5,12 397:8,10
397:13 398:5
399:3,10,14,21
400:4 401:2,6,10

402:2 406:6,10
408:3 411:6,16,19
412:15 413:4
415:20 416:1,9
418:15 419:13,20
420:8,12,19
425:15 426:11
427:3,7,14,18,21
428:3,6,13,22
429:5,8,11,17,21
430:3,21 431:2,10
431:18,21 433:17
434:5,8,10 435:1
436:16,19,22
437:17,21 438:8
438:11,17 439:4
439:12,16 440:3,6
443:21 444:4
445:1,20 446:1,5
446:9,14 447:17
448:4,7,12,16
449:8 453:16,21
457:22 460:18,22
461:13 466:11,14
468:8,12,14 470:7
470:22 471:15,19
472:1,3,12 473:12
473:15 474:17
477:16,21 478:3,6
479:15,19 481:1
481:10 483:2,4,7
487:12,16,19
488:7,21 493:2,6
494:9,17 495:20
497:5,14,17 498:6
498:15,18,21
499:5,9,15,18,21
500:3,8,11 501:6
501:9,14,17,19,22
502:7,15 503:2,6
503:22 504:3
506:3,8,14,19
507:1,4,14,18
508:2,6,11,14,17
508:21 510:3,6
512:18,21 513:3
513:11,15,21
514:8,22 515:4,6
516:15 517:1,6,20
518:7,10,20 519:4
519:16,20 520:14
521:7,14,21 522:3
522:8,11,13,18
523:12,16,19
524:3,6,11 526:1
526:3,7,11,20,22

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 352 of 771   PageID 1084
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 589

527:6,18,21
528:12 529:6,21
530:11,15 531:3,8
531:19 533:9,20
534:10 535:10,17
535:21 536:2,6,20
537:11,20 538:7
538:10 539:12
540:12 541:16
542:16 543:6
544:2,6 545:18
546:3,8,11,17
547:15,19 548:2,7
549:1,5,11 550:14
551:1,6,9 552:5
552:12,21 553:4,9
553:18,21 554:3
554:16 555:1,8,14
555:19 556:19,22
557:7 558:2,14,22
559:22 560:6,15
560:20 561:1,10
561:14 563:19
564:4,9 566:19
567:3,14 568:3,13
569:3,7 570:19
571:16 572:4,16
572:21 574:11,14
574:20 575:17
576:9 577:6,11,15
577:17,21 578:2
578:11,15,22
579:7 580:1,6,11
580:14,19 581:1,7
581:12,19 582:7
582:18,21 583:5,8
583:22 584:7
**Chalangi** 391:11,14
404:1
**chance** 280:17
287:1 295:6
485:17
**change** 267:7
549:14 570:11
**changed** 475:20
**changing** 308:9
**channel** 562:18,22
**character** 273:20
**characterize** 264:22
**charge** 332:19
336:13,17
**charged** 382:5
404:8 424:12
**charges** 535:13
567:5
**charging** 403:20

**charlatan** 481:14
**checked** 281:17
**cheek** 326:5,9,12
452:11
**chief** 451:8 458:14
496:22 497:12
574:9
**chip** 412:4
**choice** 346:19 362:2
424:17
**Christian** 364:17
**chronological** 278:4
**chuckled** 406:10
**circles** 388:21
**circulation** 442:18
**circumstances**
264:19 265:3
411:4 461:16
531:2 532:20
**citation** 461:8
**citations** 469:13
**civil** 575:22 576:18
578:7
**claim** 330:1,4
355:15 357:13
483:11,19 490:9
505:13 521:19
522:7 524:1 525:4
539:15,17 567:4
**claimed** 268:3
332:2 334:9
339:20 384:11,13
384:14 385:12
484:16 515:14
**claiming** 275:5
342:21 369:22
415:13 514:20
525:6
**claims** 378:2 444:9
486:3 505:14
529:3 558:1,20
560:17,19 566:21
576:22 578:17
**clarified** 371:18
373:4
**clarify** 386:12
555:16
**clarity** 447:8
**CLAY** 261:20
**cleaned** 572:1
**clear** 287:15 357:17
372:7 417:8 439:8
444:16 450:3
498:1 520:19
524:8 547:6
556:16

**client** 349:5 363:17
420:17 450:19
481:22
**clients** 481:15,18
550:2
**Clinton** 388:15
405:10 408:19,20
479:11,17 481:4
**close** 270:20 365:19
432:22 487:13
533:16
**closer** 507:19
**closet** 512:7 518:15
**closing** 501:5
**clothing** 354:1,3,4,6
**Clyde's** 325:17
326:19 329:17
330:21 333:14
**co-anchor** 332:3
370:6
**co-host** 564:17
**coach** 282:11
**coaching** 494:7
**coax** 560:14
**Coburn** 454:8,11
**Cockroaches**
444:12
**coerce** 397:20 559:3
572:13
**coffee** 470:11
**Cohen** 571:21
**collar** 441:14
**collateral** 273:22
512:22 516:7
524:4 528:1
532:13
**collect** 333:19
553:16
**collection** 306:3
**Colleen** 408:9
**colleges** 440:21
**Columbia** 260:1
261:6 414:16
472:17 473:1,8,16
**columns** 399:18
**come** 265:17 266:17
267:11 309:12
311:1 316:16
325:17 333:7,16
368:16 373:3
385:5 387:1 414:1
434:14 436:7
446:18 468:4,16
491:13 572:10
580:21,22 581:1
581:20 584:4,6

**comes** 268:15
343:11 399:2
533:16 537:2
555:21 580:9
**comfortable** 364:10
364:20,21
**coming** 384:12,14
388:2 491:22
500:17
**commencing** 261:3
**comment** 331:7
**commentator**
382:15
**commission** 568:19
**commitment**
363:11
**committed** 320:2
**committee** 261:4,10
264:8,11 265:21
267:19 270:17
271:3 272:16
274:4 276:22
288:10 295:9
306:3,15 312:19
316:8 320:15
417:9 440:17
442:9 454:11
487:13,15 534:9
**committee's** 266:4
**common** 380:18
583:22
**communicated**
282:21 486:11
**communicating**
273:9 281:2
485:20 538:18
**communication**
281:21 295:10
297:4 424:18
555:6
**communications**
330:12 503:11
**community** 364:11
364:13,14 367:16
371:4,9 387:21
**company** 442:12
564:3,6,7 566:8
566:11,14
**compensatory**
560:2
**competency** 477:17
**competent** 476:11
477:2
**competently** 475:16
476:8,21 477:14
478:7

**complained** 342:4
517:18
**complaining** 277:17
278:3 376:17
494:13
**complaint** 266:3
288:2 298:16
331:18,19 383:15
384:10,22 385:10
385:10 393:8,21
393:22 394:13,17
399:7 406:17
422:6 459:14
460:3,12,14
461:19 462:12,13
465:1 468:3,9,16
469:15,17,22
473:21 478:12
485:14 509:6
513:13,18,20
518:21,22 528:4
529:14 533:10
538:4 541:22
567:8 571:12
576:19
**complaint's** 470:5
**complaints** 311:20
345:16 393:1,3
399:13 460:9
525:13,14,17
528:5
**complete** 274:1
**completed** 316:11
**completely** 327:16
372:20 416:17,17
**completeness**
313:21
**complicated** 503:20
504:2
**compound** 399:22
411:7 415:22
479:15
**compounding**
355:1
**computer** 554:10
**concentrate** 419:8
**concentrated**
380:21 419:11
**concentrating**
419:5
**concern** 285:10
296:16 380:17
396:12
**concerned** 527:1
530:11
**concerning** 380:19

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 353 of 771   PageID 1085
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 590

414:14
concerns 309:2,20
  375:19 378:15
conclusion 477:9
condition 354:16
conduct 272:14
  273:20 472:17
  473:1,8 482:6,11
  532:1,9 573:12
conducted 310:19
confer 312:20
configured 416:11
conflict 547:5
confusing 555:15
confusion 377:5
congressional 464:6
congressman
  450:21 452:14
  456:10 457:18
  458:7,17 462:14
  463:2 464:14
congressmen 449:2
Connecticut 449:15
connection 284:20
  442:7 456:18
  500:3
consent 268:12,15
  283:4 286:9
consented 284:19
conservative
  387:14,22 388:20
  409:4,12 442:15
conservatives 387:7
consider 550:7
consideration
  283:14 285:19
  375:15 474:19
considerations
  376:15
considered 269:5
  300:1 312:3
considering 368:10
consistent 528:6
consists 442:16
Constitutional
  394:19
constraint 291:4
consult 312:12
  487:12
contact 268:20
  269:4 281:1
  337:10,11,13
  451:8 452:6,7,13
  466:18 467:2,13
  483:18,22 484:17
  573:16 574:2,5

contain 277:5
contained 267:18
  274:18
content 390:9
contentious 369:14
  369:16
contents 305:19
contested 521:20
context 318:12
  360:16 570:20
contingency 553:5
contingent 559:17
continue 477:22
  559:14
continued 262:1
  292:1 448:18
  557:16 567:21
continues 321:9
continuing 578:17
contract 520:11
contractor 403:9
contradicted 528:6
control 275:2
controversial
  389:10
controversy 405:1
convenience 448:17
convenient 312:20
conversation
  322:20 324:11,12
  324:17 327:1
  328:2,2 329:10,11
  329:14,16,18
  330:1,3,6,20
  331:2 332:1
  360:13 452:9
  465:11
conversations
  329:8 330:8,10,11
  336:22 414:11
  426:2 463:6,8
convicted 281:18
  283:4 318:4 469:4
convinced 482:5
convincing 500:1
  501:10
cooperating 295:22
copied 400:14,17
  402:13 554:9
copies 274:9 275:9
  303:4 398:15
  399:17 400:1
  455:22 475:2
  574:9
copy 272:8,19
  274:13 292:6

294:20 306:6,7
  430:4 577:7,13
copying 403:2,8
corner 496:15
  507:5 508:9,12
correct 279:6
  289:21 319:8,20
  319:21 322:8,9,11
  322:12,18 323:2,4
  323:10,21 324:1,3
  324:22 325:3,5,7
  325:15,18 326:6
  326:15,21 327:3,4
  327:5 328:18
  330:14 332:4,11
  332:13,19 334:5
  334:10 336:9,10
  337:14 338:22
  339:2,9,18 341:4
  342:8,9,11,17,18
  343:1,5,17 346:21
  346:22 347:9,12
  348:3 352:12,13
  352:22 354:12
  357:13 359:15,16
  359:21 362:1,17
  362:18 365:7,8,11
  365:13,14,16,17
  366:14,15 368:5
  369:3,7,8,10,11
  369:17,18 371:12
  374:12 382:17
  383:1 385:12
  389:12,13 390:22
  391:1 392:14,15
  393:16,18 395:10
  397:17,18,22
  398:1,22 399:1
  400:20 403:2,3,7
  403:7,10 404:7,10
  404:12,16 405:2
  405:12 408:10,11
  410:1,11 422:12
  422:22 423:13
  424:10,11,13
  428:21 430:14
  431:3 433:7,8,12
  436:1 441:10
  451:4 455:15
  456:8,9,14,17
  457:3,4 458:9,12
  458:13 461:12
  463:4,22 464:7
  465:22 467:3
  468:20,21 469:11
  474:15 477:11

478:5,22 479:14
  482:11,12 486:20
  487:6,7 488:2,3
  489:8 490:16,17
  492:19,21 495:12
  497:16 498:2
  499:4 504:10,12
  504:14,15,17
  505:7,8,9 507:2
  510:9 518:2,3
  531:4 538:4,5
  539:7,8,18,19
  540:18 541:7,12
  541:13 542:8
  543:20 545:2
  552:20 553:13,14
  553:16,17 556:5,6
  556:18 557:19,20
  558:1,12 563:6,7
  570:4,5,8,9
  571:10 572:3,15
  575:7,8,12,13
correctly 432:9
correspondence
  265:15 267:3,18
  275:2 488:15
corroborate 265:11
  277:13,16,20
  279:6
corroborates
  265:22
cosmetic 564:7
  565:21 566:11,13
  566:14
cosmetics 564:7
Council 562:5
counsel 264:7 267:1
  268:21 271:13
  272:18 273:6,8,12
  273:21 274:8,15
  275:12 277:12
  278:12 292:2
  298:5,9 300:10,13
  301:17 303:2
  309:16,18 311:22
  312:11 315:1,5
  330:13 338:15
  378:10 380:4
  401:1 416:19
  428:7 439:18
  440:10,12,19,21
  441:18 445:22
  462:3 489:3,7
  490:4,12 502:20
  505:18 541:7
  549:14 550:7

559:13 583:3
counsel's 264:12,15
  272:13 277:16
  297:17 400:22,22
  401:1,7 442:4
  459:16 460:4
  532:22 537:7,18
counseled 350:19
counseling 350:22
  376:4
count 506:16
counting 308:1
countries 344:11
  345:7
country 346:2
  387:1,7
County 456:11,19
  456:21 463:18
courage 265:6
course 268:9 269:2
  310:20 327:1
  336:21 348:7
  366:6 387:4 391:2
  394:4 423:2,18
  511:17
court 260:1 261:5
  317:17 374:18,22
  377:2 379:19
  380:20 381:1
  392:3 394:5
  396:19 399:7
  406:20 407:6,15
  410:11 412:18
  414:15 419:6,12
  424:6 426:15
  428:8 475:3
  476:19 485:15
  486:10 487:20
  495:18 505:14
  519:10 521:6
  523:6 525:10,20
  527:11 548:10
  558:22 582:9
courteous 537:16
  581:15
courtesy 482:22
  510:14
courthouse 530:3
  533:2
courtroom 581:3
courts 407:8 461:9
  525:17
cousin 317:11,13
  468:22 474:3
  488:11 544:22
  575:3

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 354 of 771   PageID 1086
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 591

cover 277:14 303:2
323:22 324:6,19
329:3,3 401:8
461:18
covered 277:8
290:8 308:4 526:3
526:7
covering 324:18
coworker 342:21
343:1 370:1
372:11 424:7
491:12
coworkers 369:21
376:10
crazy 483:5
create 501:2
created 357:13
creating 555:15
credibility 311:2
478:4 513:6 519:5
527:4,12 528:8
532:4 533:22
567:7
credit 293:18,18
328:6 365:7 424:4
424:5 429:4 433:7
crime 318:5
criminal 573:5,13
573:15
criticism 355:16
criticized 354:21
356:10
criticizing 356:4,6
528:16
cross 263:2 313:15
315:19 316:17
321:19 581:9
cross-examination
291:6 292:1
308:15,17 316:3
320:20 321:4,9,11
322:1 384:4
439:17 445:1,2
446:20,21 448:18
516:11 530:12
581:4 583:16
cry 332:8
crying 327:5,9,11
327:15 347:15,19
347:20 350:5
Cullum 388:19
405:11,22
cumulative 277:10
295:14
custody 275:1
custom 326:5,8

cut 347:3,4
cutting 308:16

_____
**D**
D 263:1 264:1
400:21 401:3,12
D-23 401:13,16,21
D-a-n-a 456:8
D.C 335:18 338:4,8
362:12 539:22
573:17
dad 385:16
daily 327:10 419:6
442:12,19 443:10
damage 558:1,20
damages 336:2
393:10 405:8
553:16 557:4
558:11 559:9
560:2,3
Dana 456:7,22
dangerously 533:16
dark 496:5
Dash 449:13
date 297:3,7 302:7
302:7 303:18
304:20,22 305:3
306:20,21,21
310:13 418:4,7
431:8,9,14 460:5
465:3 479:2 522:1
539:17 550:8
554:1,6,9,9,13
555:21 556:1,2
558:16
dated 266:2 288:3
292:9 300:11
444:8,11 573:4,8
daughter 459:4
463:22 465:14
David 312:21
day 274:22 302:15
309:11 321:12
347:20,20 355:18
380:9 435:9
447:12 463:2
467:11 491:7,11
521:18 549:18
563:1 580:5,15
days 270:1 432:19
461:1 485:13
511:20
DC 260:9 261:2,18
319:7 335:3
361:15,20 362:22
363:10,12 368:16

375:6 376:6
402:16
dead 379:11 551:17
deadline 308:15
485:10
deadlines 486:5
deal 288:11 296:4,6
364:3,22 365:2,4
389:5 528:13,18
570:6
dealership 434:2
dealing 281:20
328:7 358:12
392:17 536:10
deals 477:19 528:10
567:6
Dean 509:7,9
510:14 511:3
512:9 514:13
515:9,12 516:9,20
517:15,22 518:3
519:13 524:1,16
527:13
Dear 573:7
December 460:5,6
decent 364:12,13
decide 285:15
decided 349:2,3
351:12 369:9
532:8
decision 279:19
360:12 412:21
415:13 417:13,22
418:6 427:15,17
485:10 576:20,22
decisions 310:21
421:10
Declaration 510:2,8
decorum 532:19
deemed 535:4
deep 332:7
defendant 371:3
479:12,17,21
521:18 522:6
defendants 523:10
527:13
defense 532:12
Defenses 401:4
definitely 327:21
329:12 333:15,17
372:19 433:4,9
447:22 517:10
degree 441:2
degrees 441:3
delay 268:18
460:11

Delia 575:21 577:10
579:9
deliberate 274:7
deliver 540:17
delivered 268:4
273:2 276:11
545:14
democrat 455:12
democrats 388:9
demonstrate 274:6
demonstration
322:7
denied 299:22
358:2 367:18
373:20 374:4
410:11 488:8
deny 269:9
Depart 573:11
department 385:2
573:6
depends 285:3
447:10 581:8
582:3
deposing 387:10
deposit 504:14
deposition 528:18
532:15 534:18,20
535:11
depressed 347:21
depression 327:9
332:7
deprive 310:22
describe 306:2,15
441:20
described 444:18
describing 497:20
desire 450:8
desk 325:5 346:15
346:17
Despite 432:13
destroy 359:14
361:22 376:6
destroyed 566:22
detail 330:4 333:22
336:9 486:6
detailed 329:16,18
551:15
details 298:16
323:3,6 328:18
348:19 421:19
451:12,12,18,20
determination
394:7 573:22
determine 288:6
443:9 531:21
573:19

determined 296:22
devoted 552:22
dialog 406:6
diamond 515:9
536:14
die 453:20 496:6
dies 453:12
difference 364:17
377:6
different 335:3
354:4 386:2,7
410:15 413:10
437:1 449:20
473:22 477:5
485:18 542:22,22
543:15 544:1,10
544:15
differently 472:4
difficult 337:20
368:20,21,22
407:21 408:6
556:8,10
difficulties 382:3
403:13 408:16
424:9
difficulty 408:13
557:17 559:11
digging 265:9
diligence 477:17
diligent 476:11
477:3
diligently 475:17
476:7,21 477:14
478:7
dinner 325:14
329:10,17 333:6
333:11,21 334:5
335:21 336:2
449:12
diplomatic 556:9
dire 294:5 299:20
313:15 316:15,20
317:3 318:8
direct 263:2 275:7
315:22 316:11
440:12 583:14
directed 583:5
directions 283:20
directly 282:20
482:3 515:16
director 575:21
dired 315:14
disarmament
282:18
disciplinary 261:18
264:12,15 265:10

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 355 of 771   PageID 1087
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  592

268:21 271:13
273:20 274:15
275:12 277:12,15
278:12 292:2
297:16 298:5,9
300:10,13 301:17
303:1 439:18
440:9,12,19,21
441:18 442:3
445:21 531:21
**discovery** 272:14
370:12 422:8
439:9 530:20,22
531:12,13,20
532:9 559:9
**discriminated**
404:5 456:3
**discrimination**
391:5
**discursive** 396:1
**discuss** 297:9 336:1
438:12 447:19
485:21
**discussed** 284:9
286:6,15 360:11
369:6
**discussion** 289:1
309:15 372:3
487:14 534:8
568:9
**discussions** 351:6
**disingenuous**
266:19 269:20
**dismissed** 269:16
269:16 475:18
**disparage** 275:11
**District** 260:1 261:6
414:15,16 428:8
472:17 473:1,8,16
**division** 352:10
389:10 391:6
573:5
**doable** 489:6,9
**Docket** 260:4
**doctor** 351:20
**doctors** 349:12
362:6,6,8,12
363:5,18 367:22
**document** 281:5
284:16 289:8,13
292:19,21 293:7
297:13 298:2
300:9,13 304:16
305:19 306:15,16
306:19,20 314:21
316:18 317:8

318:8 319:3,19
320:1 430:22
472:19 506:6
509:1 521:2
522:19 541:5
542:4 552:7 554:7
554:9,20 560:9
561:17 569:16
572:18 575:14
576:8 577:12
579:14
**documentary** 274:4
**documentation**
282:5 341:1
351:19,22 354:12
366:13 377:21,22
378:6 476:7,20
575:6
**documentations**
381:2
**documents** 264:20
265:15,19 266:19
266:21 267:12
268:11,13 271:7
271:21 272:11
273:16 274:9,14
275:4 277:3,5,6,7
277:10,13,19,22
278:3,8,14,18,21
279:2,5,7,8,12,14
280:18,18,21
284:7,9,12,20
286:6,15,21 287:2
287:21,22 288:4
288:15,16 289:3
289:16 290:8
295:15 297:16
302:5,20 303:5,11
305:15 306:3
308:12 310:8
313:19 340:3
407:14 412:19
447:11 475:9
477:5,7,8 533:1,5
534:19,21,21
551:21
**dodge** 501:18
**dog** 401:12
**doing** 274:21 294:6
318:2 322:11
341:10 342:14
356:11 362:5
368:15 370:18
377:1 395:7 418:2
426:8,17 450:13
450:15 529:20

532:21,22 551:7
555:11 557:3
562:16,18 567:11
567:11 568:1,1
572:14
**dollars** 494:3
**door** 446:7 510:22
511:2 580:16
**doorbell** 510:20
**Dorsey** 338:16
**doubt** 374:6 574:14
**dovetails** 280:12
**downstairs** 312:22
**Dr** 350:14,16,19,22
351:19 354:14,17
413:10,11 432:6
535:1 536:4
**drafted** 393:1
**drawn** 407:21
**drip** 266:12
**drive** 267:17 268:2
272:8,19 273:12
276:7,8 353:9
**drop** 268:4
**dropped** 276:13
**drove** 433:15
**duces** 534:21
**due** 269:11 271:6
394:21 482:21,22
499:2 532:17
**duly** 440:10
**duties** 387:4 509:15
509:20
**duty** 266:20
**dwelling** 378:3
**DX1** 287:6
**DX1-28** 287:7

_____

**E**

**E** 260:5 261:2
262:10 263:1
264:1,1 439:1,1
440:5
**earlier** 335:13
377:22 460:5
526:12 533:1
554:8 582:10
**early** 321:8 339:6
339:10,10 578:16
**Eastern** 344:10
**easy** 358:21 412:10
471:9 570:7
**easy-going** 502:10
**eating** 312:15
**editing** 368:7
**editor** 342:15 386:3

386:18
**EEO** 393:21,22
394:4,7 406:21
485:11
**EEOC** 576:19
**effect** 334:2 346:10
347:1 371:3
375:20 400:10
464:13 514:5,21
559:3
**efficiency's** 583:21
**efficient** 285:9
574:12
**effort** 269:9
**efforts** 275:13
**eight** 266:15 267:6
268:18 308:3
331:15 484:18
491:2 506:12,12
506:21 513:2
532:21 567:1,8
**eighth** 506:15
**either** 265:15,18
269:10 270:2
309:18 312:21
346:15,16 370:9
382:6 403:21
409:4 424:17
527:8 544:20
571:2
**elaborate** 483:8
**elapsed** 486:4
**elevator** 511:12
**Elham** 263:3
350:10 367:19
443:11 448:10
450:19 485:9
561:22 562:1,9,12
**elicit** 287:1 295:13
297:15 499:8
583:21
**elicited** 550:16,18
**Elise** 349:5
**Ellie** 358:11 362:20
363:9 432:7
450:21 511:14,16
511:20,22 549:19
551:14
**EllieSataki@yah...**
402:9
**Elmer** 338:16
**email** 262:8 276:4
282:2 286:4 292:8
302:11,13,17
303:6,7,8,9,11
304:3,18,19,21,22

305:1,6 319:12,14
400:15,18 402:5,7
402:18 427:5
429:22 430:17
486:19 493:17,20
515:21 538:21
546:19,21 548:20
548:21 549:18
578:21
**emailed** 294:22
303:13 319:15
398:18 495:4
540:22
**emailing** 422:18
538:22
**emails** 265:7 266:1
281:9 330:7
416:16 417:18
421:5 454:16
475:6 477:5 496:7
575:8
**emotional** 347:15
502:9 535:8 536:5
547:5
**employed** 441:6
563:8,12
**employee** 337:22
**employees** 366:18
374:2 381:9
569:12
**employers** 490:14
**employment** 267:4
374:3 383:4
393:22 403:12
407:8 563:5,14,22
**empty** 491:20
**Encino** 503:4
504:11 509:7
**encounter** 324:21
**ended** 355:6 519:7
563:15
**ends** 291:6 308:15
**engaged** 531:22
**English** 301:21
345:4,5,13,15,18
345:19 441:3
461:12 476:3,5
512:14
**entail** 442:13
**enter** 516:3 517:11
**entered** 273:7
384:21 418:17
519:13 521:17
522:1
**entering** 515:19,22
519:1

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 356 of 771   PageID 1088
In The Matter Of: Larry E. Klayman
May 31, 2018

Page 593

entirely 531:4
 583:22
entirety 278:14
 494:12
entitled 278:15
 321:19 415:14
entry 314:20
equal 269:12
equally 309:17
equation 499:15
errors 421:14
ESQUIRE 261:11
 261:15,20 262:3
 262:10
essentially 264:22
 527:22
establish 478:1,4
established 529:8,9
 554:7
estimates 582:1,1
et 335:19
ethical 266:3 288:2
 473:17
evaluate 279:1
 537:2
eve 273:17
evening 277:1
 291:5 312:17
 325:20 449:7
 451:11,18,19
 582:9
event 267:8 284:15
 324:6 345:6 405:8
everybody 264:2
 329:13,14 332:9
 347:20,21 372:18
 375:9 392:21
 414:21 415:5
 443:20 480:17
 487:8 488:4 491:5
 496:7
everybody's 491:11
evidence 268:12
 269:3 271:5 274:4
 276:3 279:4,19
 299:4 307:17
 310:9,20,22 311:3
 313:20 330:15,18
 331:21 375:12
 376:14,17 380:4
 459:17 461:1
 496:8 523:22
 526:11 527:11
 528:7 529:10
 531:16,17,18
 532:1 534:2

535:10 537:2
541:15 542:11
546:14 550:12,17
551:2,4 552:1
560:21 561:11
572:19 575:15
579:5,21
evidentiary 277:8
 277:18 278:22
 380:8 415:4,9
 583:10
ex-husband 379:2,5
 379:14 380:6
exact 451:2 465:3
 484:20
exactly 265:21
 274:20 298:10
 300:21 326:2
 334:11 344:13
 346:11 358:19
 365:20 432:12
 453:2,5 475:7
 484:9 489:12
 498:5,9 502:1
 509:17,19 531:8
 568:9
examination 278:1
 287:21 289:15
 295:15 314:18
 315:22 316:11
 321:1 440:12
 502:2,10 522:19
 523:1 527:2
 536:22 583:15
examine 321:19
examined 440:11
example 271:12
 288:1 289:6
 427:22
excess 560:2
exchange 429:22
exclude 295:16
excluded 271:14,21
exclusion 277:11
excuse 292:10,12
 339:11 386:12
 414:4 416:19
 523:18 537:9
excused 313:2
 446:2
executive 324:8
 329:4
exercise 288:12
exhibit 269:3 288:1
 288:22 289:19
 292:7,21,22 293:3

298:1 299:4,15
300:6 303:18,18
303:20 304:10
307:11,18 308:2,5
313:13 315:13
317:5 320:10
400:21 401:2,3
416:20,21 429:14
429:20 430:6,6,8
459:16,18 460:3
460:13 461:3,19
461:21 465:2
468:11 472:15
484:22 485:6
502:6,13,14,22
505:2,12,16,19
506:9 507:9
520:19 521:1,4
523:21 537:6,8,18
541:3,6,15,19,20
542:11 543:7,12
546:19 551:10,13
561:9 569:6
575:20 580:7,8,9
exhibits 264:13
 272:12 285:14,22
 286:17 287:10,12
 287:13 297:17
 298:1 302:3 305:9
 309:9,10,16
 313:17 314:8
 315:11 377:3
 459:17 460:4
 537:7,8,10,19
 541:4 581:18
existence 374:4
exists 451:19
exits 581:3
expedient 286:13
expense 437:14
 475:19 551:15,18
 552:19
expenses 553:1
 582:22
expensive 512:2
 518:13
experience 358:12
 383:10 445:13
 540:15,18 545:20
 546:1 550:1
expert 445:4,14,18
 447:15 567:18
explain 405:18
 434:4,7 450:21
 475:19 482:14
 483:1 486:6

490:14,20
explained 328:3,4,7
 329:2,6,19 332:22
 337:20 346:11
 350:4 362:10
 363:14 364:2
 398:4 400:11
 417:17 451:3
 465:20 496:3
explaining 296:9
explanation 276:2
 500:1 512:4,10
 515:13 516:21
 517:9,16 518:1,4
explanations 512:8
exploited 481:21
exploiting 481:15
exploration 374:6
explore 279:7 534:3
Express 273:13
expressing 544:15
extension 271:17,17
extent 273:22
 274:17 296:21
 528:7 583:19
extra 506:17
extreme 271:12
extremely 267:9
 535:6
eyes 453:5 465:16
 507:7

———————

**F**

F 439:1
face 285:16 357:10
 496:10
facsimile 431:15
fact 277:14 278:5,8
 311:21 328:13
 333:17 341:13
 353:1 356:18
 359:22 366:4
 371:21 376:3
 382:21 383:5,8
 388:17 404:15
 406:12 414:1
 419:4 422:5 434:1
 457:5,10 465:21
 466:2,5 485:22
 488:15 493:2
 519:10 525:6
 532:20 570:1
 573:12
facts 265:2 377:14
 499:8
factual 275:22

421:14
fail 489:22
failed 274:13
 475:16,19
failure 476:7,21
fair 270:18 274:20
 360:10 367:1
 382:10 514:22
fairness 270:3
faith 275:12 314:1
Falahati 332:4
 334:14 335:16
 341:8 344:3,6,15
 346:1 384:10
 385:2 390:2 393:4
 393:8 405:6
 469:14 490:19
fall 532:6
falling 491:18
false 381:2,11,14
 529:2
falsity 529:8,11
familiar 442:3
family 335:19 352:2
 359:19 365:17
 380:22 385:15
 386:4,17 510:13
 511:22 548:19
famous 353:8,9
 494:21
far 320:4 359:10
 408:17 434:2
 456:12 505:16
 526:22 553:12
 580:17 583:16
Farsi 345:21 356:13
fashion 269:11
 278:4 561:7
father 390:11
fault 267:8 308:19
 404:14
favor 390:8 425:2,4
 425:5,9,11,14,22
 426:7,8,16,17,19
 459:10
favorable 330:14
 330:17 389:18
 394:8 395:15
 396:22 397:21
 398:12 399:18
 455:22 577:1
fax 538:21
FBI 441:7,15
 573:16 574:2
 575:2,6,10
FBI-checking 469:7

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 357 of 771   PageID 1089
In The Matter Of: Larry E. Klayman
May 31, 2018

Page 594

**fear** 465:16
**feared** 475:22
**February** 443:3
554:2
**federal** 273:13
310:9 352:5 407:6
410:22 411:14
441:8,11 485:15
485:22 573:10,13
573:20
**Federation** 569:12
**FedEx** 276:9,10
**fee** 475:20,21 553:6
559:17
**feel** 459:3 465:14
**feeling** 270:5
**feelings** 491:22
**fees** 350:13
**fell** 429:19
**felon** 281:18 283:4
**felt** 274:2 284:17
355:9 364:10,19
391:6 417:22
418:19 435:21
437:4 465:15,16
512:6
**Fernando** 360:2
**Field** 573:16
**Fifth** 394:21
**Fifty** 556:12
**fight** 311:6 371:21
532:18
**fights** 386:8
**figure** 279:11 283:2
414:20 524:6
531:14
**file** 274:18 369:9
423:19,22 436:8
485:10 489:3
507:1 521:6 525:4
525:16 533:13
535:2 536:3,12,17
**filed** 268:14 288:2
331:16,18 377:4
384:11,22 385:9
393:18 394:13,17
399:6,8 405:8
407:13,16 408:20
410:3,15 427:21
428:8 460:1,2,4
460:12,14 475:3,9
485:14 505:14
509:6 512:4
514:18 525:11,14
526:12,15,16
530:6 531:15

533:4,10,14 534:5
534:10 535:16
558:16 559:2
560:1,13 576:19
**files** 269:17,18
530:2
**filing** 385:20 468:15
513:5
**filings** 399:13
**Filipino** 361:3,4
**final** 485:10 573:22
**financial** 424:8
**find** 278:18 282:13
286:7 312:21
319:5,9 344:18,21
348:20 370:14
424:9 429:18
432:16,17 491:5
502:6 505:3,12
506:5 516:8
522:15 530:6
533:13 540:2
559:12
**finding** 522:5
526:10 573:13
**fine** 315:15 367:7
461:14 493:4
499:5 552:3
556:12,14 561:3
576:12 582:11
584:2
**finish** 321:7 446:19
497:6 582:18
**finished** 316:9
446:21 447:2
**fire** 346:8 405:3
**firm** 308:15 539:21
**first** 283:12 302:12
316:11 322:6
326:20 331:2
348:7,18 366:20
384:11,20 394:6
394:20 413:12
421:21 440:10
443:1 460:12
461:3 462:12,22
463:1,5 465:8,12
468:9 475:13
478:11,20 479:16
505:13 506:16
523:1 553:22
563:14 564:12
565:18 573:19
576:7
**fit** 316:1 582:13
**FITCH** 261:11

264:2,17 266:5,9
266:14 272:2
275:15,20 276:21
280:10,14 283:11
283:17,21 284:11
284:21 285:5,10
287:3,11 288:14
288:19 289:10,17
289:22 290:7,16
291:3,13,15,19
293:2,17 294:6
295:20 296:19
297:18 299:7,13
299:21 301:6
303:9,15 304:11
304:14 305:18
306:8 307:13,19
307:22 308:6,13
308:19 309:4,13
312:6,11,14 313:5
313:7 314:2,11,14
314:17 315:4,15
316:4,6,20 317:2
317:16 318:9
320:8,16 321:13
321:18 324:15
331:8 335:5,11
337:4,8 339:4,7
339:12 340:11,19
357:4 359:7 360:9
366:19 367:1,5
371:22 372:3
373:7,21 374:9,13
375:8,11,14
376:13 377:11,18
378:5,8,12,14,19
378:21 379:7,9,18
379:21 381:3,12
381:15,21 382:10
383:16,21 384:3
392:1,10 395:21
396:5,12 397:8,10
397:13 398:5
399:3,10,14,21
400:4 401:2,6,10
402:2 406:6,10
408:3 411:6,16,19
412:15 413:4
415:20 416:1,9
418:15 419:13,20
420:8,12,19
425:15 426:11
427:3,7,14,18,21
428:3,6,13,22
429:5,8,11,17,21
430:3,21 431:2,10

431:18,21 433:17
434:5,8,10 435:1
436:16,19,22
437:17,21 438:8
438:11,17 439:4
439:12,16 440:3,6
443:21 444:4
445:1,20 446:1,5
446:9,14 447:17
448:4,7,12,16
449:8 453:16,21
457:22 460:18,22
461:13 466:11,14
468:8,12,14 470:7
470:22 471:15,19
472:1,3,12 473:12
473:15 474:17
477:16,21 478:3,6
479:15,19 481:1
481:10 483:2,4,7
487:12,16,19
488:7,21 493:2,6
494:9,17 495:20
497:5,14,17 498:6
498:15,18,21
499:5,9,15,18,21
500:3,8,11 501:6
501:9,14,17,19,22
502:7,15 503:2,6
503:22 504:3
506:3,8,14,19
507:1,4,14,18
508:2,6,11,14,17
508:21 510:3,6
512:18,21 513:3
513:11,15,21
514:8,22 515:4,6
516:15 517:1,6,20
518:7,10,20 519:4
519:16,20 520:14
521:7,14,21 522:3
522:8,11,13,18
523:12,16,19
524:3,6,11 526:1
526:3,7,11,20,22
527:6,18,21
528:12 529:6,21
530:11,15 531:3,8
531:19 533:9,20
534:10 535:10,17
535:21 536:2,6,20
537:11,20 538:7
538:10 539:12
540:12 541:16
542:16 543:6
544:2,6 545:18

546:3,8,11,17
547:15,19 548:2,7
549:1,5,11 550:14
551:1,6,9 552:5
552:12,21 553:4,9
553:18,21 554:3
554:16 555:1,8,14
555:19 556:19,22
557:7 558:2,14,22
559:22 560:6,15
560:20 561:1,10
561:14 563:19
564:4,9 566:19
567:3,14 568:3,13
569:3,7 570:19
571:16 572:4,16
572:21 574:11,14
574:20 575:17
576:9 577:6,11,15
577:17,21 578:2
578:11,15,22
579:7 580:1,6,11
580:14,19 581:1,7
581:12,19 582:7
582:18,21 583:5,8
583:22 584:7
**five** 276:17 283:21
308:3 321:2
442:21 506:11,20
526:16 530:7
**five-minute** 320:12
**flash** 272:8,19
273:12
**flavor** 373:17
**fled** 385:17
**flood** 532:10
**flooded** 530:4
**floor** 344:12
**Florida** 262:6
267:16 269:16
**flow** 367:9 448:8
**folks** 312:19 386:14
**follow-up** 331:13
**following** 360:11
**follows** 440:11
**force** 395:7,8
572:13
**forced** 584:6
**forceful** 571:5
**forever** 361:6,7,8
**forgot** 446:13
**form** 277:17 278:1
395:19 461:8
546:4
**formally** 284:8
**former** 349:5 378:2

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 358 of 771   PageID 1090
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 595

387:11 410:22
**formulating** 372:4
**forth** 297:16 368:14
  529:15
**Fortunately** 406:3
**forum** 485:18
**forward** 286:16
  315:2 363:16
  373:19 486:14
  553:15 557:19
  558:10 559:8
  576:21
**forwarded** 293:11
  293:15 294:10,16
**forwarding** 292:15
  293:22
**found** 265:7 281:18
  328:5 347:8 349:4
  363:20 376:18
  378:4 379:3,15
  380:9 381:19
  512:5 563:4
**foundation** 287:20
  396:3,9 416:12
**foundational** 311:2
**four** 268:18 308:3
  363:22 365:9
  376:20 504:16,19
  506:11,19 583:15
**Fourth** 395:1
**frankly** 271:20
  275:4 277:5
  368:19 550:16
  568:6
**fraud** 281:18,19
  328:6 469:4
**fraudulent** 318:5
  525:7
**Frederick** 262:3,4
**free** 340:8 364:1,8
  365:5 376:20
  394:19 423:8
  504:21 562:19
**freedom** 322:7
  457:6
**frequently** 395:13
  396:21 425:8,10
  425:13
**Friday** 267:13
  268:9 276:4,9,10
  584:10
**friend** 332:16
  348:17 360:19
  391:10 405:12,22
  410:21 411:14
  412:8 423:18

424:7 425:3
436:10 495:2,6
510:16 513:1,2
536:15 571:20
**friend's** 533:18
**friends** 352:3 361:7
  365:17 380:22
  456:20 469:8
  548:19
**friendship** 336:14
  336:19 433:1
**front** 298:1 322:6
  328:14 350:9
  357:9 407:22
  409:12 453:4
  460:19 499:14
  537:21 554:18
  559:19
**fsujat@yahoo.com**
  262:8
**fuel** 491:21
**full** 440:3 497:7
**function** 341:10
  548:16
**further** 278:6
  297:12 307:14
  374:6 422:7
  444:21 445:19
  478:9 526:4,8
  556:8 583:9
**future** 267:4 325:15
  471:18 490:14

---

**G**

**G** 264:1
**gambling** 281:19
**gaming** 318:5
**garage** 434:14
**general** 335:7 338:5
  338:15 364:9
  368:4 391:16
  392:5 420:9,20
  428:11 574:8,10
**generally** 353:2
  364:11 368:5
  454:4 578:14
**Georgetown** 325:18
**getting** 282:15,20
  295:14 300:22
  383:14 393:5
  405:5 411:6
  446:10 474:11
  480:10,11,11,18
  504:19,20,20
  578:9
**girl** 564:20

**girls** 357:7 565:1
**give** 268:22 269:13
  274:10 283:19
  326:8 328:10
  363:12 415:8,10
  439:22 447:15
  452:5 455:21,21
  475:2 497:6
  511:16 535:4
  558:18 581:22
**given** 265:17 270:2
  274:9 280:4 366:7
  394:21 432:18
  528:12 557:16
**giving** 301:3 322:10
  501:11,15 528:20
  555:12
**glad** 367:8
**Gloria** 493:13
  494:14,20
**Gmail** 401:19
**go** 264:3 280:14
  285:8 286:7,21
  288:4,20 289:2
  290:1 297:1,19
  300:3 303:15
  309:10 312:12
  316:15,22 319:11
  320:20 321:20
  327:20 334:14,21
  335:14 336:4
  339:2 340:2,8
  341:16 348:10
  356:1 358:5,6
  359:11,13 360:7
  361:19,21 362:3,8
  367:9,20 369:20
  376:5 386:19
  400:4 406:20
  409:11 417:7
  422:7 427:11
  428:10,12,18
  429:8 432:14
  433:3 434:1
  435:16 436:10
  439:14 440:6
  448:7 450:5,8
  451:4 452:2 457:2
  467:7 478:4,8,11
  479:8 486:1 487:2
  487:20 490:1
  491:16 493:11
  497:18 502:18
  503:7,8 504:8
  505:14 527:7,7,9
  533:21 550:6

552:13 555:1,10
556:8 558:10
559:8 564:9
565:15 566:7,10
581:16 582:3,17
**goal** 334:13,21
  335:7,13 336:4
**goals** 374:3
**God's** 453:15
**goes** 272:9 528:8
  533:21 534:1
**going** 267:7,9 269:1
  275:17 279:13
  280:3 284:6,16,19
  286:9,14,18
  287:14 288:15
  290:1 291:8
  293:13 295:10
  296:6,11 303:12
  306:10 311:6,15
  311:16 320:20
  327:8 328:4 329:6
  331:5,12 332:6,21
  333:3,17,19
  336:12,17 338:20
  339:16 340:2
  346:8,20 347:3,4
  347:5 348:5 355:5
  358:17,21 360:8
  362:7 363:16
  367:3 368:14,18
  373:17,18 375:10
  393:3 395:1 407:8
  407:9 409:20
  417:4,6,7 425:6
  426:11 428:10
  429:13 430:15
  433:10,20 436:7
  439:10 447:6,10
  448:1 449:22
  450:6 452:18,21
  453:16,21 457:2
  465:6 467:6
  471:17 474:18,20
  480:6,17 482:20
  484:21 488:12,19
  490:8 491:4 492:3
  493:22 494:9
  498:17 502:4,18
  503:14,18 506:3
  508:2 511:21
  512:1,19 516:4,8
  516:9,10,14,15,19
  520:18 523:13,20
  523:21 526:4,8
  533:11,13 535:12

541:11 542:11
550:19 556:17
557:19 561:19
574:15 580:2,14
580:20 581:5,13
582:2,17
**gonna** 434:20 496:6
  503:8
**good** 264:5,16
  266:8 275:12
  284:17 289:6
  291:13 292:5
  311:9 312:10
  314:1 316:6
  342:20 343:4,8
  345:6,15,18
  356:14 359:9
  364:3 365:4
  383:17 411:11
  437:19 440:14,15
  461:12 493:18
  500:22 501:1
  517:21 532:19
  548:22 581:7
**gotten** 294:20
  373:17 423:8
  528:21
**government** 358:13
  385:17 395:14
  396:21 453:8
  480:13,18,21,22
  569:12
**governor** 479:13
**governors** 388:6,8
  388:13,18 394:18
  405:9,11 407:16
  479:13 481:5
  571:12,17,21
  572:6
**grab** 327:21
**grabbed** 327:2,14
**graduated** 441:5
**grant** 422:1
**grapple** 282:8
**great** 528:12
**greater** 483:12
**Green** 379:6
**greet** 326:4
**grossly** 269:10
**ground** 279:7
**grounds** 307:20
  524:5
**group** 305:15
**groups** 385:21,22
**guarantee** 358:15
**guess** 265:11 313:2

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 359 of 771   PageID 1091
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  596

382:21 442:15
447:14 449:8
534:4 581:8
**guest** 510:19
**guilty** 516:9
**guy** 377:20 524:17
524:19 533:17
564:21,22 575:3
**guys** 575:4

**H**

**H** 261:20
**H-e-r-m-e-s** 354:8
567:20
**haberdashery**
353:8
**half** 268:19 321:10
480:12,13,18
510:20
**hallway** 344:13
459:1 465:13,21
**hand** 275:7 311:5
326:8 327:2,14,21
439:21
**handed** 292:6 324:2
**handle** 432:8
**handled** 528:4
**hands** 496:7
**handwriting** 289:8
538:3,6
**happen** 355:3 453:3
**happened** 332:2
333:22 334:9,9
336:3 363:20
384:20 386:11
413:13 445:7
453:5 491:6
517:19 519:3
568:9
**happening** 265:22
361:19 456:1
**happens** 537:7
**happy** 264:13
309:17 432:15
**harass** 344:15
**harassed** 342:22
355:10 369:22
370:6 384:10
385:11
**harasser** 334:14
335:16 341:8
**harassing** 331:3,22
514:5,14
**harassment** 331:16
331:20 341:15
349:17 385:20

394:22 450:9
485:12,16 486:3
487:4,22 489:4
490:9 491:13,18
494:22 514:19
533:15 534:11,15
**hard** 267:9 362:13
368:22 371:2
**hard-hitting** 571:6
572:13
**harder** 356:17
357:7
**harm** 582:19
**hate** 270:6 559:19
**he'll** 340:16 448:7
**head** 356:22 388:12
388:13 414:5
436:21
**healthy** 547:3
**hear** 264:14 279:4,8
280:3 281:14
295:3 378:22
387:16 404:17
445:15 476:17
487:16 528:7
582:12
**heard** 264:21
279:15 312:7
373:7 379:9
455:14 481:22
529:13,15 535:10
560:15 568:3
**hearing** 260:11
261:1,3,10 264:8
264:11,11 265:5
265:13,21 267:10
268:16 270:1,16
273:17 276:22
279:19,20 282:9
288:10 295:9
306:2,15 312:18
316:8 415:4,9
417:8 418:1 439:2
440:16 442:9
449:9 523:6
528:19 531:7,21
532:7 584:9
**hears** 510:20
**hearsay** 310:14
466:13
**heart** 357:14
**heavily** 352:20
**heavy** 498:12,14
**held** 338:14
**Hello** 266:9
**help** 265:20 296:6

301:13 307:4
310:3 317:9
318:22 332:10,12
332:15,17,19
333:3 334:4
336:12,17 349:19
350:10 357:19
358:11 359:20
363:9 401:15,15
401:22 402:20
403:17 404:4,11
406:1 423:18
424:15,18,22
425:2 434:16
436:7,10 437:14
437:15 450:7
452:2,16 454:15
455:3,11 456:16
458:9,18 469:17
472:7 474:6,9,9
474:11,13,13
513:17,20 525:3
572:10
**helped** 301:14,21
317:10,11,12
348:20 394:15
470:17 475:1
512:13 544:18
**helpful** 271:8 278:9
278:14,18 314:2
380:13 574:4
**helping** 342:7
359:19 387:20
472:10
**helps** 314:1 396:13
**Hermes** 354:7,8
567:19
**hesitate** 574:5
**high** 384:1
**higher** 486:10
**highlighted** 283:13
**highly** 353:3
**Hill** 322:6 452:22
455:18
**Hillary** 388:15
479:11,16 481:4
**Hills** 353:1 364:13
365:1 496:19
**hip** 270:19
**hire** 483:14
**hired** 345:19,20
389:22
**Hispanic** 361:2
**history** 454:1
**Hoc** 261:3,10
**hold** 267:5 284:11

309:16 508:6
531:7 567:1,8,10
567:22
**holding** 566:12
**hole** 491:2
**Hollywood** 262:6
**home** 380:8 512:1
**home?'** 511:14
**honest** 425:21
501:12,16
**honestly** 417:20
502:11
**honesty** 527:4
**Honor** 270:3 280:8
285:8 286:18
288:13 292:20
293:1,14 295:12
295:13 296:14,16
299:5,18 309:2,21
313:10 314:19
316:14 318:12
319:22 331:13
367:8 377:9 378:7
380:4 396:11
402:1 414:13
428:10 437:20
446:12 460:21
494:6 499:2
501:11 502:5
521:11 526:10
528:11 531:5
533:19 534:17
535:18 541:14
542:10 544:5
546:6 550:11
553:8 554:14
559:5 566:21
572:19 575:15
579:21 580:2
581:16 582:6
583:17
**Honors** 266:8 283:8
**hope** 282:18 314:1
581:21
**hopefully** 446:16
**hopes** 311:4
**hoping** 321:8
**hospital** 355:6
**host** 382:15 383:9
383:10 388:20
564:15
**hot** 401:1
**hotel** 582:21
**hour** 277:2 321:10
**hours** 308:9 312:16
393:2 538:14

583:1,14,15
**house** 379:16 450:1
450:7 453:7
**housekeeping** 284:3
**hug** 326:8 465:12
**huge** 434:20
**hugged** 459:3
**human** 385:1
**humor** 406:9
**hundred** 386:1,6
**hundreds** 494:3
**hurt** 480:6,18 491:3
**husband** 360:21
375:5 378:2
408:17 419:17

**I**

**idea** 312:10 416:10
439:9 468:3,5,6
468:15,20 481:13
**identified** 310:12
413:17 543:18
**identify** 444:7
550:20
**identifying** 383:18
**ignore** 506:20
**ignored** 475:14
**III** 261:20
**imagine** 321:3
**immediately** 273:5
273:12 276:10
360:11
**implication** 515:3
**important** 282:14
422:19 470:6
535:6 536:4
**impression** 467:22
501:3
**impropriety** 274:6
**inadvertently**
543:14
**incapable** 433:6
**incestuous** 270:21
**incident** 520:8
**inclined** 456:16
**including** 302:22
405:10,11 548:19
**income** 566:18
568:19
**incompetence**
382:6
**incomplete** 280:19
282:5
**incorrect** 306:8
478:14,17
**incorrectly** 479:6

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 360 of 771   PageID 1092
In The Matter Of: Larry E. Klayman
May 31, 2018

Page 597

indicated 321:7
indicating 502:16
  507:11
individual 449:21
individuals 570:2
indoor 266:16
indulgence 316:15
industrious 353:4
influence 395:13
  396:20
influences 395:13
  396:21
inform 265:21
information 265:20
  271:4 273:11
  275:13 376:22
  529:1 574:3
informed 283:3
  320:21 571:22
Ing 468:21
initial 324:21
  392:22 394:7
  573:12
initially 326:1
  410:5 443:3
injunction 406:20
  422:2,6
innuendo 373:19
inside 394:4 436:21
  580:9
insofar 583:17
instances 279:10
instructed 296:17
  296:20
instructions 282:15
insurance 525:4
intended 281:7
intent 273:20 309:3
  309:7
intentionally
  269:10,11 555:18
interest 270:11
  339:18 345:7
  346:3 384:16
  385:6 475:15
  489:20
interested 322:17
  381:4 508:3
interim 462:11
intermediary
  565:20
internal 385:10
internally 384:11
  385:1 528:6
internet 445:5,10
  445:11,17 561:18

563:4
internist 351:21
interposed 310:15
interrupt 438:2
intervene 459:9
intervening 503:14
interview 322:10,11
  371:14,16 375:7
  400:16 403:6
interviews 368:15
  538:20
intimate 328:17,19
  329:12,13,14
introduce 367:3
introduced 322:13
  450:18
investigate 575:2,6
  575:11
investigated 315:1
investigation 269:1
  408:18 441:9,12
  442:4,7 457:12
  485:11,12 573:10
  573:20
investigative
  573:11
investigator 439:8
  440:18 441:13
invited 325:17
  329:17
invoke 438:6,9
involve 527:10
involved 457:1,11
  480:19 567:19
involving 486:9
  529:15
Iran 335:2 346:3
  371:14 389:16
  390:9 402:17
  457:6 562:15
Iran-Contra 457:12
Iranian 322:7 457:1
  562:5
Iranians 352:15
irrelevant 516:12
issue 274:1 280:9
  280:11 282:7
  283:6 284:4 312:4
  320:15,18 374:11
  391:16 392:5
  409:22 422:8
  443:2 462:15
  512:22 524:5
  535:8,11 568:14
  576:18
issues 285:12 291:7

413:17 435:19
  457:2 522:21
  535:13 536:10
  547:10 548:11,15
It'll 359:14
items 308:4

____ J ____

J 262:3,4
J-C-P-O-A 562:10
  562:12,13
Jackson 339:15
  340:10 341:14
  355:16
jam 268:16 373:2
  382:18
Jame 373:2 382:18
January 485:8
  564:1 579:10,12
  579:18
Jessica 510:16,19
  511:12 513:17
  514:14 527:16
Jessica's 514:15
Jewish 364:13,16
Jimmy 387:10
job 296:2 341:10
  353:16 362:3
  382:13 383:9
  423:6 441:20
  564:6,12 565:16
  568:11
jobs 404:13 566:13
Joe 455:11,14
John 410:5 449:21
  450:13 453:1
  454:15,19
JohnGChalangi...
  402:10
Johnson 575:21
  577:10 579:9
joined 479:11
joining 440:20
joke 352:18
Journals 563:11
Joy 355:18 356:4
judge 407:21 408:6
  408:7,16 409:12
  410:4,4,7,14,22
  411:1,3,14 412:3
  412:8,19 413:19
  416:5,10,14,20
  418:16 421:10
  427:16 485:22
  519:5 523:9
  527:13

judgement 278:13
judges 395:16
  397:2 444:12
judgment 278:15
  519:13 521:17,22
  522:4 529:11
Judicial 408:21
July 505:14
jumped 335:9,11
  360:6
June 303:19 304:4
  402:8 416:17
  418:8,10 444:11
  510:12,13,18
  512:2 584:10
jurisdiction 315:5,6
justice 573:6,9,11

____ K ____

K-a-v-e-h 342:8
  424:6
Kamer 574:9
Katherine 301:4,15
  307:7 317:11
Kathleen 318:14
  458:11 459:1,2,13
  460:15 468:22
  474:3 475:1
  492:17 544:20
Kaveh 342:8,10,16
  343:11 356:13
  369:21,21 370:7
  370:16,18,19
  423:19 424:6,13
  424:14,18 426:20
  432:8,11 436:10
  437:14,15
keep 266:10 276:16
  287:4 312:14
  343:12 344:3
  480:15 538:15
  547:6
keeping 276:16
  321:6 344:5
keeps 538:13,22
kept 480:10
Kersangi 348:17
Kevin 263:4 292:12
  294:15 320:21
  439:15 440:5,8
  446:2
key 449:13 507:16
keyed 373:14,15
keys 366:4,5,8
  434:19
Khomeini 389:19

390:13
kill 355:6 358:6
killed 322:16
killing 355:2
Kim 260:22 261:4
kind 265:6 271:11
  296:5 369:17
  446:14 465:17
  467:5 508:17
kiss 326:5,8 452:10
kissed 326:12,13
kitchen 511:3
Klayman 260:5
  262:10 265:4,16
  266:5,7,10,15
  272:4,20 273:2,9
  274:16 275:17
  276:11 278:7
  280:8,11,15 285:7
  285:19 286:8,14
  286:18 287:14,17
  288:13 289:5,12
  289:18 290:22
  291:6 292:9,20
  293:14 294:1,4,13
  295:2,12 296:4,11
  296:14 297:7
  299:18 302:6,10
  303:13 306:18
  307:14,20 309:1,5
  309:21 310:5,18
  311:8,11 313:10
  314:6,16,19
  315:16 316:12,14
  316:22 317:4,20
  318:11,13 319:4
  319:22 321:18,20
  322:2 324:20
  331:6,12,14
  335:10,12 337:7,9
  339:6,8,11,13,14
  340:21 356:22
  357:11 359:5,9,12
  360:15,17 363:14
  367:3,7,10 372:2
  372:6,8 373:10,11
  373:21 374:8,10
  374:15,17 375:10
  375:13,22 376:2
  377:8,13,15,19
  378:6,10,13,16,17
  379:1,12,13 380:1
  380:3,5,13,15
  381:20 382:8,11
  383:20 384:5
  386:21 387:18,21

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 361 of 771   PageID 1093
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 598

392:9,11 396:10
396:17 397:4,15
398:8 399:9,12,16
400:5 401:3,6,12
401:14,18,22
402:4,6 404:19
406:8,11 408:8
411:8,10,12,18
412:1,17 413:8
414:6,13,17 415:1
415:22 416:3,4,12
416:13,22 417:4,7
417:11 418:17,20
419:15 420:1,5,15
421:1 425:17
426:3,13,21 427:9
427:16,20 428:1,4
428:9,15,20 429:9
429:12,17,19
430:2,5,10,11
431:4,13,20 432:1
433:19 435:6
436:14,18 437:1,3
437:18 438:6,9
439:6 442:4
443:15 444:3,22
445:3,19 446:12
446:22 447:3,9
448:16,20 449:11
451:22 453:18
454:1,2 458:2,4
460:20 461:2,14
461:15 462:4,7,8
462:19 464:14
465:7 466:9,12,16
467:7,8 468:11,13
468:17,19 470:12
471:2,16,20 472:2
472:6,14 473:19
474:22 475:14
476:14,17 477:10
477:19 478:2,5,8
478:10 480:1
481:3,11,14 482:6
483:10 485:1,5
487:10,17 488:6,9
488:17 489:1,2
490:3 491:3,9
492:7 493:3,4,8
493:10 494:5,16
494:19 495:22
497:9,22 498:10
498:17 499:1,7,11
499:17,20 500:2,5
500:9,13 501:8,11
501:15,18,20

502:1,3,5,8,12,17
503:6,8,9 504:5,7
506:1,10,17,22
507:6,10,12,16,20
508:1,8,10,13,15
509:2,22 510:7
513:10,16 514:2
514:12 515:2,7
516:14,18 517:13
517:20 519:8,9
520:16,17 521:3,6
521:8,10,13,16
522:2,5,9,12
523:3,5,14,18,19
523:21 524:10,13
526:5,9,14,20,22
527:5,10,20
528:10,14 529:19
530:1,14,18 531:1
531:5,10,22
532:17 533:12
534:13,17 535:11
535:15,18,22
536:3,7 537:4,5
537:13,15,17
538:1,8,11 539:13
539:20 540:14
541:10,14,18
542:10,13,19
543:4,9,13,17
544:4,8,9,14,17
545:10,19 546:6,9
546:13,18,20
547:13,17,22
548:9 549:3,10,16
550:11,15 551:3
551:12,21,22
552:9,11,13,14
553:7,10,19 554:2
554:5,14,18,21
555:2,6,10,17,20
555:22 556:20
557:2,6,9,11
558:7,17 559:1
560:4,7,10,12,17
560:22 561:3,8,12
561:16 563:2
564:9,10 566:21
567:6,16 568:12
568:18 569:2,4,9
569:10 570:15
571:3,4,14,19
572:9,18,22 573:3
574:13,17,22
575:14,19 576:11
576:13 577:5,18

578:4,13,16 579:4
579:8,20 580:2,8
580:12 581:15
582:5,11,16 583:3
583:17 584:3
**Klayman's** 269:19
272:18 285:6
302:13 304:3
384:4
**knew** 329:13
381:11,14 396:6
405:7 406:14
437:16 454:19
455:18 456:21
480:2,5 498:5
511:7,22 515:20
**know** 265:8,13
267:2 268:8
269:14 270:17
272:9 274:4,12
275:2,3,6,12
276:5,12,13
279:15,21 281:1
281:10 282:1
283:7 284:13
286:11,13 288:11
303:20,21 318:7
318:18 319:8
320:5,19 326:3,9
326:11 328:12
329:11 331:4
340:1 345:13
346:20 353:8,11
354:18,19 355:9
359:14 361:18
362:5,13,14,19
369:5 373:5,18
376:4 395:18
397:3 409:2
414:17 417:14
418:2 419:11
421:6 422:14
424:21 426:19
431:8 433:22
445:18 447:3,7,10
448:2 450:22
454:3 455:3,8,13
459:7 461:7 466:5
466:19 467:1,16
469:6 474:6,6,16
475:11 481:2
484:6 489:13
490:5 495:16,16
496:8 498:7
500:22 502:20
507:21 509:17,19

515:17 521:7
528:14,14 529:1
530:7,14 531:11
533:8,12 536:7
540:11,20,21
544:12 545:16,18
555:20 568:5
571:15,16 575:7
576:16 580:17
582:17 583:9
584:3,4
**knowing** 290:11
481:20
**knowledge** 380:18
447:15 469:18
475:9 579:1
**known** 371:4,8
390:7,11 395:17
397:2 532:5
**knows** 267:15
278:10 447:6,18
531:16 540:11
550:1
**Kollar-Kotelly**
408:10 485:22
**Kotelly** 408:16
410:7,14 412:20
413:19 415:3
416:5,10,15 418:6
418:16 421:10
**Kotelly's** 416:20
427:17

_____

**L**

**L-a-b** 566:3
**LA** 335:11 336:4
339:16 341:17
346:14,14,15,17
347:7 358:3,18
360:18 361:14,18
362:5,7,9,12
363:4,5,6,8,18,19
364:14,21 367:15
368:5,15 369:20
382:14 397:21
401:18 402:7,16
403:6 412:9
428:16,17 451:4
458:20 553:13,17
557:4 584:4
**lack** 382:6
**language** 406:18
465:7,16,18
**lapsed** 487:6 488:2
**LARKIN** 261:13
293:3 430:8 462:5

522:15 537:9,14
**Larry** 260:5 262:10
294:3 319:4 327:2
327:15 346:13
358:5 359:14
387:21 401:18
402:6,21 403:5
442:4 450:15
452:7 464:13
475:14 485:9,19
541:10 546:20
**Las** 281:19 283:4
318:5 469:5
**late** 378:1 582:3
**latitude** 528:11,13
528:20 531:18
**law** 262:4 271:2
312:1,4 314:22
315:6 461:8
473:14 539:21
**lawsuit** 334:1 372:5
394:5,9 487:3,22
505:6 524:15
527:12 529:9,13
529:15,18 572:13
**lawsuits** 369:10
405:5 408:20
436:8 525:9,12
527:3,6,7,10
528:2 571:6
**lawyer** 270:6
311:21 315:1
317:21 318:20,21
318:22 333:1
358:13 359:8
371:3 387:13
394:10,11 395:2
406:18 420:16
424:10 432:8,11
436:5 447:17
469:9,11,16 471:4
471:10,14 474:14
477:11,12 481:2
483:14,18 484:17
487:2,9,21 488:5
488:12,13 492:4
493:12 494:21
499:3,7 541:10
547:11 548:12
550:22 552:6
**lawyers** 276:16
316:8 317:15
320:3,3 407:14
442:1
**lay** 287:20 396:2,9
416:12

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 362 of 771   PageID 1094
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 599

**laying** 510:21
**lead** 531:15,17
**leader** 390:13
**leading** 299:6
  427:16
**leaned** 452:10
**learn** 442:17 530:1
**learned** 281:6
**lease** 366:20 376:19
  376:20,21 504:8
**leased** 365:6
**leave** 283:8 287:18
  290:9 338:21
  340:8 341:3 347:4
  347:9 363:12
  511:15 583:6
**leave.'** 511:16
**leaving** 446:13
  578:22
**leeway** 583:18
**left** 325:2 386:3,20
  387:9 390:8
  408:17,17 510:16
  511:21 543:14
  565:18 566:6,15
  577:7,12
**left-hand** 508:9,12
**legal** 327:16 336:13
  336:18 362:10
  369:6 372:4
  375:20 378:15
  392:12 411:2
  419:18 421:14
  461:4,9 469:13
  470:13 471:18
  472:8 503:15
  530:8 539:6
  549:21 558:10
  570:11,20 571:1
  573:22 576:22
**legally** 312:2
**Leida** 564:20
**LEKlayman@gm...**
  402:6
**lessee** 504:21
**let's** 328:20 355:13
  363:5 376:8
  396:18 406:6
  450:5 476:17
  479:8 480:15
  504:8
**letter** 268:22 269:2
  273:1,3 293:12
  294:12,21 295:1,3
  295:7,10,19,21
  296:3 297:3 302:6

302:9 303:2 307:2
  307:4 430:18
  539:15 540:8,21
  540:22 541:20
  542:1,7,16,17,21
  543:5,18 544:19
  546:10,14 552:3,4
  552:22 554:11
  555:5 556:2 558:5
  561:1 569:11,14
  569:20 570:20
  573:4,8 574:18
  575:21 576:10,14
  577:2,7,10,19
  578:10,12 579:1,5
  579:9,16,20
**letterhead** 300:10
**letters** 419:7 540:19
  544:11 548:18
**Lewinsky** 408:18
**licensed** 414:18
**Lieberman** 455:11
  455:15
**life** 490:21 491:5
  496:6,6 497:10
  566:22 567:10,21
  567:22 568:10
**life's** 267:5 566:22
  567:7
**light** 268:17 401:8
**liked** 528:21
**likelihood** 280:16
**limitations** 484:4,7
**line** 345:22 359:10
  380:16 391:15,16
  392:4 406:13
  481:12 517:14
  527:1 555:7
  565:21
**line'** 392:4
**list** 311:6 313:11
  416:21 472:15
**listening** 334:3
  345:2
**literal** 356:14
**litigated** 480:20
**litigation** 370:13
  374:18 375:16,16
**little** 266:12 308:6
  313:3 326:17
  328:21 359:11
  360:6 389:1
  395:22 406:9
  411:7 438:14,17
  454:1 482:15
  502:19 507:19

522:11 535:3
  580:16,20
**live** 270:4 271:15
  271:16 359:18
  360:1,1,4 361:9
  361:15 364:5
  369:20 376:7
  423:10 434:3
**lived** 360:4 386:22
  424:8
**living** 318:1 342:16
  342:22 343:11
  353:18 361:16
  414:8 456:12
**loan** 318:2,2
**lobbied** 572:2,5
**lobby** 389:2
**lobbying** 449:1
  456:6
**Local** 569:12
**located** 376:8
**locked** 446:7
**long** 265:1 281:16
  309:14 320:19
  347:20 351:21
  354:17 413:11,12
  413:14 441:15,17
  452:18 483:21
  484:16 503:19
  504:1 505:22
  524:14 565:4,8
**longer** 324:11
  376:21 438:20
**look** 265:7 266:22
  280:17 286:3
  292:18 293:21
  294:9 297:22
  300:6 301:5 302:3
  302:18 303:17
  304:10 305:9
  306:14 307:12
  314:16 417:9
  428:9 435:11
  443:1 484:2
  499:12,14 500:2,6
  500:18 501:1
  539:20 555:10
  576:6 579:10
**looked** 266:19
  310:7 443:4,5
  498:3
**looking** 265:12
  302:4 307:11
  311:22 368:9,11
  435:9,11,17,19
  445:7 475:6

510:10 520:22
  521:15 543:2
  559:9
**looks** 304:1 500:22
  508:4
**Los** 334:15,18,22
  335:4,16,17 338:9
  339:2 341:3,11
  343:15 344:1
  351:9,14,15 352:1
  352:10,11,18,19
  352:20 371:6
  376:7,7 382:22
  383:12 391:19
  392:7 393:5
  400:15 406:21
  407:17 410:17
  411:5 414:2,9,12
  415:15 422:9
  427:17 436:7
  450:8 486:2
  525:10,17 551:15
  556:5 564:8,13
  572:15
**lose** 291:4 539:6
  541:11
**lost** 269:17 404:13
  419:9 421:22
  422:12 520:9
  568:10
**lot** 265:9 272:5,9
  273:18,19 280:5
  309:11 321:3
  335:3,17 336:9
  358:12 364:5
  367:13 376:12
  383:3 386:8
  391:17 392:5
  395:6 410:15
  413:9 421:17
  425:20 465:4
  503:16 580:3,12
  581:16
**lots** 330:10
**loud** 516:16
**love** 339:18 419:6,7
  422:18 491:18,22
  548:17,18
**loved** 360:5
**lower** 435:17,18
**lunch** 282:12
  321:16 492:8,12
**luncheon** 438:21
**Luxury** 509:7

───────────
**M**

**M** 260:22 261:4
**M-e-h-r-a-n** 317:18
**ma'am** 397:8
  527:18,18
**Madam** 379:18
  502:16
**Mahmonir** 403:8
  413:16
**MahmonirRahim...**
  402:9
**mail** 268:4 298:8
  300:19 301:1,1
**mailing** 540:18
**main** 564:6
**maintain** 274:13
**maintained** 274:17
  275:9 341:13
  342:6
**maintaining** 274:19
  275:1
**major** 346:3
**makeup** 498:12,14
  499:16 500:4
**making** 340:13
  341:21 342:14
  416:5 529:2
  558:21 559:1
  566:16 567:12,16
  568:22
**mall** 328:14
**man** 380:9 453:15
  465:10 497:10
  511:3,6,10,10
**management**
  515:21
**manager** 296:10
  368:7,8 509:18
  510:15 511:7
  515:19
**managers** 385:12
  404:21
**managing** 386:3,18
**manner** 273:14
  278:4
**Manouchehr**
  322:15,17
**March** 377:4 399:7
  580:10
**marching** 278:2
**marginally** 395:22
**mark** 515:16
**marked** 292:7
  300:7 484:22
**married** 377:16,20
  378:3 379:5,16
  380:10

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 363 of 771   PageID 1095
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 600

MARY 261:13
Maryland 441:1,6
Mass 544:3
Massachusetts
  543:19 545:1,8
matter 260:4 265:1
  277:15,21 310:16
  375:16 439:22
  452:3,16 459:9
  464:5 467:3
  512:15 516:7
  528:1 532:6 553:2
  570:7 573:21
  574:7 580:12
matters 264:10
  276:1 277:7
  441:14 447:19
  464:6 472:8
  532:13 538:20
  583:10
maximum 321:3
McCain 454:15,19
me?' 511:15
mean 285:2 290:22
  300:21 301:6
  303:10,12 304:1
  335:2 370:4 371:1
  371:8 373:16
  380:17 386:13
  425:19 436:9
  447:13 462:3,18
  464:4 466:20
  473:3 479:2 493:5
  493:8 494:6,7
  547:14,18 550:9
  558:9 563:17
  568:5,20 577:3
  578:5 580:7 581:6
  581:20
meaning 391:16
  392:4 432:6
means 308:20
  310:21 380:20
  422:6 544:13
  571:2
Medhi 564:22
medical 351:13,15
  354:10,15 358:1
  415:14
medium 302:16
meet 296:11 334:8
  349:8 430:15
  463:15
meeting 296:1
  337:5,6 430:14
  452:22 459:7

462:13 467:22
meetings 282:12
  337:16,19 338:14
  369:13 458:22
  463:3 464:2,4,12
  464:18
Mehdi 332:3 341:8
Mehran 281:12
  317:14
member 261:14,16
  572:5
members 264:8
  276:22 381:8
  479:12 487:13,15
  534:9
memorandum
  430:13 431:6,12
memory 452:19
men's 353:8
mention 331:19
mentioned 334:20
  433:16 454:16
  515:8
Mercedes 423:15
  434:1,19
mess 503:18
message 292:15
  293:22 294:10,17
  325:2
messages 306:5,7
  330:7
met 322:6 328:13
  329:1 330:20
  331:2 334:7 336:8
  336:16 337:2
  393:2 452:15
  455:20 458:7,11
  462:22 463:1,5
  464:7 466:21
  467:10 470:11
  485:10
MICHAEL 261:15
middle 294:9,17
  344:10 492:1
million 352:15
  442:21,21
mind 311:4 312:14
  321:6 448:13
  491:2,4 547:6
mine 349:5 405:22
  410:21 411:14
  412:8 437:12
  525:1 583:4
minute 267:12
  268:15 271:19
  276:3,14 283:17

283:19 320:16
  378:5 399:3 429:5
  497:5 506:14
  508:7 513:3
  521:21 536:20
  560:20 580:20
  581:2
minutes 277:2
  283:22 308:7
  316:19 321:2
  383:22 523:2
  581:11 582:1,2,2
mischaracterizati...
  272:5
mischaracterizes
  324:13
missed 392:2 486:6
  579:19
missing 287:11
mistake 339:13
  540:6
mistaken 366:22
  514:10
mistakes 421:15
mistreat 366:17
mix 424:16
Mm-hmm 304:14
  401:17 565:11
  569:3
moderate 552:9
moderately 312:20
Mohammadi
  322:14,15
moment 432:18
  579:10
moments 511:10
Monday 447:14
money 296:7
  327:15 332:18,22
  333:19 363:8
  393:9 405:7
  435:19 494:4
  520:1 521:19
  522:6,14 565:14
  567:12,16
Monica 365:1
  408:18
month 339:5
  366:20 442:21,22
  560:1
months 363:22,22
  364:1,8 365:5,9
  365:10 376:20
  423:8 484:18
  487:5 488:1
  504:16,19,21

morning 264:5,16
  264:17 266:8,13
  285:12 291:13,14
  292:4,5 316:6
  317:6 488:20
  549:20 583:12
Morton's 449:13
motion 264:12,15
  264:15 268:14
  280:3 320:9 488:7
  494:10 524:8
motions 272:21
mount 532:12
movant 272:3
move 286:16 288:9
  288:22 289:15
  295:16 299:4
  306:10 307:17
  313:22 314:8
  315:21 331:6
  335:4 338:8,12
  351:15 363:5,19
  375:21 377:12
  402:20 466:9,12
  487:10 494:5
  501:14,19,22
  520:5,9 522:22
  523:21 535:13
  541:14 542:10
  546:14 550:11
  551:1,3 561:10
  572:18 575:14
  576:21 579:4,20
moved 268:11
  269:17 274:7
  284:8 299:14,14
  299:14 428:16
  486:14 550:17
  551:16 553:15
moving 284:12
  290:17 363:7
  372:4 537:12
Muslim 364:12,16
Muslims 364:6

_____
        N
_____
N 263:1 264:1
  439:1,1,1
N-I-A-C 562:1,2
naked 510:21 514:6
  514:21 533:18
  536:15
name 304:8,8
  317:13,18 318:14
  318:15 342:8
  349:4,14 371:6

407:4,5 408:9
  411:1,15 440:4
  449:21 454:7
  479:2 549:22
  565:22 571:12
named 283:5
  338:15 351:21
  388:18 390:2
  479:17,20 571:17
naming 405:9
narrative 428:12
narrow 529:21
nasal 266:12
nasty 369:17
national 402:20
  562:5
natural 446:15
necessary 274:2
  436:9 570:21
need 264:10 279:11
  284:22 286:2,11
  288:7 290:1,18,20
  313:14 375:8
  401:15 427:7
  433:13 442:2
  462:19 464:13
  500:11 501:7
  514:8 522:22
  524:6 532:15,16
  535:12 541:9
  568:15 580:21
needed 307:15
  351:22 354:19
  361:5 362:3 423:5
  423:19 458:18
  474:5,12 500:10
  536:17
needs 267:4,5 382:2
  396:2 425:6 447:5
  583:1
nefarious 273:18
negative 343:19
negligent 269:10
negotiate 338:7,12
  570:3
neither 317:15
  379:18
Nella 360:19 361:1
  361:1,16
nervous 354:20
Net 442:12,18
  443:10
network 334:15
  336:5 345:20
  351:10 352:4,10
  367:14 389:10

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 364 of 771   PageID 1096
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 601

550:2
**networks** 382:14,22
  383:1,1,12 387:5
**neutral** 270:17
**never** 268:12 319:3
  320:6 328:13
  331:16 361:21
  366:4 375:2 403:4
  403:20 404:8
  405:8 409:9,10
  424:12 445:10
  461:4 466:17
  470:11 472:22
  473:2,7 480:20,21
  481:17 482:10
  512:5 514:18
  515:15 517:17,17
  518:18 524:19,19
  524:21 525:8
  540:8 545:7,14
  556:15,18 557:21
  559:15,16 563:16
**new** 266:16 276:2
  277:6 279:7,22
  363:21 377:22
  428:18,18 435:7
  435:14 564:7
  581:17
**news** 334:15 336:5
  344:2,9 345:13,19
  345:20 346:16,20
  347:3 348:5 351:9
  352:4,10 367:14
  382:14 383:11
  389:10,16 442:16
  550:2
**newspaper** 402:17
**NIAC** 562:3
**nice** 367:16 500:15
**night** 291:8 328:18
  449:13
**nine** 308:3
**NITV** 371:6 372:15
  380:11 382:17,18
  382:19
**nods** 356:22
**non-discovery**
  568:8
**nonpartisan** 409:17
**nonresponsive**
  487:11 488:6
  494:6 549:2,6
**noon** 384:1
**North** 457:15
**Northwest** 539:21
  540:5 573:17

**Notary** 261:5
**note** 265:14 308:1
  377:2,7 382:5
  515:18,22 558:14
  559:22 583:13
**noted** 439:12
**notes** 290:7 483:5
**notice** 270:1 363:12
**notification** 519:2
**notified** 316:10
  510:14
**notify** 516:2
**notifying** 304:2
**notwithstanding**
  410:13
**November** 288:3
  298:6 306:22
  307:9 539:16
  542:1 543:5,9,18
  561:2
**number** 278:18
  281:17 286:3,3
  288:22 289:6,19
  292:7,22 293:4
  298:1 299:15
  300:6 305:12
  307:18 308:2
  316:20 323:9,17
  323:18 324:1
  402:17 416:20
  421:14 465:2
  469:14 472:15
  479:13 484:22
  503:3 566:3
**numbered** 287:10
**numbers** 300:8
  443:6,7
**Nuys** 434:2,19
  530:3 532:10
  533:2
**NW** 261:2

---

**O**

**O** 264:1 439:1,1,1
**o'clock** 437:20
  438:15,16,18
  582:19
**O'Connell** 263:4
  320:21 321:14
  438:3 439:15
  440:5,8,14 446:2
**O'Connell's** 321:10
**O'Connor** 445:4
**Oaks** 360:4 361:10
  361:11
**oath** 291:17,17

448:14 493:1
  514:4 560:11
**Obama** 389:17
**object** 286:14 290:1
  291:1 299:8,12,16
  299:16,17,19
  313:14,18,19
  314:19 319:22
  320:7 395:19
  396:10 420:6
  466:9 524:5
**objected** 285:21
**objection** 287:6,9
  293:14 295:12
  299:10 300:1,2
  307:20 311:19,19
  312:6 314:3,4
  315:3 318:7 320:8
  324:13 359:4
  373:16 377:17,18
  395:22 396:11
  419:19 420:4,7
  426:9 436:12
  439:12 453:13,22
  471:15,19 472:1
  477:16 513:9,19
  513:22 515:5,6
  516:6,13 523:11
  523:11 528:1
  539:11 540:10
  541:17 542:15
  545:17 546:2,4,12
  546:16 547:12
  550:13 551:5
  561:13,14 570:14
  571:13 572:20
  573:1,2 575:16
  578:5 579:6,22
**objections** 284:16
  285:6,20 287:7
  290:13 309:16
  310:14 314:10
  439:7
**objects** 286:8 288:9
  289:18
**obligation** 266:20
  270:10 282:19
  555:16
**obligations** 376:19
  473:17
**observation** 324:15
  340:20
**observations**
  340:14,16 514:3
**observe** 264:6
  315:4

**observed** 348:3
**observing** 308:14
**obstruction** 573:9
**obtained** 264:20
  306:9
**obviously** 267:6
  314:4 377:4 494:7
  527:11 567:2,21
**occasion** 495:10
**occupation** 440:17
**occur** 370:13
**occurred** 284:5
  459:7
**occurs** 582:3
**OCR** 485:11 576:17
  576:18 578:6
**October** 292:9,10
  292:11,12 293:8
  297:5 300:11,14
  460:2,14 507:2
**Off-the-record**
  487:14 534:8
**offer** 343:22
**offered** 310:16
  332:12,14 336:14
  336:18
**offering** 296:2
  365:5
**office** 262:4 266:4
  298:5,8 300:10,13
  301:17 324:1,7
  338:5 341:17
  353:2 414:2
  440:18,20 441:18
  452:14 458:15
  463:1,6 464:6,7
  465:8 467:15
  468:1 469:19
  470:1,11 509:10
  509:11,13 540:17
  545:4,7,15 573:16
  574:6 575:22
  578:6
**official** 481:6
**oh** 287:12 306:21
  430:5 438:11
  522:11 544:8
  577:14
**ok** 275:15 298:13
  300:20 301:16
  302:14 307:1,16
  309:6,9 313:1,5
  317:2,7 323:3
  324:17 326:12
  330:16 333:15
  337:8 339:7 340:4

354:1 355:8 357:2
  358:20 360:15
  361:4 362:16
  364:19 365:20
  366:1,2 373:10
  375:22 381:22
  383:20 388:1,2,4
  391:20 395:22
  396:16 398:5,7
  399:14 400:4
  401:16 406:8
  407:1,13 411:18
  413:6 416:3
  418:11,12,13
  423:4 428:3,22
  429:11 431:2
  432:12 437:18
  443:17 444:20,22
  448:9 455:6 457:7
  457:18 461:14
  471:1 472:13
  483:3,6,9 489:1
  497:17 500:20
  501:17 502:1
  506:20,22 508:14
  508:20 513:10,15
  518:1,7,10 523:14
  523:18 526:1,19
  537:18 538:2
  539:2,9 546:13
  549:4 556:13
  558:21 569:19
  574:13 577:15
  580:6,11,14
  581:12
**okay** 556:12
**Oklahoma** 454:8
**old** 266:16 346:17
**Oliver** 457:15
**once** 353:17 362:6
  445:9 447:6
  489:10,11,16
**one's** 529:10
**one-bedroom**
  365:18
**one-hour** 321:16
**ones** 286:16 542:12
**online** 442:11
  444:18 445:7
**open** 280:21 282:6
  421:4,5,8 568:6
  580:16
**opened** 265:8 421:6
  421:7
**opening** 269:1
  417:20

Page 602

opinion 314:21
  390:16,19 395:20
  416:14,20 442:16
  492:22
opportunity 268:9
  269:13 279:9
  286:19 287:15
  311:1,14 383:4
  405:19 477:22
  478:1 569:15
  576:3
Orange 456:11,19
  456:21 463:18
order 375:1 406:19
  412:22 422:1
  486:1,11 505:14
  551:20 560:13
Ordinarily 289:14
organization 562:6
organized 264:3
original 460:3
  541:22
originally 272:19
ought 486:15
outset 266:21
outside 353:19
  580:15
overall 528:8
overnight 276:11
  363:13
overrule 426:11
overruled 295:20
  312:7 318:10
  320:9 396:13
  547:15
oversaw 454:11
overstepped 359:10
owe 521:19 522:6
  522:13
owned 353:9
owner 372:15

**P**

P 264:1
p.m 438:1,21 439:2
  447:20 510:19
  582:4 584:9
package 280:22
  281:10 511:13,15
  511:17
packages 341:16
  342:1,14,14
  356:11
packets 342:7
page 294:10,17
  298:14 300:7

302:12 303:17
305:5 306:14
401:12 430:7,12
461:18,20,22
472:15 473:21
475:14 478:11,14
478:18,20 479:9
481:9,12 505:11
505:13 506:15,15
506:16,16,18,20
507:10,12,15
508:3,8 510:11
520:19 521:5,22
539:14 542:11,14
542:20 543:2,4,6
543:11 549:17
550:15,18 551:9
554:12 575:17
pages 301:5 302:18
442:21 505:3
506:11,12 508:18
521:8 522:10
524:7,11
paid 365:9 423:13
428:16 504:13
505:21 562:21
565:2
painful 265:2
paint 382:2
papers 509:19
paperwork 318:19
par 473:2
paragraph 432:5
479:10 481:12
515:13 547:2
549:13
paragraphs 516:5
516:19
paranoia 533:19
535:7
paraphrasing
531:10
part 271:22 302:22
305:5 326:20
327:10 345:14
376:10 380:7
404:22 420:6
443:8 452:8,12
476:15 479:19
486:8 505:12
521:3 536:22
555:5
participate 307:1
particular 297:13
305:15 306:7
316:17 333:11

360:13 385:16
449:6 456:16
524:7 578:21
580:9
particularly 364:6
391:5 581:17
parties 261:7 264:7
311:5 313:8
party 304:2,8
passed 485:13
pattern 529:2
Paul 402:16 574:9
PaulRichter@LA...
402:19
pause 291:10 402:3
429:16 446:8
505:4 521:12
pay 323:6 333:1
350:13,14 362:16
363:21,22 393:10
405:8 503:17,17
520:10 565:17
583:4
paycheck 361:19
paying 582:21
583:4
payment 376:21
435:16
payments 435:18
pays 565:16
peacefully 389:3
penalties 510:10
pending 264:12
414:14
penniless 423:5
Pennsylvania 268:4
269:16 273:3
539:21 540:5
542:2
people 271:15
296:1,10 317:15
318:2 320:2
338:16 345:16
348:2 352:18
357:8 366:17
367:13,20 368:4
370:4 372:17
373:3 386:1,6,7
387:8 389:11,12
389:21 390:8
395:15 397:1
404:15,20 405:3
425:20 455:21
474:1,5,7 480:8,9
480:16 482:1,4
491:14 492:3,10

492:14 503:14
533:15 536:13,15
571:8 574:16
perceived 330:16
330:17 389:14
408:15 432:6
550:21 559:11
percent 332:21
333:4,5 553:5
556:10,12 557:19
558:12
percentage 333:16
perception 370:11
372:6 376:9
514:13
perfect 290:22
perfectly 279:17
360:9 517:21
perfume 354:7
period 279:1
340:22 351:5
357:16 360:11
366:11 381:5
399:13 423:18
427:10 428:2,5,13
462:11 486:4
565:20 579:12
periodically 341:16
perjury 510:10
permanent 422:6
permitted 499:19
Persia 336:5 345:12
345:20 351:9
352:4,10 367:14
389:10 550:2
Persian 334:15
345:7 348:17
352:11 361:1
364:11,12,14
367:16 371:4,8,9
382:13,22 383:1
383:11 387:5
Persians 352:15
353:4 364:5
385:22
person 275:1 281:4
281:7,12,12,13,19
332:5 342:6
349:19 371:15,19
372:22 378:18,19
379:2,4,14 380:6
386:2,19 450:6
452:6,7,13 453:8
454:4,5 455:1,17
457:11 463:9
469:7 497:11

536:5
personal 323:9,16
323:18 339:17
433:1 464:2,4,10
490:21
personality 547:10
548:11,15
personalizing
266:18
personally 298:17
perspective 369:17
peruses 302:20
472:19 542:4
petitioned 532:6
phase 419:1,3
421:21
phon 348:17 360:19
564:20,21 574:7,9
phone 281:15 323:9
323:16,18 325:3,5
325:13 329:1,9,16
329:19 330:5,8,10
370:17 400:12
421:15 463:4
465:4 467:14
562:19
phrase 425:8,12,18
physicians 352:2
pick 489:21
picked 473:12
picture 382:2
486:16
piece 551:7
pieces 442:16 535:3
pin 339:5
pinpoint 503:12
place 265:3 272:6
283:8,12 312:20
360:13 361:5,17
361:18 391:5
414:12 423:10
432:17 446:15
496:5 540:16,17
542:22
placed 445:10
places 335:3
plaintiff 521:19
522:6,14
plaintiff's 505:13
521:19
plaintiffs' 522:7
plans 448:2
play 270:12,13,14
274:20 275:5
played 382:19
pleading 307:13

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 366 of 771   PageID 1098
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  603

**pleadings** 407:14
410:3 412:19
413:10 419:11
475:3 476:9,22
**please** 292:19 294:3
294:3 298:2 300:5
304:12 317:16
319:1 350:10
402:15 418:5
424:16 426:14
440:16 444:7
450:21 470:22
482:14 537:9
569:18 574:5
**plenty** 532:4,14
**plus** 296:8 308:2
**PNN** 341:19
**pocket** 270:20
**podium** 266:6
**point** 266:11 275:22
282:8 286:12
297:10,14 311:17
337:5 347:14
349:10 358:10
359:17 360:10,14
369:5 376:16
383:17 417:19
426:22 437:19
505:1,5 534:4
538:9 551:20
552:17 553:15
556:1,4,16 557:12
557:21 558:20,21
559:4,16,18
560:17 580:5
581:7
**pointed** 278:7
280:16
**pointing** 401:8
**points** 478:1 532:3
534:18
**police** 512:4
**policies** 268:21
**policy** 312:2
**political** 386:2,7,7
392:20 404:22
405:4 409:11
**politician** 501:21
**politics** 391:6,17
392:6
**populated** 352:21
353:3
**population** 352:12
**portion** 523:22
**portions** 308:2
**position** 285:15

287:15 342:12
346:17 481:6
**positive** 337:21
369:19 397:20
**possess** 269:12
**possessions** 274:17
**possibility** 409:3
**possible** 274:11
296:21 447:16
495:11 578:17
**possibly** 500:22
**post** 266:1,12
427:15 540:16
545:15
**Postal** 273:1
**potential** 513:4
535:7
**potentially** 277:15
285:14 572:5
**powerful** 450:6
453:8,14 454:3,5
455:1,17
**practice** 312:1,4
315:6 411:2 529:2
**practicing** 314:22
320:3
**precedent** 367:19
**preliminary** 406:19
422:2
**premature** 286:22
**prepaid** 423:8
**preparation** 265:5
**prepare** 392:12
461:17 475:2
**prepared** 311:20
393:8,20 413:9,12
413:14 459:13
460:15 469:22
470:3,16 568:7
**preparing** 393:3
465:1
**presence** 334:13
335:14,15 341:7
397:17 466:20,21
467:10,12
**present** 261:6 262:9
264:7,8 279:16
350:21 351:2,2
549:8,10,12 550:5
564:1 568:16,17
**presentation**
289:15
**presented** 400:10
**preserve** 407:7
410:17 486:12
**preserved** 314:4

439:13
**president** 337:1
351:7 387:11
408:19 453:11,11
453:19,20,20
454:20
**prestige** 296:7
**presumably** 278:12
**pretty** 264:5 359:9
470:5
**previous** 539:4
**previously** 292:7
307:21 313:21
355:8 459:12
461:11 528:17
541:5 550:16
567:17 574:18
575:1
**preys** 481:15
**price** 365:19
**prim** 499:13
**primarily** 341:6
**prince** 371:14
**principal** 393:14
574:8
**print** 522:11
**prior** 351:19 383:10
440:20 515:13
549:19
**private** 411:2
**pro** 389:18
**pro-Iranian** 390:9
**pro-regime** 389:11
**pro-shah** 389:11
391:8 404:16,21
**probably** 281:12
301:1 321:2 329:2
390:3 412:12
417:14 421:19
430:10 447:20
474:8 579:19
**probe** 289:9,11
**problem** 266:14
282:4 289:5 309:9
327:3,17 328:2
329:7 343:10
370:5,8 399:4
408:6 409:20
450:20 490:1
536:5,16 556:14
**problematic** 374:2
**problems** 325:10
382:3
**procedural** 280:9
**procedure** 394:11
**proceed** 278:22

281:7 283:8 382:7
**proceeding** 267:6
269:3 270:8,18
271:11 273:21
419:18 516:10
**proceedings** 276:19
277:9,19
**process** 271:6,12
286:10 379:19
394:21 530:8
**produce** 267:20,22
**produced** 268:2,6
**producer** 324:8
329:4
**product** 275:5
**professional** 260:2
261:1 433:2 464:6
464:9 472:16
473:1,8 482:6,11
490:20 567:17
**proffer** 512:20
558:19
**progressing** 406:21
**prominent** 494:21
562:6
**promote** 475:18
**promoted** 383:8
**promptly** 264:6
269:4
**pronoun** 458:1
**pronouncing** 390:3
**proof** 372:17
**prop** 390:20
**propaganda** 390:20
**proper** 461:8
499:13 509:7,9
510:14 511:4
514:14 515:9
516:9,21 519:14
524:2,16 527:13
555:11,14
**Proper's** 512:9
515:12 517:15,22
518:3
**properly** 545:21
546:10
**property** 510:15
511:7
**proposal** 334:17
344:8 368:8,9
**propose** 285:7
**proposed** 285:8
**proposing** 558:11
**prospected** 559:15
**protect** 270:10,11
283:2

**protected** 485:17
**protection** 269:12
**prove** 357:8 489:11
489:17
**proved** 381:1
**proven** 267:20,22
371:10 374:21
525:20
**provide** 269:22
**provided** 267:13
276:3 280:19
548:21
**psychiatrist** 348:22
466:3
**psychologist** 348:10
348:21 349:3,4,14
349:15 351:20
413:12 431:16
466:3
**psychologists**
348:13,21
**public** 261:5,14
312:2 395:18
397:3
**publicity** 395:14,15
396:4,22,22
397:20
**pull** 285:20
**pulled** 451:7
**punitive** 560:3
**purely** 264:9
**purport** 554:1
**purportedly** 541:22
**purports** 307:14
429:21 508:15
542:17 577:8,12
**purpose** 452:1
**purposes** 277:3
481:16,21 524:9
584:1
**pursue** 486:12
490:13 558:1,20
578:17
**pursued** 486:4
541:11
**pursuing** 530:13
579:2
**pursuit** 374:2
**push** 578:6
**pushed** 264:22
**put** 265:19 285:15
309:21 346:6
360:15 377:10
380:2,3 389:15
406:8,12,17
410:16 411:4

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 367 of 771   PageID 1099
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  604

412:4,9 473:20
476:5 478:13,21
479:6 494:2 500:6
500:8 503:16
506:17 511:6
519:3 535:19
551:14 552:17
553:12 556:18
561:6
**puts** 422:2
**putting** 439:18
572:14

_____

**Q**

**qualified** 477:13
**qualify** 351:14
**question** 271:7
272:10 277:9
289:11 319:1,2
331:10,13 335:6,9
340:12,13 372:7
374:8,16 376:12
376:13 377:11
378:13,16,22
379:10,10 380:1,2
381:4 384:7 392:2
395:20 396:5,7,15
398:6 399:4,15,22
404:18 406:7
412:16 414:20
415:20 416:1,2,9
418:15 420:8,12
420:13 425:16
426:13 429:10
431:3,11,11,19
433:18 436:13,17
453:17 460:10
464:3,15 467:5
468:14,18 473:6
473:7,11,11 476:13
476:16 479:15
482:16 483:17
484:13 487:17,19
494:11,17 497:6
497:14 499:18
500:16 503:20
504:2 506:2
512:17 513:8
514:11 515:16
517:21 522:17
526:5 529:22
541:1 546:5 548:3
548:8 549:3 552:2
553:8,20,21 557:5
558:3 562:11
568:16 570:17

574:20 576:9
577:4,17 578:14
**questioned** 524:1
**questioning** 282:9
283:9 316:12
555:12
**questions** 279:12
284:14 286:12
297:12 299:6,9,12
305:13,14,18
315:18 316:13
360:8 377:9
380:14 389:9
405:16 420:20
444:21 445:19
451:13 474:20
482:18 520:15
523:4 530:19
531:6 533:4
554:15 561:5,20
580:3,13
**quick** 280:13 317:1
412:21,21
**quickly** 413:1
537:12
**quit** 565:6
**quite** 275:4 503:20
568:6
**quo** 267:7 407:7
410:17
**quote** 278:8,9

_____

**R**

**R** 264:1 439:1
471:8
**R-a-h-i-m-i** 413:16
**R-a-m-m-a-m**
574:8
**R-a-z-a-v-i** 281:13
317:19
**R-o-h-r-b-a-c-h-e-r**
456:8
**radio** 383:1
**Rahimi** 403:8
413:16
**raise** 280:8,11
283:12 285:11
439:20 566:15
**raised** 335:1 411:9
**raising** 395:9
**Rammam** 574:7
**ran** 323:8 496:22
498:11 511:5
**ranked** 338:4
**rate** 308:8
**Razavi** 281:13

283:5 312:5
317:14,21 469:2
470:13 544:21
**reached** 279:18
**react** 395:16 397:2
**reaction** 348:8
536:9
**read** 271:8 290:6
295:6 298:20
301:16 392:1
396:17,18 416:18
419:10 421:3
426:13 430:19
431:2 444:6 473:7
482:10 485:7
486:22 487:17
516:4 544:16
548:9 551:21
552:4,6 569:15
576:3,4,6,7 577:5
**readers** 442:18
**reading** 421:9
430:17 515:1
551:22 552:10
**reads** 430:22 509:1
569:16 576:8
579:14
**ready** 265:13
**Reagan** 457:12
**real** 280:12 309:8
317:1
**realities** 392:16
**realized** 265:9
356:8 366:12
**really** 272:9 282:14
283:3 285:2
310:15 311:18
328:12 336:1
362:20 363:1
393:10 401:1
406:12 436:13
445:10 486:5,15
497:1 502:8
503:19
**reason** 271:14
273:10 341:6
351:13 365:3
368:1 369:1 370:3
377:1 389:8,8
410:3 480:2 536:3
556:11 571:11
**reasonable** 285:18
351:15 354:10
366:14,17 415:14
512:4,7
**reasons** 269:7

339:17 352:9
367:11,17 528:2
559:2
**reassigned** 410:6
**reassignment**
410:10
**rebut** 274:5
**rebuttal** 272:2
**recall** 289:1 293:7
300:16 345:10,12
366:19 411:19
**receive** 293:10
304:4 306:6
503:11
**received** 272:22
276:6 302:14
305:21 417:18
460:2 540:20
**receiving** 273:5,16
293:7 305:2
**recess** 284:2 310:3
311:5 312:8,18
313:6 320:12,13
383:22 384:2
437:22 438:22
523:15 583:11
584:10
**recipient** 265:18
545:22
**recognize** 498:2
**recollection** 294:19
412:2,7 443:18
444:1 454:10
**recommend** 488:13
494:14
**recommended**
348:16 493:12
548:5,5
**recommending**
547:9 548:11
550:6 559:12
**reconsideration**
296:15
**reconvene** 447:14
**reconvening** 264:5
**record** 264:4
266:16 269:15
271:4,22 273:8
274:1,3 292:8,17
300:9 309:22
312:15 313:8
320:10,17 329:15
330:3,6,7,19
331:1 374:5
376:15,22 380:8,8
439:5,8,11 444:6

523:17 535:20
555:9,15 561:7
567:1 576:4
**recorded** 330:11
**records** 276:16,16
310:18 329:20,21
330:9,11
**recovery** 558:12
**recreate** 269:18
**recuperated** 551:19
**red** 423:15 433:16
**redirect** 286:19,21
316:1 405:20
445:20 568:8
581:6,13
**reemployed** 335:8
**refer** 424:22 425:7
443:10 458:1
518:11,12,13,14
573:21
**reference** 444:13,14
574:19
**references** 538:19
**referred** 417:3
**referring** 401:7
416:21 468:9
506:6
**reflects** 570:1
**refresh** 294:19
412:2,7 443:18
444:1 454:10
**refused** 273:4 525:6
**refute** 359:3
**regard** 281:6
311:17 313:17
318:14 343:16
391:4 394:22
495:11 503:12
581:16
**regarding** 283:20
296:10 324:5
473:16 573:8,22
**regardless** 557:17
**regime** 322:16
389:18,18 390:21
404:22
**regret** 375:22
380:13
**regrettable** 561:6
**regularly** 310:18
**reiterate** 264:18
**related** 534:21
**relates** 318:8
**relationship** 266:2
297:7 372:11,13
433:1,2 436:6

Case 3:20-mc-00043-B  Document 30  Filed 10/11/22  Page 368 of 771  PageID 1100
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 605

556:9 557:17
559:12 563:15,16
**relationships** 374:1
374:5 375:19
376:9
**relatively** 266:10
450:22
**relatives** 456:20
469:8
**release** 315:19
582:15
**relevance** 371:22
373:18 498:15,19
498:22 499:1,10
499:22 500:12
512:20 513:4,7
529:5 534:7
566:19
**relevancy** 527:1
**relevant** 266:3
373:5 529:7
531:15,15,17,17
567:4 568:14
**relief** 579:2
**rely** 471:17 573:12
**remain** 291:16,17
**remarks** 284:6
**remember** 298:4,10
300:21 302:22
303:4 305:2 319:5
319:6,18 323:3
325:4,21,22 326:7
326:17 327:6,18
333:8 338:1,18
342:3 343:2,7,12
343:20 344:4
347:16 348:11,14
348:17,19,20
349:6,7,9,10,11
349:15,21 350:7
350:11 352:7
355:4,11 356:15
356:20 357:5
358:8,9,18 360:3
365:20 373:14
385:8 394:1
400:19 403:15
407:4,11,18 408:1
408:2,11,22 409:6
409:7 410:8,15,18
410:20 411:21
412:13,16,20
413:2,5,6,20
415:6,9,11,16
416:15 418:7,21
421:9,11,13,16,19

421:20 422:3,10
423:20 429:3
431:7,12 432:10
432:12 434:6
435:4 443:13
449:5,10,12 450:2
450:4,10,16 451:1
451:10,11,14,18
451:19 452:1,8,10
452:12,21 454:9
454:13 455:13
457:8,9,14,17
459:5 463:17,20
465:3 470:4,9
471:5,7,12 473:22
475:5,7,11 476:6
476:9,16,20,22
480:10,14 484:1
484:19,20 488:14
496:2,12,14
498:12,12,20
500:21 525:7
526:17 540:22
550:17 570:22
571:1 578:1,3,9
578:20
**remembers** 538:8
**remind** 290:4
291:16
**reminded** 438:12
**remote** 584:5
**remove** 315:12
445:16
**renew** 439:6
**rent** 363:22 365:5
365:10 423:8
504:9,16 519:19
519:21 520:3,4,12
565:17
**rental** 509:13
**renting** 516:1
**rep** 366:18 413:15
564:8 576:1
**repeat** 280:3 336:15
396:16 476:13,14
570:17
**repeating** 305:13
444:16
**repetitive** 279:9
296:20,22
**rephrase** 381:4
416:3 468:17
558:8 571:3
**replied** 511:13,14
**repoed** 434:11
**report** 438:14 512:4

561:21 562:1
**Reported** 260:21
**reporter** 261:5
317:17 379:19
383:11 392:3
396:19 402:17
409:10 424:7
426:15 476:19
487:20 548:10
**reporter's** 582:9
**reporters** 329:5
**reporting** 342:14
**reports** 562:10
**represent** 322:14
351:7 387:14
419:17 476:8,21
483:14,15,19
491:10,21 495:4,8
538:13,19 556:11
557:16 559:14
**representation**
428:7 482:7
495:11 538:17
547:4 549:22
557:22 558:11
**representations**
272:13 313:9
554:17
**representative**
337:1
**Representatives**
453:7
**represented** 272:21
274:10 349:18,18
353:20 391:3,3
408:17 475:16
481:14
**representing**
349:16 405:14
491:17 556:17
563:18 564:11
**represents** 555:9
**republican** 388:20
**republicans** 388:9
409:18
**request** 299:21
343:16 410:10
422:5 432:16,17
**requested** 439:9
**required** 278:21
570:10
**reread** 516:16,20
**research** 442:6,10
442:12,13,17
443:8
**reserve** 581:13

**Residential** 503:5
**resistance** 368:4
**resolve** 338:16
389:3 448:22
449:3 450:7 452:3
452:3,16 455:6
490:1
**resolved** 372:21
374:21 459:9
467:3,15,19 492:6
516:10,11
**resources** 385:2
**respect** 272:14
273:15 286:5
287:22 315:10
482:21 499:2
501:13 532:13,17
535:18 536:1
537:4
**respective** 261:7
272:8
**respectively** 528:11
**respond** 274:3
275:16,18 282:2
**responded** 397:6
**Respondent** 260:6
262:2,11 274:8,12
278:10 284:19
285:3 288:7 311:1
317:3 322:1 359:8
371:3 445:2
446:19 448:19
494:14 499:3
**Respondent's**
278:17 299:16
308:22 401:3
429:14 430:6
439:16 484:22
485:6 502:14,22
506:9 537:8 541:4
541:20 569:5,8
**respondents** 270:13
**responding** 281:9
**response** 272:9
281:22 343:15,19
385:4 471:6
487:18 546:7
559:6 573:7
**responsibilities**
387:5 441:21
509:16
**Responsibility**
260:2 261:2
**responsible** 274:15
275:1 309:17
**responsive** 331:7

**rest** 280:2 315:22
580:7
**restart** 296:5
**restaurant** 325:18
449:13 470:10
**restaurants** 463:15
463:16 464:8
**restraining** 375:1
406:19 412:22
422:1
**restroom** 316:16
317:1
**resubmitted** 357:22
**result** 358:15
422:21 529:9
568:10
**resulted** 355:15
374:18 375:16
**results** 527:3,7
528:1,2
**resume** 321:11
448:17 583:11
**resumed** 439:3
448:12
**resumes** 316:5
**resurrected** 269:6
**retaining** 550:7
**retaliate** 346:5
**retaliated** 385:13
385:14,19 391:7
**retaliation** 485:13
485:16 486:3
**retired** 411:1,14
**return** 486:9
**returned** 446:4
**returning** 384:3
**returns** 291:11
448:10
**revenge** 490:19
496:1,4,13
**review** 266:4
**reviewed** 276:22
472:22
**reviewing** 277:2
**revisit** 265:2 422:8
**revisited** 535:12
**revive** 490:9
**Richter** 402:16
**rid** 269:17
**right** 269:19 270:18
271:10 287:14
288:19 290:17,22
291:8 316:1,13
325:6 335:21
337:5 339:12
345:11 346:14

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 369 of 771   PageID 1101
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  606

355:20 368:18
378:8 380:2 382:7
386:4,13 388:3
389:15 390:1,3
391:11 397:5
402:7 404:6,16
405:17 406:4
408:13 409:5
411:16 413:21
414:13 422:3,13
424:4 426:4,6,10
426:16 434:14
436:3 439:21
446:6 453:4 458:5
464:11 465:17
468:5 476:5 482:8
483:5 485:4,15
490:7 494:16
495:21 499:21
519:11 520:4
522:9 531:3
546:22 554:16
560:4,15 570:16
570:16 572:11,14
575:2 580:17
581:10
**right-hand** 507:4
**rights** 269:12,12
271:6 283:2
394:19 485:17
486:12 539:6
541:10 575:22
576:18 578:7
**ring** 510:20 512:2,5
515:10,14,16
516:21 520:1,1
524:18 536:14
**rings** 518:13
**road** 280:4
**Roberts** 410:5
**Rodeo** 353:9
**Rohrbacher** 456:8
456:11 457:1,19
458:7,18 462:14
**role** 437:7 471:13
499:3 500:7
563:19,20
**romantic** 381:8
**room** 312:21 313:3
446:6 511:1,6
580:16,20
**roommate** 370:7,19
527:16 536:19
**roommates** 370:5
**Roslyn** 342:17
**rough** 508:21

**round** 316:11
422:13,22
**routine** 264:9
327:10
**ruin** 567:22 582:8
**ruined** 497:10
**rule** 277:11 278:21
288:10 310:9
313:20 364:9
438:6,9 531:16
**ruled** 271:18
415:13 486:2
519:10
**rules** 267:11 269:22
270:4,13 271:15
310:20 472:16,22
473:3,7,16,20
482:6,10 516:2
**ruling** 277:3 280:12
416:6 418:17
501:13 535:11
537:4
**rulings** 421:15
535:19
**rumors** 373:19
381:7,18
**run** 323:11 352:6
353:4 394:3
454:20 484:5
491:20
**running** 278:5
527:22
**ruse** 481:14
**rush** 511:19
**RX** 543:7
**RX11** 561:11
**RX17** 575:17

────── S ──────
**S** 264:1 439:1,1,1
**S-a-j-a-d-i** 390:5
**s-l-a-n-g** 385:5
**safe** 582:14
**safety** 475:22
**Sajadi** 390:2,5,7
**sake** 583:21
**sakes** 453:15
**salary** 347:4 568:16
568:17,18,22
**Sam** 469:2 470:13
471:8,8 474:3,8
474:10,14 475:1
488:11 492:15
503:11 544:20,21
544:22
**San** 360:1

**Santa** 365:1
**sat** 268:5 350:3
369:5 392:12
393:1 454:11
481:5
**Sataki** 263:3 264:21
265:22 266:18
267:2,2 268:19
273:16 280:20
282:1,20 284:10
284:17 285:4
286:11,20 287:22
288:12 291:11,16
292:4,13 294:15
297:4,22 300:5,12
315:19 316:1,5,7
317:6 322:3
331:15 335:7
340:11 345:3
367:19 371:1
374:1 380:17
382:12 384:8
412:9 414:8
419:17 427:1
438:10 443:11
444:14 446:3,18
446:20 448:10,12
448:21 450:19
458:2 461:7
469:13 485:2
503:10 507:17
509:4 524:14
532:15 534:20
554:8 557:16
561:19,22 562:1,9
562:13 569:17
576:21 579:11
580:15
**Sataki's** 315:13
321:8 508:16
532:4 568:10
583:4
**satisfy** 288:7
**saw** 349:11 351:20
446:5 465:6
500:21 577:16
578:20 579:13,17
**saying** 266:1 270:15
281:11 288:14
289:18 328:20
364:19 366:16
372:9 403:5 416:7
416:8 421:20
453:3 471:21
478:21 500:5
501:1,2 503:13

516:20 525:2
527:15 541:9
552:22 553:2,11
556:7 557:18
558:10 560:19
567:7
**says** 294:10 304:1,7
339:4 402:15
407:6 432:13
460:1 486:7
505:13 510:1,8,12
511:16 515:12
521:17,20,22
533:9 538:12
548:4 550:18
551:14 552:7
561:2 562:12
**SC100** 505:13
**SC100-A** 508:9
**scared** 511:5
**scene** 384:21
434:18,21
**schedule** 350:18
**scheduled** 447:19
**scheduling** 447:19
580:21
**score** 532:3
**screamed** 497:13
**scrolling** 287:4
**season** 339:7
**second** 432:5
444:11 460:13
481:12 543:6
544:16 566:7,15
**secret** 343:12
**secretary** 388:14
466:7,7 479:11
**section** 344:8
**security** 504:13
**see** 267:3,9 311:18
316:1 339:17
340:8 348:10
349:13 350:16
362:8 368:12
370:3,8 378:12
401:17 402:5,11
402:13,22 416:14
419:20 430:16
432:20 444:4
446:3 448:8 457:2
457:18,20 460:8
460:17 462:9
472:18,20 479:4,5
485:6 486:17
487:2,21 488:12
499:15 500:6

505:3 507:3,6
509:3 511:3,10
513:4,6 518:5,6
533:13 535:15
537:18 542:3,5
546:22 547:7
549:20 550:3
554:12 577:7,11
578:19
**seeing** 348:22 362:6
476:9,22
**seek** 483:13 532:22
**seen** 361:11 431:5
432:2 450:14
460:22 473:2
477:4,7,9 487:8
488:5 530:16
536:7 569:14,20
576:10,14 579:11
**sell** 566:4
**Senate** 454:12
**senator** 454:7,15,19
455:11,14 456:7
**senators** 449:2
**send** 267:16 272:18
273:11 281:11
302:9 307:8
367:19 400:1
417:12
**sending** 281:9,11,22
366:13
**sense** 282:17 345:11
446:18
**sensible** 279:17
**sent** 267:14,14
272:20 273:5,13
276:8,8 281:5
292:16 301:17
303:10,10 304:18
319:3,7 330:8
398:15 399:17
402:7 403:4 410:4
416:15,16 421:3
423:13 431:15,16
457:20 485:8
488:16 493:17
539:15 540:9
549:18
**sentence** 437:8,12
475:13 518:12
**sentences** 552:7,15
**separate** 308:1
344:6 407:17
**sequence** 377:10
**serious** 312:3
**Serrano** 423:9

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 370 of 771   PageID 1102
In The Matter Of: Larry E. Klayman
May 31, 2018

Page 607

503:4 504:11
509:7 524:2,16
**service** 273:1 530:8
530:9
**services** 336:13,18
539:16,18
**session** 321:15
494:8
**sessions** 350:22
**set** 271:15 346:9
350:18 362:11
363:5 366:5
367:19,22 457:19
543:1
**setting** 362:5
363:18
**settle** 369:14
**settled** 264:3
**settlement** 395:8,9
397:21 559:3
560:14
**seven** 308:3 484:18
506:12,20 518:2
**sexual** 331:16,20
349:17 385:20
485:12,15 486:3
487:3,22 489:4
490:9 491:12,17
494:22 514:19
533:15 534:11,14
**sexually** 331:3,22
369:22 370:6
514:5,14
**Shah** 386:14,18
387:8,10,22
**shah's** 385:17
**shake** 326:8
**shaking** 347:18,18
347:19,19
**Shamble** 281:3
282:22 337:2,10
337:17,19 338:12
341:2 343:16
346:18 351:6
366:16 368:18
369:6,15 384:21
393:20 394:15
397:17 400:18
402:15 413:15
449:1 454:6 485:8
486:19 493:21
539:5 541:8 550:1
569:13 573:6,7
575:22 576:17
578:6,16 579:10
**Shambles'** 570:7

**share** 265:10
272:17
**shared** 275:3
328:11
**sharing** 328:17
**Shea** 493:12 494:14
547:5,11 548:6,13
548:20,22 549:22
550:6
**Sherman** 360:4
361:10,11
**shifted** 427:18
512:7 518:15
**shocked** 511:2
**shop** 470:11
**short** 485:7 511:9
574:18
**shot** 412:5
**show** 269:2 347:2
351:12 376:17
388:20 429:13
443:17 484:21
489:17,21 507:12
507:14 508:2
521:11,13 533:18
537:10
**showed** 541:6,21
**showing** 293:15
319:19 443:22
476:6,20 521:10
575:5
**shows** 331:21
504:13 535:6
561:21
**sick** 349:11
**side** 345:19,21
523:7
**sides** 310:4
**sign** 562:15
**signature** 298:13
508:16 509:3
**signed** 307:14 380:7
504:9
**significant** 574:15
**signing** 509:19
**similarly** 571:8
**simple** 473:6 533:4
**simply** 276:2
308:14 324:3
436:6
**Sincerely** 574:7
**single** 469:7 477:7
**sir** 340:18 349:1
364:7 375:11
446:1 473:18
534:12 535:17

**sit** 576:20
**sitting** 383:14 388:8
449:19,19 461:17
479:14 496:15,21
**situated** 571:9
**situation** 342:20
350:5 359:8
375:18 390:15
451:4 464:19
467:15
**six** 269:6 276:18
308:3 365:10
484:18 487:5
488:1 506:11,20
**six-month** 376:19
**skin** 564:3,6 566:5
**slang** 385:5
**slept** 371:15
**slick** 271:20
**slightly** 543:15
583:14
**slip** 271:19 312:19
**small** 480:16
505:14
**Smith** 261:20
264:16,18 266:17
267:15,21 272:4
279:5 282:10
283:15,16,19
284:1,3,13 285:2
286:5,19 287:18
287:19 288:16,20
289:17,21 290:3
290:14 291:2,19
292:3,22 293:6,20
294:3,8 295:17
296:13,17 297:1,2
297:14,20,21
299:3 300:3,4
301:8,10 303:15
303:16 304:13,15
305:22 306:1,12
306:13 307:16
308:5,9,11,18
309:10,19 311:14
312:9,13 313:1,11
314:7,15 315:12
315:16 316:10
318:7 320:14,18
320:19 321:17
324:13 330:22
340:15 359:4
373:16 376:11
377:17,21 395:19
396:2,7 405:20
419:19 420:4

426:9 427:6
436:12,20 438:5
439:14 440:6,13
443:19,22 444:5
444:20 445:21
446:3,10,17 447:1
447:4,13,22 448:6
448:9 453:13
467:4 483:4
488:16,18 492:9
492:13 501:4,6
503:19,22 504:1
505:16 506:5,13
507:3,8,21 508:17
508:20 510:3,5
512:19,22 513:19
514:1 515:5 516:6
520:22 521:5
523:11 524:3,4
527:22 530:21
531:19,20 532:18
533:7 535:3
537:10 539:11
540:10 541:3,7,17
542:15 543:2,8,11
544:12 545:9,17
546:2,16 547:12
550:13 551:5,20
552:1,5 554:4,6
554:19 555:1,4,8
557:1,5 561:13
567:15 568:4,5,20
570:14 571:13
572:20 573:2
575:16 578:8
579:6,22 580:18
581:5,6,8,22
582:14 583:1,7
**Smith's** 287:12
320:9
**sobbing** 332:2,5
350:5
**solemnly** 439:21
**solution** 309:4,5,6,8
**solve** 462:15,17
464:14,15
**somebody** 282:21
314:22 322:22
356:11 378:4
420:3 447:21
469:19 474:2
514:4,6 524:17
533:9
**somewhat** 543:22
**soon** 274:10 450:6
486:14

**sooner** 278:1
325:11 528:22
**sorry** 280:10 293:2
301:19 306:21
311:18 314:12
319:10 325:10
339:11 350:17
378:21 379:20
381:12 387:16,19
398:7,7 404:17
408:3 412:6 413:7
420:14 429:7
435:5 438:8 449:8
451:16,20 452:20
457:22 462:7
468:8 470:7 471:1
473:10 483:6
495:13 497:8,8
503:22 505:18
527:9,19 544:2
545:11 547:19
562:11 577:4
**sort** 265:17
**sought** 268:14
338:11
**sounds** 339:12
501:4
**speak** 275:19 345:5
486:7 563:3
**Speaker** 449:22
453:1,6
**speaking** 373:9
396:10 414:8,12
**speaks** 514:9
522:19 527:20
547:15 579:16
**special** 561:21
562:1
**specially** 518:18
**specific** 284:16
447:11
**specifically** 315:7
485:21 529:17
**specificity** 483:12
**specifics** 315:8
**specify** 524:10
**speculation** 472:4
474:18
**speculations** 474:19
**speculative** 420:21
474:20 528:3
**speech** 394:20
**speed** 274:7
**Spell** 317:16
**spelled** 318:17,18
391:13 566:2

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 371 of 771   PageID 1103
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  608

spending 368:15
spent 277:1 335:18
spins 273:18
spirit 274:20
spoke 418:21
Sporkin 410:22
    411:3,15 412:3
spring 381:6 429:1
stable 536:11
staff 451:8 452:22
    458:14 496:22
    497:13 574:9
stakes 395:9
stamp 460:6 507:2
stand 282:11
    284:18 291:12
    312:18 316:5
    320:12 383:21
    406:4 437:22
    439:15 448:11,13
    536:8 562:4 584:7
standard 571:2
standing 320:9
    353:19 511:3
stands 374:6 581:11
Stanley 410:22
    411:15
Stanton 312:5
    318:15 458:11,17
    459:1,13 460:15
    461:17 462:14,15
    466:2,18 467:10
    467:21 469:11,16
    471:3 472:8
    488:11
start 447:10 548:8
    565:13 582:9,10
started 265:8 327:5
    327:14 331:3
    342:5 347:15
    348:22 350:5
    370:12 387:20
    442:14 463:21
    465:11 503:11
    557:22 565:6
starting 278:5
state 348:3 388:14
    479:11 491:1,4
    547:2 549:19
stated 307:21
    442:20 493:2
    521:18 522:1
statement 476:10
    477:2
statements 310:17
    358:1

states 273:1 387:2
    388:14 453:8
    480:13 494:22
    520:21 573:21
station 564:14
status 267:7 407:7
    410:17
statute 484:4,6
    573:15
stay 361:6,6,8,16
    362:21 406:5
    504:18 520:5,10
    565:4
stayed 565:5
staying 360:19
    510:16
stealing 515:9
    536:14
stepped 471:13
steps 323:2
stipulations 309:14
stolen 524:18
stood 584:10
stop 335:5 538:18
    539:1,1 565:12
    582:4
stopped 563:5,18
    564:11
store 354:2,3,5,6
stores 353:3,5,5
story 265:11 279:16
    297:10 323:22
    324:18 329:3
    402:20 458:18
strategic 269:7
    382:3 559:2
strategy 363:15,17
    369:6 372:4
    378:15
Street 261:2 573:17
strenuous 516:13
strike 331:6 340:20
    427:3 453:21
    466:10,12 487:10
    488:7 494:5 549:1
    549:5 553:9
strikes 383:16
    574:11
strong 300:2 311:19
    315:3 333:2,18
    358:16 496:10
    570:11,20 571:1
stronger 366:12
strongly 271:3
    299:19
struck 324:16

331:10,11 415:21
    416:2,2,10 419:13
    466:11 488:21
    494:11,18
studio 382:19
stuff 269:20 275:6
    347:5 357:22
    413:11,19 414:2
    415:2 421:3 475:6
    478:19 501:4
    555:2
sub-theory 373:22
subject 277:7,11,14
    280:2 401:18
    402:7 554:21
    555:6
submissions 303:1
submit 272:7 274:5
    300:12,16
submitted 286:17
    298:21 330:12,13
    330:15,18 341:1
    351:18 354:11
    377:21 378:11
    413:11,19 415:2
    561:15,18
submitting 298:4
    412:18
subpoena 534:21
subsequent 337:5
    467:13
substance 293:12
    295:18
substantively
    272:10
suddenly 491:18
    511:18 512:3
    515:14 518:14
sue 485:15 487:7
    488:4
suggest 286:20
    468:4
suggested 348:9
suggesting 292:16
    527:2 549:13
    553:5 584:6
suggestion 287:17
    287:19 294:1
    309:1 311:9
    411:11
suing 480:12
suite 539:22 545:4
Sujat 262:3,4
    267:14 268:10,10
    275:15,17,19,21
    299:5,12,17 485:3

summoned 265:6
superior 377:2
    399:7 525:10
    533:2 558:22
supervisor 390:1
supervisors 339:16
supplemental
    272:11 286:16
    292:7,22 293:3
    297:17 299:15
    313:17 459:14
    460:13 461:18
    462:12 465:1
    468:12,13,15
    469:15 473:21
    478:12 581:18
support 277:16
    382:1 386:14,17
supportive 387:8,9
supports 562:13
suppose 277:20,22
    280:1
supposed 271:1
    298:11 300:22
    436:20
supposedly 375:5
supreme 390:13
sure 273:13 274:7
    289:10 344:14
    374:9 413:3 414:6
    417:16 437:21
    438:11,11 446:7
    460:18 462:1
    507:8 533:22
    534:3 535:21
    560:21 567:3
    582:8,12
surely 287:14
    474:10
surprise 265:17
    439:10
Susan 339:15 340:9
    341:13 355:16
suspended 439:17
sustain 453:22
sustained 377:18
    419:21 436:19,22
    471:15,19 472:1
    477:16 494:10,10
    504:4 513:9,21
    515:6 523:12
    539:12 540:13
    546:4,11
swear 439:21
Sweden 335:2
    385:17 510:14,17

511:22 515:20
swirling 391:17
    392:6
swore 510:9 514:3
sworn 354:14 380:7
    413:16 440:10
SX1 264:13 265:19
    276:22 284:7
    286:3 315:8
SX38 264:13 277:1
sympathetic 387:22
    572:5
sympathizing
    357:18
syntax 544:10,13
system 261:19
    265:11
systematically
    417:10 428:10

| T |
| --- |

T 439:1
table 325:21 326:16
    326:19,21 449:20
    449:20 494:1
    574:15
tad 278:6
take 290:17 292:18
    298:3 307:12
    311:11,12 312:8
    316:19 321:13
    338:21 357:14
    360:10,13 383:19
    390:21 392:13
    422:8 428:6
    434:15 438:2
    451:8 459:4
    463:21 474:18
    484:2 485:1,3
    489:11 491:5
    496:6 498:6 523:1
    523:13,14 528:17
    530:19 531:12,12
    549:21 569:15
    576:3,5,6 577:2
    579:10
taken 261:1 278:2
    280:5 284:2 313:6
    320:13 384:2
    438:22 523:15
    540:13 558:20
    560:5
talk 280:22 282:19
    304:20 324:7,8
    332:7 368:17
    388:20 426:20

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 372 of 771   PageID 1104
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 609

450:5 482:3
486:15 495:10,14
497:19 541:9
550:6 580:21
**talked** 296:10 298:2
325:13 326:16
329:1 332:20
333:4 334:6
353:17 363:3
397:16 400:11
405:6 463:3
464:18,22 481:17
488:11 492:8,12
492:15,17 529:14
**talking** 276:17
328:1,22 332:6
333:10 337:4
357:22 370:10
389:20 399:6,10
406:18 417:2
418:4 424:3,3
427:14 428:22
465:4 473:5
488:10 507:13,15
524:7 557:15
563:17
**tampering** 573:9
575:11
**tapes** 382:19
**Taylor** 407:10
**team** 278:17 299:16
316:12
**technical** 395:2
406:18
**tecum** 534:22
**Teely** 574:7
**Tehran** 390:12,21
**Tehrangeles** 352:19
**telephone** 282:3
467:2
**television** 564:15
**tell** 286:2 295:9
303:18 304:16
306:14 310:6
397:10 399:19
400:6 412:3 413:4
418:5 421:7
440:16 442:9
480:14 484:9,11
490:4 491:8
495:18 498:18,22
499:5,9 506:10
512:16 513:12
542:20 569:17
570:19 572:4
576:6 579:11

**telling** 267:19
357:17 411:20
421:11,13 467:21
480:10 538:15
552:16
**tells** 394:11 398:21
485:9,19 486:8
**temporarily** 361:8
**temporary** 406:19
412:22 422:1
**ten** 269:22 321:2
383:22 523:1
**ten-minute** 383:19
**tend** 395:16 397:2
**tendency** 533:7
**tender** 443:21
**tens** 382:21
**tenuous** 318:9
**terminate** 520:4,9
**terminated** 483:11
483:13,19 484:17
538:16 539:18
560:18,18
**terminating** 539:15
**termination** 266:2
561:1
**terminology** 392:2
**terms** 276:15 283:1
326:5 335:7
475:19
**terrible** 497:11
**testified** 280:20
288:1,17 289:7
290:4 293:17
305:10 306:9
322:5 355:8 362:1
398:9 423:12
430:14 440:11
453:14 459:12
460:16 461:11
476:10 477:1
490:18 514:17
523:7,7 536:8
538:3 555:4
567:18 575:1
**testify** 268:10 288:5
359:3 413:18
415:4,5 418:2
513:11 542:8
558:17,18 560:11
560:22 561:4
568:20
**testifying** 447:6
448:1 536:9
582:15
**testimony** 264:21

277:17,20 279:9
280:4 281:14
287:1 293:19
295:13,14,18
296:18,21 297:15
321:4,11 324:14
422:7 423:1 438:2
438:3,13 439:7,22
447:14 467:6
492:9,13 494:13
519:5 522:19
523:10 539:4
550:16,19 554:11
559:21 583:20
584:5
**text** 306:5,7 330:7
538:15 549:20
**texted** 437:9
**texting** 422:17
538:13,22
**thank** 264:16 266:7
272:1 291:14
301:8 305:8
312:13 316:4
321:17 322:4
367:1 401:16
438:5 444:20
446:1 498:9
506:13 510:6
514:1 527:21
531:18 537:14
554:3 569:2
581:20 584:8
**Thanks** 297:12
402:21
**themes** 277:6
279:10
**themself** 357:8
**theories** 278:19
279:16,21,22
537:1
**theory** 373:22
378:15 536:22
**thing** 313:22 344:22
364:2 367:9 381:3
384:20 404:1
435:4 466:13
476:18 535:1
571:22 572:14
**things** 265:7,12
272:6 273:17
274:18 275:7,9,10
283:10 304:17
315:21 318:12
329:20 357:3,12
357:14 396:14

402:20 410:15
412:12,13 442:2
447:18 512:6
518:14 519:2
533:7 582:7
**think** 264:3 266:3
270:7,15,19 271:1
272:4 274:20
278:20 282:7
284:21,22 285:18
285:19,21 286:2
286:12 287:8,20
288:21 289:22
290:10,18,20
305:12,13,18
308:9 311:8 312:9
314:2 315:20,21
335:8 340:11,12
343:4 357:8 359:9
366:21 373:7,16
373:21 376:13,16
381:22 393:9
395:22 396:13,15
409:19 429:9
430:12 431:18
432:2 435:1
438:18 442:14
443:15 447:2
453:13 456:18
461:22 472:4
479:7 486:15
490:7,10 492:3,3
493:22 502:15
523:16 524:8,17
533:21 534:6
535:12 537:20
540:12 544:6
548:7 552:3 554:4
554:6 555:8,11
557:7 559:13
568:13 572:16
**thinking** 315:17
355:2
**thinks** 426:10
**third** 304:2,8 430:7
430:12 453:7
481:12 547:2
549:13 551:9
**Thirteen** 441:19
**thought** 269:15
328:10 346:9
348:9 373:22
446:5 480:6,17
545:13 549:20
**thoughts** 525:1
544:15

**thousands** 494:3
**threatened** 281:14
347:1 434:19
470:19,20 487:7
488:4
**threatening** 570:4
**three** 264:7 268:19
276:21 308:3
385:22 506:11,19
533:14 552:6,15
566:3 583:14
**throw** 282:7
**throwing** 282:15
**thumb** 276:7,7
**Thump** 562:14
**Thursday** 260:8
276:8
**tie** 417:4 498:17
516:14
**Tigar** 261:15 287:8
310:1,6 311:10
314:12 386:12,16
387:16 404:17
414:4,7,11,14,19
416:19 417:2,6
462:3,6 502:20
503:4 505:18
531:16 551:7,11
**Tim** 337:1 351:6
366:16 369:15
393:20 413:15
486:16,19 493:12
493:22 494:14
547:4,11 548:6,13
548:20,22 549:22
549:22 550:6
569:13 575:22
**time** 265:1 273:6
279:1 283:7
290:17 291:7
296:13 298:3
299:3 300:22
308:16,22 309:14
311:12,13 314:7
315:22 318:22
323:1 327:8,9,12
328:13 331:2,4
332:6,7 333:6
334:3 336:11
338:20,21 339:5
340:6,8,22 341:22
342:13,19 343:14
346:4 347:2,8,11
347:22 348:10
351:5 353:2 354:2
356:10 357:16

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 373 of 771   PageID 1105
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page  610

360:14,18 363:10
365:19 366:11
368:10,15 369:3
369:12 370:15,22
371:17 373:1
375:4 377:5
379:22 381:5
384:9 385:9,21
387:10,20 388:13
388:15,18,19
389:17 390:12
391:3,18 392:7
393:21 395:6
398:16,21 399:2,4
399:12 400:6,10
403:10 407:20
410:21 412:11
414:7 416:16
417:19 418:9,22
422:7,15 423:5,7
423:18 424:13
426:22 427:10,19
428:1,4,13,15
432:15,18 437:14
438:1 446:12
447:1 452:18,18
452:19,20 458:12
463:5 465:8,22
466:21 467:9
471:4,11 478:22
484:20 487:3,5,21
488:1 494:3 499:8
503:16,17 505:1,5
505:21 510:21
511:1 516:12
532:5,14,16 537:2
549:9,12 550:19
551:8,14,18
552:17,19 553:1
556:19,20 557:12
558:21 559:4,10
562:19 564:1
565:18,20 566:7
566:12,15 568:16
574:12 576:5
579:12 581:13,20
581:22 584:1
**timely** 273:14
**times** 279:11
377:16 400:15
401:18 402:7,16
403:6 406:15
414:5 488:18
491:20 503:13
512:6 538:14
552:4

**TimShamble@ve...**
402:8
**tip** 282:10
**title** 509:20
**titled** 444:12
**today** 267:10
285:11 286:16
320:20 321:8
322:3 377:22
432:14,15 439:19
446:13,19 490:8
492:12 530:5
532:20
**told** 268:6 270:6
295:1 325:9 332:2
332:15,17 334:12
335:13 336:12,16
336:21 337:11
339:15 341:14
342:19 345:1,3,3
345:9 346:4,13
348:1,2,4 358:5
359:22 361:9,10
361:13,21 363:7
368:19 370:15,22
376:5 385:15,19
388:19 393:9
395:6 397:5,6,12
397:14 407:20
408:12,22 409:2,6
409:22 410:20
412:8 435:2
437:10 449:22
456:10,22 457:10
457:15 458:17
462:15,21 464:12
465:9,13 466:7,15
467:18,20 472:7
482:1,4 484:3,8
484:12 485:20
490:12 493:11
495:3,16,19
499:22 501:10
511:6,20 524:14
538:16 559:20
570:16 572:7
575:10
**Tom** 454:7
**tomorrow** 291:4,8
312:16 320:22
438:4 439:19
447:1,12,19 448:1
488:20 581:14
582:4,10,13,15
583:11
**tonight** 447:16

**top** 267:17 268:8
402:17 431:14
460:7 481:5 508:9
554:5
**tortured** 322:17
**totally** 271:5 500:22
**tough** 327:9 452:19
452:20
**tow** 434:14
**town** 395:14 396:21
**trade** 435:18
**training** 461:4
470:13
**transfer** 334:18
344:7 358:17
361:14 362:4
367:12 368:4
**transferred** 335:16
341:4 343:17
358:3 363:4
367:15 368:2
**transferring** 344:1
368:14
**transition** 383:17
**transitional** 299:8
**transported** 428:17
**trash** 282:16
**tread** 359:9
**treated** 356:3
**trial** 559:10
**tribunals** 461:9
**tried** 267:8 268:3
268:20 282:22
319:5,9 346:18
354:10 389:2
410:13
**tries** 268:16
**TRO** 427:15,22
**trouble** 346:5
**true** 267:21,22
273:15 333:5
356:9 359:2,6
364:9 371:10,11
372:9,14,16,18,19
380:18 396:8
421:2 437:13
535:1
**truncate** 286:10
**trust** 282:10 574:3
**truth** 310:16 416:6
416:8 440:1,1
**truthful** 500:18
**truthfulness** 477:20
529:12
**try** 283:21 334:4
336:11,16 337:20

338:7,16 360:15
362:20 369:13
370:12 376:8
397:20 410:4
436:7 455:11
467:2 478:1 516:8
532:9 555:16
559:3 572:13
**trying** 280:22 283:2
294:4 296:4
313:22 334:18
346:5 367:8
377:10,14 391:18
392:7 395:8
400:15 403:17
404:4,11 406:8
414:20 428:11
429:18 435:16
448:22 449:2
457:5 459:8
467:14,18 499:11
500:15 502:6
517:2,3,5,7,8
530:1,2,5 531:14
537:15 539:5,9
541:8 553:16,17
556:5 557:3 559:5
559:18 570:3,6
578:6 583:20
**turn** 300:5 340:17
400:21 401:11
429:15 430:6,12
459:18 461:3,20
481:9 502:4 505:2
505:11 510:1
520:18 537:6
538:12 539:14
541:2,19 542:14
546:19 549:17
551:13 561:9
569:5 575:20
**Turning** 317:5
502:13
**TV** 371:8 562:22
563:9 564:13,14
566:13
**Twenty-four** 462:5
**Twenty-six** 441:16
**Twenty-three** 301:8
**twice** 277:12
**two** 308:3,8 309:9
316:19 326:21
348:13,20 349:10
358:18,19 363:22
364:1,8 365:5
376:20 385:21,22

386:1,6 423:8
441:3 443:12
444:2 461:1
465:17 474:4
504:18,21 506:11
506:19 516:4,19
522:10,21 533:6
544:11 552:6
565:5 566:12
583:1
**two-bedroom**
365:12,18,21
**two-hour** 447:5
**tying** 395:7
**type** 301:12,13
379:19 542:22
568:9

U
**U.S** 414:15 428:7
454:7,12 573:6
**ulcer** 354:21 355:1
355:5,7,12,13,15
356:2 357:13
**ultimately** 357:21
415:12
**unappreciative**
427:1
**unauthorized**
311:22 312:4
315:6
**unavailable** 439:19
**uncertain** 447:18
**unclear** 399:5
**uncommon** 552:6
**uncontrollably**
347:15
**understand** 289:9
304:9 309:2 313:8
314:5 373:6
376:11 392:16
395:21 418:16,18
449:9 460:10
462:20 464:3
467:4 473:10
482:13,16,19
503:21 504:2,3
506:4 522:16
530:8 536:2,6
537:1 548:2
549:12,15 552:21
553:4 558:2,4
578:5,12,15
583:18
**understandable**
359:7

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 374 of 771   PageID 1106
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 611

understanding
381:7,18 387:7
479:20 549:8,9,10
550:5 559:7
**understands** 396:3
453:14
**understood** 396:6
547:14,18 552:20
553:11 558:9
578:9
**undertaken** 376:19
**underwater** 530:10
530:17 533:1
**unethical** 271:20
531:22
**unfair** 271:5 275:5
355:16 439:10
**unfairly** 354:21
356:3
**unfortunate** 568:12
**unfortunately**
405:15 545:13,14
**unhappy** 304:19
490:20
**unilateral** 282:18
**unilaterally** 475:20
**union** 337:1 351:6
366:18 413:15
576:1
**unit** 515:19,22
516:3 517:12
519:1,3
**United** 273:1 387:2
388:14 453:8
480:13 494:22
573:21
**universities** 440:22
**University** 441:1,5
**unnecessarily**
311:12
**unprofessionally**
475:21
**unquote** 278:8,9
**unusual** 277:18
390:15
**Upper** 507:4
**upset** 347:7 417:21
418:17,22 419:2,7
422:16,20,21
423:2 548:18
**urge** 271:3
**use** 291:7 349:2,3
370:12,16,18,21
391:15 392:4
425:8 426:2 430:3
467:18 574:12

**user** 562:18
**uses** 425:17
**usually** 276:16
298:11 500:20
515:18

**V**

**V** 407:9
**vacation** 338:21
340:8
**vague** 421:16
**vaguely** 449:14,16
449:18 450:2,3
451:2,5,18
**validate** 267:4
**valley** 360:1,2
361:10 364:11
382:14,22 387:6
**value** 522:20
**Van** 434:2,19 530:3
532:9 533:2
**vanished** 512:3
515:14,17 518:14
**vanishing** 516:22
**various** 346:7,16
351:22 382:3,13
412:18 475:10
**Vegas** 281:19 283:5
318:5 469:5
**Ventura** 360:2
361:12 423:9
456:13 504:10
**verge** 355:2
**versa** 277:20
**vice** 453:11,20
**victim** 349:17
499:12,14
**victimhood** 499:16
500:4
**videos** 563:3
**view** 277:16 382:2
386:7 405:4
478:22
**viewed** 387:14,21
388:2 404:15,20
442:22
**views** 386:2,8
409:11 442:21
**violated** 482:6
573:15
**violation** 394:19
**violations** 472:16
**violent** 497:1
**Virginia** 342:17
424:8
**virtually** 436:1

**visa** 277:20
**visit** 463:11,11,14
465:5
**visiting** 510:13
511:21
**visits** 512:9 515:12
517:15 518:1,3
**VOA** 328:3 329:7
337:2 340:10
341:14 346:19
347:1 356:3
360:12 374:2
380:18 381:7,8
382:13 383:6,10
385:21 386:1
394:18 397:20
415:18 448:22
449:3 452:3,16
456:1 459:9 465:6
467:3,15 487:4,22
489:5,21 490:2,9
494:1 525:22
570:6 571:6
**VOA/PNN** 550:2
**voice** 301:3 327:17
332:3 336:5
337:20 338:8,15
341:2 342:10
343:15 344:9
351:7,21 352:6
354:22 355:10,17
367:12 368:3
369:16 385:1
388:3,5,12 390:18
391:4,18 392:6,17
393:4 403:9 404:2
404:21 406:22
413:14 416:7
444:10 450:20
454:12 464:19
481:5 568:11
570:2 573:9
**voicemail** 281:15
**void** 312:1,2 320:11
**voir** 294:5 299:20
313:14 315:14
316:15,20 317:3
318:8
**vs** 469:14

**W**

**Wagner** 355:18
356:4 407:9
**wait** 296:14 313:2
320:16 378:5
399:3 429:5 430:5

459:20 497:5
506:14 511:8
513:3 521:21
536:20 560:20
580:15,19
**waited** 487:5 488:1
**waiting** 276:18
326:2 431:18
446:17 522:18
**walk** 279:13
**walked** 322:22
325:20 378:3
434:21 450:12
**walking** 323:1,7
**want** 268:11 270:8
270:22 275:16
276:1,15 279:8,12
280:7 283:17
290:16 300:18
304:17 308:14
311:11,12 315:18
321:7 326:10
329:3 340:5
345:22 346:7,16
352:15 360:3,5
362:20 363:1
367:12,20 377:9
384:6 389:5
396:16 397:7
398:21 400:12
403:5 406:4 429:6
430:18 435:14
438:14 439:6
465:5 478:3 484:8
484:11,13 486:14
490:18 494:4
495:16 502:2,9,9
506:15 526:17
532:18 539:1,1
546:1 549:8
550:19 551:1,3
557:18 560:8
561:10 576:4,5,20
582:9,10
**want?'** 511:13
**wanted** 271:17
272:17 275:22
276:4 283:3 285:3
290:15 324:6,19
341:7 357:18
359:22 360:1
364:4 365:15,21
367:14 386:19
393:13 412:22
428:17 433:14
435:7 451:4 489:3

490:13,13,16
492:5 496:1,4
500:18 501:2
511:10 520:1,4,8
530:5,19 533:3
534:18 535:2,4
536:11 558:6
561:5
**wants** 291:6 313:12
340:15 401:10
405:20 499:13
500:2 503:6 529:4
532:3,12 537:10
568:6 576:21
583:3
**war** 359:11
**warranted** 573:20
**WARREN** 261:11
**Washington** 260:9
261:2 335:18
338:4,8 354:22
362:12 367:14
539:22 573:16,17
**wasn't** 289:7
315:17 336:12,17
355:5 363:1
368:11 370:10
371:8 372:10
394:8 396:7
417:19 421:21
433:20 446:6
464:9 465:6
476:11 477:2
519:15,17,22
520:12 533:6
538:2 548:14
556:17
**waste** 516:12
532:16 550:19
**Watch** 408:21
**way** 265:2 270:21
271:1 279:3 281:6
285:7 320:5
327:20 353:22
355:9 356:3
362:11 367:11
375:15 420:10
437:2 450:22
451:12 481:20
489:20 497:1,19
500:16 511:11
527:8 528:16
543:22 544:15
555:12 563:17
583:9
**ways** 331:9 570:12

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 375 of 771   PageID 1107
In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 612

**we'll** 269:7 288:11
293:18 340:20
344:2,6,7,7,14
350:4 367:9 389:1
417:9 438:6,9
446:14 448:8
451:8 459:2 471:8
483:12 503:12
514:11 519:5
523:1,14 537:1
552:12 555:10
581:1
**we're** 264:5 274:21
276:17 279:19
280:3 291:8
296:11 308:8
311:6 312:15
313:22 333:10,17
337:4 340:2 344:1
347:3,4,5 376:16
395:7 411:6 418:2
427:14 428:22
431:18 446:17
447:18 461:22
478:6 480:12
506:3,8 507:22
522:18 523:13,16
524:7 526:4,8
537:3 580:14,20
581:12
**we've** 331:8 373:17
526:3,7 529:13,13
532:19 536:7
583:15
**weather** 367:15
**website** 303:12
442:14,16,20
**Wednesday** 510:18
**week** 358:19 378:1
432:6 550:20
**weekend** 276:12
**weeks** 268:5 358:18
358:19 378:2
379:15 380:10
532:9 533:6
**weighing** 527:11
**weight** 279:2
**weightlifting**
561:22
**welcome** 430:3
**wellbeing** 420:17
**went** 276:10 289:3
315:2 329:9 334:8
336:8 341:3
353:18 371:18
383:6 434:9 441:1

452:15 457:18
458:5 511:9 530:9
559:10
**weren't** 267:12,13
288:17 327:11
394:21 435:15
**Westwood** 364:22
**whatsoever** 295:18
**white** 441:14 462:1
503:2
**wife** 373:13 374:11
419:17 525:19
529:16
**willing** 528:7
**Wilshire** 352:5
496:16
**win** 333:17 419:2
422:13
**Windjammer** 262:5
**window** 447:5
583:2
**wing** 463:21
**wish** 279:16 486:12
499:7 519:6
**wishes** 264:14
475:14
**withdraw** 504:5,6
**witness** 263:2
277:17 278:2,3
280:7 285:12
291:4,9,11,14,18
293:5 295:21
302:20 303:13
308:10 310:12
313:1,4 316:5
317:18 321:19
324:17 331:1
340:18 357:6
360:12 366:21
370:16,18,20
375:9,17 376:18
377:14 378:20
379:8,20 381:10
381:13,19 386:15
386:17 397:9,12
397:14 398:7
400:3 401:5,9
406:3 408:5
411:21 413:6
414:10 418:18
420:10,14 425:19
426:18 427:4
429:2,7 430:22
431:1 434:6,9,11
435:3 438:3,16,19
439:15,19,20

440:2,5,9 444:2
446:2 447:5
448:11,15 449:10
451:17 470:9
471:1 472:13,19
473:14,18 476:15
477:4 479:18,22
483:3,6,9 489:12
494:13 495:18
497:8,16,18 498:4
498:9,20 502:21
502:21 503:1
505:20 508:4
509:1 513:1,14
517:4,8 518:6,9
518:16,22 519:17
519:21 522:16
526:2,21 527:16
527:19 528:9
534:12 536:18
537:22 542:4
547:20 548:4,14
549:4,15 552:2
553:3 555:13
558:4 564:2,5
567:13 568:17,22
569:16 570:22
571:18 572:7
573:8 575:11
576:8 577:9,14,16
578:1,19 579:3,14
580:22 581:3
583:15,16,19
**witness'** 438:2
478:4 513:5
**witnesses** 320:21
372:21 415:19
416:7 418:1 570:4
571:8
**woah** 498:21
567:14,14
**women** 494:21
**won** 419:1
**wondering** 315:18
491:14 580:4
**word** 277:13 301:18
311:18 379:10
391:15 525:1
**wording** 515:1
**words** 294:16 392:4
394:6 473:4 476:4
482:8 518:3,5,8
**work** 279:3 324:5
334:13,15 336:4
344:2,7 346:1,19
351:9 352:4

353:12,14 354:1
356:5,10,17 357:7
361:20 391:5,19
392:7 393:5
406:20 407:17
410:17 411:4
412:4,9 414:2
422:2 441:15
475:17 486:2,9
489:18 532:5
566:7
**worked** 342:10
441:13 457:15
567:19
**working** 323:5
336:22 346:21
354:6 362:8,13
363:17 370:4
373:2 382:13,18
385:22 386:1
387:5 413:21
441:17 469:20
476:11 477:3
491:13 509:10
562:21 563:6
564:2,5,13 565:6
565:7,12,15,20
566:11 576:1,2
**works** 362:11
**world** 266:16
442:12,18 443:10
**worms** 568:6
**worried** 297:19
381:10,13
**worry** 350:14
**worse** 434:22
**worst** 338:3,4
**worth** 382:1 553:1
**wouldn't** 267:16
393:10 415:8,9
433:2 461:7 539:6
582:16
**wound** 405:21
**write** 286:4 290:5
298:17,18,19
301:11,20 307:4
345:16 368:8
400:7 429:6 432:5
476:1 512:11,13
513:17 541:22
544:19 548:18
**writing** 307:1
383:15 398:20
400:9 483:4
513:13,20 556:18
559:17

**written** 267:3
277:16 314:21
334:17 399:18
400:2 518:19
543:22 544:10
556:21
**wrong** 338:22
374:22 419:16
420:2,16 465:10
479:5 513:12
540:7,16 542:8,21
545:13
**wrongly** 491:12
525:19
**wrote** 317:8,9
398:11 430:13
437:9 455:22
479:1 518:2,7

| X |
|---|

**X** 260:3,7 263:1
483:8

| Y |
|---|

**Y** 483:8
**yeah** 299:7 309:5
310:5 311:8 327:6
332:18 335:4
342:5 348:4,6
364:15 375:13
415:12 418:14
419:4 427:20
430:10 431:20
436:18 438:11
443:7 448:6
468:13 476:17
478:20 503:8
520:16 521:10,16
557:9 576:18
**year** 278:6 460:4,8
460:11 485:14
488:16 489:5
496:14 565:5,7,9
565:10 569:1
**years** 265:3 266:15
267:6 268:18,19
269:6 274:14
275:10 276:17,18
331:15 335:18
358:14 433:15
441:16,19 450:14
457:6 491:2 498:2
532:21 562:17
567:1,9
**yelled** 355:18 497:3
497:10

Case 3:20-mc-00043-B   Document 30   Filed 10/11/22   Page 376 of 771   PageID 1108
In The Matter Of: Larry E. Klayman
May 31, 2018

Page 613

| | | | |
|---|---|---|---|
| **yesterday** 264:19 277:1 280:2,16 284:9 286:6,15 288:17,22 289:4 290:3,9 298:2 305:11,16 311:16 321:7 398:10 423:12 443:5,18 444:19 490:19 496:1,3 536:8 538:4 **yesterday's** 277:8 **York** 564:8 | **13th** 505:15 510:12 **15** 581:11 **150M** 444:9 **1525** 262:5 **15th** 306:22 307:9 510:18 539:16 542:1 543:5,9,18 **16** 308:7 502:13,14 502:22 503:3 504:8 **17** 569:6,8 **17-BD-063** 260:5 **18** 575:20 580:10 **180** 485:13 **180-day** 486:4 **1812** 569:13 **18th** 573:4 **1997** 442:15 **1998** 507:2 **19th** 292:10,12 297:5 **1st** 302:15 305:1 | **554:2 564:1** 578:16 579:10,13 579:18 580:10 **2015** 443:3 **2017** 561:22 562:10 562:13 **2018** 260:8 584:10 **202** 402:18 574:3 **2020** 540:5 **20535** 573:18 **20th** 300:11,14 **21st** 303:19 304:5 **22nd** 554:2 **23** 300:6 305:9 307:18 314:8,16 314:17 315:8 401:12 459:16,18 459:20 461:3,19 468:11 **23-10** 302:4 **23-12** 302:18 **23-2** 300:8 478:12 478:15 **23-28** 286:3 **23-4** 301:5 462:3 475:15 479:9 **23-43** 302:19 **23-45** 303:17 **23-47** 304:10,13 **23-48** 305:5 **23-56** 306:14 **23-58** 307:11 **23-6** 301:5,9 472:15 473:21 481:9,12 **23-72** 300:8 307:12 **23-8** 302:4 **23-9** 302:4 **23rd** 272:22 444:8 **24** 313:13 314:8 315:8 462:6 **24-4** 461:20 **24th** 272:18 292:9 293:8 460:2,14 **25** 313:13 314:8 315:8 508:22 **250,000** 551:14 552:18 553:1 **25th** 276:5 580:10 **26** 301:7,7 313:13 314:9 315:8 **26-1** 430:8 **26th** 510:13 **27** 313:13 314:9 315:8 **278-2000** 574:3 **27th** 485:8 | **28** 287:10,13 313:14,15 314:5,6 314:12,14 315:13 316:21 317:5 320:10 **29** 308:7 313:16 314:9 315:8 **292** 263:3 **2nd** 288:3 298:6 428:8 560:1 |

| **3** | |
|---|---|
| **3** 465:2 481:9 575:17 **3,050** 504:14 **3:00** 582:19 **3:25** 523:2 **3:37** 523:17 **30** 582:1,2 **30th** 302:8 555:5 557:1 **31** 260:8 292:8,21 293:1,4 **322** 263:3 **33019** 262:6 **345** 539:22 **36** 284:7 **38** 265:20 297:17 **39** 313:18 315:9 **3Lab** 566:1 **3rd** 460:5,6 569:11 573:8 **3read** 516:16 | |

| **4** | |
|---|---|
| **4** 537:8 **4:37** 583:11 **4:39** 584:9 **4:45'ish** 446:16 **40** 332:21 333:4,5 442:21 **430** 261:2 **440** 263:4 **445** 263:4 **448** 263:3 **45** 277:2 **45-minute** 321:15 **48** 304:10,13 **4th** 272:20 573:17 | |

| **5** | |
|---|---|
| **5:00** 582:4 **50** 290:20,21 305:9 553:5 556:10 557:18 558:12 **5th** 579:10,12,18 | |

| **Z** | |
|---|---|
| **Z** 483:8 **zealous** 382:9 **zealousness** 382:6 **Zia** 371:6 372:15 373:13 378:18 379:3 380:10 525:18 **Zia's** 374:11 **zip** 267:17 268:2 | |

| **0** | |
|---|---|

| **1** | |
|---|---|
| **1** 288:1,22 289:20 297:17 298:1 299:4,15 313:17 314:8 377:4,5 399:7 460:3,13 506:16 507:2 537:6,18 584:10 **1-2** 298:14 538:12 **1-6** 502:22 **1:00** 437:20 438:15 447:20 **1:01** 438:1 **1:03** 438:21 **1:58** 439:2,5 **10** 308:4 581:11 **10:44** 313:8 **100M** 560:2 **108** 533:22 **10th** 402:8 543:8 **11** 551:13 **11/15/10** 542:18 **11/2/2010** 460:6 **11:00** 320:17 **11th** 444:11 **12** 505:2 506:9 523:22 **12:08** 384:4 **13** 308:7 561:9 | **2** |
| | **2** 554:12 **2,287.50** 504:16 **2:00** 438:1,16,18,19 447:20 510:19 **2:15** 438:19 **20** 508:18,22 582:1 **2000** 539:21 542:1 **20006** 539:22 **2001** 543:19 544:7 545:8 **2008** 454:20 **2009** 339:6,10 **201** 544:3,8 545:1,9 545:11 **2010** 288:3 292:9 292:12 293:8 297:5 298:6 302:8 303:19 304:5 305:1 306:22 307:9 339:10 381:6 402:8 429:1 429:22 431:15 444:8,12 460:5 512:2 539:16 542:1 543:5,10 546:20 549:18 550:8 555:5 556:22 557:1 569:11 573:5,8 **2011** 300:11,14 460:2,15 485:8 505:15 510:12,13 |

| **6** | |
|---|---|
| **601** 573:17 **62,000** 569:1 | |

| **7** | |
|---|---|
| **7** 484:22 485:6 541:4,15 **7/13/11** 508:12 **7th** 431:15 | |

| **8** | |
|---|---|
| **8** 429:22 541:19,20 542:11 **8/23/2011** 521:18 **815-5221** 262:7 **824-8300** 402:18 **8th** 546:20 549:18 550:8 | |

| **9** | |
|---|---|
| **9** 429:14,20 430:6,6 546:19 551:10 **9:30** 261:3 264:6 267:13 276:4 582:10,11 583:11 584:11 **901(b)(4)** 310:9 **904(b)(1)** 310:11 **954** 262:7 **99** 387:3 | |



RECEIVED

June 20, 2018

Board on Professional
Responsibility

**Date:** June 1, 2018

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 615

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,              : Board Docket No.

LARRY E. KLAYMAN,              : 17-BD-063

     Respondent.    :

- - - - - - - - - - - - - - - X

     Friday, June 1, 2018

     Washington, DC


    HEARING


Reported by

 Kim M. Brantley, C.S.R.

In Re:  Larry E. Klayman
June 1, 2018

| | |
|---|---|
| **Page 616** | **Page 618** |

**Page 616**

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:30 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10    AD HOC HEARING COMMITTEE:
11    WARREN ANTHONY FITCH, ESQUIRE
12    Chair
13    MS. MARY LARKIN
14    Public Member
15    MICHAEL TIGAR, ESQUIRE
16    Attorney Member
17
18    On behalf of the DC Attorney Disciplinary
19    System:
20      H. CLAY SMITH, III, ESQUIRE
21
22

**Page 618**

I N D E X

| WITNESS: | DIRECT: | CROSS: |
|---|---|---|
| Ms. Elham Sataki | 769 | 620 |
| Joel Bennett | 795 | 823 |

**Page 617**

1  APPEARANCES CONTINUED:
2    On behalf of Respondent:
3      FREDERICK J. SUJAT, ESQUIRE
4      Law Office of Frederick J. Sujat
5      1525 Windjammer Way
6      Hollywood, Florida 33019
7      (954) 815-5221
8      Email: fsujat@yahoo.com
9    ALSO PRESENT:
10      LARRY E. KLAYMAN, ESQUIRE
11      Respondent
12    and
13      MEGHAN BORRAZAS,
14      BOPR Staff
15
16
17
18
19
20
21
22

**Page 619**

1  P R O C E E D I N G S
2    CHAIRMAN FITCH:  If we're all settled
3  in, back on the record.
4    Good morning.  I observe that the three
5  hearing committee members and the Respondent and
6  Disciplinary Counsel are all here.
7    Mr. Smith, any preliminary matters?
8    MR. SMITH:  Nothing from Disciplinary
9  Counsel.  Thank you.
10    CHAIRMAN FITCH:  Any preliminary
11  matters from Respondent?
12    MR. SUJAT:  Nothing at this time, your
13  Honor.
14    CHAIRMAN FITCH:  I think we should
15  resume the cross-examination of Ms. Sataki.
16    (Ms. Elham Sataki resumes the witness
17  stand.)
18    THE WITNESS:  Good morning.
19    CHAIRMAN FITCH:  Good morning.
20
21
22

2  (Pages 616 to 619)

In Re: Larry E. Klayman

June 1, 2018

|  | Page 620 |
|---|---|

1          CONTINUED CROSS-EXAMINATION
2      ON BEHALF OF RESPONDENT:
3          BY MR. KLAYMAN:
4      Q.  Good morning, Ms. Sataki.
5      A.  Good morning.
6          CHAIRMAN FITCH:  I remind you that you
7  remain under oath.
8          THE WITNESS:  Yes.
9          CHAIRMAN FITCH:  Go ahead, Mr. Klayman,
10  if you wish.
11  BY MR. KLAYMAN:
12      Q.  Ms. Sataki, yesterday, towards the end
13  of the day, you testified that you were employed
14  by a cosmetic company and before that by Andisher
15  Television in Los Angeles, a Persian broadcasting
16  network, throughout the last eight years, correct?
17      A.  Correct.
18      Q.  And that your current salary is
19  $65,000.
20      A.  $62,000.
21      Q.  Do you get commissions in addition to
22  that?

|  | Page 622 |
|---|---|

1          MR. SMITH:  Did you mean to give me
2  this document?
3          MR. KLAYMAN:  No.  You're right.
4  BY MR. KLAYMAN:
5      Q.  I want to you to turn to the third page of
6  this exhibit --
7          MR. KLAYMAN:  Which I'll ask to be
8  marked Respondent's Supplemental Exhibit 1.
9          CHAIRMAN FITCH:  Well, no, we don't
10  want to mark it that, because -- oh, Respondent's
11  Supplemental Exhibit 1.  But you want the whole
12  document?
13          MR. KLAYMAN:  Yes.
14          CHAIRMAN FITCH:  So the top of this
15  one, if Ms. Borrazas agrees, we will do RX-1.
16          Ms. Borrazas:  Does calling this R --
17          MS. BORRAZAS:  RX?
18          CHAIRMAN FITCH:  No, no, not RX,
19  because that's the denomination that we'll be
20  using in the briefs, in the report for
21  Respondent's exhibits.
22          I guess RSX.

|  | Page 621 |
|---|---|

1      A.  No.
2      Q.  Are there any other benefits that you
3  get with your job?
4      A.  Health insurance.
5      Q.  How much is that worth per month?
6          MR. SMITH:  Objection.
7          THE WITNESS:  I don't know.
8  BY MR. KLAYMAN:
9      Q.  Alright, I'm going to ask if I may
10  approach, or I'll give it to Mr. Smith, a pleading
11  that was filed in this case, which I'm going to
12  ask be make part of the record.
13          MR. KLAYMAN:  It's for Ms. Sataki.  May
14  I approach?
15          CHAIRMAN FITCH:  Mr. Smith, will you
16  hand it to her.
17          MR. KLAYMAN:  And I have copies for the
18  hearing committee.  I have actually two, I
19  apologize.
20          It's a matter of the record in this
21  case, but I'm going to ask that it be attached and
22  admitted as an exhibit, a Respondent's exhibit.

|  | Page 623 |
|---|---|

1          MR. KLAYMAN:  Ok, RSS?
2          CHAIRMAN FITCH:  And could I have a
3  proffer, Mr. Klayman?
4          MR. KLAYMAN:  Yes.  I'm going to ask
5  questions about the email that she wrote, going to
6  issues of credibility -- purports to have written.
7  BY MR. KLAYMAN:
8      Q.  Would you please turn to Page 3.  That
9  is an email --
10          MR. SMITH:  And for the record it is
11  identified as Attachment 1.
12  BY MR. KLAYMAN:
13      Q.  Attachment 1 to that Exhibit RSS1,
14  that's an email which purports to come from you,
15  Ms. Sataki, from your email address,
16  EllieSataki@yahoo.com, to Clay Smith, CC Elham
17  Sataki, "Subject: Hearing."
18          MR. KLAYMAN:  May I read it, your
19  Honor?  It's very short.  I'll try not to read
20  much today.
21          CHAIRMAN FITCH:  Continue.
22          MR. KLAYMAN:  Ok.

3  (Pages 620 to 623)

In Re:  Larry E. Klayman
June 1, 2018

Page 624

BY MR. KLAYMAN:

1   Q.  "Hello, Mr. Smith.  As you know I work
2   full time.  I requested time off for this hearing
3   and I had to use vacation time to be able to make
4   it.  I talked to my boss to see if I can change
5   the date and they said that they already had done
6   the schedule and vacation time for orders
7   according to the time off that I needed, as this
8   is very important.
9       "I hope and pray that we can still keep
10  the date.  Otherwise, if I have to quit my job, I
11  will make it in July, because, as you know, this
12  is very important to me.
13      "My life has been on hold for the past
14  eight years since Mr. Klayman completely ruined my
15  career and my life.  I hope we don't have to
16  extend it even more.  Best, Elham Sataki," with
17  your phone number.
18      Ms. Sataki, this is English, which is
19  not -- it's not your English, is it?  You had
20  somebody write this, correct?
21      A.  Not correct.

Page 625

1       You know me, eight -- within eight
2   years, I could learn more English.
3       Q.  Well, let me ask you --
4       A.  This is my writing.
5       Q.  Before you wrote this, did you consult
6   with anyone about what you were going to put in
7   it?
8       A.  No.
9       Q.  I take it, though, that Mr. Smith, Bar
10  Counsel, asked you to write this email?
11      A.  He asked me, yes, to write an email and
12  explain why I would have to get -- why I feel that
13  I need to keep these things, yes.
14      Q.  And before you wrote the email, you
15  discussed with Mr. Smith what you were going to
16  put in this email, correct?
17      A.  Well, I -- I explained to him over the
18  phone why I need to keep the date, and he says,
19  "Ok, put it in an email and send it to me."
20      Q.  So you went over the matters in this
21  email with Mr. Smith before you sent it to him?
22      MR. SMITH:  Objection, vague.

Page 626

1       THE WITNESS:  I don't understand.
2       MR. KLAYMAN:  Alright, let me rephrase
3   it.
4   BY MR. KLAYMAN:
5       Q.  You told Mr. Smith what you were going
6   to say in this email before you sent him this
7   email.
8       A.  Not the last part, no.  I just
9   explained to Mr. Smith that it's going to
10  interrupt with my schedule and my job, so please
11  let's try to keep the date.
12      That part I talked to Mr. Smith about,
13  not the last part.
14      Q.  Did Mr. Smith ask you to be able to
15  talk with your employer to see if the scheduling
16  could be worked out?
17      A.  Yes.
18      Q.  And what did you say?
19      A.  I said I will talk to them and see if I
20  can.
21      Q.  Did Mr. Smith ask to talk to your
22  employer?

Page 627

1       A.  If Mr. Smith can talk to my employer?
2       Q.  Yes, to see if he could work it out, so
3   the employer would know there was a legitimate
4   reason why you needed to reschedule.
5       MR. SMITH:  Please restate the
6   question.
7   BY MR. KLAYMAN:
8       Q.  Did Mr. Smith --
9       CHAIRMAN FITCH:  That question is
10  struck.
11  BY MR. KLAYMAN:
12      Q.  Did Mr. Smith ask to talk to your
13  employer about the schedule?
14      A.  I explained to Mr. Smith that I talked
15  to my employer and it's not doable.  It's going to
16  hurt my -- the schedule.
17      Q.  The question was did Mr. Smith ask you
18  if it would be ok if he talked with your employer?
19      A.  No.
20      Q.  Now the last sentence, "My life has
21  been on hold for the past eight years since Mr.
22  Klayman completely ruined my career and my life."

4  (Pages 624 to 627)

Page 628

1      You see that?
2      A.  Yes.
3      Q.  Now that's not true --
4      MR. SMITH:  Objection.
5      CHAIRMAN FITCH:  Asked and answered.
6   That's a different subject matter from
7   the other paragraphs.  It's been covered.
8   Sustained.
9      THE WITNESS:  Do -- I'm sorry, I'm
10  answering something now?
11     CHAIRMAN FITCH:  No, there's no
12  question right now.
13     MR. TIGAR:  He sustained the objection.
14     THE WITNESS:  Ok, I'm sorry.
15  BY MR. KLAYMAN:
16     Q.  I turn your attention to Exhibit 18.
17  We were on Exhibit 18 when we left off yesterday.
18     CHAIRMAN FITCH:  Mr. Klayman is
19  referring, I believe, to Respondent's Exhibit 18.
20     MR. KLAYMAN:  Exactly.  Thank you, your
21  Honor.
22     I'm going to get a little water.

Page 629

1      CHAIRMAN FITCH:  Sure.
2   BY MR. KLAYMAN:
3      Q.  I turn your attention to the letter to
4   you from Delia Johnson, director, Office of Civil
5   Rights, in that package.
6      If you would like Mr. Smith to help you
7   find that letter, it's March 23rd, 2011.
8      MR. SMITH:  The third letter in.
9      MR. KLAYMAN:  Yes.  But, to identify
10  the letter, it's March 23rd, 2011 to Ms. Elham
11  Sataki from Delia Johnson.
12  BY MR. KLAYMAN:
13     Q.  Do you see that letter, Ms. Sataki?
14  You can take your time --
15     A.  Thank you.
16     Q.  -- and read it.
17     (Witness reads document.)
18     Q.  Now this letter is addressed to you,
19  correct?
20     A.  Correct.
21     Q.  And that was your address at the
22  apartment that I rented for you in the Valley,

Page 630

1   correct?
2      A.  Correct.
3      Q.  And it's dated March 23rd, 2011, and it
4   says "Dear Ms. Sataki."  That's telling that you
5   there was final agency action on your EEO
6   complaint, your employment complaint against Voice
7   of America and that, there in closing, the
8   findings of the office of civil rights, as part of
9   the EEO complaint, we handed it to you, correct?
10     A.  Correct.
11     Q.  Now when you got this letter, you read
12  the findings, did you not?
13     A.  I don't remember it.
14     Q.  Now the findings that are made here
15  were very important to your life, professionally
16  and personally, correct?
17     A.  Correct.
18     Q.  So you would have logically read the
19  findings, correct?
20     A.  Correct.
21     Q.  So does that refresh your recollection
22  as to whether you read these findings?

Page 631

1      A.  You mean the money that they said --
2   the 1,614?  Is that what you --
3      Q.  The attachment to the letter says --
4   you can turn the page, "Final Decision in the
5   Discrimination Complaint of Elham Sataki.
6   OCR-10-11."  It starts with "Background."
7      So take an opportunity and look at all
8   the documents, that one and the documents after
9   that one, to the very end before Respondent's
10  Exhibit 19.  You can take your time and look at
11  it.
12     (Witness peruses documents.)
13     A.  You want me to read all this?
14     Q.  No.  I just want you to identify it to
15  confirm that you read it when you received it on
16  or about March 23rd, 2011.
17     CHAIRMAN FITCH:  Just for the clarity
18  of the record, Mr. Klayman, you referred at one
19  point to a document behind the Decision memo, and
20  I understand why you did so.
21     I suggest that the entire 19 pages that
22  follow the final decision cover letter be

5 (Pages 628 to 631)

In Re: Larry E. Klayman
June 1, 2018

Page 632

1  considered one document.
2       MR. KLAYMAN: Yes.
3       CHAIRMAN FITCH: Because it's divided
4  into Background and then Analysis, which is why I
5  think you bifurcated it.
6       MR. KLAYMAN: That's a good session.
7       CHAIRMAN FITCH: But it seems to be all
8  one document for the purposes of --
9       MR. KLAYMAN: Ok.
10       But, in any event, I'm showing it to
11  Ms. Sataki to refresh her recollection.
12       (Witness reads document.)
13       THE WITNESS: Again, from that time I
14  don't remember much, so, I can't say that I
15  exactly -- I can't go back to March 23rd, 2011 and
16  exactly remember receiving this. Unfortunately I
17  can't say that, because I don't remember.
18  BY MR. KLAYMAN:
19       Q.  The decision by the Office of Civil
20  Rights was with regard to your substantive claims
21  of sexual harassment and workplace retaliation,
22  correct?

Page 633

1       A.  Correct.
2       Q.  This is what we were putting in all the
3  time and expense to get, was an initial
4  determination from Office of Civil Rights,
5  correct?
6       A.  Correct.
7       Q.  So therefore, it would have been very
8  important for you to know what it is the Office of
9  Civil Rights ruled, correct?
10       A.  Correct.
11       Q.  So, does that help you remember,
12  whether you read this?
13       A.  No, because I was very sick at that
14  time.
15       Q.  So you gave it to other people to read?
16  You gave it to your cousin Sam --
17       A.  I don't remember.
18       Q.  -- to read?
19       A.  I don't remember. I don't remember.
20       Q.  You gave it to Kathleen to read?
21       A.  I don't remember.
22       Q.  So this was really very unimportant to

Page 634

1  you. Is that what you're saying?
2       A.  It was very important to me, but it was
3  very unfortunate that I was very sick during that
4  time.
5       Q.  Well, you had an opportunity to read it
6  after that. Did you read it after that?
7       A.  I don't remember.
8       Q.  Up to today you don't know whether
9  you've read it?
10       A.  I don't know.
11       Q.  Up to today, you don't know whether you
12  gave it to somebody else to help you understand
13  what was in it?
14       A.  No.
15       Q.  But you did understand this was the
16  decision on your claims of sexual harassment?
17       A.  I don't remember that I received this,
18  I'm sorry. I don't remember, I apologize.
19       At that time I was just very sick and
20  was trying to survive and not get -- not be
21  homeless. So, I can't remember this particular --
22       I remember the big picture, what

Page 635

1  happened during that time. But this particular --
2  if you're asking about this particular event, or
3  this particular letter, unfortunately I don't
4  remember.
5       Q.  That is your address, is it not?
6       A.  Yes, it is.
7       Q.  I turn your attention to the Final
8  Decision and go to Page 4, please, wherein it says
9  "Excepted Claims," and they have a list of 13.
10       Take an opportunity and review those
11  13, if you will. I'll ask you some questions.
12  I'm not going to read all of it.
13       (Witness reads document.)
14       Q.  And I'll turn your attention in
15  particular to number three. So, when you've had a
16  chance to read it, let me know.
17       (Witness reads document.)
18       Q.  Number three deals with your having
19  alleged unwarranted verbal and physical sexual
20  advances from another employee.
21       Was that Mr. Falahati?
22       A.  Yes.

6 (Pages 632 to 635)

In Re:  Larry E. Klayman
June 1, 2018

Page 636

1    Q.   And then you allege, "When she
2  rejected" -- when you rejected his sexual
3  advances, that Mr. Falahati told people that you
4  weren't doing a good job and engaged in other acts
5  of harassment and intimidation.
6       That was part of your complaint,
7  correct?
8    A.   Correct.
9    Q.   Now we go to number four.
10      You're also alleging that one day, when
11  you refused Falahati's sexual advances, that he
12  grabbed and fondled your bra straps and repeated
13  the act later in the week, correct?
14    A.   Correct.
15    Q.   And then you're alleging that he
16  started a campaign to have you replaced as co-host
17  of Straight Talk, correct?
18    A.   Correct.
19    Q.   Then in number five, you alleged that
20  "There was a continuous daily campaign by Falahati
21  and management officials to publicly disparage the
22  plaintiff's language ability in Farsi, spread

Page 637

1  false rumors and publish false statements to the
2  staff regarding her newscasting abilities,
3  manufactured false complaints from viewers about
4  her newscasting abilities, spread false rumors to
5  the staff that she was receptive to workplace
6  romantic liaisons," l-i-a-i-s-o-n-s -- "and
7  falsely accused her of having an affair with
8  another Persian broadcaster."
9       Those were also your allegations,
10  correct?
11    A.   Correct.
12    Q.   Number six.
13      Your other allegations were also that
14  false allegations and rumors resulted in you being
15  removed from your position as co-anchor of
16  Straight Talk and relegated to menial jobs,
17  correct?
18    A.   Correct.
19    Q.   And then seven, that the individual who
20  sexually harassed you, Mr. Falahati, was
21  subsequently placed back on the Straight Talk
22  program while you got nothing, correct?

Page 638

1    A.   Correct.
2    Q.   And then you alleged "Complainant's
3  reasonable accommodation request to be detailed to
4  Los Angeles was denied" and that you were
5  threatened by the Deputy General Counsel with
6  being removed from the Persia News Network and
7  placed in the Central News Bureau, which is in the
8  physical vicinity of the sexual harasser.
9       That's correct, right?
10    A.   Yes.
11    Q.   And number nine, you also --
12    CHAIRMAN FITCH:  What's the point of
13  reading all of this?
14    MR. KLAYMAN:  Because I'm laying a
15  foundation for the question --
16    CHAIRMAN FITCH:  Yes, yes, but for
17  what?
18    MR. KLAYMAN:  I'll go to this part,
19  your Honor.  They were short, so I was trying to
20  paraphrase to a certain extent.
21    MR. SMITH:  If I could suggest, rather
22  than reading all that in the record, could you

Page 639

1  just ask the witness whether she read paragraph
2  six and whether she agrees with it as opposed to
3  actually reading the --
4    CHAIRMAN FITCH:  Whatever foundation he
5  wants to lay, it's laid and I want a question.
6    MR. KLAYMAN:  I'm trying to create a
7  good record for the transcript, too, which we're
8  going to have to use as to what we're talking
9  about.
10    CHAIRMAN FITCH:  The document is going
11  to be in evidence.  Ask a question.
12    MR. KLAYMAN:  Yes, I understand.
13    CHAIRMAN FITCH:  Consider the
14  foundation laid.
15  BY MR. KLAYMAN:
16    Q.   Go to Analysis, and I'll ask you
17  questions.  I won't read, ok, but I want you to
18  read pages five -- excuse me, Page 9, 10, 11, 12,
19  13 --
20    A.   You want me to read all these now?
21    Q.   Yes, please read it.
22    CHAIRMAN FITCH:  Objection sustained.

7 (Pages 636 to 639)

Page 640

1   This is a waste of your time, counsel.
2   MR. KLAYMAN: Alright, then I'll ask
3   the question, a general question.
4   BY MR. KLAYMAN:
5   Q.  It is correct that the Office of Civil
6   Rights interviewed a number of people inside of
7   VOA and elsewhere and found that your claims were
8   false?
9   MR. SMITH: Objection.
10   CHAIRMAN FITCH: Now, what is the --
11   Wait a minute. Do not answer.
12   What is the relevance of whether her
13   claims were false or not? They were pursued.
14   They were lost. She could have lost this for any
15   number of reasons. This is the same thing as
16   trying to say that a court decision proves some
17   falsity or dishonesty. Not so.
18   Next question.
19   MR. KLAYMAN: Well, let me explain.
20   You asked me to explain.
21   CHAIRMAN FITCH: I'm sorry?
22   MR. KLAYMAN: You asked me to explain.

Page 641

1   CHAIRMAN FITCH: And it's not a
2   sufficient explanation.
3   MR. KLAYMAN: I didn't give an
4   explanation, your Honor.
5   CHAIRMAN FITCH: Well, you just did.
6   You told me, I asked you to explain it, quote
7   unquote.
8   MR. KLAYMAN: Yeah, and I would like to
9   put on the record what the reason for this is.
10   CHAIRMAN FITCH: That's perfectly ok.
11   MR. KLAYMAN: Ok. The reason for the
12   record is that she -- I relied upon certain
13   information that she gave to me to make various
14   claims.
15   CHAIRMAN FITCH: Of course.
16   MR. KLAYMAN: I put in my time,
17   expense. I tried to do what I could to make her
18   whole again and to understand that she had a place
19   to live and moving expenses and everything else.
20   Based upon these findings, it would
21   appear that she did not tell me the truth in this
22   process.

Page 642

1   CHAIRMAN FITCH: That does not go to
2   that.
3   And also, given all of the credibility
4   challenges, it's repetitive and cumulative, and
5   I'm not even sure that it's otherwise relevant to
6   any of the charges in this case.
7   MR. KLAYMAN: Well, it goes to
8   credibility, your Honor. You recognize that
9   credibility is a big issue, and that's why we're
10   not --
11   CHAIRMAN FITCH: I'm actually not sure
12   of that. You can argue that to me at the end. I
13   have an open mind as to whether it is, given the
14   charges in this case, that the evidence has been
15   adduced by both sides.
16   But we certainly have had enough of
17   this -- and I'm holding up Exhibit 18 -- kind of
18   evidence.
19   MR. KLAYMAN: Your Honor, we just went
20   through a document. I've been very light. I have
21   not tried to be abrasive in any way.
22   CHAIRMAN FITCH: No one has said you've

Page 643

1   been abrasive, and that comment, whether you've
2   been abrasive or not, or gracious or not, has
3   nothing to do with this legal evidentiary issue.
4   MR. KLAYMAN: Well, it does, because I
5   don't want to -- you know, I had wanted some time
6   to be able to have Mr. Sujat do the
7   cross-examination, but the reality is this: is
8   that, yes, credibility is always a huge part in
9   every proceeding, and we just went through a
10   document that she sent to Mr. Smith where it
11   simply wasn't true that her career had been
12   ruined. She continued on as before.
13   THE WITNESS: It's the only -- I'm
14   sorry.
15   MR. KLAYMAN: So, this is very
16   important in weighing credibility.
17   CHAIRMAN FITCH: A, I'm not sure of
18   that, but B, we know your point. The document,
19   which speaks for itself, rejects her claims. It
20   doesn't necessarily make them false, but you have
21   a theory that it makes them false --
22   MR. KLAYMAN: It does so --

8  (Pages 640 to 643)

In Re:  Larry E. Klayman
June 1, 2018

Page 644

1    CHAIRMAN FITCH:  -- and I understand
2    that.  And I'm going to take, and in fact the
3    three of us are going to take that into
4    consideration.
5    MR. KLAYMAN:  It does so in great
6    detail, in great detail.
7    CHAIRMAN FITCH:  We're going to read
8    all these documents.
9    MR. KLAYMAN:  No, we're not going to
10   read it all, your Honor.
11   CHAIRMAN FITCH:  No, no, we the three
12   of us fact-finders, we're going to read these
13   documents.
14   MR. KLAYMAN:  Ok.  I respect your
15   rulings, your Honor.  I don't agree with them, but
16   I respect your rulings and will obey them.
17   But, the issues I'm allowed to probe on
18   certain things that are said here that OCR
19   rejected and said were not true and get into
20   specifics of that and why she didn't give me the
21   information to adequately defend her or decide
22   whether I wanted to defend her at all in these

Page 645

1    matters.
2    You know, I spent a lot of time and
3    expense, and frankly I feel as if I was not dealt
4    with fairly.
5    So, that's where we are today.
6    Now as a zealous advocate and former
7    counsel to her, I did my best, even after this, to
8    get her a good result.  But candidly, when I read
9    this --
10   CHAIRMAN FITCH:  But we know that that
11   evidence is here and you're not charged with not
12   doing your best for her.
13   I keep reminding you.  There is no lack
14   of zealousness charged here.  There is no lack of
15   competency charged here.
16   You have, in addition, on the issue of
17   whether or not you handled the termination issue
18   correctly, you have introduced evidence of that
19   also, but you may want to introduce more evidence
20   on that.
21   MR. KLAYMAN:  It also bears on this,
22   and thank you for hearing me out, and it's

Page 646

1    regrettable that I have to say this in front of
2    Ms. Sataki, but it bears on her honesty.  It bears
3    on truthfulness.  It bears on candor.
4    I mean, we just heard testimony that
5    she never read this.  Obviously no one is ever
6    going to believe that.  That's inconceivable,
7    since this was so important she claims I ruined
8    her life, that she wouldn't read this?
9    So this is why credibility is so
10   important.
11   CHAIRMAN FITCH:  This is a repetitive
12   argument.  That is not being heard.
13   Q.  I turn your attention to Exhibit Number
14   20.  Take an opportunity to review it.  This is
15   the EEO OCR complaint that you filed and signed.
16   Or that was filed for you, and you signed it on
17   Page 3.
18   A.  Yes.
19   Q.  Correct?
20   A.  Correct.
21   MR. KLAYMAN:  Your Honor, I move
22   Exhibit 18 and 19 into evidence.

Page 647

1    MR. SMITH:  No objection.
2    CHAIRMAN FITCH:  Wait a minute, we have
3    skipped over --
4    MR. KLAYMAN:  I'm sorry, I'm sorry.
5    CHAIRMAN FITCH:  Eighteen is admitted.
6    MR. KLAYMAN:  Yes.
7    CHAIRMAN FITCH:  And you have moved 20?
8    MR. KLAYMAN:  20.
9    MR. SMITH:  No objection to 18 or 20.
10   MR. KLAYMAN:  By the way, let me say
11   this one other thing in the hearing --
12   CHAIRMAN FITCH:  Let me make clear for
13   your sake that all pages of 18 are admitted.
14   Now, did you want to say something
15   about 20, before I admit it?
16   MR. KLAYMAN:  No, that's all.
17   But I want to say something just
18   generally here bearing on some of the testimony,
19   very briefly, for the record.
20   What I want to say is that my
21   questioning her on the letter she sent to Mr.
22   Smith is no reflection on you or anybody on the

9  (Pages  644 to 647)

In Re: Larry E. Klayman
June 1, 2018

Page 648

1    committee. I don't in any way view that you did
2    anything improper in not continuing her testimony
3    or anything like that, but I did want to --
4         CHAIRMAN FITCH:  Must say that had
5    never crossed my mind.
6         MR. KLAYMAN:  Well, I thought maybe
7    because you're showing a little bit of --
8         CHAIRMAN FITCH: It's a perfectly good
9    cross-examination. Nicely done.
10         MR. KLAYMAN:  Alright, alright.
11    Thanks.
12    BY MR. KLAYMAN:
13         Q.  I turn your attention to Exhibit 19.
14    That's a Freedom of Information Act request that I
15    filed for you, correct?
16         CHAIRMAN FITCH:  That question is
17    struck. It seems to be an inaccurate question.
18         MR. KLAYMAN:  I'll just ask that it be
19    admitted into the record. That's all.
20         CHAIRMAN FITCH:  It is with the
21    response.
22         MR. KLAYMAN:  Ok. Yes, correct.

Page 649

1         MR. TIGAR:  That's Exhibit 19?
2         MR. KLAYMAN:  Yes.
3         MR. TIGAR:  That's the one addressed to
4    UPS Box 345 at 2000 Pennsylvania?
5         MR. KLAYMAN:  Yes.
6    BY MR. KLAYMAN:
7         Q.  Now, turn to Exhibit 24.
8         CHAIRMAN FITCH:  We have admitted
9    number 19 in evidence.
10         Did I say admitted for 19?
11         MR. KLAYMAN:  Yes.
12         CHAIRMAN FITCH:  It is, indeed.
13    BY MR. KLAYMAN:
14         Q.  Take a quick look at that. This is
15    something that you and I prepared together on
16    February 21st, 2010, a letter to Paul Kollmer
17    Dorsey.
18         Do you see that?
19         A.  Yes.
20         Q.  And we prepared that together, didn't
21    we? Because we were trying to resolve all these
22    matters.

Page 650

1         A.  Yes.
2         MR. SMITH:  Objection; one question at
3    a time.
4         MR. KLAYMAN:  I heard two distinct
5    yeses.
6    BY MR. KLAYMAN:
7         Q.  Turn to the letter of February 22nd,
8    2010, and the attachments, which is an email from
9    Tim Shamble to me. Blanquita's cell, (703)
10    307-9510. She gives the home number.
11         So I just want to ask a general
12    question on this and not take up much time...
13         You are aware that we were trying to
14    settle this thing amicably, and even because of my
15    friendship with Blanquita Cullum believed that we
16    had a really good chance of doing --
17         A.  That's what you said at that time, yes.
18         Q.  And Blanquita Cullum sat on the board
19    of governors at the time.
20         A.  You told me that, yes.
21         MR. KLAYMAN:  Your Honor, I ask that
22    that be admitted as Respondent's Exhibit 24.

Page 651

1         MR. SMITH:  No objection.
2         CHAIRMAN FITCH:  All of RX24 is
3    admitted.
4         MR. KLAYMAN:  Yes.
5    BY MR. KLAYMAN:
6         Q.  Exhibit 25 is a letter of May 12th,
7    2010 addressed to you, care of the UPS Store,
8    "Dear Ms. Sataki," and it's from the International
9    Broadcasting Bureau.
10         Take an opportunity and look at that
11    letter. It's only two pages.
12         (Witness reads document.)
13         CHAIRMAN FITCH:  Again, for clarity of
14    the record, Mr. Klayman may have correctly said
15    May 10. I heard March 10, but it purports to be
16    May 10, as I think --
17         MR. KLAYMAN:  It is May 12th, your
18    Honor.
19         CHAIRMAN FITCH:  May 12th?
20         MR. KLAYMAN:  Yes.
21         CHAIRMAN FITCH:  Thank you.
22

10  (Pages 648 to 651)

App.0340

In Re:  Larry E. Klayman
June 1, 2018

Page 652

1   BY MR. KLAYMAN:
2       Q.  Tell me when you're finished reading
3   it.
4       A.  You want me to read the whole email to
5   the end?
6       Q.  Well, it's only two pages.  I'm going
7   to ask you questions about it.  I can ask you
8   without it.
9           What I'm going to ask you is, on or
10  about May 12th, 2010, you were advised that they
11  were not -- International Broadcasting Bureau of
12  the Broadcasting Board of Governors was not going
13  to agree to you being stationed in Los Angeles,
14  correct?
15      A.  Correct.
16      Q.  And instead, they offered you to be
17  stationed in another part of Voice of America in
18  Washington, DC, and that's in paragraph four.  So
19  if you could look at that.
20      A.  Yes.
21      Q.  You didn't want to do that, correct?
22      A.  You advised me not to do that.

Page 653

1       Q.  Wait.  Didn't you previously testify
2   that you didn't want to be in the vicinity of the
3   harasser?
4       A.  You advised me to say that.  You were
5   my attorney --
6       Q.  So you were willing to be in the same
7   building with Medhi Falahati?
8       A.  If it would cost my job, if it would
9   cost my job -- I lost my career.  I lost my job,
10  and I lost a government job that could provide a
11  future for me.
12          So if I had to deal with that and --
13          THE WITNESS: I don't know, can I
14  continue talking or I have to stop?
15          CHAIRMAN FITCH:  Yes, you're answering
16  the question.  Go ahead.
17          THE WITNESS:  Before you started
18  representing me, Tim Shamble and Delia Johnson,
19  they all were involved in this and they were
20  trying to resolve it within and see what they're
21  going to do.
22          So I was still working there.  It was a

Page 654

1   tough situation, but I was trying to handle it.  I
2   was still working there.
3           But then when you came in and you
4   explained my rights that, "No, you don't have to
5   do that.  We can do this.  We can take you to LA.
6   We can do that," so then I started doing as my
7   attorney tells me, as I'm not an attorney and my
8   attorney knows best.  But --
9   BY MR. KLAYMAN:
10      Q.  Ms.- --
11      A.  Before that, choosing between a career
12  and my job, and if I have to just stay tough and
13  take it and continue and hope for the better, I
14  would have done it.
15      Q.  You previously testified earlier in
16  this hearing that if you had to go back to
17  Washington and work at Voice of America here you
18  would kill yourself.
19          You remember you testified to that?
20      A.  No, I didn't say that.
21      Q.  Well, the record is clear.
22          Now --

Page 655

1       A.  The only time I said I would kill
2   myself was during the time that I was very, very
3   sick and I lost everything and I was -- that's
4   what I said.  That is after you weren't
5   representing me any more and everything went down.
6           That's the only time I said I would --
7   I even thought about it.
8           Please don't bring that to everything.
9       Q.  Ms. Sataki, who did you talk to last
10  night about your testimony in this case?
11      A.  I'm sorry, what?
12      Q.  Who did you talk to yesterday evening,
13  after we finished, about your testimony in this
14  case?
15          You talked to Sam.  You talked to
16  Kathleen.
17          Who did you talk to?
18      A.  No.
19          MR. KLAYMAN:  We'll let the record
20  speak for itself.  Move on, next exhibit.
21          THE WITNESS:  I haven't talked to
22  Kathleen for a long, long, long time.

11 (Pages 652 to 655)

In Re:  Larry E. Klayman
June 1, 2018

Page  656

1      CHAIRMAN FITCH:  We have your answer.

2      MR. TIGAR:  We have your answer.  Thank

3  you.  We heard.

4      THE WITNESS:  I'm sorry.

5      MR. KLAYMAN:  We heard.  No, it's okay.

6      MR. KLAYMAN:  Your Honor, rather than

7  to belabor things here, because, you know, there's

8  no point, I'm just getting completely conflicting

9  testimony to previous testimony, I'll just ask

10 that Exhibit 25 be entered in as an exhibit.

11     CHAIRMAN FITCH:  Twenty-five is

12 admitted.

13     MR. KLAYMAN:  I'll ask that Exhibit 28

14 be admitted into evidence.

15     CHAIRMAN FITCH:  Give me a moment,

16 please.

17     MR. SMITH:  Twenty-eight?

18     CHAIRMAN FITCH:  And Mr. Smith a

19 moment.

20     MR. SMITH:  No objection to 25.  Let me

21 take a look at 28.

22     And assuming that 28 is a letter dated

Page  657

1  June 16th, 2010 and another letter dated June

2  22nd, 2010, Bar Exhibit 28 --

3      MR. TIGAR:  Just for my -- 28 is the

4  one which the first is the June 16th, 2010 letter?

5      MR. KLAYMAN:  Yes.

6      MR. TIGAR:  Thank you.

7      CHAIRMAN FITCH:  And Mr. Smith I think

8  does not object to either pages?

9      MR. SMITH:  No, no, I was just trying

10 to make sure, because I know that Mr. Klayman had

11 said that his Bar exhibits may have been out of

12 order.  So I was just trying to make sure that

13 what I was looking at was what everybody else was

14 looking at.

15     I have no objection.

16     CHAIRMAN FITCH:  Ok, 28, Respondent's

17 28 is admitted in its entirety.

18     MR. KLAYMAN:  Exhibit 29, I ask for it

19 to be admitted.  We can deal with the other

20 exhibits later, if your Honor prefers, at the end

21 of this proceeding.  Because I don't intend to ask

22 her questions about 29 or 30.  How ever you wish.

Page  658

1  We can take care of it now and just have them

2  entered into evidence now.

3      CHAIRMAN FITCH:  Yes.

4      MR. SMITH:  Well, assuming that Bar

5  Exhibit 29 is a civil complaint, Larry Klayman vs.

6  Judicial Watch, Elham Sataki vs. Broadcasting

7  Board of Governors, and Elham Sataki vs. Medhi

8  Falahati, I have no objection to that.

9      And to the extent that Bar Exhibit 30

10 is a Certificate of Disciplinary History for Larry

11 Klayman, I don't object to its admission.

12     MR. KLAYMAN:  Thank you.

13     CHAIRMAN FITCH:  Are all the documents

14 in 29 part of one judicial submission?  I mean,

15 there's --

16     MR. KLAYMAN:  You're right, your Honor.

17 They're not all the same.

18     CHAIRMAN FITCH:  They may all be

19 judicial submissions.

20     MR. KLAYMAN:  They are judicial

21 submissions.  They're all judicial submissions and

22 they speak for themselves.

Page  659

1      CHAIRMAN FITCH:  That's right.

2      MR. KLAYMAN:  So you'll be able to

3  identify what they are, and if you have any

4  questions I'll be happy to answer you, even after

5  the hearing concludes.

6      MR. SMITH:  No objection.

7      CHAIRMAN FITCH:  They're admitted

8  without objection.

9      MR. KLAYMAN:  Thank you.

10     CHAIRMAN FITCH:  RX 29 is admitted

11 without objection in its entirety.

12 BY MR. KLAYMAN:

13     Q.  I'm going to turn your attention to the

14 supplemental petitioner's exhibits.  We're going

15 to go through some of them right now.

16     CHAIRMAN FITCH:  Say that again.

17     MR. KLAYMAN:  The supplemental exhibits

18 of the petitioner, the Office of Bar Counsel.

19     CHAIRMAN FITCH:  Ok.  Does the witness

20 have that package?

21     (Brief pause.)

22     MR. SMITH:  Alright.

12  (Pages 656 to 659)

In Re: Larry E. Klayman
June 1, 2018

Page 660

1 BY MR. KLAYMAN:
2     Q.  I'm going to turn your attention to
3 Exhibit 5, SX5.  Do you see that?
4     A.  Yes.
5     Q.  It's an email that I sent you on May
6 8th, 2010, "Legal Representation".  You sent it,
7 as is reflected on the top, to Mr. Smith on May
8 24th, 2018, correct?
9     A.  Correct.
10     Q.  Now you remember receiving it because
11 you actually just pulled it up the other day.
12 That's what you testified, correct?
13     MR. SMITH:  Objection.
14     CHAIRMAN FITCH:  Overruled.  Go ahead.
15     THE WITNESS:  Would you --
16 BY MR. KLAYMAN:
17     Q.  You remember getting this document in
18 and around May 8th, 2010, this email from me?
19     A.  Yes.
20     MR. KLAYMAN:  I won't read it, your
21 Honor.  It'll save time.
22

Page 661

1 BY MR. KLAYMAN:
2     Q.  I turn your attention to Petitioner's
3 Supplemental Exhibit 7.  You remember getting this
4 email from me on or about May 9th, 2010?
5     A.  I don't remember it from then, but I do
6 remember it from two weeks ago, when I looked at
7 it.
8     Q.  You have no reason not to believe that
9 you got it and saw it on May 9th, 2010, correct?
10     A.  I'm sorry, what?
11     Q.  You have no reason not to believe that
12 you didn't see it on or about May 9th, 2010?
13     A.  It was in some emails of yours that I
14 wouldn't even open it.  I would leave it unopened,
15 because -- so.
16     Even a week ago when I started going
17 through all of your emails, I had a bunch of
18 unopened emails from that time that I opened and
19 started going through all of them last week.
20     CHAIRMAN FITCH:  No, he didn't ask you
21 about opening.
22     He asked you, is there any reason to

Page 662

1 believe that it was not sent from him to you on
2 May 9th.
3     THE WITNESS:  No, sir.
4 BY MR. KLAYMAN:
5     Q.  Now, you said that some emails you
6 didn't open, but you were aware that I was trying
7 to communicate with you about your case.
8     Wouldn't you want to know what's going
9 on in your cases, to read about your cases?
10     A.  About my case, yes, but there was a
11 lost other emails, too.  So I -- at that point I
12 didn't know which one is about my case, which one
13 is about you getting in arguments with me.
14     Q.  Did you ask anybody else to communicate
15 with me, so you would understand what was going on
16 on your case, if you wouldn't open some emails?
17     A.  No, I don't think so.  I don't
18 remember.
19     Q.  In fact, you could have contacted Mr.
20 Shamble and asked him what's happening.  But you
21 didn't, did you?
22     A.  I contacted Mr. Shamble later.  Not at

Page 663

1 this date, but later.
2     Q.  At all times you had the ability to
3 talk to Mr. Shamble about your cases, correct?
4     A.  Correct.
5     Q.  And you knew that Mr. Shamble was
6 working closely with me on your behalf.
7     A.  Yes.
8     THE WITNESS:  May I -- is this email
9 about the case, this particular email that --
10     MR. KLAYMAN:  There's no question
11 pending, your Honor.
12     CHAIRMAN FITCH:  Let him ask you
13 another question.
14     THE WITNESS:  Ok, I'm sorry.  I'm
15 sorry.
16 BY MR. KLAYMAN:
17     Q.  Turn your attention to Supplemental
18 Exhibit 9.  This is an email from me, Larry
19 Klayman, to you on May 19th, 2010.
20     Do you see that?
21     A.  Yes.
22     MR. KLAYMAN:  May I read this, your

13 (Pages 660 to 663)

Page 664

1  Honor?  It's extremely short.
2        CHAIRMAN FITCH:  Go ahead.
3  BY MR. KLAYMAN:
4        Q.   Ok.  "I did not realize payday had
5  passed with all that is going on.  Please email me
6  the bank name, location, routing number and
7  account number and I will have Vanessa wire the
8  money into your account tomorrow morning.  I have
9  always told you what I mean and I make good on my
10  commitments.  Larry."
11        You see that?
12        A.   Yes.
13        Q.   It is true, is it not, that I offered
14  to pay monies when your salaries were cut off by
15  VOA and asked for your bank account number so I
16  could wire money into your account so you would
17  have money to eat and live?
18        A.   Yes.
19        Q.   Turn to Petitioner's Supplemental
20  Exhibit Number 10.  This is an email of May 19th,
21  2010 to you from me, correct?
22        A.   Correct.

Page 665

1        MR. KLAYMAN:  If I may, your Honor, I'm
2  going to read two lines at the bottom.
3        CHAIRMAN FITCH:  Go ahead.
4  BY MR. KLAYMAN:
5        Q.   "In this email I'm sending you a legal
6  brief of what I've prepared on your behalf to
7  submit in legal proceedings."  And I say, "Please
8  read the legal brief I sent earlier and you will
9  see what I'm doing about it, as you put it.  I've
10  never tried to own you," in quotes, "'by having
11  you owe me money.'  I just wanted to be treated
12  with respect with the realization that I am an
13  important person."
14        You remember my saying that, correct?
15        A.   Correct.
16        Q.   And then in the last sentence, "You
17  don't owe me anything.  I did what I did from the
18  heart.  That's me.  That's why I am not persons
19  who think" -- that's enough.
20        You will acknowledge that I told you
21  you don't owe me any money and I did what I did
22  from my heart?

Page 666

1        A.   Yes.
2        Q.   Turn to Supplemental Exhibit 14.  This
3  is an email from me dated June 16th, 2010, which
4  you forwarded to Mr. Smith last Thursday, May 24,
5  2018, that we didn't see until the next day,
6  wherein I state --
7        MR. KLAYMAN:  I'm just going to read
8  small portions, your Honor.
9  BY MR. KLAYMAN:
10        Q.   "Ellie, next time have somebody write
11  your emails.  This email is poorly written by
12  someone who knows nothing about what has
13  occurred."
14        You see that?
15        What I'm talking about, based on your
16  knowledge, is that something was sent to me
17  purporting to give you legal advice on how this
18  case -- how your cases should proceed?
19        MR. SMITH:  Objection.
20  BY MR. KLAYMAN:
21        Q.   Correct?
22        A.   Not correct.

Page 667

1        CHAIRMAN FITCH:  Objection is
2  overruled.
3  BY MR. KLAYMAN:
4        Q.   When you called up all your emails to
5  give to Mr. Smith last week, you didn't send all
6  of the emails that you had concerning your cases
7  to him, did you?
8        A.   I don't understand your question.
9        Q.   I believe you testified earlier that
10  you didn't open all -- to this day you haven't
11  owned all of your emails from me --
12        A.   I didn't say "to this day."  I said to
13  last week.  To this day, when I sent these.
14        Q.   But you did not forward to Mr. Smith
15  all of the emails that relate to the legal
16  proceedings that I brought on your behalf and
17  matters related to that?
18        A.   Not all legal, because I didn't think
19  that that's -- no, I didn't.
20        THE WITNESS:  With that -- I don't
21  really understand it.  Is it that from the time
22  that he was representing me until --

14  (Pages 664 to 667)

Page 668

1    MR. TIGAR:  There's no question.
2  You've answered.
3    MR. KLAYMAN:  There's no question.
4    THE WITNESS:  Ok, I'm sorry.
5  BY MR. KLAYMAN:
6    Q.  Turn to Petitioner's Supplemental
7  Exhibit 16, Office of Bar Counsel.  That's an
8  email which I sent to you on June 23rd, 2010.
9    You remember receiving it, correct?
10   A.  Yes.
11   Q.  And in there I'm trying to make you
12 feel optimistic that you have a good life ahead of
13 you, correct?
14   MR. SMITH:  Objection.
15   MR. KLAYMAN:  That she understood it.
16   MR. SMITH:  Objection.
17   CHAIRMAN FITCH:  It's overruled.
18   THE WITNESS:  Can you repeat your
19 question.
20   MR. KLAYMAN:  Madame Court Reporter,
21 can you read it back.
22   We have a very good court reporter.

Page 670

1  my call, did you?  I left a message.
2    A.  Correct.
3    Q.  And you're aware that I got into that
4  car crash after Judge Kotelly issued her decision
5  and I was not in a happy state myself at that
6  point in time.
7    You're aware of that?
8    MR. SMITH:  Objection.  He's asking her
9  whether she knows his feelings.  I mean, how does
10 she know his feelings?
11   MR. KLAYMAN:  Because we were in
12 communication, Mr. Smith?
13   MR. SMITH:  No, you were not --
14   MR. KLAYMAN:  No, I don't want your
15 testimony, please.
16   MR. SMITH:  I don't want yours.
17   MR. KLAYMAN:  Fine, I've listed you as
18 a witness.  I've listed you as a witness, so we'll
19 have to address that issue later.
20   CHAIRMAN FITCH:  I've lost track of the
21 question.
22   MR. KLAYMAN:  Can we read it back.

Page 669

1  She gets things exact.
2    THE COURT REPORTER:  "And in there I'm
3  trying to make you feel optimistic that you have a
4  good life ahead of you, correct?"
5    THE WITNESS:  In the email, that's what
6  he's writing.
7  BY MR. KLAYMAN:
8    Q.  Turn to Bar Counsel's Supplemental
9  Exhibit 17.  This is an email which I sent to you
10 on June 23rd, 2010.
11   You remember receiving that at that
12 time, correct?
13   A.  Correct.
14   Q.  You were aware in and around that time
15 period that I was in a very serious car crash on
16 the 405, correct?
17   A.  So you told me.  I don't know.  You
18 told me that.
19   Q.  Yes.  And that evening, when I walked
20 up the exit, I called you, because your apartment
21 was very close to where I had crashed the car, and
22 I called you for help, and you did not respond to

Page 671

1    THE COURT REPORTER:  "That evening,
2  when I walked up the exit, I called you, because
3  your apartment was very close to where I had
4  crashed the car, and I called you for help, and
5  you did not respond to my call, did you?  I left a
6  message.
7    "Answer:  Correct.
8    "Question:  And you're aware that I got
9  into that car crash after Judge Kotelly issued her
10 decision and I was not in a happy state myself at
11 that point in time.
12   You're aware of that?"
13   CHAIRMAN FITCH:  Ok, now wait just a
14 minute.
15   When you say "that decision," are you
16 referring to the denial of the TRO?
17   MR. KLAYMAN:  Yes, yes.  Thank you,
18 your Honor.
19 BY MR. KLAYMAN:
20   Q.  You may respond.
21   CHAIRMAN FITCH:  Just a second.
22   Read it back.

15  (Pages 668 to 671)

Page 672

1    THE COURT REPORTER: "And you're aware
2 that I got into that car crash after Judge Kotelly
3 issued her decision and I was not in a happy state
4 myself at that point in time.
5    You're aware of that?"
6    MR. SMITH: It's a compound question.
7    CHAIRMAN FITCH: I'm sorry?
8    MR. SMITH: There's a compound
9 question.
10    There are two distinct questions in
11 there, one, whether or not she was aware that he
12 had just received a decision from Judge
13 Kollar-Kotelly, and the next, what his state of
14 mind was with respect to that.
15    It's two questions, and the second
16 question is certainly improper.
17    CHAIRMAN FITCH: Well, it is improper.
18 One at a time is a fair point.
19 BY MR. KLAYMAN:
20    Q.  You're aware that the date that I got
21 into the cash where I totalled my car was the date
22 where Judge Kotelly issued her decision for you to

Page 673

1 be sent back to LA at the Persia News Network
2 there?
3    A.  That's what you told me.
4    Q.  And you're aware that my car was
5 totalled?
6    A.  That's what you told me.
7    Q.  And you're aware that I had a
8 concussion and had to go to Kaiser Permanente?
9    A.  That's what you told me.
10    Q.  And you didn't answer the phone when I
11 called you to ask you for help when I came up the
12 exit close to your apartment, correct?
13    A.  Correct.
14    Q.  And you didn't respond to the voicemail
15 that I left.
16    A.  Correct.
17    Q.  Turn to Exhibit 18.
18    CHAIRMAN FITCH: Give me a moment,
19 please.
20    MR. KLAYMAN: Sure.
21    (Brief pause.)
22    MR. KLAYMAN: I'm not going to ask

Page 674

1 questions about 18.  We'll move on.
2    CHAIRMAN FITCH: That's alright.  Just
3 give me a moment.
4    MR. KLAYMAN: Ok.  They're already in
5 evidence.
6    CHAIRMAN FITCH: Just let the old guy
7 plod along here a little bit.
8    Mr. Smith, do your exhibits include the
9 TRO denial or a docket number?
10    MR. SMITH: Yes.
11    MR. KLAYMAN: I'm going to go back
12 to --
13    CHAIRMAN FITCH: Have they been
14 admitted into evidence?
15    MR. SMITH: Not as of yet.  I can move
16 it all into evidence.
17    CHAIRMAN FITCH: But you're going to
18 admit them?
19    MR. SMITH: I am going to move all of
20 my exhibits into evidence, yes, thank you.
21    CHAIRMAN FITCH: Ok.  I note that
22 because the committee may want to take into

Page 675

1 consideration the various dates that have been
2 purported here.
3    MR. SMITH: I appreciate that and I was
4 waiting, since the Respondent had previously
5 objected to all of our exhibits, I was going to
6 move them in when appropriate.
7    I can move them all in now.
8    CHAIRMAN FITCH: Now, no, he's in his
9 case --
10    MR. SMITH: Alright.
11    CHAIRMAN FITCH: Not in his case.
12 Later.  We're preserving everybody's rights.
13    I'm sorry, Mr. Klayman.
14 BY MR. KLAYMAN:
15    Q.  Ok, now, it is true, is it not, Ms.
16 Sataki, that the day after I got into that
17 near-fatal car cash, that was the day that Judge
18 Kotelly had issued a decision not to put you back
19 to work in Los Angeles?
20    A.  Again, it's what you told me.  I was
21 not there.  I didn't see the car crash.  I don't
22 know.

16  (Pages 672 to 675)

In Re: Larry E. Klayman
June 1, 2018

Page 676

1    Q.  We did have a conversation, however,
2 the next day, talking about what Judge Kotelly had
3 ruled, did we not, a telephone conversation?
4    A.  I think so.  I mean, it's such a long
5 time ago.  I'm sure that's -- yes.
6    Q.  And you were -- I'm sorry, go on.
7    A.  I just don't remember exactly
8 everything from eight years ago.  I mean, there
9 was so many.
10       But, yes, we had a conversation.
11    Q.  And you were very upset and you blamed
12 me in the conversation?
13    A.  Not correct.
14    Q.  Well, you were willing to talk to me
15 the day after my crash, but you weren't willing to
16 give me any help when I almost killed myself on
17 the highway, correct?
18    A.  Your words, sir.  I don't know that.
19    Q.  Ok.  Turn your attention to Bar
20 Counsel's Supplemental Exhibit 19.  That's an
21 email that I sent to you on June 29th, 2010,
22 correct?

Page 677

1    A.  Correct.
2    Q.  You remember receiving it around that
3 time, correct?
4    A.  Honestly I don't remember if I just --
5 I received it at that time, yes.
6    MR. KLAYMAN:  In the fourth paragraph,
7 your Honor, if I may read that?
8    CHAIRMAN FITCH:  Sure.
9 BY MR. KLAYMAN:
10    Q.  "In fact, working as hard as I have to
11 try to get you back to the Persia News Network
12 gets me nothing, assuming I ever wanted a
13 percentage of the damages we could have won in
14 court, which I never asked for.  I told you to
15 keep it all.
16       "There is no money in having you return
17 to Persia News Network.  There is with the damage
18 claims.  And I have spent several hundred thousand
19 dollars in time and expense fighting to get you
20 back to a $75,000-a-year job in a network that is
21 a cesspool of corruption.  But that's what you
22 wanted."

Page 678

1       Now, I told you that, correct?
2    A.  Yes.
3    Q.  Well, let me ask you this question: in
4 this email I'm also saying some of the pitfalls
5 that we have to get over are with regard to rumors
6 about your past that are circulating inside of
7 Voice of America, correct?
8    A.  Yes.
9    Q.  Then I'm urging you in this email to --
10    THE WITNESS:  Can I add anything to
11 that, or no?
12    MR. KLAYMAN:  No, I think that's
13 enough.
14    Your Honor, I move that in.  Mr. Smith
15 has no objection to it going into evidence.
16    MR. SMITH:  It's already admitted and
17 received into evidence.
18 BY MR. KLAYMAN:
19    Q.  Attached to this email is an affidavit
20 of your former husband, Bamboos Pourgol,
21 B-a-m-b-o-o-s P-o-u-r-g-o-l.
22       Do you see that?

Page 679

1    A.  Yes.
2    Q.  And I was concerned about what he had
3 sworn to under oath, that it could be used against
4 you, correct?
5    A.  Correct.
6       And I explained to you how we can have
7 our own people to -- we had witnesses, too, right,
8 Mr. Klayman?
9    Q.  There's no question.
10    A.  I'm sorry.
11    Q.  I'm not under oath.
12    A.  Ok, I'm sorry.  I can't ask -- I'm
13 sorry.
14    Q.  You can give them to Mr. Smith.  He can
15 ask me when I'm on the stand.
16    A.  Ok, I apologize.
17    Q.  I'm sure you will.
18    A.  I apologize.
19    Q.  The witnesses that you had me go to to
20 try to prove your case, they were discussed in
21 that Office of Civil Rights' final determination,
22 correct, which you remember?

17  (Pages 676 to 679)

Page 680

1    Assuming that you ever read it, are you
2 aware that the Office of Civil Rights ever talked
3 to those witnesses and discredited their
4 testimony?
5    MR. SMITH:  I'm just going to again
6 object to the form of the question.  There were a
7 couple of questions in there, so if we could --
8    MR. KLAYMAN:  This is the last
9 question.
10    CHAIRMAN FITCH:  Well, I think we're on
11 the last question.
12    THE WITNESS:  Please repeat your
13 question.
14 BY MR. KLAYMAN:
15    Q.  You're aware that the Office of Civil
16 Rights, in making a final determination rejecting
17 your discrimination and work place retaliation
18 claims, interviewed the witnesses whose names you
19 gave to me and that the Office of Civil Rights
20 found those witnesses not to be credible?
21    MR. SMITH:  Objection.
22    CHAIRMAN FITCH:  Sustained.

Page 681

1    THE WITNESS:  Do I answer it?
2    CHAIRMAN FITCH:  When he objects and I
3 say "sustained" -- he's objecting to a question.
4 When I say "sustained," it means that you don't
5 need to answer the question.
6    MR. KLAYMAN:  I'm not going to belabor
7 this, your Honor, because you have the decision
8 and you all can read it.  Ok.
9 BY MR. KLAYMAN:
10    Q.  Turn to Bar Counsel's Exhibit 20.
11    MR. SMITH:  Supplemental Exhibit 20,
12 for the record.
13    CHAIRMAN FITCH:  I'm sorry?
14    MR. SMITH:  Supplemental Exhibit 20,
15 for the record.
16    CHAIRMAN FITCH:  Thank you.
17 BY MR. KLAYMAN:
18    Q.  Now, this is an email which I sent to
19 you on July 26, 2010, correct?
20    A.  Correct.
21    Q.  I'm just talking about the first one.
22 Do you remember receiving it in and around that

Page 682

1 time?
2    A.  No.
3    Q.  What was your response?
4    A.  No.
5    Q.  Take an opportunity to look at it now,
6 assuming you're correct that you didn't read it or
7 see it before.
8    (Witness reads document.)
9    Q.  And then I will also ask you about the
10 email at the bottom, which is on July 26, 2010,
11 which was also sent to you, where it says "Talked
12 with Kathleen of Congressman Rohrbacher's office."
13    You see that?
14    A.  Yes.
15    MR. KLAYMAN:  Your Honor, may I read
16 this?  It's short.
17    CHAIRMAN FITCH:  Go ahead.
18    MR. KLAYMAN:  May I do that?
19    CHAIRMAN FITCH:  I said go ahead.
20    MR. KLAYMAN:  Oh, thank you.
21 BY MR. KLAYMAN:
22    Q.  "Talked with Kathleen of Congressman

Page 683

1 Rohrbacher's office and she told me that you told
2 her that 'You never wanted to do anything in
3 court' and implied that you did not want to be in
4 LA and that it was all my idea.
5    "Saying and implying stuff like that
6 not other things shows further how you view me but hurts
7 your case.  If you undercut your lawyer, it speaks
8 poorly of you.  Indeed I sense that Kathleen and
9 the congressman are now backing off and have less
10 enthusiasm to help you.
11    "I suggest you let me deal with the
12 congressman from this point forward.  Larry."
13    Do you remember getting that email?
14    A.  Again, I got a lot of emails during
15 that time and I didn't open all of them.
16    So, I did get it at that time, but I
17 know about this email, yes.
18    Q.  Turn to Bar Counsel's Supplemental
19 Exhibit 21.  These are emails dated July 30th,
20 2010.
21    Look at the one at the bottom that I
22 sent to you.

18  (Pages 680 to 683)

In Re:  Larry E. Klayman
June 1, 2018

| Page 684 | Page 686 |
|---|---|

**Page 684**

1    MR. KLAYMAN:  If I may read this.  It's
2  short, your Honor.  We're moving along pretty well
3  here.
4    CHAIRMAN FITCH:  Go ahead.
5  BY MR. KLAYMAN:
6    Q.  "This email contains many false
7  statements and is dishonest.  I am in Phoenix and
8  will respond in greater detail later.
9    "In the meantime, please refrain from
10  more dishonest emails written by your friend.  It
11  does not serve anyone's interest, including yours.
12    "At a minimum I would have expected
13  honesty from you.  The way you deal with me and
14  the lack of respect is very disappointing, to say
15  the least.  It's a question of not just honesty,
16  but no class.  Larry."
17    Do you see that?
18    A.  Yes.
19    Q.  Now, what we don't have here in this
20  package is the email that was sent to me by your
21  friend.
22    A.  You do.  It's right under.  If you

**Page 685**

1  continue, please.
2    And it was -- I didn't say it was sent
3  by my friend.  I said that -- but you continue.
4  That's my email.  You responded -- you see, it
5  says "Dear, Larry"?
6    You responded to that.
7    Q.  You're right, I'm sorry.
8    A.  You have the email.
9    Q.  Now you testified previously that
10  Kathleen helped you with that, right?
11    A.  Yes.
12    Q.  And that you told her what to write?
13    A.  Yes.
14    Q.  But you never told me that Kathleen was
15  helping you write emails to me, did you?
16    A.  No.
17    Q.  You are aware that Kathleen was not a
18  lawyer and is not a lawyer?
19    A.  Yes.
20    Q.  I turn your attention to --
21    CHAIRMAN FITCH:  Give me a second to
22  catch up on something that I'm doing here.

**Page 686**

1    MR. KLAYMAN:  Sure.
2    (Brief pause.)
3    CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
4  Thank you.
5  BY MR. KLAYMAN:
6    Q.  I turn your attention to Respondent's
7  Exhibit 23.
8    MR. SMITH:  Respondent's Exhibit 23?
9    MR. KLAYMAN:  I'm sorry, Bar Counsel's
10  Supplemental Exhibit 23.
11  BY MR. KLAYMAN:
12    Q.  This is an email that I sent to you on
13  July 31st, 2010, correct?
14    A.  Correct.
15    Q.  You remember receiving it around that
16  time?
17    A.  Again, yes, around that time.  Yes.
18    Q.  And I write at the top, "Whoever wrote
19  in email either intentionally falsified the facts
20  or was ill informed by you.
21    "In any event, you did not write this,
22  because it is not in your English syntax,"

**Page 687**

1  s-y-n-t-a-x.
2    You see that?
3    A.  Yes.
4    Q.  And what I'm referring to is the letter
5  that Kathleen wrote for you that was sent to me
6  that you just testified to, correct?
7    A.  Yes.
8    Again, my words.  She helped me with
9  the English.
10    Q.  I'm going to turn to the fifth
11  paragraph where in I wrote --
12    MR. KLAYMAN:  I'm not going to read the
13  whole thing, your Honor, the whole letter.
14  BY MR. KLAYMAN:
15    Q.  "During periods that you were lucid,
16  you would tell me how you hated VOA and its
17  management, how they hated you because they see
18  you as a monarchist, and PNN, the Persian branch
19  of VOA, as being run by communists loyal to
20  Tehran.
21    "You asked me to take legal action, and
22  I knew, because I knew that had early feelings for

In Re:  Larry E. Klayman
June 1, 2018

Page 688

1    you, I referred you to Gloria Allred.  However,
2    Gloria, a friend of mine, and you did not seem to
3    relate well and you said you felt more comfortable
4    if I would help you.  I agreed."
5         You remember my writing that to you,
6    correct?
7         A.   These are your words.
8         Q.   You remember my writing that to you,
9    correct?
10        A.   Yes.
11        Q.   And you never responded to refute what
12   wrote, did you?
13        A.   I asked -- I even called Gloria myself.
14   She said she won't represent me since you
15   represented me.  I even got an email from her.
16        Q.   Why don't we have that email?  Have you
17   been withholding that from Mr. Smith and everybody
18   else?
19        A.   I'm sorry, I forgot it.
20        Q.   Ok, now you forgot it.
21             You're under oath, Ms. Sataki.  You're
22   obligated to tell the truth.  You did not --

Page 689

1         MR. SMITH:  Objection.  He does not
2    need to be admonishing the witness about her role
3    or anything else.
4         THE WITNESS:  I did not email Gloria at
5    this time.  It was about two years ago when I was
6    watching her on TV with her daughter, and I just
7    sent letter an email regarding this whole thing,
8    and she said she doesn't want to have anything to
9    do with this, and she said it before, too.  She
10   emailed me back.
11        I completely -- I didn't think that
12   email would be relevant here now.  So...
13        MR. KLAYMAN:  Your Honor, because --
14        THE WITNESS:  Because it was years
15   after this.
16        But there is emails here, Mr. Klayman,
17   that you said Gloria Allred is not going to accept
18   me as a client and also that --
19        I don't know.  Can I continue?
20        MR. KLAYMAN:  Your Honor, this presents
21   a problem.  I would ask that before we reconvene
22   again -- I know we're going to discuss scheduling

Page 690

1    and stuff -- that we get all the documents.
2         There is a rule of completeness.  She
3    can't just submit what she wants.  I'm not saying
4    that Mr. Smith did anything wrong here, but
5    there's an obligation to do some kind of due
6    diligence to find out if all the documents have
7    been turned over, not just the stuff that Bar
8    Counsel and that Ms. Sataki thinks are helpful to
9    them.
10        This is a very important piece of
11   evidence that she just contradicted herself three
12   times on and came up with a new story, and it will
13   speak for itself.  It's on the record, about Ms.
14   Allred.  And Ms. Allred is going to be a witness
15   in this case.  So we need that email and we need
16   any other emails that she has that relate to this
17   case.
18        That's why I wanted to take discovery
19   early on, with a subpoena, because we need this
20   stuff.  I need that to be able to defend myself
21   here.  Due process, equal protection, the rest.
22        And, you know, you've not been dealt

Page 691

1    with, the hearing committee, fairly either.  And
2    this is not -- this is not right, and we just went
3    through that letter earlier today where she said
4    that her career is ruined.  That's obviously not
5    the case.
6         So, you know, we both have issues here
7    with the way this matter has been handled.  I need
8    everything that she's got to defend myself, and
9    this is a material piece of evidence.
10        CHAIRMAN FITCH:  Mr. Klayman has
11   suggested that we will deal with this issue at
12   some later point in time.  He has preserved it.
13   We'll get there.
14        MR. KLAYMAN:  What I'm going to ask
15   for, and I don't argue it now, is to get a service
16   to come in to be appointed to -- as is accepted
17   and in a way that preserves everybody's privacy,
18   go through the computer and determine what needs
19   to be produced here.
20        This happens frequently in litigation.
21   I'm sure that you and Mr. Tigar, you know, have
22   gone through that yourself in various cases.

20  (Pages 688 to 691)

In Re:  Larry E. Klayman
June 1, 2018

Page 692

1    So that's what we're going to need to
2  do.
3         MR. SMITH:  I'm going to have to
4  respond to all of this right now, if you don't
5  mind, just very briefly.
6         This is not a civil proceeding.  This
7  is not a formal proceeding.  This is a
8  disciplinary proceeding.
9         A pleading got filed earlier.  I cited
10  to a case where the court had just kind of
11  informed that these proceedings should not be
12  raised to the elevation of a civil or a criminal
13  proceeding, with all of the rules and whatnot that
14  are attendant thereto.
15         We should not be entertaining --
16         CHAIRMAN FITCH:  Mr. Smith, I let you
17  get that sentence in because Mr. Klayman had done
18  a little preview of positions that might be taken
19  on the request that he says he's going to make.
20  But he hasn't made the request yet, and we can
21  just go to the next question here.
22

Page 693

1  BY MR. KLAYMAN:
2         Q.   The second page of this letter again
3  discusses -- you say you received it, the
4  difficulties that we were facing with regard to
5  what Voice of America believed was your past with
6  regard to a number of different matters that I
7  don't need to get into now, correct?
8         A.   Correct.
9         CHAIRMAN FITCH:  We've done about an
10  hour and a half, Mr. Klayman.
11         MR. KLAYMAN:  We can take a break, your
12  Honor.
13         CHAIRMAN FITCH:  Whatever works for
14  you.
15         MR. KLAYMAN:  Yeah, that's good.  We're
16  making due process.
17         CHAIRMAN FITCH:  We'll make it a little
18  bit longer session, probably, after we come back
19  from the break.  But we'll break now.
20         MR. KLAYMAN:  Take a break?
21         CHAIRMAN FITCH:  Yeah.
22         MR. KLAYMAN:  Thank you.

Page 694

1         CHAIRMAN FITCH:  The usual, 10, 12
2  minutes.  Whatever works best for people.  We
3  stand in recess here at 10:55.
4         And the witness will remember not to
5  speak with anyone about her testimony.
6         THE WITNESS:  Yes, sir.
7         (Recess taken.)
8         CHAIRMAN FITCH:  We are back on the
9  record at 11:10, and the witness is present and I
10  think that Mr. Klayman wants to continue his
11  cross-examination.
12         MR. KLAYMAN:  Yes, thank you.
13  BY MR. KLAYMAN:
14         Q.   Turn your attention, Ms. Sataki, to Bar
15  Counsel's Exhibit 25, Supplemental Exhibit 25.
16  This is an email that I sent you on August 2nd,
17  2010.
18         You remember receiving it around that
19  time, correct?
20         A.   I don't remember.  Not around that
21  time.
22         Q.   It says, "I have followed your

Page 695

1  instructions and dismissed all of the cases
2  against VOA, except the part about having you work
3  in LA.
4         "This aspect of the case is not against
5  anyone personally and I intend to appeal the
6  judge's decision to a higher court."
7         You see that?
8         A.   Yes.
9         Q.   So you were aware that I followed your
10  instructions, correct?
11         MR. SMITH:  Objection.  She said she
12  didn't recall.
13         CHAIRMAN FITCH:  No, overruled.
14         MR. SMITH:  It's asking for past
15  recollection.
16         MR. KLAYMAN:  That's inserting
17  testimony to the witness.  That's totally
18  inappropriate.
19         CHAIRMAN FITCH:  Overruled.
20         His question is -- you want to ask it
21  again or you want me to?  Do you prefer to do it?
22

21  (Pages 692 to 695)

In Re:  Larry E. Klayman
June 1, 2018

|  | Page 696 |
|---|---|

1  BY MR. KLAYMAN:
2      Q.  Yeah, are you aware that I followed
3  your directions and dismissed the cases you asked
4  me to dismiss?
5      A.  No, I was not aware because I didn't
6  open your emails any more at that time.
7      Q.  You didn't bother calling anyone else,
8  such as Mr. Shamble, to find out whether the cases
9  had been dismissed either, did you?
10     A.  I had a couple of conversations with
11 Mr. Shamble during that time, phone conversations.
12     Q.  Did you ask him whether your cases had
13 been dismissed?
14     A.  I don't remember if I have
15 conversation.  It was long time ago.
16     Q.  So basically, Ms. Sataki, in all due
17 respect, you remember what you want to remember
18 and forget what you want to forget.
19     A.  No, sir.  I said that I don't remember
20 much from eight years ago.
21     Q.  Only when it's something that's
22 negative towards me do you remember it.

|  | Page 697 |
|---|---|

1      A.  Sir, the emails here that I had to
2  review last week made that I remembered a lot of
3  stuff from that time now.
4      Q.  Turn your attention to Office of Bar
5  Counsel's Exhibit 26.
6      MR. SMITH:  Supplemental Exhibit 26?
7      MR. KLAYMAN:  Supplemental Exhibit 26.
8  BY MR. KLAYMAN:
9      Q.  This is an email that I sent to you on
10 or about August 5th, 2010.
11     You remember receiving it, do you not?
12     A.  I don't remember I received it at that
13 time.
14     Q.  This letter refers to the letter which
15 was sent to Dan Austin, which I believe Kathleen
16 Stanton wrote for you, in the first sentence?
17     A.  What's your question?  I'm sorry.
18     Q.  The first sentence, "This letter that
19 you sent to Dan Austin and Tim Shamble but not me
20 makes no sense and is counterproductive for the
21 following reasons."
22     You see that?

|  | Page 698 |
|---|---|

1      A.  Yes.
2      Q.  You're referring to the letter that
3  Kathleen Stanton had written for you to Dan Austin
4  of Voice of America, correct?
5      CHAIRMAN FITCH:  No, she didn't.  This
6  is your letter, but your question was --
7      MR. KLAYMAN:  Yeah.  The reference is
8  to that.
9      CHAIRMAN FITCH:  I thought your
10 question started to her, you were referring to --
11     MR. KLAYMAN:  I can rephrase it.
12     CHAIRMAN FITCH:  Ok.
13 BY MR. KLAYMAN:
14     Q.  The reference that I make there with
15 regard to the letter to Dan Austin, that's the one
16 that was prepared by Kathleen Stanton for you?
17     A.  That particular letter, I don't
18 remember who helped me with that letter, but
19 someone did help me with that letter, and we sent
20 it then -- I sent it to Dan Austin, yes.
21     Q.  Whoever that person was, that person
22 wasn't a lawyer, correct?

|  | Page 699 |
|---|---|

1      A.  Correct.
2      At that time I didn't have a lawyer any
3  more.
4      Q.  I didn't ask you a question.
5      MR. KLAYMAN:  I move to strike.
6      CHAIRMAN FITCH:  It is struck.
7  BY MR. KLAYMAN:
8      Q.  I turn your attention to Bar Counsel's
9  Supplemental Exhibit 27.  It's an email of August
10 19th, 2010 sent by me to you.  I'm looking at the
11 one on the bottom, initially at 12:46 p.m.
12     Do you see that?
13     A.  Yes.
14     Q.  You remember receiving this email on or
15 about August 19th, 2010, correct?
16     A.  I don't remember receiving that on that
17 date.
18     Q.  Around that time?
19     A.  Again, I opened a lot of emails and I
20 revisited that time last week.
21     Q.  Ms. Sataki, when it suits you, you like
22 to play the victim, correct?

22 (Pages 696 to 699)

In Re:  Larry E. Klayman
June 1, 2018

Page 700

1    A.  I'm sorry, what?
2    Q.  When it suits you, you play the victim.
3        MR. SMITH:  Objection.
4        CHAIRMAN FITCH:  Sustained.
5  BY MR. KLAYMAN:
6    Q.  Nobody prevented you from opening
7  emails at that point in time in August 19th, 2010,
8  correct?
9    A.  Correct.
10   Q.  I'm just going to read the first
11 sentence...
12       " Your actions and failure to
13 communicate have harmed not only your interest and
14 mine, but also Tim Shamble's and the union.  Tim
15 really went all out for you and does not deserve
16 this."
17       In fact, Mr. Shamble did go all out for
18 you, didn't he?
19       MR. SMITH:  Objection.  I don't really
20 know what that means, "going all out".
21       MR. KLAYMAN:  I think it's common --
22       CHAIRMAN FITCH:  Overruled.

Page 701

1        THE WITNESS:  He did help me with some
2  stuff, yes.  But I don't know what "all out," what
3  you mean, but he helped me, yes.
4  BY MR. KLAYMAN:
5    Q.  He did a lot of things for you to try
6  to resolve your situation, correct?
7    A.  Yes.  He was the chief of the union.  I
8  mean, that was -- I went to him first.  He --
9    Q.  And he worked closely with me, correct?
10   A.  He worked closely with you, yes.  I
11 introduced you to him.
12   Q.  And based on your experience in dealing
13 with Mr. Shamble, he's a very good person?
14   A.  Yes, he is.
15   Q.  Isn't that true?  Very sincere?
16   A.  I don't --
17   Q.  He's honest, isn't he?  You found him
18 to be honest?
19   A.  Yes.
20   Q.  I turn your attention to Office of Bar
21 Counsel's Supplemental Exhibit 28.  I turn your
22 attention to the third paragraph.

Page 702

1        The first question is: You do remember
2  receiving this email from me on or about August
3  22nd, 2010, "Subject: Legal Matters and Meeting.
4  Urgent."
5    A.  I don't remember receiving it at that
6  time.
7    Q.  But you do remember receiving it in or
8  around that time, correct?
9    A.  No.
10   Q.  You do remember receiving it generally?
11   A.  In general?  Yes, I had it in my
12 emails.
13   Q.  So, the third paragraph, "It's not fair
14 that you blame me for not getting the results you
15 wanted sooner.  In this regard I was reviewing the
16 report of the Office of Civil Rights the other day
17 and Joy Wagner, your supervisor, stated at Page 40
18 that the first time that you went to Los Angeles
19 in 2010, when you broke down and I found Dr.
20 Arlene Aviera for you, you had told Joy Wagner
21 before you left that 'you,' had a romantic
22 interest in Los Angeles, because (you) left in

Page 703

1  February, 2010 to see there gentleman on
2  Valentine's Day."
3        That's an accurate statement, isn't it?
4    A.  It's what?
5    Q.  That's an accurate statement, is it
6  not?
7    A.  No, it's not.
8    Q.  That's what you told Joy Wagner,
9  correct?
10   A.  No, I didn't.
11   Q.  You told Joy Wagner that so you could
12 get leave, correct?
13   A.  I didn't tell her that I have a
14 romantic -- I didn't say that.
15   Q.  I'm referring to Page 40 of the final
16 decision of the Office of Civil Rights.
17       I take it that you went to Page 40 to
18 see what I was saying here?
19   A.  What is question -- what's the
20 question?  What I told Joy Wagner or what Joy
21 Wagner told the committee?
22       Which one is the question?

23  (Pages 700 to 703)

In Re:  Larry E. Klayman
June 1, 2018

Page 704

1      Q.   Well, when you talked to Joy Wagner,
2  you weren't telling her the truth, were you?
3          You told her something that was false,
4  that you were going for another reason other than
5  what you told me.
6          MR. SMITH:  Objection.  I really
7  don't --
8          THE WITNESS:  I'm confused, I'm sorry.
9          MR. SMITH:  There's a lot there.
10         MR. KLAYMAN:  Ok, let me break it town.
11 BY MR. KLAYMAN:
12     Q.   You didn't tell me that you were going
13 to LA to pursue a romantic relationship with
14 someone on Valentine's Day, correct?
15     A.   I didn't do that.  Because I didn't go
16 to LA to pursue a romantic relationship with
17 somebody.  I didn't.  Why should I say that?
18     Q.   Or quote, "You had a romantic interest
19 in Los Angeles because you left in February, 2010
20 to see this gentleman on Valentine's Day."
21         You told that to Joy Wagner, didn't
22 you?

Page 705

1      A.   I did not tell that to Joy Wagner.
2      Q.   Turn to the second page and the
3  paragraph at the top where it says -- I'm reading
4  the sentence, "Therefore I look forward to meeting
5  to hash out the issues and you can invite Nella,
6  Abdy and/or Janet, if you so desire."
7          Those are your friends, correct?
8      A.   Correct.
9      Q.   You introduced me to your friends, did
10 you not?
11     A.   You picked me up at their house to take
12 me to the doctor when I was staying -- in the
13 beginning when I was staying at their place.
14     Q.   In fact, we all had dinner at Nella's
15 and Abdy's house in Calabasas, correct?
16     A.   Yes, in the beginning.
17     Q.   Yes, ok.  And in fact we saw Nella
18 later at her work place.  We went to visit her, on
19 Ventura Boulevard.
20     A.   I don't remember that, but, we probably
21 did.  You say that, we probably did it.
22     Q.   "When I had previously referred to the

Page 706

1  low-class sleazy people you hang around, I was not
2  referring to them.  I was referring to people like
3  the person who stole your diamond ring and the
4  long list of other sleazy people, including
5  persons with no legal identity in this country,
6  who have abused you in the past and perhaps
7  currently.
8          "I was recently contacted in this
9  regard by an investigator who found our legal
10 relationship on the internet and I gave her your
11 telephone number since I was concerned that you
12 could be in some other danger or other peril.  I
13 pray that this is not the case."
14         You see that?
15     A.   Yes.
16     Q.   So you remember my saying these things
17 to you, that I was contacted by an investigator
18 and I was concerned about it was all about
19 considering the kinds of people you hung around
20 with in the past?
21     A.   Not from that time.  Again, I didn't
22 open your emails at this time any more.

Page 707

1      Q.   Turn to the next page.
2          MR. SMITH:  Which page?
3          MR. KLAYMAN:  Bar Counsel's
4  Supplemental Exhibit 29.
5  BY MR. KLAYMAN:
6      Q.   This is an email that I sent to you on
7  or about September 10th, 2010, and you remember
8  receiving it on or about that day, correct?
9      A.   Not on that day.  I don't remember on
10 that day.
11     Q.   You received it another day.  You read
12 it on another day, I should say.
13     A.   Read it last week, yes.
14     Q.   Turn your attention to Bar Counsel's
15 Supplemental Exhibit 30.  This is an email that I
16 sent to you on September 10th, 2010.
17         Do you see that?
18     A.   Yes.
19     Q.   You received it on or about that date,
20 correct?
21     A.   You sent it that date, correct.
22     Q.   And you read it on or about that date,

In Re:  Larry E. Klayman
June 1, 2018

Page 708

1  correct?
2      A.  Again, I wouldn't open your emails
3  around that time any more.
4      Q.  I'm going to read this.  It's very
5  short: "Ellie, the cost expended on your behalf
6  for legal and related matters, including advanced
7  living expenses, rent, movers for transporting
8  your car, travel expenses, plane tickets, et
9  cetera, to and from LAX, court filing fees,
10  polygraph examination costs, process servers, and
11  other independent legal contractors, excluding of
12  my time and working on the cases and settlement
13  negotiations, comes to in excess of $30,000."
14      You see that?
15      A.  Yes.
16      Q.  And then I wrote, "These monies I had
17  hoped and still hope to collect from litigation
18  concerning VOA and its managers."
19      You see that?
20      A.  Yes.
21      Q.  And then I wrote, "Interference by
22  third parties in my ability to collect these

Page 709

1  amounts, and in addition to that legal fees, will
2  result in legal action against these third
3  parties."
4      You see that?
5      A.  Yes.
6      Q.  So I was saying, if they're interfering
7  in the case and messing the cases up, such that I
8  can't even perhaps even recoup the expenses, and I
9  never -- that's what I'm saying, is it not?
10      MR. SMITH:  Objection.  That's what
11  he's saying now.
12      MR. KLAYMAN:  Alright, let me break it
13  down.
14      And I ask Mr. Smith not to make
15  speaking objections, because he's done that a
16  couple of times.
17      CHAIRMAN FITCH:  He has a right to
18  explain his objection.
19      MR. KLAYMAN:  I agree, but it's in a
20  way that's permitted under the Federal Rules of
21  Civil Procedure.
22      CHAIRMAN FITCH:  Which I think that

Page 710

1  was.
2      MR. KLAYMAN:  Yeah, I agree.
3      But I want to ask this question, and
4  I'll rephrase it because it was too long anyway.
5  BY MR. KLAYMAN:
6      Q.  What I'm saying is, I'm not going to
7  ever ask you to pay me anything, whether it's
8  legal fees or costs, but if something comes back
9  ultimately, if we ever pursue the damage claims,
10  then I should be reimbursed.
11      MR. SMITH:  Objection.  The document
12  speaks for itself.  The witness need not
13  testify --
14      CHAIRMAN FITCH:  I think he can elicit
15  general questions about her understanding in that
16  regard.  That's the general understanding as to
17  the accuracy or not of what he is asserting here.
18      It's a fair examination.
19      MR. KLAYMAN:  Can we read that back,
20  Madame Court Reporter.
21      THE COURT REPORTER:  "What I'm saying
22  is, I'm not going to ever ask you to pay me

Page 711

1  anything, whether it's legal fees or costs, but if
2  something comes back ultimately, if we ever pursue
3  the damage claims, then I should be reimbursed."
4  BY MR. KLAYMAN:
5      Q.  That's what I was saying to you,
6  correct?
7      A.  Correct.
8      Q.  And what I was also saying was, if
9  someone else interferes improperly and prevents
10  these cases from going forward in some improper
11  way, then I'll hold them legally accountable.  Not
12  you.
13      A.  But nobody interfered.  There was --
14      Q.  You did testify several times that two
15  non-lawyers were writing letters for you which
16  contained legal advice, including legal citations.
17      A.  No, I didn't say legal advice, sir.  I
18  just said they helped me with English.  That's it.
19      It's all my words.
20      Q.  But these people weren't lawyers,
21  correct?
22      CHAIRMAN FITCH:  Asked and answered.

25 (Pages 708 to 711)

In Re:  Larry E. Klayman
June 1, 2018

| | |
|---|---|
| Page 712 | Page 714 |

### Page 712

1    MR. KLAYMAN:  Alright, we've gone
2  through that.
3  BY MR. KLAYMAN:
4    Q.  I turn your attention to Bar Counsel's
5  Supplemental Exhibit 31.  The top of the page is
6  an email that I sent to your brother, Kevin
7  Sataki@Hotmail.com.  Correct?
8    A.  Correct.
9    Q.  Dated October 19th, 2010, correct?
10    A.  Correct.
11    Q.  And your brother, Kevin, forwarded that
12  to you in and around that time, correct?
13    A.  He forwarded that to me, yes.
14    Q.  And you did read it in and around that
15  time?
16    A.  I read it last week.
17    Q.  So you wouldn't even read an email
18  that's coming from your brother?
19    A.  I know it's forwarded from you -- it
20  was from you to him, and that's why.  So I didn't
21  open it.
22    Q.  If your brother was sending it to you,

### Page 713

1  would you not think that it was important for you
2  to read it?
3    CHAIRMAN FITCH:  Sustained.
4    MR. KLAYMAN:  Ok.  It calls for
5  speculation.
6  BY MR. KLAYMAN:
7    Q.  Given that it came from your brother,
8  in your own mind at that time, wouldn't it take on
9  greater significance to read the email?
10    A.  My brother explained to me that Mr.
11  Klayman sent me an email.  "I forwarded it to you,
12  but if it bothers you, don't read it."
13    Q.  Well, you don't know whether it bothers
14  you until you read it?
15    A.  I knew it was going to bother me.  My
16  brother explained that to me.
17    Q.  Well, let's go through it.
18    Take a look at it.  You've seen it
19  since?
20    A.  I read it last week.  Yes, sir.
21    Q.  Now what I'm saying in this email is
22  that you had a chance to get a job with CBN,

### Page 714

1  Christian Broadcasting Network, correct?
2    A.  Correct.
3    Q.  And an individual by the name of Ted
4  Baehr, B-a-e-h-r -- you've met Ted Baehr, did you
5  not?  I introduced you to him.
6    A.  Yes.
7    Q.  And Mr. Bear is the head of a group,
8  public interest group, called Movieguide, correct?
9    A.  Correct.
10    Q.  And he puts on a miniature Academy
11  Awards each year promoting family films, correct?
12    A.  Yes, that's what you told me.
13    Q.  Good, wholesome films for families.
14    And he also runs a group called the
15  Christian Film and Television Commission.
16    You're aware of that?
17    A.  Again, these are things you told me.
18  Yes.
19    Q.  Now, is it not true that you said "I'd
20  like to meet Ted Baehr" --
21    A.  You said I'd like -- you wanted me to
22  meet him, yes.

### Page 715

1    Q.  Well, it's true I told you who he was
2  and what he does.
3    A.  Yes, you told me about that.
4    Q.  And that you'd like to meet him because
5  you wanted to get some spirituality in your life?
6    A.  Your words.
7    Q.  So you didn't want spirituality?
8    CHAIRMAN FITCH:  Objection.
9    MR. SMITH:  Objection.
10    CHAIRMAN FITCH:  Objection sustained.
11  BY MR. KLAYMAN:
12    Q.  Did you want to pursue a more spiritual
13  life at that time?
14    CHAIRMAN FITCH:  You don't have to
15  answer that.
16    MR. KLAYMAN:  Ok.
17    CHAIRMAN FITCH:  Relevance.
18  BY MR. KLAYMAN:
19    Q.  Dr. Beahr, he's actually a doctor --
20    CHAIRMAN FITCH: Struck.
21  BY MR. KLAYMAN:
22    Q.  You're aware that he is a doctor --

26  (Pages 712 to 715)

App.0356

In Re:  Larry E. Klayman
June 1, 2018

|  | Page 716 |
|---|---|

1      MR. KLAYMAN:  I agree, your Honor.
2  BY MR. KLAYMAN:
3      Q.  You're aware that he had a doctorate,
4  Dr. Beahr?
5      A.  I don't know.
6      Q.  And you were aware at the time that he
7  was very prominent in Hollywood?
8      A.  Your words.  That's what you told me.
9      Q.  You met with Dr. Beahr on several
10  occasions, did you not?
11      A.  I believe one time.  I don't -- I
12  think -- was that the person we went to their
13  house?
14      Q.  You went to his house, right?
15      A.  Yes.
16      Q.  And he was there and he tried to help
17  you with your psychological issues and other
18  issues, right, to mentor you?
19      MR. SMITH:  Objection.  This is a
20  compound question at this point.
21      MR. KLAYMAN:  It's leading.
22

|  | Page 718 |
|---|---|

1      A.  Well, no --
2      CHAIRMAN FITCH:  I think we've gone far
3  enough.  We know what the alleged help allegedly
4  was.
5  BY MR. KLAYMAN:
6      Q.  Ted Baehr said that he would try to
7  help you find a good job, correct, in Hollywood?
8      A.  Correct.
9      Q.  And in fact he made an effort along
10  with me to try to get you a job at CBN, correct?
11      A.  Correct.
12      Q.  And you were aware at the time that CBN
13  had a bureau in the valley, in Los Angeles,
14  correct?
15      A.  Yes.
16      Q.  And that CBN broadcasted into Iran,
17  correct?
18      A.  I'm not that familiar with this.  So,
19  dash.
20      CHAIRMAN FITCH:  That's fine.  You
21  don't know.  Next question.
22

|  | Page 717 |
|---|---|

1  BY MR. KLAYMAN:
2      Q.  He tried to help you?
3      CHAIRMAN FITCH:  That's alright.  It's
4  overruled.
5  BY MR. KLAYMAN:
6      Q.  He tried to help you, correct?
7      MR. SMITH:  Objection.  Because there
8  were two different things that he asked about what
9  he was helping her with.  It's a yes or no
10  question.
11      CHAIRMAN FITCH:  No, but now he's asked
12  a general question and she can handle it one way
13  or the other.
14      THE WITNESS:  Yes, he was praying for
15  me.
16  BY MR. KLAYMAN:
17      Q.  Yes, and you prayed with him?
18      A.  Yes, he told -- he told me, "Let's do
19  it this way."  And I was standing there, and he
20  was praying and I was listening.
21      Q.  He didn't force to you pray with him,
22  did he?

|  | Page 719 |
|---|---|

1  BY MR. KLAYMAN:
2      Q.  You were aware generally that CBN would
3  broadcast into Iran, just like Voice of America?
4      CHAIRMAN FITCH:  She said yes on that
5  part.
6      MR. KLAYMAN:  Alright.
7  BY MR. KLAYMAN:
8      Q.  So this was a really good
9  opportunity -- you viewed this as a good
10  opportunity for you because you could do what you
11  wanted to do at VOA through CBN, broadcast into
12  Iran and give freedom messages.
13      THE WITNESS:  Is it a yes or no
14  question, or I can --
15  BY MR. KLAYMAN:
16      Q.  Yes or no?
17      A.  Not necessarily, no.
18      CHAIRMAN FITCH:  Ok.
19  BY MR. KLAYMAN:
20      Q.  But you never actually had a chance to
21  interview with CBN, did you?
22      A.  No.

27 (Pages 716 to 719)

Page 720

1    Q.  Because, and I'm going to read it,
2  second paragraph, "The last time that Ellie was to
3  be interviewed, then by CBN" -- I'm writing to
4  your brother -- "which I had arranged for her with
5  a friend who runs Movieguide, a prestigious
6  broadcasting company with the bureau in LA" -- I'm
7  talking about CBN, "and which televises into Iran
8  in the Middle East, someone who identified herself
9  as her manager intervened and scared CBN away from
10  interviewing her."
11        You are aware that CBN was called by
12  someone who purported to be your manager?
13        You asked somebody to call --
14        CHAIRMAN FITCH:  Your question is
15  whether she was aware of what is --
16        MR. KLAYMAN:  No, let me withdraw it.
17  BY MR. KLAYMAN:
18    Q.  You asked someone to call CBN on your
19  behalf, correct?
20    A.  Honestly, I don't remember.  Honestly.
21        CHAIRMAN FITCH:  Ok.
22        THE WITNESS:  I mean, I can't say yes,

Page 721

1  but I don't remember.
2        CHAIRMAN FITCH:  That's fine.
3        He has a right to ask and you have a
4  right to tell us truthfully what you do or don't
5  remember.  That's fine.
6  BY MR. KLAYMAN:
7    Q.  This refreshes your recollection, does
8  it not, that you asked someone to call CBN about
9  this possible job?
10    A.  I remember Mr. Ted, I remember that
11  whole big picture, but I don't remember the
12  details.
13        I'm sorry.  I don't remember the
14  details.
15    Q.  Then I write to your brother, "The CBN
16  job would have provided much more income and been
17  a great position that would have allowed Ellie to
18  realize her potential.  CBN broadcasts in both
19  Farsi and English and has a wide, global reach.
20        "The so-called manager told CBN's
21  executive, Mark Woodland," W-o-o-d-l-a-n-d, "who
22  had traveled to LA to meet with Ellie, that, while

Page 722

1  'he is a Muslim,' he did not mind her working for
2  a Christian-owned company, (this should have never
3  been said.  It was unnecessary), then imposed
4  conditions on her employment before Ellie was ever
5  interviewed, (that she wanted much more), and that
6  I was not to be present at the meeting since Ellie
7  was going to sue me."
8        You see that?
9    A.  Yes.
10    Q.  That person who called CBN, that was
11  Sam Razzazi, wasn't it, your cousin?
12    A.  I don't know.  I don't remember.
13    Q.  You asked him to call them.
14    A.  I don't remember.
15    Q.  Continuing, "anyway, this scared the
16  CBN executive Mark Woodland away since he could
17  not figure out what was going on and why Ellie did
18  not talk to him herself (She never called him back
19  despite several calls to her) and why Ellie's
20  so-called manager was threatening me, as I am
21  close with CBN.
22        "All of this had nothing to do with

Page 723

1  Ellie interviewing at CBN, and in fact I told
2  Ellie in emails, before the so-called manager
3  intervened (He obviously is not a manager since an
4  entertainment manager would never have said these
5  things), that I would not be present at the
6  interview."
7        You see that?
8        Does that refresh your recollection as
9  to what you instructed Sam Razzazi or someone else
10  to do?
11    A.  No.
12        These are all your words.  I don't --
13  it doesn't refresh anything for me.
14    Q.  You wanted a job at that time.  You
15  wanted a job, a good paying job, correct?
16    A.  Correct.
17    Q.  So --
18    A.  You explained to me that as a Muslim
19  girl -- and these are in the emails, too -- that
20  you explained to them that I turned to Christ and
21  it's going be to programs that I'm going to say
22  that I'm going Muslim now -- now I'm Christian and

28  (Pages 720 to 723)

Page 724

1  that's how I'm going to do the programs.
2      I didn't want to do that.  I didn't
3  want to say that.
4      Q.  In fact you told me that you wanted to
5  become a Christian, didn't you?
6      A.  No.
7      Q.  You told me that you didn't want to be
8  part of the Muslim faith any more.
9      A.  The fact that I don't want to be a part
10 of the Muslim faith doesn't mean that I want to be
11 Christian.  I believe in God and our religion.
12     Q.  But you also said you wanted to hear
13 what Ted Baehr had to say and find out for
14 yourself?
15     A.  You wanted me that.  You wanted me
16 that, and I said ok.
17     Q.  You're not prejudiced towards
18 Christian, are you?
19     A.  Absolutely not.
20     MR. SMITH:  Objection.
21     CHAIRMAN FITCH:  Overruled.  Overruled.
22 There is no basis in the record.

Page 725

1      MR. KLAYMAN:  I'm just trying to show
2  that there was no --
3      CHAIRMAN FITCH:  It's overruled.
4      MR. KLAYMAN:  No lack of respect.
5      CHAIRMAN FITCH:  It's overruled.
6      MR. KLAYMAN:  Ok.
7      CHAIRMAN FITCH:  The objection is not
8  overruled, but it's sustained.
9      MR. KLAYMAN:  I was just trying to show
10 that there was no impediment for her to call.
11 That's all.
12     CHAIRMAN FITCH:  You have adduced
13 substantial evidence through this document for
14 that.  You made an effort.
15     MR. KLAYMAN:  Ok.
16     CHAIRMAN FITCH:  In that for one reason
17 or another the efforts may not have come to
18 fruition.
19     MR. KLAYMAN:  I didn't want it taken in
20 a way that there is any criticism of any faith,
21 just whether she didn't have the hesitancy.
22 That's all.

Page 726

1  BY MR. KLAYMAN:
2      Q.  Then I say at the end that we were also
3  talking about getting a book deal, right?
4      A.  I read this email last week about the
5  book deal.
6      This is your word to my brother eight
7  years -- seven years ago.
8      Q.  The book deal would be for you and not
9  for me, correct?  Correct?
10     CHAIRMAN FITCH:  Was it your
11 understanding that, in the book deal, theoretical
12 book deal, it would be a deal for you or a deal
13 for Mr. Klayman?
14     THE WITNESS:  Well, in here it says
15 it's for me.
16     CHAIRMAN FITCH:  And did you have any
17 other understanding?
18     THE WITNESS:  I didn't --
19     CHAIRMAN FITCH:  Additional
20 understanding?
21     THE WITNESS:  I didn't have any
22 understanding at all during that time.

Page 727

1      CHAIRMAN FITCH:  Ok.
2      Next question.
3  BY MR. KLAYMAN:
4      Q.  And in fact, some of the columns that I
5  wrote for you, particularly the first one, you
6  know, I was really --
7      MR. SMITH:  Objection.  Let's identify
8  what columns we're talking about.
9      MR. KLAYMAN:  We'll deal with that
10 later.  I'll withdraw the question and we'll get
11 to those, ok?
12 BY MR. KLAYMAN:
13     Q.  That whole issue of your getting a job
14 with CBN and a book, you never responded to this
15 email, so you never told me that you weren't
16 interested, correct?
17     A.  Mr. Klayman, I was not responding to
18 you at this point at all.
19     Q.  I take it you did respond to Kevin,
20 though, right, your brother?  Correct?
21     A.  I talked to my brother.
22     Q.  You emailed him back, didn't you?

29  (Pages 724 to 727)

Page 728

1    A.  I talked to him.
2    Q.  That's one of the emails that you
3  decided on your own weren't relevant to give to
4  Bar Counsel or to me --
5        MR. SMITH:  Objection.
6  BY MR. KLAYMAN:
7    Q.  -- or to me.
8    A.  I talked to my brother.  I didn't email
9  him back.
10    Q.  So what did you talk to him about this?
11    A.  Family matters.
12        CHAIRMAN FITCH:  Woah, woah.  Objection
13  sustained.
14  BY MR. KLAYMAN:
15    Q.  So you did talk to your brother
16  about --
17        CHAIRMAN FITCH:  Objection sustained.
18        MR. KLAYMAN:  Ok.
19  BY MR. KLAYMAN:
20    Q.  Turn to Bar Disciplinary Counsel's
21  Exhibit 32.  That's an email I sent on or about
22  November 25th, 2010: "Ellie, all the best wishes

Page 729

1  to you, your mom, brother and the rest of your
2  family for Thanksgiving.  I hope that you're well.
3  If you get a chance, it would be nice if you could
4  call Mahmonir and wish her a nice Thanksgiving.  I
5  had a glass of wine with her the other evening.  I
6  had been helping her and Jamshid, both of who were
7  also retaliated against.  I'm sure both Mahmonir
8  and Jamshid would love to hear from you.  Best
9  wishes.  Larry."
10        Do you remember getting this email from
11  me in November, 2010?
12    A.  I read this email last week when I
13  opened it.
14    Q.  Turn your attention to Bar Disciplinary
15  Supplemental Exhibit 33.  It's an email to you
16  dated December 25th, 2010, "Subject: "Good
17  morning," wherein I state very short, "This is my
18  Christmas message of you and my friends, Ellie.  I
19  wish you the very best.  So too does God.  The
20  column (inaudible) daily explains how you are part
21  of the most profound experience in my life.
22        "Someone called me today and threatened

Page 730

1  me.  I know you would not do this.
2        "Keep yourself well and believe, as
3  this is stronger than any psychologist.  God bless
4  you and your family.  Larry."
5        You remember receiving that in or
6  around that date?
7    A.  I read this email last week.
8    Q.  The person that called and threatened
9  me, that was your cousin, Sam Razzazi, wasn't it?
10    A.  I'm not aware of anybody calling you
11  and threatening you.
12    Q.  In fact, you are aware that Sam Razzazi
13  has a criminal record?
14        CHAIRMAN FITCH:  Don't answer --
15        THE WITNESS:  No, I'm not aware of
16  that.
17  BY MR. KLAYMAN:
18    Q.  Turning your attention to Office of Bar
19  Counsel's Supplemental Exhibit 34, this is an
20  email that I sent to you on January 14th, 2011,
21  correct?
22    A.  I opened this email last week.

Page 731

1    Q.  Well, let's talk about it.  If you
2  could take a look at it -- you read it last week?
3    A.  Yes.
4    Q.  So you know what's in it?
5    A.  Yes.
6    Q.  And in this email I'm talking about
7  someone who sent me something and somebody who
8  threatened me, correct?
9    A.  You're talking about this, correct?
10    Q.  Yes.  And I'm sending this to you,
11  because I don't know who that is, correct?
12    A.  Ok.
13        CHAIRMAN FITCH:  Woah, woah, woah.
14        He sent it to you.  Yes.
15        What was the next part of that?
16  BY MR. KLAYMAN:
17    Q.  You understood, having read this, that
18  I sent it to you, because I don't know who to
19  respond to, what that person said to me and the
20  threats to me.
21    A.  I don't understand it.  What's the
22  reason that you sent it to me?

Page 732

1    Q.  Because I didn't know who sent me a
2  communication that threatened me.
3    A.  So, whoever threatening you, you sent
4  me an email?
5    Q.  You are aware that, having read this,
6  that I say I was threatened during that period by
7  an anonymous person.
8    A.  Again --
9    CHAIRMAN FITCH:  No, you've already
10  said you weren't aware of any threats.
11    He's asking you now are you aware that
12  he says he was -- he says now that he was
13  threatened.
14    THE WITNESS:  I was not communicating
15  with him at that time.  So I wouldn't be aware of
16  it.
17  BY MR. KLAYMAN:
18    Q.  But you're aware now --
19    CHAIRMAN FITCH:  He's asking you
20  whether you understand now that he says now that
21  he was threatened.
22    THE WITNESS:  Now, yes, I do.

Page 733

1    CHAIRMAN FITCH:  Ok.
2  BY MR. KLAYMAN:
3    Q.  And I'm writing you, having read this,
4  you're understanding that I'm sending it to you so
5  you could send it to the person who threatened me,
6  correct?
7    CHAIRMAN FITCH:  Mr. Klayman, it speaks
8  for itself.  I don't see what her --
9    MR. KLAYMAN:  Alright, I'm going to
10  move on.  Let me move on.
11  BY MR. KLAYMAN:
12    Q.  The fourth paragraph, "However,
13  whatever your legal status, you must be in contact
14  directly with Ms. Sataki.  Please tell her to
15  contact me or the union president of the AFL-CIO,
16  Tim Shamble, to bring her up to date on the legal
17  matters.
18    "We cannot advise you as you are not
19  our client."
20    You see that?
21    A.  Where are we at now?  I'm sorry, I lost
22  it.

Page 734

1    Q.  The fourth paragraph in that email that
2  I sent you.
3    A.  Which --
4    Q.  Exhibit --
5    CHAIRMAN FITCH:  It's the one that
6  starts with the word "however".
7    THE WITNESS:  Ok, I saw it, I'm sorry.
8    Ok, so what's the question?
9  BY MR. KLAYMAN:
10    Q.  Yes, you're aware that what I'm saying
11  to this person, I'm asking you to forward it to
12  the person who threatened me, that we can't talk
13  to you about Ms. Sataki's legal matters, because
14  you're not Ms. Sataki, and please have her contact
15  either me or Tim Shamble so she could be brought
16  up to date on the status of her cases.
17    That's what I'm saying.  You understand
18  that, correct, in this letter?
19    A.  I understand that you wrote this in
20  this letter, yes.  I just read it and I understand
21  the sentence, yes.
22    Q.  And in and around this time period, you

Page 735

1  did not contact Mr. Shamble to learn of the status
2  of your legal matters, correct?
3    A.  I don't remember when I contacted Mr.
4  Shamble.  I don't remember the dates.
5    Q.  I turn your attention to Bar
6  Disciplinary Counsel Exhibit 35.  It's an email I
7  sent to you January 16th, 2011: "Communication
8  with Elham Sataki to protect her legal rights and
9  fully inform her of her obligations.  To, Mehran,
10  Razavi, alias Sam Razzazi, Sam Razz, et. al."
11    You received this email from me on or
12  about January 16, 2011, correct?
13    A.  I read this email last week.
14    Q.  Now, Mehran Razavi, that's your cousin
15  Sam, correct?
16    A.  Yes.
17    Q.  And he also goes by the name Sam
18  Razzazi, correct?
19    A.  No, Sam Razavi.  You misspelled it,
20  though.
21    Q.  Ok, so he's got two names there.  And
22  he's also got another name called Sam Razz,

In Re: Larry E. Klayman
June 1, 2018

| Page 736 | Page 738 |
|---|---|
| 1  R-a-z-z, correct? | 1  BY MR. KLAYMAN: |
| 2  A.  No.  His American name is Sam.  His | 2  Q.  You knew of that? |
| 3  Persian name is Mehran.  And the last name is the | 3  CHAIRMAN FITCH:  That question, now |
| 4  same, Razavi. | 4  being in the record, is struck. |
| 5  Q.  Now, having read this last week, you | 5  MR. KLAYMAN:  I'm asking if she knew |
| 6  were aware that, after I got this communication | 6  that he has been convicted of a crime. |
| 7  from the anonymous person who threatened me, that | 7  CHAIRMAN FITCH:  It is struck. |
| 8  I had that person identified through a private | 8  BY MR. KLAYMAN: |
| 9  investigator, correct? | 9  Q.  This is the person that you asked to |
| 10  CHAIRMAN FITCH:  Struck. | 10  communicate with me and threatened me, correct? |
| 11  THE WITNESS:  I don't know -- | 11  CHAIRMAN FITCH:  It is struck, |
| 12  CHAIRMAN FITCH:  It's struck.  You | 12  likewise. |
| 13  don't need to answer that question. | 13  BY MR. KLAYMAN: |
| 14  THE WITNESS:  I'm sorry. | 14  Q.  Turn to Office of Bar Counsel's |
| 15  BY MR. KLAYMAN: | 15  Supplemental Exhibit 37.  This is an email that I |
| 16  Q.  You know generally that you can take a | 16  sent to you that was addressed to Mr. Razavi on or |
| 17  telephone number and trace who it belongs to.  A | 17  about January 26, 2011, correct? |
| 18  private investigator can do that. | 18  A.  I saw this email last week. |
| 19  CHAIRMAN FITCH:  Struck. | 19  Q.  Yes. |
| 20  MR. KLAYMAN:  Ok. | 20  A.  I read this email last week. |
| 21  | 21  Q.  Have you discussed any of these emails |
| 22  BY MR. KLAYMAN: | 22  with regard to Sam Razavi with him since the time |

| Page 737 | Page 739 |
|---|---|
| 1  Q.  I turn your attention to Bar Counsel | 1  that you read it? |
| 2  Supplemental Exhibit 36.  This is an email I sent | 2  A.  No. |
| 3  to you on January 26th, 2011, "Subject: Mehran | 3  Q.  Have you discussed it with anybody? |
| 4  Razavi, Private Investigator's Initial Report." | 4  A.  I'm sorry, what? |
| 5  I'm forwarding an email from Matt | 5  Q.  Have you discussed these emails that I |
| 6  Garrison, who is the private investigator who | 6  just went over, that deal with my being threatened |
| 7  worked with me: "Mr. Klayman, with regards to your | 7  by Mr. Razavi, with anyone? |
| 8  subject, Mehran Razavi, our investigation revealed | 8  A.  No.  I just pulled them up -- I'm |
| 9  that he was arrested for, pled guilty to and was | 9  sorry. |
| 10  convicted by the 2nd District Court of the State | 10  CHAIRMAN FITCH:  That's fine. |
| 11  of Nevada, Washoe County, for conspiracy to commit | 11  BY MR. KLAYMAN: |
| 12  fraudulent acts involving gaming. | 12  Q.  I turn your attention to an email which |
| 13  "Our investigation also that subject | 13  I sent to you on September 15th, 2011. |
| 14  Razavi entered a plea of guilty on January 27, | 14  CHAIRMAN FITCH:  The one in SX38? |
| 15  2006 and that he was convicted and sentenced on | 15  MR. KLAYMAN:  Yes. |
| 16  March 8th, 2006. | 16  THE WITNESS:  Where are we now? |
| 17  "The specific codes that apply may be | 17  CHAIRMAN FITCH:  SX38. |
| 18  located at"... and the investigator gives that. | 18  THE WITNESS:  Ok. |
| 19  You know that to be the case, that your | 19  MR. SMITH:  The last page of all that |
| 20  cousin, Sam Razavi, whatever name he used, was in | 20  package of documents. |
| 21  fact convicted. | 21  |
| 22  MR. SMITH:  Objection. | 22  BY MR. KLAYMAN: |

Page 740

1    Q.  "Subject: It is your fault that I lost
2  my case."  And I'm referring to an email which you
3  sent to me, September 11th at 5:28 a.m.
4        Do you see that?
5        Do you see the email that you sent to
6  me on September 11th at 5:28 a.m.?
7    A.  I don't see the time.  I'm sorry.
8    Q.  Alright, don't worry about the time.
9    A.  September 15th, 2011?
10        CHAIRMAN FITCH:  Let me explain to you.
11        Look about halfway down, and you see,
12  after the words "Larry Klayman," there's the words
13  that say on Sunday, September 11th, 2011 at
14  5:28 a.m. --
15        THE WITNESS:  Ok.
16        CHAIRMAN FITCH:  -- "Elham Sataki
17  wrote," and then there's some words --
18        THE WITNESS:  Yes.
19        CHAIRMAN FITCH:  -- that may be your
20  email.  He's asking you about that.
21        THE WITNESS:  Thank you.
22        CHAIRMAN FITCH:  Then there's an email

Page 741

1  above it which seems to be arguably about five
2  hours later that purports to be from him to you.
3        Now he's going to ask you about one or
4  more aspects of the two emails that appear on this
5  page.
6        THE WITNESS:  Yes.
7  BY MR. KLAYMAN:
8    Q.  I'm reading the one that you sent to me
9  on September 11th, 2011: "Mr. Klayman, are you
10  happy now that you've completely destroyed and
11  lost my case?  A case with so many evidence and
12  witnesses.  Only a very bad and clueless attorney
13  could lose it, or lost it on purps (sic) because
14  he made a dill (sic), with the other party."
15        What you're suggesting is that I lost
16  your case because I was bribed by VOA and
17  therefore lost it on purpose, correct?
18    A.  Yes, that's what I'm suggesting
19  there -- well, not bribed.  It's just -- I was
20  very upset at that time and I just -- I wrote that
21  email.
22        The state of mind that I was in at that

Page 742

1  moment was the way I felt and I just put it down,
2  the way I felt.
3    Q.  You had no evidence or facts to say
4  that I had been bribed to lose your case?
5    A.  Did I use the word -- let me see.  What
6  did I write?
7        (Witness reads document.)
8    Q.  Let me refer your attention to what you
9  said.  That I lost it on "purps (sic).  You mean
10  a perk of giving somebody something.  And "he made
11  a dill (sic)," d-i-l-l.  You meant d-e-a-l?
12    A.  Yes.
13    Q.  But you had no facts or evidence at
14  that time, or ever, to show that I had been bribed
15  to lose your case?
16    A.  No.
17    Q.  So that was untrue, correct?  You just
18  said it.  But you knew it not to be true.
19    A.  It was just a feeling I had at that
20  time, and I didn't say it to anybody else.  I
21  wrote it to you.  I didn't say it to anybody else.
22        I sent you an email and sent you about

Page 743

1  my feelings regarding the case, not anybody else.
2    Q.  I didn't ask you whether you sent it to
3  anybody else.  But I take it you did share it with
4  your cousin Sam?
5    A.  I didn't share it with anybody, nobody.
6    Q.  I take it --
7    A.  As you see, it's 5:00 o'clock in the
8  morning and in that state of mind that I was, I
9  mailed this email to you.
10    Q.  And you shared it with Kathleen, too?
11    A.  I didn't share it with anybody, nobody.
12    Q.  I'm not talking necessarily at 5:28
13  a.m.
14    A.  Nobody.  I never said anything about
15  this to nobody at no time.
16    Q.  But do you often say things that you
17  don't have facts to back up?
18        CHAIRMAN FITCH:  Struck.
19  BY MR. KLAYMAN:
20    Q.  "I do not know if you are Christian or
21  Jewish, because whichever suits you best, you
22  become one.  But I believe in karma and what you

33  (Pages 740 to 743)

In Re:  Larry E. Klayman
June 1, 2018

| | Page 744 |
|---|---|
| 1 | have done with my case and losing it." |
| 2 | Now, why are you disparaging my faith? |
| 3 | MR. SMITH:  Objection. |
| 4 | CHAIRMAN FITCH:  That is sustained. |
| 5 | THE WITNESS:  I have to answer? |
| 6 | CHAIRMAN FITCH:  You don't have to |
| 7 | answer that. |
| 8 | BY MR. KLAYMAN: |
| 9 | Q.  I did tell you in the course of our |
| 10 | having worked together and done other things |
| 11 | together that I was born Jewish and became a |
| 12 | Christian. |
| 13 | I told you that, right? |
| 14 | CHAIRMAN FITCH:  Sustained. |
| 15 | BY MR. KLAYMAN: |
| 16 | Q.  So you knew that? |
| 17 | CHAIRMAN FITCH:  Sustained. |
| 18 | BY MR. KLAYMAN: |
| 19 | Q.  "And what you have done with my case |
| 20 | and losing it and not stopping working on it when |
| 21 | I ordered you, one day you'll answer to God, even |
| 22 | if you throw your life and play with people life. |

| | Page 746 |
|---|---|
| 1 | you've been employed during that period, correct? |
| 2 | CHAIRMAN FITCH:  Asked and answered. |
| 3 | MR. KLAYMAN:  Ok. |
| 4 | BY MR. KLAYMAN: |
| 5 | Q.  And in fact, even when you were in Los |
| 6 | Angeles, before these cases were resolved, you |
| 7 | were working for Andisheh Television in the |
| 8 | valley? |
| 9 | CHAIRMAN FITCH:  Asked and answered. |
| 10 | MR. KLAYMAN:  Your Honor, this might be |
| 11 | good time to take lunch, because I'm going into |
| 12 | another area right now. |
| 13 | Ok, so I thank you for your indulgence. |
| 14 | CHAIRMAN FITCH:  Ok, we will break on |
| 15 | the early side. |
| 16 | MR. KLAYMAN:  I'm sorry? |
| 17 | CHAIRMAN FITCH:  That's fine.  Six of |
| 18 | one, and half a dozen of in another. |
| 19 | MR. KLAYMAN:  Thank you. |
| 20 | CHAIRMAN FITCH:  Let's return at 1:00 |
| 21 | o'clock.  That's just short of an hour for lunch. |
| 22 | |

| | Page 745 |
|---|---|
| 1 | "I am nobody, just a little girl who |
| 2 | was retaliated and harassment by some VOA employee |
| 3 | and you seed (sic) that you can help me. |
| 4 | "Not only did you not help me, but |
| 5 | destroyed my life to nothing.  Ellie Sataki. |
| 6 | Correct? |
| 7 | A.  Yes. |
| 8 | Q.  You also had accused VOA of destroying |
| 9 | your life to nothing, correct? |
| 10 | A.  I'm sorry, what? |
| 11 | Q.  You had accused VOA of destroying your |
| 12 | life, Voice of America?  Those are the people that |
| 13 | you accused of destroying your life? |
| 14 | A.  Well, I'm sorry, but I don't know how |
| 15 | they tied in together. |
| 16 | Q.  Yes or no?  You did accuse Voice of |
| 17 | America of destroying your life, correct? |
| 18 | A.  Some of the lies that they and |
| 19 | executive producer said that's -- that's what I |
| 20 | said. |
| 21 | Q.  Ms. Sataki, since the time that you |
| 22 | went to Los Angeles, as you testified previously, |

| | Page 747 |
|---|---|
| 1 | (Whereupon at 12:02 p.m. a luncheon |
| 2 | recess was taken.) |
| 3 | A F T E R N O O N   S E S S I O N |
| 4 | (Whereupon at 12:57 p.m. the hearing |
| 5 | resumed.) |
| 6 | CHAIRMAN FITCH:  We are back on the |
| 7 | record at 12:57. |
| 8 | Mr. Smith, do you or do the parties |
| 9 | jointly have any thoughts on scheduling? |
| 10 | MR. SMITH:  I have not spoken with |
| 11 | Respondent or his counsel about scheduling going |
| 12 | forward.  No, sir. |
| 13 | CHAIRMAN FITCH:  Ok, Respondent? |
| 14 | MR. KLAYMAN:  Yes, what we would |
| 15 | propose -- I think I mentioned this before -- that |
| 16 | we would propose to resume when we were going to |
| 17 | originally perhaps continue this matter to the 2nd |
| 18 | of July, give Mr. Sujat time to get up to speed. |
| 19 | He's in Florida; I'm in California, but we'll meet |
| 20 | up.  I'll go to Florida and meet with him and go |
| 21 | through everything with him, and it also gives me |
| 22 | time to get Mr. Sporkin, Judge Sporkin up to |

In Re: Larry E. Klayman
June 1, 2018

Page 748

1   speed. He's not in really great health, so I have
2   to go out to his house and go through everything
3   with him.
4        In light of also, your Honor, the fact
5   that there are some documents here that are out
6   there that haven't been provided, such as the ones
7   we identified at the end of the morning session,
8   dealing with Gloria Allred, are super important.
9   This will give us time to come up with a way to
10  produce everything that's relevant or may lead to
11  relevant evidence, and obviously I need that time
12  to digest it. Fred needs to digest it, and I'd
13  like him to be fully briefed when we start up
14  again.
15       So we would request to July 2nd,
16  respectfully.
17       CHAIRMAN FITCH: Any further thoughts,
18  Mr. Smith?
19       MR. SMITH: About scheduling?
20       CHAIRMAN FITCH: Yes.
21       MR. SMITH: No -- well, I mean,
22  certainly if Respondent wants to get something

Page 749

1   from Gloria Allred, perhaps Gloria Allred can
2   provide documents, but discovery in this -- I
3   suppose there will be motions and I welcome
4   motions along those lines so that we can fully
5   articulate the limits of the Disciplinary System
6   in discovery going forward.
7        But having said that, July 2nd or any
8   time in July is find. I do have a hearing that is
9   scheduled to start I believe August 8th, so I
10  would not want proceedings to kind of bleed into
11  that, but if we're talking about the 2nd week
12  in July --
13       CHAIRMAN FITCH: It won't.
14       MR. KLAYMAN: -- then that's fine with
15  me.
16       CHAIRMAN FITCH: We'll confer during
17  the first break, the three of us.
18       MR. KLAYMAN: I appreciate Mr. Smith's
19  consent to that.
20       CHAIRMAN FITCH: If the witness is
21  here...
22       (Elham Sataki resumes the witness

Page 750

1   stand.)
2        CHAIRMAN FITCH: Afternoon.
3        THE WITNESS: Good afternoon.
4        CONTINUED CROSS-EXAMINATION
5        ON BEHALF OF RESPONDENT:
6        BY MR. KLAYMAN:
7   BY MR. KLAYMAN:
8        Q. Good afternoon, Ms. Sataki.
9        CHAIRMAN FITCH: Give me one second to
10  do one other thing.
11       (Brief pause.)
12       Thank you, go ahead.
13  BY MR. KLAYMAN:
14       Q. Ms. Sataki, good afternoon.
15       A. Good afternoon.
16       Q. I turn your attention to Exhibit 23 of
17  Bar Counsel's exhibits.
18       CHAIRMAN FITCH: Say that again.
19       MR. KLAYMAN: Exhibit 23 of Bar
20  Counsel's exhibits, petitioner.
21       CHAIRMAN FITCH: This is the blue book
22  now, Ms. Sataki.

Page 751

1   BY MR. KLAYMAN:
2        Q. And I turn your attention to the pages
3   of 23-33, 23-34, 23-35. Do you see that article
4   that's entitled "The Government War on a
5   Freedom-Loving Beauty: Larry Klayman Goes to Bat
6   For Harassed Broadcaster Fighting For a Free
7   Iran."
8        A. What's the question, I'm sorry?
9        Q. Do you see it?
10       A. Yes.
11       Q. Do you remember that article that I
12  wrote on your behalf?
13       A. Yes, I do.
14       Q. And in fact, it's a very complimentary
15  article of you, is it not?
16       A. Yes.
17       Q. Go to pages 23-30, 23-31 to 23-33.
18  This is an article which I wrote called "A Voice
19  For Persian Freedom: Larry Klayman explains why
20  Iran is the most important country in world," end
21  quote. May 1st, 2010.
22       You remember seeing that article?

35 (Pages 748 to 751)

Page 752

1    A.  Yes.
2    Q.  This article is also complimentary of
3  you, is it not?
4    A.  What is it again?
5    Q.  This article is also complimentary of
6  you.
7        If you want, you can take time to
8  review it.
9        (Witness reads document.)
10   A.  Ok.
11   Q.  Isn't it?
12   A.  Yes.
13   Q.  So this article is also complimentary
14  of you, correct?
15   A.  Ok.
16   Q.  Now in this article, as you understand
17  it, I was trying to make the point that we need a
18  voice for Persian freedom, which is people like
19  you at Voice of America who are going to tell the
20  truth to the Iranian people, correct?
21   A.  That's what it says in the article.
22  Yes, sir.

Page 753

1    Q.  Right, and I say at the end, "God bless
2  the Persian people and God bless the real America,
3  true to its own principals, that can again summon
4  the will to broadcast its message of freedom
5  around the world."
6        That was the theme of the article as
7  understand it, yes?
8    A.  I understand it, yes.
9    Q.  So, in effect, what I was saying was
10  don't discriminate against people like Ms. Sataki,
11  because they're going to -- they're good for
12  America and they're good for Persian freedom?
13  Correct?
14   A.  That's what you're saying in the
15  article.
16   Q.  Yes.
17   A.  Thank you.
18   Q.  I'm not going to go through all of the
19  articles, because they speak for themselves, but
20  you were a broadcaster at Voice of America,
21  correct?
22   A.  Correct.

Page 754

1    Q.  And your mission was to change the way
2  people think in Iran and around the world to bring
3  freedom to your native country?
4    A.  Well, as employee of Voice of America,
5  our mission is to provide balanced news.
6    Q.  When you got the job at VOA, you were
7  very proud to have that done?
8    A.  Very proud, yes.
9    Q.  And the reason was you were going to be
10  able to influence the world some way, through
11  broadcasting?
12   A.  I -- I don't know if I would influence
13  the world by broadcasting from VOA.
14   Q.  No, I'm not saying you would control
15  the world -- I'm not saying you controlled the
16  world.  No one can.  But I'm saying you would have
17  your little role to play in making Iran a better
18  place.
19       MR. SMITH:  Asked and answered.
20       CHAIRMAN FITCH:  Overruled.
21       Go ahead and answer the question,
22  please.

Page 755

1        THE WITNESS:  We wanted to -- yes, I
2  mean, Voice of America was providing balanced news
3  and providing the news to people.  That's to tell
4  the truth and that's what we were hoping was going
5  to happen.
6  BY MR. KLAYMAN:
7    Q.  So, by broadcasting, by publicizing the
8  views of Voice of America, you could play a role
9  in trying to change things in Iran.
10       You felt that, correct?
11   A.  Yes.
12   Q.  Now, isn't it true, given your
13  experience as a broadcaster and someone in the
14  media, that publicity can influence events, just
15  generally speaking?
16   A.  In general, yes, but not always.
17   Q.  But that the media plays a big role in
18  educating people and can play a role in getting
19  certain actions to happen with media.
20       That's your experience, correct?
21   A.  Not always.
22   Q.  When you and I were working together,

36  (Pages 752 to 755)

In Re:  Larry E. Klayman
June 1, 2018

Page 756

1   didn't I say to you that one of the reasons that I
2   was so interested in your case and the other
3   broadcasters is because, during the Reagan
4   administration, Voice of America was used to help
5   bring down the Soviet Union by broadcasting into
6   the Soviet Union to its people?
7       A.  You said that.  That's your words, yes.
8           I don't know.  Those are your words,
9   yes.
10      Q.  And that you were performing a valuable
11  role as a broadcaster in helping to change the
12  regime in Iran some day by communicating with the
13  people of Iran who were oppressed.
14      A.  That was not my role.  I couldn't say
15  that.  I could never say that.
16      Q.  No, I didn't say that you would say
17  that publicly, but we talked about that.
18      A.  Again, as a broadcast journalist, I
19  can't say that.
20      Q.  You are aware that the role of Voice of
21  America is to be a propaganda -- and I mean that
22  in a positive way -- organ for the United States

Page 757

1   government to promote freedom.
2           That's the purpose of Voice of America?
3       A.  Yes, and to provide balanced news.
4       Q.  So isn't it true that favorable
5   articles on behalf of you and your other
6   broadcasters, in the media, based on your
7   experience, could be used to try to change the
8   attitudes of your managers at Voice of America?
9           MR. SMITH:  Could I have that question
10  read back, please.
11          THE COURT REPORTER:  "So isn't it true
12  that favorable articles on behalf of you and your
13  other broadcasters, in the media, based on your
14  experience, could be used to try to change the
15  attitudes of your managers at Voice of America?"
16          THE WITNESS:  Based on my experience
17  now?  No, it's not true.
18  BY MR. KLAYMAN:
19      Q.  But we believed that at the time, did
20  we not?
21      A.  No, I didn't.  You said that.
22      Q.  Now, the first article that I showed

Page 758

1   you, "The government war on a freedom loving
2   beauty," we actually discussed in front of Mr.
3   Shamble that article, did we not?
4           Those are pages 23 to 35 of Bar
5   Counsel's Exhibit 23.
6           We actually discussed that with Mr.
7   Shamble?
8       A.  If you say we did, we did.
9           I -- I don't remember that particular
10  date.
11      Q.  And, in front of Mr. Shamble, you
12  understood that we were going to use publicity to
13  try to change the attitude of your managers and
14  their approach towards you to try to get a
15  settlement.
16      A.  Again, it was you saying that that's
17  going to happen.
18          I -- I was -- I did raise my concern
19  that it could backfire on me and also everybody's
20  going to find out about it.
21      Q.  But, notwithstanding your testimony,
22  which obviously I disagree with, we did discuss

Page 759

1   this in front of Mr. Shamble, the use of
2   publicity?
3       A.  We finally, yes, did that.
4       Q.  Now, I never told you, did I, that I
5   was going to use publicity to try to sell my
6   autobiography, did I?
7           I never said that to you?
8           MR. TIGAR:  I'm sorry, I didn't hear
9   the question.
10  BY MR. KLAYMAN:
11      Q.  Yes, I never discussed with you or told
12  you that I was going to use publicity concerning
13  you and the other broadcasters to sell my book
14  about my professional career.
15          I never told you that.
16      A.  We talked about that, the fact that
17  publicity always is going to help everybody.  You
18  always said that.
19      Q.  And you never told Mr. Shamble, did
20  you, not to use publicity to help you?  You never
21  told him that.
22      A.  Not to use publicity to help me?

37  (Pages 756 to 759)

App.0367

Page 760

1   Q.  You never told him.
2       Let me say is again.
3       You never instructed Mr. Shamble not to
4   use publicity to try to get a settlement for you
5   for Voice of America.
6       MR. SMITH:  That was like a double
7   negative.  You never did not do ever --
8       CHAIRMAN FITCH:  It is, but I think
9   it's the best one could do.
10      Do you understand the question?
11      THE WITNESS:  I don't think I even had
12  that conversation with Mr. Shamble.
13      I probably had maybe very few, one, two
14  or three conversations with Mr. Shamble.  It was
15  mostly you who have conversations with Mr. Shamble
16  and I had conversations with you.
17      So this particular question --
18      CHAIRMAN FITCH:  You can ask it again.
19  BY MR. KLAYMAN:
20      Q.  Yes, the question is you never --
21      MR. KLAYMAN:  Sorry, your Honor.
22      CHAIRMAN FITCH:  It's up to you.

Page 761

1       I request that you ask it the following
2   way: Did you ever tell Mr. Shamble not to use
3   publicity or publicity for your case?
4   BY MR. KLAYMAN:
5       Q.  Do you ever tell Mr. Shamble not to use
6   publicity to try to get a favorable result for you
7   with Voice of America?
8       A.  I don't believe we ever discussed that
9   subject with Mr. Shamble.
10      Q.  The question is, did you ever tell him
11  not to use publicity?
12      A.  I don't remember.  I don't remember.
13      CHAIRMAN FITCH:  In your previous
14  answer I believe you said "I don't believe we ever
15  discussed -- that I ever discussed that subject
16  with Mr. Shamble."
17      THE WITNESS:  Exactly.
18      CHAIRMAN FITCH:  I think you have a
19  negative answer.
20      MR. KLAYMAN:  I just want to be clear
21  if I ask one more question.
22

Page 762

1   BY MR. KLAYMAN:
2       Q.  But on your own, you never went to Mr.
3   Shamble and said to him, "Please don't use
4   publicity on my behalf and please tell Mr. Klayman
5   not to use publicity" --
6       A.  I --
7       Q.  Let me finish, please.
8       MR. SMITH:  It's a compound question.
9       CHAIRMAN FITCH:  It is, actually.
10      MR. KLAYMAN:  Compounds are sometimes
11  ok.
12      CHAIRMAN FITCH:  I agree.  But give it
13  a try.
14      MR. KLAYMAN:  Ok, let me give it a try.
15  BY MR. KLAYMAN:
16      Q.  The question was you never, ever went
17  to Mr. Shamble and said, "Don't use publicity on
18  my behalf and please instruct Mr. Klayman not to
19  use publicity on my behalf, too"?
20      You never said that to Mr. Shamble.
21  You never went to Mr. Shamble with that.
22      A.  No, I didn't.

Page 763

1       Q.  Ms. Sataki, after you filed your
2   initial complaint --
3       MR. KLAYMAN:  Excuse me, your Honor.
4   I'm just looking for something.
5       CHAIRMAN FITCH:  Perfectly alright.
6       (Brief pause.)
7       MR. KLAYMAN:  We're making really good
8   progress in terms of time.
9   BY MR. KLAYMAN:
10      Q.  Turning your attention to Respondent's
11  exhibit -- it's your original complaint, that
12  someone had written in their handwriting.
13      CHAIRMAN FITCH:  That's struck.
14  BY MR. KLAYMAN:
15      Q.  Exhibit 1, which is dated November
16  20th, 1970 -- excuse me, that's the date of your
17  birth.  It was dated November 2nd, 2010 and
18  apparently filed on November 3rd.
19      MR. SMITH:  Is that Respondent's
20  Exhibit Number 4?
21      MR. KLAYMAN:  No, it's your Exhibit
22  Number 1.

38  (Pages  760 to 763)

Page 764

1      CHAIRMAN FITCH:  White notebook for
2  Exhibit 1.
3      MR. SMITH:  Now we're back to
4  Disciplinary Counsel's exhibits, Exhibit 1.
5      CHAIRMAN FITCH:  Ms. Sataki has it.
6      MR. KLAYMAN:  I'm doing this from a
7  point of reference to lay a foundation.
8  BY MR. KLAYMAN:
9      Q.   Referring to Exhibit 1, that's your
10 original complaint, and Exhibit 23 is the
11 supplement which was filed about a year later on
12 or about October 24th, correct?  And that's
13 Exhibit 23?
14     CHAIRMAN FITCH:  Mr. Klayman, in your
15 exhibits, the original complaint dated 11/2/2010
16 is I think Exhibit 4.
17     MR. KLAYMAN:  Thank you, your Honor.
18     Again we had Kinko's do this quickly so
19 we could make the deadline last week.
20     MR. SMITH:  I think he's now using Bar
21 Counsel's Exhibit Number 1, which is Respondent's
22 Exhibit Number 23.

Page 765

1      CHAIRMAN FITCH:  Ok.
2  BY MR. KLAYMAN:
3      Q.   Also turning to Exhibit 23, that was
4  filed on or about October 24th, 2011, a year
5  later, correct?
6      A.   Correct.
7      Q.   Now, after you filed this, you received
8  correspondence from Bar Counsel saying that your
9  case was being processed by them, correct?
10     A.   Yes.
11     Q.   And that was shortly after you filed
12 your complaint?
13     CHAIRMAN FITCH:  We have a vague
14 pronoun here.  "This" being number one or number
15 23?
16     MR. KLAYMAN:  Exhibit 23, I'm talking
17 about 23.  I'm talking about actually both of
18 them.
19 BY MR. KLAYMAN:
20     Q.   But after these documents were
21 received, you received correspondence from Bar
22 Counsel shortly thereafter?

Page 766

1      A.   Ok, yes.
2      Q.   Now, for three and a half years after
3  that, you never had any contact with Bar Counsel,
4  correct, for several years after that?
5      A.   Probably correct.  I don't -- I
6  don't --
7      CHAIRMAN FITCH:  He's asking you
8  approximately, and when you say probably, I think
9  you're saying yes, that's approximately the
10 period.
11     THE WITNESS:  About.  I don't know
12 exactly.
13     CHAIRMAN FITCH:  Fair enough.
14 BY MR. KLAYMAN:
15     Q.   Several years, correct?
16     A.   Ok.
17     Q.   And eventually someone contacted you
18 from Bar Counsel and told you that this case was
19 going forward, correct?
20     A.   Correct.
21     Q.   And that was about three to four years
22 after you filed your initial complaints, correct?

Page 767

1      A.   About.
2      Q.   It wasn't you that contacted Bar
3  Counsel.  They contacted you at that time?
4      A.   Yes.
5      Q.   During that three- to four-year period,
6  you didn't submit anything further to Bar Counsel,
7  correct?
8      A.   Correct.
9      MR. KLAYMAN:  Your Honor, I'm just
10 going to double-check everything, but I think that
11 my cross is concluded as for now, subject to other
12 documents that may come to light.
13     CHAIRMAN FITCH:  We all like to check
14 things.
15     MR. KLAYMAN:  I'm moving along at your
16 suggestion.
17     CHAIRMAN FITCH:  We all have too many
18 "oops".
19     (Brief pause.)
20     MR. KLAYMAN:  Let me just make sure
21 that I moved most of my exhibits into evidence at
22 some point.

39  (Pages  764  to  767)

In Re:  Larry E. Klayman
June 1, 2018

| Page 768 | Page 770 |
|---|---|

**Page 768**

1    Did I move Exhibit 16 into evidence,
2  which is --
3    CHAIRMAN FITCH:  Give me a minute here
4  to get ready to go along with you.
5    Ok, go ahead.
6    MR. KLAYMAN:  And Exhibit 19 as well,
7  was that moved into evidence?
8    CHAIRMAN FITCH:  Exhibit 16 is admitted
9  without objection.
10    I thought 19 was admitted.  It is.
11    MR. KLAYMAN:  Just double-checking.
12    CHAIRMAN FITCH:  20 has been admitted.
13    MR. KLAYMAN:  Thank you.
14    CHAIRMAN FITCH:  For your information,
15  Mr. Klayman, I have RS18 admitted in its entirety,
16  same for 19, same for 20.
17    MR. KLAYMAN:  And we have also that
18  court case we talked about yesterday admitted.
19  That was Exhibit 12.
20    CHAIRMAN FITCH:  And I have a number of
21  others that were admitted.
22    MR. KLAYMAN:  Ok, alright.

**Page 770**

1  publicity.  In Mr. Klayman's examination you
2  discussed publicity.  Let me show you what has
3  been marked already as Disciplinary Counsel's
4  Exhibit D, Page 23-D.
5    CHAIRMAN FITCH:  Which, I'm sorry?
6    MR. SMITH:  The blue book.
7    CHAIRMAN FITCH:  What number?
8    MR. SMITH:  D and it's D-23.
9    CHAIRMAN FITCH:  You mean you have a D
10  exhibit in your book?  Do you mean DX23?
11    MR. SMITH:  No, I mean D -- actually
12  it's Respondent's Answer.
13    CHAIRMAN FITCH: DXD.
14    MR. KLAYMAN:  Sorry, I don't know where
15  Mr. Smith is referring.
16    CHAIRMAN FITCH:  It's at the very
17  beginning of his blue book.
18    MR. SMITH:  It's the Specification of
19  Charges that you filed, Bar exhibit in the
20  Specification of Charges.
21    CHAIRMAN FITCH:  He has an A, B, C, D
22  in the beginning of his blue book.

| Page 769 | Page 771 |
|---|---|

**Page 769**

1    Your Honor, I have no further questions
2  at this time.
3    CHAIRMAN FITCH:  Any redirect, Mr.
4  Smith?
5    MR. SMITH:  Yeah, if you could indulge
6  me about five minutes to kind of make sure I have
7  everything organized properly.
8    CHAIRMAN FITCH:  Make it 10.
9    MR. SMITH:  Alright.
10    CHAIRMAN FITCH:  If you want to work at
11  your desk, we'll step outside.  Another little
12  break, for better or worse.
13    (Recess taken.)
14    CHAIRMAN FITCH:  Go ahead, Mr. Smith.
15    MR. SMITH:  Alright, thank you, Mr.
16  Chairman.
17    REDIRECT EXAMINATION
18    ON BEHALF OF DISCIPLINARY COUNSEL
19    BY MR. SMITH:
20  Q.  Good afternoon, Ms. Sataki.
21  A.  Good afternoon.
22  Q.  Earlier in your testimony you discussed

**Page 771**

1    MR. KLAYMAN:  Exhibit D.  Ok.
2    MR. SMITH:  For the record, it looks to
3  be a communication dated June 10th, 2010 from
4  Larry Klayman to --
5    CHAIRMAN FITCH:  No, I seem to be
6  entirely wrong.  I thought you told me it was
7  Exhibit D in your blue book.
8    Is that wrong?
9    MR. SMITH:  Yes.  No.
10    CHAIRMAN FITCH:  It's Respondent's
11  Answer?
12    MR. SMITH:  To the Specification of
13  Charges.
14    CHAIRMAN FITCH:  I thought you said
15  something else.  That's fine.  I thought you said
16  communication.
17    MR. TIGAR:  And you're on 23 of that?
18    MR. SMITH:  23-I.
19    MR. TIGAR:  It's Bates numbered D-23?
20    MR. SMITH:  Correct.
21    MR. SMITH:  And again, for the record,
22  it is a communication dated June 10, 2010 from

40  (Pages 768 to 771)

Page 772

1 Larry Klayman to T. Shamble.
2      Are we all on the same exhibit now?
3      MR. KLAYMAN:  I have it.
4 BY MR. SMITH:
5      Q.  Ms. Sataki, it suggests that a courtesy
6 copy of this email was sent to you.
7      Do you remember receiving it?
8      A.  Yes, yes.  That's just I probably
9 received it, but I don't remember --
10     Q.  Ok.
11     A.  -- exactly that moment that I wrote
12 this.
13     MR. TIGAR:  I'm sorry, Mr. Smith.
14 Could I ask you to move the microphone down.
15 She's a broadcaster, she knows.  Yes.
16     THE WITNESS:  I'm sorry.
17     MR. TIGAR:  Ok.
18 BY MR. SMITH:
19     Q.  Do you recall having conversations with
20 Mr. Klayman about publicity in your case?
21     A.  Yes.
22     Q.  At what point in the representation, if

Page 773

1 you recall, did you have those conversations?
2      A.  Maybe after two months.  So say we
3 started about in February, so sometime March,
4 sometime there probably.  I don't know exactly.
5      Q.  And so looking at this date of June
6 10th, you had had conversations with Mr. Klayman
7 prior to June 10th, 2010?
8      A.  Yes.
9      Q.  Could you tell the committee what it
10 was that you told Mr. Klayman with respect to your
11 views about publicity?
12     A.  Well, I thought that the publicity is
13 going to --
14     To start with, I didn't want the case
15 to go out and have everybody find out, and
16 especially publicity with everybody.  So, then
17 everybody is going to question me, "What's going
18 on?  What happened?"
19     And it was a sexual harassment case.
20 It wasn't something -- it's not something that a
21 woman is comfortable to be asked about all the
22 time.  Especially someone like me or, then people

Page 774

1 nonstop start asking about that, how -- what the
2 sexual harassment, how it was, and they want me to
3 describe it.  And also they think that sexual
4 harassment means rape.  So they asked me, and
5 still ask me to this day, how I was raped and
6 where I was raped.
7      Q.  And did you --
8      A.  So that was my concern.
9      Q.  Did you express this concern to Mr.
10 Klayman?
11     A.  Yes, I did.
12     Q.  Did he respond to those concerns?
13     A.  He did, but he believed that publicity
14 is going to help our case.
15     Q.  How many times did you have this
16 conversation about publicity?
17     A.  Several times --
18     MR. KLAYMAN:  Objection, that's leading
19 and it presumes number of times.  He's giving the
20 witness --
21     CHAIRMAN FITCH:  Let's rephrase it.
22     MR. SMITH:  I asked how many times did

Page 775

1 you --
2      CHAIRMAN FITCH:  No, "Did you have such
3 a conversation one time or more than one time?"
4 BY MR. SMITH:
5      Q.  Did you have such a conversation with
6 Mr. Klayman more than one time?
7      A.  Yes.
8      Q.  How many times did you have one?
9      A.  I don't know, a few times.  I can't
10 recall exactly how many times.
11     It was a conversation back and forth
12 until --
13     Q.  Ok.  Did you ultimately agree with Mr.
14 Klayman about publicity?
15     A.  I did.
16     Q.  Ok.  Could you tell the committee what
17 it was that persuaded you to ultimately agree to
18 the publicity?
19     A.  Because he was my attorney, and as an
20 attorney I thought he was best and that's going to
21 probably help my case and help me out.
22     So he basically convinced me that

In Re:  Larry E. Klayman
June 1, 2018

| | |
|---|---|
| Page 776 | Page 778 |

Page 776

1  that's for my best interest.
2      Q.  Now, in addition to the articles that
3  you have been shown previously that Mr. Klayman
4  authored that were on the World Net Daily, are you
5  aware of any other publicity that your case has
6  had?
7      A.  I know there is a link on YouTube that
8  Mr. Klayman had a -- it was a conference in
9  National Press Club, and he had some speakers
10  there, and I -- I found out later.  I saw that
11  link way after the event.  Someone actually told
12  me and sent me the link.  And it was November
13  17th, 2010 that he had my picture blown up, a
14  picture, and he listed the picture and told
15  everybody that he's representing me and I work for
16  VOA.
17      MR. KLAYMAN:  Objection.  Move to
18  strike, hearsay.
19      CHAIRMAN FITCH:  Ask her how she knows
20  that a poster or photograph or whatever was shown.
21      MR. SMITH:  Alright.
22

Page 777

1  BY MR. SMITH:
2      Q.  How do you know that all of the things
3  you just described are in this YouTube video?
4      A.  I saw it.
5      Q.  You watched it yourself?
6      A.  I watched it myself.  It's on YouTube.
7      Q.  So you're reporting what you saw?
8      A.  Yes.
9      Q.  To your knowledge, is that YouTube
10  video still available online?
11      A.  As far as two days ago, yes.
12      Q.  Do you recall how it could be found,
13  searched, if the committee, for example, wanted to
14  take a look at it?
15      A.  I believe that if you put the date and
16  Mr. Klayman's name, "Larry Klayman, "National
17  Press Club," November 17th, 2010, it will come up.
18      MR. TIGAR:  Excuse me, Mr. Chairman,
19  I'm going to interrupt here.
20      If there's something that either party
21  wants the committee to hear, it wouldn't be right
22  for us to go out in the community and start doing

Page 778

1  investigation.
2      We prefer to have it that you present
3  it and show it to the committee and we look at it.
4  Other wise it's extrajudicial receipt of evidence.
5      MR. SMITH:  It was an unartfully
6  crafted question, but I think we all know.
7      I will make an effort to get a copy of
8  that, at or least the link available, so that it
9  can become a part of the record.
10      CHAIRMAN FITCH:  Well, no, hold on
11  there.
12      MR. SMITH:  Or request that it become a
13  part of the record, move that it become a part of
14  the record.
15      CHAIRMAN FITCH:  You can request.
16      MR. SMITH:  And I'm not doing it at
17  this time.
18      CHAIRMAN FITCH:  I'm sorry.  Go ahead.
19  BY MR. SMITH:
20      Q.  Do you recall whether or not there were
21  any conversations about the specific types of
22  publicity that Mr. Klayman planned on having with

Page 779

1  respect to your case?
2      A.  No, we didn't.
3      Q.  No, you don't recall or no, you did not
4  have any specific --
5      A.  I did not have the specific
6  conversation with him.
7      Q.  I ask you to look at what has been
8  marked in the supplemental Bar Counsel exhibits as
9  number 23.
10      A.  Yes.
11      Q.  Alright, in paragraph four, Mr. Klayman
12  states that he referred you to Gloria Allred, and
13  then if you look at the next paragraph down, he
14  says, "I successfully represented other parties in
15  sexual harassment cases over the years.  Gloria is
16  not skilled in suing the government, but rather
17  prior employers, so it's thought that I would be
18  better in that event."
19      Does that refresh your recollection at
20  all about your conversation with Mr. Klayman about
21  retaining Gloria Allred?
22      A.  Yes.

42  (Pages 776 to 779)

Page 780

1    Q.   Could you please tell the committee how
2  that is so.
3    A.   This was during the difficult time,
4  when it was starting to get more difficult and
5  difficult between -- to communicate with Mr.
6  Klayman.
7      So, I -- as he emailed me before
8  regarding -- and we talked before regarding Gloria
9  and also Tim Shea, I emailed him and asked him,
10  and also I told him, "Why don't we have Gloria
11  help us?"  And also I asked about Tim Shea, "Why
12  can't we have Tim Shea help with this?"
13      So, as me and him, we couldn't
14  communicate any more, because of the unfortunate
15  situation that we were in.
16    Q.   And if you would look at Page 3 of that
17  exhibit, there appears to be a communication dated
18  July 15th --
19      CHAIRMAN FITCH:  Let me interrupt,
20  because we all have to go over the record, the
21  documents and find them in the record.
22      As I count the references to Ms.

Page 781

1  Allred, they're in the fifth and sixth paragraphs
2  of this document.  I think you said fourth and
3  fifth.
4      MR. SMITH:  Thank you.
5      CHAIRMAN FITCH:  Ask your question
6  again.  I interrupted you.
7  BY MR. SMITH:
8    Q.   At Page 3 of this document there is a
9  communication dated July 30th, 2010.
10    A.   Yes.
11    Q.   Is this the email that you were
12  referring to that Mr. Klayman was replying to?
13    A.   Yes.  That's the email that I wrote him
14  and that was his reply.
15    Q.   Would you tell the hearing committee
16  why it was that Tim Shea was not hired by you to
17  pursue this matter.
18    A.   It was because Mr. Klayman said that he
19  evaluated him and realized that he can't be an
20  asset, "he won't be able to handle this case."
21    Q.   Yesterday there was I think some
22  examination with respect to a car.  Mr. Klayman

Page 782

1  had asked you whether or not you had asked him to
2  assist you in purchasing a car.
3      Do you recall that testimony?
4    A.   Yes --
5    Q.   Those questions?
6    A.   Yes.
7    Q.   What was your reply?
8      MR. KLAYMAN:  Objection, asked and
9  answered, your Honor.
10      MR. TIGAR:  Ok.
11  BY MR. SMITH:
12    Q.   Well, your testimony was that you did
13  not ask him to buy you a car.
14      MR. KLAYMAN:  Wait, wait, wait.  That's
15  not a correct way of questioning, your Honor.
16  Objection.  He should not be telling --
17      CHAIRMAN FITCH:  He may ask her the
18  perfectly normal transition: "Did you testify
19  that," blah, blah, blah, blah, blah blah.
20      MR. SMITH:  Thank you.
21      CHAIRMAN FITCH:  Go ahead and ask that
22  question.

Page 783

1      MR. SMITH:  Alright.
2  BY MR. SMITH:
3    Q.   As I recall your testimony was Mr.
4  Klayman did not -- you did not ask Mr. Klayman to
5  help you purchase a car?
6    A.   No, I did not.
7    Q.   Was there any situation where Mr.
8  Klayman was involved in a car situation with you?
9    A.   Yes.
10    Q.   Could you explain what that situation
11  was, please.
12    A.   My car was towed away from my garage
13  because they repoed my car and took it to the
14  dealership.  And my brother was staying with me at
15  that time, so he found out and he came upstairs
16  and told me.
17      As me and my brother going to the
18  dealership to see what's going on, Mr. Klayman, I
19  asked an attorney, so I had asked advice what we
20  should do and say, and he said he's going to come
21  and meet us there.
22      He came, and basically we couldn't

43 (Pages 780 to 783)

In Re: Larry E. Klayman
June 1, 2018

Page 784

1  resolve it that moment with Mr. Klayman, because
2  he started telling the people that he's going to
3  sue them.
4      Then later me and my brother and a
5  friend went back and we resolved the situation.
6      MR. KLAYMAN:  Your Honor, I object to
7  what she's recounting, which is hearsay, that I
8  said I was going to sue them.
9      CHAIRMAN FITCH:  Overruled.
10  BY MR. SMITH:
11      Q.   During your testimony -- and I'll just
12  make a reference to the Bar exhibits which began
13  at I guess about Bar Exhibit Number 24, which for
14  the record is an email dated August 1st, 2010,
15  through Bar Exhibit 37, which is an email dated
16  January 26th, 2011, all from Mr. Klayman to you.
17  And from the record, it does not appear that you
18  responded to any of those emails.
19      So here's my question -- and during
20  your testimony --
21      MR. KLAYMAN:  Objection, your Honor.
22      CHAIRMAN FITCH:  Well, let me hear his

Page 785

1  objection.
2      MR. KLAYMAN:  This is really, no lack
3  of respect to Mr. Smith, it's a jumbled way of
4  asking a question.  He's got a question on top of
5  a question, and I don't think anybody knows
6  exactly what the question was.
7      So I ask that he please rephrase a more
8  precise question, because it's vague and
9  ambiguous.
10      MR. SMITH:  There was no question.
11      MR. KLAYMAN:  He's telling her --
12      CHAIRMAN FITCH:  I'm leave that to Mr.
13  Smith.
14      MR. KLAYMAN:  What he is doing is he's
15  giving her the testimony and then asking a
16  question.  And that's inappropriate.
17      CHAIRMAN FITCH:  I don't think it's
18  inappropriate.
19      Go ahead, Mr. Smith, wherever you were.
20  BY MR. SMITH:
21      Q.   So my statement is, earlier today Mr.
22  Klayman examined you on Supplemental Exhibits 24

Page 786

1  through 37 and 24, the period beginning August
2  1st, 2010, and 37 was a document ending on --
3  excuse me, that was sent on January 21st -- 26th,
4  2011.
5      You testified that you only recently
6  opened up all of those emails and therefore did
7  not respond to any of them.
8      Can you tell the hearing committee why
9  it was that you stopped opening up emails that you
10  were receiving from Mr. Klayman that are referred
11  to in Bar exhibits 24 through 37?
12      A.   Because I was receiving -- during a few
13  months earlier, the emails I was receiving and
14  text messages and calls from Mr. Klayman, most of
15  them was not regarding my case, but it was
16  regarding stuff that was really hurting me, and it
17  got to a point that physically, mentally,
18  psychologically I just couldn't deal with it any
19  more.  So I had to shut down.  I couldn't.
20      I couldn't, because it was his wording
21  was abusive and he wouldn't respect me or the
22  people around me.  He would disrespect me, and I

Page 787

1  had to prove myself often.
2      So basically the conversations and
3  everything was mostly non-case related.  So
4  therefore I just -- it got to a point that
5  psychologically and mentally I couldn't deal with
6  it any more.
7      Q.   When you say that he disrespected you,
8  could you give the hearing committee as many
9  examples as a you can think of how you were
10  disrespected.
11      A.   The people -- I "hang out with ghetto
12  Persians" and "classless Persians," and I'm
13  becoming one of them.
14      He would accuse me of having
15  relationships with this person and that person.
16  Every person that I would interact with, he would
17  accuse me that I have a relationship with that
18  person and it got exhausting.
19      It was -- I was dealing -- it was a
20  vicious cycle and never ending and if felt like
21  I'm in an abusive relationship instead of a
22  client/attorney, and I had to prove myself all the

44 (Pages 784 to 787)

In Re:  Larry E. Klayman
June 1, 2018

Page 788

1  time, and I was in a trial all the time and I had
2  to all the time tell him that, "No, what you're
3  saying is not true."
4       So that was -- I -- I would go to a
5  friend's house with my mom, and if I wouldn't turn
6  his call that evening, then we would have -- help
7  would break down for a few things.  Then
8  everything would be ok.  Then we could go back to
9  the case again, and then some other things would
10  come up.
11       Like I would go to a play and didn't
12  invite him, and then he would get upset again and
13  then I would -- he would just beat on me again for
14  days with text messages, calls and emails.  And
15  that was going on.
16       It was always something going on.  I
17  mean, it's so many different things.
18  Q.  Can you think of anything which you may
19  have done which led Mr. Klayman to believe that it
20  was ok to question you about your personal
21  relationships?
22  A.  Definitely not.

Page 789

1       I asked him over and over and over
2  again, "Please leave my private life to myself and
3  you're not to interfere, and it's not right."
4       And he -- I even asked him, when he --
5  the first time he used the word "Persian ghetto,"
6  I asked him, very nicely, that "This is not right
7  and please do not say that again."  But he again
8  repeated himself regarding that.  And I asked him
9  nicely -- I mean, I asked him all the time not to
10  do that.
11  Q.  Let me ask you to take a look at
12  Supplemental Exhibit Number 38.
13       MR. SMITH:  For the record, it is an
14  email dated Sunday, September 11th, 2011, which
15  appears to have been sent at 5:28 a.m. from Ms.
16  Sataki to Mr. Klayman.
17       THE WITNESS:  Yes.
18  BY MR. SMITH:
19  Q.  Can you tell the hearing committee what
20  your mental and physical state of being was at
21  that time?
22  A.  This was a very, very difficult time,

Page 790

1  and I -- at this particular time, it was 5:28
2  a.m., I was very sad.  I used to take medication
3  to go to sleep, and I woke up and I just really
4  thinking about what happened to me, and everything
5  that happened to me.  I woke up crying and upset
6  and just looking back at everything.
7       Unfortunately I can't say that I was in
8  a perfect state of mind, that I was thinking
9  clearly when I sent that email.
10       MR. SMITH:  Thank you.  I have no
11  further questions.
12       MR. KLAYMAN:  Can I recross?
13       CHAIRMAN FITCH:  About what?
14       MR. KLAYMAN:  The matters that he got
15  into in this regard.
16       CHAIRMAN FITCH:  Which specific --
17       MR. KLAYMAN:  I won't need more than 15
18  minutes.
19       CHAIRMAN FITCH:  Which specific
20  matters?
21       MR. KLAYMAN:  This matter here, Exhibit
22  38.

Page 791

1       CHAIRMAN FITCH:  That examination and
2  testimony about SX38 was totally rebuttal within
3  the scope.  You may not examine it further.
4       MR. KLAYMAN:  Then the recitation of
5  what happened with the car.  This was new
6  information.
7       CHAIRMAN FITCH:  That has been covered
8  in cross-examination and in the rebuttal -- the
9  redirect.  That was solely within the scope.
10       You may not examine on that.
11       MR. KLAYMAN:  Ok.  Those were the
12  two -- hold on, your Honor.
13       (Brief pause.)
14       CHAIRMAN FITCH:  Ms. Sataki.
15       THE WITNESS:  Yes?
16       CHAIRMAN FITCH:  We have completed your
17  testimony.  As with any witness it can be tiring
18  and, as Mr. Klayman said, the difference in time
19  zones probably adds to that.  We all understand
20  that.  But you are excused.
21       THE WITNESS:  Thank you.
22       CHAIRMAN FITCH:  That means we're

45 (Pages 788 to 791)

In Re:  Larry E. Klayman
June 1, 2018

Page 792

1 finished.
2          THE WITNESS:  We're finished, yeah?
3          CHAIRMAN FITCH:  With your testimony.
4          And we will stand in recess here at
5 2:15 until Mr. Bennett arrives.
6          (Brief pause.)
7          CHAIRMAN FITCH:  Back on the record.
8          The hearing committee wants to address
9 again, not necessarily conclusively, the
10 scheduling issue.
11          We think that this hearing may resume
12 on Monday, June 25 and proceed for the five
13 weekdays of that week.
14          The parties can address that now or
15 they can take a few minutes to think about it and
16 we can address it later.
17          MR. KLAYMAN:  That's acceptable to
18 Respondent.
19          CHAIRMAN FITCH:  That being the
20 schedule.
21          MR. KLAYMAN:  We agree to those dates.
22          MR. SMITH:  Disciplinary Counsel agrees

Page 793

1 to those dates as well.
2          CHAIRMAN FITCH:  We're on.
3          And now we'll stand in recess pending
4 Mr. Bennett's appearance.
5          (Recess taken.)
6          (Joel Bennett on the witness stand.)
7          CHAIRMAN FITCH:  We are back on the
8 record at 3:20 p.m., and I understand that Mr.
9 Smith has called his next witness.
10          What is your name, sir?
11          THE WITNESS:  Joel Bennett.
12          CHAIRMAN FITCH:  Would you raise your
13 right hand, please.
14          Do you swear or affirm that the
15 testimony you are about to give will be the truth,
16 the whole truth and nothing but the truth?
17          THE WITNESS:  I do.
18          MR. KLAYMAN:  Your Honor, I would like
19 to voir dire the expert at the appropriate time.
20          CHAIRMAN FITCH:  You may be seated.
21          The party calling the expert has the
22 right to do the first voir dire.

Page 794

1          MR. SMITH:  As a preliminary matter,
2 while we were off the record I passed along to
3 everyone, the Respondent and his counsel and the
4 hearing committee members, a curriculum vitae for
5 Mr. Joel Bennett.
6          It had originally been submitted in our
7 book of exhibits as Exhibit 50.  There was a
8 typographical error that Mr. Bennett noted and
9 brought to our attention, so a corrected version
10 has been provided.
11          If the committee sees fit, you can
12 replace the Bar Exhibit 50 that was initially in
13 your book with the corrected version.
14          I'll have Mr. Bennett testify as to
15 what the discrepancy was.
16          CHAIRMAN FITCH:  That's fine.
17          MR. SMITH:  I didn't give a copy to
18 Carly.
19          MR. TIGAR:  At the risk of causing
20 difficulty, I would appreciate it if you all would
21 put it up on the Justice website in electronic
22 form, so that would make it easier for me to put

Page 795

1 it with the other things that I have to look at.
2          MR. SMITH:  Not a problem.
3          CHAIRMAN FITCH:  Go ahead, Mr. Smith.
4          MR. SMITH:  Thank you, your Honor.
5 Whereupon,
6              JOEL BENNETT
7 called as a witness on behalf of Disciplinary
8 Counsel, and after having been first duly sworn,
9 was examined and testified as follows:
10     DIRECT EXAMINATION ON BEHALF OF BAR COUNSEL:
11          BY MR. SMITH:
12     Q.  Could you please state your name again,
13 for the record.
14     A.  Joel Bennett.
15     Q.  What is your occupation, sir?
16     A.  Attorney.
17     Q.  How long have you been an attorney?
18     A.  I've been a member of the District of
19 Columbia Bar continuously since 1972.
20     Q.  Are you licensed anywhere other than
21 the District of Columbia?
22     A.  I'm admitted to several other courts,

46  (Pages 792 to 795)

App.0376

Page 796

1  but I'm not licensed in any other states.
2      Q.  Did you receive an undergraduate
3  degree?
4      A.  Yes.
5      Q.  Where was that?
6      A.  Brown University.
7      Q.  What year was that?
8      A.  1968.
9      Q.  What was your major?
10     A.  American civilization.
11     Q.  Did you attend law school?
12     A.  Yes.
13     Q.  Where did you attend law school?
14     A.  Georgetown.
15     Q.  Did you get a degree?
16     A.  Yes.
17     Q.  In what year?
18     A.  February of 1972.
19     Q.  Have you been practicing as a lawyer
20  since 1972?
21     A.  Yes.
22     Q.  With whom have you been employed?

Page 797

1      A.  My first job after law school was
2  clerking for a United States district judge in
3  Chicago, Richard McLaren.  That was about seven
4  months, from February to September.  Then I joined
5  the Federal Trade Commission as a trial in the
6  Bureau of Consumer Protection.  I worked there
7  from 1972 to 1975.
8          In 1975 I joined the firm of Stein,
9  Mitchell and Mezinas (phon) as an associate.  I
10  worked there from I believe it was May of 1975 to
11  October of 1976.
12         October of 1976 I started my own solo
13  practice in DC.  I merged with two other lawyers
14  in I believe it was early 1980 or 1981.  The firm
15  was initially called Bennett, Diso (phon) and
16  Greenberg.  We brought in a fourth partner.  It
17  was called Bennett, Diso, Greenberg and Thomas.
18         In 1984 I went back to being a solo
19  practitioner, and I've been a solo practitioner in
20  DC continuously since 1984.
21     Q.  Is there a particular field of the law
22  that you practice primarily?

Page 798

1      A.  For most of my career and private
2  practice, my primary area of practice has been
3  employment law, including employment
4  discrimination cases, especially against the
5  federal government.
6      Q.  For about how much of your career have
7  you been doing employment law?
8      A.  I took my first case in 1973 pro bono
9  when I was still employed at the Federal Trade
10  Commission, and when I went out on my own in 1976
11  I started doing it heavily in 1976 to the present.
12     Q.  About how many cases would you say that
13  you have handled in your career, federal
14  employment discrimination cases?
15     A.  I've represented more than three
16  hundred federal employees since 1973.  I've also
17  handled several employment discrimination cases on
18  the defense side for law firms and other
19  employers.
20     Q.  Do you participate in any continuing
21  legal education programs?
22     A.  I have.  I've been both a student and a

Page 799

1  lecturer in many CLE programs over the last 40
2  some odd years.
3      Q.  Those CLEs deal with employment law
4  issues?
5      A.  Many of them have, yes.
6      Q.  Have you been active in the Bar?
7      A.  Yes, I have.
8      Q.  What have you done with respect to the
9  District of Columbia Bar?
10     A.  The District of Columbia Bar, I have
11  the cofounder and first chair of the Law Practice
12  Management Section.  Now they're called
13  Communities, I think.  I also --
14         CHAIRMAN FITCH:  For reasons that
15  puzzle us all.
16         THE WITNESS:  I also was a member of
17  the steering committee of the Labor and Employment
18  Law Section for several years.  These are all
19  elected posts.  Then I was also a member of the
20  steering committee of the litigation section and I
21  also chaired the litigation section of the
22  District of Columbia Bar.

47  (Pages 796 to 799)

In Re:  Larry E. Klayman
June 1, 2018

Page 800

1    I also was appointed to chair the
2 Membership Benefits Committee, I believe it was
3 when David Isabel was the president.
4    Q.  Have you ever written any publications?
5    A.  Yes.  In 1984 I was contacted by Law
6 Journal Seminars Press to write a book on Winning
7 Attorney's Fees Against the U.S. Government.  That
8 was initially published in 1984.  It was updated
9 annually for about 40 years, and now it's not
10 being updated any more.  But it's still available
11 online on Lexis and Westlaw.
12    I also participated in writing the
13 first edition of How to Start and Build a Law
14 Practice In the District of Columbia, and I was
15 the sole author of the second and third editions
16 of that book, which is published by the Bar
17 Association of the District of Columbia, the
18 voluntary Bar.
19    I've also been the author of many
20 articles published in law journals on a variety of
21 topics, including employment law, litigation, law
22 office management, and so on.

Page 801

1    Q.  Have you ever appeared as an expert
2 witness before?
3    A.  Yes, I have, both before Bar Counsel
4 committees and in the United States District Court
5 of the District of Columbia.  I've been qualified
6 as an expert witness on employment law,
7 particularly as it involves federal employees.
8    Q.  When you testified in connection with
9 the DC Bar Board on Professional Responsibility
10 matters, were you testifying on behalf of the
11 Office of Bar Counsel?
12    A.  Yes.
13    Q.  Have you ever testified on behalf of a
14 Respondent?
15    A.  Not that I can recall.
16    I don't recall ever being asked.  I
17 don't have any prejudice against doing so.  It's
18 just whoever asked me to be the expert.
19    Q.  In the civil litigation, who were you
20 testifying on behalf of?
21    A.  I've been an expert in several cases in
22 civil litigation.  Only one went to trial.  That

Page 802

1 case was before Judge John Bates in the United
2 States District Court for the District of
3 Columbia, and there I was testifying --
4    It's a complicated case.  I was
5 testifying on behalf after lawyer who had a
6 dispute about a client over fees, and I honestly
7 can't remember whether he was the plaintiff or the
8 defendant, because they had claims against each
9 other.
10    Q.  Now, could you remind me of how many
11 federal employment related discrimination cases
12 you've been involved with since 1973.
13    A.  More than three hundred.
14    Q.  And of that number, could you estimate
15 the number of times you've had to file pleadings
16 in those cases?
17    A.  Well, for federal employees, cases are
18 handled at different levels.  First you're at the
19 agency, then you have the option of going to the
20 Equal Employment Opportunity Commission where you
21 can get a hearing before an administrative judge.
22 Then you can appeal to the EEOC, Office of Federal

Page 803

1 Operations, and then you can go to court.
2    I've handled cases in all the different
3 levels, and I honestly couldn't give you a count
4 of all I've had at all those different levels, but
5 I've had more than 300 total.
6    But I've tried more than 75 cases to
7 judgment in courts over the years.
8    Q.  How many different agencies have you
9 sued on behalf of a client against the federal
10 government?
11    A.  It seems like almost all of them, but I
12 couldn't give you a count.
13    All the major ones.  That's for sure.
14    Q.  And in preparation for filing the cases
15 to the extent they had to go to litigation, did
16 you have to research who the appropriate parties
17 were to sue on behalf of the agency?
18    A.  Yes.
19    MR. SMITH:  At this point I'd like to
20 have Mr. Bennett accepted as an expert witness in
21 this case on the issues of employment law related
22 to the filing of pleadings as they will relate to

48  (Pages 800 to 803)

Page 804

1  the issues in this case.
2        MR. KLAYMAN:  May I voir dire first,
3  sir?
4        CHAIRMAN FITCH:  Yes, sir.
5        VOIR DIRE ON BEHALF OF RESPONDENT:
6        BY MR. KLAYMAN:
7    Q.  Mr. Bennett, I take it, because you did
8  not mention Voice of America, that you've never
9  had an employment discrimination case with Voice
10  of America?
11    A.  I have had at least one, possibly more.
12        I didn't mention any specific agencies
13  because I've had cases against every major federal
14  agency in the last 45 years and I honestly can't
15  remember all of the 300 cases.
16        But I'm sure I've had at least one
17  against the Voice of America and I've also had at
18  least one case against Radio Free Europe, which is
19  kind of an affiliated entity.
20    Q.  What were those cases?  Can you give me
21  their names?
22    A.  The case against Radio Free Europe was

Page 805

1  before Judge John Pratt in the United States
2  District Court of the District of Columbia, and
3  I'm pretty sure it was in the late '70s or the
4  early '80s, and I honestly cannot remember the
5  name of the plaintiff.
6        It was a female plaintiff.  But I
7  cannot remember her name.  I'm sorry.
8    Q.  So that was about 28 years ago?
9    A.  More.  Closer to 40.
10    Q.  That was in district court.  That was
11  not before VOA in terms of an office of
12  discrimination complaint.
13    A.  Well, it depends on when the client
14  comes to me.  If the client comes to me at the
15  very beginning of the process, there's a procedure
16  you have to go through to exhaust administrative
17  remedies:  first the client has to go through
18  counseling; then you get a notice of final
19  interview; then you file a formal complaint; then
20  the agency investigates.
21        You can't go to court until the formal
22  complaint is 180 days --

Page 806

1    Q.  I understand all that.  That's not my
2  question.
3        CHAIRMAN FITCH:  He's not finished.
4  BY MR. KLAYMAN:
5    Q.  Ok, go on.
6    A.  So I couldn't tell you from that case,
7  40 or so years ago, when I got involved, was it
8  the counseling stage, the formal complaint stage,
9  the investigative stage.
10        I just don't remember.  It's too long
11  ago.
12    Q.  You don't ever remember being before
13  the Office of Civil Rights for the Voice of
14  America?
15    A.  I may well have been.  I just don't
16  recall.
17    Q.  You don't remember.
18        And within the last ten years you've
19  had no contact with the Voice of America in terms
20  of legal proceedings, correct?
21    A.  I can't recall any case I've had with
22  VOA in the last ten years.

Page 807

1    Q.  So you don't know the makeup of the
2  people that you have to deal with there concerning
3  employment discrimination?
4    A.  I know the offices you have to go to in
5  every federal agency.  It does not vary by agency.
6  I don't know the names of the civil rights officer
7  in all several hundred federal agencies.
8    Q.  I didn't ask you that question.
9        MR. KLAYMAN:  If I can get an
10  instruction that he respond to my questions.
11        CHAIRMAN FITCH:  I think that Mr.
12  Bennett knows to try to respond.
13  BY MR. KLAYMAN:
14    Q.  What I'm saying is you haven't had any
15  contact or proceedings with people at Voice of
16  America in the Office of Civil Rights or otherwise
17  for at least ten years, correct?
18    A.  That is correct.
19    Q.  Now you testified that you've never
20  actually appeared as an expert in a Bar
21  disciplinary matter for a respondent, correct?
22    A.  I've never been asked to appear as an

49 (Pages 804 to 807)

In Re:  Larry E. Klayman

June 1, 2018

<table>
<tr><td>

Page 808

1   expert in a Bar disciplinary matter for a
2   Respondent.
3       Q.   You make considerable income being the
4   expert for Office of Disciplinary Counsel, don't
5   you?
6       A.   I don't know what you mean by -- I
7   mean, I am being paid by the hour.  Whether it's
8   considerable income or not I suspect is debatable.
9       Q.   Approximately how much are you paid
10  each year, let's say for 2017?  How much were you
11  paid by the Office of Disciplinary Counsel,
12  roughly?
13      A.   I'm handling this case on an hourly fee
14  basis.  I believe the rate is 475 an hour, and
15  I've been paid a few thousand dollars, which I do
16  not consider a considerable income.
17      Q.   I didn't ask you that question.
18          CHAIRMAN FITCH:  It's a different
19  question.
20          What was your total compensation
21  approximately in the year 2017 for testimony as an
22  expert witness in disciplinary cases in the

</td><td>

Page 810

1   years.  So my answer, when I say about this case,
2   is everything.
3       Q.   Now, you testified that you handled
4   employment discrimination cases.  You didn't have
5   any employment discrimination cases when you were
6   in the Bureau of Consumer Protection or the
7   Federal Trade Commission, did you?
8       A.   That is incorrect.  I took my first
9   case in 1973 through a program sponsored by the DC
10  Bar.  I handled that case at the administrative
11  level when I was an attorney at the Federal Trade
12  Commission.
13      Q.   You were not acting on behalf of the
14  Federal Trade Commission.
15      A.   Oh, no.
16      Q.   When you were at Stein, Mitchell and
17  Mazinas, what cases did you handle that had
18  employment discrimination, if any?
19      A.   I had my first case and I think I had a
20  second pro bono case.  The first case was against
21  the IRS and the second case was against
22  Smithsonian, and I believe I worked on both of

</td></tr>
<tr><td>

Page 809

1   District of Columbia?
2           THE WITNESS:  I didn't testify in any
3   disciplinary cases in the District of Columbia in
4   2017, to the best of my knowledge.  I worked on
5   this case in 2017, but I didn't testify.
6   BY MR. KLAYMAN:
7       Q.   Regardless of testifying, how much were
8   you paid by the Office of Disciplinary Counsel in
9   2017?
10      A.   I'd have to look at my bills and my
11  file.
12      Q.   An estimate?
13      A.   A few thousand dollars.  Not a
14  considerable sum.
15      Q.   And in 2016?
16      A.   I started the case in 2016 and I would
17  estimate maybe $1,000.
18      Q.   Again, I didn't ask you that question.
19          How much were you paid total, as the
20  chair has suggested?
21      A.   This is the only case I've had with the
22  Office of Disciplinary Counsel in the last three

</td><td>

Page 811

1   those while I was with Stein, Mitchell and
2   Mazinas.
3           MR. KLAYMAN:  Your Honor, I'm finished
4   with the voir dire, but I do have objections to
5   portions of Mr. Bennett's testimony that I'd like
6   to raise right now.
7           CHAIRMAN FITCH:  The portions of his
8   forthcoming testimony?
9           MR. KLAYMAN:  Yes, based upon the
10  Disciplinary Counsel's list of witnesses and an
11  explanation of what he's testified to, if I may
12  raise that right now.
13          CHAIRMAN FITCH:  It's an objection to
14  specific portions of his anticipated testimony?
15          MR. KLAYMAN:  That it's irrelevant.
16  It's an issue of relevancy, based upon the way the
17  case is structured.
18          CHAIRMAN FITCH:  I will not hear that
19  right now and he will be admitted as an expert in
20  the field of serving as counsel in employment
21  discrimination cases before federal or other
22  governmental agencies.

</td></tr>
</table>

50  (Pages 808 to 811)

Page 812

1    You can raise your objections as
2  specific topics may be encountered.
3    MR. KLAYMAN: Ok.
4    CHAIRMAN FITCH: Thank you.
5    CONTINUED DIRECT EXAMINATION
6    ON BEHALF OF DISCIPLINARY COUNSEL:
7    BY MR. SMITH:
8    Q.  In front of you, Mr. Bennett, is a book
9  of exhibits, and if you'll just look briefly at
10  the first couple pages of Bar Exhibit 4, 5, 6, 7,
11  8, 9, 10, 11, 12, 13, 14, 15, 16, 17.
12    MR. KLAYMAN:  Those are your exhibits?
13    MR. SMITH:  Yes.
14  BY MR. KLAYMAN:
15    Q.  Have you studied those exhibits prior
16  to today?
17    A.  Yes.
18    Q.  About how much time did it take you to
19  read through all of this stuff?
20    A.  I've looked through them twice, once
21  when I was initially retained and I believe it
22  took me one or two hours, and I looked through

Page 813

1  them a few days ago and it took between one and
2  two hours.
3    Q.  Thank you.
4    I'd like to make a reference to Bar
5  Exhibit Number 4.
6    A.  Yes.
7    Q.  For the record, it is a civil complaint
8  styled "Elham Sataki vs. The Broadcasting Board of
9  Governors," filed in the United States District
10  Court for the District of Columbia, case number
11  1:10-CV-00534 CKK.
12    A.  Yes, I'm familiar with the document.
13    Q.  Are you familiar with that document --
14  alright.
15    On Page 4-2 of the document, you'll see
16  that one of the defendants named is Hillary Rodham
17  Clinton, as Secretary of State, Ex Officio, Member
18  of the Board of Governors.
19    A.  Yes, I see that.
20    Q.  In connection with your preparation of
21  your testimony today, did you look into whether or
22  not it was necessary to name Hillary Rodham

Page 814

1  Clinton as a defendant in this complaint?
2    MR. KLAYMAN:  Objection, your Honor.
3  Let me make my objection now.
4    As we have all agreed and realized and
5  acknowledged, based on the Specification of
6  Charges, there is no allegation here of my
7  practicing with either a lack of competence or in
8  a diligent manner.  This is not a case about the
9  legal proceedings that I filed.  And during the
10  testimony earlier in this proceeding with Ms.
11  Sataki, your Honor correctly instructed me at the
12  time that that was not an issue.
13    Now they're trying to, in fact, second
14  guess my legal representation and imply that
15  somehow it was not competent, it was not
16  appropriate.
17    Lawyers do things in different ways,
18  but that's not an issue in this case.  So it's
19  irrelevant and that testimony should not be
20  permitted.
21    CHAIRMAN FITCH:  The objection is going
22  to be overruled.

Page 815

1    It is correct that neither zealousness
2  nor competency is at issue here, but his line of
3  examination potentially relates to other
4  Disciplinary Counsel's charges and underlying
5  theories related to those charges.
6    Go ahead.
7    MR. SMITH:  I thought I asked a pretty
8  good question.
9    Could you read the question back,
10  please.
11    CHAIRMAN FITCH:  The question was
12  whether it was necessary to name Secretary of
13  State Clinton as a defendant in Ms. Sataki's
14  matter.
15    THE WITNESS:  No.
16  BY MR. SMITH:
17    Q.  Could you tell the committee why it was
18  not necessary?
19    A.  It involves -- I have to explain a
20  little bit about how the federal employment
21  discrimination system works.
22    The federal employees and applicants

In Re:  Larry E. Klayman
June 1, 2018

| Page 816 | Page 818 |
|---|---|

**Page 816**

1  can file complaints of discrimination or
2  retaliation under several statutes.
3        Initially the Civil Rights Act of 1964
4  was the first broad employment discrimination
5  statute, Title VII.  That did not cover federal
6  employees.  It was amended in 1972 to cover
7  federal employees for discrimination based on
8  race, sex, religion, national origin.
9        There are also other statutes that
10  federal employees can sue under: the
11  Rehabilitation Act, the Age Discrimination and
12  Employment Act and so on.  These statutes state
13  right in them who the proper defendant is.
14        The proper defendant is the head of the
15  agency.  For example, if Ms. Sataki had been an
16  employee of Main State, the State Department,
17  itself, the only proper defendant would have been
18  Hillary Clinton, if she were the Secretary of
19  State at the time.
20        But Ms. Sataki, as I understand it, was
21  not an employee of Main State.  She was an
22  employee of VOA, which is governed by the Board of

**Page 818**

1        Q.   And if the name had not been added,
2  would it in any way have hurt her ability to
3  prosecute her underlying claim?
4        MR. KLAYMAN:  Objection.  Calls for
5  speculation.
6        MR. SMITH:  Calls for expert testimony.
7        CHAIRMAN FITCH:  Overruled.
8        THE WITNESS:  It would not have hurt
9  her claim by not naming Hillary Clinton as a
10  defendant.
11        MR. SMITH:  I have no further questions
12  of this witness.
13        CHAIRMAN FITCH:  I think Mr. Tigar has
14  a question.
15        MR. TIGAR:  Mr. Bennett, you've read
16  Exhibit 4?
17        THE WITNESS:  Yes.
18        MR. TIGAR:  You've read the complaint,
19  Exhibit 4?
20        THE WITNESS:  Yes.
21        MR. TIGAR:  And you noticed that one of
22  the jurisdictional bases is Section 3131 of Title

**Page 817**

1  International Broadcasters.  And so, under the
2  statutes, she could only name as a defendant the
3  head of the agency.  That's stated in the
4  statutes.
5        Also, when a federal employee exhausts
6  administrative remedies, the agencies have to give
7  them notice of their right to file a civil action,
8  and these notices routinely state, "You must name
9  as defendant the head of your agency by name and
10  title."
11        I've seen that hundreds of times at the
12  agency level, at the EEOC administrative judge
13  level, at the EEOC office of federal operations
14  level, and it's also in EEOC, "other regulations."
15        So it's crystal clear who the proper
16  defendant is in an employment discrimination by a
17  federal employee.
18        Q.   By adding Hillary Rodham Clinton's name
19  to the complaint, did it confer any benefit that
20  would assist Ms. Sataki in any way in pursuing her
21  claims?
22        A.   No.

**Page 819**

1  XXVIII, right?
2        THE WITNESS:  There are a lot of
3  jurisdictional bases.
4        MR. TIGAR:  Right.
5        THE WITNESS:  I can't remember all of
6  them.
7        MR. TIGAR:  If you look at the
8  jurisdictional venue allegation as it continues on
9  over to Page 5 --
10        THE WITNESS:  I see it.
11        MR. TIGAR:  It's about 10 lines down.
12        THE WITNESS:  Yeah, I see it.
13        MR. TIGAR:  Now, in your experience, is
14  it a reasonable judgment for a lawyer to decide
15  that, in addition to suing an agency, you would
16  bring a Bivens-type action against individual
17  agency employees and add them in?
18        First of all, you know what a Bivens
19  action is?
20        THE WITNESS:  Yes, I do, sir.
21        MR. TIGAR:  Alright.  Would that be a
22  reasonable judgment of a lawyer?  Not necessarily

52 (Pages 816 to 819)

App.0382

Page 820

1    you.

2          THE WITNESS:  Right.

3          MR. TIGAR:  But a reasonable judgment,

4    to see if you could kind of heat things up, you

5    know, put on extra pressure?

6          THE WITNESS:  There's a lot of case law

7    on that, and the only time you can bring a

8    Bivens-type action is if you have egregious

9    conduct, and by egregious conduct I mean something

10   like breaking into someone's home, a physical

11   assault.

12         There's a law called the Westfall Act

13   that -- I think it was used in this case to move

14   the case from superior court to district court.

15   When you sue federal employees -- first of all,

16   you can't sue them in superior court anyway.

17   Secondly, if you do, the U.S. Attorney's office

18   invokes the Westfall Act and that says, if this

19   all happened within the ordinary scope of duties,

20   it has to be in federal court and there can't be

21   any individual defendants, other than the head of

22   the agency.

Page 821

1          I don't see any Bivens --

2          Now, let's assume for just a moment

3    that Ms. Sataki had been physically assaulted by

4    the supervisor she was complaining of sexual

5    harassment with.  Yes, she could have sued him in

6    superior court by himself, under assault and

7    battery and other common law tort claims.  But for

8    the federal government you have to deal with the

9    Federal Claims Act.

10         So it's mess.

11         MR. TIGAR:  I understand your answer,

12   but the question is: is it completely unreasonable

13   for a lawyer handing a sexual harassment suit, in

14   which unwanted physical touching is an element, as

15   well as retaliation on the other matters in this

16   paragraph, to believe that is reasonable, assuming

17   the client has consented to add claims against

18   individuals?

19         THE WITNESS:  For federal employees

20   it's not, because everything is covered by Title

21   VII.  You just don't need it.

22         CHAIRMAN FITCH:  We may have a little

Page 822

1    difficulty with words.

2          Is it reasonable or unreasonable?

3          THE WITNESS:  I would say it's

4    unreasonable.

5          CHAIRMAN FITCH:  So the record is

6    clear.

7          THE WITNESS:  Yeah, I've never done it

8    and I know lots of other leading plaintiffs and

9    employment lawyers who handle sexual harassment

10   cases.

11         Federal employees, I can't think of any

12   case that I know of where they -- for a federal

13   employee, where they sued the individual.

14         Private sector cases are different, but

15   for federal employees, I can't think of any one

16   where they sued the individual harasser in

17   addition to the Title VII claim.

18         MR. TIGAR:  No, I'm not talking about

19   the individual harasser.  I'm talking about

20   individuals connected with the decision-making

21   process.

22         THE WITNESS:  Oh, I've never seen that

Page 823

1    done.  You always sue the head of the agency.

2          MR. TIGAR:  Could you do so?  And I'm

3    going to stop asking all these questions.

4          Could you do so as a good faith effort

5    to change the law and to bring about

6    responsibility of the board of governors?

7          THE WITNESS:  To me that's rather

8    speculative.  I can't imagine that being

9    successful.

10         MR. TIGAR:  Thank you.

11   CROSS-EXAMINATION ON BEHALF OF RESPONDENT:

12         BY MR. KLAYMAN:

13   Q.  Mr. Bennett, you are aware that Hillary

14   Clinton was the --

15         CHAIRMAN FITCH:  Well, now wait a

16   minute.

17         "I can't imagine it being successful."

18         That may or may not be an answer to the

19   question that Mr. Tigar asked whether a good faith

20   effort to change the law would include -- I'll put

21   it a little bit differently, naming the Secretary

22   of State in this case.

53  (Pages 820 to 823)

In Re: Larry E. Klayman

June 1, 2018

|  | Page 824 |
|---|---|

1       THE WITNESS:  To me it's a million to
2   one shot.
3       Whether that's a good faith effort or
4   not, it's hard to say.  I suppose it depends on
5   how much of a gambler you are and how much of a
6   gambler the client is.
7       I've never done it, I can't imagine
8   recommending it to a client, and I've never seen
9   it done.
10      MR. KLAYMAN:  Any further questions
11  from the Chair?
12      MR. TIGAR:  No, I didn't have anything
13  further.  I got the answer.
14  BY MR. KLAYMAN:
15      Q.  You are aware that the Secretary of
16  State is a member of the board of governors, and
17  in this case Mrs. Clinton sat on top of that board
18  of governors?  She's the number one board of
19  governors member.
20      A.  In her official capacity, yes.
21      Q.  And you're not aware, you don't have
22  any of the background facts as to what was going

|  | Page 826 |
|---|---|

1       A.  I would think you'd have to show notice
2   and failure to take action, which I find
3   incredible in this case.
4       Q.  Well, you have to concede, don't you,
5   because you haven't had any contact with Voice of
6   America for at least ten years, that you don't
7   know what's going on over there?
8       A.  I don't know what's going on in
9   hundreds of federal agencies on a day-to-day
10  basis, but that doesn't preclude me from
11  litigating it.
12      Q.  Now in representing the client, you
13  wouldn't be coming to a snap decision or a snap
14  judgment like this before having firsthand
15  knowledge of what was going on at an agency,
16  correct?
17      A.  I would investigate the complaint and
18  we would go through the investigative process at
19  the agency that's required for exhaustion of
20  administrative remedies.
21      I would interview every relevant
22  witness I could find for the client and find out

|  | Page 825 |
|---|---|

1   on over at Voice of America in terms of how Ms.
2   Sataki was being treated or other employees were
3   being treated by the agency?
4       A.  Well, I've read all of the exhibits,
5   including her -- all the pleadings filed on her
6   behalf, and there's a lot of facts in there about
7   sexual harassment and failure to accommodate, and
8   being sent -- working out of the LA office.
9       So, I'm aware of all of that that's in
10  these exhibits.
11      Q.  Let me give you a hypothetical, because
12  you're an expert, at least named as an expert: If
13  the head of an agency, in this case Hillary
14  Clinton, fails to police that agency, fails to
15  take action to correct a serious case of sexual
16  discrimination or retaliation by managers against
17  its employee, and this apparently even goes beyond
18  that particular individual to other broadcasters,
19  shouldn't one be able to file a Bivens action
20  against the head of an agency, in this case Mrs.
21  Clinton, for in fact ratifying that illegal and
22  discriminatory conduct?

|  | Page 827 |
|---|---|

1   what the facts are and take appropriate action.
2       Q.  And the reality is that you never
3   investigated, before you came here to testify,
4   what has been going on at VOA yourself.
5       You have never done that?
6       A.  I reviewed all the exhibits.  I did not
7   conduct an independent investigation.
8       Q.  Right, and the exhibits which I
9   prepared, the pleadings which I filed, are not
10  attacking Mrs. Clinton in a political way or in
11  any sense?
12      A.  In all of these hundreds of pages of
13  exhibits, I do not recall any individual attack on
14  Mrs. Clinton.
15      Q.  Correct.  And it is legitimate, you're
16  aware, to use strategy to try to coerce a
17  settlement through litigation, correct?
18      A.  That depends.  That's an iffy question.
19      It's legitimate for a lawyer to use
20  facts to represent a client to get the best
21  possible settlement.  I'm not comfortable with the
22  word "coerce."

54  (Pages 824 to 827)

In Re:  Larry E. Klayman
June 1, 2018

Page 828

1  Q.  I didn't say "coerce," did I?
2  A.  I think you did.
3  Q.  Well, yeah, "coerce" is fine.
4      It's to convince them that it's in
5  their best interest to settle.
6  A.  Convincing the other side to settle is
7  perfectly fine.
8  Q.  Based on your considerable experience
9  with the government, as you've testified to,
10 you're aware that sometimes, in the course of
11 legal representation, to hold a government
12 official personally accountable can cause that
13 government official to act in a more responsive
14 way towards one's client?
15 A.  First of all, in a typical --
16     CHAIRMAN FITCH:  I didn't get the
17 question part.  I heard everything you said.
18     You are aware, in the course of your
19 various legal activity over all these years, that
20 holding a government official accountable
21 personally can, in effect, serve as a way to get
22 them to do the right thing, because they're

Page 829

1  personally accountable and government officials
2  generally feel like they're not accountable
3  because they have immunity.
4      You're aware of that?
5      THE WITNESS:  Well, the way you stated
6  the question is really not an accurate statement
7  of the situation.
8      Federal government officials have
9  immunity for things that are done in the course of
10 their official duties as long as they don't do
11 something that's illegal.  If they do something
12 that's illegal, they can be disciplined by the
13 agency, itself, or they could possibly be subject
14 to a separate civil action.
15     I've had cases involving, for example,
16 sex discrimination, where, under the statute, the
17 agency can discipline the employee who is found to
18 be guilty of sex discrimination, or any other
19 illegal discrimination, although that's extremely
20 rare, even in cases that are won.
21     And to say that you can coerce someone,
22 I'm just not comfortable with the word "coerce."

Page 830

1  BY MR. KLAYMAN:
2  Q.  "Coax," let's use the word "coax."
3      To convince them that it's in their
4  best interest to resolve the matter because that
5  government official can be held personally
6  accountable for violating the Constitutional
7  rights of your client.
8  A.  I would say that's extremely rare, and
9  I cannot recall that ever coming up in a case in
10 any of the 300 or more cases that I've handled.
11 Q.  Are you aware that Judge Ellen Huvell,
12 H-u-v-e-l-l, had such a case concerning Voice of
13 America and ruled that that case could proceed
14 against the board of governors, that it was a
15 viable claim to bring against the board of
16 governors in the context of alleged employment
17 discrimination?
18 A.  I'm not aware of that particular case.
19     I've appeared before Judge Huvell, but
20 I'm not aware of that case.
21 Q.  You didn't bother to research that
22 issue before you came in today?

Page 831

1  A.  I was not asked to research that issue.
2  Q.  And you don't know whether or not I
3  knew that before I filed the complaint for Ms.
4  Sataki against the board of governors?
5  A.  I didn't see anything in the pleadings
6  that I felt justified naming all these defendants.
7  Q.  But lawyers are entitled to their own
8  strategy.  Not all lawyers do the same thing,
9  based on your experience, correct?
10 A.  Correct.
11 Q.  There are many ways to get to Mecca,
12 correct?
13 A.  I haven't been to Mecca, but there are
14 many ways to try a lawsuit.
15 Q.  My grandfather used to say, "Some folks
16 drive Cadillacs, others drive Lincolns."
17 A.  Right.
18 Q.  We all try to get to the same place.
19 A.  Right.
20 Q.  That's true with lawyers, too, that you
21 can use different strategies and still succeed?
22 A.  Absolutely.  There are many different

55  (Pages 828 to 831)

In Re:  Larry E. Klayman
June 1, 2018

|  | Page 832 |
|---|---|

1  ways that lawyers litigate cases.
2      Q.  Did you vote for Hillary Clinton in the
3  last election?
4          MR. SMITH:  Objection.
5          CHAIRMAN FITCH:  Sustained.
6  BY MR. KLAYMAN:
7      Q.  Now, I turn your attention to Exhibit
8  10 of Respondent's exhibits.
9          CHAIRMAN FITCH:  It's the white
10  notebook.
11          THE WITNESS:  I've got it.
12          MR. SMITH:  Your exhibits or --
13          MR. KLAYMAN:  My exhibits.
14          THE WITNESS:  I've got all these books
15  of exhibits.  I don't have Mr. Klayman's.
16          CHAIRMAN FITCH:  Let me just ask the
17  questions.  Maybe we don't have to go to the
18  actual exhibits.
19          THE WITNESS:  Ok, I see the book.  I've
20  got it up here.  I've got your Exhibit 10.
21  BY MR. KLAYMAN:
22      Q.  You were actually contacted and

|  | Page 834 |
|---|---|

1  BY MR. KLAYMAN:
2      Q.  Let me turn your attention to a
3  document --
4          MR. SMITH:  No objection.
5          CHAIRMAN FITCH:  Exhibit 10 will then
6  be admitted.  In that case, we will now admit
7  Exhibit 10 in its entirety.
8  BY MR. KLAYMAN:
9      Q.  In this exhibit, Exhibit 10, it's a
10  letter from Bar Disciplinary Counsel to you
11  thanking you for agreeing to serve as an expert in
12  employment law issues in the above-referenced
13  matter.
14          Do you see that?
15      A.  Well, there are quite a few pages in
16  here, so if you could give me --
17      Q.  Take your time.
18      A.  Just tell me where it is.
19          CHAIRMAN FITCH:  Go through Page 1, 2,
20  3, 4, and tell him that it's going to be the fifth
21  page, or eighth page.
22

|  | Page 833 |
|---|---|

1  retained by Bar Disciplinary Counsel before I was
2  even notified that was a proceeding that had been
3  filed back in 2010 that was going on.
4          You're aware of that, correct?
5      A.  I was retained in 2016 as I recall.
6  I'm not aware of the other aspects of your
7  situation.
8          MR. KLAYMAN:  I can shorten this
9  testimony, your Honor, by just simply moving into
10  evidence Exhibit 10.
11          I'll ask a few more questions.
12  Respondent's Exhibit 10.
13          MR. SMITH:  There's a lot of stuff in
14  Respondent's Exhibit 10.
15          MR. KLAYMAN:  Yes, it's various tiers
16  pertaining to Mr. Bennett.
17          CHAIRMAN FITCH:  What's the
18  significance on 10, counsel?
19          MR. SMITH:  I have actually quite a bit
20  in here, so I just want to make sure that there's
21  nothing that --
22          (Mr. Smith peruses document.)

|  | Page 835 |
|---|---|

1  BY MR. KLAYMAN:
2      Q.  It's one, two, three, four, five, six,
3  seven, eight, nine -- it's the tenth page in.
4      A.  Ok, I see it, a July 18th, 2016 letter.
5          Is that what you are referring to?
6      Q.  Yes.
7          You did receive that letter on or about
8  that date retaining you?
9      A.  Yes.
10      Q.  Are you aware that I was not contacted
11  that there was in fact a pending proceeding until
12  August 8th of 2016?
13      A.  I really didn't focus on whether you
14  were contacted about anything.  That was not what
15  I was retained for.
16      Q.  Around the time that you were retained
17  in July 18th, 2016, you were sent a draft
18  Specification of Charges by Mr. Smith, correct?
19      A.  Yes.
20      Q.  And in fact, comparing that to the
21  current Specification of Charges, which is the one
22  that's operative in this proceeding, that draft is

56 (Pages 832 to 835)

App.0386

Page 836

1  different, correct?

2  MR. SMITH: I'm going to object at this

3  point. Not only is it beyond the scope of the

4  expert's testimony, you know, for what I asked him

5  here, which was the necessity of naming Hillary

6  Rodham Clinton, now we're getting into essentially

7  what's work product for Disciplinary Counsel, and

8  very far afield of why, you know, Mr. Bennett was

9  called as an expert to testify here today.

10  I see no purpose being served by this

11  other than a waste of time --

12  CHAIRMAN FITCH: I'm going to overrule

13  that objection for two reasons: one, arguably, we

14  may get to evidence in this line of examination

15  that impacts upon the expert's views and

16  observations and conclusions and opinions; and

17  two, it doesn't relate to other -- it probably

18  relates to other matters of delay and the like

19  that Mr. Klayman has raised that this committee

20  has no jurisdiction to resolve, that in at least

21  some aspects of it the committee might be expected

22  to render advice to the board as part of its

Page 837

1  report.

2  So, even though I have my doubts, I'm

3  going, not just to let Mr. Klayman make a proffer,

4  but to let him explore this a little bit in the

5  rare chance that this expert has some information

6  on that.

7  Go ahead.

8  BY MR. KLAYMAN:

9  Q. So you actually received a draft

10  Specification of Charges from the Office of

11  Disciplinary Counsel and Mr. Smith in and around

12  the time that you were retained?

13  A. Correct.

14  Q. Did you undertake an investigation to

15  see why, before you even rendered an opinion, you

16  had been sent a draft Specification of Charges?

17  A. No.

18  Q. Wouldn't that suggest to you, based on

19  your experience, that Bar Disciplinary Counsel had

20  prejudged the issue of whether I acted ethically

21  or not and was just simply getting you as an

22  expert to try to paper over that prejudgment?

Page 838

1  A. No.

2  CHAIRMAN FITCH: That's beyond the

3  scope of his expertise.

4  BY MR. KLAYMAN:

5  Q. Based on what you know.

6  Now that is peculiar, is it not, to be

7  sent a draft Specification of Charges before you

8  even gave an opinion as to whether or not in this

9  case Larry Klayman had done anything unethical?

10  CHAIRMAN FITCH: Do not answer. That's

11  beyond the scope of what he's been qualified for.

12  MR. KLAYMAN: If I may ask these

13  questions, your Honor. If your Honor would permit

14  me.

15  BY MR. KLAYMAN:

16  Q. Do you know of a Professor Ronald

17  Rotunda, an ethics expert? There's a book on

18  ethics that he wrote, a famous treatise.

19  A. I don't know that individual.

20  Q. Have you ever appeared in front of

21  Judge Stanley Sporkin?

22  A. Yes.

Page 839

1  Q. Judge Stanley Sporkin is a man based on

2  your opinion of high --

3  MR. SMITH: Objection. He's not called

4  as a character witness for any of the Respondent's

5  witnesses.

6  CHAIRMAN FITCH: I haven't heard the

7  question.

8  MR. KLAYMAN: Let me ask the question

9  differently.

10  BY MR. KLAYMAN:

11  Q. You're aware that Judge Sporkin has a

12  very good reputation in the legal community?

13  CHAIRMAN FITCH: Do not answer that.

14  It's beyond the scope of your qualification.

15  MR. KLAYMAN: I have no further

16  questions. Thank you.

17  MR. TIGAR: May I ask one or two more?

18  MR. SMITH: Nothing from Disciplinary

19  Counsel. I encourage the committee to ask --

20  MR. TIGAR: Mr. Bennett, have you any

21  familiarity with the supreme court's position in

22  Ziglar vs. Abbasi, Z-i-g-l-a r, A-b-b-a-s-i, which

57 (Pages 836 to 839)

|  | Page 840 |
|---|---|

1    is a Bivens action in which John Ashcroft was
2    included as a defendant?
3          THE WITNESS: I'm not familiar with
4    that case.
5          MR. TIGAR: Alright, thank you.
6          MR. KLAYMAN: May I ask a follow-up
7    question for that?
8          CHAIRMAN FITCH: Of course.
9          MR. TIGAR: I'm not in charge.
10         CHAIRMAN FITCH: Yes.
11   BY MR. KLAYMAN:
12         Q.   Are you aware that when I was running
13   Judicial Watch that I brought a lawsuit against
14   Louis Freeh for breaking into my client, Trulock's
15   apartment, for having his agents do that, in the
16   fourth circuit, sustained his being named as a
17   defendant in that?
18         Are you familiar with that case?
19         A.  I'm not familiar with that case.
20         MR. KLAYMAN: No further questions.
21         CHAIRMAN FITCH: Mr. Bennett, thank you
22   for coming down on rather short notice on a Friday

|  | Page 841 |
|---|---|

1    afternoon. And you are excused.
2          THE WITNESS: Thank you.
3          (Witness is excused.)
4          CHAIRMAN FITCH: I think that, pursuant
5    to discussions about scheduling matters, that,
6    unless somebody tells me differently, we are going
7    to adjourn.
8          Mr. Klayman, another matter?
9          MR. SMITH: I would like to move in all
10   the Disciplinary Counsel's exhibits at this time.
11         CHAIRMAN FITCH: Fair point.
12         Does that make sense to do that now,
13   Mr. Klayman, and then take your points?
14         He wants to move in some exhibits.
15         MR. KLAYMAN: Subject to my
16   objections --
17         CHAIRMAN FITCH: I'm sorry?
18         MR. KLAYMAN: Subject to my objections.
19         CHAIRMAN FITCH: Of course. I propose
20   to do that now and get his case done before taking
21   your points.
22         MR. KLAYMAN: My objections are for the

|  | Page 842 |
|---|---|

1    record.
2          MR. SMITH: At this point I move in Bar
3    Exhibits A through D and 1 through 22, which have
4    not yet been admitted, and then Bar Exhibits 30
5    through 51 I believe they are.
6          CHAIRMAN FITCH: A through D, 1 through
7    22, and 30 through 51.
8          MR. SMITH: Correct.
9          CHAIRMAN FITCH: Mr. Klayman, you have
10   the right to be heard.
11         MR. KLAYMAN: I'm just going to stand
12   by the objections, your Honor.
13         CHAIRMAN FITCH: Alright.
14         MR. KLAYMAN: And I assume you're going
15   to enter them. I just want them on the record,
16   that's all.
17         CHAIRMAN FITCH: Over Respondent's
18   objections as previously submitted in this
19   proceeding, which are preserved, those exhibits
20   are admitted.
21         MR. SMITH: With that, Disciplinary
22   Counsel rests his case in chief.

|  | Page 843 |
|---|---|

1          CHAIRMAN FITCH: Thank you.
2          MR. KLAYMAN: Let me give your Honors
3    and Mr. Smith the Motion to Dismiss I filed today.
4    I filed it a short while ago.
5          MR. KLAYMAN: Did the office, the clerk
6    give you all a copy?
7          CHAIRMAN FITCH: If you have a courtesy
8    copy, that would be fine. But if you file it
9    today it will appear in the system tomorrow.
10         MR. KLAYMAN: Right, thank you.
11         All of what is in here may prove to be
12   moot, now that we actually have dates, so I'll be
13   able to ascertain whether the witnesses are
14   available for live testimony in the near future,
15   and we have contacted David Taylor, as you
16   instructed. We were hoping that he would call us
17   back today, but he was off.
18         We are using a service which we've used
19   in many of our cases, it's called Planet Depo, and
20   they're highly sophisticated.
21         CHAIRMAN FITCH: Sure.
22         MR. KLAYMAN: They can take video

In Re:  Larry E. Klayman
June 1, 2018

Page 844

1  equipment to someone's house and hook it up.  They
2  are the best.  I find them to be the best.
3       CHAIRMAN FITCH:  I note that you have
4  given me a courtesy copy and I assume that it will
5  appear on the website that we use either tomorrow
6  or this afternoon or Monday.
7       Mr. Smith has seven days in which to
8  respond to it -- or is it ten days.
9       MR. SMITH:  I believe it's 10.  But
10  I'll ask -- if it's going to be moot?
11       Mr. Klayman, is it going to be moot, so
12  I don't --
13       CHAIRMAN FITCH:  Yes, the final point
14  is --
15       CHAIRMAN FITCH:  I expect counsel to
16  confer early next week as to which parts need to
17  be ruled on.  So it appears to refer to two
18  witnesses.  It's certainly possible that it won't
19  be necessary to rule on one part and necessary to
20  rule on the other part.
21       Just let Mr. Smith know.
22       MR. KLAYMAN:  Yes, I'll let you know.

Page 845

1  I'm sorry, your Honor.
2       CHAIRMAN FITCH:  Let Mr. Smith know and
3  I'll resolve it as need be.
4       MR. KLAYMAN:  Some of those witnesses
5  are lawyers, and we all know that we can be called
6  away on short notice, at the beck and call of
7  judges.
8       CHAIRMAN FITCH:  This is true.  This is
9  true.
10       There appears to be no further
11  administrative or other matters.  We will recess
12  for the day and we will stand in adjournment until
13  9:30 a.m. on Monday June 25th.
14       MR. KLAYMAN:  I want to thank the
15  hearing committee for their courtesy and
16  professionalism.
17       CHAIRMAN FITCH:  Of course.
18       (Whereupon at 4:14 p.m. the hearing was
19  in recess until Monday, June 25, 2028, at 9:30
20  a.m.)
21
22

**A**

**A-b-b-a-s-i** 839:22
**a.m** 616:3 740:3,6
 740:14 743:13
 789:15 790:2
 845:13,20
**Abbasi** 839:22
**Abdy** 705:6
**Abdy's** 705:15
**abilities** 637:2,4
**ability** 636:22 663:2
 708:22 818:2
**able** 624:4 626:14
 643:6 659:2
 690:20 754:10
 781:20 825:19
 843:13
**above-referenced**
 834:12
**abrasive** 642:21
 643:1,2
**Absolutely** 724:19
 831:22
**abused** 706:6
**abusive** 786:21
 787:21
**Academy** 714:10
**accept** 689:17
**acceptable** 792:17
**accepted** 691:16
 803:20
**accommodate**
 825:7
**accommodation**
 638:3
**account** 664:7,8,15
 664:16
**accountable** 711:11
 828:12,20 829:1,2
 830:6
**accuracy** 710:17
**accurate** 703:3,5
 829:6
**accuse** 745:16
 787:14,17
**accused** 637:7
 745:8,11,13
**acknowledge**
 665:20
**acknowledged**
 814:5
**act** 636:13 648:14
 816:3,11,12
 820:12,18 821:9
 828:13
**acted** 837:20

**acting** 810:13
**action** 630:5 687:21
 709:2 817:7
 819:16,19 820:8
 825:15,19 826:2
 827:1 829:14
 840:1
**actions** 700:12
 755:19
**active** 799:6
**activity** 828:19
**acts** 636:4 737:12
**actual** 832:18
**Ad** 616:3,10
**add** 678:10 819:17
 821:17
**added** 818:1
**adding** 817:18
**addition** 620:21
 645:16 709:1
 776:2 819:15
 822:17
**Additional** 726:19
**address** 623:15
 629:21 635:5
 670:19 792:8,14
 792:16
**addressed** 629:18
 649:3 651:7
 738:16
**adds** 791:19
**adduced** 642:15
 725:12
**adequately** 644:21
**adjourn** 841:7
**adjournment**
 845:12
**administration**
 756:4
**administrative**
 802:21 805:16
 810:10 817:6,12
 826:20 845:11
**admission** 658:11
**admit** 647:15
 674:18 834:6
**admitted** 621:22
 647:5,13 648:19
 649:8,10 650:22
 651:3 656:12,14
 657:17,19 659:7
 659:10 674:14
 678:16 768:8,10
 768:12,15,18,21
 795:22 811:19
 834:6 842:4,20

**admonishing** 689:2
**advanced** 708:6
**advances** 635:20
 636:3,11
**advice** 666:17
 711:16,17 783:19
 836:22
**advise** 733:18
**advised** 652:10,22
 653:4
**advocate** 645:6
**affair** 637:7
**affidavit** 678:19
**affiliated** 804:19
**affirm** 793:14
**afield** 836:8
**AFL-CIO** 733:15
**afternoon** 750:2,3,8
 750:14,15 769:20
 769:21 841:1
 844:6
**Age** 816:11
**agencies** 803:8
 804:12 807:7
 811:22 817:6
 826:9
**agency** 630:5
 802:19 803:17
 804:14 805:20
 807:5,5 816:15
 817:3,9,12 819:15
 819:17 820:22
 823:1 825:3,13,14
 825:20 826:15,19
 829:13,17
**agents** 840:15
**ago** 661:6,16 676:5
 676:8 689:5
 696:15,20 726:7
 777:11 805:8
 806:7,11 813:1
 843:4
**agree** 644:15
 652:13 709:19
 710:2 716:1
 762:12 775:13,17
 792:21
**agreed** 688:4 814:4
**agreeing** 834:11
**agrees** 622:15 639:2
 792:22
**ahead** 620:9 653:16
 660:14 664:2
 665:3 668:12
 669:4 682:17,19
 684:4 686:3

**750:12 754:21
 768:5 769:14
 778:18 782:21
 785:19 795:3
 815:6 837:7
**al** 735:10
**alias** 735:10
**allegation** 814:6
 819:8
**allegations** 637:9
 637:13,14
**allege** 636:1
**alleged** 635:19
 636:19 638:2
 718:3 830:16
**allegedly** 718:3
**alleging** 636:10,15
 731:1
**allowed** 644:17
 721:17
**Allred** 688:1 689:17
 690:14,14 748:8
 749:1,1 779:12,21
 781:1
**alright** 621:9 626:2
 640:2 648:10,10
 659:22 674:2
 675:10 709:12
 712:1 717:3 719:6
 733:9 740:8 763:5
 768:22 769:9,15
 776:21 779:11
 783:1 813:14
 819:21 840:5
 842:13
**ambiguous** 785:9
**amended** 816:6
**America** 630:7
 652:17 654:17
 678:7 693:5 698:4
 719:3 745:12,17
 752:19 753:2,12
 753:20 754:4
 755:2,8 756:4,21
 757:2,8,15 760:5
 761:7 804:8,10,17
 806:14,19 807:16
 825:1 826:6
 830:13
**American** 736:2
 796:10
**amicably** 650:14
**amounts** 709:11
**Analysis** 632:4
 639:16
**and/or** 705:6
**Andisheh** 746:7

**Andisher** 620:14
**Angeles** 620:15
 638:4 652:13
 675:19 702:18,22
 704:19 718:13
 745:22 746:6
**annually** 800:9
**anonymous** 732:7
 736:7
**answer** 640:11
 656:1,2 659:4
 671:7 673:10
 681:1,5 715:15
 730:14 736:13
 744:5,7,21 754:21
 761:14,19 770:12
 771:11 810:1
 821:11 823:18
 824:13 838:10
 839:13
**answered** 628:5
 668:2 711:22
 746:2,9 754:19
 782:9
**answering** 628:10
 653:15
**ANTHONY** 616:11
**anticipated** 811:14
**anybody** 647:22
 662:14 730:10
 739:3 742:20,21
 743:1,3,5,11
 785:5
**anyone's** 684:11
**anyway** 710:4
 722:15 820:16
**apartment** 629:22
 669:20 671:3
 673:12 840:15
**apologize** 621:19
 634:18 679:16,18
**apparently** 763:18
 825:17
**appeal** 695:5
 802:22
**APPEALS** 615:1
**appear** 641:21
 741:4 784:17
 807:22 843:9
 844:5
**appearance** 793:4
**APPEARANCES**
 616:9 617:1
**appeared** 801:1
 807:20 830:19
 838:20

**appears** 780:17
789:15 844:17
845:10
**applicants** 815:22
**apply** 737:17
**appointed** 691:16
800:1
**appreciate** 675:3
749:18 794:20
**approach** 621:10
621:14 758:14
**appropriate** 675:6
793:19 803:16
814:16 827:1
**approximately**
766:8,9 808:9,21
**area** 746:12 798:2
**arguably** 741:1
836:13
**argue** 642:12
691:15
**argument** 646:12
**arguments** 662:13
**Arlene** 702:20
**arranged** 720:4
**arrested** 737:9
**arrives** 792:5
**article** 751:3,11,15
751:18,22 752:2,5
752:13,16,21
753:6,15 757:22
758:3
**articles** 753:19
757:5,12 776:2
800:20
**articulate** 749:5
**ascertain** 843:13
**Ashcroft** 840:1
**asked** 625:10,11
628:5 640:20,22
641:6 661:22
662:20 664:15
677:14 687:21
688:13 696:3
711:22 717:8,11
720:13,18 721:8
722:13 738:9
746:2,9 754:19
773:21 774:4,22
780:9,11 782:1,1
782:8 783:19,19
789:1,4,6,8,9
801:16,18 807:22
815:7 823:19
831:1 836:4
**asking** 635:2 670:8

695:14 732:11,19
734:11 738:5
740:20 766:7
774:1 785:4,15
823:3
**aspect** 695:4
**aspects** 741:4 833:6
836:21
**assault** 820:11
821:6
**assaulted** 821:3
**asserting** 710:17
**asset** 781:20
**assist** 782:2 817:20
**associate** 797:9
**Association** 800:17
**assume** 821:2
842:14 844:4
**assuming** 656:22
658:4 677:12
680:1 682:6
821:16
**attached** 621:21
678:19
**attachment** 623:11
623:13 631:3
**attachments** 650:8
**attack** 827:13
**attacking** 827:10
**attend** 796:11,13
**attendant** 692:14
**attention** 628:16
629:3 635:7,14
646:13 648:13
659:13 660:2
661:2 663:17
676:19 685:20
686:6 694:14
697:4 699:8
701:20,22 707:14
712:4 729:14
730:18 735:5
737:1 739:12
742:8 750:16
751:2 763:10
794:9 832:7 834:2
**attitude** 758:13
**attitudes** 757:8,15
**attorney** 616:16,18
653:5 654:7,7,8
741:12 775:19,20
783:19 795:16,17
810:11
**Attorney's** 800:7
820:17
**August** 694:16

697:10 699:9,15
700:7 702:2 749:9
784:14 786:1
835:12
**Austin** 697:15,19
698:3,15,20
**author** 800:15,19
**authored** 776:4
**autobiography**
759:6
**available** 777:10
778:8 800:10
843:14
**Aviera** 702:20
**Awards** 714:11
**aware** 650:13 662:6
669:14 670:3,7
671:8,12 672:1,5
672:11,20 673:4,7
680:2,15 685:17
695:9 696:2,5
714:16 715:22
716:3,6 718:12
719:2 720:11,15
730:10,12,15
732:5,10,11,15,18
734:10 736:6
756:20 776:5
823:13 824:15,21
825:9 827:16
828:10,18 829:4
830:11,18,20
833:4,6 835:10
839:11 840:12

---

## B

**B** 643:18 770:21
**B-a-e-h-r** 714:4
**B-a-m-b-o-o-s**
678:21
**back** 619:3 632:15
637:21 654:16
668:21 670:22
671:22 673:1
674:11 675:18
677:11,20 689:10
693:18 694:8
710:8,19 711:2
722:18 727:22
728:9 743:17
747:6 757:10
764:3 775:11
784:5 788:8 790:6
792:7 793:7
797:18 815:9
833:3 843:17

**backfire** 758:19
**background** 631:6
632:4 824:22
**backing** 683:9
**bad** 741:12
**Baehr** 714:4,4,20
718:6 724:13
**balanced** 754:5
755:2 757:3
**Bamboos** 678:20
**bank** 664:6,15
**Bar** 625:9 657:2,11
658:4,9 659:18
668:7 669:8
676:19 681:10
683:18 686:9
690:7 694:14
697:4 699:8
701:20 707:3,14
712:4 728:4,20
729:14 730:18
735:5 737:1
738:14 750:17,19
758:4 764:20
765:8,21 766:3,18
767:2,6 770:19
779:8 784:12,13
784:15 786:11
794:12 795:10,19
799:6,9,10,22
800:16,18 801:3,9
801:11 807:20
808:1 810:10
812:10 813:4
833:1 834:10
837:19 842:2,4
**based** 641:20
666:15 701:12
757:6,13,16 811:9
811:16 814:5
816:7 828:8 831:9
837:18 838:5
839:1
**bases** 818:22 819:3
**basically** 696:16
775:22 783:22
787:2
**basis** 724:22 808:14
826:10
**Bat** 751:5
**Bates** 771:19 802:1
**battery** 821:7
**Beahr** 715:19 716:4
716:9
**Bear** 714:7
**bearing** 647:18

**bears** 645:21 646:2
646:2,3
**beat** 788:13
**beauty** 751:5 758:2
**beck** 845:6
**becoming** 787:13
**began** 784:12
**beginning** 705:13
705:16 770:17,22
786:1 805:15
**behalf** 616:6,18
617:2 620:2 663:6
665:6 667:16
708:5 720:19
750:5 751:12
757:5,12 762:4,18
762:19 769:18
795:7,10 801:10
801:13,20 802:5
803:9,17 804:5
810:13 812:6
823:11 825:6
**belabor** 656:7
681:6
**believe** 628:19
646:6 661:8,11
662:1 667:9
697:15 716:11
724:11 730:2
743:22 749:9
761:8,14,14
777:15 788:19
797:10,14 800:2
808:14 810:22
812:21 821:16
842:5 844:9
**believed** 650:15
693:5 757:19
774:13
**belongs** 736:17
**benefit** 817:19
**benefits** 621:2
800:2
**Bennett** 618:4
792:5 793:6,11
794:5,8,14 795:6
795:14 797:15,17
803:20 804:7
807:12 812:8
818:15 823:13
833:16 836:8
839:20 840:21
**Bennett's** 793:4
811:5
**best** 624:17 645:7
645:12 654:8

694:2 728:22
729:8,19 743:21
760:9 775:20
776:1 809:4
827:20 828:5
830:4 844:2,2
**better** 654:13
754:17 769:12
779:18
**beyond** 825:17
836:3 838:2,11
839:14
**bifurcated** 632:5
**big** 634:22 642:9
721:11 755:17
**bills** 809:10
**birth** 763:17
**bit** 648:7 674:7
693:18 815:20
823:21 833:19
837:4
**Bivens** 819:18
821:1 825:19
840:1
**Bivens-type** 819:16
820:8
**blah** 782:19,19,19
782:19,19,19
**blame** 702:14
**blamed** 676:11
**Blanquita** 650:15
650:18
**Blanquita's** 650:9
**bleed** 749:10
**bless** 730:3 753:1,2
**blown** 776:13
**blue** 750:21 770:6
770:17,22 771:7
**board** 615:2,4
616:1 650:18
652:12 658:7
801:9 813:8,18
816:22 823:6
824:16,17,18
830:14,15 831:4
836:22
**bono** 798:8 810:20
**book** 726:3,5,8,11
726:12 727:14
750:21 759:13
770:6,10,17,22
771:7 794:7,13
800:6,16 812:8
832:19 838:17
**books** 832:14
**BOPR** 617:14

**born** 744:11
**Borrazas** 617:13
622:15,16,17
**boss** 624:5
**bother** 696:7
713:15 830:21
**bothers** 713:12,13
**bottom** 665:2
682:10 683:21
699:11
**Boulevard** 705:19
**Box** 649:4
**bra** 636:12
**branch** 687:18
**Brantley** 615:22
616:4
**break** 693:11,19,19
693:20 704:10
709:12 746:14
749:17 769:12
788:7
**breaking** 820:10
840:14
**bribed** 741:16,19
742:4,14
**brief** 659:21 665:6
665:8 673:21
686:2 750:11
763:6 767:19
791:13 792:6
**briefed** 748:13
**briefly** 647:19
692:5 812:9
**briefs** 622:20
**bring** 655:8 733:16
754:2 756:5
819:16 820:7
823:5 830:15
**broad** 816:4
**broadcast** 719:3,11
753:4 756:18
**broadcasted** 718:16
**broadcaster** 637:8
751:6 753:20
755:13 756:11
772:15
**broadcasters** 756:3
757:6,13 759:13
817:1 825:18
**broadcasting**
620:15 651:9
652:11,12 658:6
714:1 720:6
754:11,13 755:7
756:5 813:8
**broadcasts** 721:18

**broke** 702:19
**brother** 712:6,11
712:18,22 713:7
713:10,16 720:4
721:15 726:6
727:20,21 728:8
728:15 729:1
783:14,17 784:4
**brought** 667:16
734:15 794:9
797:16 840:13
**Brown** 796:6
**Build** 800:13
**building** 653:7
**bunch** 661:17
**bureau** 638:7 651:9
652:11 718:13
720:6 797:6 810:6
**buy** 782:13

_____
          **C**
_____

**C** 619:1 770:21
**C.S.R** 615:22 616:4
**Cadillacs** 831:16
**Calabasas** 705:15
**California** 747:19
**call** 670:1 671:5
720:13,18 721:8
722:13 725:10
729:4 788:6
843:16 845:6
**called** 667:4 669:20
669:22 671:2,4
673:11 688:13
714:8,14 720:11
722:10,18 729:22
730:8 735:22
751:18 793:9
795:7 797:15,17
799:12 820:12
836:9 839:3
843:19 845:5
**calling** 622:16
696:7 730:10
793:21
**calls** 713:4 722:19
786:14 788:14
818:4,6
**campaign** 636:16
636:20
**candidly** 645:8
**candor** 646:3
**capacity** 824:20
**car** 669:15,21 670:4
671:4,9 672:2,21
673:4 675:17,21

708:8 781:22
782:2,13 783:5,8
783:12,13 791:5
**care** 651:7 658:1
**career** 624:16
627:22 643:11
653:9 654:11
691:4 759:14
798:1,6,13
**Carly** 794:18
**case** 621:11,21
642:6,14 655:10
655:14 662:7,10
662:12,16 663:9
666:18 675:9,11
679:20 683:7
690:15,17 691:5
692:10 695:4
706:13 709:7
737:19 740:2
741:11,11,16
742:4,15 743:1
744:1,19 756:2
761:3 765:9
766:18 768:18
772:20 773:14,19
774:14 775:21
776:5 779:1
781:20 786:15
788:9 798:8 802:1
802:4 803:21
804:1,9,18,22
806:6,21 808:13
809:5,16,21 810:1
810:9,10,19,20,20
810:21 811:17
813:10 814:8,18
820:6,13,14
822:12 823:22
824:17 825:13,15
825:20 826:3
830:9,12,13,18,20
834:6 838:9 840:4
840:18,19 841:20
842:22
**cases** 662:9,9 663:3
666:18 667:6
691:22 695:1
696:3,8,12 708:12
709:7 711:10
734:16 746:6
779:15 798:4,12
798:14,17 801:21
802:11,16,17
803:2,6,14 804:13
804:15,20 808:22

809:3 810:4,5,17
811:21 822:10,14
829:15,20 830:10
832:1 843:19
**cash** 672:21 675:17
**catch** 685:22
**cause** 828:12
**causing** 794:19
**CBN** 713:22 718:10
718:12,16 719:2
719:11,21 720:3,7
720:9,11,18 721:8
721:15,18 722:10
722:16,21 723:1
727:14
**CBN's** 721:20
**CC** 623:16
**cell** 650:9
**Central** 638:7
**certain** 638:20
641:12 644:18
755:19
**certainly** 642:16
672:16 748:22
844:18
**Certificate** 658:10
**cesspool** 677:21
**cetera** 708:9
**chair** 616:12 799:11
800:1 809:20
824:11
**chaired** 799:21
**Chairman** 619:2,10
619:14,19 620:6,9
621:15 622:9,14
622:18 623:2,21
627:9 628:5,11,18
629:1 631:17
632:3,7 638:12,16
639:4,10,13,22
640:10,21 641:1,5
641:10,15 642:1
642:11,22 643:17
644:1,7,11 645:10
646:11 647:2,5,7
647:12 648:4,8,16
648:20 649:8,12
651:2,13,19,21
653:15 656:1,11
656:15,18 657:7
657:16 658:3,13
658:18 659:1,7,10
659:16,19 660:14
661:20 663:12
664:2 665:3 667:1
668:17 670:20

671:13,21 672:7
672:17 673:18
674:2,6,13,17,21
675:8,11 677:8
680:10,22 681:2
681:13,16 682:17
682:19 684:4
685:21 686:3
691:10 692:16
693:9,13,17,21
694:1,8 695:13,19
698:5,9,12 699:6
700:4,22 709:17
709:22 710:14
711:22 713:3
715:8,10,14,17,20
717:3,11 718:2,20
719:4,18 720:14
720:21 721:2
724:21 725:3,5,7
725:12,16 726:10
726:16,19 727:1
728:12,17 730:14
731:13 732:9,19
733:1,7 734:5
736:10,12,19
738:3,7,11 739:10
739:14,17 740:10
740:16,19,22
743:18 744:4,6,14
744:17 746:2,9,14
746:17,20 747:6
747:13 748:17,20
749:13,16,20
750:2,9,18,21
754:20 760:8,18
760:22 761:13,18
762:9,12 763:5,13
764:1,5,14 765:1
765:13 766:7,13
767:13,17 768:3,8
768:12,14,20
769:3,8,10,14,16
770:5,7,9,13,16
770:21 771:5,10
771:14 774:21
775:2 776:19
777:18 778:10,15
778:18 780:19
781:5 782:17,21
784:9,22 785:12
785:17 790:13,16
790:19 791:1,7,14
791:16,22 792:3,7
792:19 793:2,7,12
793:20 794:16

795:3 799:14
804:4 806:3
807:11 808:18
811:7,13,18 812:4
814:21 815:11
818:7,13 821:22
822:5 823:15
828:16 832:5,9,16
833:17 834:5,19
836:12 838:2,10
839:6,13 840:8,10
840:21 841:4,11
841:17,19 842:6,9
842:13,17 843:1,7
843:21 844:3,13
844:15 845:2,8,17
**challenges** 642:4
**chance** 635:16
650:16 713:22
719:20 729:3
837:5
**change** 624:5 754:1
755:9 756:11
757:7,14 758:13
823:5,20
**character** 839:4
**charge** 840:9
**charged** 645:11,14
645:15
**charges** 642:6,14
770:19,20 771:13
814:6 815:4,5
835:18,21 837:10
837:16 838:7
**check** 767:13
**Chicago** 797:3
**chief** 701:7 842:22
**choosing** 654:11
**Christ** 723:20
**Christian** 714:1,15
723:22 724:5,11
724:18 743:20
744:12
**Christian-owned**
722:2
**Christmas** 729:18
**circuit** 840:16
**circulating** 678:6
**citations** 711:16
**cited** 692:9
**civil** 629:4 630:8
632:19 633:4,9
640:5 658:5
679:21 680:2,15
680:19 692:6,12
702:16 703:16

709:21 801:19,22
806:13 807:6,16
813:7 816:3 817:7
829:14
**civilization** 796:10
**CKK** 813:11
**claim** 818:3,9
822:17 830:15
**claims** 632:20
634:16 635:9
640:7,13 641:14
643:19 646:7
677:18 680:18
710:9 711:3 802:8
817:21 821:7,9,17
**clarity** 631:17
651:13
**class** 684:16
**classless** 787:12
**Clay** 616:20 623:16
**CLE** 799:1
**clear** 647:12 654:21
761:20 817:15
822:6
**clearly** 790:9
**clerk** 843:5
**clerking** 797:2
**CLEs** 799:3
**client** 689:18
733:19 802:6
803:9 805:13,14
805:17 821:17
824:6,8 826:12,22
827:20 828:14
830:7 840:14
**client/attorney**
787:22
**Clinton** 813:17
814:1 815:13
816:18 818:9
823:14 824:17
825:14,21 827:10
827:14 832:2
836:6
**Clinton's** 817:18
**close** 669:21 671:3
673:12 722:21
**closely** 663:6 701:9
701:10
**Closer** 805:9
**closing** 630:7
**Club** 776:9 777:17
**clueless** 741:12
**co-anchor** 637:15
**co-host** 636:16
**coax** 830:2,2

**codes** 737:17
**coerce** 827:16,22
828:1,3 829:21,22
**cofounder** 799:11
**collect** 708:17,22
**Columbia** 615:1
616:6 795:19,21
799:9,10,22
800:14,17 801:5
802:3 805:2 809:1
809:3 813:10
**column** 729:20
**columns** 727:4,8
**come** 623:14 691:16
693:18 725:17
748:9 767:12
777:17 783:20
788:10
**comes** 708:13 710:8
711:2 805:14,14
**comfortable** 688:3
773:21 827:21
829:22
**coming** 712:18
826:13 830:9
840:22
**commencing** 616:3
**comment** 643:1
**Commission** 714:15
797:5 798:10
802:20 810:7,12
810:14
**commissions**
620:21
**commit** 737:11
**commitments**
664:10
**committee** 616:4,10
619:5 621:18
648:1 674:22
691:1 703:21
773:9 775:16
777:13,21 778:3
780:1 781:15
786:8 787:8
789:19 792:8
794:4,11 799:17
799:20 800:2
815:17 836:19,21
839:19 845:15
**committees** 801:4
**common** 700:21
821:7
**communicate** 662:7
662:14 700:13
738:10 780:5,14

**communicating**
732:14 756:12
**communication**
670:12 732:2
735:7 736:6 771:3
771:16,22 780:17
781:9
**communists** 687:19
**Communities**
799:13
**community** 777:22
839:12
**company** 620:14
720:6 722:2
**comparing** 835:20
**compensation**
808:20
**competence** 814:7
**competency** 645:15
815:2
**competent** 814:15
**Complainant's**
638:2
**complaining** 821:4
**complaint** 630:6,6,9
631:5 636:6
646:15 658:5
763:2,11 764:10
764:15 765:12
805:12,19,22
806:8 813:7 814:1
817:19 818:18
826:17 831:3
**complaints** 637:3
766:22 816:1
**completed** 791:16
**completely** 624:15
627:22 656:8
689:11 741:10
821:12
**completeness** 690:2
**complicated** 802:4
**complimentary**
751:14 752:2,5,13
**compound** 672:6,8
716:20 762:8
**Compounds** 762:10
**computer** 691:18
**concede** 826:4
**concern** 758:18
774:8,9
**concerned** 679:2
706:11,18
**concerning** 667:6
708:18 759:12
807:2 830:12

concerns 774:12
concluded 767:11
concludes 659:5
conclusions 836:16
conclusively 792:9
concussion 673:8
conditions 722:4
conduct 820:9,9
    825:22 827:7
confer 749:16
    817:19 844:16
conference 776:8
confirm 631:15
conflicting 656:8
confused 704:8
congressman
    682:12,22 683:9
    683:12
connected 822:20
connection 801:8
    813:20
consent 749:19
consented 821:17
consider 639:13
    808:16
considerable 808:3
    808:8,16 809:14
    828:8
consideration 644:4
    675:1
considered 632:1
considering 706:19
conspiracy 737:11
Constitutional
    830:6
consult 625:5
Consumer 797:6
    810:6
contact 733:13,15
    734:14 735:1
    766:3 806:19
    807:15 826:5
contacted 662:19
    662:22 706:8,17
    735:3 766:17
    767:2,3 800:5
    832:22 835:10,14
    843:15
contained 711:16
contains 684:6
context 830:16
continue 623:21
    653:14 654:13
    685:1,3 689:19
    694:10 747:17
continued 617:1

620:1 643:12
    750:4 812:5
continues 819:8
continuing 648:2
    722:15 798:20
continuous 636:20
continuously
    795:19 797:20
contractors 708:11
contradicted
    690:11
control 754:14
controlled 754:15
conversation 676:1
    676:3,10,12
    696:15 760:12
    774:16 775:3,5,11
    779:6,20
conversations
    696:10,11 760:14
    760:15,16 772:19
    773:1,6 778:21
    787:2
convicted 737:10
    737:15,21 738:6
convince 828:4
    830:3
convinced 775:22
Convincing 828:6
copies 621:17
copy 772:6 778:7
    794:17 843:6,8
    844:4
correct 620:16,17
    624:21,22 625:16
    629:19,20 630:1,2
    630:9,10,16,17,19
    630:20 632:22
    633:1,5,6,9,10
    636:7,8,13,14,17
    636:18 637:10,11
    637:17,18,22
    638:1,9 640:5
    646:19,20 648:15
    648:22 652:14,15
    652:21 660:8,9,12
    661:9 663:3,4
    664:21,22 665:14
    665:15 666:21,22
    668:9,13 669:4,12
    669:13,16 670:2
    671:7 673:12,13
    673:16 676:13,17
    676:22 677:1,3
    678:1,7 679:4,5
    679:22 681:19,20

682:6 686:13,14
    687:6 688:6,9
    693:7,8 694:19
    695:10 698:4,22
    699:1,15,22 700:8
    700:9 701:6,9
    702:8 703:9,12
    704:14 705:7,8,15
    707:8,20,21 708:1
    711:6,7,21 712:7
    712:8,9,10,12
    714:1,2,8,9,11
    717:6 718:7,8,10
    718:11,14,17
    720:19 723:15,16
    726:9,9 727:16,20
    730:21 731:8,9,11
    733:6 734:18
    735:2,12,15,18
    736:1,9 738:10,17
    741:17 742:17
    745:6,9,17 746:1
    752:14,20 753:13
    753:21,22 755:10
    755:20 764:12
    765:5,6,9 766:4,5
    766:15,19,20,22
    767:7,8 771:20
    782:15 806:20
    807:17,18,21
    815:1 825:15
    826:16 827:15,17
    831:9,10,12 833:4
    835:18 836:1
    837:13 842:8
corrected 794:9,13
correctly 645:18
    651:14 814:11
correspondence
    765:8,21
corruption 677:21
cosmetic 620:14
cost 653:8,9 708:5
costs 708:10 710:8
    711:1
counsel 619:6,9
    625:10 638:5
    640:1 645:7
    659:18 668:7
    690:8 728:4 735:6
    737:1 747:11
    765:8,22 766:3,18
    767:3,6 769:18
    779:8 792:22
    794:3 795:8,10
    801:3,11 808:4,11

809:8,22 811:20
    812:6 833:1,18
    834:10 836:7
    837:11,19 839:19
    842:22 844:15
Counsel's 669:8
    676:20 681:10
    683:18 686:9
    694:15 697:5
    699:8 701:21
    707:3,14 712:4
    728:20 730:19
    738:14 750:17,20
    758:5 764:4,21
    770:3 811:10
    815:4 841:10
counseling 805:18
    806:8
count 780:22 803:3
    803:12
counterproductive
    697:20
country 706:5
    751:20 754:3
County 737:11
couple 680:7
    696:10 709:16
    812:10
course 641:15
    744:9 828:10,18
    829:9 840:8
    841:19 845:17
court 615:1 616:5
    640:16 668:20,22
    669:2 671:1 672:1
    677:14 692:10
    695:6 708:9
    710:20,21 737:10
    757:11 768:18
    801:4 802:2 803:1
    805:2,10,21
    813:10 820:14,14
    820:16,20 821:6
court' 683:3
court's 839:21
courtesy 772:5
    843:7 844:4
    845:15
courts 795:22 803:7
cousin 633:16
    722:11 730:9
    735:14 737:20
    743:4
cover 631:22 816:5
    816:6
covered 628:7

791:7 821:20
crafted 778:6
crash 669:15 670:4
    671:9 672:2
    675:21 676:15
crashed 669:21
    671:4
create 639:6
credibility 623:6
    642:3,8,9 643:8
    643:16 646:9
credible 680:20
crime 738:6
criminal 692:12
    730:13
criticism 725:20
cross 618:2 767:11
cross-examination
    619:15 620:1
    643:7 648:9
    694:11 750:4
    791:8 823:11
crossed 648:5
crying 790:5
crystal 817:15
Cullum 650:15,18
cumulative 642:4
current 620:18
    835:21
currently 706:7
curriculum 794:4
cut 664:14
cycle 787:20

D

D 618:1 619:1
    770:4,8,9,11,21
    771:1,7 842:3,6
D-23 770:8 771:19
d-e-a-l 742:11
d-i-l-l 742:11
daily 636:20 729:20
    776:4
damage 677:17
    710:9 711:3
damages 677:13
Dan 697:15,19
    698:3,15,20
danger 706:12
dash 718:19
date 624:6,11
    625:18 626:1
    663:1 672:20,21
    699:17 707:19,21
    707:22 730:6
    733:16 734:16

758:10 763:16
773:5 777:15
835:8
**dated** 630:3 656:22
657:1 666:3
683:19 712:9
729:16 763:15,17
764:15 771:3,22
780:17 781:9
784:14,15 789:14
**dates** 675:1 735:4
792:21 793:1
843:12
**daughter** 689:6
**David** 800:3 843:15
**day** 620:13 636:10
660:11 666:5
667:10,12,13
675:16,17 676:2
676:15 702:16
703:2 704:14,20
707:8,9,10,11,12
744:21 756:12
774:5 845:12
**day-to-day** 826:9
**days** 777:11 788:14
805:22 813:1
844:7,8
**DC** 615:9 616:2,18
652:18 797:13,20
801:9 810:9
**deadline** 764:19
**deal** 653:12 657:19
683:11 684:13
691:11 726:3,5,8
726:11,12,12,12
727:9 739:6
786:18 787:5
799:3 807:2 821:8
**dealership** 783:14
783:18
**dealing** 701:12
748:8 787:19
**deals** 635:18
**dealt** 645:3 690:22
**Dear** 630:4 651:8
685:5
**debatable** 808:8
**December** 729:16
**decide** 644:21
819:14
**decided** 728:3
**decision** 631:4,19
631:22 632:19
634:16 635:8
640:16 670:4

671:10,15 672:3
672:12,22 675:18
681:7 695:6
703:16 826:13
**decision-making**
822:20
**defend** 644:21,22
690:20 691:8
**defendant** 802:8
814:1 815:13
816:13,14,17
817:2,9,16 818:10
840:2,17
**defendants** 813:16
820:21 831:6
**defense** 798:18
**Definitely** 788:22
**degree** 796:3,15
**delay** 836:18
**Delia** 629:4,11
653:18
**denial** 671:16 674:9
**denied** 638:4
**denomination**
622:19
**Department** 816:16
**depends** 805:13
824:4 827:18
**Depo** 843:19
**Deputy** 638:5
**describe** 774:3
**described** 777:3
**deserve** 700:15
**desire** 705:6
**desk** 769:11
**despite** 722:19
**destroyed** 741:10
745:5
**destroying** 745:8,11
745:13,17
**detail** 644:6,6 684:8
**detailed** 638:3
**details** 721:12,14
**determination**
633:4 679:21
680:16
**determine** 691:18
**diamond** 706:3
**difference** 791:18
**different** 628:6
693:6 717:8
788:17 802:18
803:2,4,8 808:18
814:17 822:14
831:21,22 836:1
**differently** 823:21

839:9 841:6
**difficult** 780:3,4,5
789:22
**difficulties** 693:4
**difficulty** 794:20
822:1
**digest** 748:12,12
**diligence** 690:6
**diligent** 814:8
**dill** 741:14 742:11
**dinner** 705:14
**dire** 793:19,22
804:2,5 811:4
**DIRECT** 618:2
795:10 812:5
**directions** 696:3
**directly** 733:14
**director** 629:4
**disagree** 758:22
**disappointing**
684:14
**disciplinary** 616:18
619:6,8 658:10
692:8 728:20
729:14 735:6
749:5 764:4
769:18 770:3
792:22 795:7
807:21 808:1,4,11
808:22 809:3,8,22
811:10 812:6
815:4 833:1
834:10 836:7
837:11,19 839:18
841:10 842:21
**discipline** 829:17
**disciplined** 829:12
**discovery** 690:18
749:2,6
**discredited** 680:3
**discrepancy** 794:15
**discriminate**
753:10
**discrimination**
631:5 680:17
798:4,14,17
802:11 804:9
805:12 807:3
810:4,5,18 811:21
815:21 816:1,4,7
816:11 817:16
825:16 829:16,18
829:19 830:17
**discriminatory**
825:22
**discuss** 689:22

758:22
**discussed** 625:15
679:20 738:21
739:3,5 758:2,6
759:11 761:8,15
761:15 769:22
770:2
**discusses** 693:3
**discussions** 841:5
**dishonest** 684:7,10
**dishonesty** 640:17
**dismiss** 696:4 843:3
**dismissed** 695:1
696:3,9,13
**Diso** 797:15,17
**disparage** 636:21
**disparaging** 744:2
**dispute** 802:6
**disrespect** 786:22
**disrespected** 787:7
787:10
**distinct** 650:4
672:10
**district** 615:1 616:6
737:10 795:18,21
797:2 799:9,10,22
800:14,17 801:4,5
802:2,2 805:2,2
805:10 809:1,3
813:9,10 820:14
**divided** 632:3
**doable** 627:15
**docket** 615:4 674:9
**doctor** 705:12
715:19,22
**doctorate** 716:3
**document** 622:2,12
629:17 631:19
632:1,8,12 635:13
635:17 639:10
642:20 643:10,18
651:12 660:17
682:8 710:11
725:13 742:7
752:9 781:2,8
786:2 813:12,13
813:15 833:22
834:3
**documents** 631:8,8
631:12 644:8,13
658:13 690:1,6
739:20 748:5
749:2 765:20
767:12 780:21
**doing** 636:4 645:12
650:16 654:6

665:9 685:22
764:6 777:22
778:16 785:14
798:7,11 801:17
**dollars** 677:19
808:15 809:13
**Dorsey** 649:17
**double** 760:6
**double-check**
767:10
**double-checking**
768:11
**doubts** 837:2
**dozen** 746:18
**Dr** 702:19 715:19
716:4,9
**draft** 835:17,22
837:9,16 838:7
**drive** 831:16,16
**due** 690:5,21
693:16 696:16
**duly** 795:8
**duties** 820:19
829:10
**DX23** 770:10
**DXD** 770:13

**E**

**E** 615:5 616:2
617:10 618:1
619:1,1 747:3,3
**earlier** 654:15
665:8 667:9 691:3
692:9 769:22
785:21 786:13
814:10
**early** 687:22 690:19
746:15 797:14
805:4 844:16
**easier** 794:22
**East** 720:8
**eat** 664:17
**edition** 800:13
**editions** 800:15
**educating** 755:18
**education** 798:21
**EEO** 630:5,9
646:15
**EEOC** 802:22
817:12,13,14
**effect** 753:9 828:21
**effort** 718:9 725:14
778:7 823:4,20
824:3
**efforts** 725:17
**egregious** 820:8,9

eight 620:16 624:15
  625:1,1 627:21
  676:8 696:20
  726:6 835:3
Eighteen 647:5
eighth 834:21
either 657:8 686:19
  691:1 696:9
  734:15 777:20
  814:7 844:5
elected 799:19
election 832:3
electronic 794:21
element 821:14
elevation 692:12
Elham 618:3
  619:16 623:16
  624:17 629:10
  631:5 658:6,7
  735:8 740:16
  749:22 813:8
elicit 710:14
Ellen 830:11
Ellie 666:10 708:5
  720:2 721:17,22
  722:4,6,17 723:1
  723:2 728:22
  729:18 745:5
Ellie's 722:19
EllieSataki@yah...
  623:16
email 617:8 623:5,9
  623:14,15 625:10
  625:11,14,16,19
  625:21 626:6,7
  650:8 652:4 660:5
  660:18 661:4
  663:8,9,18 664:5
  664:20 665:5
  666:3,11 668:8
  669:5,9 676:21
  678:4,9,19 681:18
  682:10 683:13,17
  684:6,20 685:4,8
  686:12,19 688:15
  688:16 689:4,7,12
  690:15 694:16
  697:9 699:9,14
  702:2 707:6,15
  712:6,17 713:9,11
  713:21 726:4
  727:15 728:8,21
  729:10,12,15
  730:7,20,22 731:6
  732:4 734:1 735:6
  735:11,13 737:2,5

738:15,18,20
  739:12 740:2,5,20
  740:22 741:21
  742:22 743:9
  772:6 781:11,13
  784:14,15 789:14
  790:9
emailed 689:10
  727:22 780:7,9
emails 661:13,17,18
  662:5,11,16
  666:11 667:4,6,11
  667:15 683:14,19
  684:10 685:15
  689:16 690:16
  696:6 697:1
  699:19 700:7
  702:12 706:22
  708:2 723:2,19
  728:2 738:21
  739:5 741:4
  784:18 786:6,9,13
  788:14
employed 620:13
  746:1 796:22
  798:9
employee 635:20
  745:2 754:4
  816:16,21,22
  817:5,17 822:13
  825:17 829:17
employees 798:16
  801:7 802:17
  815:22 816:6,7,10
  819:17 820:15
  821:19 822:11,15
  825:2
employer 626:15,22
  627:1,3,13,15,18
employers 779:17
  798:19
employment 630:6
  722:4 798:3,3,7
  798:14,17 799:3
  799:17 800:21
  801:6 802:11,20
  803:21 804:9
  807:3 810:4,5,18
  811:20 815:20
  816:4,12 817:16
  822:9 830:16
  834:12
encountered 812:2
encourage 839:19
engaged 636:4
English 624:19,20

625:2 686:22
  687:9 711:18
  721:19
enter 842:15
entered 656:10
  658:2 737:14
entertaining 692:15
entertainment
  723:4
enthusiasm 683:10
entire 631:21
entirely 771:6
entirety 657:17
  659:11 768:15
  834:7
entitled 751:4 831:7
entity 804:19
equal 690:21
  802:20
equipment 844:1
error 794:8
especially 773:16
  773:22 798:4
ESQUIRE 616:11
  616:15,20 617:3
  617:10
essentially 836:6
estimate 802:14
  809:12,17
et 708:8 735:10
ethically 837:20
ethics 838:17,18
Europe 804:18,22
evaluated 781:19
evening 655:12
  669:19 671:1
  729:5 788:6
event 632:10 635:2
  686:21 776:11
  779:18
events 755:14
eventually 766:17
everybody 657:13
  688:17 759:17
  773:15,16,17
  776:15
everybody's 675:12
  691:17 758:19
evidence 639:11
  642:14,18 645:11
  645:18,19 646:22
  649:9 656:14
  658:2 674:5,14,16
  674:20 678:15,17
  690:11 691:9
  725:13 741:11

742:3,13 748:11
  767:21 768:1,7
  778:4 833:10
  836:14
evidentiary 643:3
Ex 813:17
exact 669:1
exactly 628:20
  632:15,16 676:7
  761:17 766:12
  772:11 773:4
  775:10 785:6
examination 708:10
  710:18 769:17
  770:1 781:22
  791:1 795:10
  812:5 815:3
  836:14
examine 791:3,10
examined 785:22
  795:9
example 777:13
  816:15 829:15
examples 787:9
Excepted 635:9
excess 708:13
excluding 708:11
excuse 639:18
  763:3,16 777:18
  786:3
excused 791:20
  841:1,3
executive 721:21
  722:16 745:19
exhaust 805:16
exhausting 787:18
exhaustion 826:19
exhausts 817:5
exhibit 621:22,22
  622:6,8,11 623:13
  628:16,17,19
  631:10 642:17
  646:13,22 648:13
  649:1,7 650:22
  651:6 655:20
  656:10,10,13
  657:2,18 658:5,9
  660:3 661:3
  663:18 664:20
  666:2 668:7 669:9
  673:17 676:20
  681:10,11,14
  683:19 686:7,8,10
  694:15,15 697:5,6
  697:7 699:9
  701:21 707:4,15

712:5 728:21
  729:15 730:19
  734:4 735:6 737:2
  738:15 750:16,19
  758:5 763:11,15
  763:20,21 764:2,4
  764:9,10,13,16,21
  764:22 765:3,16
  768:1,6,8,19
  770:4,10,19 771:1
  771:7 772:2
  780:17 784:13,15
  789:12 790:21
  794:7,12 812:10
  813:5 818:16,19
  832:7,20 833:10
  833:12,14 834:5,7
  834:9,9
exhibits 622:21
  657:11,20 659:14
  659:17 674:8,20
  675:5 750:17,20
  764:4,15 767:21
  779:8 784:12
  785:22 786:11
  794:7 812:9,12,15
  825:4,10 827:6,8
  827:13 832:8,12
  832:13,15,18
  841:10,14 842:3,4
  842:19
exit 669:20 671:2
  673:12
expect 844:15
expected 684:12
  836:21
expended 708:5
expense 633:3
  641:17 645:3
  677:19
expenses 641:19
  708:7,8 709:8
experience 701:12
  729:21 755:13,20
  757:7,14,16
  819:13 828:8
  831:9 837:19
expert 793:19,21
  801:1,6,18,21
  803:20 807:20
  808:1,4,22 811:19
  818:6 825:12,12
  834:11 836:9
  837:5,22 838:17
expert's 836:4,15
expertise 838:3

**explain** 625:12
  640:19,20,22
  641:6 709:18
  740:10 783:10
  815:19
**explained** 625:17
  626:9 627:14
  654:4 679:6
  713:10,16 723:18
  723:20
**explains** 729:20
  751:19
**explanation** 641:2,4
  811:11
**explore** 837:4
**express** 774:9
**extend** 624:17
**extent** 638:20 658:9
  803:15
**extra** 820:5
**extrajudicial** 778:4
**extremely** 664:1
  829:19 830:8

————————————
**F**
**F** 747:3
**facing** 693:4
**fact** 644:2 662:19
  677:10 700:17
  705:14,17 718:9
  723:1 724:4,9
  727:4 730:12
  737:21 746:5
  748:4 751:14
  759:16 814:13
  825:21 835:11,20
**fact-finders** 644:12
**facts** 686:19 742:3
  742:13 743:17
  824:22 825:6
  827:1,20
**fails** 825:14,14
**failure** 700:12
  825:7 826:2
**fair** 672:18 702:13
  710:18 766:13
  841:11
**fairly** 645:4 691:1
**faith** 724:8,10
  725:20 744:2
  823:4,19 824:3
**Falahati** 635:21
  636:3,20 637:20
  653:7 658:8
**Falahati's** 636:11
**false** 637:1,1,3,4,14

**640:8,13 643:20
  643:21 684:6
  704:3
**falsely** 637:7
**falsified** 686:19
**falsity** 640:17
**familiar** 718:18
  813:12,13 840:3
  840:18,19
**familiarity** 839:21
**families** 714:13
**family** 714:11
  728:11 729:2
  730:4
**famous** 838:18
**far** 718:2 777:11
  836:8
**Farsi** 636:22 721:19
**fault** 740:1
**favorable** 757:4,12
  761:6
**February** 649:16
  650:7 703:1
  704:19 773:3
  796:18 797:4
**federal** 709:20
  797:5 798:5,9,13
  798:16 801:7
  802:11,17,22
  803:9 804:13
  807:5,7 810:7,11
  810:14 811:21
  815:20,22 816:5,7
  816:10 817:5,13
  817:17 820:15,20
  821:8,9,19 822:11
  822:12,15 826:9
  829:8
**fee** 808:13
**feel** 625:12 645:3
  668:12 669:3
  829:2
**feeling** 742:19
**feelings** 670:9,10
  687:22 743:1
**fees** 708:9 709:1
  710:8 711:1 800:7
  802:6
**felt** 688:3 742:1,2
  755:10 787:20
  831:6
**female** 805:6
**field** 797:21 811:20
**fifth** 687:10 781:1,3
  834:20
**fighting** 677:19

**751:6
**figure** 722:17
**file** 802:15 805:19
  809:11 816:1
  817:7 825:19
  843:8
**filed** 621:11 646:15
  646:16 648:15
  692:9 763:1,18
  764:11 765:4,7,11
  766:22 770:19
  813:9 814:9 825:5
  827:9 831:3 833:3
  843:3,4
**filing** 708:9 803:14
  803:22
**Film** 714:15
**films** 714:11,13
**final** 630:5 631:4,22
  635:7 679:21
  680:16 703:15
  805:18 844:13
**finally** 759:3
**find** 629:7 690:6
  696:8 718:7
  724:13 749:8
  758:20 773:15
  780:21 826:2,22
  826:22 844:2
**findings** 630:8,12
  630:14,19,22
  641:20
**fine** 670:17 718:20
  721:2,5 739:10
  746:17 749:14
  771:15 794:16
  828:3,7 843:8
**finish** 762:7
**finished** 652:2
  655:13 792:1,2
  806:3 811:3
**firm** 797:8,14
**firms** 798:18
**first** 657:4 681:21
  697:16,18 700:10
  701:8 702:1,18
  727:5 749:17
  757:22 789:5
  793:22 795:8
  797:1 798:8
  799:11 800:13
  802:18 804:2
  805:17 810:8,19
  810:20 812:10
  816:4 819:18
  820:15 828:15

**firsthand** 826:14
**fit** 794:11
**FITCH** 616:11
  619:2,10,14,19
  620:6,9 621:15
  622:9,14,18 623:2
  623:21 627:9
  628:5,11,18 629:1
  631:17 632:3,7
  638:12,16 639:4
  639:10,13,22
  640:10,21 641:1,5
  641:10,15 642:1
  642:11,22 643:17
  644:1,7,11 645:10
  646:11 647:2,5,7
  647:12 648:4,8,16
  648:20 649:8,12
  651:2,13,19,21
  653:15 656:1,11
  656:15,18 657:7
  657:16 658:3,13
  658:18 659:1,7,10
  659:16,19 660:14
  661:20 663:12
  664:2 665:3 667:1
  668:17 670:20
  671:13,21 672:7
  672:17 673:18
  674:2,6,13,17,21
  675:8,11 677:8
  680:10,22 681:2
  681:13,16 682:17
  682:19 684:4
  685:21 686:3
  691:10 692:16
  693:9,13,17,21
  694:1,8 695:13,19
  698:5,9,12 699:6
  700:4,22 709:17
  709:22 710:14
  711:22 713:3
  715:8,10,14,17,20
  717:3,11 718:2,20
  719:4,18 720:14
  720:21 721:2
  724:21 725:3,5,7
  725:12,16 726:10
  726:16,19 727:1
  728:12,17 730:14
  731:13 732:9,19
  733:1,7 734:5
  736:10,12,19
  738:3,7,11 739:10
  739:14,17 740:10
  740:16,19,22

**743:18 744:4,6,14
  744:17 746:2,9,14
  746:17,20 747:6
  747:13 748:17,20
  749:13,16,20
  750:2,9,18,21
  754:20 760:8,18
  760:22 761:13,18
  762:9,12 763:5,13
  764:1,5,14 765:1
  765:13 766:7,13
  767:13,17 768:3,8
  768:12,14,20
  769:3,8,10,14
  770:5,7,9,13,16
  770:21 771:5,10
  771:14 774:21
  775:2 776:19
  778:10,15,18
  780:19 781:5
  782:17,21 784:9
  784:22 785:12,17
  790:13,16,19
  791:1,7,14,16,22
  792:3,7,19 793:2
  793:7,12,20
  794:16 795:3
  799:14 804:4
  806:3 807:11
  808:18 811:7,13
  811:18 812:4
  814:21 815:11
  818:7,13 821:22
  822:5 823:15
  828:16 832:5,9,16
  833:17 834:5,19
  836:12 838:2,10
  839:6,13 840:8,10
  840:21 841:4,11
  841:17,19 842:6,9
  842:13,17 843:1,7
  843:21 844:3,13
  844:15 845:2,8,17
**five** 636:19 639:18
  741:1 769:6
  792:12 835:2
**Florida** 617:6
  747:19,20
**focus** 835:13
**folks** 831:15
**follow** 631:22
**follow-up** 840:6
**followed** 694:22
  695:9 696:2
**following** 697:21
  761:1

follows 795:9
fondled 636:12
force 717:21
forget 696:18,18
forgot 688:19,20
form 680:6 794:22
formal 692:7
  805:19,21 806:8
former 645:6
  678:20
forth 775:11
forthcoming 811:8
forward 667:14
  683:12 705:4
  711:10 734:11
  747:12 749:6
  766:19
forwarded 666:4
  712:11,13,19
  713:11
forwarding 737:5
found 640:7 680:20
  701:17 702:19
  706:9 776:10
  777:12 783:15
  829:17
foundation 638:15
  639:4,14 764:7
four 636:9 652:18
  766:21 779:11
  835:2
four-year 767:5
fourth 677:6 733:12
  734:1 781:2
  797:16 840:16
frankly 645:3
fraudulent 737:12
Fred 748:12
Frederick 617:3,4
Free 751:6 804:18
  804:22
freedom 648:14
  719:12 751:19
  752:18 753:4,12
  754:3 757:1 758:1
Freedom-Loving
  751:5
Freeh 840:14
frequently 691:20
Friday 615:8
  840:22
friend 684:10,21
  685:3 688:2 720:5
  784:5
friend's 788:5
friends 705:7,9

729:18
friendship 650:15
front 646:1 758:2
  758:11 759:1
  812:8 838:20
fruition 725:18
fsujat@yahoo.com
  617:8
full 624:3
fully 735:9 748:13
  749:4
further 683:6
  748:17 767:6
  769:1 790:11
  791:3 818:11
  824:10,13 839:15
  840:20 845:10
future 653:11
  843:14

G

G 619:1
gambler 824:5,6
gaming 737:12
garage 783:12
Garrison 737:6
general 638:5 640:3
  650:11 702:11
  710:15,16 717:12
  755:16
generally 647:18
  702:10 719:2
  736:16 755:15
  829:2
gentleman 703:1
  704:20
Georgetown 796:14
getting 656:8
  660:17 661:3
  662:13 683:13
  702:14 726:3
  727:13 729:10
  755:18 836:6
  837:21
ghetto 787:11 789:5
girl 723:19 745:1
give 621:10 622:1
  641:3 644:20
  656:15 666:17
  667:5 673:18
  674:3 676:16
  679:14 685:21
  719:12 728:3
  747:18 748:9
  750:9 762:12,14
  768:3 787:8

793:15 794:17
  803:3,12 804:20
  817:6 825:11
  834:16 843:2,6
given 642:3,13
  713:7 755:12
  844:4
gives 650:10 737:18
  747:21
giving 742:10
  774:19 785:15
glass 729:5
global 721:19
Gloria 688:1,2,13
  689:4,17 748:8
  749:1,1 779:12,15
  779:21 780:8,10
go 620:9 632:15
  635:8 636:9
  638:18 639:16
  642:1 653:16
  654:16 659:15
  660:14 664:2
  665:3 673:8
  674:11 676:6
  679:19 682:17,19
  684:4 686:3
  691:18 692:21
  700:17 704:15
  713:17 747:20,20
  748:2,2 750:12
  751:17 753:18
  754:21 768:4,5
  769:14 773:15
  777:22 778:18
  780:20 782:21
  785:19 788:4,8,11
  790:3 795:3 803:1
  803:15 805:16,17
  805:21 806:5
  807:4 815:6
  826:18 832:17
  834:19 837:7
God 724:11 729:19
  730:3 744:21
  753:1,2
goes 642:7 735:17
  751:5 825:17
going 621:9,11,21
  623:4,5 625:6,15
  626:5,9 627:15
  628:22 635:12
  639:8,10 644:2,3
  644:7,9,12 646:6
  652:6,9,12 653:21
  659:13,14 660:2

661:16,19 662:8
  662:15 664:5
  665:2 666:7
  673:22 674:11,17
  674:19 675:5
  678:15 680:5
  681:6 687:10,12
  689:17,22 690:14
  691:14 692:1,3,19
  700:10,20 704:4
  704:12 708:4
  710:6,22 711:10
  713:15 720:1
  722:7,17 723:21
  723:21,22 724:1
  733:9 741:3
  746:11 747:11,16
  749:6 752:19
  753:11,18 754:9
  755:4 758:12,17
  758:20 759:5,12
  759:17 766:19
  767:10 773:13,17
  773:17 774:14
  775:20 777:19
  783:17,18,20
  784:2,8 788:15,16
  802:19 814:21
  823:3 824:22
  826:7,8,15 827:4
  833:3 834:20
  836:2,12 837:3
  841:6 842:11,14
  844:10,11
good 619:4,18,19
  620:4,5 632:6
  636:4 639:7 645:8
  648:8 650:16
  664:9 668:12,22
  669:4 693:15
  701:13 714:13
  718:7 719:8,9
  723:15 729:16
  746:11 750:3,8,14
  750:15 753:11,12
  763:7 769:20,21
  815:8 823:4,19
  824:3 839:12
governed 816:22
government 653:10
  751:4 757:1 758:1
  779:16 798:5
  800:7 803:10
  821:8 828:9,11,13
  828:20 829:1,8
  830:5

governmental
  811:22
governors 650:19
  652:12 658:7
  813:9,18 823:6
  824:16,18,19
  830:14,16 831:4
grabbed 636:12
gracious 643:2
grandfather 831:15
great 644:5,6
  721:17 748:1
greater 684:8 713:9
Greenberg 797:16
  797:17
group 714:7,8,14
guess 622:22
  784:13 814:14
guilty 737:9,14
  829:18
guy 674:6

H

H 616:20
H-u-v-e-l-l 830:12
half 693:10 746:18
  766:2
halfway 740:11
hand 621:16 793:13
handed 630:9
handing 821:13
handle 654:1
  717:12 781:20
  810:17 822:9
handled 645:17
  691:7 798:13,17
  802:18 803:2
  810:3,10 830:10
handling 808:13
handwriting 763:12
hang 706:1 787:11
happen 755:5,19
  758:17
happened 635:1
  773:18 790:4,5
  791:5 820:19
happening 662:20
happens 691:20
happy 659:4 670:5
  671:10 672:3
  741:10
harassed 637:20
  751:6
harasser 638:8
  653:3 822:16,19
harassment 632:21

634:16 636:5
745:2 773:19
774:2,4 779:15
821:5,13 822:9
825:7
**hard** 677:10 824:4
**harmed** 700:13
**hash** 705:5
**hated** 687:16,17
**head** 714:7 816:14
817:3,9 820:21
823:1 825:13,20
**health** 621:4 748:1
**hear** 724:12 729:8
759:8 777:21
784:22 811:18
**heard** 646:4,12
650:4 651:15
656:3,5 828:17
839:6 842:10
**hearing** 615:11
616:1,3,10 619:5
621:18 623:17
624:3 645:22
647:11 654:16
659:5 691:1 747:4
749:8 781:15
786:8 787:8
789:19 792:8,11
794:4 802:21
845:15,18
**hearsay** 776:18
784:7
**heart** 665:18,22
**heat** 820:4
**heavily** 798:11
**held** 830:5
**Hello** 624:2
**help** 629:6 633:11
634:12 669:22
671:4 673:11
676:16 683:10
688:4 698:19
701:1 716:16
717:2,6 718:3,7
745:3,4 756:4
759:17,20,22
774:14 775:21,21
780:11,12 783:5
788:6
**helped** 685:10
687:8 698:18
701:3 711:18
**helpful** 690:8
**helping** 685:15
717:9 729:6

756:11
**hesitancy** 725:21
**high** 839:2
**higher** 695:6
**highly** 843:20
**highway** 676:17
**Hillary** 813:16,22
816:18 817:18
818:9 823:13
825:13 832:2
836:5
**hired** 781:16
**History** 658:10
**Hoc** 616:3,10
**hold** 624:14 627:21
711:11 778:10
791:12 828:11
**holding** 642:17
828:20
**Hollywood** 617:6
716:7 718:7
**home** 650:10
820:10
**homeless** 634:21
**honest** 701:17,18
**honestly** 677:4
720:20,20 802:6
803:3 804:14
805:4
**honesty** 646:2
684:13,15
**Honor** 619:13
623:19 628:21
638:19 641:4
642:8,19 644:10
644:15 646:21
650:21 651:18
656:6 657:20
658:16 660:21
663:11 664:1
665:1 666:8
671:18 677:7
678:14 681:7
682:15 684:2
687:13 689:13,20
693:12 716:1
746:10 748:4
760:21 763:3
764:17 767:9
769:1 782:9,15
784:6,21 791:12
793:18 795:4
811:3 814:2,11
833:9 838:13,13
842:12 845:1
**Honors** 843:2

**hook** 844:1
**hope** 624:10,16
654:13 708:17
729:2
**hoped** 708:17
**hoping** 755:4
843:16
**hour** 693:10 746:21
808:7,14
**hourly** 808:13
**hours** 741:2 812:22
813:2
**house** 705:11,15
716:13,14 748:2
788:5 844:1
**huge** 643:8
**hundred** 677:18
798:16 802:13
807:7
**hundreds** 817:11
826:9 827:12
**hung** 706:19
**hurt** 627:16 818:2,8
**hurting** 786:16
**hurts** 683:6
**husband** 678:20
**Huvell** 830:11,19
**hypothetical** 825:11

_____
**I**
**idea** 683:4
**identified** 623:11
720:8 736:8 748:7
**identify** 629:9
631:14 659:3
727:7
**identity** 706:5
**iffy** 827:18
**III** 616:20
**ill** 686:20
**illegal** 825:21
829:11,12,19
**imagine** 823:8,17
824:7
**immunity** 829:3,9
**impacts** 836:15
**impediment** 725:10
**implied** 683:3
**imply** 814:14
**implying** 683:5
**important** 624:9,13
630:15 633:8
634:2 643:16
646:7,10 665:13
690:10 713:1
748:8 751:20

**imposed** 722:3
**improper** 648:2
672:16,17 711:10
**improperly** 711:9
**inaccurate** 648:17
**inappropriate**
695:18 785:16,18
**inaudible** 729:20
**include** 674:8
823:20
**included** 840:2
**including** 684:11
706:4 708:6
711:16 798:3
800:21 825:5
**income** 721:16
808:3,8,16
**inconceivable** 646:6
**incorrect** 810:8
**incredible** 826:3
**independent** 708:11
827:7
**individual** 637:19
714:3 819:16
820:21 822:13,16
822:19 825:18
827:13 838:19
**individuals** 821:18
822:20
**indulge** 769:5
**indulgence** 746:13
**influence** 754:10,12
755:14
**inform** 735:9
**information** 641:13
644:21 648:14
768:14 791:6
837:5
**informed** 686:20
692:11
**initial** 633:3 737:4
763:2 766:22
**initially** 699:11
794:12 797:15
800:8 812:21
816:3
**inserting** 695:16
**inside** 640:6 678:6
**instruct** 762:18
**instructed** 723:9
760:3 814:11
843:16
**instruction** 807:10
**instructions** 695:1
695:10
**insurance** 621:4

**intend** 657:21 695:5
**intentionally**
686:19
**interact** 787:16
**interest** 684:11
700:13 702:22
704:18 714:8
776:1 828:5 830:4
**interested** 727:16
756:2
**interfere** 789:3
**interfered** 711:13
**Interference** 708:21
**interferes** 711:9
**interfering** 709:6
**International** 651:8
652:11 817:1
**internet** 706:10
**interrupt** 626:10
777:19 780:19
**interrupted** 781:6
**intervened** 720:9
723:3
**interview** 719:21
723:6 805:19
826:21
**interviewed** 640:6
680:18 720:3
722:5
**interviewing**
720:10 723:1
**intimidation** 636:5
**introduce** 645:19
**introduced** 645:18
701:11 705:9
714:5
**investigate** 826:17
**investigated** 827:3
**investigates** 805:20
**investigation** 737:8
737:13 778:1
827:7 837:14
**investigative** 806:9
826:18
**investigator** 706:9
706:17 736:9,18
737:6,18
**Investigator's**
737:4
**invite** 705:5 788:12
**invokes** 820:18
**involved** 653:19
783:8 802:12
806:7
**involves** 801:7
815:19

**involving** 737:12
  829:15
**Iran** 718:16 719:3
  719:12 720:7
  751:7,20 754:2,17
  755:9 756:12,13
**Iranian** 752:20
**irrelevant** 811:15
  814:19
**IRS** 810:21
**Isabel** 800:3
**issue** 642:9 643:3
  645:16,17 670:19
  691:11 727:13
  792:10 811:16
  814:12,18 815:2
  830:22 831:1
  837:20
**issued** 670:4 671:9
  672:3,22 675:18
**issues** 623:6 644:17
  691:6 705:5
  716:17,18 799:4
  803:21 804:1
  834:12
**It'll** 660:21

---

**J**

**J** 617:3,4
**Jamshid** 729:6,8
**Janet** 705:6
**January** 730:20
  735:7,12 737:3,14
  738:17 784:16
  786:3
**Jewish** 743:21
  744:11
**job** 621:3 624:11
  626:10 636:4
  653:8,9,9,10
  654:12 677:20
  713:22 718:7,10
  721:9,16 723:14
  723:15,15 727:13
  754:6 797:1
**jobs** 637:16
**Joel** 618:4 793:6,11
  794:5 795:6,14
**John** 802:1 805:1
  840:1
**Johnson** 629:4,11
  653:18
**joined** 797:4,8
**jointly** 747:9
**Journal** 800:6
**journalist** 756:18

**journals** 800:20
**Joy** 702:17,20
  703:8,11,20,20
  704:1,21 705:1
**judge** 670:4 671:9
  672:2,12,22
  675:17 676:2
  747:22 797:2
  802:1,21 805:1
  817:12 830:11,19
  838:21 839:1,11
**judge's** 695:6
**judges** 845:7
**judgment** 803:7
  819:14,22 820:3
  826:14
**judicial** 658:6,14,19
  658:20,21 840:13
**July** 624:12 681:19
  682:10 683:19
  686:13 747:18
  748:15 749:7,8,12
  780:18 781:9
  835:4,17
**jumbled** 785:3
**June** 615:8 657:1,1
  657:4 666:3 668:8
  669:10 676:21
  771:3,22 773:5,7
  792:19 845:13,19
**jurisdiction** 836:20
**jurisdictional**
  818:22 819:3,8
**Justice** 794:21
**justified** 831:6

---

**K**

**Kaiser** 673:8
**karma** 743:22
**Kathleen** 633:20
  655:16,22 682:12
  682:22 683:8
  685:10,14,17
  687:5 697:15
  698:3,16 743:10
**keep** 624:10 625:13
  625:18 626:11
  645:13 677:15
  730:2
**Kevin** 712:6,11
  727:19
**kill** 654:18 655:1
**killed** 676:16
**Kim** 615:22 616:4
**kind** 642:17 690:5
  692:10 749:10

769:6 804:19
  820:4
**kinds** 706:19
**Kinko's** 764:18
**Klayman** 615:5
  617:10 620:3,9,11
  621:8,13,17 622:3
  622:4,7,13 623:1
  623:3,4,7,12,18
  623:22 624:1,15
  626:2,4 627:7,11
  627:22 628:15,18
  628:20 629:2,9,12
  631:18 632:2,6,9
  632:18 638:14,18
  639:6,12,15 640:2
  640:4,19,22 641:3
  641:8,11,16 642:7
  642:19 643:4,15
  643:22 644:5,9,14
  645:21 646:21
  647:4,6,8,10,16
  648:6,10,12,18,22
  649:2,5,6,11,13
  650:4,6,21 651:4
  651:5,14,17,20
  652:1 654:9
  655:19 656:6,13
  657:5,10,18 658:5
  658:11,12,16,20
  659:2,9,12,17
  660:1,16,20 661:1
  662:4 663:10,16
  663:19,22 664:3
  665:1,4 666:7,9
  666:20 667:3
  668:3,5,15,20
  669:7 670:11,14
  670:17,22 671:17
  671:19 672:19
  673:20,22 674:4
  674:11 675:13,14
  677:6,9 678:12,18
  679:8 680:8,14
  681:6,9,17 682:15
  682:18,20,21
  684:1,5 686:1,3,5
  686:9,11 687:12
  687:14 689:13,16
  689:20 691:10,14
  692:17 693:1,10
  693:11,15,20,22
  694:10,12,13
  695:16 696:1
  697:7,8 698:7,11
  698:13 699:5,7

700:5,21 701:4
  704:10,11 707:3,5
  709:12,19 710:2,5
  710:19 711:4
  712:1,3 713:4,6
  713:11 715:11,16
  715:18,21 716:1,2
  716:21 717:1,5,16
  718:5 719:1,6,7
  719:15,19 720:16
  720:17 721:6
  725:1,4,6,9,15,19
  726:1,13 727:3,9
  727:12,17 728:6
  728:14,18,19
  730:17 731:16
  732:17 733:2,7,9
  733:11 734:9
  736:15,20,22
  737:7 738:1,5,8
  738:13 739:11,15
  739:22 740:12
  741:7,9 743:19
  744:8,15,18 746:3
  746:4,10,16,19
  747:14 749:14,18
  750:6,7,13,19
  751:1,5,19 755:6
  757:18 759:10
  760:19,21 761:4
  761:20 762:1,4,10
  762:14,15,18
  763:3,7,9,14,21
  764:6,8,14,17
  765:2,16,19
  766:14 767:9,15
  767:20 768:6,11
  768:13,15,17,22
  770:14 771:1,4
  772:1,3,20 773:6
  773:10 774:10,18
  775:6,14 776:3,8
  776:17 777:16
  778:22 779:11,20
  780:6 781:12,18
  781:22 782:8,14
  783:4,4,8,18
  784:1,6,16,21
  785:2,11,14,22
  786:10,14 788:19
  789:16 790:12,14
  790:17,21 791:4
  791:11,18 792:17
  792:21 793:18
  804:2,6 806:4
  807:9,13 809:6

811:3,9,15 812:3
  812:12,14 814:2
  818:4 823:12
  824:10,14 830:1
  832:6,13,21 833:8
  833:15 834:1,8
  835:1 836:19
  837:3,8 838:4,9
  838:12,15 839:8
  839:10,15 840:6
  840:11,20 841:8
  841:13,15,18,22
  842:9,11,14 843:2
  843:5,10,22
  844:11,22 845:4
  845:14
**Klayman's** 770:1
  777:16 832:15
**knew** 663:5 687:22
  687:22 713:15
  738:2,5 742:18
  744:16 831:3
**know** 621:7 624:2
  624:12 625:1
  627:3 633:8 634:8
  634:10,11 635:16
  643:5,18 645:2,10
  653:13 656:7
  657:10 662:8,12
  669:17 670:10
  675:22 676:18
  683:17 689:19,22
  690:22 691:6,21
  700:20 701:2
  712:19 713:13
  716:5 718:3,21
  722:12 727:6
  730:1 731:4,11,18
  732:1 736:11,16
  737:19 743:20
  745:14 754:12
  756:8 766:11
  770:14 773:4
  775:9 776:7 777:2
  778:6 807:1,4,6
  808:6 819:18
  820:5 822:8,12
  826:7,8 831:2
  836:4,8 838:5,16
  838:19 844:21,22
  845:2,5
**knowledge** 666:16
  777:9 809:4
  826:15
**knows** 654:8 666:12
  670:9 772:15

776:19 785:5
807:12
**Kollar-Kotelly**
672:13
**Kollmer** 649:16
**Kotelly** 670:4 671:9
672:2,22 675:18
676:2

_____
**L**
**l-i-a-i-s-o-n-s** 637:6
**LA** 654:5 673:1
683:4 695:3
704:13,16 720:6
721:22 825:8
**Labor** 799:17
**lack** 645:13,14
684:14 725:4
785:2 814:7
**laid** 639:5,14
**language** 636:22
**LARKIN** 616:13
**Larry** 615:5 617:10
658:5,10 663:18
664:10 683:12
684:16 685:5
729:9 730:4
740:12 751:5,19
771:4 772:1
777:16 838:9
**late** 805:3
**law** 617:4 796:11
796:13 797:1,21
798:3,7,18 799:3
799:11,18 800:5
800:13,20,21,21
801:6 803:21
820:6,12 821:7
823:5,20 834:12
**lawsuit** 831:14
840:13
**lawyer** 683:7
685:18,18 698:22
699:2 796:19
802:5 819:14,22
821:13 827:19
**lawyers** 711:20
797:13 814:17
822:9 831:7,8,20
832:1 845:5
**LAX** 708:9
**lay** 639:5 764:7
**laying** 638:14
**lead** 748:10
**leading** 716:21
774:18 822:8

**learn** 625:2 735:1
**leave** 661:14 703:12
785:12 789:2
**lecturer** 799:1
**led** 788:19
**left** 628:17 670:1
671:5 673:15
702:21,22 704:19
**legal** 643:3 660:6
665:5,7,8 666:17
667:15,18 687:21
702:3 706:5,9
708:6,11 709:1,2
710:8 711:1,16,16
711:17 733:13,16
734:13 735:2,8
798:21 806:20
814:9,14 828:11
828:19 839:12
**legally** 711:11
**legitimate** 627:3
827:15,19
**let's** 626:11 713:17
717:18 727:7
731:1 746:20
774:21 808:10
821:2 830:2
**letter** 629:3,7,8,10
629:13,18 630:11
631:3,22 635:3
647:21 649:16
650:7 651:6,11
656:22 657:1,4
687:4,13 689:7
691:3 693:2
697:14,14,18
698:2,6,15,17,18
698:19 734:18,20
834:10 835:4,7
**letters** 711:15
**level** 810:11 817:12
817:13,14
**levels** 802:18 803:3
803:4
**Lexis** 800:11
**liaisons** 637:6
**licensed** 795:20
796:1
**lies** 745:18
**life** 624:14,16
627:20,22 630:15
646:8 668:12
669:4 715:5,13
729:21 744:22,22
745:5,9,12,13,17
789:2

**light** 642:20 748:4
767:12
**likewise** 738:12
**limits** 749:5
**Lincolns** 831:16
**line** 815:2 836:14
**lines** 665:2 749:4
819:11
**link** 776:7,11,12
778:8
**list** 635:9 706:4
811:10
**listed** 670:17,18
776:14
**listening** 717:20
**litigate** 832:1
**litigating** 826:11
**litigation** 691:20
708:17 799:20,21
800:21 801:19,22
803:15 827:17
**little** 628:22 648:7
674:7 692:18
693:17 745:1
754:17 769:11
815:20 821:22
823:21 837:4
**live** 641:19 664:17
843:14
**living** 708:7
**located** 737:18
**location** 664:6
**logically** 630:18
**long** 655:22,22,22
676:4 696:15
706:4 710:4
795:17 806:10
829:10
**longer** 693:18
**look** 631:7,10
649:14 651:10
652:19 656:21
682:5 683:21
705:4 713:18
731:2 740:11
777:14 778:3
779:7,13 780:16
789:11 795:1
809:10 812:9
813:21 819:7
**looked** 661:6
812:20,22
**looking** 657:13,14
699:10 763:4
773:5 790:6
**looks** 771:2

**Los** 620:15 638:4
652:13 675:19
702:18,22 704:19
718:13 745:22
746:5
**lose** 741:13 742:4
742:15
**losing** 744:1,20
**lost** 640:14,14
653:9,9,10 655:3
662:11 670:20
733:21 740:1
741:11,13,15,17
742:9
**lot** 645:2 683:14
697:2 699:19
701:5 704:9 819:2
820:6 825:6
833:13
**lots** 822:8
**Louis** 840:14
**love** 729:8
**loving** 758:1
**low-class** 706:1
**loyal** 687:19
**lucid** 687:15
**lunch** 746:11,21
**luncheon** 747:1

_____
**M**
**M** 615:22 616:4
**Madame** 668:20
710:20
**Mahmonir** 729:4,7
**mailed** 743:9
**Main** 816:16,21
**major** 796:9 803:13
804:13
**makeup** 807:1
**making** 680:16
693:16 754:17
763:7
**man** 839:1
**management**
636:21 687:17
799:12 800:22
**manager** 720:9,12
721:20 722:20
723:2,3,4
**managers** 708:18
757:8,15 758:13
825:16
**manner** 814:8
**manufactured**
637:3
**March** 629:7,10

630:3 631:16
632:15 651:15
737:16 773:3
**mark** 622:10
721:21 722:16
**marked** 622:8
770:3 779:8
**MARY** 616:13
**material** 691:9
**Matt** 737:5
**matter** 615:4
621:20 628:6
691:7 747:17
781:17 790:21
794:1 807:21
808:1 815:14
830:4 834:13
841:8
**matters** 619:7,11
625:20 645:1
649:22 667:17
693:6 702:3 708:6
728:11 733:17
734:13 735:2
790:14,20 801:10
821:15 836:18
841:5 845:11
**Mazinas** 810:17
811:2
**McLaren** 797:3
**mean** 622:1 631:1
646:4 658:14
664:9 670:9 676:4
676:8 701:3,8
720:22 724:10
742:9 748:21
755:2 756:21
770:9,10,11
788:17 789:9
808:6,7 820:9
**means** 681:4 700:20
774:4 791:22
**meant** 742:11
**Mecca** 831:11,13
**Medhi** 653:7 658:7
**media** 755:14,17,19
757:6,13
**medication** 790:2
**meet** 714:20,22
715:4 721:22
747:19,20 783:21
**meeting** 702:3
705:4 722:6
**MEGHAN** 617:13
**Mehran** 735:9,14
736:3 737:3,8

member 616:14,16
  795:18 799:16,19
  813:17 824:16,19
members 619:5
  794:4
Membership 800:2
memo 631:19
menial 637:16
mental 789:20
mentally 786:17
  787:5
mention 804:8,12
mentioned 747:15
mentor 716:18
merged 797:13
mess 821:10
message 670:1
  671:6 729:18
  753:4
messages 719:12
  786:14 788:14
messing 709:7
met 714:4 716:9
Mezinas 797:9
MICHAEL 616:15
microphone 772:14
Middle 720:8
million 824:1
mind 642:13 648:5
  672:14 692:5
  713:8 722:1
  741:22 743:8
  790:8
mine 688:2 700:14
miniature 714:10
minimum 684:12
minute 640:11
  647:2 671:14
  768:3 823:16
minutes 694:2
  769:6 790:18
  792:15
mission 754:1,5
misspelled 735:19
Mitchell 797:9
  810:16 811:1
mom 729:1 788:5
moment 656:15,19
  673:18 674:3
  742:1 772:11
  784:1 821:2
monarchist 687:18
Monday 792:12
  844:6 845:13,19
money 631:1 664:8
  664:16,17 665:21

677:16
money.' 665:11
monies 664:14
  708:16
month 621:5
months 773:2
  786:13 797:4
moot 843:12 844:10
  844:11
morning 619:4,18
  619:19 620:4,5
  664:8 729:17
  743:8 748:7
Motion 843:3
motions 749:3,4
move 646:21
  655:20 674:1,15
  674:19 675:6,7
  678:14 699:5
  733:10,10 768:1
  772:14 776:17
  778:13 820:13
  841:9,14 842:2
moved 647:7
  767:21 768:7
movers 708:7
Movieguide 714:8
  720:5
moving 641:19
  684:2 767:15
  833:9
Ms.- 654:10
Muslim 723:18,22
  724:8,10
Muslim,' 722:1

_____
         N
N 618:1 619:1
  747:3,3,3
name 664:6 714:3
  735:17,22 736:2,3
  736:3 737:20
  777:16 793:10
  795:12 805:5,7
  813:22 815:12
  817:2,8,9,18
  818:1
named 813:16
  825:12 840:16
names 680:18
  735:21 804:21
  807:6
naming 818:9
  823:21 831:6
  836:5
national 776:9

777:16 816:8
native 754:3
near 843:14
near-fatal 675:17
necessarily 643:20
  719:17 743:12
  792:9 819:22
necessary 813:22
  815:12,18 844:19
  844:19
necessity 836:5
need 625:13,18
  681:5 689:2
  690:15,15,19,20
  691:7 692:1 693:7
  710:12 736:13
  748:11 752:17
  790:17 821:21
  844:16 845:3
needed 624:8 627:4
needs 691:18
  748:12
negative 696:22
  760:7 761:19
negotiations 708:13
neither 815:1
Nella 705:5,17
Nella's 705:14
Net 776:4
network 620:16
  638:6 673:1
  677:11,17,20
  714:1
Nevada 737:11
never 646:5 648:5
  665:10 677:14
  683:2 685:14
  688:11 709:9
  719:20 722:2,18
  723:4 727:14,15
  743:14 756:15
  759:4,7,11,15,19
  759:20 760:1,3,7
  760:20 762:2,16
  762:20,21 766:3
  787:20 804:8
  807:19,22 822:7
  822:22 824:7,8
  827:2,5
new 690:12 791:5
news 638:6,7 673:1
  677:11,17 754:5
  755:2,3 757:3
newscasting 637:2
  637:4
nice 729:3,4

nicely 648:9 789:6
  789:9
night 655:10
nine 638:11 835:3
non-case 787:3
non-lawyers 711:15
nonstop 774:1
normal 782:18
Notary 616:5
note 674:21 844:3
notebook 764:1
  832:10
noted 794:8
notice 805:18 817:7
  826:1 840:22
  845:6
noticed 818:21
notices 817:8
notified 833:2
notwithstanding
  758:21
November 728:22
  729:11 763:15,17
  763:18 776:12
  777:17
number 624:18
  635:15,18 636:9
  636:19 637:12
  638:11 640:6,15
  646:13 649:9
  650:10 664:6,7,15
  664:20 674:9
  693:6 706:11
  736:17 763:20,22
  764:21,22 765:14
  765:14 768:20
  770:7 774:19
  779:9 784:13
  789:12 802:14,15
  813:5,10 824:18
numbered 771:19
NW 616:2

_____
         O
O 619:1 747:3,3,3
o'clock 743:7
  746:21
oath 620:7 679:3,11
  688:21
obey 644:16
object 657:8 658:11
  680:6 784:6 826:20
objected 675:5
objecting 681:3
objection 621:6
  625:22 628:4,13

639:22 640:9
  647:1,9 650:2
  651:1 656:20
  657:15 658:8
  659:6,8,11 660:13
  666:19 667:1
  668:14,16 670:8
  678:15 680:21
  689:1 695:11
  700:3,19 704:6
  709:10,18 710:11
  715:8,9,10 716:19
  717:7 724:20
  725:7 727:7 728:5
  728:12,17 737:22
  744:3 768:9
  774:18 776:17
  782:8,16 784:21
  785:1 811:13
  814:2,3,21 818:4
  832:4 834:4
  836:13 839:3
objections 709:15
  811:4 812:1
  841:16,18,22
  842:12,18
objects 681:2
obligated 688:22
obligation 690:5
obligations 735:9
observations
  836:16
observe 619:4
obviously 646:5
  691:4 723:3
  748:11 758:22
occasions 716:10
occupation 795:15
occurred 666:13
OCR 644:18 646:15
OCR-10-11 631:6
October 712:9
  764:12 765:4
  797:11,12
odd 799:2
offered 652:16
  664:13
office 617:4 629:4
  630:8 632:19
  633:4,8 640:5
  659:18 668:7
  679:21 680:2,15
  680:19 682:12
  683:1 697:4
  701:20 702:16
  703:16 730:18

738:14 800:22
801:11 802:22
805:11 806:13
807:16 808:4,11
809:8,22 817:13
820:17 825:8
837:10 843:5
**officer** 807:6
**offices** 807:4
**official** 824:20
828:12,13,20
829:10 830:5
**officials** 636:21
829:1,8
**Officio** 813:17
**oh** 622:10 682:20
810:15 822:22
**ok** 623:1,22 625:19
627:18 628:14
632:9 639:17
641:10,11 644:14
648:22 657:16
659:19 663:14
664:4 668:4
671:13 674:4,21
675:15 676:19
679:12,16 681:8
688:20 698:12
704:10 705:17
713:4 715:16
719:18 720:21
724:16 725:6,15
727:1,11 728:18
731:12 733:1
734:7,8 735:21
736:20 739:18
740:15 746:3,13
746:14 747:13
752:10,15 762:11
762:14 765:1
766:1,16 768:5,22
771:1 772:10,17
775:13,16 782:10
788:8,20 791:11
806:5 812:3
832:19 835:4
**okay** 656:5
**old** 674:6
**once** 812:20
**one's** 828:14
**ones** 748:6 803:13
**online** 777:10
800:11
**oops** 767:18
**open** 642:13 661:14
662:6,16 667:10

683:15 696:6
706:22 708:2
712:21
**opened** 661:18
699:19 729:13
730:22 786:6
**opening** 661:21
700:6 786:9
**operations** 803:1
817:13
**operative** 835:22
**opinion** 837:15
838:8 839:2
**opinions** 836:16
**opportunity** 631:7
634:5 635:10
646:14 651:10
682:5 719:9,10
802:20
**opposed** 639:2
**oppressed** 756:13
**optimistic** 668:12
669:3
**option** 802:19
**order** 657:12
**ordered** 744:21
**orders** 624:7
**ordinary** 820:19
**organ** 756:22
**organized** 769:7
**origin** 816:8
**original** 763:11
764:10,15
**originally** 747:17
794:6
**outside** 769:11
**overrule** 836:12
**overruled** 660:14
667:2 668:17
695:13,19 700:22
717:4 724:21,21
725:3,5,8 754:20
784:9 814:22
818:7
**owe** 665:11,17,21
**owned** 667:11

---

**P**

**P** 619:1
**P-o-u-r-g-o-l**
678:21
**p.m** 699:11 747:1,4
793:8 845:18
**package** 629:5
659:20 684:20
739:20

**page** 622:5 623:8
631:4 635:8
639:18 646:17
693:2 702:17
703:15,17 705:2
707:1,2 712:5
739:19 741:5
770:4 780:16
781:8 813:15
819:9 834:19,21
834:21 835:3
**pages** 631:21
639:18 647:13
651:11 652:6
657:8 751:2,17
758:4 812:10
827:12 834:15
**paid** 808:7,9,11,15
809:8,19
**paper** 837:22
**paragraph** 639:1
652:18 677:6
687:11 701:22
702:13 705:3
720:2 733:12
734:1 779:11,13
821:16
**paragraphs** 628:7
781:1
**paraphrase** 638:20
**part** 621:12 626:8
626:12,13 630:8
636:6 638:18
643:8 652:17
658:14 695:2
719:5 724:8,9
729:20 731:15
778:9,13,13
828:17 836:22
844:19,20
**participate** 798:20
**participated** 800:12
**particular** 634:21
635:1,2,3,15
663:9 698:17
758:9 760:17
790:1 797:21
825:18 830:18
**particularly** 727:5
801:7
**parties** 616:7
708:22 709:3
747:8 779:14
792:14 803:16
**partner** 797:16
**parts** 844:16

**party** 741:14
777:20 793:21
**passed** 664:5 794:2
**Paul** 649:16
**pause** 659:21
673:21 686:2
750:11 763:6
767:19 791:13
792:6
**pay** 664:14 710:7
710:22
**payday** 664:4
**paying** 723:15
**peculiar** 838:6
**pending** 663:11
793:3 835:11
**Pennsylvania** 649:4
**people** 633:15
636:3 640:6 679:7
694:2 706:1,2,4
706:19 711:20
744:22 745:12
752:18,20 753:2
753:10 754:2
755:3,18 756:6,13
773:22 784:2
786:22 787:11
807:2,15
**percentage** 677:13
**perfect** 790:8
**perfectly** 641:10
648:8 763:5
782:18 828:7
**performing** 756:10
**peril** 706:12
**period** 669:15
732:6 734:22
746:1 766:10
767:5 786:1
**periods** 687:15
**perk** 742:10
**Permanente** 673:8
**permit** 838:13
**permitted** 709:20
814:20
**Persia** 638:6 673:1
677:11,17
**Persian** 620:15
637:8 687:18
736:3 751:19
752:18 753:2,12
789:5
**Persians** 787:12,12
**person** 665:13
698:21,21 701:13
706:3 716:12

722:10 730:8
731:19 732:7
733:5 734:11,12
736:7,8 738:9
787:15,15,16,18
**personal** 788:20
**personally** 630:16
695:5 828:12,21
829:1 830:5
**persons** 665:18
706:5
**persuaded** 775:17
**pertaining** 833:16
**peruses** 631:12
833:22
**petitioner** 659:18
750:20
**petitioner's** 659:14
661:2 664:19
668:6
**Phoenix** 684:7
**phon** 797:9,15
**phone** 624:18
625:18 673:10
696:11
**photograph** 776:20
**physical** 635:19
638:8 789:20
820:10 821:14
**physically** 786:17
821:3
**picked** 705:11
**picture** 634:22
721:11 776:13,14
776:14
**piece** 690:10 691:9
**pitfalls** 678:4
**place** 641:18 680:17
705:13,18 754:18
831:18
**placed** 637:21
638:7
**plaintiff** 802:7
805:5,6
**plaintiff's** 636:22
**plaintiffs** 822:8
**plane** 708:8
**Planet** 843:19
**planned** 778:22
**play** 699:22 700:2
744:22 754:17
755:8,18 788:11
**plays** 755:17
**plea** 737:14
**pleading** 621:10
692:9

**pleadings** 802:15
  803:22 825:5
  827:9 831:5
**please** 623:8 626:10
  627:5 635:8
  639:21 655:8
  656:16 664:5
  665:7 670:15
  673:19 680:12
  684:9 685:1
  733:14 734:14
  754:22 757:10
  762:3,4,7,18
  780:1 783:11
  785:7 789:2,7
  793:13 795:12
  815:10
**pled** 737:9
**plod** 674:7
**PNN** 687:18
**point** 631:19 638:12
  643:18 656:8
  662:11 670:6
  671:11 672:4,18
  683:12 691:12
  700:7 716:20
  727:18 752:17
  764:7 767:22
  772:22 786:17
  787:4 803:19
  836:3 841:11
  842:2 844:13
**points** 841:13,21
**police** 825:14
**political** 827:10
**polygraph** 708:10
**poorly** 666:11
  683:8
**portions** 666:8
  811:5,7,14
**position** 637:15
  721:17 839:21
**positions** 692:18
**positive** 756:22
**possible** 721:9
  827:21 844:18
**possibly** 804:11
  829:13
**poster** 776:20
**posts** 799:19
**potential** 721:18
**potentially** 815:3
**Pourgol** 678:20
**practice** 797:13,22
  798:2,2 799:11
  800:14

**practicing** 796:19
  814:7
**practitioner** 797:19
  797:19
**Pratt** 805:1
**pray** 624:10 706:13
  717:21
**prayed** 717:17
**praying** 717:14,20
**precise** 785:8
**preclude** 826:10
**prefer** 695:21 778:2
**prefers** 657:20
**prejudged** 837:20
**prejudgment**
  837:22
**prejudice** 801:17
**prejudiced** 724:17
**preliminary** 619:7
  619:10 794:1
**preparation** 803:14
  813:20
**prepared** 649:15,20
  665:6 698:16
  827:9
**present** 616:6 617:9
  694:9 722:6 723:5
  778:2 798:11
**presents** 689:20
**preserved** 691:12
  842:19
**preserves** 691:17
**preserving** 675:12
**president** 733:15
  800:3
**Press** 716:9 777:17
  800:6
**pressure** 820:5
**prestigious** 720:5
**presumes** 774:19
**pretty** 684:2 805:3
  815:7
**prevented** 700:6
**prevents** 711:9
**preview** 692:18
**previous** 656:9
  761:13
**previously** 653:1
  654:15 675:4
  685:9 705:22
  745:22 776:3
  842:18
**primarily** 797:22
**primary** 798:2
**principals** 753:3
**prior** 773:7 779:17

812:15
**privacy** 691:17
**private** 736:8,18
  737:4,6 789:2
  798:1 822:14
**pro** 798:8 810:20
**probably** 693:18
  705:20,21 760:13
  766:5,8 772:8
  773:4 775:21
  791:19 836:17
**probe** 644:17
**problem** 689:21
  795:2
**procedure** 709:21
  805:15
**proceed** 666:18
  792:12 830:13
**proceeding** 643:9
  657:21 692:6,7,8
  692:13 814:10
  833:2 835:11,22
  842:19
**proceedings** 665:7
  667:16 692:11
  749:10 806:20
  807:15 814:9
**process** 641:22
  690:21 693:16
  708:10 805:15
  822:21 826:18
**processed** 765:9
**produce** 748:10
**produced** 691:19
**producer** 745:19
**product** 836:7
**professional** 615:2
  616:1 759:14
  801:9
**professionalism**
  845:16
**professionally**
  630:15
**Professor** 838:16
**proffer** 623:3 837:3
**profound** 729:21
**program** 637:22
  810:9
**programs** 723:21
  724:1 798:21
  799:1
**progress** 763:8
**prominent** 716:7
**promote** 757:1
**promoting** 714:11
**pronoun** 765:14

**propaganda** 756:21
**proper** 816:13,14
  816:17 817:15
**properly** 769:7
**propose** 747:15,16
  841:19
**prosecute** 818:3
**protect** 735:8
**protection** 690:21
  797:6 810:6
**proud** 754:7,8
**prove** 679:20 787:1
  787:22 843:11
**proves** 640:16
**provide** 653:10
  749:2 754:5 757:3
**provided** 721:16
  748:6 794:10
**providing** 755:2,3
**psychological**
  716:17
**psychologically**
  786:18 787:5
**psychologist** 730:3
**public** 616:5,14
  714:8
**publications** 800:4
**publicity** 755:14
  758:12 759:2,5,12
  759:17,20,22
  760:4 761:3,3,6
  761:11 762:4,5,17
  762:19 770:1,2
  772:20 773:11,12
  773:16 774:13,16
  775:14,18 776:5
  778:22
**publicizing** 755:7
**publicly** 636:21
  756:17
**publish** 637:1
**published** 800:8,16
  800:20
**pulled** 660:11 739:8
**purchase** 783:5
**purchasing** 782:2
**purported** 675:2
  720:12
**purporting** 666:17
**purports** 623:6,14
  651:15 741:2
**purpose** 741:17
  757:2 836:10
**purposes** 632:8
**purps** 741:13 742:9
**pursuant** 841:4

**pursue** 704:13,16
  710:9 711:2
  715:12 781:17
**pursued** 640:13
**pursuing** 817:20
**put** 625:6,16,19
  641:9,16 665:9
  675:18 742:1
  777:15 794:21,22
  820:5 823:20
**puts** 714:10
**putting** 633:2
**puzzle** 799:15

---

**Q**

**qualification**
  839:14
**qualified** 801:5
  838:11
**question** 627:6,9,17
  628:12 638:15
  639:5,11 640:3,3
  640:18 648:16,17
  650:2,12 653:16
  663:10,13 667:8
  668:1,3,19 670:21
  671:8 672:6,9,16
  678:3 679:9 680:6
  680:9,11,13 681:3
  681:5 684:15
  692:21 695:20
  697:17 698:6,10
  699:4 702:1
  703:19,20,22
  710:3 716:20
  717:10,12 718:21
  719:14 720:14
  727:2,10 734:8
  736:13 738:3
  751:8 754:21
  757:9 759:9
  760:10,17,20
  761:10,21 762:8
  762:16 773:17
  778:6 781:5
  782:22 784:19
  785:4,4,5,6,8,10
  785:16 788:20
  806:2 807:8
  808:17,19 809:18
  815:8,9,11 818:14
  821:12 823:19
  827:18 828:17
  829:6 839:7,8
  840:7
**questioning** 647:21

782:15
**questions** 623:5
635:11 639:17
652:7 657:22
659:4 672:10,15
674:1 680:7
710:15 769:1
782:5 790:11
807:10 818:11
823:3 824:10
832:17 833:11
838:13 839:16
840:20
**quick** 649:14
**quickly** 764:18
**quit** 624:11
**quite** 833:19 834:15
**quote** 641:6 704:18
751:21
**quotes** 665:10

―――――――
**R**
**r** 619:1 622:16
747:3 839:22
**R-a-z-z** 736:1
**race** 816:8
**Radio** 804:18,22
**raise** 758:18 793:12
811:6,12 812:1
**raised** 692:12
836:19
**rape** 774:4
**raped** 774:5,6
**rare** 829:20 830:8
837:5
**rate** 808:14
**ratifying** 825:21
**Razavi** 735:10,14
735:19 736:4
737:4,8,14,20
738:16,22 739:7
**Razz** 735:10,22
**Razzazi** 722:11
723:9 730:9,12
735:10,18
**reach** 721:19
**read** 623:18,19
629:16 630:11,18
630:22 631:13,15
633:12,15,18,20
634:5,6,9 635:12
635:16 639:1,17
639:18,20,21
644:7,10,12 645:8
646:5,8 652:4
660:20 662:9

663:22 665:2,8
666:7 668:21
670:22 671:22
677:7 680:1 681:8
682:6,15 684:1
687:12 700:10
707:11,13,22
708:4 710:19
712:14,16,17
713:2,9,12,14,20
720:1 726:4
729:12 730:7
731:2,17 732:5
733:3 734:20
735:13 736:5
738:20 739:1
757:10 812:19
815:9 818:15,18
825:4
**reading** 638:13,22
639:3 652:2 705:3
741:8
**reads** 629:17
632:12 635:13,17
651:12 682:8
742:7 752:9
**ready** 768:4
**Reagan** 756:3
**real** 753:2
**reality** 643:7 827:2
**realization** 665:12
**realize** 664:4
721:18
**realized** 781:19
814:4
**really** 633:22
650:16 667:21
700:15,19 704:6
719:8 727:6 748:1
763:7 785:2
786:16 790:3
829:6 835:13
**reason** 627:4 641:9
641:11 661:8,11
661:22 704:4
725:16 731:22
754:9
**reasonable** 638:3
819:14,22 820:3
821:16 822:2
**reasons** 640:15
697:21 756:1
799:14 836:13
**rebuttal** 791:2,8
**recall** 695:12
772:19 773:1

775:10 777:12
778:20 779:3
782:3 783:3
801:15,16 806:16
806:21 827:13
830:9 833:5
**receipt** 778:4
**receive** 796:2 835:7
**received** 631:15
634:17 672:12
677:5 678:17
693:3 697:12
707:11,19 735:11
765:7,21,21 772:9
837:9
**receiving** 632:16
660:10 668:9
669:11 677:2
681:22 686:15
694:18 697:11
699:14,16 702:2,5
702:7,10 707:8
730:5 772:7
786:10,12,13
**receptive** 637:5
**recess** 694:3,7
747:2 769:13
792:4 793:3,5
845:11,19
**recitation** 791:4
**recognize** 642:8
**recollection** 630:21
632:11 695:15
721:7 723:8
779:19
**recommending**
824:8
**reconvene** 689:21
**record** 619:3
621:12,20 623:10
631:18 638:22
639:7 641:9,12
647:19 648:19
651:14 654:21
655:19 681:12,15
690:13 694:9
724:22 730:13
738:4 747:7 771:2
771:21 778:9,13
778:14 780:20,21
784:14,17 789:13
792:7 793:8 794:2
795:13 813:7
822:5 842:1,15
**recounting** 784:7
**recoup** 709:8

**recross** 790:12
**redirect** 769:3,17
791:9
**refer** 742:8 844:17
**reference** 698:7,14
764:7 784:12
813:4
**references** 780:22
**referred** 631:18
688:1 705:22
779:12 786:10
**referring** 628:19
671:16 687:4
698:2,10 703:15
706:2,2 740:2
764:9 770:15
781:12 835:5
**refers** 697:14
**reflected** 660:7
**reflection** 647:22
**refrain** 684:9
**refresh** 630:21
632:11 723:8,13
779:19
**refreshes** 721:7
**refused** 636:11
**refute** 688:11
**regard** 632:20
678:5 693:4,6
698:15 702:15
706:9 710:16
738:22 790:15
**regarding** 637:2
689:7 743:1 780:8
780:8 786:15,16
789:8
**Regardless** 809:7
**regards** 737:7
**regime** 756:12
**regrettable** 646:1
**regulations** 817:14
**Rehabilitation**
816:11
**reimbursed** 710:10
711:3
**rejected** 636:2,2
644:19
**rejecting** 680:16
**rejects** 643:19
**relate** 667:15 688:3
690:16 803:22
836:17
**related** 667:17
708:6 787:3
802:11 803:21
815:5

**relates** 815:3
836:18
**relationship** 704:13
704:16 706:10
787:17,21
**relationships**
787:15 788:21
**relegated** 637:16
**relevance** 640:12
715:17
**relevancy** 811:16
**relevant** 642:5
689:12 728:3
748:10,11 826:21
**relied** 641:12
**religion** 724:11
816:8
**remain** 620:7
**remedies** 805:17
817:6 826:20
**remember** 630:13
632:14,16,17
633:11,17,19,19
633:21 634:7,17
634:18,21,22
635:4 654:19
660:10,17 661:3,5
661:6 662:18
665:14 668:9
669:11 676:7
677:2,4 679:22
681:22 683:13
686:15 688:5,8
694:4,18,20
696:14,17,17,19
696:22 697:11,12
698:18 699:14,16
702:1,5,7,10
705:20 706:16
707:7,9 720:20
721:1,5,10,10,11
721:13 722:12,14
729:10 730:5
735:3,4 751:11,22
758:9 761:12,12
772:7,9 802:7
804:15 805:4,7
806:10,12,17
819:5
**remembered** 697:2
**remind** 620:6
802:10
**reminding** 645:13
**removed** 637:15
638:6
**render** 836:22

rendered 837:15
rent 708:7
rented 629:22
repeat 668:18
  680:12
repeated 636:12
  789:8
repetitive 642:4
  646:11
rephrase 626:2
  698:11 710:4
  774:21 785:7
replace 794:12
replaced 636:16
reply 781:14 782:7
replying 781:12
repoed 783:13
report 622:20
  702:16 737:4
  837:1
Reported 615:21
reporter 616:5
  668:20,22 669:2
  671:1 672:1
  710:20,21 757:11
reporting 777:7
represent 688:14
  827:20
representation
  660:6 772:22
  814:14 828:11
represented 688:15
  779:14 798:15
representing
  653:18 655:5
  667:22 776:15
  826:12
reputation 839:12
request 638:3
  648:14 692:19,20
  748:15 761:1
  778:12,15
requested 624:3
required 826:19
reschedule 627:4
research 803:16
  830:21 831:1
resolve 649:21
  653:20 701:6
  784:1 830:4
  836:20 845:3
resolved 746:6
  784:5
respect 644:14,16
  665:12 672:14
  684:14 696:17

725:4 773:10
779:1 781:22
785:3 786:21
799:8
respectfully 748:16
respective 616:7
respond 669:22
  671:5,20 673:14
  684:8 692:4
  727:19 731:19
  774:12 786:7
  807:10,12 844:8
responded 685:4,6
  688:11 727:14
  784:18
respondent 615:6
  617:2,11 619:5,11
  620:2 675:4
  747:11,13 748:22
  750:5 792:18
  794:3 801:14
  804:5 807:21
  808:2 823:11
Respondent's
  621:22 622:8,10
  622:21 628:19
  631:9 650:22
  657:16 686:6,8
  763:10,19 764:21
  770:12 771:10
  832:8 833:12,14
  839:4 842:17
responding 727:17
response 648:21
  682:3
responsibility 615:2
  616:2 801:9 823:6
responsive 828:13
rest 690:21 729:1
restate 627:5
rests 842:22
result 645:8 709:2
  761:6
resulted 637:14
results 702:14
resume 619:15
  747:16 792:11
resumed 747:5
resumes 619:16
  749:22
retained 812:21
  833:1,5 835:15,16
  837:12
retaining 779:21
  835:8
retaliated 729:7

745:2
retaliation 632:21
  680:17 816:2
  821:15 825:16
return 677:16
  746:20
revealed 737:8
review 635:10
  646:14 697:2
  752:8
reviewed 827:6
reviewing 702:15
revisited 699:20
Richard 797:3
right 622:3 628:12
  638:9 658:16
  659:1,15 679:7
  684:22 685:7,10
  691:2 692:4
  709:17 716:14,18
  721:3,4 726:3
  727:20 744:13
  746:12 753:1
  777:21 789:3,6
  793:13,22 811:6
  811:12,19 816:13
  817:7 819:1,4
  820:2 827:8
  828:22 831:17,19
  842:10 843:10
rights 629:5 630:8
  632:20 633:4,9
  640:6 654:4
  675:12 680:2,16
  680:19 702:16
  703:16 735:8
  806:13 807:6,16
  816:3 830:7
Rights' 679:21
ring 706:3
risk 794:19
Rodham 813:16,22
  817:18 836:6
Rohrbacher's
  682:12 683:1
role 689:2 754:17
  755:8,17,18
  756:11,14,20
romantic 637:6
  702:21 703:14
  704:13,16,18
Ronald 838:16
Rotunda 838:17
roughly 808:12
routinely 817:8
routing 664:6

RS18 768:15
RSS 623:1
RSS1 623:13
RSX 622:22
ruined 624:15
  627:22 643:12
  646:7 691:4
rule 690:2 844:19
  844:20
ruled 633:9 676:3
  830:13 844:17
rules 692:13 709:20
rulings 644:15,16
rumors 637:1,4,14
  678:5
run 687:19
running 840:12
runs 714:14 720:5
  659:10
RX 622:17,18
RX-1 622:15
RX24 651:2

———————

**S**

S 619:1 747:3,3,3
s-y-n-t-a-x 687:1
sad 790:2
sake 647:13
salaries 664:14
salary 620:18
Sam 633:16 655:15
  722:11 723:9
  730:9,12 735:10
  735:10,15,17,19
  735:22 736:2
  737:20 738:22
  743:4
sat 650:18 824:17
Sataki 618:3 619:15
  619:16 620:4,12
  621:13 623:15,17
  624:17,19 629:11
  629:13 630:4
  631:5 632:11
  646:2 651:8 655:9
  658:6,7 675:16
  688:21 690:8
  694:14 696:16
  699:21 733:14
  734:14 735:8
  740:16 745:5,21
  749:22 750:8,14
  750:22 753:10
  763:1 764:5
  769:20 772:5
  789:16 791:14

813:8 814:11
816:15,20 817:20
821:3 825:2 831:4
Sataki's 734:13
  815:13
Sataki@Hotmail....
  712:7
save 660:21
saw 661:9 705:17
  734:7 738:18
  776:10 777:4,7
saying 634:1 665:14
  678:4 683:5 690:3
  703:18 706:16
  709:6,9,11 710:6
  710:21 711:5,8
  713:21 734:10,17
  753:9,14 754:14
  754:15,16 758:16
  765:8 766:9 788:3
  807:14
says 625:18 630:4
  631:3 635:8
  682:11 685:5
  692:19 694:22
  705:3 726:14
  732:12,12,20
  752:21 779:14
  820:18
scared 720:9
  722:15
schedule 624:7
  626:10 627:13,16
  792:20
scheduled 749:9
scheduling 626:15
  689:22 747:9,11
  748:19 792:10
  841:5
school 796:11,13
  797:1
scope 791:3,9
  820:19 836:3
  838:3,11 839:14
searched 777:13
seated 793:20
second 671:21
  672:15 685:21
  693:2 705:2 720:2
  750:9 800:15
  810:20,21 814:13
Secondly 820:17
Secretary 813:17
  815:12 816:18
  823:21 824:15
section 799:12,18

799:20,21 818:22
**sector** 822:14
**see** 624:5 626:15,19
  627:2 628:1
  629:13 649:18
  653:20 660:3
  661:12 663:20
  664:11 665:9
  666:5,14 675:21
  678:22 682:7,13
  684:17 685:4
  687:2,17 695:7
  697:22 699:12
  703:1,18 704:20
  706:14 707:17
  708:14,19 709:4
  722:8 723:7 733:8
  733:20 740:4,5,7
  740:11 742:5
  743:7 751:3,9
  783:18 813:15,19
  819:10,12 820:4
  821:1 831:5
  832:19 834:14
  835:4 836:10
  837:15
**seed** 745:3
**seeing** 751:22
**seen** 713:18 817:11
  822:22 824:8
**sees** 794:11
**sell** 759:5,13
**Seminars** 800:6
**send** 625:19 667:5
  733:5
**sending** 665:5
  712:22 731:10
  733:4
**sense** 683:8 697:20
  827:11 841:12
**sent** 625:21 626:6
  643:10 647:21
  660:5,6 662:1
  665:8 666:16
  667:13 668:8
  669:9 673:1
  676:21 681:18
  682:11 683:22
  684:20 685:2
  686:12 687:5
  689:7 694:16
  697:9,15,19
  698:19,20 699:10
  707:6,16,21 712:6
  713:11 728:21
  730:20 731:7,14

731:18,22 732:1,3
734:2 735:7 737:2
738:16 739:13
740:3,5 741:8
742:22,22 743:2
772:6 776:12
786:3 789:15
790:9 825:8
835:17 837:16
838:7
**sentence** 627:20
665:16 692:17
697:16,18 700:11
705:4 734:21
**sentenced** 737:15
**separate** 829:14
**September** 707:7
707:16 739:13
740:3,6,9,13
741:9 789:14
797:4
**serious** 669:15
825:15
**serve** 684:11 828:21
834:11
**served** 836:10
**servers** 708:10
**service** 691:15
843:18
**serving** 811:20
**session** 632:6
693:18 748:7
**settle** 650:14 828:5
828:6
**settled** 619:2
**settlement** 708:12
758:15 760:4
827:17,21
**seven** 637:19 726:7
797:3 835:3 844:7
**sex** 816:8 829:16,18
**sexual** 632:21
634:16 635:19
636:2,11 638:8
773:19 774:2,3
779:15 821:4,13
822:9 825:7,15
**sexually** 637:20
**Shamble** 650:9
653:18 662:20,22
663:3,5 696:8,11
697:19 700:17
701:13 733:16
734:15 735:1,4
758:3,7,11 759:1
759:19 760:3,12

760:14,15 761:2,5
761:9,16 762:3,17
762:20,21 772:1
**Shamble's** 700:14
**share** 743:3,5,11
**shared** 743:10
**Shea** 780:9,11,12
781:16
**short** 623:19 638:19
664:1 682:16
684:2 708:5
729:17 746:21
840:22 843:4
845:6
**shorten** 833:8
**shortly** 765:11,22
**shot** 824:2
**show** 725:1,9
742:14 770:2
778:3 826:1
**showed** 757:22
**showing** 632:10
648:7
**shown** 776:3,20
**shows** 683:6
**shut** 786:19
**sic** 741:13,14 742:9
742:11 745:3
**sick** 633:13 634:3
634:19 655:3
**side** 746:15 798:18
828:6
**sides** 642:15
**signed** 646:15,16
**significance** 713:9
833:18
**simply** 643:11
833:9 837:21
**sincere** 701:15
**sir** 662:3 676:18
694:6 696:19
697:1 711:17
713:20 747:12
752:22 793:10
795:15 804:3,4
819:20
**situation** 654:1
701:6 780:15
783:7,8,10 784:5
829:7 833:7
**six** 637:12 639:2
746:17 835:2
**sixth** 781:1
**skilled** 779:16
**skipped** 647:3
**sleazy** 706:1,4

**sleep** 790:3
**small** 666:8
**Smith** 616:20 619:7
619:8 621:6,10,15
622:1 623:10,16
624:2 625:9,15,21
625:22 626:5,9,12
626:14,21 627:1,5
627:8,12,14,17
628:4 629:6,8
638:21 640:9
643:10 647:1,9,22
650:2 651:1
656:17,18,20
657:7,9 658:4
659:6,22 660:7,13
666:4,19 667:5,14
668:14,16 670:8
670:12,13,16
672:6,8 674:8,10
674:15,19 675:3
675:10 678:14,16
679:14 680:5,21
681:11,14 686:8
688:17 689:1
690:4 692:3,16
695:11,14 697:6
700:3,19 704:6,9
707:2 709:10,14
710:11 715:9
716:19 717:7
724:20 727:7
728:5 737:22
739:19 744:3
747:8,10 748:18
748:19,21 754:19
757:9 760:6 762:8
763:19 764:3,20
769:4,5,9,14,15
769:19 770:6,8,11
770:15,18 771:2,9
771:12,18,20,21
772:4,13,18
774:22 775:4
776:21 777:1
778:5,12,16,19
781:4,7 782:11,20
783:1,2 784:10
785:3,10,13,19,20
789:13,18 790:10
792:22 793:9
794:1,17 795:2,3
795:4,11 803:19
812:7,13 815:7,16
818:6,11 832:4,12
833:13,19,22

834:4 835:18
836:2 837:11
839:3,18 841:9
842:2,8,21 843:3
844:7,9,21 845:2
**Smith's** 749:18
**Smithsonian**
810:22
**snap** 826:13,13
**so-called** 721:20
722:20 723:2
**sole** 800:15
**solely** 791:9
**solo** 797:12,18,19
**somebody** 624:21
634:12 666:10
704:17 720:13
731:7 742:10
841:6
**someone's** 820:10
844:1
**sooner** 702:15
**sophisticated**
843:20
**sorry** 628:9,14
634:18 640:21
643:14 647:4,4
655:11 656:4
661:10 663:14,15
668:4 672:7
675:13 676:6
679:10,12,13
681:13 685:7
686:9 688:19
697:17 700:1
704:8 721:13
733:21 734:7
736:14 739:4,9
740:7 745:10,14
746:16 751:8
759:8 760:21
770:5,14 772:13
772:16 778:18
805:7 841:17
845:1
**Soviet** 756:5,6
**speak** 655:20
658:22 690:13
694:5 753:19
**speakers** 776:9
**speaking** 709:15
755:15
**speaks** 643:19
683:7 710:12
733:7
**specific** 737:17

778:21 779:4,5
790:16,19 804:12
811:14 812:2
**Specification**
770:18,20 771:12
814:5 835:18,21
837:10,16 838:7
**specifics** 644:20
**speculation** 713:5
818:5
**speculative** 823:8
**speed** 747:18 748:1
**spent** 645:2 677:18
**spiritual** 715:12
**spirituality** 715:5,7
**spoken** 747:10
**sponsored** 810:9
**Sporkin** 747:22,22
838:21 839:1,11
**spread** 636:22
637:4
**staff** 617:14 637:2,5
**stage** 806:8,8,9
**stand** 619:17
679:15 694:3
750:1 792:4 793:3
793:6 842:11
845:12
**standing** 717:19
**Stanley** 838:21
839:1
**Stanton** 697:16
698:3,16
**start** 748:13 749:9
773:14 774:1
777:22 800:13
**started** 636:16
653:17 654:6
661:16,19 698:10
773:3 784:2
797:12 798:11
809:16
**starting** 780:4
**starts** 631:6 734:6
**state** 666:6 670:5
671:10 672:3,13
729:17 737:10
741:22 743:8
789:20 790:8
795:12 813:17
815:13 816:12,16
816:16,19,21
817:8 823:22
824:16
**stated** 702:17 817:3
829:5

**statement** 703:3,5
785:21 829:6
**statements** 637:1
684:7
**states** 756:22
779:12 796:1
797:2 801:4 802:2
805:1 813:9
**stationed** 652:13,17
**status** 733:13
734:16 735:1
**statute** 816:5
829:16
**statutes** 816:2,9,12
817:2,4
**stay** 654:12
**staying** 705:12,13
783:14
**steering** 799:17,20
**Stein** 797:8 810:16
811:1
**step** 769:11
**stole** 706:3
**stop** 653:14 823:3
**stopped** 786:9
**stopping** 744:20
**Store** 651:7
**story** 690:12
**Straight** 636:17
637:16,21
**straps** 636:12
**strategies** 831:21
**strategy** 827:16
831:8
**Street** 616:2
**strike** 699:5 776:18
**stronger** 730:3
**struck** 627:10
648:17 699:6
715:20 736:10,12
736:19 738:4,7,11
743:18 763:13
**structured** 811:17
**student** 798:22
**studied** 812:15
**stuff** 683:5 690:1,7
690:20 697:3
701:2 786:16
812:19 833:13
**styled** 813:8
**subject** 623:17
628:6 702:3
729:16 737:3,8,13
740:1 761:9,15
767:11 829:13
841:15,18

**submission** 658:14
**submissions** 658:19
658:21,21
**submit** 665:7 690:3
767:6
**submitted** 794:6
842:18
**subpoena** 690:19
**subsequently**
637:21
**substantial** 725:13
**substantive** 632:20
**succeed** 831:21
**successful** 823:9,17
**successfully** 779:14
**sue** 722:7 784:3,8
803:17 816:10
820:15,16 823:1
**sued** 803:9 821:5
822:13,16
**sufficient** 641:2
**suggest** 631:21
638:21 683:11
837:18
**suggested** 691:11
809:20
**suggesting** 741:15
741:18
**suggestion** 767:16
**suggests** 772:5
**suing** 779:16
819:15
**suit** 821:13
**suits** 699:21 700:2
743:21
**Sujat** 617:3,4
619:12 643:6
747:18
**sum** 809:14
**summon** 753:3
**Sunday** 740:13
789:14
**super** 748:8
**superior** 820:14,16
821:6
**supervisor** 702:17
821:4
**supplement** 764:11
**supplemental** 622:8
622:11 659:14,17
661:3 663:17
664:19 666:2
668:6 669:8
676:20 681:11,14
683:18 686:10
694:15 697:6,7

699:9 701:21
707:4,15 712:5
729:15 730:19
737:2 738:15
779:8 785:22
789:12
**suppose** 749:3
824:4
**supreme** 839:21
**sure** 629:1 642:5,11
643:17 657:10,12
673:20 676:5
677:8 679:17
686:1 691:21
729:7 767:20
769:6 803:13
804:16 805:3
833:20 843:21
**survive** 634:20
**suspect** 808:8
**sustained** 628:8,13
639:22 680:22
681:3,4 700:4
713:3 715:10
725:8 728:13,17
744:4,14,17 832:5
840:16
**swear** 793:14
**sworn** 679:3 795:8
**SX38** 739:14,17
791:2
**SX5** 660:3
**syntax** 686:22
**system** 616:19
749:5 815:21
843:9

_____

**T**

**T** 747:3 772:1
**take** 625:9 629:14
631:7,10 635:10
644:2,3 646:14
649:14 650:12
651:10 654:5,13
656:21 658:1
674:22 682:5
687:21 690:18
693:11,20 703:17
705:11 713:8,18
727:19 731:2
736:16 743:3,6
746:11 752:7
777:14 789:11
790:2 792:15
804:7 812:18
825:15 826:2

699:9 701:21
827:1 834:17
841:13 843:22
**taken** 616:1 692:18
694:7 725:19
747:2 769:13
793:5
**talk** 626:15,19,21
627:1,12 636:17
637:16,21 655:9
655:12,17 663:3
676:14 722:18
728:10,15 731:1
734:12
**talked** 624:5 626:12
627:14,18 655:15
655:15,21 680:2
682:11,22 704:1
727:21 728:1,8
756:17 759:16
768:18 780:8
**talking** 639:8
653:14 666:15
676:2 681:21
720:7 726:3 727:8
731:6,9 743:12
749:11 765:16,17
822:18,19
**Taylor** 843:15
**Ted** 714:3,4,20
718:6 721:10
724:13
**Tehran** 687:20
**telephone** 676:3
706:11 736:17
**televises** 720:7
**Television** 620:15
714:15 746:7
**tell** 641:21 652:2
687:16 688:22
703:13 704:12
705:1 721:4
733:14 744:9
752:19 755:3
761:2,5,10 762:4
773:9 775:16
780:1 781:15
786:8 788:2
789:19 806:6
815:17 834:18,20
**telling** 630:4 704:2
782:16 784:2
785:11
**tells** 654:7 841:6
**ten** 806:18,22
807:17 826:6
844:8

**tenth** 835:3
**termination** 645:17
**terms** 763:8 805:11
  806:19 825:1
**testified** 620:13
  654:15,19 660:12
  667:9 685:9 687:6
  745:22 786:5
  795:9 801:8,13
  807:19 810:3
  811:11 828:9
**testify** 653:1 710:13
  711:14 782:18
  794:14 809:2,5
  827:3 836:9
**testifying** 801:10,20
  802:3,5 809:7
**testimony** 646:4
  647:18 648:2
  655:10,13 656:9,9
  670:15 680:4
  694:5 695:17
  758:21 769:22
  782:3,12 783:3
  784:11,20 785:15
  791:2,17 792:3
  793:15 808:21
  811:5,8,14 813:21
  814:10,19 818:6
  833:9 836:4
  843:14
**text** 786:14 788:14
**thank** 619:9 628:20
  629:15 645:22
  651:21 656:2
  657:6 658:12
  659:9 671:17
  674:20 681:16
  682:20 686:4
  693:22 694:12
  740:21 746:13,19
  750:12 753:17
  764:17 768:13
  769:15 781:4
  782:20 790:10
  791:21 795:4
  812:4 813:3
  823:10 839:16
  840:5,21 841:2
  843:1,10 845:14
**thanking** 834:11
**Thanks** 648:11
**Thanksgiving**
  729:2,4
**theme** 753:6
**theoretical** 726:11

**theories** 815:5
**theory** 643:21
**thereto** 692:14
**thing** 640:15 647:11
  650:14 687:13
  689:7 750:10
  828:22 831:8
**things** 625:13
  644:18 656:7
  669:1 701:5
  706:16 714:17
  717:8 723:5
  743:16 744:10
  755:9 767:14
  777:2 788:7,9,17
  795:1 814:17
  820:4 829:9
**think** 619:14 632:5
  651:16 657:7
  662:17 665:19
  667:18 676:4
  678:12 680:10
  689:11 694:10
  700:21 709:22
  710:14 713:1
  716:12 718:2
  747:15 754:2
  760:8,11 761:18
  764:16,20 766:8
  767:10 774:3
  778:6 781:2,21
  785:5,17 787:9
  788:18 792:11,15
  799:13 807:11
  810:19 818:13
  820:13 822:11,15
  826:1 828:2 841:4
**thinking** 790:4,8
**thinks** 690:8
**third** 622:5 629:8
  701:22 702:13
  708:22 709:2
  800:15
**Thomas** 797:17
**thought** 648:6
  655:7 698:9
  768:10 771:6,14
  771:15 773:12
  775:20 779:17
  815:7
**thoughts** 747:9
  748:17
**thousand** 677:18
  808:15 809:13
**threatened** 638:5
  729:22 730:8

731:8 732:2,6,13
  732:21 733:5
  734:12 736:7
  738:10 739:6
**threatening** 722:20
  730:11 732:3
**threats** 731:20
  732:10
**three** 619:4 635:15
  635:18 644:3,11
  690:11 749:17
  760:14 766:2,21
  798:15 802:13
  809:22 835:2
**three-** 767:5
**throw** 744:22
**Thursday** 666:4
**tickets** 708:8
**tied** 745:15
**tiers** 833:15
**Tigar** 616:15
  628:13 649:1,3
  656:2,5 657:3,6
  668:1 691:21
  759:8 771:17,19
  772:13,17 777:18
  782:10 794:19
  818:13,15,18,21
  819:4,7,11,13,21
  820:3 821:11
  822:18 823:2,10
  823:19 824:12
  839:17,20 840:5,9
**Tim** 650:9 653:18
  697:19 700:14,14
  733:16 734:15
  780:9,11,12
  781:16
**time** 619:12 624:3,3
  624:4,7,8 629:14
  631:10 632:13
  633:3,14 634:4,19
  635:1 640:1
  641:16 643:5
  645:2 650:3,12,17
  650:19 655:1,2,6
  655:22 660:21
  661:18 666:10
  667:21 669:12,13
  670:6 671:11
  672:4,18 676:5
  677:3,5,19 682:1
  683:15,16 686:16
  686:17 689:5
  691:12 694:19,21
  696:6,11,15 697:3

697:13 699:2,18
  699:20 700:7
  702:6,8,18 706:21
  706:22 708:3,12
  712:12,15 713:8
  715:13 716:6,11
  718:12 720:2
  723:14 726:22
  732:15 734:22
  738:22 740:7,8
  741:20 742:14,20
  743:15 745:21
  746:11 747:18,22
  748:9,11 749:8
  752:7 757:19
  763:8 767:3 769:2
  773:22 775:3,3,6
  778:17 780:3
  783:15 788:1,1,2
  789:5,9,21,22
  790:1 791:18
  793:19 812:18
  814:12 816:19
  820:7 834:17
  835:16 836:11
  837:12 841:10
**times** 663:2 690:12
  709:16 711:14
  774:15,17,19,22
  775:8,9,10 802:15
  817:11
**tiring** 791:17
**title** 816:5 817:10
  818:22 821:20
  822:17
**today** 623:20 634:8
  634:11 645:5
  691:3 729:22
  785:21 812:16
  813:21 830:22
  836:9 843:3,9,17
**told** 626:5 636:3
  641:6 650:20
  664:9 665:20
  669:17,18 673:3,6
  673:9 675:20
  677:14 678:1
  683:1,1 685:12,14
  702:20 703:8,11
  703:20,21 704:3,5
  704:21 714:12,17
  715:1,3 716:8
  717:18,18 721:20
  723:1 724:4,7
  727:15 744:13
  759:4,11,15,19,21

760:1 766:18
  771:6 773:10
  776:11,14 780:10
  783:16
**tomorrow** 664:8
  843:9 844:5
**top** 622:14 660:7
  686:18 705:3
  712:5 785:4
  824:17
**topics** 800:21 812:2
**tort** 821:7
**total** 803:5 808:20
  809:19
**totalled** 672:21
  673:5
**totally** 695:17 791:2
**touching** 821:14
**tough** 654:1,12
**towed** 783:12
**town** 704:10
**trace** 736:17
**track** 670:20
**Trade** 797:5 798:9
  810:7,11,14
**transcript** 639:7
**transition** 782:18
**transporting** 708:7
**travel** 708:8
**traveled** 721:22
**treated** 665:11
  825:2,3
**treatise** 838:18
**trial** 788:1 797:5
  801:22
**tried** 641:17 642:21
  665:10 716:16
  717:2,6 803:6
**TRO** 671:16 674:9
**true** 628:3 643:11
  644:19 664:13
  675:15 701:15
  714:19 715:1
  742:18 753:3
  755:12 757:4,11
  757:17 788:3
  831:20 845:8,9
**Trulock's** 840:14
**truth** 641:21 688:22
  704:2 752:20
  755:4 793:15,16
  793:16
**truthfully** 721:4
**truthfulness** 646:3
**try** 623:19 626:11
  677:11 679:20

701:5 718:6,10
757:7,14 758:13
758:14 759:5
760:4 761:6
762:13,14 807:12
827:16 831:14,18
837:22
**trying** 634:20
638:19 639:6
640:16 649:21
650:13 653:20
654:1 657:9,12
662:6 668:11
669:3 725:1,9
752:17 755:9
814:13
**turn** 622:5 623:8
628:16 629:3
631:4 635:7,14
646:13 648:13
649:7 650:7
659:13 660:2
661:2 663:17
664:19 666:2
668:6 669:8
673:17 676:19
681:10 683:18
685:20 686:6
687:10 694:14
697:4 699:8
701:20,21 705:2
707:1,14 712:4
728:20 729:14
735:5 737:1
738:14 739:12
750:16 751:2
788:5 832:7 834:2
**turned** 690:7
723:20
**turning** 730:18
763:10 765:3
**TV** 689:6
**Twenty-eight**
656:17
**Twenty-five** 656:11
**twice** 812:20
**two** 621:18 650:4
651:11 652:6
661:6 665:2
672:10,15 689:5
711:14 717:8
735:21 741:4
760:13 773:2
777:11 791:12
797:13 812:22
813:2 835:2

836:13,17 839:17
844:17
**types** 778:21
**typical** 828:15
**typographical**
794:8

---

**U**

**U.S** 800:7 820:17
**ultimately** 710:9
711:2 775:13,17
**unartfully** 778:5
**undercut** 683:7
**undergraduate**
796:2
**underlying** 815:4
818:3
**understand** 626:1
631:20 634:12,15
639:12 641:18
644:1 662:15
667:8,21 731:21
732:20 734:17,19
734:20 752:16
753:7,8 760:10
791:19 793:8
806:1 816:20
821:11
**understanding**
710:15,16 726:11
726:17,20,22
733:4
**understood** 668:15
731:17 758:12
**undertake** 837:14
**unethical** 838:9
**unfortunate** 634:3
780:14
**unfortunately**
632:16 635:3
790:7
**unimportant**
633:22
**union** 700:14 701:7
733:15 756:5,6
**United** 756:22
797:2 801:4 802:1
805:1 813:9
**University** 796:6
**unnecessary** 722:3
**unopened** 661:14
661:18
**unquote** 641:7
**unreasonable**
821:12 822:2,4
**untrue** 742:17

**unwanted** 821:14
**unwarranted**
635:19
**updated** 800:8,10
**UPS** 649:4 651:7
**upset** 676:11
741:20 788:12
790:5
**upstairs** 783:15
**Urgent** 702:4
**urging** 678:9
**use** 624:4 639:8
742:5 758:12
759:1,12,20,22
760:4 761:2,5,11
762:3,5,17,19
827:16,19 830:2
831:21 844:5
**usual** 694:1

---

**V**

**vacation** 624:4,7
**vague** 625:22
765:13 785:8
**Valentine's** 703:2
704:14,20
**valley** 629:22
718:13 746:8
**valuable** 756:10
**Vanessa** 664:7
**variety** 800:20
**various** 641:13
675:1 691:22
828:19 833:15
**vary** 807:5
**Ventura** 705:19
**venue** 819:8
**verbal** 635:19
**version** 794:9,13
**viable** 830:15
**vicinity** 638:8 653:2
**vicious** 787:20
**victim** 699:22 700:2
**video** 777:3,10
843:22
**view** 648:1 683:6
**viewed** 719:9
**viewers** 637:3
**views** 755:8 773:11
836:15
**VII** 816:5 821:21
822:17
**violating** 830:6
**visit** 705:18
**vitae** 794:4
**VOA** 640:7 664:15

687:16,19 695:2
708:18 719:11
741:16 745:2,8,11
754:6,13 776:16
805:11 806:22
816:22 827:4
**voice** 630:6 652:17
654:17 678:7
693:5 698:4 719:3
745:12,16 751:18
752:18,19 753:20
754:4 755:2,8
756:4,20 757:2,8
757:15 760:5
761:7 804:8,9,17
806:13,19 807:15
825:1 826:5
830:12
**voicemail** 673:14
**voir** 793:19,22
804:2,5 811:4
**voluntary** 800:18
**vote** 832:2
**vs** 658:5,6,7 813:8
839:22

---

**W**

**W-o-o-d-l-a-n-d**
721:21
**Wagner** 702:17,20
703:8,11,20,21
704:1,21 705:1
**wait** 640:11 647:2
653:1 671:13
782:14,14,14
823:15
**waiting** 675:4
**walked** 669:19
671:2
**want** 622:5,10,11
631:13,14 639:5
639:17,20 643:5
645:19 647:14,17
647:20 648:3
650:11 652:4,21
653:2 662:8
670:14,16 674:22
683:3 689:8
695:20,21 696:17
696:18 710:3
715:7,12 724:2,3
724:7,9,10 725:19
749:10 752:7
761:20 769:10
773:14 774:2
833:20 842:15

845:14
**wanted** 643:5
644:22 665:11
677:12,22 683:2
690:18 702:15
714:21 715:5
719:11 722:5
723:14,15 724:4
722:12,15,15
755:1 777:13
**wants** 639:5 690:3
694:10 748:22
777:21 792:8
841:14
**war** 751:4 758:1
**WARREN** 616:11
**Washington** 615:9
616:2 652:18
654:17
**Washoe** 737:11
**wasn't** 643:11
698:22 722:11
730:9 767:2
773:20
**waste** 640:1 836:11
**Watch** 658:6
840:13
**watched** 777:5,6
**watching** 689:6
**water** 628:22
**way** 617:5 642:21
647:10 648:1
684:13 691:7,17
709:20 711:11
717:12,19 725:20
742:1,2 748:9
754:1,10 756:22
761:2 776:11
782:15 785:3
811:16 817:20
818:2 827:10
828:14,21 829:5
**ways** 814:17 831:11
831:14 832:1
**we'll** 622:19 655:19
670:18 674:1
691:13 693:17,19
727:9,10 747:19
749:16 769:11
793:3
**we're** 619:2 639:7,8
642:9 644:7,9,12
659:14 675:12
680:10 684:2
689:22 692:1
693:15 727:8

749:11 763:7
764:3 791:22
792:2 793:2 836:6
**we've** 693:9 712:1
718:2 843:18
**website** 794:21
844:5
**week** 636:13 661:16
661:19 667:5,13
697:2 699:20
707:13 712:16
713:20 726:4
729:12 730:7,22
731:2 735:13
736:5 738:18,20
749:11 764:19
792:13 844:16
**weekdays** 792:13
**weeks** 661:6
**weighing** 643:16
**welcome** 749:3
**went** 625:20 642:19
643:9 655:5 691:2
700:15 701:8
702:18 703:17
705:18 716:12,14
739:6 745:22
762:2,16,21 784:5
797:18 798:10
801:22
**weren't** 636:4 655:4
676:15 704:2
711:20 727:15
728:3 732:10
**Westfall** 820:12,18
**Westlaw** 800:11
**whatnot** 692:13
**whichever** 743:21
**white** 764:1 832:9
**wholesome** 714:13
**wide** 721:19
**willing** 653:6
676:14,15
**Windjammer** 617:5
**wine** 729:5
**Winning** 800:6
**wire** 664:7,16
**wise** 778:4
**wish** 620:10 657:22
729:4,19
**wishes** 728:22
729:9
**withdraw** 720:16
727:10
**withholding** 688:17
**witness** 618:2

619:16,18 620:8
621:7 626:1 628:9
628:14 629:17
631:12 632:12,13
635:13,17 639:1
643:13 651:12
653:13,17 655:21
656:4 659:19
660:15 662:3
663:8,14 667:20
668:4,18 669:5
670:18,18 678:10
680:12 681:1
682:8 689:2,4,14
690:14 694:4,6,9
695:17 701:1
704:8 710:12
717:14 719:13
720:22 726:14,18
726:21 730:15
732:14,22 734:7
736:11,14 739:16
739:18 740:15,18
740:21 741:6
742:7 744:5
749:20,22 750:3
752:9 755:1
757:16 760:11
761:17 766:11
772:16 774:20
789:17 791:15,17
791:21 792:2
793:6,9,11,17
795:7 799:16
801:2,6 803:20
808:22 809:2
815:15 818:8,12
818:17,20 819:2,5
819:10,12,20
820:2,6 821:19
822:3,7,22 823:7
824:1 826:22
829:5 832:11,14
832:19 839:4
840:3 841:2,3
**witnesses** 679:7,19
680:3,18,20
741:12 811:10
839:5 843:13
844:18 845:4
**woah** 728:12,12
731:13,13,13
**woke** 790:3,5
**woman** 773:21
**won** 677:13 829:20
**Woodland** 721:21

722:16
**word** 726:6 734:6
742:5 789:5
827:22 829:22
830:2
**wording** 786:20
**words** 676:18 687:8
688:7 711:19
715:6 716:8
723:12 740:12,12
740:17 756:7,8
822:1
**work** 624:2 627:2
654:17 675:19
680:17 695:2
705:18 769:10
776:15 836:7
**worked** 626:16
701:9,10 737:7
744:10 797:6,10
809:4 810:22
**working** 653:22
654:2 663:6
677:10 708:12
722:1 744:20
746:7 755:22
825:8
**workplace** 632:21
637:5
**works** 693:13 694:2
815:21
**world** 751:20 753:5
754:2,10,13,15,16
776:4
**worry** 740:8
**worse** 769:12
**worth** 621:5
**wouldn't** 646:8
661:14 662:8,16
708:2 712:17
713:8 732:15
777:21 786:21
788:5 826:13
837:18
**write** 624:21 625:10
625:11 666:10
685:12,15 686:18
686:21 721:15
742:6 800:6
**writing** 625:4 669:6
688:5,8 711:15
720:3 733:3
800:12
**written** 623:6
666:11 684:10
698:3 763:12

800:4
**wrong** 690:4 771:6
771:8
**wrote** 623:5 625:5
625:14 686:18
687:5,11 688:12
697:16 708:16,21
727:5 734:19
740:17 741:20
742:21 751:12,18
772:11 781:13
838:18

----

**X**

**X** 615:3,7 618:1
**XXVIII** 819:1

----

**Y**

**yeah** 641:8 693:15
693:21 696:2
698:7 710:2 769:5
792:2 819:12
822:7 828:3
**year** 714:11 764:11
765:4 796:7,17
808:10,21
**years** 620:16
624:15 625:2
627:21 676:8
689:5,14 696:20
726:7,7 766:2,4
766:15,21 779:15
799:2,18 800:9
803:7 804:14
805:8 806:7,18,22
807:17 810:1
826:6 828:19
**yeses** 650:5
**yesterday** 620:12
628:17 655:12
768:18 781:21
**you,'** 702:21
**YouTube** 776:7
777:3,6,9

----

**Z**

**Z-i-g-l-a** 839:22
**zealous** 645:6
**zealousness** 645:14
815:1
**Ziglar** 839:22
**zones** 791:19

----

**0**

----

**1**

**1** 615:8 622:8,11
623:11,13 763:15
763:22 764:2,4,9
764:21 834:19
842:3,6
**1,000** 809:17
**1,614** 631:2
**1:00** 746:20
**1:10-CV-00534**
813:11
**10** 639:18 651:15
651:15,16 664:20
694:1 769:8
771:22 812:11
819:11 832:8,20
833:10,12,14,18
834:5,7,9 844:9
**10:55** 694:3
**10th** 707:7,16 771:3
773:6,7
**11** 639:18 812:11
**11/2/2010** 764:15
**11:10** 694:9
**11th** 740:3,6,13
741:9 789:14
**12** 639:18 694:1
768:19 812:11
**12:02** 747:1
**12:46** 699:11
**12:57** 747:4,7
**12th** 651:6,17,19
652:10
**13** 635:9,11 639:19
812:11
**14** 666:2 812:11
**14th** 730:20
**15** 790:17 812:11
**1525** 617:5
**15th** 739:13 740:9
780:18
**16** 668:7 735:12
768:1,8 812:11
**16th** 657:1,4 666:3
735:7
**17** 669:9 812:11
**17-BD-063** 615:5
**17th** 776:13 777:17
**18** 628:16,17,19
642:17 646:22
647:9,13 673:17
674:1
**180** 805:22
**18th** 835:4,17
**19** 631:10,21
646:22 648:13
649:1,9,10 676:20

768:6,10,16
**1964** 816:3
**1968** 796:8
**1970** 763:16
**1972** 795:19 796:18
796:20 797:7
816:6
**1973** 798:8,16
802:12 810:9
**1975** 797:7,8,10
**1976** 797:11,12
798:10,11
**1980** 797:14
**1981** 797:14
**1984** 797:18,20
800:5,8
**19th** 663:19 664:20
699:10,15 700:7
712:9
**1st** 751:21 784:14
786:2

**2**

**2** 834:19
**2:15** 792:5
**20** 646:14 647:7,8,9
647:15 681:10,11
681:14 768:12,16
**2000** 649:4
**2006** 737:15,16
**2010** 649:16 650:8
651:7 652:10
657:1,2,4 660:6
660:18 661:4,9,12
663:19 664:21
666:3 668:8
669:10 676:21
681:19 682:10
683:20 686:13
694:17 697:10
699:10,15 700:7
702:3,19 703:1
704:19 707:7,16
712:9 728:22
729:11,16 751:21
763:17 771:3,22
773:7 776:13
777:17 781:9
784:14 786:2
833:3
**2011** 629:7,10
630:3 631:16
632:15 730:20
735:7,12 737:3
738:17 739:13
740:9,13 741:9

765:4 784:16
786:4 789:14
**2016** 809:15,16
833:5 835:4,12,17
**2017** 808:10,21
809:4,5,9
**2018** 615:8 660:8
666:5
**2028** 845:19
**20th** 763:16
**21** 683:19
**21st** 649:16 786:3
**22** 842:3,7
**22nd** 650:7 657:2
702:3
**23** 686:7,8,10
750:16,19 758:4,5
764:10,13,22
765:3,15,16,17
771:17 779:9
**23-30** 751:17
**23-31** 751:17
**23-33** 751:3,17
**23-34** 751:3
**23-35** 751:3
**23-D** 770:4
**23-I** 771:18
**23rd** 629:7,10
630:3 631:16
632:15 668:8
669:10
**24** 649:7 650:22
666:4 784:13
785:22 786:1,11
**24th** 660:8 764:12
765:4
**25** 651:6 656:10,20
694:15,15 792:12
845:19
**25th** 728:22 729:16
845:13
**26** 681:19 682:10
697:5,6,7 738:17
**26th** 737:3 784:16
786:3
**27** 699:9 737:14
**28** 656:13,21,22
657:2,3,16,17
701:21 805:8
**29** 657:18,22 658:5
658:14 659:10
707:4
**29th** 676:21
**2nd** 694:16 737:10
747:17 748:15
749:7,11 763:17

**3**

**3** 623:8 646:17
780:16 781:8
834:20
**3:20** 793:8
**30** 657:22 658:9
707:15 842:4,7
**30,000** 708:13
**300** 803:5 804:15
830:10
**307-9510** 650:10
**30th** 683:19 781:9
**31** 712:5
**3131** 818:22
**31st** 686:13
**32** 728:21
**33** 729:15
**33019** 617:6
**34** 730:19
**345** 649:4
**35** 735:6 758:4
**36** 737:2
**37** 738:15 784:15
786:1,2,11
**38** 789:12 790:22
**3rd** 763:18

**4**

**4** 635:8 763:20
764:16 812:10
813:5 818:16,19
834:20
**4-2** 813:15
**4:14** 845:18
**40** 702:17 703:15
703:17 799:1
800:9 805:9 806:7
**405** 669:16
**430** 616:2
**45** 804:14
**475** 808:14

**5**

**5** 660:3 812:10
819:9
**5:00** 743:7
**5:28** 740:3,6,14
743:12 789:15
790:1
**50** 794:7,12
**51** 842:5,7
**5th** 697:10

**6**

**6** 812:10
**62,000** 620:20

**620** 618:3
**65,000** 620:19

**7**

**7** 661:3 812:10
**703** 650:9
**70s** 805:3
**75** 803:6
**75,000-a-year**
677:20
**769** 618:3
**795** 618:4

**8**

**8** 812:11
**80s** 805:4
**815-5221** 617:7
**823** 618:4
**8th** 660:6,18 737:16
749:9 835:12

**9**

**9** 639:18 663:18
812:11
**9:30** 616:3 845:13
845:19
**954** 617:7
**9th** 661:4,9,12
662:2



RECEIVED

July 12, 2018

Board on Professional
Responsibility

**Date:** June 25, 2018

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 870

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - - X

In the Matter of,              : Board Docket No.

LARRY E. KLAYMAN,              : 17-BD-063

            Respondent.    :  Vol IV

- - - - - - - - - - - - - - - - X

            Monday, June 25, 2018

            Washington, DC


        HEARING


Reported by

   Kim M. Brantley, C.S.R.

Page 871

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:30 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10     AD HOC HEARING COMMITTEE:
11     WARREN ANTHONY FITCH, ESQUIRE
12     Chair
13     MARY LARKIN
14     Public Member
15     MICHAEL TIGAR, ESQUIRE
16     Attorney Member
17
18     On behalf of the DC Attorney Disciplinary
19     System:
20        H. CLAY SMITH, III, ESQUIRE
21
22

Page 873

1           I N D E X
2  WITNESSES:       DIRECT:      CROSS:
3  Timothy Shamble    880, 944     936
4  Larry Klayman      947
5  Gloria Allred      1098
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 872

1  APPEARANCES CONTINUED:
2     On behalf of Respondent:
3        FREDERICK J. SUJAT, ESQUIRE
4        Law Office of Frederick J. Sujat
5        1525 Windjammer Way
6        Hollywood, Florida 33019
7        (954) 815-5221
8        Email: fsujat@yahoo.com
9  ALSO PRESENT:
10        LARRY E. KLAYMAN, ESQUIRE
11        Respondent
12
13
14
15
16
17
18
19
20
21
22

Page 874

1           P R O C E E D I N G S
2        CHAIRMAN FITCH:  Good morning.  We have
3  returned here on June 25 from standing in recess
4  since Friday afternoon, June 1st.  I note that all
5  counsel and parties are present and that all three
6  members of the hearing committee are present.
7        The court reporter remains under oath.
8        Mr. Smith, preliminary matters, if any?
9        MR. SMITH:  Nothing from Disciplinary
10  Counsel, thank you.
11        CHAIRMAN FITCH:  Mr. Sujat, Mr.
12  Klayman, preliminary matters, if any?
13        MR. KLAYMAN:  I have a few.  I filed a
14  supplemental exhibit list.
15        CHAIRMAN FITCH:  Get closer to one
16  microphone or the other, please.
17        MR. KLAYMAN:  I'm sorry.  I filed on
18  Friday a supplemental exhibit list regarding
19  communications to and from Ms. Gloria Allred, who
20  will testify at 4:00 p.m. today, via remote.
21  Arrangements have been made.
22        CHAIRMAN FITCH:  Yes.

2  (Pages 871 to 874)

Page 875

1    MR. KLAYMAN:  There was also some
2  other documents that I came upon over the weekend
3  which basically came out of the files of Mr. Smith
4  and Bar Disciplinary Counsel.  So there's no
5  surprise here, and it also contains, elsewhere in
6  our exhibits, but I made extra copies so we can
7  get to them quickly.
8    Ok, I'd like to give you copies of
9  these.  There are very view.  May I approach --
10    CHAIRMAN FITCH:  Whenever you wish.
11    MR. KLAYMAN:  Yes.
12    CHAIRMAN FITCH:  I see that you have
13  numbered them and we will take care of that matter
14  a bit later.
15    MR. KLAYMAN:  Yes.  I'd like to see if
16  we could move into evidence by agreement, as I
17  stipulated during the last hearing with Mr.
18  Smith, all the exhibits.  That will move things
19  that we have in our books along much more quickly.
20    CHAIRMAN FITCH:  Have we given any
21  thought to that, Mr. Smith, or should we take this
22  up a little bit later?

Page 876

1    MR. SMITH:  Yes, I'm inclined to not
2  object, but, yeah, let's take it up a little bit
3  later.
4    MR. KLAYMAN:  Ok.  The other thing is I
5  request, your Honor, because I have something that
6  I have to attend to, if we could take lunch
7  between 1:00 o'clock and 2:30, if I could have an
8  extra half hour or so, maybe, or 40 minutes?
9    CHAIRMAN FITCH:  We will do that, and I
10  assure you that my generosity in agreeing to that
11  has absolutely nothing to do with the fact that I
12  was going to suggest the same thing, for a matter
13  that I have.
14    MR. KLAYMAN:  Ok, good.  We all have
15  matters.
16    I think that that's all that I want to
17  raise at this time.
18    CHAIRMAN FITCH:  Ok.  As I recall, Mr.
19  Smith did indeed rest his case and I'm assuming
20  that we're prepared to begin the Respondent's
21  case.
22    Do you have a brief estimate of the

Page 877

1  order your case may take?
2    MR. KLAYMAN:  Yes.  Well, today we're
3  going to put on Mr. Shamble first, Tim Shamble,
4  and then I will testify.
5    CHAIRMAN FITCH:  Ok.
6    MR. KLAYMAN:  And if we can take a
7  short break for Ms. Allred, which will be very
8  brief testimony, and then we could, with of course
9  your permission, resume with me at 4:00.
10    She was available today, so we worked
11  her in on that.
12    CHAIRMAN FITCH:  Good.
13    MR. KLAYMAN:  She travels a lot.
14    CHAIRMAN FITCH:  I think it's likely
15  that we will recess at 4:20, 4:30, 4:45, whenever
16  Ms. Allred's testimony is completed.  Unless we
17  have to interrupt your testimony like two or three
18  minutes before some transition point or something.
19    MR. KLAYMAN:  Right.
20    CHAIRMAN FITCH:  But I'm inclined, if
21  it's not an inconvenience to you, to recess after
22  her testimony.  And again that's partially selfish

Page 878

1  on my part, because a matter that I have may take
2  a little longer than the lunch hour.
3    MR. KLAYMAN:  Well, I don't know how
4  everything is going to go this week, your Honor,
5  but I have a feeling we'll be done before Friday.
6  I think that will probably be the case.
7    CHAIRMAN FITCH:  And the other heads up
8  is that there's a possibility that we'll need to
9  be in recess for part of Wednesday.  And we don't
10  know yet exactly when that is.  So, notice of that
11  could come 6:00 a.m. Wednesday morning, or 8:00
12  a.m.  So keep an eye out on your email.
13    MR. KLAYMAN:  Is that with regard to
14  this matter or some other matter?
15    CHAIRMAN FITCH:  It's another matter
16  that one of us may have.  An effort will be made
17  to clarify that.
18    MR. KLAYMAN:  Ok.  So we're ready to
19  call Mr. Shamble.
20    CHAIRMAN FITCH:  I think that's fine.
21    (Tim Shamble on the witness stand.)
22    CHAIRMAN FITCH:  Good morning, sir.

3  (Pages 875 to 878)

In Re: Larry E. Klayman
June 25, 2018

Page 879

1    THE WITNESS: Morning.

2    CHAIRMAN FITCH: Remain standing for

3  just a second. What is your full name.

4    THE WITNESS: Timothy E. Shamble.

5    CHAIRMAN FITCH: Mr. Shamble, do you

6  swear or affirm that the testimony you are about

7  to give will be the truth, the whole truth and

8  nothing but the truth?

9    THE WITNESS: Yes.

10    CHAIRMAN FITCH: Please be seated.

11  Make yourself comfortable.

12    Mr. Klayman, you may proceed with your

13  direct examination.

14    MR. KLAYMAN: I'm just going to put

15  Respondent's Supplemental Exhibit 3 in front of

16  Mr. Shamble now, if I may. And we'll get to that,

17  so I don't have to interrupt the testimony.

18    CHAIRMAN FITCH: Mr. Shamble, there are

19  various compilations of exhibits and we'll guide

20  you through those to the extent necessary. One of

21  the compilations looks something like this, a

22  small one (indicating).

Page 880

1    THE WITNESS: Ok.

2    CHAIRMAN FITCH: And it has some RS EX

3  1 to 3, whatever, up in the right-hand corner, and

4  I think that, at least right now, Mr. Klayman

5  wants to look at RS Number 3, and then he'll

6  lead you all through those as he may wish.

7    MR. KLAYMAN: Yeah, that will come up

8  early in the testimony, the three.

9    Whereupon,

10    TIMOTHY SHAMBLE

11  called as a witness on behalf of Respondent, and,

12  after having been first duly sworn, was examined

13  and testified as follows:

14    DIRECT EXAMINATION ON BEHALF OF RESPONDENT:

15    BY MR. KLAYMAN:

16  Q.  Mr. Shamble, how are you today?

17  A.  I'm ok.

18  Q.  Would you please state your name.

19  A.  Timothy Shamble.

20  Q.  How old are you?

21  A.  I'm 61.

22  Q.  I'm 67 almost.

Page 881

1  A.  A little younger than you.

2    CHAIRMAN FITCH: Mr. Klayman keeps

3  rubbing in his age advantage on me.

4  BY MR. KLAYMAN:

5  Q.  Mr. Shamble, run us through your

6  educational background, briefly.

7  A.  I'm a college graduate. I graduated

8  from IAMA College in Michigan, with a BA in

9  history.

10  Q.  And your employment history?

11  A.  I work for -- well, I started out in

12  radio. I worked in Pennsylvania, moved to Ocean

13  City, Maryland, I worked in radio there. Then I

14  moved to the Washington, D.C. area, worked in

15  radio here. Then I started working for the

16  federal government, Office Keeper of Broadcasting

17  in 1991, and then moved over to the Voice of

18  America in 1996 and have been with the Voice of

19  America ever since.

20    Currently I'm the local union

21  president, AFG Local 1812, and I've been the local

22  president since 2000.

Page 882

1  Q.  Year 2000?

2  A.  Yes.

3  Q.  What are your duties and

4  responsibilities as local union president at Voice

5  of America?

6  A.  Represent employees' rights, defend the

7  contract, bargain for employee rights.

8  Q.  You're in fact their representative?

9  A.  Yes.

10  Q.  You have an office at Voice of America?

11  A.  Currently, yes.

12  Q.  Did there come a point in time when you

13  met, in the course of your duties and

14  responsibilities, Ms. Elham Sataki, who goes by

15  the name Ellie?

16  A.  Yes.

17  Q.  When was that?

18  A.  Several years ago, 2009 maybe. Yes,

19  she came into my office. She was in distress.

20  Q.  What did she tell you? What transpired

21  when she came into your office?

22  A.  She said she was -- she had been

4  (Pages 879 to 882)

In Re:  Larry E. Klayman
June 25, 2018

Page 883

1  sexually harassed and that management was not
2  listening to her.  They were treating her
3  unfairly.
4          She had been removed as a co-host and
5  then relegated to producing TV packages, which she
6  felt was a less important job, and then the person
7  she had accused of harassing her was still hosting
8  TV programs.  She felt that was unfair.
9      Q.  Was that person an individual named
10 Mehdi Falahati?
11     A.  Yeah, that was the co-host.
12     Q.  At the time this happened, was there
13 also a political division, based on your
14 knowledge, inside the Persia News Network at
15 VOA?
16     A.  Yeah, that service has always been
17 politically divergent.
18     Q.  What were the two factions?  Were there
19 two factions?
20     A.  There's at least two.
21         There's those that support the Shah,
22 and then there's those that seem to support -- I

Page 884

1  mean, there's accusation, they support the Mughals
2  in Iran.  There's probably even more factions.
3      Q.  What faction did you perceive Ms.
4  Sataki to be in?
5      A.  Who?
6      Q.  Ms. Sataki.  What faction did she seem
7  to be in?
8      A.  Oh, Elham.  She seemed to be with the
9  pro-Shah faction.
10     Q.  Give us your experience in trying to
11 negotiate with Voice of America and your
12 experience in terms of its reputation.
13     A.  They are very hard-edged.  We've won --
14 matter of fact, we've won several cases and they
15 still don't knowledge it.  If fact, we won a case
16 where they have been illegally hiring
17 non-citizens.  We won that arbitration.  They
18 appealed that up to the FRA.  They lost the FRA,
19 then they appealed it to the Court of Appeals, and
20 eventually had to withdraw their appeal, and they
21 still won't abide by that decision.  That's just
22 an example of the type of management they are.

Page 885

1          CHAIRMAN FITCH:  When you say they are
2  "hard-edged," is that in all the labor
3  negotiations that you're aware of, or just certain
4  categories?
5          THE WITNESS:  Yeah, we just got done
6  negotiating a new contract with them, and they
7  sought concession after concession relief.  We
8  went to impasse on that.  That took about eight
9  years to negotiate that contract.  They went to
10 impasse.  Finally the union -- we signed it.
11 They have refused to sign that contract.  It's
12 been through impasse.  It's been through agency
13 head review.  That proposal went to impasse.
14 That's been decided on, but they still refused to
15 sign that contract.
16 BY MR. KLAYMAN:
17     Q.  I turn your attention to the document
18 that I put in front of you, which is Respondent's
19 Supplemental Exhibit 3.
20     A.  Mm-hmm.
21     Q.  What is that, Mr. Shamble?
22     A.  This is an article by Joe Davidson in

Page 886

1  the Washington Post where he discusses the
2  Open-Ended (phon) Survey.  It used to be called
3  the Human Capital Survey.  It's now the Employee
4  Feedback Survey, same thing.
5      Q.  What was the date of that article?
6      A.  2009.
7      Q.  Around the time that you first met Ms.
8  Sataki.
9      A.  Right around that time, yeah.
10     Q.  Did you give this article to me at the
11 time?
12     A.  I don't recall, but I probably did.
13     Q.  Right.  And what does it reflect, based
14 on your experience?  What is that article talking
15 about?
16     A.  Well, winners and losers, according to
17 the survey results, and this shows the
18 Broadcasting Board of Governors is at the very
19 bottom.  Employees don't rank them very high.
20     Q.  So it ranks as one of the worst in
21 government?
22     A.  Consistently.  Ever since they have

5  (Pages 883 to 886)

In Re:  Larry E. Klayman
June 25, 2018

| | | | |
|---|---|---|---|
| Page 887 | | Page 889 | |

Page 887

1  been doing this they have been worst or next to
2  worst throughout the federal government.
3      Q.  Now after you met with Ms. Sataki that
4  you just described, what if anything happened?
5      A.  Well, we were in discussions with her
6  regarding which way she wanted to go with her
7  case, whether bringing a grievance or an EEO
8  complaint or exactly how we could address this.
9        We contacted Labor Relations, tried to
10  reach some kind of settlement there.  I discussed
11  with the head of human resource, Donna Grace,
12  whether there was a way to resolve this -- all her
13  complaint really was that she wasn't being treated
14  fairly.  So we sought, is there a way you could
15  include her as a host in that inquiry.   But they
16  just weren't willing to reach some kind of, you
17  know, fair settlement.
18      Q.  Is that consistent with your experience
19  in dealing with them?
20      A.  Oftentimes, yes.
21      Q.  Yes.  And was there a solution that she
22  wanted with regard to being in Los Angeles?

Page 888

1      A.  Yeah, eventually --
2      MR. SMITH:  Objection.  Leading.
3      CHAIRMAN FITCH:  Overruled.
4  BY MR. SMITH:
5      Q.  Did she see a solution?  Did she
6  propose a solution to you?
7      A.  One of the solutions that she had filed
8  was possibly working out of the Los Angeles
9  Bureau, bureau of broadcasting.
10      Q.  Did that have anything to do with the
11  person who harassed her?
12      A.  She -- well, letter complaint was that
13  she didn't want to be near this person, and the
14  agency, what the agency had offered is that they
15  would put her back in Persian service where she
16  would be in close contact with him, or they would
17  move her over to the English Central News room.
18  But that's right across the hall.  And she would
19  run into him.  So she did not want that as a
20  solution.
21      But she could do her work from Los
22  Angeles.  We can do remotes from there.  So that

Page 889

1  would have been the solution that the agency could
2  have done, if they wanted to.
3      Q.  Based on your experience dealing with
4  the Persia News Network and various offices, is
5  there a large Persian population in Los Angeles?
6      A.  Yes.  I think it's probably the largest
7  in the United States.
8      Q.  Was it your experience that in fact Ms.
9  Sataki had done some remotes from other offices?
10  Did she say anything about that?
11      A.  I don't recall her saying that.
12      Q.  Now did there come a point in time that
13  you met me?
14      A.  Yes.
15      Q.  Larry Klayman?
16      A.  Yes.
17      Q.  When was that?
18      A.  She had contacted me and said that she
19  had hired an attorney that she had met, and she
20  brought you in to discuss the case.  So I met you
21  in my office.
22      Q.  And we met with Ms. Sataki present?

Page 890

1      A.  Yes.
2      Q.  Did we have several meetings in that
3  regard with her?
4      A.  Yes.
5      Q.  During the course of those meetings,
6  did we decide on whether we would try to pursue
7  settlement or not first?
8      A.  Yes.  I mean, we always -- our policy
9  in the union is we would rather do settlement than
10  grievance or any other kind of option.  And that
11  was our objective was to somehow come to a
12  settlement.
13      Q.  Did Ms. Sataki agree to do settlement,
14  try settlement first?
15      A.  Yes, absolutely.  Yes.
16      Q.  Did we ultimately undertake to try to
17  settle the case?
18      A.  Yes.
19      Q.  What transpired in that regard?  What
20  did we do?
21      A.  Well, we met with -- with your
22  involvement we met with the Broadcasting Board of

6  (Pages 887 to 890)

App.0419

Page 891

1  Governors for one thing, and the general counsel.
2      Q.   What was the response of our attempts
3  to settle and their attitude?
4      A.   The agency was very negative.  They
5  just seemed to be determined and stubborn that
6  they weren't going to do anything in regard for
7  Elham.
8      Q.   Was that consistent with your previous
9  experience about them?
10      A.   Yeah, it's pretty typical of them.
11      Q.   What was their response in terms of our
12  settlement negotiations?  What did they offer?
13  Was it what you just said?
14      A.   What they offered was to have her go
15  back and work in the Persian service.  They
16  weren't going to give her an anchor position.  Or
17  she could go to the central newsroom, and she told
18  them that she didn't feel comfortable around this
19  person and she would be in close proximity with
20  him.  But they would not bump.
21      Q.   Did her decision not to go to -- she
22  decided not to go to the Central News Bureau.  Is

Page 892

1  that correct?
2      A.   Yes.
3      Q.   Did that hinge on her language in part,
4  based on what she told you?
5      A.   I don't think she was very comfortable
6  working strictly in English, and I think the major
7  part was that she didn't want to be in the
8  proximity of Falahati.
9      Q.   So she was adamant about going to Los
10  Angeles?
11      A.   Yeah, she wanted to -- she thought that
12  was a good solution to work out of Los Angeles.
13      Q.   Did there come a time when she had
14  discussions, you, me and her, about using
15  publicity to try to coax the agency into
16  settlement or a reasonable solution?
17      A.   Yes.
18      Q.   Was she present at the time?
19      A.   Yes.  It was in my office.
20      Q.   Why is publicity helpful based, on your
21  experience, in trying to get a solution with this
22  very difficult agency?

Page 893

1      A.   We've done it.  It's something that you
2  can use to pressure managers, if they're
3  intractable, you know, to try to get them to come
4  to some sort of agreement.  We have our own
5  website, so we use it, too.
6      Q.   Is it your experience, based upon being
7  in Washington, that publicity sometimes coaxes
8  people to do the right thing?
9      A.   Sometimes, yes.
10      Q.   And did there come a point in time when
11  you actually went with her and distributed
12  publicity?
13      A.   I remember one time.  The VOA was on
14  the mall here in Washington, some kind of
15  public -- it might have been a recruitment fair or
16  something.  But we had an article and both her and
17  I were distributing it to people in the vicinity,
18  tried to let people know and to let the agency
19  know that, you know, we were going to publicize
20  this.
21      Q.   I'm going to turn your attention to
22  Exhibit 23 of Bar Counsel's exhibits.

Page 894

1      MR. KLAYMAN:  And Mr. Sujat, please
2  turn to Page 23-33 for Mr. Shamble, 23-33.
3  BY MR. KLAYMAN:
4      Q.   Ok, great.  Is that the article that
5  you distributed in Ms. Sataki's presence?
6      A.   Yes, I believe it is.  Yes.
7      Q.   It's called: "Government War on a
8  Freedom Loving Beauty.  Exclusive, Larry Klayman
9  Goes to Bat for Harassed Broadcaster Fighting for
10  a Free Iran."
11      That's it?
12      A.   Yes.
13      Q.   And was she there when she gave it out
14  and she approved of that?
15      A.   Yes.  We were both on the mall handing
16  that out.
17      Q.   Now you saw other articles that I have
18  written on her behalf?
19      A.   I have seen other articles, yes.
20      Q.   And I provided them to you, correct?
21      A.   I've seen some, yeah, that you had
22  given me.

7 (Pages 891 to 894)

Page 895

1    Q.   Were they always very positive -- were
2  they positive or negative in how I described her?
3       CHAIRMAN FITCH:  That question is
4  struck.
5  BY MR. KLAYMAN:
6    Q.   How did you perceive those articles?
7    A.   They were always positive towards her.
8    Q.   I'm going to turn your attention to
9  Exhibit 5.
10      MR. KLAYMAN:  And Mr. Sujat, please
11 turn to the affidavits of Mr. Shamble.  Flip those
12 forward, me, in that exhibit.
13      While we're here, your Honor, I'm going
14 to move the article, Respondent's Exhibit 3, into
15 evidence.
16      MR. SMITH:  No objection.
17      CHAIRMAN FITCH:  Admitted.
18      MR. KLAYMAN:  To the extent that I can
19 do it as I'm going, I will, and then we can go
20 back.
21      MR. SUJAT:  Respondent's 5.
22      MR. KLAYMAN:  I want the affidavit of

Page 896

1  Timothy Shamble.
2       CHAIRMAN FITCH:  We're looking for
3  Respondent's 5.
4       MR. KLAYMAN:  No, excuse me, it's Bar
5  Counsel's Exhibit 23.
6       MR. SUJAT:  Bar Counsel, ok.
7       THE WITNESS:  That's the one I just
8  looked at.
9       CHAIRMAN FITCH:  I've gotten confused.
10      MR. KLAYMAN:  I'm sorry, I'm confused.
11 Yes, it's Exhibit 5.
12      CHAIRMAN FITCH:  We were just
13 discussing R.S., Respondent's Exhibit 23.  And
14 that was admitted.
15      And now we're looking at --
16      MR. KLAYMAN:  We're looking at
17 Respondent's Exhibit 5.  I'm sorry, it was my
18 fault.
19      Turn to the declarations of Mr.
20 Shamble.
21      THE WITNESS:  Which book is that?
22      MR. SUJAT:  This is Respondent's.

Page 897

1       MR. KLAYMAN:  Thank you.
2  BY MR. KLAYMAN:
3    Q.   Mr. Shamble, is this an affidavit, a
4  declaration that you signed on or about February
5  3rd, 2012?
6    A.   Yes.
7    Q.   Is that your signature?
8    A.   Yes.
9    Q.   And you dated it?
10   A.   Yes.
11   Q.   Ok.  Is that declaration true and
12 correct?
13   A.   Yes.
14   Q.   I turn your attention to the first
15 paragraph --
16      CHAIRMAN FITCH:  I'm still writing, I'm
17 behind.
18      KLAYMAN:  We apologize, your Honor.
19      CHAIRMAN FITCH:  No, no, it's not your
20 fault in any way.
21      Is it Respondent's Exhibit 5?
22      MR. KLAYMAN:  Five.  And in there

Page 898

1  that's part of my answer to the Specification of
2  Charges, Respondent's Exhibit 5.  It's in book
3  four.
4       MR. TIGAR:  It's the six numbered
5  paragraphs, correct?
6       MR. KLAYMAN:  Right, exactly, Mr.
7  Tigar.
8       CHAIRMAN FITCH:  Our book has gotten
9  out of order.
10      MR. KLAYMAN:  Your Honor, I can help
11 you.
12      CHAIRMAN FITCH:  Unless it's somewhere
13 within five --
14      MR. KLAYMAN:  Yes, it was within five.
15      CHAIRMAN FITCH:  How far along do I go?
16      MR. KLAYMAN:  Let's say about a quarter
17 of an inch of pages maybe; the Declaration of
18 Timothy Shamble.
19      CHAIRMAN FITCH:  Supplemental?
20      MR. KLAYMAN:  Well, there's one before.
21 They're two.  I'm talking about the first one.
22      CHAIRMAN FITCH:  That's dated February

8  (Pages 895 to 898)

Page 899

1   3, 2012?
2        MR. KLAYMAN:  Yeah, that's it.
3        CHAIRMAN FITCH:  Now let me go back and
4   clarify something else.
5        MR. KLAYMAN:  Ok.
6        CHAIRMAN FITCH:  The exhibit that we
7   were first looking at was a supplemental exhibit
8   of yours.
9        MR. KLAYMAN:  Correct.  Number three.
10       CHAIRMAN FITCH:  Ok.  That's R
11  supplemental.
12       So let me state clearly for the record
13  that Respondent's Supplemental Exhibit 3, a copy
14  of a Washington Post article, has been admitted
15  into evidence.
16  BY MR. KLAYMAN:
17       Q.   So returning to Respondent's Exhibit 5,
18  your declaration on February 3rd, 2012, is the
19  first paragraph accurate?
20       A.   Yes.
21       Q.   Second paragraph?
22       A.   Yes.

Page 900

1        Q.   The third paragraph?  I'm going to read
2   this.
3        MR. KLAYMAN:  I'm not going to read the
4   whole thing, your Honor.  This is an important
5   paragraph...
6        "I found Mr. Klayman to be very
7   diligent in attempting to zealously represent Ms.
8   Sataki, putting in many hours, and did not to my
9   knowledge compromise any of her rights.
10       "However, communication became very
11  difficult and nearly non-existent with Ms. Sataki,
12  perhaps due to her health condition.
13       "When Mr. Klayman and I would try to
14  contact her, we usually got no response, even for
15  months.  During these periods Mr. Klayman
16  attempted to protect Ms. Sataki's rights so that
17  they would not be forfeited.
18       "It is my opinion that Mr. Klayman
19  acted professionally and ethically in trying to
20  protect Ms. Sataki's rights, even when she would
21  not communicate with him."
22       Is that an accurate statement?

Page 901

1        A.   Yes.
2        Q.   That's your experience?
3        A.   Yes.
4        Q.   Paragraph four: "I have given Mr.
5   Klayman's name and contact information to at least
6   one other aggrieved VOA employee when they
7   requested the name of an aggressive attorney.  I
8   was impressed by his willingness to doggedly
9   defend Ms. Sataki under difficult circumstances.
10       "The Broadcast Board of Governors, of
11  which VOA is a subcomponent, has been ranked the
12  worst agency in government and it is very
13  difficult to negotiate any settlement with them
14  because of management's attitude and approach to
15  employees."
16       Is that accurate?
17       A.   Yes.
18       Q.   Is it fair to say based on that that
19  you felt highly of my professional abilities?
20       MR. SMITH:  Objection, leading.
21  BY MR. KLAYMAN:
22       Q.   Why did you recommend me to another

Page 902

1   employee?
2        A.   Another employee came to me, Ms. Vera
3   Wiley, who wanted an aggressive attorney for her
4   case, and I recommended that she contact you.
5        Q.   Were you aware that I was also
6   representing other people, broadcasters in the
7   Persia News Network?
8        A.   I was aware, yes.
9        Q.   Who were they?
10       A.   Manohir (phon) -- I don't know if I
11  pronounced it right, and Mr. Chalangi were two of
12  them.
13       Q.   Mahmonir Rahimi?
14       A.   That's it.
15       Q.   And how do you spell Mr. Chalangi's
16  name?
17       A.   And that's his last name.  It's
18  C-h-a-r-l-a-n-g-i, I believe.
19       Q.   Based on their knowledge, what was
20  their issue, generally speaking?  For Mr.
21  Chalangi?
22       A.   Chalangi.  I think they felt they

9  (Pages 899 to 902)

Page 903

1  weren't being treated fairly because of their
2  political views.
3      Q.   Were there a number of broadcasters at
4  Voice of America, Persia News Network who felt
5  that way?
6      A.   Still do.
7      Q.   Paragraph five: "It did not appear to
8  me that Mr. Klayman was representing Ms. Sataki to
9  promote his interests rather than Ms. Sataki's.
10 He appeared to me to be very dedicated to her
11 interests, and I was aware that public relations
12 avenues were used to try to prod VOA into a
13 settlement."
14      Is that an accurate statement?
15      A.   Yes.
16      CHAIRMAN FITCH:  What do you base that
17 view on?
18      THE WITNESS:  I've had several
19 employees that have hired attorneys, and they have
20 asked for the union to cooperate with them and to,
21 you know, help them with their cases.
22      But, in all honesty, I've never seen

Page 904

1  one go as far and as dedicated as Mr. Klayman was
2  towards Ms. Sataki.  I felt like he went above and
3  beyond.
4      MR. KLAYMAN:  I move this affidavit
5  into -- I move Exhibit 5 into evidence.  It's my
6  Answer and Affirmative Defenses.  I move the whole
7  exhibit in, to make it easier.
8      CHAIRMAN FITCH:  Alright, give me a
9  minute.
10      (Brief pause.)
11      CHAIRMAN FITCH:  Mr. Smith, I'm still
12 going through the first part of Respondent's
13 Exhibit 5.
14      MR. KLAYMAN:  Your Honor, this is -- if
15 I can help you, it's already in evidence with Mr.
16 Smith's exhibits.
17      CHAIRMAN FITCH:  Is that right.
18 Alright.  It will be admitted.
19      MR. KLAYMAN:  Yes.  It's just my Answer
20 to the Specification of Charges.  That's all it
21 is.  That's what I filed.
22      CHAIRMAN FITCH:  Well, and then toward

Page 905

1  the end there's some additional --
2      MR. KLAYMAN:  Yeah, I attached that and
3  incorporated it by reference.
4      CHAIRMAN FITCH:  Mr. Smith?
5      MR. SMITH:  I have no objection to the
6  admission of the exhibits.
7      CHAIRMAN FITCH:  Thank you.
8  BY MR. KLAYMAN:
9      Q.   I turn your attention to the
10 Supplemental Declaration of Tim Shamble, if you
11 can flip the page.  You identify yourself in the
12 first paragraph, and getting to -- excuse me, the
13 preamble, "My name is Tim Shamble.  I am the
14 president of the American Federation of Government
15 Employees, Local 112, and attest the following
16 information:  Number one, I sat in and was present
17 at at least one meeting with Larry Klayman and
18 Elham Sataki where using public relations such as
19 press articles and news stories to describe and
20 publicize the alleged sexual and workplace
21 harassment of Elham at VOA was discussed.
22      "Indeed, the idea was that public

Page 906

1  relations should help push the agency into a
2  settlement, a resolution of Elham's claims,
3  especially since VOA had been consistently ranked
4  one of the worst agencies in the federal
5  government according to the OPM."
6      Is that an accurate statement?
7      A.   Yes.
8      Q.   "Number two:  In this regard, attached
9  is an email between Larry Klayman and Elham and
10 two other broadcasters at VOA, who Larry Klayman
11 was also speaking to help, as they too, along with
12 others in the Persia News Network branch of VOA,
13 believed they were experiencing workplace
14 harassment of various sorts, about an interview of
15 the Los Angeles Times."
16      I turn your attention to an email which
17 is behind your affidavit.  Do you see that?
18      A.   Yes.
19      Q.   Do you recollect getting that email
20 from me on or about June 10th, 2010?
21      A.   Yes.
22      Q.   And that's an email that purports to be

10 (Pages 903 to 906)

In Re:  Larry E. Klayman
June 25, 2018

| | Page 907 |
|---|---|

1  sent to -- is dealing with an interview with the
2  LA Times for Ms. Sataki, correct?
3      A.  Yes.
4      Q.  She's copied on that, correct?
5      A.  Yes.
6      Q.  And is that consistent with her having
7  agreed to publicity?
8      A.  Yes.
9          MR. SMITH:  Objection.
10  BY MR. SMITH:
11      Q.  Now, "Number four: Public relations can
12  influence entities such as VOA and congressmen to
13  take positive action as the press can be very
14  influential in this regard.
15          "It was my impression that Elham
16  understood this and approved it."
17          Is that an accurate statement?
18      A.  Yes.
19      Q.  "Five: As a broadcaster and TV anchor,
20  I believe that Elham understood the benefit of
21  public relations.  I am not aware that any public
22  relations about Elham's situation was anything but

| | Page 908 |
|---|---|

1  positive and complimentary about her."
2          Is that an accurate statement?
3      A.  Yes.
4          CHAIRMAN FITCH:  What do you base that
5  first sentence on?
6          THE WITNESS:  Broadcaster and anchor,
7  that's speaking of her.  So she was in the
8  business, plus we were in discussions about using
9  public relations.
10          CHAIRMAN FITCH:  Were you or are you
11  aware of any work or other activity by Ms. Sataki
12  in the public relations field, however that may
13  be?
14          THE WITNESS:  Of her in public
15  relations?
16          CHAIRMAN FITCH:  However that may be
17  defined.
18          THE WITNESS:  I was just aware that she
19  was in the media.  She was a broadcaster.
20  BY MR. KLAYMAN:
21      Q.  Following up on that, she was a
22  broadcaster.  Where was she broadcasting?  What

| | Page 909 |
|---|---|

1  country was she broadcasting into?
2      A.  The VOA, the Persia News Network
3  broadcasts into Iran.
4      Q.  Based on VOA's mission, is it to
5  broadcast pro-American propaganda into Iran, for
6  lack of a better word?
7      A.  We don't broadcast propaganda.  We
8  represent the United States.
9      Q.  I was trying to go ahead of you.
10          CHAIRMAN FITCH:  Everybody's
11  understanding is that, in this context, the word
12  "propaganda" means information.
13          MR. KLAYMAN:  Yeah.
14          THE WITNESS:  That's a dirty word over
15  at the VOA.
16  BY MR. KLAYMAN:
17      Q.  Right, but the purpose is, and that's
18  why I said it this way, tongue in cheek, is that
19  we're trying to influence thought in Iran,
20  pro-freedom thought?
21      A.  We extol the virtues of our way of
22  government.

| | Page 910 |
|---|---|

1      Q.  Now, is that something as a broadcaster
2  that broadcasts into Iran carries some risk?
3      A.  Absolutely.
4      Q.  How is that?
5      A.  Well, to themselves, and, you know, to
6  possible family members that may still be in Iran,
7  yeah, their name and face is out there.
8      Q.  Did Ms. Sataki ever express concerns
9  that she was broadcasting into Iran to you?
10      A.  No, she wanted to.  She wanted to
11  broadcast into Iran.
12      Q.  Did it appear to you that she was not
13  afraid of publicity into Iran?
14      A.  I never heard her complain about that.
15      Q.  In fact, in the lobby of VOA they have
16  rather strict security, correct?
17      A.  Correct.
18      Q.  And is it for that reason, with regard
19  to all the other networks there?
20      A.  I could only speculate on that.  I
21  mean, they have a lot of security there.  We are a
22  target, according to them.

11 (Pages 907 to 910)

App.0424

Page 911

1      Q.   Now, as we were going through, trying
2  to settle initially, did there come a point in
3  time when we learned that we were trying to settle
4  it through a member of the Board of Governors by
5  the name of Blanquita Collum?
6      A.   Yes.  She had told me you contacted
7  her.
8      Q.   Were you aware of my friendship with
9  Blanquita?
10      A.   You informed me you were a friend of
11  hers, yes.
12      Q.   And we went to her after we attempted
13  with the general counsel and others to settle, we
14  thought maybe we could --
15          MR. SMITH:  Objection.
16          CHAIRMAN FITCH:  First of all, what is
17  the individual's name.
18          THE WITNESS:  Blanquita Collum.
19          MR. KLAYMAN:  B-l-a-n-q-u-i-t-a
20  C-o-l-l-u-m.
21  BY MR. KLAYMAN:
22      Q.   How many people were on the Board of

Page 912

1  Governors at that time when we were trying to
2  settle?
3      A.   I don't remember how many there were.
4  I think it was eight.
5      Q.   And the very top person on the Board of
6  Governors, who was that?  Was it the Secretary of
7  State, Mrs. Clinton?
8      A.   The Secretary of State has a seat on
9  the board.  The chairman at that time I think was
10  probably Kenneth Tomlinson.
11      Q.   But the Secretary of State is a member
12  of the Board of Governors at the time?
13      A.   Secretary of State has a seat on the
14  board, yes.
15      Q.   I'll turn your attention and back up,
16  were we successful in lobbying Ms. Collum?
17      A.   I don't know.  I assume not.  But you
18  were lobbying her.
19      Q.   Ok.  Did we also take other actions
20  with regard to congressman and senators to try to
21  intercede?
22      A.   Yeah.  We went up to several I know

Page 913

1  senators' offices.
2      Q.   Who were some of the senators that we
3  went to?
4      A.   I know I --
5      Q.   You and I both went, right?
6      A.   Yeah.  I know I was there for Coburn's
7  office.
8      Q.   Tom Coburn of Oklahoma?
9      A.   Tom Coburn, of Oklahoma.  I'm drawing a
10  blank --
11      Q.   Let me stop you.  He was on the
12  Oversight Committee at VOA?
13      A.   Foreign Affairs.
14      Q.   Did we go to see John McCain?
15      A.   That's one of the offices that was
16  contacted, yes.
17      Q.   During the time that we went up there,
18  did we take some press materials to give them?
19      A.   Yes.
20      Q.   Did Ms. Sataki tell you not to do that?
21      A.   No.
22      Q.   She was aware we were going up there?

Page 914

1      A.   Yeah, I assume, yeah.
2      Q.   Now, were you aware that I had even
3  sought the help from John Boehner, who was
4  incoming Speaker of the House?
5      A.   Yeah, I remember you telling me.  Yeah.
6      Q.   I turn your attention to Respondent's
7  Exhibit 24.
8          MR. KLAYMAN:  You can just leave that
9  there, Fred, and then we're going to do another
10  one.
11  BY MR. KLAYMAN:
12      Q.   Take a look at that, Mr. Shamble.  I'm
13  going to ask you questions.
14          Is this exemplary of some of the
15  matters that I made to try to settle this matter
16  with VOA, this letter?
17      A.   Yes.
18          MR. KLAYMAN:  I'm going to move Exhibit
19  24 into evidence.
20          MR. SMITH:  No objection.
21  BY MR. KLAYMAN:
22      Q.   Take a look at Exhibit 24 and tell me

12  (Pages 911 to 914)

In Re: Larry E. Klayman
June 25, 2018

Page 915

1  what it is that we were trying to accomplish, just
2  generally speaking.
3      A.  This letter dated February 21st, 2010?
4      Q.  Yes.
5      A.  Well, trying to get a settlement here,
6  trying to get the agency to do the right thing.
7      Q.  Were you aware -- you can take a look
8  at it -- that when Ms. Sataki went out on leave to
9  Los Angeles that she had a nervous breakdown, for
10  lack of a better word, and went to see doctors?
11     A.  I was aware, yes.
12         CHAIRMAN FITCH:  If we have moved from
13  Exhibit 24, I'm prepared to admit it.  He asked
14  that it be admitted and there's no objection.
15         MR. SMITH:  Right.
16         MR. KLAYMAN:  Because it's admitted I'm
17  just going to ask a few brief questions, since
18  it's in the record.
19         CHAIRMAN FITCH:  Oh, I'm sorry, I
20  thought you were finished.
21         MR. KLAYMAN:  No, that's fine.
22

Page 916

1  BY MR. KLAYMAN:
2      Q.  And the agency, based on your
3  knowledge, you were asking for reasonable medical
4  accommodation?
5      A.  Correct.
6      Q.  Was that granted?
7      A.  No.
8      Q.  Now, was it at that time that the offer
9  to go work in the Central News Division occurred?
10         I'll turn your attention to Exhibit 25,
11  if you can flip the page.
12     A.  Flip the tab?
13     Q.  Yeah, flip the tab.
14     A.  Ok.  May 12, 2010?
15     Q.  Yeah.  You've seen this before, have
16  you not?
17     A.  I don't know.  Let me just look at it.
18         (Witness peruses document.)
19     A.  Yes, I have seen this.
20     Q.  This is where they're offering to put
21  her on the middle eastern desk of the Central News
22  Division in Washington, D.C.?

Page 917

1      A.  Correct.
2      Q.  Which she then declined?
3      A.  Correct.
4         MR. KLAYMAN:  I'll move Exhibit 325
5  into evidence.
6         CHAIRMAN FITCH:  Admitted.
7  BY MR. KLAYMAN:
8      Q.  I turn your attention to Exhibit 26.
9  You can flip the page, Mr. Shamble.
10     A.  Ok.
11     Q.  You're copied on that, are you not?
12     A.  Yes.
13     Q.  And in there we are presenting
14  information to try to get that reasonable
15  accommodation, that's your understanding,
16  reasonable medical accommodation?
17     A.  Yes.
18         MR. KLAYMAN:  I'll move Exhibit 26 into
19  evidence, your Honor.
20         MR. SMITH:  No objection.
21         CHAIRMAN FITCH:  It's admitted.
22

Page 918

1  BY MR. SMITH:
2      Q.  What I've just shown you, Exhibits 24,
3  25 and 26, are they exemplary of just some of the
4  efforts I made to resolve this?
5      A.  Yes.
6      Q.  And we made?
7      A.  Yes.
8      Q.  Every step of the way I kept you
9  apprised of what's going on?
10     A.  As far as I know, yeah.
11     Q.  Now, are you also aware that on behalf
12  of Ms. Sataki I filed an Office of Civil Rights
13  complaint for her?
14     A.  Yes.
15     Q.  And tell us what an OCR -- we call it
16  an OCR complaint -- entails, based on your
17  experience.
18     A.  That you file a complaint with the
19  Office of Civil Rights regarding discrimination.
20     Q.  And what kind of discrimination were we
21  claiming?
22     A.  I don't recall offhand.  It's sexual

13 (Pages 915 to 918)

App.0426

In Re:  Larry E. Klayman
June 25, 2018

Page 919

1  harassment, I would imagine, and retaliation.
2      Q.  Did there come a time when, you know,
3  you felt that the case needed to move more
4  quickly?
5          Let me back up.  I'll turn your
6  attention to Respondent's Exhibit 17.  I'll make
7  it easier.
8      A.  Same book?
9      Q.  Yes.
10     A.  This is a letter May 3rd?
11     Q.  Yes.
12     A.  Ok.  Yes, I remember this it.
13     Q.  Was there an aspect of this
14 investigation that troubled you, those being
15 conducted by Office of Civil Rights?
16         You can take your time and take a look
17 at that letter.
18     A.  Ok.  They seemed to be stalling coming
19 to some sort of resolution, and that was blocking
20 any further progress in the case.
21     Q.  Was there an issue with witnesses and
22 how they were being handled?

Page 920

1      A.  Yeah, that there were witnesses that
2  were claiming they were being harassed.
3      Q.  Were they witnesses on Ms. Sataki's
4  behalf?
5      A.  Yes.
6      Q.  And you wrote a letter to the Justice
7  Department?
8      A.  Correct.
9      Q.  "Honorable Lanny Breuer, Assistant
10 Attorney General, Criminal Division"?
11     A.  Correct.
12     Q.  Of the Justice Department?
13     A.  Correct.
14     Q.  What was the purpose of the letter?  To
15 resolve this whole thing?
16     A.  Yeah, hopefully.  Yes.
17     Q.  After this letter, turn to a letter
18 dated May 18th, 2010, which is being sent to you.
19         Do you remember receiving that from the
20 Justice Department on or about that date?
21     A.  Let me just read it.
22         (Witness reads document.)

Page 921

1      A.  Yes, I remember.
2      Q.  Yes, and they're referring you to the
3  FBI if you want to pursue this.  They're basically
4  giving you the back of the hand there?
5      A.  Yes.
6          MR. KLAYMAN:  I move Exhibit 17 into
7  evidence, your Honor.
8          MR. SMITH:  No objection.
9  BY MR. KLAYMAN:
10     Q.  Please turn to Exhibit 18.  That's the
11 letter of January 4th, 2011, to Ms. Delia Johnson,
12 Director, Office of Civil Rights.
13         Without having to read the whole thing,
14 what are you trying to say to Ms. Johnson with
15 that letter?
16     A.  That they need to come to some kind of
17 conclusion.  They need to issue a final decision.
18     Q.  Why was that?
19     A.  Because it was stalled.  There was
20 nothing happening.
21     Q.  Is that consistent with your experience
22 with Voice of America when dealing with employment

Page 922

1  matters?
2      A.  Basically happens all the time.
3          We've had an employee that's been on
4  administrative leave for three years now, because
5  they won't resolve the case.
6      Q.  Turn to the next page, a January 5th,
7  2011 letter from Ms. Delia Johnson to you.
8          What is your understanding that Ms.
9  Johnson was trying to accomplish, by sending that
10 letter from OCR to you?  What was she conveying to
11 you?  How did you take it?
12     A.  It looks like she's saying you can go
13 ahead and proceed, and I imagine she was getting
14 pressure not to issue a final decision.
15     Q.  I'll turn your attention to the next
16 letter, March 23rd, 2011 from Delia Johnson to Ms.
17 Sataki.  This is the actual finding of OCR,
18 correct, which did not grant relief for Ms.
19 Sataki?
20     A.  I'm sorry, I didn't hear the last --
21     Q.  This is the actuality finding, the
22 finding of the Office of Civil Rights, which did

14  (Pages 919 to 922)

App.0427

In Re: Larry E. Klayman
June 25, 2018

Page 923

1  not grant the relief that Ms. Sataki was seeking?
2      A.  Yes, that's true.
3      Q.  And then attaches a report?
4      A.  Correct.
5      Q.  And you have seen this before?
6      A.  I have seen this, yes.
7          MR. KLAYMAN:  Your Honor, I move
8  Exhibit 18 into evidence.
9          MR. SMITH:  No objection.
10         CHAIRMAN FITCH:  It's admitted.
11  BY MR. KLAYMAN:
12     Q.  Now after OCR issues a report, that's
13  not the end of the story, is it?
14     A.  There's appeal rights.
15     Q.  You have rights.  You have time to take
16  an appeal.
17     A.  Correct.
18     Q.  At that point you can go to court with
19  a Title VII action.
20     A.  Correct.
21         CHAIRMAN FITCH:  We're been referring
22  to the Office of Civil Rights here.  Are we

Page 924

1  referring to "an" Office of Civil Rights in VOA?
2          THE WITNESS:  Yes.
3          MR. KLAYMAN:  And sometimes I've used
4  the word "EEO actions."  It's the same thing as
5  I'm referring to, your Honor.  It's employment
6  discrimination, administrative proceeding.
7  BY MR. KLAYMAN:
8      Q.  Now, after this issue, did we try to
9  contact -- you and me, try to contact Ms. Sataki
10  to let her know she still had rights that she
11  could pursue in court, as in a Title VII action?
12     A.  Yeah, you had contacted me and said you
13  couldn't reach her, and I had tried to contact
14  her, too.
15     Q.  Unsuccessfully?
16     A.  Unsuccessfully, yes.
17     Q.  So I turn your attention to
18  Respondent's Exhibit 21.  This is an email to Ms.
19  Sataki dated May 12, 2011.
20         Is that an email which you sent to Ms.
21  Sataki?
22     A.  I'm not -- I don't see an email

Page 925

1  dated --
2      Q.  Excuse me, it's January 27, 2011.  I'm
3  sorry, I misread the date.
4      A.  Yes.
5      Q.  You sent it to her --
6      A.  Yes.
7      Q.  -- on January 27th, 2011?
8      A.  Correct.
9      Q.  Is that accurate, this email?
10     A.  Yes.
11     Q.  And I had asked you to send that email
12  to her, correct?
13     A.  Yes you did, yeah.
14     Q.  Let me just read it.
15         MR. KLAYMAN:  I'm not reading very
16  much, your Honor, these days --
17         CHAIRMAN FITCH:  That's alright.
18         MR. KLAYMAN:  I'm trying to move it
19  along.
20  BY MR. KLAYMAN:
21     Q.  "Elham, Larry tells me that, since he
22  met the deadline to file for a final decision in

Page 926

1  your OCR investigation of sexual harassment and
2  retaliation, and now that 180 days have passed
3  since your complaint was filed last year, you now
4  have the right to sue in federal court for sexual
5  harassment and retaliation.  Therefore, all your
6  rights were protected.  Your chance to address
7  them are just in a different form.
8          "Larry tells me that you are not
9  communicating with him.  He's told me that he
10  would like to discuss this with you, specifically
11  the fact that Judge Kollar-Kotelly would not order
12  that you be allowed to go back to work in Los
13  Angeles, and had ruled that your sexual harassment
14  and retaliation claims could not be pursued before
15  the 180 day period had elapsed.
16         "So there really were no deadlines
17  missed.  He can explain this in more detail than I
18  can but he tells me you won't speak to him.
19         "He also tells me that the part of the
20  case involving your returning to work was appealed
21  to the higher court.  He did this even though you
22  have not communicated with him, in order to

15 (Pages 923 to 926)

App.0428

Page 927

```
1    preserve your rights.
2         "If you wish to pursue this, the appeal
3    is still out there but it must be moved forward
4    soon if you want to do so.
5         "I think you really ought to talk to
6    him to get a better picture about this.  Tim."
7         That's accurate, what you wrote?
8    A.  Yes.
9    Q.  Ok.  So, the situation behind us is
10   that neither you nor I could get in touch with
11   her.
12   A.  Yes.
13   Q.  And we didn't want her to lose her
14   rights.
15   A.  Correct.
16   Q.  Now, Ms. Sataki, based on your
17   experience, knew that she could always call you,
18   right?
19   A.  I mean, she had my contact info, yes.
20   Q.  Just to recap testimony, she initially
21   came to me before she even came to you.
22   A.  Correct.
```

Page 928

```
1         MR. KLAYMAN:  Your Honor, I move
2    Exhibit 21 into evidence.
3         MR. SMITH:  No objection.
4         CHAIRMAN FITCH:  Admitted.
5    BY MR. KLAYMAN:
6    Q.  I turn your attention to a letter to
7    Danforth Austin of August 4th, 2010, which is part
8    of that exhibit.  It purports to be copied on you
9    on August 5th, correct?
10   A.  I'm CC'd on this, yes.
11   Q.  Yes, now before this letter was written
12   by Ms. Sataki, you weren't consulted on what she
13   was going to do with Mr. Austin, were you?
14        MR. SMITH:  Objection.
15        CHAIRMAN FITCH:  Why don't you ask
16   that --
17   BY MR. KLAYMAN:
18   Q.  Were you consulted by Ms. Sataki before
19   she sent this?
20        (Witness reads document.)
21   A.  To the best of my recollection, no.
22   Q.  Based on your testimony, you were aware
```

Page 929

```
1    I was having difficulty interacting and
2    communicating with Ms. Sataki?
3    A.  Correct.
4    Q.  Did there come a time when I asked you
5    to give me the name of another lawyer who might be
6    able to help her?
7    A.  Yes.
8    Q.  And did you do that?
9    A.  Yes.
10   Q.  Who was that?
11   A.  The other attorney was Tim Shea.
12   Q.  What's Mr. Shea's background, to the
13   best of your knowledge, with regard to VOA?
14   A.  He had worked with several other
15   employees and he had worked with at least one
16   other employee in the Persia News Network.  So he
17   was familiar with that entity and he was familiar
18   with the agency.
19   Q.  He would be a good person to try to
20   step in?
21   A.  Yeah.  I liked Tim.  I thought he would
22   be good.
```

Page 930

```
1    Q.  Do you continue to have issues to this
2    day with Voice of America?
3         MR. SMITH:  Objection.
4         CHAIRMAN FITCH:  I think that's
5    alright.  Overruled.
6         THE WITNESS:  Should I answer?
7         CHAIRMAN FITCH:  Yes, go ahead.
8         THE WITNESS:  Yes.
9    BY MR. KLAYMAN:
10   Q.  What's going on now, if anything?
11   A.  Well, they're still not abiding by some
12   arbitration cases we won that have been appealed,
13   all the way through the appeals process.
14        And just this weekend I found out that
15   they're removing one of my executive board
16   members.  He was a non-citizen.  He just became a
17   citizen and they determined they were going to
18   cancel his appointment.
19        I can go on and on if you want more.
20   Q.  Yeah, give us some more.
21   A.  Well, we had a case with the Office of
22   Cuban Broadcasting where they conducted an illegal
```

16  (Pages 927 to 930)

Page 931

1   rift and we won that in arbitration.  They
2   appealed that for several years.  These employees
3   were out of work for over five years, and the
4   agency lost the appeal and had to finally bring
5   them back and then provide them back pay.
6        Several of them were over paid, and
7   there's no way that they would have known they
8   were over paid, and yet the agency refused to
9   grant them a waiver of a debt.  So we had to file
10  a grievance on that.
11       When I filed the grievance, they filed
12  for unfair labor practice charge against me and
13  they also filed a grievance against me for filing
14  my grievance.
15       But that's the type of action that they
16  do.
17       Q.  And you are the president of the union?
18       A.  Yes.
19       Q.  And you're there --
20       A.  President of the local.
21       Q.  Local union.
22       A.  Yes.

Page 932

1        Q.  I'm going to return to exhibit, just
2   briefly, 21, which is in evidence.  Turn to the
3   second page where it says -- paragraph two: "I
4   wish to also inform you that I've instructed Larry
5   Klayman to withdraw any and all civil actions that
6   you may have filed in my name."
7        Again, did she ever discuss that with
8   you?
9        A.  She did contact me after we had been
10  trying to reach her and saying that she was having
11  second thoughts.
12       Q.  But that was well after we tried to
13  contact her?
14       A.  Yes.
15       Q.  And that was well after January 23rd,
16  2011?
17       A.  Yes.
18       The date of that email?
19       Q.  Right.
20       A.  Yes.
21       Q.  I turn your attention to Exhibit 20.
22  This is the actual Office of Civil Rights

Page 933

1   complaint.
2        You've seen that, correct?
3        A.  I believe I have seen that.
4        Q.  It was filed on Ms. Sataki's behalf by
5   me, signed by her, third page?
6        A.  If looks like her signature.
7        CHAIRMAN FITCH:  Your Honor, I move
8   this into evidence, Exhibit 20.
9        MR. SMITH:  No objection.
10       CHAIRMAN FITCH:  Give me just a minute,
11  please.
12       (Brief pause.)
13       CHAIRMAN FITCH:  It is admitted, of
14  course.
15       MR. KLAYMAN:  I have no further
16  questions, subject to redirect, if any.
17       CHAIRMAN FITCH:  Mr. Smith?
18       MR. SMITH:  If you will indulge me a
19  few seconds to clear my thoughts.
20       CHAIRMAN FITCH:  You want a ten-minute
21  break?
22       MR. SMITH:  Yes.

Page 934

1        CHAIRMAN FITCH:  We will stand in
2   recess until 10:50 approximately.
3        (Recess taken.)
4        MR. KLAYMAN:  Your Honor, I have one
5   last question.
6        CHAIRMAN FITCH:  Ok.  We are back on
7   the record at 10:50.
8        Mr. Klayman?
9   BY MR. SMITH:
10       Q.  Yes, Mr. Shamble, did I ever discuss
11  with you in the presence of Ms. Sataki the judge
12  that we drew in the federal court for her cases
13  against the Board of Governors?  And to refresh
14  your recollection, Judge Colleen Kollar-Kotelly.
15       A.  I know that you discussed it with me.
16  I don't know if it was in the presence of Elham.
17       Q.  What did I say to you?
18       A.  That she didn't have a very favorable
19  opinion of you or your politics or the way that
20  you conduct your business.
21       Q.  Did I say that she could be a problem
22  in this case?

17  (Pages 931 to 934)

In Re:  Larry E. Klayman
June 25, 2018

Page 935

1    A.  Yeah, you made that clear.
2    Q.  Did I explain anything about her
3  politics as perceived?
4    A.  Something to do with -- well, not --
5  she didn't see eye to eye with you on your
6  politics and something to do with the Clintons, I
7  think.  I think she was some how favorable to
8  them.
9    Q.  Were you aware that I had sued the
10  Clintons a long time ago?
11    A.  You had told me that, yes.
12    Q.  And I think I gave you a copy of my
13  book at one time, didn't I?
14    A.  Yes, you did.
15    CHAIRMAN FITCH:  You're mumbling a
16  little bit, Mr. Klayman.
17  BY MR. SMITH:
18    Q.  I think I gave you a copy of my
19  autobiography?
20    A.  Yes.
21    Q.  And it discusses it in there?
22    A.  Yes.

Page 936

1    MR. KLAYMAN:  No further questions.
2    CHAIRMAN FITCH:  Mr. Smith, you may
3  cross examine.
4    CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
5    BY MR. SMITH:
6    Q.  Good morning, Mr. Shamble.
7    A.  Good morning.
8    Q.  We have spoken a few times over the
9  telephone last several years?
10    A.  Ok, yeah, yeah, I remember.
11    Q.  Now --
12    MR. KLAYMAN:  Objection.  That was
13  leading.  Move to strike.
14    MR. SMITH:  I'm cross examining.
15    MR. KLAYMAN:  It was lack of
16  foundation.
17    CHAIRMAN FITCH:  Go ahead, Mr. Smith.
18  BY MR. SMITH:
19    Q.  Now prior to your meeting Mr. Klayman,
20  you spoke with Ms. Sataki about her claim,
21  correct?
22    A.  Yes.

Page 937

1    Q.  And you sought to assist her with her
2  concerns.
3    A.  Yeah, we were meeting with her to find
4  out what they were and what options she might
5  have, yes.
6    Q.  And at that time she did not mention to
7  you that she was interested in moving to Los
8  Angeles, did she?
9    A.  No.
10    Q.  Thereafter you met with Ms. Sataki and
11  Mr. Klayman.
12    A.  Yes.
13    Q.  And she introduced Mr. Klayman to you
14  as her attorney.
15    A.  Yes.
16    Q.  So the first time that you learned of
17  any Los Angeles solution was after you met with
18  Mr. Klayman, correct?
19    A.  It was after the time that, yeah, she
20  had hired him as her attorney.
21    Q.  Prior to your meeting with Mr. Klayman,
22  Ms. Sataki did not discuss publicizing her case,

Page 938

1  did she?
2    A.  No.
3    Q.  And there came a time when you met with
4  Ms. Sataki and Mr. Klayman and the subject of
5  publicity was discussed, right?
6    A.  Yes.
7    Q.  You don't really recall the specific
8  details of that meeting, do you?
9    A.  I just remember it was in my office.  I
10  can remember where they were sitting.
11    Q.  Ok.
12    A.  But other than that, no.
13    Q.  Because you don't recall whether any
14  particular media options were discussed at that
15  time, correct?
16    MR. KLAYMAN:  Objection, leading.
17    THE WITNESS:  The discussion involved
18  various options we had in order to address her
19  issues.
20  BY MR. SMITH:
21    Q.  Alright, but you did not discuss any
22  particular forum with respect to that?

18  (Pages 935 to 938)

In Re:  Larry E. Klayman
June 25, 2018

Page 939

1      MR. KLAYMAN:  Objection, vague and
2  ambiguous.  "Forum."
3      CHAIRMAN FITCH:  By "forum" I think he
4  means, not courthouse.  Media forum.
5      THE WITNESS:  Various options were
6  discussed, whether newspaper, magazine or, you
7  know.
8  BY MR. SMITH:
9      Q.  And you did not discuss with Ms. Sataki
10  her personal views about publicity at that time,
11  did you?
12      A.  I didn't directly.  No, I assume -- she
13  was there, so if she had a problem she would raise
14  objections.
15      Q.  You assumed, but --
16      A.  I didn't ask her specifically if she
17  had a problem with that, no.
18      Q.  Thank you.
19      If you could turn to Respondent's
20  Exhibit 25.  It's in the white book.
21      A.  May 12, 2010 letter?
22      Q.  Yes.

Page 940

1      A.  Ok.
2      Q.  So I'm assuming that on or about May
3  12th you got a copy of this letter?
4      A.  Probably, yes.
5      Q.  You were aware that Ms. Sataki declined
6  the settlement offer outlined in this letter,
7  correct?
8      A.  Yes.
9      Q.  But you didn't have any personal
10  discussions with her about why she declined the
11  settlement offer, did you?
12      A.  No.
13      Q.  Turn to Respondent's Exhibit Number 5,
14  please.  That would be the two affidavits that you
15  had previously testified to, the affidavits dated
16  February 3rd, 2012, which is identified as the
17  Declaration of Timothy Shamble, and then the
18  Supplemental Declaration of Timothy Shamble dated
19  July 9th, 2017.
20      A.  Yeah.
21      Q.  These affidavits were prepared by
22  someone other than you, correct?

Page 941

1      A.  I received suggestions from someone
2  else, but I changed them.
3      Q.  Ok.  And the person that made the
4  suggestions, was that Mr. Klayman?
5      A.  Yes.
6      Q.  Turn to Respondent's Exhibit --
7      CHAIRMAN FITCH:  Let me ask, you were
8  asked if this was prepared by somebody else, and
9  you said you received suggestions.
10      Who wrote the first draft.
11      THE WITNESS:  Larry Klayman.
12      MR. TIGAR:  Excuse me, but is that your
13  signature at the bottom of each of the two of
14  them?
15      THE WITNESS:  It is, yes.
16      MR. TIGAR:  You signed them yourself?
17      THE WITNESS:  I did, yes.
18  BY MR. SMITH:
19      Q.  Mr. Klayman drafted both affidavits,
20  both the declaration and then the supplemental
21  declaration?
22      A.  Yeah.  He provided me what he was

Page 942

1  looking for and I changed what I felt was
2  incorrect or was not to the best of my
3  recollection.
4      Q.  Turn to the Respondent's Exhibit Number
5  21.  Specifically it would be the second page.  It
6  would be the August 4th, 2010 letter from Ms.
7  Sataki to Mr. Austin.
8      A.  Ok.
9      Q.  You said that you recall receiving this
10  letter on or about August 5th, 2010?
11      A.  This is the August 4th letter?
12      Q.  Yes.
13      A.  I don't recall exactly when I received
14  this.
15      Q.  But do you recall receiving it at or
16  about the time that it was dated?
17      A.  Yeah, because it's -- I mean the email
18  is dated August 5th, so I assume that's correct.
19      Q.  Prior to receiving this letter from Ms.
20  Sataki, you were not aware that she was unhappy
21  with Mr. Klayman.
22      Is that correct?

19  (Pages 939 to 942)

In Re: Larry E. Klayman
June 25, 2018

Page 943

1      A.  To the best my recollection, I was not
2  aware.
3      Q.  And you were not aware that Mr. Klayman
4  was in love with Ms. Sataki?
5      MR. KLAYMAN:  Objection, your Honor.
6  It goes beyond the scope of direct.
7      CHAIRMAN FITCH:  I think it's fair.  Go
8  ahead.
9      THE WITNESS:  I was not aware of
10  anything like that.
11  BY MR. SMITH:
12      Q.  You were not aware that he was sending
13  her emails expressing his love to her?
14      MR. KLAYMAN:  Objection.  It lacks
15  foundation.
16      CHAIRMAN FITCH:  There's foundation in
17  the record.  Overruled.
18      THE WITNESS:  I have -- I'm not aware
19  of that.
20  BY MR. SMITH:
21      Q.  Are you just learning of that today?
22      A.  I am.

Page 944

1      MR. SMITH:  Thank you.  I have no
2  further questions.
3      CHAIRMAN FITCH:  And Mr. Klayman has a
4  right to do redirect examination, which he will.
5      REDIRECT EXAMINATION ON BEHALF OF RESPONDENT:
6           BY MR. KLAYMAN:
7      Q.  With regard to the affidavits,
8  everything in there that you signed, the affidavit
9  and the supplemental affidavit, was true, was it
10  not?
11      A.  Yes.
12      Q.  And you've made changes on the drafts
13  that I've given to you.
14      A.  Yes.
15      Q.  And before I sent you the affidavits,
16  we talked about what to put in the affidavits,
17  correct?
18      A.  Yes.
19      Q.  So you stand by everything you said in
20  those affidavits, correct?
21      A.  Yes.
22      Q.  Based upon your experience, there's

Page 945

1  nothing wrong with someone caring for someone, is
2  there?
3      A.  No.
4      MR. KLAYMAN:  Ok.  No further
5  questions.
6      CHAIRMAN FITCH:  Mr. Shamble, you'll be
7  delighted to know that I think you can be
8  discharged.
9      THE WITNESS:  Thank you.
10      CHAIRMAN FITCH:  And we very much
11  appreciate your time.
12      THE WITNESS:  Thanks.
13      (Witness is excused.)
14      CHAIRMAN FITCH:  Respondent's team,
15  where do we go from here?
16      MR. KLAYMAN:  Me.
17      CHAIRMAN FITCH:  Ok.
18      MR. KLAYMAN:  I'm the next witness.
19      CHAIRMAN FITCH:  May I ask a question
20  of Respondent's team?
21      Do you want to go to 1:00 o'clock,
22  because the obligation --

Page 946

1      MR. KLAYMAN:  Yes.
2      CHAIRMAN FITCH:  -- involves something
3  around 2:00 o'clock or so, or are you willing to
4  break earlier for an hour and a half.
5      MR. KLAYMAN:  Yeah, I would like to
6  just take the full hour and a half.
7      CHAIRMAN FITCH:  No, we're going to
8  take the full hour and a half, no question of
9  that.  But does it a have to be 1:00 to 2:30, or
10  can it be 12:30 to --
11      MR. KLAYMAN:  It has to be 1:00 to
12  2:30.  Thank you very much for your courtesy.
13      CHAIRMAN FITCH:  Sure.
14      Alright.  I understand that the
15  Respondent's team has called Respondent to
16  testify.
17      Mr. Klayman, raise your right hand,
18  please.  Do you swear or affirm that the testimony
19  you are about to give will be the truth, the whole
20  truth and nothing but the truth?
21      THE WITNESS:  I do.
22      CHAIRMAN FITCH:  You may, of course, be

20  (Pages 943 to 946)

App.0433

In Re:  Larry E. Klayman
June 25, 2018

Page 947

1  seated.
2  Whereupon,
3      LARRY KLAYMAN,
4  called as a witness on behalf of Respondent, and
5  after having been first duly sworn, was examined
6  and testified as follows:
7      DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
8      BY MR. SUJAT:
9      Q.  Good morning, Mr. Chair, and members of
10  the committee, Mr. Klayman.
11      A.  Good morning, Mr. Sujat.
12      Q.  Would you please indicate for the
13  record your full name.
14      A.  Larry Elliot Klayman, E-l-l-i-o-t,
15  Klayman.  I generally don't use the middle name.
16      Q.  Where and when did you receive your
17  undergraduate degrees?
18      A.  Well, I attended, in terms of my
19  education, Harriton High School in Philadelphia,
20  Pennsylvania.  I graduated in 1969.
21      Q.  Mm-hmm.
22      A.  And I then matriculated, as they say,

Page 948

1  in Duke University, in Durham, North Carolina.
2      Q.  Mm-hmm.
3      A.  I graduated with a degree in political
4  science and French literature in 1973.  And also I
5  was an honor student.  I wrote a thesis on the
6  events of 1968 in France when the government was
7  almost overthrown.
8      Q.  Now where and when did you receive your
9  law degree?
10      A.  I took a year off between law school
11  and undergraduate school, and I worked for Senator
12  Dick Schweiker from Pennsylvania on Capitol Hill.
13  It was during Watergate, ironically.
14      I also worked on weekends and holidays
15  at Ritz Camera in Georgetown selling cameras.
16      That's my hobby.  I actually liked
17  working in the camera store more than working on
18  Capitol Hill.
19      Q.  Could you maybe explain a little bit
20  more what you did on Capitol Hill?
21      A.  Yes.  I was basically an entry-level
22  person.  So I would assign correspondence to

Page 949

1  various parties.
2      If I may just say a little bit -- I
3  don't want to belabor it, although I really loved
4  Senator Schweiker, I think he was a great man at
5  the time -- what struck me is that assigning
6  letters on the same subject, ranging from left to
7  right, in terms of impression, to give the
8  constituents the impression that you agreed with
9  them, I felt that kind of strange.  I think that
10  was the beginnings of Judicial Watch and Freedom
11  Watch years later.
12      But he's a very nice man, a good man,
13  and he was thought of as a liberal republican and
14  ran on the first ticket with Ronald Reagan in 1976
15  against Gerald Ford.
16      So I worked there and I did other odd
17  jobs.
18      Q.  Did that help compel you maybe into
19  working for Washington, DC?
20      A.  Yes.  I really learned to love
21  Washington, D.C., just the challenge of being
22  here.  Not everything that went on, such as

Page 950

1  writing six different letters on the same subject.
2      Q.  So what is your occupation right now?
3      A.  My occupation, I'm a lawyer, and, just
4  to give you a little background in that regard as
5  to what kind of lawyer I am, is that I started
6  with a litigation law firm in Miami called
7  Blackwell and Walker, and it was at that time the
8  biggest law firm in Florida, which wasn't that big
9  by today's standards.  It was about 60 people,
10  litigation, and I learned how to try cases.  I was
11  lucky to work with a really excellent trial lawyer
12  named Paul Larkin.
13      After two years my first love was to be
14  in Washington, although I loved Miami, too.  But I
15  was up here on vacation, and in those days you
16  didn't have all this security.  I literally rang
17  the bell at the Justice Department and said "I
18  want to talk to somebody in the Antitrust Division
19  in the Assistant Attorney General's office."  And
20  I was called up.  Antitrust was very popular then.
21  I interviewed with someone named Bill Colton, who
22  was the Chief of staff to the Assistant Attorney

21  (Pages 947 to 950)

App.0434

Page  951

1  General John Shenefield, and they offered me
2  several positions in the Justice Department in the
3  antitrust division and I chose the Consumer
4  Affairs division.
5      Later, when I was in Consumer Affairs,
6  I transferred to the AT&T division.  I helped
7  break up the monopoly.
8      I left in 1983.  Because of my
9  international background -- I speak French and
10  Italian and I also speak understandable Spanish.
11  It's not as good as the other two -- I wanted to
12  do something internationally, so I went with an
13  international trade law firm by the name of Busby
14  Reem and Leonard, free trade, and I was with them
15  for about two and a half rears, and I started my
16  own law firm, Law Office of Larry E. Klayman.  I
17  dropped the E and later became Klayman and
18  Associates.
19      In the course of doing that I did all
20  kinds of litigation.  We did international trade,
21  import/export, anti-dumping, countervailing duty.
22      You were with me for a time, Fred, at

Page  952

1  that law firm.  You worked with me, actually for a
2  long time.  And, you know, we also did some
3  employment matters for people.  We had some cases
4  in that regard.
5      I mean, it was basically general
6  practice with an emphasis on international trade
7  and litigation and corporate law work.
8  Q.  Did you also represent various
9  government agencies in the process?
10  A.  Yes.  Well, we represented a lot of
11  foreign government agencies.  I represented the
12  Italian Trade Commission for the government of
13  Italy.  I represented the Portuguese Trade
14  Commission.  We represented the government of
15  Thailand.  We represented -- I'm trying to think.
16  Interestingly enough, there was the Romanian steel
17  industry at one point.
18      I'm a free trader, I believe in free
19  trade, and that was what Busby Reem and Leonard
20  believed in.
21      So we were generally on the defense
22  side of international trade proceedings, and we

Page  953

1  represented American importers, the importers of
2  fireworks, for instance, from China.
3      So that was kind of the practice I did,
4  general practice.  I've been very fortunate to
5  practice in a number of different areas in my
6  career, which is now 40 years old.
7  Q.  I was going to ask you, more recently,
8  what type of practice have you had, say in the
9  last ten or fifteen years?
10  CHAIRMAN FITCH:  Just keep going
11  chronologically.
12  THE WITNESS:  Yeah, so I started
13  Klayman and Associates.  First it was the Law
14  Office of Larry E. Klayman, and at some point I
15  had had some experiences about the courts with
16  what I thought were unjust judges that were
17  discriminating against my clients based on their
18  national origin, that they were not getting a fair
19  shake.
20      And there came a point in time when I
21  encountered a judge in California who made various
22  remarks about my client that were very

Page  954

1  prejudicial, and mocking his Chinese -- his
2  Taiwanese heritage.  The judge was mocking my
3  Jewish heritage and some of the witnesses, and
4  also mocking a gay witness of theirs.  I said to
5  myself after that, "Some day I'm going to start a
6  group to try to, in effect, be a type of Hamburger
7  Helper to the Bar to promote integrity in the
8  legal profession."  Because I had gotten to the
9  point where I didn't think that we were living to
10  the standards that we should live to, and I don't
11  want to take up too much time with the panel --
12  CHAIRMAN FITCH:  Don't worry about that
13  right now.
14  THE WITNESS:  Ok.
15      I'm very proud of what I did, and I'll
16  tell you why.  I actually conceived of the name
17  "Judicial Watch" walking through Georgetown.  I
18  was living in Georgetown.  I was then married, and
19  I was walking in front of the Sports Authority and
20  the name came to me, "Judicial Watch," and that
21  became the name of my organization.  And it was
22  like an alternative Bar association, in a way, to

22  (Pages 951 to 954)

Page 955

1  keep the government honest, try to keep it
2  honest -- today I say less dishonest -- and also
3  to promote ethics in the legal profession and get
4  good judges.  That was it.
5        By the way, I really respect the
6  government and I respect the legal profession.  I
7  believe in it.  I don't believe it's held up to
8  the standards, and we heard Mr. Shamble talk about
9  that.
10       MR. TIGAR:  I'm going to ask a favor of
11 both of you.  Would you keep your voice up.  If
12 you would.
13       THE WITNESS:  I know I'm mumbling.  I'm
14 sorry.
15       So I started Judicial Watch on July
16 29th, 1994.  It became very prominent.  It was
17 nonpartisan.  It had a conservative Libertarian
18 ideology, which is mine.  I'm half conservative,
19 half Libertarian in many ways, and I'm eclectic.
20 Many views of mine are actually liberal.  I don't
21 believe in the death penalty, for instance.  Who
22 was in office at the time?  The Clintons were.

Page 956

1  And we tried to address some of the scandals that
2  were there, such as China gate.  I played a big
3  roll in triggering the campaign finance scandal.
4  I had sought a FOIA request with regard to
5  overseas trade missions, which I had read an
6  article coming back from Los Angeles one day on
7  the plane: "Clinton cozies up to business in
8  Business Week."
9        An individual by the name of Bernard
10 Schwartz, who was the CEO of Loral Corporation,
11 was bagging that he gave $100,000 to the
12 Clinton/Gore reelection campaign and got a seat on
13 the trade mission to China where the government,
14 under Secretary Ron Brown, helped him do business.
15       And I said to myself, "That's not
16 right."  Because I'm a small law firm.  I can't
17 afford to pay $100,000 to have the government help
18 me do business.  This is from my antitrust
19 background.
20       So I filed this FOIA request and one
21 thing led to the next.  We uncovered a suspected
22 Chinese agent by the name of John Wong.

Page 957

1  Everything just kind of went crazy.  And at that
2  point I was just an international trade lawyer.  I
3  did this as a hobby, Judicial Watch.
4        So, that's kind of when I came on and
5  people began to know about me and my advocacy.
6  Later there were cases involving Filegate,
7  Chinagate, Travelgate, IRSgate, all kinds of
8  gates.  We all knew about it.  And, you know, I
9  brought cases against the Clinton administration.
10       Then later, when President George W.
11 Bush won, people were surprised, because I always
12 said I was nonpartisan, but a lot of people didn't
13 believe me at that point.  And I brought federal
14 lawsuits against him and Vice President Dick
15 Cheney.  The one against the president himself was
16 over what I perceived to be, through a client,
17 Scott Dolley, the unconstitutional mass
18 surveillance of the American people.
19       And at Freedom Watch -- I'll tell you
20 about that as I get to it -- I brought another
21 case and we prevailed on that, under the -- that
22 is current, under the Obama administration.

Page 958

1        I also sued Vice President Cheney with
2  regard to what he did at Halliburton, which was to
3  inflate the earnings of Halliburton to create
4  investment through (inaudible).  It was similar to
5  the Enron case.  People couldn't believe I did
6  that either.
7        And then I also sued the vice president
8  and his energy task force for not disclosing who
9  he was meeting with in secret meetings, which were
10 setting energy policy for the United States.
11       So, I've always been nonpartisan.  I
12 brought cases against Tom DeLay for taking
13 gratuities.  I was the first to criticize Newt
14 Gingrich when he got into difficulty when he was
15 Speaker, suggested that he resign as the Speaker.
16       So that's who I am, ok.  And by the
17 year 2003, I saw that Senator Graham in Florida,
18 because Florida is my home state -- adopted home
19 state.  I was born in Philadelphia, having started
20 there with Blackwell and Walker.  But I had a
21 condominium there.  I would go frequently.
22       I was very much involved in the Cuban

23 (Pages 955 to 958)

Page 959

1   American community at Judicial Watch.  I got a
2   judgment against the Cuban government for shooting
3   down the airplanes of Brothers to the Rescue, for
4   Jose Basulto.  They were picking up rafters coming
5   out of Cuba.
6       Also I played some role in the Elian
7   case at the end.  And I really love Florida,
8   and -- like you do, Fred.
9       So, I decided, when I saw that Senator
10  Graham was retiring, that I would run for the U.S.
11  Senate.  I ran as a very independent republican,
12  in other words I ran against the republican party.
13  But I could not overcome the George W. Bush
14  machine which wanted to install HUD Secretary Mel
15  Martinez.  So I lost that race.
16      I probably was better off.  I think I'm
17  better off from the outside, and after that I
18  started Freedom Watch, and I also continued on in
19  my private practice doing many of the same things
20  I did at Klayman and Associates.  So I had a dual
21  practice.
22      But I went through a difficult period,

Page 960

1   and in and around 2008, the finances were bad.  I
2   was hurting.  And so I developed sympathy for
3   other people that were hurting and were not
4   treated well.  And Ms. Sataki was one of them.
5       CHAIRMAN FITCH:  Approximately when was
6   Freedom Watch founded?
7       THE WITNESS:  It was founded earlier
8   than 2004 when I did not win the primary.  It was
9   previously known as the International Center for
10  Economic Justice, and I forget the exact years.  I
11  think it was maybe 1996.
12      CHAIRMAN FITCH:  Sure.
13      THE WITNESS:  And I founded it to
14  promote immigration, interestingly enough, which
15  is a big controversy today, because I thought
16  immigration was good for the United States, and I
17  also did it to promote free trade.
18      Around that time I also was trying to
19  help personally congressman Jack Kemp be elected
20  president, because I really liked him.  He brought
21  minorities into the republican party.  He believed
22  in free trade.  I thought he was a really good

Page 961

1   man.  So I was on the executive finance committee.
2       But the international center, after I
3   finished the campaign, I changed its name and I
4   changed its mission.  I converted it to Freedom
5   Watch.  And we still promote free trade.  We still
6   promote legal immigration.  And I was never one to
7   go out there bashing immigrants.  I'm a
8   second-generation myself.  And I really loved the
9   Latino -- "Latin," they'll say in Miami, "Latin"
10  community.  They don't say "Latino" --in Miami.
11      So, my Chief of Staff when I ran for
12  the senate, Sandy Cobas, is Cuban American, and
13  she introduced me to a lot of the Cuban community.
14      So the answer to the Chair's question,
15  it was started earlier, but it really -- the
16  International Center for Economic Justice put on a
17  debate in 1996 I believe it was at the Press Club
18  to promote an understanding of immigration, why it
19  was important in the United States, and free trade
20  as well.  And I had all the third-party candidates
21  there, the major party candidates.  It was
22  televised on C-SPAN.

Page 962

1       Later, Judicial Watch, we did a debate
2   of the presidential candidates in 2000, and,
3   interestingly enough, Vice President Al Gore
4   accepted.  But I think he got criticism for that
5   and bowed out at the last minute, because, you
6   know, to be with Larry Klayman on the dais who had
7   sued the administration, I think he -- but he did
8   accept at first, and we had the third-party
9   candidates there, and that also was televised.
10      So this is who I am.  I do believe in
11  causes.  I do believe in justice.  I do believe
12  in, ironically, what the Bar sometimes does.
13  Obviously not with regard to this case.
14      But I tried to be someone who would
15  improve the legal profession in my public interest
16  capacity, make it more honest, and tried to
17  address, particularly federal judges who
18  frequently feel that they're not accountable
19  because of their lifetime tenure and they can
20  basically do whatever they want.  I saw that
21  frequently, particularly because I was
22  representing people from the other side of the

24 (Pages 959 to 962)

Page 963

1  street, you know, foreign interests, employers,
2  and I didn't think that was fair, to treat the
3  American interest better than interest generally.
4  BY MR. SUJAT:
5  Q.  Mr. Klayman, have you also worked on
6  employment matters and, you know, represented
7  employees?
8  A.  No, I have, and I had several cases in
9  that regard.  As I said, I was part of a general
10  practice, and that's part of what we did.
11  Q.  Mm-hmm?
12  A.  You know, one of the reasons I took the
13  job at the Consumer Affairs section -- because I
14  was offered to go to the International Antitrust
15  section -- was because Consumer Affairs
16  represented five government agencies.  I wanted to
17  learn, not just government litigation, but
18  administrative law in a better way.  And we
19  represented the Federal Trade Commission and the
20  Consumer Products Safety Commission, the Federal
21  Reserve Board, the Department of Agriculture, the
22  National Highway Safety and Transportation

Page 964

1  Administration, and this gave me a deep
2  understanding in administrative practice as well
3  as litigation.
4      So, you know, given the fact that you
5  have Office of Civil Rights complaints in
6  administrative cases, I felt I was very well
7  versed in that kind of administrative law.
8  Q.  Mr. Klayman, in what states are you
9  licensed to practice law?
10  A.  I'm licensed in Florida and the
11  District of Columbia.  I've been continuously a
12  member in good standing with those bars, and I'm
13  currently inactive in Pennsylvania.  I didn't take
14  CLE.  I was moving around a lot.  I didn't get --
15  I accidentally checked off that I was an active
16  member rather than an inactive member, so my
17  ability to practice law in Pennsylvania
18  deactivated.  And recently I've taken a number of
19  CLE courses to reactivate it.
20      I have no disciplinary record in
21  Pennsylvania over all these years, and -- so
22  that's Pennsylvania.

Page 965

1  Q.  I was going to ask another question on
2  that.
3  A.  Yeah.
4  Q.  And again, I just wanted to ask you,
5  are you now and have you always been in good
6  standing to practice in those states?
7  A.  Yeah -- with that caveat that I didn't
8  take the CLE -- in all three bars.
9  Q.  So what I was going to ask here is,
10  could you explain the disciplinary history in
11  Florida and Pennsylvania.
12      I was going to also refer you to
13  Respondent's Exhibits 23 and 30, respectively.
14      MR. SUJAT:  Which I would like to enter
15  into the record.
16      THE WITNESS:  We'll do one at a time.
17  Now at 23.
18  BY MR. SUJAT:
19  Q.  Yes.
20  A.  This is Petitioner's Exhibit 23.
21  Q.  Respondent's.
22  A.  No, it's Petitioner's Exhibit 23.

Page 966

1  Q.  And also have you looked at -- would
2  you take a look at 30.
3  A.  Is that Respondent's --
4  Q.  Respondent's Exhibit 30.
5  A.  You know, Fred, I'm sorry about being
6  informal here.  You were right about Respondent's
7  Exhibit 23.  That's also relevant to this
8  question.
9  Q.  Yes.
10  A.  Which I'll point out, if I may?
11  Q.  Yes, absolutely.
12  A.  Petitioner's Exhibit 23 contains the
13  supplemental complaint of Ms. Sataki that was
14  prepared by either her --
15      MR. SMITH:  Which exhibit are you
16  looking at now?
17      THE WITNESS:  Respondent's.  Let me
18  just key it up, because I can move it along
19  faster.
20      MR. SMITH:  Respondent's 23?
21      THE WITNESS:  Respondent's Exhibit 23
22  is the supplemental complaint of Ms. Sataki.  I'm

In Re: Larry E. Klayman

June 25, 2018

---

**Page 967**

1  going to get back into her testimony, but it's
2  prepared by Miss Kathleen Staunton.
3      CHAIRMAN FITCH: That's not my
4  Respondent's 23.
5      THE WITNESS: I'm sorry, Petitioner's
6  23. My apologies.
7      CHAIRMAN FITCH: Is that the one you
8  want to discuss?
9      THE WITNESS: Yeah, that's the one --
10     CHAIRMAN FITCH: Now wait a minute, Mr.
11 Klayman. I'm asking Mr. Sujat.
12     Do you want to discuss Respondent's 23
13 or Disciplinary Counsel's 23?
14     MR. SUJAT: Actually I'd like to
15 discuss both of them. Right now we're looking at
16 23 and 30 of Respondent's exhibits.
17     THE WITNESS: Let's start with the
18 petitioner's.
19 BY MR. SUJAT:
20     Q.  You want to start with the
21 petitioner's. It was the amended complaint, I
22 believe. That references --

**Page 968**

1      A.  Number 23.
2      MS. LARKIN: What are we doing now?
3      CHAIRMAN FITCH: My understanding is
4  that we are now getting ready to talk about --
5      MR. SUJAT: Petitioner's 23.
6      CHAIRMAN FITCH: -- DX23, or
7  Petitioner's 23, as Mr. Klayman sometimes refers
8  to it.
9  BY MR. SUJAT:
10     Q.  So could you explain that?
11     A.  Yeah, I'll link it up and I'll try to
12 move it along.
13     This supplemental complaint was,
14 according to Ms. Sataki's testimony, prepared by
15 Kathleen Staunton and perhaps her cousin, Sam
16 Razavi. It states at paragraph C, "Have you filed
17 a complaint about this matter anywhere else?  If
18 yes, give details." "Complaint also filed in
19 Pennsylvania and Florida."
20     I wanted to be able to show that in
21 fact those complaints were summarily dismissed.
22 However, by the time that this case was

**Page 969**

1  reactivated, six years into the fact, the records
2  of those bars were purged. After five years
3  they're purged, essentially. So I got the
4  disciplinary records from those bars to show that
5  there was none, so that therefore this must have
6  been dismissed, this complaint.
7      That's what you're referring to in
8  Respondent's exhibits.
9      MR. SUJAT: Yes, we want to move those
10 two exhibits, Respondent's exhibits into evidence.
11     CHAIRMAN FITCH: Wait just a minute.
12 Because I think you want me and the other members,
13 at least as one does always as evidence that's
14 going on, to look preliminarily at something else.
15 And what you want us to look preliminarily at is
16 Respondent's Exhibit 23.
17     MR. SUJAT: Preliminarily we're looking
18 at Bar --
19     THE WITNESS: Yeah, and we're looking
20 at Respondent's Exhibit 23.
21     MR. SUJAT: -- Bar 23, and then we're
22 looking at 23, Respondent's.

**Page 970**

1      THE WITNESS: Well, I can turn then to
2  the Respondent's.
3  BY MR. SUJAT:
4      Q.  And 23 references the Florida Bar.
5      A.  Yes, 23 is my disciplinary record in
6  Florida, and it doesn't make any reference to any
7  action that was taken with regard to Ms. Sataki.
8      Q.  Alright.
9      A.  Therefore confirming that it was
10 dismissed.
11     Q.  Yes.
12     A.  And when Ms. Sataki testified she
13 confirmed that the Exhibit 23 and Bar Counsel was
14 accurate, and I specifically refer to line C, I
15 believe, complaint also filed in Pennsylvania and
16 Florida.
17     I'll turn to 30, as you requested.
18     Q.  Mm-hmm?
19     A.  And this is my disciplinary record in
20 Pennsylvania, and it says there's no record of
21 private or public discipline in Pennsylvania, and
22 that I have no complaints pending as of May 22nd,

---

26 (Pages 967 to 970)

In Re: Larry E. Klayman
June 25, 2018

| Page 971 | Page 973 |
|---|---|
| 1  2018. | 1  loophole, in Florida, because that was my first |
| 2  So that also confirms that Pennsylvania | 2  Bar, that you had to have lived there six months |
| 3  was dismissed because they don't have the records | 3  before you took the bar to waive into DC.  And I |
| 4  anymore. | 4  hadn't lived there six months before, so I |
| 5  And in addition I might add, Mr. Sujat, | 5  actually had to take the DC bar, and I passed. |
| 6  I had discarded a lot of my records over the six | 6  So since 1982.  That would make it 36 |
| 7  years before I was notified by Bar Counsel that | 7  years. |
| 8  this case was still active.  I thought the case | 8  Q.  So, getting into this case here, |
| 9  had been dismissed, so, my records either were | 9  approximately when did you meet Ms. Sataki for the |
| 10  discarded and/or lost.  I thought this thing had | 10  first time? |
| 11  been resolved, such as Pennsylvania and Florida | 11  A.  I met her in the late fall of 2009. |
| 12  had done. | 12  Q.  Where did you meet her? |
| 13  THE WITNESS:  Move these into evidence. | 13  A.  I was at that time, to give you a |
| 14  MR. SUJAT:  Yes. | 14  little context, representing a family whose sons |
| 15  CHAIRMAN FITCH:  They are admitted. | 15  were leaders of the student movement in Iran, the |
| 16  MR. SMITH:  I have a question about -- | 16  Green Movement.  Their names are Akbar and |
| 17  there's some handwriting appears on Page 2 of the | 17  Manouchehr Mohammadi.  And, you know, as you'll |
| 18  Bar Exhibit Number 23 and I'd like some | 18  see in some of the columns that I wrote, not only |
| 19  explanation for that handwriting, whether that's | 19  did I sympathize with them, because they were very |
| 20  something from the Florida Bar or whether someone | 20  brave people -- Akbar was tortured and killed; |
| 21  else wrote that in there. | 21  Manouchehr escaped -- and I was bringing a case |
| 22  THE WITNESS:  Are you talking about | 22  for Akbar, initially.  Later Manouchehr came into |

| Page 972 | Page 974 |
|---|---|
| 1  Respondent's exhibit, or -- | 1  the case.  So I became very much involved in the |
| 2  MR. SMITH:  Respondent's Exhibit Number | 2  Iranian freedom movement.  I felt this was |
| 3  23. | 3  something really unique that could change the |
| 4  THE WITNESS:  You said Bar exhibit. | 4  whole scope of the word.  And Iran -- I'm starting |
| 5  MR. SUJAT:  I think he's referring to | 5  to talk a little bit with an Iranian accent, a |
| 6  Respondent's exhibit. | 6  little sing-songy, which is a nice accent -- I |
| 7  MR. SMITH:  Respondent's Exhibit Number | 7  felt that if the regime could change, then we |
| 8  23 on the second page. | 8  wouldn't have an issue with nuclear weapons and |
| 9  THE WITNESS:  Yeah, that's my | 9  that Iran ultimately could become a friend of |
| 10  handwriting.  I was just making reference to the | 10  Israel, I felt, because they had common interests |
| 11  fact that it didn't have anything to do with | 11  in the Middle East. |
| 12  Sataki. | 12  So I became very much involved with |
| 13  MR. SMITH:  No objection. | 13  that and I really sympathized with that family and |
| 14  THE WITNESS:  Thank you for asking. | 14  I brought lawsuits for that family. |
| 15  BY MR. SUJAT: | 15  So insofar as I got to know the Iranian |
| 16  Q.  Mr. Klayman, how long have you | 16  community, I went up to Capitol Hill.  There was a |
| 17  practiced law in the District of Columbia? | 17  freedom match.  And standing, doing an interview, |
| 18  A.  I became a member in 1982, right before | 18  was a lady who appeared to be about 40 years old, |
| 19  I left the Justice Department.  I'm one of the few | 19  about that, and I walked up and I said, you know, |
| 20  people in the history of DC that actually took the | 20  "I'm Larry Klayman and I see you're doing an |
| 21  Bar exam here and didn't just waive in. | 21  interview.  I brought a lawsuit for Akbar |
| 22  In those years there was kind of a | 22  Mohammadi" -- Akbar's very famous -- and I said, |

27 (Pages 971 to 974)

App.0440

Page 975

1  "If you ever want to do a story about it, let me
2  know."  And it was very brief  because she was
3  busy doing her interview.  And I gave her my card.
4  And then I walked away.
5       I was with somebody else, probably my
6  client, the Mohammadi family, and she ran after me
7  as I was walking town the path at the Capitol on
8  the side facing the mall, and she says, "Here,
9  take my card."  And she had written on that card
10  her personal cell phone number.  She said, "Call
11  me," ok.  And I called her and I left a message.
12  She didn't get back to me for a while.
13       Eventually she got back to me, and she
14  said, "Larry, I've had some difficulties.  It's
15  been a hard time.  Sorry, I didn't call you back."
16       And I said to her, "Well, you want to
17  meet?  You want to have dinner sometime?"  She was
18  attractive.  She seemed nice.  And I was single.
19       So I invited her to Clyde's Restaurant.
20  And we met there.  And I was in the back, I had a
21  table for two.  And she came in, and I saw her at
22  the bar, and I came up to her, and she gave me a

Page 976

1  kiss on the cheek, you know, Persian style.
2       Latins are very -- are that way, too.
3       Q.  Could you explain "Persian style"?
4       A.  Well, it's like Latins.  You greet
5  somebody by giving somebody a kiss.  I think we're
6  really the only people that don't do that in the
7  world.
8       Q.  You're right.
9       A.  On the cheek.
10       And we sat down.  And the -- you know,
11  pleasantries, niceties, trying to get to know each
12  other.  And it was clear to me, I hadn't really
13  asked her there for a professional reason.  I had
14  no desire that I knew of at the time to represent
15  her.  I just wanted to get to know her and see
16  what she did and if she might be interested, you
17  know, in doing some stories and that kind of
18  thing.
19       It was no sooner than about five to ten
20  minutes before she broke down in tears and grabbed
21  my hand and said, "Larry, I really have big
22  problems.  I've been sexually harassed by my

Page 977

1  co-anchor," she described it, "Mehdi Falahati, and
2  before that I was unfairly criticized for my
3  abilities and I need help."
4       And I said, "Well, I'll try to help
5  you, and you, know, I'll do it out of friendship.
6  We're now friends."
7       I mean, I do that.  I'm not wealthy.  I
8  don't have much.  I never made a lot of money, and
9  so it was clear I would do it pro bono for her and
10  try to help her, you know.
11       And we later met and she would tell me
12  what was going on.  And we met in a private place.
13  I had actually had an apartment over in Arlington
14  near Pentagon City.  We met there, and that's
15  where we actually prepared complaints together.
16  So she was there when the complaints were
17  prepared.  She was giving me the information to
18  prepare.  We did them together.  And it developed
19  into a friendship, a close friendship, and I was
20  going through a hard time.
21       I had difficulty with my former
22  organization, Judicial Watch, that -- there's

Page 978

1  somebody from them sitting back there right now
2  taking notes.  How they got there is another
3  story.  And I have a malicious defamation judgment
4  against them, over the years, and I don't need to
5  get into that here, but his name was James
6  Peterson.  I actually hired him.
7       But I sympathized with her, because I
8  had gone through a hard time in my life.  I had
9  gone through a hard time in my personal life.  I
10  had gone through a hard time financially.  At one
11  point I had so little money I would, you know, go
12  to the Hyatt and get a free apple.  I mean, I
13  understood what it was like to hit the skids, you
14  know.
15       So my heart went out to her, and I
16  identified with her.  To some extent, and I -- you
17  know, by trying to help her and others that I was
18  helping, I was trying to forget about my own
19  problems that I had.  So it became a close
20  friendship.
21       From there, you know, I was introduced
22  to Tim Shamble.  She told me she was writing --

28  (Pages 975 to 978)

Page 979

1    that she had met with him over this.  I met Mr.
2    Shamble.  I was very impressed with him.  He's a
3    very honest and good person.  And, you know,
4    that's when we had the meetings that he testified
5    to a few minutes ago, where we discussed trying to
6    settle this thing, to settle the case.  He told me
7    how difficult Voice of America was to work with.
8         He was aware, to some extent, of my
9    background, that I take on difficult causes that
10   other people don't take on, and that he needed a
11   strong lawyer to take VOA on.
12        So we set out -- if I may just do a
13   little narrative here, we can break it up, but I
14   can move it along quickly, if the panel indulges
15   me...
16        We decided to try to set up some
17   meetings with VOA, and we did that, and we got
18   this resistance.  We got this hostility, and I
19   couldn't figure out why we were getting hostility.
20   But later Mr. Shamble explained to me, "That's the
21   way they are."  And we decided we needed to try to
22   coax them into a settlement.  That was the reason

Page 980

1    for the publicity.
2         Because I knew over the years that
3    publicity drives legal cases and other matters in
4    Washington, D.C.  No place in the world is
5    publicity more important to trying -- to move a
6    case.  Not just with agencies, but with judges.  I
7    saw that at Judicial Watch judges would take an
8    interest in the case if they read about it in the
9    newspaper or they saw it on TV.  Everybody wants a
10   sexy case, you know, so to speak, quote unquote.
11        So that was the reason for that.
12        And these people were so difficult that
13   I was basically saying to them, and in fact I told
14   them this in advance, you know, "This is not good.
15   It's not going to be good for VOA.  Let's settle
16   this thing."  And they just dug in their heels.
17        So that was the reason for the
18   publicity.  She agreed to it, Tim agreed to it,
19   and there will be other witness that will testify
20   in this proceeding that she agreed to the
21   publicity, and that to me was the way things could
22   be moved along.  And she accepted that.

Page 981

1    So at that point, when we couldn't
2    settle it, I then fashioned lawsuits, and perhaps
3    you'll show me those lawsuits, Mr. Sujat, that
4    also would try to put pressure on them, because
5    the publicity was not producing exactly what we
6    needed at that time.  And she had wanted me to sue
7    the harasser, Falahati, and two of her managers,
8    Susan Jackson and another one.  Because when she
9    complained to Mr. Shambles, she was -- she told me
10   she was retaliated against.
11        So we filed that lawsuit, and then I
12   did one against the Board of Governors, and you
13   know, they were named.  You know, it was a Bivens
14   case, but it was also a case that was fashioned,
15   later amended under a case called Wagner vs.
16   Taylor, and we also had filed -- we identified
17   that this morning -- an Office of Civil Rights
18   complaint, an administrative complaint.
19        Wagner v. Taylor stands for the
20   proposition that, while a civil rights complaint
21   is ongoing, administratively, that you can go to a
22   federal district court and ask them to preserve

Page 982

1    the status quo, which in this case would be --
2    because this is what she wanted.  She wanted to be
3    in LA.  That's where the Persian community is.
4    That's where her friends were.  She told me she
5    didn't like Washington, D.C.  She was only here
6    because of Voice of America.  And she didn't feel
7    comfortable in that environment in Washington,
8    D.C.  She told me -- in fact it's in her
9    testimony -- "Larry, if I stay here, I'll kill
10   myself.  I'll commit suicide.  And I don't want to
11   be in this presence, and I don't speak English
12   that well."  That was one of the criticisms of her
13   and her Farsi at VOA, and "I won't -- I'll get
14   fired in the Central News Agency, because my
15   English isn't good enough.  So they're setting me
16   up.  And I don't want to be there because of -- I
17   don't want to have to walk past my former
18   co-anchor, Falahati, every morning."
19        And she was very emotional and would
20   break down, and you know, apparently eight years
21   later, it's not changed that much, from what I
22   could see, you know, when she was on the witness

29 (Pages 979 to 982)

Page 983

1 stand, is that she fears people.
2        She has a -- I perceived her to have a
3 fear of men, and I tried to be her close friend
4 and I really started to care about her deeply.  I
5 really did.  And I don't make any apologies for
6 that, and I care about everything that I do
7 deeply.  That's who I am.
8        So we filed these cases and I told her,
9 I advised her when the case was filed, it was
10 first filed and assigned randomly --
11        CHAIRMAN FITCH:  Before we get to the
12 case, I was just taking some notes on something.
13        THE WITNESS:  Sure.
14        CHAIRMAN FITCH:  And you used the term,
15 and we've had it from -- Mr. Shamble?
16        THE WITNESS:  Shamble.
17        CHAIRMAN FITCH:  -- Shamble, as well,
18 "Central News Bureau."  Is that initial caps?
19 That's a formal part of the Persian part of VOA?
20        THE WITNESS:  Yes.
21        CHAIRMAN FITCH:  So it is a formal
22 section.  Alright.

Page 984

1        THE WITNESS:  It's not part of the
2 Persia News Network.
3        CHAIRMAN FITCH:  That is of course what
4 the record shows.
5        THE WITNESS:  It's a separate part.  It
6 broadcasts to the Middle East in English.  It's
7 mostly to Arabic countries.
8        CHAIRMAN FITCH:  This testimony is
9 important and I want the record to be precise.
10        THE WITNESS:  I yes.  And she -- you
11 know, Persian people, Iranian people, are not
12 Arabic.
13        CHAIRMAN FITCH:  Right.
14        THE WITNESS:  So they don't gravitate
15 to that culture, and they're very proud of being
16 Persian.  So she didn't really want to be there,
17 because she didn't feel that she would influence
18 the world much there and that she couldn't speak
19 English well.  So she felt they were setting her
20 up to fail.  So she was very adamant about going
21 to LA.
22        At this time we were trying to settle

Page 985

1 things.  I was writing letters, and you saw some
2 of them this morning.  And we were having meetings
3 with Voice of America, general counsel,
4 Kollmer-Dorsey, and others, and we weren't getting
5 anywhere.
6        So I then decided that, before we even
7 filed suit, and even thereafter, we would try to,
8 knowing the way Washington works, get some support
9 on Capitol Hill.  That's when Mr. Shamble and I
10 went up to meet with the Chief of Staff of Senator
11 Tom Coburn.  He had been very critical of Voice of
12 America, about the way it was broadcasting
13 overseas.  It wasn't as pro-American as he wanted.
14 He was critical of, you know, the employment
15 situation and we sought his help.  And I met with
16 his Chief of Staff who I'd known from earlier
17 travails in Washington, and Mr. Shamble was with
18 me.
19        We also went to the office of Senator
20 John McCain and Mr. Shamble was with me.  I had
21 several meetings with them -- we had several
22 meetings with them, at the staff members, and

Page 986

1 Senator McCain and Mr. Coburn never did much of
2 anything -- didn't do anything for Ms. Sataki.
3 They were preoccupied, I guess, with other issues,
4 which was unfortunate.
5        I then went to Senator Lieberman, asked
6 for his help.  He didn't do anything.  And then I
7 have a friend -- he's going to testify, who I got
8 to know, he's Iranian, he lives in the Washington,
9 D.C. community -- named Keya Dash.  Keya's brother
10 worked for VOA.  It's a prominent family, the Dash
11 family.  People might remember Dash Designers, it
12 was a clothing store?  The family owned that
13 store.  They're now in commercial real estate.
14 And Keya's brother worked for Voice of America in
15 the accounting department.  So I thought maybe we
16 could use that as a way to convince people at
17 Voice of America to help Ms. Sataki.
18        So I wanted Elham to meet Keya.  And we
19 met at Morton's Restaurant and Keya was there.
20 And Keya smoked cigars, so we went in the smoking
21 room -- I don't smoke -- on the side on the
22 patio...

In Re:  Larry E. Klayman
June 25, 2018

Page 987

1      As we're sitting there, I noticed --
2   and I'm trying to explain to Keya to meet Elham,
3   so he could be of help to her, you know, with the
4   family, and others he might know in the Iranian
5   community -- and sitting across from me is John
6   Boehner.  And I said, "Look, there's Congressman
7   Boehner.  He's soon going to be Speaker of the
8   House."  So I said, "Let's meet Congressman
9   Boehner.  Maybe he can be of some help."
10      So I had met Congressman Boehner, you
11   know, on more than one occasion in the past.  He
12   knew who I was from the past.  We were on Judicial
13   Watch all the time.  And I went up to him, and I
14   said "John" -- you know, in Washington you use
15   someone's first name, and I said, "how you been?"
16      He said, "I'm fine.  How are you,
17   Larry?"  And I said, "I want to introduce you to
18   my client, Elham Sataki.  She has a problem with
19   Voice of America."  And I turned to Elham and I
20   said, "Can you explain to the next Speaker of the
21   House what your problem is."  And she did,
22   briefly.  He was very friendly.  He had a couple

Page 988

1   of drinks.  He smokes a lot, and he was really
2   warm, and he said, "We'll help you."  And he gave
3   us a card of his Chief of Staff, and he says, "You
4   contact them and we'll help you."
5      When the meeting ended, he gave her a
6   kiss on the cheek.  It wasn't anything untoward.
7   And he said "I just wish you well and we'll help
8   you."
9      So we went up to his office, too, and
10   we asked them for help, and nothing ever
11   transpired there either.  I was getting very
12   disillusioned that he wouldn't help somebody like
13   this, you know, who had a need.
14      And I was also trying to get them to
15   clean up the situation about the division of
16   politics at Voice of America, because you did have
17   these two factions.  And one of the reasons that
18   Elham, we thought, was discriminated against and
19   why they didn't give dignity to her claims is
20   because her family was in the government of the
21   Shah, and that's how they wound up in Sweden.
22   They had to flee.  The parties that were in

Page 989

1   control of VOA were the anti-Shah people.  One of
2   them was named Alex Sajedi, S-a-j-e-d-i, and the
3   rumor was that his father was a "mullah," an
4   advisor to Ayatollah Khomeini in Iran.  How
5   someone like that could run the Persia News
6   Network, which I jokingly said was supposed to do
7   propaganda into Iran, was difficult to understand.
8      But there were these factions.  And
9   there were 30 VOA broadcasters that complained
10   about the coverage that was being done.  And I
11   think, to some extent, the then Obama
12   administration didn't want to offend the Iranians
13   that negotiated with VOA, but it offended the
14   broadcasters because they thought maybe VOA should
15   be used as it was during the days of the Soviet
16   Union and try to bring it down.
17      So, there was that.
18      And that's what ultimately gave rise to
19   my preparing these complaints with Ms. Sataki,
20   sitting there side-by-side with her, hour upon
21   hour.  And if you look at, you know, all the
22   correspondence and the complaints, they're very

Page 990

1   detailed.  They're very exact.  She was feeding me
2   information.
3   BY MR. SUJAT:
4      Q.  Mr. Klayman, what I'd like to do is I'd
5   like to introduce into evidence these pleadings.
6      A.  Yes.
7      Q.  For instance, two of them I have in
8   mind right now, Exhibit 2, Respondent's Exhibit 2,
9   Sataki vs. Falahati, and Exhibit 3, and exhibit
10   29, which would deal with Sataki vs. Broadcasting
11   Board of Governors, et. al.
12      CHAIRMAN FITCH:  Give us a minute,
13   because I think those are in different books, am I
14   right?
15      THE WITNESS:  Show me the first one,
16   Mr. Sujat.
17   BY MR. SUJAT:
18      Q.  Right.  Two and three.
19      MR. TIGAR:  Two is in binder one and
20   three is in binder two.
21      MR. SUJAT:  Two, yes, in the book
22   that's one of four.

                              31  (Pages 987 to 990)

                                                        App.0444

Page 991

1    CHAIRMAN FITCH:  Are you proposing to
2  spend some time on these?  If so, I will take a
3  minute and get a copy.
4    THE WITNESS:  Yes, let's take a minute.
5    MR. SUJAT:  Do you have that?
6    THE WITNESS:  Which exhibit?
7  BY KLAYMAN:
8    Q.   This will be Exhibit 2.  We'll do one
9  at a time.  That will be Exhibit 2, Respondent's
10  exhibit.  It's book one of four.
11    CHAIRMAN FITCH:  Alright, are we going
12  to talk about RX2?
13    MR. SUJAT:  That's correct, your Honor.
14    CHAIRMAN FITCH:  Ok.
15  BY MR. SUJAT:
16    Q.   RX2 is the case of Sataki vs Falahati,
17  and Mr. Klayman --
18    A.   Right, and for the court reporter, it's
19  M-e-d-h-i F-a-l-a-h-a-t-i.
20    A.   I brought this case because we wanted
21  to get a case against the harasser for the
22  harassment.  But it was understood that Mr.

Page 992

1  Falahati didn't -- I didn't do it for money.  I
2  did it because she wanted me to do it.  And I
3  thought it was the right thing to do, and it was
4  clear that she would never really get a recovery
5  against Mr. Falahati, but this was the right way
6  to proceed, so I did it, and I did it pro bono.
7    And it was also to put pressure on.
8  That was another reason I did it.  Because this
9  was their anchor.  I mean, ironically, and
10  tragically, while they wouldn't give her
11  ultimately -- and we'll get to that -- leave to
12  live in Los Angeles, they later cut her salary
13  off.  I then kept her afloat financially.
14    Falahati was still working there at
15  Voice of America.  Ultimately they put him on
16  administrative leave, after I filed the Office of
17  Civil Rights complaint.  They continued to pay
18  him, but they cut her off, you see?  So that's why
19  I subsidized her at the time -- you'll see the
20  documents later, I paid her what she would have
21  gotten, her salary.
22    Q.   This case here, it was filed, is it

Page 993

1  true, on March 1st, 2010 in the District Court, DC
2  Superior Court?
3    A.   Correct.  And then it was removed to
4  the federal court.
5    Q.   Could you explain a little bit more
6  about the --
7    A.   The other complaint was removed against
8  the Board of Governors.  You might want to show me
9  that.
10    Q.   Right.
11    A.   And of move this into evidence.
12    MR. SUJAT:  Yes, we're going to
13  introduce that into evidence.  So that is
14  Respondent's 3, Respondent's Exhibit 3.  So it
15  would be the next book.
16    THE WITNESS:  I believe it's Exhibit 2
17  we just identified.
18    MR. SUJAT:  We just introduced Exhibit
19  2, Sataki vs. Falahati.
20    CHAIRMAN FITCH:  And, Mr. Smith, you
21  will no doubt notice that there are some number of
22  pleadings behind tab number two in Respondent's

Page 994

1  book.
2    Do you object to any of that?
3    MR. SMITH:  I do not.
4    CHAIRMAN FITCH:  The entire body of
5  documents comprising Exhibit 2 is admitted.
6    MR. SUJAT:  Thank you, your Honor.
7  BY KLAYMAN:
8    Q.   And we have Respondent's Exhibit 3.  I
9  believe that would be the second book.
10    MR. TIGAR:  To be clear, Exhibit 3 is a
11  lengthy exhibit and portions of it are in binder
12  two and than portions carry over into binder
13  three.
14    Is that correct?
15    MR. SUJAT:  It starts in two of four,
16  Respondent's Exhibits 2 of 4.
17    CHAIRMAN FITCH:  And, as Mr. Tigar
18  points out, the latter part of Exhibit 3, which is
19  about an inch thick or more, appears at the
20  beginning of Respondent's Part 1 of 4.
21    MR. SUJAT:  Part 3 of 4, right?
22    CHAIRMAN FITCH:  No.  In mine,

32  (Pages 991 to 994)

Page 995

1    something appears at the beginning of part one of
2    four without any title, and I'm kind of
3    assuming -- well, I stand corrected.
4         Am I correct, for the record, that
5    Exhibit 3, the entire Exhibit 3, is found in the
6    Respondent's notebook that's called Part 2 of 4
7    and the Respondent's notebook that's called Part 3
8    of 4?
9         MR. SUJAT:  That's correct.
10        MR. SMITH:  I have a question.
11        You're correct, in my book there is
12   about an inch, inch-and-a-half thick compendium of
13   documents which precede what is marked as Exhibit
14   1, and I'm curious as to whether or not these
15   documents should be as part of --
16        CHAIRMAN FITCH:  And I have that
17   question also.
18        THE WITNESS:  Yes, they should be.
19        MR. SMITH:  My solution is to put that
20   inch thing of documents which precedes Exhibit 1,
21   which was in book one of four, into book two of
22   four as I would imagine the rest of Bar Exhibit

Page 996

1    Number 3.
2         CHAIRMAN FITCH:  Let me suggest that
3    counsel will workout this little organizational
4    matter.  Then we will make clear for the record,
5    if the Board wants to go through it at some point,
6    where exactly Respondent's Exhibit 3 can be found,
7    ok?
8         We think we know the answer, but you
9    folks are going to confer and we're going to make
10   the record clear.
11        MR. SUJAT:  Yes, your Honor.
12        CHAIRMAN FITCH:  Ok, we're talking
13   about Respondent's 3.  Go ahead, counsel.
14        MR. SUJAT:  And this is --
15        THE WITNESS:  What book is that in, Mr.
16   Sujat?
17        CHAIRMAN FITCH:  Respondent's 3 starts,
18   we are sure, in Part 2 of 4.
19        MR. SUJAT:  Right, it starts there.
20        THE WITNESS:  So you're going to turn
21   my attention to the Board of Governor's
22   complaints.

Page 997

1         CHAIRMAN FITCH:  And it starts with a
2    superior court docket sheet, a filing sheet.
3    BY MR. SUJAT:
4         Q.  Mr. Klayman, can you explain what
5    brought about this lawsuit?
6         CHAIRMAN FITCH:  I have misspoken.  I
7    have misspoken.
8         The Exhibit 3 that starts in Part 2 of
9    4 begins with not a superior court information
10   sheet but with a United States District Court
11   information sheet.
12        Go ahead.
13        THE WITNESS:  This lawsuit, Mr. Sujat,
14   which is styled 10-CV-00534, is the case that was
15   brought against the Board of Governors.  This is
16   the case that I described previously that named
17   Hillary Clinton as one of the Board of Governors.
18   She sits on top of it, as Mr. Shamble testified,
19   and all the rest of the Board of Governors.  And
20   it deals with Ms. Sataki's situation, not with
21   other political considerations.  And it was
22   brought to try to coax, by naming in a Bivens

Page 998

1    action, which is for Constitutional violations --
2    sexual harassment would be a violation of the
3    Constitution, discrimination based on sex -- plus
4    a First Amendment, and those kinds of things, to
5    put pressure on them to settle.
6         But it also contained a component,
7    because this was also amended as part of this
8    overall exhibit, to include the cause of action
9    for a Wagner vs. Taylor type remedy, which was, as
10   I testified, to have a federal district court,
11   while an administrative EEO or Office of Civil
12   Rights complaint is proceeding, who will preserve
13   the status quo, to make sure that the parties
14   aren't hurt, that the complainant is not hurt, the
15   harassed person or whatever that employee's
16   problem was.  And so, in the outset of this
17   litigation, that was my concern, because, number
18   one, I wanted to get a good result for Ms. Sataki.
19   I wanted her to be in Los Angeles.  That's where
20   she wanted to be.  You know, I cared what happened
21   to her, I cared about her.  And there was no
22   pursuit of damages or anything like that.  I just

33  (Pages 995 to 998)

Page 999

1  wanted to get her back to LA.
2       And, you know, one of the things about
3  litigating against the government, if you think
4  you're going to get rich on that, as Mr. Shamble
5  pointed out, if you ever see a judge it will be
6  probably be five, ten years down the line, with
7  all the appeals, maybe even longer.
8       So I never did this for money.  My
9  primary goal, and she agreed, was to get her back
10 to work at the field office on Wilshire Boulevard
11 in the federal building of Voice of America.  They
12 did do broadcasting out of there because, you have
13 over a million Iranians in Los Angeles.  This is
14 the biggest community in the world outside of
15 Tehran, so much so that people call Los Angeles
16 "Tehrangeles."  And there was no reason she why
17 couldn't be there, particularly since she had a
18 situation, and I'll describe that.  But there was
19 a situation that occurred while she was on leave
20 and visiting LA, and that's what this case was
21 about.
22       Now the case initially was randomly

Page 1000

1  assigned to Judge John Roberts, no relationship to
2  John Roberts, Chief Justice.  A different John
3  Roberts in the district court here.  And then for
4  some inexplicable reason it was transferred to
5  Judge Colleen Kollar-Kotelly.  And it was at that
6  time, and Mr. Shamble made reference to that and
7  that I raised the issue with both him and Ms.
8  Sataki, that this was a judge that was very
9  problematic for us.
10      MR. TIGAR:  Could I interrupt briefly.
11 I see the civil cover sheet for double O 543 and
12 it says Judge Huvelle.
13      THE WITNESS:  I think it actually
14 passed through the hands of two judges at the
15 time.  For some reason it kept getting reassigned.
16 That's my recollection.  So it was Huvelle and
17 then it was Roberts and then it was Kotelly.
18      When it went to Kotelly, I said to
19 myself, this is not optimal.  I had difficulty
20 with her in the past over a client where I had
21 sued George W. Bush, I made reference to that,
22 over over-surveillance of him, his name was Scott

Page 1001

1  Dolley.  She dismissed his case.  He claimed he
2  was being surveilled.  The New York Times
3  reporter, Eric Lichtblau, believed he was being
4  surveilled.  He made a comment after 9/11 at the
5  airport, to Southwest, that, when he was asked by
6  a check-in clerk, "Do you have any suggestions for
7  a chairman," he said "Yes.  You can check your
8  cargo holds."  She said, "Why is that?"  He said,
9  "There may be a bomb in there."  It was the wrong
10 thing to say.  He was the IT person in Congress
11 during Christopher Cox.  A very distinguished guy,
12 a young guy.
13      And so that was a problem I had.  She
14 actually dismissed the case based on newspaper
15 articles.  She was also head of the FISA court.
16 And then I had issues with a case I brought with
17 Judicial Watch.  I won't belabor that.  It's in
18 the record and I'll get into it later.
19      I mean, we live in the real world,
20 unfortunately, and people sometimes make decisions
21 on the basis of their own personal predilections.
22 Judges too.  That was the reason for Judicial

Page 1002

1  Watch.  And I had been a strong advocate against
2  the Clinton administration.  She was an appointee.
3  Her husband had defended a Secret Service agent in
4  the White House who had information about
5  Lewinsky.  She had been opposed by every
6  conservative group under the umbrella for the
7  communist organization.  Her reputation was she
8  didn't like conservatives, and both Ms. Sataki and
9  I are conservative.  She's conservative in the
10 Iranian sense and I'm a conservative Libertarian
11 in the American sense.  And I mean, as you can see
12 from later today with Ms. Allred, we're different
13 politically, but I have friends that are not
14 conservative, good friends.
15      But, you know, that was my concern.  I
16 raised it with them, and this is what happened in
17 the case.
18      Now, while this case was proceeding --
19 you'll find these in these exhibits -- is that, to
20 get her back to work in LA, I had to file for a
21 TRO and preliminary injunction.  But before that
22 happened, she had taken leave to go to Los

34  (Pages 999 to 1002)

Page 1003

1  Angeles, and while she was in Los Angeles, she had
2  word that she was being denied her reasonable
3  medical accommodation and transfer to LA, and she
4  had a nervous reaction and got very upset, and for
5  that reason I found psychologists and doctors for
6  her, two of which were Dr. Aviera and another one
7  was Dr. Long.  Aviera has a PhD in psychology.
8  She specializes in these kinds of matters.  And
9  Long was an M.D., a psychiatrist.  And there was
10  another one that I got for her that she didn't
11  like that one.  I didn't think he was high-powered
12  enough.  And I took her there and I paid for the
13  initial visits and everything.  A, I felt she
14  needed help psychologically, and also I felt, and
15  she agreed, that we could build a case that she
16  should be in Los Angeles to be able to consult
17  with her physicians.  And that was her home.
18  That's where she felt more comfortable.  She liked
19  the sun.  She liked the Iranian community.  She
20  told me she never really felt comfortable here.
21  She just liked the job at VOA.
22          When she was living here -- this became

Page 1004

1  an issue in the early discussions, as I elicited
2  on her testimony -- she was living here with a
3  coworker named Kevah, K-e-v-a-h, sharing an
4  apartment with him, and that, in conjunction with
5  rumors at that time that she had had this
6  relationship with this owner of NITV named Zia,
7  and that she got into an altercation with Zia's
8  wife, who keyed her car.
9          By the way, the case -- she didn't get
10  a temporary retraining over whether there was a --
11  the documents will show this and they're in the
12  record.  It wasn't over whether or not she had an
13  affair with Zia.  It was over the fact that Zia's
14  wife had keyed her car.  So she got a restraining
15  order on that.
16          And also because I became aware that
17  her former husband had also alleged that she had
18  been adulterous.  And I felt that it would be good
19  to get her out of Washington.  It wasn't good to
20  be living there with Kevah, another coworker,
21  because we're claiming sexual harassment by a
22  coworker.

Page 1005

1          Now in that context, one of the
2  criticisms of Ms. Sataki by VOA, her supervisor,
3  Susan Jackson, was not only that her English was
4  not good -- her Farsi was not good.  It wasn't a
5  literal Farsi.  She moved to Sweden, the record
6  shows, when she was very young.  So she never
7  learned to speak Farsi in her own language in her
8  own country.
9          It was also the fact that she was
10  getting help.  It was said that she couldn't
11  produce packages on her own, that someone was
12  helping her.  That was Kevah that was helping her.
13  And they had a close friendship, as well.
14          So I thought it was a good idea for a
15  number of reasons.  I suggested it to her and she
16  said she always wanted to be in LA anyway and she
17  didn't want to ever pass by Falahati again.
18          So that was how that decision was
19  arrived at.
20          So then I moved for a TRO and a
21  preliminary injunction before Judge Kotelly.  All
22  these records are in this record as being

Page 1006

1  admitted.  And they speak for themselves.  And I
2  made all these arguments.  I filed for a TRO and
3  Judge Kotelly said to me, "Why don't we roll this
4  into a preliminary injunction?"
5          I then asked for a hearing, because
6  this is a very fact-intensive analysis.  In fact
7  the motion that you will find in here has all
8  kinds of affidavits in it from the psychologist
9  and the psychiatrists that were treating her.  It
10  has a polygraph examination that I had her take,
11  it cost me $2,500 out of my own money, to confirm
12  that she was telling the truth.  She passed it.
13  There were affidavits from coworkers who had
14  knowledge of the harassment and the politics at
15  VOA, and it's a very thick, very well-documented
16  motion for temporary restraining order and
17  preliminary injunction.  I had affidavits from Mr.
18  Shamble.  I had affidavits from others, as well.
19          What happened was -- and this is why
20  the issues with Judge Kotelly came to the
21  forefront -- is that, without granting us an
22  evidentiary hearing, or even discovery, Judge

35  (Pages 1003 to 1006)

In Re:  Larry E. Klayman
June 25, 2018

Page 1007

1   Kotelly denied the TRO and motion for preliminary
2   injunction and didn't grant a hearing.
3          Now, you're going to hear testimony
4   from Judge Sporkin.  As this was going on, I
5   called Judge Sporkin.  He had become a friend of
6   mine.  I first appeared in front of him as a young
7   man.  It's kind of a funny story, if I may tell
8   it...
9          I had rented office space at 601
10  Pennsylvania Avenue when it was just being built,
11  this area was just being built up, from B.F. Saul,
12  II, who owned Chevy Chase; the richest man in
13  Washington, D.C.; could buy Dan Snyder ten times
14  over.  And I had a letter of intent and I was
15  waiting to get the lease.  I had forgone -- I was
16  a new lawyer and I rented a little portion on the
17  sixth floor -- ninth floor.  Someone from
18  Westminster Real Estate calls me up -- that's
19  owned by B.F. Saul, Chevy Chase -- and said "Mr.
20  Klayman, we rented it to someone else."
21          I said, "Well, you can't do that.  I
22  have a letter of intent.  Unless I die or

Page 1008

1   financially I can't qualify, you have to offer it
2   to me first."  I had been forbearing on that.  So
3   they said, "Sue me if you don't like it."  And I
4   was just a young lawyer.  I was just in my
5   thirties.
6          I said, "Ok.  I'll sue you."
7          I sued them, and it got assigned to
8   Judge Sporkin.  This is a funny story and very
9   interesting.  It tells you about the kind of judge
10  that I really respect and admire.  The first
11  status conference, he says, "Mr. Klayman, what's
12  this case about?"  And he has his staff sitting in
13  the jury box and he has his glasses down.  And I
14  said, "Your Honor, I have a letter of intent for
15  601 Pennsylvania Avenue and I got the rug pulled
16  out from under me and they rented it to somebody
17  else."
18          Judge Sporkin, says, "You know, Mr.
19  Klayman, the same thing happened to me last week.
20  He said, "I had a hotel room in New York.  I got
21  there and they had given it to someone else."
22          He said, "You know what I did?"  He

Page 1009

1   said, "I got a room ten times better."  And he
2   said, "How about 1001 Pennsylvania Avenue?  I can
3   put you there it's better."
4          And I said "No, I like 601.  It's a
5   personal preference."
6          He said, "Ok, if you win, I'll put you
7   in 601."
8          To make a long story short, at the end
9   of the day, he even let me depose B.F. Saul.  This
10  is like deposing Howard Hughes.  I was a young
11  lawyer.  B.F. Saul sat at a table about as far as
12  the court reporter is from me today.  And he was
13  instrumental in getting a settlement, and that's
14  how I wound up renting my office space over in
15  501.  I let 601 go and I had a settlement and I
16  went to 501.
17          But I had asked Judge Sporkin, I called
18  him years later, I said "Because, your Honor, I
19  admired you" -- I had him in another case.  I
20  never talked to him about the cases -- I said,
21  "let's have lunch one day."  So I got to know him.
22  So I called him up and I said, "Judge Sporkin" --

Page 1010

1   I was calling him "Your Honor."  He was retired
2   then -- and I explained to him the facts of this
3   case and Wagner V. Taylor, and I said, "What would
4   you do?"  This was before Kotelly ruled.  And he
5   said, "It's a chip shot, Larry.  Obviously I'd put
6   her to work in LA.  That's the status quo."
7          But Kotelly didn't.  And it pretty much
8   confirmed my impression of how she would react to
9   me and react to Ms. Sataki.  And also the fact
10  that she's the type of judge that believes
11  everything the government says.  And obviously I
12  don't.  And she discounted all of our affidavits
13  and ruled for the government without a hearing.
14          That's the basis of why I wrote a
15  column that said there is no basis in law or fact.
16  Because there really wasn't.  Without a hearing,
17  how could you make a ruling?  There is no basis to
18  make factual findings or make a ruling like that.
19  I thought it was heartless.
20          And you know, and this will tell you
21  something about me and how I interacted on this
22  case and what I did.  I moved for reconsideration.

Page 1011

1  Ms. Sataki knew every step of the way what I was
2  doing.  I was meeting with her.  I had previously
3  moved to have the case sent back to Judge Roberts.
4  That didn't succeed.  And I ultimately ruled --
5  moved to disqualify Judge Kotelly.  She knew of
6  that, Ms. Sataki.  Because if I could disqualify
7  her, I could get all of the orders vacated
8  potentially, and, you know, we could get a judge
9  who would give us a hearing.  And Judge Sporkin
10 said, "I would have given you a hearing, Larry, at
11 least a hearing."
12      And consequently there is no basis.
13 And that's just my opinion.  Ok.  I'm entitled to
14 my opinion.  There is no basis in law or fact.
15 The Bar tries to make an issue of that, Bar
16 Disciplinary Counsel.  But lawyers say that all
17 the time, there was no basis for the court to make
18 a ruling.  And there wasn't a hearing.  Because
19 without a hearing and just simply not considering
20 her affidavits and considering the government,
21 particularly when I had a polygraph that she
22 passed and all that medical information, to me was

Page 1012

1  exemplary of extrajudicial bias and prejudice.
2  There was no other way to explain it in my mind,
3  and there was no basis in law or fact.
4      So that's what happened.
5      Now, the day that that happened -- I'm
6  going to put it all in context and then Mr. Sujat
7  will take me back into certain exhibits -- I was
8  in Los Angeles, and --
9      MR. TIGAR:  The day that all that
10 happened --
11     THE WITNESS:  She ruled against Ms.
12 Sataki.
13     MR. TIGAR:  That day.  Ok.
14     THE WITNESS:  I took it to heart, as my
15 grandmother used to say, Freda Klayman, F-r-e-d-a.
16 It really affected me a lot.  Because, you know, I
17 had been fighting for justice for years at
18 Judicial Watch and then Freedom Watch and in my
19 private practice, and I didn't see how a judge
20 could do that.  I didn't see how a judge could be
21 so heartless.  Certainly Judge Sporkin wouldn't
22 have been.

Page 1013

1      In the context of everything, I was
2  just down and out; down and out about, you know,
3  situations going on in my personal life, you know,
4  continuously fighting with Judicial Watch.  The
5  directors were very wary of me when I left.  I ran
6  for the Senate and the person who runs it, Mr.
7  Fitton, is not a lawyer, and he always felt very
8  competitive with me.  They tried to harm me in a
9  number of ways.  I got a judgment against them for
10 defamation, later, later I got that.  And I was
11 really down and out about what happened with
12 Sataki, because it really shook my confidence in
13 the legal system, even more than it had been
14 shaken to get me to start Judicial Watch and
15 Freedom Watch.
16     But I went that evening with a friend
17 of mine, an Israeli-American friend of mine, Adam
18 Bar, to a restaurant in LA.  I had only two
19 glasses of wine, right, not much, but I was really
20 down and out.  And I drove home -- I was staying
21 at that time -- because I had just moved to LA
22 with someone I call my surrogate mom, Louise

Page 1014

1  Benson, who lived in the valley.  And I was
2  driving on the 405, which is the most dangerous
3  highway in the United States, towards Woodland
4  Hills.  It splits at some point on the 101 going
5  into LA.  The other way goes towards Ventura.  I
6  was supposed to go towards Ventura.  And it was
7  raining cats and dogs, and all of a sudden the car
8  in front of me jams on its brakes and I hit that
9  car at about 50 miles an hour.  My glasses fly
10 off.  And I'm basically blind, even with my
11 glasses, and I don't see that well.  And I
12 couldn't see, and it was raining cats and dogs; a
13 five-lane highway.
14     By the grace of God, I got over to the
15 side.  I left the car.  The driver that I hit, he
16 had jammed on his brakes, drove away, for whatever
17 reason.  Maybe he had a criminal record.  I don't
18 know.  And I just walked up the exit, the Haskell
19 exit past where my car was totalled.  It was
20 totalled.  It was a Saab, a used Saab.  And by the
21 grace of God I wasn't hit by a car doing that.
22 But I was looking at a laptop computer and a suit

In Re:  Larry E. Klayman
June 25, 2018

Page 1015

1 that I had in the car, and I walked up there to go
2 to my surrogate mom's house at Ventura.
3         When I got off the exit, that was where
4 the apartment -- close to the apartment that I
5 rented for Ms. Sataki.  And I called her because I
6 needed some help.  I was really shaking.  And she
7 didn't answer the call.  She conceded the other
8 day she knew I called but didn't answer the call.
9         So I then got a cab, a Yellow Cab and
10 went to my surrogate mom's house.
11         The next morning we went to get the
12 car.  We took it, had it towed in to my surrogate
13 mom, Louise.  She's one who kind of like adopted
14 me.  She's 87 right now.  And she helped Judicial
15 Watch when I was running that in the California
16 office.
17         MR. TIGAR:  So that my notes are
18 clear --
19         THE WITNESS:  Yeah.
20         MR. TIGAR:  Do you have a date for this
21 event?
22         THE WITNESS:  It was the day Judge

Page 1016

1 Kotelly ruled and I can get that for you.  I'll
2 tie it in.  I'm trying to get the narrative in so
3 we have it in context and then we will go back.
4         It was the date that Kotelly ruled
5 initially.  I think it was in June, but we'll make
6 that precise.
7         CHAIRMAN FITCH:  There's an allegation
8 that the issuance of the order denying the TRO
9 occurred on July 1, 2010.
10         THE WITNESS:  Ok, 2010.  That comports
11 with my memory, and it's in here in the exhibit.
12 So when we brief this I can lay it all out in the
13 chronology for you.
14         And the next day I get up.  I have a
15 concussion.  I go to Kaiser Permanente where I
16 have insurance.  They said I had a concussion.  I
17 rented a car through the insurance company, and
18 I'm driving to work the next week.  I had rented
19 some office space in LA, going down Ventura
20 Boulevard.  It was a sublease.  I just had one
21 office.  It was on Camden and Wilshire in Beverly
22 Hills.  I was trying to do some entertainment work

Page 1017

1 then.  That's why the locale was there.  I went to
2 LA because I wanted to use Hollywood to try to
3 change people's values and make it more ethical
4 and just.
5         So, I'm driving down Ventura.  This
6 tells you about me.  Because there's references in
7 the record in one of Ms. Sataki's last emails that
8 talks about me, in a mocking way, being Christian
9 and Jewish.  I was born Jewish.  And I feel
10 strongly about my heritage.
11         And as I'm driving down the exit at
12 Ventura and I go past Haskell, something happened
13 to me that happened to me ten years earlier in the
14 Catholic church in Georgetown -- Our Mother of
15 Victory I think is the name of the church, when I
16 was staying there with my then wife and my two
17 young kids -- ten years earlier alter boys had
18 come by at Christmas and I heard someone talking
19 to me saying, "Larry, I do exist.  Do you accept
20 me?"
21         My grandfather actually believed
22 intellectually in Jewish Christ, even though he

Page 1018

1 was Jewish and he thought of being a rabbi full
2 time.  Instead he went into the pork business.  I
3 didn't know he ate pork.
4         So I'm driving down and I'm really
5 upset about this injustice, and I'm saying to
6 myself, "Larry" -- in my head, "you're a
7 revolutionary; Jesus was a revolutionary.  I mean
8 obviously much more than you are.  And he told the
9 high priest to go stick it."  I was actually using
10 a nasty word.  I don't want to say it on the
11 record.  In my head.  And he also told the Romans
12 to go stick it.
13         And all of a sudden I got the same
14 feeling from ten years earlier.  And I felt maybe
15 I self-induced it.  Maybe I was trying to make
16 myself feel better.  So I pulled to the side of
17 the road.  And it builds for about 30 to 45
18 seconds, and it's this warmth and adulation.  And
19 I hear him talking to me and -- not in words, but
20 in thoughts, saying, "Larry, you are a
21 revolutionary and you'll pay a price, too, like I
22 did.  Obviously not like I did.  I paid the

38  (Pages 1015 to 1018)

Page 1019

1  ultimate price.  But you're working for me now.
2  Get it all out of your head.  Get all these
3  problems out of your head."
4          And, you know, I was very blessed and
5  fortunate that, you know, he's come to me two
6  times during difficult periods, and it cleared out
7  my entire head.  And to this day a lot of
8  things --
9          Because, you know, I'm in a very
10  contentious area of the law:  political interest,
11  Freedom Watch, taking on politicians, powerful
12  people.  I don't let things knock me off my
13  rocker.  I was always feeling kind of vulnerable,
14  even though I took strong actions.  That's why I
15  left and I ran for the Senate.  I felt I wanted a
16  different life.
17          But, I put myself in his hands.  And
18  the reason that I felt that way is because of the
19  strength of the feeling of injustice toward Ms.
20  Sataki, and because I cared about her.  Honestly,
21  I cared about her.
22          So that's what happened in that regard.

Page 1020

1          And she was very upset.  I talked to
2  her that day.  That had upset me, and she blamed
3  me.  I thought that that was inappropriate.  I
4  understood that she was upset, but she went too
5  far.
6          There is an email that Mr. Sujat is
7  going to show to you accusing me of being bribed,
8  disparaging my faith.  And that's the way she was
9  frequently with me.  That's why some of those
10  emails about respect is that I was really going
11  all out for her.  I believed in her.  I didn't
12  want her to sink.
13          I paid for her moving expenses.  I paid
14  for her car to go to LA.  I paid initially for the
15  psychiatrist.  I got her an apartment.  She had no
16  credit.  I got the apartment she wanted.  She
17  picked it out.  It was a two-bedroom.  I said,
18  "Ok, you can put your family and friends there."
19  I signed the lease for her.
20          I was not in good financial shape
21  myself.  That's why I had to look for apples at
22  the Hyatt around here when I came back to

Page 1021

1  Washington for a while.
2          And I just thought it was incredibly
3  ungrateful and very self-centered, and I told her,
4  I said, "You didn't lose your rights.  This is
5  just round one.  We still have a motion for a
6  complaint as to permanent injunction, and you were
7  put back to work in LA.  And I said, "And also,
8  you have your Office of Civil Rights and EEO
9  complaint, and you haven't lost any of your
10  rights.  We just lost round one."
11          But she just really blamed me and was
12  very, very nasty and I felt unappreciative.
13          And it was around that time that I had
14  told her -- because also in the context of
15  everything else, she started to ask me for things
16  that, you know, were very, very personal.  Like,
17  "Please go with me to buy a car," and she did want
18  me to buy a car.  You heard the testimony, your
19  Honors.  First she says it was because of her
20  credit that they were repossessing her car, and
21  that was true.  But then she says, "I need to get
22  a cheaper car.  So, can you buy it for me, Larry?

Page 1022

1  I have no credit.  There will be lower payments
2  and I'll pay you back for the payments."  She did
3  ask me to buy her a car.  And she asked me to help
4  her friend Kevah with a bankruptcy attorney, to
5  find one for him.  I found one for him, and then
6  she berated me over who I found for him.  She said
7  he was worthless.
8          There are two sides to Ms. Sataki:
9  there is one where she presents herself in a very
10  opinionated way as a victim, and then there's one
11  that's frankly vicious.  That's why you see that
12  last email.  I mean, who would write something
13  like that to somebody who put himself out like
14  that, whatever the circumstances, accusing me of
15  bribery.  And then mocking my Christian, Jewish
16  faith, highlighting Jewish faith.
17          And I might say, I always respected her
18  religion.  We'll get into this.
19          I told her actually I thought she
20  lacked confidence.  And you'll see that in all the
21  correspondence that we're going to go through.
22  She did have a lot of talent and I believed in

Page 1023

1  her. And I used to joke with her, I said, "You
2  could be the Tokyo Rose" -- in the positive sense
3  "at the VOA with Iran. You could be very
4  persuasive over there, that there's lots of other
5  places you could work.
6      "A, VOA doesn't pay that well, and B,
7  you've got all these networks that have" --
8  because Iran was very much in the news. They have
9  Persian hosts. There was one on CNN. Christiane
10  Amanpour is Persian on CNN news, and there's
11  another one, begins with a D. I said, "You can do
12  that."
13      So I tried to take her out of this
14  walling-off that she did for herself and say, "You
15  can get out into the real world."
16      I didn't mean anything by saying
17  "Persian ghetto." Look, there were Jewish ghettos
18  in Poland and there are in Miami Beach and New
19  York City. I didn't mean it in that way. What I
20  meant was, "You have to move out of this
21  environment and profit from the rest of the media.
22  You can do it. You don't need VOA. If you don't

Page 1024

1  succeed, get yourself another job." They cut her
2  off.
3      So, that's why I took her to that Movie
4  Guide, so she could meet people. Movie Guide, the
5  Christian Film and Television Commission, does a
6  miniature Academy Awards for family films and
7  films of faith -- not just Christian and Jewish
8  and Muslim, but all of them, teaching good values.
9  And I sat on the board of directors. The head of
10  it is Ted Baehr, B-a-e-h-r. Instead of giving
11  Oscars they give teddy bears to all the people who
12  win awards. And they have all the studios from LA
13  there, actors. They even gave an award one year
14  to Spiderman because it teaches good values, not
15  just religious films.
16      And I took her there and she was very
17  rude at that event, and that's what caused the
18  thing -- and she described, she already testified
19  on that, but it wasn't true. Yeah, I mean, we had
20  difficulty, but why I did go into the bathroom at
21  the Luxe Hotel. But she's so scared of people,
22  venturing out of her environment.

Page 1025

1      And she wasn't scared of me. That's
2  not correct. In fact she shook when Kathleen
3  Staunton met her. She used to shake all the time.
4      But she treated me in a really lesser
5  way, like I was there to do anything that she
6  wanted and didn't have to show any kind of concern
7  or any kind of an appreciation towards me.
8      In one email that she wrote, which,
9  we'll get into that, it was written by somebody
10  else, she says that she does appreciate me and,
11  you know, "thank you for helping me." But mostly
12  it was not -- it was like I was just there to
13  serve her, whether it was buying a car or an
14  apartment or this or that. And I did it because I
15  believed in her and I really did care for her.
16      So, that's what that was about.
17      And we tried to get her to get other
18  employment. Now there was right here, you'll see
19  it on M Street, the Christian Broadcasting
20  Network. I introduced her to Ted Baehr. Ted
21  Baehr is a minister. On July 21st -- I never got
22  baptized. He's actually going to baptize me at

Page 1026

1  his house this year after my birthday. And she
2  said, "Larry, I really don't feel Muslim. I
3  feel -- I don't feel anything." And she said, "I
4  think I might want to learn more about
5  Christianity."
6      And a lot of Iranians do that in that
7  country, and what radical Islam has done in their
8  country -- not Islam, but radical Islam. The
9  mullahs, they call themselves Zoroastrians, and
10  there's a big conversion there.
11      So anyway, I introduced her to Ted
12  Baehr and Ted Baehr, you know, mentored her, and
13  it was comforting for her. And Ted helped me try
14  to find her other employment, and that was the CBN
15  matter. And there was a very good chance that
16  she'd get a job there and could be very well paid.
17      Contrary to the Central News Bureau,
18  CBN was broadcasting right out of the valley in
19  Los Angeles, their headquarters are there, right
20  out of Iran, in Farsi, which was her language.
21      So I introduced her to Mark Woodland
22  who was present of CBN Broadcasting, and before

In Re:  Larry E. Klayman
June 25, 2018

Page 1027

1 she could get an interview, apparently -- because
2 the correspondence, whatever was missing, that's
3 why I asked for all of it to be produced, and
4 we'll go through that.
5      Mr. Razavi, Sam, with several different
6 alias names, apparently spoke to Mark Woodland and
7 scared him off and said, "You know she's a Muslim?
8 I don't have a problem with her working for you,
9 but she has certain conditions" -- we'll go
10 through that -- "that have to be met."  You don't
11 do that before you get an interview.  It was clear
12 that Sam didn't want her to be there, so Woodland
13 got cold feet and backed off.
14      But that was what that was all about.
15 I was trying to --
16      CHAIRMAN FITCH:  When was this the
17 summer of?
18      THE WITNESS:  Let's find that email.
19      CHAIRMAN FITCH:  The summer of 2010.
20      THE WITNESS:  Yes.
21      CHAIRMAN FITCH:  I want to make sure,
22 about other things, that we have finished with

Page 1028

1 relevant evidence relating to federal court
2 actions.
3      THE WITNESS:  Ok, I did that as an
4 aside.
5      CHAIRMAN FITCH:  We're beyond the TRO.
6      THE WITNESS:  We didn't really finish
7 with it.
8      CHAIRMAN FITCH:  I'd like to wrap up
9 that federal action in the next 16 minutes.
10      THE WITNESS:  Ok.  Fred, why don't you
11 walk me through it.
12 BY MR. SUJAT:
13      Q.  One of the concerns here on the BBG
14 case was -- while we have that open, I think maybe
15 that's the last place we were anyhow with our
16 exhibits -- the defendants were members of the
17 board of governors, or BBG, and then there's also
18 Hillary Clinton.
19      A.  Yes, and I included Hillary Clinton
20 because she's the head of the board of governors,
21 and there's nothing in that complaint that attacks
22 her for her politics or being the former First

Page 1029

1 Lady or anything like that.  She was just sued
2 like everybody else, that's all.  That was the
3 reason for that, to put pressure on her.  She
4 wasn't singled out.
5      But with regard to that, and Mr. Sujat
6 can get into that after the break as we go through
7 the specific pleadings, is that I tried to get
8 those orders vacated by resubmission and by filing
9 a motion for disqualification.  Ms. Sataki knew of
10 that.  Obviously if Judge Kotelly didn't
11 disqualify herself, and I thought if she had, we
12 could get our ruling vacated and start with
13 someone who would give us a hearing.  I asked for
14 a hearing.  She wouldn't give us a hearing.  I
15 couldn't understand that.
16      But none of the rights were lost.
17 That's the basis of the email that Mr. Shamble
18 wrote to her.  "Your rights haven't been lost.
19 This is just round one.  So communicate with me or
20 Mr. Klayman."
21      Now, if she had some problem with me,
22 she could always talk to Mr. Shamble.  She didn't

Page 1030

1 do that either, until much later.
2      CHAIRMAN FITCH:  I'm glad to hear this
3 evidence a little bit later.  I just really want
4 to finish --
5      THE WITNESS:  I apologize.
6      CHAIRMAN FITCH:  -- with the federal
7 court action --
8      THE WITNESS:  Ok.
9      CHAIRMAN FITCH:  -- and not come back
10 to it.
11      THE WITNESS:  Yes.
12      CHAIRMAN FITCH:  Because I think that
13 the court action is related to Disciplinary
14 Counsel's 1.7(b)(4) charge.  They have charged you
15 with conflict of interest, and I think one of
16 their theories is that the naming of Secretary
17 Clinton and related actions were not taken
18 entirely in Ms. Sataki's interest.
19      You have explained why you named her
20 and the Bivens basis and other basis for the
21 action and so on.
22      I think, unless Mr. Smith tells me

41  (Pages 1027 to 1030)

App.0454

In Re:  Larry E. Klayman
June 25, 2018

Page 1031

1   differently, that charge is related -- the only
2   relevance of this action, and we've heard you for
3   a while, but I want to make sure, if there's
4   anything else to cover about the federal court
5   action, you may want to testify more --
6         THE WITNESS:  Yeah, we'll testify on
7   it --
8         CHAIRMAN FITCH:  -- about it in the
9   next 12 minutes.
10        THE WITNESS:  Not necessarily.  Just
11  that we're continuing on.  And you'll see later
12  that, while Ms. Sataki purported to tell me that
13  she had the wrong address on some of the things
14  that she was sending, and she wasn't communicating
15  with Mr. Shamble either, told me to, as the Austin
16  case letter shows, to drop all actions.
17        She was getting advice from non-lawyers
18  that "Maybe if you're nice to them it will help
19  you," apparently.
20        You'll see that she, herself, sent the
21  Notice of Appeal to Judge Kotelly, she herself.
22  And Kotelly has responded --

Page 1032

1         MR. SMITH:  Excuse me, if I could be
2   heard.
3         I mean, I understand the committee has
4   given Mr. Klayman a tremendous amount of latitude
5   in allowing him to testify in a narrative manner,
6   but the record is not going to be well-served by
7   an ongoing narrative kind of like that moves from
8   point to point and contains a lot of hearsay, a
9   lot of anecdotal stories.  It's more like a
10  fireside chat, you know, on the radio than it is
11  testimony at this point.
12        I would suggest that when we resume,
13  perhaps in the next ten minutes, we allow Mr.
14  Sujat to kind of direct the testimony in this
15  matter and that the answers be kind of within that
16  framework, so that we don't go all around the
17  world as we --
18        CHAIRMAN FITCH:  Leaving aside the
19  characterizations, we'll take that up after the
20  break.  But we are not going to take up after the
21  break anything more about the filing and theory
22  and reasons, legal and strategic, for the actual

Page 1033

1   federal court action.  We could talk later about
2   what, at a later date, August, September, Ms.
3   Sataki did or didn't do.
4         But we are now down to ten minutes on
5   the filing and litigation of the federal court
6   action.  I think we've heard enough of that,
7   unless you have more to say, and you've said quite
8   a bit, about the reasons for the proposed
9   disqualification.
10        THE WITNESS:  Right.
11        CHAIRMAN FITCH:  And we have that.
12        Is there anything else about the
13  federal court action itself?
14        THE WITNESS:  Not that I can think of
15  at this time, but I'll think over it over the
16  break if there's something else.  I can certainly
17  identify when we come back more specifically the
18  pleadings that are at issue.
19        One thing is when I went back to have
20  Judge Kotelly recuse herself -- and this is part
21  of the exhibit, and we'll identify that, Mr. Sujat
22  will do that -- or be disqualified, I attached a

Page 1034

1   page, it was about 17 pages, single-spaced, of
2   factual errors that I alleged she had made.  I had
3   testimony from Ms. Sataki and from others with
4   regard to the affidavits and Judge Kotelly's
5   findings.  And to me that was so egregious, the
6   factual errors, that that was one basis that I
7   said there was no basis in law or fact for this
8   finding.
9         Not only that, because we never had a
10  hearing.  How do you rule on something like this
11  without giving somebody an evidentiary hearing,
12  after you have already refused to allow her
13  discovery?
14        And I had agreed with Ms. Sataki to
15  roll the TRO into the injunction --
16        CHAIRMAN FITCH:  Right.
17        THE WITNESS:  -- in good faith thinking
18  that I was getting a hearing.  So, that's why I
19  saw there is no basis in law and fact.
20        That's also in fact why I totaled my
21  car that night.  It's not funny.  But I was so
22  upset.  I just couldn't believe that any judge

42  (Pages 1031 to 1034)

App.0455

Page 1035

1  would do that.
2       And I've seen a lot in my career and
3  time.
4       CHAIRMAN FITCH:  I think we all have.
5  We have thoroughly examined the
6  litigation in that case through the order of July
7  7 denying the motion to reassign.  And of course
8  the TRO was decided in June.  We are not going to
9  hear any more about that.
10      THE WITNESS:  Understood.
11      CHAIRMAN FITCH:  We will hear, if you
12 wish to bring out, evidence about later steps in
13 the case in October, November and December,
14 because I think Bar Counsel has an accusation
15 against you about the very latter part of trying
16 to resuscitate that case and what was going on.
17      With that said --
18      MR. TIGAR:  Mr. Chairman, is Exhibit 3
19 in evidence?
20      THE WITNESS:  Yes, subject to
21 rejiggering it somewhat to make sure it's in the
22 right folder.  We'll do that over the break I

Page 1036

1  assume.
2       CHAIRMAN FITCH:  I do not show Exhibit
3  3 being in evidence.
4       I assume you move it into evidence, Mr.
5  Sujat.
6       MR. SUJAT:  Yes.
7       MR. SMITH:  To the extent that Bar
8  Exhibit 3 is just the pleadings --
9       MR. TIGAR:  I'm sorry, I'm not hearing
10 your words.
11      MR. SMITH:  To the extent that Bar
12 Exhibit 3 is just the pleadings that comprise that
13 Sataki vs. BBG case, then I would have no
14 objection.
15      CHAIRMAN FITCH:  I will admit Exhibit 3
16 with the understanding that the record needs to be
17 clarified a little bit about where future readings
18 can find all exhibits if they wish.
19      With that notation and reminder, we'll
20 adjourn a few minutes before 1:00 and stand in
21 recess until 2:30.
22      THE WITNESS:  Thank you, your Honor.

Page 1037

1  Appreciate your courtesy.
2       (Whereupon at 12:53 p.m. a luncheon
3  recess was taken.)
4  A F T E R N O O N   S E S S I O N
5       (Whereupon at 2:30 p.m. the hearing
6  resumed.)
7       CHAIRMAN FITCH:  We are back on the
8  record at 2:30.  All requisite persons are present
9  and I believe that Mr. Sujat is going to resume
10 his examination of Mr. Klayman.
11      CONTINUED DIRECT EXAMINATION
12      ON BEHALF OF RESPONDENT:
13      BY MR. SUJAT:
14   Q.  At this point I'd like to refer to
15 certain exhibits related to the termination of the
16 representation or alleged termination of the
17 representation.
18   A.  Ok.
19   Q.  This basically will show the chronology
20 of the letters that went out for notification.
21      So, first I'd like to refer to
22 Respondent's Exhibit Number 21.  It's a letter

Page 1038

1  dated August 4th, 2010, a letter to the Voice of
2  America director, Danforth Austin.  The letter is
3  from Ellie Sataki, and in it she instructs that
4  Larry Klayman has already --
5    A.  Just show me the letter.  Where is it?
6    Q.  Ok.  Again, Respondent's Exhibit 20 --
7       THE WITNESS:  Let me help you.
8       CHAIRMAN FITCH:  What exhibit number,
9  please?
10      MR. SUJAT:  That's Exhibit Number 21,
11 Respondent's Exhibit Number 21.  It's dated August
12 4th, 2010.
13      CHAIRMAN FITCH:  I think we're all
14 reasonably there.  And you may ask your question.
15 BY MR. SUJAT:
16   Q.  Mr. Klayman, can you take a look at the
17 letter.
18   A.  Yes.  This is a letter that purports to
19 be to Mr. Dan Austin of Voice of America and
20 apparently was sent to Mr. Shamble, copied to Mr.
21 Shamble in addition to Mr. Austin, but it was not
22 sent to me.

43 (Pages 1035 to 1038)

In Re:  Larry E. Klayman
June 25, 2018

Page 1039

1    Q.  So, it was sent to just Danforth
2  Austin?
3    A.  That's what it says, yeah.
4    Q.  No other person received a copy from
5  what you know?
6    A.  I'm testifying as to myself.  I don't
7  know who else received it.  I didn't receive it.
8    Q.  Thank you.
9    A.  From Ms. Sataki.
10     Let me point out, and it's something
11  that will come out later, and it's in the
12  supplemental exhibits --
13     MR. SMITH:  Objection.
14     CHAIRMAN FITCH:  Let's let counsel ask
15  his next question.
16     THE WITNESS:  I'm allowed to explain
17  the letter.
18     CHAIRMAN FITCH:  Well, it sounds like
19  you were explaining something else.
20     Counsel, where do you want to take Mr.
21  Klayman?  You can jump around.  Ask him a
22  question.

Page 1040

1  BY MR. SUJAT:
2    Q.  Yeah, well, I mean, my question here
3  is, when did you become aware of this?  Did you
4  ever receive this?
5    A.  Yeah, I testified to that.
6     What I wanted to add was that in this
7  letter, even though it wasn't sent to me, she's
8  instructing to get rid of all the civil actions,
9  ok, yet she did file a Notice of Appeal in her
10  case involving the Board of Governors of BBG, and
11  that Notice of Appeal is one of our supplemental
12  exhibits.
13    Q.  Right.
14    A.  So that's inconsistent.
15    Q.  Right.  So this inconsistency shown by
16  Respondent's Supplemental Exhibit 4 --
17     MR. SMITH:  Objection.  I mean, that's
18  a narrative.  I think we need a question, not a
19  narrative.
20     THE WITNESS:  Just ask me the question.
21
22  BY MR. SUJAT:

Page 1041

1    Q.  Ok, Mr. Klayman, can you take a look at
2  Respondent's Supplemental Exhibit Number 4.
3    A.  Can you give me a copy of that, please.
4    Q.  Yes.
5    A.  This is the Notice of Appeal that I'm
6  referring to, and the way I was able to get a copy
7  of this, this actually came out of Bar Counsel's
8  files, but I had a copy too, because it appeared
9  on the court's docket that, at the same time
10  she's telling Mr. Austin -- or actually before
11  that -- excuse me, later than that, and she's
12  telling Mr. Austin that she wants all cases to be
13  dismissed.  She's appealing the action.
14     So this is part and parcel to the
15  problems that I was having during that period in
16  time.  That's why I wanted to contact her.
17  Because I was getting communications that didn't
18  appear to come to her.  It wasn't in her way of
19  speaking.  It wasn't in her English.  It was in
20  virtually perfect English, as the letter to Mr.
21  Austin demonstrates.  That's why I needed to be
22  able to talk to her, and that's why the first

Page 1042

1  document in this exhibit, sent by Mr. Shamble, was
2  important, because we were trying to reach her --
3     MR. SMITH:  Objection.  Not responsive
4  to the question.
5     THE WITNESS:  I'm explaining the
6  context of the document.
7     CHAIRMAN FITCH:  No, overruled.
8     THE WITNESS:  Because I needed to find
9  out, you know, what she really wanted to do.  And
10  apparently, whatever advice she was getting, we
11  learned in her testimony, was from non-lawyers, it
12  was contradictory and in my view not in her best
13  interest.
14  BY MR. SUJAT:
15    Q.  Mr. Klayman, there were also other
16  letters that were sent regarding termination.
17    A.  Just show me the letters.
18    Q.  That would be Exhibit 8, Respondent's
19  Exhibit 8.  One dated November 15th, 2010,
20  addressed to the Klayman Law Firm at 2000
21  Pennsylvania Avenue, and then another one the same
22  date addressed to Klayman Law Firm, 201

44  (Pages 1039 to 1042)

In Re:  Larry E. Klayman
June 25, 2018

Page 1043

1  Massachusetts Avenue.
2       A.  Right.
3            The first one here is a November 15th,
4  2010, and it says "Termination of Services Case."
5  Now it's written again in perfect English and the
6  address here is incorrect.  So I never got this
7  letter, apparently.  And even if I did, I had to
8  be able to talk to her and communicate with her.
9  Because I knew this was not coming from her.  She
10  doesn't write like that and it didn't make any
11  sense to me.  And out of an abundance of caution,
12  I had to take actions to try to protect her, not
13  just contacting her -- trying to contract her, and
14  that's what she's talking about, a lot of the
15  calls, trying to reach her, but also asking Mr.
16  Shamble to communicate with her to get
17  instructions on what to do.
18            In the meantime, I myself filed a
19  Notice of Appeal, which is part of the documents
20  that were entered into evidence, and I paid for it
21  myself.  I mean, to this day I haven't been
22  remunerated or anything else that I paid for,

Page 1044

1  whether it was the apartment, whether it was
2  moving expenses, whether it was this, or anything
3  else.  And I don't seek to be compensated.  I did
4  it out of my heart to do the right thing and to
5  help someone who I thought was in distress and
6  needed help.
7       MR. TIGAR:  Excuse me, when you say
8  that the address is wrong, is that the 2000
9  Pennsylvania address is wrong?
10       THE WITNESS:  Yeah, and that
11  probably -- in some ways that was my fault, ok.
12  Because I thought the address was 2000.  It was
13  basically a mail drop.  I was practicing out of
14  Florida at that time.  So it never got to me.  The
15  real address is 2020 Pennsylvania Avenue.
16       MR. TIGAR:  You had 2000 Pennsylvania
17  at one time?
18       THE WITNESS:  I had it on letterhead at
19  one time and I corrected it.  But I didn't get
20  this, as a result.
21            The next letter that you're referring
22  to is addressed -- it's very similar --

Page 1045

1       CHAIRMAN FITCH:  Am I correct that this
2  office building in question is exactly on I Street
3  between 20th and 21st, but it carries a
4  Pennsylvania Avenue because of the --
5       THE WITNESS:  I think it fronts I
6  Street, yeah.  It fronts Pennsylvania, too.  So I
7  use that as an address when I'm in DC.
8       CHAIRMAN FITCH:  Does the entire office
9  building have one address?
10       THE WITNESS:  No.  The address of that
11  office was 2020 -- that drop, UPS, was 2020
12  Pennsylvania Avenue, and I still use that today.
13  But in any event, I didn't get the letter.
14            And even if I did, what I'm saying is I
15  had to get instructions on what to do, because it
16  didn't make any sense, and it's clear it wasn't
17  written by her.  That's why I was trying to send
18  emails.  You'll see later --
19       MS. LARKIN:  Have you ever received any
20  communication to 2000 Pennsylvania?
21       THE WITNESS:  No.  It went to the wrong
22  address.  That's why I had to correct it.

Page 1046

1       MS. LARKIN:  You've never received
2  anything?
3       THE WITNESS:  Not that I can recollect,
4  no.
5            And I was moving around a lot on that,
6  but I realized it was the incorrect address and I
7  changed it, ultimately.
8            And this next letter, 2001
9  Massachusetts Avenue, that was not my office
10  address either.  And in any event I didn't get the
11  letter.  But even if I had gotten the letter, I
12  would have not been able to dismiss all the cases
13  unless I was able to talk to her first.
14            That's why you'll see from documents --
15  and that's the more important point -- is that
16  that's why, you know, I sent some emails, and
17  you'll see them later, and they also came up in
18  Office of Disciplinary Counsel's supplemental
19  complaint exhibits, is I was communicating with
20  her trying to say, "What do I do here?"  Because
21  it was clear these communications were coming from
22  other people.  And I thought they may be coming

45  (Pages 1043 to 1046)

App.0458

Page 1047

1  from this Sam Razavi or someone who I had done
2  some research and seen that he had been convicted
3  of fraud in Las Vegas, Nevada.
4      CHAIRMAN FITCH:  Have you ever had an
5  office on Capitol Hill.
6      THE WITNESS: Capitol Hill?  No.  I
7  didn't have an office on Capitol Hill.
8      That was an address of an office run by
9  Armstrong Williams where I was working out of, but
10  it wasn't my office.
11     CHAIRMAN FITCH: The 201 --
12     THE WITNESS:  Yeah, the problem is that
13  there is no suite number on that, and I'm not
14  registered as a tenant this.
15     This is during the period of time in my
16  life that was very difficult.  This is when I was
17  going over to the Hyatt to get an apple.  I mean,
18  I was basically on my back, bankrupt, so it wasn't
19  my office.  I simply was using that when I was in
20  Washington, D.C.  And there was a suite number and
21  the suite number is not on the address here.
22     So, I also did not get that letter, but

Page 1048

1  again, even if I did, I could not have done what
2  she was asking at that time then forfeit over
3  rights, unless I talked to her, or at least Mr.
4  Shamble talked to her.
5      And she was always free to call Mr.
6  Shamble and ask him what was going on and she
7  didn't do that.  You heard the testimony.
8      CHAIRMAN FITCH:  What kind of building
9  is 201 Massachusetts Avenue?  I just want picture
10  it.
11     THE WITNESS:  It's an office building.
12  It's across from Heritage Foundation.
13     CHAIRMAN FITCH:  I'm sorry.
14     THE WITNESS:  It was across from
15  Heritage Foundation.  There's a barbershop in the
16  lobby.
17     CHAIRMAN FITCH:  Is it a new office
18  building?
19     THE WITNESS:  No, it's an older
20  building.
21     CHAIRMAN FITCH:  It's an older
22  building.

Page 1049

1      THE WITNESS:  There are a number of
2  offices there.
3      And I was moving around, so, honestly,
4  I didn't get these letters.  But the more
5  important point is, if I did, I have an obligation
6  not to dismiss outs cases and give up her rights
7  without some communication.  And that's why I was
8  even asking Mr. Shamble to be in communication
9  with her so I could find out what was going on.
10  BY MR. SUJAT:
11     Q.  Mr. Klayman I'd like to, if I could,
12  ask you questions relating to --
13     CHAIRMAN FITCH:  When was the first
14  time you saw either of these two letters?
15     THE WITNESS:  I'm not sure when I saw
16  them.  I mean, they come up in the documentation
17  that was produced by Bar Counsel.
18     There's also "Received, Chambers of
19  Judge Kotelly."  So I suspect that around January
20  24th this came to my attention.  She probably sent
21  it to me.
22     It says, "January 24th, Chambers of

Page 1050

1  Judge Kotelly, Received."  So that's probably when
2  I learned of it.
3      And she put it on the record that she
4  had put it on Pacer.
5      THE WITNESS:  I do observe that on the
6  November 15th, 2010 letter, below that there is
7  the word "received."  I can't read -- and that's
8  below that, there appears "January 14th, 2011,"
9  and then that appears, "Angela D." somebody, "a
10  clerk of court," and there's a possibility that
11  below that it says "United States District Court."
12  And as you point out, Mr. Klayman, there is a
13  clear "Received January 24th Judge Kotelly's
14  Chambers."
15     THE WITNESS:  I believe she mailed them
16  to me, and we're on the record, as received
17  January 24th, 2011 in chambers, Judge Kotelly.
18     I might add, during that period of
19  time, there was a lot of mail that wasn't getting
20  to me, including mail that Mr. Smith sent to me.
21  He sent something to a post office box in
22  Washington, DC., apparently the supplemental

46  (Pages 1047 to 1050)

## Page 1051

1  complaint at the time, and I never got that.
2       That actually was a fundraising box for
3  Freedom Watch and the mail got forwarded to the
4  cage of the people who open the mail contributions
5  and they didn't forward it back to me.  So I never
6  got this request for supplemental comment in that
7  time period.  I was moving around a lot.  I was in
8  very bad financial shape.
9       It also accounts for the fact that a
10 lot of the documents are missing because a lot of
11 it got lost in the shuffle.
12      CHAIRMAN FITCH:  Does the indication
13 Suite 354 in connection with 2000 Pennsylvania
14 Avenue or 2020 Pennsylvania Avenue mean anything
15 to you?
16      THE WITNESS:  Yes.  That's the correct
17 suite number, you know, it's the box number,
18 everybody calls it a "suite," but again it's at
19 2020, not 2000.  That goes to Pennsylvania Avenue
20 and they would have no way of knowing I was on
21 2020 when they got that letter.
22      And I wasn't on any kind of marquis or

## Page 1052

1  board, you know, in the front of the building.
2       CHAIRMAN FITCH:  Are you saying that
3  Suite 345 was in fact not a room or set of rooms,
4  but it was in fact a mail drop?
5       THE WITNESS:  Correct.  And that's the
6  way people refer to it.  A lot of people refer to
7  those mail drops as suites.
8       CHAIRMAN FITCH:  It's a suite, or the
9  appearance of it.
10      THE WITNESS:  It is a portion that it
11 goes into.
12      CHAIRMAN FITCH:  Ok.
13      THE WITNESS:  It's a portion of the
14 suite that it goes into, the box.  It's accurate
15 that it's a suite.
16      But the point I'm making is that 2000
17 Pennsylvania Avenue is a separate building from
18 2020.  It's a different part of the building over
19 there.
20      CHAIRMAN FITCH:  So there are at least
21 two entrances in this block-long building?
22      THE WITNESS:  There's several.  I think

## Page 1053

1  there are four entrances, and there's a Devon
2  Grill in front of it, and you have one on the
3  side, one on one side, one on the other side, and
4  two in the front.
5       So if the letter goes to 2000, nobody
6  in 2000 knows where I'm located.  That's the
7  problem, you see.  So they can't forward it.
8       CHAIRMAN FITCH:  The mail drop 354, was
9  that located sort of in the part of the building
10 that had lessors to 2020.
11      THE WITNESS:  I frankly don't know.
12 It's located -- it's like retail level
13 when you go in.
14      CHAIRMAN FITCH:  Correct.
15      THE WITNESS:  Ok, so it wasn't next to
16 lessors other than retail facilities on that.
17      I never really explored the rest of
18 that building.  I was just concerned that I needed
19 to get the address changed to 2020, and it
20 explains I wasn't getting a lot of things in that
21 period.  It was going to the wrong place.
22      CHAIRMAN FITCH:  The record should

## Page 1054

1  show, I suppose out of an abundance of caution,
2  that in evaluating evidence, I will look only at
3  what the evidence in the record is.  I'm familiar
4  with that building.  I was familiar with that
5  building, a long time along, when Kincaid --
6       THE WITNESS:  It's a nice building.
7       CHAIRMAN FITCH:  -- whether Kincaid was
8  there.  But I have no memory of it.
9       So I will take judicial notice of it
10 and I will not allow my non-familiarity to affect
11 it.
12      THE WITNESS:  Here's the other point...
13      Regardless of the address, regardless
14 of the fact that I couldn't accept what was being
15 sent because it clearly wasn't written by her, she
16 could have emailed me then, and she didn't.  You
17 know, she has all kinds of texts and emails and
18 all kinds of other things, and I didn't get notice
19 one way or the other, and neither did Mr. Shamble.
20 She could have always gone back to Mr. Shamble.
21 She was on good terms with Mr. Shamble.  He tried
22 to help her.  She knew, in effect, Mr. Shamble was

In Re:  Larry E. Klayman
June 25, 2018

Page 1055

1  my partner in helping her, and she didn't even get
2  back to him, and he didn't know.  That's why I
3  asked him to try to get ahold of her.
4          CHAIRMAN FITCH:  Mr. Sujat, go ahead.
5  BY MR. SUJAT:
6      Q.  There have been some emails that
7  reference contingency fees.
8      A.  Fred, just show me the document.
9      Q.  And I wanted to bring those to your
10  attention to look at.
11     A.  Yeah.
12     Q.  They would be SX12.  Let me just help
13  you with this.  Exhibit 12?
14  BY MR. SUJAT:
15     Q.  It's Exhibit SX12.
16         CHAIRMAN FITCH:  Mr. Sujat, I at least
17  don't have an RX12 -- oh, it's this group of X's.
18         THE WITNESS:  Supplemental exhibit?
19         CHAIRMAN FITCH:  I'm sorry, go ahead.
20  BY MR. SUJAT:
21     Q.  SX12.
22     A.  Yes.

Page 1056

1      Q.  Would you take a look at that, please.
2      A.  I will.
3          This is an email from Elham Sataki --
4  from me to Ellie Sataki and it's dated May 31st,
5  2010.
6          Ok, what I want to point out is that I
7  had always done this in a pro bono way.  I was
8  pointing out in this letter that this is the time
9  that I put in.  This was very, very expensive AND
10  that it's unlikely that this will ever be
11  remunerated in any final judgment.
12         As I testified earlier, to get a
13  judgment against the government, you know, we'll
14  all be close to expiring by the time that happens,
15  and that was not what we were trying to do.  We
16  were trying to put her back to work in Los
17  Angeles.
18         But I was getting to the point where I
19  didn't feel that I was being respected, as I said.
20  It was a difficult relationship, and if I
21  continued on, I'm suggesting 50 percent of any
22  recovery of what's fair.  But we never agreed,

Page 1057

1  either 40 percent or 50 percent, previously.
2          And, you know, it was around this time
3  period that I was trying to get her other counsel,
4  too, because I realized that she was just very
5  difficult to deal with.  I viewed her as, you
6  know, better.  It was getting personal.  She was
7  asking me to buy a car.  I cared for her.  I
8  thought it needed to go on to other lawyers, such
9  as Mr. Shea and Ms. Allred.
10         You, and I refer to this here, and I'm
11  trying to kind of wake her up, you know.  I did
12  really care for the woman, and she does kind of
13  have a diva mentality.  And I was seeing that, and
14  I realized, this is not good to continue on under
15  that circumstances.
16         So it was not that I was demanding 50
17  percent, because I was trying to get out of the
18  case at that point.  I was trying to make a point
19  that I put in a lot of time and expense, and to
20  this day, after the representation ended, for
21  whatever reason, I've never asked her to pay me
22  back.  I've never asked anybody to pay my back.

Page 1058

1          To the extent that there's
2  communications later on that we can get into, what
3  I was saying was if those people interfered in my
4  relationship, given the fact that I've put in so
5  much time and expense, then, you know, they should
6  have to pay for that.  Because it's all going for
7  an naught.  I tried and I tried.  It's all going
8  in the trash.  I didn't expect her to pay for it.
9  I would never ask her to pay for it.  She didn't
10  have any money to pay anyway.  She had no credit.
11         But I was very much concerned and very
12  much perplexed, and very much at a loss to try to
13  understand why, after we had done all that work,
14  why she would just say "give up."
15         And this is a crucial point, your
16  Honors: it was not in her best interest to drop
17  everything.  It was not in her best interest to
18  fall on her sword.  At any time she was free to
19  get another lawyer, and these people that were
20  helping her -- Kathleen Staunton, is a woman who
21  is educated.  She was the Chief of Staff in the
22  Orange County office for Congressman Rohrabacher.

48 (Pages 1055 to 1058)

In Re:  Larry E. Klayman
June 25, 2018

Page 1059

1  They obviously could have gotten her a lawyer
2  rather than just telling her to drop stuff.  And
3  same for Sam Razavi or anybody else that was
4  giving her what I perceived to be very bad advice.
5      So it's a little bit like the Wizard of
6  Oz and Dorothy --
7      MR. SMITH:  I'm going to object,
8  because this goes beyond the scope of the May 31st
9  letter, which is talking about the 50-percent
10  contingency fees.
11      There is no testimony pertaining about
12  her dropping the case, unless he understood her to
13  have dropped the case on or about May 31st, 2010.
14      CHAIRMAN FITCH:  No, I'm going to
15  overrule that, Mr. Smith.
16      I think that it is potentially and
17  theoretically in the Respondent's team view
18  relevant to and possibly explanatory of the charge
19  that he undertook to represent his client on a
20  contingent-fee basis, et cetera.
21      I may or may not be convinced at the
22  present time of what this stuff means, but it

Page 1060

1  seems to me it's potentially relevant and they
2  have a right to pursue their theory.
3      THE WITNESS:  So to finish my point is
4  that, it's a little bit like Dorothy in the Wizard
5  of Oz, where the voice says at the end, "Dorothy,
6  you could always come back to Oz.  You don't have
7  to be here," Auntie Em.  She could have always
8  gotten another lawyer.  She wasn't tied to me.
9      But, you know, I was representing her
10  for free.  That's a pretty good deal.  And she
11  knew that I believed in her.  She knew how much I
12  tried for her.
13      But like I said, there were two sides
14  to her personality: one you see, and sometimes the
15  other that was quite aggressive and I viewed it as
16  not respectful.
17      So that's the quandary we were in, and
18  at that time I said that I didn't have any
19  intention of asking her for 50 percent.  I just
20  kind of threw it out there to wake her up.  And
21  that's what that letter's about.
22      CHAIRMAN FITCH:  Next question.

Page 1061

1  BY MR. SUJAT:
2      Q.  Along the same line here, Mr. Klayman,
3  would you pull out SX19.
4      A.  Ok, this is an email from me to
5  elliesataki@yahoo.com, June 29th, 2010.  The third
6  paragraph is the key to this -- actually the third
7  paragraph and the fourth: "I did not help you for
8  money and it is not my motivation now."  This is
9  really where I was at.  "In fact, working as hard
10  as I have to try to get you back to PNN, Persia
11  News Network, gets me nothing, assuming I ever
12  wanted a percentage of the damages we could have
13  won in court, which I never asked for.  I told you
14  to 'keep it all.'
15      "There is no money in having you return
16  to Persia News Network, PNN.  There is the damage
17  claims, and I've spent several hundred thousand
18  dollars of my own expense trying to get you back
19  to a $75,000 a year job at a network that is a
20  cesspool of corruption.  But that's what you
21  wanted."
22      And then I get into some of the

Page 1062

1  difficulties with Judge Kotelly and this occurred
2  after she made that ruling denying the preliminary
3  injunction, and I get into, you know, the
4  difficulties with PNN and the rumors that were out
5  there that may have influenced their
6  decision-making.
7      I'm basically, you know, just trying to
8  explain to her that it wasn't my fault.  I did
9  everything I could to try to help her.  I'm not
10  the kind of person that worries about fault, you
11  know.  But because I cared for her.  I wanted her
12  to understand.  And I wanted her to understand
13  that she doesn't owe me any money and never will.
14      I didn't do it for a contingent fee.  I
15  didn't do it for money.  I did it because it's who
16  I am and it's the right thing to do.  I knew she
17  had no money.
18      I knew that, at that point we hadn't
19  gotten into the damage aspect of the case, and
20  that was something as far down the line that in
21  all likelihood she would not see, in the near or
22  immediate future, and I probably would never see.

49  (Pages 1059 to 1062)

Page 1063

1      We never went to discovery.  We never
2   took depositions.  It didn't go far enough.  And
3   before the relationship could go forward, into the
4   damage aspect of things, where there could in
5   theory be a recovery, the relationship ended.  So
6   there was no need to get into a contingent fee
7   agreement because it just simply wasn't relevant
8   at that point.
9          MR. TIGAR:  In the last paragraph of
10   SX19, it says, "I now agree with your conclusion
11   that it's best that you go back with your family
12   in Sweden."
13          Where had she expressed that
14   conclusion?
15          THE WITNESS:  One of her
16   frustrations -- I was trying to use reverse
17   psychology, even though I'm not a psychologist.
18   She always told me, and it hasn't changed, because
19   you heard it yourself when she testified, she
20   always told people that she was going to commit
21   suicide, that she is going to give up.  It was for
22   affect.  So I was basically saying to her -- I was

Page 1064

1   challenging her really with some reverse
2   psychology.
3          MR. TIGAR:  When did she say that she
4   had reached that conclusion?  That was the
5   question.
6          THE WITNESS:  In and around the time
7   that Judge Kotelly ruled against us.
8          I mean, she was as dejected as I was.
9   And I might add, your Honor, before this
10   proceeding ever began, the hearing, you received
11   correspondence.  It's in the record.  She said "My
12   life's been ruined.  It is put on hold for eight
13   years."  And obviously you heard the testimony.
14   It wasn't ruined.  She continued on fully employed
15   doing broadcasting with Persian networks in Los
16   Angeles, with cosmetic firms, which is her
17   background.  She's making a good salary.  Her life
18   wasn't ruined.
19          And I can jump ahead a little bit.  In
20   and around the time that Mr. Smith told me that
21   this case was not dismissed, that's when he
22   re-contacted me and said he would respond.  I

Page 1065

1   think it was shortly before he told me that, I'm
2   sitting in a cafe having lunch with my CHIEF OF
3   STAFF, and this woman comes running over to me,
4   screaming, "This man ruined my life.  This man's a
5   terrible person," in front of my chief of staff.
6   I didn't know who she was, because and I hadn't
7   seen her for a number of years.  First I thought
8   she was my haircutter, and then I realized it was
9   Ellie.
10          So she's screaming and she's just going
11   crazy.  And eventually I don't say anything, and
12   she walks off, and then she comes back again
13   screaming, and tells my chief of staff to contact
14   her, she'll tell her what a very terrible person I
15   am.
16          So she's just not stable, and, you
17   know, eight years later it's not me.  This is her.
18   And I'm very sorry what happened to her.  I wish
19   it would have been different.  But I didn't ruin
20   her life.
21          And she told you that her life was on
22   hold.  It obviously wasn't on hold.  She told you

Page 1066

1   that her life was ruined.
2          It's kind of like -- and I don't mean
3   this with any lack of respect.  It's a little like
4   Blanch DuBois in A Street Car Named Desire -- and
5   I've always believed in the generosity of
6   strangers.  You can also say no good deed goes
7   unpunished.  And there has to be somebody to
8   blame.  And I understand that, because victims,
9   when they get into this mode -- and I have
10   represented a lot of victims, people that were
11   wounded in battle, sexual harassment victims,
12   other than her, victims that were liaised, you
13   know, by foreign powers -- is that they tend --
14   the world tends to revolve around them and they
15   feel the world owes them.
16          So the reaction is, when you don't get
17   what you want, based on my experience, is to
18   strike out at the person that's easiest to strike
19   out at.  And that was me.  So I've never, ever
20   asked her to be paid back, and to this day I wish
21   her well.  I pray to God that she has a good life,
22   but I'm not the cause of her problems.

In Re:  Larry E. Klayman
June 25, 2018

Page 1067

1    CHAIRMAN FITCH:  This letter, SX19,
2    that you emailed to her on June 29th, 2010, so
3    this would have been about 27 days after the
4    TRO/PI was denied, correct?
5        THE WITNESS:  Right.
6        CHAIRMAN FITCH:  If, assuming the date
7    is correct.
8        THE WITNESS:  If the date is correct,
9    and we'll go back to it, yeah.
10       CHAIRMAN FITCH:  Both you and she were
11   in Los Angeles that whole period of time.  Is that
12   correct.
13       THE WITNESS:  It's my understanding --
14   I don't know where she was, but I was.
15       CHAIRMAN FITCH:  Ok.  That was my next
16   question.
17       Did you have communications with her
18   between roughly June 2nd and your unsuccessful
19   attempt to reach her that night after the
20   automobile --
21       THE WITNESS:  I'll have to go back and
22   check.

Page 1068

1        CHAIRMAN FITCH:  -- and June 29th,
2    2010?
3        THE WITNESS:  I don't recollect any
4    communications during that period.
5        CHAIRMAN FITCH:  Ok.
6        THE WITNESS:  She just kind of shut off
7    and just went off, you know, in effect -- and I
8    don't mean this in a disrespectful kind of way,
9    feeling sorry for herself.  That's why the
10   comments, "I'm going to go back to Sweden," she
11   doesn't want to go back to Sweden, and drama.  And
12   I was trying -- I was doing reverse psychology
13   there.
14       I really wanted to help her, that she
15   had to get other counseling because things had
16   gotten in a manner that we couldn't communicate
17   with each other.  If you can't talk to your
18   client, you can't represent your client.
19       CHAIRMAN FITCH:  The June 29
20   letter/email has a subject line and it says
21   "Sweden."
22       Do you have any recollection now -- and

Page 1069

1    Sweden is discussed in the last paragraph, as we
2    see and heard.  Do you have any recollection now
3    of why on June 29, or approximately at that time,
4    on or about that time, you sent her a letter about
5    Sweden, or had Sweden on your mind?
6        THE WITNESS:  I think that it may have
7    been when I had the conversations with her after
8    Judge Kotelly's ruling that I made that reference.
9        CHAIRMAN FITCH:  Say that again.
10       THE WITNESS:  I think, I think, I'm
11   trying to recollect, remember this is eight years
12   ago --
13       CHAIRMAN FITCH:  Fair enough.
14       THE WITNESS:  -- that around the time
15   that I had that conversation with her that we had
16   not won the preliminary injunction.  I think she
17   mentioned that, ok, "I'm going to go back to
18   Sweden."
19       We did have a telephone conversation
20   that day.  She really ripped into me that day.
21       CHAIRMAN FITCH:  I may have the
22   timelines a little bit confused.  If the denial of

Page 1070

1    the TRO and the PI came down on approximately June
2    1, 2010 -- when did the automobile accident
3    happen?  That night?
4        THE WITNESS:  That night.
5        CHAIRMAN FITCH:  And had you already
6    contacted her about the adverse decision?
7        THE WITNESS:  I talked to her earlier
8    in the day.
9        CHAIRMAN FITCH:  You called her earlier
10   in the day.
11       THE WITNESS:  Yeah, and that was one of
12   the things that really upset me.
13       CHAIRMAN FITCH:  Ok.
14       THE WITNESS:  the combination of Judge
15   Kotelly's ruling and your client reading you the
16   riot act --
17       CHAIRMAN FITCH:  Ok.
18       THE WITNESS:  And vilifying you.
19       CHAIRMAN FITCH:  Mr. Sujat.
20   BY MR. SUJAT:
21       Q.  Mr. Klayman, on the same line, would
22   you take a look at SX26, please.

51  (Pages 1067 to 1070)

Page 1071

1    A.  Yes.
2         This is an email that I wrote on or
3    around August 5th.  Apparently the letter to
4    Austin had been forwarded to me.  It wasn't sent
5    to me, and I'm trying to --
6         CHAIRMAN FITCH:  Wait a minute, Mr.
7    Klayman.  I apologize.
8         (Brief pause.)
9         CHAIRMAN FITCH:  You were going to
10   respond to Mr. Sujat's question?
11        THE WITNESS:  Yes.
12        This is an email I sent to Ms. Sataki,
13   apparently on or about August 5th, which was
14   dealing with the Dan Austin letter.  This may have
15   been brought to my attention by Mr. Shamble,
16   because he got the letter.  I didn't.  And that's
17   why the letter says, "The letter which you sent to
18   Dan Austin and Tim Shamble, but not to me, makes
19   no sense and is counterproductive for the
20   following basic reasons."  And I'm telling her
21   that, "Given everything we know about Voice of
22   America, being nice to them, appearing to placate

Page 1072

1    them or rollover for them is not going to get you
2    in all likelihood what you want."  I'm saying,
3    "Being nice to them won't get you anywhere anyway,
4    as Tim has also advised you.  You tried that
5    before, before I agreed to help you, and we tried
6    that when I tried to negotiate an amicable
7    solution when a lawsuit was filed."
8         And then I state, "Second" -- I won't
9    read the whole thing, but this is important.
10   "Second, by giving up all totally in court, this
11   is what you intended, which for the most part
12   eliminated any means for you to have VOA pay any
13   costs.  How then will you pay me back for rent,
14   living expenses, polygraphs and other costs you
15   agreed to?
16        Now, I never asked for this and I
17   wouldn't have taken it.  I made it clear.  There
18   are several things in here that were said, but
19   this is what she said.
20        I said, "If you give up the suit then
21   you are personally responsible for paying these
22   costs, in theory" -- not that I would make her pay

Page 1073

1    them, but in theory, when a client does something
2    like that, lawyers generally ask to be paid.  But
3    I have never asked to be paid, I never wanted to
4    be paid, and, you know, I did it for her.  That's
5    what "in theory" meant.  I think that's an
6    important word.
7         But there are other documents where I
8    clearly say, it's pro bono.  I'm not asking to be
9    paid back.  I don't want to ask to be paid back.
10   "I did it, Ellie, for you."  That's why I said,
11   when Mr. Smith produced this stuff the first day
12   of trial, I said there is a lot of stuff in here
13   that's extremely helpful, that explains where I
14   was at, what I was doing, what I was thinking and
15   what I said.
16        CHAIRMAN FITCH:  Go ahead, Mr. Sujat.
17   I'm not going to interrupt.
18        MR. SUJAT:  No problem.
19   BY MR. SUJAT:
20   Q.  So, staying in the line of financial
21   assistance that you provided Ms. Sataki and also
22   helping her with employment, I would like to refer

Page 1074

1    you to the Bar Exhibit 29.
2    A.  The supplement Exhibit 29?
3    Q.  No, just the regular Exhibit 29 Bar
4    exhibit, from Larry Klayman to Ms. Sataki.
5    A.  Yes, this is an email of November 21st,
6    2011.
7         You know, I felt that she had to get
8    other counsel at this time.  She had to move on.
9    I had gotten her a six-month lease.  I prepaid it
10   with my money.  And it's not that she was being
11   told to leave, but I wanted to give her notice
12   that we were going to likely have to go in
13   different directions, because the relationship had
14   become very difficult and noncommunicative.
15        And I said, "I will take, if you do not
16   want to assume the lease, I will notify the Serano
17   in the morning.  I have prepaid four months plus
18   the security deposit for a total of over $11,000,
19   the equivalent of five months rent.  The security
20   deposits will provide your monthly rent at the
21   Serano until and including September 7, 2010, as
22   of the date when you vacate the apartment.

52 (Pages 1071 to 1074)

Page 1075

1 However you must keep the apartment neat and clean
2 so they can at least begin to show it. The Serano
3 executives will keep you advised. This one-month
4 period should give you time to find another place
5 to live.
6      "Ellie, I'm not taking this position to
7 coerce you to do anything. You are your own free
8 agent and I respect that. I assume by now that
9 you have reflected and understand why we have to
10 move on in this regard. I'm not retaliating
11 against you. It's just that you cannot expect me
12 to indefinitely support you, like a boyfriend,
13 husband or family.
14      "So now that you do not owe me anything
15 going forward into the future, this should make
16 you feel better.
17      "I will continue to try to help you get
18 a job and if you're ill or there is an emergency,
19 you can always count on me. But like I told you
20 many times, I cannot continue to be where I'm not
21 wanted.
22      And I finally got the message, while it

Page 1076

1 hurts and while I would have given you the shirt
2 off my back, something has to be done, no matter
3 how much I love you and always will."
4      And the reference to love, too, I love
5 a lot of people. I love my dog, Beverly. I love
6 my friends. I did love Ellie. I'm not
7 embarrassed about that. That's one reason I tried
8 so hard for her, because I really did want her to
9 succeed and I really cared.
10      So when we got to the point of
11 separation, you know, that's why I suggested Tim
12 Shea and also, you know, made reference to that in
13 communications with Dr. Aviera that she didn't
14 understand that she needed to get other counsel at
15 that point.
16      Because I saw the potential of this not
17 going good when I could not communicate with her,
18 and when she expected things like me buying a car
19 or helping Kevah and berating me when I didn't get
20 the right lawyer, and it just was getting too
21 personal. And I recognized that.
22      But I didn't ever pursue my personal

Page 1077

1 interest. My interest was to get her what she
2 wanted. My interest was, as a lawyer, to win the
3 case. And to the extent that she was part of this
4 whole Persian movement to try to liberate Iran,
5 that was a good thing. That's why I admired her
6 and admired other people at VOA for tying to
7 that. And I was trying to do that.
8 BY MR. SUJAT:
9      Q. Mr. Klayman, would you look at SX31.
10 It's an email from you to Ms. Sataki dated October
11 24th, 2010.
12      A. Let me just check something Mr. Sujat.
13      Q. SX31?
14      A. If I could ask, Mr. Sujat, just to go
15 back, because it goes with the flow.
16      THE WITNESS: He's not as familiar with
17 this case as I am.
18      If you can, I want to direct your
19 attention to the emails in our exhibit book where
20 I'm talking to Dr. Aviera saying she needs to get
21 another lawyer, in our exhibit book.
22      I can help you with it. It's Exhibit

Page 1078

1 9.
2      MR. TIGAR: Respondent's Exhibit 9?
3      THE WITNESS: Respondent's Exhibit 9.
4      And this is an email May 10th -- May
5 8th, 2010 -- May 10th, 2010 where I'm saying in
6 paragraph three, "It's not healthy for you or me.
7 You will get better legal representation from
8 someone else like Tim Shea who does not have an
9 emotional conflict."
10      So I recognized that there was that
11 personal aspect of things and it was getting too
12 close. So that's why I tried to find somebody
13 else, and Mr. Shamble had given me Tim Shea's name
14 and he seemed like a very competent person.
15      And then in the next email, the next
16 page, "In case you did not see my text this
17 morning, I thought of someone who can take over
18 your legal representation. His name is Tim Shea.
19 Tim Shamble also knows him. And he has had
20 experience for clients before VOA, and PNN, Persia
21 News Network."
22 BY MR. SUJAT:

53 (Pages 1075 to 1078)

Page 1079

1   Q.  That's SX5 you're referring to --
2       CHAIRMAN FITCH:  I'm sorry, where are
3   we now?
4       THE WITNESS:  This is Respondent's
5   Exhibit 9.
6       CHAIRMAN FITCH:  I'm looking at RX9.
7       THE WITNESS:  Yeah, right.
8       CHAIRMAN FITCH:  What's the date of the
9   email you want me to look at?
10      THE WITNESS:  It's May 8th, 2010.
11  They're two of them.
12      CHAIRMAN FITCH:  And which one -- you
13  have testified about the first one.
14      THE WITNESS:  Yes, and I testified
15  about the second one, too.
16      CHAIRMAN FITCH:  You're on the second
17  one that says, "In case you did not see my text
18  this morning"?
19      THE WITNESS:  Yeah.
20      CHAIRMAN FITCH:  About Tim Shea?
21      THE WITNESS:  This is what I would like
22  everyone to understand, is that I realized it was

Page 1080

1   getting too close and I was trying to give her
2   another lawyer to take over the case.  I know
3   that, you know, there's an issue that was raised
4   by Bar Counsel about conflict.  I felt that, to
5   avoid a conflict, she should get other counsel.
6   That comes out in a number of different
7   communications.
8       Thank you, Mr. Sujat, for indulging me.
9       MR. TIGAR:  What kind of love
10  relationship did you want to have with Ms. Sataki?
11      THE WITNESS:  That's a good question.
12  I never wanted a sexual relationship.
13  I never had a sexual relationship.  I never
14  touched her.  I'm someone who gravitates to
15  somebody and, you know, I did love Ms. Sataki, but
16  it wasn't in any way intended to be a long-term
17  relationship or marriage or anything like that.
18      Because I was going through a difficult
19  period of my life and I sympathized with her and I
20  fell in love with her.  And I did that because I
21  kind of projected to myself, too, the difficulties
22  that I was going through at the time.  And it was

Page 1081

1   a way also of trying to forget about my issues,
2   you know, and trying to help other people.   And I
3   felt bad or her.
4       I had gotten divorced before that.  I
5   felt that I didn't do enough to try to help.
6   Maybe I was responsible in part for the earlier
7   divorce, I didn't give enough attention to my
8   female wife.  So I wanted -- I'm not trying to
9   psychoanalyze myself, but I'm basically trying to
10  say that I tried to help her.  I tried to help out
11  a woman in need.  I believe in women's rights.
12  Ms. Allred's my friend.  You know, we're
13  politically different.
14      So it was a combination of factors.  I
15  said that: "I'm not your boyfriend.  I don't want
16  to be your boyfriend."  That's in the
17  correspondence.
18      MR. TIGAR:  Thank you.
19      THE WITNESS:  And I would add that
20  there were times that I was treated so badly that
21  I reacted to that, and that was because I did
22  care.  Something like Sweden, you know, using

Page 1082

1   reverse psychology.
2   BY MR. SUJAT:
3       Q.  Mr. Klayman, would you open up SX3, ON
4   Pages 2 and 3.  This is an email from Ms. Sataki
5   to you dated 23, April 2010.
6       A.  I don't think I have that exhibit.
7       CHAIRMAN FITCH:  The date of the email
8   again.  April 23, '10.
9       MR. SUJAT:  It's 23 April, 2010.
10      CHAIRMAN FITCH:  Thank you.  Just
11  making sure.
12  BY MR. SUJAT:
13      Q.  So I would ask Mr. Klayman to take a
14  look at it and --
15      A.  Yes.
16      Q.  This would relate to the relationship?
17      A.  Yes.
18      It's an email of April 23rd, 2010 from
19  Elham Sataki to me, Larry Klayman: "Dear Larry, I
20  wish we didn't have this unfortunate problem at
21  this stage in my life."  It's important, so I want
22  to read this part...

54  (Pages 1079 to 1082)

In Re:  Larry E. Klayman
June 25, 2018

Page 1083

1        "But, as you know better than anyone
2    else, I'm so tired and anxious that I can't even
3    think about anything else but my case.
4        "I tried so many times to tell you, you
5    are not the problem.  As I said before the only
6    unfortunate thing is the timing" -- which is, you
7    know, kind of -- I mean that's kind of intimate of
8    itself, saying something from her point of view.
9        "If you say you love me, then you
10    should be able to put yourself in my shoes for
11    even one minute.  Right now I don't have any
12    money, because VOA is not paying me, for whatever
13    reason.  I'm not even sure if I have a job any
14    more.  I rented a new apartment with no money."
15        Actually I rented the apartment.
16        "I don't think I need to explain to you
17    what I have and what I don't because you know
18    every detail of my life now.  You always say I can
19    count on you  and lean on you with problems, but
20    sometimes you say some hurtful things like, 'you
21    never let me into your world with your reach'" --
22    she meant rich -- "'Persian friends.  What in

Page 1084

1    God's name were you thinking when you wrote that?
2    Sometimes I feel, not only I can't lean on you,
3    but for if there is an understanding or other
4    reason, you drop me suddenly and I lose all the
5    support."
6        I'm not going to read the whole thing.
7        "I don't and I cannot see anything
8    besides my case.  This is not that I don't see
9    your hard work and thoughtfulness, your kindness,
10    and above all your compassion that is in your
11    heart.
12        "Again, thank you for all your help and
13    understanding.  Can you please tell me we will win
14    or lose this case.  Please don't let anything come
15    between our friendship."
16        This is the way it started and then it
17    just kind of went downhill after that,
18    particularly when we didn't get the result we
19    wanted with Kotelly.  She blamed me.
20        She has a -- again, I'm not a
21    psychologist.  And I don't mean this with any lack
22    of respect.  She has two sides: One side is this,

Page 1085

1    and the other side is a very aggressive -- it can
2    be a vicious side from time to time.  It explains
3    a lot of the interaction.
4    BY MR. SUJAT:
5        Q.  Mr. Klayman, could you take a look at
6    SX20 while you have it there, the email from you
7    to Ms. Sataki.
8        A.  Yes.
9        This was talking about the interactions
10    with Kathleen Staunton in Congressman
11    Rohrabacher's office, and let me give you the
12    context of that.
13        It said I had known Congressman
14    Rohrabacher.  He was active with regard to -- in
15    Iran he sits I believe on the Foreign Relations
16    Committee.  He's from Orange County.  Ms. Sataki
17    is not from Orange County but I went to him to see
18    if I could get some help.
19        That's the day that I went to get some
20    help.  So I took her there and we met with the
21    congressman and we met with Kathleen Staunton.
22    And they said she is the manager of the office, in

Page 1086

1    effect.  And they said they would try to help
2    Ellie.  And from that day forward I didn't really
3    have much, if any, contact with Kathleen Staunton.
4        But I did find out -- I mean I did talk
5    to her at some point, and I was trying to find out
6    whether Congressman Rohrabacher was going to do
7    anything.  No one else had done anything, and she
8    told me, as recorded in this email, which is now
9    in evidence, that she was told by Ellie Sataki
10    that she never wanted to do anything in court and
11    implied that she did not want to be in LA and that
12    it was all my idea, which is totally false.  I
13    mean, you can glean that from her own testimony
14    and Mr. Shambles' testimony.
15        So I'm writing at the bottom, and I'm
16    saying, "Saying and implying stuff like that not
17    only shows further how you view me, but hurts your
18    case.  If you undercut your lawyer, it speaks
19    poorly of you.
20        "Indeed I sense that Kathleen and the
21    congressman are now backing off and have less
22    enthusiasm to help you."

55  (Pages 1083 to 1086)

App.0468

In Re:  Larry E. Klayman
June 25, 2018

## Page 1087

1  They were worked under a false
2  pretense, that I had made this all up myself, and
3  that may explain why Kathleen Staunton wrote the
4  Bar complaint, the supplemental complaint.  There
5  is another aspect of this which bears on
6  credibility, where I say, that, you know, "Your
7  diamond ring and a litany of past and present
8  persons who abused you who may not have stolen from
9  you," I'm telling her in fact I'm not one of them.
10  But Ms. Sataki had actually told me
11  that the diamond ring had been taken probably by
12  her girlfriend or someone like that.  And then she
13  blames the apartment for it, unequivocally.  You
14  might remember that.  The only explanation is, and
15  she's talking about her diamond ring and breaking
16  in, and Dean Popper, the manager, with her
17  roommate, who was laying naked in bed.  She blames
18  me for that.  But she told me she thought it was
19  her roommate, her friend, her female friend who
20  had taken it.
21  So, for whatever reason she makes up
22  stories when it suits her.  And so she was selling

## Page 1088

1  Kathleen a bill of goods there and I had to try
2  and straighten it out.
3  But it also explains why Kathleen
4  helped her come after me.  Because that's
5  obviously not true, based upon Mr. Shambles'
6  testimony and my testimony.  You'll hear other
7  testimony.
8  So that's what that's about.
9  Q.  Regarding this other side of her, would
10  you take a look at SX38.
11  A.  This is an email I sent.  Again, I'm
12  trying to get in touch with her.  It was sent to
13  her on September 15th, 2011.
14  CHAIRMAN FITCH:  What document?
15  THE WITNESS:  Supplemental Exhibit 38.
16  CHAIRMAN FITCH:  What document are we
17  looking at?
18  MR. SUJAT:  SX38.
19  MR. TIGAR:  Oh, 38.
20  THE WITNESS:  It's September 15th,
21  2011.  I'm sending an email to Ms. Sataki.  And
22  the subject, "Is it your fault that I lost my

## Page 1089

1  case?"  Apparently that's what it was perceived
2  where she was coming from, and it says.  "I tried
3  to" --
4  MS. LARKIN:  Can you speak up, please.
5  THE WITNESS:  Yes, that's where I
6  perceived she was coming from, and why she
7  wouldn't communicate.
8  "I tried to communicate with you, but I
9  got no response.  This is the first time I've
10  heard from you, assuming that this email was
11  written by you.  It appears you are still
12  experiencing severe emotional issues."  I'm
13  referring to the email below.
14  "You had a right of appeal and could
15  probably appeal the lower court's decision.  The
16  appeal will not be dismissed finally until October
17  24th, 2011, so if you decide to appeal, you can
18  notify the court that you want to proceed.  It
19  would be best if you have another attorney, given
20  your statements below."
21  And this is symptomatic of the way she
22  talked to me frequently.

## Page 1090

1  And she wrote, "Mr. Klayman, are you
2  happy now that you completely destroyed and lost
3  my case; a case with so many evidence and
4  witnesses?  Only a very bad and clueless attorney
5  could lose it, or lost it on purps (sic), just
6  because he made a dill" (sic), she meant a deal,
7  "with the other parties."  She's accusing me of
8  being bribed.
9  "I don't know if you are Christian or
10  Jewish" -- and then she underlines Jewish, which
11  is kind of curious.  And I took it that she was
12  taking a swipe at, you know, the fact that I'm
13  Jewish -- "because whichever suits you best you
14  become one.
15  "But I do believe in karma and what you
16  have done with my case and loosing (sic) it and
17  not stop working on it when I ordered you to, one
18  day you will answer to God, even if you throw your
19  life -- go throw your life and go play with people
20  life.
21  "I am nobody.  Just a little girl that
22  was retaliated and harassment by some VOA

Page 1091

1  employee, and you seed (sic) that you can help me.
2  Not only did you not help me, but destroyed my
3  life to nothing."
4           This is consistent with, you know,
5  other things that she said and did, including
6  going up to the president.
7           You can see from this, this is her
8  English, ok. That is why she didn't want to work
9  in the Central News Bureau, because her English
10  is not that good, and it's broadcast in English.
11  That's why I knew when I got these other
12  communications in perfect English that it was not
13  coming from her, and why I needed to communicate
14  with her truly, with fully informed consent, what
15  she wanted to do.
16          Because this is her English. But this
17  is a very aggressive, abrasive, nasty and
18  demeaning letter. And to accuse your lawyer of
19  taking bribes when he did so much to try to help
20  you, that's the other side of Ellie Sataki. So
21  when I talk about respect, that's what I'm talking
22  about.

Page 1092

1           So I suggested she get another lawyer,
2  too.
3           CHAIRMAN FITCH: This letter is dated
4  September 15, 2011. This is about ten months or
5  more after the period of preceding correspondence
6  that we've seen.
7           Were there communications between you
8  and Sataki in 2011, for example?
9           THE WITNESS: Yeah -- I think that what
10  triggered this was my attempt to communicate with
11  her after the Judge Kotelly ruling, and she's
12  reacting to that. Because I am sending emails; I
13  am sending texts, "Please communicate with me or
14  Mr. Shamble." And she just let's it rip here.
15  And, you know, to the best of my recollection,
16  right now, it was a one-way communication.
17          Again, I didn't understand why, even if
18  she didn't want to talk with me, she didn't talk
19  with Mr. Shamble. And there's also a very
20  important --
21          CHAIRMAN FITCH: Well, let me interrupt
22  or stop you for a minute.

Page 1093

1           THE WITNESS: Yes, sir.
2           CHAIRMAN FITCH: I haven't done a
3  timeline here by any means, but I don't see any
4  Kotelly rulings in the 2011 period.
5           If you don't know the answer, it's no
6  big deal. You have overnight to figure it out.
7           THE WITNESS: Yes, I'll take a look at
8  it, your Honor.
9           CHAIRMAN FITCH: It seems to be an
10  email that's ten months after many events.
11          THE WITNESS: It may be -- again it's
12  eight years later. Maybe she just bubbled up one
13  day and decided she was going to take a shot at
14  me.
15          CHAIRMAN FITCH: You mean the
16  intervening period or hiatus or something else may
17  have some significance? It may not have some
18  significance.
19          THE WITNESS: It came up recently. It
20  came up recently when I was just trying to get a
21  continuance of a month, "ruined my life, my life's
22  worth nothing."

Page 1094

1           We know now she's gainfully employed,
2  making a good living.
3           This bubbles up periodically with her,
4  and it started with people like her supervisors
5  and people around her before I even knew, and she
6  thought they were out to get her. And, you know,
7  that's just where she's at, emotionally, that
8  people are out to get her, particularly men.
9           And, you know, I think she probably had
10  bad experiences in the past. I don't want to get
11  into that. I respect her past. But these rumors
12  were out there at Voice of America, and it was
13  something I had to deal with, too.
14          And it was unfortunate, you know, and I
15  can say this, based on my own experience, there
16  are a lot of people who come out of an environment
17  like she grew up in, she told me once that when
18  there was the Iran/Iraq war, when Saddam Hussein
19  was fighting the Ayatollah Khomeini, not Kamenei,
20  that there were bombs coming into Tehran, that she
21  was literally hiding under her bed. That's a very
22  charged atmosphere where you think things are

Page 1095

1    going to happen to you.
2        I'm not a psychologist.  I don't know
3    what happened.  But, you know, she had a lot of
4    things happen in her life that were not from me
5    and were not caused by me.  And she confided in
6    me, and that's one reason why I cared so much,
7    because I saw the whole totality of the person.
8        I thought at the time at Voice of
9    America that this was unfair and unjust, what
10   happened, and my heart went out to her.
11       CHAIRMAN FITCH:  Mr. Sujat, you have a
12   choice of stopping now or stopping one minute from
13   now.
14       THE WITNESS:  This would be a good
15   point.
16       MR. SUJAT:  Let him see if he can wants
17   to adds to the question.
18       CHAIRMAN FITCH:  Let him ask his
19   question.
20   BY MR. SUJAT:
21       Q.  This type of attitude, has this
22   continued up to the present?

Page 1096

1        What I'd like you to do is take a look
2    at this transcript of Ms. Sataki dated May 30th,
3    Page 200, you know, if you can just explain what
4    you see here.
5        MR. SMITH:  Objection to the comments
6    upon Ms. Sataki's testimony a few weeks ago.
7        CHAIRMAN FITCH:  I think we'll hold
8    that question to think about it, and we will stand
9    in recess for fifteen minutes to set up the remote
10   testimony.
11       THE WITNESS:  Thank you.
12       (Recess taken.)
13       (Gloria Allred appearing before the
14   hearing committee via video conference.)
15       CHAIRMAN FITCH:  I believe we are back
16   on the record now.  All requisite parties are
17   present.
18       We have interrupted Mr. Klayman's
19   examination in order to take evidence from Ms.
20   Gloria Allred.
21       Ms. Allred?  Can you hear us?
22       THE WITNESS:  Yes.

Page 1097

1        CHAIRMAN FITCH:  I believe you
2    understand, do you not, that this is a
3    disciplinary proceeding before an ad hoc hearing
4    committee of the Board on Professional
5    Responsibility of the District of Columbia Court
6    of Appeals.
7        THE WITNESS:  Yes, thank you.
8        CHAIRMAN FITCH:  We are prepared to
9    receive your testimony.  If you will raise your
10   right hand, I will swear you.
11       Ms. Allred, do you solemnly swear or
12   affirm that the testimony you are about to give
13   will be the truth, the whole truth and nothing but
14   the truth?
15       THE WITNESS:  I do.
16       CHAIRMAN FITCH:  I think, Ms. Allred,
17   that you can see that there is a hearing committee
18   of three here, and you can also see counsel table
19   and the podium at which Mr. Klayman is standing.
20   He will be examining you.
21       If you are prepared to proceed, I
22   believe we are also.

Page 1098

1        THE WITNESS:  Yes, I am prepared to
2    proceed.  Thank you.
3        CHAIRMAN FITCH:  Mr. Klayman.
4    Whereupon,
5            GLORIA ALLRED,
6    called as a witness on behalf of Respondent, and,
7    after having been first duly sworn, was examined
8    and testified (via video conference) as follows:
9        DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
10           BY MR. KLAYMAN:
11       Q.  Ms. Allred, how are you today?
12       A.  Just fine.  Thank you, sir.
13       Q.  Would you please state your name.
14       A.  I'm attorney Gloria Allred,
15   G-l-o-r-i-a, A-l-l-r-e-d.
16       Q.  I don't mean to get into much of your
17   background, since you're so famous.  Would it be
18   fair to say that you're the most famous women's
19   rights lawyer in the history of this country?
20       A.  Well, I think it's fair to say that my
21   law firm, Allred Maroko and Goldberg, has been the
22   leading private women's rights law firm in the

In Re:  Larry E. Klayman
June 25, 2018

## Page 1099

1  United States for 42 years.
2      Q.   And I believe you were roasted by the
3  Friar's Club over the weekend for your efforts and
4  service.
5      A.   That's correct.  That was actually
6  Thursday night.
7      Q.   Ok.
8      A.   For my efforts to make sure that women
9  could be members of the Friar's Club, and it
10 celebrated its 30th anniversary of accepting women
11 as members as a result of my efforts.
12     Q.   And recently, just briefly, I believe
13 you were the subject of a Netflix documentary of
14 your life story.
15     A.   That's true.  It's called Seeing
16 Allred.  It is streaming on Netflix right now and
17 it is essentially a documentary about my 42-year
18 battle for women's rights.
19     Q.   Of course I don't need to ask this, but
20 you are a lawyer?
21     A.   I'm a lawyer and also a partner in the
22 law firm Allred Maroko and Goldberg.

## Page 1100

1      Q.   You're also licensed in the District of
2  Columbia, are you not?
3      A.   Yes, I'm licensed in California, in the
4  District of Columbia and also in New York.
5      Q.   Did there come a time, and I refer your
6  attention Ms. Allred to Respondent's Supplemental
7  Exhibit Number 1, when I sent you an email on or
8  about June 15th, 2010, which stated -- and if you
9  have at that in front of you, because I sent it --
10     A.   I do.
11     Q.   -- to your assistant, Patty.
12     A.   I have it.
13     Q.   It says "Gloria, I would like to
14 discuss your taking this case over.  It's not
15 because I don't believe in the strength of Ellie's
16 claims.  She has very strong claims and the
17 damages are large.
18          "Please call me when you can to
19 discuss.  Ellie can meet with you.  If your firm
20 wishes to meet with her, she is now living in Los
21 Angeles.
22          "Warm regards, Larry."

## Page 1101

1      Q.   Do you remember receiving that from me?
2      A.   Yes, we do show that you have sent --
3  that you did send that email to me on Tuesday,
4  June 15th, 2010, at 6:09 p.m.
5      Q.   And since I'm referring to "Ellie," I
6  must have had prior discussions with you about her
7  before I even sent the email, otherwise I wouldn't
8  have used "Ellie."
9          Is that your understanding?
10     A.   You know, I don't recollect whether you
11 had prior discussions with me or not.
12     Q.   Now --
13     A.   But you may have because you didn't
14 give her last name.
15     Q.   Right.
16          So, did there come a point in time when
17 we had a conference call -- Ellie Sataki, me and
18 you -- to discuss whether you would represent her?
19     A.   I believe there was such a call.  I
20 don't recollect what was said on the call or
21 exactly when it took place.
22     Q.   In any event, did you decide to

## Page 1102

1  represent her?
2      A.   No.
3          Let's put it this way: we did not
4  represent her.
5      Q.   Now, there's a subsequent --
6      A.   I don't know whose decision that was,
7  but we did not accept representation of her.  She
8  was never our client.
9      Q.   I turn your attention to a letter which
10 your partner Mike Maroko -- am I pronouncing his
11 name correctly?
12          CHAIRMAN FITCH:  If I may ask you about
13 your last answer, you said "I don't know whose
14 decision it was."  You essentially said, "I do not
15 know whose decision it was not to represent her."
16          Were you --
17          THE WITNESS:  Right, I don't recollect
18 the contents of any telephone call that we have
19 and I wouldn't have any notes on it either.
20          CHAIRMAN FITCH:  Was it a decision of
21 the law firm that -- when you say you don't know
22 who, were you referring just to the law firm, or

Page 1103

1  you were you referring to the law firm and Ms.
2  Sataki?
3       THE WITNESS:  Well, we only accept
4  cases as a law firm.  We don't accept cases
5  individually outside of the law firm.
6       CHAIRMAN FITCH:  Ok, sure.
7       THE WITNESS:  What I'm saying is, we
8  didn't end up representing her, which I would have
9  no way of knowing what that reason was.
10      But, you know, whether it was a mutual
11 decision, whether it was all three, two, one, it
12 would just be sheer speculation on my part.
13      All I can say is, we didn't end up
14 representing her.
15      CHAIRMAN FITCH:  Thank you.
16 BY MR. KLAYMAN:
17   Q.  Ms. Allred, this email from me to you
18 occurred over eight years ago, correct?
19   A.  This was 2010.
20   Q.  Right.  And it was over eight years
21 ago?
22   A.  That's correct.

Page 1104

1   Q.  It's a long time, isn't it?
2   A.  Yes, and we -- every day and all week,
3  for more than four decades, to represent
4  individuals, and some we can -- some we accept as
5  clients, some we do not accept as clients.
6       I just have no way of finding out the
7  reason that we didn't represent her.
8   Q.  I turn your attention to two emails
9  that were produced by Bar Counsel as Exhibit 2,
10 Respondent's Supplemental Exhibit 2.
11   A.  Yes.
12   Q.  Excuse me, it was produced --
13   A.  I'm looking at it.
14   Q.  It was produced by your department?
15   A.  Yes.
16   Q.  And I'm going to read the bottom email:
17 "Friday, March 23rd, 2012 at 10:05 a.m. to Gloria
18 Allred" --
19       CHAIRMAN FITCH:  Mr. Klayman, what
20 volume is this in?
21       MR. KLAYMAN:  These are the
22 supplemental exhibits I handed you today.

Page 1105

1       CHAIRMAN FITCH:  They have the same
2  numbers.
3       MR. KLAYMAN:  We can reenter them if
4  necessary.
5       CHAIRMAN FITCH:  But I didn't know
6  where the new supplemental exhibits were.
7       MR. KLAYMAN:  Right.  This is Exhibit
8  2, the second page, Respondent's Supplemental
9  Exhibit 2.
10      CHAIRMAN FITCH:  Go ahead.
11 BY MR. KLAYMAN:
12   Q.  This purports to be an email of Friday,
13 March 23rd, 2012, sent at 10:05 p.m. to Gloria
14 Allred from Elham Sataki, Subject: Please let me
15 meet you."
16      It's very short.  I'll just read it...
17      "Hi, Gloria.  My name is Elham Sataki.
18 I'm watching you on CNN now.  All my hope
19 regarding my case died, and I'm on medication and
20 go to my therapist every week just so I can stay
21 alive for my mom.  And I love my mom, the same way
22 that you (sic) daughter loves you.  My mom is a

Page 1106

1  strong mom like you.  I'm in LA and hope that I
2  can have a meeting with you regarding my Voice of
3  America case.
4       "Larry Klayman was representing me in
5  this case but completely destroyed it.  You can
6  Google and YouTube me.
7       "I just want you to know, if there is
8  any hope left, I have emailed women's rights
9  groups, but no answer."
10      You see that?
11   A.  Yes, I'm looking at that now.  Thank
12 you.
13   Q.  Your partner sent this to me last week,
14 correct?
15   A.  I don't know when he sent it to you,
16 but I do have it in front of me.
17   Q.  And you responded to that email,
18 looking above.
19   A.  Yes --
20   Q.  -- with, stating to Ms. Sataki, on
21 March 23rd, 2012, at 10:15 p.m.
22      So you responded to her within ten

Page 1107

1  minutes, correct?
2      A.  That's correct.
3      Q.  "I was willing to consider helping you
4  at the beginning of your case, but unfortunately a
5  great deal of time has passed and at this point
6  I'm no longer able to assist you, given my other
7  existing commitments to my clients who have
8  retained me.
9          "I do wish you the best of luck and
10  that you receive justice."
11          That's your email?
12      A.  Yes, that's my email, correct.
13          MR. KLAYMAN:  I have no further
14  questions.  Thank you.
15          CHAIRMAN FITCH:  Mr. Smith?
16          Mr. Smith is the Assistant Disciplinary
17  Counsel, Ms. Allred.
18          Mr. Smith do you have any questions for
19  Ms. Allred?
20          MR. SMITH:  Disciplinary Counsel has no
21  questions of Ms. Allred.
22          CHAIRMAN FITCH:  Well, Ms. Allred, we

Page 1108

1  didn't take too much of your time in the hearing,
2  but it took time to set things up and arrange your
3  schedule.  It goes without saying that all of us
4  are very appreciative and we wish you the best for
5  the rest of your day.  Thank you.
6          MR. KLAYMAN:  Thank you Gloria.  Thank
7  you very much.
8          THE WITNESS:  Thank you very much.
9          (Video conference has ended and Ms.
10  Allred is excused.)
11          CHAIRMAN FITCH:  Should we stand in
12  recess?
13          MR. KLAYMAN:  Yes, that would be good
14  idea.
15          MR. SMITH:  That's fine with me.
16          Recess for the rest of the day?
17          CHAIRMAN FITCH:  Yes.
18          MR. SMITH:  Absolutely.
19          CHAIRMAN FITCH:  I think, based on
20  prior discussions, that everyone agrees it's time
21  to adjourn, and we will reconvene from our recess
22  at 9:30 a.m. tomorrow morning.

Page 1109

1          MR. KLAYMAN:  May I raise something?
2          CHAIRMAN FITCH:  The final point, we
3  think part or all of the pleadings being entered
4  is no longer in question, so we will start 9:30
5  Wednesday.
6          MR. KLAYMAN:  And I wanted to point
7  out, because of the availability in schedules that
8  I have Mr. Sporkin, with your permission, coming
9  in the morning.  His testimony will be short, too,
10  Judge Sporkin.
11          CHAIRMAN FITCH:  We'll take it whenever
12  it's best for Judge Sporkin.
13          MR. KLAYMAN:  Yes.
14          CHAIRMAN FITCH:  Will that be 9:30 or a
15  little bit later?
16          MR. KLAYMAN:  It will be a little
17  later.  We will start with my testimony.  He's
18  coming from Chevy Chase.  It won't be a long
19  testimony.
20          CHAIRMAN FITCH:  I'm just concerned for
21  your sake of taking twenty minutes of your
22  testimony and cutting you off.

Page 1110

1          We stand in recess until 9:30 a.m.
2  tomorrow morning.
3          (Whereupon the hearing stood in recess
4  until Tuesday, June 26, 2018, at 9:30 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

61 (Pages 1107 to 1110)

**A**

A-l-l-r-e-d 1098:15
a.m 871:3 878:11
  878:12 1104:17
  1108:22 1110:1,4
abide 884:21
abiding 930:11
abilities 901:19
  977:3
ability 964:17
able 929:6 968:20
  1003:16 1041:6
  1041:22 1043:8
  1046:12,13
  1083:10 1107:6
abrasive 1091:17
absolutely 876:11
  890:15 910:3
  966:11 1108:18
abundance 1043:11
  1054:1
abused 1087:8
Academy 1024:6
accent 974:5,6
accept 962:8
  1017:19 1054:14
  1102:7 1103:3,4
  1104:4,5
accepted 962:4
  980:22
accepting 1099:10
accident 1070:2
accidentally 964:15
accommodation
  916:4 917:15,16
  1003:3
accomplish 915:1
  922:9
accountable 962:18
accounting 986:15
accounts 1051:9
accurate 899:19
  900:22 901:16
  903:14 906:6
  907:17 908:2
  925:9 927:7
  970:14 1052:14
accusation 884:1
  1035:14
accuse 1091:18
accused 883:7
accusing 1020:7
  1022:14 1090:7
act 1070:16
acted 900:19
action 907:13

923:19 924:11
931:15 970:7
998:1,8 1028:9
1030:7,13,21
1031:2,5 1033:1,6
1033:13 1041:13
actions 912:19
  924:4 932:5
  1019:14 1028:2
  1030:17 1031:16
  1040:8 1043:12
active 964:15 971:8
  1085:14
activity 908:11
actors 1024:13
actual 922:17
  932:22 1032:22
actuality 922:21
ad 871:3,10 1097:3
Adam 1013:17
adamant 892:9
  984:20
add 971:5 1040:6
  1050:18 1064:9
  1081:19
addition 971:5
  1038:21
additional 905:1
address 887:8
  926:6 938:18
  956:1 962:17
  1031:13 1043:6
  1044:8,9,12,15
  1045:7,9,10,22
  1046:6,10 1047:8
  1047:21 1053:19
  1054:13
addressed 1042:20
  1042:22 1044:22
adds 1095:17
adjourn 1036:20
  1108:21
administration
  957:9,22 962:7
  964:1 989:12
  1002:2
administrative
  922:4 924:6
  963:18 964:2,6,7
  981:18 992:16
  998:11
administratively
  981:21
admire 1008:10
admired 1009:19
  1077:5,6

admission 905:6
admit 915:13
  1036:15
admitted 895:17
  896:14 899:14
  904:18 915:14,16
  917:6,21 923:10
  928:4 933:13
  971:15 994:5
  1006:1
adopted 958:18
  1015:13
adulation 1018:18
adulterous 1004:18
advance 980:14
advantage 881:3
adverse 1070:6
advice 1031:17
  1042:10 1059:4
advised 983:9
  1072:4 1075:3
advisor 989:4
advocacy 957:5
advocate 1002:1
affair 1004:13
Affairs 913:13
  951:4,5 963:13,15
affect 1054:10
  1063:22
affidavit 895:22
  897:3 904:4
  906:17 944:8,9
affidavits 895:11
  940:14,15,21
  941:19 944:7,15
  944:16,20 1006:8
  1006:13,17,18
  1010:12 1011:20
  1034:4
affirm 879:6 946:18
  1097:12
Affirmative 904:6
afford 956:17
AFG 881:21
afloat 992:13
afraid 910:13
afternoon 874:4
age 881:3
agencies 906:4
  952:9,11 963:16
  980:6
agency 885:12
  888:14,14 889:1
  891:4 892:15,22
  893:18 901:12
  906:1 915:6 916:2

929:18 931:4,8
982:14
agent 956:22
  1002:3 1075:8
aggressive 901:7
  902:3 1060:15
  1085:1 1091:17
aggrieved 901:6
ago 882:18 935:10
  979:5 1069:12
  1096:6 1103:18
  1103:21
agree 890:13
  1063:10
agreed 907:7 949:8
  980:18,18,20
  999:9 1003:15
  1034:14 1056:22
  1072:5,15
agreeing 876:10
agreement 875:16
  893:4 1063:7
agrees 1108:20
Agriculture 963:21
ahead 909:9 922:13
  930:7 936:17
  943:8 996:13
  997:12 1055:4,19
  1064:19 1073:16
  1105:10
ahold 1055:3
airplanes 959:3
airport 1001:5
Akbar 973:16,20,22
  974:21
Akbar's 974:22
al 962:3 990:11
Alex 989:2
alias 1027:6
alive 1105:21
all.' 1061:14
allegation 1016:7
alleged 905:20
  1004:17 1034:2
  1037:16
allow 1032:13
  1034:12 1054:10
allowed 926:12
  1039:16
allowing 1032:5
Allred 873:5 874:19
  877:7 1002:12
  1057:9 1096:13
  1096:20,21
  1097:11,16
  1098:5,11,14,21

1099:16,22
1100:6 1103:17
1104:18 1105:14
1107:17,19,21,22
1108:10
Allred's 877:16
  1081:12
alright 904:8,18
  925:17 930:5
  938:21 946:14
  970:8 983:22
  991:11
alter 1017:17
altercation 1004:7
alternative 954:22
Amanpour 1023:10
ambiguous 939:2
amended 967:21
  981:15 998:7
Amendment 998:4
America 881:18,19
  882:5,10 884:11
  903:4 921:22
  930:2 979:7 982:6
  985:3,12 986:14
  986:17 987:19
  988:16 992:15
  999:11 1038:2,19
  1071:22 1094:12
  1095:9 1106:3
American 905:14
  953:1 957:18
  959:1 961:12
  963:3 1002:11
amicable 1072:6
amount 1032:4
analysis 1006:6
anchor 891:16
  907:19 908:6
  992:9
and/or 971:10
anecdotal 1032:9
Angela 1050:9
Angeles 887:22
  888:8,22 889:5
  892:10,12 906:15
  915:9 926:13
  937:8,17 956:6
  992:12 998:19
  999:13,15 1003:1
  1003:1,16 1012:8
  1026:19 1056:17
  1064:16 1067:11
  1100:21
anniversary
  1099:10

answer 898:1 904:6
904:19 930:6
961:14 996:8
1015:7,8 1090:18
1093:5 1102:13
1106:9
answers 1032:15
ANTHONY 871:11
anti-dumping
951:21
anti-Shah 989:1
antitrust 950:18,20
951:3 956:18
963:14
anxious 1083:2
anybody 1057:22
1059:3
anymore 971:4
anyway 1005:16
1026:11 1058:10
1072:3
apartment 977:13
1004:4 1015:4,4
1020:15,16
1025:14 1044:1
1074:22 1075:1
1083:14,15
1087:13
apologies 967:6
983:5
apologize 897:18
1030:5 1071:7
apparently 982:20
1027:1,6 1031:19
1038:20 1042:10
1043:7 1050:22
1071:3,13 1089:1
appeal 884:20
923:14,16 927:2
931:4 1031:21
1040:9,11 1041:5
1043:19 1089:14
1089:15,16,17
appealed 884:18,19
926:20 930:12
931:2
appealing 1041:13
appeals 870:1
884:19 930:13
999:7 1097:6
appear 903:7
910:12 1041:18
appearance 1052:9
APPEARANCES
871:9 872:1
appeared 903:10

974:18 1007:6
1041:8
appearing 1071:22
1096:13
appears 971:17
994:19 995:1
1050:8,9 1089:11
apple 978:12
1047:17
apples 1020:21
appointee 1002:2
appointment
930:18
appreciate 945:11
1025:10 1037:1
appreciation
1025:7
appreciative 1108:4
apprised 918:9
approach 875:9
901:14
approved 894:14
907:16
approximately
934:2 960:5 973:9
1069:3 1070:1
April 1082:5,8,9,18
Arabic 984:7,12
arbitration 884:17
930:12 931:1
area 881:14
1007:11 1019:10
areas 953:5
arguments 1006:2
Arlington 977:13
Armstrong 1047:9
arrange 1108:2
Arrangements
874:21
arrived 1005:19
article 885:22 886:5
886:10,14 893:16
894:4 895:14
899:14 956:6
articles 894:17,19
895:6 905:19
1001:15
aside 1028:4
1032:18
asked 903:20
915:13 925:11
929:4 941:8
976:13 986:5
988:10 1001:5
1006:5 1009:17
1022:3 1027:3

1029:13 1055:3
1057:21,22
1061:13 1066:20
1072:16 1073:3
asking 916:3
967:11 972:14
1043:15 1048:2
1049:8 1057:7
1060:19 1073:8
aspect 919:13
1062:19 1063:4
1078:11 1087:5
assign 948:22
assigned 983:10
1000:1 1008:7
assigning 949:5
assist 937:1 1107:6
assistance 1073:21
assistant 920:9
950:19,22
1100:11 1107:16
Associates 951:18
953:13 959:20
association 954:22
assume 912:17
914:1 939:12
942:18 1036:1,4
1074:16 1075:8
assumed 939:15
assuming 876:19
940:2 995:3
1061:11 1067:6
1089:10
assure 876:10
AT&T 951:6
ate 1018:3
atmosphere
1094:22
attached 905:2
906:8 1033:22
attaches 923:3
attacks 1028:21
attempt 1067:19
1092:10
attempted 900:16
911:12
attempting 900:7
attempts 891:2
attend 876:6
attended 947:18
attention 885:17
893:21 895:8
897:14 905:9
906:16 912:15
914:6 916:10
917:8 919:6

922:15 924:17
928:6 932:21
996:21 1049:20
1055:10 1071:15
1077:19 1081:7
1100:6 1102:9
1104:8
attest 905:15
attitude 891:3
901:14 1095:21
attorney 871:16,18
889:19 901:7
902:3 920:10
929:11 937:14,20
950:19,22 1022:4
1089:19 1090:4
1098:14
attorneys 903:19
attractive 975:18
August 928:7,9
942:6,10,11,18
1033:2 1038:1,11
1071:3,13
Auntie 1060:7
Austin 928:7,13
942:7 1031:15
1038:2,19,21
1039:2 1041:10
1041:12,21
1071:4,14,18
Authority 954:19
autobiography
935:19
automobile 1067:20
1070:2
availability 1109:7
available 877:10
Avenue 1007:10
1008:15 1009:2
1042:21 1043:1
1044:15 1045:4
1045:12 1046:9
1048:9 1051:14
1051:14,19
1052:17
avenues 903:12
Aviera 1003:6,7
1076:13 1077:20
avoid 1080:5
award 1024:13
awards 1024:6,12
aware 885:3 902:5
902:8 903:11
907:21 908:11,18
911:8 913:22
914:2 915:7,11

918:11 928:22
935:9 940:5
942:20 943:2,3,9
943:12,18 979:8
1004:16 1040:3
Ayatollah 989:4
1094:19

_____
**B**

B 1023:6
B-a-e-h-r 1024:10
B-l-a-n-q-u-i-t-a
911:19
B.F 1007:11,19
1009:9,11
BA 881:8
back 888:15 891:15
895:20 899:3
912:15 919:5
921:4 926:12
931:5,5 934:6
956:6 967:1
975:12,13,15,20
978:1 999:1,9
1002:20 1011:3
1012:7 1016:3
1020:22 1021:7
1022:2 1030:9
1033:17,19
1037:7 1047:18
1051:5 1054:20
1055:2 1056:16
1057:22,22
1060:6 1061:10
1061:18 1063:11
1065:12 1066:20
1067:9,21
1068:10,11
1069:17 1072:13
1073:9,9 1076:2
1077:15 1096:15
backed 1027:13
background 881:6
929:12 950:4
951:9 956:19
979:9 1064:17
1098:17
backing 1086:21
bad 960:1 1051:8
1059:4 1081:3
1090:4 1094:10
badly 1081:20
Baehr 1024:10
1025:20,21
1026:12,12
bagging 956:11

bankrupt 1047:18
bankruptcy 1022:4
baptize 1025:22
baptized 1025:22
bar 875:4 893:22
  896:4,6 954:7,22
  962:12 969:18,21
  970:4,13 971:7,18
  971:20 972:4,21
  973:2,3,5 975:22
  995:22 1011:15
  1011:15 1013:18
  1035:14 1036:7
  1036:11 1041:7
  1049:17 1074:1,3
  1080:4 1087:4
  1104:9
barbershop
  1048:15
bargain 882:7
bars 964:12 965:8
  969:2,4
base 903:16 908:4
based 883:13
  886:13 889:3
  892:4,20 893:6
  901:18 902:19
  909:4 916:2
  918:16 927:16
  928:22 944:22
  953:17 998:3
  1001:14 1066:17
  1088:5 1094:15
  1108:19
bashing 961:7
basic 1071:20
basically 875:3
  921:3 922:2
  948:21 952:5
  962:20 980:13
  1014:10 1037:19
  1044:13 1047:18
  1062:7 1063:22
  1081:9
basis 1001:21
  1010:14,15,17
  1011:12,14,17
  1012:3 1029:17
  1030:20,20
  1034:6,7,19
  1059:20
Basulto 959:4
Bat 894:9
bathroom 1024:20
battle 1066:11
  1099:18

BBG 1028:13,17
  1036:13 1040:10
Beach 1023:18
bears 1024:11
  1087:5
Beauty 894:8
bed 1087:17
  1094:21
began 957:5
  1064:10
beginning 994:20
  995:1 1107:4
beginnings 949:10
begins 997:9
  1023:11
behalf 871:6,18
  872:2 880:11,14
  894:18 918:11
  920:4 933:4 944:5
  947:4,7 1037:12
  1098:6,9
belabor 949:3
  1001:17
believe 894:6
  902:18 907:20
  933:3 952:18
  955:7,7,21 957:13
  958:5 961:17
  962:10,11,11
  967:22 970:15
  993:16 994:9
  1034:22 1037:9
  1050:15 1081:11
  1085:15 1090:15
  1096:15 1097:1
  1097:22 1099:2
  1099:12 1100:15
  1101:19
believed 906:13
  952:20 960:21
  1001:3 1017:21
  1020:11 1022:22
  1025:15 1060:11
  1066:5
believes 1010:10
bell 950:17
benefit 907:20
Benson 1014:1
berated 1022:6
berating 1076:19
Bernard 956:9
best 928:21 929:13
  942:2 943:1
  1042:12 1058:16
  1058:17 1063:11
  1089:19 1090:13

1092:15 1107:9
  1108:4 1109:12
better 909:6 915:10
  927:6 959:16,17
  963:3,18 1009:1,3
  1018:16 1057:6
  1075:16 1078:7
  1083:1
Beverly 1016:21
  1076:5
beyond 904:3 943:6
  1028:5 1059:8
bias 1012:1
big 950:8 956:2
  960:15 976:21
  1026:10 1093:6
biggest 950:8
  999:14
bill 950:21 1088:1
binder 990:19,20
  994:11,12
birthday 1026:1
bit 875:14,22 876:2
  935:16 948:19
  949:2 974:5 993:5
  1030:3 1033:8
  1036:17 1059:5
  1060:4 1064:19
  1069:22 1109:15
Bivens 981:13
  997:22 1030:20
Blackwell 950:7
  958:20
blame 1066:8
blamed 1020:2
  1021:11 1084:19
blames 1087:13,17
Blanch 1066:4
blank 913:10
Blanquita 911:5,9
  911:18
blessed 1019:4
blind 1014:10
block-long 1052:21
blocking 919:19
board 870:2,4
  871:1 886:18
  890:22 901:10
  911:4,22 912:5,9
  912:12,14 930:15
  934:13 963:21
  981:12 990:11
  993:8 996:5,21
  997:15,17,19
  1024:9 1028:17
  1028:20 1040:10

1052:1 1097:4
body 994:4
Boehner 914:3
  987:6,7,9,10
bomb 1001:9
bombs 1094:20
bono 977:9 992:6
  1056:7 1073:8
book 896:21 898:2
  898:8 919:8
  935:13 939:20
  990:21 991:10
  993:15 994:1,9
  995:11,21,21
  996:15 1077:19
  1077:21
books 875:19
  990:13
born 958:19 1017:9
bottom 886:19
  941:13 1086:15
  1104:16
Boulevard 999:10
  1016:20
bowed 962:5
box 1008:13
  1050:21 1051:2
  1051:17 1052:14
boyfriend 1075:12
  1081:15,16
boys 1017:17
brakes 1014:8,16
branch 906:12
Brantley 870:22
  871:4
brave 973:20
break 877:7 933:21
  946:4 951:7
  979:13 982:20
  1029:6 1032:20
  1032:21 1033:16
  1035:22
breakdown 915:9
breaking 1087:15
Breuer 920:9
bribed 1020:7
  1090:8
bribery 1022:15
bribes 1091:19
brief 876:22 877:8
  904:10 915:17
  933:12 975:2
  1016:12 1071:8
briefly 881:6 932:2
  987:22 1000:10
  1099:12

bring 931:4 989:16
  1035:12 1055:9
bringing 887:7
  973:21
broadcast 901:10
  909:5,7 910:11
  1091:10
broadcaster 894:9
  907:19 908:6,19
  908:22 910:1
broadcasters 902:6
  903:3 906:10
  989:9,14
broadcasting
  881:16 886:18
  888:9 890:22
  908:22 909:1
  910:9 930:22
  985:12 990:10
  999:12 1025:19
  1026:18,22
  1064:15
broadcasts 909:3
  910:2 984:6
broke 976:20
brother 986:9,14
Brothers 959:3
brought 889:20
  957:9,13,20
  958:12 960:20
  974:14,21 991:20
  997:5,15,22
  1001:16 1071:15
Brown 956:14
bubbled 1093:12
bubbles 1094:3
build 1003:15
building 999:11
  1045:2,9 1048:8
  1048:11,18,20,22
  1052:1,17,18,21
  1053:9,18 1054:4
  1054:5,6
builds 1018:17
built 1007:10,11
bump 891:20
bureau 888:9,9
  891:22 983:18
  1026:17 1091:9
Busby 951:13
  952:19
Bush 957:11 959:13
  1000:21
business 908:8
  934:20 956:7,8,14
  956:18 1018:2

busy 975:3
buy 1007:13
  1021:17,18,22
  1022:3 1057:7
buying 1025:13
  1076:18

**C**

C 874:1 968:16
  970:14
C-h-a-r-l-a-n-g-i
  902:18
C-o-l-l-u-m 911:20
C-SPAN 961:22
C.S.R 870:22 871:4
cab 1015:9,9
cafe 1065:2
cage 1051:4
California 953:21
  1015:15 1100:3
call 878:19 918:15
  927:17 975:10,15
  999:15 1013:22
  1015:7,8 1026:9
  1048:5 1100:18
  1101:17,19,20
  1102:18
called 880:11 886:2
  894:7 946:15
  947:4 950:6,20
  975:11 981:15
  995:6,7 1007:5
  1009:17,22
  1015:5,8 1070:9
  1098:6 1099:15
calling 1010:1
calls 1007:18
  1043:15 1051:18
Camden 1016:21
camera 948:15,17
cameras 948:15
campaign 956:3,12
  961:3
cancel 930:18
candidates 961:20
  961:21 962:2,9
capacity 962:16
Capital 886:3
Capitol 948:12,18
  948:20 974:16
  975:7 985:9
  1047:5,6,7
caps 983:18
car 1004:8,14
  1014:7,9,15,19,21
  1015:1,12

1016:17 1020:14
1021:17,18,20,22
1022:3 1025:13
1034:21 1057:7
1066:4 1076:18
card 975:3,9,9
  988:3
care 875:13 983:4,6
  1025:15 1057:12
  1081:22
cared 998:20,21
  1019:20,21
  1057:7 1062:11
  1076:9 1095:6
career 953:6 1035:2
cargo 1001:8
caring 945:1
Carolina 948:1
carries 910:2
  1045:3
carry 994:12
case 876:19,21
  877:1 878:6
  884:15 887:7
  889:20 890:17
  902:4 919:3,20
  922:5 926:20
  930:21 934:22
  937:22 957:21
  958:5 959:7
  962:13 968:22
  971:8,8 973:8,21
  974:1 979:6 980:6
  980:8,10 981:14
  981:14,15 982:1
  983:9,12 991:16
  991:20,21 992:22
  999:22 1001:1,14
  1001:16 1002:17
  1002:18 1003:15
  1004:9 1008:12
  1009:19 1010:3
  1010:22 1011:3
  1028:14 1031:16
  1035:6,13,16
  1036:13 1040:10
  1043:4 1057:18
  1059:12,13
  1062:19 1064:21
  1077:3,17
  1078:16 1079:17
  1080:2 1083:3
  1084:8,14
  1086:18 1089:1
  1090:3,3,16

1100:14 1105:19
1106:3,5 1107:4
cases 884:14 903:21
  930:12 934:12
  950:10 952:3
  957:6,9 958:12
  963:8 964:6 980:3
  983:8 1009:20
  1041:12 1046:12
  1049:6 1103:4,4
categories 885:4
Catholic 1017:14
cats 1014:7,12
cause 998:8
  1066:22
caused 1024:17
  1095:5
causes 962:11 979:9
caution 1043:11
  1054:1
caveat 965:7
CBN 1026:14,18,22
CC'd 928:10
celebrated 1099:10
cell 975:10
center 960:9 961:2
  961:16
central 888:17
  891:17,22 916:9
  916:21 982:14
  983:18 1026:17
  1091:9
CEO 956:10
certain 885:3
  1012:7 1027:9
  1037:15
certainly 1012:21
  1033:16
cesspool 1061:20
cetera 1059:20
Chair 871:12 947:9
Chair's 961:14
chairman 874:2,11
  874:15,22 875:10
  875:12,20 876:9
  876:18 877:5,12
  877:14,20 878:7
  878:15,20,22
  879:2,5,10,18
  880:2 881:2 885:1
  888:3 895:3,17
  896:2,9,12 897:16
  897:19 898:8,12
  898:15,19,22
  899:3,6,10 903:16
  904:8,11,17,22

905:4,7 908:4,10
908:16 909:10
911:16 912:9
915:12,19 917:6
917:21 923:10,21
925:17 928:4,15
930:4,7 933:7,10
933:13,17,20
934:1,6 935:15
936:2,17 939:3
941:7 943:7,16
944:3 945:6,10,14
945:17,19 946:2,7
946:13,22 953:10
954:12 960:5,12
967:3,7,10 968:3
968:6 969:11
971:15 983:11,14
983:17,21 984:3,8
984:13 990:12
991:1,11,14
993:20 994:4,17
994:22 995:16
996:2,12,17 997:1
997:6 1001:7
1016:7 1027:16
1027:19,21
1028:5,8 1030:2,6
1030:9,12 1031:8
1032:18 1033:11
1034:16 1035:4
1035:11,18
1036:2,15 1037:7
1038:8,13
1039:14,18
1042:7 1045:1,8
1047:4,11 1048:8
1048:13,17,21
1049:13 1051:12
1052:2,8,12,20
1053:8,14,22
1054:7 1055:4,16
1055:19 1059:14
1060:22 1067:1,6
1067:10,15
1068:1,5,19
1069:9,13,21
1070:5,9,13,17,19
1071:6,9 1073:16
1079:2,6,8,12,16
1079:20 1082:7
1082:10 1088:14
1088:16 1092:3
1092:21 1093:2,9
1093:15 1095:11
1095:18 1096:7

1096:15 1097:1,8
1097:16 1098:3
1102:12,20
1103:6,15
1104:19 1105:1,5
1105:10 1107:15
1107:22 1108:11
1108:17,19
1109:2,11,14,20
Chalangi 902:11,21
  902:22
Chalangi's 902:15
challenge 949:21
challenging 1064:1
chambers 1049:18
  1049:22 1050:14
  1050:17
chance 926:6
  1026:15
change 974:3,7
  1017:3
changed 941:2
  942:1 961:3,4
  982:21 1046:7
  1053:19 1063:18
changes 944:12
characterizations
  1032:19
charge 931:12
  1030:14 1031:1
  1059:18
charged 1030:14
  1094:22
Charges 898:2
  904:20
Chase 1007:12,19
  1109:18
chat 1032:10
cheaper 1021:22
check 1001:7
  1067:22 1077:12
check-in 1001:6
checked 964:15
cheek 909:18 976:1
  976:9 988:6
Cheney 957:15
  958:1
Chevy 1007:12,19
  1109:18
chief 950:22 961:11
  985:10,16 988:3
  1000:2 1058:21
  1065:2,5,13
China 953:2 956:2
  956:13
Chinagate 957:7

Chinese 954:1
956:22
chip 1010:5
choice 1095:12
chose 951:3
Christ 1017:22
Christian 1017:8
1022:15 1024:5,7
1025:19 1090:9
Christiane 1023:9
Christianity 1026:5
Christmas 1017:18
Christopher
1001:11
chronologically
953:11
chronology
1016:13 1037:19
church 1017:14,15
cigars 986:20
circumstances
901:9 1022:14
1057:15
citizen 930:17
City 881:13 977:14
1023:19
civil 918:12,19
919:15 921:12
922:22 923:22
924:1 932:5,22
964:5 981:17,20
992:17 998:11
1000:11 1021:8
1040:8
claim 936:20
claimed 1001:1
claiming 918:21
920:2 1004:21
claims 906:2 926:14
988:19 1061:17
1100:16,16
clarified 1036:17
clarify 878:17
899:4
CLAY 871:20
CLE 964:14,19
965:8
clean 988:15 1075:1
clear 933:19 935:1
976:12 977:9
992:4 994:10
996:4,10 1015:18
1027:11 1045:16
1046:21 1050:13
1072:17
cleared 1019:6

clearly 899:12
1054:15 1073:8
clerk 1001:6
1050:10
client 953:22
957:16 975:6
987:18 1000:20
1059:19 1068:18
1068:18 1070:15
1073:1 1102:8
clients 953:17
1078:20 1104:5,5
1107:7
Clinton 912:7 956:7
957:9 997:17
1002:2 1028:18
1028:19 1030:17
Clinton/Gore
956:12
Clintons 935:6,10
955:22
close 888:16 891:19
977:19 978:19
983:3 1005:13
1015:4 1056:14
1078:12 1080:1
closer 874:15
clothing 986:12
Club 961:17 1099:3
1099:9
clueless 1090:4
Clyde's 975:19
CNN 1023:9,10
1105:18
co-anchor 977:1
982:18
co-host 883:4,11
coax 892:15 979:22
997:22
coaxes 893:7
Cobas 961:12
Coburn 913:8,9
985:11 986:1
Coburn's 913:6
coerce 1075:7
cold 1027:13
Colleen 934:14
1000:5
college 881:7,8
Collum 911:5,18
912:16
Colton 950:21
Columbia 870:1
871:6 964:11
972:17 1097:5
1100:2,4

column 1010:15
columns 973:18
combination
1070:14 1081:14
come 878:11 880:7
882:12 889:12
890:11 892:13
893:3,10 911:2
919:2 921:16
929:4 1017:18
1019:5 1030:9
1033:17 1039:11
1041:18 1049:16
1060:6 1084:14
1088:4 1094:16
1100:5 1101:16
comes 1065:3,12
1080:6
comfortable 879:11
891:18 892:5
982:7 1003:18,20
comforting 1026:13
coming 919:18
956:6 959:4
1043:9 1046:21
1046:22 1089:2,6
1091:13 1094:20
1109:8,18
commencing 871:3
comment 1001:4
1051:6
comments 1068:10
1096:5
commercial 986:13
Commission 952:12
952:14 963:19,20
1024:5
commit 982:10
1063:20
commitments
1107:7
committee 871:4,10
874:6 913:12
947:10 961:1
1032:3 1085:16
1096:14 1097:4
1097:17
common 974:10
communicate
900:21 1029:19
1043:8,16
1068:16 1076:17
1089:7,8 1091:13
1092:10,13
communicated
926:22

communicating
926:9 929:2
1031:14 1046:19
communication
900:10 1045:20
1049:7,8 1092:16
communications
874:19 1041:17
1046:21 1058:2
1067:17 1068:4
1076:13 1080:7
1091:12 1092:7
communist 1002:7
community 959:1
961:10,13 974:16
982:3 986:9 987:5
999:14 1003:19
company 1016:17
compassion
1084:10
compel 949:18
compendium
995:12
compensated
1044:3
competent 1078:14
competitive 1013:8
compilations
879:19,21
complain 910:14
complainant
998:14
complained 981:9
989:9
complaint 887:8,13
888:12 918:13,16
918:18 926:3
933:1 966:13,22
967:21 968:13,17
968:18 969:6
970:15 981:18,18
981:20 992:17
993:7 998:12
1021:6,9 1028:21
1046:19 1051:1
1087:4,4
complaints 964:5
968:21 970:22
977:15,16 989:19
989:22 996:22
completed 877:16
completely 1090:2
1106:5
complimentary
908:1
component 998:6

comports 1016:10
comprise 1036:12
comprising 994:5
compromise 900:9
computer 1014:22
conceded 1015:7
conceived 954:16
concern 998:17
1002:15 1025:6
concerned 1053:18
1058:11 1109:20
concerns 910:8
937:2 1028:13
concession 885:7,7
conclusion 921:17
1063:10,14
1064:4
concussion 1016:15
1016:16
condition 900:12
conditions 1027:9
condominium
958:21
conduct 934:20
conducted 919:15
930:22
confer 996:9
conference 1008:11
1096:14 1098:8
1101:17 1108:9
confided 1095:5
confidence 1013:12
1022:20
confirm 1006:11
confirmed 970:13
1010:8
confirming 970:9
confirms 971:2
conflict 1030:15
1078:9 1080:4,5
confused 896:9,10
1069:22
Congress 1001:10
congressman
912:20 960:19
987:6,8,10
1058:22 1085:10
1085:13,21
1086:6,21
congressmen
907:12
conjunction 1004:4
connection 1051:13
consent 1091:14
consequently
1011:12

**conservative**
955:17,18 1002:6
1002:9,9,10,14
**conservatives**
1002:8
**consider** 1107:3
**considerations**
997:21
**considering**
1011:19,20
**consistent** 887:18
891:8 907:6
921:21 1091:4
**consistently** 886:22
906:3
**constituents** 949:8
**Constitution** 998:3
**Constitutional**
998:1
**consult** 1003:16
**consulted** 928:12
928:18
**Consumer** 951:3,5
963:13,15,20
**contact** 888:16
900:14 901:5
902:4 924:9,9,13
927:19 932:9,13
988:4 1041:16
1065:13 1086:3
**contacted** 887:9
889:18 911:6
913:16 924:12
1070:6
**contacting** 1043:13
**contained** 998:6
**contains** 875:5
966:12 1032:8
**contentious**
1019:10
**contents** 1102:18
**context** 909:11
973:14 1005:1
1012:6 1013:1
1016:3 1021:14
1042:6 1085:12
**contingency** 1055:7
1059:10
**contingent** 1062:14
1063:6
**contingent-fee**
1059:20
**continuance**
1093:21
**continue** 930:1
1057:14 1075:17

1075:20
**continued** 872:1
959:18 992:17
1037:11 1056:21
1064:14 1095:22
**continuing** 1031:11
**continuously**
964:11 1013:4
**contract** 882:7
885:6,9,11,15
1043:13
**contradictory**
1042:12
**Contrary** 1026:17
**contributions**
1051:4
**control** 989:1
**controversy** 960:15
**conversation**
1069:15,19
**conversations**
1069:7
**conversion** 1026:10
**converted** 961:4
**conveying** 922:10
**convicted** 1047:2
**convince** 986:16
**convinced** 1059:21
**cooperate** 903:20
**copied** 907:4
917:11 928:8
1038:20
**copies** 875:6,8
**copy** 899:13 935:12
935:18 940:3
991:3 1039:4
1041:3,6,8
**corner** 880:3
**corporate** 952:7
**Corporation**
956:10
**correct** 892:1
894:20 897:12
898:5 899:9 907:2
907:4 910:16,17
916:5 917:1,3
920:8,11,13
922:18 923:4,17
923:20 925:8,12
927:15,22 928:9
929:3 933:2
936:21 937:18
938:15 940:7,22
942:18,22 944:17
944:20 991:13
993:3 994:14

995:4,9,11 1025:2
1045:1,22
1051:16 1052:5
1053:14 1067:4,7
1067:8,12 1099:5
1103:18,22
1106:14 1107:1,2
1107:12
**corrected** 995:3
1044:19
**correctly** 1102:11
**correspondence**
948:22 989:22
1022:21 1027:2
1064:11 1081:17
1092:5
**corruption** 1061:20
**cosmetic** 1064:16
**cost** 1006:11
**costs** 1072:13,14,22
**counsel** 874:5,10
875:4 891:1 896:6
911:13 936:4
970:13 971:7
985:3 996:3,13
1011:16 1035:14
1039:14,20
1049:17 1057:3
1074:8 1076:14
1080:4,5 1097:18
1104:9 1107:17
1107:20
**Counsel's** 893:22
896:5 967:13
1030:14 1041:7
1046:18
**counseling** 1068:15
**count** 1075:19
1083:19
**counterproductive**
1071:19
**countervailing**
951:21
**countries** 984:7
**country** 909:1
1005:8 1026:7,8
1098:19
**County** 1058:22
1085:16,17
**couple** 987:22
**course** 877:8
882:13 890:5
933:14 946:22
951:19 984:3
1035:7 1099:19
**courses** 964:19

**court** 870:1 871:5
874:7 884:19
923:18 924:11
926:4,21 934:12
981:22 991:18
993:1,2,4 997:2,9
997:10 998:10
1000:3 1001:15
1009:12 1011:17
1028:1 1030:7,13
1031:4 1033:1,5
1033:13 1050:10
1050:11 1061:13
1072:10 1086:10
1089:18 1097:5
**court's** 1041:9
1089:15
**courtesy** 946:12
1037:1
**courthouse** 939:4
**courts** 953:15
**cousin** 968:15
**cover** 1000:11
1031:4
**coverage** 989:10
**coworker** 1004:3
1004:20,22
**coworkers** 1006:13
**Cox** 1001:11
**cozies** 956:7
**crazy** 957:1
1065:11
**create** 958:3
**credibility** 1087:6
**credit** 1020:16
1021:20 1022:1
1058:10
**criminal** 920:10
1014:17
**critical** 985:11,14
**criticism** 962:4
**criticisms** 982:12
1005:2
**criticize** 958:13
**criticized** 977:2
**cross** 873:2 936:3
936:14
**CROSS-EXAMI...**
936:4
**crucial** 1058:15
**Cuba** 959:5
**Cuban** 930:22
958:22 959:2
961:12,13
**culture** 984:15
**curious** 995:14

1090:11
**current** 957:22
**currently** 881:20
882:11 964:13
**cut** 992:12,18
1024:1
**cutting** 1109:22

---

**D**

**D** 873:1 874:1
1023:11 1050:9
**D.C** 881:14 916:22
949:21 980:4
982:5,8 986:9
1007:13 1047:20
**dais** 962:6
**damage** 1061:16
1062:19 1063:4
**damages** 998:22
1061:12 1100:17
**Dan** 1007:13
1038:19 1071:14
1071:18
**Danforth** 928:7
1038:2 1039:1
**dangerous** 1014:2
**Dash** 986:9,10,11
**date** 886:5 920:20
925:3 932:18
1015:20 1016:4
1033:2 1042:22
1067:6,8 1074:22
1079:8 1087:2
**dated** 897:9 898:22
915:3 920:18
924:19 925:1
940:15,18 942:16
942:18 1038:1,11
1042:19 1056:4
1077:10 1082:5
1092:3 1096:2
**daughter** 1105:22
**Davidson** 885:22
**day** 926:15 930:2
954:5 956:6
1009:9,21 1012:5
1012:9,13 1015:8
1015:22 1016:14
1019:7 1020:2
1043:21 1057:20
1066:20 1069:20
1069:20 1070:8
1070:10 1073:11
1085:19 1086:2
1090:18 1093:13
1104:2 1108:5,16

In Re: Larry E. Klayman
June 25, 2018

Page 1117

days 925:16 926:2
  950:15 989:15
  1067:3
DC 870:9 871:2,18
  949:19 972:20
  973:3,5 993:1
  1045:7 1050:22
deactivated 964:18
deadline 925:22
deadlines 926:16
deal 990:10 1057:5
  1060:10 1090:6
  1093:6 1094:13
  1107:5
dealing 887:19
  889:3 907:1
  921:22 1071:14
deals 997:20
Dean 1087:16
Dear 1082:19
death 955:21
debate 961:17
  962:1
debt 931:9
decades 1104:3
December 1035:13
decide 890:6
  1089:17 1101:22
decided 885:14
  891:22 959:9
  979:16,21 985:6
  1035:8 1093:13
decision 884:21
  891:21 921:17
  922:14 925:22
  1005:18 1070:6
  1089:15 1102:6
  1102:14,15,20
  1103:11
decision-making
  1062:6
decisions 1001:20
declaration 897:4
  897:11 898:17
  899:18 905:10
  940:17,18 941:20
  941:21
declarations 896:19
declined 917:2
  940:5,10
dedicated 903:10
  904:1
deed 1066:6
deep 964:1
deeply 983:4,7
defamation 978:3

1013:10
defend 882:6 901:9
defendants 1028:16
defended 1002:3
defense 952:21
Defenses 904:6
defined 908:17
degree 948:3,9
degrees 947:17
dejected 1064:8
DeLay 958:12
Delia 921:11 922:7
  922:16
delighted 945:7
demanding 1057:16
demeaning 1091:18
demonstrates
  1041:21
denial 1069:22
denied 1003:2
  1007:1 1067:4
denying 1016:8
  1035:7 1062:2
department 920:7
  920:12,20 950:17
  951:2 963:21
  972:19 986:15
  1104:14
depose 1009:9
deposing 1009:10
deposit 1074:18
depositions 1063:2
deposits 1074:20
describe 905:19
  999:18
described 887:4
  895:2 977:1
  997:16 1024:18
Designers 986:11
desire 976:14
  1066:4
desk 916:21
destroyed 1090:2
  1091:2 1106:5
detail 926:17
  1083:18
detailed 990:1
details 938:8
  968:18
determined 891:5
  930:17
developed 960:2
  977:18
Devon 1053:1
diamond 1087:7,11
  1087:15

Dick 948:12 957:14
die 1007:22
died 1105:19
different 926:7
  950:1 953:5
  990:13 1000:2
  1002:12 1019:16
  1027:5 1052:18
  1065:19 1074:13
  1080:6 1081:13
differently 1031:1
difficult 892:22
  900:11 901:9,13
  959:22 979:7,9
  980:12 989:7
  1019:6 1047:16
  1056:20 1057:5
  1074:14 1080:18
difficulties 975:14
  1062:1,4 1080:21
difficulty 929:1
  958:14 977:21
  1000:19 1024:20
dignity 988:19
diligent 900:7
dill 1090:6
dinner 975:17
direct 873:2 879:13
  880:14 943:6
  947:7 1032:14
  1037:11 1077:18
  1098:9
directions 1074:13
directly 939:12
director 921:12
  1038:2
directors 1013:5
  1024:9
dirty 909:14
discarded 971:6,10
discharged 945:8
disciplinary 871:18
  874:9 875:4 936:4
  964:20 965:10
  967:13 969:4
  970:5,19 1011:16
  1030:13 1046:18
  1097:3 1107:16
  1107:20
discipline 970:21
disclosing 958:8
discounted 1010:12
discovery 1006:22
  1034:13 1063:1
discriminated
  988:18

discriminating
  953:17
discrimination
  918:19,20 924:6
  998:3
discuss 889:20
  926:10 932:7
  934:10 937:22
  938:21 939:9
  967:8,12,15
  1100:14,19
  1101:18
discussed 887:10
  905:21 934:15
  938:5,14 939:6
  979:5 1069:1
discusses 886:1
  935:21
discussing 896:13
discussion 938:17
discussions 887:5
  892:14 908:8
  940:10 1004:1
  1101:6,11
  1108:20
dishonest 955:2
disillusioned
  988:12
dismiss 1046:12
  1049:6
dismissed 968:21
  969:6 970:10
  971:3,9 1001:1,14
  1041:13 1064:21
  1089:16
disparaging 1020:8
disqualification
  1029:9 1033:9
disqualified
  1033:22
disqualify 1011:5,6
  1029:11
disrespectful
  1068:8
distinguished
  1001:11
distress 882:19
  1044:5
distributed 893:11
  894:5
distributing 893:17
district 870:1 871:6
  964:11 972:17
  981:22 993:1
  997:10 998:10
  1000:3 1050:11

1097:5 1100:1,4
diva 1057:13
divergent 883:17
division 883:13
  916:9,22 920:10
  950:18 951:3,4,6
  988:15
divorce 1081:7
divorced 1081:4
docket 870:4 997:2
  1041:9
doctors 915:10
  1003:5
document 885:17
  916:18 920:22
  928:20 1042:1,6
  1055:8 1088:14
  1088:16
documentary
  1099:13,17
documentation
  1049:16
documents 875:2
  992:20 994:5
  995:13,15,20
  1004:11 1043:19
  1046:14 1051:10
  1073:7
dog 1076:5
doggedly 901:8
dogs 1014:7,12
doing 887:1 951:19
  959:19 968:2
  974:17,20 975:3
  976:17 1011:2
  1014:21 1064:15
  1068:12 1073:14
dollars 1061:18
Dolley 957:17
  1001:1
Donna 887:11
Dorothy 1059:6
  1060:4,5
double 1000:11
doubt 993:21
downhill 1084:17
Dr 1003:6,7
  1076:13 1077:20
draft 941:10
drafted 941:19
drafts 944:12
drama 1068:11
drawing 913:9
drew 934:12
drinks 988:1
driver 1014:15

drives 980:3
driving 1014:2
   1016:18 1017:5
   1017:11 1018:4
drop 1031:16
   1044:13 1045:11
   1052:4 1053:8
   1058:16 1059:2
   1084:4
dropped 951:12
   1059:13
dropping 1059:12
drops 1052:7
drove 1013:20
   1014:16
dual 959:20
DuBois 1066:4
due 900:12
dug 980:16
Duke 948:1
duly 880:12 947:5
   1098:7
Durham 948:1
duties 882:3,13
duty 951:21
DX23 968:6

─────────
E
E 870:5 871:2
   872:10 873:1
   874:1,1 879:4
   951:16,17 953:14
   1037:4,4
E-l-l-i-o-t 947:14
earlier 946:4 960:7
   961:15 985:16
   1017:13,17
   1018:14 1056:12
   1070:7,9 1081:6
early 880:8 1004:1
earnings 958:3
easier 904:7 919:7
easiest 1066:18
East 974:11 984:6
eastern 916:21
eclectic 955:19
Economic 960:10
   961:16
educated 1058:21
education 947:19
educational 881:6
EEO 887:7 924:4
   998:11 1021:8
effect 954:6
   1054:22 1068:7
   1086:1

effort 878:16
efforts 918:4
   1099:3,8,11
egregious 1034:5
eight 885:8 912:4
   982:20 1064:12
   1065:17 1069:11
   1093:12 1103:18
   1103:20
either 958:6 966:14
   971:9 988:11
   1030:1 1031:15
   1046:10 1049:14
   1057:1 1102:19
elapsed 926:15
elected 960:19
Elham 882:14
   884:8 891:7
   905:18,21 906:9
   907:15,20 925:21
   934:16 986:18
   987:2,18,19
   988:18 1056:3
   1082:19 1105:14
   1105:17
Elham's 906:2
   907:22
Elian 959:6
elicited 1004:1
eliminated 1072:12
Ellie 882:15 1038:3
   1056:4 1065:9
   1073:10 1075:6
   1076:6 1086:2,9
   1091:20 1100:19
   1101:5,8,17
Ellie's 1100:15
elliesataki@yaho...
   1061:5
Elliot 947:14
Em 1060:7
email 872:8 878:12
   906:9,16,19,22
   924:18,20,22
   925:9,11 932:18
   942:17 1020:6
   1022:12 1025:8
   1027:18 1029:17
   1056:3 1061:4
   1071:2,12 1074:5
   1077:10 1078:4
   1078:15 1079:9
   1082:4,7,18
   1085:6 1086:8
   1088:11,21
   1089:10,13

1093:10 1100:7
   1101:3,7 1103:17
   1104:16 1105:12
   1106:17 1107:11
   1107:12
emailed 1054:16
   1067:2 1106:8
emails 943:13
   1017:7 1020:10
   1045:18 1046:16
   1054:17 1055:6
   1077:19 1092:12
   1104:8
embarrassed
   1076:7
emergency 1075:18
emotional 982:19
   1078:9 1089:12
emotionally 1094:7
emphasis 952:6
employed 1064:14
   1094:1
employee 882:7
   886:3 901:6 902:1
   902:2 922:3
   929:16 1091:1
employee's 998:15
employees 886:19
   901:15 903:19
   905:15 929:15
   931:2 963:7
employees' 882:6
employers 963:1
employment 881:10
   921:22 924:5
   952:3 963:6
   985:14 1025:18
   1026:14 1073:22
encountered 953:21
ended 988:5
   1057:20 1063:5
   1108:9
energy 958:8,10
English 888:17
   892:6 982:11,15
   984:6,19 1005:3
   1041:19,20
   1043:5 1091:8,9
   1091:10,12,16
Enron 958:5
entails 918:16
enter 965:14
entered 1043:20
   1109:3
entertainment
   1016:22

enthusiasm
   1086:22
entire 994:4 995:5
   1019:7 1045:8
entirely 1030:18
entities 907:12
entitled 1011:13
entity 929:17
entrances 1052:21
   1053:1
entry-level 948:21
environment 982:7
   1023:21 1024:22
   1094:16
equivalent 1074:19
Eric 1001:3
errors 1034:2,6
escaped 973:21
especially 906:3
ESQUIRE 871:11
   871:15,20 872:3
   872:10
essentially 969:3
   1099:17 1102:14
estate 986:13
   1007:18
estimate 876:22
et 990:11 1059:20
ethical 1017:3
ethically 900:19
ethics 955:3
evaluating 1054:2
evening 1013:16
event 1015:21
   1024:17 1045:13
   1046:10 1101:22
events 948:6
   1093:10
eventually 884:20
   888:1 975:13
   1065:11
everybody 980:9
   1029:2 1051:18
Everybody's
   909:10
evidence 875:16
   895:15 899:15
   904:5,15 914:19
   917:5,19 921:7
   923:8 928:2 932:2
   933:8 969:10,13
   971:13 990:5
   993:11,13 1028:1
   1030:3 1035:12
   1035:19 1036:3,4
   1043:20 1054:2,3

1086:9 1090:3
   1096:19
evidentiary
   1006:22 1034:11
EX 880:2
exact 960:10 990:1
exactly 878:10
   887:8 898:6
   942:13 981:5
   996:6 1045:2
   1101:21
exam 972:21
examination 879:13
   880:14 944:4,5
   947:7 1006:10
   1037:10,11
   1096:19 1098:9
examine 936:3
examined 880:12
   947:5 1035:5
   1098:7
examining 936:14
   1097:20
example 884:22
   1092:8
excellent 950:11
Exclusive 894:8
excuse 896:4
   905:12 925:2
   941:12 1032:1
   1041:11 1044:7
   1104:12
excused 945:13
   1108:10
executive 930:15
   961:1
executives 1075:3
exemplary 914:14
   918:3 1012:1
exhibit 874:14,18
   879:15 885:19
   893:22 895:9,12
   895:14 896:5,11
   896:13,17 897:21
   898:2 899:6,7,13
   899:17 904:5,7,13
   914:7,18,22
   915:13 916:10
   917:4,8,18 919:6
   921:6,10 923:8
   924:18 928:2,8
   932:1,21 933:8
   939:20 940:13
   941:6 942:4
   965:20,22 966:4,7
   966:12,15,21

969:16,20 970:13
971:18 972:1,2,4
972:6,7 990:8,8,9
990:9 991:6,8,9
991:10 993:14,16
993:18 994:5,8,10
994:11,18 995:5,5
995:13,20,22
996:6 997:8 998:8
1016:11 1033:21
1035:18 1036:2,8
1036:12,15
1037:22 1038:6,8
1038:10,11
1040:16 1041:2
1042:1,18,19
1055:13,15,18
1074:1,2,3,4
1077:19,21,22
1078:2,3 1079:5
1082:6 1088:15
1100:7 1104:9,10
1105:7,9
**exhibits** 875:6,18
879:19 893:22
904:16 905:6
918:2 965:13
967:16 969:8,10
969:10 994:16
1002:19 1012:7
1028:16 1036:18
1037:15 1039:12
1040:12 1046:19
1104:22 1105:6
**exist** 1017:19
**existing** 1107:7
**exit** 1014:18,19
1015:3 1017:11
**expect** 1058:8
1075:11
**expected** 1076:18
**expense** 1057:19
1058:5 1061:18
**expenses** 1020:13
1044:2 1072:14
**expensive** 1056:9
**experience** 884:10
884:12 886:14
887:18 889:3,8
891:9 892:21
893:6 901:2
918:17 921:21
927:17 944:22
1066:17 1078:20
1094:15
**experiences** 953:15

1094:10
**experiencing**
906:13 1089:12
**expiring** 1056:14
**explain** 926:17
935:2 948:19
965:10 968:10
976:3 987:2,20
993:5 997:4
1012:2 1039:16
1062:8 1083:16
1087:3 1096:3
**explained** 979:20
1010:2 1030:19
**explaining** 1039:19
1042:5
**explains** 1053:20
1073:13 1085:2
1088:3
**explanation** 971:19
1087:14
**explanatory**
1059:18
**explored** 1053:17
**express** 910:8
**expressed** 1063:13
**expressing** 943:13
**extent** 879:20
895:18 978:16
979:8 989:11
1036:7,11 1058:1
1077:3
**extol** 909:21
**extra** 875:6 876:8
**extrajudicial**
1012:1
**extremely** 1073:13
**eye** 878:12 935:5,5

**F**

**F** 1037:4
**F-a-l-a-h-a-t-i**
991:19
**F-r-e-d-a** 1012:15
**face** 910:7
**facilities** 1053:16
**facing** 975:8
**fact** 876:11 882:8
884:14,15 889:8
910:15 926:11
964:4 968:21
969:1 972:11
980:13 982:8
1004:13 1005:9
1006:6 1010:9,15
1011:14 1012:3

1025:2 1034:7,19
1034:20 1051:9
1052:3,4 1054:14
1058:4 1061:9
1087:9 1090:12
**fact-intensive**
1006:6
**faction** 884:3,6,9
**factions** 883:18,19
884:2 988:17
989:8
**factors** 1081:14
**facts** 1010:2
**factual** 1010:18
1034:2,6
**fail** 984:20
**fair** 887:17 893:15
901:18 943:7
953:18 963:2
1056:22 1069:13
1098:18,20
**fairly** 887:14 903:1
**faith** 1020:8
1022:16,16
1024:7 1034:17
**Falahati** 883:10
892:8 977:1 981:7
982:18 990:9
991:16 992:1,5,14
993:19 1005:17
**fall** 973:11 1058:18
**false** 1086:12
1087:1
**familiar** 929:17,17
1054:3,4 1077:16
**family** 910:6 973:14
974:13,14 975:6
986:10,11,12
987:4 988:20
1020:18 1024:6
1063:11 1075:13
**famous** 974:22
1098:17,18
**far** 908:15 904:1
918:10 1009:11
1020:5 1062:20
1063:2
**Farsi** 982:13 1005:4
1005:5,7 1026:20
**fashioned** 981:2,14
**faster** 966:19
**father** 989:3
**fault** 896:18 897:20
1044:11 1062:8
1062:10 1088:22
**favor** 955:10

**favorable** 934:18
935:7
**FBI** 921:3
**fear** 983:3
**fears** 983:1
**February** 897:4
898:22 899:18
915:3 940:16
**federal** 881:16
887:2 906:4 926:4
934:12 957:13
962:17 963:19,20
981:22 993:4
998:10 999:11
1028:1,9 1030:6
1031:4 1033:1,5
1033:13
**Federation** 905:14
**fee** 1062:14 1063:6
**Feedback** 886:4
**feeding** 990:1
**feel** 891:18 962:18
982:6 984:17
1017:9 1018:16
1026:2,3,3
1056:19 1066:15
1075:16 1084:2
**feeling** 878:5
1018:14 1019:13
1019:19 1068:9
**fees** 1055:7 1059:10
**feet** 1027:13
**fell** 1080:20
**felt** 883:6,8 901:19
902:22 903:4
904:2 919:3 942:1
949:9 964:6 974:2
974:7,10 984:19
1003:13,14,18,20
1004:18 1013:7
1018:14 1019:15
1019:18 1021:12
1074:7 1080:4
1081:3,5
**female** 1081:8
1087:19
**field** 908:12 999:10
**fifteen** 953:9 1096:9
**fighting** 894:9
1012:17 1013:4
1094:19
**figure** 979:19
1093:6
**file** 918:18 925:22
931:9 1002:20
1040:9

**filed** 874:13,17
888:7 904:21
918:12 926:3
931:11,11,13
932:6 933:4
956:20 948:16,18
970:15 981:11,16
983:8,9,10 985:7
992:16,22 1006:2
1043:18 1072:7
**Filegate** 957:6
**files** 875:3 1041:8
**filing** 931:13 997:2
1029:8 1032:21
1033:5
**Film** 1024:5
**films** 1024:6,7,15
**final** 921:17 922:14
925:22 1056:11
1109:2
**finally** 885:10 931:4
1075:22 1089:16
**finance** 956:3 961:1
**finances** 960:1
**financial** 1020:20
1051:8 1073:20
**financially** 978:10
992:13 1008:1
**find** 937:3 1002:19
1006:7 1022:5
1026:14 1027:18
1036:18 1042:8
1049:9 1075:4
1078:12 1086:4,5
**finding** 922:17,21
922:22 1034:8
1104:6
**findings** 1010:18
1034:5
**fine** 878:20 915:21
987:16 1098:12
1108:15
**finish** 1028:6
1030:4 1060:3
**finished** 915:20
961:3 1027:22
**fired** 982:14
**fireside** 1032:10
**fireworks** 912:3
**firm** 950:6,8 951:13
951:16 952:1
956:16 1042:20
1042:22 1098:21
1098:22 1099:22
1100:19 1102:21
1102:22 1103:1,4

1103:5
**firms** 1064:16
**first** 877:3 880:12
  886:7 890:7,14
  897:14 898:21
  899:7,19 904:12
  905:12 908:5
  911:16 937:16
  941:10 947:5
  949:14 950:13
  953:13 958:13
  962:8 973:1,10
  983:10 987:15
  990:15 998:4
  1007:6 1008:2,10
  1021:19 1028:22
  1037:21 1041:22
  1043:3 1046:13
  1049:13 1065:7
  1073:11 1079:13
  1089:9 1098:7
**FISA** 1001:15
**FITCH** 871:11
  874:2,11,15,22
  875:10,12,20
  876:9,18 877:5,12
  877:14,20 878:7
  878:15,20,22
  879:2,5,10,18
  880:2 881:2 885:1
  888:3 895:3,17
  896:2,9,12 897:16
  897:19 898:8,12
  898:15,19,22
  899:3,6,10 903:16
  904:8,11,17,22
  905:4,7 908:4,10
  908:16 909:10
  911:16 915:12,19
  917:6,21 923:10
  923:21 925:17
  928:4,15 930:4,7
  933:7,10,13,17,20
  934:1,6 935:15
  936:2,17 939:3
  941:7 943:7,16
  944:3 945:6,10,14
  945:17,19 946:2,7
  946:13,22 953:10
  954:12 960:5,12
  967:3,7,10 968:3
  968:6 969:11
  971:15 983:11,14
  983:17,21 984:3,8
  984:13 990:12
  991:1,11,14

**Florida** 872:6 950:8
  958:17,18 959:7
  964:10 965:11
  968:19 970:4,6,16
  971:11,20 973:1
  1044:14
**flow** 1077:15
**fly** 1014:9
**FOIA** 956:4,20
**folder** 1035:22
**folks** 996:9
**following** 905:15
  908:21 1071:20
**follows** 880:13
  947:6 1098:8
**forbearing** 1008:2
**force** 958:8
**Ford** 949:15
**forefront** 1006:21
**foreign** 913:13
  952:11 963:1
  1066:13 1085:15
**forfeit** 1048:2
**forfeited** 900:17
**forget** 960:10
  978:18 1081:1
**forgone** 1007:15
**form** 926:7
**formal** 983:19,21
**former** 977:21
  982:17 1004:17
  1028:22
**fortunate** 953:4
  1019:5
**forum** 938:22 939:2
  939:3,4
**forward** 895:12
  927:3 1051:5
  1053:7 1063:3
  1075:15 1086:2
**forwarded** 1051:3
  1071:4
**found** 900:6 930:14
  995:5 996:6
  1003:5 1022:5,6
**foundation** 936:16
  943:15,16
  1048:12,15
**founded** 960:6,7,13
**four** 898:3 901:4
  907:11 990:22
  991:10 994:15
  995:2,21,22
  1053:1 1074:17
  1104:3
**fourth** 1061:7

**FRA** 884:18,18
**framework** 1032:16
**France** 948:6
**frankly** 1022:11
  1053:11
**fraud** 1047:3
**Fred** 914:9 951:22
  959:8 966:5
  1028:10 1055:8
**Freda** 1012:15
**Frederick** 872:3,4
**free** 894:10 951:14
  952:18,18 960:17
  960:22 961:5,19
  978:12 1048:5
  1058:18 1060:10
  1075:7
**freedom** 894:8
  949:10 957:19
  959:18 960:6
  961:4 974:2,17
  1012:18 1013:15
  1019:11 1051:3
**French** 948:4 951:9
**frequently** 958:21
  962:18,21 1020:9
  1089:22
**Friar's** 1099:3,9
**Friday** 874:4,18
  878:5 1104:17
  1105:12
**friend** 911:10 974:9
  983:3 986:7
  1007:5 1013:16
  1013:17 1022:4
  1081:12 1087:19
  1087:19
**friendly** 987:22
**friends** 977:6 982:4
  1002:13,14
  1020:18 1076:6
  1083:22
**friendship** 911:8
  977:5,19,19
  978:20 1005:13
  1084:15
**front** 879:15 885:18
  954:19 1007:6
  1014:8 1052:1
  1053:2,4 1065:5
  1100:9 1106:16
**fronts** 1045:5,6
**frustrations**
  1063:16
**fsujat@yahoo.com**
  872:8

**full** 879:3 946:6,8
  947:13 1018:1
**fully** 1064:14
  1091:14
**fundraising** 1051:2
**funny** 1007:7
  1008:8 1034:21
**further** 919:20
  933:15 936:1
  944:2 945:4
  1086:17 1107:13
**future** 1036:17
  1062:22 1075:15

―――――――――――
            **G**
―――――――――――
**G** 874:1
**G-l-o-r-i-a** 1098:15
**gainfully** 1094:1
**gate** 956:2
**gates** 957:8
**gay** 954:4
**general** 891:1
  911:13 920:10
  951:1 952:5 953:4
  963:9 985:3
**General's** 950:19
**generally** 902:20
  915:2 947:15
  952:21 963:3
  1073:2
**generosity** 876:10
  1066:5
**George** 957:10
  959:13 1000:21
**Georgetown** 948:15
  954:17,18
  1017:14
**Gerald** 949:15
**getting** 905:12
  906:19 922:13
  953:18 968:4
  973:8 979:19
  985:4 988:11
  1000:15 1005:10
  1009:13 1031:17
  1034:18 1041:17
  1042:10 1050:19
  1053:20 1056:18
  1057:6 1076:20
  1078:11 1080:1
**ghetto** 1023:17
**ghettos** 1023:17
**Gingrich** 958:14
**girl** 1090:21
**girlfriend** 1087:12
**give** 875:8 879:7

993:20 994:4,17
  994:22 995:16
  996:2,12,17 997:1
  997:6 1016:7
  1027:16,19,21
  1028:5,8 1030:2,6
  1030:9,12 1031:8
  1032:18 1033:11
  1034:16 1035:4
  1035:11 1036:2
  1036:15 1037:7
  1038:8,13
  1039:14,18
  1042:7 1045:1,8
  1047:4,11 1048:8
  1048:13,17,21
  1049:13 1051:12
  1052:2,8,12,20
  1053:8,14,22
  1054:7 1055:4,16
  1055:19 1059:14
  1060:22 1067:1,6
  1067:10,15
  1068:1,5,19
  1069:9,13,21
  1070:5,9,13,17,19
  1071:6,9 1073:16
  1079:2,6,8,12,16
  1079:20 1082:7
  1082:10 1088:14
  1088:16 1092:3
  1092:21 1093:2,9
  1093:15 1095:11
  1095:18 1096:7
  1096:15 1097:1,8
  1097:16 1098:3
  1102:12,20
  1103:6,15
  1104:19 1105:1,5
  1105:10 1107:15
  1107:22 1108:11
  1108:17,19
  1109:2,11,14,20
**Fitton** 1013:7
**five** 897:22 898:13
  898:14 903:7
  907:19 931:3
  963:16 969:2
  976:19 999:6
  1074:19
**five-lane** 1014:13
**flee** 988:22
**flip** 895:11 905:11
  916:11,12,13
  917:9
**floor** 1007:17,17

In Re:  Larry E. Klayman
June 25, 2018

884:10 886:10
891:16 904:8
913:18 929:5
930:20 933:10
946:19 949:7
950:4 968:18
973:13 988:19
990:12 992:10
1011:9 1024:11
1029:13,14
1041:3 1049:6
1058:14 1063:21
1072:20 1074:11
1075:4 1080:1
1081:7 1085:11
1097:12 1101:14
**given** 875:20
894:22 901:4
944:13 964:4
1008:21 1011:10
1032:4 1058:4
1071:21 1076:1
1078:13 1089:19
1107:6
**giving** 921:4 976:5
977:17 1024:10
1034:11 1059:4
1072:10
**glad** 1030:2
**glasses** 1008:13
1013:19 1014:9
1014:11
**glean** 1086:13
**Gloria** 873:5
874:19 1096:13
1096:20 1098:5
1098:14 1100:13
1104:17 1105:13
1105:17 1108:6
**go** 878:4 887:6
891:14,17,21,22
895:19 898:15
899:3 904:1 909:9
913:14 916:9
922:12 923:18
926:12 930:7,19
936:17 943:7
945:15,21 958:21
961:7 963:14
978:11 981:21
996:5,13 997:12
1002:22 1009:15
1014:6 1015:1
1016:3,15
1017:12 1018:9
1018:12 1020:14

1021:17 1022:21
1024:20 1027:4,9
1029:6 1032:16
1053:13 1055:4
1055:19 1057:8
1063:2,3,11
1067:9,21
1068:10,11
1069:17 1073:16
1074:12 1077:14
1090:19,19
1105:10,20
**goal** 999:9
**God** 1014:14,21
1066:21 1090:18
**God's** 1084:1
**goes** 882:14 894:9
943:6 1014:5
1051:19 1052:11
1052:14 1053:5
1059:8 1066:6
1077:15 1108:3
**going** 876:12 877:3
878:4 879:14
891:6,16 892:9
893:19,21 895:8
895:13,19 900:1,3
904:12 911:1
913:22 914:9,13
914:18 915:17
918:9 928:13
930:10,17 932:1
946:7 953:7,10
954:5 955:10
965:1,9,12 967:1
969:14 977:12,20
980:15 984:20
986:7 987:7
991:11 993:12
996:9,9,20 999:4
1007:3,4 1012:6
1013:3 1014:4
1016:19 1020:7
1020:10 1022:21
1025:22 1032:6
1032:20 1035:8
1035:16 1037:9
1047:17 1048:6
1049:9 1053:21
1058:6,7 1059:7
1059:14 1063:20
1063:21 1065:10
1068:10 1069:17
1071:9 1072:1
1073:17 1074:12
1075:15 1076:17

1080:18,22
1084:6 1086:6
1091:6 1093:13
1095:1 1104:16
**Goldberg** 1098:21
1099:22
**good** 874:2 876:14
877:12 878:22
892:12 929:19,22
936:6,7 947:9,11
949:12 951:11
955:4 960:16,22
964:12 965:5
979:3 980:14,15
982:15 998:18
1002:14 1004:18
1004:19 1005:4,4
1005:14 1020:20
1024:8,14
1026:15 1034:17
1054:21 1057:14
1060:10 1064:17
1066:6,21
1076:17 1077:5
1080:11 1091:10
1094:2 1095:14
1108:13
**goods** 1088:1
**Google** 1106:6
**Gore** 962:3
**gotten** 896:9 898:8
954:8 992:21
1046:11 1059:1
1060:8 1062:19
1068:16 1074:9
1081:4
**government** 881:16
886:21 887:2
894:7 901:12
905:14 906:5
909:22 948:6
952:9,11,12,14
955:1,6 956:13,17
959:2 963:16,17
988:20 999:3
1010:11,13
1011:20 1056:13
**Governor's** 996:21
**governors** 886:18
891:1 901:10
911:4 912:1,6,12
934:13 981:12
990:11 993:8
997:15,17,19
1028:17,20
1040:10

**grabbed** 976:20
**grace** 887:11
1014:14,21
**graduate** 881:7
**graduated** 881:7
947:20 948:3
**Graham** 958:17
959:10
**grandfather**
1017:21
**grandmother**
1012:15
**grant** 922:18 923:1
931:9 1007:2
**granted** 916:6
**granting** 1006:21
**gratuities** 958:13
**gravitate** 984:14
**gravitates** 1080:14
**great** 894:4 949:4
1107:5
**Green** 973:16
**greet** 976:4
**grew** 1094:17
**grievance** 887:7
890:10 931:10,11
931:13,14
**Grill** 1053:2
**group** 954:6 1002:6
1055:17
**groups** 1106:9
**guess** 986:3
**guide** 879:19
1024:4,4
**guy** 1001:11,12

_____
**H**
_____

**H** 871:20
**haircutter** 1065:8
**half** 876:8 946:4,6,8
951:15 955:18,19
**hall** 888:18
**Halliburton** 958:2
958:3
**Hamburger** 954:6
**hand** 921:4 946:17
976:21 1097:10
**handed** 1104:22
**handing** 894:15
**handled** 919:22
**hands** 1000:14
1019:17
**handwriting** 971:17
971:19 972:10
**happen** 1070:3
1095:1,4

**happened** 883:12
887:4 998:20
1002:16,22
1006:19 1008:19
1012:4,5,10
1013:11 1017:12
1017:13 1019:22
1065:18 1095:3
1095:10
**happening** 921:20
**happens** 922:2
1056:14
**happy** 1090:2
**harassed** 883:1
888:11 894:9
920:2 976:22
998:15
**harasser** 981:7
991:21
**harassing** 883:7
**harassment** 905:21
906:14 919:1
926:1,5,13 991:22
998:2 1004:21
1006:14 1066:11
1090:22
**hard** 975:15 977:20
978:8,9,10 1061:9
1076:8 1084:9
**hard-edged** 884:13
885:2
**harm** 1013:8
**Harriton** 947:19
**Haskell** 1014:18
1017:12
**he'll** 880:5
**head** 885:13 887:11
1001:15 1018:6
1018:11 1019:2,3
1019:7 1024:9
1028:20
**headquarters**
1026:19
**heads** 878:7
**health** 900:12
**healthy** 1078:6
**hear** 922:20 1007:3
1018:19 1030:2
1035:9,11 1088:6
1096:21
**heard** 910:14 955:8
1017:18 1021:18
1031:2 1032:2
1033:6 1048:7
1063:19 1064:13
1069:2 1089:10

hearing 870:11
  871:1,3,10 874:6
  875:17 1006:5,22
  1007:2 1010:13
  1010:16 1011:9
  1011:10,11,18,19
  1029:13,14,14
  1034:10,11,18
  1036:9 1037:5
  1064:10 1096:14
  1097:3,17 1108:1
  1110:3
hearsay 1032:8
heart 978:15
  1012:14 1044:4
  1084:11 1095:10
heartless 1010:19
  1012:21
heels 980:16
held 955:7
help 898:10 903:21
  904:15 906:1,11
  914:3 929:6
  949:18 956:17
  960:19 977:3,4,10
  978:17 985:15
  986:6,17 987:3,9
  988:2,4,7,10,12
  1003:14 1005:10
  1015:6 1022:3
  1031:18 1038:7
  1044:5,6 1054:22
  1055:12 1061:7
  1062:9 1068:14
  1072:5 1075:17
  1077:22 1081:2,5
  1081:10,10
  1084:12 1085:18
  1085:20 1086:1
  1086:22 1091:1,2
  1091:19
helped 951:6
  956:14 1015:14
  1026:13 1088:4
Helper 954:7
helpful 892:20
  1073:13
helping 978:18
  1005:12,12
  1025:11 1055:1
  1058:20 1073:22
  1076:19 1107:3
heritage 954:2,3
  1017:10 1048:12
  1048:15
Hi 1105:17

hiatus 1093:16
hiding 1094:21
high 886:19 947:19
  1018:9
high-powered
  1003:11
higher 926:21
highlighting
  1022:16
highly 901:19
highway 963:22
  1014:3,13
Hill 948:12,18,20
  974:16 985:9
  1047:5,6,7
Hillary 997:17
  1028:18,19
Hills 1014:4
  1016:22
hinge 892:3
hired 889:19
  903:19 937:20
  978:6
hiring 884:16
history 881:9,10
  965:10 972:20
  1098:19
hit 978:13 1014:8
  1014:15,21
hobby 948:16 957:3
hoc 871:3,10
  1097:3
hold 1064:12
  1065:22,22
  1096:7
holds 1001:8
holidays 948:14
Hollywood 872:6
  1017:2
home 958:18,18
  1003:17 1013:20
honest 955:1,2
  962:16 979:3
honestly 1019:20
  1049:3
honesty 903:22
honor 876:5 878:4
  895:13 897:18
  898:10 900:4
  904:14 917:19
  921:7 923:7 924:5
  925:16 928:1
  933:7 934:4 943:5
  948:5 991:13
  994:6 996:11
  1008:14 1009:18

1010:1 1036:22
  1064:9 1093:8
Honorable 920:9
Honors 1021:19
  1058:16
hope 1105:18
  1106:1,8
hopefully 920:16
host 887:15
hostility 979:18,19
hosting 883:7
hosts 1023:9
hotel 1008:20
  1024:21
hour 876:8 878:2
  946:4,6,8 989:20
  989:21 1014:9
hours 900:8
house 914:4 987:8
  987:21 1002:4
  1015:2,10 1026:1
Howard 1009:10
HUD 959:14
Hughes 1009:10
human 886:3
  887:11
hundred 1061:17
hurt 998:14,14
hurtful 1083:20
hurting 960:2,3
hurts 1076:1
  1086:17
husband 1002:3
  1004:17 1075:13
Hussein 1094:18
Huvelle 1000:12,16
Hyatt 978:12
  1020:22 1047:17

                  I
IAMA 881:8
idea 905:22
  1005:14 1086:12
  1108:14
identified 940:16
  978:16 981:16
  993:17
identify 905:11
  1033:17,21
ideology 955:18
II 1007:12
III 871:20
ill 1075:18
illegal 930:22
illegally 884:16
imagine 919:1

922:13 995:22
immediate 1062:22
immigrants 961:7
immigration 960:14
  960:16 961:6,18
impasse 885:8,10
  885:12,13
implied 1086:11
implying 1086:16
import/export
  951:21
important 883:6
  900:4 961:19
  980:5 984:9
  1042:2 1046:15
  1049:5 1072:9
  1073:6 1082:21
  1092:20
importers 953:1,1
impressed 901:8
  979:2
impression 907:15
  949:7,8 1010:8
improve 962:15
inactive 964:13,16
inappropriate
  1020:3
inaudible 958:4
inch 898:17 994:19
  995:12,20
inch-and-a-half
  995:12
inclined 876:1
  877:20
include 887:15
  998:8
included 1028:19
including 1050:20
  1074:21 1091:5
incoming 914:4
inconsistency
  1040:15
inconsistent
  1040:14
inconvenience
  877:21
incorporated 905:3
incorrect 942:2
  1043:6 1046:6
incredibly 1021:2
indefinitely
  1075:12
independent 959:11
indicate 947:12
indicating 879:22
indication 1051:12

individual 883:9
  956:9
individual's 911:17
individually 1103:5
individuals 1104:4
indulge 933:18
indulges 979:14
indulging 1080:8
industry 952:17
inexplicable 1000:4
inflate 958:3
influence 907:12
  909:19 984:17
influenced 1062:5
influential 907:14
info 927:19
inform 932:4
informal 966:6
information 901:5
  905:16 909:12
  917:14 977:17
  990:2 997:9,11
  1002:4 1011:22
informed 911:10
  1091:14
initial 983:18
  1003:13
initially 911:2
  927:20 973:22
  999:22 1016:5
  1020:14
injunction 1002:21
  1005:21 1006:4
  1006:17 1007:2
  1021:6 1034:15
  1062:3 1069:16
injustice 1018:5
  1019:19
inquiry 887:15
inside 883:14
insofar 974:15
install 959:14
instance 953:2
  955:21 990:7
instructed 932:4
instructing 1040:8
instructions
  1043:17 1045:15
instructs 1038:3
instrumental
  1009:13
insurance 1016:16
  1016:17
integrity 954:7
intellectually
  1017:22

| | | | | |
|---|---|---|---|---|
| **intended** 1072:11 1080:16 | 958:22 974:1,12 | **Jewish** 954:3 1017:9,9,22 | **July** 940:19 955:15 1016:9 1025:21 | 890:10 893:14 918:20 921:16 |
| **intent** 1007:14,22 1008:14 | **involvement** 890:22 **involves** 946:2 | 1018:1 1022:15 1022:16 1023:17 | 1035:6 **jump** 1039:21 | 949:9 950:5 953:3 957:1,4 964:7 |
| **intention** 1060:19 | **involving** 926:20 957:6 1040:10 | 1024:7 1090:10 1090:10,13 | 1064:19 **June** 870:8 874:3,4 | 972:22 976:17 995:2 1007:7 |
| **interacted** 1010:21 | **Iran** 884:2 894:10 | **job** 883:6 963:13 | 906:20 1016:5 | 1008:9 1015:13 |
| **interacting** 929:1 | 909:3,5,19 910:2 | 1003:21 1024:1 | 1035:8 1061:5 | 1019:13 1025:6,7 |
| **interaction** 1085:3 | 910:6,9,11,13 | 1026:16 1061:19 | 1067:2,18 1068:1 | 1032:7,14,15 |
| **interactions** 1085:9 | 973:15 974:4,9 | 1075:18 1083:13 | 1068:19 1069:3 | 1048:8 1051:22 |
| **intercede** 912:21 | 989:4,7 1023:3,8 | **jobs** 949:17 | 1070:1 1100:8 | 1057:11,12 |
| **interest** 962:15 | 1026:20 1077:4 | **Joe** 885:22 | 1101:4 1110:4 | 1060:20 1062:10 |
| 963:3,3 980:8 | 1085:15 | **John** 913:14 914:3 | **jury** 1008:13 | 1066:2 1068:6,8 |
| 1019:10 1030:15 | **Iran/Iraq** 1094:18 | 951:1 956:22 | **justice** 920:6,12,20 | 1080:9,21 1083:7 |
| 1030:18 1042:13 | **Iranian** 974:2,5,15 | 985:20 987:5,14 | 950:17 951:2 | 1083:7 1084:17 |
| 1058:16,17 | 984:11 986:8 | 1000:1,2,2 | 960:10 961:16 | 1090:11 |
| 1077:1,1,2 | 987:4 1002:10 | **Johnson** 921:11,14 | 962:11 972:19 | **kindness** 1084:9 |
| **interested** 937:7 | 1003:19 | 922:7,9,16 | 1000:2 1012:17 | **kinds** 951:20 957:7 |
| 976:16 | **Iranians** 989:12 | **joke** 1023:1 | 1107:10 | 998:4 1003:8 |
| **interesting** 1008:9 | 999:13 1026:6 | **jokingly** 989:6 | | 1006:8 1054:17 |
| **interestingly** | **ironically** 948:13 | **Jose** 959:4 | | 1054:18 |
| 952:16 960:14 | 962:12 992:9 | **judge** 926:11 | **K** | **kiss** 976:1,5 988:6 |
| 962:3 | **IRSgate** 957:7 | 934:11,14 953:21 | **K-e-v-a-h** 1004:3 | **Klayman** 870:5 |
| **interests** 903:9,11 | **Islam** 1026:7,8,8 | 954:2 999:5 | **Kaiser** 1016:15 | 872:10 873:4 |
| 963:1 974:10 | **Israel** 974:10 | 1000:1,5,8,12 | **Kamenei** 1094:19 | 874:12,13,17 |
| **interfered** 1058:3 | **Israeli-American** | 1005:21 1006:3 | **karma** 1090:15 | 875:1,11,15 876:4 |
| **international** 951:9 | 1013:17 | 1006:20,22 | **Kathleen** 967:2 | 876:14 877:2,6,13 |
| 951:13,20 952:6 | **issuance** 1016:8 | 1007:4,5 1008:8,9 | 968:15 1025:2 | 877:19 878:3,13 |
| 952:22 957:2 | **issue** 902:20 919:21 | 1008:18 1009:17 | 1058:20 1085:10 | 878:18 879:12,14 |
| 960:9 961:2,16 | 921:17 922:14 | 1009:22 1010:10 | 1085:21 1086:3 | 880:4,7,15 881:2 |
| 963:14 | 924:8 974:8 | 1011:3,5,8,9 | 1086:20 1087:3 | 881:4 885:16 |
| **internationally** | 1000:7 1004:1 | 1012:19,20,21 | 1088:1,3 | 889:15 894:1,3,8 |
| 951:12 | 1011:15 1033:18 | 1015:22 1029:10 | **keep** 878:12 953:10 | 895:5,10,18,22 |
| **interrupt** 877:17 | 1080:3 | 1031:21 1033:20 | 955:1,1,11 | 896:4,10,16 897:1 |
| 879:17 1000:10 | **issues** 923:12 930:1 | 1034:4,22 | 1061:14 1075:1,3 | 897:2,18,22 898:6 |
| 1073:17 1092:21 | 938:19 986:3 | 1049:19 1050:1 | **Keeper** 881:16 | 898:10,14,16,20 |
| **interrupted** | 1001:16 1006:20 | 1050:13,17 | **keeps** 881:2 | 899:2,5,9,16 |
| 1096:18 | 1081:1 1089:12 | 1062:1 1064:7 | **Kemp** 960:19 | 900:3,6,13,15,18 |
| **intervening** | **Italian** 951:10 | 1069:8 1070:14 | **Kenneth** 912:10 | 901:21 903:8 |
| 1093:16 | 952:12 | 1092:11 1109:10 | **kept** 918:8 992:13 | 904:1,4,14,19 |
| **interview** 906:14 | **Italy** 952:13 | 1109:12 | 1000:15 | 905:2,8,17 906:9 |
| 907:1 974:17,21 | **IV** 870:6 | **judges** 953:16 | **Kevah** 1004:3,20 | 906:10 908:20 |
| 975:3 1027:1,11 | | 955:4 962:17 | 1005:12 1022:4 | 909:13,16 911:19 |
| **interviewed** 950:21 | **J** | 980:5,2 1000:14 | 1076:19 | 911:21 914:8,11 |
| **intimate** 1083:7 | **J** 872:3,4 | 1001:22 | **key** 966:18 1061:6 | 914:18,21 915:16 |
| **intractable** 893:3 | **Jack** 960:19 | **judgment** 959:2 | **Keya** 986:9,18,19 | 915:21 916:1 |
| **introduce** 987:17 | **Jackson** 981:8 | 978:3 1013:9 | 986:20 987:2 | 917:4,7,18 921:6 |
| 990:5 993:13 | 1005:3 | 1056:11,13 | **Keya's** 986:9,14 | 921:9 923:7,11 |
| **introduced** 937:13 | **James** 978:5 | **judicial** 949:10 | **keyed** 1004:8,14 | 924:3,7 925:15,18 |
| 961:13 978:21 | **jammed** 1014:16 | 954:17,20 955:15 | **Khomeini** 989:4 | 925:20 928:1,5,17 |
| 993:18 1025:20 | **jams** 1014:8 | 957:3 959:1 962:1 | 1094:19 | 930:9 932:5 |
| 1026:11,21 | **January** 921:11 | 977:22 980:7 | **kids** 1017:17 | 933:15 934:4,8 |
| **investigation** | 922:6 925:2,7 | 987:12 1001:17 | **kill** 982:9 | 935:16 936:1,12 |
| 919:14 926:1 | 932:15 1049:19 | 1001:22 1012:18 | **killed** 973:20 | 936:15,19 937:11 |
| **investment** 958:4 | 1049:22 1050:8 | 1013:4,14 | **Kim** 870:22 871:4 | 937:13,18,21 |
| **invited** 975:19 | 1050:13,17 | 1015:14 1054:9 | **Kincaid** 1054:5,7 | 938:4,16 939:1 |
| **involved** 938:17 | **Jesus** 1018:7 | | **kind** 887:10,16 | |

941:4,11,19
942:21 943:3,5,14
944:3,6 945:4,16
945:18 946:1,5,11
946:17 947:3,10
947:14,15 951:16
951:17 953:13,14
959:20 962:6
963:5 964:8
967:11 968:7
972:16 974:20
990:4 991:7,17
994:7 997:4
1007:20 1008:11
1008:19 1012:15
1029:20 1032:4
1037:10 1038:4
1038:16 1039:21
1041:1 1042:15
1042:20,22
1049:11 1050:12
1061:2 1070:21
1071:7 1074:4
1077:9 1082:3,13
1082:19 1085:5
1090:1 1097:19
1098:3,10
1103:16 1104:19
1104:21 1105:3,7
1105:11 1106:4
1107:13 1108:6
1108:13 1109:1,6
1109:13,16
**Klayman's** 901:5
1096:18
**knew** 927:17 957:8
976:14 980:2
987:12 1011:1,5
1015:8 1029:9
1043:9 1054:22
1060:11,11
1062:16,18
1091:11 1094:5
**knock** 1019:12
**know** 878:3,10
887:17 893:3,18
893:19,19 902:10
903:21 910:5
912:17,22 913:4,6
916:17 918:10
919:2 924:10
934:15,16 939:7
945:7 952:2
955:13 957:5,8
962:6 963:1,6,12
964:4 966:5

973:17 974:15,19
975:2 976:1,10,11
976:15,17 977:5
977:10 978:11,14
978:17,21 979:3
980:10,14 981:13
981:13 982:20,22
984:11 985:14
986:8 987:3,4,11
987:14 988:13
989:21 996:8
998:20 999:2
1002:15 1008:18
1008:22 1009:21
1010:20 1011:8
1012:16 1013:2,3
1014:18 1018:3
1019:4,5,9
1021:16 1025:11
1026:12 1027:7
1032:10 1039:5,7
1042:9 1046:16
1051:17 1052:1
1053:11 1054:17
1055:2 1056:13
1057:2,6,11
1058:5 1060:9
1062:3,7,11
1065:6,17
1066:13 1067:14
1068:7 1071:21
1073:4 1074:7
1076:11,12
1080:2,3,15
1081:2,12,22
1083:1,7,17
1087:6 1090:9,12
1091:4 1092:15
1093:5 1094:1,6,9
1094:14 1095:2,3
1096:3 1101:10
1102:6,13,15,21
1103:10 1105:5
1106:7,15
**knowing** 985:8
1051:20 1103:9
**knowledge** 883:14
884:15 900:9
902:19 916:3
929:13 1006:14
**known** 931:7 960:9
985:16 1085:13
**knows** 1053:6
1078:19
**Kollar-Kotelly**
926:11 934:14

1000:5
**Kollmer-Dorsey**
985:4
**Kotelly** 1000:17,18
1005:21 1006:3
1006:20 1007:1
1010:4,7 1011:5
1016:1,4 1029:10
1031:21,22
1033:20 1049:19
1050:1,17 1062:1
1064:7 1084:19
1092:11 1093:4
**Kotelly's** 1034:4
1050:13 1069:8
1070:15

_____

**L**

**LA** 907:2 982:3
984:21 999:1,20
1002:20 1003:3
1005:16 1010:6
1013:18,21
1014:5 1016:19
1017:2 1020:14
1021:7 1024:12
1086:11 1106:1
**labor** 885:2 887:9
931:12
**lack** 909:6 915:10
936:15 1066:3
1084:21
**lacked** 1022:20
**lacks** 943:14
**lady** 974:18 1029:1
**language** 892:3
1005:7 1026:20
**Lanny** 920:9
**laptop** 1014:22
**large** 889:5 1100:17
**largest** 889:6
**Larkin** 871:13
950:12 968:2
1045:19 1046:1
1089:4
**Larry** 870:5 872:10
873:4 889:15
894:8 905:17
906:9,10 925:21
926:8 932:4
941:11 947:3,14
951:16 953:14
962:6 974:20
975:14 976:21
982:9 987:17
1010:5 1011:10

1017:19 1018:6
1018:20 1021:22
1026:2 1038:4
1074:4 1082:19
1082:19 1100:22
1106:4
**Las** 1047:3
**late** 973:11
**Latin** 961:9,9
**Latino** 961:9,10
**Latins** 976:2,4
**latitude** 1032:4
**law** 872:4 948:9,10
950:6,8 951:13,16
951:16 952:1,7
953:13 956:16
963:18 964:7,9,17
972:17 1010:15
1011:14 1012:3
1019:10 1034:7
1034:19 1042:20
1042:22 1098:21
1098:22 1099:22
1102:21,22
1103:1,4,5
**lawsuit** 974:21
981:11 997:5,13
1072:7
**lawsuits** 957:14
974:14 981:2,3
**lawyer** 929:5 950:3
950:5,11 957:2
979:11 1007:16
1008:4 1009:11
1013:7 1058:19
1059:1 1060:8
1076:20 1077:2
1077:21 1080:2
1086:18 1091:18
1092:1 1098:19
1099:20,21
**lawyers** 1011:16
1057:8 1073:2
**lay** 1016:12
**laying** 1087:17
**lead** 880:6
**leaders** 973:15
**leading** 888:2
901:20 936:13
938:16 1098:22
**lean** 1083:19
1084:2
**learn** 963:17 1026:4
**learned** 911:3
937:16 949:20
950:10 1005:7

1042:11 1050:2
**learning** 943:21
**lease** 1007:15
1020:19 1074:9
1074:16
**leave** 914:8 915:8
922:4 992:11,16
999:19 1002:22
1074:11
**Leaving** 1032:18
**led** 956:21
**left** 949:6 951:8
972:19 975:11
1013:5 1014:15
1019:15 1106:8
**legal** 954:8 955:3,6
961:6 962:15
980:3 1013:13
1032:22 1078:7
1078:18
**lengthy** 994:11
**Leonard** 951:14
952:19
**lesser** 1025:4
**lessors** 1053:10,16
**let's** 876:2 898:16
967:17 980:15
987:8 991:4
1009:21 1027:18
1039:14 1092:14
1102:3
**letter** 888:12
914:16 915:3
919:10,17 920:6
920:14,17,17
921:11,15 922:7
922:10,16 928:6
928:11 939:21
940:3,6 942:6,10
942:11,19
1007:14,22
1008:14 1031:16
1037:22 1038:1,2
1038:5,17,18
1039:17 1040:7
1041:20 1043:7
1044:21 1045:13
1046:8,11,11
1047:22 1050:6
1051:21 1053:5
1056:8 1059:9
1067:1 1069:4
1071:3,14,16,17
1071:17 1091:18
1092:3 1102:9
**letter's** 1060:21

**letter/email**
   1068:20
**letterhead** 1044:18
**letters** 949:6 950:1
   985:1 1037:20
   1042:16,17
   1049:4,14
**level** 1053:12
**Lewinsky** 1002:5
**liaised** 1066:12
**liberal** 949:13
   955:20
**liberate** 1077:4
**Libertarian** 955:17
   955:19 1002:10
**licensed** 964:9,10
   1100:1,3
**Lichtblau** 1001:3
**Lieberman** 986:5
**life** 978:8,9 1013:3
   1019:16 1047:16
   1064:17 1065:4
   1065:20,21
   1066:1,21
   1080:19 1082:21
   1083:18 1090:19
   1090:19,20
   1091:3 1093:21
   1095:4 1099:14
**life's** 1064:12
   1093:21
**lifetime** 962:19
**liked** 929:21 948:16
   960:20 1003:18
   1003:19,21
**likelihood** 1062:21
   1072:2
**line** 970:14 999:6
   1061:2 1062:20
   1068:20 1070:21
   1073:20
**link** 968:11
**list** 874:14,18
**listening** 883:2
**litany** 1087:7
**literal** 1005:5
**literally** 950:16
   1094:21
**literature** 948:4
**litigating** 999:3
**litigation** 950:6,10
   951:20 952:7
   963:17 964:3
   998:17 1033:5
   1035:6
**little** 875:22 876:2

878:2 881:1
935:16 948:19
949:2 950:4
973:14 974:5,6
978:11 979:13
993:5 996:3
1007:16 1030:3
1036:17 1059:5
1060:4 1064:19
1066:3 1069:22
1090:21 1109:15
1109:16
**live** 954:10 992:12
   1001:19 1075:5
**lived** 973:2,4
   1014:1
**lives** 986:8
**living** 954:9,18
   1003:22 1004:2
   1004:20 1072:14
   1094:2 1100:20
**lobby** 910:15
   1048:16
**lobbying** 912:16,18
**local** 881:20,21,21
   882:4 905:15
   931:20,21
**locale** 1017:1
**located** 1053:6,9,12
**long** 935:10 952:2
   972:16 1003:7,9
   1009:8 1054:5
   1104:1 1109:18
**long-term** 1080:16
**longer** 878:2 999:7
   1107:6 1109:4
**look** 880:5 914:12
   914:22 915:7
   916:17 919:16
   966:2 969:14,15
   987:6 989:21
   1020:21 1023:17
   1038:16 1041:1
   1054:2 1055:10
   1056:1 1070:22
   1077:9 1079:9
   1082:14 1085:5
   1088:10 1093:7
   1096:1
**looked** 896:8 966:1
**looking** 896:2,15,16
   899:7 942:1
   966:16 967:15
   969:17,19,22
   1014:22 1079:6
   1088:17 1104:13

1106:11,18
**looks** 879:21 922:12
   933:6
**loophole** 973:1
**loosing** 1090:16
**Loral** 956:10
**Los** 887:22 888:8
   888:21 889:5
   892:9,12 906:15
   915:9 926:12
   937:7,17 956:6
   992:12 998:19
   999:13,15
   1002:22 1003:1
   1003:16 1012:8
   1026:19 1056:16
   1064:15 1067:11
   1100:20
**lose** 927:13 1021:4
   1084:4,14 1090:5
**losers** 886:16
**loss** 1058:12
**lost** 884:18 931:4
   959:15 971:10
   1021:9,10
   1029:16,18
   1051:11 1088:22
   1090:2,5
**lot** 877:13 910:21
   952:10 957:12
   961:13 964:14
   971:6 977:8 988:1
   1012:16 1019:7
   1022:22 1026:6
   1032:8,9 1035:2
   1043:14 1046:5
   1050:19 1051:7
   1051:10,10
   1052:6 1053:20
   1057:19 1066:10
   1073:12 1076:5
   1085:3 1094:16
   1095:3
**lots** 1023:4
**Louise** 1013:22
   1015:13
**love** 943:4,13
   949:20 950:13
   959:7 1076:3,4,4
   1076:5,5,6 1080:9
   1080:15,20
   1083:9 1105:21
**loved** 949:3 950:14
   961:8
**loves** 1105:22
**Loving** 894:8

**lower** 1022:1
   1089:15
**luck** 1107:9
**lucky** 950:11
**lunch** 876:6 878:2
   1009:21 1065:2
**luncheon** 1037:2
**Luxe** 1024:21

————————

**M**

**M** 870:22 871:4
   1025:19
**M-e-d-h-i** 991:19
**M.D** 1003:9
**machine** 959:14
**magazine** 939:6
**Mahmonir** 902:13
**mail** 1044:13
   1050:19,20
   1051:3,4 1052:4,7
   1053:8
**mailed** 1050:15
**major** 892:6 961:21
**making** 972:10
   1052:16 1064:17
   1082:11 1094:2
**malicious** 978:3
**mall** 893:14 894:15
   975:8
**man** 949:4,12,12
   961:1 1007:7,12
   1065:4
**man's** 1065:4
**management** 883:1
   884:22
**management's**
   901:14
**manager** 1085:22
   1087:16
**managers** 893:2
   981:7
**manner** 1032:5
   1068:16
**Manohir** 902:10
**Manouchehr**
   973:17,21,22
**March** 922:16
   993:1 1104:17
   1105:13 1106:21
**Mark** 1026:21
   1027:6
**marked** 995:13
**Maroko** 1098:21
   1099:22 1102:10
**marquis** 1051:22
**marriage** 1080:17

**married** 954:18
**Martinez** 959:15
**MARY** 871:13
**Maryland** 881:13
**mass** 957:17
**Massachusetts**
   1043:1 1046:9
   1048:9
**match** 974:17
**materials** 913:18
**matriculated**
   947:22
**matter** 870:4
   875:13 876:12
   878:1,14,14,15
   884:14 914:15
   968:17 996:4
   1026:15 1032:15
   1076:2
**matters** 874:8,12
   876:15 914:15
   922:1 952:3 963:6
   980:3 1003:8
**McCain** 913:14
   985:20 986:1
**mean** 884:1 890:8
   910:21 927:19
   942:17 952:5
   977:7 978:12
   992:9 1001:19
   1002:11 1018:7
   1022:12 1023:16
   1023:19 1024:19
   1032:3 1040:2,17
   1043:21 1047:17
   1049:16 1051:14
   1064:8 1066:2
   1068:8 1083:7
   1084:21 1086:4
   1086:13 1093:15
   1098:16
**means** 909:12 939:4
   1059:22 1072:12
   1093:3
**meant** 1023:20
   1073:5 1083:22
   1090:6
**media** 908:19
   938:14 939:4
   1023:21
**medical** 916:3
   917:16 1003:3
   1011:22
**medication** 1105:19
**meet** 973:9,12
   975:17 985:10

986:18 987:2,8
1024:4 1100:19
1100:20 1105:15
**meeting** 905:17
936:19 937:3,21
938:8 958:9 988:5
1011:2 1106:2
**meetings** 890:2,5
958:9 979:4,17
985:2,21,22
**Mehdi** 883:10
977:1
**Mel** 959:14
**member** 871:14,16
911:4 912:11
964:12,16,16
972:18
**members** 874:6
910:6 930:16
947:9 969:12
985:22 1028:16
1099:9,11
**memory** 1016:11
1054:8
**men** 983:3 1094:8
**mentality** 1057:13
**mention** 937:6
**mentioned** 1069:17
**mentored** 1026:12
**message** 975:11
1075:22
**met** 882:13 886:7
887:3 889:13,19
889:20,22 890:21
890:22 925:22
937:10,17 938:3
973:11 975:20
977:11,12,14
979:1,1 985:15
986:19 987:10
1025:3 1027:10
1085:20,21
**Miami** 950:6,14
961:9,10 1023:18
**MICHAEL** 871:15
**Michigan** 881:8
**microphone** 874:16
**middle** 916:21
947:15 974:11
984:6
**Mike** 1102:10
**miles** 1014:9
**million** 999:13
**mind** 990:8 1012:2
1069:5
**mine** 955:18,20

994:22 1007:6
1013:17,17
**miniature** 1024:6
**minister** 1025:21
**minorities** 960:21
**minute** 904:9
933:10 962:5
967:10 969:11
990:12 991:3,4
1071:6 1083:11
1092:22 1095:12
**minutes** 876:8
877:18 976:20
979:5 1028:9
1031:9 1032:13
1033:4 1036:20
1096:9 1107:1
1109:21
**misread** 925:3
**missed** 926:17
**missing** 1027:2
1051:10
**mission** 909:4
956:13 961:4
**missions** 956:5
**misspoken** 997:6,7
**Mm-hmm** 885:20
947:21 948:2
963:11 970:18
**mocking** 954:1,2,4
1017:8 1022:15
**mode** 1066:9
**Mohammadi**
973:17 974:22
975:6
**mom** 1013:22
1015:13 1105:21
1105:21,22
1106:1
**mom's** 1015:2,10
**Monday** 870:8
**money** 977:8
978:11 992:1
999:8 1006:11
1058:10 1061:8
1061:15 1062:13
1062:15,17
1074:10 1083:12
1083:14
**monopoly** 951:7
**month** 1093:21
**monthly** 1074:20
**months** 900:15
973:2,4 1074:17
1074:19 1092:4
1093:10

**morning** 874:2
878:11,22 879:1
936:6,7 947:9,11
981:17 982:18
985:2 1015:11
1074:17 1078:17
1079:18 1108:22
1109:9 1110:2
**Morton's** 986:19
**Mother** 1017:14
**motion** 1006:7,16
1007:1 1021:5
1029:9 1035:7
**motivation** 1061:8
**move** 875:16,18
888:17 895:14
904:4,5,6 914:18
917:4,18 919:3
921:6 923:7
925:18 928:1
933:7 936:13
966:18 968:12
969:9 971:13
979:14 980:5
993:11 1023:20
1036:4 1074:8
1075:10
**moved** 881:12,14
881:17 915:12
927:3 980:22
1005:5,20
1010:22 1011:3,5
1013:21
**movement** 973:15
973:16 974:2
1077:4
**moves** 1032:7
**Movie** 1024:3,4
**moving** 937:7
964:14 1020:13
1044:2 1046:5
1049:3 1051:7
**Mughals** 884:1
**mullah** 989:3
**mullahs** 1026:9
**mumbling** 935:15
955:13
**Muslim** 1024:8
1026:2 1027:7
**mutual** 1103:10

_____
**N**

**N** 873:1 874:1
1037:4,4,4
**naked** 1087:17
**name** 879:3 880:18

882:15 901:5,7
902:16,17 905:13
910:7 911:5,17
929:5 932:6
947:13,15 951:13
954:16,20,21
956:9,22 961:3
978:5 987:15
1000:22 1017:15
1078:13,18
1084:1 1098:13
1101:14 1102:11
1105:17
**named** 883:9
950:12,21 981:13
986:9 989:2
997:16 1004:3,6
1030:19 1066:4
**names** 973:16
1027:6
**naming** 997:22
1030:16
**narrative** 979:13
1016:2 1032:5,7
1040:18,19
**nasty** 1018:10
1021:12 1091:17
**national** 953:18
963:22
**naught** 1058:7
**near** 888:13 977:14
1062:21
**nearly** 900:11
**neat** 1075:1
**necessarily** 1031:10
**necessary** 879:20
1105:4
**need** 878:8 921:16
921:17 977:3
978:4 988:13
1021:21 1023:22
1040:18 1063:6
1081:11 1083:16
1099:19
**needed** 919:3
979:10,21 981:6
1003:14 1015:6
1041:21 1042:8
1044:6 1053:18
1057:8 1076:14
1091:13
**needs** 1036:16
1077:20
**negative** 891:4
895:2
**negotiate** 884:11

885:9 901:13
1072:6
**negotiated** 989:13
**negotiating** 885:6
**negotiations** 885:3
891:12
**neither** 927:10
1054:19
**nervous** 915:9
1003:4
**Netflix** 1099:13,16
**network** 883:14
889:4 902:7 903:4
906:12 909:2
929:16 984:2
989:6 1025:20
1061:11,16,19
1078:21
**networks** 910:19
1023:7 1064:15
**Nevada** 1047:3
**never** 903:22
910:14 961:6
977:8 986:1 992:4
999:8 1003:20
1005:6 1009:20
1025:21 1034:9
1043:6 1044:14
1046:1 1051:1,5
1053:17 1056:22
1057:21,22
1058:9 1061:13
1062:13,22
1063:1,1 1066:19
1072:16 1073:3,3
1080:12,13,13
1083:21 1086:10
1102:8
**new** 885:6 1001:2
1007:16 1008:20
1023:18 1048:17
1083:14 1100:4
1105:6
**news** 883:14 888:17
889:4 891:22
902:7 903:4
905:19 906:12
909:2 916:9,21
929:16 982:14
983:18 984:2
989:5 1023:8,10
1026:17 1061:11
1061:16 1078:21
1091:9
**newspaper** 939:6
980:9 1001:14

newsroom 891:17
Newt 958:13
nice 949:12 974:6
  975:18 1031:18
  1054:6 1071:22
  1072:3
niceties 976:11
night 1034:21
  1067:19 1070:3,4
  1099:6
ninth 1007:17
NITV 1004:6
non-citizen 930:16
non-citizens 884:17
non-existent 900:11
non-familiarity
  1054:10
non-lawyers
  1031:17 1042:11
noncommunicative
  1074:14
nonpartisan 955:17
  957:12 958:11
North 948:1
Notary 871:5
notation 1036:19
note 874:4
notebook 995:6,7
notes 978:2 983:12
  1015:17 1102:19
notice 878:10
  993:21 1031:21
  1040:9,11 1041:5
  1043:19 1054:9
  1054:18 1074:11
noticed 987:1
notification
  1037:20
notified 971:7
notify 1074:16
  1089:18
November 1035:13
  1042:19 1043:3
  1050:6 1074:5
nuclear 974:8
number 880:5
  899:9 903:3
  905:16 906:8
  907:11 940:13
  942:4 953:5
  964:18 968:1
  971:18 972:2,7
  975:10 993:21,22
  996:1 998:17
  1005:15 1013:9
  1037:22 1038:8

1038:10,11
1041:2 1047:13
1047:20,21
1049:1 1051:17
1051:17 1065:7
1080:6 1100:7
numbered 875:13
  898:4
numbers 1105:2
offhand 918:22
NW 871:2

**O**

O 874:1 1000:11
  1037:4,4,4
o'clock 876:7
  945:21 946:3
oath 874:7
Obama 957:22
  989:11
object 876:2 994:2
  1059:7
objection 888:2
  895:16 901:20
  905:5 907:9
  911:15 914:20
  915:14 917:20
  921:8 923:9 928:3
  928:14 930:3
  933:9 936:12
  938:16 939:1
  943:5,14 972:13
  1036:14 1039:13
  1040:17 1042:3
  1096:5
objections 939:14
objective 890:11
obligation 945:22
  1049:5
observe 1050:5
obviously 962:13
  1010:5,11 1018:8
  1018:22 1029:10
  1059:1 1064:13
  1065:22 1088:5
occasion 987:11
occupation 950:2,3
occurred 916:9
  999:19 1016:9
  1062:1 1103:18
Ocean 881:12
OCR 918:15,16
  922:10,17 923:12
  926:1
October 1035:13
  1077:10 1089:16
odd 949:16

offend 989:12
offended 989:13
offer 891:12 916:8
  940:6,11 1081:9
offered 888:14
  891:14 951:1
  963:14
offering 916:20
offhand 918:22
office 872:4 881:16
  882:10,19,21
  889:21 892:19
  913:7 918:12,19
  919:15 921:12
  922:22 923:22
  924:1 930:21
  932:22 938:9
  950:19 951:16
  953:14 955:22
  964:5 981:17
  985:19 988:9
  992:16 998:11
  999:10 1007:9
  1009:14 1015:16
  1016:19,21
  1021:8 1045:2,8
  1045:11 1046:9
  1046:18 1047:5,7
  1047:8,10,19
  1048:11,17
  1050:21 1058:22
  1085:11,22
offices 889:4,9
  913:1,15 1049:2
Oftentimes 887:20
oh 884:8 915:19
  1055:17 1088:19
ok 875:8 876:4,14
  876:18 877:5
  878:18 880:1,17
  894:4 896:6
  897:11 899:5,10
  912:19 916:14
  917:10 919:12,18
  927:9 934:6
  936:10 938:11
  940:1 941:3 942:8
  945:4,17 954:14
  958:16 975:11
  991:14 996:7,12
  1008:6 1009:6
  1011:13 1012:13
  1016:10 1020:18
  1028:3,10 1030:8
  1037:18 1038:6
  1040:9 1041:1

1044:11 1052:12
1053:15 1056:6
1061:4 1067:15
1068:5 1069:17
1070:13,17
1091:8 1099:7
1103:6
Oklahoma 913:8,9
old 880:20 953:6
  974:18
older 1048:19,21
once 1094:17
one-month 1075:3
one-way 1092:16
ongoing 981:21
  1032:7
open 1028:14
  1051:4 1082:3
Open-Ended 886:2
opinion 900:18
  934:19 1011:13
  1011:14
opinionated
  1022:10
OPM 906:5
opposed 1002:5
optimal 1000:19
option 890:10
options 937:4
  938:14,18 939:5
Orange 1058:22
  1085:16,17
order 877:1 889:9
  926:11,22 938:18
  1004:15 1006:16
  1016:8 1035:6
  1096:19
ordered 1090:17
orders 1011:7
  1029:8
organization
  954:21 977:22
  1002:7
organizational
  996:3
origin 953:18
Oscars 1024:11
ought 927:5
outlined 940:6
outset 998:16
outside 959:17
  999:14 1103:5
over-surveillance
  1000:22
overall 998:8
overcome 959:13

overnight 1093:6
overrule 1059:15
overruled 888:3
  930:5 943:17
  1042:7
overseas 956:5
  985:13
Oversight 913:12
overthrown 948:7
owe 1062:13
  1075:14
owes 1066:15
owned 986:12
  1007:12,19
owner 1004:6
Oz 1059:6 1060:5,6

**P**

P 874:1
p.m 874:20 1037:2
  1037:5 1101:4
  1105:13 1106:21
Pacer 1050:4
packages 883:5
  1005:11
page 894:2 905:11
  916:11 917:9
  922:6 932:3 933:5
  942:5 971:17
  972:8 1034:1
  1078:16 1096:3
  1105:8
pages 898:17
  1034:1 1082:4
paid 931:6,8 992:20
  1003:12 1018:22
  1020:13,13,14
  1026:16 1043:20
  1043:22 1066:20
  1073:2,3,4,9,9
panel 954:11
  979:14
paragraph 897:15
  899:19,21 900:1,5
  901:4 903:7
  905:12 932:3
  968:16 1061:6,7
  1063:9 1069:1
  1078:6
paragraphs 898:5
parcel 1041:14
part 878:1,9 892:3
  892:7 898:1
  904:12 926:19
  928:7 963:9,10
  983:19,19 984:1,5

994:18,20,21
995:1,6,7,15
996:18 997:8
998:7 1033:20
1035:15 1041:14
1043:19 1052:18
1053:9 1072:11
1077:3 1081:6
1082:22 1103:12
1109:3
**partially** 877:22
**particular** 938:14
938:22
**particularly** 962:17
962:21 999:17
1011:21 1084:18
1094:8
**parties** 871:7 874:5
949:1 988:22
998:13 1090:7
1096:16
**partner** 1055:1
1099:21 1102:10
1106:13
**party** 959:12
960:21 961:21
**pass** 1005:17
**passed** 926:2 973:5
1000:14 1006:12
1011:22 1107:5
**path** 975:7
**patio** 986:22
**Patty** 1100:11
**Paul** 950:12
**pause** 904:10
933:12 1071:8
**pay** 931:5 956:17
992:17 1018:21
1022:2 1023:6
1057:21,22
1058:6,8,9,10
1072:12,13,22
**paying** 1072:21
1083:12
**payments** 1022:1,2
**penalty** 955:21
**pending** 970:22
**Pennsylvania**
881:12 947:20
948:12 964:13,17
964:21,22 965:11
968:19 970:15,20
970:21 971:2,11
1007:10 1008:15
1009:2 1042:21
1044:9,15,16

1045:4,6,12,20
1051:13,14,19
1052:17
**Pentagon** 977:14
**people** 893:8,17,18
902:6 911:22
950:9 952:3 957:5
957:11,12,18
958:5 960:3
962:22 972:20
973:20 976:6
979:10 980:12
983:1 984:11,11
986:11,16 989:1
999:15 1001:20
1019:12 1024:4
1024:11,21
1046:22 1051:4
1052:6,6 1058:3
1058:19 1063:20
1066:10 1076:5
1077:6 1081:2
1090:19 1094:4,5
1094:8,16
**people's** 1017:3
**perceive** 884:3
895:6
**perceived** 935:3
957:16 983:2
1059:4 1089:1,6
**percent** 1056:21
1057:1,1,17
1060:19
**percentage** 1061:12
**perfect** 1041:20
1043:5 1091:12
**period** 926:15
959:22 1041:15
1047:15 1050:18
1051:7 1053:21
1057:3 1067:11
1068:4 1075:4
1080:19 1092:5
1093:4,16
**periodically** 1094:3
**periods** 900:15
1019:6
**permanent** 1021:6
**Permanente**
1016:15
**permission** 877:9
1109:8
**perplexed** 1058:12
**Persia** 883:14 889:4
902:7 903:4
906:12 909:2

929:16 984:2
989:5 1061:10,16
1078:20
**Persian** 888:15
889:5 891:15
976:1,3 982:3
983:19 984:11,16
1023:9,10,17
1064:15 1077:4
1083:22
**person** 883:6,9
888:11,13 891:19
912:5 929:19
941:3 948:22
979:3 998:15
1001:10 1013:6
1039:4 1062:10
1065:5,14
1066:18 1078:14
1095:7
**personal** 939:10
940:9 975:10
978:9 1001:21
1009:5 1013:3
1021:16 1057:6
1076:21,22
1078:11
**personality** 1060:14
**personally** 960:19
1072:21
**persons** 1037:8
1087:8
**persuasive** 1023:4
**pertaining** 1059:11
**peruses** 916:18
**Peterson** 978:6
**petitioner's** 965:20
965:22 966:12
967:5,18,21 968:5
968:7
**PhD** 1003:7
**Philadelphia**
947:19 958:19
**phon** 886:2 902:10
**phone** 975:10
**physicians** 1003:17
**PI** 1070:1
**picked** 1020:17
**picking** 959:4
**picture** 927:6
1048:9
**placate** 1071:22
**place** 977:12 980:4
1028:15 1053:21
1075:4 1101:21
**places** 1023:5

**plane** 956:7
**play** 1090:19
**played** 956:2 959:6
**pleadings** 990:5
993:22 1029:7
1033:18 1036:8
1036:12 1109:3
**pleasantries** 976:11
**please** 874:16
879:10 880:18
894:1 895:10
921:10 933:11
940:14 946:18
947:12 1021:17
1038:9 1041:3
1056:1 1070:22
1084:13,14
1089:4 1092:13
1098:13 1100:18
1105:14
**plus** 908:8 998:3
1074:17
**PNN** 1061:10,16
1062:4 1078:20
**podium** 1017:19
**point** 877:18 882:12
889:12 893:10
911:2 923:18
952:17 953:14,20
954:9 957:2,13
966:10 978:11
981:1 996:5
1014:4 1032:8,8
1032:11 1037:14
1039:10 1046:15
1049:5 1050:12
1052:16 1054:12
1056:6,18
1057:18,18
1058:15 1060:3
1062:18 1063:8
1076:10,15
1083:8 1086:5
1095:15 1101:16
1107:5 1109:2,6
**pointed** 999:5
**pointing** 1056:8
**points** 994:18
**Poland** 1023:18
**policy** 890:8 958:10
**political** 883:13
903:2 948:3
997:21 1019:10
**politically** 883:17
1002:13 1081:13
**politicians** 1019:11

**politics** 934:19
935:3,6 988:16
1006:14 1028:22
**polygraph** 1006:10
1011:21
**polygraphs** 1072:14
**poorly** 1086:19
**Popper** 1087:16
**popular** 950:20
**population** 889:5
**pork** 1018:2,3
**portion** 1007:16
1052:10,13
**portions** 994:11,12
**Portuguese** 952:13
**position** 891:16
1075:6
**positions** 951:2
**positive** 895:1,2,7
907:13 908:1
1023:2
**possibility** 878:8
1050:10
**possible** 910:6
**possibly** 888:8
1059:18
**post** 886:1 899:14
1050:21
**potential** 1076:16
**potentially** 1011:8
1059:16 1060:1
**powerful** 1019:11
**powers** 1066:13
**practice** 931:12
952:6 953:3,4,5,8
959:19,21 963:10
964:2,9,17 965:6
1012:19
**practiced** 972:17
**practicing** 1044:13
**pray** 1066:21
**preamble** 905:13
**precede** 995:13
**precedes** 995:20
**preceding** 1092:5
**precise** 984:9
1016:6
**predilections**
1001:21
**preference** 1009:5
**prejudice** 1012:1
**prejudicial** 954:1
**preliminarily**
969:14,15,17
**preliminary** 874:8
874:12 1002:21

In Re: Larry E. Klayman
June 25, 2018

Page 1129

1005:21 1006:4
1006:17 1007:1
1062:2 1069:16
**preoccupied** 986:3
**prepaid** 1074:9,17
**prepare** 977:18
**prepared** 876:20
915:13 940:21
941:8 966:14
967:2 968:14
977:15,17 1097:8
1097:21 1098:1
**preparing** 989:19
**presence** 894:5
934:11,16 982:11
**present** 871:6 872:9
874:5,6 889:22
892:18 905:16
1026:22 1037:8
1059:22 1087:7
1095:22 1096:17
**presenting** 917:13
**presents** 1022:9
**preserve** 927:1
981:22 998:12
**president** 881:21,22
882:4 905:14
931:17,20 957:10
957:14,15 958:1,7
960:20 962:3
1091:6
**presidential** 962:2
**press** 905:19 907:13
913:18 961:17
**pressure** 893:2
922:14 981:4
992:7 998:5
1029:3
**pretense** 1087:2
**pretty** 891:10
1010:7 1060:10
**prevailed** 957:21
**previous** 891:8
**previously** 940:15
960:9 997:16
1011:2 1057:1
**price** 1018:21
1019:1
**priest** 1018:9
**primary** 960:8
999:9
**prior** 936:19 937:21
942:19 1101:6,11
1108:20
**private** 959:19
970:21 977:12

1012:19 1098:22
**pro** 977:9 992:6
1056:7 1073:8
**pro-American**
909:5 985:13
**pro-freedom**
909:20
**pro-Shah** 884:9
**probably** 878:6
884:2 886:12
889:6 912:10
940:4 959:16
975:5 999:6
1044:11 1049:20
1050:1 1062:22
1087:11 1089:15
1094:9
**problem** 934:21
939:13,17 987:18
987:21 998:16
1001:13 1027:8
1029:21 1047:12
1053:7 1073:18
1082:20 1083:5
**problematic** 1000:9
**problems** 976:22
978:19 1019:3
1041:15 1066:22
1083:19
**proceed** 879:12
922:13 992:6
1089:18 1097:21
1098:2
**proceeding** 924:6
980:20 998:12
1002:18 1064:10
1097:3
**proceedings** 952:22
**process** 930:13
952:9
**prod** 903:12
**produce** 1005:11
**produced** 1027:3
1049:17 1073:11
1104:9,12,14
**producing** 883:5
981:5
**Products** 963:20
**profession** 954:8
955:3,6 962:15
**professional** 870:2
871:1 901:19
976:13 1097:4
**professionally**
900:19
**profit** 1023:21

**programs** 883:8
**progress** 919:20
**projected** 1080:21
**prominent** 955:16
986:10
**promote** 903:9
954:7 955:3
960:14,17 961:5,6
961:18
**pronounced** 902:11
**pronouncing**
1102:10
**propaganda** 909:5
909:7,12 989:7
**proposal** 885:13
**propose** 888:6
**proposed** 1033:8
**proposing** 991:1
**proposition** 981:20
**protect** 900:16,20
1043:12
**protected** 926:6
**proud** 954:15
984:15
**provide** 931:5
1074:20
**provided** 894:20
941:22 1073:21
**proximity** 891:19
892:8
**psychiatrist** 1003:9
1020:15
**psychiatrists**
1006:9
**psychoanalyze**
1081:9
**psychologically**
1003:14
**psychologist** 1006:8
1063:17 1084:21
1095:2
**psychologists**
1003:5
**psychology** 1003:7
1063:17 1064:2
1068:12 1082:1
**public** 871:5,14
893:15 903:11
905:18,22 907:11
907:21,21 908:9
908:12,14 962:15
970:21
**publicity** 892:15,20
893:7,12 907:7
910:13 938:5
939:10 980:1,3,5

980:18,21 981:5
**publicize** 893:19
905:20
**publicizing** 937:22
**pull** 1061:3
**pulled** 1008:15
1018:16
**purged** 969:2,3
**purported** 1031:12
**purports** 906:22
928:8 1038:18
1105:12
**purpose** 909:17
920:14
**purps** 1090:5
**pursue** 890:6 921:3
924:11 927:2
1060:2 1076:22
**pursued** 926:14
**pursuit** 998:22
**push** 906:1
**put** 877:3 879:14
885:18 888:15
916:20 944:16
961:16 981:4
992:7,15 995:19
998:5 1009:3,6
1010:5 1012:6
1019:17 1020:18
1021:7 1022:13
1029:3 1050:3,4
1056:9,16
1057:19 1058:4
1064:12 1083:10
1102:3
**putting** 900:8

**Q**

**qualify** 1008:1
**quandary** 1060:17
**quarter** 898:16
**question** 895:3
934:5 945:19
946:8 961:14
965:1 966:8
971:16 995:10,17
1038:14 1039:15
1039:22 1040:2
1040:18,20
1042:4 1045:2
1060:22 1064:5
1067:16 1071:10
1080:11 1095:17
1095:19 1096:8
1109:4
**questions** 914:13

915:17 933:16
936:1 944:2 945:5
1049:12 1107:14
1107:18,21
**quickly** 875:7,19
919:4 979:14
**quite** 1033:7
1060:15
**quo** 982:1 998:13
1010:6
**quote** 980:10

**R**

**R** 874:1 899:10
1037:4
**R.S** 896:13
**rabbi** 1018:1
**race** 959:15
**radical** 1026:7,8
**radio** 881:12,13,15
1032:10
**rafters** 959:4
**Rahimi** 902:13
**raining** 1014:7,12
**raise** 876:17 939:13
946:17 1097:9
1109:1
**raised** 1000:7
1002:16 1080:3
**ran** 949:14 959:11
959:12 961:11
975:6 1013:5
1019:15
**randomly** 983:10
999:22
**rang** 950:16
**ranging** 949:6
**rank** 886:19
**ranked** 901:11
906:3
**ranks** 886:20
**Razavi** 968:16
1027:5 1047:1
1059:3
**re-contacted**
1064:22
**reach** 887:10,16
924:13 932:10
1042:2 1043:15
1067:19
**reach'** 1083:21
**reached** 1064:4
**react** 1010:8,9
**reacted** 1081:21
**reacting** 1092:12
**reaction** 1003:4

1066:16
**reactivate** 964:19
**reactivated** 969:1
**read** 900:1,3 920:21
    921:13 925:14
    956:5 980:8
    1050:7 1072:9
    1082:22 1084:6
    1104:16 1105:16
**reading** 925:15
    1070:15
**readings** 1036:17
**reads** 920:22
    928:20
**ready** 878:18 968:4
**Reagan** 949:14
**real** 986:13 1001:19
    1007:18 1023:15
    1044:15
**realized** 1046:6
    1057:4,14 1065:8
    1079:22
**really** 887:13
    926:16 927:5
    938:7 949:3,20
    950:11 955:5
    959:7 960:20,22
    961:8,15 974:3,13
    976:6,12,21 983:4
    983:5 984:16
    988:1 992:4
    1003:20 1008:10
    1010:16 1012:16
    1013:11,12,19
    1015:6 1018:4
    1020:10 1021:11
    1025:4,15 1026:2
    1028:6 1030:3
    1042:9 1053:17
    1057:12 1061:9
    1064:1 1068:14
    1069:20 1070:12
    1076:8,9 1086:2
**rears** 951:15
**reason** 910:18
    976:13 979:22
    980:11,17 992:8
    999:16 1000:4,15
    1001:22 1003:5
    1014:17 1019:18
    1029:3 1057:21
    1076:7 1083:13
    1084:4 1087:21
    1095:6 1103:9
    1104:7
**reasonable** 892:16

916:3 917:14,16
    1003:2
**reasonably** 1038:14
**reasons** 963:12
    988:17 1005:15
    1032:22 1033:8
    1071:20
**reassign** 1035:7
**reassigned** 1000:15
**recall** 876:18
    886:12 889:11
    918:22 938:7,13
    942:9,13,15
**recap** 927:20
**receive** 947:16
    948:8 1039:7
    1040:4 1097:9
    1107:10
**received** 941:1,9
    942:13 1039:4,7
    1045:19 1046:1
    1049:18 1050:1,7
    1050:13,16
    1064:10
**receiving** 920:19
    942:9,15,19
    1101:1
**recess** 874:3 877:15
    877:21 878:9
    934:2,3 1036:21
    1037:3 1096:9,12
    1108:12,16,21
    1110:1,3
**recognized** 1076:21
    1078:10
**recollect** 906:19
    1046:3 1068:3
    1069:11 1101:10
    1101:20 1102:17
**recollection** 928:21
    934:14 942:3
    943:1 1000:16
    1068:22 1069:2
    1092:15
**recommend** 901:22
**recommended**
    902:4
**reconsideration**
    1010:22
**reconvene** 1108:21
**record** 899:12
    915:18 934:7
    943:17 947:13
    964:20 965:15
    970:5,19,20 984:4
    984:9 995:4 996:4

996:10 1001:18
    1004:12 1005:5
    1005:22 1014:17
    1017:7 1018:11
    1032:6 1036:16
    1037:8 1050:3,16
    1053:22 1054:3
    1064:11 1096:16
**recorded** 1086:8
**records** 969:1,4
    971:3,6,9 1005:22
**recovery** 992:4
    1056:22 1063:5
**recruitment** 893:15
**recuse** 1033:20
**redirect** 933:16
    944:4,5
**reelection** 956:12
**Reem** 951:14
    952:19
**reenter** 1105:3
**refer** 965:12 970:14
    1037:14,21
    1052:6,6 1057:10
    1073:22 1100:5
**reference** 905:3
    970:6 972:10
    1000:6,21 1055:7
    1069:8 1076:4,12
**references** 967:22
    970:4 1017:6
**referring** 921:2
    923:21 924:1,5
    969:7 972:5
    1041:6 1044:21
    1079:1 1089:13
    1101:5 1102:22
    1103:1
**refers** 968:7
**reflect** 886:13
**reflected** 1075:9
**refresh** 934:13
**refused** 885:11,14
    931:8 1034:12
**regard** 878:13
    887:22 890:3,19
    891:6 906:8
    907:14 910:18
    912:20 929:13
    944:7 950:4 952:4
    956:4 958:2
    962:13 963:9
    970:7 1019:22
    1029:5 1034:4
    1075:10 1085:14
**regarding** 874:18

887:6 918:19
    1042:16 1088:9
    1105:19 1106:2
**regardless** 1054:13
    1054:13
**regards** 1100:22
**regime** 974:7
**registered** 1047:14
**regular** 1074:3
**rejiggering** 1035:21
**relate** 1082:16
**related** 1030:13,17
    1031:1 1037:15
**relating** 1028:1
    1049:12
**relations** 887:9
    903:11 905:18
    906:1 907:11,21
    907:22 908:9,12
    908:15 1085:15
**relationship** 1000:1
    1004:6 1056:20
    1058:4 1063:3,5
    1074:13 1080:10
    1080:12,13,17
    1082:16
**relegated** 883:5
**relevance** 1031:2
**relevant** 966:7
    1028:1 1059:18
    1060:1 1063:7
**relief** 885:7 922:18
    923:1
**religion** 1022:18
**religious** 1024:15
**Remain** 879:2
**remains** 874:7
**remarks** 953:22
**remedy** 998:9
**remember** 893:13
    912:3 914:5
    919:12 920:19
    921:1 936:10
    938:9,10 986:11
    1069:11 1087:14
    1101:1
**reminder** 1036:19
**remote** 874:20
    1096:9
**remotes** 888:22
    889:9
**removed** 883:4
    993:3,7
**removing** 930:15
**remunerated**
    1043:22 1056:11

**rent** 1072:13
    1074:19,20
**rented** 1007:9,16
    1007:20 1008:16
    1015:5 1016:17
    1016:18 1083:14
    1083:15
**renting** 1009:14
**report** 923:3,12
**Reported** 870:21
**reporter** 871:5
    874:7 991:18
    1001:3 1009:12
**repossessing**
    1021:20
**represent** 882:6
    900:7 909:8 952:8
    976:14 1059:19
    1068:18 1101:18
    1102:1,4,15
    1104:3,7
**representation**
    1037:16,17
    1057:20 1078:7
    1078:18 1102:7
**representative**
    882:8
**represented** 952:10
    952:11,13,14,15
    953:1 963:6,16,19
    1066:10
**representing** 902:6
    903:8 962:22
    973:14 1060:9
    1103:8,14 1106:4
**republican** 949:13
    959:11,12 960:21
**reputation** 884:12
    1002:7
**request** 876:5 956:4
    956:20 1051:6
**requested** 901:7
    970:17
**requisite** 1037:8
    1096:16
**Rescue** 959:3
**research** 1047:2
**Reserve** 963:21
**resign** 963:11
**resistance** 979:18
**resolution** 906:2
    919:19
**resolve** 887:12
    918:4 920:15
    922:5
**resolved** 971:11

resource 887:11
respect 938:22
  955:5,6 1008:10
  1020:10 1066:3
  1075:8 1084:22
  1091:21 1094:11
respected 1022:17
  1056:19
respectful 1060:16
respective 871:7
respectively 965:13
respond 1064:22
  1071:10
responded 1031:22
  1106:17,22
Respondent 870:6
  872:2,11 880:11
  880:14 944:5
  946:15 947:4,7
  1037:12 1098:6,9
Respondent's
  876:20 879:15
  885:18 895:14,21
  896:3,13,17,22
  897:21 898:2
  899:13,17 904:12
  914:6 919:6
  924:18 939:19
  940:13 941:6
  942:4 945:14,20
  946:15 965:13,21
  966:3,4,6,17,20
  966:21 967:4,12
  967:16 969:8,10
  969:16,20,22
  970:2 972:1,2,6,7
  990:8 991:9
  993:14,14,22
  994:8,16,20 995:6
  995:7 996:6,13,17
  1037:22 1038:6
  1038:11 1040:16
  1041:2 1042:18
  1059:17 1078:2,3
  1079:4 1100:6
  1104:10 1105:8
response 891:2,11
  900:14 1089:9
responsibilities
  882:4,14
Responsibility
  870:2 871:2
  1097:5
responsible
  1072:21 1081:6
responsive 1042:3

rest 876:19 995:22
  997:19 1023:21
  1053:17 1108:5
  1108:16
restaurant 975:19
  986:19 1013:18
restraining 1004:14
  1006:16
resubmission
  1029:8
result 998:18
  1044:20 1084:18
  1099:11
results 886:17
resume 877:9
  1032:12 1037:9
resumed 1031:8
resuscitate 1035:16
retail 1053:12,16
retained 1107:8
retaliated 981:10
  1090:22
retaliating 1075:10
retaliation 919:1
  926:2,5,14
retired 1010:1
retiring 959:10
retraining 1004:10
return 932:1
  1061:15
returned 874:3
returning 899:17
  926:20
reverse 1063:16
  1064:1 1068:12
  1082:1
review 885:13
revolutionary
  1018:7,7,21
revolve 1066:14
rich 999:4 1083:22
richest 1007:12
rid 1040:8
rift 931:1
right 877:19 880:4
  886:9,13 888:18
  893:8 898:6
  902:11 904:17
  909:17 913:5
  915:6,15 926:4
  927:18 932:19
  938:5 944:4
  946:17 949:7
  950:2 954:13
  956:16 966:6
  967:15 972:18

976:8 978:1
  984:13 990:8,14
  990:18 991:18
  992:3,5 993:10
  994:21 996:19
  1013:19 1015:14
  1025:18 1026:18
  1026:19 1033:10
  1034:16 1035:22
  1040:13,15
  1043:2 1044:4
  1060:2 1062:16
  1067:5 1076:20
  1079:7 1083:11
  1089:14 1092:16
  1097:10 1099:16
  1101:15 1102:17
  1103:20 1105:7
right-hand 880:3
rights 882:6,7
  900:9,16,20
  918:12,19 919:15
  921:12 922:22
  923:14,15,22
  924:1,10 926:6
  927:1,14 932:22
  964:5 981:17,20
  992:17 998:12
  1021:4,8,10
  1029:16,18
  1048:3 1049:6
  1081:11 1098:19
  1098:22 1099:18
  1106:8
ring 1087:7,11,15
riot 1070:16
rip 1092:14
ripped 1069:20
rise 989:18
risk 910:2
Ritz 948:15
road 1018:17
roasted 1099:2
Roberts 1000:1,2,3
  1000:17 1011:3
rocker 1019:13
Rohrbacher
  1058:22 1085:14
  1086:6
Rohrbacher's
  1085:11
role 959:6
roll 956:3 1006:3
  1034:15
rollover 1072:1
Romanian 952:16

Romans 1018:11
Ron 956:14
Ronald 949:14
room 888:17
  986:21 1008:20
  1009:1 1052:3
roommate 1087:17
  1087:19
rooms 1052:3
Rose 1023:2
roughly 1067:18
round 1021:5,10
  1029:19
RS 880:2,5
rubbing 881:3
rude 1024:17
rug 1008:15
ruin 1065:19
ruined 1064:12,14
  1064:18 1065:4
  1066:1 1093:21
rule 1034:10
ruled 926:13
  1010:4,13 1011:4
  1012:11 1016:1,4
  1064:7
ruling 1010:17,18
  1011:18 1029:12
  1062:2 1069:8
  1070:15 1092:11
rulings 1093:4
rumor 989:3
rumors 1004:5
  1062:4 1094:11
run 881:5 888:19
  959:10 989:5
  1047:8
running 1015:15
  1065:3
runs 1013:6
RX12 1055:17
RX2 991:12,16
RX9 1079:6

_____
S
_____

S 874:1 1037:4,4,4
S-a-j-e-d-i 989:2
Saab 1014:20,20
Saddam 1094:18
Safety 963:20,22
Sajedi 989:2
sake 1109:21
salary 992:12,21
  1064:17
Sam 968:15 1027:5
  1027:12 1047:1

1059:3
Sandy 961:12
sat 905:16 976:10
  1009:11 1024:9
Sataki 882:14 884:4
  884:6 886:8 887:3
  889:9,22 890:13
  900:8,11 901:9
  903:8 904:2
  905:18 907:2
  908:11 910:8
  913:20 915:8
  918:12 922:17,19
  923:1 924:9,19,21
  927:16 928:12,18
  929:2 934:11
  936:20 937:10,22
  938:4 939:9 940:5
  942:7,20 943:4
  960:4 966:13,22
  970:7,12 972:12
  973:9 986:2,17
  987:18 989:19
  990:9,10 991:16
  993:19 998:18
  1000:8 1002:8
  1005:2 1010:9
  1011:1,6 1012:12
  1013:12 1015:5
  1019:20 1022:8
  1029:9 1031:12
  1033:3 1034:3,14
  1036:13 1038:3
  1039:9 1056:3,4
  1071:12 1073:21
  1074:4 1077:10
  1080:10,15
  1082:4,19 1085:7
  1085:16 1086:9
  1087:10 1088:21
  1091:20 1092:8
  1096:2 1101:17
  1103:2 1105:14
  1105:17 1106:20
Sataki's 894:5
  900:16,20 903:9
  920:3 933:4
  968:14 997:20
  1017:7 1030:18
  1096:6
Saul 1007:11,19
  1009:9,11
saw 894:17 958:17
  959:9 962:20
  975:21 980:7,9
  985:1 1034:19

1049:14,15
1076:16 1095:7
**saying** 889:11
922:12 932:10
980:13 1017:19
1018:5,20
1023:16 1045:14
1052:2 1058:3
1063:22 1072:2
1077:20 1078:5
1083:8 1086:16
1086:16 1103:7
1108:3
**says** 932:3 970:20
975:8 988:3
1000:12 1008:11
1008:18 1010:11
1021:19,21
1025:10 1039:3
1043:4 1049:22
1050:11 1060:5
1063:10 1068:20
1071:17 1079:17
1089:2 1100:13
**scandal** 956:3
**scandals** 956:1
**scared** 1024:21
1025:1 1027:7
**schedule** 1108:3
**schedules** 1109:7
**school** 947:19
948:10,11
**Schwartz** 956:10
**Schweiker** 948:12
949:4
**science** 948:4
**scope** 943:6 974:4
1059:8
**Scott** 957:17
1000:22
**screaming** 1065:4
1065:10,13
**seat** 912:8,13
956:12
**seated** 879:10 947:1
**second** 879:3
899:21 932:3,11
942:5 972:8 994:9
1072:8,10
1079:15,16
1105:8
**second-generation**
961:8
**seconds** 933:19
1018:18
**secret** 958:9 1002:3

**Secretary** 912:6,8
912:11,13 956:14
959:14 1030:16
**section** 963:13,15
983:22
**security** 910:16,21
950:16 1074:18
1074:19
**see** 875:12,15 888:5
906:17 913:14
915:10 924:22
935:5 973:18
974:20 976:15
982:22 992:18,19
999:5 1000:11
1002:11 1012:19
1012:20 1014:11
1014:12 1022:11
1022:20 1025:18
1031:11,20
1045:18 1046:14
1046:17 1053:7
1060:14 1062:21
1062:22 1069:2
1078:16 1079:17
1084:7,8 1085:17
1091:7 1093:3
1095:16 1096:4
1097:17,18
1106:10
**seed** 1091:1
**seeing** 1057:13
1099:15
**seek** 1044:3
**seeking** 923:1
**seen** 894:19,21
903:22 916:15,19
923:5,6 933:2,3
1035:2 1047:2
1065:7 1092:6
**self-centered**
1021:3
**self-induced**
1018:15
**selfish** 877:22
**selling** 948:15
1087:22
**senate** 959:11
961:12 1013:6
1019:15
**Senator** 948:11
949:4 958:17
959:9 985:10,19
986:1,5
**senators** 912:20
913:2

**senators'** 913:1
**send** 925:11
1045:17 1101:3
**sending** 925:2
943:12 1031:14
1088:21 1092:12
1092:13
**sense** 1002:10,11
1023:2 1043:11
1045:16 1071:19
1086:20
**sent** 907:1 920:18
924:20 925:5
928:19 944:15
1011:3 1031:20
1038:20,22
1039:1 1040:7
1042:1,16
1046:16 1049:20
1050:20,21
1054:15 1069:4
1071:4,12,17
1088:11,12
1100:7,9 1101:2,7
1105:13 1106:13
1106:15
**sentence** 908:5
**separate** 984:5
1052:17
**separation** 1076:11
**September** 1033:2
1074:21 1088:13
1088:20 1092:4
**Serano** 1074:16,21
1075:2
**serve** 1025:13
**service** 883:16
888:15 891:15
1002:3 1099:4
**Services** 1043:4
**set** 979:12,16
1052:3 1096:9
1108:2
**setting** 958:10
982:15 984:19
**settle** 890:17 891:3
911:2,3,13 912:2
914:15 979:6,6
980:15 981:2
984:22 998:5
**settlement** 887:10
887:17 890:7,9,12
890:13,14 891:12
892:16 901:13
903:13 906:2
915:5 940:6,11

979:22 1009:13
1009:15
**severe** 1089:12
**sex** 998:3
**sexual** 905:20
918:22 926:1,4,13
998:2 1004:21
1066:11 1080:12
1080:13
**sexually** 883:1
976:22
**sexy** 980:10
**Shah** 883:21 988:21
**shake** 953:19
1025:3
**shaken** 1013:14
**shaking** 1015:6
**Shamble** 873:3
877:3,3 878:19,21
879:4,5,16,18
880:10,16,19
881:5 885:21
894:2 895:11
896:1,20 897:3
898:18 905:10,13
914:12 917:9
934:10 936:6
940:17,18 945:6
955:8 978:22
979:2,20 983:15
983:16,17 985:9
985:17,20 997:18
999:4 1000:6
1006:18 1029:17
1029:22 1031:15
1038:20,21
1042:1 1043:16
1048:4,6 1049:8
1054:19,20,21,22
1071:15,18
1078:13,19
1092:14,19
**Shambles** 981:9
**Shambles'** 1086:14
1088:5
**shape** 1020:20
1051:8
**sharing** 1004:3
**she'd** 1026:16
**she'll** 1065:14
**Shea** 929:11 1057:9
1076:12 1078:8
1078:18 1079:20
**Shea's** 929:12
1078:13
**sheer** 1103:12

**sheet** 997:2,2,10,11
1000:11
**Shenefield** 951:1
**shirt** 1076:1
**shoes** 1083:10
**shook** 1013:12
1025:2
**shooting** 959:2
**short** 877:7 1009:8
1105:16 1109:9
**shortly** 1065:1
**shot** 1010:5
1093:13
**show** 968:20 969:4
981:3 990:15
993:8 1004:11
1020:7 1025:6
1036:2 1037:19
1038:5 1042:17
1054:1 1055:8
1075:2 1101:2
**shown** 918:2
1040:15
**shows** 886:17 984:4
1005:6 1031:16
1086:17
**shuffle** 1051:11
**shut** 1068:6
**sic** 1090:5,6,16
1091:1 1105:22
**side** 952:22 962:22
975:8 986:21
1014:15 1018:16
1053:3,3,3
1084:22 1085:1,2
1088:9 1091:20
**side-by-side** 989:20
**sides** 1022:8
1060:13 1084:22
**sign** 885:11,15
**signature** 897:7
933:6 941:13
**signed** 885:10 897:4
933:5 941:16
944:8 1020:19
**significance**
1093:17,18
**similar** 958:4
1044:22
**simply** 1011:19
1047:19 1063:7
**sing-songy** 974:6
**single** 975:18
**single-spaced**
1034:1
**singled** 1029:4

sink 1020:12
sir 878:22 1093:1
  1098:12
sits 997:18 1085:15
sitting 938:10 978:1
  987:1,5 989:20
  1008:12 1065:2
situation 907:22
  927:9 985:15
  988:15 997:20
  999:18,19
situations 1013:3
six 898:4 950:1
  969:1 971:6 973:2
  973:4
six-month 1074:9
sixth 1007:17
skids 978:13
small 879:22
  956:16
Smith 871:20 874:8
  874:9 875:3,18,21
  876:1,19 888:2,4
  895:16 901:20
  904:11 905:4,5
  907:9,10 911:15
  914:20 915:15
  917:20 918:1
  921:8 923:9 928:3
  928:14 930:3
  933:9,17,18,22
  934:9 935:17
  936:2,5,14,17,18
  938:20 939:8
  941:18 943:11,20
  944:1 966:15,20
  971:16 972:2,7,13
  993:20 994:3
  995:10,19
  1030:22 1032:1
  1036:7,11
  1039:13 1040:17
  1042:3 1050:20
  1059:7,15
  1064:20 1073:11
  1096:5 1107:15
  1107:16,18,20
  1108:15,18
Smith's 904:16
smoke 986:21
smoked 986:20
smokes 988:1
smoking 986:20
Snyder 1007:13
solemnly 1097:11
solution 887:21

888:5,6,20 889:1
  892:12,16,21
  937:17 995:19
  1072:7
solutions 888:7
somebody 941:8
  950:18 975:5
  976:5,5 978:1
  988:12 1008:16
  1022:13 1025:9
  1034:11 1050:9
  1066:7 1078:12
  1080:15
someone's 987:15
somewhat 1035:21
sons 973:14
soon 927:4 987:7
sooner 976:19
sorry 874:17
  896:10,17 915:19
  922:20 925:3
  955:14 966:5
  967:5 975:15
  1036:9 1048:13
  1055:19 1065:18
  1068:9 1079:2
sort 893:4 919:19
  1053:9
sorts 906:14
sought 885:7
  887:14 914:3
  937:1 956:4
  985:15
sounds 1039:18
Southwest 1001:5
Soviet 989:15
space 1007:9
  1009:14 1016:19
Spanish 951:10
speak 926:18 951:9
  951:10 980:10
  982:11 984:18
  1005:7 1006:1
  1089:4
Speaker 914:4
  958:15,15 987:7
  987:20
speaking 902:20
  906:11 908:7
  915:2 1041:19
speaks 1086:18
specializes 1003:8
specific 938:7
  1029:7
specifically 926:10
  939:16 942:5

970:14 1033:17
Specification 898:1
  904:20
speculate 910:20
speculation
  1103:12
spell 902:15
spend 991:2
spent 1061:17
Spiderman 1024:14
splits 1014:4
spoke 936:20
  1027:6
spoken 936:8
Sporkin 1007:4,5
  1008:8,18
  1009:17,22
  1011:9 1012:21
  1109:8,10,12
Sports 954:19
stable 1065:16
staff 950:22 961:11
  985:10,16,22
  988:3 1008:12
  1058:21 1065:3,5
  1065:13
stage 1082:21
stalled 921:1
stalling 919:18
stand 878:21 934:1
  944:19 983:1
  995:3 1036:20
  1096:8 1108:11
  1110:1
standards 950:9
  954:10 955:8
standing 874:3
  879:2 964:12
  965:6 974:17
  1097:19
stands 981:19
start 954:5 967:17
  967:20 1013:14
  1029:12 1109:4
  1109:17
started 881:11,15
  950:5 951:15
  953:12 955:15
  958:19 959:18
  961:15 983:4
  1021:15 1084:16
  1094:4
starting 974:4
starts 994:15
  996:17,19 997:1,8
state 880:18 899:12

912:7,8,11,13
  958:18,19 1072:8
  1098:13
stated 1100:8
statement 900:22
  903:14 906:6
  907:17 908:2
statements 1089:20
states 889:7 909:8
  958:10 960:16
  961:19 964:8
  965:6 968:16
  997:10 1014:3
  1050:11 1099:1
stating 1106:20
status 982:1 998:13
  1008:11 1010:6
Staunton 967:2
  968:15 1025:3
  1058:20 1085:10
  1085:21 1086:3
  1087:3
stay 982:9 1105:20
staying 1013:20
  1017:16 1073:20
steel 952:16
step 918:8 929:20
  1011:1
steps 1035:12
stick 1018:9,12
stipulated 875:17
stolen 1087:8
stood 1110:3
stop 913:11
  1090:17 1092:22
stopping 1095:12
  1095:12
store 948:17 986:12
  986:13
stories 905:19
  976:17 1032:9
  1087:22
story 923:13 975:1
  978:3 1007:7
  1008:8 1009:8
  1099:14
straighten 1088:2
strange 949:9
strangers 1066:6
strategic 1032:22
streaming 1099:16
street 871:2 963:1
  1025:19 1045:2,6
  1066:4
strength 1019:19
  1100:15

strict 910:16
strictly 892:6
strike 936:13
  1066:18,18
strong 979:11
  1002:1 1019:14
  1100:16 1106:1
strongly 1017:10
struck 895:4 949:5
stubborn 891:5
student 948:5
  973:15
studios 1024:12
stuff 1059:2,22
  1073:11,12
  1086:16
style 976:1,3
styled 997:14
subcomponent
  901:11
subject 933:16
  938:4 949:6 950:1
  1035:20 1068:20
  1088:22 1099:13
  1105:14
sublease 1016:20
subsequent 1102:5
subsidized 992:19
succeed 1011:4
  1024:1 1076:9
successful 912:16
sudden 1014:7
  1018:13
suddenly 1084:4
sue 926:4 981:6
  1008:3,6
sued 935:9 958:1,7
  962:7 1000:21
  1008:7 1029:1
suggest 876:12
  996:2 1032:12
suggested 958:15
  1005:15 1076:11
  1092:1
suggesting 1056:21
suggestions 941:1,4
  941:9 1001:6
suicide 982:10
  1063:21
suit 985:7 1014:22
  1072:20
suite 1047:13,20,21
  1051:13,17,18
  1052:3,8,14,15
suites 1052:7
suits 1087:22

1090:13
**Sujat** 872:3,4
  874:11 894:1
  895:10,21 896:6
  896:22 947:8,11
  963:4 965:14,18
  967:11,14,19
  968:5,9 969:9,17
  969:21 970:3
  971:5,14 972:5,15
  981:3 990:3,16,17
  990:21 991:5,13
  991:15 993:12,18
  994:6,15,21 995:9
  996:11,14,16,19
  997:3,13 1012:6
  1020:6 1028:12
  1029:5 1032:14
  1033:21 1036:5,6
  1037:9,13
  1038:10,15
  1040:1,22
  1042:14 1049:10
  1055:4,5,14,16,20
  1061:1 1070:19
  1070:20 1073:16
  1073:18,19
  1077:8,12,14
  1078:22 1080:8
  1082:2,9,12
  1085:4 1088:18
  1095:11,16,20
**Sujat's** 1071:10
**summarily** 968:21
**summer** 1027:17,19
**sun** 1003:19
**superior** 993:2
  997:2,9
**supervisor** 1005:2
**supervisors** 1094:4
**supplement** 1074:2
**supplemental**
  874:14,18 879:15
  885:19 898:19
  899:7,11,13
  905:10 940:18
  941:20 944:9
  966:13,22 968:13
  1039:12 1040:11
  1040:16 1041:2
  1046:18 1050:22
  1051:6 1055:18
  1087:4 1088:15
  1100:6 1104:10
  1104:22 1105:6,8
**support** 883:21,22

884:1 985:8
  1075:12 1084:5
**suppose** 1054:1
**supposed** 989:6
  1014:6
**sure** 946:13 960:12
  983:13 996:18
  998:13 1027:21
  1031:3 1035:21
  1049:15 1082:11
  1083:13 1099:8
  1103:6
**surprise** 875:5
**surprised** 957:11
**surrogate** 1013:22
  1015:2,10,12
**surveillance** 957:18
**surveilled** 1001:2,4
**survey** 886:2,3,4,17
**Susan** 981:8 1005:3
**suspect** 1049:19
**suspected** 956:21
**swear** 879:6 946:18
  1097:10,11
**Sweden** 988:21
  1005:5 1063:12
  1068:10,11,21
  1069:1,5,5,18
  1081:22
**swipe** 1090:12
**sword** 1058:18
**sworn** 880:12 947:5
  1098:7
**SX12** 1055:12,15
  1055:21
**SX19** 1061:3
  1063:10 1067:1
**SX20** 1085:6
**SX26** 1070:22
**SX3** 1082:3
**SX31** 1077:9,13
**SX38** 1088:10,18
**SX5** 1079:1
**sympathize** 973:19
**sympathized**
  974:13 978:7
  1080:19
**sympathy** 960:2
**symptomatic**
  1089:21
**system** 871:19
  1013:13

_____

**T**

**T** 1037:4
**tab** 916:12,13

993:22
**table** 975:21
  1009:11 1097:18
**Taiwanese** 954:2
**take** 875:13,21
  876:2,6 877:1,6
  878:1 907:13
  912:19 913:18
  914:12,22 915:7
  919:16,16 922:11
  923:15 946:6,8
  954:11 964:13
  965:8 966:2 973:5
  975:9 979:9,10,11
  980:7 991:2,4
  1006:10 1012:7
  1023:13 1032:19
  1032:20 1038:16
  1039:20 1041:1
  1043:12 1054:9
  1056:1 1070:22
  1074:15 1078:17
  1080:2 1082:13
  1085:5 1088:10
  1093:7,13 1096:1
  1096:19 1108:1
  1109:11
**taken** 871:1 934:3
  964:18 970:7
  1002:22 1030:17
  1037:3 1072:17
  1087:11,20
  1096:12
**talent** 1022:22
**talk** 927:5 950:18
  955:8 968:4 974:5
  991:12 1029:22
  1033:1 1041:22
  1043:8 1046:13
  1068:17 1086:4
  1091:21 1092:18
  1092:18
**talked** 944:16
  1009:20 1020:1
  1048:3,4 1070:7
  1089:22
**talking** 886:14
  898:21 971:22
  996:12 1017:18
  1018:19 1043:14
  1059:9 1077:20
  1085:9 1087:15
  1091:21
**talks** 1017:8
**target** 910:22
**task** 958:8

**Taylor** 981:16,19
  998:9 1010:3
**teaches** 1024:14
**teaching** 1024:8
**team** 945:14,20
  946:15 1059:17
**tears** 976:20
**Ted** 1024:10
  1025:20,20
  1026:11,12,13
**teddy** 1024:11
**Tehran** 999:15
  1094:20
**Tehrangeles** 999:16
**telephone** 936:9
  1069:19 1102:18
**televised** 961:22
  962:9
**Television** 1024:5
**tell** 882:20 913:20
  914:22 918:15
  954:16 957:19
  977:11 1007:7
  1010:20 1031:12
  1065:14 1083:4
  1084:13
**telling** 914:5
  1006:12 1041:10
  1041:12 1059:2
  1071:20 1087:9
**tells** 925:21 926:8
  926:18,19 1008:9
  1017:6 1030:22
  1065:13
**temporary** 1004:10
  1006:16
**ten** 953:9 976:19
  999:6 1007:13
  1009:1 1017:13
  1017:17 1018:14
  1032:13 1033:4
  1092:4 1093:10
  1106:22
**ten-minute** 933:20
**tenant** 1047:14
**tend** 1066:13
**tends** 1066:14
**tenure** 962:19
**term** 983:14
**termination**
  1037:15,16
  1042:16 1043:4
**terms** 884:12
  891:11 947:18
  949:7 1054:21
**terrible** 1065:5,14

**testified** 880:13
  940:15 947:6
  970:12 979:4
  997:18 998:10
  1024:18 1040:5
  1056:12 1063:19
  1079:13,14
  1098:8
**testify** 874:20 877:4
  946:16 980:19
  986:7 1031:5,6
  1032:5
**testifying** 1039:6
**testimony** 877:8,16
  877:17,22 879:6
  879:17 880:8
  927:20 928:22
  946:18 967:1
  968:14 982:9
  984:8 1004:2
  1007:3 1021:18
  1032:11,14
  1034:3 1042:11
  1048:7 1059:11
  1064:13 1086:13
  1086:14 1088:6,6
  1088:7 1096:6,10
  1097:9,12 1109:9
  1109:17,19,22
**text** 1078:16
  1079:17
**texts** 1054:17
  1092:13
**Thailand** 952:15
**thank** 874:10 897:1
  905:7 939:18
  944:1 945:9
  946:12 972:14
  994:6 1025:11
  1036:22 1039:8
  1080:8 1081:18
  1082:10 1084:12
  1096:11 1097:7
  1098:2,12
  1103:15 1106:11
  1107:14 1108:5,6
  1108:6,8
**Thanks** 945:12
**theirs** 954:4
**theoretically**
  1059:17
**theories** 1030:16
**theory** 1032:21
  1060:2 1063:5
  1072:22 1073:1,5
**therapist** 1105:20

thesis 948:5
thick 994:19 995:12
  1006:15
thing 876:4,12
  886:4 891:1 893:8
  900:4 915:6
  920:15 921:13
  924:4 956:21
  971:10 976:18
  979:6 980:16
  992:3 995:20
  1001:10 1008:19
  1024:18 1033:19
  1044:4 1062:16
  1072:9 1077:5
  1083:6 1084:6
things 875:18
  959:19 980:21
  985:1 998:4 999:2
  1019:8,12
  1021:15 1027:22
  1031:13 1053:20
  1054:18 1063:4
  1068:15 1070:12
  1072:18 1076:18
  1078:11 1083:20
  1091:5 1094:22
  1095:4 1108:2
think 876:16
  877:14 878:6,20
  880:4 889:6 892:5
  892:6 902:22
  912:4,9 927:5
  930:4 935:7,7,12
  935:18 939:3
  943:7 945:7 949:4
  949:9 952:15
  954:9 959:16
  960:11 962:4,7
  963:2 969:12
  972:5 976:5
  989:11 990:13
  996:8 999:3
  1000:13 1003:11
  1016:5 1017:15
  1026:4 1028:14
  1030:12,15,22
  1033:6,14,15
  1035:4,14
  1038:13 1040:18
  1045:5 1052:22
  1059:16 1065:1
  1069:6,10,10,16
  1073:5 1082:6
  1083:3,16 1092:9
  1094:9,22 1096:7

1096:8 1097:16
  1098:20 1108:19
  1109:3
thinking 1034:17
  1073:14 1084:1
third 900:1 933:5
  1061:5,6
third-party 961:20
  962:8
thirties 1008:5
thoroughly 1035:5
thought 875:21
  892:11 909:19,20
  911:14 915:20
  929:21 949:13
  953:16 960:15,22
  971:8,10 986:15
  988:18 989:14
  992:3 1005:14
  1010:19 1018:1
  1020:3 1021:2
  1022:19 1029:11
  1044:5,12
  1046:22 1057:8
  1065:7 1078:17
  1087:18 1094:6
  1095:8
thoughtfulness
  1084:9
thoughts 932:11
  933:19 1018:20
thousand 1061:17
three 874:5 877:17
  880:8 899:9 922:4
  965:8 990:18,20
  994:13 1078:6
  1097:18 1103:11
threw 1060:20
throw 1090:18,19
Thursday 1099:6
ticket 949:14
tie 1016:2
tied 1060:8
Tigar 871:15 898:4
  898:7 941:12,16
  955:10 990:19
  994:10,17
  1000:10 1012:9
  1012:13 1015:17
  1015:20 1035:18
  1036:9 1044:7,16
  1063:9 1064:3
  1078:2 1080:9
  1081:18 1088:19
Tim 877:3 878:21
  905:10,13 927:6

929:11,21 978:22
  980:18 1071:18
  1072:4 1076:11
  1078:8,13,18,19
  1079:20
time 876:17 882:12
  883:12 886:7,9,11
  889:12 892:13,18
  893:10,13 911:3
  912:1,9,12 913:17
  916:8 919:2,16
  922:2 923:15
  929:4 935:10,13
  937:6,16,19 938:3
  938:15 939:10
  942:16 945:11
  949:5 950:7
  951:22 952:2
  953:20 954:11
  955:22 960:18
  965:16 968:22
  973:10,13 975:15
  976:14 977:20
  978:8,9,10 981:6
  984:22 987:13
  991:2,9 992:19
  1000:6,15 1004:5
  1011:17 1013:21
  1018:2 1021:13
  1025:3 1033:15
  1035:3 1041:9,16
  1044:14,17,19
  1047:15 1048:2
  1049:14 1050:19
  1051:1,7 1054:5
  1056:8,14 1057:2
  1057:19 1058:5
  1058:18 1059:22
  1060:18 1064:6
  1064:20 1067:11
  1069:3,4,14
  1074:8 1075:4
  1080:22 1085:2,2
  1089:9 1095:8
  1100:5 1101:16
  1104:1 1107:5
  1108:1,2,20
timeline 1093:3
timelines 1069:22
times 906:15 907:2
  936:8 1001:2
  1007:13 1009:1
  1019:6 1075:20
  1081:20 1083:4
timing 1083:6
Timothy 873:3

879:4 880:10,19
  896:1 898:18
  940:17,18
tired 1083:2
title 923:19 924:11
  995:2
today 874:20 877:2
  877:10 880:16
  943:21 955:2
  960:15 1002:12
  1009:12 1045:12
  1098:11 1104:22
today's 950:9
Tokyo 1023:2
told 891:17 892:4
  911:6 926:9
  935:11 978:22
  979:6 980:13
  981:9 982:4,8
  983:8 1003:20
  1018:8,11 1021:3
  1021:14 1022:19
  1031:15 1061:13
  1063:18,20
  1064:20 1065:1
  1065:21,22
  1074:11 1075:19
  1086:8,9 1087:10
  1087:18 1094:17
Tom 913:8,9 958:12
  985:11
Tomlinson 912:10
tomorrow 1108:22
  1110:2
tongue 909:18
top 912:5 997:18
tortured 973:20
total 1074:18
totaled 1034:20
totality 1095:7
totalled 1014:19,20
totally 1072:10
  1086:12
touch 927:10
  1088:12
touched 1080:14
towed 1015:12
town 975:7
trade 951:13,14,20
  952:6,12,13,19,22
  956:5,13 957:2
  960:17,22 961:5
  961:19 963:19
trader 952:18
tragically 992:10
transcript 1096:2

transfer 1003:3
transferred 951:6
  1000:4
transition 877:18
transpired 882:20
  890:19 988:11
Transportation
  963:22
trash 1058:8
travails 985:17
Travelgate 957:7
travels 877:13
treat 963:2
treated 887:13
  903:1 960:4
  1025:4 1081:20
treating 883:2
  1006:9
tremendous 1032:4
trial 950:11
  1073:12
tried 887:9 893:18
  924:13 932:12
  956:1 962:14,16
  983:3 1013:8
  1023:13 1025:17
  1029:7 1054:21
  1058:7,7 1060:12
  1072:4,5,6 1076:7
  1078:12 1081:10
  1081:10 1083:4
  1089:2,8
tries 1011:15
triggered 1092:10
triggering 956:3
TRO 1002:21
  1005:20 1006:2
  1007:1 1016:8
  1028:5 1034:15
  1035:8 1070:1
TRO/PI 1067:4
troubled 919:14
true 897:11 923:2
  944:9 993:1
  1021:21 1024:19
  1088:5 1099:15
truly 1091:14
truth 879:7,7,8
  946:19,20,20
  1006:12 1097:13
  1097:13,14
try 890:6,14,16
  892:15 893:3
  900:13 903:12
  912:20 914:15
  917:14 924:8,9

929:19 950:10
954:6 955:1
968:11 977:4,10
979:16,21 981:4
985:7 989:16
997:22 1017:2
1026:13 1043:12
1055:3 1058:12
1061:10 1062:9
1075:17 1077:4
1081:5 1086:1
1088:1 1091:19
**trying** 884:10
892:21 900:19
909:9,19 911:1,3
912:1 915:1,5,6
921:14 922:9
925:18 932:10
952:15 960:18
976:11 978:17,18
979:5 980:5
984:22 987:2
988:14 1016:2,22
1018:15 1027:15
1035:15 1042:2
1043:13,15
1045:17 1046:20
1056:15,16
1057:3,11,17,18
1061:18 1062:7
1063:16 1068:12
1069:11 1071:5
1077:7 1080:1
1081:1,2,8,9
1086:5 1088:12
1093:20
**Tuesday** 1101:3
1110:4
**turn** 885:17 893:21
894:2 895:8,11
896:19 897:14
905:9 906:16
912:15 914:6
916:10 917:8
919:5 920:17
921:10 922:6,15
924:17 928:6
932:2,21 939:19
940:13 941:6
942:4 970:1,17
996:20 1102:9
1104:8
**turned** 987:19
**TV** 883:5,8 907:19
980:9
**twenty** 1109:21

**two** 877:17 883:18
883:19,20 898:21
902:11 906:8,10
932:3 940:14
941:13 950:13
951:11,15 969:10
975:21 981:7
988:17 990:7,18
990:19,20,21
993:22 994:12,15
995:21 1000:14
1003:6 1013:18
1017:16 1019:5
1022:8 1049:14
1052:21 1053:4
1060:13 1079:11
1084:22 1103:11
1104:8
**two-bedroom**
1020:17
**tying** 1077:6
**type** 884:22 931:15
953:8 954:6 998:9
1010:10 1095:21
**typical** 891:10

_____
**U**
**U.S** 959:10
**ultimate** 1019:1
**ultimately** 890:16
974:9 989:18
992:11,15 1011:4
1046:7
**umbrella** 1002:6
**unappreciative**
1021:12
**unconstitutional**
957:17
**uncovered** 956:21
**undercut** 1086:18
**undergraduate**
947:17 948:11
**underlines** 1090:10
**understand** 946:14
989:7 1029:15
1032:3 1058:13
1062:12,12
1066:8 1075:9
1076:14 1079:22
1092:17 1097:2
**understandable**
951:10
**understanding**
909:11 917:15
922:8 961:18
964:2 968:3

1036:16 1067:13
1084:3,13 1101:9
**understood** 907:16
907:20 978:13
991:22 1020:4
1035:10 1059:12
**undertake** 890:16
**undertook** 1059:19
**unequivocally**
1087:13
**unfair** 883:8 931:12
1095:9
**unfairly** 883:3
977:2
**unfortunate** 986:4
1082:20 1083:6
1094:14
**unfortunately**
1001:20 1107:4
**ungrateful** 1021:3
**unhappy** 942:20
**union** 881:20 882:4
885:10 890:9
903:20 931:17,21
989:16
**unique** 974:3
**United** 889:7 909:8
958:10 960:16
961:19 997:10
1014:3 1050:11
1099:1
**University** 948:1
**unjust** 953:16
1095:9
**unpunished** 1066:7
**unquote** 980:10
**unsuccessful**
1067:18
**Unsuccessfully**
924:15,16
**untoward** 988:6
**UPS** 1045:11
**upset** 1003:4
1018:5 1020:1,2,4
1034:22 1070:12
**use** 893:2,5 947:15
986:16 987:14
1017:2 1045:7,12
1063:16
**usually** 900:14

_____
**V**
**v** 981:19 1010:3
**vacate** 1074:22
**vacated** 1011:7
1029:8,12

**vacation** 950:15
**vague** 939:1
**valley** 1014:1
1026:18
**values** 1017:3
1024:8,14
**various** 879:19
889:4 906:14
938:18 939:5
949:1 952:8
953:21
**Vegas** 1047:3
**Ventura** 1014:5,6
1015:2 1016:19
1017:5,12
**venturing** 1024:22
**Vera** 902:2
**versed** 964:7
**vice** 957:14 958:1,7
962:3
**vicinity** 893:17
**vicious** 1022:11
1085:2
**victim** 1022:10
**victims** 1066:8,10
1066:11,12
**Victory** 1017:15
**video** 1096:14
1098:8 1108:9
**view** 875:9 903:17
1042:12 1059:17
1083:8 1086:17
**viewed** 1057:5
1060:15
**views** 903:2 939:10
955:20
**VII** 923:19 924:11
**vilifying** 1070:18
**violation** 998:2
**violations** 998:1
**virtually** 1041:20
**virtues** 909:21
**visiting** 999:20
**visits** 1003:13
**VOA** 883:15 893:13
901:6,11 903:12
905:21 906:3,10
906:12 907:12
909:2,15 910:15
913:12 914:16
924:1 929:13
979:11,17 980:15
982:13 983:19
986:10 989:1,9,13
989:14 1003:21
1005:2 1006:15

1023:3,6,22
1072:12 1077:6
1078:20 1083:12
1090:22
**VOA's** 909:4
**voice** 881:17,18
882:4,10 884:11
903:4 921:22
930:2 955:11
979:7 982:6 985:3
985:11 986:14,17
987:19 988:16
992:15 999:11
1038:1,19 1060:5
1071:21 1094:12
1095:8 1106:2
**Vol** 870:6
**volume** 1104:20
**vs** 981:15 990:9,10
991:16 993:19
998:9 1036:13
**vulnerable** 1019:13

_____
**W**
**W** 957:10 959:13
1000:21
**Wagner** 981:15,19
998:9 1010:3
**wait** 967:10 969:11
1071:6
**waiting** 1007:15
**waive** 972:21 973:3
**waiver** 931:9
**wake** 1057:11
1060:20
**walk** 982:17
1028:11
**walked** 974:19
975:4 1014:18
1015:1
**Walker** 950:7
958:20
**walking** 954:17,19
975:7
**walks** 1065:12
**walling-off** 1023:14
**want** 876:16 888:13
888:19 892:7
895:22 921:3
927:4,13 930:19
933:20 945:21
949:3 950:18
954:11 962:20
967:8,12,20 969:9
969:12,15 975:1
975:16,17 982:10

| | | | | |
|---|---|---|---|---|
| 982:16,17 984:9 | 985:8,17 986:8 | **ways** 955:19 1013:9 | 1015:10,11 | 970:1 971:13,22 |
| 984:16 987:17 | 987:14 1004:19 | 1044:11 | 1017:1 1018:2 | 972:4,9,14 980:19 |
| 989:12 993:8 | 1007:13 1021:1 | **we'll** 878:5,8 | 1020:4 1033:19 | 982:22 983:13,16 |
| 1005:17 1018:10 | 1047:20 1050:22 | 879:16,19 965:16 | 1037:20 1045:21 | 983:20 984:1,5,10 |
| 1020:12 1021:17 | **wasn't** 887:13 | 988:2,4,7 991:8 | 1063:1 1068:7 | 984:14 990:15 |
| 1026:4 1027:12 | 950:8 985:13 | 992:11 1016:5 | 1084:17 1085:17 | 991:4,6 993:16 |
| 1027:21 1030:3 | 988:6 1004:12,19 | 1022:18 1025:9 | 1085:19 1095:10 | 995:18 996:15,20 |
| 1031:3,5 1039:20 | 1005:4 1010:16 | 1027:4,9 1031:6 | **weren't** 887:16 | 997:13 1000:13 |
| 1048:9 1056:6 | 1011:18 1014:21 | 1032:19 1033:21 | 891:6,16 903:1 | 1012:11,14 |
| 1066:17 1068:11 | 1024:19 1025:1 | 1035:22 1036:19 | 928:12 985:4 | 1015:19,22 |
| 1072:2 1073:9 | 1029:4 1031:14 | 1056:13 1067:9 | **Westminster** | 1016:10 1027:18 |
| 1074:16 1076:8 | 1040:7 1041:18 | 1096:7 1109:11 | 1007:18 | 1027:20 1028:3,6 |
| 1077:18 1079:9 | 1041:19 1045:16 | **we're** 876:20 877:2 | **whichever** 1090:13 | 1028:10 1030:5,8 |
| 1080:10 1081:15 | 1047:10,18 | 878:18 895:13 | **white** 939:20 | 1030:11 1031:6 |
| 1082:21 1086:11 | 1050:19 1051:22 | 896:2,15,16 | 1002:4 | 1031:10 1033:10 |
| 1089:18 1091:8 | 1053:15,20 | 909:19 914:9 | **wife** 1004:8,14 | 1033:14 1034:17 |
| 1092:18 1094:10 | 1054:15 1060:8 | 923:21 946:7 | 1017:16 1081:8 | 1035:10,20 |
| 1106:7 | 1062:8 1063:7 | 967:15 969:17,19 | **Wiley** 902:3 | 1036:22 1038:7 |
| **wanted** 887:6,22 | 1064:14,18 | 969:21 976:5 | **Williams** 1047:9 | 1039:16 1040:20 |
| 889:2 892:11 | 1065:22 1071:4 | 977:6 987:1 | **willing** 887:16 | 1042:5,8 1044:10 |
| 902:3 910:10,10 | 1080:16 | 993:12 996:9,12 | 946:3 1107:3 | 1044:18 1045:5 |
| 951:11 959:14 | **Watch** 949:10,11 | 1002:12 1004:21 | **willingness** 901:8 | 1045:10,21 |
| 963:16 965:4 | 954:17,20 955:15 | 1022:21 1028:5 | **Wilshire** 999:10 | 1046:3 1047:6,12 |
| 968:20 976:15 | 957:3,19 959:1,18 | 1031:11 1038:13 | 1016:21 | 1048:11,14,19 |
| 981:6 982:2,2 | 960:6 961:5 962:1 | 1050:16 1081:12 | **win** 960:8 1009:6 | 1049:1,15 1050:5 |
| 985:13 986:18 | 977:22 980:7 | **we've** 884:13,14 | 1024:12 1077:2 | 1050:15 1051:16 |
| 991:20 992:2 | 987:13 1001:17 | 893:1 922:3 | 1084:13 | 1052:5,10,13,22 |
| 998:18,19,20 | 1002:1 1012:18 | 983:15 1031:2 | **Windjammer** 872:5 | 1053:11,15 |
| 999:1 1005:16 | 1012:18 1013:4 | 1033:6 1092:6 | **wine** 1013:19 | 1054:6,12 |
| 1017:2 1019:15 | 1013:14,15 | **wealthy** 977:7 | **winners** 886:16 | 1055:18 1060:3 |
| 1020:16 1025:6 | 1015:15 1019:11 | **weapons** 974:8 | **wish** 875:10 880:6 | 1063:15 1064:6 |
| 1040:6 1041:16 | 1051:3 | **website** 893:5 | 927:2 932:4 988:7 | 1067:5,8,13,21 |
| 1042:9 1055:9 | **watching** 1105:18 | **Wednesday** 878:9 | 1035:12 1036:18 | 1068:3,6 1069:6 |
| 1061:12,21 | **Watergate** 948:13 | 878:11 1109:5 | 1065:18 1066:20 | 1069:10,14 |
| 1062:11,12 | **way** 872:5 887:6,12 | **week** 878:4 956:8 | 1082:20 1107:9 | 1070:4,7,11,14,18 |
| 1068:14 1073:3 | 887:14 897:20 | 1008:19 1016:18 | 1108:4 | 1071:11 1077:16 |
| 1074:11 1075:21 | 903:5 909:18,21 | 1104:2 1105:20 | **wishes** 1100:20 | 1078:3 1079:4,7 |
| 1077:2 1080:12 | 918:8 930:13 | 1106:13 | **withdraw** 884:20 | 1079:10,14,19,21 |
| 1081:8 1084:19 | 931:7 934:19 | **weekend** 875:2 | 932:5 | 1080:11 1081:19 |
| 1086:10 1091:15 | 954:22 955:5 | 930:14 1099:3 | **witness** 878:21 | 1088:15,20 |
| 1109:6 | 963:18 976:2 | **weekends** 948:14 | 879:1,4,9 880:1 | 1089:5 1092:9 |
| **wants** 880:5 980:9 | 979:21 980:21 | **weeks** 1096:6 | 880:11 885:5 | 1093:1,7,11,19 |
| 996:5 1041:12 | 985:8,12 986:16 | **well-documented** | 896:7,21 903:18 | 1095:14 1096:11 |
| 1095:16 | 992:5 1004:9 | 1006:15 | 908:6,14,18 | 1096:22 1097:7 |
| **war** 894:7 1094:18 | 1011:1 1012:2 | **well-served** 1032:6 | 909:14 911:18 | 1097:15 1098:1,6 |
| **warm** 988:2 | 1014:5 1017:8 | **went** 885:8,9,13 | 916:18 920:22 | 1102:17 1103:3,7 |
| 1100:22 | 1019:18 1020:8 | 893:11 904:2 | 924:2 928:20 | 1108:8 |
| **warmth** 1018:18 | 1022:10 1023:19 | 911:12 912:22 | 930:6,8 938:17 | **witnesses** 873:2 |
| **WARREN** 871:11 | 1025:5 1041:6,18 | 913:3,5,17 915:8 | 939:5 941:11,15 | 919:21 920:1,3 |
| **wary** 1013:5 | 1051:20 1052:6 | 915:10 949:22 | 941:17 943:9,18 | 954:3 1090:4 |
| **Washington** 870:9 | 1054:19 1056:7 | 951:12 957:1 | 945:9,12,13,18 | **Wizard** 1059:5 |
| 871:2 881:14 | 1068:8 1080:16 | 959:22 974:16 | 946:21 947:4 | 1060:4 |
| 886:1 893:7,14 | 1081:1 1084:16 | 978:15 985:10,19 | 953:12 954:4,14 | **woman** 1057:12 |
| 899:14 916:22 | 1089:21 1102:3 | 986:5,20 987:13 | 955:13 960:7,13 | 1058:20 1065:3 |
| 949:19,21 950:14 | 1103:9 1104:6 | 988:9 1000:18 | 965:16 966:17,21 | 1081:11 |
| 980:4 982:5,7 | 1105:21 | 1009:16 1013:16 | 967:5,9,17 969:19 | **women** 1099:8,10 |

**women's** 1081:11
1098:18,22
1099:18 1106:8
**won** 884:13,14,15
884:17 930:12
931:1 957:11
1061:13 1069:16
**Wong** 956:22
**Woodland** 1014:3
1026:21 1027:6
1027:12
**word** 909:6,11,14
915:10 924:4
974:4 1003:2
1018:10 1050:7
1073:6
**words** 959:12
1018:19 1036:10
**work** 881:11 888:21
891:15 892:12
908:11 916:9
926:12,20 931:3
950:11 952:7
979:7 999:10
1002:20 1010:6
1016:18,22
1021:7 1023:5
1056:16 1058:13
1084:9 1091:8
**worked** 877:10
881:12,13,14
929:14,15 948:11
948:14 949:16
952:1 963:5
986:10,14 1087:1
**working** 881:15
888:8 892:6
948:17,17 949:19
992:14 1019:1
1027:8 1047:9
1061:9 1090:17
**workout** 996:3
**workplace** 905:20
906:13
**works** 985:8
**world** 976:7 980:4
984:18 999:14
1001:19 1023:15
1032:17 1066:14
1066:15 1083:21
**worries** 1062:10
**worry** 954:12
**worst** 886:20 887:1
887:2 901:12
906:4
**worth** 1093:22

**worthless** 1022:7
**wouldn't** 974:8
988:12 992:10
1012:21 1029:14
1072:17 1089:7
1101:7 1102:19
**wound** 988:21
1009:14
**wounded** 1066:11
**wrap** 1028:8
**write** 1022:12
1043:10
**writing** 897:16
950:1 978:22
985:1 1086:15
**written** 894:18
928:11 975:9
1025:9 1043:5
1045:17 1054:15
1089:11
**wrong** 945:1 1001:9
1031:13 1044:8,9
1045:21 1053:21
**wrote** 920:6 927:7
941:10 948:5
971:21 973:18
1010:14 1025:8
1029:18 1071:2
1084:1 1087:3
1090:1

**X**

**X** 870:3,7 873:1
**X's** 1055:17

**Y**

**yeah** 876:2 880:7
883:11,16 885:5
886:9 888:1
891:10 892:11
894:21 899:2
905:2 909:13
910:7 912:22
913:6 914:1,1,5,5
916:13,15 918:10
920:1,16 924:12
925:13 929:21
930:20 935:1
936:10,10 937:3
937:19 940:20
941:22 942:17
946:5 953:12
965:3,7 967:9
968:11 969:19
972:9 1015:19
1024:19 1031:6

1039:3 1040:2,5
1044:10 1045:6
1047:12 1055:11
1067:9 1070:11
1079:7,19 1092:9
**year** 882:1 926:3
948:10 958:17
1024:13 1026:1
1061:19
**years** 882:18 885:9
922:4 931:2,3
936:9 949:11
950:13 953:6,9
960:10 964:21
969:1,2 971:7
972:22 973:7
974:18 978:4
980:2 982:20
999:6 1009:18
1012:17 1017:13
1017:17 1018:14
1064:13 1065:7
1065:17 1069:11
1093:12 1099:1
1103:18,20
**Yellow** 1015:9
**York** 1001:2
1008:20 1023:19
1100:4
**young** 1001:12
1005:6 1007:6
1008:4 1009:10
1017:17
**younger** 881:1
**YouTube** 1106:6

**Z**

**zealously** 900:7
**Zia** 1004:6,13
**Zia's** 1004:7,13
**Zoroastrians**
1026:9

**0**

**1**

**1** 880:3 994:20
995:14,20 1016:9
1070:2 1100:7
**1.7(b)(4)** 1030:14
**1:00** 876:7 945:21
946:9,11 1036:20
**10** 1082:8
**10-CV-00534**
997:14
**10:05** 1104:17

1105:13
**10:15** 1106:21
**10:50** 934:2,7
**100,000** 956:11,17
**1001** 1009:2
**101** 1014:4
**1098** 873:5
**10th** 906:20 1078:4
1078:5
**11,000** 1074:18
**112** 905:15
**12** 916:14 924:19
939:21 1031:9
1055:13
**12:30** 946:10
**12:53** 1037:2
**12th** 940:3
**14th** 1050:8
**15** 1092:4
**1525** 872:5
**15th** 1042:19
1043:3 1050:6
1088:13,20
1100:8 1101:4
**16** 1028:9
**17** 919:6 921:6
1034:1
**17-BD-063** 870:5
**18** 921:10 923:8
**180** 926:2,15
**1812** 881:21
**18th** 920:18
**1968** 948:6
**1969** 947:20
**1973** 948:4
**1976** 949:14
**1982** 972:18 973:6
**1983** 951:8
**1991** 881:17
**1994** 955:16
**1996** 881:18 960:11
961:17
**1st** 874:4 993:1

**2**

**2** 971:17 990:8,8
991:8,9 993:16,19
994:5,16 995:6
996:18 997:8
1082:4 1104:9,10
1105:8,9
**2,500** 1006:11
**2:00** 946:3
**2:30** 876:7 946:9,12
1036:21 1037:5,8
**20** 932:21 933:8

1038:6
**200** 1096:3
**2000** 881:22 882:1
962:2 1042:20
1044:8,12,16
1045:20 1051:13
1051:19 1052:16
1053:5,6
**2001** 1046:8
**2003** 958:17
**2004** 960:8
**2008** 960:1
**2009** 882:18 886:6
973:11
**201** 1042:22
1047:11 1048:9
**2010** 906:20 915:3
916:14 920:18
928:7 939:21
942:6,10 993:1
1016:9,10
1027:19 1038:1
1038:12 1042:19
1043:4 1050:6
1056:5 1059:13
1061:5 1067:2
1068:2 1070:2
1074:21 1077:11
1078:5,5 1079:10
1082:5,9,18
1100:8 1101:4
1103:19
**2011** 921:11 922:7
922:16 924:19
925:2,7 932:16
1050:8,17 1074:6
1088:13,21
1089:17 1092:4,8
1093:4
**2012** 897:5 899:1
899:18 940:16
1104:17 1105:13
1106:21
**2017** 940:19
**2018** 870:8 971:1
1110:4
**2020** 1044:15
1045:11,11
1051:14,19,21
1052:18 1053:10
1053:19
**20th** 1045:3
**21** 924:18 928:2
932:2 942:5
1037:22 1038:10
1038:11

In Re:  Larry E. Klayman
June 25, 2018

| | | |
|---|---|---|
| **21st** 915:3 1025:21 1045:3 1074:5 | **36** 973:6 | **815-5221** 872:7 |
| **22nd** 970:22 | **38** 1088:15,19 | **87** 1015:14 |
| **23** 893:22 896:5,13 965:13,17,20,22 966:7,12,20,21 967:4,6,12,13,16 968:1,5,7 969:16 969:20,21,22 970:4,5,13 971:18 972:3,8 1082:5,8 1082:9 | **3rd** 897:5 899:18 919:10 940:16 | **880** 873:3 |

**21st** 915:3 1025:21
   1045:3 1074:5
**22nd** 970:22
**23** 893:22 896:5,13
   965:13,17,20,22
   966:7,12,20,21
   967:4,6,12,13,16
   968:1,5,7 969:16
   969:20,21,22
   970:4,5,13 971:18
   972:3,8 1082:5,8
   1082:9
**23-33** 894:2,2
**23rd** 922:16 932:15
   1082:18 1104:17
   1105:13 1106:21
**24** 914:7,19,22
   915:13 918:2
**24th** 1049:20,22
   1050:13,17
   1077:11 1089:17
**25** 870:8 874:3
   916:10 918:3
   939:20
**26** 917:8,18 918:3
   1110:4
**27** 925:2 1067:3
**27th** 925:7
**29** 990:10 1068:19
   1069:3 1074:1,2,3
**29th** 955:16 1061:5
   1067:2 1068:1
**2nd** 1067:18

**_____ 3 _____**

**3** 879:15 880:3,5
   885:19 895:14
   899:1,13 990:9
   993:14,14 994:8
   994:10,18,21
   995:5,5,7 996:1,6
   996:13,17 997:8
   1035:18 1036:3,8
   1036:12,15
   1082:4
**30** 965:13 966:2,4
   967:16 970:17
   989:9 1018:17
**30th** 1096:2
   1099:10
**31st** 1056:4 1059:8
   1059:13
**325** 917:4
**33019** 872:6
**345** 1052:3
**354** 1051:13 1053:8

**_____ 4 _____**

**4** 994:16,20,21
   995:6,8 996:18
   997:9 1040:16
   1041:2
**4:00** 874:20 877:9
**4:20** 877:15
**4:30** 877:15
**4:45** 877:15
**40** 876:8 953:6
   974:18 1057:1
**405** 1014:2
**42** 1099:1
**42-year** 1099:17
**430** 871:2
**45** 1018:17
**4th** 921:11 928:7
   942:6,11 1038:1
   1038:12

**_____ 5 _____**

**5** 895:9,21 896:3,11
   896:17 897:21
   898:2 899:17
   904:5,13 940:13
**50** 1014:9 1056:21
   1057:1,16
   1060:19
**50-percent** 1059:9
**501** 1009:15,16
**543** 1000:11
**5th** 922:6 928:9
   942:10,18 1071:3
   1071:13

**_____ 6 _____**

**6:00** 878:11
**6:09** 1101:4
**60** 950:9
**601** 1007:9 1008:15
   1009:4,7,15
**61** 880:21
**67** 880:22

**_____ 7 _____**

**7** 1035:7 1074:21
**75,000** 1061:19

**_____ 8 _____**

**8** 1042:18,19
**8:00** 878:11

**815-5221** 872:7
**87** 1015:14
**880** 873:3
**8th** 1078:5 1079:10

**_____ 9 _____**

**9** 1078:1,2,3 1079:5
**9/11** 1001:4
**9:30** 871:3 1108:22
   1109:4,14 1110:1
   1110:4
**936** 873:3
**944** 873:3
**947** 873:4
**954** 872:7
**9th** 940:19



RECEIVED

July 13, 2018

Board on Professional Responsibility

**Date:** June 26, 2018

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 1141

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,                  : Board Docket No.

LARRY E. KLAYMAN,                  : 17-BD-063

                    Respondent.    :  Vol V

- - - - - - - - - - - - - - - X

                         Tuesday, June 26, 2018

                         Washington, DC

                    HEARING

Reported by

    Kim M. Brantley, C.S.R.

In Re:  Larry E. Klayman
June 26, 2018

|  | Page 1142 |
|---|---|
| 1 | Hearing, taken at the Board on Professional |
| 2 | Responsibility, 430 E Street, NW, Washington, DC, |
| 3 | commencing at 9:29 a.m., before the Ad Hoc Hearing |
| 4 | Committee, and before Kim M. Brantley, C.S.R., a |
| 5 | Court Reporter and Notary Public in and for the |
| 6 | District of Columbia, when were present on behalf |
| 7 | of the respective parties: |
| 8 | |
| 9 | APPEARANCES: |
| 10 | AD HOC HEARING COMMITTEE: |
| 11 | WARREN ANTHONY FITCH, ESQUIRE |
| 12 | Chair |
| 13 | MARY LARKIN |
| 14 | Public Member |
| 15 | MICHAEL TIGAR, ESQUIRE |
| 16 | Attorney Member |
| 17 | |
| 18 | On behalf of the DC Attorney Disciplinary |
| 19 | System: |
| 20 | H. CLAY SMITH, III, ESQUIRE |
| 21 | |
| 22 | |

Page 1143

1 APPEARANCES CONTINUED:
2 On behalf of Respondent:
3 FREDERICK J. SUJAT, ESQUIRE
4 Law Office of Frederick J. Sujat
5 1525 Windjammer Way
6 Hollywood, Florida 33019
7 (954) 815-5221
8 Email: fsujat@yahoo.com
9 ALSO PRESENT:
10 LARRY E. KLAYMAN, ESQUIRE
11 Respondent
12
13
14
15
16
17
18
19
20
21
22

Page 1144

1         I N D E X
2 WITNESSES:       DIRECT:     CROSS:
3 Larry Klayman    1147, 1180    1267
4 Judge Sporkin    1171    1175
5 Keya Dashtara (Dash) 1340, 1376    1363
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 1145

1         P R O C E E D I N G S
2     CHAIRMAN FITCH:  Good morning,
3 everyone.  We are back on the record.  All
4 requisite persons are present.
5     Mr. Smith, any preliminary matters?
6     MR. SMITH:  No preliminary matters from
7 Disciplinary Counsel.
8     CHAIRMAN FITCH:  Mr. Sujat or Mr.
9 Klayman, any preliminary matters?
10     MR. KLAYMAN:  Yes.
11     With respect to the witnesses, I've had
12 to schedule them when I can get them, and they're
13 coming from a distance.  I thank you for
14 accommodating Judge Sporkin this morning.  The
15 testimony won't be long.
16     But also, Keya Dash, another one of the
17 witness, I'm hoping to put him on today around
18 4:00 o'clock.
19     CHAIRMAN FITCH:  Why don't you spell
20 that name for the court reporter.
21     MR. KLAYMAN:  K-e-y-a, Dash, D-a-s-h.
22 We have an affidavit from him in

Page 1146

1 Respondent's Exhibit 5, I believe it is, and in
2 speaking with him yesterday, he found some emails
3 that he had written to me and me to him, and also
4 an email from Ms. Sataki, who had been in contact
5 with him.
6         I would like to have this made
7 Respondent's Supplemental Exhibit 7. I wanted to
8 give it to Mr. Smith well in advance of the
9 testimony and give it to you, ok.
10        CHAIRMAN FITCH: That will be fine.
11        For the record, the Respondent's team
12 has tendered to the hearing committee members and
13 to Mr. Smith a set of documents that appear to
14 consist of nine pages. They are stapled together
15 and they are denominated as RSUP7.
16        We will address these documents to the
17 extent necessary in due course.
18        I think we're ready to --
19        MR. KLAYMAN: Yes, I'll take the
20 witness stand.
21        CHAIRMAN FITCH: -- to resume the
22 Respondent's testimony.

Page 1147

1         Mr. Sujat, you may proceed.
2         (Larry Klayman resumes the witness
3 stand.)
4         MR. SUJAT: Thank you, your Honor.
5         Your Honor, and members of the
6 committee, I'd like to begin with the pleadings in
7 the two cases involved here, the Sataki
8 litigation, Sataki vs. Falahati, and then also the
9 Sataki vs. The Broadcasting Board of Governors.
10 And I'd like to go through the pleadings and have
11 Mr. Klayman identify the pleadings on the record.
12 I'd like to start with the superior court
13 complaint that was filed on March 1st of 2010.
14 It's in Respondent's Exhibit 2.
15        CHAIRMAN FITCH: Let me ask you to make
16 a proffer of why that needs to be done to any
17 substantial extent? I mean, I emphasize again,
18 Mr. Klayman has not been charged with lack of
19 zealousness or lack of competency.
20        MR. KLAYMAN: Your Honor, he's just
21 going to go through the timeline, because you
22 requested about the timeline yesterday, how it

Page 1148

1 lines up. It will be brief. I'm not really going
2 to get into the documentation.
3         CHAIRMAN FITCH: Well, let's give it a
4 try.
5         CONTINUED DIRECT EXAMINATION
6         ON BEHALF OF RESPONDENT:
7         BY MR. SUJAT:
8     Q. Ok, so please look at Respondent's
9 Exhibit Number 2.
10    A. Yes.
11    Q. Respondent's 2.
12    A. I've got it.
13    Q. Would you please --
14    A. Yes, this is a complaint which I filed.
15 It's in that -- there's a document on top of it.
16 Excuse me.
17        First is a letter that I wrote to Mr.
18 Smith dealing with this particular matter. I
19 don't need to get into that. But behind it on
20 Exhibit 3, this is Exhibit 3 --
21        CHAIRMAN FITCH: Are we talking about
22 Exhibit 2 and 3, or are we talking about

Page 1149

1 supplementals?
2         THE WITNESS: We're talking about
3 Respondent's Exhibit 3.
4 BY MR. SUJAT:
5     Q. Respondent's Exhibit Number 2 --
6     A. Ok, well let's go through the exhibits
7 of Bar Counsel.
8         CHAIRMAN FITCH: Alright.
9         THE WITNESS: Or I can go to
10 Respondent's Exhibit 2. That's fine.
11        CHAIRMAN FITCH: I just want you to
12 tell me where we are, because, in my book, the
13 first thing behind a tab that has a number two on
14 it is a removal notice.
15        MR. TIGAR: Yes, that's what I have
16 also.
17        MR. SUJAT: That's right, and the
18 superior court complaint is 40 pages in.
19        MR. TIGAR: Forty pages in?
20        MR. SUJAT: Into it, right.
21        CHAIRMAN FITCH: I see it. Ask a
22 question.

3 (Pages 1146 to 1149)

In Re:  Larry E. Klayman
June 26, 2018

Page 1150

1    THE WITNESS: Yes, I have it, and thank
2  you.  And I will identify it by the book it's in,
3  Respondent's exhibits, when we go to Respondent's
4  exhibits.  So it's in book two, Exhibit 2 -- it's
5  book one, Exhibit 2.  Book one, Exhibit 2.
6    Yes, this is a complaint that I filed
7  with regard to the alleged harasser, Mehdi
8  Falahati.  I filed it with regard to Ms. Sataki's
9  instructions, to bring an action.
10    Just to be brief, I testified yesterday
11  I didn't believe that she would ever see any money
12  out of this because he doesn't really have any
13  money I was told by her and by others.  But there
14  was the complaint, ok, and it was removed -- as
15  you can see later on Notice of Removal of Civil
16  Action to Federal Court, on April 19th, 2010.
17  That's also part of that exhibit.
18    There's also another notice of removal
19  with regard to that case for some reason and I
20  don't recollect why the defendants did it twice.
21  I think because there was more than one defendant,
22  even though the caption shows Mehdi Falahati.

Page 1151

1    There's also a notice of removal on
2  March 26th, 2010.
3    By the way, I misspoke.  The prior one
4  is March 19th, 2010, and there's another notice of
5  removal in that exhibit for March 26, 2010.
6  That's when it was filed.
7    So this case was removed to the federal
8  court here in Washington, D.C.
9    You want to move this into evidence,
10  Fred?
11    MR. SUJAT:  Yes.
12    We'd like to move the Respondent's
13  Exhibit Number 2 in totality into evidence.
14    MR. SMITH:  No objection.
15    CHAIRMAN FITCH:  Mr. Smith?
16    MR. SMITH:  No objection.
17    CHAIRMAN FITCH:  It is admitted.
18    THE WITNESS:  And I testified about
19  this yesterday.
20    CHAIRMAN FITCH:  Yes.
21    THE WITNESS:  So I won't be
22  duplicative.

Page 1152

1    MR. SUJAT:  So then we can move right
2  along here to this U.S. District Court case, and
3  the pleading would be the Motion for a Temporary
4  Restraining Order, Bar Exhibit D6.
5    THE WITNESS:  Yes, this has already
6  been admitted into evidence, as I have stipulated
7  with Mr. Smith.  This is with relationship to the
8  case that I brought against the board of governors
9  and their individual governors, and it is the
10  original motion that was filed for temporary
11  restraining order and preliminary injunction on
12  May 24th, 2010.  That's what it shows at the top
13  of the Pacer marking.  It was assigned to Judge
14  Colleen Kollar-Kotelly, and I've testified about
15  that yesterday.
16  BY MR. SUJAT:
17    Q.  Mr. Klayman, I refer you to the order.
18  This would be the Bar Exhibit D-7.
19    A.  Yes, thank you, Mr. Sujat.
20    Q.  It would be seven.
21    MR. SMITH:  Bar Counsel's 7.
22    MR. SUJAT:  Bar 7, ok.

Page 1153

1  BY MR. SUJAT:
2    Q.  It's an order dated June 1st, 2010.
3    A.  This is the order denying the motion
4  for temporary restraining order along with a
5  memorandum opinion.  The order and the memorandum
6  opinion are June 1st, 2010.
7    This was my first attempt to have Judge
8  Kotelly rule in Ms. Sataki's favor, and I didn't
9  give up.  I proceeded on and wanted to have the
10  preliminary injunction aspect of that motion
11  decided.  So this was just for the temporary
12  restraining order.
13    This has already been admitted into
14  evidence as well by stipulation.
15    Q.  And then Bar Exhibit 9, Motion For
16  Reconsideration Order Denying Motion for the TRO.
17    A.  Yes.
18    As you can see, I was persistent and
19  this is a motion I filed to have the judge
20  reconsider her ruling.  And the document speaks
21  for itself.  It's been admitted into evidence.
22    I felt that based on my review and my

4  (Pages 1150 to 1153)

Page 1154

1  experience that the judge had made manifest errors
2  of law and fact, and I was pointing it out to her
3  that we had substantial evidence for the TRO, in
4  addition to Dr. Aviera's reports and a polygraph
5  examination and other affidavits and other
6  evidence.  And at that point, I felt that we
7  should have gotten a TRO based just upon the
8  affidavits.
9       Now, when we went to a preliminary
10  injunction, we wanted to have an evidentiary
11  hearing, because that obviously is much more
12  substantial than a TRO that would only last, you
13  know, for days.  But Ms. Sataki was in such bad
14  emotional state that I thought I had to file the
15  TRO to try to get her some relief, some peace of
16  mind that she would be in Los Angeles, ultimately,
17  to be able to see her doctors and be with her
18  friends and family.
19       Exhibit 9 is also already in evidence.
20  Q.  Mr. Klayman, I refer you to Bar Exhibit
21  12, Denial of Motion For Reconsideration.
22       CHAIRMAN FITCH:  Give me one second,

Page 1155

1  please, Mr. Sujat.
2       (Brief pause.)
3       CHAIRMAN FITCH:  Thank you.  We're
4  moving to DX12.
5       THE WITNESS:  Mr. Sujat, let me talk
6  about 10, that's important.
7       This is Bar Exhibit 10.  This is a
8  motion, plaintiff Elham Sataki's motion and
9  memorandum to Chief Judge and/or Judge
10  Kollar-Kotelly to reassign and remand the case by
11  consent or otherwise to prior trial judge, Richard
12  W. Roberts, or in the alternative to assign Sataki
13  cases to another trial judge through random
14  assignment system.  It was filed on or about June
15  9th, 2010.  That's what it says on Pacer markings
16  on top.
17       In this I'm trying to politely ask
18  Judge Kotelly, without trying to be provocative --
19  because as I said yesterday, I had prior issues
20  with her in other cases up to this point -- to
21  send the case back to Judge Roberts, that she had
22  the potential for a conflict here, given certain

Page 1156

1  things that had happened in prior litigation
2  between me and other defendants and her sitting as
3  the trial judge, and I asked -- if she wouldn't do
4  it, I asked if Joyce Lambert, who had been the
5  chief judge at the time, could reassign it under
6  the court rules.
7       This proved to be unsuccessful.  It
8  wasn't reassigned.
9       But it's Exhibit 10.  It's already in
10  evidence.
11       And then there's Exhibit 11, plaintiff
12  Elham Sataki's Supplemental Memorandum --
13       CHAIRMAN FITCH:  With respect to DX10
14  filed on 6/9/10, this was filed expeditiously
15  eight days after the opinion and order.
16       Were you still in communication with
17  Ms. Sataki during that week, that eight-day
18  period.
19       THE WITNESS:  I don't recollect whether
20  I was or wasn't.
21       As I testified yesterday, I was trying
22  to get in contact with her and I was getting

Page 1157

1  instructions from people who clearly were not her,
2  written in other English, and I was trying to
3  confirm that.  So I was trying to protect her
4  interests in the interim.
5       Having seen the ruling of Judge Kotelly
6  at that point, I thought it would be worth a try
7  to get this to another jump to move on with regard
8  to the preliminary injunction aspect of it.
9       So I was protecting her interests at
10  that time, and as Mr. Shamble also testified, you
11  know, we couldn't get in touch with her.  So I
12  couldn't let her rights be lost.
13       Then there's Exhibit 11.  This is a
14  supplemental memorandum exhibit in support of the
15  motion for preliminary injunction.  It's quite
16  extensive.  The document which is in Bar Counsel's
17  exhibit book doesn't have all of the attachments
18  in it.  But literally it was that thick, it was
19  about three inches thick with affidavits and
20  everything else.
21       At that point, as I testified yesterday
22  briefly, Judge Kotelly had had a status

5  (Pages 1154 to 1157)

In Re: Larry E. Klayman
June 26, 2018

Page 1158

1 conference, and I asked her for a preliminary
2 injunction hearing, and prior to that discovery.
3 She would not grant it. But it's in the context
4 of this supplemental memorandum in support of the
5 motion for preliminary injunction that I asked for
6 that hearing and asked for prior discovery.
7 Because, if she didn't accept the affidavits up
8 front, of all the people that I had submitted, I
9 felt that we needed to put people on the witness
10 stand so she could judge demeanor, take a look at
11 the demeanor of the government witnesses and look
12 at the demeanor of our witness, which was very
13 important, and also the need for
14 cross-examination. Because at that point I
15 believed that the government witnesses who had
16 submitted affidavits were not telling the truth.
17          I believed in Ms. Sataki and her case.
18          So that's what Exhibit 11 is about.
19 It's already in evidence.
20 BY MR. SUJAT:
21     Q.  Mr. Klayman, could you also take a look
22 at Bar exhibit 12, the next tab.

Page 1159

1          CHAIRMAN FITCH:  Twelve.
2          MR. SUJAT:  Twelve, yes, the next tab.
3          THE WITNESS:  Yes, this is the
4 memorandum opinion of Judge Kotelly that she
5 wrote.  It was filed on July 7th, 2010, and it's
6 denying the motion for temporary restraining
7 order.  She's elaborating, because I went back and
8 asked for reconsideration, and basically on the
9 same grounds as before she accepted everything
10 that the government said and discounted, to the
11 extreme, didn't accept anything that Ms. Sataki
12 and our witnesses had said.
13          And I was pointing out in the pleadings
14 the case of Wagner vs. Taylor, which says that the
15 federal court has the right to preserve the status
16 quo while the Office of Civil Rights proceeding is
17 going forward.
18          So that's her memorandum opinion, and
19 that's already in evidence.
20          MR. TIGAR:  Just to clarify.
21          THE WITNESS:  Yes.
22          MR. TIGAR:  Mr. Klayman, you were in

Page 1160

1 Los Angeles on the 1st of June.  Is that right?
2 You had the car accident that day.
3          THE WITNESS:  In and around that time
4 period, yeah.
5          MR. TIGAR:  So where were you as you
6 were filing these things eight days later?  Do you
7 remember whether you were in DC or in LA?
8          THE WITNESS:  I don't remember exactly,
9 because I don't have records.  I lost them all,
10 or -- I probably was in LA and we were filing
11 documents electronically under the Pacer system.
12          I actually had an associate working
13 with me, a Persian-American, and he was assisting
14 me with this, who had actually met with Ms. Sataki
15 as well.
16          MR. TIGAR:  I'm sorry?
17          THE WITNESS:  He had actually met with
18 Ms. Sataki as well.
19          In other words, he was participating in
20 this case with me.
21          MR. TIGAR:  What is his name?
22          THE WITNESS:  David Purati (phon).

Page 1161

1          MR. TIGAR:  Did he meet with her during
2 this period of time between the 1st of June and
3 the 8th?
4          THE WITNESS:  No, no.  He was working
5 under my umbrella and helping me work things out.
6          CHAIRMAN FITCH:  Go ahead, Mr. Sujat.
7          THE WITNESS:  Yes, and I would like to
8 add here, one of the things that came up yesterday
9 was where Ms. Sataki's purported termination
10 notices were sent on November 15th, and they were
11 of course sent to incorrect addresses, for
12 whatever reason, but she knew that I was in Los
13 Angeles then.  She knew where my office was.  It
14 was at 9701 Wilshire Boulevard.  She could have
15 certainly sent it there, and she knew that I
16 wasn't in Washington.
17          And she in fact, you know, met with me
18 there and the small staff that I had during
19 various periods of time.
20          So I think that's an important point,
21 is that --
22          CHAIRMAN FITCH:  In that regard, what

                                      6  (Pages 1158 to 1161)

App.0510

Page 1162

1  particular document or communication are you
2  referring to?
3       THE WITNESS:  Just general, the
4  November 15th alleged letters terminating me.
5       CHAIRMAN FITCH:  Ok.
6       THE WITNESS:  Ok?
7       CHAIRMAN FITCH:  Right now we're in
8  June.
9       THE WITNESS:  Yeah, I'm just pointing
10 that out because we were talking about where I was
11 in location.  And she knew I was in my office at
12 9701 Wilshire.  It's at the corner of Wilshire and
13 Camden in Beverly Hills.
14      I was doing some entertainment stuff.
15 That's why I had a small office that I had sublet
16 from somebody, one office from an accountant in
17 that building.
18      CHAIRMAN FITCH:  Mr. Sujat?
19 BY MR. SUJAT:
20   Q.  Mr. Klayman, I refer you to Bar Exhibit
21 13.
22   A.  Correct.

Page 1163

1       This is a motion for disqualification,
2  which I fired with regard to Judge Kotelly on July
3  26th, 2010.  That's what the Pacer notice shows.
4  And what's really important about this document,
5  your Honors, is that it sets forth at the back, on
6  pages Bar Counsel Exhibit 13 -- it's Exhibit 13,
7  but the page is 13-25 through and including 13-38,
8  all of what I had determined to be the factual
9  errors of Judge Kotelly's ruling.  And that's the
10 basis upon which I had stated in an article that
11 she had no basis in fact and in law to have denied
12 the preliminary injunction motion and the TRO.
13 And on the left I say, if you go to Judge
14 Kotelly's facts, which she determined and what I
15 viewed to be the actual facts of the case, so I
16 detailed it in great -- with great detail, so to
17 speak.  Because I wanted her to reconsider,
18 showing her that she had significantly erred.
19      And I believed honestly -- and you'll
20 see, I have a judge coming here to testify for me,
21 I have good relationships with many judge -- but I
22 believed honestly that Judge Kotelly did not rule

Page 1164

1  honestly here, and that she tried to create facts
2  to arrive at the conclusion that she wanted
3  because she doesn't like me and doesn't like Ms.
4  Sataki, in part based on my activism, which was
5  against the person who appointed her and others,
6  and, you know, other factors.
7       She has a reputation of not liking
8  conservatives.  There have been many cases where
9  she has ruled with other conservative entities
10 where she's ruled against them or been very, very
11 difficult.
12      Interestingly enough, in this motion I
13 point out that her standard for granting a
14 preliminary injunction was different for Sataki
15 than for other interests.  She raised the
16 threshold of the Bar which she had to get over for
17 preliminary injunction.  But most important, she
18 didn't ever give us a hearing.  I don't understand
19 why you would not give a hearing to a woman who
20 had alleged that she was being destroyed, both
21 legally and emotionally.  It just was beyond my
22 imagination.

Page 1165

1       But also with regard to my having
2  written that there was no basis of law and fact,
3  I'm entitled to my opinion on that.  And lawyers
4  frequently do that in the context of a case, is
5  that, you know, when they speak about them
6  publicly, they do comment, and we know that what a
7  lawyer says outside of the courtroom, in the
8  context of the case, is entitled to First
9  Amendment protections as well and privilege.
10      That's what lawyers do, and we've seen
11 a lot of that lately, in particular, on both sides
12 of the political spectrum.
13      CHAIRMAN FITCH:  This filing on July
14 26th, 2010, do you recall whether you had any
15 discussions with Ms. Sataki --
16      THE WITNESS:  Yes, I had --
17      CHAIRMAN FITCH:  -- about filing --
18      THE WITNESS:  I had --
19      CHAIRMAN FITCH:  -- this motion?
20      THE WITNESS:  I'm sorry, your Honor.  I
21 didn't mean to interrupt you.
22      I had prior discussions with her about

7  (Pages 1162 to 1165)

Page 1166

1   Judge Kotelly and the need of her potentially
2   having to disqualify herself.  She knew about the
3   motion for reassignment.  She knew that ultimately
4   I would have to ask the judge, if necessary, to
5   disqualify herself.
6       Mr. Shamble testified yesterday that --
7       CHAIRMAN FITCH:  Stop.  Stop right
8   there.
9       THE WITNESS:  Yeah.
10      CHAIRMAN FITCH:  What is the basis for
11  your saying that Ms. Sataki knew about the motion
12  to disqualify?
13      THE WITNESS:  She knew that ultimately
14  I may have to file a motion to disqualify her.
15      CHAIRMAN FITCH:  What's the basis of
16  that comment?
17      THE WITNESS:  The conversations that we
18  had, which Mr. Shamble also testified to in some
19  manner yesterday that I raised up front, the
20  difficulty being before this judge, and my prior
21  experience with her in other case, and the fact
22  that she disliked me and generally dislikes people

Page 1167

1   that she perceives to be conservative.
2       CHAIRMAN FITCH:  Do you have any
3   recollection of whether, in the approximately
4   seven days before July 26th, 2010, you had any
5   conferences or communications with Ms. Sataki --
6       THE WITNESS:  I don't have any
7   recollection about that.
8       CHAIRMAN FITCH:  -- about filing for
9   the motion to disqualify.
10      THE WITNESS:  I don't have any
11  recollection of that.
12      Again, I'm trying to protect her
13  interests.  If I succeeded in getting Judge
14  Kollar-Kotelly to recuse herself -- and this is an
15  interesting issue in the law -- is that a judge is
16  supposed to take himself or herself off the case
17  immediately when there is a 144 motion with an
18  affidavit filed.  But she doesn't do that, and
19  many other judges don't do that, to be candid.
20  They rule on it themselves.  That's kind of like
21  asking someone to say that you've been
22  disqualified.

Page 1168

1       But if I had succeeded and I had to do
2   it for purposes of appeal, to have a record, if I
3   succeeded, then ultimately I could have the prior
4   orders vacated and get a preliminary injunction
5   hearing.  So I was protecting her interests.
6       And again it was very difficult to
7   communicate with her and, as you can see from some
8   of my testimony in her documents, she was all over
9   the place in what she wanted to do, based upon
10  advice she was getting from non-lawyers.
11      At one point, yesterday, you know, she
12  claims to have --
13      Here's Judge Sporkin.  Hold on.
14      CHAIRMAN FITCH:  Go ahead.
15      (Mr. Klayman communicates on his cell
16  phone off the record.)
17      THE WITNESS:  So, to finish my
18  response, I had to do this to protect her
19  interests.
20      And she was all over the place.  At one
21  point, you know, she's telling Dan Austin, "I want
22  to dismiss all cases," and then she's telling

Page 1169

1   Kathleen Staunton, "Well, I never wanted to go to
2   LA.  Larry Klayman made that up."  Well, we know
3   that's not the case from various documentation and
4   testimony.
5       And then she's filing a notice of
6   appeal of Kotelly's ruling.
7       So, with all of that uncertainty and
8   all of the prevarication -- and I asked your
9   Honors also to look at this issue in context of
10  her credibility.
11      Also with regard to the publicity,
12  which clearly you're going to hear a lot of
13  testimony that she agreed to the publicity.  But
14  she came in here and testified under oath that she
15  didn't.
16      I had to protect her interest.  And
17  quite apart from any, you know, aspect of how I
18  felt about Ms. Sataki, I believed in her interests
19  and believed in her.  I would have to do that as a
20  lawyer for any client.  I can't let those rights
21  go into the tank, until we can sort out who is
22  involved here and what she wants to do.

8  (Pages 1166 to 1169)

## Page 1170

1    So, that was it.  But she knew that we
2    would ultimately perhaps have to move to
3    disqualify Judge Kotelly.  And I was hoping that
4    would not be the case, particularly since I
5    thought, much like with Ms. Allred, that women can
6    appreciate even better than men what it's like to
7    be sexually harassed.  And I thought maybe she
8    might have some empathy and rule in our favor,
9    even though I was very skeptical, given her past
10   experience with me in other cases.
11       CHAIRMAN FITCH:  At this point, we will
12   take a brief recess in order to interrupt the
13   Respondent's testimony, at his request, in order
14   to accommodate the scheduling and other needs of
15   another witness in Respondent's case.
16       (Recess taken.)
17       (Judge Sporkin present in the hearing
18   room.)
19       CHAIRMAN FITCH:  This seems a little
20   silly, your Honor, but I need to swear you.
21   THE WITNESS:  I'll swear.
22       CHAIRMAN FITCH:  Do you solemnly swear

## Page 1171

1    or affirm that the testimony you're about to give
2    will be the truth, the whole truth and nothing but
3    the truth?
4        THE WITNESS:  I swear.
5    Whereupon,
6            STANLEY SPORKIN
7    called as a witness on behalf of Respondent, and
8    after having been first duly sworn, was examined
9    and testified as follows:
10       DIRECT EXAMINATION ON BEHALF OF THE RESPONDENT:
11           BY MR. KLAYMAN:
12   Q.  Please state your name, your Honor.
13   A.  Stanley Sporkin.
14   Q.  Can you run us through briefly your
15   educational background?
16   A.  Well, I went through college at Penn
17   State University.  I went to law school at Yale.
18   I'm a lawyer, a member of the Bar.  I'm a CPA.
19       Anything else?
20   Q.  No, I think that does it.
21       And we had some cases together early on
22   when we were younger, right?

## Page 1172

1    A.  Yes, we have.
2    Q.  I told a little story yesterday about
3    one of them with B.F. Saul.
4    A.  Yeah.
5    Q.  And your sense of humor.  You remember
6    that?
7    A.  Yeah.
8    Q.  In the time that I appeared before you,
9    did you find me to be an honest and ethical
10   lawyer?
11       THE WITNESS:  He has an objection?
12       MR. SMITH:  No, no objection.
13       THE WITNESS:  Alright.
14       Yes, I found you to be an ethical
15   lawyer and a good lawyer.
16   BY MR. KLAYMAN:
17   Q.  And of good character?
18   A.  I have no reason to doubt your
19   character.
20   Q.  And we've known each other over the
21   years since then.  After we stopped having cases
22   together, we got to know each other.

## Page 1173

1    A.  Yeah.
2    Q.  There came a point in time when I
3    called you about one of my clients, Elham Sataki,
4    a woman who alleged she had been sexually harassed
5    at the Voice of America, a government agency.  And
6    I went through facts with you about her harassment
7    and also I discussed the case of Wagner vs.
8    Taylor, putting her back to work in Los Angeles to
9    preserve the status quo while her administrative
10   sexual discrimination claim went through.
11       What did you tell me at that time about
12   what you would do if you were sitting on the bench
13   about that case?
14   A.  This was all nonformal, right.
15   Q.  Right.
16   A.  I was not representing this woman.
17   Q.  No, I just asked you.  You were a
18   retired judge.  And I said "What would you do,
19   your Honor?"
20   A.  And you had suggested what you had told
21   her and you mentioned to me what that was and I
22   said I saw that that seemed to be reasonable.

In Re:  Larry E. Klayman
June 26, 2018

## Page 1174

1    Q.   And we discussed whether you would have
2  given her a preliminary injunction hearing before
3  making a ruling, an actual evidentiary hearing.
4    A.   Yeah.
5    Q.   And what did you tell me?
6    A.   What's that?
7    Q.   I asked whether you would have given
8  her a preliminary injunction hearing --
9    A.   Yeah.
10    Q.   -- before making a ruling, with
11  evidence.  And what did --
12    A.   Well, you asked what the process would
13  have been.
14    Q.   Yeah.
15    A.   And I agreed that you have to have a
16  hearing before you can get an injunction.
17    Q.   And that would be fair for all parties?
18    A.   What's that?
19    Q.   That would be the fairest thing for all
20  parties, to have an evidentiary hearing.
21    A.   Right.
22        MR. KLAYMAN:  I have no further

## Page 1175

1  questions.
2        CHAIRMAN FITCH:  Let me catch up here
3  in my notes.
4        (Brief pause.)
5        CHAIRMAN FITCH:  And Mr. Smith, do you
6  have any questions?
7        MR. SMITH:  Just a few.
8        CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
9        BY MR. SMITH:
10    Q.   Good morning, your Honor.
11    A.   Good morning.
12    Q.   I take it that you have not read the
13  orders of the district court in the Elham Sataki
14  case denying the requests for injunctive relief?
15    A.   No, I have not read it.
16        MR. SMITH:  I have no further
17  questions.
18        MR. KLAYMAN:  One further question.
19        CHAIRMAN FITCH:  Redirect, Mr. Klayman?
20        MR. KLAYMAN:  Yeah.
21
22

## Page 1176

1        REDIRECT EXAMINATION ON BEHALF OF THE RESPONDENT:
2        BY MR. KLAYMAN:
3    Q.   During our conversation I gave you
4  facts that she had been sexually harassed, that
5  there was an office of Persia News Network, Voice
6  of America, in Los Angeles, that she needed
7  medical help from her doctors there.
8        You remember that?
9    A.   If you say you told me, you told me.
10    Q.   Yeah.  This was eight years ago,
11  correct?
12    A.   It was a number of years ago, yes.
13    Q.   And you would have put her back to work
14  in Los Angeles, at least in the interim during
15  this whole thing?
16    A.   Well, I mean, I would have wanted to
17  hear all the facts, but that certainly was one
18  option.
19    Q.   And you would have had an evidentiary
20  hearing?
21    A.   Well, if we needed one, yeah.
22    Q.   And that's the fairest thing to do?

## Page 1177

1        MR. SMITH:  Objection, that goes beyond
2  the scope of my cross-examination.
3        CHAIRMAN FITCH:  Sustained.
4        MR. KLAYMAN:  Ok, no further questions.
5        CHAIRMAN FITCH:  Thank you, judge.  I
6  very much appreciate your accommodation for this
7  proceeding.
8        THE WITNESS:  Well, thanks.
9        CHAIRMAN FITCH:  It was a great honor
10  to have seen you.
11        We will stand in recess for a few
12  minutes.
13        (Witness Stanley Sporkin is excused.)
14        (Recess taken.)
15        (Mr. Klayman on the witness stand.)
16        CHAIRMAN FITCH:  Mr. Sujat, we left off
17  with discussion of the motion to disqualify --
18        MR. SUJAT:  That's correct.
19        CHAIRMAN FITCH:  Of 7/26/10, and that
20  gets us back up to where we ended up yesterday,
21  having in my view completed testimony about
22  pre-August matters.  We also have allowed

Page 1178

1  testimony about the August 10, I believe, letter.
2  It seems to have been thoroughly examined.
3       You may proceed from there with your
4  questions.
5       MR. SUJAT:  Thank you, Your Honor.
6       MR. KLAYMAN:  And your Honor --
7       MR. TIGAR:  I'd like it put one
8  question if I may.
9       You filed the section under United
10  States Code Section 144 which requires that the
11  affidavit be the affidavit of a party, but you
12  didn't file an affidavit of a party.
13       Why was that.
14       THE WITNESS:  Because of the fact that
15  I thought most of the prejudice was coming
16  vis-à-vis me.  It's unclear --
17       There are case cases.  I've done
18  research on this.  In my life -- not like your
19  professional life, Mr. Tigar and your very
20  distinguished career, but, you know, sometimes you
21  go up against judges that are biased or whatever.
22  There are cases you can impute to the court on the

Page 1179

1  client, and that's why I filed the affidavit
2  myself.
3       And also, at that point it was very
4  difficult to communicate with her and get her to
5  communicate with me.
6       MR. TIGAR:  Do you recall reaching out
7  to her and asking her if she would make such an
8  affidavit?
9       THE WITNESS:  Yes.  I was calling out
10  generally because I needed to get instructions
11  from her by talking to her, not getting letters
12  secondhand.
13       Well, actually at that point we didn't
14  get anything.  We didn't have any communication.
15  I was trying to reach her the whole time, and she
16  just kind of went into hiding.
17       But there are cases that say prejudice
18  to the lawyer can be imputed to the client.
19       It's an interesting sideline here,
20  something I want to work on in the future in my
21  public interest capacity.  In some states, for
22  instance, like California, when you draw a judge,

Page 1180

1  you get one peremptory challenge of the judge, and
2  you can get another judge.  And if you look at the
3  legislative history of 144, there are aspects of
4  this being like a peremptory challenge.  You
5  should be at least allowed, if you can show, you
6  know, bias and prejudice in some way, to get
7  another judge on your case.  I think the federal
8  system needs to be amended in this regard.  Maybe
9  the Bar can work on that, and also the fact that
10  judges shouldn't be sitting on their own
11  disqualification motions.  It should go to another
12  judge in the courthouse.
13       CONTINUED DIRECT EXAMINATION
14       ON BEHALF OF RESPONDENT:
15       BY MR. SUJAT:
16       Q.  Mr. Klayman, we were just on the Bar
17  Exhibit 13 and I was going to refer you here now
18  to 14, Exhibit 14.
19       A.  Yes.
20       Q.  It's the memorandum opinion, October
21  13, 2010.
22       A.  Yes.

Page 1181

1       This is the memorandum opinion of
2  October 13, 2010, of Judge Kotelly denying the
3  motion for disqualification.
4       And I might add to Mr. Tigar's
5  question, and I not only moved, if you look at the
6  papers under 144, but I moved under 28 U.S.C. 145,
7  as well, which is actually a lower threshold, but
8  it's not an automatic disqualification as 144
9  should be if the affidavit is sufficient under
10  144.
11       So I moved under both bases.
12       I guess we can turn to 15, Mr. Sujat.
13       Q.  Yes, please.  That's the memorandum
14  opinion of October 22nd, 2010.
15       A.  Yes.
16       This was a motion to dismiss that had
17  been filed by the defendants, and that's her order
18  on October 22nd, 2010.
19       And then Exhibit 16 is a motion to
20  reconsider court's dismissal, order of October
21  22nd, 2010, and to correct manifest intentional
22  errors.  The action should not have been

11 (Pages 1178 to 1181)

Page 1182

1  dismissed.  There was a preliminary injunction
2  claim in the complaint for Judge Kotelly to
3  dismiss it short of letting us go to a permanent
4  injunction was error.
5        She also characterized my complaint as
6  simply a Bivens claim, you know, claiming for
7  Constitutional violations, and the complaint was
8  more than that.  It had other counts in it, which
9  she should not have dismissed, and in particular
10  we had the amendment with regard to Wagner vs.
11  Taylor for status quo, and that dealt with the
12  permanent injunction.
13        So she just, for lack of a better word,
14  no lack of respect, threw the baby out with the
15  bath water, and I asked her for her
16  reconsideration.
17        It was another example of what I
18  perceived to be her extrajudicial bias against my
19  client, and me.
20     Q.  So would you also look at Bar Exhibit
21  16.
22     A.  What is the number?

Page 1183

1     Q.  It's tab 16 --
2     A.  Yes, I just talked about this.
3     Q.  Ok, then I'm sorry, 21.
4        CHAIRMAN FITCH:  I'm sorry, what
5  number?
6        MR. SUJAT:  The order on Exhibit 21.
7        CHAIRMAN FITCH:  Twenty-one, ok.
8        MR. SUJAT:  December 21st, 2010, Bar
9  exhibits.
10        THE WITNESS:  The interim exhibit is
11  already in evidence, so I don't need to take up
12  the hearing committee's time on that.  They speak
13  for themselves.
14  BY MR. SUJAT:
15     Q.  Also I was going to reference a Notice
16  of Appeal.  That's Exhibit 22.
17     A.  Ok, let's take it one at a time.
18        With regard to Exhibit 21, which is in
19  evidence, that is the opinion denying the motion
20  for reconsideration of Judge Kotelly -- made
21  before Judge Kotelly.  And again, to encapsulate
22  what I was saying is, your Honor, you have to let

Page 1184

1  the case go forward, and there are other counts.
2  The Wagner v. Taylor case we're seeking permanent
3  injunction.  So you can't just throw the case out
4  now, which never had an evidentiary hearing.  We
5  never had an evidentiary hearing, so how can you
6  dismiss a case before you take evidence and allow
7  for cross-examination, much less she didn't allow
8  for discovery, which I view as very biased and
9  prejudiced in that, in the ordinary course of
10  things, a judge would certainly have granted -- in
11  this circumstance, where a woman alleged that she
12  was virtually on the verge of a nervous breakdown
13  and suicide, to give her a hearing?  It's the
14  least you could do.
15        So, anyway, I filed a notice of appeal
16  on or about the 22nd of -- excuse me, January
17  1st -- excuse me, January 19th, 2011.  Again, I
18  couldn't be in contact with Ms. Kotelly (sic).  I
19  paid for the filing fee myself.  I've never
20  recuperated.  I've never asked for it.
21        Then later, as we identified yesterday,
22  Ms. Kotelly (sic) herself, Mr. Sujat will find

Page 1185

1  that notice of appeal --
2        CHAIRMAN FITCH:  I think you mean Ms.
3  Sataki.  The word "Kotelly" came out of your
4  mouth.
5        THE WITNESS:  Oh.  I'm a little tired.
6        CHAIRMAN FITCH:  Yes, I know.
7        THE WITNESS:  I filed a NOTICE OF
8  APPEAL.  I paid for it myself.  I never asked to
9  be reimbursed.  I couldn't get in touch with her.
10        And then, I testified yesterday, Mr.
11  Sujat, if you can find that exhibit in our
12  supplemental exhibits, the notice of appeal to Ms.
13  Sataki.
14        MR. SUJAT:  I know what you're talking
15  about.  That would be exhibit -- let me give the
16  whole citation here, Respondent's Supplemental
17  Exhibit 4.
18        THE WITNESS:  Can I see that.
19        (Brief pause.)
20        THE WITNESS:  Thank you.
21        This is the notice of appeal which Ms.
22  Sataki filed on her own.  She hadn't called me

12  (Pages 1182 to 1185)

Page 1186

1   about it.  She hadn't called Mr. Shamble, from his
2   testimony.  And there's a notation here from Judge
3   Kotelly, in her handwriting:  "Let this be filed:
4   Judge Collar, C-o-l-l-a-r- C-o-t-e-l-l-y," January
5   27th, 2011.
6        So, there is an important point here in
7   that she claims she instructed people to do
8   nothing, drop all cases with Dan Austin in early
9   August, but that she herself was now appealing the
10  case that had been dismissed by Judge Kotelly.
11  It's totally inconsistent with testimony that she
12  gave with regard to Kathleen Staunton and
13  testimony that she got from me through documents
14  dealing with what Kathleen Staunton was told by
15  Ms. Sataki, that she didn't want to go back to LA,
16  that it was all my idea.
17       There's nothing here that makes sense
18  and it's clear on the record.  Ms. Sataki's
19  testimony was inconsistent and untruthful.
20       MR. SMITH:  Move to strike.  This is
21  all editorial, not testimony.
22       CHAIRMAN FITCH:  That's struck.

Page 1187

1        Let me ask counsel, on this document
2   RSUPX4, which is a notice of appeal signed by
3   Elham Sataki, and part of the notice says, "This
4   14th day of January, 2011," and then --
5        THE WITNESS:  Can I see it, Mr. Sujat?
6        CHAIRMAN FITCH:  And then it says
7   "Received, mailroom, January 20th, 2011."
8        At the top, Mr. Sujat, can you tell
9   what date is being indicated in the court's
10  standard line, at the top of this document?
11       MR. SUJAT:  I might need a magnifying
12  glass.
13       THE WITNESS:  I think I can, your
14  Honor.
15       CHAIRMAN FITCH:  It's printed over.
16       THE WITNESS:  Yeah, it looks to me like
17  it says January 31st, 2011.
18       CHAIRMAN FITCH:  Thirty-one was my best
19  guess.
20       THE WITNESS:  Yes.
21       CHAIRMAN FITCH:  I note for the record
22  that it is difficult to ascertain.

Page 1188

1        Was this a timely notice of appeal?
2        THE WITNESS:  No, I don't believe it
3   was.  She missed the deadline, and that's why I
4   had to file it by the deadline, didn't want her to
5   lose her rights.
6        But it will tell you that she wanted to
7   appeal it, despite what she testified to.  And I
8   couldn't communicate with her and neither could
9   Mr. Shamble.
10       MR. SMITH:  Move to strike.
11       CHAIRMAN FITCH:  I think that motion to
12  strike is denied.  I think it's reasonable in the
13  scope of what was asked.
14       Just remind me, had you filed a notice
15  of appeal from anything at this point?
16       THE WITNESS:  Yes, that's Exhibit 22.
17       CHAIRMAN FITCH:  Twenty what?
18       THE WITNESS:  Twenty-two.  It was filed
19  timely.
20       CHAIRMAN FITCH:  Oh, that's right, this
21  is from December.
22       THE WITNESS:  Right.

Page 1189

1        CHAIRMAN FITCH:  Go ahead, Mr. Sujat.
2        MR. SUJAT:  That's all I have right now
3   on this.
4        THE WITNESS:  No, we're going on to
5   other testimony.
6        MR. SUJAT:  That's all with the
7   pleadings.
8        CHAIRMAN FITCH:  Give me a chance to
9   wrap up my work here.
10       (Brief pause.)
11       CHAIRMAN FITCH:  Returning to your
12  Exhibit RSUPX4...
13       THE WITNESS:  Can I see it, Mr. Sujat?
14       CHAIRMAN FITCH:  You agree that, with
15  respect to the statement, typewritten statement,
16  "This 14th day of January, 2011," if filed on that
17  day, it would have been timely.
18       THE WITNESS:  Yes, but however this was
19  sent -- you actually raised a good point, which I
20  forgot to testify to.
21       It's signed "Elham Sataki, pro per."
22  She would have no way of knowing "pro per."  She

13  (Pages 1186 to 1189)

In Re:  Larry E. Klayman
June 26, 2018

Page 1190

1  wouldn't even know "pro se," because she doesn't
2  have a legal background.  But pro per is the term
3  that's used in California for pro se.
4      CHAIRMAN FITCH:  Mm-hmm.
5      THE WITNESS:  So I'm only supposing
6  here that this was mailed in to the courthouse and
7  it took a while to get to Judge Kotelly and then a
8  while to file it.
9      But whoever was advising her -- and it
10  was likely Ms. Staunton and/or her cousin, Sam
11  Razavi -- obviously they were not giving her good
12  advice.
13      MR. TIGAR:  Mr. Klayman, is VOA or the
14  Broadcasting Board of Governors an agency of the
15  United States?
16      THE WITNESS:  Yes.
17      MR. TIGAR:  So that if they're a party
18  to the proceeding, you have 60 days to appeal,
19  correct?
20      THE WITNESS:  I believe they do.
21      CHAIRMAN FITCH:  Oh, ok.
22      THE WITNESS:  They do, but I don't

Page 1191

1  believe the private plaintiff has 60 days to
2  appeal.  I may be wrong on the government, too.
3      MR. TIGAR:  I'm reading, just so that
4  we're clear, from 4(a)1B of "The notice of appeal
5  may be filed by any party within 60 days if one of
6  the parties is a United States agency."
7      THE WITNESS:  That's a good point, Mr.
8  Tigar.  It shows you that I don't know everything.
9      I did remember that -- actually I was a
10  Justice Department lawyer, so I should have known
11  that.
12      It does raise an important point.  If
13  that's the case -- I have no reason to doubt what
14  you read -- then she had time to pursue the
15  appeal, and she could have done that with whoever
16  was helping her, pro per, pro se, or gotten her
17  another lawyer.
18      But obviously she abandoned the claim.
19      MR. TIGAR:  If I can follow up on that.
20      THE WITNESS:  Yeah.
21      MR. TIGAR:  Later on in October of
22  2011, you wrote a letter to Ms. Sataki, an

Page 1192

1  email -- and I can't right now lay my lands on
2  it -- in which you tell her that she has the 24th
3  of October to do something.
4      Do you recall that?
5      THE WITNESS:  I believe, without
6  looking at it, that was with regard to filing a
7  Title VII action.
8      MR. TIGAR:  I tried to count on my
9  fingers how many months it was since the final
10  action of the ODC, or the OCR.
11      THE WITNESS:  Yeah.
12      MR. TIGAR:  Would you and Mr. Sujat
13  refresh my recollection by finding that document
14  and then I could -- we'll talk about it.
15      THE WITNESS:  Well.  May I do that in
16  the course of my testimony.  During a break we'll
17  find it.
18      MR. TIGAR:  Of course, during a break.
19      What was the date of that?
20      MR. SUJAT:  October 22nd.  I'm not sure
21  of the year.
22      THE WITNESS:  We'll discuss it at

Page 1193

1  lunch.  I was constantly aware.  That's why I
2  wanted to contact her.  She still had rights
3  beyond this case.
4      MR. TIGAR:  I don't want to take time
5  up with it now.
6      THE WITNESS:  Sure.
7      You can proceed, Mr. Sujat.
8  BY MR. SUJAT:
9      Q.   So this next area will be some emails.
10  And Mr. Klayman, I'd like you to look at SX3?
11      A.   I need the book.
12      Q.   Ok, Mr. Klayman, I draw your attention
13  to Bar Supplemental Exhibit 3 and the first page.
14      A.   Yes.
15      Q.   And the first sentence.
16      CHAIRMAN FITCH:  Wait a minute.  I
17  don't think the Bar has a supplemental exhibit,
18  does it?
19      THE WITNESS:  Yes.  That was what they
20  presented the day of trial, a lot of
21  correspondence.
22      CHAIRMAN FITCH:  He said the Bar.  It's

14  (Pages 1190 to 1193)

Page 1194

1  not Bar.
2        THE WITNESS: It is the Bar. It was
3  that package that Mr. Smith provided the first day
4  of trial.
5        CHAIRMAN FITCH: Ok. I apologize, my
6  error.
7        THE WITNESS: Yes, this is an email
8  that I wrote to Ms. Sataki on April 23rd, 2010,
9  and it says, "You do not have to worry about
10  money. I honor my commitments in all respects.
11  Your apartment is prepaid for six months and I
12  will pay any expense that must be paid as I
13  prepare to go to the judge with full ammunition,"
14  meaning, you know, take strong action legally.
15        "I'm not trying to bribe you," blah,
16  blah, blah. "I would be hurting myself if I let
17  this happen."
18        So this is an example of how I was
19  never seeking to be paid back for these expenses.
20  I say doing this pro bono.
21  BY MR. SUJAT:
22        Q. Mr. Klayman, I refer you to SX5 in the

Page 1195

1  same book.
2        MR. TIGAR: Excuse me, before you go to
3  that, would you look again at SX3, and the
4  paragraph that begins, "I am human," and you can
5  read that.
6        What were you trying to convey here
7  about your feelings about your client?
8        THE WITNESS: That I had really strong
9  feelings, believed in her and loved her. And I
10  don't think there's any crime in loving someone
11  and working really hard for them. And it
12  certainly is not a slap at anybody. It's a
13  compliment.
14        So that's what I was trying to convey.
15  I'm human. Things happen in life that you don't
16  expect, and when they do, you have to deal with
17  them.
18        But in this case it actually made me
19  work harder for her. And as Mr. Shamble
20  confirmed, and also when I thought that the
21  relationship was over the top, when she asked me
22  to buy the car and things like that, and got mad

Page 1196

1  at me over trying to help her friend Kaveh, and
2  other issues, then I said, "You know, you've got
3  another lawyer," and I testified that.
4        I might add, in the course of -- I'm
5  not equating this to me, but in a famous case
6  involving William Kennedy Smith, I believe that my
7  friend, Roy Black in Miami, the criminal lawyer,
8  afterwards fell in love with a juror and married
9  her.
10        You know, people are human. It doesn't
11  mean he did anything wrong. He didn't. But
12  that's people decide to love people. You can't
13  really say why that happens. That's a miracle,
14  you know.
15        CHAIRMAN FITCH: Mr. Sujat, continue,
16  please.
17  BY MR. SUJAT:
18        Q. Mr. Klayman, I refer you to SX5, the
19  same book.
20        A. Yes.
21        This is an email that I sent on or
22  about May 8th, 2010 to Ms. Sataki: "Ellie, in case

Page 1197

1  you do not see my text this morning, I thought of
2  someone who can take over your legal
3  representation. His name is Tim Shea. Tim
4  Shamble also knows him and he has experience with
5  clients before VOA. I will ask him to call you on
6  Monday.
7        "Until all is resolved I will sent you
8  a check every two weeks the equivalent of your
9  paycheck. Your rent is paid for six months, and
10  if you need help I will pay beyond that.
11        "I wish you, your family and Kaveh" --
12  that's her friend that she had lived with in DC.
13  She asked me to help, and I helped Kaveh. "The
14  best -- this is in your best interest."
15        THE WITNESS: So that's what I'm
16  saying, Mr. Tigar, you know, is that I felt we
17  needed to get somebody else in there to represent
18  her, for everyone's interest.
19        CHAIRMAN FITCH: Go ahead. Keep going.
20        THE WITNESS: And it also underscores
21  again that I wasn't going to let her sink. I was
22  taking money out of my own pocket, which

Page 1198

1  ultimately later caused me a lot of financial
2  issues personally, and I've never asked to be paid
3  back.
4
5  BY MR. SUJAT:
6      Q.  Mr. Klayman, I refer to you Exhibit
7  SX10.
8      A.  Yes.
9          That's an email I sent on May 19th,
10  2010, to Ms. Sataki.  It stated here, "I'm working
11  on your case tonight with Vanessa and Alice, so
12  I'm still in the office."  They were helping me
13  legally as assistants.  "I told you that we had to
14  wait until your convalescence was over since VOA
15  and I would reevaluate your request to be in LA at
16  that time.  I told you I would reimburse your pay
17  so you would not sink during this period if we did
18  not get VOA to reverse its position."
19          This shows two things: One, that I was
20  not going to let her thing, and I was not going to
21  ever ask her to pay the expenses.  It's part of
22  the whole continuing to tell her that.  It also

Page 1199

1  deals with the fact that she knew I was in LA.
2  That's where I was, and she met in the office from
3  time to time with Vanessa and with Alice, and me.
4          So she certainly knew where to find me
5  if she wanted to.
6      Q.  Mr. Klayman I refer you now to a
7  different book.  This would be Bar Exhibit 23 and
8  SUP Exhibit 2.
9      A.  Yes.
10          CHAIRMAN FITCH:  Which book are we in?
11          MR. SUJAT:  This would be the Bar
12  exhibit, the blue book.
13          CHAIRMAN FITCH:  Go ahead.  What
14  exhibit number?
15          MR. SUJAT:  And I refer you to Exhibit
16  2 and 23.
17          THE WITNESS:  You mean the page number
18  two?
19          MR. SUJAT:  Well, it's 23-11.
20          CHAIRMAN FITCH:  I'm sorry, are we on
21  Exhibit 23 in the Bar's exhibits?
22          MR. SUJAT:  Correct, your Honor.

Page 1200

1          CHAIRMAN FITCH:  So it's not two.
2          MR. TIGAR:  Are we at Page 12 of that
3  exhibit?
4          MR. SUJAT:  Yes, your Honor, 23-12.
5  Now I'm referring to an article that was posted
6  December 25th, 2010.
7          THE WITNESS:  Yes.
8          With regard to this article -- and what
9  I wanted to point out is that this article was
10  written on December 25th and, like all the other
11  articles, was extremely complimentary of Ms.
12  Sataki.  It didn't reveal any confidential
13  information that was already out there -- that was
14  not already out there that she had a approved.
15          We had testimony yesterday from Mr.
16  Shamble that they went up actually with the first
17  article I had written to try to get media
18  attention to try to coerce or coax, I should say,
19  Voice of America into a settlement.
20          But what's important here, the date,
21  December 25th, this was I think the last article
22  that I had written.  It's part of the articles

Page 1201

1  entered into evidence and it was written before --
2  I still could not get in touch with Ms. Sataki,
3  and again I was getting things from her which
4  clearly did not come from her.  We found out
5  during her testimony that Kathleen Staunton and
6  her cousin were behind things.  And that's why
7  when January 23rd Mr. Shamble calls her -- or
8  sends her an email and says -- and we went through
9  that testimony, I won't belabor it, "Please
10  contact us.  We need to know what to do," contact
11  Mr. Klayman, but she could have also contacted
12  him.
13          So it was still in that period of
14  Never-never Land, so to speak, where I didn't feel
15  I had been terminated, because I was getting stuff
16  from other people and it was so contradictory that
17  I needed to talk to her.
18          But I was still trying to advance her
19  interests, and this is extremely complimentary of
20  her.  There's nothing confidential.
21          Now, there is a statement in the
22  Specification of Charges.  It speaks for itself,

16  (Pages 1198 to 1201)

Page 1202

1   that somehow I was promoting myself with my book.
2        Well, WorldNetDaily had bought about
3   200 copies of my book.  So they were inserting
4   this into my columns, trying to sell the books
5   themselves.  I wasn't tying to sell the book for
6   my columns.  It was WorldNetDaily who bought the
7   books and inserted them.
8        When I sold them the books, I didn't
9   know what they were going to put in there.  They
10  put in advertisements.  That's how they pay for
11  their website.  But it's not me soliciting for to
12  buy my book there, so that's important.
13       CHAIRMAN FITCH:  Which portion or
14  paragraph of this article are you referring to?
15       THE WITNESS:  Yeah, maybe I'm talking
16  about another article, actually.
17       CHAIRMAN FITCH:  Alright.
18       MR. SUJAT:  Yeah, it wasn't in this
19  article, but in the later article, and some of
20  them, the Republican Establishment and Revolution,
21  "Larry Klayman Sees GOP Kingpin Still in Control
22  Despite Tea Party Victories."  So, it not only

Page 1203

1   shows that I'm nonpartisan and very critical of my
2   own technically registered party, the republican
3   party, they way they act sometimes.  I'm
4   nonpartisan.
5        In this one you'll see going down, it
6   says "Get Larry Klayman's "Fascinating Encounters
7   With the Powers That Be: Whores - How I Came to
8   Fight the Establishment.'"
9        So that was WorldNetDaily advertising
10  it, not me.
11       MR. TIGAR:  At the time you wrote this,
12  did you still have a belief that Ms. Sataki had
13  meritorious claims of sexual harassment and the
14  related claims?
15       THE WITNESS:  Yes.  Yes, and, you know,
16  up to today, you know, in hearing her testimony,
17  and I don't mean again to be provocative, but to
18  editorialize, but to hear how untruthful it was,
19  in my opinion, and I now question, as of today,
20  the voracity of her claims of sexual harassment.
21       CHAIRMAN FITCH:  Mr. Sujat, go ahead.
22  BY MR. SUJAT:

Page 1204

1        Q.  Next article is dated September 30th,
2   2011.
3        A.  Yes, this is -- I can say this --
4        CHAIRMAN FITCH:  What exhibit number is
5   this?
6        MR. SUJAT:  This is still 23.
7        MR. TIGAR:  What page number?
8        MR. SUJAT:  It's the next one, 23-14.
9        THE WITNESS:  Yes, I just testified to
10  that.  That's it.  So I have no further testimony
11  on that.
12       CHAIRMAN FITCH:  Ok, next.
13  BY MR. SUJAT:
14       Q.  And then the next one, 23-16.
15       A.  Yes.
16       That's THE October 14th article.  Again
17  I make passing reference to the situation at Voice
18  of America.  Again it's very complimentary of Ms.
19  Sataki.  There's nothing that's confidential.  And
20  I was not trying to sell my book there.
21  WorldNetDaily was trying to sell books that they
22  had purchased and owned.

Page 1205

1        And I'm not promoting my self-interest
2   in any of these articles.  I'm promoting the
3   interests of Ms. Sataki and what I believe in in
4   terms of freedom in Iran, and she believed in
5   that, too, and so did the other broadcasters at
6   BOA that I represented, and continued to represent
7   at that time.
8   BY MR. SUJAT:
9        Q.  Mr. Klayman, I next refer you to an
10  article, same day, October 14th, 2011, and it's on
11  Page 23-19.
12       A.  This was posted October 1st, 2010.
13       Q.  Posted October 1st, 2010.
14       A.  That's correct.
15       So essentially it's the same testimony
16  as before, that everything I said was
17  complimentary to Ms. Sataki, not confidential.  I
18  was trying to promote her interest, still trying
19  to bring about the possibility of a settlement.  I
20  never kept -- I never stopped trying, because I
21  believed so much that this was the right thing to
22  do.  People really paid attention and cared.  But

17  (Pages 1202 to 1205)

In Re:  Larry E. Klayman
June 26, 2018

Page 1206

1  in this town sometimes that doesn't happen in
2  particular.  Or in other towns, but here there
3  seems to be sometimes politics that enter into
4  things, from my experience in 40 years.  But
5  that's what it was about.
6      In this particular article there's no
7  reference to my autobiography.
8      Q.  I refer you to the next article, posted
9  July 2nd, 2010.  It's on Page 23-22.
10     A.  Yes.  This is called "The Ultimate
11 Freedom Fighter: Larry Klayman Chronicles His
12 Transformation into Jewish Follower of Christ."
13 This gets into the testimony previously.  I won't
14 repeat it, belabor it.  I'm very proud, very happy
15 that I've had two experiences where he came to me
16 and spoke to me, and I'm saying that there is
17 something that influenced a lot of what I do and
18 how I'm able to take on powerful forces and not
19 worry about what can happen to me, because I
20 believe he is with me.  He said he was.  And I
21 believe that, obviously, coming from the Son of
22 God.

Page 1207

1      And this -- I might say I'm not the
2  only person in world history that he's ever come
3  to and talked to directly.  With regard to my
4  Jewish background, God obviously had a pretty good
5  line of communication with Moses.
6      And then again the book is being sold
7  by WorldNetDaily on the site, not me.
8      Q.  Mr. Klayman, I now refer you to the
9  article posted June 11th, 2010 is the next one.
10     A.  Yes.
11     Q.  It's Exhibit 23-25.
12     A.  That's posted June 11th, 2010, and
13 that's my article about "Cockroaches and Judges."
14     There was no disrespect to the many
15 fine people that are on the judiciary, whom many
16 of them are my friends at this point, including
17 Judge Royce Lamberth, who I had many cases with,
18 and Judge Sanders Sauls in Tallahassee, who is
19 retired, and people like that.  But I tried to
20 bring humor to it.  I made a joke.
21     Actually I've done standup comedy
22 before in my life.  I don't know if anybody found

Page 1208

1  me funny.  That's probably why I'm a lawyer.
2      This is what I was talking about and I
3  was talking about the injustice here that had
4  occurred.
5      So that's what this article is about.
6      Again, I'm not selling my book.  It's
7  WorldNetDaily selling the books that they owned.
8      And again I make reference to Judge
9  Sporkin in 23-16.  There are very few Judge
10 Sporkins alive on the bench these days, and I get
11 into the politics that give rise to judges being
12 appointed and confirmed.  And I, myself, just to
13 say, it just didn't arise here, but I actually
14 recommended different ways to choose judges.  It's
15 that I think that our founding fathers were
16 extremely intelligent, enlightened by God, but
17 they didn't get everything right.  They weren't
18 God.  And I think it was just a mistake, just to
19 be short, to give them life tenure and not have
20 them accountable for anything that they do.
21     Because, as we know, either -- your
22 only resource is to file a motion for

Page 1209

1  disqualification or a complaint with the Judicial
2  Council.  And the Judicial Council is composed of
3  judges who are in the same courthouse, or friends
4  of the judge at issue, are not going to recommend
5  any kind of remedial action with regard to their
6  colleague.  I've never seen it happen.
7      And I also tried that with Kotelly,
8  too.  I wanted her colleagues to correct this,
9  using that mechanism.
10     So, just to be brief, I recommended
11 that we have independent panels that recommend
12 judges, that they serve two full terms of five
13 years each, renewable for good behavior.
14     MR. TIGAR:  I want to make clear that,
15 at least as far as I'm concerned, that the way the
16 federal judges are selected and confirmed really
17 has nothing to do with the issues in this case --
18     THE WITNESS:  I agree.
19     MR. TIGAR:  -- and our respective views
20 don't matter.
21     THE WITNESS:  Ok, but --
22     MR. TIGAR:  My son is a United States

18  (Pages 1206 to 1209)

Page 1210

1  judge who was chosen through this process, and I
2  want to make clear that --
3       THE WITNESS: Yeah --
4       MR. TIGAR: -- that didn't have any
5  impact on what's going on.
6       THE WITNESS: I'm sure he's a fine
7  judge.
8       Yes, and there are many fine judges who
9  were selected through that process. But there
10 were other judges who were selected based on
11 politics.
12      It's no reflection on your son.
13      MR. TIGAR: No, I didn't take it to
14 mean that. I just wanted to make it clear that
15 that has nothing to do with the burden here.
16      THE WITNESS: I'm sorry if I made it an
17 issue.
18      But there are many fine judges. Judge
19 Lamberth is one and Sullivan is another. He came
20 through that process. Judge Sporkin, he's
21 another.
22      But I do believe we need a system, and

Page 1211

1  I'll be brief, that he takes the politics out.
2       CHAIRMAN FITCH: Now that Mr. Klayman
3  has completed that answer, that answer is struck.
4       THE WITNESS: Ok.
5       CHAIRMAN FITCH: I think that we are
6  not going to finish the rest of the articles -- I
7  think we're going to finish them fairly quickly,
8  but if you don't mind, it's been a long time, and
9  we'll take a 12-, 15-minute break here at 11:29,
10 and then we will go to roughly 1:00 p.m., if
11 that's alright with everybody.
12      We stand in recess.
13      THE WITNESS: Thank you.
14      (Recess taken.)
15      CHAIRMAN FITCH: We are returning to
16 the record from our 11:29 break here at 11:46, and
17 I think Mr. Sujat is ready to resume his
18 examination, if I'm not mistaken.
19      MR. SUJAT: Yes, thank you, your Honor.
20 BY MR. SUJAT:
21      Q. Mr. Klayman, I refer you to the --
22      A. Mr. Sujat, let's finish the articles,

Page 1212

1  first.
2       Q. Yes, that's what I'm going to do.
3       A. And where were we?
4       Q. I believe we finished up the one that
5  was called -- or the one that's dated --
6       CHAIRMAN FITCH: We last had testimony
7  on DS-25.
8       MR. SUJAT: Yes, 23-25.
9       THE WITNESS: And let me add to that,
10 and with regard to Mr. Tigar's observations, that
11 I actually believed judges are our most important
12 public servants, and I've written about them a
13 lot. That's no pandering. And they protect us
14 from the tyranny of the other two branches of
15 government. I'm not one of those conservatives
16 that believes that judges are inferior to the
17 other two branches of government. In fact I think
18 they're more important.
19      CHAIRMAN FITCH: Are we ready to go to
20 DSX27?
21      MR. SUJAT: Yes.
22      CHAIRMAN FITCH: DSX23-27. What's your

Page 1213

1  question?
2       MR. SUJAT: Yes.
3       THE WITNESS: You asked me about the
4  next article. It's May 28th, 2010, and it's "Man
5  the Barricades."
6       I want to point out with WorldNetDaily,
7  I'm not an owner of WorldNetDaily. I don't
8  benefit from them selling my books in anyway.
9  They keep the proceeds.
10      This is another article that I wrote:
11 Truthful, complimentary of Ms. Sataki; nothing
12 confidential.
13      And then turning to the next article,
14 "A Voice for Persian Freedom," this was one of the
15 first articles, May 21st, 2010. That's at 23-30.
16      23-32, same testimony as the prior
17 testimony about regard to the columns that I
18 wrote, articles, whatever you want to call them.
19      And then we have May 14th, 2010, "The
20 Government War on a Freedom-Loving Beauty: Larry
21 Klayman Goes to Bat for Harassed Broadcaster
22 Fighting for a Free Iran;" extremely

19  (Pages 1210 to 1213)

Page 1214

1    complimentary.
2         Ms. Sataki knew of this and the other
3    articles which I sent to her.  This is the one
4    where Mr. Shamble, along with Ms. Sataki, took to
5    an event to promote her case and to try to coax
6    the government into a favorable settlement.
7         Same testimony as the prior testimony
8    with regard to the columns and the articles.
9         Then there's one written by someone, a
10   reporter at WorldNetDaily, Rob Unruh, May 11,
11   2010: "Lawyer Accuses VOA Manager of Pro-Iranian
12   Bias.  Claims Emerging Lawsuit Over Six
13   Discrimination Allegations.
14        Again, this is what Ms. Sataki wanted
15   to alleviate, along with her other broadcasters.
16   This is what they were there for, and they were
17   broadcasting into Iran, which, you know, created
18   some risk for them.  So it really didn't hinge on
19   the publicity with regard to her trying to get a
20   settlement in her case.
21        And I might also add, this was
22   testimony by her.  This is important --

Page 1215

1         CHAIRMAN FITCH:  Well, wait a minute.
2         THE WITNESS:  Sorry, I'm going too
3    fast?
4         CHAIRMAN FITCH:  Yes, you are.
5         A moment ago, did you testify that you
6    do not receive any remuneration from the sale by
7    this publisher of books that you have written?
8         THE WITNESS:  Correct.
9         CHAIRMAN FITCH:  And did you receive
10   any remuneration associated with these articles?
11        THE WITNESS:  At one point I did.
12        CHAIRMAN FITCH:  Any tangible
13   remuneration.
14        THE WITNESS:  Intangible?
15        CHAIRMAN FITCH:  Tangible, like money.
16        THE WITNESS:  Yes, at one point I did.
17   I don't believe I was during this period of time.
18   Later, I had an agreement when I represented
19   WorldNetDaily in a lawsuit that one way they could
20   compensate me was to pay me $100 per article, but
21   that occurred after this article was written.
22        CHAIRMAN FITCH:  Was that related to

Page 1216

1    Ms. Sataki's case?
2         THE WITNESS:  No.
3         What happened was, Esquire Magazine had
4    allegedly defamed the publisher of WorldNetDaily,
5    Joseph Farah, and a writer called Joseph Corsi,
6    and --
7         CHAIRMAN FITCH:  But that was after --
8         THE WITNESS:  That was afterwards, yes.
9         CHAIRMAN FITCH:  Alright.  So is it
10   correct that you received no remuneration for or
11   in association or connection with this group of
12   articles?
13        THE WITNESS:  That is correct.
14        CHAIRMAN FITCH:  And is it true that,
15   at least during this period of time that's
16   relevant to this case, that you received no
17   remuneration from this publisher for books by you
18   that they published?
19        THE WITNESS:  Correct.  Correct, that
20   Larry Klayman did not.
21        CHAIRMAN FITCH:  Ok.  Mr. Sujat.
22   BY MR. SUJAT:

Page 1217

1         Q.  Yes, next article is posted May 11th I
2    think.
3         CHAIRMAN FITCH:  What page is it on?
4         MR. SUJAT:  23-36.
5         THE WITNESS:  Yes, I just identified
6    that.
7         CHAIRMAN FITCH:  Wait a minute.  Don't
8    interrupt him.  I can't hear him.
9         Twenty-three dash what?
10        MR. SUJAT:  Thirty-six, 23-36.
11        CHAIRMAN FITCH:  I have Mr. Klayman's
12   testimony in that connection.
13        THE WITNESS:  The next article then in
14   this exhibit --
15        CHAIRMAN FITCH:  Well, actually I want
16   some more testimony about that article.
17        Did you arrange with Mr. Unruh, the
18   author of the article, or prompt Mr. Unruh to
19   write this article?
20        THE WITNESS:  Yes, I talked to him
21   about it and I thought it would be helpful, to try
22   to settle Ms. Sataki's case.

20  (Pages 1214 to 1217)

Page 1218

1      CHAIRMAN FITCH: Mr. Sujat.

2

3  BY MR. SUJAT:

4      Q.  Mr. Klayman, I refer you to the article

5  posted with the date April 30, 2010.

6      A.  Correct, that's "How to Free the

7  Iranian People" --

8      CHAIRMAN FITCH: I have to interrupt

9  you. For the record, this appears at DSX23-41.

10     MR. SUJAT: Mm-hmm.

11     CHAIRMAN FITCH: Go ahead.

12     THE WITNESS: It's titled "How to Free

13 the Iranian People."

14     I really admire the Iranian people. I

15 think that's pretty clear in everything I write.

16 And I have many, many friends in the community,

17 other than clients. And this was trying, again,

18 to advance the cause of Ms. Sataki who believed in

19 American -- in freedom and really held herself out

20 for that.

21     I was going to add something that I

22 forgot to testify to yesterday, that, when she

Page 1219

1  said that she had been threatened and that they

2  had posted her picture on websites with

3  pornographic images, not only did I take her to

4  the FBI on that -- that was the reference to the

5  FBI. I didn't use the FBI to investigate her or

6  any of her family or friends.

7      She believed -- she told me that she

8  believed it was coming from the harasser,

9  Falahati, and the manager Sajadi, Ali Sajadi. And

10 Sajadi, as she had advised me and other

11 broadcasters had advised me, his father lived in

12 Tehran and was advisor to the supreme leader, the

13 Ayatollah Khomeini, and consequently that

14 activity -- that's why I asked the FBI to

15 investigate -- would have occurred regardless of

16 any publicity that was trying to further her case

17 and get a settlement, because they knew of her

18 claims against them, both in terms of the internal

19 complaints that had been filed initially by her

20 with the Office of Human Resources, and then with

21 OCR, Office of Civil Rights, and then in court.

22     So, if they were going to retaliate,

Page 1220

1  they already knew about that. And she firmly

2  believed -- she told me that it was Falahati and

3  Sajadi that were behind that. This was the way to

4  try to intimidate her to get her to back off her

5  claims.

6      CHAIRMAN FITCH: And I note, Mr.

7  Klayman, that there is a group of articles from --

8  that the articles as they are put into

9  Disciplinary Counsel's exhibit book are in reverse

10 chronological order.

11     So now that we have reached the end of

12 those articles at DSX23-41, there are five

13 articles between April 30 and May 28. And then

14 there's another one just a few days later on June

15 11th. So that's six articles in a month and 11

16 days.

17     Why was there that flurry?

18     THE WITNESS: Well, because I write a

19 column every week, every Friday.

20     CHAIRMAN FITCH: Well, that's fine, but

21 why was that there at that point?

22     THE WITNESS: Oh, because I'm still

Page 1221

1  trying to settle this thing. I'm trying to get

2  them to agree to give her what she wanted, and

3  we're trying also --

4      CHAIRMAN FITCH: Was this period that I

5  just referred to sort of the height of the active

6  settlement, including engagement with the other

7  side?

8      THE WITNESS: Yeah, they continued

9  on --

10     CHAIRMAN FITCH: Ok.

11     THE WITNESS: They continued on. Mr.

12 Shamble continued to attempt that.

13     And if you look at Exhibit 21 --

14     CHAIRMAN FITCH: Well, I'm not ready to

15 look at that.

16     THE WITNESS: Ok.

17     CHAIRMAN FITCH: And then there are

18 articles a month later on 7/2 and then three

19 months later, 10/1, and 10/15, and in between that

20 there was one on nine, nine as in September, 30.

21     What was the reason for the more

22 intermittent articles in that time?

21 (Pages 1218 to 1221)

In Re:  Larry E. Klayman
June 26, 2018

Page 1222

1        THE WITNESS:  As I just testified, that
2    we were still pursuing this.
3        And what I was going to refer to that I
4    hadn't testified to was Exhibit 21 of Bar
5    Counsel's exhibits, and that's not supplementary,
6    but the actual one.  The order, the final order of
7    Judge Kotelly came down with regard to all of
8    these matters on December 21st, 2010.  So these
9    all, except for that one article about Christmas,
10    written before that time period.  This was still
11    ongoing into the courts.
12        And I was also hoping, not just to
13    influence Voice of America, but also to
14    influence -- because publicity does drive judges,
15    unfortunately, and they're good judges, such as
16    Mr. Tigar's son, and Mr. Sporkin and Judge
17    Lamberth and others, and Judge Sullivan who was
18    Clinton appointee, I have a great deal of respect
19    for -- they read the press.  And that's the
20    reality of life.  Everybody reads the press these
21    days and their decision-making can be influenced
22    by what's out there in the media.

Page 1223

1        That's why we see a lot now with regard
2    to the investigations of Robert Muller on both
3    sides.  And also, you know, the prosecutions of
4    Paul Manafort and others, on both sides.
5        So that's what I was doing.  I had a
6    dual purpose, and I do write a column every
7    Friday, and I also write for News Max.  I have a
8    blog on News Max.  That's recently.  That wasn't
9    during this period, at all.  That was much later.
10        So I'm a writer.  I love writing.
11        CHAIRMAN FITCH:  Mr. Sujat, have we
12    finished the articles?
13        MR. SUJAT:  I believe so.
14        THE WITNESS:  Yes.  I want to add one
15    other thing, though.  I want to go back to Exhibit
16    21 of the judge's order, last order.
17        And I believe I'm correct with regard
18    to my prior testimony, but I started thinking
19    about this, because this case is eight years old,
20    and memories fade, that this may have been the
21    trigger point when I crashed my car, after that
22    final order came out on December 21st, 2010.

Page 1224

1        So I just wanted to point that out.
2    I'm not 100 percent sure that the earlier order on
3    June 1st was the day I had the auto accident.  I
4    just wanted to say that.
5        But I was very upset both times, and I
6    felt badly for Ms. Sataki, and I felt badly,
7    frankly, for the American justice system.
8        CHAIRMAN FITCH:  Where are we going
9    from here, Mr. Sujat?
10        MR. SUJAT:  I have some other things
11    I'd like Mr. Klayman to look at.
12    BY MR. SUJAT:
13        Q.  I refer you to the transcript of Ms.
14    Sataki dated May 31st, 2018, on Page 332, lines
15    five through nine.
16        MR. SMITH:  I'd like a proffer about
17    where we're going about what the live testimony is
18    going it be, about the prior testimony of Ms.
19    Sataki.
20        CHAIRMAN FITCH:  Start over again,
21    there, Mr. Sujat, for the slow guy here.
22        MR. SUJAT:  I would like to refer Mr.

Page 1225

1    Klayman to the transcript where Ms. Sataki makes
2    some statements on Page 332.  I think it's very
3    relevant to his case, and it, you know, shows a
4    pattern.
5        CHAIRMAN FITCH:  Well, you can save
6    your argument.
7        MR. SUJAT:  Yes.
8        CHAIRMAN FITCH:  I think asking Mr.
9    Klayman about facts asserted by Ms. Sataki is
10    perfectly legitimate.
11        MR. SMITH:  I do, too, but I don't
12    think that they need to refer to the transcript.
13    If they have specific questions from specific
14    subject matters --
15        CHAIRMAN FITCH:  No, no.  It's not
16    uncommon to use a transcript to ask the witness so
17    and so, so and so.
18        So let's see where we go.
19    BY MR. SUJAT:
20        Q.  I would like to know, Mr. Klayman, what
21    you think about that.  I'd like you to read that.
22        MR. SMITH:  Objection, that's a vague

22 (Pages 1222 to 1225)

Page 1226

1  question, what he thinks about that.
2      CHAIRMAN FITCH:  Ok, Mr. Smith, I'm
3  with you.  That question is struck.
4      What page of the transcript?
5      MR. SUJAT:  It's on Page 332.
6      CHAIRMAN FITCH:  Do you have a copy of
7  the transcript.
8      MR. SUJAT:  That's the only one I have.
9      CHAIRMAN FITCH:  Walk over there,
10  please, take the transcript, and read into the
11  record what you wish to ask Mr. Klayman about, so
12  that we all know.
13      CHAIRMAN FITCH:  Someone needs to tell
14  me what page and what lines I'm going to hear.
15      THE WITNESS:  Page 332.
16      CHAIRMAN FITCH:  And what lines am I
17  going to hear?
18      THE WITNESS:  Lines five to nine.
19      CHAIRMAN FITCH:  Ok.  And this is Ms.
20  Sataki's testimony, correct?
21      THE WITNESS:  Yes.
22      MR. SUJAT:  Correct.

Page 1227

1      CHAIRMAN FITCH:  What does that
2  testimony say?
3      THE WITNESS:  It's dealing with and
4  I'll just characterize it --
5      CHAIRMAN FITCH:  No, no, read me the
6  testimony.
7      THE WITNESS:  "I was sobbing to every
8  person" --
9      CHAIRMAN FITCH:  I can't hear you.  I'm
10  seventy-five years old.
11      THE WITNESS:  I'm sorry.  I'm only
12  seven behind you.  Your eyes may be better than
13  mine.
14      CHAIRMAN FITCH:  Read it clearly, Mr.
15  Klayman.
16      THE WITNESS:  "I was sobbing to every
17  person I was talking at the time, because I was
18  going through a deep depression and every time I
19  talk about that, I would cry.  That's just how it
20  was, not only with you, but with everybody."
21      CHAIRMAN FITCH:  Do you recall what
22  time period she was referring to in that testimony

Page 1228

1  when she said, "that time"?
2      THE WITNESS:  What I believe is it was
3  from the very inception, from the date I met her
4  and had dinner with her at Clyde's Restaurant.
5  That was my experience, that she would just break
6  down in tears, before anything happened, you know,
7  she testified to with regard to our legal and
8  otherwise friendship, relationship.
9      CHAIRMAN FITCH:  And what is your
10  question about that testimony?
11  BY MR. SUJAT:
12      Q.  Well, my question is, is that your
13  experience of what, you know --
14      A.  Yes.  As I just testified to, this
15  condition had nothing to do with me.  I mean, it
16  was existent the very first day I met her.
17      And, you know, it shows that I'm not
18  a -- I'm not a psychologist, and no disrespect,
19  that she wasn't terribly stable.
20      Q.  In that regard I also refer to
21  Respondent's Exhibit 30, Supplemental Exhibits 1
22  and 2.  Those are the emails relating to Ms.

Page 1229

1  Allred.
2      A.  Can you show me those, please.  Yes, we
3  went through this yesterday with Ms. Allred.
4      MR. SMITH:  What exhibits are we
5  looking at?
6      THE WITNESS:  Respondent's Exhibit 2.
7  It's the email --
8      CHAIRMAN FITCH:  Wait a minute.  Are we
9  in the white book?
10      MR. SUJAT:  These are supplemental to
11  the white book, yes.
12      THE WITNESS:  Your Honor, those are not
13  our exhibits.  We can put them in a binder for you
14  tonight, to make it easier for you.
15      CHAIRMAN FITCH:  Thank you.
16      Alright, this document has, at the top
17  of it, the denomination RSEX.2.
18      MR. SUJAT:  Right.
19      CHAIRMAN FITCH:  Ok.  And what do you
20  want me to look at.
21      THE WITNESS:  And as we identified with
22  Ms. Sataki, at the bottom, the email that was sent

23  (Pages 1226 to 1229)

In Re: Larry E. Klayman
June 26, 2018

---

Page 1230

1  to Ms. Allred, who she identified, for Ms. Sataki,
2  on March 23rd, 2012, at 10:05 in the evening,
3  "Subject: Please let me meet you." This earlier
4  testimony is about her instability and dramatizing
5  her situation is also seen in this email.
6      And, for instance, "All my hope
7  regarding my case died and I'm on medication and
8  go to my therapist every week, just so I can stay
9  alive. And my mom -- and I love my mom the same
10  way your dotter" -- (sic), d-o-t-t-e-r, I think
11  she means daughter -- "loves you." This kind of
12  drama and --
13      I mean, this is a long time after I
14  stopped representing her. And this was Ms.
15  Sataki. It wasn't my doing that she's this way.
16  And she apparently likes -- you know, tries to
17  bring people in to help her and into her fold by
18  being the victim and telling them that she's going
19  to kill herself or she's going to die, or
20  whatever. And that even came out -- that approach
21  came out recently with correspondence which was
22  submitted by Bar Counsel when I was trying to get

---

Page 1231

1  a 30-day continuance rescheduling, the drama, the
2  overstatement, trying to play on people's
3  sympathies.
4      You know, I was lured in. I was lured
5  in. I believed in her case and I believed in her
6  case. And I did everything I could, and I still
7  wish her the best, despite everything.
8      CHAIRMAN FITCH: I had noted also the
9  March 23, 2012 date of this email.
10     Am I correct that your examination of
11  Ms. Allred yesterday pertained to contacts with
12  Ms. Allred in 2010?
13     THE WITNESS: Correct.
14     CHAIRMAN FITCH: Ok.
15     THE WITNESS: That's correct.
16     CHAIRMAN FITCH: And with respect to
17  this March 23, 2012 email, were you aware of this
18  communication --
19     THE WITNESS: I was not.
20     CHAIRMAN FITCH: -- from Sataki to
21  Allred? Were you aware in 2012 of this email?
22     THE WITNESS: I was not. And

---

Page 1232

1  apparently, lack of a better word, it was bang,
2  bang. There was a communication at 10:05 p.m.,
3  and Ms. Allred responded on March 23rd, same day,
4  ten minutes later. I never found out about it. I
5  just learned of it recently.
6      CHAIRMAN FITCH: Go ahead, Mr. Sujat.
7  BY MR. SUJAT:
8      Q.  Mr. Klayman, I'm going to refer you to
9  the transcript for Ms. Sataki, and this is May
10  30th, 2018, Page 200.
11      Would you please read this and
12  explain --
13      CHAIRMAN FITCH: What lines?
14      MR. SUJAT: These would be lines one
15  through five.
16      THE WITNESS: Mr. Sujat, if you can
17  please show me that, because I don't have that. I
18  have May 31st, 2018.
19      CHAIRMAN FITCH: Question and answer,
20  please.
21      MR. SMITH: For the benefit of us who
22  don't have the transcript, if you could read the

---

Page 1233

1  testimony into the record.
2      THE WITNESS: Yes, I will.
3      This is part of a question that was
4  asked by Mr. Smith on Page 199, the preceding
5  page, "Under what circumstances was it that you
6  got around to sending me that package of emails
7  that you recently sent to me?"
8      These are his supplemental exhibits.
9      And as part of that answer, which is
10  quite a long answer, she says, "I wanted" -- she's
11  characterizing the situation --
12      MR. SMITH: Well, objection. Either
13  read it into the record or you're going to do --
14      CHAIRMAN FITCH: I want it read in the
15  record, word for word.
16      THE WITNESS: Alright. The answer is,
17  "As you can see, this whole thing happened eight
18  years ago, and when I was finally rescued from Mr.
19  Klayman, I at that point was homeless, had no job,
20  and I slept in my car two nights later on. So my
21  focus during the last eight years was to recover
22  economically and get a job, and the only way that

---

24 (Pages 1230 to 1233)

Page 1234

1  I could survive and my doctors to help me not to
2  take so much medication, in a way maybe I think I
3  just brushed everything under the rug and put
4  everything aside so I can survive, because
5  otherwise there was a time that I was -- I wanted
6  to take my life, and that's how I wanted to have
7  revenge against Mr. Falahati and Mr. Klayman,
8  because I felt that those two, and --  and I had a
9  will, and I had all the evidence and the papers
10  there, and once I died, people are going to come
11  and see what they did to me, because I didn't have
12  the strength to do it and go through everything,
13  and I didn't for the past eight years."
14       CHAIRMAN FITCH:  Ok, now tell me what
15  lines you read from Page 200.  You've read more
16  than one to five.
17       THE WITNESS:  I've read lines from Page
18  199, line one, through and including lines five on
19  200, Page 200.
20       And your Honors, that's consistent with
21  Ms. Sataki in that she's always trying to explain
22  what she does -- from my experience, and what I've

Page 1235

1  heard -- is she's the ultimate victim, and that
2  was the way she explained not looking at documents
3  earlier to you.
4       It's clear that what she wanted was to
5  have revenge against Mr. Falahati and Mr. Klayman,
6  and this Bar Counsel proceeding, in all respect,
7  is not here to mete out revenge.
8  BY MR. SUJAT:
9       Q.  Mr. Klayman, I refer you to Exhibit D1,
10  Bar Exhibit D1, or Bar 1.
11       A.  Ok.
12       Q.  Mr. Klayman, would you please --
13       A.  Yes, this is Respondent's Answer and
14  Affirmative Defenses to Specification of Charges,
15  which denies the allegations of the Specification
16  of Charges and attaches and incorporates by
17  reference --
18       CHAIRMAN FITCH:  Alright, once again,
19  my DX1 is the initial inquiry.  It's a letter from
20  Sataki.
21       THE WITNESS:  Oh.
22       MR. SUJAT:  This is not SX.  This is D.

Page 1236

1       THE WITNESS:  Yes, it's the original
2  blue exhibit book.
3       MR. TIGAR:  Oh, it's exhibit number D
4  as in dog.
5       MR. SMITH:  No, I think they're
6  referring to a different Exhibit 1.  I could being
7  wrong.
8       CHAIRMAN FITCH:  In your book, Mr.
9  Smith, there's A, B, C, D?
10       MR. SMITH:  Right.
11       CHAIRMAN FITCH:  And D is denominated
12  Respondent's Answer and Affirmative Defense to
13  Specification of Charges.
14       MR. SMITH:  Correct.
15       CHAIRMAN FITCH:  I think that's what
16  we're talking about.
17       MR. SUJAT:  No, it's the tab number one
18  right after that.
19       CHAIRMAN FITCH:  Behind the tab that
20  says one?
21       MR. SUJAT:  Correct, your Honor.
22       CHAIRMAN FITCH:  Ok.  In my book,

Page 1237

1  page --
2       MR. SUJAT:  It would be Page 1.1 and
3  1.2, or 1-1 and 1-2.
4       CHAIRMAN FITCH:  Alright.  Those are
5  documents executed by Sataki.
6       What's your question?
7  BY MR. SUJAT:
8       Q.  And my question is, Mr. Klayman, what
9  is the complaint at that time?
10       A.  I'm sorry, I may still be -- oh, here
11  it is.  It's Exhibit 1 -- it's Exhibit 1 you're
12  looking at?
13       Q.  Yes.
14       A.  Yes, well, the complaint speaks for
15  itself, but I do remember hearing Ms. Sataki's
16  testimony that she couldn't tell us exactly who
17  wrote it.  She didn't know whose handwriting it
18  was.
19       And this is what, for many years, I
20  thought was her entire complaint until I was
21  notified by Mr. Smith of Bar Counsel's office that
22  in fact there had been a supplemental filing.

25  (Pages 1234 to 1237)

In Re:  Larry E. Klayman
June 26, 2018

Page 1238

1  This is what I thought was out there at that time
2  with the DC Bar.  Because this did not refer to
3  sending -- this particular one -- onto any other
4  Bar.  The later one does.  It says they're also
5  filing it with Florida and Pennsylvania.
6      Q.  Mr. Klayman, you're referring to
7  Exhibit 23?
8      A.  Yes.  Number one.
9      So that's my testimony.
10     CHAIRMAN FITCH:  Mr. Smith, I'm
11  allowing this question and answer because, even
12  though it addresses an issue that is beyond the
13  jurisdiction of this committee, he has a right, at
14  least to some extent, to make the record.
15     MR. SMITH:  And I have not proposed an
16  objection.
17     CHAIRMAN FITCH:  And you have not
18  objected.  That's right.
19     Go ahead.
20  BY MR. SUJAT:
21     Q.  Mr. Klayman, I refer you to Bar Exhibit
22  Number 43.

Page 1239

1      A.  I'm there.
2      Q.  Ok.  And what does this letter from Mr.
3  Smith to you state about what is being considered
4  in the charges?
5      A.  Well, the first email of December 12th,
6  2016 talks about -- let me put this in context,
7  ok, and I can speed the testimony along, and then
8  we'll look at the exhibits -- that I was notified
9  I believe shortly after the time when Ms. Sataki
10  came running over to that cafe where I was sitting
11  with my chief of staff, you know, screaming,
12  saying that I had ruined her life and I was the
13  worse person that ever lived, and asking my chief
14  of staff to contact her.
15     I believe I was notified by Mr. Smith
16  after that, and that there was -- they were
17  proceeding on this complaint.
18     On the supplemental complaint it asked
19  to give a response to the supplemental complaint,
20  the second complaint that had been filed that was
21  prepared by Kathleen Staunton and Ms. Sataki's
22  cousin, apparently.  And I then asked Mr. Smith to

Page 1240

1  send me what was in his file, documents, because
2  my documents had been lost or discarded after all
3  these years, six years.  A lawyer doesn't
4  generally keep documents for six years if they
5  don't need to, and I didn't think there had been a
6  complaint pending in DC because Florida and
7  Pennsylvania had dismissed it.  And I thought DC
8  had, too, honestly, I thought they had.
9      So, when Mr. Smith sent me some of the
10  documentation, he apparently inadvertently sent me
11  the draft Specification of Charges that had been
12  already prepared before I had been re-contacted, a
13  draft.  Also he sent me documents -- and we'll
14  identify them, they're part of our exhibits, part
15  of Respondent's exhibits -- where he had retained
16  the expert who testified at the end of the first
17  session that we had here, Joel Bennett.
18     That raised alarm bells with me,
19  because, after six or seven years of not knowing
20  what was going on over there, without my even
21  being told, they apparently had prejudged the
22  issue and had already gone ahead and prepared a

Page 1241

1  Specification of Charges before I even had a
2  chance to respond to the supplemental complaint,
3  and they even hired an expert.  So at that point,
4  you know, I communicated with Mr. Smith and I
5  said, "I'd like to come in and talk to you about
6  this."  And I did.  I talked to him, and I said,
7  "What is this really about?"  It was in Bar
8  Counsel's office.  And he said, "Well, really, Mr.
9  Klayman, the only issue is whether you zealously
10  and competently represented the client."  They
11  thought I had abandoned Ms. Sataki, and I said
12  that's not the case.  All of her rights were still
13  there.  I couldn't get in touch with her.
14     And she still had, not just the
15  permanent injunction aspect of Wagner v. Taylor,
16  but she also had her civil rights complaint, OCR
17  complaint that could have been brought to court.
18     So then I submitted documentation --
19  you know, we'll go through that -- to Mr. Smith
20  and Bar Counsel, showing that, and I thought that
21  resolved the issue.  And then one day I get a call
22  from Mr. Smith.  I believe it was right before the

26  (Pages 1238 to 1241)

Page 1242

1 July 4th weekend.  I don't remember the exact
2 date.  We have documentation.
3     CHAIRMAN FITCH:  Of what year?
4     MR. TIGAR:  Of what year?
5     THE WITNESS:  Of 2017.
6     And he's telling me, "We're about ready
7 to start this case.  Is there anything else that
8 you want to provide?"
9     He gave me the impression that he
10 wasn't really in charge of this case himself, he
11 always gave me that impression, that basically the
12 decisions were being made by Elizabeth Herman,
13 Deputy Bar Counsel and higher ups.
14     He's always said to me -- I will say I
15 have issues with Mr. Smith in the way this case
16 was brought, but he's always been a gentleman to
17 me.  But he's always told me, "It's out of my
18 hands, Larry.  It's the higher ups."
19     He's shaking his head, but I actually
20 have absolute proof of that.
21     So I said, "I'd like to meet with you
22 and Ms. Herman," and I said, "before you start

Page 1243

1 this thing.  What's it about now?"  And he said,
2 "Well, it's the publicity."
3     MR. TIGAR:  What was the last words?
4     THE WITNESS:  Publicity.
5     So I took it that they were moving the
6 goalpost back.  They wanted some reason to proceed
7 against me, and, since the first one didn't
8 succeed, because it was clear I hadn't abandoned
9 the client, I represented her zealously, and
10 that's why it was taken out of this Specification
11 of Charges, while it was in the earlier one, they
12 didn't prepare even after they got a response from
13 me, even with, the supplemental
14 complaint.  I said, "I need to meet with you."
15     So I met with Mr. Smith and Ms. Herman,
16 and I said, "With regard to the publicity, I'll
17 get you an affidavit from Tim Shamble, and you,
18 Mr. Smith, feel free to contact him, because this
19 was approved and he was a witness to that.  But
20 please hold off on filing a complaint until I give
21 it to you."
22     Now during this meeting, I sensed this

Page 1244

1 hostility from Ms. Herman.  And I'd never met her
2 before.  I couldn't understand it.  And I said to
3 her, "Have you met with Ms. Sataki?  Ms. Sataki
4 can be very" -- she likes to portray herself as
5 this victim that wants to kill herself.  So I
6 asked that question, and the response from Ms.
7 Herman was, "None of your business."
8     Then I asked, "Are you aware that
9 Florida and Pennsylvania dismissed this case years
10 ago?"
11     And she said, "I could care less."
12     Then I said, "Well, I want you to" --
13 she made a comment to me.  I said, "What's the
14 problem here?"  And she said something to the
15 effect, "I don't like the way you practice law."
16     And I said, "The issue here is not
17 whether you like the way I practice law.  It's
18 whether I violated the Code of Professional
19 Responsibility.  So give me the opportunity to
20 make a supplemental submission with regard to Mr.
21 Shamble and others" -- and that's when Keya Dash's
22 affidavit submitted as well -- "before you

Page 1245

1 start the case.
2     "Because this is very costly.  It's
3 very upsetting.  You know, you're dealing here
4 with a very emotional issue.  I'm recently
5 married, you know, and there are a lot of issues
6 here."
7     I then went back and begrudgingly I
8 asked for, I think it was ten days is my estimate,
9 and she didn't really want to give it to me.  And
10 as I was walking out, Mr. Smith said to me,
11 "Larry, I'll get it for you, ok?"
12     And I said, "Thank you, Clay."
13     And I decided, rather than submitting
14 it to Ms. Herman, because I saw this hostility,
15 and Mr. Smith, that I would send a letter to the
16 Bar Counsel, the new Bar Disciplinary Counsel,
17 Hamilton Fox, thinking that Ms. Herman, who
18 appeared to be in charge of this -- that's what I
19 was led to believe, and also she came to the
20 meeting -- that maybe he might be able to exercise
21 some judgment here and not proceed with a
22 non-meritorious complaint which was now seven

Page 1246

1    years old, which any other Bar in this country
2    would have dismissed by then, based on my research
3    and Professor Rotunda's research.  If not that,
4    based on laches.  There are some bars, as you can
5    see from Professor Rotunda's opinion, that
6    actually put in rules, and then there's case
7    law -- Florida is one of them -- that you just
8    can't proceed against a lawyer after eight years.
9    It's not due process.  It's not even a protection.
10   It's not a right.  It's just general.  It's
11   fairness.
12       So I wrote this letter to Bar Counsel,
13   Hamilton Fox.  It's part of my -- attached to the
14   Answer to the Specification of Charges, which is
15   admitted into evidence in both Bar Counsel's books
16   and our book of exhibits.
17       I turn your attention to it in Bar
18   Counsel's book.  It appears at Section D in the
19   beginning.  It's been moved into evidence.
20       That's where I attached the letter I
21   had written to Mr. Fox and the supporting
22   documentation, the affidavits of Mr. Shamble, the

Page 1248

1    Mr. Tigar's prior firm, Williams and Connolly, by
2    some lawyer named Ty Clevenger, and he had written
3    an article.  And it was dismissed summarily, at
4    the last minute according to Mr. Kendall, by the
5    way who has always been polite towards me, and
6    I've been in many cases with him over the
7    Clintons, that she had destroyed documentation of
8    the 33,000 so-called missing emails.
9        MR. SMITH:  Objection.
10       At some point is there going to be some
11   focus or --
12       THE WITNESS:  I'm going to get back to
13   that.
14       MR. SMITH:  He's dovetailing into
15   stories and things that have nothing to do with
16   this case.
17       THE WITNESS:  Well, it does.
18       CHAIRMAN FITCH:  He has argument that
19   there's a context and that that context is
20   important.  The Board may or may not agree with
21   that argument, but I think I'm required to let him
22   at least get it out.

Page 1247

1    affidavit of Mr. Keya Dash, the opinion that I had
2    previously submitted to Mr. Smith and Ronald
3    Rotunda, who regrettably is deceased, and other
4    materials dealing with the fact that Florida and
5    Pennsylvania never had a disciplinary record for
6    me regarding this, and therefore it's clear they
7    dismissed this case.
8        So I sent it to Mr. Fox hoping that he
9    would take control.  Because I sensed that maybe
10   Ms. Herman didn't like me.  I had done a little
11   research, and you know, we're entitled to donate
12   campaign contributions to whomever we want.  She
13   gave contributions to President Obama, and I had
14   sued President Obama, as I had other presidents.
15   And I also thought maybe I was getting wrapped up
16   into this whole "Me Too" thing, you know, that
17   somehow, I was a man, and this was a way to try to
18   make a point with a high-profile lawyer who had
19   taken positions which were not consistent with her
20   politics.
21       In that regard, I was also aware that a
22   complaint had been filed by David Kendall, from

Page 1249

1        Even though we have no jurisdiction in
2    this matter, I do have the right and obligation to
3    administratively manage this matter.  So I'm
4    taking into consideration those time
5    considerations.
6        But you may continue, Mr. Klayman.
7        THE WITNESS:  Yes, sir.
8        CHAIRMAN FITCH:  We are not going to
9    have any of these materials read into the record.
10   They speak for themselves.
11       THE WITNESS:  Well, I'll just identify
12   them after I give this summary.
13       So therefore I felt like I had to go to
14   Mr. Fox to see whether he would exercise
15   independent judgment here.
16       So I wrote him the letter which is
17   attached to Exhibit D of Respondent's exhibit book
18   and also in our exhibits.  I think it's one -- or
19   five rather --
20       MR. SUJAT:  5R.
21       THE WITNESS:  Five, yeah, which is in
22   evidence, and I said, "I'd like to meet with you

28  (Pages 1246 to 1249)

Page 1250

1   and hear the facts, and attach them to an answer."

2          I never got a response.  And the next

3   thing I knew I was notified by Mr. Smith that this

4   proceeding had been commenced.  I never had an

5   opportunity to meet with Bar Counsel.

6          Now I have spoken with other

7   practitioners about this, someone by the name of

8   George Clark, as a matter of fact.  He was a

9   friend of Mr. Rotunda.  He practices here and he

10  does a lot of ethics proceedings before this

11  Board.  And I said to him, "Why do you think I

12  couldn't meet with Mr. Fox?"

13         He says, "Well, you know, it is policy

14  in the office that you at least get a meeting

15  before they start something."

16         I never got it.  I never got a

17  response.

18         So after I was notified by Mr. Smith

19  that this matter had started, ultimately I came in

20  to accept service of process of the Specification

21  of Charges.  But I requested the opportunity to

22  meet with Mr. Fox finally, thinking that maybe

Page 1251

1   this Specification of Charges would be withdrawn.

2          I had a meeting.  Rather than having

3   Mr. Fox there, I had Mr. Smith there and Ms.

4   Herman again.  During that meeting, I reiterated

5   that it looked like to me that the goalposts were

6   being moved, that they just wanted to bring a case

7   against me, after all this time, and, based on my

8   advocacy and my politics -- not really Mr. Smith,

9   but Ms. Herman and others in the office -- and

10  that this was totally unfair and I would like to

11  meet with Mr. Smith.

12         During that meeting it was reiterated

13  by -- I said to Ms. Herman, I said, "You don't

14  like the way I practice law, right?"

15         "Yeah."

16         I said, "Well, obviously you know

17  that's not the issue here.  I am a particular type

18  of lawyer.  I'm a public advocate here."

19         And Mr. Smith said to me kindly, "I'll

20  try to arrange a meeting with Mr. Fox."

21         Ultimately we arranged for a meeting,

22  and Mr. Fox said to me, "I can't meet unless you

Page 1252

1   sign a waiver, because I have a conflict of

2   interest, potentially, myself."

3          I said "What's that?"

4          And he said, "I actually represented a

5   partner in my law firm, Sutherland, Asbill and

6   Brennan, on a case you had filed against Judicial

7   Watch for breach of your severance agreement when

8   you left Judicial Watch to run for the U.S.

9   Senate.  I represented Mr. Beller at a

10  deposition," and then I remembered that in fact

11  that was the case.  In fact his name was appearing

12  as copied on court pleadings in that case, you

13  know, off Pacer.  He was getting copies through

14  the electronic filing system, Hamilton Fox.

15         So I said, "I'll sign a waiver."

16         And I believe he knew of this and

17  participated before I was asked to sign the

18  waiver, and I believe that he most likely does

19  have a conflict of interest here, but.  I wanted

20  to be able to meet him, because I had never met

21  him, and I was hoping that fairness and justice

22  would prevail.

Page 1253

1          And I told him what went on and that

2   Pennsylvania and Florida had dismissed the matter

3   and that it was eight years old.  And at that

4   point Professor Rotunda was still alive before he

5   had an unexpected death.  He talked with Rotunda,

6   read the opinion, and he said he would go back and

7   look at it.

8          And after, I got the impression that

9   Mr. Smith wanted it dismissed, too.  He made a

10  statement, he says, "You know, I got to do a lot

11  of preparation, because this hearings's coming

12  up."  It's kind of like saying, you know, spare me

13  from having to work on this case.

14         But very shortly later I got a letter

15  back, very terse, "We're not going to do this.

16  We've looked at the evidence and we think it

17  warrants going forward."  But it was a very, very

18  tough and a very abrupt letter, which I didn't

19  expect, because, you know, I'd had what I thought

20  was a cordial meeting.  At that point I came to

21  the conclusion again, he's not in control.  He's

22  the new Bar Counsel, and he's going along with

29  (Pages 1250 to 1253)

Page 1254

1   what Ms. Herman wants to do and others in the
2   office. I think that's natural when you're new,
3   to defer it to people who are working under you.
4       But nevertheless, he's part of this
5   decision to go forward, so I asked him to look
6   into it this and stop him.
7       To get to this summary, to identify
8   some of the communications, I had also noted, I
9   asked Mr. Sujat to show me that, that I was aware
10  of a document that had been produced which early
11  on said to Ms. Sataki -- it was part of our
12  supplemental exhibit. I think it's six --
13       MR. SUJAT: It's 10.
14       THE WITNESS: No, not 10. It was
15  provided yesterday --
16       CHAIRMAN FITCH: Keep going.
17       THE WITNESS: Well --
18       CHAIRMAN FITCH: Keep going. We're
19  going to take care of any documents in a minute or
20  so.
21       MR. SUJAT: Ok.
22       THE WITNESS: It was a document that

Page 1255

1   was sent when the complaint was received by Ms.
2   Sataki, back in 2010, when Bar Counsel received
3   it. It says that, you know, "Attorney's going to
4   make a response" -- I did respond to the initial
5   complaint, "and if we don't hear from you, the
6   gist of it is that we assume you're not going to
7   proceed with this matter, that you've abandoned
8   the matter." And they never got anything from
9   her.
10       And then I learned from the
11  documentation that was produced, and Mr. Sujat
12  will identify that, so I can look at it, that in
13  2014, not hearing from Ms. Sataki for all that
14  time, they contacted her -- or tried to contact
15  her in 2009, and there are emails to that effect,
16  to resurrect this case. And that in fact, even
17  after they tried that it appears they couldn't get
18  ahold of her, and she didn't surface until 2016.
19  And if she had surfaced earlier, she would have
20  found all those letters that she says she found at
21  the last minute at the last hearing.
22       So that's the story, and I'll identify

Page 1256

1   the emails. But I feel that this is very unfair
2   and it has denied me due process.
3       During this time period a lot of
4   documents have been lost, memories have faded.
5   Witnesses, some of them, I've got witness, but
6   some I don't know where they are. There's a lot
7   of witnesses on my behalf. And I had hoped that
8   Bar Counsel, Mr. Fox, would have exercised his
9   authority, but he didn't.
10       I believe that the person behind this
11  primarily is Ms. Herman, who didn't like me for my
12  politics, and perhaps for my gender, you know, in
13  this whole atmosphere we live in today.
14       That's why I brought in Ms. Allred. I
15  told her, "Look, one of my very good friends is
16  Ms. Allred. I believe in women's rights. That's
17  why I represented Ms. Sataki. I represented
18  others. I felt strongly about" -- I don't think
19  Gloria Allred would consider me a friend if I felt
20  otherwise. I have gotten to know her very well in
21  the last nine years. I invited her when I went to
22  LA -- I wanted to meet her -- to lunch. I said,

Page 1257

1   "You know, we've been on TV together over certain
2   issues and I'd like to say hello." We've become
3   very good friends.
4       Her politics are different than mine.
5   One thing we have in common is we believe in
6   women's rights and to be treated with dignity and
7   fairly, by men or anybody else.
8       So this whole thing is costing me a lot
9   of emotional distress. It's costing me a lot of
10  time and expense. It's created issues in terms of
11  the distress and that kind of thing, and it should
12  never have been brought.
13       And I believe that it is strategic. As
14  I've set forth in certain pleadings, Judicial
15  Watch has filed a complaint against me too, and
16  they're trying to pile on.
17       I mean, you saw Judicial Watch's person
18  sitting here. How did he know of this? This
19  isn't that public. I think that probably Ms.
20  Herman or somebody told them about it and they
21  came to see what they could get to use against me
22  sometime in the future.

30  (Pages 1254 to 1257)

Page 1258

1    Because we've had problems since I
2  left, and I have a judgment for defamation against
3  Judicial Watch in the Southern District of
4  Florida, which included punitive damages.
5    So, that's the story here.  And Mr.
6  Sujat can show me the documents.
7    First, I ask that you can show me from
8  the first supplemental exhibits, ours, where
9  they're saying "Ms. Sataki, if we don't hear from
10  you"...
11    CHAIRMAN FITCH:  Let me --
12  BY MR. SUJAT:
13    Q.  That's right.  That is Respondent's
14  Supplemental Exhibit Number 5.
15    CHAIRMAN FITCH:  Let me --
16  BY MR. SUJAT:
17    Q.  It's a letter dated July 15th, 2011.
18    CHAIRMAN FITCH:  Let me interject here.
19    If this committee does a report, that
20  report will include a subsection that informs the
21  Board of any prejudicial delay that we find, or
22  don't find, and why we recommend to the Board a

Page 1260

1  thoroughly covered each and every count in the
2  four-count Specification of Charges.  One count
3  relates to one of the actions.  You've been
4  through that.  One count relates to the other
5  action.  You've been through that.  The fourth
6  count relates to publicity and articles.  You've
7  been through that.  And the first count relates to
8  the fee issue.  You've been through that.
9    I need to be convinced by a specific
10  proffer of what other nonrepetitive evidence you
11  have after several hours of evidentiary
12  presentation, not to mention cross-examination.
13    We will stand in recess until 2:00
14  o'clock.
15    MR. KLAYMAN:  Thank you, your Honor.
16    MR. SUJAT:  Thank you, your Honor.
17    CHAIRMAN FITCH:  In recess until 2:00
18  o'clock.
19    (Whereupon at 12:46 p.m. a luncheon
20  recess was taken.)
21
22

Page 1259

1  finding of no prejudicial delay or prejudicial
2  delay.  Otherwise, as I've pointed out earlier, we
3  have no jurisdiction over the points you've raised
4  over the past segment.  But you have a right to
5  raise them.  There's no point about that.
6    We're going to break now.  It's a
7  little bit before 1:00, and, after we return, you
8  will be allowed to read into the record any and
9  every exhibit number that you want and intend to
10  bring to the attention of the Board in connection
11  with points that Mr. Klayman has just made.
12    We are not going to hear summaries of
13  those documents, descriptions of those documents,
14  wording of those documents or anything else about
15  those documents.  It's a waste of your time to
16  have us listen to that, because we can't do
17  anything about it.  But you will be able to make
18  whatever arguments you want to to the Board at the
19  appropriate time.
20    The other thing I will expect after
21  lunch is a proffer as to what other evidence you
22  think is needed in this matter.  You have

Page 1261

1  A F T E R N O O N   S E S S I O N
2    CHAIRMAN FITCH:  I think that we are
3  back on the record and all of the participants are
4  present.
5    Does someone from the Respondent's team
6  wish to read into the record the list of exhibits
7  that you wish to bring to the Board's attention
8  with respect to the last subject matter of
9  testimony?
10    MR. KLAYMAN:  We're prepared to do
11  that, your Honor.
12    May I raise a scheduling issue here for
13  a minute?
14    CHAIRMAN FITCH:  Sure.
15    THE WITNESS:  Is that Mr. Keya Dash,
16  I'm sending an Uber for him -- his car broke
17  down -- so he can be here no later than 4:00
18  o'clock, to allow for cross-examination of myself.
19    He's not available tomorrow and I do
20  believe that we'll wrap up tomorrow.  I don't
21  know, you know, what else may ensue, but we're
22  going to wrap up our case tomorrow morning.

31  (Pages 1258 to 1261)

In Re:  Larry E. Klayman
June 26, 2018

Page 1262

1    CHAIRMAN FITCH:  Well, we'll discuss
2 that.
3        Why don't you give us that list right
4 at the beginning of the afternoon session.
5    THE WITNESS:  Ok, thank you.
6    CHAIRMAN FITCH:  So it will be readily
7 available for the Board.
8    THE WITNESS:  I just want to say one
9 other thing.  I will need to take a little break
10 around 2:30 to order the Uber for him on my cell
11 phone.  It will take me about thirty seconds.
12    CHAIRMAN FITCH:  Ok.
13    Mr. Sujat?
14    MR. SUJAT:  Yes, Mr. Chair.  We would
15 like to introduce into the record the Respondent
16 Exhibits 1 through 30, which would include all of
17 the exhibit books one through four, and also the
18 Respondent's supplemental exhibits, which should
19 be one through seven.
20    CHAIRMAN FITCH:  Disciplinary Counsel?
21 Take your time.
22    MR. SMITH:  Disciplinary Counsel

Page 1263

1 doesn't have any objection to 1 through 30 or
2 Respondent's Supplemental Exhibits 1 through 6.
3        However, given the lateness of the -- I
4 know we've been doing last-minute production
5 ourselves, but given the production of Mr. Dash's
6 documents today, perhaps we could get just some
7 proffer or get a factual basis regarding Mr. Dash
8 about the circumstances under which those emails
9 were called up today.
10    CHAIRMAN FITCH:  We're taking things
11 one at a time.
12    Respondent's Exhibits 1 through 30 are
13 admitted and Respondent's Supplemental Exhibits 1
14 through 6 are admitted.
15    MR. SUJAT:  It's one through seven.
16    THE WITNESS:  Yes, but we're holding
17 seven in abeyance until --
18    MR. SUJAT:  Ok, sure.
19    THE WITNESS:  -- Mr. Dash testifies.
20    MR. SUJAT:  No, I just want to make a
21 record that that's what we're asking for.
22    CHAIRMAN FITCH:  No, you're on record

Page 1264

1 as having moved it in.
2    MR. SUJAT:  Thank you.
3    CHAIRMAN FITCH:  But we'll hold it in
4 abeyance until we hear testimony.
5        Now is this a list of documents you
6 want to bring to the Board's attention relating to
7 the --
8    MR. SUJAT:  Yes.
9    CHAIRMAN FITCH:  Read it into the
10 record, just like I asked you to.
11    MR. SUJAT:  Ok, so the ones that we
12 would enter into the record would be Exhibit 5,
13 which includes letters, basically different
14 communications between Mr. Klayman and Mr. Smith.
15    CHAIRMAN FITCH:  And when you say five,
16 what do you mean?
17    MR. SUJAT:  Respondent's Exhibit Number
18 5 that we have presented to --
19    CHAIRMAN FITCH:  I thought that we had
20 admitted 1 through 30.
21        Oh, but you want to make a specific
22 list.  Go ahead.

Page 1265

1    MR. SUJAT:  So the ones that deal with
2 the Bar Counsel communications.
3    CHAIRMAN FITCH:  Which deal in any way
4 in your view with the subject matter of what Mr.
5 Klayman testified to before the lunch break.
6    MR. SUJAT:  Before the lunch break, ok.
7        Alright, so that would be Respondent's
8 Exhibit 5, and it would be Respondent's Exhibit
9 10, Respondent's Exhibit 14, Respondent's Exhibit
10 15, Respondent's Exhibit 24, Respondent's Exhibit
11 27.
12        And with respect to the supplemental
13 respondent's exhibits --
14    MS. LARKIN:  Has 23 already been
15 entered in?
16    CHAIRMAN FITCH:  It's already been
17 admitted.
18    MR. SUJAT:  Twenty-three has previously
19 been entered in.
20    MS. LARKIN:  Ok.
21    MR. SUJAT:  That was the good standing
22 in Florida history.

32  (Pages 1262 to 1265)

Page 1266

1       MS. LARKIN:  Ok.
2       MR. SUJAT:  Florida Bar history.
3       CHAIRMAN FITCH:  Any others?
4       MR. SUJAT:  Then we have this one here,
5   the supplemental -- number six.
6       CHAIRMAN FITCH:  Ok.  I think that will
7   be helpful.  If this gets to the Board stage, that
8   would be helpful to the Board, and I'm sure that,
9   if you happened to have overlooked one or two, the
10  Board I predict will --
11      MR. SUJAT:  It's possible there might
12  be some in the Bar's books.
13      CHAIRMAN FITCH:  I just thought having
14  this list, if it gets to the Board stage, might be
15  useful to someone on the Board who might have some
16  responsibility for helping the entire Board to
17  deal with the issues, if it gets that far.
18      Do you have cross-examination, Mr.
19  Smith?
20      MR. SMITH:  I do.  Were you --
21      CHAIRMAN FITCH:  Ok.
22      MR. SMITH:  Give me a few seconds.  I

Page 1267

1   thought we were going to have a few more items.
2       CHAIRMAN FITCH:  Ok.
3       (Brief pause.)
4       CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
5       BY MR. SMITH:
6       Q.  Good afternoon, Mr. Klayman.
7       A.  Good afternoon, Mr. Smith.
8       Q.  I believe I saw in the supplemental
9   exhibit that has not yet been admitted that you
10  sued your own mother.
11      A.  I sued to get -- well, I object on
12  relevancy.
13      CHAIRMAN FITCH:  What is the relevance
14  of that?
15      MR. SMITH:  Character.
16      CHAIRMAN FITCH:  What's the relevance
17  as to character to these charges?
18      MR. SMITH:  Credibility.
19      CHAIRMAN FITCH:  I don't see how that
20  goes to credibility.
21      Sustained.
22      MR. SMITH:  Ok.

Page 1268

1   BY MR. SMITH:
2       Q.  Beginning in about May, 2010, you
3   suggested to Ms. Sataki, that, because of your
4   love for her, she should consider getting other
5   counsel, correct?
6       A.  That's not correct, in large part.
7       The reason was not just because there
8   was a personal feeling there, but because I
9   couldn't communicate with her.  She became very
10  difficult and very belligerent and disrespectful,
11  and generally, as I testified to at great extent,
12  I felt that it was better that she got other
13  counsel.
14      She blamed me for things that were
15  going on in the case, and I was trying to do my
16  best, and I was paying expenses, I was paying for
17  apartment.  I was being asked to buy cars.  I was
18  being asked to help her friend Kaveh, which she
19  wasn't happy with when I tried to do that.
20      So there are a lot of factors involved.
21      Q.  So let's take a look at Supplemental
22  Exhibit 6.

Page 1269

1       A.  I got it.
2       Q.  So your first sentence in Supplemental
3   Exhibit 6 is, "When someone loves you as much as I
4   do"... correct?  The first sentence there.
5       A.  Yes, yes.  I mean it says what it says.
6       Q.  Then you go on to say, "It's not help
7   for me.  You'll get better representation from
8   someone like Tim Shea who does not have an
9   emotional conflict and can keep his mind clear,"
10  correct?
11      A.  It says what it says.
12      Q.  But there's nothing in there about her
13  not communicating about her?
14      A.  Well, there are other documents to --
15      Q.  There is nothing in this document that
16  says there is --
17      A.  You don't need to raise your voice with
18  me, Mr. Smith.
19      Q.  You're right, you're correct.
20      There are no other reasons in this
21  letter that suggests that you --
22      A.  I don't know.  It says what it says.

33  (Pages 1266 to 1269)

In Re:  Larry E. Klayman
June 26, 2018

Page 1270

1    What I was building into that was,
2  there's emotional conflict because she's reacting
3  to me in a way that is not respectful and doesn't
4  understand how I'm trying to help her.
5    So, yes, it's in there, but I also say
6  in there that I love letter, and I felt --
7    And that's why I don't understand why
8  we're here, in part, because I said, "We should
9  get another lawyer," here.  And she didn't.  She
10  was always free to do that.
11    Q.  So you mentioned to her several times
12  that she should get another lawyer, right, after
13  this May --
14    A.  Yeah, I did suggest it several times.
15  Yes.
16    Q.  And then on July 30th, 2010, she sent
17  you a letter directing you to withdraw from all
18  lawsuits, correct?
19    A.  Where is that?
20    Q.  Bar Exhibit Number 27.
21    A.  Supplemental 27?
22    Q.  No, Bar Exhibit 27.

Page 1271

1    A.  Ok.  I'm reading it.
2    Q.  Paragraph three.
3    A.  Yeah, I would like to see it all in
4  context, if I may, please.
5    (Witness reads document.)
6    A.  Ok.  Thank you.
7    Q.  So she asked you on this date to
8  withdraw all lawsuits you had on her behalf and
9  only file the harassment case against Mr.
10  Falahati, the main harasser, and only Ali Sajadi
11  and Susan Jackson, correct?
12    A.  In the context of my testimony, that's
13  not correct, because I didn't know who this letter
14  was coming from.  It's in perfect English.
15    You can see, you know, her English in
16  the last email of your supplemental exhibit, and
17  it doesn't match up here.  And I thought this was
18  coming from someone else.  And it was inconsistent
19  with other things I understood she wanted me to
20  do.
21    So it looked like someone had gotten
22  control of her, and of course now we found out

Page 1272

1  was her cousin, Sam Razavi, and/or Kathleen
2  Staunton.
3    So I couldn't take actions not having
4  spoken with her, and that's why I was trying to
5  get ahold of her, and that's why I ultimately
6  asked Mr. Shamble to try to get ahold of her.
7    Q.  But didn't you just testify that you
8  suggested to her earlier that she get other
9  counsel?
10    A.  Yes, but she didn't apparently advise
11  me whether she got it or not?
12    Q.  Did she have to advise you of that?
13    A.  Yeah, that's what you have to do when
14  you get other counsel?
15    Q.  What rule requires that?  What rule
16  requires that?
17    A.  I object to the question.  It's not
18  that there has to be a rule.  That's protocol with
19  dealing with your lawyer.  You have respect for
20  your lawyer and you tell your lawyer what the
21  situation is, and you should talk to him and tell
22  him what you want to do.

Page 1273

1    And of course later we have an exhibit
2  that comes up that she actually files an appeal.
3    So she didn't want to do these things
4  in fact showing that this is inconsistent with
5  what I had been told and it was inconsistent with
6  her own desires.
7    So this thing was a total mess, and I
8  needed to talk to her, and I represented her
9  interests by trying to protect them.
10    Q.  Let's take a look at Supplemental
11  Exhibit Number 25, please.  Please take your time
12  and read that.
13    (Witness reads document.)
14    Q.  The first sentence, and this is a
15  letter dated August 2nd, 2010, from Larry Klayman
16  to Ellie Sataki, correct?
17    A.  Right.
18    Q.  And the first sentence, "I have
19  followed your instructions and dismissed all of
20  the cases against VOA, except the part about
21  having you work in L.A."
22    A.  What are we reading here?  I thought it

34  (Pages 1270 to 1273)

In Re:  Larry E. Klayman
June 26, 2018

<table>
<tr><td>

Page 1274

1    was Exhibit 25.
2        Q.  It is Exhibit 25.  I'm looking at a
3    letter, Supplemental Exhibit 25.
4        A.  Oh, I didn't know it was supplemental.
5        I see it.  Let me read the whole thing.
6        Q.  I'm sorry?
7        A.  Let me read the whole thing, if I may.
8        Q.  Sure.
9        A.  I mean, you're reacting in this way.
10       Q.  Certainly.
11       (Witness reads document.)
12       A.  Ok.
13       Q.  So this letter, or this email
14   correspondence, you told her that you have
15   followed her instructions and dismissed all the
16   cases against VOA, except the part about having
17   her work in LA.
18       A.  That's right and that's what I told
19   her, and I told her earlier that we could continue
20   on with a permanent injunction hearing, and that's
21   why I was trying to get ahold of her.  That's why
22   there were pleadings in fact that you submitted in

</td><td>

Page 1276

1    reconsider the dismissal.  I was in fact pursuing
2    the permanent injunction claims, and I told her to
3    continue with that, and that's what the appeal was
4    about.
5        So, those claims were not dismissed as
6    far as LA was concerned, and that's what I was
7    proceeding on.  But the rest of the case, at least
8    in terms of the lower court level was gone, thanks
9    to Judge Kotelly.
10   BY MR. SMITH:
11       Q.  The document spokes for itself, but
12   this was inconsistent with what Ms. Sataki asked
13   you to do in her July 30th, 2010 email to you
14   where she instructed you to dismiss all cases.
15       A.  The documents do speak for themselves,
16   but you're not characterizing them correctly, Mr.
17   Smith.
18       Q.  And then you say --
19       A.  Wait a minute, can I finish?
20       Q.  No.
21       CHAIRMAN FITCH:  Yes, he can.
22       MR. SMITH:  Jesus Christ.

</td></tr>
<tr><td>

Page 1275

1    your other pleadings to Judge Kotelly saying --
2        Q.  That wasn't consistent with her
3    instructions.  On you --
4        A.  I didn't finish my response, Mr. Smith.
5        Q.  You have gone beyond the scope of my
6    question.  I asked you a yes or no question and
7    you have been editorializing?
8        A.  I'm not editorializing.  I'm giving you
9    an answer to my question.
10       THE WITNESS:  Your Honor, would you
11   instruct him to allow me to finish my answer.
12   I'll be brief.  I just want to be able to finish
13   the answer.
14       CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
15       THE WITNESS:  Yes.
16       I advised Judge Kotelly that we wanted
17   to continue on.  It's in the pleadings that are
18   part of your exhibits as well as mine, in that she
19   had dismissed the entire case herself against the
20   board of governors, and I went back on
21   reconsideration on that.
22       She denied that and I asked her to

</td><td>

Page 1277

1        CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
2        THE WITNESS:  Your Honor, I want this
3    to proceed in a way that's respectful to each
4    other.
5        Now -- I kind of lose my train of
6    thought when he says stuff like "Jesus Christ."
7        Now -- what was your question?  Please
8    give me your question again.
9    BY MR. SMITH:
10       Q.  The question was, your actions after
11   July 30th, 2010, instructions for you to dismiss
12   the case, this response about your continuing the
13   case about the work in LA, which was inconsistent
14   with her instruction for you to dismiss the
15   cases --
16       A.  Yeah, but I don't believe that the
17   instructions were coming from her.  That's the
18   thing, ok?  So I didn't do anything that
19   prejudiced her rights.  I was protecting her
20   rights.  And, you know, that's what lawyers are
21   supposed to do, particularly if they're unclear in
22   terms of who is communicating with them.

</td></tr>
</table>

35  (Pages 1274 to 1277)

App.0539

## Page 1278

1    All I wanted to do was talk to her.
2  She knew where I was.  I was in Los Angeles, and I
3  wasn't getting instructions from her.  This is not
4  her handwriting that I was getting.  It was
5  somebody else's.  It's in perfect English.
6    Q.  And so you never spoke with Ms. Sataki
7  again after that July 30th, 2010 email either, did
8  you?
9    A.  My recollection is I didn't have a
10  communication after that.
11    But, you know, it was eight years, Mr.
12  Smith, and if this thing had been brought sooner
13  and it hadn't sat in your files for eight years,
14  we'd probably have better recollection.
15    Q.  In your August 2nd, 2010 email
16  correspondence, you go on to tell Ms. Sataki,
17  "This aspect of the case is not against anyone
18  personal and I intend to appeal the judge's
19  decision to the higher court."
20    A.  Where are you reading from?
21    Q.  The second sentence in the first
22  paragraph.

## Page 1279

1    A.  Of the same exhibit?
2    Q.  Yes, SX25.
3    A.  Yes.  I'm trying to advise her as best
4  I can that this is what I intend to do.
5    Q.  But this is inconsistent with what she
6  had asked you to do in her letter discharging you
7  correct?
8    A.  But again, I don't want to have to take
9  up everybody's time repeating my testimony,
10  because it's got to be at least ten to twelve
11  times.
12    Q.  Is that inconsistent?
13    A.  It's not inconsistent based on my
14  testimony of what the situation was at the time.
15  No, it's not inconsistent at all.
16    Q.  Is it inconsistent with what Ms. Sataki
17  asked you to do?
18    A.  Ms. Sataki did not send that letter, or
19  write it.  So I needed to be able to talk to her
20  and I needed to be able to protect her rights.
21    Q.  By the way --
22    A.  I suspect, Mr. Smith, that if I had let

## Page 1280

1  all of her rights go down the drain, that, as you
2  previously wrote in the Specification of Charges
3  in draft, before you even re-contacted me after
4  six years, we may have a different case here.
5    MR. SMITH:  Move to strike as
6  nonresponsive.
7    CHAIRMAN FITCH:  I agree.
8    I do want to ask you, Mr. Klayman --
9    THE WITNESS:  Yes.
10    CHAIRMAN FITCH:  -- her email came to
11  you on Friday, July 30, correct?  At least that's
12  what it shows on --
13    THE WITNESS:  Which one are we
14  referring to?
15    CHAIRMAN FITCH:  D27.
16    THE WITNESS:  D27 as in David?
17    MR. SMITH:  DX27.
18    CHAIRMAN FITCH:  -- no, DX27.
19    THE WITNESS:  I have DX27 as --
20    CHAIRMAN FITCH:  It came from her to
21  you on Friday, July 30, right?
22    THE WITNESS:  Yeah, I don't see that.

## Page 1281

1  I'm going to 27 right now.
2    CHAIRMAN FITCH:  It's the email,
3  DX27-1.  You had it in front of you a minute ago.
4    THE WITNESS:  Is this a supplemental
5  exhibit?
6    CHAIRMAN FITCH:  No.  I said DX27-1.
7    THE WITNESS:  Ok, I'm sorry.
8    Yes, and I --
9    CHAIRMAN FITCH:  Alright.
10    THE WITNESS:  Ok.
11    CHAIRMAN FITCH:  My next question, look
12  at SX25.  It purports to have been sent on Monday,
13  August 2, 2010, correct, SX25?
14    THE WITNESS:  I'm looking at SX25?
15    CHAIRMAN FITCH:  Ok.
16    THE WITNESS:  Wait a minute.  Let me
17  turn to it.
18    That's the email that I wrote to her.
19    CHAIRMAN FITCH:  That's correct.
20    THE WITNESS:  Ok.
21    CHAIRMAN FITCH:  And it's dated August
22  2, 2010, correct.

36 (Pages 1278 to 1281)

Page 1282

1      THE WITNESS:  Correct.
2      CHAIRMAN FITCH:  Which is a Monday.
3      THE WITNESS:  I don't know whether it's
4  a Monday -- oh, yes, it says Monday.
5      CHAIRMAN FITCH:  Right.
6      So you received her email Friday, and
7  you responded after the weekend on Monday,
8  correct?
9      THE WITNESS:  Yes.
10      CHAIRMAN FITCH:  Do you have any
11  recollection of whether there were any other
12  communications with her in that period of time?
13      THE WITNESS:  I don't have any
14  recollections.
15      CHAIRMAN FITCH:  Ok, my next question
16  is to ask you --
17      THE WITNESS:  There might have been.
18      CHAIRMAN FITCH:  Well, "might have
19  been" --
20      THE WITNESS:  I don't think so.
21      CHAIRMAN FITCH:  My next question is to
22  ask you to carefully read the DX27 from Sataki,

Page 1283

1  and carefully read the SX25 from you to Ms.
2  Sataki, and tell me if there is any difference
3  between what she or someone requested in that
4  letter and what you say you were going to do.
5      And Mr. Smith can make the same
6  analysis and then, if he disagrees with your
7  answer, he can pursue that.
8      THE WITNESS:  Yeah, let me just say
9  with --
10      CHAIRMAN FITCH:  You could not possibly
11  have read those two emails.
12      THE WITNESS:  I was going to first
13  address the --
14      CHAIRMAN FITCH:  I want you to do what
15  I asked you to do.  I want you to carefully read
16  the two emails.
17      (Witness reads documents.)
18      THE WITNESS:  Ok, I've got it, your
19  Honor.
20      CHAIRMAN FITCH:  Is there a difference
21  between what was asked and what was done?
22      THE WITNESS:  Based on what I've

Page 1284

1  testified to, it's not my view that there is a
2  difference.
3      If I may explain...
4      CHAIRMAN FITCH:  Go ahead.
5      THE WITNESS:  Is that I did continue on
6  it.  You know, I allowed, subject to appeal
7  Kotelly's -- I had no control over dismissals.
8  Yes, they were dismissed and I didn't pursue
9  anything further in front of Kotelly planning to
10  take an appeal.
11      With regard to Mr. Falahati, I had
12  filed a lawsuit against Mr. Falahati.  I don't
13  remember at that time whether that lawsuit was
14  active or not, but I had filed a lawsuit against
15  Mr. Falahati for her.  So that's consistent.
16      And in addition, I said at the end, in
17  the middle paragraph there, on SX25, that "I'm
18  still trying to settle this case."  This is what I
19  was saying this morning.  I never gave up trying
20  to do that.  And I asked Mr. Shamble to seek a
21  reasonable accommodation with VOA to try to get
22  Ms. Sataki what she wanted, which was to go back

Page 1285

1  to work in LA and be outside of the presence of
2  the harasser.
3      And then at the end I say I will
4  continue -- this is important, it's the bottom  of
5  the page, Page 1 -- SX25, "I continue to protect
6  your interests and continue to pray for your
7  wellbeing."
8      So I was telling her, look, I've got to
9  take actions here to do that.
10      And I also asked her to contact me
11  again in the paragraph before that, "I also
12  offered to meet with you but you did not reply."
13      So this is all consistent with what
14  I've testified to.
15      CHAIRMAN FITCH:  Mr. Smith, you want to
16  follow up with some questions?
17      MR. SMITH:  Well, I'll go back to Bar
18  Exhibit Number 27 --
19      THE WITNESS:  Your Honor, I have to
20  order that -- if we may, I can order that Uber for
21  Mr. Dash.  It will just take me thirty seconds.
22      CHAIRMAN FITCH:  Go ahead.  We stand in

37  (Pages 1282 to 1285)

Page 1286

1    recess for a moment.
2          THE WITNESS:  Ok.
3          (Recess taken.)
4    BY MR. SMITH:
5    Q.  Mr. Klayman, please take a look at
6    Supplemental Exhibit Number 26.
7    A.  Ok.
8    Q.  For the record, this is an email dated
9    August 5th, 2010 from Larry Klayman to Ellie
10   Sataki.
11   A.  Correct.
12   Q.  Have you had a chance to read that
13   email?
14   A.  I testified at length about it
15   yesterday.  I'll look at it again.
16         (Witness reads document.)
17   A.  Ok.
18   Q.  So in this letter you acknowledge
19   having read the letter that Ms. Sataki wrote to
20   Dan Austin dated August 4th, 2010, correct?
21   A.  Yes.  I got it, I believe, from Mr.
22   Shamble.  He sent it to me.

Page 1287

1    Q.  In that letter Ms. Sataki, as you will
2    recall, told Mr. Austin she was directing you to
3    dismiss all actions against the agency, correct?
4    A.  Again, I didn't know that it came from
5    her, and she didn't send it to me.  Why wouldn't
6    she send it to me?  Why would she send it to
7    Austin?
8    Q.  That was not the question that I asked
9    you.
10   A.  Yeah, well, I didn't know that it was
11   her letter that she wrote.  It was written again
12   in perfect English.
13   Q.  But the letter directed to you -- told
14   Mr. Austin that she had directed you to dismiss
15   all actions against the agency, correct?
16   A.  Can you me show the Austin letter.
17   Q.  Yeah, that would be Bar Exhibit Number
18   28.
19   A.  Ok.
20   Q.  Last sentence, second page.
21         (Witness reads document.)
22   A.  Well, if I may add, to the best of my

Page 1288

1    recollection -- number one, I stand by my
2    testimony of yesterday in terms of how I could not
3    conceive that this came from her, and secondly, I
4    was not copied on this.  She knew where to find
5    me.  She could have emailed it.  And three, I had
6    never been advised, as of that time, that I no
7    longer represented her.  That's the best of my
8    knowledge here.
9          So this came as a great surprise to me,
10   and she said that, you know -- she's telling him
11   that she told me not to represent her anymore, and
12   I hadn't gotten any instruction to that effect, so
13   obviously I had to protect her interest.
14   Q.  That was totally nonresponsive to my
15   question.
16   A.  It was totally responsive to your
17   question, because it's --
18         CHAIRMAN FITCH:  Repeat your question
19   for me again.
20         MR. SMITH:  The question was whether or
21   not he understood the letter that Ms. Sataki wrote
22   to Dan Austin to direct him to withdraw all legal

Page 1289

1    actions that she had pending against the VOA.
2          THE WITNESS:  Yes, and I told you that
3    I could not do that because it looked to me like
4    this letter -- even though I never got it, and I
5    got it apparently by Mr. Shamble -- it was not
6    written by her.
7          I had been, in and around this time
8    period, threatened by somebody on her behalf.  I
9    didn't know who if anyone was behind what was
10   going on, and it looked to me like it was such
11   nonsensical request that, just as a matter of
12   logic, I couldn't do that.
13         In fact what's being said here is get
14   rid of everything, and I just hope -- I believe in
15   the innocence of strangers that they're going to
16   help me.  And we know that that wasn't the case.
17         She was advised by Mr. Shamble,
18   repeatedly, "This is a difficult agency.  You have
19   to fight to get what you want, and you don't
20   unilaterally surrender," and this thing made no
21   sense.  It made no sense.
22         CHAIRMAN FITCH:  I think that when Mr.

38 (Pages 1286 to 1289)

In Re: Larry E. Klayman
June 26, 2018

Page 1290

1  Klayman has twice said "I couldn't do that," I
2  think that's the answer "yes" to your question.
3        MR. SMITH: Ok.
4        CHAIRMAN FITCH: If I understood, which
5  I think is the answer you were seeking.
6        MR. SMITH: That is what I was seeking
7  and that is not what I heard.
8        But if that's how the committee
9  receives his testimony --
10        CHAIRMAN FITCH: Well, I'm hearing
11  "yes."
12        MR. SMITH: Well, if that's how the
13  committee receives his testimony --
14        CHAIRMAN FITCH: And I agree that was a
15  rambling answer.
16        MR. SMITH: That's the bottom line.
17        CHAIRMAN FITCH: The record shows that.
18        THE WITNESS: And if I may add to my
19  answer, I could not do that as a matter of
20  professional responsibility.
21        CHAIRMAN FITCH: I strike that --
22        THE WITNESS: Ok.

Page 1291

1        CHAIRMAN FITCH: -- as nonresponsive to
2  that question.
3        THE WITNESS: I understand. We can
4  strike it, your Honor. I just want to put it on
5  the record, in all due respect.
6        CHAIRMAN FITCH: I don't need to be
7  instructed as to these matters, Mr. Witness.
8        THE WITNESS: I'm not trying to be
9  disrespectful, your Honor. I'm just trying to put
10  something on the record.
11        CHAIRMAN FITCH: You're doing a good
12  imitation with comments like that.
13        Go ahead, Mr. Smith.
14  BY MR. SMITH:
15        Q. Let's take a look at Supplemental
16  Exhibit Number 27.
17        THE WITNESS: By the way, I wasn't
18  trying to criticize you. I was just --
19        CHAIRMAN FITCH: Mr. Smith -- Mr. Smith
20  has already asked you a question.
21        THE WITNESS: That's fine. It was not
22  with regard to you, your Honor.

Page 1292

1        CHAIRMAN FITCH: Mr. Smith is ready to
2  ask you a question.
3        THE WITNESS: Ok.
4  BY MR. SMITH:
5        Q. Please look at Supplemental Exhibit
6  Number 27. Let me know when you've had a chance
7  to finish reading that document.
8        For the record it is email
9  correspondence dated August 19th, 2010 from Larry
10  Klayman to Ellie Sataki.
11        A. Did I just read this before?
12        Q. No.
13        A. Twenty-seven?
14        Q. No.
15        CHAIRMAN FITCH: We understood it to be
16  SX27.
17        THE WITNESS: Oh, ok, it's the
18  supplemental one. I'll read it, hold on.
19        (Witness reads document.)
20        THE WITNESS: Ok.
21        CHAIRMAN FITCH: The question...
22  BY MR. SMITH:

Page 1293

1        Q. By August 19th, 2010, you understood
2  that you had been dumped by your client, correct?
3        A. I didn't understand that, because I had
4  never been informed by her through a communication
5  that was in her way of writing, or I hadn't been
6  communicated with, and neither had Mr. Shamble.
7        Q. So the first sentence --
8        A. So I didn't --
9        Q. -- where you add --
10        A. I didn't receive it.
11        Q. "PS, please be careful not to harm my
12  reputation or Tim further. Tim told me that
13  Parashir (phon), his assistant, had heard inside
14  VOA that I was dumped. Obviously you or persons
15  close to you spread this rumor and VOA's
16  management is using this. Again, obviously you or
17  persons close to you spread this rumor."
18        A. You see, that can happen -- I'm
19  challenging her on this, because I want her to
20  communicate with me, ok. I was using a little bit
21  of psychology.
22        But that could have come from Falahati

39 (Pages 1290 to 1293)

App.0543

In Re:  Larry E. Klayman
June 26, 2018

Page 1294

1  or Sajadi or other people inside of the agency who
2  were trying to create discord between Ms. Sataki
3  and I.
4        I had no confirmation that I was
5  dumped.  This was a rumor inside VOA.  But I'm
6  challenging her to get back to me directly or get
7  back to Mr. Shamble directly.
8        Q.  But again you didn't speak to Ms.
9  Sataki after her email of July 30th, 2010 telling
10  you to withdraw all lawsuits against VOA, correct?
11       A.  I certainly, Mr. Smith, tried to, on a
12  number of occasions -- through making calls,
13  emails, texts -- I tied to get a line of
14  communication.
15       And at one point I went to Mr. Shamble,
16  because he hadn't heard anything either, and I
17  said, "Can you please try to email her so we can
18  find out what's going on," and she didn't even
19  respond to him.
20       Q.  So the answer to my question is Ms.
21  Sataki did not speak with you again after July
22  30th, 2010, correct?

Page 1295

1        A.  I don't believe she was speaking to me
2  on July, July 31.  I don't believe she was.  So
3  that's a loaded question.
4        CHAIRMAN FITCH:  No, it's not.  It's a
5  fair question.
6        Go ahead.
7  BY MR. SMITH:
8        Q.  We can explore that.  Because there
9  were a number of email exchanges between you and
10  Ms. Sataki throughout July.
11       Would you like to take a look at those
12  now?
13       THE WITNESS:  Move to strike, your
14  Honor.  That's editorializing.
15       MR. SMITH:  We'll get back to that.
16       THE WITNESS:  Move to strike those
17  comments.
18       CHAIRMAN FITCH:  It's stricken.  It's
19  not in evidence.
20  BY MR. SMITH:
21       Q.  You testified that when you met Ms.
22  Sataki she was experiencing some mental

Page 1296

1  instabilities?
2        A.  What I said was I didn't believe them
3  at the time to be instabilities.  In retrospect, I
4  do, because they have continued to today, by her
5  own admissions and emails that she's written.
6        My heart went out to her because she
7  took my hand and started crying and told me her
8  story.  So I didn't realize that there was a --
9  there was potentially a psychological disorder
10  there.
11       But in retrospect, I've come to believe
12  that.
13       Q.  When did you first come to understand
14  that she was in need of psychiatric assistance?
15       A.  When she asked me for that, when she --
16  well, when she had that very emotional and had a
17  breakdown in Los Angeles, when she was there on
18  leave to --
19       Q.  Do you remember when that was?
20       A.  Wait a minute.  Let me finish.
21       When we learned that they weren't going
22  to put her back to work in LA, the first time we

Page 1297

1  got that response, and they weren't going to grant
2  a reasonable medical accommodation -- and they
3  also, it's in the record, said, "If you don't come
4  back to work at a certain point in Washington at
5  VOA there, we'll consider you AWOL and terminate
6  you."
7        So she had a breakdown.
8        And that's when I asked a friend of
9  mine, who is a doctor, who is Persian, named Ben
10  Kasanji (phon), did he know a psychiatrist.  And
11  Ben is a very sweet person, a good guy, and he
12  recommended one to me.  And that one wasn't
13  acceptable to her.  He didn't seem high-powered
14  enough.
15       So then I asked a friend of mine who
16  had been going through psychological counseling,
17  who she might recommend.  I called that doctor and
18  then she referred me to Dr. Aviera.  And then
19  later on I got Ms. Sataki Dr. Long, who is a
20  psychiatrist; not just to help Ms. Sataki, but to
21  buttress her case to get her a reasonable medical
22  accommodation.

40  (Pages 1294 to 1297)

App.0544

Page 1298

1      Q.   This was about in February or March of
2  2010?
3      A.   You'll have to key me in on the
4  documents.
5      Q.   Well, I guess if you look at the
6  exhibits that you filed in the lawsuit, you might
7  see a date.
8      MR. TIGAR:  While counsel is looking
9  for that, Mr. Klayman, did you believe that first
10  night, when you met at Clyde's Restaurant in
11  Georgetown, that Ms. Sataki was vulnerable?  Did
12  you see her as a vulnerable person?
13      THE WITNESS:  Not to me.  I saw her as
14  vulnerable towards what happened to her.  I didn't
15  think that she was vulnerable generally at that
16  time.
17      MR. TIGAR:  So you felt that she was
18  vulnerable in the sense that she was going through
19  a very difficult situation in her work place.
20      THE WITNESS:  That she was traumatized
21  by what she claimed was Mr. Falahati's behavior.
22      But I believed that she was a strong

Page 1299

1  person at that time, because I had seen her out on
2  the mall doing interviews when I met her.
3      Her type of work, to broadcast into
4  Iran a pro-American message to the radical regime
5  like that, is really putting herself on the line.
6  You've got to be fearless to do that.
7      So I didn't believe that she was
8  vulnerable in general?
9      MR. TIGAR:  Did you notice at that time
10  that she had difficulty expressing herself in
11  English?
12      THE WITNESS:  Not -- yeah, she had
13  difficulty expressing herself in English in the
14  sense that she could write something that was in
15  good English, but she could express herself
16  verbally, ok.  She could express herself verbally
17  well enough that I could understand.  We heard her
18  on the witness stand in that regard.
19      But in determines of written
20  communications, she couldn't write English very
21  well, you know, as we've seen in various exhibits.
22      And in addition, her English, when she

Page 1300

1  spoke, wasn't perfect.  There were a lot of
2  grammatical errors.
3      MR. TIGAR:  So can you put a time on
4  your realization that her ability to express
5  herself in written English was questionable or not
6  perfect.
7      THE WITNESS:  Well, she told me that.
8  And she told me that that was a criticism of Susan
9  Jackson, one of her supervisors, in terms of her
10  work and why she wasn't going to be transferred to
11  LA.
12      And I also was aware of that, because
13  when she turned down an opportunity to work in the
14  Central News Bureau, which was in English, she
15  said, "I can't do it in English.   They're setting
16  up.  I'm going to be fired."
17      MR. TIGAR:  You began to be aware of
18  this as early as that evening at Clyde's when she
19  was talking about her situation?
20      THE WITNESS:  I was aware at that time
21  that her English wasn't perfect, but she was able
22  to convey her thoughts to me.

Page 1301

1      And I might add, I have a lot of -- and
2  Mr. Sujat knows this -- I started off, after I did
3  litigation, in Miami.  I was an international
4  trade lawyer for many years, and I still am.  And
5  so I understand -- I can piece things together,
6  and I understand when foreigners talk to me,
7  because I represented a lot of them.
8      But when I get a letter that's
9  obviously written by somebody else and didn't make
10  sense, I have to pull back and say, "Hey, I can't
11  throw the baby out with the bath water at that
12  point.  I have to protect her interests."
13      MR. TIGAR:  Go ahead, Mr. Smith.
14  BY MR. SMITH:
15      Q.   If you could take a look at Bar Exhibit
16  4, at Page 4-34 --
17      CHAIRMAN FITCH:  Mr. Smith, may I
18  interject?
19      Are you going to come back in SX27 in
20  one context or another?  If not, I'm going to go
21  ahead and ask a question about SX27.  That's the
22  August 19, the two August 19 emails.

41  (Pages 1298 to 1301)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1302

1    MR. SMITH:  No, I was not going to.

2    CHAIRMAN FITCH:  Ok, let me ask

3    something.

4    MR. SMITH:  Go right ahead.

5    CHAIRMAN FITCH:  Look at SX27, please,

6    Mr. Klayman.

7    THE WITNESS:  I have it, your Honor.

8    CHAIRMAN FITCH:  And look at the first

9    email in time, the 12:46 p.m., email.  It's the

10   one at the bottom of the page.

11   You see where that is?

12   THE WITNESS:  The one at the top of the

13   page?

14   CHAIRMAN FITCH:  No, the bottom of the

15   page.

16   THE WITNESS:  Where it says "

17   Ellie"?

18   CHAIRMAN FITCH:  Yes.

19   Do you see in the fourth paragraph, in

20   the last sentence of the last paragraph on that

21   page, "In addition I deserve to have costs and

22   expenses reimbursed at a minimum, notwithstanding

## Page 1303

1    the hundreds of thousands of dollars in time I put

2    in."

3    THE WITNESS:  Right.

4    CHAIRMAN FITCH:  Can you provide any

5    explanation for how a reader of that would know

6    that you were not seeking costs and expenses,

7    especially since in other such instances, at least

8    one other such instance, you had written in

9    theory.

10   THE WITNESS:  Well, the reason that was

11   written that way is because I was trying to show

12   her just generally that I put in a lot of time and

13   expense on her behalf.

14   If someone was going to come in and

15   interfere with it, what I was trying to say is --

16   maybe I was inarticulate on that, that.  If they

17   were going to interfere in what I was doing, then

18   they should have to pay me.  Not her, not her.

19   Because, to throw everything away,

20   after I put in so much of my heart and soul, and

21   whatever legal ability I had -- and Mr. Shamble

22   testified to my efforts -- to have someone come in

## Page 1304

1    who I couldn't even find out who they were, and

2    completely deep six everything that I did,

3    obviously they should be responsible.

4    That's what I was trying to say , not

5    that she should have to pay me.  That's why

6    repeatedly I said, "You don't owe me anything."

7    I'm a lawyer and I know if I write

8    something like that, if I ever had to try to

9    collect -- which I wouldn't do with her, which I

10   have done with some other clients in the past --

11   that that would completely negate my ability to

12   collect, writing something like that.

13   So, I wasn't intending to have her pay.

14   But I was trying to tell her that, hey, you know,

15   whoever is behind this, they're throwing

16   everything for you and for me away, and I have put

17   in a lot of time and expense and I believe in your

18   case and I took it, and it's not right to have

19   someone who doesn't even know what the case is all

20   about, you know, cut the legs out from under you

21   and cut them out from under me.

22   CHAIRMAN FITCH:  What would you point

## Page 1305

1    to in that sentence that would tell me or Ms.

2    Sataki that you meant in that sentence to say that

3    some third person should pay costs and expenses?

4    THE WITNESS:  Well, I didn't say she

5    had to pay me.  And again there are other emails

6    that say "You don't have to owe me anything ever,

7    that I'm doing this pro bono."

8    So what I was saying in the context of

9    other communications that I was sending her, that,

10   if there are people out there interfering with my

11   representation and what I've invested and what I

12   believe in, and I believe in you, then they should

13   reimburse me, if you just want to throw everything

14   away.  And that's what I was trying to convey.

15   So that's my answer.

16   CHAIRMAN FITCH:  Ok, alright.

17   You've told me the context, and you

18   have told me what you're trying to convey.

19   THE WITNESS:  Yeah.

20   CHAIRMAN FITCH:  And that's perfectly

21   alright.

22   But I asked you, what is there in the

42  (Pages 1302 to 1305)

In Re:  Larry E. Klayman
June 26, 2018

Page 1306

1  wording of that sentence that would suggest to a
2  reader that you were talking about other people
3  paying costs and expenses?
4      THE WITNESS:  In the context of
5  everything else --
6      CHAIRMAN FITCH:  I didn't ask you that.
7  You told me about the context; perfectly
8  reasonable testimony.
9      What is there in that sentence, what
10  words that suggest that you were suggesting that
11  others would pay.
12      THE WITNESS:  It's the omission of
13  words.  I didn't say "you have to pay me."
14      CHAIRMAN FITCH:  Ok.  Thank you, Mr.
15  Klayman.
16      THE WITNESS:  Sure.
17  BY MR. SMITH:
18      Q.  Alright, I think the last question I
19  asked you is when you first became aware of Ms.
20  Sataki's need for mental health assistance, and I
21  have endeavored to find a document that would
22  perhaps jog your recollection.

Page 1307

1      So I'll ask you about Disciplinary
2  Counsel Exhibit Number 4, at Page 4-34.
3      A.  I just responded to you that it became
4  apparent to me, when I saw her have --
5      Q.  Would you please look at Bar Exhibit
6  Number 4-34, please.
7      A.  Sure.
8      MR. TIGAR:  I'm sorry, Bar exhibit
9  number?
10      MR. SMITH:  Disciplinary Counsel
11  Exhibit 4, and it is a letter written by Arlene
12  Aviera dated March 14th, 2010.
13      THE WITNESS:  I'll do that.  Can I just
14  consult with Mr. Sujat just quickly --
15      CHAIRMAN FITCH:  No.
16      THE WITNESS:  No, ok.  Not on
17  testimony.
18      CHAIRMAN FITCH:  Thank you.
19      I note for your information, Mr.
20  Klayman, that there's a preceding letter from Ms.
21  Aviera also.
22      He's asked you about the March 15th

Page 1308

1  letter.
2      MR. SMITH:  Thank you.
3      I note for the record that is Page
4  4-33, and it is a letter from Dr. Aviera dated
5  February 24th, 2010.
6      THE WITNESS:  Correct.
7  BY MR. SMITH:
8      Q.  So does that refresh your recollection
9  on when you first began to understand that Ms.
10  Sataki was having issues for which she required
11  some clinical psychology?
12      A.  Yes.  And that's consistent with what I
13  testified to that I took her to see Dr. Aviera,
14  paid for it initially myself, as well as the other
15  doctors, and I took her to see Dr. Aviera, not
16  just so she could have a psychological evaluation,
17  but also to be able to make a record that I could
18  give to VOA to convince them to put her back to
19  work in Los Angeles as a reasonable medical
20  accommodation.
21      So this document was written by Dr.
22  Aviera for purposes of litigation, and I asked her

Page 1309

1  to do that.
2      She wouldn't ordinarily write this kind
3  of a thing, you know, for her notebook.  And
4  that's why in fact I requested, you know, in
5  discovery, to get her file, because this was
6  something that was for litigation purposes.
7      MR. SMITH:  I move to strike that
8  testimony as unresponsive.
9      CHAIRMAN FITCH:  Yeah, that's struck.
10      Ask your question again.
11      MR. SMITH:  I think he answered with
12  respect that it refreshed his recollection about
13  this document.
14      THE WITNESS:  Yeah.
15  BY MR. SMITH:
16      Q.  Now the reason Ms. Sataki was in need
17  of this psychiatric or psychological assistance
18  was because she was suffering from the
19  aftereffects of being sexually harassed on the job
20  by Mr. Falahati, correct?
21      A.  It wasn't the only reason, as I
22  testified to.

43  (Pages 1306 to 1309)

App.0547

Page 1310

1      Q.  Was that one of the reasons?
2      A.  That was one of the stated reasons by
3   Dr. Arlene Aviera.
4         Ok, the thing speaks for itself.
5         But it was also because she had been
6   unfairly criticized, she claimed, for her work by
7   Susan Jackson and that, you know, she got her job
8   because of her looks, that, you know, she had
9   other people doing packages for her, which was
10  Kaveh, that she couldn't communicate well in
11  Farsi, that her Farsi was no good.
12        She developed a bleeding ulcer, and
13  that -- that's what she claimed.
14        So there were other factors there,
15  other than the alleged sexual harassment.
16     Q.  Now Ms. Sataki has told you that she
17  did not want people to know about her legal
18  problems, right?
19     A.  She never said that, no.  In fact -- I
20  mean, you'll hear testimony to the contrary later
21  on in my case -- but that she never said that, and
22  that's false.  That was completely false.

Page 1311

1      Q.  That was false, and -- completely
2   false?
3      A.  Completely false.
4      Q.  She never said that?
5      A.  That's what I just said.
6      Q.  Let me ask you to look at Bar Exhibit
7   Number 24, please.
8         MR. SMITH:  For the record it is a
9   letter which has a date on it -- it looks like a
10  facsimile dated April 7th, 2010, and it is
11  addressed to Arlene -- I would imagine it's
12  Aviera, and it is sent to her by Mr. Klayman.  And
13  it is a letter.
14  BY MR. SMITH:
15     Q.  Alright, looking at the very last two
16  lines under the heading number one on Page 24-1,
17  the last sentence there where you are telling Dr.
18  Aviera, "I found this very peculiar at the time as
19  she did not want to otherwise let people know
20  about her legal problems."
21     A.  Where is that?
22     Q.  You see that?

Page 1312

1      A.  Where is that?
2      Q.  Bar Exhibit Number 24, the very bottom
3   of the page.
4         (Witness reads document.)
5      A.  That was in the beginning.  That was in
6   the very beginning.  But it changed, as she
7   testified to.  I advised her, and so did Tim, that
8   the publicity could help her get a settlement.
9      Q.  But you just said it was false that she
10  never spoke to you about her desire to keep her
11  legal problems quiet?
12     A.  Maybe I didn't hear your question
13  properly.  I thought your question was saying that
14  she always wanted to keep it quiet.  That's the
15  way I took it.
16        But it wasn't true, and you'll hear --
17  you heard testimony and you'll hear more testimony
18  about this.
19     Q.  At some point you understood, though.
20  At some point you understood she had some issues
21  with respect to publicity about her case, correct?
22     A.  Right up front, in the first week or so

Page 1313

1   we tried to settle it quietly, yes.  But then it
2   changed, the situation changed, and we had to put
3   pressure on both, in terms of legal actions and in
4   terms of positive public relations, to try to get
5   the agency to do the right thing.
6      Q.  Did you put pressure on her to go
7   public with the case?
8      A.  No, I never put any pressure on her.  I
9   cared for the girl, you know.  Why would I put
10  pressure on her?  This wasn't about me.  It was
11  about her.
12     Q.  It's a rhetorical question.
13        Let me ask you to look at Bar Exhibit
14  Number 23, and I'll ask you to flip to the
15  compendium of WorldNetDaily articles that begin on
16  23-12 and on through 23-36 -- 23-41 actually.
17        CHAIRMAN FITCH:  I have a question
18  about the previous exhibit, 24, please, in the
19  last sentence that Mr. Smith asked about...
20        That last sentence in those printed
21  words --
22        THE WITNESS:  Which exhibit is this?  I

44  (Pages 1310 to 1313)

Page 1314

1    just flipped it, your Honor.
2         CHAIRMAN FITCH:  Twenty-four.  The last
3    sentence that he just asked you about.
4         THE WITNESS:  Yes.
5         CHAIRMAN FITCH:  "I found this very
6    peculiar at the time as it/she, did not want to
7    otherwise let people know about her legal
8    problems."
9         Now that sentence as written makes no
10   sense, as "it/she," did not want blah, blah, blah.
11        Tell me whether it is a typo.
12        THE WITNESS:  Yeah, it's a typo.
13        CHAIRMAN FITCH:  What is it your
14   testimony that that was meant to be?
15        THE WITNESS:  Well, it shouldn't be in
16   there, ok.
17        As I just testified to, in the very
18   beginning she was reticent, and then we explained
19   to her, Mr. Shamble and I --
20        CHAIRMAN FITCH:  Ok, so is your
21   testimony that the mistake was including to the
22   word i-t, "it," and that this sentence should

Page 1315

1    read, "as she did not want to otherwise let people
2    know"?
3         THE WITNESS:  Let me take a look at the
4    whole sentence.  I didn't read it.
5         (Witness reads document.)
6         THE WITNESS:  I think -- yeah, I think
7    "it" is superfluous there.
8         I stand by my testimony that in the
9    beginning she was reticent.  But I explained to
10   her that legal proceeding is public and you can't
11   keep it away from public domains and public files
12   when it was dealing with an agency.  And, you
13   know, she understood that she would have to accept
14   that this was public.
15        And then of course we advised her that
16   publicity could help her case and get her a
17   settlement.
18        So things changed.  This was in the
19   very beginning.
20        CHAIRMAN FITCH:  It's a bit after 3:00.
21   Do we need to do anything about this witness and
22   his Uber trip?

Page 1316

1         THE WITNESS:  Oh, no, he should be on
2    his way.
3         CHAIRMAN FITCH:  I thought you wanted
4    to do something?
5         THE WITNESS:  I did, I called him and
6    told him I sent an Uber to his house.
7         CHAIRMAN FITCH:  I thought there was a
8    later point you wanted --
9         MR. LIDDLE:  May I ask a question about
10   that paragraph.
11        THE WITNESS:  I asked him to call me
12   when he gets here.
13        CHAIRMAN FITCH:  Ok, then we're all
14   set.
15        THE WITNESS:  Let me just remind him of
16   that.
17        CHAIRMAN FITCH:  Mr. Tigar has a
18   question.
19        MR. TIGAR:  I'll wait until after he's
20   done with that.
21        THE WITNESS:  Thank you for reminding
22   me.

Page 1317

1         (Brief pause.)
2         THE WITNESS:  Ok, thank you.
3         MR. TIGAR:  One question:  You said
4    "During our first trip to LA together"; that's the
5    beginning of numbered paragraph number one.
6         THE WITNESS:  Same exhibit?
7         MR. TIGAR:  Page-24-1.
8         THE WITNESS:  Right.
9         MR. TIGAR:  Numbered paragraph at the
10   bottom of the page.
11        THE WITNESS:  Yes, I see that.
12        MR. TIGAR:  When was that trip.  Do you
13   recall?
14        THE WITNESS:  This -- I went out to LA
15   at the same time.  We took separate planes and
16   all.  But I went out to LA at the same time when
17   she was taking leave, and, you know, she had that
18   nervous reaction to not --
19        MR. TIGAR:  When approximately?
20        THE WITNESS:  That was right in the
21   beginning.  Yeah, in early -- it was in January or
22   February.

                         45  (Pages 1314 to 1317)

Page 1318

1    CHAIRMAN FITCH:  Ok.
2    Go ahead, Mr. Smith.
3    THE WITNESS:  It was in January.
4    CHAIRMAN FITCH:  Ok.
5    Go ahead, Mr. Smith.
6  BY MR. SMITH:
7    Q.   So you are familiar with the compendium
8  of articles that appeared in WorldNetDaily,
9  correct?
10    A.   Correct.
11    Q.   And you've testified that some of the
12  references in these articles to your book, "Larry
13  Klayman's Fascinating Encounter with the Battle
14  With the Powers That Be, Whores: Why and How I
15  Came to Fight the Establishment," was something
16  that was inserted into these articles by the
17  publisher?
18    A.   Correct.  Many of them, yeah.
19    Q.   But you knew that these
20  cross-references to your book were going to be in
21  these articles, right?
22    A.   I actually didn't know that.  I never

Page 1319

1  actually paid made much attention.
2    I saw that they were doing that, but
3  they had purchased books and they wanted to sell
4  them, and I had no problem with them trying to
5  sell them.  But I didn't get any proceeds from
6  them.
7    Q.   If you look at 23 --
8    A.   Larry Klayman didn't get any proceeds
9  from them.
10    Q.   If you look at 23-14.
11    A.   Yes.
12    Q.   And towards the bottom of the page,
13  right within the last paragraph, there's a little
14  insert there, "Get Larry Klayman's Fascinating
15  Encounter With His Battle With the Powers That
16  Be," is that an example of what you're saying was
17  kind of like an insert by the --
18    A.   Yes, that's inserted by the publisher
19  of WorldNetDaily.
20    Q.   And it seems to be disconnected in the
21  overall body of work that you have there?
22    A.   Right.

Page 1320

1    Q.   Let's take a look at Bar Exhibit Number
2  23 at 12, 23-12, and in the second paragraph, last
3  sentence of the second paragraph, it says -- well,
4  let's start -- the next to last sentence, about
5  four lines from the bottom, "I was in a very sad
6  and angry mood" --
7    A.   Wait, 23-12?  I don't see that.
8    Q.   23-12.  It's like the second paragraph,
9  four lines from the bottom.  It's the very
10  beginning of the sentence, "I was in a very sad
11  and angry mood."
12    A.   Oh, the reason I'm confused, it's five
13  lines from the bottom.  It's five lines from the
14  bottom.
15    Q.   Are we on the same page now?
16    A.   Yeah, and it's five lines, just to
17  identify further.
18    Q.   "I was in a very sad and angry mood,
19  and I also thought about my life as a
20  revolutionary, which has not been easy.
21    "As I discuss in my recent book,
22  "Whores: Why and How I Came to Fight the

Page 1321

1  Establishment," I have paid a personal price for
2  my dissenting style."
3    That's not an insert from the
4  publisher, is it?
5    A.   No.  And I frequently refer to my book.
6  I'm proud of my book.  It's my auto autobiography.
7  And I wasn't selling my book.  I said that in
8  there.  I was confirming that this has been my
9  view of life.  And I frequently talk about today
10  what I wrote in that book.
11    Because that was my life story up to
12  that point in time.  I wrote it 2004 after my
13  Senate campaign and it was actually published in
14  2009.
15    Q.   Alright, I think we have discussed
16  already that certainly after August 5th, 2010, you
17  understood that Ms. Sataki, or someone working
18  with her, had sent you correspondence telling you
19  to withdraw the cases that you had filed on her
20  behalf, correct?
21    A.   I think -- I'm happy to answer again,
22  but I've asked and answered this many, many

46  (Pages 1318 to 1321)

Page 1322

1  times...

2      I didn't believe that it came from her

3  and I had to get confirmation as to what she

4  wanted to do.

5      I'm not going to repeat all my

6  testimony.

7      Q.  But on or about August 5th you

8  understood that that letter written by someone had

9  come with those instructions, correct?

10     A.  I didn't see that it was written by

11  her.  I thought it was written by others.  I got

12  it secondhand.  So that called into question the

13  authenticity and also the content.

14     CHAIRMAN FITCH:  Wait, wait, wait.  I'm

15  going to strike that answer and I want a correct

16  answer to your question.

17     THE WITNESS:  What was the question?

18     MR. SMITH:  Could you please read the

19  question back.

20     THE COURT REPORTER:  "I think we have

21  discussed already that certainly after August 5th,

22  2010, you understood that Ms. Sataki, or someone

Page 1323

1  working with her, had sent you correspondence

2  telling you to withdraw the cases that you had

3  filed on her behalf, correct?"

4      THE WITNESS:  The answer is no, because

5  it wasn't sent to me.

6  BY MR. SMITH:

7      Q.  Certainly after the --

8      CHAIRMAN FITCH:  Are you satisfied with

9  that --

10     MR. SMITH:  Well, if that's his

11  answer... You all will judge his credibility with

12  respect to that.

13     THE WITNESS:  Your Honor, I think those

14  editorial comments are just not right.

15     CHAIRMAN FITCH:  No, I asked him, and

16  he shot right back.  I can take it.

17     THE WITNESS:  Alright.

18     CHAIRMAN FITCH:  I prefer you answer

19  that question yes or no.

20     THE WITNESS:  Well, I did.  I answered

21  it the way it was posed.  Yes.

22     CHAIRMAN FITCH:  You did, and he's

Page 1324

1  satisfied.

2      But go ahead, Mr. Smith.

3  BY MR. SMITH:

4      Q.  And you'll also remember that you had

5  no further direct communications with Ms. Sataki

6  after the July 30th, 2010 letter to you that was

7  addressed by her?

8      A.  Where is that letter?

9      Q.  That is the Bar Exhibit 27.

10     CHAIRMAN FITCH:  Keep in mind, whenever

11  it's a good time for you to break.

12     MR. SMITH:  Well, let's do it right

13  now.

14     (Recess taken.)

15  BY MR. SMITH:

16     Q.  So I believe the last question on the

17  table was, you did not have any further direct

18  communications with Ms. Sataki after the July

19  30th, 2010 correspondence that was sent to you by

20  her or someone working for her.

21     A.  Ok, the reason that that question is

22  difficult to answer is because it's loaded.  It

Page 1325

1  says that I was communicating with "her."  She

2  communicated with me in that letter.  I don't

3  believe that that was a communication from her.  I

4  don't.

5      Q.  Did you --

6      CHAIRMAN FITCH:  That answer, with it's

7  characterization of "a loaded question," is

8  struck.

9      THE WITNESS:  Alright, I'll take out

10  the "loaded question" part.

11     It's that the --

12     MR. SMITH:  I'll withdraw that

13  question.

14  BY MR. SMITH:

15     Q.  Ms. Sataki did not contact you again

16  after July 30th, 2010, correct?

17     A.  I don't recollect any.  But it's so

18  long ago, Mr. Smith, I don't recollect any.

19     Q.  Well, there's no communications in the

20  record between you and Ms. Sataki communicating

21  directly with you again until September 15th,

22  2011.

47  (Pages 1322 to 1325)

Page 1326

1   A.  Well, again you're presuming that it
2   came from her.
3       Where is the September 15th that you're
4   referring to?
5   Q.  Supplementary Exhibit 38.
6   A.  Ok.
7   Q.  Notwithstanding the fact --
8   CHAIRMAN FITCH:  Now, wait a minute.  I
9   haven't heard a question about that exhibit, where
10  the number is.
11      You want to ask a question about that?
12  MR. SMITH:  Well, I thought I had, that
13  there had been no communication between July 30th,
14  2010, direct communication from Ms. Sataki to Mr.
15  Klayman from July 30th, 2010 to September of '11.
16  CHAIRMAN FITCH:  Well, you had asked a
17  question about anything after July 30, and he said
18  no -- he said "don't recall it."  And now you're
19  asking a similar question, but a lightly more
20  specific question, any after July 30 until
21  September 15, 2011; perfectly good question.
22      Do you know of any?

Page 1327

1   THE WITNESS:  I don't recollect any,
2   no.
3   CHAIRMAN FITCH:  Ok, there's the
4   answer.
5   THE WITNESS:  And in fact, my email
6   there, your Honor, says "This is the first time
7   I've heard from you and it appears this email is
8   written by you and you're still experiencing some
9   emotional issues."
10      The reason why I knew this one did come
11  from her is because it's in her broken English.
12  BY MR. SMITH:
13  Q.  So, despite the fact that you had
14  received this communication asking you to stop
15  representing her in those cases, you continued to
16  seek publicity in order to pressure the government
17  to settle cases that she no longer wanted you to
18  handle?
19  CHAIRMAN FITCH:  Objection.  That's too
20  argumentative, even for cross.
21  MR. SMITH:  Alright.
22  THE WITNESS:  I object, also, because

Page 1328

1   it's compound.
2       CHAIRMAN FITCH:  Well, you don't have
3   to answer.
4   BY MR. SMITH:
5   Q.  On October 1st, 2010, you published
6   another article in WorldNetDaily, 23-19, Bar
7   Exhibit 23, Page 19.
8   A.  Let me turn to it, thanks.  Ok I see
9   it.
10  Q.  In this article you discuss Ms.
11  Sataki's legal case, correct?
12  A.  Let me look at it.  I turned to it.
13  Now I want to read it.
14      (Witness reads document.)
15  A.  I don't make specific reference --
16  well, let me strike that.
17      In effect I am -- let me just try to be
18  precise.
19      I'm talking about the situation with
20  Mehdi Falahati and Ali Sajadi and what was going
21  on at Voice of America.
22  Q.  And in this article --

Page 1329

1   A.  Yeah, and I'm just talking about it in
2   that context of what's going on.  Yeah.
3   Q.  And in this article you also disclose
4   that Ms. Sataki had a severe depression and a
5   nervous breakdown, don't you?
6   A.  That had been disclosed in other
7   articles and also in other publicity --
8   Q.  But you disclosed it in this article,
9   too, right?
10  A.  Yeah, that's what it says.
11  Q.  Thank you.
12  A.  But it had been out there before --
13  Q.  Thank you.
14  A.  -- in stuff that I wrote with her
15  permission, yeah.
16      There's no shame in that.
17  Q.  And then on October 15th, 2010, you
18  wrote another article in WorldNetDaily.  That
19  would be Exhibit 23-16.
20  A.  Is that the article posted on October
21  15th, 2010?
22  Q.  Excuse me, yes, 2010: "Evil Ground

48  (Pages 1326 to 1329)

In Re:  Larry E. Klayman
June 26, 2018

Page 1330

1  Zero" --
2      A.  Yes.
3      Q.  And in this article you mention Ms.
4  Sataki.
5      CHAIRMAN FITCH:  For all of our sake,
6  point out where you mean, Mr. Smith, please.
7      MR. SMITH:  I'm sorry?
8      CHAIRMAN FITCH:  For everybody's sake,
9  point out where.
10     MR. SMITH:  Oh, on Page 2 --
11     CHAIRMAN FITCH:  23-17?
12     MR. SMITH:  Yes, 23-17, which is three
13  lines from the bottom.
14     THE WITNESS:  Fifteen?
15     MR. SMITH:  23-17.
16     THE WITNESS:  23-17, ok.
17     CHAIRMAN FITCH:  I actually don't see
18  it, Mr. Smith.  Oh, wait a minute.
19     You were referring to the first
20  paragraph on 23-17?
21     MR. SMITH:  Yes.
22     CHAIRMAN FITCH:  What is your question?

Page 1331

1      MR. SMITH:  That this article mentions
2  Ms. Sataki.  I was trying to assist the witness
3  in --
4      THE WITNESS:  Yeah, I mean the article
5  speaks for itself.
6  BY MR. SMITH:
7      Q.  Let me ask you to look at Bar Exhibit
8  23 again.  This is 23-14, and for the record it is
9  an article posted October 29th, 2010, in
10  WorldNetDaily.
11     MR. TIGAR:  I'm sorry, counsel, what
12  page is that?
13     MR. SMITH:  23-14 is the beginning of
14  that article.
15     MR. TIGAR:  Is that the article that
16  says posted, October 29th?
17     MR. SMITH:  Yes.
18     CHAIRMAN FITCH:  Where do you want Mr.
19  Klayman to look?
20  BY MR. SMITH:
21     Q.  If you could look at Page 23-15, the
22  second paragraph and the beginning of the third

Page 1332

1  paragraph.
2      CHAIRMAN FITCH:  And your question is?
3      MR. SMITH:  Well, after he's had a
4  chance to read it, I'll ask him.
5      (Witness reads document.)
6      CHAIRMAN FITCH:  Fair enough.
7      THE WITNESS:  Is there a question?
8  BY MR. SMITH:
9      Q.  Yes.  Have you read it?
10     A.  I skimmed it quickly.  I mean, it
11  speaks for itself.
12     Q.  Once again you discuss Ms. Sataki's
13  case in this article, correct?
14     A.  I'm just looking at that.
15     The facts that relate to that case,
16  yes.
17     Q.  And you talk about how you met with
18  congressmen trying to assist Ms. Sataki with
19  her --
20     A.  Yeah.  The document speaks for itself.
21     You know, and I was still trying to get
22  settlement for her at that time.

Page 1333

1      MR. TIGAR:  Excuse me, was that at
2  Morton's or Clyde's?
3      THE WITNESS:  Well I met her in
4  Morton's, ok, but I actually later met with her
5  and Mr. Keya Dash, who is going to be here
6  momentarily, at Morton's.  And we met, I testified
7  at the beginning on the patio where you can smoke,
8  because Keya smokes cigars, and that's where I met
9  Boehner.
10     MR. TIGAR:  At what restaurant was it
11  did Mr. Boehner kiss and offer to help?  Morton's
12  or Clyde's?
13     THE WITNESS:  Morton's, on Connecticut
14  Avenue.
15     CHAIRMAN FITCH:  For the sake of the
16  record, as an aide to myself, as I review the
17  record, since Mr. Klayman said "the article speaks
18  for itself," there are specific references to
19  "Elham Sataki" and "Sataki" and "Elham."
20     Next question, Mr. Smith.
21
22  BY MR. SMITH:

49  (Pages 1330 to 1333)

In Re:  Larry E. Klayman
June 26, 2018

Page 1334

1    Q.   Moving on, during your testimony
2  yesterday, when you were discussing the issue of
3  love -- now you can direct me if I'm wrong -- but
4  I thought that you compared the love that you had
5  for Ms. Sataki as the love that you had for your
6  doing Beverly.
7    A.   No, I didn't do that.  That's very
8  unfair.
9    Q.   Ok.
10    A.   What I'm saying is that there are lots
11  of things in life that I love, ok, and I don't
12  equate a human being such as Ms. Sataki with a
13  dog, even though I love my dog a whole lot.
14        Her name is Beverly.  She's a
15  Labradoodle.
16    Q.   When did you fall in love with Ms.
17  Sataki?
18    A.   I can't say the exact time.  It
19  happens -- you know, it happens over time, that
20  you start to care for somebody deeply.  And that's
21  the way I would more accurately describe it during
22  the time I wasn't involved in the way I was being

Page 1335

1  treated.  Because it was a deep friendship, I
2  thought, and I was being treated badly.
3        And yes, I did love Ms. Sataki.  I did.
4  And I'm not making any apologies for that.  I
5  don't see that that in any way, from my
6  perspective and the perspective of any Bar rules.
7  I didn't engage in any sexual contact with her.  I
8  didn't ask for any.  But to love somebody, you
9  can't control that in real life.
10    Q.   But Ms. Sataki never told you that she
11  loved you, did she?
12    A.   There was one email -- she never said
13  that directly.  She said, wait 'till this thing is
14  over, and in effect then we'll see.  There was one
15  email to that effect during her testimony, just
16  wait till this thing is over.
17        And I think what she was suggesting --
18  I don't know what she was suggesting, but it was
19  suggestive.  I leave it to her to decide what she
20  meant by that.
21        I do know this, if I may answer this
22  question, is that, in retrospect, I see Ms. Sataki

Page 1336

1  as very manipulative, that she wanted to get
2  something from me, and she got a lot from me, and
3  when she didn't get what she wanted at the end,
4  she had to blame somebody, and she blamed me.
5        It was not my fault that she didn't get
6  what she wanted because she abandoned all of her
7  cases, except for that notice of appeal.  I mean,
8  we still probably could have gotten a result in
9  one manner, shape or form.  It's not fair to blame
10  me.
11    Q.   So you'll agree with me that you did
12  have romantic intentions with Ms. Sataki, right?
13    A.   No, I will not agree with that.
14        In fact it's clear in the various
15  correspondence that I said, "I'm not your
16  boyfriend."  I said that.  Did I love her?  Yeah.
17  "But I'm not your boyfriend," and I never, ever
18  tried to get her to be my girlfriend.
19        But there was a very close friendship,
20  and I thought there was affection between us.  And
21  sometimes I couldn't understand why I was being
22  insulted, like I was in Exhibit 38, accused of

Page 1337

1  taking bribes and things like that, and it was
2  upsetting.
3    Q.   Well, let's go through some of the
4  emails and some of the things you said directly to
5  Ms. Sataki or her psychologist about your feelings
6  of love for her.
7        Alright, let's take a look at Bar
8  Exhibit Number 25.
9    A.   Didn't we talk about that before?
10    Q.   I haven't had a chance to talk to you
11  about it, not in the context we're about to.
12        (Witness reads document.)
13        THE WITNESS:  Ok, I just got a call
14  from Mr. Dash.  Let me call back.
15        Can I go down and get him, your Honor?
16        CHAIRMAN FITCH:  I think we'll
17  interrupt your testimony now.  You should bring
18  Mr. Dash up, and we'll get his testimony.
19        THE WITNESS:  You want to take his
20  testimony now?
21        CHAIRMAN FITCH:  Right now.  If he's
22  downstairs, bring him up right now and we'll go

50  (Pages 1334 to 1337)

In Re: Larry E. Klayman
June 26, 2018

## Page 1338

1  from there.
2  THE WITNESS: Thank you. I will.
3  CHAIRMAN FITCH: We are taking a break
4  for a few minutes to facilitate the testimony of
5  another witness and to accommodate the schedule.
6  (Recess taken.)
7  (Attorney for Respondent, Mr. Sujat,
8  present in the court. Respondent, Larry Klayman,
9  not present.)
10  CHAIRMAN FITCH: I'm inclined, Mr.
11  Smith, to recess after this witness' testimony.
12  Does that screw you up at all?
13  MR. SMITH: Not at all. I think that
14  would be perfectly fine.
15  CHAIRMAN FITCH: Thank you. We can go
16  off the record.
17  (Recess taken.)
18  (Keya Dash on the witness stand.)
19  CHAIRMAN FITCH: I believe, sir, you
20  are Mr. Dash?
21  THE WITNESS: Yes, sir.
22  CHAIRMAN FITCH: Why don't you approach

## Page 1339

1  the witness stand. We appreciate your
2  accommodating this this afternoon.
3  THE WITNESS: No problem.
4  CHAIRMAN FITCH: Wait right there just
5  a minute, please. What is your full name?
6  THE WITNESS: My name is Keya Dashtara,
7  D-a-s-h-t-a-r-a. First name K-e-y-a.
8  CHAIRMAN FITCH: If you would raise
9  your right hand, please, sir.
10  Do you swear or affirm that the
11  testimony you are about to give will be the truth,
12  the whole truth and nothing but the truth?
13  THE WITNESS: Yes.
14  CHAIRMAN FITCH: Please be seated, and
15  Mr. Klayman will ask you questions.
16  MR. KLAYMAN: May I ask, your Honor, I
17  thought that I had another copy of Exhibit 7. I
18  made copies, I gave one to Mr. Smith and I'm
19  wondering if I could borrow one of your copies for
20  Mr. Dash.
21  CHAIRMAN FITCH: Sure.
22  MR. KLAYMAN: Thank you.

## Page 1340

1  Whereupon,
2  KEYA DASHTARA
3  called as a witness on behalf of Respondent, and
4  after having been first duly sworn, was examined
5  and testified as follows:
6  DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
7  BY MR. KLAYMAN:
8  Q. Mr. Dash, would you please state your
9  full name.
10  A. My name is Keya Dashtara.
11  Q. Tell us a little bit about your
12  background and your family.
13  A. My dad came here in the '60s; my mother
14  in the '70's. I was a businessman all my life,
15  since adulthood. I suppose -- right after high
16  school I went straight into business anyhow.
17  Q. Right?
18  A. And for the past twenty years, I've
19  been a business owner. I've owned many different
20  companies from retail to consulting, a full
21  plethora.
22  Q. Approximately when did I meet you and

## Page 1341

1  your family?
2  A. At least a decade ago, a very long time
3  ago. You were very close friends with my father,
4  in fact.
5  Q. Your father, actually, he's the one
6  that founded Dash Clothing Designers?
7  A. This is true. In the '70's he founded
8  a chain of retail clothing stores called Dash's
9  Designers. They were based in the metropolitan
10  area, six locations. They were quite big at the
11  time.
12  Q. How did we meet? Do you know?
13  A. Yes. You and I met through a mutual
14  friend named Richard Miniter.
15  Q. What was his position at the time, or
16  had he just leave?
17  A. He had just left the Washington Times.
18  He's a journalist and an author.
19  Q. Ok. And we used to get together at his
20  house?
21  A. Yes.
22  Q. And we became good friends?

App.0555

In Re:  Larry E. Klayman
June 26, 2018

Page 1342

1      A.  Yes, sir.
2      Q.  Your brother, he had, at the time that
3  I met you, been working for Voice of America?
4      A.  That's right.  He was working for the
5  Broadcasting Board of Governors that oversees
6  Voice of America.
7      Q.  Would it be fair to say that your
8  family is a very prominent Persian family in the
9  Washington, D.C. area?
10     A.  Yes.
11     Q.  Did there come a time when I asked you
12 for help for Ms. Sataki?
13     A.  Yes, you did.  You asked me to
14 intervene with a friend I had on the broadcasting
15 board whose name was Blanquita Cullum.  My brother
16 worked in the CFO's office for the Broadcasting
17 Board of Governors and Blanquita was one of the
18 governors.
19         You had asked me to personally make the
20 case to Blanquita as a friend to her.
21     Q.  We're going to get back to that, but
22 for now I turn your attention -- and I will open

Page 1343

1  it up for you, to make it easier -- to Exhibit D
2  of Bar Counsel's exhibits, Exhibit D in front.
3  And it's also Exhibit 5 to Respondent's exhibits.
4      A.  I think they're not labeled the same
5  way here.
6         CHAIRMAN FITCH:  D24 is the affidavit?
7         MR. KLAYMAN:  Exactly, your Honor.
8         CHAIRMAN FITCH:  The declaration.
9  BY MR. KLAYMAN:
10     Q.  Take your time and review that, Mr.
11 Dash.
12     A.  Yes.
13     Q.  Is this affidavit that you signed under
14 oath accurate?
15     A.  Yes, it is true and correct.  Yes.
16     Q.  You signed it on December 20th, 2016.
17     A.  That's right.
18     Q.  I turn your attention to paragraph six,
19 initially, where you state, "Given what I know
20 about VOA and the Persia News Network, the use of
21 publicity to try to coax the managers into a
22 settlement of Ms. Sataki's claims was a prudent

Page 1344

1  strategy, and I'm aware, from having been in Ms.
2  Sataki's presence, that her case was discussed and
3  she approved it."
4         Is that right?
5      A.  Yes.
6         CHAIRMAN FITCH:  If I may interject,
7  "Given what I know about VOA and the Persia News
8  Network and use of publicity to try to coax the
9  managers into a settlement of Ms. Sataki's claim
10 was a prudent strategy," that is opinion testimony
11 and it is not going to be omitted.
12 BY MR. KLAYMAN:
13     Q.  Based on your knowledge of VOA -- I'll
14 ask it a different way -- and your brother having
15 worked there, do you know this to be a very
16 difficult agency to deal with?
17     A.  Yes, particularly very bureaucratic,
18 cavernous.
19     Q.  Did there come a point in time when you
20 met Ms. Sataki?
21     A.  Yes, I did meet her.
22     Q.  When was that?

Page 1345

1      A.  Around February of 2010 I believe is
2  when we met.  We first met at Morton's Restaurant.
3      Q.  I had asked you to come to meet her?
4      A.  That's right.
5      Q.  Yes.  And I was trying to get your help
6  at that time?
7      A.  That's right.
8      Q.  Did we sit in a particular part of
9  Morton's that you like to sit in?
10     A.  Yes.  We sat on the enclosed patio,
11 which is where I usually like to sit because you
12 can smoke there.
13     Q.  Smoke cigars?
14     A.  That's right.
15         CHAIRMAN FITCH:  Is this the Morton's
16 in Georgetown?
17         THE WITNESS:  No, the one on Wisconsin
18 Avenue, on the patio that overlooks Connecticut.
19 BY MR. KLAYMAN:
20     Q.  And you were sitting there -- I'm
21 trying to speed it along -- with me and Ms.
22 Sataki?

52  (Pages 1342 to 1345)

In Re: Larry E. Klayman
June 26, 2018

Page 1346

1      A.  That's right.
2      Q.  Did there come a point in time when we
3  noticed John Boehner?
4      A.  Yes.
5      Q.  Also smoking?
6      A.  Yes.  He was smoking cigars and he was
7  sitting a table over from us.
8      Q.  He was drinking a bit, too?
9      A.  A little more than a bit, but yes.
10     Q.  I then said -- you were there in my
11  presence -- didn't I say to Ms. Sataki, "Let's
12  didn't meet" --
13         CHAIRMAN FITCH:  That's a leading
14  question.
15  BY MR. KLAYMAN:
16     Q.  What did I say to Ms. Sataki about Mr.
17  Boehner?
18     A.  "Let's go talk to Mr. Boehner."
19     Q.  With regard to helping her?
20     A.  That's right.  To plead her case to him
21  and enlist his support.
22     Q.  What did you observe at that point?

Page 1347

1  Did we then go over and I introduced Ms. Sataki?
2      A.  I observed a couple of things: that you
3  knew him, that you were friendly with him, that he
4  heard the case.  He seemed very interested in it.
5  In fact he seemed to side with her.  And that it
6  was a good interaction.
7      Q.  Were you aware as to whether or not I
8  then sought his help?
9      A.  Excuse me?
10     Q.  Are you aware whether or not we sought
11  his help to resolve a situation with her at Voice
12  of America after that?
13     A.  Yes, I am aware that that was the
14  entire purpose.
15     Q.  Did there come another point in time
16  when you met Ms. Sataki?
17     A.  Yes.  There was another occasion that I
18  met her with you at a French restaurant.
19     Q.  In Virginia?
20     A.  In Virginia.
21     Q.  During the two encounters that you had
22  with her, did she explain to you her situation

Page 1348

1  with VOA and ask you for help?
2      A.  Yes.  She told me in depth her issues
3  and she sought my assistance in talking to
4  Blanquita Cullum, in particular, Richard Miniter,
5  also, who is a journalist friend, and others whom
6  I might know.
7      Q.  At that time that I introduced you to
8  Ms. Sataki, did you have any reservations about
9  helping her?
10     A.  Yes.  In the beginning I had quite a
11  few reservations, based on her reputation.
12     Q.  What did you understand that reputation
13  to be?
14     A.  Well, her reputation was something of
15  an opportunist who advances herself, and when she
16  reaches the point of no return, alleges sexual
17  discrimination, sexual harassment.  This was
18  something I had told you at the time.
19     Q.  How did you come to that conclusion?
20  How did you come to that understanding?
21     A.  She used to work at a TV station in Los
22  Angeles before working at the Voice of America.

Page 1349

1  The TV station I believe was called NITV, which is
2  National Iranian Television, and there was a
3  gentleman who owned it names Mr. Zia, Z-i-a,
4  Attaby, A-t-t-a-b-y, and Mr. Attaby was a happily
5  married man, until he met her, at which point he
6  was divorced.  Afterwards he was divorced, because
7  of allegations of an affair and promiscuity on her
8  part.
9      Q.  Is the Persian community a close-knit?
10     A.  Yes, it was very close-knit.
11     Q.  So those were the kinds of things that
12  one learns about families in Washington, D.C.?
13     A.  Yes, sir.
14         MR. SMITH:  Objection, leading.
15  BY MR. KLAYMAN:
16     Q.  After you met her, did you decide to
17  help her, even with those reservations?
18     A.  So I had those reservations and I had
19  reservations, also about the fact that my brother
20  worked there and it might not be prudent.
21         So, after meeting with her the second
22  time, I was convinced to help her.

53  (Pages 1346 to 1349)

App.0557

Page 1350

1    Q.  Was it my urging that played a role in
2  doing that?
3    A.  For the most part, yes.
4    Q.  What if anything did you do after that
5  to try had to help her, with regard to Blanquita
6  Cullum?
7       Who is Blanquita Cullum, specifically?
8    A.  Blanquita Cullum was a governor of the
9  Board of Broadcasting Governors.  She's a radio
10 host.  She's a media personality.  Very well
11 known, especially known within the Latin
12 community.  But particularly she has a reputation
13 on freedom movements in South America and Iran.
14 These are areas of concern for her.
15    Q.  Did you understand her to be a member
16 of the board of governors at VOA?
17    A.  Yes.
18    Q.  How did you know of that?
19    A.  How did I come to know that she
20 works --
21    Q.  Yeah, that she was on the board of
22 governors.

Page 1351

1    A.  She was appointed -- I know this
2  because my brother was employed by her.
3    Q.  Did you ultimately decide to approach
4  Blanquita Cullum to try to help Ms. Sataki?
5    A.  Yes, I did approach Ms. Cullum to help
6  Ms. Sataki.
7    Q.  I'm going to show you what has been
8  marked as Respondent's Exhibit 7.
9       MR. KLAYMAN:  It's not in evidence.
10      THE WITNESS:  Yes.
11      CHAIRMAN FITCH:  Am I correct in
12 understanding you mean to say it's Supplemental
13 Exhibit 7?
14      MR. KLAYMAN:  Yes, Respondent's
15 Supplemental Exhibit 7.
16 BY MR. KLAYMAN:
17    Q.  Now, take an opportunity to look at the
18 dockets and the exhibits.  They purport to be
19 emails by and between you and me, and also there's
20 an email from Ms. Sataki to you.
21      (Witness reads documents.)
22      CHAIRMAN FITCH:  While the witness is

Page 1352

1  reviewing those emails in general, before he's
2  asked a specific question, the testimony about
3  Sataki's reputation is not admitted as repetition
4  testimony.
5       It is admitted as relevant to other
6  issues in the case such as actions that you've
7  testified to that you took and so on.
8       Have you had a chance to look at those?
9       THE WITNESS:  Excuse me?
10      CHAIRMAN FITCH:  Have you had a chance
11 to take a look at those?
12      THE WITNESS:  Yes, sir.
13      CHAIRMAN FITCH:  Go ahead.
14 BY MR. KLAYMAN:
15    Q.  You emailed these last night, correct?
16    A.  Yes, sir.
17    Q.  And I didn't know that you had them.
18 We discussed that, correct?
19    A.  That's true.
20    Q.  Look at the first page where it says,
21 June 25th, 2018, from Keya Dash to Larry Klayman,
22 "Larry, here's an email where I told you I

Page 1353

1  couldn't intervene with BQ because of the fact
2  that my brother worked there.  He later did speak
3  to her, and she passed it off as being in the
4  hands of the lawyers and consequently claimed she
5  couldn't speak about it.  Keya."
6       Do you remember that email that I sent
7  you?
8    A.  That's right.
9    Q.  And then I wrote back to you --
10      CHAIRMAN FITCH:  Who is "her"?
11 BY MR. KLAYMAN:
12    Q.  Who is the "her" we're talking about?
13    A.  We're speaking about Ms. Sataki.
14    Q.  And I had written to you earlier.  It's
15 below, the email of 2010.  You see that, an email?
16      "Keya, this matter only involves having
17 the woman taken out of the DC office and put in
18 LA.  I don't want to have to sue.  So if someone
19 could get beyond the political nonsense, this
20 would be in the best interest of all.
21      "BQ, Blanquita Cullum, is very
22 political, and at this point it's someone neutral

Page 1354

1   to show here that a woman's life is at stake.
2        "Washington is a very cruel and cold
3   place.  BQ Blanquita Cullum, thinks only of
4   herself, by doing this I wanted to avoid
5   consequences for her.  I wanted to avoid this."
6        CHAIRMAN FITCH:  Sir, going back to the
7   area I just asked you about, when you wrote to Mr.
8   Klayman, "I later did speak to her and she passed
9   that off as being in the hands of all the
10  lawyers," now is "her" Ms. Sataki or is that BQ?
11       THE WITNESS:  Oh, that "her" is BQ.
12       CHAIRMAN FITCH:  Ok.
13       Go ahead, Mr. Klayman.
14  BY MR. KLAYMAN:
15       Q.   And you aware that I considered myself
16  to be a friend of BQ, too?
17       A.   Yes.
18       Q.   Did I ever tell you that I was on a
19  radio show a lot with her?
20       A.   I wouldn't know.
21       CHAIRMAN FITCH:  Irrelevant, struck.
22  BY MR. KLAYMAN:

Page 1355

1        Q.   Ok.  Then I'm going to turn your
2   attention to the next page in the emails, an email
3   from Larry Klayman to you on February 22nd, which
4   states, "Keya, what happened with BQ?  Thanks,
5   Larry."
6        Do you remember receiving that?
7        A.   Yes.
8        Q.   I'll turn your attention, flipping the
9   page, to an email from you to me, on Monday, June
10  25th, 2018, where you're writing to me saying, "In
11  reviewing my files, I have this email below that
12  you forwarded to me.  In order that I speak to
13  Blanquita, you copied journalist Richard Miniter,"
14  M-i-n-i-t-e-r, "regarding an email and Mitch
15  Baxter."
16       Do you see that?
17       A.   Yes, I do.
18       Q.   And Mitch Baxter, he was a friend of
19  ours, too?
20       A.   That's right.
21       Q.   And he was also trying to help.
22       Ok, so, then I wrote, this is an email

Page 1356

1   the 2nd of March from me to you, "Keya, I'm losing
2   respect for Blanquita.  If she thinks I won't sue
3   her if necessary, then she does not know me very
4   well.  There is a human life involved here, and I
5   will not hold back.  I hope you're well enough in
6   the next day.  Best Larry."
7        You remember receiving that?
8        A.   Yes.
9        Q.   And then there's, on the next page
10  there's an email that I sent to Blanquita, "Please
11  take steps to resolve this.  I'm the guy who sued
12  his own mother and if you think this will just go
13  away, you don't know me very well.  While you are
14  a board of governors" --
15       CHAIRMAN FITCH:  I can read the whole
16  thing.
17       MR. KLAYMAN:  Ok, that's fine.
18  BY MR. KLAYMAN:
19       Q.   So you remember receiving this from me,
20  correct, Keya?
21       A.   Yes.
22       Q.   Then there's an email below and that I

Page 1357

1   forwarded to you which --
2        CHAIRMAN FITCH:  Let me ask you, sir,
3   in that email Mr. Klayman -- this the March 2nd
4   email -- Mr. Klayman wrote do you see in the final
5   paragraph, "Any additional delay by the board or
6   agency will put her over the edge.  Her doctor
7   already documented her suicidal state."
8        Do you see where Mr. Klayman says that
9   to you?
10       (Witness nods head in the affirmative.)
11       CHAIRMAN FITCH:  Had you made any
12  observations of Ms. Sataki or the board at this
13  point in time, the January, February, very early
14  March 2010 point in time?
15       THE WITNESS:  I had observed that she
16  was very distraught, very nervous, easily
17  agitated, very concerned.
18       CHAIRMAN FITCH:  I apologize for
19  interrupting.  Go ahead.
20       MR. KLAYMAN:  That's ok.
21
22  BY MR. KLAYMAN:

55  (Pages 1354 to 1357)

In Re:  Larry E. Klayman
June 26, 2018

Page 1358

1      Q.   And again this was early on.  This was
2  back in February of 2010?
3      A.   That's right.
4      Q.   Then I write, at the bottom of the page
5  from the email, Tuesday, March 2nd, 2010, from me
6  to BQview (phon).  That's the email of Blanquita
7  Cullum, correct?
8      A.   Yes, I see that.
9      Q.   I sent that to you.
10         I said, "Blanquita, please take steps
11  to resolve this."  I'm not going to repeat the
12  email -- "remember, I'm the guy who sued my own
13  mother."  My stepfather took my grandmother's
14  money.  My grandmother had dementia and
15  Alzheimer's.
16         CHAIRMAN FITCH:  Did you receive this
17  email?
18         THE WITNESS:  Yes, sir, I did.
19  BY MR. KLAYMAN:
20      Q.   And I say to her at the end, "As a
21  board of governor you have the ability to have
22  this resolved."

Page 1359

1      A.   Mm-hmm.
2      Q.   And then, on the next page, there's an
3  email that Ms. Sataki sent to you on February
4  21st, 2010: "This is Ellie Sataki.  Thanks for the
5  push with Blanquita."
6         You see that?
7      A.   Yes.
8      Q.   And you got that from Ms. Sataki,
9  herself?
10      A.   That's right.
11      Q.   And then above that you're sending me
12  that email that you got from her.
13      A.   That's right.  I was forwarding it back
14  to you.
15      Q.   Yeah, so that she thanked me.
16         And then the next email is attached.
17  Apparently I gave you that so you could watch her
18  videos.  I got you that so you could watch her
19  videos of her appearances on TV, a glimpse.
20      A.   Yes.  I was already aware, but I did
21  watch those videos as well.
22      Q.   Correct.

Page 1360

1         And then the next one is an email from
2  you to me of June 25th, 2018: "Larry, below is
3  another email.  Tim Shamble at Voice of America
4  wrote an email to Tim Shambles" -- he probably
5  meant VOA -- "supportive of Elham Sataki.  He
6  forwarded that email to you and also then appealed
7  to you, so I could send it to my best friend,
8  Richard Miniter.  (Inaudible)
9         "I'll bring the book if I can find it,
10  Keya."
11         I was trying to get Mr. Miniter to
12  write a positive article, too, for settlement,
13  correct?
14      A.   That's right.
15      Q.   And then there's an email, the next
16  email from Tim Shamble to Elham Sataki, which I
17  apparently forwarded to you, and it's Mr. Shamble
18  again appealing to Paul Kollmer-Dorsey,
19  K-o-l-l-m-e-r dash D-o-r-s-e-y, the general
20  counsel of Voice of America trying to settle this
21  matter."
22         Take a look at that.

Page 1361

1         (Witness reads document.)
2         CHAIRMAN FITCH:  For the record, this
3  purports would be a February 26, 2010 email
4  dispatched at 10:29:36.
5         MR. KLAYMAN:  Correct.  It says
6  original message below, February 10, two days --
7  three days --
8         THE WITNESS:  Oh, I see the one, yes.
9  BY MR. KLAYMAN:
10      Q.   So did you take that to understand that
11  Mr. Shamble was trying to get a settlement from
12  VOA?
13      A.   That's correct.
14      Q.   So, Mr. Dash, you used your personal
15  efforts and the prestige of your family in the
16  Persian community to try to help Ms. Sataki?
17      A.   Yes.  I believe she knew I was
18  reluctant to help in the beginning and she tried
19  to have me coax them, and I did.  I did speak to
20  her.
21      Q.   What was your observation, in looking
22  that I was trying to help her, in terms of my

56  (Pages 1358 to 1361)

Page 1362

1  efforts to help her?
2      A.  You were very -- let me preface it.
3      You've always been very concerned with
4  your own affairs, and you've always been very
5  passionate about the Iranian freedom movement.
6  And so you've always been known to support the
7  Iranian community, and I took it as just another
8  example of that.
9      Q.  Did I work very hard for her?
10     A.  Yes, absolutely.
11     Q.  And I used my own personal --
12         MR. SMITH:  Objection.
13         CHAIRMAN FITCH:  Sustained.
14         MR. KLAYMAN:  Ok.  No further guess.
15     I move Respondent's Supplemental
16  Exhibit 7 into evidence.
17         MR. KLAYMAN:  No objection.
18         CHAIRMAN FITCH:  Ok.
19         Mr. Smith.
20
21
22

Page 1363

1      CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
2         BY MR. SMITH:
3      Q.  Good afternoon, Mr. Dash.
4      A.  Good afternoon, sir.
5      Q.  In your affidavit -- and I don't know
6  if you still have it in front of you.  I don't
7  know whether you were looking --
8      A.  I have it here.
9         MR. KLAYMAN:  Let me help him.
10        MR. SMITH:  He's got it, ok.
11  BY MR. KLAYMAN:
12     Q.  Paragraph five you said you've known
13  Mr. Klayman for several years and knew him as a
14  friend and consulted with him on matters in the
15  past.
16     A.  Yes.
17     Q.  How long have you known him?
18     A.  At least ten years.
19     Q.  At least ten years.  And you say your
20  parents have know him as well?
21     A.  Yes.
22     Q.  They know him the same amount of time

Page 1364

1  or longer?
2      A.  The same amount of time.
3      Q.  How did you come to meet him?
4      A.  I met him through a mutual friend
5  called Richard Miniter.
6      Q.  Do you often dine with him?
7      A.  With Mr. Klayman?
8      Q.  Yes.
9      A.  I don't know that I dine particularly
10  much with him, no.
11     Q.  Did you hang out with him much?
12     A.  Yes, we've hung out a lot, sure.
13     Q.  What do you do when you're hanging out
14  with Mr. Klayman?
15     A.  Mostly just talk, current events.
16     Q.  Do you hang out at bars?
17         MR. KLAYMAN:  Objection, relevance.
18         MR. SMITH:  I'm trying to figure out
19  how they're depends, the nature the friendship.
20         This is like discovery for me.
21         CHAIRMAN FITCH:  I allowed his
22  question; I'm waiting for his answer now.

Page 1365

1      THE WITNESS:  Excuse me?
2      Can you repeat the question?
3  BY MR. KLAYMAN:
4      Q.  Yeah, do you hang out with him at bars,
5  for example?
6      A.  Not particularly.
7      Q.  Where do you hang out with him?
8      A.  At that time often at Mr. Miniter's
9  house, as an example, or at my own house.
10     Q.  Now, this declaration, it was prepared
11  by Mr. Klayman, correct?  You didn't write this
12  yourself, did you?
13     A.  To be honest, I don't remember how it
14  was prepared.
15     Q.  You don't remember how it was prepared?
16     A.  I might have added to it.
17     Q.  You might have added to it.
18     A.  Yeah.
19     Q.  But you didn't write the whole thing,
20  yourself?
21     A.  I could have.  Yeah, it's not very
22  long.

Page 1366

1  Q.  Alright.
2     Have you ever been to law school?
3  A.  No, sir.
4  Q.  No, ok.
5     So Mr. Klayman told you about the --
6     MR. TIGAR:  Excuse me just a minute.
7     I didn't understand your last answer.
8  Who did the first draft of the declaration?
9     THE WITNESS:  I don't remember.  But
10 it's very straightforward and it's very short.
11 But it's conceivable that I did write this because
12 I do write this way, too.
13    MR. TIGAR:  But you don't remember one
14 way or the other?
15    THE WITNESS:  I don't remember who
16 wrote it in its initial stage, because this was
17 2015.  It was a few years ago.
18 BY MR. SMITH:
19 Q.  Do you know why you wrote this?
20 A.  I wrote it in order to memorialize my
21 account, which is in the document.
22 Q.  Did Mr. Klayman ask you to write this?

Page 1367

1  A.  Yes, Mr. Klayman asked.
2  Q.  Did he tell you why he wanted you to
3  write this for him?
4  A.  I told me that there was a conflict
5  with Ms. Sataki and he wanted me to write about
6  what I remember about the issues that are in the
7  document.
8  Q.  Did you read any materials that May
9  have served as the basis for the complaint that
10 was going --
11 A.  Are you asking if I read the complaint?
12 Q.  Yes.
13 A.  I have not read the complaint.
14 Q.  But you understood that you were
15 supposed to be helping him respond to something?
16 A.  He asked me about my knowledge of
17 certain things and I put it in the document.
18 Q.  Did he ask you whether or not he had a
19 romantic relationship with Ms. Sataki?
20 A.  Are you asking if I asked him this?
21 Q.  No, did he ask you to put your
22 recollections down about any romantic relationship

Page 1368

1  he may have had with Ms. Sataki?
2  A.  I don't understand that question.
3  Q.  Look at paragraph five again and, when
4  you've read the entire paragraph, let me know.
5     (Witness reads document.)
6  A.  Yes, I've read it.
7  Q.  And there's a sentence that says, "With
8  regard to Ms. Sataki, I was present with Larry and
9  Ms. Sataki to discuss her case on more than one
10 occasion.  I observed that he always treated her
11 with respect and was not in any way involved in a
12 romantic relationship with her and nor did he seek
13 one."
14 A.  Yes.
15 Q.  Why did you write that?
16 A.  He told me that one of the allegations
17 was that there was a romantic relationship.
18    I haven't read the complaint, but
19 that's what he told me.
20 Q.  But that was one of the allegations,
21 and he wanted you to --
22 A.  My understanding, yes.

Page 1369

1  Q.  He wanted you to talk about what your
2  recollection was about his involvement with her
3  regarding sexuality, right?
4  A.  Yes.
5  Q.  Now during your testimony earlier
6  today, you talked about Ms. Sataki's reputation --
7  A.  Mm-hmm.
8  Q.  And that she doesn't necessarily have a
9  great reputation in the Persian community.
10    You didn't think that was something
11 important to put in the declaration in order to
12 help your friend deal with an allegation about him
13 being in a romantic relationship with her?
14    MR. KLAYMAN:  Compound question.
15    THE WITNESS:  Well, I think you're
16 asking if something was left out?
17    CHAIRMAN FITCH:  Sir, there's an
18 objection.
19 BY MR. SMITH:
20 Q.  That's exactly what I'm asking.
21    CHAIRMAN FITCH:  I'm thinking about
22 this, and it's always a slow process.

58 (Pages 1366 to 1369)

Page 1370

1    If you want to ask that question, Mr.
2  Smith, I'm going to have to consider whether you
3  have opened a door and that therefore I have to
4  admit Mr. Dash's prior testimony about reputation
5  for the purpose of reputation.
6    You can ask that question in a few more
7  minutes, or you can withdraw the question.
8    MR. SMITH:  No, I will ask that
9  question.
10    CHAIRMAN FITCH:  Ok.
11    MR. SMITH:  The testimony is already in
12  the record, so it will be received for how it's
13  going to be received.
14    CHAIRMAN FITCH:  Ok.
15    THE WITNESS:  Are you asking me why
16  something is not in the document?
17  BY MR. SMITH:
18    Q.  Yeah.
19    A.  The subject of the document is Larry,
20  and so, I think, in my own thought process, I
21  wouldn't have put it, if that makes sense to you.
22  It's centered around Larry.

Page 1371

1    Q.  It doesn't matter whether it makes
2  sense to me, sir.
3    CHAIRMAN FITCH:  Please.
4    MR. SMITH:  Alright.
5  BY MR. SMITH:
6    Q.  So, at the time that you wrote this
7  document, you said that you were not aware that he
8  was involved in a romantic relationship with Ms.
9  Sataki, nor did he seek one.
10    CHAIRMAN FITCH:  No, your question was
11  somewhat different from --
12    MR. SMITH:  No, I'm actually repeating
13  what was in his affidavit.
14  BY MR. KLAYMAN:
15    Q.  My question was, in your affidavit you
16  state that "Mr. Klayman was not in any way
17  involved in a romantic relationship with her,"
18  meaning Ms. Sataki.
19    CHAIRMAN FITCH:  Ok.
20  BY MR. SMITH:
21    Q.  "Nor did he seek one."
22    A.  Yes.

Page 1372

1    CHAIRMAN FITCH:  That's a fair
2  question.
3  BY MR. SMITH:
4    Q.  Would you be surprised if I told you
5  that Mr. Klayman was sending emails to --
6    MR. KLAYMAN:  Objection.
7  BY MR. SMITH:
8    Q.  -- Ms. Sataki expressing his love --
9    MR. KLAYMAN:  Objection.
10  BY MR. SMITH:
11    Q.  -- his love for her?
12    CHAIRMAN FITCH:  I'll hear the
13  objection.  What is it?  Tell me your objection.
14    MR. KLAYMAN:  He's editorializing.
15  It's nothing he has knowledge of, based on his
16  testimony.
17    MR. SMITH:  He's also testified about
18  his character.
19    CHAIRMAN FITCH:  I think that that is
20  probably a fair question on cross-examination and
21  the objection is overruled.
22

Page 1373

1  BY MR. SMITH:
2    Q.  So would you be surprised if I told
3  that you Mr. Klayman was sending -- exchanging
4  emails with Ms. Sataki wherein he expressed his
5  love for her?
6    MR. KLAYMAN:  Objection.
7    THE WITNESS:  I don't know about it.  I
8  don't know about it.
9  BY MR. SMITH:
10    Q.  Would you be surprised if that was the
11  case?
12    A.  I'd be surprised.
13    Q.  Because, as far as you knew, he didn't
14  have any romantic -- he did not concede a romantic
15  relationship with her?
16    A.  That's correct.
17    Q.  Let me show you what's been marked
18  Supplemental Exhibit Number 3.  I don't know if
19  you have in front of you.
20    MR. KLAYMAN:  Exhibit 3 in the --
21    MR. SMITH:  Supplemental Exhibit 3,
22  Disciplinary Counsel's Supplemental Exhibit 3.

59  (Pages 1370 to 1373)

## Page 1374

1      THE WITNESS: Yes.
2  BY MR. SMITH:
3      Q.  Mr. Klayman never told you about these
4  feelings that he may have been having for Ms.
5  Sataki?
6      A.  I've only taken a cursory look at this,
7  but I'm not sure that this says what you say it's
8  saying.
9      Q.  Look at the second paragraph from the
10 bottom.
11     A.  Ok.
12     MR. SMITH:  For the record, this is a
13 letter from Elham Sataki -- April 23rd, 2010, and
14 it's written by Larry Klayman.
15 BY MR. SMITH:
16     Q.  And it says, "I am human, you are, and
17 this is to for the only woman that I have ever
18 really loved.  You know, when I walk down Beverly
19 Hills, I see an attractive woman, my thoughts
20 immediately flip to you.  I see no one else.  This
21 has never happened like this with me before."
22     Mr. Klayman never expressed those kinds

## Page 1375

1  of emotions that he had for Ms. Sataki to you?
2      A.  The fact is I can only go based on what
3  I've seen and what I know.
4      Q.  Ok.
5      A.  And what I have seen and therefore what
6  I know is that his interactions were perfectly
7  professional and he was a very zealous advocate.
8      He was very passionate certainly about
9  the case, but he was a very zealous advocate and
10 that's what I knew him about.
11     Q.  In your affidavit which was dated
12 September 20th, 2016, about six years after this
13 email went out, you had no idea that this kind of
14 email correspondence was going on between Mr.
15 Klayman and Ms. Sataki, correct?
16     A.  I did not see this email before.
17     Q.  Yeah, and you had no idea of what his
18 emotions may or may not have been towards Ms.
19 Sataki, correct?
20     A.  Mr. Klayman and I are friends, and I
21 think I would have come to know if there was some
22 sort of over-romantic desire on his behalf.  I

## Page 1376

1  would have known about that.  He never expressed
2  it to me.
3      MR. SMITH:  I have no further
4  questions.
5      CHAIRMAN FITCH:  Redirect, Mr. Klayman?
6      MR. KLAYMAN:  Yes, just one question.
7      REDIRECT EXAMINATION ON BEHALF OF RESPONDENT:
8      BY MR. KLAYMAN:
9      Q.  Looking at the affidavit, is that
10 accurate, what you wrote there?
11     A.  Yes.  This is all accurate.
12     Q.  And you signed it under oath?
13     A.  I signed it under oath.
14     And also I've been thinking about this
15 while I've been testifying on other things.  I
16 think I showed this to an attorney, as well, my
17 own attorney, as well.  And it could be that he
18 originated it.
19     MR. KLAYMAN:  Ok, I have no further
20 questions.
21     THE WITNESS:  Sure.
22     CHAIRMAN FITCH:  Thank you, sir, for

## Page 1377

1  coming down to be a witness at these proceedings.
2  It has been helpful to our process, to say the
3  least, and we all very much appreciate it.
4      THE WITNESS:  Thank you.
5      CHAIRMAN FITCH:  You are excused.  Have
6  a pleasant evening.
7      (Witness is excused.)
8      MR. KLAYMAN:  Let me just see him
9  downstairs.  I'll just be a minute.
10     CHAIRMAN FITCH:  A minute.
11     MR. KLAYMAN:  A minute.
12     (Brief pause.)
13     (Mr. Sujat, counsel for the Respondent,
14 is present before the hearing committee.  Mr.
15 Klayman is not present.)
16     CHAIRMAN FITCH:  We are ready to start.
17     Do you have any more testimony to
18 present in your case?
19     MR. SUJAT:  No, I don't have anything
20 further.
21     CHAIRMAN FITCH:  So you're prepared to
22 rest?

60  (Pages 1374 to 1377)

Page 1378

1       MR. SUJAT:  I am.
2       CHAIRMAN FITCH:  The Respondent has
3  rested his case.
4       MR. SMITH:  I still have some
5  cross-examination that I'm going to resume
6  tomorrow.
7       CHAIRMAN FITCH:  That is a fair point.
8  That is a fair point.
9       Mr. Smith has further cross-examination
10  of Mr. Klayman and we will take that tomorrow
11  morning.
12       Do you have any rebuttal case?
13       MR. SMITH:  No.
14       (Mr. Klayman present before the hearing
15  committee.)
16       CHAIRMAN FITCH:  We will have closing
17  arguments at approximately 11:00 a.m. tomorrow
18  morning.  Closing arguments will be approximately
19  half an hour each, with some flexibility.
20       I will expect Mr. Smith to be prepared
21  to specify for me -- he can say whatever he wants
22  to in his closing argument, but to specify for me

Page 1379

1  with respect to each of the four counts what the
2  theory is and what the -- in general what the
3  evidence is with respect to each of the charges in
4  each of the counts.
5       Do you have anything further, Mr.
6  Klayman?
7       MR. KLAYMAN:  Yes, your Honor.  I
8  suppose after that we'll be doing a post-hearing
9  brief.
10       CHAIRMAN FITCH:  If, "if" we make a
11  finding tentatively of the possibility of some
12  finding of violation, then we'll discuss a
13  briefing schedule.
14       If we don't reach a tentative
15  conclusion that there is even one violation, then
16  I don't know quite what happens.
17       MR. SMITH:  I think what happens if
18  there is no violation, there's been no aggravation
19  or mitigation --
20       MR. KLAYMAN:  Well, what I was going to
21  request is, before you make that finding, one way
22  or the other, whether it was a tentative ruling,

Page 1380

1  then we do a post-hearing brief.
2       CHAIRMAN FITCH:  Read the rules.  The
3  rules don't allow me to do that.
4       MR. KLAYMAN:  Ok.
5       CHAIRMAN FITCH:  I don't say I agree
6  with the rules, but those are the rules.
7       MR. KLAYMAN:  It would make your life
8  easier, but...
9       CHAIRMAN FITCH:  I think I'll have to
10  disagree with you.
11       MR. SMITH:  Will we be meeting tomorrow
12  at 9:30 tomorrow morning for the
13  cross-examination?  We have to leave time for the
14  oral arguments --
15       CHAIRMAN FITCH:  Well, I hope that your
16  cross-examination will --
17       MR. KLAYMAN:  I wanted to say one other
18  thing.
19       CHAIRMAN FITCH:  Well, wait a minute --
20       MR. SMITH:  There's still one witness
21  that's going to be here tomorrow, Ashley Klayman,
22  so I want to present her.

Page 1381

1       CHAIRMAN FITCH:  Who?
2       MR. KLAYMAN:  Ashley Klayman.
3       CHAIRMAN FITCH:  Who is she?
4       MR. KLAYMAN:  She's my sister.  She's a
5  lawyer and she was privy to discussions with Ms.
6  Sataki.  She is on the witness list.
7       CHAIRMAN FITCH:  And she'll be here.
8       How long is your cross-examination
9  going to be?
10       MR. SMITH:  It depends on the
11  Respondent's answers.
12       CHAIRMAN FITCH:  But you're not going
13  to be here roughly two days.  I don't see any
14  reason for the cross-examination to go more than
15  an hour and a half, Mr. Smith.
16       MR. SMITH:  And I would not either, but
17  it depends on the cooperation of the witness.
18       CHAIRMAN FITCH:  I would like to ask
19  you to accommodate Mr. Klayman and have Ms.
20  Klayman be available at around 11:00 a.m.
21       Is that alright.
22       MR. KLAYMAN:  That's fine.

61  (Pages 1378 to 1381)

In Re:  Larry E. Klayman
June 26, 2018

```
                                    Page 1382
 1        CHAIRMAN FITCH:  And I anticipate we
 2   will have closing argument after lunch.
 3        MR. KLAYMAN:  That works.
 4        CHAIRMAN FITCH:  We stand in recess.
 5        (Whereupon at 4:35 p.m. the hearing was
 6   in recess until Friday, June 27th, 2018, at 9:30
 7   a.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

62  (Page 1382)

App.0566

**A**

**A-t-t-a-b-y** 1349:4
**a.m** 1142:3 1378:17
1381:20 1382:7
**abandoned** 1191:18
1241:11 1243:8
1255:7 1336:6
**abeyance** 1263:17
1264:4
**ability** 1300:4
1303:21 1304:11
1358:21
**able** 1154:17
1206:18 1245:20
1252:20 1259:17
1275:12 1279:19
1279:20 1300:21
1308:17
**abrupt** 1253:18
**absolute** 1242:20
**absolutely** 1362:10
**accept** 1158:7
1159:11 1250:20
1315:13
**acceptable** 1297:13
**accepted** 1159:9
**accident** 1160:2
1224:3
**accommodate**
1170:14 1338:5
1381:19
**accommodating**
1145:14 1339:2
**accommodation**
1177:6 1284:21
1297:2,22
1308:20
**account** 1366:21
**accountable**
1208:20
**accountant** 1162:16
**accurate** 1343:14
1376:10,11
**accurately** 1334:21
**accused** 1336:22
**Accuses** 1214:11
**acknowledge**
1286:18
**act** 1203:3
**action** 1150:9,16
1181:22 1192:7
1192:10 1194:14
1209:5 1260:5
**actions** 1260:3
1272:3 1277:10
1285:9 1287:3,15

1289:1 1313:3
1352:6
**active** 1221:5
1284:14
**activism** 1164:4
**activity** 1219:14
**actual** 1163:15
1174:3 1222:6
**Ad** 1142:3,10
**add** 1161:8 1181:4
1196:4 1212:9
1214:21 1218:21
1223:14 1287:22
1290:18 1293:9
1301:1
**added** 1365:16,17
**addition** 1154:4
1284:16 1299:22
1302:21
**additional** 1357:5
**address** 1146:16
1283:13
**addressed** 1311:11
1324:7
**addresses** 1161:11
1238:12
**administrative**
1173:9
**administratively**
1249:3
**admire** 1218:14
**admissions** 1296:5
**admit** 1370:4
**admitted** 1151:17
1152:6 1153:13
1153:21 1246:15
1263:13,14
1264:20 1265:17
1267:9 1352:3,5
**adulthood** 1340:15
**advance** 1146:8
1201:18 1218:18
**advances** 1348:15
**advertisements**
1202:10
**advertising** 1203:9
**advice** 1168:10
1190:12
**advise** 1272:10,12
1279:3
**advised** 1219:10,11
1275:16 1288:6
1289:17 1312:7
1315:15
**advising** 1190:9
**advisor** 1219:12

**advocacy** 1251:8
**advocate** 1251:18
1375:7,9
**affair** 1349:7
**affairs** 1362:4
**affection** 1336:20
**affidavit** 1145:22
1167:18 1178:11
1178:11,12
1179:1,8 1181:9
1243:17 1244:22
1247:1 1343:6,13
1363:5 1371:13
1371:15 1375:11
1376:9
**affidavits** 1154:5,8
1157:19 1158:7
1158:16 1246:22
**affirm** 1171:1
1339:10
**affirmative** 1235:14
1236:12 1357:10
**aftereffects**
1309:19
**afternoon** 1262:4
1267:6,7 1339:2
1363:3,4
**agency** 1173:5
1190:14 1191:6
1287:3,15
1289:18 1294:1
1313:5 1315:12
1344:16 1357:6
**aggravation**
1379:18
**agitated** 1357:17
**ago** 1176:10,12
1215:5 1233:18
1244:10 1281:3
1325:18 1341:2,3
1366:17
**agree** 1189:14
1209:18 1221:2
1248:20 1280:7
1290:14 1336:11
1336:13 1380:5
**agreed** 1169:13
1174:15
**agreement** 1215:18
1252:7
**ahead** 1161:6
1168:14 1189:1
1197:19 1199:13
1203:21 1218:11
1232:6 1238:19
1240:22 1264:22

1275:14 1277:1
1284:4 1285:22
1291:13 1295:6
1301:13,21
1302:4 1318:2,5
1324:2 1352:13
1354:13 1357:19
**ahold** 1255:18
1272:5,6 1274:21
**aide** 1333:16
**alarm** 1240:18
**Ali** 1219:9 1271:10
1328:20
**Alice** 1198:11
1199:3
**alive** 1208:10
1230:9 1253:4
**allegation** 1369:12
**allegations** 1214:13
1235:15 1349:7
1368:16,20
**alleged** 1150:7
1162:4 1164:20
1173:4 1184:11
1310:15
**allegedly** 1216:4
**alleges** 1348:16
**alleviate** 1214:15
**allow** 1184:6,7
1261:18 1275:11
1380:3
**allowed** 1177:22
1180:5 1259:8
1284:6 1364:21
**allowing** 1238:11
**Allred** 1170:5
1229:1,3 1230:1
1231:11,12,21
1232:3 1256:14
1256:16,19
**alright** 1149:8
1172:13 1202:17
1211:11 1216:9
1229:16 1233:16
1235:18 1237:4
1265:7 1281:9
1305:16,21
1306:18 1311:15
1321:15 1323:17
1325:9 1327:21
1337:7 1366:1
1371:4 1381:21
**alternative** 1155:12
**Alzheimer's**
1358:15
**amended** 1180:8

**amendment** 1165:9
1182:10
**America** 1173:5
1176:6 1200:19
1204:18 1222:13
1328:21 1342:3,6
1347:12 1348:22
1350:13 1360:3
1360:20
**American** 1218:19
1224:7
**ammunition**
1194:13
**amount** 1363:22
1364:2
**analysis** 1283:6
**and/or** 1155:9
1190:10 1272:1
**Angeles** 1154:16
1160:1 1161:13
1173:8 1176:6,14
1278:2 1296:17
1308:19 1348:22
**angry** 1320:6,11,18
**answer** 1211:3,3
1232:19 1233:9
1233:10,16
1235:13 1236:12
1238:11 1246:14
1250:1 1275:9,11
1275:13 1283:7
1290:2,5,15,19
1294:20 1305:15
1321:21 1322:15
1322:16 1323:4
1323:11,18
1324:22 1325:6
1327:4 1328:3
1335:21 1364:22
1366:7
**answered** 1309:11
1321:22 1323:20
**answers** 1381:11
**ANTHONY**
1142:11
**anticipate** 1382:1
**anybody** 1195:12
1207:22 1257:7
**anymore** 1288:11
**anyway** 1184:15
1213:8
**apart** 1169:17
**apartment** 1194:11
1268:17
**apologies** 1335:4
**apologize** 1194:5

1357:18
apparent 1307:4
apparently 1230:16
  1232:1 1239:22
  1240:10,21
  1272:10 1289:5
  1359:17 1360:17
appeal 1168:2
  1169:6 1183:16
  1184:15 1185:1,8
  1185:12,21
  1187:2 1188:1,7
  1188:15 1190:18
  1191:2,4,15
  1273:2 1276:3
  1278:18 1284:6
  1284:10 1336:7
appealed 1360:6
appealing 1186:9
  1360:18
APPEALS 1141:1
appear 1146:13
appearances
  1142:9 1143:1
  1359:19
appeared 1172:8
  1245:18 1318:8
appearing 1252:11
appears 1218:9
  1246:18 1255:17
  1327:7
appointed 1164:5
  1208:12 1351:1
appointee 1222:18
appreciate 1170:6
  1177:6 1339:1
  1377:3
approach 1230:20
  1338:22 1351:3,5
appropriate
  1259:19
approved 1200:14
  1243:19 1344:3
approximately
  1167:3 1317:19
  1340:22 1378:17
  1378:18
April 1150:16
  1194:8 1218:5
  1220:13 1311:10
  1374:13
area 1193:9
  1341:10 1342:9
  1354:7
areas 1350:14
argument 1225:6

1248:18,21
1378:22 1382:2
argumentative
  1327:20
arguments 1259:18
  1378:17,18
  1380:14
Arlene 1307:11
  1310:3 1311:11
arrange 1217:17
  1251:20
arranged 1251:21
arrive 1164:2
article 1163:10
  1200:5,8,9,17,21
  1202:14,16,19,19
  1204:1,16
  1205:10 1206:6,8
  1207:9,13 1208:5
  1213:4,10,13
  1215:20,21
  1217:1,13,16,18
  1217:19 1218:4
  1222:9 1248:3
  1328:6,10,22
  1329:3,8,18,20
  1330:3 1331:1,4,9
  1331:14,15
  1332:13 1333:17
  1360:12
articles 1200:11,22
  1205:2 1211:6,22
  1213:15,18
  1214:3,8 1215:10
  1216:12 1220:7,8
  1220:12,13,15
  1221:18,22
  1223:12 1260:6
  1313:15 1318:8
  1318:12,16,21
  1329:7
Asbill 1252:5
ascertain 1187:22
Ashley 1380:21
  1381:2
aside 1234:4
asked 1156:3,4
  1158:1,5,6 1159:8
  1169:8 1173:17
  1174:7,12
  1182:15 1184:20
  1185:8 1188:13
  1195:21 1197:13
  1198:2 1213:3
  1219:14 1233:4
  1239:18,22

1244:6,8 1245:8
1252:17 1254:5,9
1264:10 1268:17
1268:18 1271:7
1272:6 1275:6,22
1276:12 1279:6
1279:17 1283:15
1283:21 1284:20
1285:10 1287:8
1291:20 1296:15
1297:8,15
1305:22 1306:19
1307:22 1308:22
1313:19 1314:3
1316:11 1321:22
1323:15 1326:16
1342:11,13,19
1345:3 1352:2
1354:7 1367:1,16
1367:20
asking 1167:21
  1179:7 1225:8
  1239:13 1263:21
  1326:19 1327:14
  1367:11,20
  1369:16,20
  1370:15
aspect 1153:10
  1157:8 1169:17
  1241:15 1278:17
aspects 1180:3
asserted 1225:9
assign 1155:12
assigned 1152:13
assignment 1155:14
assist 1331:2
  1332:18
assistance 1296:14
  1306:20 1309:17
  1348:3
assistant 1293:13
assistants 1198:13
assisting 1160:13
associate 1160:12
associated 1215:10
association 1216:11
assume 1255:6
atmosphere
  1256:13
Attaby 1349:4,4
attach 1250:1
attached 1246:13
  1246:20 1249:17
  1359:16
attaches 1235:16
attachments

1157:17
attempt 1153:7
  1221:12
attention 1193:12
  1200:18 1205:22
  1246:17 1259:10
  1261:7 1264:6
  1319:1 1342:22
  1343:18 1355:2,8
attorney 1142:16
  1142:18 1338:7
  1376:16,17
Attorney's 1255:3
attractive 1374:19
August 1178:1
  1186:9 1273:15
  1278:15 1281:13
  1281:21 1286:9
  1286:20 1292:9
  1293:1 1301:22
  1301:22 1321:16
  1322:7,21
Austin 1168:21
  1186:8 1286:20
  1287:2,7,14,16
  1288:22
authenticity
  1322:13
author 1217:18
  1341:18
authority 1256:9
auto 1224:3 1321:6
autobiography
  1206:7 1321:6
automatic 1181:8
available 1261:19
  1262:7 1381:20
Avenue 1333:14
  1345:18
Aviera 1297:18
  1307:12,21
  1308:4,13,15,22
  1310:3 1311:12
  1311:18
Aviera's 1154:4
avoid 1354:4,5
aware 1193:1
  1231:17,21
  1244:8 1247:21
  1254:9 1300:12
  1300:17,20
  1306:19 1344:1
  1347:7,10,13
  1354:15 1359:20
  1371:7
AWOL 1297:5

Ayatollah 1219:13

**B**

B 1236:9
B.F 1172:3
baby 1182:14
  1301:11
back 1145:3
  1155:21 1159:7
  1163:5 1173:8
  1176:13 1177:20
  1186:15 1194:19
  1198:3 1220:4
  1223:15 1243:6
  1245:7 1248:12
  1253:6,15 1255:2
  1261:3 1275:20
  1284:22 1285:17
  1294:6,7 1295:15
  1296:22 1297:4
  1301:10,19
  1308:18 1322:19
  1323:16 1337:14
  1342:21 1353:9
  1354:6 1356:5
  1358:2 1359:13
background
  1171:15 1190:2
  1207:4 1340:12
bad 1154:13
badly 1224:6,6
  1335:2
bang 1232:1,2
Bar 1149:7 1152:4
  1152:18,21,22
  1153:15 1154:20
  1155:7 1157:16
  1158:22 1162:20
  1163:6 1164:16
  1171:18 1180:9
  1180:16 1182:20
  1183:8 1193:13
  1193:17,22
  1194:1,2 1199:7
  1199:11 1222:4
  1230:22 1235:6
  1235:10,10
  1237:21 1238:2,4
  1238:21 1241:7
  1241:20 1242:13
  1245:16,16
  1246:1,12,15,17
  1250:5 1253:22
  1255:2 1256:8
  1265:2 1266:2
  1270:20,22

1285:17 1287:17
1301:15 1307:5,8
1311:6 1312:2
1313:13 1320:1
1324:9 1328:6
1331:7 1335:6
1337:7 1343:2
**Bar's** 1199:21
1266:12
**Barricades** 1213:5
**bars** 1246:4
1364:16 1365:4
**based** 1153:22
1154:7 1164:4
1168:9 1210:10
1246:2,4 1251:7
1279:13 1283:22
1341:9 1344:13
1348:11 1372:15
1375:2
**bases** 1181:11
**basically** 1159:8
1242:11 1264:13
**basis** 1163:10,11
1165:2 1166:10
1166:15 1263:7
1367:9
**Bat** 1213:21
**bath** 1182:15
1301:11
**Battle** 1318:13
1319:15
**Baxter** 1355:15,18
**Beauty** 1213:20
**began** 1300:17
1308:9
**beginning** 1246:19
1262:4 1268:2
1312:5,6 1314:18
1315:9,19 1317:5
1317:21 1320:10
1331:13,22
1333:7 1348:10
1361:18
**begins** 1195:4
**begrudgingly**
1245:7
**behalf** 1142:6,18
1143:2 1148:6
1171:7,10 1176:1
1180:14 1256:7
1271:8 1289:8
1303:13 1321:20
1323:13 1340:3,6
1375:22 1376:7
**behavior** 1209:13

1298:21
**belabor** 1201:9
1206:14
**belief** 1203:12
**believe** 1146:1
1150:11 1178:1
1188:2 1190:20
1191:1 1192:5
1196:6 1205:3
1206:20,21
1210:22 1212:4
1215:17 1223:13
1223:17 1228:2
1239:9,15
1241:22 1245:19
1252:16,18
1256:10,16
1257:5,13
1261:20 1267:8
1277:16 1286:21
1289:14 1295:1,2
1296:2,11 1298:9
1299:7 1304:17
1305:12,12
1322:2 1324:16
1325:3 1338:19
1345:1 1349:1
1361:17
**believed** 1158:15,17
1163:19,22
1169:18,19
1195:9 1205:4,21
1212:11 1218:18
1219:7,8 1220:2
1231:5,5 1298:22
**believes** 1212:16
**Beller** 1252:9
**belligerent** 1268:10
**bells** 1240:18
**Ben** 1297:9,11
**bench** 1173:12
1208:10
**benefit** 1213:8
1232:21
**Bennett** 1240:17
**best** 1187:18
1197:14,14
1231:7 1268:16
1279:3 1287:22
1288:7 1353:20
1356:6 1360:7
**better** 1170:6
1182:13 1227:12
1232:1 1268:12
1269:7 1278:14
**Beverly** 1162:13

1334:6,14
1374:18
**beyond** 1164:21
1177:1 1193:3
1197:10 1238:12
1275:5 1353:19
**bias** 1180:6 1182:18
1214:12
**biased** 1178:21
1184:8
**big** 1341:10
**binder** 1229:13
**bit** 1259:7 1293:20
1315:20 1340:11
1346:8,9
**Bivens** 1182:6
**Black** 1196:7
**blah** 1194:15,16,16
1314:10,10,10
**blame** 1336:4,9
**blamed** 1268:14
1336:4
**Blanquita** 1342:15
1342:17,20
**blah** 1348:4 1350:5,7,8
1351:4 1353:21
1354:3 1355:13
1356:2,10 1358:6
1358:10 1359:5
**bleeding** 1310:12
**blog** 1223:8
**blue** 1199:12
1236:2
**BOA** 1205:6
**board** 1141:2,4
1142:1 1147:9
1152:8 1190:14
1248:20 1250:11
1258:21,22
1259:10,18
1262:7 1266:7,8
1266:10,14,15,16
1275:20 1342:5
1342:15,17
1350:9,16,21
1356:14 1357:5
1357:12 1358:21
**Board's** 1261:7
1264:6
**body** 1319:21
**Boehner** 1333:9,11
1346:3,17,18
**bono** 1194:20
1305:7
**book** 1149:12
1150:2,4,5,5

1157:17 1193:11
1195:1 1196:19
1199:7,10,12
1202:1,3,5,12
1204:20 1207:6
1208:6 1220:9
1229:9,11 1236:2
1236:8,22
1246:16,18
1249:17 1318:12
1318:20 1320:21
1321:5,6,7,10
1360:9
**books** 1202:4,7,8
1204:21 1208:7
1213:8 1215:7
1216:17 1246:15
1262:17 1266:12
1319:3
**borrow** 1339:19
**bottom** 1229:22
1285:4 1290:16
1302:10,14
1312:2 1317:10
1319:12 1320:5,9
1320:13,14
1330:13 1358:4
1374:10
**bought** 1202:2,6
**Boulevard** 1161:14
**boyfriend** 1336:16
1336:17
**BQ** 1353:1,21
1354:3,10,11,16
1355:4
**BQview** 1358:6
**branches** 1212:14
1212:17
**Brantley** 1141:22
1142:4
**breach** 1252:7
**break** 1192:16,18
1211:9,16 1228:5
1259:6 1262:9
1265:5,6 1324:11
1338:3
**breakdown**
1184:12 1296:17
1297:7 1329:5
**Brennan** 1252:6
**bribe** 1194:15
**bribes** 1337:1
**brief** 1148:1
1150:10 1155:2
1170:12 1175:4
1185:19 1189:10

1209:10 1211:1
1267:3 1275:12
1317:1 1377:12
1379:9 1380:1
**briefing** 1379:13
**briefly** 1157:22
1171:14
**bring** 1150:9
1205:19 1207:20
1230:17 1251:6
1259:10 1261:7
1264:6 1337:17
1337:22 1360:9
**broadcast** 1299:3
**Broadcaster**
1213:21
**broadcasters**
1205:5 1214:15
1219:11
**broadcasting**
1147:9 1190:14
1214:17 1342:5
1342:14,16
1350:9
**broke** 1261:16
**broken** 1327:11
**brother** 1342:2,15
1344:14 1349:19
1351:2 1353:2
**brought** 1152:8
1241:17 1242:16
1256:14 1257:12
1278:12
**brushed** 1234:3
**building** 1162:17
1270:1
**burden** 1210:15
**Bureau** 1300:14
**bureaucratic**
1344:17
**business** 1244:7
1340:16,19
**businessman**
1340:14
**buttress** 1297:21
**buy** 1195:22
1202:12 1268:17

___

**C**

**C** 1145:1 1236:9
**C-o-l-l-a-r-** 1186:4
**C-o-t-e-l-l-y** 1186:4
**C.S.R** 1141:22
1142:4
**cafe** 1239:10
**California** 1179:22

1190:3
**call** 1197:5 1213:18
  1241:21 1316:11
  1337:13,14
**called** 1171:7
  1173:3 1185:22
  1186:1 1206:10
  1212:5 1216:5
  1263:9 1297:17
  1316:5 1322:12
  1340:3 1341:8
  1349:1 1364:5
**calling** 1179:9
**calls** 1201:7
  1294:12
**Camden** 1162:13
**campaign** 1247:12
  1321:13
**candid** 1167:19
**capacity** 1179:21
**caption** 1150:22
**car** 1160:2 1195:22
  1223:21 1233:20
  1261:16
**care** 1244:11
  1254:19 1334:20
**cared** 1205:22
  1313:9
**career** 1178:20
**careful** 1293:11
**carefully** 1282:22
  1283:1,15
**cars** 1268:17
**case** 1150:19
  1151:7 1152:2,8
  1155:10,21
  1158:17 1159:14
  1160:20 1163:15
  1165:4,8 1166:21
  1167:16 1169:3
  1170:4,15 1173:7
  1173:13 1175:14
  1178:17 1180:7
  1184:1,2,3,6
  1186:10 1191:13
  1193:3 1195:18
  1196:5,22
  1198:11 1209:17
  1214:5,20 1216:1
  1216:16 1217:22
  1219:16 1223:19
  1225:3 1230:7
  1231:5,6 1241:12
  1242:7,10,15
  1244:9 1245:1
  1246:6 1247:7

1248:16 1251:6
1252:6,11,12
1253:13 1255:16
1261:22 1268:15
1271:9 1275:19
1276:7 1277:12
1277:13 1278:17
1280:4 1284:18
1289:16 1297:21
1304:18,19
1310:21 1312:21
1313:7 1315:16
1328:11 1332:13
1332:15 1342:20
1344:2 1346:20
1347:4 1352:6
1368:9 1373:11
1375:9 1377:18
1378:3,12
**cases** 1147:7
  1155:13,20
  1164:8 1168:22
  1170:10 1171:21
  1172:21 1178:17
  1178:22 1179:17
  1186:8 1207:17
  1248:6 1273:20
  1274:16 1276:14
  1277:15 1321:19
  1323:2 1327:15
  1327:17 1336:7
**catch** 1175:2
**cause** 1218:18
**caused** 1198:1
**cavernous** 1344:18
**cell** 1168:15
  1262:10
**centered** 1370:22
**Central** 1300:14
**certain** 1155:22
  1257:1,14 1297:4
  1367:17
**certainly** 1161:15
  1176:17 1184:10
  1195:12 1199:4
  1274:10 1294:11
  1321:16 1322:21
  1323:7 1375:8
**CFO's** 1342:16
**chain** 1341:8
**Chair** 1142:12
**CHAIRMAN**
  1145:2,8,19
  1146:10,21
  1147:15 1148:3

1148:21 1149:8
1149:11,21
1151:15,17,20
1154:22 1155:3
1156:13 1159:1
1161:6,22 1162:5
1162:7,18
1165:13,17,19
1166:7,10,15
1167:2,8 1168:14
1170:11,19,22
1175:2,5,19
1177:3,5,9,16,19
1183:4,7 1185:2,6
1186:22 1187:6
1187:15,18,21
1188:11,17,20
1189:1,8,11,14
1190:4,21
1193:16,22
1194:5 1196:15
1197:19 1199:10
1199:13,20
1200:1 1202:13
1202:17 1203:21
1204:4,12 1211:2
1211:5,15 1212:6
1212:19,22
1215:1,4,9,12,15
1215:22 1216:7,9
1216:14,21
1217:3,7,11,15
1218:1,8,11
1220:6,20 1221:4
1221:10,14,17
1223:11 1224:8
1224:20 1225:5,8
1225:15 1226:2,6
1226:9,13,16,19
1227:1,5,9,14,21
1228:9 1229:8,15
1229:19 1231:8
1231:14,16,20
1232:6,13,19
1233:14 1234:14
1235:18 1236:8
1236:11,15,19,22
1237:4 1238:10
1238:17 1242:3
1248:18 1249:8
1254:16,18
1258:11,15,18
1260:17 1261:2
1261:14 1262:1,6
1262:12,20
1263:10,22

1264:3,9,15,19
1265:3,16 1266:3
1266:6,13,21
1267:2,13,16,19
1275:14 1276:21
1277:1 1280:7,10
1280:15,18,20
1281:2,6,9,11,15
1281:19,21
1282:2,5,10,15,18
1282:21 1283:10
1283:14,20
1284:4 1285:15
1285:22 1288:18
1289:22 1290:4
1290:10,14,17,21
1291:1,6,11,19
1292:1,15,21
1295:4,18
1301:17 1302:2,5
1302:8,14,18
1303:4 1304:22
1305:16,20
1306:6,14
1307:15,18
1309:9 1313:17
1314:2,5,13,20
1315:20 1316:3,7
1316:13,17
1318:1,4 1322:14
1323:8,15,18,22
1324:10 1325:6
1326:8,16 1327:3
1327:19 1328:2
1330:5,8,11,17,22
1331:18 1332:2,6
1333:15 1337:16
1337:21 1338:3
1338:10,15,19,22
1339:4,8,14,21
1343:6,8 1344:6
1345:15 1346:13
1351:11,22
1352:10,13
1353:10 1354:6
1354:12,21
1356:15 1357:2
1357:11,18
1358:16 1361:2
1362:13,18
1364:21 1369:17
1369:21 1370:10
1370:14 1371:3
1371:10,19
1372:1,12,19
1376:5,22 1377:5

1377:10,16,21
1378:2,7,16
1379:10 1380:2,5
1380:9,15,19
1381:1,3,7,12,18
1382:1,4
**challenge** 1180:1,4
**challenging**
  1293:19 1294:6
**chance** 1189:8
  1241:2 1286:12
  1292:6 1332:4
  1337:10 1352:8
  1352:10
**changed** 1312:6
  1313:2,2 1315:18
**character** 1172:17
  1172:19 1267:15
  1267:17 1372:18
**characterization**
  1325:7
**characterize** 1227:4
**characterized**
  1182:5
**characterizing**
  1233:11 1276:16
**charge** 1242:10
  1245:18
**charged** 1147:18
**charges** 1201:22
  1235:14,16
  1236:13 1239:4
  1240:11 1241:1
  1243:11 1246:14
  1250:21 1251:1
  1260:2 1267:17
  1280:2 1379:3
**check** 1197:8
**chief** 1155:9 1156:5
  1239:11,13
**choose** 1208:14
**chosen** 1210:1
**Christ** 1206:12
  1276:22 1277:6
**Christmas** 1222:9
**Chronicles** 1206:11
**chronological**
  1220:10
**cigars** 1333:8
  1345:13 1346:6
**circumstance**
  1184:11
**circumstances**
  1233:5 1263:8
**citation** 1185:16
**civil** 1150:15

1159:16 1219:21
1241:16
**claim** 1173:10
1182:2,6 1191:18
1344:9
**claimed** 1298:21
1310:6,13 1353:4
**claiming** 1182:6
**claims** 1168:12
1186:7 1203:13
1203:14,20
1214:12 1219:18
1220:5 1276:2,5
1343:22
**clarify** 1159:20
**Clark** 1250:8
**Clay** 1142:20
1245:12
**clear** 1186:18
1191:4 1209:14
1210:2,14
1218:15 1235:4
1243:8 1247:6
1269:9 1336:14
**clearly** 1157:1
1169:12 1201:4
1227:14
**Clevenger** 1248:2
**client** 1169:20
1179:1,18
1182:19 1195:7
1241:10 1243:9
1293:2
**clients** 1173:3
1197:5 1218:17
1304:10
**clinical** 1308:11
**Clinton** 1222:18
**Clintons** 1248:7
**close** 1293:15,17
1336:19 1341:3
**close-knit** 1349:9
1349:10
**closing** 1378:16,18
1378:22 1382:2
**clothing** 1341:6,8
**Clyde's** 1228:4
1298:10 1300:18
1333:2,12
**coax** 1200:18
1214:5 1343:21
1344:8 1361:19
**Cockroaches**
1207:13
**Code** 1178:10
1244:18

**coerce** 1200:18
**cold** 1354:2
**Collar** 1186:4
**colleague** 1209:6
**colleagues** 1209:8
**collect** 1304:9,12
**Colleen** 1152:14
**college** 1171:16
**Columbia** 1141:1
1142:6
**column** 1220:19
1223:6
**columns** 1202:4,6
1213:17 1214:8
**come** 1201:4 1207:2
1234:10 1241:5
1293:22 1296:11
1296:13 1297:3
1301:19 1303:14
1303:22 1323:9
1327:10 1342:11
1344:19 1345:3
1346:2 1347:15
1348:19,20
1350:19 1364:3
1375:21
**comedy** 1207:21
**comes** 1273:2
**coming** 1145:13
1163:20 1178:15
1206:21 1219:8
1253:11 1271:14
1271:18 1277:17
1377:1
**commenced** 1250:4
**commencing**
1142:3
**comment** 1165:6
1166:16 1244:13
**comments** 1291:12
1295:17 1323:14
**commitments**
1194:10
**committee** 1142:4
1142:10 1146:12
1147:6 1238:13
1258:19 1290:8
1290:13 1377:14
1378:15
**committee's**
1183:12
**common** 1257:5
**communicate**
1168:7 1179:4,5
1188:8 1268:9
1293:20 1310:10

**communicated**
1241:4 1293:6
1325:2
**communicates**
1168:15
**communicating**
1269:13 1277:22
1325:1,20
**communication**
1156:16 1162:1
1179:14 1207:5
1231:18 1232:2
1278:10 1293:4
1294:14 1325:3
1326:13,14
1327:14
**communications**
1167:5 1254:8
1264:14 1265:2
1282:12 1299:20
1305:9 1324:5,18
1325:19
**community** 1218:16
1349:9 1350:12
1361:16 1362:7
1369:9
**companies** 1340:20
**compared** 1334:4
**compendium**
1313:15 1318:7
**compensate**
1215:20
**competency**
1147:19
**competently**
1241:10
**complaint** 1147:13
1148:14 1149:18
1150:6,14 1182:2
1182:5,7 1209:1
1237:9,14,20
1239:17,18,19,20
1240:6 1241:2,16
1241:17 1243:14
1243:20 1245:22
1247:22 1255:1,5
1257:15 1367:9
1367:11,13
1368:18
**complaints** 1219:1
**completed** 1177:21
1211:3
**completely** 1304:2
1304:11 1310:22
1311:1,3
**compliment**

1195:13
**complimentary**
1200:11 1201:19
1204:18 1205:17
1213:11 1214:1
**composed** 1209:2
**compound** 1328:1
1369:14
**concede** 1373:14
**conceivable**
1366:11
**conceive** 1288:3
**concern** 1350:14
**concerned** 1209:15
1276:6 1357:17
1362:3
**conclusion** 1164:2
1253:21 1348:19
1379:15
**condition** 1228:15
**conference** 1158:1
**conferences** 1167:5
**confidential**
1200:12 1201:20
1204:19 1205:17
1213:12
**confirm** 1157:3
**confirmation**
1294:4 1322:3
**confirmed** 1195:20
1208:12 1209:16
**confirming** 1321:8
**conflict** 1155:22
1252:1,19 1269:9
1270:2 1367:4
**confused** 1320:12
**congressmen**
1332:18
**Connecticut**
1333:13 1345:18
**connection** 1216:11
1217:12 1259:10
**Connolly** 1248:1
**consent** 1155:11
**consequences**
1354:5
**consequently**
1219:13 1353:4
**conservative**
1164:9 1167:1
**conservatives**
1164:8 1212:15
**consider** 1256:19
1268:4 1297:5
1370:2
**consideration**

1249:4
**considerations**
1249:5
**considered** 1239:3
1354:15
**consist** 1146:14
**consistent** 1234:20
1247:19 1275:2
1284:15 1285:13
1308:12
**constantly** 1193:1
**Constitutional**
1182:7
**consult** 1307:14
**consulted** 1363:14
**consulting** 1340:20
**contact** 1146:4
1156:22 1184:18
1193:2 1201:10
1201:10 1239:14
1243:18 1255:14
1285:10 1325:15
1335:7
**contacted** 1201:11
1255:14
**contacts** 1231:11
**content** 1322:13
**context** 1158:3
1165:4,8 1169:9
1239:6 1248:19
1248:19 1271:4
1271:12 1301:20
1305:8,17 1306:4
1306:7 1329:2
1337:11
**continuance** 1231:1
**continue** 1196:15
1249:6 1274:19
1275:17 1276:3
1284:5 1285:4,5,6
**continued** 1143:1
1148:5 1180:13
1205:6 1221:8,11
1221:12 1296:4
1327:15
**continuing** 1198:22
1277:12
**contradictory**
1201:16
**contrary** 1310:20
**contributions**
1247:12,13
**control** 1202:21
1247:9 1253:21
1271:22 1284:7
1335:9

**convalescence**
1198:14
**conversation**
1176:3
**conversations**
1166:17
**convey** 1195:6,14
1300:22 1305:14
1305:18
**convince** 1308:18
**convinced** 1260:9
1349:22
**cooperation**
1381:17
**copied** 1252:12
1288:4 1355:13
**copies** 1202:3
1252:13 1339:18
1339:19
**copy** 1226:6
1339:17
**cordial** 1253:20
**corner** 1162:12
**correct** 1162:22
1176:11 1177:18
1181:21 1190:19
1199:22 1205:14
1209:8 1215:8
1216:10,13,19,19
1218:6 1223:17
1226:20,22
1231:10,13,15
1236:14,21
1268:5,6 1269:4
1269:10,19
1270:18 1271:11
1271:13 1273:16
1279:7 1280:11
1281:13,19,22
1282:1,8 1286:11
1286:20 1287:3
1287:15 1293:2
1294:10,22
1308:6 1309:20
1312:21 1318:9
1318:10,18
1321:20 1322:9
1322:15 1323:3
1325:16 1328:11
1332:13 1343:15
1351:11 1352:15
1352:18 1356:20
1358:7 1359:22
1360:13 1361:5
1361:13 1365:11
1373:16 1375:15

1375:19
**correctly** 1276:16
**correspondence**
1193:21 1230:21
1274:14 1278:16
1292:9 1321:18
1323:1 1324:19
1336:15 1375:14
**Corsi** 1216:5
**costing** 1257:8,9
**costly** 1245:2
**costs** 1302:21
1303:6 1305:3
1306:3
**Council** 1209:2,2
**counsel** 1145:7
1149:7 1163:6
1175:8 1187:1
1230:22 1235:6
1241:20 1242:13
1245:16,16
1246:12 1250:5
1253:22 1255:2
1256:8 1262:20
1262:22 1265:2
1267:4 1268:5,13
1272:9,14 1298:8
1307:2,10
1331:11 1360:20
1363:1 1377:13
**Counsel's** 1152:21
1157:16 1220:9
1222:5 1237:21
1241:8 1246:15
1246:18 1343:2
1373:22
**counseling** 1297:16
**count** 1192:8
1260:1,2,4,6,7
**country** 1246:1
**counts** 1182:8
1184:1 1379:1,4
**couple** 1347:2
**course** 1146:17
1161:11 1184:9
1192:16,18
1196:4 1271:22
1273:1 1315:15
**court** 1141:1
1142:5 1145:20
1147:12 1149:18
1150:16 1151:8
1152:2 1156:6
1159:15 1175:13
1178:22 1219:21
1241:17 1252:12

1276:8 1278:19
1322:20 1338:8
**court's** 1181:20
1187:9
**courthouse** 1180:12
1190:6 1209:3
**courtroom** 1165:7
**courts** 1222:11
**cousin** 1190:10
1201:6 1239:22
1272:1
**covered** 1260:1
**CPA** 1171:18
**crashed** 1223:21
**create** 1164:1
1294:2
**created** 1214:17
1257:10
**credibility** 1169:10
1267:18,20
1323:11
**crime** 1195:10
**criminal** 1196:7
**critical** 1203:1
**criticism** 1300:8
**criticize** 1291:18
**criticized** 1310:6
**cross** 1144:2
1327:20
**cross-examination**
1158:14 1175:8
1177:2 1184:7
1260:12 1261:18
1266:18 1267:4
1363:1 1372:20
1378:5,9 1380:13
1380:16 1381:8
1381:14
**cross-references**
1318:20
**cruel** 1354:2
**cry** 1227:19
**crying** 1296:7
**Cullum** 1342:15
1348:4 1350:6,7,8
1351:4,5 1353:21
1354:3 1358:7
**current** 1364:15
**cursory** 1374:6
**cut** 1304:20,21

—————————————
**D**
—————————————
**D** 1144:1 1145:1
1235:22 1236:3,9
1236:11 1246:18
1249:17 1343:1,2

**D-7** 1152:18
**D-a-s-h** 1145:21
**D-a-s-h-t-a-r-a**
1339:7
**D-o-r-s-e-y** 1360:19
**d-o-t-t-e-r** 1230:10
**D.C** 1151:8 1342:9
1349:12
**D1** 1235:9,10
**D24** 1343:6
**D27** 1280:15,16
**D6** 1152:4
**dad** 1340:13
**damages** 1258:4
**Dan** 1168:21
1186:8 1286:20
1288:22
**dash** 1144:5
1145:16,21
1217:9 1247:1
1261:15 1263:7
1263:19 1285:21
1333:5 1337:14
1337:18 1338:18
1338:20 1339:20
1340:8 1341:6
1343:11 1352:21
1360:19 1361:14
1363:3
**Dash's** 1244:21
1263:5 1341:8
1370:4
**Dashtara** 1144:5
1339:6 1340:2,10
**date** 1187:9
1192:19 1200:20
1218:5 1228:3
1231:9 1242:2
1271:7 1298:7
1311:9
**dated** 1153:2
1204:1 1212:5
1224:14 1258:17
1273:15 1281:21
1286:8,20 1292:9
1307:12 1308:4
1311:10 1375:11
**daughter** 1230:11
**David** 1160:22
1247:22 1280:16
**day** 1160:2 1187:4
1189:16,17
1193:20 1194:3
1205:10 1224:3
1228:16 1232:3
1241:21 1356:6

**days** 1154:13
1156:15 1160:6
1167:4 1190:18
1191:1,5 1208:10
1220:14,16
1222:21 1245:8
1361:6,7 1381:13
**DC** 1141:9 1142:2
1142:18 1160:7
1197:12 1238:2
1240:6,7 1353:17
**deadline** 1188:3,4
**deal** 1195:16
1222:18 1265:1,3
1266:17 1344:16
1369:12
**dealing** 1148:18
1186:14 1227:3
1245:3 1247:4
1272:19 1315:12
**deals** 1199:1
**dealt** 1182:11
**death** 1253:5
**decade** 1341:2
**deceased** 1247:3
**December** 1183:8
1188:21 1200:6
1200:10,21
1222:8 1223:22
1239:5 1343:16
**decide** 1196:12
1335:19 1349:16
1351:3
**decided** 1153:11
1245:13
**decision** 1254:5
1278:19
**decision-making**
1222:21
**decisions** 1242:12
**declaration** 1343:8
1365:10 1366:8
1369:11
**deep** 1227:18
1304:2 1335:1
**deeply** 1334:20
**defamation** 1258:2
**defamed** 1216:4
**defendant** 1150:21
**defendants** 1150:20
1156:2 1181:17
**Defense** 1236:12
**Defenses** 1235:14
**defer** 1254:3
**delay** 1258:21
1259:1,2 1357:5

**demeanor** 1158:10
1158:11,12
**dementia** 1358:14
**Denial** 1154:21
**denied** 1163:11
1188:12 1256:2
1275:22
**denies** 1235:15
**denominated**
1146:15 1236:11
**denomination**
1229:17
**denying** 1153:3,16
1159:6 1175:14
1181:2 1183:19
**Department**
1191:10
**depends** 1364:19
1381:10,17
**deposition** 1252:10
**depression** 1227:18
1329:4
**depth** 1348:2
**Deputy** 1242:13
**describe** 1334:21
**descriptions**
1259:13
**deserve** 1302:21
**Designers** 1341:6,9
**desire** 1312:10
1375:22
**desires** 1273:6
**despite** 1188:7
1202:22 1231:7
1327:13
**destroyed** 1164:20
1248:7
**detail** 1163:16
**detailed** 1163:16
**determined** 1163:8
1163:14
**determines** 1299:19
**developed** 1310:12
**die** 1230:19
**died** 1230:7
1234:10
**difference** 1283:2
1283:20 1284:2
**different** 1164:14
1199:7 1208:14
1236:6 1257:4
1264:13 1280:4
1340:19 1344:14
1371:11
**difficult** 1164:11
1168:6 1179:4

1187:22 1268:10
1289:18 1298:19
1324:22 1344:16
**difficulty** 1166:20
1299:10,13
**dignity** 1257:6
**dine** 1364:6,9
**dinner** 1228:4
**direct** 1144:2
1148:5 1171:10
1180:13 1288:22
1324:5,17
1326:14 1334:3
1340:6
**directed** 1287:13,14
**directing** 1270:17
1287:2
**directly** 1207:3
1294:6,7 1325:21
1335:13 1337:4
**disagree** 1380:10
**disagrees** 1283:6
**discarded** 1240:2
**discharging** 1279:6
**disciplinary**
1142:18 1145:7
1175:8 1220:9
1245:16 1247:5
1262:20,22
1267:4 1307:1,10
1363:1 1373:22
**disclose** 1329:3
**disclosed** 1296:8
**disconnected**
1319:20
**discord** 1294:2
**discounted** 1159:10
**discovery** 1158:2,6
1184:8 1309:5
1364:20
**discrimination**
1173:10 1214:13
1348:17
**discuss** 1192:22
1262:1 1320:21
1328:10 1332:12
1368:9 1379:12
**discussed** 1173:7
1174:1 1321:15
1322:21 1344:2
1352:18
**discussing** 1334:2
**discussion** 1177:17
**discussions** 1165:15
1165:22 1381:15
**disliked** 1166:22

**dislikes** 1166:22
**dismiss** 1168:22
1181:16 1182:3
1184:6 1276:14
1277:11,14
1287:3,14
**dismissal** 1181:20
1276:1
**dismissals** 1284:7
**dismissed** 1182:1,9
1186:10 1240:7
1244:9 1246:2
1247:7 1248:3
1253:2,9 1273:19
1274:15 1275:19
1276:5 1284:8
**disorder** 1296:9
**dispatched** 1361:4
**disqualification**
1163:1 1180:11
1181:3,8 1209:1
**disqualified**
1167:22
**disqualify** 1166:2,5
1166:12,14
1167:9 1170:3
1177:17
**disrespect** 1207:14
1228:18
**disrespectful**
1268:10 1291:9
**dissenting** 1321:2
**distance** 1145:13
**distinguished**
1178:20
**distraught** 1357:16
**distress** 1257:9,11
**district** 1141:1
1142:6 1152:2
1175:13 1258:3
**divorced** 1349:6,6
**Docket** 1141:4
**dockets** 1351:18
**doctor** 1297:9,17
1357:6
**doctors** 1154:17
1176:7 1234:1
1308:15
**document** 1148:15
1153:20 1157:16
1162:1 1163:4
1187:1,10
1192:13 1229:16
1254:10,22
1269:15 1271:5
1273:13 1274:11

1276:11 1286:16
1287:21 1292:7
1292:19 1306:21
1308:21 1309:13
1312:4 1315:5
1328:14 1332:5
1332:20 1337:12
1361:1 1366:21
1367:7,17 1368:5
1370:16,19
1371:7
**documentation**
1148:2 1169:3
1240:10 1241:18
1242:2 1246:22
1248:7 1255:11
**documented** 1357:7
**documents** 1146:13
1146:16 1160:11
1168:8 1186:13
1235:2 1237:5
1240:1,2,4,13
1254:19 1256:4
1258:6 1259:13
1259:13,14,15
1263:6 1264:5
1269:14 1276:15
1283:17 1298:4
1351:21
**dog** 1236:4 1334:13
1334:13
**doing** 1162:14
1194:20 1223:5
1230:15 1263:4
1291:11 1299:2
1303:17 1305:7
1310:9 1319:2
1334:6 1350:2
1354:4 1379:8
**dollars** 1303:1
**domains** 1315:11
**donate** 1247:11
**door** 1370:3
**dotter** 1230:10
**doubt** 1172:18
1191:13
**dovetailing** 1248:14
**downstairs** 1337:22
1377:9
**Dr** 1154:4 1297:18
1297:19 1308:4
1308:13,15,21
1310:3 1311:17
**draft** 1240:11,13
1280:3 1366:8
**drain** 1280:1

**drama** 1230:12
1231:1
**dramatizing** 1230:4
**draw** 1179:22
1193:12
**drinking** 1346:8
**drive** 1222:14
**drop** 1186:8
**DS-25** 1212:7
**DSX23-27** 1212:22
**DSX23-41** 1218:9
1220:12
**DSX27** 1212:20
**dual** 1223:6
**due** 1146:17 1246:9
1256:2 1291:5
**duly** 1171:8 1340:4
**dumped** 1293:2,14
1294:5
**duplicative** 1151:22
**DX1** 1235:19
**DX10** 1156:13
**DX12** 1155:4
**DX27** 1280:17,18
1280:19 1282:22
**DX27-1** 1281:3,6

**E**

**E** 1141:5 1142:2
1143:10 1144:1
1145:1,1 1261:1,1
**earlier** 1224:2
1230:3 1235:3
1243:11 1255:19
1259:2 1272:8
1274:19 1353:14
1369:5
**early** 1171:21
1186:8 1254:10
1300:18 1317:21
1357:13 1358:1
**easier** 1229:14
1343:1 1380:8
**easily** 1357:16
**easy** 1320:20
**economically**
1233:22
**edge** 1357:6
**editorial** 1186:21
1323:14
**editorialize** 1203:18
**editorializing**
1275:7,8 1295:14
1372:14
**educational**
1171:15

effect 1244:15
1255:15 1288:12
1328:17 1335:14
1335:15
efforts 1303:22
1361:15 1362:1
eight 1156:15
1160:6 1176:10
1223:19 1233:17
1233:21 1234:13
1246:8 1253:3
1278:11,13
eight-day 1156:17
either 1208:21
1233:12 1278:7
1294:16 1381:16
elaborating 1159:7
electronic 1252:14
electronically
1160:11
Elham 1155:8
1156:12 1173:3
1175:13 1187:3
1189:21 1333:19
1333:19 1360:5
1360:16 1374:13
Elizabeth 1242:12
Ellie 1196:22
1273:16 1286:9
1292:10 1302:17
1359:4
else's 1278:5
email 1143:8
1146:4 1192:1
1194:7 1196:21
1198:9 1201:8
1229:7,22 1230:5
1231:9,17,21
1239:5 1271:16
1274:13 1276:13
1278:7,15
1280:10 1281:2
1281:18 1282:6
1286:8,13 1292:8
1294:9,17 1295:9
1302:9,9 1327:5,7
1335:12,15
1351:20 1352:22
1353:6,15,15
1355:2,9,11,14,22
1356:10,22
1357:3,4 1358:5,6
1358:12,17
1359:3,12,16
1360:1,3,4,6,15
1360:16 1361:3

1375:13,14,16
emailed 1288:5
1352:15
emails 1146:2
1193:9 1228:22
1233:6 1248:8
1255:15 1256:1
1263:8 1283:11
1283:16 1294:13
1296:5 1301:22
1305:5 1337:4
1351:19 1352:1
1355:2 1372:5
1373:4
Emerging 1214:12
emotional 1154:14
1245:4 1257:9
1269:9 1270:2
1296:16 1327:9
emotionally
1164:21
emotions 1375:1,18
empathy 1170:8
emphasize 1147:17
employed 1351:2
encapsulate
1183:21
enclosed 1345:10
Encounter 1318:13
1319:15
encounters 1203:6
1347:21
endeavored
1306:21
ended 1177:20
engage 1335:7
engagement 1221:6
English 1157:2
1271:14,15
1278:5 1287:12
1299:11,13,15,20
1299:22 1300:5
1300:14,15,21
1327:11
enlightened
1208:16
enlist 1346:21
ensue 1261:21
enter 1206:3
1264:12
entered 1201:1
1265:15,19
entertainment
1162:14
entire 1237:20
1266:16 1275:19

1347:14 1368:4
entities 1164:9
entitled 1165:3,8
1247:11
equate 1334:12
equating 1196:5
equivalent 1197:8
erred 1163:18
error 1182:4
1194:6
errors 1154:1
1163:9 1181:22
1300:2
especially 1303:7
1350:11
Esquire 1142:11,15
1142:20 1143:3
1143:10 1216:3
essentially 1205:15
Establishment
1202:20 1318:15
1321:1
Establishment.'
1203:8
estimate 1245:8
ethical 1172:9,14
ethics 1250:10
evaluation 1308:16
evening 1230:2
1300:18 1377:6
event 1214:5
events 1364:15
everybody 1211:11
1222:20 1227:20
everybody's 1279:9
1330:8
everyone's 1197:18
evidence 1151:9,13
1152:6 1153:14
1153:21 1154:3,6
1154:19 1156:10
1158:19 1159:19
1174:11 1183:11
1183:19 1184:6
1201:1 1234:9
1246:15,19
1249:22 1253:16
1259:21 1260:10
1295:19 1351:9
1362:16 1379:3
evidentiary
1154:10 1174:3
1174:20 1176:19
1184:4,5 1260:11
Evil 1329:22
exact 1242:1

1334:18
exactly 1160:8
1237:16 1343:7
1369:20
examination 1148:5
1154:5 1171:10
1176:1 1180:13
1211:18 1231:10
1340:6 1376:7
examined 1171:8
1178:2 1340:4
example 1182:17
1194:18 1319:16
1362:8 1365:5,9
exchanges 1295:9
exchanging 1373:3
excuse 1148:16
1184:16,17
1195:2 1329:22
1333:1 1347:9
1352:9 1365:1
1366:6
excused 1177:13
1377:5,7
executed 1237:5
exercise 1245:20
1249:14
exercised 1256:8
exhibit 1146:1,7
1147:14 1148:9
1148:20,20,22
1149:3,5,10
1150:4,5,5,17
1151:5,13 1152:4
1152:18 1153:15
1154:19,20
1155:7 1156:9,11
1157:13,14,17
1158:18,22
1162:20 1163:6,6
1180:17,18
1181:19 1182:20
1183:6,10,16,18
1185:11,15,17
1188:16 1189:12
1193:13,17
1198:6 1199:7,8
1199:12,14,15,21
1200:3 1204:4
1207:11 1217:14
1220:9 1221:13
1222:4 1223:15
1228:21 1229:6
1235:9,10 1236:2
1236:3,6 1237:11
1237:11 1238:7

1238:21 1249:17
1249:17 1254:12
1258:14 1259:9
1262:17 1264:12
1264:17 1265:8,8
1265:9,9,10,10
1267:9 1268:22
1269:3 1270:20
1270:22 1271:16
1273:1,11 1274:1
1274:2,3 1279:1
1281:5 1285:18
1286:6 1287:17
1291:16 1292:5
1301:15 1307:2,5
1307:8,11 1311:6
1312:2 1313:13
1313:18,22
1317:6 1320:1
1324:9 1326:5,9
1328:7 1329:19
1331:7 1336:22
1337:8 1339:17
1343:1,2,3 1351:8
1351:13,15
1362:16 1373:18
1373:20,21,22
exhibits 1149:6
1150:3,4 1183:9
1185:12 1199:21
1222:5 1228:21
1229:4,13 1233:8
1239:8 1240:14
1240:15 1246:16
1249:18 1258:8
1261:6 1262:16
1262:18 1263:2
1263:12,13
1265:13 1275:18
1298:6 1299:21
1343:2,3 1351:18
existent 1228:16
expect 1195:16
1253:19 1259:20
1378:20
expeditiously
1156:14
expense 1194:12
1257:10 1303:13
1304:17
expenses 1194:19
1198:21 1268:16
1302:22 1303:6
1305:3 1306:3
experience 1154:1
1166:21 1170:10

1197:4 1206:4
1228:5,13
1234:22
**experiences**
1206:15
**experiencing**
1295:22 1327:8
**expert** 1240:16
1241:3
**explain** 1232:12
1234:21 1284:3
1347:22
**explained** 1235:2
1314:18 1315:9
**explanation** 1303:5
**explore** 1295:8
**express** 1299:15,16
1300:4
**expressed** 1373:4
1374:22 1376:1
**expressing** 1299:10
1299:13 1372:8
**extensive** 1157:16
**extent** 1146:17
1147:17 1238:14
1268:11
**extrajudicial**
1182:18
**extreme** 1159:11
**extremely** 1200:11
1201:19 1208:16
1213:22
**eyes** 1227:12

**F**

**F** 1261:1
**facilitate** 1338:4
**facsimile** 1311:10
**fact** 1154:2 1161:17
1163:11 1165:2
1166:21 1178:14
1180:9 1199:1
1212:17 1237:22
1247:4 1250:8
1252:10,11
1255:16 1273:4
1274:22 1276:1
1289:13 1309:4
1310:19 1326:7
1327:5,13
1336:14 1341:4
1347:5 1349:19
1353:1 1375:2
**factors** 1164:6
1268:20 1310:14
**facts** 1163:14,15

1164:1 1173:6
1176:4,17 1225:9
1250:1 1332:15
**factual** 1163:8
1263:7
**fade** 1223:20
**faded** 1256:4
**fair** 1174:17 1295:5
1332:6 1336:9
1342:7 1372:1,20
1378:7,8
**fairest** 1174:19
1176:22
**fairly** 1211:7
1257:7
**fairness** 1246:11
1252:21
**Falahati** 1147:8
1150:8,22 1219:9
1220:2 1234:7
1235:5 1271:10
1284:11,12,15
1293:22 1309:20
1328:20
**Falahati's** 1298:21
**fall** 1334:16
**false** 1310:22,22
1311:1,2,3 1312:9
**familiar** 1318:7
**families** 1349:12
**family** 1154:18
1197:11 1219:6
1340:12 1341:1
1342:8,8 1361:15
**famous** 1196:5
**far** 1209:15
1266:17 1276:6
1373:13
**Farah** 1216:5
**Farsi** 1310:11,11
**Fascinating** 1203:6
1318:13 1319:14
**fast** 1215:3
**father** 1219:11
1341:3,5
**fathers** 1208:15
**fault** 1336:5
**favor** 1153:8
1170:8
**favorable** 1214:6
**FBI** 1219:4,5,5,14
**fearless** 1299:6
**February** 1298:1
1308:5 1317:22
1345:1 1355:3
1357:13 1358:2

1359:3 1361:3,6
**federal** 1150:16
1151:7 1159:15
1180:7 1209:16
**fee** 1184:19 1260:8
**feel** 1201:14
1243:18 1256:1
**feeling** 1268:8
**feelings** 1195:7,9
1337:5 1374:4
**fell** 1196:8
**felt** 1153:22 1154:6
1158:9 1169:18
1197:16 1224:6,6
1234:8 1249:13
1256:18,19
1268:12 1270:6
1298:17
**Fifteen** 1330:14
**fight** 1203:8
1289:19 1318:15
1320:22
**Fighter** 1206:11
**Fighting** 1213:22
**figure** 1364:18
**file** 1154:14
1166:14 1178:12
1188:4 1190:8
1208:22 1240:1
1271:9 1309:5
**filed** 1147:13
1148:14 1150:6,8
1151:6 1152:10
1153:19 1155:14
1156:14,14
1159:5 1167:18
1178:9 1179:1
1181:17 1184:15
1185:7,22 1186:3
1188:14,18
1189:16 1191:5
1219:19 1239:20
1247:22 1252:6
1257:15 1284:12
1284:14 1298:6
1321:19 1323:3
**files** 1273:2 1278:13
1315:11 1355:11
**filing** 1160:6,10
1165:13,17
1167:8 1169:5
1184:19 1192:6
1237:22 1238:5
1243:20 1252:14
**final** 1192:9 1222:6
1223:22 1357:4

**finally** 1233:18
1250:22
**financial** 1198:1
**find** 1172:9 1184:22
1185:11 1192:17
1199:4 1258:21
1258:22 1288:4
1294:18 1304:1
1306:21 1360:9
**finding** 1192:13
1259:1 1379:11
1379:12,21
**fine** 1146:10
1149:10 1207:15
1210:6,8,18
1220:20 1291:21
1338:14 1356:17
1381:22
**fingers** 1192:9
**finish** 1168:17
1211:6,7,22
1275:4,11,12
1276:19 1292:7
1296:20
**finished** 1212:4
1223:12
**fired** 1163:2
1300:16
**firm** 1248:1 1252:5
**firmly** 1220:1
**first** 1148:17
1149:13 1153:7
1165:8 1171:8
1193:13,15
1194:3 1200:16
1212:1 1213:15
1228:16 1239:5
1240:16 1243:7
1258:7,8 1260:7
1269:2,4 1273:14
1273:18 1278:21
1283:12 1293:7
1296:13,22
1298:9 1302:8
1306:19 1308:9
1312:22 1317:4
1327:6 1330:19
1339:7 1340:4
1345:2 1352:20
1366:8
**FITCH** 1142:11
1145:2,8,19
1146:10,21
1147:15 1148:3
1148:21 1149:8
1149:11,21

1151:15,17,20
1154:22 1155:3
1156:13 1159:1
1161:6,22 1162:5
1162:7,18
1165:13,17,19
1166:7,10,15
1167:2,8 1168:14
1170:11,19,22
1175:2,5,19
1177:3,5,9,16,19
1183:4,7 1185:2,6
1186:22 1187:6
1187:15,18,21
1188:11,17,20
1189:1,8,11,14
1190:4,21
1193:16,22
1194:5 1196:15
1197:19 1199:10
1199:13,20
1200:1 1202:13
1202:17 1203:21
1204:4,12 1211:2
1211:5,15 1212:6
1212:19,22
1215:1,4,9,12,15
1215:22 1216:7,9
1216:14,21
1217:3,7,11,15
1218:1,8,11
1220:6,20 1221:4
1221:10,14,17
1223:11 1224:8
1224:20 1225:5,8
1225:15 1226:2,6
1226:9,13,16,19
1227:1,5,9,14,21
1228:9 1229:8,15
1229:19 1231:8
1231:14,16,20
1232:6,13,19
1233:14 1234:14
1235:18 1236:8
1236:11,15,19,22
1237:4 1238:10
1238:17 1242:3
1248:18 1249:8
1254:16,18
1258:11,15,18
1260:17 1261:2
1261:14 1262:1,6
1262:12,20
1263:10,22
1264:3,9,15,19
1265:3,16 1266:3

1266:6,13,21
1267:2,13,16,19
1275:14 1276:21
1277:1 1280:7,10
1280:15,18,20
1281:2,6,9,11,15
1281:19,21
1282:2,5,10,15,18
1282:21 1283:10
1283:14,20
1284:4 1285:15
1285:22 1288:18
1289:22 1290:4
1290:10,14,17,21
1291:1,6,11,19
1292:1,15,21
1295:4,18
1301:17 1302:2,5
1302:8,14,18
1303:4 1304:22
1305:16,20
1306:6,14
1307:15,18
1309:9 1313:17
1314:2,5,13,20
1315:20 1316:3,7
1316:13,17
1318:1,4 1322:14
1323:8,15,18,22
1324:10 1325:6
1326:8,16 1327:3
1327:19 1328:2
1330:5,8,11,17,22
1331:18 1332:2,6
1333:15 1337:16
1337:21 1338:3
1338:10,15,19,22
1339:4,8,14,21
1343:6,8 1344:6
1345:15 1346:13
1351:11,22
1352:10,13
1353:10 1354:6
1354:12,21
1356:15 1357:2
1357:11,18
1358:16 1361:2
1362:13,18
1364:21 1369:17
1369:21 1370:10
1370:14 1371:3
1371:10,19
1372:1,12,19
1376:5,22 1377:5
1377:10,16,21
1378:2,7,16

1379:10 1380:2,5
1380:9,15,19
1381:1,3,7,12,18
1382:1,4
**five** 1209:12
1220:12 1224:15
1226:18 1232:15
1234:16,18
1249:19,21
1264:15 1320:12
1320:13,16
1363:12 1368:3
**flexibility** 1378:19
**flip** 1313:14
1374:20
**flipped** 1314:1
**flipping** 1355:8
**Florida** 1143:6
1238:5 1240:6
1244:9 1246:7
1247:4 1253:2
1258:4 1265:22
1266:2
**flurry** 1220:17
**focus** 1233:21
1248:11
**fold** 1230:17
**follow** 1191:19
1285:16
**followed** 1273:19
1274:15
**Follower** 1206:12
**follows** 1171:9
1340:5
**forces** 1206:18
**foreigners** 1301:6
**forgot** 1189:20
1218:22
**form** 1336:9
**forth** 1163:5
1257:14
**Forty** 1149:19
**forward** 1159:17
1184:1 1253:17
1254:5
**forwarded** 1355:12
1357:1 1360:6,17
**forwarding**
1359:13
**found** 1146:2
1172:14 1201:4
1207:22 1232:4
1255:20,20
1271:22 1311:18
1314:5
**founded** 1341:6,7

**founding** 1208:15
**four** 1262:17
1320:5,9 1379:1
**four-count** 1260:2
**fourth** 1260:5
1302:19
**Fox** 1245:17
1246:13,21
1247:8 1249:14
1250:12,22
1251:3,20,22
1252:14 1256:8
**frankly** 1224:7
**Fred** 1151:10
**Frederick** 1143:3,4
**free** 1213:22 1218:6
1218:12 1243:18
1270:10
**freedom** 1205:4
1206:11 1213:14
1218:19 1350:13
1362:5
**Freedom-Loving**
1213:20
**French** 1347:18
**frequently** 1165:4
1321:5,9
**Friday** 1220:19
1223:7 1280:11
1280:21 1282:6
1382:6
**friend** 1196:1,7
1197:12 1250:9
1256:19 1268:18
1297:8,15
1341:14 1342:14
1342:20 1348:5
1354:16 1355:18
1360:7 1363:14
1364:4 1369:12
**friendly** 1347:3
**friends** 1154:18
1207:16 1209:3
1218:16 1219:6
1256:15 1257:3
1341:3,22
1375:20
**friendship** 1228:8
1335:1 1336:19
1364:19
**front** 1158:8
1166:19 1281:3
1284:9 1312:22
1343:2 1363:6
1373:19
**fsujat@yahoo.com**

1143:8
**full** 1194:13
1209:12 1339:5
1340:9,20
**funny** 1208:1
**further** 1174:22
1175:16,18
1177:4 1204:10
1219:16 1284:9
1293:12 1320:17
1324:5,17
1362:14 1376:3
1376:19 1377:20
1378:9 1379:5
**future** 1179:20
1257:22

----

**G**

**G** 1145:1
**gender** 1256:12
**general** 1162:3
1246:10 1299:8
1352:1 1360:19
1379:2
**generally** 1166:22
1179:10 1240:4
1268:11 1298:15
1303:12
**gentleman** 1242:16
1349:3
**George** 1250:8
**Georgetown**
1298:11 1345:16
**getting** 1156:22
1167:13 1168:10
1179:11 1201:3
1201:15 1247:15
1252:13 1268:4
1278:3,4
**girl** 1313:9
**girlfriend** 1336:18
**gist** 1255:6
**give** 1146:8,9
1148:3 1153:9
1154:22 1164:18
1164:19 1171:1
1184:13 1185:15
1189:8 1208:11
1208:19 1221:2
1239:19 1243:20
1244:19 1245:9
1249:12 1262:3
1266:22 1277:8
1308:18 1339:11
**given** 1155:22
1170:9 1174:2,7

1263:3,5 1343:19
1344:7
**giving** 1190:11
1275:8
**glass** 1187:12
**glimpse** 1359:19
**Gloria** 1256:19
**go** 1147:10,21
1149:6,9 1150:3
1161:6 1163:13
1168:14 1169:1
1169:21 1178:21
1180:11 1182:3
1184:1 1186:15
1189:1 1194:13
1195:2 1197:19
1199:13 1203:21
1211:10 1212:19
1218:11 1223:15
1225:18 1230:8
1232:6 1234:12
1238:19 1241:19
1249:13 1253:6
1254:5 1264:22
1269:6 1275:14
1277:1 1278:16
1280:1 1284:4,22
1285:17,22
1291:13 1295:6
1301:13,20
1302:4 1313:6
1318:2,5 1324:2
1337:3,15,22
1338:15 1346:18
1347:1 1352:13
1354:13 1356:12
1357:19 1375:2
1381:14
**goalpost** 1243:6
**goalposts** 1251:5
**God** 1206:22
1207:4 1208:16
1208:18
**goes** 1177:1
1213:21 1267:20
**going** 1147:21
1148:1 1159:17
1169:12 1180:17
1183:15 1189:4
1197:19,21
1198:20,20
1202:9 1203:5
1209:4 1210:5
1211:6,7 1212:2
1215:2 1218:21
1219:22 1222:3

1224:8,17,18
1226:14,17
1227:18 1230:18
1230:19 1232:8
1233:13 1234:10
1240:20 1248:10
1248:12 1249:8
1253:15,17,22
1254:16,18,19
1255:3,6 1259:6
1259:12 1261:22
1267:1 1268:15
1281:1 1283:4,12
1289:10,15
1294:18 1296:21
1297:1,16
1298:18 1300:10
1300:16 1301:19
1301:20 1302:1
1303:14,17
1318:20 1322:5
1322:15 1328:20
1329:2 1333:5
1342:21 1344:11
1351:7 1354:6
1355:1 1358:11
1367:10 1370:2
1370:13 1375:14
1378:5 1379:20
1380:21 1381:9
1381:12
**good** 1145:2
1163:21 1172:15
1172:17 1175:10
1175:11 1189:19
1190:11 1191:7
1207:4 1209:13
1222:15 1256:15
1257:3 1265:21
1267:6,7 1291:11
1297:11 1299:15
1310:11 1324:11
1326:21 1341:22
1347:6 1363:3,4
**GOP** 1202:21
**gotten** 1154:7
1191:16 1256:20
1271:21 1288:12
1336:8
**government**
1158:11,15
1159:10 1173:5
1191:2 1212:15
1212:17 1213:20
1214:6 1327:16
**governor** 1350:8

1358:21
**governors** 1147:9
1152:8,9 1190:14
1275:20 1342:5
1342:17,18
1350:9,16,22
1356:14
**grammatical**
1300:2
**grandmother**
1358:14
**grandmother's**
1358:13
**grant** 1158:3
1297:1
**granted** 1184:10
**granting** 1164:13
**great** 1163:16,16
1177:9 1222:18
1268:11 1288:9
1369:9
**Ground** 1329:22
**grounds** 1159:9
**group** 1216:11
1220:7
**guess** 1181:12
1187:19 1298:5
1362:14
**guy** 1224:21
1297:11 1356:11
1358:12

---
**H**
---

**H** 1142:20
**half** 1378:19
1381:15
**Hamilton** 1245:17
1246:13 1252:14
**hand** 1296:7 1339:9
**handle** 1327:18
**hands** 1242:18
1353:4 1354:9
**handwriting** 1186:3
1237:17 1278:4
**hang** 1364:11,16
1365:4,7
**hanging** 1364:13
**happen** 1194:17
1195:15 1206:1
1206:19 1209:6
1293:18
**happened** 1156:1
1216:3 1228:6
1233:17 1266:9
1298:14 1355:4
1374:21

**happens** 1196:13
1334:19,19
1379:16,17
**happily** 1349:4
**happy** 1206:14
1268:19 1321:21
**harassed** 1170:7
1173:4 1176:4
1213:21 1309:19
**harasser** 1150:7
1219:8 1271:10
1285:2
**harassment** 1173:6
1203:13,20
1271:9 1310:15
1348:17
**hard** 1195:11
1362:9
**harder** 1195:19
**harm** 1293:11
**head** 1242:19
1357:10
**heading** 1311:16
**health** 1306:20
**hear** 1169:12
1176:17 1203:18
1217:8 1226:14
1226:17 1227:9
1250:1 1255:5
1258:9 1259:12
1264:4 1310:20
1312:12,16,17
1372:12
**heard** 1235:1
1290:7 1293:13
1294:16 1299:17
1312:17 1326:9
1327:7 1347:4
**hearing** 1141:11
1142:1,3,10
1146:12 1154:11
1158:2,6 1164:18
1164:19 1168:5
1170:17 1174:2,3
1174:8,16,20
1176:20 1183:12
1184:4,5,13
1203:16 1237:15
1255:13,21
1274:20 1290:10
1377:14 1378:14
1382:5
**hearings's** 1253:11
**heart** 1296:6
1303:20
**height** 1221:5

**held** 1218:19
**hello** 1257:2
**help** 1176:7 1196:1
1197:10,13
1230:17 1234:1
1268:18 1269:6
1270:4 1289:16
1297:20 1312:8
1315:16 1333:11
1342:12 1345:5
1347:8,11 1348:1
1349:17,22
1350:5 1351:4,5
1355:21 1361:16
1361:18,22
1362:1 1363:9
1369:12
**helped** 1197:13
**helpful** 1217:21
1266:7,8 1377:2
**helping** 1161:5
1191:16 1198:12
1266:16 1346:19
1348:9 1367:15
**Herman** 1242:12
1242:22 1243:15
1244:1,7 1245:14
1245:17 1247:10
1251:4,9,13
1254:1 1256:11
1257:20
**hey** 1301:10
1304:14
**hiding** 1179:16
**high** 1340:15
**high-powered**
1297:13
**high-profile**
1247:18
**higher** 1242:13,18
1278:19
**Hills** 1162:13
1374:19
**hinge** 1214:18
**hired** 1241:3
**history** 1180:3
1207:2 1265:22
1266:2
**Hoc** 1142:3,10
**hold** 1168:13
1243:20 1264:3
1292:18 1356:5
**holding** 1263:16
**Hollywood** 1143:6
**homeless** 1233:19
**honest** 1172:9

1365:13
**honestly** 1163:19
1163:22 1164:1
1240:8
**honor** 1147:4,5,20
1165:20 1170:20
1171:12 1173:19
1175:10 1177:9
1178:5,6 1183:22
1187:14 1194:10
1199:22 1200:4
1211:19 1229:12
1236:21 1260:15
1260:16 1261:11
1275:10 1277:2
1283:19 1285:19
1291:4,9,22
1295:14 1302:7
1314:1 1323:13
1327:6 1337:15
1339:16 1343:7
1379:7
**Honors** 1163:5
1169:9 1234:20
**hope** 1230:6
1289:14 1356:5
1380:15
**hoped** 1256:7
**hoping** 1145:17
1170:3 1222:12
1247:8 1252:21
**host** 1350:10
**hostility** 1244:1
1245:14
**hour** 1378:19
1381:15
**hours** 1260:11
**house** 1316:6
1341:20 1365:9,9
**human** 1195:4,15
1196:10 1219:20
1334:12 1356:4
1374:16
**humor** 1172:5
1207:20
**hundreds** 1303:1
**hung** 1364:12
**hurting** 1194:16

---
**I**
---

**i-t** 1314:22
**idea** 1186:16
1375:13,17
**identified** 1184:21
1217:5 1229:21
1230:1

**identify** 1147:11
  1150:2 1240:14
  1249:11 1254:7
  1255:12,22
  1320:17
**III** 1142:20
**images** 1219:3
**imagination**
  1164:22
**imagine** 1311:11
**imitation** 1291:12
**immediately**
  1167:17 1374:20
**impact** 1210:5
**important** 1155:6
  1158:13 1161:20
  1163:4 1164:17
  1186:6 1191:12
  1200:20 1202:12
  1212:11,18
  1214:22 1248:20
  1285:4 1369:11
**impression** 1242:9
  1242:11 1253:8
**impute** 1178:22
**imputed** 1179:18
**inadvertently**
  1240:10
**inarticulate**
  1303:16
**Inaudible** 1360:8
**inception** 1228:3
**inches** 1157:19
**inclined** 1338:10
**include** 1258:20
  1262:16
**included** 1258:4
**includes** 1264:13
**including** 1163:7
  1207:16 1221:6
  1234:18 1314:21
**inconsistent**
  1186:11,19
  1271:18 1273:4,5
  1276:12 1277:13
  1279:5,12,13,15
  1279:16
**incorporates**
  1235:16
**incorrect** 1161:11
**independent**
  1209:11 1249:15
**indicated** 1187:9
**individual** 1152:9
**inferior** 1212:16
**influence** 1222:13

1222:14
**influenced** 1206:17
  1222:21
**information**
  1200:13 1307:19
**informed** 1293:4
**informs** 1258:20
**initial** 1235:19
  1255:4 1366:16
**initially** 1219:19
  1308:14 1343:19
**injunction** 1152:11
  1153:10 1154:10
  1157:8,15 1158:2
  1158:5 1163:12
  1164:14,17
  1168:4 1174:2,8
  1174:16 1182:1,4
  1182:12 1184:3
  1241:15 1274:20
  1276:2
**injunctive** 1175:14
**injustice** 1208:3
**innocence** 1289:15
**inquiry** 1235:19
**insert** 1319:14,17
  1321:3
**inserted** 1202:7
  1318:16 1319:18
**inserting** 1202:3
**inside** 1293:13
  1294:1,5
**instabilities** 1296:1
  1296:3
**instability** 1230:4
**instance** 1179:22
  1230:6 1303:8
**instances** 1303:7
**instruct** 1275:11
**instructed** 1186:7
  1276:14 1291:7
**instruction** 1277:14
  1288:12
**instructions** 1150:9
  1157:1 1179:10
  1273:19 1274:15
  1275:3 1277:11
  1277:17 1278:3
  1322:9
**insulted** 1336:22
**Intangible** 1215:14
**intelligent** 1208:16
**intend** 1259:9
  1278:18 1279:4
**intending** 1304:13
**intentional** 1181:21

**intentions** 1336:12
**interaction** 1347:6
**interactions** 1375:6
**interest** 1169:16
  1179:21 1197:14
  1197:18 1205:18
  1252:2,19
  1288:13 1353:20
**interested** 1347:4
**interesting** 1167:15
  1179:19
**Interestingly**
  1164:12
**interests** 1157:4,9
  1164:15 1167:13
  1168:5,19
  1169:18 1201:19
  1205:3 1273:9
  1285:6 1301:12
**interfere** 1303:15
  1303:17
**interfering** 1305:10
**interim** 1157:4
  1176:14 1183:10
**interject** 1258:18
  1301:18 1344:6
**intermittent**
  1221:22
**internal** 1219:18
**international**
  1301:3
**interrupt** 1165:21
  1170:12 1217:8
  1218:8 1337:17
**interrupting**
  1357:19
**intervene** 1342:14
  1353:1
**interviews** 1299:2
**intimidate** 1220:4
**introduce** 1262:15
**introduced** 1347:1
  1348:7
**invested** 1305:11
**investigate** 1219:5
  1219:15
**investigations**
  1223:2
**invited** 1256:21
**involved** 1147:7
  1169:22 1268:20
  1334:22 1356:4
  1368:11 1371:8
  1371:17
**involvement** 1369:2
**involves** 1353:16

**involving** 1196:6
**Iran** 1205:4
  1213:22 1214:17
  1299:4 1350:13
**Iranian** 1218:7,13
  1218:14 1349:2
  1362:5,7
**Irrelevant** 1354:21
**issue** 1167:15
  1169:9 1209:4
  1210:17 1238:12
  1240:22 1241:9
  1241:21 1244:16
  1245:4 1251:17
  1260:8 1261:12
  1334:2
**issues** 1155:19
  1196:2 1198:2
  1209:17 1242:15
  1245:5 1257:2,10
  1266:17 1308:10
  1312:20 1327:9
  1348:2 1352:6
  1367:6
**it/she** 1314:6,10
**items** 1267:1

─────────────
**J**
─────────────
**J** 1143:3,4
**Jackson** 1271:11
  1300:9 1310:7
**January** 1184:16
  1184:17 1186:4
  1187:4,7,17
  1189:16 1201:7
  1317:21 1318:3
  1357:13
**Jesus** 1276:22
  1277:6
**Jewish** 1206:12
  1207:4
**job** 1233:19,22
  1309:19 1310:7
**Joel** 1240:17
**jog** 1306:22
**John** 1346:3
**joke** 1207:20
**Joseph** 1216:5,5
**journalist** 1341:18
  1348:5 1355:13
**Joyce** 1156:4
**judge** 1144:4
  1145:14 1152:13
  1153:7,19 1154:1
  1155:9,9,11,13,18
  1155:21 1156:3,5

1157:5,22
  1158:10 1159:4
  1163:2,9,13,20,21
  1163:22 1166:1,4
  1166:20 1167:13
  1167:15 1168:13
  1170:3,17
  1173:18 1177:5
  1179:22 1180:1,2
  1180:7,12 1181:2
  1182:2 1183:20
  1183:21 1184:10
  1186:2,4,10
  1190:7 1194:13
  1207:17,18
  1208:8,9 1209:4
  1210:1,7,18,20
  1222:7,16,17
  1275:1,16 1276:9
  1323:11
**judge's** 1223:16
  1278:18
**judges** 1167:19
  1178:21 1180:10
  1207:13 1208:11
  1208:14 1209:3
  1209:12,16
  1210:8,10,18
  1212:11,16
  1222:14,15
**judgment** 1245:21
  1249:15 1258:2
**Judicial** 1209:1,2
  1252:6,8 1257:14
  1257:17 1258:3
**judiciary** 1207:15
**July** 1159:5 1163:2
  1165:13 1167:4
  1206:9 1242:1
  1258:17 1270:16
  1276:13 1277:11
  1278:7 1280:11
  1280:21 1294:9
  1294:21 1295:2,2
  1295:10 1324:6
  1324:18 1325:16
  1324:15,17,20
**jump** 1157:7
**June** 1141:8 1153:2
  1153:6 1155:14
  1160:1 1161:2
  1162:8 1207:9,12
  1220:14 1224:3
  1352:21 1355:9
  1360:2 1382:6
**jurisdiction**

1238:13 1249:1
1259:3
**juror** 1196:8
**justice** 1191:10
1224:7 1252:21

### K

**K-e-y-a** 1145:21
1339:7
**K-o-l-l-m-e-r**
1360:19
**Kasanji** 1297:10
**Kathleen** 1169:1
1186:12,14
1201:5 1239:21
1272:1
**Kaveh** 1196:1
1197:11,13
1268:18 1310:10
**keep** 1197:19
1213:9 1240:4
1254:16,18
1269:9 1312:10
1312:14 1315:11
1324:10
**Kendall** 1247:22
1248:4
**Kennedy** 1196:6
**kept** 1205:20
**key** 1298:3
**Keya** 1144:5
1145:16 1244:21
1247:1 1261:15
1333:5,8 1338:18
1339:6 1340:2,10
1352:21 1353:5
1353:16 1355:4
1356:1,20
1360:10
**Khomeini** 1219:13
**kill** 1230:19 1244:5
**Kim** 1141:22
1142:4
**kind** 1167:20
1179:16 1209:5
1230:11 1253:12
1257:11 1277:5
1309:2 1319:17
1375:13
**kindly** 1251:19
**kinds** 1349:11
1374:22
**Kingpin** 1202:21
**kiss** 1333:11
**Klayman** 1141:5
1143:10 1144:3

1145:9,10,21
1146:19 1147:2
1147:11,18,20
1152:17 1154:20
1158:21 1159:22
1162:20 1168:15
1169:2 1171:11
1172:16 1174:22
1175:18,19,20
1176:2 1177:4,15
1178:6 1180:16
1190:13 1193:10
1193:12 1194:22
1196:18 1198:6
1199:6 1201:11
1202:21 1205:9
1206:11 1207:8
1211:2,21
1213:21 1216:20
1218:4 1220:7
1224:11 1225:1,9
1225:20 1226:11
1227:15 1232:8
1233:19 1234:7
1235:5,9,12
1237:8 1238:6,21
1241:9 1249:6
1259:11 1260:15
1261:10 1264:14
1265:5 1267:6
1273:15 1275:14
1277:1 1280:8
1286:5,9 1290:1
1292:10 1298:9
1302:6 1306:15
1307:20 1311:12
1319:8 1326:15
1331:19 1333:17
1338:8 1339:15
1339:16,22
1340:7 1343:7,9
1344:12 1345:19
1346:15 1349:15
1351:9,14,16
1352:14,21
1353:11 1354:8
1354:13,14,22
1355:3 1356:17
1356:18 1357:3,4
1357:8,20,22
1358:19 1361:5,9
1362:14,17
1363:9,11,13
1364:7,14,17
1365:3,11 1366:5
1366:22 1367:1

1369:14 1371:14
1371:16 1372:5,6
1372:9,14 1373:3
1373:6,20 1374:3
1374:14,22
1375:15,20
1376:5,6,8,19
1377:8,11,15
1378:10,14
1379:6,7,20
1380:4,7,17,21
1381:2,2,4,19,20
1381:22 1382:3
**Klayman's** 1203:6
1217:11 1318:13
1319:14
**knew** 1161:12,13
1161:15 1162:11
1166:2,3,11,13
1170:1 1199:1,4
1214:2 1219:17
1220:1 1250:3
1252:16 1278:2
1288:4 1318:19
1327:10 1347:3
1361:17 1363:13
1373:13 1375:10
**know** 1154:13
1157:11 1161:17
1164:6 1165:5,6
1168:11,21
1169:2,17
1172:22 1178:20
1180:6 1182:6
1185:6,14 1190:1
1191:8 1194:14
1196:2,10,14
1197:16 1201:10
1202:9 1203:15
1203:16 1207:22
1208:21 1214:17
1223:3 1225:3,20
1226:12 1228:6
1228:13,17
1230:16 1231:4
1237:17 1239:11
1241:4,19 1245:3
1245:5 1247:11
1247:16 1250:13
1251:16 1252:13
1253:10,12,19
1255:3 1256:6,12
1256:20 1257:1
1257:18 1261:21
1261:21 1263:4
1269:22 1271:13

1271:15 1274:4
1277:20 1278:11
1282:3 1284:6
1287:4,10
1288:10 1289:9
1289:16 1292:6
1297:10 1299:21
1303:5 1304:7,14
1304:19,20
1309:3,4 1310:7,8
1310:17 1311:19
1313:9 1314:7
1315:2,13
1317:17 1318:22
1326:22 1332:21
1334:19 1335:18
1335:21 1341:12
1343:19 1344:7
1344:15 1348:6
1350:18,19
1351:1 1352:17
1354:20 1356:3
1356:13 1363:5,7
1363:20,22
1364:9 1366:19
1368:4 1373:7,8
1373:18 1374:18
1375:3,6,21
1379:16
**knowing** 1189:22
1240:19
**knowledge** 1288:8
1344:13 1367:16
1372:15
**known** 1172:20
1191:10 1350:11
1350:11 1362:6
1363:12,17
1376:1
**knows** 1197:4
1301:2
**Kollar-Kotelly**
1152:14 1155:10
1167:14
**Kollmer-Dorsey**
1360:18
**Kotelly** 1153:8
1155:18 1157:5
1157:22 1159:4
1163:2,22 1166:1
1170:3 1181:2
1182:2 1183:20
1183:21 1184:18
1184:22 1185:3
1186:3,10 1190:7
1209:7 1222:7

1275:1,16 1276:9
1284:9
**Kotelly's** 1163:9,14
1169:6 1284:7

### L

**LA** 1160:7,10
1169:2 1186:15
1198:15 1199:1
1256:22 1273:21
1274:17 1276:6
1277:13 1285:1
1296:22 1300:11
1317:4,14,16
1353:18
**labeled** 1343:4
**Labradoodle**
1334:15
**laches** 1246:4
**lack** 1147:18,19
1182:13,14
1232:1
**Lambert** 1156:4
**Lamberth** 1207:17
1210:19 1222:17
**Land** 1201:14
**lands** 1192:1
**large** 1268:6
**LARKIN** 1142:13
1265:14,20
1266:1
**Larry** 1141:5
1143:10 1144:3
1147:2 1169:2
1202:21 1203:6
1206:11 1213:20
1216:20 1242:18
1245:11 1273:15
1286:9 1292:9
1318:12 1319:8
1319:14 1338:8
1352:21,22
1355:3,5 1356:6
1360:2 1368:8
1370:19,22
1374:14
**last-minute** 1263:4
**lately** 1165:11
**lateness** 1263:3
**Latin** 1350:11
**law** 1143:4 1154:2
1163:11 1165:2
1167:15 1171:17
1244:15,17
1246:7 1251:14
1252:5 1366:2

**lawsuit** 1214:12
  1215:19 1284:12
  1284:13,14
  1298:6
**lawsuits** 1270:18
  1271:8 1294:10
**lawyer** 1165:7
  1169:20 1171:18
  1172:10,15,15
  1179:18 1191:10
  1191:17 1196:3,7
  1208:1 1214:11
  1240:3 1246:8
  1247:18 1248:2
  1251:18 1270:9
  1270:12 1272:19
  1272:20,20
  1301:4 1304:7
  1381:5
**lawyers** 1165:3,10
  1277:20 1353:4
  1354:10
**lay** 1192:1
**leader** 1219:12
**leading** 1346:13
  1349:14
**learned** 1232:5
  1255:10 1296:21
**learns** 1349:12
**leave** 1296:18
  1317:17 1335:19
  1341:16 1380:13
**led** 1245:19
**left** 1163:13
  1177:16 1252:8
  1258:2 1341:17
  1369:16
**legal** 1190:2 1197:2
  1228:7 1288:22
  1303:21 1310:17
  1311:20 1312:11
  1313:3 1314:7
  1315:10 1328:11
**legally** 1164:21
  1194:14 1198:13
**legislative** 1180:3
**legitimate** 1225:10
**legs** 1304:20
**length** 1286:14
**let's** 1148:3 1149:6
  1183:17 1211:22
  1225:18 1268:21
  1273:10 1291:15
  1320:1,4 1324:12
  1337:3,7 1346:11
  1346:18

**letter** 1148:17
  1178:1 1191:22
  1235:19 1239:2
  1245:15 1246:12
  1246:20 1249:16
  1253:14,18
  1258:17 1269:21
  1270:6,17
  1271:13 1273:15
  1274:3,13 1279:6
  1279:18 1283:4
  1286:18,19
  1287:1,11,13,16
  1288:21 1289:4
  1301:8 1307:11
  1307:20 1308:1,4
  1311:9,13 1322:8
  1324:6,8 1325:2
  1374:13
**letters** 1162:4
  1179:11 1255:20
  1264:13
**letting** 1182:3
**level** 1276:8
**life** 1178:18,19
  1195:15 1207:22
  1208:19 1222:20
  1234:6 1239:12
  1320:19 1321:9
  1321:11 1334:11
  1335:9 1340:14
  1354:1 1356:4
  1380:7
**lightly** 1326:19
**likes** 1230:16
  1244:4
**liking** 1164:7
**line** 1187:10 1207:5
  1234:18 1290:16
  1294:13 1299:5
**lines** 1148:1
  1224:14 1226:14
  1226:16,18
  1232:13,14
  1234:15,17,18
  1311:16 1320:5,9
  1320:13,13,16
  1330:13
**list** 1261:6 1262:3
  1264:5,22
  1266:14 1381:6
**listen** 1259:16
**literally** 1157:18
**litigation** 1147:8
  1156:1 1301:3
  1308:22 1309:6

**little** 1170:19
  1172:2 1185:5
  1247:10 1259:7
  1262:9 1293:20
  1319:13 1340:11
  1346:9
**live** 1224:17
  1256:13
**lived** 1197:12
  1219:11 1239:13
**loaded** 1295:3
  1324:22 1325:7
  1325:10
**location** 1162:11
**locations** 1341:10
**logic** 1289:12
**long** 1145:15
  1211:8 1230:13
  1233:10 1297:19
  1325:18 1341:2
  1363:17 1365:22
  1381:8
**longer** 1288:7
  1327:17 1364:1
**look** 1148:8
  1158:10,11,21
  1169:9 1180:2
  1181:5 1182:20
  1193:10 1195:3
  1221:13,15
  1224:11 1229:20
  1239:8 1253:7
  1254:5 1255:12
  1256:15 1268:21
  1273:10 1281:11
  1285:8 1286:5,15
  1291:15 1292:5
  1295:11 1298:5
  1301:15 1302:5,8
  1307:5 1311:6
  1313:13 1315:3
  1319:7,10 1320:1
  1328:12 1331:7
  1331:19,21
  1337:7 1351:17
  1352:8,11,20
  1360:22 1368:3
  1374:6,9
**looked** 1251:5
  1253:16 1271:21
  1289:3,10
**looking** 1192:6
  1229:5 1235:2
  1237:12 1274:2
  1281:14 1298:8
  1311:15 1332:14

  1361:21 1363:7
  1376:9
**looks** 1187:16
  1310:8 1311:9
**Los** 1154:16 1160:1
  1161:12 1173:8
  1176:6,14 1278:2
  1296:17 1308:19
  1348:21
**lose** 1188:5 1277:5
**losing** 1356:1
**lost** 1157:12 1160:9
  1240:2 1256:4
**lot** 1165:11 1169:12
  1193:20 1198:1
  1206:17 1212:13
  1223:1 1245:5
  1250:10 1253:10
  1256:3,6 1257:8,9
  1268:20 1300:1
  1301:1,7 1303:12
  1304:17 1334:13
  1336:2 1354:19
  1364:12
**lots** 1334:10
**love** 1196:8,12
  1223:10 1230:9
  1268:4 1270:6
  1334:3,4,5,11,13
  1334:16 1335:3,8
  1336:16 1337:6
  1372:8,11 1373:5
**loved** 1195:9
  1335:11 1374:18
**loves** 1230:11
  1269:3
**loving** 1195:10
**lower** 1181:7
  1276:8
**lunch** 1193:1
  1256:22 1259:21
  1265:5,6 1382:2
**luncheon** 1260:19
**lured** 1231:4,4

**M**

**M** 1141:22 1142:4
**M-i-n-i-t-e-r**
  1355:14
**mad** 1195:22
**Magazine** 1216:3
**magnifying**
  1187:11
**mailed** 1190:6
**mailroom** 1187:7
**main** 1271:10

**making** 1174:3,10
  1294:12 1335:4
**mall** 1299:2
**man** 1213:4
  1247:17 1349:5
**Manafort** 1223:4
**manage** 1249:3
**management**
  1293:16
**manager** 1214:11
  1219:9
**managers** 1343:21
  1344:9
**manifest** 1154:1
  1181:21
**manipulative**
  1336:1
**manner** 1166:19
  1336:9
**March** 1147:13
  1151:2,4,5 1230:2
  1231:9,17 1232:3
  1298:1 1307:12
  1307:22 1356:1
  1357:3,14 1358:5
**marked** 1351:8
  1373:17
**marking** 1152:13
**markings** 1155:15
**married** 1196:8
  1245:5 1349:5
**MARY** 1142:13
**match** 1271:17
**materials** 1247:4
  1249:9 1367:8
**matter** 1141:4
  1148:18 1209:20
  1249:2,3 1250:8
  1250:19 1253:2
  1255:7,8 1259:22
  1261:8 1265:4
  1289:11 1290:19
  1353:16 1360:21
  1371:1
**matters** 1145:5,6,9
  1177:22 1222:8
  1225:14 1291:7
  1363:14
**Max** 1253:7,8
**mean** 1147:17
  1165:21 1176:16
  1185:2 1196:11
  1199:17 1203:17
  1210:14 1228:15
  1263:13 1257:17
  1264:16 1269:5

1274:9 1310:20
1330:6 1331:4
1332:10 1336:7
1351:12
**meaning** 1194:14
1371:18
**means** 1230:11
**meant** 1305:2
1314:14 1335:20
1360:5
**mechanism** 1209:9
**media** 1200:17
1222:22 1350:10
**medical** 1176:7
1297:2,21
1308:19
**medication** 1230:7
1234:2
**meet** 1161:1 1230:3
1242:21 1243:14
1249:22 1250:5
1250:12,22
1251:11,22
1252:20 1256:22
1285:12 1340:22
1341:12 1344:21
1345:3 1346:12
1364:3
**meeting** 1243:22
1245:20 1250:14
1251:2,4,12,20,21
1253:20 1349:21
1380:11
**Mehdi** 1150:7,22
1328:20
**member** 1142:14,16
1171:18 1350:15
**members** 1146:12
1147:5
**memorandum**
1153:5,5 1155:9
1156:12 1157:14
1158:4 1159:4,18
1180:20 1181:1
1181:13
**memorialize**
1366:20
**memories** 1223:20
1256:4
**men** 1170:6 1257:7
**mental** 1295:22
1306:20
**mention** 1260:12
1330:3
**mentioned** 1173:21
1270:11

**mentions** 1331:1
**meritorious**
1203:13
**mess** 1273:7
**message** 1299:4
1361:6
**met** 1160:14,17
1161:17 1199:2
1228:3,16
1243:15 1244:1,3
1252:20 1295:21
1298:10 1299:2
1332:17 1333:3,4
1333:6,8 1341:13
1342:3 1344:20
1345:2,2 1347:16
1347:18 1349:5
1349:16 1364:4
**mete** 1235:7
**metropolitan**
1341:9
**Miami** 1196:7
1301:3
**MICHAEL**
1142:15
**middle** 1284:17
**mind** 1154:16
1211:8 1269:9
1324:10
**mine** 1227:13
1257:4 1275:18
1297:9,15
**minimum** 1302:22
**Miniter** 1341:14
1348:4 1355:13
1360:8,11 1364:5
**Miniter's** 1365:8
**minute** 1193:16
1215:1 1217:7
1229:8 1248:4
1254:19 1255:21
1261:13 1276:19
1281:3,16
1296:20 1326:8
1330:18 1339:5
1366:6 1377:9,10
1377:11 1380:19
**minutes** 1177:12
1232:4 1338:4
1370:7
**miracle** 1196:13
**missed** 1188:3
**missing** 1248:8
**misspoke** 1151:3
**mistake** 1208:18
1314:21

**mistaken** 1211:18
**Mitch** 1355:14,18
**mitigation** 1379:19
**Mm-hmm** 1190:4
1218:10 1359:1
1369:7
**mom** 1230:9,9
**moment** 1215:5
1286:1
**momentarily**
1333:6
**Monday** 1197:6
1281:12 1282:2,4
1282:4,7 1355:9
**money** 1150:11,13
1194:10 1197:22
1215:15 1358:14
**month** 1220:15
1221:18
**months** 1192:9
1194:11 1197:9
1221:19
**mood** 1320:6,11,18
**morning** 1145:2,14
1175:10,11
1197:1 1261:22
1284:19 1378:11
1378:18 1380:12
**Morton's** 1333:2,4
1333:6,11,13
1345:2,9,15
**Moses** 1207:5
**mother** 1267:10
1340:13 1356:12
1358:13
**motion** 1152:3,10
1153:3,10,15,16
1153:19 1154:21
1155:8,8 1157:15
1158:5 1159:6
1163:1,12
1164:12 1165:19
1166:3,11,14
1167:9,17
1177:17 1181:3
1181:16,19
1183:19 1188:11
1208:22
**motions** 1180:11
**mouth** 1185:4
**move** 1151:9,12
1152:1 1157:7
1170:2 1186:20
1188:10 1280:5
1295:13,16
1309:7 1362:15

**moved** 1181:5,6,11
1246:19 1251:6
1264:1
**movement** 1362:5
**movements** 1350:13
**moving** 1155:4
1243:5 1334:1
**Muller** 1223:2
**mutual** 1341:13
1364:4

———————
**N**

**N** 1144:1 1145:1
1261:1,1,1
**name** 1145:20
1160:21 1171:12
1197:3 1250:7
1252:11 1334:14
1339:5,6,7 1340:9
1340:10 1342:15
**named** 1248:2
1297:9 1341:14
**names** 1349:3
**National** 1349:2
**natural** 1254:2
**nature** 1364:19
**necessarily** 1369:8
**necessary** 1146:17
1166:4 1356:3
**need** 1148:19
1158:13 1166:1
1170:20 1183:11
1187:11 1193:11
1197:10 1201:10
1210:22 1225:12
1240:5 1243:14
1260:9 1262:9
1269:17 1291:6
1296:14 1306:20
1309:16 1315:21
**needed** 1158:9
1176:6,21
1179:10 1197:17
1201:17 1259:22
1273:8 1279:19
1279:20
**needs** 1147:16
1170:14 1180:8
1226:13
**negate** 1304:11
**neither** 1188:8
1293:6
**nervous** 1184:12
1317:18 1329:5
1357:16
**Network** 1176:5

**1343:20** 1344:8
**neutral** 1353:22
**never** 1169:1
1184:4,5,19,20
1185:8 1194:19
1198:2 1205:20
1205:20 1209:6
1232:4 1244:1
1247:5 1250:2,4
1250:16,16
1252:20 1255:8
1257:12 1278:6
1284:19 1288:6
1289:4 1293:4
1310:19,21
1311:4 1312:10
1313:8 1318:22
1335:10,12
1336:17 1374:3
1374:21,22
1376:1
**Never-never**
1201:14
**nevertheless** 1254:4
**new** 1245:16
1253:22 1254:2
**News** 1176:5
1223:7,8 1300:14
1343:20 1344:7
**night** 1298:10
1352:15
**nights** 1233:20
**nine** 1146:14
1221:20,20
1224:15 1226:18
1256:21
**NITV** 1349:1
**nods** 1357:10
**non-lawyers**
1168:10
**non-meritorious**
1245:22
**nonformal** 1173:14
**nonpartisan** 1203:1
1203:4
**nonrepetitive**
1260:10
**nonresponsive**
1280:6 1288:14
1291:1
**nonsense** 1353:19
**nonsensical**
1289:11
**Notary** 1142:5
**notation** 1186:2
**note** 1187:21

1220:6 1307:19
  1308:3
**notebook** 1309:3
**noted** 1231:8
  1254:8
**notes** 1175:3
**notice** 1149:14
  1150:15,18
  1151:1,4 1163:3
  1169:5 1183:15
  1184:15 1185:1,7
  1185:12,21
  1187:2,3 1188:1
  1188:14 1191:4
  1299:9 1336:7
**noticed** 1346:3
**notices** 1161:10
**notified** 1237:21
  1239:8,15 1250:3
  1250:18
**notwithstanding**
  1302:22 1326:7
**November** 1161:10
  1162:4
**number** 1148:9
  1149:5,13
  1151:13 1176:12
  1182:22 1183:5
  1199:14,17
  1204:4,7 1236:3
  1236:17 1238:8
  1238:22 1258:14
  1259:9 1264:17
  1266:5 1270:20
  1273:11 1285:18
  1286:6 1287:17
  1288:1 1291:16
  1292:6 1294:12
  1295:9 1307:2,6,9
  1311:7,16 1312:2
  1313:14 1317:5
  1320:1 1326:10
  1337:8 1373:18
**numbered** 1317:5,9
**NW** 1142:2

**O**

**O** 1145:1 1261:1,1
  1261:1
**o'clock** 1145:18
  1260:14,18
  1261:18
**oath** 1169:14
  1343:14 1376:12
  1376:13
**Obama** 1247:13,14

**object** 1267:11
  1272:17 1327:22
**objected** 1238:18
**objection** 1151:14
  1151:16 1172:11
  1172:12 1177:1
  1225:22 1233:12
  1238:16 1248:9
  1263:1 1327:19
  1349:14 1362:12
  1362:17 1364:17
  1369:18 1372:6,9
  1372:13,13,21
  1373:6
**obligation** 1249:2
**observation**
  1361:21
**observations**
  1212:10 1357:12
**observe** 1346:22
**observed** 1347:2
  1357:15 1368:10
**obviously** 1154:11
  1190:11 1191:18
  1206:21 1207:4
  1251:16 1288:13
  1293:14,16
  1301:9 1304:3
**occasion** 1347:17
  1368:10
**occasions** 1294:12
**occurred** 1208:4
  1215:21 1219:15
**OCR** 1192:10
  1219:21 1241:16
**October** 1180:20
  1181:2,14,18,20
  1191:21 1192:3
  1192:20 1204:16
  1205:10,12,13
  1328:5 1329:17
  1329:20 1331:9
  1331:16
**ODC** 1192:10
**offer** 1333:11
**offered** 1285:12
**office** 1143:4
  1159:16 1161:13
  1162:11,15,16
  1176:5 1198:12
  1199:2 1219:20
  1219:21 1237:21
  1241:8 1250:14
  1251:9 1254:2
  1342:16 1353:17
**oh** 1185:5 1188:20

1190:21 1220:22
  1235:21 1236:3
  1237:10 1264:21
  1274:4 1282:4
  1292:17 1316:1
  1320:12 1330:10
  1330:18 1354:11
  1361:8
**ok** 1146:9 1148:8
  1149:6 1150:14
  1152:22 1162:5,6
  1177:4 1183:3,7
  1183:17 1190:21
  1193:12 1194:5
  1204:12 1209:21
  1211:4 1216:21
  1221:10,16
  1226:2,19
  1229:19 1231:14
  1234:14 1235:11
  1236:22 1239:2,7
  1245:11 1254:21
  1262:5,12
  1263:18 1264:11
  1265:6,20 1266:1
  1266:6,21 1267:2
  1267:22 1271:1,6
  1274:12 1277:18
  1281:7,10,15,20
  1282:15 1283:18
  1286:2,7,17
  1287:19 1290:3
  1290:22 1292:3
  1292:17,20
  1293:20 1299:16
  1302:2 1305:16
  1306:14 1307:16
  1310:4 1314:16
  1314:20 1316:13
  1317:2 1318:1,4
  1324:21 1326:6
  1327:3 1328:8
  1330:16 1333:4
  1334:9,11
  1337:13 1341:19
  1354:12 1355:1
  1355:22 1356:17
  1357:20 1362:14
  1362:18 1363:10
  1366:4 1370:10
  1370:14 1371:19
  1374:11 1375:4
  1376:19 1380:4
**old** 1223:19
  1227:10 1246:1
  1253:3

**omission** 1306:12
**omitted** 1344:11
**once** 1234:10
  1235:18 1332:12
**ones** 1264:11
  1265:1
**ongoing** 1222:11
**open** 1342:22
**opened** 1370:3
**opinion** 1153:5,6
  1156:15 1159:4
  1159:18 1165:3
  1180:20 1181:1
  1181:14 1183:19
  1203:19 1246:5
  1247:1 1253:6
  1344:10
**opportunist**
  1348:15
**opportunity**
  1244:19 1250:5
  1250:21 1300:13
  1351:17
**option** 1176:18
**oral** 1380:14
**order** 1152:4,11,17
  1153:2,3,4,5,12
  1153:16 1156:15
  1159:7 1170:12
  1170:13 1181:17
  1181:20 1183:6
  1220:10 1222:6,6
  1223:16,16,22
  1224:2 1262:10
  1285:20,20
  1327:16 1355:12
  1366:20 1369:11
**orders** 1168:4
  1175:13
**ordinarily** 1309:2
**ordinary** 1193:4
**original** 1152:10
  1236:1 1361:6
**originated** 1376:18
**outside** 1165:7
  1285:1
**over-romantic**
  1375:22
**overall** 1319:21
**overlooked** 1266:9
**overlooks** 1345:18
**overruled** 1372:21
**oversees** 1342:5
**overstatement**
  1231:2
**owe** 1304:6 1305:6

**owned** 1204:22
  1208:7 1340:19
  1349:3
**owner** 1213:7
  1340:19

**P**

**P** 1145:1
**p.m** 1211:10 1232:2
  1260:19 1302:9
  1382:5
**Pacer** 1152:13
  1155:15 1160:11
  1163:3 1252:13
**package** 1194:3
  1233:6
**packages** 1310:9
**page** 1163:7
  1193:13 1199:17
  1200:2 1204:7
  1205:11 1206:9
  1217:3 1224:14
  1225:2 1226:4,5
  1226:14,15
  1232:10 1233:4,5
  1234:15,17,19
  1237:1,2 1285:5,5
  1287:20 1301:16
  1302:10,13,15,21
  1307:2 1308:3
  1311:16 1312:3
  1317:10 1319:12
  1320:15 1328:7
  1330:10 1331:12
  1331:21 1352:20
  1355:2,9 1356:9
  1358:4 1359:2
**Page-24-1** 1317:7
**pages** 1146:14
  1149:18,19
  1163:6
**paid** 1184:19
  1185:8 1194:12
  1194:19 1197:9
  1198:2 1205:22
  1308:14 1319:1
  1321:1
**pandering** 1212:13
**panels** 1209:11
**papers** 1181:6
  1234:9
**paragraph** 1195:4
  1202:14 1271:2
  1278:22 1284:17
  1285:11 1302:19
  1302:20 1316:10

1317:5,9 1319:13
1320:2,3,8
1330:20 1331:22
1332:1 1343:18
1357:5 1363:12
1368:3,4 1374:9
**Parashir** 1293:13
**parents** 1363:20
**part** 1150:17
1164:4 1187:3
1198:21 1200:22
1233:3,9 1240:14
1240:14 1246:13
1254:4,11 1268:6
1270:8 1273:20
1274:16 1275:18
1325:10 1345:8
1349:8 1350:3
**participants** 1261:3
**participated**
1252:17
**participating**
1160:19
**particular** 1148:18
1162:1 1165:11
1182:9 1206:2,6
1238:3 1251:17
1345:8 1348:4
**particularly** 1170:4
1277:21 1344:17
1350:12 1364:9
1365:6
**parties** 1142:7
1174:17,20
1191:6
**partner** 1252:5
**party** 1178:11,12
1190:17 1191:5
1202:22 1203:2,3
**passed** 1353:3
1354:8
**passing** 1204:17
**passionate** 1362:5
1375:8
**patio** 1333:7
1345:10,18
**pattern** 1225:4
**Paul** 1223:4
1360:18
**pause** 1155:2
1175:4 1185:19
1189:10 1267:3
1317:1 1377:12
**pay** 1194:12
1197:10 1198:16
1198:21 1202:10

1215:20 1303:18
1304:5,13 1305:3
1305:5 1306:11
1306:13
**paycheck** 1197:9
**paying** 1268:16,16
1306:3
**peace** 1154:15
**peculiar** 1311:18
1314:6
**pending** 1240:6
1289:1
**Penn** 1171:16
**Pennsylvania**
1238:5 1240:7
1244:9 1247:5
1253:2
**people** 1157:1
1158:8,9 1166:22
1186:7 1196:10
1196:12,12
1201:16 1205:22
1207:15,19
1218:7,13,14
1230:17 1234:10
1254:3 1294:1
1305:10 1306:2
1310:9,17
1311:19 1314:7
1315:1
**people's** 1231:2
**perceived** 1182:18
**perceives** 1167:1
**percent** 1224:2
**peremptory** 1180:1
1180:4
**perfect** 1271:14
1278:5 1287:12
1300:1,6,21
**perfectly** 1225:10
1305:20 1306:7
1326:21 1338:14
1375:6
**period** 1156:18
1160:4 1161:2
1198:17 1201:13
1215:17 1216:15
1221:4 1222:10
1223:9 1227:22
1256:3 1282:12
1289:8
**periods** 1161:19
**permanent** 1182:3
1182:12 1184:2
1241:15 1274:20
1276:2

**permission** 1329:15
**Persia** 1176:5
1343:20 1344:7
**Persian** 1213:14
1297:9 1342:8
1349:9 1361:16
1369:9
**Persian-American**
1160:13
**persistent** 1153:18
**person** 1164:5
1207:2 1227:8,17
1239:13 1256:10
1257:17 1297:11
1298:12 1299:1
1305:3
**personal** 1268:8
1278:18 1321:1
1361:14 1362:11
**personality** 1350:10
**personally** 1198:2
1342:19
**persons** 1145:4
1293:14,17
**perspective** 1335:6
1335:6
**pertained** 1231:11
**phon** 1160:22
1293:13 1297:10
1358:6
**phone** 1168:16
1262:11
**picture** 1219:2
**piece** 1301:5
**pile** 1257:16
**place** 1168:9,20
1298:19 1354:3
**plaintiff** 1155:8
1156:11 1191:1
**planes** 1317:15
**planning** 1284:9
**play** 1231:2
**played** 1350:1
**plead** 1346:20
**pleading** 1152:3
**pleadings** 1147:6
1147:10,11
1159:13 1189:7
1252:12 1257:14
1274:22 1275:1
1275:17
**pleasant** 1377:6
**please** 1148:8,13
1155:1 1171:12
1181:13 1196:16
1201:9 1226:10

1229:2 1230:3
1232:11,17,20
1235:12 1243:20
1271:4 1273:11
1273:11 1277:7
1286:5 1292:5
1293:11 1294:17
1302:5 1307:5,6
1311:7 1313:18
1322:18 1330:6
1339:5,9,14
1340:8 1356:10
1358:10 1371:3
**plethora** 1340:21
**pocket** 1197:22
**point** 1154:6
1155:20 1157:6
1157:21 1158:14
1161:20 1164:13
1168:11,21
1170:11 1173:2
1179:3,13 1186:6
1188:15 1189:19
1191:7,12 1200:9
1207:16 1213:6
1215:11,16
1220:21 1223:21
1224:1 1233:19
1241:3 1247:18
1248:10 1253:4
1253:20 1259:5
1294:15 1297:4
1301:12 1304:22
1312:19,20
1316:8 1321:12
1330:6,9 1344:19
1346:2,22
1347:15 1348:16
1349:5 1353:22
1357:13,14
1378:7,8
**pointed** 1259:2
**pointing** 1154:2
1159:13 1162:9
**points** 1259:3,11
**policy** 1250:13
**polite** 1248:5
**politely** 1155:17
**political** 1165:12
1353:19,22
**politics** 1206:3
1208:11 1210:11
1211:1 1247:20
1251:8 1256:12
1257:4
**polygraph** 1154:4

**pornographic**
1219:3
**portion** 1202:13
**portray** 1244:4
**posed** 1323:21
**position** 1198:18
1341:15
**positions** 1247:19
**positive** 1313:4
1360:12
**possibility** 1205:19
1379:11
**possible** 1266:11
**possibly** 1283:10
**post-hearing**
1379:8 1380:1
**posted** 1200:5
1205:12,13
1206:8 1207:9,12
1217:1 1218:5
1219:2 1329:20
1331:9,16
**potential** 1155:22
**potentially** 1166:1
1252:2 1296:9
**powerful** 1206:18
**Powers** 1203:7
1318:14 1319:15
**practice** 1244:15,17
1251:14
**practices** 1250:9
**practitioners**
1250:7
**pray** 1285:6
**pre-August**
1177:22
**preceding** 1233:4
1307:20
**precise** 1328:18
**predict** 1266:10
**preface** 1362:2
**prefer** 1323:18
**prejudged** 1240:21
**prejudice** 1178:15
1179:17 1180:6
**prejudiced** 1184:9
1277:19
**prejudicial** 1258:21
1259:1,1
**preliminary** 1145:5
1145:6,9 1152:11
1153:10 1154:9
1157:8,15 1158:1
1158:5 1163:12
1164:14,17
1168:4 1174:2,8

1182:1
**prepaid** 1194:11
**preparation**
1253:11
**prepare** 1194:13
1243:12
**prepared** 1239:21
1240:12,22
1261:10 1365:10
1365:14,15
1377:21 1378:20
**presence** 1285:1
1344:2 1346:11
**present** 1142:6
1143:9 1145:4
1170:17 1261:4
1338:8,9 1368:8
1377:14,15,18
1378:14 1380:22
**presentation**
1260:12
**presented** 1193:20
1264:18
**preserve** 1159:15
1173:9
**President** 1247:13
1247:14
**presidents** 1247:14
**press** 1222:19,20
**pressure** 1313:3,6,8
1313:10 1327:16
**prestige** 1361:15
**presuming** 1326:1
**pretty** 1207:4
1218:15
**prevail** 1252:22
**prevarication**
1169:8
**previous** 1313:18
**previously** 1206:13
1247:2 1265:18
1280:2
**price** 1321:1
**primarily** 1256:11
**printed** 1187:15
1313:20
**prior** 1151:3
1155:11,19
1156:1 1158:2,6
1165:22 1166:20
1168:3 1213:16
1214:7 1223:18
1224:18 1248:1
1370:4
**private** 1191:1
**privilege** 1165:9

**privy** 1381:5
**pro** 1189:21,22
1190:1,2,3
1191:16,16
1194:20 1305:7
**pro-American**
1299:4
**Pro-Iranian**
1214:11
**probably** 1160:10
1208:1 1257:19
1278:14 1336:8
1360:4 1372:20
**problem** 1244:14
1319:4 1339:3
**problems** 1258:1
1310:18 1311:20
1312:11 1314:8
**proceed** 1147:1
1178:3 1193:7
1243:6 1245:21
1246:8 1255:7
1277:3
**proceeded** 1153:9
**proceeding** 1159:16
1177:7 1190:18
1235:6 1239:17
1250:4 1276:7
1315:10
**proceedings**
1250:10 1377:1
**proceeds** 1213:9
1319:5,8
**process** 1174:12
1210:1,9,20
1246:9 1250:20
1256:2 1369:22
1370:20 1377:2
**produced** 1254:10
1255:11
**production** 1263:4
1263:5
**professional** 1141:2
1142:1 1178:19
1244:18 1290:20
1375:7
**Professor** 1246:3,5
1253:4
**proffer** 1147:16
1224:16 1259:21
1260:10 1263:7
**prominent** 1342:8
**promiscuity** 1349:7
**promote** 1205:18
1214:5
**promoting** 1202:1

1205:1,2
**prompt** 1217:18
**proof** 1242:20
**properly** 1312:13
**proposed** 1238:15
**prosecutions**
1223:3
**protect** 1157:3
1167:12 1168:18
1169:16 1212:13
1273:9 1279:20
1285:5 1288:13
1301:12
**protecting** 1157:9
1168:5 1277:19
**protection** 1246:9
**protections** 1165:9
**protocol** 1272:18
**proud** 1206:14
1321:6
**proved** 1156:7
**provide** 1242:8
1303:4
**provided** 1194:3
1254:15
**provocative**
1155:18 1203:17
**prudent** 1343:22
1344:10 1349:20
**PS** 1293:11
**psychiatric** 1296:14
1309:17
**psychiatrist**
1297:10,20
**psychological**
1296:9 1297:16
1308:16 1309:17
**psychologist**
1228:18 1337:5
**psychology** 1293:21
1308:11
**public** 1142:5,14
1179:21 1212:12
1251:18 1257:19
1313:4,7 1315:10
1315:11,11,14
**publicity** 1169:11
1169:13 1214:19
1219:16 1222:14
1243:2,4,16
1260:6 1312:8,21
1315:16 1327:16
1329:7 1343:21
1344:8
**publicly** 1165:6
**published** 1216:18

1321:13 1328:5
**publisher** 1215:7
1216:4,17
1318:17 1319:18
1321:4
**pull** 1301:10
**punitive** 1258:4
**Purati** 1160:22
**purchased** 1204:22
1319:3
**purport** 1351:18
**purported** 1161:9
**purports** 1281:12
1361:3
**purpose** 1223:6
1347:14 1370:5
**purposes** 1168:2
1308:22 1309:6
**pursue** 1191:14
1283:7 1284:8
**pursuing** 1222:2
1276:1
**push** 1359:5
**put** 1145:17 1158:9
1176:13 1178:7
1202:9,10 1220:8
1229:13 1234:3
1239:6 1246:6
1291:4,9 1296:22
1300:3 1303:1,12
1303:20 1304:16
1308:18 1313:2,6
1313:8,9 1353:17
1357:6 1367:17
1367:21 1369:11
1370:21
**putting** 1173:8
1299:5

**Q**

**question** 1149:22
1175:18 1178:8
1181:5 1203:19
1213:1 1226:1,3
1228:10,12
1232:19 1233:3
1237:6,8 1238:11
1244:6 1272:17
1275:6,6,9 1277:7
1277:8,10
1281:11 1282:15
1282:21 1287:8
1288:15,17,18,20
1290:2 1291:2,20
1292:2,21
1294:20 1295:3,5

1301:21 1306:18
1309:10 1312:12
1312:13 1313:12
1313:17 1316:9
1316:18 1317:3
1322:12,16,17,19
1323:19 1324:16
1324:21 1325:7
1325:10,13
1326:9,11,17,19
1326:20,21
1330:22 1332:2,7
1333:20 1335:22
1346:14 1352:2
1364:22 1365:2
1368:2 1369:14
1370:1,6,7,9
1371:10,15
1372:2,20 1376:6
**questionable**
1300:5
**questions** 1175:1,6
1175:17 1177:4
1178:4 1225:13
1285:16 1339:15
1376:4,20
**quickly** 1211:7
1307:14 1332:10
**quiet** 1312:11,14
**quietly** 1313:1
**quite** 1157:15
1169:17 1233:10
1341:10 1348:10
1379:16
**quo** 1159:16 1173:9
1182:11

**R**

**R** 1145:1 1261:1
**radical** 1299:4
**radio** 1350:9
1354:19
**raise** 1191:12
1259:5 1261:12
1269:17 1339:8
**raised** 1164:15
1166:19 1189:19
1240:18 1259:3
**rambling** 1290:15
**random** 1155:13
**Razavi** 1190:11
1272:1
**re-contacted**
1240:12 1280:3
**reach** 1179:15
1379:14

reached 1220:11
reaches 1348:16
reaching 1179:6
reacting 1270:2
  1274:9
reaction 1317:18
read 1175:12,15
  1191:14 1195:5
  1222:19 1225:21
  1226:10 1227:5
  1227:14 1232:11
  1232:22 1233:13
  1233:14 1234:15
  1234:15,17
  1249:9 1253:6
  1259:8 1261:6
  1264:9 1273:12
  1274:5,7 1282:22
  1283:1,11,15
  1286:12,19
  1292:11,18
  1315:1,4 1322:18
  1328:13 1332:4,9
  1356:15 1367:8
  1367:11,13
  1368:4,6,18
  1380:2
reader 1303:5
  1306:2
readily 1262:6
reading 1191:3
  1271:1 1273:22
  1278:20 1292:7
reads 1222:20
  1271:5 1273:13
  1274:11 1283:17
  1286:16 1287:21
  1292:19 1312:4
  1315:5 1328:14
  1332:5 1337:12
  1351:21 1361:1
  1368:5
ready 1146:18
  1211:17 1212:19
  1221:14 1242:6
  1292:1 1377:16
real 1335:9
reality 1222:20
realization 1300:4
realize 1296:8
really 1148:1
  1150:12 1163:4
  1195:8,11
  1196:13 1205:22
  1209:16 1214:18
  1218:14,19

1241:7,8 1242:10
1245:9 1251:8
1299:5 1374:18
reason 1150:19
  1161:12 1172:18
  1191:13 1221:21
  1243:6 1268:7
  1303:10 1309:16
  1309:21 1320:12
  1324:21 1327:10
  1381:14
reasonable 1173:22
  1188:12 1284:21
  1297:2,21 1306:8
  1308:19
reasons 1269:20
  1310:1,2
reassign 1155:10
  1156:5
reassigned 1156:8
reassignment
  1166:3
rebuttal 1378:12
recall 1165:14
  1179:6 1192:4
  1227:21 1287:2
  1317:13 1326:18
receive 1215:6,9
  1293:10 1358:16
received 1187:7
  1216:10,16
  1255:1,2 1282:6
  1327:14 1370:12
  1370:13
receives 1290:9,13
receiving 1355:6
  1356:7,19
recess 1170:12,16
  1177:11,14
  1211:12,14
  1260:13,17,20
  1286:1,3 1324:14
  1338:6,11,17
  1382:4,6
recollect 1150:20
  1156:19 1325:17
  1325:18 1327:1
recollection 1167:3
  1167:7,11
  1192:13 1278:9
  1278:14 1282:11
  1288:1 1306:22
  1308:8 1309:12
  1369:2
recollections
  1282:14 1367:22

recommend 1209:4
  1209:11 1258:22
  1297:17
recommended
  1208:14 1209:10
  1297:12
reconsider 1153:20
  1163:17 1181:20
  1276:1
reconsideration
  1153:16 1154:21
  1159:8 1182:16
  1183:20 1275:21
record 1145:3
  1146:11 1147:11
  1168:2,16
  1186:18 1187:21
  1211:16 1218:9
  1226:11 1233:1
  1233:13,15
  1238:14 1247:5
  1249:9 1259:8
  1261:3,6 1262:15
  1263:21,22
  1264:10,12
  1286:8 1290:17
  1291:5,10 1292:8
  1297:3 1308:3,17
  1311:8 1325:20
  1331:8 1333:16
  1333:17 1338:16
  1361:2 1370:12
  1374:12
records 1160:9
recover 1233:21
recuperated
  1184:20
recuse 1167:14
Redirect 1175:19
  1176:1 1376:5,7
reevaluate 1198:15
refer 1152:17
  1154:20 1162:20
  1180:17 1194:22
  1196:18 1198:6
  1199:6,15 1205:9
  1206:8 1207:8
  1211:21 1218:4
  1222:3 1224:13
  1224:22 1225:12
  1228:20 1232:8
  1235:9 1238:2,21
  1321:5
reference 1183:15
  1204:17 1206:7
  1208:8 1219:4

1235:17 1328:15
references 1318:12
  1333:18
referred 1221:5
  1297:18
referring 1162:2
  1200:5 1202:14
  1227:22 1236:6
  1238:6 1280:14
  1326:4 1330:19
reflection 1210:12
refresh 1192:13
  1308:8
refreshed 1309:12
regard 1150:7,8,19
  1157:7 1161:22
  1163:2 1165:1
  1169:11 1180:8
  1182:10 1183:18
  1186:12 1192:6
  1200:8 1207:3
  1209:5 1212:10
  1213:17 1214:8
  1214:19 1222:7
  1223:1,17 1228:7
  1228:20 1243:16
  1244:20 1247:21
  1284:11 1291:22
  1299:18 1346:19
  1350:5 1368:8
regarding 1230:7
  1247:6 1263:7
  1355:14 1369:3
regardless 1219:15
regime 1299:4
registered 1203:2
regrettably 1247:3
reimburse 1198:16
  1305:13
reimbursed 1185:9
  1302:22
reiterated 1251:4
  1251:12
relate 1332:15
related 1203:14
  1215:22
relates 1260:3,4,6,7
relating 1228:22
  1264:6
relations 1313:4
relationship 1152:7
  1195:21 1228:8
  1367:19,22
  1368:12,17
  1369:13 1371:8
  1371:17 1373:15

relationships
  1163:21
relevance 1267:13
  1267:16 1364:17
relevancy 1267:12
relevant 1216:16
  1225:3 1352:5
relief 1154:15
  1175:14
reluctant 1361:18
remand 1155:10
remedial 1209:5
remember 1160:7,8
  1172:5 1176:8
  1191:9 1237:15
  1242:1 1284:13
  1296:19 1324:4
  1353:6 1355:6
  1356:7,19
  1358:12 1365:13
  1365:15 1366:9
  1366:13,15
  1367:6
remembered
  1252:10
remind 1188:14
  1316:15
reminding 1316:21
removal 1149:14
  1150:15,18
  1151:1,5
removed 1150:14
  1151:7
remuneration
  1215:6,10,13
  1216:10,17
renewable 1209:13
rent 1197:9
repeat 1206:14
  1288:18 1322:5
  1358:11 1365:2
repeatedly 1289:18
  1304:6
repeating 1279:9
  1371:12
repetition 1352:3
reply 1285:12
report 1258:19,20
Reported 1141:21
reporter 1142:5
  1145:20 1214:10
  1322:20
reports 1154:4
represent 1197:17
  1205:6 1288:11
representation

1197:3 1269:7
1305:11
**represented** 1205:6
1215:18 1241:10
1243:9 1252:4,9
1256:17,17
1273:8 1288:7
1301:7
**representing**
1173:16 1230:14
1327:15
**republican** 1202:20
1203:2
**reputation** 1164:7
1293:12 1348:11
1348:12,14
1350:12 1352:3
1369:6,9 1370:4,5
**request** 1170:13
1198:15 1289:11
1379:21
**requested** 1147:22
1250:21 1283:3
1309:4
**requests** 1175:14
**required** 1248:21
1308:10
**requires** 1178:10
1272:15,16
**requisite** 1145:4
**rescheduling**
1231:1
**rescued** 1233:18
**research** 1178:18
1246:2,3 1247:11
**reservations** 1348:8
1348:11 1349:17
1349:18,19
**resolve** 1347:11
1356:11 1358:11
**resolved** 1197:7
1241:21 1358:22
**resource** 1208:22
**Resources** 1219:20
**respect** 1145:11
1156:13 1182:14
1189:15 1222:18
1231:16 1235:6
1261:8 1265:12
1272:19 1291:5
1309:12 1312:21
1323:12 1356:2
1368:11 1379:1,3
**respectful** 1270:3
1277:3
**respective** 1142:7

1209:19
**respects** 1194:10
**respond** 1241:2
1255:4 1294:19
1367:15
**responded** 1232:3
1282:7 1307:3
**Respondent** 1141:6
1143:2,11 1148:6
1171:7,10 1176:1
1180:14 1262:15
1338:7,8 1340:3,6
1376:7 1377:13
1378:2
**respondent's**
1146:1,7,11,22
1147:14 1148:8
1148:11 1149:3,5
1149:10 1150:3,3
1151:12 1170:13
1170:15 1185:16
1228:21 1229:6
1235:13 1236:12
1240:15 1249:17
1258:13 1261:5
1262:18 1263:2
1263:12,13
1264:17 1265:7,8
1265:9,9,10,10,13
1343:3 1351:8,14
1362:15 1381:11
**response** 1168:18
1239:19 1243:12
1244:6 1250:2,17
1255:4 1275:4
1277:12 1297:1
**responsibility**
1141:2 1142:2
1244:19 1266:16
1290:20
**responsible** 1304:3
**responsive** 1288:16
**rest** 1211:6 1276:7
1377:22
**restaurant** 1228:4
1298:10 1333:10
1345:2 1347:18
**rested** 1378:3
**restraining** 1152:4
1152:11 1153:4
1153:12 1159:6
**result** 1336:8
**resume** 1146:21
1211:17 1378:5
**resumes** 1147:2
**resurrect** 1255:16

**retail** 1340:20
1341:8
**retained** 1240:15
**retaliate** 1219:22
**reticent** 1314:18
1315:9
**retired** 1173:18
1207:19
**retrospect** 1296:3
1296:11 1335:22
**return** 1259:7
1348:16
**returning** 1189:11
1211:15
**reveal** 1200:12
**revenge** 1234:7
1235:5,7
**reverse** 1198:18
1220:9
**review** 1153:22
1333:16 1343:10
**reviewing** 1352:1
1355:11
**Revolution** 1202:20
**revolutionary**
1320:20
**rhetorical** 1313:12
**Richard** 1155:11
1341:14 1348:4
1355:13 1360:8
1364:5
**rid** 1289:14
**right** 1149:17,20
1152:1 1159:15
1160:1 1162:7
1166:7 1171:22
1173:14,15
1174:21 1188:20
1188:22 1189:2
1192:1 1205:21
1208:17 1229:18
1236:10,18
1238:13,18
1241:22 1246:10
1249:2 1251:14
1258:13 1259:4
1262:3 1269:19
1270:12 1273:17
1274:18 1280:21
1281:1 1282:5
1302:4 1303:3
1304:18 1310:18
1312:22 1313:5
1317:8,20
1318:21 1319:13
1319:22 1323:14

1323:16 1324:12
1329:9 1336:12
1337:21,22
1339:4,9 1340:15
1340:17 1342:4
1343:17 1344:4
1345:4,7,14
1346:1,20 1353:8
1355:20 1358:3
1359:10,13
1360:14 1369:3
**rights** 1157:12
1159:16 1169:20
1188:5 1193:2
1219:21 1241:12
1241:16 1256:16
1257:6 1277:19
1277:20 1279:20
1280:1
**rise** 1208:11
**risk** 1214:18
**Rob** 1214:10
**Robert** 1223:2
**Roberts** 1155:12,21
**role** 1350:1
**romantic** 1336:12
1367:19,22
1368:12,17
1369:13 1371:8
1371:17 1373:14
1373:14
**Ronald** 1247:2
**room** 1170:18
**Rotunda** 1247:3
1250:9 1253:4,5
**Rotunda's** 1246:3,5
**roughly** 1211:10
1381:13
**Roy** 1196:7
**Royce** 1207:17
**RSEX.2** 1229:17
**RSUP7** 1146:15
**RSUPX4** 1187:2
1189:12
**rug** 1234:3
**ruined** 1239:12
**rule** 1153:8 1163:22
1167:20 1170:8
1272:15,15,18
**ruled** 1164:9,10
**rules** 1156:6 1246:6
1335:6 1380:2,3,6
1380:6
**ruling** 1153:20
1157:5 1163:9
1169:6 1174:3,10

1379:22
**rumor** 1293:15,17
1294:5
**run** 1171:14 1252:8
**running** 1239:10

─────────────
**S**
─────────────

**S** 1145:1 1261:1,1,1
**sad** 1320:5,10,18
**Sajadi** 1219:9,9,10
1220:3 1271:10
1294:1 1328:20
**sake** 1330:5,8
1333:15
**sale** 1215:6
**Sam** 1190:10
1272:1
**Sanders** 1207:18
**sat** 1278:13 1345:10
**Sataki** 1146:4
1147:7,8,9
1154:13 1155:12
1156:17 1158:17
1159:11 1160:14
1160:18 1164:4
1164:14 1165:15
1166:11 1167:5
1169:18 1173:3
1175:13 1185:3
1185:13,22
1186:15 1187:3
1189:21 1191:22
1194:8 1196:22
1198:10 1200:12
1201:2 1203:12
1204:19 1205:3
1205:17 1213:11
1214:2,4,14
1218:18 1224:6
1224:14,19
1225:1,9 1229:22
1230:1,15
1231:20 1232:9
1234:21 1235:20
1237:5 1239:9
1241:11 1244:3,3
1254:11 1255:2
1255:13 1256:17
1258:9 1268:3
1273:16 1276:12
1278:6,16
1279:16,18
1282:22 1283:2
1284:22 1286:10
1286:19 1287:1
1288:21 1292:10

| | | | | |
|---|---|---|---|---|
| 1295:10,22 | **says** 1155:15 | 1308:13,15 | 1240:13 1247:8 | 1348:16,17 |
| 1297:19,20 | 1159:14 1165:7 | 1311:22 1317:11 | 1255:1 1270:16 | **sexuality** 1369:3 |
| 1298:11 1305:2 | 1187:3,6,17 | 1320:7 1322:10 | 1281:12 1286:22 | **sexually** 1170:7 |
| 1308:10 1309:16 | 1194:9 1201:8 | 1328:8 1330:17 | 1311:12 1316:6 | 1173:4 1176:4 |
| 1310:16 1321:17 | 1203:6 1233:10 | 1335:5,14,22 | 1321:18 1323:1,5 | 1309:19 |
| 1322:22 1324:5 | 1236:20 1238:4 | 1353:15 1355:16 | 1324:19 1353:6 | **shaking** 1242:19 |
| 1324:18 1325:15 | 1250:13 1253:10 | 1357:4,8 1358:8 | 1356:10 1358:9 | **Shamble** 1157:10 |
| 1325:20 1326:14 | 1255:3,20 1269:5 | 1359:6 1361:8 | 1359:3 | 1166:6,18 1186:1 |
| 1329:4 1330:4 | 1269:5,11,11,16 | 1374:19,20 | **sentence** 1193:15 | 1188:9 1195:19 |
| 1331:2 1332:18 | 1269:22,22 | 1375:16 1377:8 | 1269:2,4 1273:14 | 1197:4 1200:16 |
| 1333:19,19 | 1277:6 1282:4 | 1381:13 | 1273:18 1278:21 | 1201:7 1214:4 |
| 1334:5,12,17 | 1302:16 1320:3 | **seek** 1284:20 | 1287:20 1293:7 | 1221:12 1243:17 |
| 1335:3,10,22 | 1325:1 1327:6 | 1327:16 1368:12 | 1302:20 1305:1,2 | 1244:21 1246:22 |
| 1336:12 1337:5 | 1329:10 1331:16 | 1371:9,21 | 1306:1,9 1311:17 | 1272:6 1284:20 |
| 1342:12 1344:20 | 1352:20 1357:8 | **seeking** 1184:2 | 1313:19,20 | 1286:22 1289:5 |
| 1345:22 1346:11 | 1361:5 1368:7 | 1194:19 1290:5,6 | 1314:3,9,22 | 1289:17 1293:6 |
| 1346:16 1347:1 | 1374:7,16 | 1303:6 | 1315:4 1320:3,4 | 1294:7,15 |
| 1347:16 1348:8 | **schedule** 1145:12 | **seen** 1157:5 | 1320:10 1368:7 | 1303:21 1314:19 |
| 1351:4,6,20 | 1338:5 1379:13 | 1165:10 1177:10 | **separate** 1317:15 | 1360:3,16,17 |
| 1353:13 1354:10 | **scheduling** 1170:14 | 1209:6 1230:5 | **September** 1204:1 | 1361:11 |
| 1357:12 1359:3,4 | 1261:12 | 1299:1,21 1375:3 | 1221:20 1325:21 | **Shambles** 1360:4 |
| 1359:8 1360:5,16 | **school** 1171:17 | 1375:5 | 1326:3,15,21 | **shame** 1329:16 |
| 1361:16 1367:5 | 1340:16 1366:2 | **Sees** 1202:21 | 1375:12 | **shape** 1336:9 |
| 1367:19 1368:1,8 | **scope** 1177:2 | **segment** 1259:4 | **servants** 1212:12 | **she'll** 1381:7 |
| 1368:9 1371:9,18 | 1188:13 1275:5 | **selected** 1209:16 | **serve** 1209:12 | **Shea** 1197:3 1269:8 |
| 1372:8 1373:4 | **screaming** 1239:11 | 1210:9,10 | **served** 1367:9 | **short** 1182:3 |
| 1374:5,13 1375:1 | **screw** 1338:12 | **self-interest** 1205:1 | **service** 1250:20 | 1208:19 1366:10 |
| 1375:15,19 | **se** 1190:1,3 1191:16 | **sell** 1202:4,5 | **session** 1240:17 | **shortly** 1329:9 |
| 1381:6 | **seated** 1339:14 | 1204:20,21 | 1262:4 | 1253:14 |
| **Sataki's** 1150:8 | **second** 1154:22 | 1319:3,5 | **set** 1146:13 1257:14 | **shot** 1323:16 |
| 1153:8 1155:8 | 1239:20 1278:21 | **selling** 1208:6,7 | 1316:14 | **show** 1180:5 1229:2 |
| 1156:12 1161:9 | 1287:20 1320:2,3 | 1213:8 1321:7 | **sets** 1163:5 | 1232:17 1254:9 |
| 1186:18 1216:1 | 1320:8 1331:22 | **Senate** 1252:9 | **setting** 1300:15 | 1258:6,7 1287:16 |
| 1217:22 1226:20 | 1349:21 1374:9 | 1321:13 | **settle** 1217:22 | 1303:11 1351:7 |
| 1237:15 1239:21 | **secondhand** | **send** 1155:21 | 1221:1 1284:18 | 1354:1,19 |
| 1306:20 1328:11 | 1179:12 1322:12 | 1240:1 1245:15 | 1313:1 1327:17 | 1373:17 |
| 1332:12 1343:22 | **secondly** 1288:3 | 1279:18 1287:5,6 | 1360:20 | **showed** 1376:16 |
| 1344:2,9 1352:3 | **seconds** 1262:11 | 1287:6 1360:7 | **settlement** 1200:19 | **showing** 1163:18 |
| 1369:6 | 1266:22 1285:21 | **sending** 1233:6 | 1205:19 1214:6 | 1241:20 1273:4 |
| **satisfied** 1323:8 | **section** 1178:9,10 | 1238:3 1261:16 | 1214:20 1219:17 | **shows** 1150:22 |
| 1324:1 | 1246:18 | 1305:9 1359:11 | 1221:6 1312:8 | 1152:12 1163:3 |
| **Saul** 1172:3 | **see** 1149:21 | 1372:5 1373:3 | 1315:17 1332:22 | 1191:8 1198:19 |
| **Sauls** 1207:18 | 1150:11,15 | **sends** 1201:8 | 1343:22 1344:9 | 1203:1 1225:3 |
| **save** 1225:5 | 1153:18 1154:17 | **sense** 1172:5 | 1360:12 1361:11 | 1228:17 1280:12 |
| **saw** 1173:22 | 1163:20 1168:7 | 1186:17 1289:21 | **seven** 1152:19 | 1290:17 |
| 1245:14 1257:17 | 1185:18 1187:5 | 1289:21 1298:18 | 1167:4 1227:12 | **sic** 1184:18,22 |
| 1267:8 1298:13 | 1189:13 1197:1 | 1299:14 1301:10 | 1240:19 1245:22 | 1230:10 |
| 1307:4 1319:2 | 1203:5 1223:1 | 1314:10 1370:21 | 1262:19 1263:15 | **side** 1221:7 1347:5 |
| **saying** 1166:11 | 1225:18 1233:17 | 1371:2 | 1263:17 | **sideline** 1179:19 |
| 1183:22 1197:16 | 1234:11 1246:5 | **sensed** 1243:22 | **seventy-five** | **sides** 1165:11 |
| 1206:16 1239:12 | 1249:14 1257:21 | 1247:9 | 1227:10 | 1223:3,4 |
| 1253:12 1258:9 | 1267:19 1271:3 | **sent** 1161:10,11,15 | **severance** 1252:7 | **sign** 1252:1,15,17 |
| 1275:1 1284:19 | 1271:15 1274:5 | 1189:19 1196:21 | **severe** 1329:4 | **signed** 1187:2 |
| 1305:8 1312:13 | 1280:22 1293:18 | 1197:7 1198:9 | **sexual** 1173:10 | 1189:21 1343:13 |
| 1319:16 1334:10 | 1298:7,12 | 1214:3 1229:22 | 1203:13,20 | 1343:16 1376:12 |
| 1355:10 1374:8 | 1302:11,19 | 1233:7 1240:9,10 | 1310:15 1335:7 | 1376:13 |

**significantly**
1163:18
**silly** 1170:20
**similar** 1326:19
**simply** 1182:6
**sink** 1197:21
1198:17
**sir** 1249:7 1338:19
1338:21 1339:9
1342:1 1349:13
1352:12,16
1354:6 1357:2
1358:18 1363:4
1366:3 1369:17
1371:2 1376:22
**sister** 1381:4
**sit** 1345:8,9,11
**site** 1207:7
**sitting** 1156:2
1173:12 1180:10
1239:10 1257:18
1345:20 1346:7
**situation** 1204:17
1230:5 1233:11
1272:21 1279:14
1298:19 1300:19
1313:2 1328:19
1347:11,22
**six** 1194:11 1197:9
1214:12 1220:15
1240:3,4,19
1243:13 1254:12
1266:5 1280:4
1304:2 1341:10
1343:18 1375:12
**skeptical** 1170:9
**skimmed** 1332:10
**slap** 1195:12
**slept** 1233:20
**slow** 1224:21
1369:22
**small** 1161:18
1162:15
**Smith** 1142:20
1145:5,6 1146:8
1146:13 1148:18
1151:14,15,16
1152:7,21
1172:12 1175:5,7
1175:9,16 1177:1
1186:20 1188:10
1194:3 1196:6
1224:16 1225:11
1225:22 1226:2
1229:4 1232:21
1233:4,12 1236:5

1236:9,10,14
1237:21 1238:10
1238:15 1239:3
1239:15,22
1240:9 1241:4,19
1241:22 1242:15
1243:15,18
1245:10,15
1247:2 1248:9,14
1250:3,18 1251:3
1251:8,11,19
1253:9 1262:22
1264:14 1266:19
1266:20,22
1267:5,7,15,18,22
1268:1 1269:18
1275:4 1276:10
1276:17,22
1277:9 1278:12
1279:22 1280:5
1280:17 1283:5
1285:15,17
1286:4 1288:20
1290:3,6,12,16
1291:13,14,19,19
1292:1,4,22
1294:11 1295:7
1295:15,20
1301:13,14,17
1302:1,4 1306:17
1307:10 1308:2,7
1309:7,11,15
1311:8,14
1313:19 1318:2,5
1318:6 1322:18
1323:6,10 1324:2
1324:3,12,15
1325:12,14,18
1326:12 1327:12
1327:21 1328:4
1330:6,7,10,12,15
1330:18,21
1331:1,6,13,17,20
1332:3,8 1333:20
1333:22 1338:11
1338:13 1339:18
1349:14 1362:12
1362:19 1363:2
1363:10 1364:18
1366:18 1369:19
1370:2,8,11,17
1371:4,5,12,20
1372:3,7,10,17
1373:1,9,21
1374:2,12,15
1376:3 1378:4,9

1378:13,20
1379:17 1380:11
1380:20 1381:10
1381:15,16
**smoke** 1333:7
1345:12,13
**smokes** 1333:8
**smoking** 1346:5,6
**so-called** 1248:8
**sobbing** 1227:7,16
**sold** 1202:8 1207:6
**solemnly** 1170:22
**soliciting** 1202:11
**somebody** 1162:16
1197:17 1257:20
1278:5 1289:8
1301:9 1334:20
1335:8 1336:4
**somewhat** 1371:11
**son** 1206:21
1209:22 1210:12
1222:16
**sooner** 1278:12
**sorry** 1160:16
1165:20 1183:3,4
1199:20 1210:16
1215:2 1227:11
1237:10 1274:6
1281:7 1307:8
1330:7 1331:11
**sort** 1169:21 1221:5
1375:22
**sought** 1347:8,10
1348:3
**soul** 1303:20
**South** 1350:13
**Southern** 1258:3
**spare** 1253:12
**speak** 1163:17
1165:5 1183:12
1201:14 1249:10
1276:15 1294:8
1294:21 1353:2,5
1354:8 1355:12
1361:19
**speaking** 1146:2
1295:1 1353:13
**speaks** 1153:20
1201:22 1237:14
1310:4 1331:5
1332:11,20
1333:17
**specific** 1225:13,13
1260:9 1264:21
1326:20 1328:15
1333:18 1352:2

**specifically** 1350:7
**Specification**
1201:22 1235:14
1235:15 1236:13
1240:11 1241:1
1243:10 1246:14
1250:20 1251:1
1260:2 1280:2
**specify** 1378:21,22
**spectrum** 1165:12
**speed** 1239:7
1345:21
**spell** 1145:19
**spoke** 1206:16
1278:6 1300:1
1312:10
**spoken** 1250:6
1272:4
**spokes** 1276:11
**Sporkin** 1144:4
1145:14 1168:13
1170:17 1171:6
1171:13 1177:13
1208:9 1210:20
1222:16
**Sporkins** 1208:10
**spread** 1293:15,17
**stable** 1228:19
**staff** 1161:18
1239:11,14
**stage** 1266:7,14
1366:16
**stake** 1354:1
**stand** 1146:20
1147:3 1158:10
1177:11,15
1211:12 1260:13
1285:22 1288:1
1299:18 1315:8
1338:18 1339:1
1382:4
**standard** 1164:13
1187:10
**standing** 1265:21
**standup** 1207:21
**Stanley** 1171:6,13
1177:13
**stapled** 1146:14
**start** 1147:12
1224:20 1242:7
1242:22 1245:1
1250:15 1320:4
1334:20 1377:16
**started** 1223:18
1250:19 1296:7
1301:2

**state** 1154:14
1171:12,17
1239:3 1340:8
1343:19 1357:7
1371:16
**stated** 1163:10
1198:10 1310:2
**statement** 1189:15
1189:15 1201:21
1253:10
**statements** 1225:2
**states** 1178:10
1179:21 1190:15
1191:6 1209:22
1355:4
**station** 1348:21
1349:1
**status** 1157:22
1159:15 1173:9
1182:11
**Staunton** 1169:1
1186:12,14
1190:10 1201:5
1239:21 1272:2
**stay** 1230:8
**stepfather** 1358:13
**steps** 1356:11
1358:10
**stipulated** 1152:6
**stipulation** 1153:14
**stop** 1166:7,7
1254:6 1327:14
**stopped** 1172:21
1205:20 1230:14
**stores** 1341:8
**stories** 1248:15
**story** 1172:2
1255:22 1258:5
1296:8 1321:11
**straight** 1340:16
**straightforward**
1366:10
**strangers** 1289:15
**strategic** 1257:13
**strategy** 1344:1,10
**Street** 1142:2
**strength** 1234:12
**stricken** 1295:18
**strike** 1186:20
1188:10,12
1280:5 1290:21
1291:4 1295:3
1295:16 1309:7
1322:15 1328:16
**strong** 1194:14
1195:8 1298:22

strongly 1256:18
struck 1186:22
    1211:3 1226:3
    1309:9 1325:8
    1354:21
stuff 1162:14
    1201:15 1277:6
    1329:14
style 1321:2
subject 1225:14
    1230:3 1261:8
    1265:4 1284:6
    1370:19
sublet 1162:15
submission 1244:20
submitted 1158:8
    1158:16 1230:22
    1241:18 1244:22
    1247:2 1274:22
submitting 1245:13
subsection 1258:20
substantial 1147:17
    1154:3,12
succeed 1243:8
succeeded 1167:13
    1168:1,3
sue 1353:18 1356:2
sued 1247:14
    1267:10,11
    1356:11 1358:12
suffering 1309:18
sufficient 1181:9
suggest 1270:14
    1306:1,10
suggested 1173:20
    1268:3 1272:8
suggesting 1306:10
    1335:17,18
suggestive 1335:19
suggests 1269:21
suicidal 1357:7
suicide 1184:13
Sujat 1143:3,4
    1145:8 1147:1,4
    1148:7 1149:4,17
    1149:20 1151:11
    1152:1,16,19,22
    1153:1 1155:1,5
    1158:20 1159:2
    1161:6 1162:18
    1162:19 1177:16
    1177:18 1178:5
    1180:15 1181:12
    1183:6,8,14
    1184:22 1185:11
    1185:14 1187:5,8

1187:11 1189:1,2
1189:6,13
1192:12,20
1193:7,8 1194:21
1196:15,17
1198:5 1199:11
1199:15,19,22
1200:4 1202:18
1203:21,22
1204:6,8,13
1205:8 1211:17
1211:19,20,22
1212:8,21 1213:2
1216:21,22
1217:4,10 1218:1
1218:3,10
1223:11,13
1224:9,10,12,21
1224:22 1225:7
1225:19 1226:5,8
1226:22 1228:11
1229:10,18
1232:6,7,14,16
1235:8,22
1236:17,21
1237:2,7 1238:20
1249:20 1254:9
1254:13,21
1255:11 1258:6
1258:12,16
1260:16 1262:13
1262:14 1263:15
1263:18,20
1264:2,8,11,17
1265:1,6,18,21
1266:2,4,11
1301:2 1307:14
1338:7 1377:13
1377:19 1378:1
Sullivan 1210:19
    1222:17
summaries 1259:12
summarily 1248:3
summary 1249:12
    1254:7
SUP 1199:8
superfluous 1315:7
superior 1147:12
    1149:18
supervisors 1300:9
supplemental
    1146:7 1156:12
    1157:14 1158:4
    1185:12,16
    1193:13,17
    1228:21 1229:10

1233:8 1237:22
1239:18,19
1241:2 1243:13
1244:20 1254:12
1258:8,14
1262:18 1263:2
1263:13 1265:12
1266:5 1267:8
1268:21 1269:2
1270:21 1271:16
1273:10 1274:3,4
1281:4 1286:6
1291:15 1292:5
1292:18 1351:12
1351:15 1362:15
1373:18,21,22
supplementals
    1149:1
supplementary
    1222:5 1326:5
support 1157:14
    1158:4 1346:21
    1362:6
supporting 1246:21
supportive 1360:5
suppose 1340:15
    1379:8
supposed 1167:16
    1277:21 1367:15
supposing 1190:5
supreme 1219:12
sure 1192:20
    1193:6 1210:6
    1224:2 1261:14
    1263:18 1266:8
    1274:8 1306:16
    1307:7 1339:21
    1364:12 1374:7
    1376:21
surface 1255:18
surfaced 1255:19
surprise 1288:9
surprised 1372:4
    1373:2,10,12
surrender 1289:20
survive 1234:1,4
Susan 1271:11
    1300:8 1310:7
suspect 1279:22
Sustained 1177:3
    1267:21 1362:13
Sutherland 1252:5
swear 1170:20,21
    1170:22 1171:4
    1339:10
sweet 1297:11

sworn 1171:8
    1340:4
SX 1235:22
SX10 1198:7
SX25 1279:2
    1281:12,13,14
    1283:1 1284:17
    1285:5
SX27 1292:16
    1301:19,21
    1302:5
SX3 1193:10
    1195:3
SX5 1194:22
    1196:18
sympathies 1231:3
system 1142:19
    1155:14 1160:11
    1180:8 1210:22
    1224:7 1252:14

_____

**T**

T 1261:1
tab 1149:13
    1158:22 1159:2
    1183:1 1236:17
    1236:19
table 1324:17
    1346:7
take 1146:19
    1158:10,21
    1167:16 1170:12
    1175:12 1183:11
    1183:17 1184:6
    1193:4 1194:14
    1197:2 1206:18
    1210:13 1211:9
    1219:3 1226:10
    1234:2,6 1247:9
    1254:19 1262:9
    1262:11,21
    1268:21 1272:3
    1273:10,11
    1279:8 1284:10
    1285:9,21 1286:5
    1291:15 1295:11
    1301:15 1315:3
    1320:1 1323:16
    1325:9 1337:7,19
    1343:10 1351:17
    1352:11 1356:11
    1358:10 1360:22
    1361:10 1378:10
taken 1142:1
    1170:16 1177:14
    1211:14 1243:10

1247:19 1260:20
1286:3 1324:14
1338:6,17
1353:17 1374:6
takes 1211:1
talk 1155:5 1192:14
    1201:17 1227:19
    1241:5 1272:21
    1273:8 1278:1
    1279:19 1301:6
    1321:9 1332:17
    1337:9,10
    1346:18 1364:15
    1369:1
talked 1183:2
    1207:3 1217:20
    1241:6 1253:5
    1369:6
talking 1148:21,22
    1149:2 1162:10
    1179:11 1185:14
    1202:15 1208:2,3
    1227:17 1236:16
    1300:19 1306:2
    1328:19 1329:1
    1348:3 1353:12
talks 1239:6
Tallahassee
    1207:18
tangible 1215:12,15
tank 1169:21
Taylor 1159:14
    1173:8 1182:11
    1184:2 1241:15
Tea 1202:22
team 1146:11
    1261:5
tears 1228:6
technically 1203:2
Tehran 1219:12
Television 1349:2
tell 1149:12
    1173:11 1174:5
    1187:8 1188:6
    1192:2 1198:22
    1226:13 1234:14
    1237:16 1272:20
    1272:21 1278:16
    1283:2 1304:14
    1305:1 1314:11
    1340:11 1354:18
    1367:2 1372:13
telling 1158:16
    1168:21,22
    1230:18 1242:6
    1285:8 1288:10

1294:9 1311:17
1321:18 1323:2
**temporary** 1152:3
1152:10 1153:4
1153:11 1159:6
**ten** 1232:4 1245:8
1279:10 1363:18
1363:19
**tendered** 1146:12
**tentative** 1379:14
1379:22
**tentatively** 1379:11
**tenure** 1208:19
**term** 1190:2
**terminate** 1297:5
**terminated** 1201:15
**terminating** 1162:4
**termination** 1161:9
**terms** 1205:4
1209:12 1219:18
1257:10 1276:8
1277:22 1288:2
1300:9 1313:3,4
1361:22
**terribly** 1228:19
**terse** 1253:15
**testified** 1150:10
1151:18 1152:14
1156:21 1157:10
1157:21 1166:6
1166:18 1169:14
1171:9 1185:10
1188:7 1196:3
1204:9 1222:1,4
1228:7,14
1240:16 1265:5
1268:11 1284:1
1285:14 1286:14
1295:21 1303:22
1308:13 1309:22
1312:7 1314:17
1318:11 1333:6
1340:5 1352:7
1372:17
**testifies** 1263:19
**testify** 1163:20
1189:20 1215:5
1218:22 1272:7
**testifying** 1376:15
**testimony** 1145:15
1146:9,22 1168:8
1169:4,13
1170:13 1171:1
1177:21 1178:1
1186:2,11,13,19
1186:21 1189:5

1192:16 1200:15
1201:5,9 1203:16
1204:10 1205:15
1206:13 1212:6
1213:16,17
1214:7,22
1217:12,16
1223:18 1224:17
1224:18 1226:20
1227:2,6,22
1228:10 1230:4
1233:1 1237:16
1238:9 1239:7
1261:9 1264:4
1271:12 1279:9
1279:14 1288:2
1290:9,13 1306:8
1307:17 1309:8
1310:20 1312:17
1312:17 1314:14
1314:21 1315:8
1322:6 1334:1
1335:15 1337:17
1337:18,20
1338:4,11
1339:11 1344:10
1352:2,4 1369:5
1370:4,11
1372:16 1377:17
**text** 1197:1
**texts** 1294:13
**thank** 1145:13
1147:4 1150:1
1152:19 1155:3
1177:5 1178:5
1185:20 1211:13
1211:19 1229:15
1245:12 1260:15
1260:16 1262:5
1264:2 1271:6
1306:14 1307:18
1308:2 1316:21
1317:2 1329:11
1329:13 1338:2
1338:15 1339:22
1376:22 1377:4
**thanked** 1359:15
**thanks** 1177:8
1276:8 1328:8
1355:4 1359:4
**theory** 1303:9
1379:2
**therapist** 1230:8
**thick** 1157:18,19
**thing** 1149:13
1174:19 1176:15

1176:22 1198:20
1205:21 1221:1
1223:15 1233:17
1243:1 1247:16
1250:3 1257:5,8
1257:11 1259:20
1262:9 1273:7
1274:5,7 1277:18
1278:12 1289:20
1309:3 1310:4
1313:5 1335:13
1335:16 1356:16
1365:19 1380:18
**things** 1156:1
1160:6 1161:5,8
1184:10 1195:15
1195:22 1198:19
1201:3,6 1206:4
1224:10 1248:15
1263:10 1268:14
1271:19 1273:3
1301:5 1315:18
1334:11 1337:1,4
1347:2 1349:11
1367:17 1376:15
**think** 1146:18
1150:21 1161:20
1171:20 1180:7
1185:2 1187:13
1188:11,12
1193:17 1195:10
1200:21 1208:15
1208:18 1211:5,7
1211:17 1212:17
1217:2 1218:15
1225:2,8,12,21
1230:10 1234:2
1236:5,15 1240:5
1245:8 1248:21
1249:18 1250:11
1253:16 1254:2
1254:12 1256:18
1257:19 1259:22
1261:2 1266:6
1282:20 1289:22
1290:2,5 1298:15
1306:18 1309:11
1315:6,6 1321:15
1321:21 1322:20
1323:13 1335:17
1337:16 1338:13
1343:4 1356:12
1369:10,15
1370:20 1372:19
1375:21 1376:16
1379:17 1380:9

**thinking** 1223:18
1245:17 1250:22
1369:21 1376:14
**thinks** 1226:1
1354:3 1356:2
**third** 1305:3
1331:22
**thirty** 1262:11
1285:21
**Thirty-one** 1187:18
**Thirty-six** 1217:10
**thoroughly** 1178:2
1260:1
**thought** 1154:14
1157:6 1170:5,7
1178:15 1195:20
1197:1 1217:21
1237:20 1238:1
1240:7,8 1241:11
1241:20 1247:15
1253:19 1264:19
1266:13 1267:1
1271:17 1273:22
1277:6 1312:13
1316:3,7 1320:19
1322:11 1326:12
1334:4 1335:2
1336:20 1339:17
1370:20
**thoughts** 1300:22
1374:19
**thousands** 1303:1
**threatened** 1219:1
1289:8
**three** 1157:19
1221:18 1271:2
1288:5 1330:12
1361:7
**threshold** 1164:16
1181:7
**threw** 1182:14
**throw** 1184:3
1301:11 1303:19
1305:13
**throwing** 1304:15
**tied** 1294:13
**Tigar** 1142:15
1149:15,19
1159:20,22
1160:5,16,21
1161:1 1178:7,19
1179:6 1190:13
1190:17 1191:3,8
1191:19,21
1192:8,12,18
1193:4 1195:2

1197:16 1200:2
1203:11 1204:7
1209:14,19,22
1210:4,13 1236:3
1242:4 1243:3
1298:8,17 1299:9
1300:3,17
1301:13 1307:8
1316:9,17,19
1317:3,7,9,12,19
1331:11,15
1333:1,10 1366:6
1366:13
**Tigar's** 1181:4
1212:10 1222:16
1248:1
**till** 1335:13,16
**Tim** 1197:3,3
1243:17 1269:8
1293:12,12
1312:7 1360:3,4
1360:16
**time** 1156:5
1157:10 1160:3
1161:2,19 1172:8
1173:2,11
1179:15 1183:12
1183:17 1191:14
1193:4 1198:16
1199:3,3 1203:11
1205:7 1211:8
1215:17 1216:15
1221:22 1222:10
1227:17,18,22
1228:1 1230:13
1234:5 1237:9
1238:1 1239:9
1249:4 1251:7
1255:14 1256:3
1257:10 1259:15
1259:19 1262:21
1263:11 1273:11
1279:9,14
1282:12 1284:13
1288:6 1289:7
1296:3,22
1298:16 1299:1,9
1300:3,20 1302:9
1303:1,12
1304:17 1311:18
1314:6 1317:15
1317:16 1321:12
1324:11 1327:6
1332:22 1334:18
1334:19,22
1341:2,11,15

1342:2,11
1343:10 1344:19
1345:6 1346:2
1347:15 1348:7
1348:18 1349:22
1357:13,14
1363:22 1364:2
1365:8 1371:6
1380:13
**timeline** 1147:21,22
**timely** 1188:1,19
1189:17
**times** 1224:5
1270:11,14
1279:11 1322:1
1341:17
**tired** 1185:5
**Title** 1192:7
**titled** 1218:12
**today** 1145:17
1203:16,19
1256:13 1263:6,9
1296:4 1321:9
1369:6
**told** 1150:13 1172:2
1173:20 1176:9,9
1186:14 1198:13
1198:16 1219:7
1220:2 1240:21
1242:17 1253:1
1256:15 1257:20
1273:5 1274:14
1274:18,19
1276:2 1287:2,13
1288:11 1289:2
1293:12 1296:7
1300:7,8 1305:17
1305:18 1306:7
1310:16 1316:6
1335:10 1348:2
1348:18 1352:22
1366:5 1367:4
1368:16,19
1372:4 1373:2
1374:3
**tomorrow** 1261:19
1261:20,22
1378:6,10,17
1380:11,12,21
**tonight** 1198:11
1229:14
**top** 1148:15
1152:12 1155:16
1187:8,10
1195:21 1229:16
1302:12

**total** 1273:7
**totality** 1151:13
**totally** 1186:11
1251:10 1288:14
1288:16
**touch** 1157:11
1185:9 1201:2
1241:13
**tough** 1253:18
**town** 1206:1
**towns** 1206:2
**trade** 1301:4
**train** 1277:5
**transcript** 1224:13
1225:1,12,16
1226:4,7,10
1232:9,22
**transferred**
1300:10
**Transformation**
1206:12
**traumatized**
1298:20
**treated** 1257:6
1335:1,2 1368:10
**trial** 1155:11,13
1156:3 1193:20
1194:4
**tried** 1164:1 1192:8
1207:19 1209:7
1255:14,17
1268:19 1294:11
1313:1 1336:18
1361:18
**tries** 1230:16
**trigger** 1223:21
**trip** 1315:22 1317:4
1317:12
**TRO** 1153:16
1154:3,7,12,15
1163:12
**true** 1216:14
1312:16 1341:7
1343:15 1352:19
**truth** 1158:16
1171:2,2,3
1339:11,12,12
**Truthful** 1213:11
**try** 1148:4 1154:15
1157:6 1200:17
1200:18 1214:5
1217:21 1220:4
1247:17 1251:20
1272:6 1284:21
1294:17 1304:8
1313:4 1328:17

1343:21 1344:8
1350:5 1351:4
1361:16
**trying** 1155:17,18
1156:21 1157:2,3
1167:12 1179:15
1194:15 1195:6
1195:14 1196:1
1201:18 1202:4
1204:20,21
1205:18,18,20
1214:19 1218:17
1219:16 1221:1,1
1221:3 1230:22
1231:2 1234:21
1257:16 1268:15
1270:4 1272:4
1273:9 1274:21
1279:3 1284:18
1284:19 1291:8,9
1291:18 1294:2
1303:11,15
1304:4,14
1305:14,18
1319:4 1331:2
1332:18,21
1345:5,21
1355:21 1360:11
1360:20 1361:11
1361:22 1364:18
**Tuesday** 1141:8
1358:5
**turn** 1181:12
1246:17 1281:17
1328:8 1342:22
1343:18 1355:1,8
**turned** 1300:13
1328:12
**turning** 1213:13
**TV** 1257:1 1348:21
1349:1 1359:19
**twelve** 1159:1,2
1279:10
**twenty** 1188:17
1340:18
**Twenty-four**
1314:2
**Twenty-one** 1183:7
**Twenty-seven**
1292:13
**Twenty-three**
1217:9 1265:18
**Twenty-two**
1188:18
**twice** 1150:20
1290:1

**two** 1147:7 1149:13
1150:4 1197:8
1198:19 1199:18
1200:1 1206:15
1209:12 1212:14
1212:17 1233:20
1234:8 1266:9
1283:11,16
1301:22 1311:15
1347:21 1361:6
1381:13
**Ty** 1248:2
**tying** 1202:5
**type** 1251:17
1299:3
**typewritten**
1189:15
**typo** 1314:11,12
**tyranny** 1212:14

_____
U
_____

**U.S** 1152:2 1252:8
**U.S.C** 1181:6
**Uber** 1261:6
1262:10 1285:20
1315:22 1316:6
**ulcer** 1310:12
**ultimate** 1206:10
1235:1
**ultimately** 1154:16
1166:3,13 1168:3
1170:2 1198:1
1250:19 1251:21
1272:5 1351:3
**umbrella** 1161:5
**uncertainty** 1169:7
**unclear** 1178:16
1277:21
**uncommon** 1225:16
**underscores**
1197:20
**understand**
1164:18 1244:2
1270:4,7 1291:3
1293:3 1296:13
1299:17 1301:5,6
1308:9 1336:21
1348:12 1350:15
1361:10 1366:7
1368:2
**understanding**
1348:20 1351:12
1368:22
**understood**
1271:19 1288:21
1290:4 1292:15

1293:1 1312:19
1312:20 1315:13
1321:17 1322:8
1322:22 1367:14
**unexpected** 1253:5
**unfair** 1251:10
1256:1 1334:8
**unfairly** 1310:6
**unfortunately**
1222:15
**unilaterally**
1289:20
**United** 1178:9
1190:15 1191:6
1209:22
**University** 1171:17
**unresponsive**
1309:8
**Unruh** 1214:10
1217:17,18
**unsuccessful**
1156:7
**untruthful** 1186:19
1203:18
**ups** 1242:13,18
**upset** 1224:5
**upsetting** 1245:3
1337:2
**urging** 1350:1
**use** 1219:5 1225:16
1257:21 1343:20
1344:8
**useful** 1266:15
**usually** 1345:11

_____
V
_____

**v** 1141:6 1184:2
1241:15
**vacated** 1168:4
**vague** 1225:22
**Vanessa** 1198:11
1199:3
**various** 1161:19
1169:3 1299:21
1336:14
**verbally** 1299:16,16
**verge** 1184:12
**victim** 1230:18
1235:1 1244:5
**Victories** 1202:22
**videos** 1359:18,19
1359:21
**view** 1177:21
1184:8 1265:4
1284:1 1321:9
**viewed** 1163:15

views 1209:19
VII 1192:7
violated 1244:18
violation 1379:12
  1379:15,18
violations 1182:7
Virginia 1347:19
  1347:20
virtually 1184:12
vis-à-vis 1178:16
VOA 1190:13
  1197:5 1198:14
  1198:18 1214:11
  1273:20 1274:16
  1284:21 1289:1
  1293:14 1294:5
  1294:10 1297:5
  1308:18 1343:20
  1344:7,13 1348:1
  1350:16 1360:5
  1361:12
VOA's 1293:15
voice 1173:5 1176:5
  1200:19 1204:17
  1213:14 1222:13
  1269:17 1328:21
  1342:3,6 1347:11
  1348:22 1360:3
  1360:20
Vol 1141:6
voracity 1203:20
vs 1147:8,9 1159:14
  1173:7 1182:10
vulnerable 1298:11
  1298:12,14,15,18
  1299:8

_____

W

W 1155:12
Wagner 1159:14
  1173:7 1182:10
  1184:2 1241:15
wait 1193:16
  1198:14 1215:1
  1217:7 1229:8
  1276:19 1281:16
  1296:20 1316:19
  1320:7 1322:14
  1322:14,14
  1326:8 1330:18
  1335:13,16
  1339:4 1380:19
waiting 1364:22
waiver 1252:1,15
  1252:18
walk 1226:9

1374:18
walking 1245:10
want 1149:11
  1151:9 1168:21
  1179:20 1186:15
  1188:4 1193:4
  1209:14 1210:2
  1213:6,18
  1217:15 1223:14
  1223:15 1229:20
  1233:14 1242:8
  1244:12 1245:9
  1247:12 1259:9
  1259:18 1262:8
  1263:20 1264:6
  1264:21 1272:22
  1273:3 1275:12
  1277:2 1279:8
  1280:8 1283:14
  1283:15 1285:15
  1289:19 1291:4
  1293:19 1305:13
  1310:17 1311:19
  1314:6,10 1315:1
  1322:15 1326:11
  1328:13 1331:18
  1337:19 1353:18
  1370:1 1380:22
wanted 1146:7
  1153:9 1154:10
  1163:17 1164:2
  1168:9 1169:1
  1176:16 1188:6
  1193:2 1199:5
  1200:9 1209:8
  1210:14 1214:19
  1221:2 1224:1,4
  1233:10 1234:5,6
  1235:4 1243:6
  1251:6 1252:19
  1253:9 1256:22
  1271:19 1275:16
  1278:1 1284:22
  1312:14 1316:3,8
  1319:3 1322:4
  1327:17 1336:1,3
  1336:6 1354:4,5
  1367:2,5 1368:21
  1369:1 1380:17
wants 1169:22
  1244:5 1254:1
  1378:21
War 1213:20
warrants 1253:17
WARREN 1142:11
Washington 1141:9

1142:2 1151:8
1161:16 1297:4
1341:17 1342:9
1349:12 1354:2
wasn't 1156:8,20
  1161:16 1197:21
  1202:5,18 1223:8
  1228:19 1230:15
  1242:10 1268:19
  1275:2 1278:3
  1289:16 1291:17
  1297:12 1300:1
  1300:10,21
  1304:13 1309:21
  1312:16 1313:10
  1321:7 1323:5
  1334:22
waste 1259:15
watch 1252:7,8
  1257:15 1258:3
  1359:17,18,21
Watch's 1257:17
water 1182:15
  1301:11
way 1143:5 1151:3
  1180:6 1189:22
  1203:3 1209:15
  1215:19 1220:3
  1230:10,15
  1233:22 1234:2
  1235:2 1242:15
  1244:15,17
  1247:17 1248:5
  1251:14 1265:3
  1270:3 1274:9
  1277:3 1279:21
  1291:17 1293:5
  1303:11 1312:15
  1316:2 1333:21
  1334:21,22
  1335:5 1343:5
  1344:14 1366:12
  1366:14 1368:11
  1371:16 1379:21
ways 1208:14
we'll 1192:14,16,22
  1211:9 1239:8
  1240:13 1241:19
  1261:20 1262:1
  1264:3 1295:15
  1297:5 1335:14
  1337:16,18,22
  1379:8,12
we're 1146:18
  1149:2 1155:3
  1162:7 1184:2

1189:4 1191:4
1211:7 1221:3
1224:17 1236:16
1242:6 1247:11
1253:15 1254:18
1259:6 1261:10
1261:21 1263:10
1263:16,21
1270:8 1316:13
1337:11 1342:21
1353:12,13
we've 1165:10
  1172:20 1253:16
  1257:1,2 1258:1
  1263:4 1299:21
  1364:12
website 1202:11
websites 1219:2
week 1156:17
  1220:19 1230:8
  1312:22
weekend 1242:1
  1282:7
weeks 1197:8
wellbeing 1285:7
went 1154:9 1159:7
  1171:16,17
  1173:6,10
  1179:16 1200:16
  1201:8 1229:3
  1245:7 1253:1
  1256:21 1275:20
  1294:15 1296:6
  1317:14,16
  1340:16 1375:13
weren't 1208:17
  1296:21 1297:1
white 1229:9,11
Whores 1203:7
  1318:14 1320:22
William 1196:6
Williams 1248:1
Wilshire 1161:14
  1162:12,12
Windjammer
  1143:5
Wisconsin 1345:17
wish 1197:11
  1226:11 1231:7
  1261:6,7
withdraw 1270:17
  1271:8 1288:22
  1294:10 1321:19
  1323:2 1325:12
  1370:7
withdrawn 1251:1

witness 1145:17
1146:20 1147:2
1149:2,9 1150:1
1151:18,21
1152:5 1155:5
1156:19 1158:9
1158:12 1159:3
1159:21 1160:3,8
1160:17,22
1161:4,7 1162:3,6
1162:9 1165:16
1165:18,20
1166:9,13,17
1167:6,10
1168:17 1170:15
1170:21 1171:4,7
1172:11,13
1177:8,13,15
1178:14 1179:9
1183:10 1185:5,7
1185:18,20
1187:5,13,16,20
1188:2,16,18,22
1189:4,13,18
1190:5,16,20,22
1191:7,20 1192:5
1192:11,15,22
1193:6,19 1194:2
1194:7 1195:8
1197:15,20
1199:17 1200:7
1202:15 1203:15
1204:9 1209:18
1209:21 1210:3,6
1210:16 1211:4
1211:13 1212:9
1213:3 1215:2,8
1215:11,14,16
1216:2,8,13,19
1217:5,13,20
1218:12 1220:18
1220:22 1221:8
1221:11,16
1222:1 1223:14
1225:16 1226:15
1226:18,21
1227:3,7,11,16
1228:2 1229:6,12
1229:21 1231:13
1231:15,19,22
1232:16 1233:2
1233:16 1234:17
1235:21 1236:1
1242:5 1243:4,19
1248:12,17
1249:7,11,21

1254:14,17,22
1256:5 1261:15
1262:5,8 1263:16
1263:19 1271:5
1273:13 1274:11
1275:10,15
1277:2 1280:9,13
1280:16,19,22
1281:4,7,10,14,16
1281:20 1282:1,3
1282:9,13,17,20
1283:8,12,17,18
1283:22 1284:5
1285:19 1286:2
1286:16 1287:21
1289:2 1290:18
1290:22 1291:3,7
1291:8,17,21
1292:3,17,19,20
1295:13,16
1298:13,20
1299:12,18
1300:7,20 1302:7
1302:12,16
1303:3,10 1305:4
1305:19 1306:4
1306:12,16
1307:13,16
1308:6 1309:14
1312:4 1313:22
1314:4,12,15
1315:3,5,6,21
1316:1,5,11,15,21
1317:2,6,8,11,14
1317:20 1318:3
1322:17 1323:4
1323:13,17,20
1325:9 1327:1,5
1327:22 1328:14
1330:14,16
1331:2,4 1332:5,7
1333:3,13
1337:12,13,19
1338:2,5,18,21
1339:1,3,6,13
1340:3 1345:17
1351:10,21,22
1352:9,12
1354:11 1357:10
1357:15 1358:18
1361:1,8 1365:1
1366:9,15 1368:5
1369:15 1370:15
1373:7 1374:1
1376:21 1377:1,4
1377:7 1380:20

1381:6,17
**witness'** 1338:11
**witnesses** 1144:2
 1145:11 1158:11
 1158:15 1159:12
 1256:5,7
**woman** 1164:19
 1173:4,16
 1184:11 1353:17
 1374:17,19
**woman's** 1354:1
**women** 1170:5
**women's** 1256:16
 1257:6
**wondering** 1339:19
**word** 1182:13
 1185:3 1232:1
 1233:15,15
 1314:22
**wording** 1259:14
 1306:1
**words** 1160:19
 1243:3 1306:10
 1306:13 1313:21
**work** 1161:5 1173:8
 1176:13 1179:20
 1180:9 1189:9
 1195:19 1253:13
 1273:21 1274:17
 1277:13 1285:1
 1296:22 1297:4
 1298:19 1299:3
 1300:10,13
 1308:19 1310:6
 1319:21 1348:21
 1362:9
**worked** 1342:16
 1344:15 1349:20
 1353:2
**working** 1160:12
 1161:4 1195:11
 1198:10 1254:3
 1321:17 1323:1
 1324:20 1342:3,4
 1348:22
**works** 1350:20
 1382:3
**world** 1207:2
**WorldNetDaily**
 1202:2,6 1203:9
 1204:21 1207:7
 1208:7 1213:6,7
 1214:10 1215:19
 1216:4 1313:15
 1318:8 1319:19
 1328:6 1329:18

1331:10
**worry** 1194:9
 1206:19
**worse** 1239:13
**worth** 1157:6
**wouldn't** 1156:3
 1190:1 1287:5
 1304:9 1309:2
 1354:20 1370:21
**wrap** 1189:9
 1261:20,22
**wrapped** 1247:15
**write** 1217:19
 1218:15 1220:18
 1223:6,7 1279:19
 1299:14,20
 1304:7 1309:2
 1358:4 1360:12
 1365:11,19
 1366:11,12,22
 1367:3,5 1368:15
**writer** 1216:5
 1223:10
**writing** 1223:10
 1293:5 1304:12
 1355:10
**written** 1146:3
 1157:2 1165:2
 1200:10,17,22
 1201:1 1212:12
 1214:9 1215:7,21
 1222:10 1246:21
 1248:2 1287:11
 1289:6 1296:5
 1299:19 1300:5
 1301:9 1303:8,11
 1307:11 1308:21
 1314:9 1322:8,10
 1322:11 1327:8
 1353:14 1374:14
**wrong** 1191:2
 1196:11 1236:7
 1334:3
**wrote** 1148:17
 1159:5 1191:22
 1194:8 1203:11
 1213:10,18
 1237:17 1246:12
 1249:16 1280:2
 1281:18 1286:19
 1287:11 1288:21
 1321:10,12
 1329:14,18
 1353:9 1354:7
 1355:22 1357:4
 1360:4 1366:16

1366:19,20
1371:6 1376:10

_____

**X**

**X** 1141:3,7 1144:1

_____

**Y**

**Yale** 1171:17
**yeah** 1160:4 1162:9
 1166:9 1172:4,7
 1173:1 1174:4,9
 1174:14 1175:20
 1176:10,21
 1187:16 1191:20
 1192:11 1202:15
 1202:18 1210:3
 1221:8 1249:21
 1251:15 1270:14
 1271:3 1272:13
 1277:16 1280:22
 1283:8 1287:10
 1287:17 1299:12
 1305:19 1309:9
 1309:14 1314:12
 1315:6 1317:21
 1318:18 1320:16
 1329:1,2,10,15
 1331:4 1332:20
 1336:16 1350:21
 1359:15 1365:4
 1365:18,21
 1370:18 1375:17
**year** 1192:21
 1242:3,4
**years** 1172:21
 1176:10,12
 1206:4 1209:13
 1223:19 1227:10
 1233:18,21
 1234:13 1237:19
 1240:3,3,4,19
 1243:13 1244:9
 1246:1,8 1253:3
 1256:21 1278:11
 1278:13 1280:4
 1301:4 1340:18
 1363:13,18,19
 1366:17 1375:12
**yesterday** 1146:2
 1147:22 1150:10
 1151:19 1152:15
 1155:19 1156:21
 1157:21 1161:8
 1166:6,19
 1168:11 1172:2
 1177:20 1184:21

1185:10 1200:15
1218:22 1229:3
1231:11 1254:15
1286:15 1288:2
1334:2
**younger** 1171:22

_____

**Z**

**Z-i-a** 1349:3
**zealous** 1375:7,9
**zealously** 1241:9
 1243:9
**zealousness**
 1147:19
**Zero** 1330:1
**Zia** 1349:3

_____

**0**

_____

**1**

**1** 1228:21 1235:10
 1236:6 1237:11
 1237:11 1262:16
 1263:1,2,12,13
 1264:20 1285:5
**1-1** 1237:3
**1-2** 1237:3
**1.1** 1237:2
**1.2** 1237:3
**1:00** 1211:10
 1259:7
**10** 1155:6,7 1156:9
 1178:1 1254:13
 1254:14 1265:9
 1361:6
**10/1** 1221:19
**10/15** 1221:19
**10:05** 1230:2
 1232:2
**10:29:36** 1361:4
**100** 1215:20 1224:2
**11** 1156:11 1157:13
 1158:18 1214:10
 1220:15 1326:15
**11:00** 1378:17
 1381:20
**11:29** 1211:9,16
**11:46** 1211:16
**1147** 1144:3
**1171** 1144:4
**1175** 1144:4
**1180** 1144:3
**11th** 1207:9,12
 1217:1 1220:15
**12** 1154:21 1158:22
 1200:2 1320:2

**12-** 1211:9
**12:46** 1260:19
  1302:9
**1267** 1144:3
**12th** 1239:5
**13** 1162:21 1163:6
  1163:6 1180:17
  1180:21 1181:2
**13-25** 1163:7
**13-38** 1163:7
**1340** 1144:5
**1363** 1144:5
**1376** 1144:5
**14** 1180:18,18
  1265:9
**144** 1167:17
  1178:10 1180:3
  1181:6,8,10
**145** 1181:6
**14th** 1187:4
  1189:16 1204:16
  1205:10 1213:19
  1307:12
**15** 1181:12 1265:10
  1326:21
**15-minute** 1211:9
**1525** 1143:5
**15th** 1161:10
  1162:4 1258:17
  1307:22 1325:21
  1326:3 1329:17
  1329:21
**16** 1181:19 1182:21
  1183:1
**17-BD-063** 1141:5
**19** 1301:22,22
  1328:7
**199** 1233:4 1234:18
**19th** 1150:16
  1151:4 1184:17
  1198:9 1292:9
  1293:1
**1st** 1147:13 1153:2
  1153:6 1160:1
  1161:2 1184:17
  1205:12,13
  1224:3 1328:5

---
**2**
---
**2** 1147:14 1148:9
  1148:11,22
  1149:5,10 1150:4
  1150:5,5 1151:13
  1199:8,16
  1228:22 1229:6
  1281:13,22

1330:10
**2:00** 1260:13,17
**2:30** 1262:10
**200** 1202:3 1232:10
  1234:15,19,19
**2004** 1321:12
**2009** 1255:15
  1321:14
**2010** 1147:13
  1150:16 1151:2,4
  1151:5 1152:12
  1153:2,6 1155:15
  1159:5 1163:3
  1165:14 1167:4
  1180:21 1181:2
  1181:14,18,21
  1183:8 1194:8
  1196:22 1198:10
  1200:6 1205:12
  1205:13 1206:9
  1207:9,12 1213:4
  1213:15,19
  1214:11 1218:5
  1222:8 1223:22
  1231:12 1255:2
  1268:2 1270:16
  1273:15 1276:13
  1277:11 1278:7
  1278:15 1281:13
  1281:22 1286:9
  1286:20 1292:9
  1293:1 1294:9,22
  1298:2 1307:12
  1308:5 1311:10
  1321:16 1322:22
  1324:6,19
  1325:16 1326:14
  1326:15 1328:5
  1329:17,21,22
  1331:9 1345:1
  1353:15 1357:14
  1358:2,5 1359:4
  1361:3 1374:13
**2011** 1184:17
  1186:5 1187:4,7
  1187:17 1189:16
  1191:22 1204:2
  1205:10 1258:17
  1325:22 1326:21
**2012** 1230:2 1231:9
  1231:17,21
**2014** 1255:13
**2015** 1366:17
**2016** 1239:6
  1255:18 1343:16
  1375:12

**2017** 1242:5
**2018** 1141:8
  1224:14 1232:10
  1232:18 1352:21
  1355:10 1360:2
  1382:6
**20th** 1187:7
  1343:16 1375:12
**21** 1183:3,6,18
  1221:13 1222:4
  1223:16
**21st** 1183:8 1213:15
  1222:8 1223:22
  1359:4
**22** 1183:16 1188:16
**22nd** 1181:14,18,21
  1184:16 1192:20
  1355:3
**23** 1199:7,16,21
  1204:6 1231:9,17
  1238:7 1265:14
  1313:14 1319:7
  1320:2 1328:7
  1331:8
**23-11** 1199:19
**23-12** 1200:4
  1313:16 1320:2,7
  1320:8
**23-14** 1204:8
  1319:10 1331:8
  1331:13
**23-15** 1331:21
**23-16** 1204:14
  1208:9 1329:19
**23-17** 1330:11,12
  1330:15,16,20
**23-19** 1205:11
  1328:6
**23-22** 1206:9
**23-25** 1207:11
  1212:8
**23-30** 1213:15
**23-32** 1213:16
**23-36** 1217:4,10
  1313:16
**23-41** 1313:16
**23rd** 1194:8 1201:7
  1230:2 1232:3
  1374:13
**24** 1265:10 1311:7
  1312:2 1313:18
**24-1** 1311:16
**24th** 1152:12
  1192:2 1308:5
**25** 1273:11 1274:1
  1274:2,3 1337:8

**25th** 1200:6,10,21
  1352:21 1355:10
  1360:2
**26** 1141:8 1151:5
  1286:6 1361:3
**26th** 1151:2 1163:3
  1165:14 1167:4
**27** 1265:11 1270:20
  1270:21,22
  1281:1 1285:18
  1291:16 1292:6
  1324:9
**27th** 1186:5 1382:6
**28** 1181:6 1220:13
  1287:18
**28th** 1213:4
**29th** 1331:9,16
**2nd** 1206:9 1273:15
  1278:15 1356:1
  1357:3 1358:5

---
**3**
---
**3** 1148:20,20,22
  1149:3 1193:13
  1373:18,20,21,22
**3:00** 1315:20
**30** 1218:5 1220:13
  1221:20 1228:21
  1262:16 1263:1
  1263:12 1264:20
  1280:11,21
  1326:17,20
**30-day** 1231:1
**30th** 1204:1
  1232:10 1270:16
  1276:13 1277:11
  1278:7 1294:9,22
  1324:6,19
  1325:16 1326:13
  1326:15
**31** 1295:2
**31st** 1187:17
  1224:14 1232:18
**33,000** 1248:8
**33019** 1143:6
**332** 1224:14 1225:2
  1226:5,15
**38** 1326:5 1336:22

---
**4**
---
**4** 1185:17 1301:16
  1307:2,11
**4-33** 1308:4
**4-34** 1301:16
  1307:2,6
**4(a)1B** 1191:4

**4:00** 1145:18
  1261:17
**4:35** 1382:5
**40** 1191:18 1206:4
**43** 1238:22
**430** 1142:2
**4th** 1242:1 1286:20

---
**5**
---
**5** 1146:1 1258:14
  1264:12,18
  1265:8 1343:3
**5R** 1249:20
**5th** 1286:9 1321:16
  1322:7,21

---
**6**
---
**6** 1263:2,14
  1268:22 1269:3
**6/9/10** 1156:14
**60** 1190:18 1191:1
  1191:5
**60s** 1340:13

---
**7**
---
**7** 1146:7 1152:21
  1152:22 1339:17
  1351:8,13,15
  1362:16
**7/2** 1221:18
**7/26/10** 1177:19
**70's** 1340:14 1341:7
**7th** 1159:5 1311:10

---
**8**
---
**815-5221** 1143:7
**8th** 1161:3 1196:22

---
**9**
---
**9** 1153:15 1154:19
**9:29** 1142:3
**9:30** 1380:12
  1382:6
**954** 1143:7
**9701** 1161:14
  1162:12
**9th** 1155:15



RECEIVED

July 19, 2018

Board on Professional
Responsibility

**Date:** June 27, 2018

**Case:** In Re:  Larry Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 1412

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - - X

In the Matter of,                 : Board Docket No.

LARRY E. KLAYMAN,                 : 17-BD-063

           Respondent.    :  Vol VI

- - - - - - - - - - - - - - - - X

              Wednesday, June 27, 2018

              Washington, DC


          HEARING


Reported by

    Kim M. Brantley, C.S.R.

Page 1413

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:32 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10     AD HOC HEARING COMMITTEE:
11     WARREN ANTHONY FITCH, ESQUIRE
12     Chair
13     MARY LARKIN
14     Public Member
15     MICHAEL TIGAR, ESQUIRE
16     Attorney Member
17
18     On behalf of the DC Attorney Disciplinary
19     System:
20         H. CLAY SMITH, III, ESQUIRE
21
22

Page 1414

1  APPEARANCES CONTINUED:
2     On behalf of Respondent:
3         FREDERICK J. SUJAT, ESQUIRE
4         Law Office of Frederick J. Sujat
5         1525 Windjammer Way
6         Hollywood, Florida 33019
7         (954) 815-5221
8         Email: fsujat@yahoo.com
9     ALSO PRESENT:
10         LARRY E. KLAYMAN, ESQUIRE
11         Respondent
12     and
13         MEGHAN BORRAZAS,
14         BOPR Staff
15
16
17
18
19
20
21
22

Page 1415

1              I N D E X
2  WITNESSES:       DIRECT:    CROSS:
3  Larry Klayman        1532      1422
4  Joshua Ashley Klayman      1521
5
6  CLOSING ARGUMENTS:          PAGE:
7  By Mr. Smith              1547
8  By Mr. Klayman             1569
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 1416

1          P R O C E E D I N G S
2      CHAIRMAN FITCH:  Good morning.  We are
3  now back on the record at 9:32 and ready to resume
4  Mr. Smith's cross-examination of Mr. Klayman.
5      First, any preliminary matters, Mr.
6  Smith?
7      MR. SMITH:  Yes.
8      There was one document that I was going
9  to introduce during our case, and it is a letter
10 dated January 14th, 2011.  It is the letter that
11 opened our investigation in this matter and the
12 cover letter, along with the ethical complaint,
13 which was not included.
14     So, I'm actually going to just ask this
15 to be -- I'm giving a copy to Respondent and his
16 counsel.
17     CHAIRMAN FITCH:  Does this document
18 relate to the testimony by Respondent Klayman as
19 to the circumstances that are beyond the
20 jurisdiction of this committee?
21     MR. SMITH:  It does not.
22     CHAIRMAN FITCH:  What does it relate

In Re:  Larry Klayman
June 27, 2018

---

Page 1417

1  to?

2  MR. SMITH:  This actually should have

3  been a part of Bar Exhibit Number 1.  It is a

4  letter that we sent to Mr. Klayman in January of

5  2011 opening the investigation.

6  What we have as Exhibit 1 is just a

7  copy of the ethical complaint.  But for purposes

8  of knowing exactly when we first --

9  CHAIRMAN FITCH:  I thought this was

10  already in your exhibits.

11  MR. SMITH:  Not the cover letter.  The

12  complaint itself is, it's Bar Exhibit 1, but the

13  cover letter was not.

14  CHAIRMAN FITCH:  Ok.

15  MR. SMITH:  And I would ask that this

16  document be received as Disciplinary Counsel

17  Exhibit 52.

18  CHAIRMAN FITCH:  Respondent?

19  MR. KLAYMAN:  No objection.

20  CHAIRMAN FITCH:  We are writing 52

21  underneath the words Disciplinary Counsel Exhibit.

22  Did you give one to Ms. Borrazas?

---

Page 1418

1  MR. SMITH:  I certainly will.

2  CHAIRMAN FITCH:  Alright then.

3  I think we're set.  Anything else?

4  MR. KLAYMAN:  Your Honor, just that --

5  CHAIRMAN FITCH:  Wait a minute.

6  Anything else, Mr. Smith?

7  MR. SMITH:  Nothing else from

8  Disciplinary Counsel.

9  CHAIRMAN FITCH:  Mr. Klayman?

10  MR. KLAYMAN:  Just that Ms. Klayman is

11  on the way here from New York City.  She will be

12  here at the estimated time of 11:00 a.m.  And if I

13  may go down when she arrives here, I will go down

14  and bring her up.

15  CHAIRMAN FITCH:  Is she training or

16  planing?

17  MR. KLAYMAN:  She is coming by train.

18  I just need to go down and get her.  She doesn't

19  know this courthouse.

20  CHAIRMAN FITCH:  No, given this

21  construction...

22  Why don't you resume the stand and you

---

Page 1419

1  and Mr. Sujat can keep track of when you should --

2  is she going to call you?

3  MR. KLAYMAN:  Yes, she's going to call

4  me.

5  CHAIRMAN FITCH:  Ok.

6  MR. KLAYMAN:  I'll leave my cell phone

7  on silent.

8  CHAIRMAN FITCH:  So, Mr. Smith, just

9  for your information, if you happen to go that

10  long, your cross-examination, in terms of your

11  organization and so on, keep in mind that there's

12  a definite likelihood of a break in your

13  examination.

14  MR. SMITH:  Alright.

15  CHAIRMAN FITCH:  Shortly before 11:00

16  a.m., apparently.

17  MR. SMITH:  Alright, thank you.

18  CHAIRMAN FITCH:  Mr. Klayman, resume

19  the stand.

20  (Mr. Klayman resumes the stand.)

21  CHAIRMAN FITCH:  Go ahead, Mr. Smith.

22  Mr. Klayman remains under oath.

---

Page 1420

1  MR. TIGAR:  Before you start, I have in

2  front of me Disciplinary Counsel Exhibit 52, which

3  has just been admitted, and Mr. Klayman, it was

4  addressed to Post Office Box 2788, Washington,

5  D.C., 200013.

6  Now that's a new one?

7  THE WITNESS:  It is, yeah.

8  MR. TIGAR:  So can you tell me about

9  that?

10

11  THE WITNESS:  Yeah, at that time in my

12  life I didn't have a virtual office at 2020

13  Pennsylvania Avenue.  There was a post office box,

14  and I believe that post office box was for my

15  group, Freedom Watch, so it was sent there, and

16  for myself -- actually it was for myself, and I

17  had used that, I believe, as the address with the

18  Bar, and then I changed the address later with the

19  Bar registration as to where I was located.

20  MR. TIGAR:  Thank you.

21  CHAIRMAN FITCH:  During what period of

22  time did you have that as your post office

---

In Re:  Larry Klayman
June 27, 2018

## Page 1421

1    address?  I mean the letter is dated the 11th.
2         THE WITNESS:  Yes, I don't remember the
3    exact timeframe, but I'm not disputing --
4         CHAIRMAN FITCH:  Yeah, I know.
5         THE WITNESS:  -- that I got that.
6         CHAIRMAN FITCH:  No, I know.
7         THE WITNESS:  Yeah.
8         CHAIRMAN FITCH:  This is January 2011.
9    At that point in time had you had the post office
10   box for a week, a year?
11        THE WITNESS:  I think I did.  Well, I
12   had it before.  Yeah, I was using it before.
13        CHAIRMAN FITCH:  For how long before?
14   Approximately how long before January?
15        THE WITNESS:  I don't recollect, you
16   know.  This has been eight years, this case.  It's
17   hard to remember exactly.
18        But I may have had both addresses at
19   the time, and it's probable that I did.
20        But I'm just speculating now.  This
21   goes back eight years.  I don't really remember
22   specifically when I took the box out.

## Page 1422

1         But I was moving around a lot, and I
2    was in Florida, which is my home state, and I was
3    here, I was in California, I was in another
4    states.  So I needed a post office box to send
5    things to, and then I felt that I needed an
6    address, you know, a street address, so that's
7    when I took out the virtual office on 2020
8    Pennsylvania Avenue.
9         But I don't remember the exact dates,
10   your Honor.
11        CHAIRMAN FITCH:  Go ahead, Mr. Smith.
12        MR. SMITH:  Thank you.
13        CONTINUED CROSS-EXAMINATION
14        BY DISCIPLINARY COUNSEL:
15        BY MR. SMITH:
16   Q.  Mr. Klayman, I will ask you to look at
17   Bar Exhibit Number 51.  For the record, it is a
18   letter dated December 19, 2016 from Mr. Klayman to
19   the Office of Bar Counsel.
20   A.  Is this the new exhibit?
21   Q.  No.  Fifty-one is the --
22   A.  I don't have 51 in the book.

## Page 1423

1         CHAIRMAN FITCH:  The blue book.
2         THE WITNESS:  In the blue book I only
3    have up to 50.
4    BY MR. SMITH:
5    Q.  It's not in that blue book?
6    A.  No.  I've never seen 51.  This was the
7    book that was sent to me by you.
8         MR. SMITH:  Fifty-one was the exhibit
9    that we added at the beginning of the hearing.
10        Do you have another copy of your --
11        MR. SUJAT:  Let me see.  This is my
12   copy.
13        CHAIRMAN FITCH:  Now wait a minute.
14   Fifty-one -- oh, he has it.
15        MR. SUJAT:  Yes.
16        CHAIRMAN FITCH:  Ok.  Mr. Sujat has
17   taken it from the Respondent's file and provided
18   it to Mr. Klayman.
19        Go ahead.
20        THE WITNESS:  Wait a second.  Is this
21   our exhibit or your exhibit?
22        CHAIRMAN FITCH:  It's Disciplinary

## Page 1424

1    Counsel's Exhibit 51.
2         MR. SMITH:  Our Exhibit 51.
3    BY MR. SMITH:
4    Q.  It's the letter you wrote to
5    Disciplinary Counsel on December 19th, 2016.
6    A.  Ok, you also have that in your Exhibit
7    D, which is in evidence, which is part of -- it
8    was attached to my Answer and Affirmative Defenses
9    to the Specification of Charges.
10   Q.  Ok.
11   A.  So it's there, as well.
12   Q.  Ok.  Thanks.
13        CHAIRMAN FITCH:  Go ahead.
14   BY MR. SMITH:
15   Q.  Have you had a chance to read that, or
16   do you want some more time to read it?
17   A.  I'll read it.
18   Q.  I'd like to take your attention to --
19        MR. SUJAT:  Excuse me, Mr. Chair, I
20   have one question if I could.
21        CHAIRMAN FITCH:  Sure.
22        MR. SUJAT:  I was looking at these

4 (Pages 1421 to 1424)

App.0599

Page 1425

1  exhibits here.  I do see that Exhibit 51 in the
2  binder that you sent me to Florida, remember I
3  asked for a copy that you sent, so I see here, and
4  I'm looking in probably what you had given Mr.
5  Klayman previously to look at, and this is all he
6  has right now.
7       I don't see 51 and I don't see it in
8  the index in the front -- if you look at the front
9  cover.
10      MR. SMITH:  We amended it the first
11 day.  We amended that the first day.
12      MR. SUJAT:  Oh, I see, ok.
13      MR. SMITH:  And, as Mr. Klayman pointed
14 out, there's a copy in Bar Exhibit D.
15      MR. SUJAT:  Right.
16      MR. SMITH:  Which is his answer to the
17 Specification of Charges.
18      MR. TIGAR:  I'm having trouble finding
19 51.  Would you mind referring to it as part of D,
20 using the D reference.
21      MR. SMITH:  Ok.  Yep, absolutely.
22      MR. TIGAR:  If that's the case, does it

Page 1426

1  begin at D26?  Mr. Sujat is nodding yes.
2       MR. SUJAT:  I've been having the same
3  problem, your Honor.
4       MR. SMITH:  Yes, it begins at D26.
5       MR. TIGAR:  If you wouldn't mind using
6  that for your basis of examination, that would be
7  more feasible.
8       CHAIRMAN FITCH:  Well, now I'm
9  confused.  My D26 has nothing to do -- oh, DXD
10 is what --
11      THE WITNESS:  Actually, your Honor, I
12 have no problem.  I liked 51 in the record.  I
13 think that's good.  I didn't realize it was
14 part --
15      CHAIRMAN FITCH:  Anyhow, we all have
16 the same document.
17      THE WITNESS:  Yeah, two different
18 numbers.
19      CHAIRMAN FITCH:  DXD and DX51.
20 Question.
21      THE WITNESS:  Just one note, I think
22 there may be some things in 51 attachments that

Page 1427

1  were not in Exhibit D of Bar Counsel that's in the
2  book.
3       CHAIRMAN FITCH:  Question.
4       THE WITNESS:  I agree to have this in
5  the record as 51.
6       MR. SMITH:  So, if we are looking at
7  either Exhibit D, I will ask those who are looking
8  at Exhibit D to look at Page D28.  For those of us
9  who have Bar Exhibit 51, please look at Page 51-3.
10      And I would ask you to look at footnote
11 12 --
12 BY MR. SMITH:
13      Q.  Let me refer you to this.  This was
14 your response to Disciplinary Counsel's inquiry
15 into Ms. Sataki's supplemental complaint, correct?
16      A.  Correct.
17      There had been an earlier response at
18 the time that you identified that the initial
19 complaint, which was in handwriting, was sent to
20 my post office box, apparently.  There had been an
21 initial response.
22      But this is in response to the

Page 1428

1  supplemental complaint after I was notified, after
2  six years, that this matter was still pending,
3  having believed that it had been dismissed, much
4  earlier.
5       Q.  Alright, would you take a look at
6  footnote one, please.  Let me know when you finish
7  reading that.
8       A.  I don't see a footnote --
9       Q.  Footnote one on the third page of the
10 letter.
11      A.  Oh, ok.
12      (Witness reads document.)
13      A.  Yes.
14      Q.  Now I take it that this footnote was in
15 response to the allegation in Ms. Sataki's
16 complaint that you wanted a romantic relationship
17 with her, correct?
18      A.  I don't believe there was an allegation
19 in her complaint that I wanted a romantic
20 relationship.  I think that's something that y'all
21 came up with.
22      Q.  Ok, then this --

5 (Pages 1425 to 1428)

Page 1429

1  A.  She never alleged that in either of her
2  complaints.
3  Q.  So in response to the draft complaint,
4  with respect to whether or not there was a
5  romantic relationship, this was your response to
6  that, correct?
7  A.  No.  I don't know what you're talking
8  about "draft complaint."
9  CHAIRMAN FITCH:  Well, let me cut
10  through it.
11  Mr. Klayman, in footnote number one --
12  THE WITNESS:  Right.
13  CHAIRMAN FITCH:  It appears that you
14  wrote, I quote, "I notice the draft complaint you
15  sent me makes the surprising claim that I
16  announced to Ms. Sataki that I wanted a romantic
17  relationship with her and that she declined my
18  entreaties."
19  THE WITNESS:  Right.
20  CHAIRMAN FITCH:  "Let me make this
21  clear:  That is false."
22  THE WITNESS:  Ok.

Page 1430

1  CHAIRMAN FITCH:  And then there are
2  about ten more lines in that footnote.
3  THE WITNESS:  Right.
4  CHAIRMAN FITCH:  Mr. Smith is asking
5  you one question about that.
6  Go ahead, Mr. Smith.
7  THE WITNESS:  Right, I guess I was
8  confused, because I had --
9  CHAIRMAN FITCH:  Ok, he wants to ask
10  you a question.
11  THE WITNESS:  Yeah, that's fine.
12  CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13  BY MR. SMITH:
14  Q.  And as part of your response to that
15  allegation, you said, "Let me make this clear:
16  That is false," correct?
17  A.  Correct.
18  Q.  And you said you did not pursue her,
19  correct?
20  A.  That's correct.
21  Q.  You said you never kissed her on the
22  lips.

Page 1431

1  A.  That's correct.
2  Q.  And you said, "Perhaps she is imagining
3  these things," right?  "Perhaps she imagines that
4  people are sexually coming on to her when they are
5  not".
6  A.  Correct, because I was confused when
7  you first asked me about the draft complaint.
8  This was the Specification of Charges that I was
9  referring to that had been prepared before you
10  even notified me that you were resurrecting this
11  case, and that you inadvertently sent that to me
12  when I asked you to send me some of the
13  documentation that was in the file when I found
14  out that this matter had been resurrected from the
15  dead.  Or I thought it was the dead, because
16  Florida and Pennsylvania had dismissed it.
17  So, yes.  I mean, that's what I said,
18  and I stand by it.
19  Q.  And you also suggested that "Perhaps
20  she is just lying," correct?
21  A.  Yes, because over time I came to
22  believe that she had not even told me the truth

Page 1432

1  about the original harassment, and you heard the
2  testimony of Mr. Dash yesterday in terms of, you
3  know, what he perceived to be her way of doing
4  things.
5  He actually testified as to reputation,
6  but the reputation part was ruled not part of this
7  testimony --
8  CHAIRMAN FITCH:  Next question.
9  BY MR. SMITH:
10  Q.  She took a lie detector test in
11  connection with the litigation, didn't she?
12  A.  She did.  In fact I paid for it.
13  Q.  And she passed that lie detector test,
14  didn't she?
15  A.  She did.  Polygraph tests are not a
16  hundred percent accurate.  I mean they're not used
17  in court --
18  Q.  You were prepared to use that evidence
19  in support of her claim that she was telling the
20  truth about her sexual harassment.
21  Am I correct?
22  A.  Correct, because I'm zealously

6 (Pages 1429 to 1432)

Page 1433

1  representing her within the bounds and ethics of
2  the law, and I'm going to use everything I can to
3  try to get my client a good result.
4      Q.  Let me ask you to look at Bar Exhibit
5  Number 24, please.
6      A.  Bar Exhibit 24?
7      Q.  Yeah, Bar Exhibit 24.
8      A.  By the way, I'm not saying she wasn't
9  sexually harassed by Falahati or mental.  What I'm
10  saying is, listening to her testimony, how
11  contradictory in many aspects how untruthful it
12  was, I have to question it now.
13          And the Office of Civil Rights found in
14  interviewing a lot of witness, and that's in the
15  record, their findings, that she was not truthful
16  about it.  That was their conclusion.
17      Q.  Have you had a chance to look at Bar
18  Exhibit Number 24.
19      A.  I'm doing it, yes.  Thank you.
20      (Witness reads document.)
21      A.  Ok.
22      Q.  Dr. Aviera was the psychologist that

Page 1434

1  you had retained for Ms. Sataki to see for, among
2  other things, the issues that she was dealing with
3  because of her sexual harassment at PNN, correct?
4      A.  Well, she had retained Dr. Aviera, of
5  course, but I put her in contact with Dr. Aviera
6  and paid for her coverage.
7      Q.  And that was in part to help her with
8  her issues that she dealt with because of her
9  sexual harassment at the PNN, correct?
10      A.  Right.
11      Q.  In this letter to Dr. Aviera, is it
12  fair to say that you are complaining to her about
13  your inability to foster a better personal
14  relationship with Ms. Sataki?
15      A.  That's not what I'm complaining about.
16          I'm complaining about a lack of
17  respect, is that we were I thought very close
18  friends.  I thought we cared about each other, and
19  she treated me badly as if I didn't even exist.
20          That's what I'm saying, is that, you
21  know, I just wanted to be treated like her other
22  friends and have some courtesy.

Page 1435

1          And we've seen, for instance, Exhibit
2  38, your Exhibit 38, the other side of Elham
3  Sataki, and that was exhibited several times
4  throughout the time I was trying to represent her,
5  zealously, and within the bounds of law.
6      Q.  Take a at Supplemental Exhibit Number
7  1, please.  For the record, this is an email dated
8  April 9th, 2010 from Mr. Klayman to Mr. Sataki.
9      MR. TIGAR:  Mr. Smith, before you go to
10  that...
11      Mr. Klayman, at the bottom paragraph of
12  this Exhibit 24 that you were just looking at --
13      THE WITNESS:  Right.
14      MR. TIGAR:  It says, "Because I do care
15  so much about Ellie, I, too, have trouble seeing
16  the proverbial forest from the trees."
17      What did you mean?
18      THE WITNESS:  I meant it reached the
19  point, your Honor, when she was asking me to buy
20  her a car.  And obviously my heart went out to
21  her.  She had no credit.  And she asked me for
22  other things, like helping Kaveh, her friend, that

Page 1436

1  obviously that affected me.
2          Because I couldn't understand why
3  someone who was trying to do so much for her was
4  being berated for trying to help her, or being
5  asked to do things that were beyond the scope of
6  legal representation.
7          So at that point, that's what I felt,
8  and I felt that we needed to find another lawyer
9  here, that this wasn't working.
10      MR. TIGAR:  Thank you.
11      MS. LARKIN:  I have another question
12  also.
13          On the same document, paragraph one,
14  where it says, "That's why I've done what I have.
15  I've not helped her for money.  I love Ellie."
16      THE WITNESS:  Yes, and -- I'm sorry.
17      MS. LARKIN:  Go on.
18      THE WITNESS:  And that confirms that I
19  didn't do it for money, and I was doing it pro
20  bono, and I never expected to be paid anything,
21  and that's the case many, many years later.
22          Because I loved Ellie.  I love many

7 (Pages 1433 to 1436)

In Re: Larry Klayman
June 27, 2018

## Page 1437

1 people. Love is love. There's nothing wrong with
2 that, and it actually made me work harder, because
3 I felt that, you know, there was a need to help
4 her.
5         So the fact that you love somebody is
6 not negative. It's positive.
7 BY MR. SMITH:
8    Q. Bar Supplemental Exhibit Number 1.
9    A. Exhibit Number 1?
10   Q. Supplemental Exhibit Number 1.
11   A. I don't think I have that. I'll have
12 to get it.
13       (Brief pause.)
14   A. Ok.
15   Q. In this letter you are listing seven
16 things that you believed at the time constitute
17 what it meant to be a friend?
18   A. That's what I'm trying to do, yeah.
19   Q. And you're telling her that you want to
20 be her companion?
21   A. Where do I say that? I don't see that.
22   Q. "Friendship, companionship."

## Page 1438

1        Did you want to spend time with her?
2    A. Where is what you just said?
3    Q. It's not there.
4    A. Ok, then that's not --
5    Q. I'm paraphrasing?
6        THE WITNESS: I object to that, your
7 Honor. It's editorializing and prejudicial, those
8 kind of remarks, Mr. Smith.
9 BY MR. SMITH:
10   Q. You tell her in this letter that you
11 want to "spend more time with her," "have more fun
12 with her."
13   A. The letter says what it says. I stand
14 by the letter and it says what it says, and you're
15 mischaracterizing it.
16   Q. And would Ms. Sataki be lying if she
17 thought that this was some sort of pursuit of her?
18 Would she get mad at that?
19   A. That's speculation. I don't know what
20 was in her mind then.
21       I was trying to say we were friends, we
22 were close friends, and this is what I thought

## Page 1439

1 being a friend was, and I was not being respected
2 in terms of being even a friend, when I was going
3 all out for her and working as hard as I could, as
4 Mr. Shamble testified to, spending my own money to
5 try to get her health care and do other things, to
6 get her an apartment, this and that.
7        You know, I cared about her as a close
8 friend, and yes, I felt love towards Ms. Sataki,
9 and I feel love to other people, too, you know, in
10 my life.
11   Q. Let's take a look at Supplementary
12 Exhibit Number 2.
13       MR. TIGAR: Mr. Smith, before we do
14 that...
15       There's a mention in this exhibit you
16 just looked at about a documentary in Turkey.
17       Was there a plan that Ms. Sataki was
18 going to go to Turkey to produce or participate in
19 a documentary?
20       THE WITNESS: That's a good question.
21 That was her idea, not mine. I have no contacts
22 in Turkey.

## Page 1440

1        MR. TIGAR: You had heard that that was
2 out there.
3        THE WITNESS: Right, and she wanted to
4 do that.
5        MR. TIGAR: And you wanted to go with
6 her to Turkey?
7        THE WITNESS: Well, to control what the
8 documentary said, so that it was favorable. Yes.
9        I mean, if she is going to do a
10 documentary to be used as evidence in her case, I
11 need to know how it's being structured.
12       And a lot of times people in the media
13 are not very sympathetic. You all know that on
14 both sides of the political spectrum. And I
15 myself have been subject to that from time to
16 time, and you probably have too, your Honor.
17       So you want to make sure it's done
18 right. And Turkey is a place, it's a very murky
19 place in terms of who is in charge of it.
20       MR. TIGAR: I just wanted to know.
21       THE WITNESS: Yeah, you don't know if
22 somebody is going to be favorable to her because

8 (Pages 1437 to 1440)

In Re:  Larry Klayman
June 27, 2018

Page 1441

1  she was pro-Shah or favorable to her because of
2  other reasons.
3      CHAIRMAN FITCH:  And I have a question,
4  and this is an April 9, 2010 email, or purports to
5  be that.  It was sent by Ms. Sataki a few years
6  later, May 24, 2018, and in that 2018 email it
7  says "Subject: Forward:  Friendship and what it
8  means to me."
9      Does that indicate that, even though
10  there's no subject matter set forth in the part of
11  this page that includes the 4/9/2010 email, that
12  your original email to her said "Friendship and
13  what it means to me"?
14      THE WITNESS:  Yeah.  I mean, that's
15  what I was trying to convey, is that we were
16  friends.  We were close friends, and I wasn't
17  being treated even like a friend.
18      As I said, you know, other people were
19  treated much better than me, and I was doing the
20  work.
21      CHAIRMAN FITCH:  So is it your belief
22  that in your email, your subject matter, even

Page 1442

1  though it doesn't appear, right, as part of your
2  email --
3      THE WITNESS:  Right.
4      CHAIRMAN FITCH:  -- is it true that in
5  your email there was a part that said that subject
6  matter and what it means?
7      THE WITNESS:  I think that's part of
8  the case.
9      CHAIRMAN FITCH:  Yeah.
10      THE WITNESS:  And I think that confirms
11  what I thought we were as friends and I wanted to
12  have that to represent her, because I represented
13  friends before.
14      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
15  BY MR. SMITH:
16      Q.  Did you have a chance to look at
17  Supplemental Exhibit Number 2?
18      (Witness reads document.)
19      A.  Yes.
20      Q.  And in the first sentence, you're
21  asking her to look at the email that you sent to
22  Dr. Aviera.

Page 1443

1      Would that be what we looked at before,
2  the April 7th, 2010 email to Dr. Aviera?
3      A.  I don't know and at this time, eight
4  years later, I'm not sure.
5      Q.  In this letter, paragraph three, is it
6  fair to say that you are complaining that she
7  tells you that "You'll never be my boyfriend?"
8      A.  What I'm saying is it's unnecessary to
9  say that, because I didn't consider myself to be
10  her boyfriend, and I made that clear to Dr. Aviera
11  and to others.  That, you know, it really was
12  irrelevant.
13      And Mr. Tigar raised an important
14  point, which actually I had forgotten about, is
15  that she was the one that wanted to go to Turkey
16  to do a documentary, and for her to then testify
17  untruthfully that she wanted to keep everything
18  quiet.
19      I mean, my God, to go to Turkey where
20  there are some very radical people that are
21  pro-regime, in Iran, and to do a documentary...
22  talk about risk, and that's why I wanted to go.  I

Page 1444

1  was concerned about her safety.  I was concerned
2  about what might be said, how it might be twisted
3  by the people in the Turkish media that would harm
4  our case.
5      Q.  And later on in this letter you say to
6  Ms. Sataki, "I am very sad because I really do
7  love you, Ellie," correct?
8      A.  Yes.  And that's true, I was sad,
9  because, when you love somebody, you expect to get
10  at least common courtesy coming back and not to be
11  berated for how you're going all out for them.
12      You saw in Exhibit 38 where I was
13  accused of taking bribes to take a dive on her
14  case.
15      Q.  Let's look at Bar Supplemental Exhibit
16  Number 3, please.
17      A.  Yes.
18      Q.  In the penultimate paragraph on that
19  page, you say, "I am human, you are, and this is
20  about the fact that you're the only woman I've
21  every really loved.  You know, when I walk down
22  the street in Beverly Hills and I see an

Page 1445

1  attractive woman, my thoughts immediately flip to
2  you.  I see no one else.  This has never happened
3  like this with me before."
4      Those are your words, right?
5      A.   They're my words, and see, here's what
6  I don't understand, Mr. Smith, in the context of
7  that, why you're trying to make loving someone
8  into something that's dirty, in effect, and I take
9  that --
10      CHAIRMAN FITCH:  That's nonresponsive
11  and it's struck.
12      MR. KLAYMAN:  You know, and I've never
13  said that I didn't love her, and you know that's
14  why I worked so hard.  But I never said I wanted
15  to be her boyfriend, I didn't.
16  BY MR. SMITH:
17      Q.   And later on in the letter you say,
18  last sentence, "My loving you has given me true
19  meaning in my life."
20      A.   And I testified -- yes, I testified to
21  this earlier that I was going through a very
22  difficult time in my life, and I saw, when she

Page 1446

1  grabbed my hand and started trying at Clyde's
2  restaurant, that I could help somebody.
3      And to some extent, if I can be a
4  psychologist on my own behalf, is that I was kind
5  of taking my problems away by trying to help
6  somebody else.  I was kind of sublimating the way
7  I felt, and it made me feel good to help her.
8      And that's why I also say, "I'm not
9  trying to bribe you.  I simply love you.  I'm not
10  saying you're owing me anything here.  I'm doing
11  this because, A, I'm a professional lawyer who
12  believes in you and your case, and B, I care about
13  you."
14      And see, that's what's positive, is
15  that when you care about somebody, you're going to
16  try harder.
17      And Mr. Shamble, boy, he said he never
18  saw a lawyer that worked as hard as I did, he
19  testified, and he recommended me to other clients
20  at Voice of America because of that.
21      And I had other clients come to me at
22  Voice of America, other broadcasters who claimed

Page 1447

1  that they too were being discriminated against.
2      Q.   On Page 2 and 3 of the exhibit, we have
3  Ms. Sataki's reply to your letter.  Have you had a
4  chance to look at that?
5      A.   Well, you know --
6      Q.   It begins with the sentence, "I wish we
7  didn't have this unfortunate problem?"
8      A.   I don't know that it's a reply.  Look
9  at the -- maybe I'm reading this thing wrong.  I
10  sent mine at 11:13 a.m., and hers seem to be at
11  10:42, before I sent mine.
12      CHAIRMAN FITCH:  Or hers seems to be
13  7:00 p.m. Pacific time, Pacific daylight time.
14      THE WITNESS:  Ok, well, mine may have
15  been Pacific time, too.  I guess my account didn't
16  do what hers did in terms of setting the time.
17      This may have been sent before I sent
18  mine.
19      I don't know.  It's eight years down
20  the line.
21      CHAIRMAN FITCH:  What does the subject
22  matter say.

Page 1448

1      THE WITNESS:  It says -- I don't think
2  there is a subject matter, unless I'm missing
3  something -- oh, "Respond to your letter".
4      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
5  BY MR. SMITH:
6      Q.   Now, if you look at the last two
7  sentences of her letter --
8      A.   Let me read the whole letter.
9      Q.   Ok.
10      (Witness reads document.)
11      Q.   Reading the letter in a whole, you will
12  agree with me that she's asking you to stop
13  pursuing her with this relationship and to
14  concentrate on her case, correct?
15      A.   That's not what she's saying, Mr.
16  Smith, and I take offense to that, because you're
17  characterizing things that aren't in the letter.
18  It's not right.
19      Q.   Ok.  So you don't agree with me?
20      A.   No, I don't agree with you.
21      Q.   Ok.  Please take a look at Supplemental
22  Exhibit Number 4 --

10  (Pages 1445 to 1448)

Page 1449

1      A.  Let me tell you why I don't agree with

2  you.

3      Q.  I didn't ask you that.  You'll have a

4  chance on redirect I would imagine.

5      CHAIRMAN FITCH:  I think he may explain

6  his answer.

7      THE WITNESS:  Yes.  Is that clearly I'm

8  saying -- I'm saying "You always said I could

9  count on you as a friend."  So it was clear, that

10  was the relationship in terms of friendship, in

11  addition to professional, and I can lean on you as

12  a friend.

13      And then it says, in the next page,

14  "Let me be clear one more time, right now I don't

15  and cannot see anything besides my case.  That

16  doesn't mean I don't see your kindness, your hard

17  work -- your thoughtfulness and hard work..."

18  (inaudible).

19      So she recognized at that moment at

20  least that, yes, I was putting myself all out for

21  her.  And she's apologizing and she's talking

22  about timing, you know.

Page 1450

1      She's in a bad way right now, and I

2  understood that, but there was also another side

3  of her, and that was the side that I've already

4  testified to, is that this was one of the few

5  times that she actually acknowledged my hard work

6  and the fact that I cared about her.  But the rest

7  of the time it was berating me and putting me down

8  and things like that.

9      So, I'm glad that you brought that to

10  your attention, but the letter doesn't say what

11  she said.

12  BY MR. SMITH:

13      Q.  So the last couple of sentences at the

14  bottom of Page 3, it says, "All I'm asking to

15  concentrate on the case now, so I have peace of

16  mind on our future projects.  Thank you so much

17  for your help and understanding, my friend.

18  Please don't let anything else come between our

19  friendship."

20      A.  Thank you for reading that.

21  "Friendships."  She acknowledges friendships.

22      At the same time she is saying

Page 1451

1  "concentrate on the case," she is saying "I don't

2  have a place to live," she's saying, "Go get me a

3  cheaper car.  I have no credit."  And then she is

4  saying, "Go help my friend, Kaveh," and then

5  berating me for.

6      Q.  I don't see that anywhere in the

7  record.

8      CHAIRMAN FITCH:  I think that's

9  nonresponsive.

10      THE WITNESS:  But she does acknowledge

11  friendships.

12  BY MR. SMITH:

13      Q.  Please look at supplemental Exhibit

14  Number 4.

15      A.  Let me read it.

16      (Witness reads document.)

17      A.  Ok.

18      Q.  Is it fair to say this letter reflects

19  you again complaining about the lack of a personal

20  relationship that she is willing to have with you?

21      A.  That's not at all -- please stop

22  mischaracterizing --

Page 1452

1      CHAIRMAN FITCH:  He has a right to ask

2  that question.

3      THE WITNESS:  Ok, then the answer is

4  no.

5      CHAIRMAN FITCH:  You have a right to

6  say, "that's not correct."

7      THE WITNESS:  The answer is no, and in

8  fact, I said, except for my role as a lawyer, I'm

9  a low priority.

10      I just wanted to be treated as a

11  friend, as a close friend, as someone who cared

12  about her.

13      That's what this is all about.

14  BY MR. SMITH:

15      Q.  You also said, "Given all that I know

16  and feel, you do not want, however, to call me in

17  front of the rich Persian family for fear they

18  might think we have a personal relationship and

19  are boyfriend and girlfriend."

20      A.  That's correct.  And she was saying we

21  had a friendship.  And I was saying every aspect

22  of what I did was like I had no importance at all,

11 (Pages 1449 to 1452)

Page 1453

1   except for that, you know, one acknowledgment in
2   that email, which appears to be written by
3   somebody else in the prior exhibit.  She can't
4   write that.  She's not capable of writing in that
5   English.
6       Q.  Mr. Klayman, would you look at Bar
7   Exhibit 25, back in the blue book.
8       A.  Let me read that.
9       (Witness reads document.)
10      Q.  For the record, this is a letter dated
11  May 9th, 2010, written by Mr. Klayman to Dr.
12  Arlene Aviera.
13      A.  Ok.
14      Q.  Have you had a chance to read that?
15      A.  I read it.
16      Q.  Now in your letter, the second
17  paragraph, you say, "I want to ask you this
18  question:" -- this is Dr. Aviera -- "as to what I
19  have to do under the sad circumstances.  Ellie has
20  never found someone who truly loves her and meets
21  her expectations of someone she wants to be with.
22  But suppose someone comes along who falls in love

Page 1454

1   with her and deeply loves her, and, more
2   importantly, wants to care for her because of who
3   she is as a person as opposed to just because she
4   is beautiful, and suppose it's not the right time
5   for a relationship, so the conventional
6   psychological wisdom goes"...
7       Is that person you that she's talking
8   about?
9       A.  Where?  In the last sentence?
10      Q.  In this entire --
11      A.  Yeah, and it's recognizing it's not the
12  right time to have any kind of relationship with
13  her.  It's romantic.  I recognize that.
14      And if you go down in the paragraph
15  four, I say I just want to be treated like a
16  roommate, Kaveh, to be treated like Kaveh, to have
17  some understanding that I'm doing something for
18  her above, and beyond the call of duty.
19      So I'm glad you read that, Mr. Smith.
20      Q.  And you go on later, a few paragraphs
21  down that begins with, "I'm sure you realize that
22  no man, particularly this one who wears his heart

Page 1455

1   on his sleeve, is super human.  How long can
2   anyone go along trying to be selfless without
3   getting anything back, but instead being hit over
4   the head constantly with the proverbial pot or
5   kettle?"
6       A.  I'm glad you asked me that, too,
7   because it's consistent with what I've said.
8       Somebody that is doing as much as I
9   did, that cares about her, deserves some respect,
10  like Kaveh got, and understanding that that
11  person's there for you.
12      You can't be a whipping boy and
13  represent somebody in a case like this, because
14  this is an emotional case for her, and it's
15  emotional for me, and I was telling Dr. Aviera
16  that basically she needs to get another lawyer,
17  and that comes up in and around this time period.
18      So, I can't function when someone has
19  absolutely little to no appreciation for what I'm
20  doing for free.
21      Q.  On the next page, you say in the second
22  paragraph, "So I come along, fall in love with

Page 1456

1   Ellie, and I am there to help lift her up because
2   I love her.  I tell her that I love her so that
3   she does not think I am there to get something
4   from her.  Is it ok, then, for Ellie to feel that
5   it's okay for her to feel something too?
6       "True love.  Is that a term that has
7   many meanings across the emotional spectrum does
8   not come along at the right time.  It happens when
9   you least expect it and it cannot be controlled
10  clinically.  And should not love factor into
11  Ellie's well-being and rehabilitation?  Love is
12  the strongest medicine, I believe."
13      Those are your words?
14      A.  Correct.
15      But in the context of this letter and
16  everything else what I was trying to say is that,
17  yes, things happen in life.  You do love people.
18  You fall in love with people.  That's not
19  something which is to be disparaged.  It's not
20  negative.  It's a positive.  That's what this
21  world is all about.
22      And to get, as I'm saying here, just

12  (Pages 1453 to 1456)

Page 1457

1  some minimal recognition of that, to be treated
2  like everybody else that's her friend -- and she
3  acknowledges the friendship -- we've just gone
4  through that -- that's what I'm asking for.
5       And it got to a point, where, at the
6  same time that I was getting no recognition, she
7  was asking me to do a lot of things which had
8  nothing to do with my role as a lawyer or even as
9  a friend.  Because you don't ask somebody to go
10  out and buy you a car.  You don't ask them to do
11  things for you because you have no credit.
12       I did it because it was in my heart to
13  do it and I didn't expect anything back from her.
14       Q.  In the next paragraph you say, "I do
15  not believe that I met her by accident.  Maybe I'm
16  overly romantic, or too religious, but I feel that
17  I was meant to help Ellie, and then I fell in love
18  with her, totally."
19       A.  Yes, I am a romantic in thought.
20  That's why I do what I do.  That's why I founded
21  Judicial Watch.  That's why I ran for the Senate.
22  That's why I started Freedom Watch, because

Page 1458

1  everything I do comes from my heart.  If it's not
2  there, I don't do it, and that's what I mean by
3  romantic, and also religious.
4       Because, I've testified at length about
5  my spiritual believes, and I believe that God uses
6  you and puts you in a place where you can help
7  people.  I believe that what I'm doing now at
8  Freedom Watch is with the grace of God.  I don't
9  do everything all the time.  Sometimes I
10  make mistakes.  Sometimes I don't see things as
11  clearly as God may want me to see it.  But I feel
12  that I'm trying to do things that he wants me to
13  do, and I pray every day that I'm trying to
14  fulfill his will.
15       That's what I meant.
16       Q.  You would agree that Ms. Sataki may
17  have a different view of all these professations
18  of love?
19       A.  I think that her view is ex post facto,
20  after the fact, and I think she's reactive and
21  wants to blame somebody because her life didn't
22  turn out exactly the way she wanted.

Page 1459

1       But we heard testimony that she wasn't
2  unemployed, that she had good jobs after this.  I
3  tried to get her even better jobs.  Sam Razavi,
4  her cousin, intervened.  She could have had a
5  really great job with CBN.  And you have to blame
6  somebody.
7       So what she testifies here, what she
8  said three weeks ago, what she wanted was revenge.
9  Well, that's not the purpose of a Bar proceeding
10  and, if she's unhappy with her life, that's not my
11  fault.
12       CHAIRMAN FITCH:  I think that's
13  marginally responsive to the question, arguably.
14       Let me rephrase 34 Smith's question.
15       THE WITNESS:  Ok.
16       CHAIRMAN FITCH:  Did you have any basis
17  at the time for --
18       And then what did you say, Mr. Smith?
19  What was your original question?
20       -- or understanding?  Did you have any
21  knowledge or basis at the time for knowing what
22  her reaction was to this letter?

Page 1460

1       Was that your question?
2       MR. SMITH:  That's the gist of the
3  question, yes.
4       THE WITNESS:  To the extent that she --
5       CHAIRMAN FITCH:  You can answer, "I
6  don't, that would be speculation," or do you have
7  some basis for understanding, for knowing what her
8  reaction was at the time to this series of
9  letters?
10       THE WITNESS:  My reaction and
11  understanding was that Ms. Sataki, as happens
12  frequently with victims -- I've represented
13  victims before in sexual harassment cases in the
14  military and elsewhere -- they become very
15  self-centered, and the world revolves around them.
16  Everybody's to give them something.  And I didn't
17  view that negatively towards her, but I tried to
18  understand that.
19       And I am a woman's advocate, so, you
20  know, Ms. Allred is my close friend.
21       So I tried to understand that.  So I
22  tried to understand people that they're in a

In Re: Larry Klayman
June 27, 2018

Page 1461

1 difficult situation, and I'm not judgemental, but
2 I did just simply want to be treated with respect,
3 and let me --
4    CHAIRMAN FITCH: No, no, no.
5    What if any information did you have at
6 the time for knowing what her reaction was to this
7 series of letters?
8    If you have none, just say "I have
9 none." If you have some basis that you can
10 identify, tell me.
11    Now you said that you have this general
12 experience with some clients falling into a victim
13 syndrome. I think that's responsive.
14    Any other basis at this time for
15 understanding --
16    THE WITNESS: Well --
17    CHAIRMAN FITCH: I know I speak solely.
18 I try to find the right word.
19    THE WITNESS: You speak very well.
20    CHAIRMAN FITCH: Bear with me.
21    THE WITNESS: I will.
22    CHAIRMAN FITCH: Any other basis at

Page 1462

1 that time for knowing what her reactions to these
2 letters were?
3    THE WITNESS: I would say, you know, at
4 the same time -- yes, to be honest, because I've
5 been honest with you throughout this, yes, and I
6 always try to be honest, and I realize I'm under
7 oath, and I respect the legal profession and
8 judges and others -- is that I knew she wanted --
9 and that's what I meant by my response, because I
10 didn't mean to take a shot at her. I really
11 didn't. It was the contrary.
12    What I was saying is, to me it was
13 understandable that she might say, "We will just
14 focus on my case," but at the same time she was
15 claiming that I was her friend, and friend should
16 be treated like your other friends.
17    So that's what I understood all this to
18 be.
19    And I discount a lot when people are
20 under that degree of, when they're in that kind of
21 a situation.
22    If I can give you one example of

Page 1463

1 another instance, if your Honor would indulge me?
2    CHAIRMAN FITCH: Go ahead.
3    THE WITNESS: I represented Cliven
4 Bundy in his criminal trial in Las Vegas, Nevada.
5 We got a good result in the end in a number of
6 different capacities.
7    The first time I met him, he was under
8 a lot of pressure. He was being criticized for
9 something he said to the New York Times, which he
10 didn't mean. And I was being introduced to him
11 right after the federal government had left his
12 property, and I walked in and I said, "Mr. Bundy,
13 I think that the comment that you made in the New
14 York Times, you've got to get out and clarify,
15 ok?" And he did, but his reaction was, "I don't
16 need to hear from no lawyers."
17    Now, he didn't know me, but I
18 understood he was under a lot of stress, and we
19 have since become extremely close friends --
20    CHAIRMAN FITCH: Did you understand --
21 is the point of that comment or that observation,
22 is the point of that that you understood that she,

Page 1464

1 that Ms. Sataki, was under a lot of stress at that
2 point?
3    THE WITNESS: I understood that she was
4 under a lot of -- yeah, that she was under a lot
5 of stress in terms of what was being done to her.
6 She thought that VOA was trying to destroy her and
7 I was trying to be her night in shining armor, so
8 to speak, to take her out of that, so I just
9 wanted minimum respect --
10    CHAIRMAN FITCH: I didn't ask you what
11 you wanted.
12    THE WITNESS: Ok, that's my
13 understanding.
14    CHAIRMAN FITCH: I asked you what you
15 understood, and you said you understood that she
16 was under a lot of stress at the time.
17    THE WITNESS: That's with regard to
18 Voice of America, not from me.
19    Because you see --
20    CHAIRMAN FITCH: No, I understand.
21    THE WITNESS: -- eight years later that
22 she is still under stress and I had nothing to do

14 (Pages 1461 to 1464)

Page 1465

1   with that.
2        MR. TIGAR:  Mr. Smith, in your
3   examination as it goes on, are you going to
4   inquire about Supplemental Exhibit 8 and
5   Supplemental Exhibit 15?
6        MR. SMITH:  Yes.
7        MR. TIGAR:  Well, in that case, they're
8   related to what just went on and I'll wait for the
9   examination.
10       MR. SMITH:  Ok.
11       CHAIRMAN FITCH:  Go ahead, Mr. Smith.
12       MR. SMITH:  Thank you.
13  BY MR. SMITH:
14       Q.   Would you take a look at Supplemental
15  Exhibit 7, please.  For the record it is an email
16  dated Sunday, May 9th, 2010.  Subject, "Letter to
17  Dr. Aviera," from Larry Klayman to Ellie Sataki.
18       MR. TIGAR:  I'm sorry, what exhibit is
19  that?
20       CHAIRMAN FITCH:  Supplemental.
21       MR. SMITH:  Supplemental Exhibit 7.
22       CHAIRMAN FITCH:  SX7.

Page 1466

1   BY MR. SMITH:
2        Q.   By this email are you sending a copy of
3   your letter to Dr. Aviera to Ms. Sataki, your May
4   9th letter that we just talked about to Ms.
5   Sataki?
6        A.   Perhaps.  I'm not absolutely sure at
7   this point, eight years later.  But perhaps.
8        Q.   And in the end you again begin to tell
9   her that you love her?  Ms. Sataki?
10       A.   Yes, I've told her that before.  "I
11  care about you.  I love you.  I want the best for
12  you."
13       And I say, "It's painful for me,
14  because at this point I'm going to have to move on
15  and I'm recommending to you other lawyers to
16  represent you."
17       That's what I'm saying.
18       Q.   This is what we talked about
19  yesterday --
20       A.   Then we had communication problems, and
21  my, you know, letting everything not go down the
22  drain.

Page 1467

1        Q.   Alright, so can you take a look at
2   Supplemental Exhibit Number 8, please.
3        For the record it is an email dated May
4   18th, 2010, Larry Klayman to Ellie Sataki.
5        (Witness reads document.)
6        A.   Yes.
7        Q.   The sentence here, "By the way, the
8   Luxe Hotel, Hotel Luxe, renamed the women's
9   restroom in my honor.  It's now called the Klayman
10  Room.  I could now use it for client meetings."
11       Is that a joke?
12       A.   That was a joke, yes.
13       Q.   Is that a joke because you had chased
14  Ms. Sataki into the women's room?
15       A.   No, it's because she had ran into the
16  women's room.  I never went into the women's room.
17  I was trying to see that she was alright.
18       And you know, she was very emotional.
19  She's been emotional before, and she's been
20  emotional here, and she was emotional with others.
21  And I was concerned about her.
22       But I didn't go into the women's room.

Page 1468

1   That was just a joke.
2        MR. SMITH:  Mr. Tigar, you had some
3   questions about this exhibit?
4        Excuse me, Mr. Tigar, you said you had
5   some questions about this exhibit?
6        MR. TIGAR:  This letter apparently
7   relates to testimony that we have heard about an
8   evening in which she got out of the car in Beverly
9   Hills and went into the hotel.
10       THE WITNESS:  That's correct.
11       MR. TIGAR:  And you no doubt remember
12  the testimony.
13       THE WITNESS:  I do.
14       MR. TIGAR:  What happened?
15       THE WITNESS:  What happened was we were
16  at this MovieGuide event.  I took her there to try
17  to meet people.  That's Ted Baehr's event, I
18  testified, MovieGuide.  It's like the Academy
19  Awards.  I spent -- and money's not an issue with
20  me, but I spent a lot of money to take her there.
21  It cost $1,000 a ticket.  Ted Baehr discounts it
22  for me because I'm on the board.

15 (Pages 1465 to 1468)

Page 1469

1      But she was so disrespectful to me
2  there, not even acknowledging my presence and
3  looking the other way, and we're trying to talk to
4  people, I'm trying to introduce her to people,
5  that, yes, I was upset.
6      And then she got upset, as I was
7  driving her home and, you know, got out of the car
8  and went into the restroom --
9      MR. TIGAR:  Is it fair to say, then,
10  the two of you had an argument.
11      THE WITNESS:  Yeah.
12      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13      MR. SMITH:  Thank you.
14      THE WITNESS:  And these kinds of
15  things, to answer your other question, Mr. Tigar,
16  is that I realized why I had to move on.  That's
17  why I referred her to Ms. Allred and Mr. Shea.
18      She was always free to get another
19  lawyer.  And she had people helping her, Kathleen
20  Staunton and her cousin.  They could have found
21  another lawyer.
22  BY MR. SMITH:

Page 1470

1      Q.  Please take a look at Supplemental
2  Exhibit Number 13.
3      CHAIRMAN FITCH:  DX or SX.
4      MR. SMITH:  SX, thank you.  SX13.
5      THE WITNESS:  Let me read it.
6      MR. SMITH:  For the record, it is an
7  email dated June 1st, 2019 from Mr. Klayman to Ms.
8  Sataki.
9      THE WITNESS:  Ok.
10  BY MR. SMITH:
11      Q.  And you're complaining that she won't
12  allow you to come visit her at her apartment when
13  she's, are you not?
14      A.  I'm not complaining about that.  I'm
15  saying not to -- again to respect me because
16  that's not right.
17      I didn't have keys to her apartment.  I
18  never took keys to her apartment.  I didn't expect
19  anything in return.
20      It's all in this context of respect and
21  not making you feel like you're a leper, in
22  effect.  So this is what I'm trying to say.

Page 1471

1      And then --
2      Q.  You're complaining that she won't allow
3  you to come visit her while she's alone at her
4  apartment?
5      A.  No.
6      Read that portion to me, ok.  What are
7  you talking about --
8      Q.  The last sentence of the first
9  paragraph, "And, you have made it clear of late
10  that I cannot even enter the apartment when you
11  are alone there.  I am not welcome."
12      A.  Yes, but I never, ever asked to go into
13  that apartment with her.  That's why I didn't have
14  the keys.
15      But the fact that, you know, other
16  people could go there, but I couldn't go there...
17      You know, she had her brother who I had
18  met, she had her mom, who I had met, she had her
19  friends that were living there.  She testified to
20  that.  The apartment person tried to break in, the
21  manager, Mr. Hopper, while her roommate was naked;
22  that other people had been in the apartment, she

Page 1472

1  told me, that stole her diamond ring.
2      So I couldn't understand, you know, why
3  I was being treated differently.
4      That's what it was all about.  That's
5  what all this was about, was I just wanted to be
6  treated with respect.
7      Q.  But you did understand.
8      The last sentence says "Larry, you did,
9  and you had no problem with this until you started
10  seeing someone else.  Larry?"
11      So you did have understanding?
12      A.  I'm trying to figure out what it's
13  about.  I've told her, "I'm not your boyfriend.
14  I'm not a threat to you, or anybody else."  That's
15  what I told her.
16      Later I got calls from someone else
17  threatening me.
18      Q.  Let's take a look at Supplemental
19  Exhibit Number 14.  For the record, this is an
20  email from Larry Klayman to Ellie Sataki dated
21  June 16th, 2010, subject:  "One more time."
22      (Witness reads document.)

16 (Pages 1469 to 1472)

Page 1473

1    A.  Ok, I read it.
2    Q.  It's fair to say that you're getting
3  more and more frustrated with the lack of
4  relationship you've been able to foster with her
5  by this time, isn't it?
6    A.  That's unfair to say.  In fact, it's
7  unfair to say.
8        The key here is the second page, and
9  that's why I was upset, the third paragraph -- ok,
10  I had, as I testified to, and as Ms. Sataki
11  testified to, gotten emails --
12        CHAIRMAN FITCH:  Let him -- the second
13  page may be of --
14        THE WITNESS:  Ok.
15        CHAIRMAN FITCH:  No, I stand corrected.
16  Go ahead.
17        THE WITNESS:  Ok, I had gotten into a
18  near-fatal auto accident, which resulted in my
19  totaling my car on the 405, where it splits to Los
20  Angeles and Ventura, the most dangerous
21  intersection in the country, it's been ranked.
22  And I came up the Haskell exit, which was close to

Page 1474

1  there, and I then learned the next day I had a
2  concussion.  But I was really dizzy and feeling
3  like I might faint.  And I called her because her
4  apartment was right near the Haskell exit to ask
5  her for help.
6        I didn't have a car.  She did.  And,
7  you know, she could help me.  Now she admits that
8  I called her and she didn't answer the phone.  I
9  left a message that I was in a serious accident
10  and she didn't even respond.  And that's exactly
11  what I'm talking about, is that if your friends,
12  and your friend, you know, had gotten into a
13  serious accident, you at least answer the phone.
14        So this is what got me upset there.
15  BY MR. SMITH:
16    Q.  Well, staying on Page 2, you say, "Good
17  luck burying yourself in the Persian ghetto."
18        And then Ms. Sataki testified that she
19  was offended by this.
20        You'll agree this was insulting, right?
21    A.  No, it wasn't insulting.
22        What I was saying to her was -- number

Page 1475

1  one, everybody knows -- and Mr. Dash testified to
2  this, he's Persian -- he knows my reputation in
3  the Persian community.  I really love the Persian
4  people.  I love what they're trying to do.  I have
5  many Persian friends.
6        One of my best friends in LA, Benjamin
7  Kasanji, is Persian, and in fact he helped her in
8  the beginning to find the initial psychologist.
9        So I'm saying this, you know, "You have
10  to get out of that world.  Don't wear yourself
11  out.  You have so much potential."  And I was
12  trying to get her that potential, and she slammed
13  that in my face, too.
14        Somebody called Mark Woodland of CBN
15  and said, you know --
16    Q.  That's nonresponsive.
17    A.  Alright, that's fine.
18        That's what it's about.  It's not --
19  there's a Jewish ghetto, and I'm a
20  Jewish-Christian.  There's a Polish ghetto.  It's
21  not a negative phrase.  It's that when people wall
22  themselves in one place and don't want to come out

Page 1476

1  and don't want to assimilate, it hurts them.
2    Q.  Well, let's look at Page 1 of the
3  letter, and if you skip down to the third
4  paragraph.  There you say, "It appears that you're
5  defining the term 'Persian ghetto'.  As for use of
6  the term 'Persian ghetto,' that's accurate, and
7  you should take no offense.  You've been with six
8  or more Persian guys, all of whom have abused you,
9  stole from you and harmed you."
10    A.  What I'm saying --
11    Q.  Is that something that she should not
12  have been insulted about?
13    A.  It's not -- it's something she had to
14  deal with because of what we were going through
15  with the case, because there were allegations and
16  apparently more than rumors, because we heard from
17  Mr. Dash about NITV and Zia Attaby.  We were
18  dealing with that.
19        What I'm saying is "I'm not abusing you
20  as a friend.  I'm not abusing you as somebody that
21  cares for you.  I'm not abusing you as somebody
22  who loves you.  But other people have and you're

17 (Pages 1473 to 1476)

Page 1477

1  projecting that onto me.  It's not fair."
2       That's what I'm saying.
3       Q.  Let's take a look --
4       A.  And then I say, "I recognize that Kaveh
5  is a very good person," and those are the kinds of
6  people she should hang with, Kaveh.
7       Q.  You're telling her who she should be
8  friends with and who she shouldn't be friends
9  with?
10      A.  I'm suggesting she should not be
11  friends with people who have abused her.
12      And here's what I don't understand, and
13  let me answer it from my perspective, I've had
14  many clients that have given me personal advice.
15  I've had many clients that I've given personal
16  advice, because we've become very close, right,
17  and that's the nature of even professional
18  relationships, that you want to try to help that
19  person, and if you can, you know, make a
20  suggestion, there's nothing wrong with it.  And
21  this is obviously not something which should be
22  involved in a Bar proceeding, that I'm giving her

Page 1478

1  some advice to hang around with better people.
2  That's what I don't understand here, particularly
3  when it affects her case, because she's being
4  accused of sleeping around.  She's being accused
5  of living with her roommate.
6       MR. SMITH:  Objection, move to strike.
7  Now he's telling me what his case is --
8       CHAIRMAN FITCH:  I know it's close, but
9  you have suggested a certain characterization of
10  some of the statements in there, and, although
11  he's rambling, I think it's arguably responsive.
12      Go ahead, Mr. Klayman, if you wish.
13      THE WITNESS:  Yes, so I'm basically
14  saying "This is not good for you.  It's not good
15  for your case, in effect.  Be around people like
16  Kaveh.  He's a fine person."
17  BY MR. SMITH:
18      Q.  Can you take a look at Supplementary
19  Exhibit Number 15, please.
20      A.  Let me add one other thing...
21      She also accused one of her friends as
22  having --

Page 1479

1       CHAIRMAN FITCH:  Move to strike,
2  nonresponsive.
3       THE WITNESS:  No, no, I am putting it
4  in context.
5       CHAIRMAN FITCH:  I fail to see the
6  context.  Sustained.
7       THE WITNESS:  Ok.
8       CHAIRMAN FITCH:  SX15?
9       MR. SMITH:  Fifteen, yes.  For the
10  record it is an email dated June 21st, 2010, from
11  Mr. Klayman to Ms. Sataki.
12      (Witness reads document.)
13      THE WITNESS:  I see it.
14  BY MR. SMITH:
15      Q.  You wrote this email to Ms. Sataki?
16      A.  Yes.
17      Q.  At the end it says "anonymous"?
18      A.  Anonymous, yeah -- this was tongue in
19  cheek, and I was tying to say, in a nice way,
20  that, as I said, "I regret to inform you that Mr.
21  Klayman died last week."  It's joking to try to
22  make a point.  Sometimes humor, even black humor,

Page 1480

1  can make a point.  "And as he was on his way off
2  to heaven -- hopefully he won't be going south --
3  but he told me to tell you this:  And what I'm
4  saying is I cared about you, Ms. Sataki.  And
5  don't feel sorry for yourself.  You've got a lot
6  of promise and you have a life ahead of you, and
7  I'm trying to help you by getting you another
8  job," but CNN -- I mean not CNN, but PNN is not
9  that great a place.  It's the worst agency in
10  government and they treat people badly, and "your
11  salary is not that good.  So I tried to help you.
12  And with a little bit of coaching," as I say in
13  the second page, "major English-speaking
14  television networks like CNN, BBC, ABC, CBS, NBC
15  and Fox could hire you.  But you have to be
16  positive and look to the future and have faith in
17  God and yourself.
18      "That's why I wanted to take you to
19  events where you could meet people and help
20  yourself."  That's the MovieGuide and other and
21  things.
22      And I'm saying "I died.  You took the

18  (Pages 1477 to 1480)

Page 1481

1  life out of me because you weren't appreciative of
2  what I was trying to do for you and you weren't
3  respectful," and that's why in and around this
4  time period I'm saying, you know, "You've got to
5  move on and get another lawyer."
6       Q.  And you did again express your love for
7  her?
8       A.  Yes, that's not in dispute.
9       Q.  And with tears in your eyes, you closed
10  your eyes and passed away.
11       You thought this was funny?
12       A.  I'm trying to say that I've got to --
13  you know, I've got to -- we both need to move on.
14       CHAIRMAN FITCH:  Mr. Tigar, did you
15  have some questions about this exhibit?
16       MR. TIGAR:  Mr. Klayman, in your law
17  practice, had you ever before this time told a
18  client with whom you were having this
19  understanding that you had died?
20       THE WITNESS:  No.
21       I was trying to make a point, because
22  she was always saying, "I'm going to kill myself,"

Page 1482

1  so it was kind of playing off that.  "Things
2  aren't that bad."  That's what I was saying to
3  her.  "You have a bright future."
4       MR. TIGAR:  This was in a response then
5  to her saying that she was suicidal?
6       THE WITNESS:  In effect, it was the
7  same theme.  But I was trying to get the point
8  across in a humorous way.  That's what I was
9  trying to do; that she should go out and make a
10  great life for herself.
11       I was willing to help her with that,
12  and I tried my best, and, you know, she just
13  walled herself in pity, and that's not good,
14  because I believe --
15       CHAIRMAN FITCH:  Another question.
16       THE WITNESS:  I believe she had a great
17  potential.
18       CHAIRMAN FITCH:  Another question.
19       MS. LARKIN:  Just a question: What in
20  the letter would let Ms. Sataki know that you were
21  joking?
22       THE WITNESS:  The fact that I said,

Page 1483

1  "Hopefully he won't be going south."  That's me.
2  It's self-deprecating towards me.
3       "South" means h-e-l-l.
4       MS. LARKIN:  I know what south means.
5  Thank you.
6       CHAIRMAN FITCH:  Mr. Smith.
7       THE WITNESS:  By the way, humor can be
8  very, very strong.  Like I said, I've done
9  stand-up comedy before.
10       CHAIRMAN FITCH:  Mr. Smith.
11       THE WITNESS:  Makes a point.
12       CHAIRMAN FITCH:  Mr. Smith.
13  BY MR. SMITH:
14       Q.  Please take a look at Supplemental
15  Exhibit Number 16.  For the record, it is a --
16       A.  Which number?
17       Q.  Sixteen.  It is a letter or email dated
18  June 23rd, 2010 from Mr. Klayman to Ms. Sataki,
19  and there's also at the bottom of the page a
20  response from Ms. Sataki to Mr. Klayman.
21       A.  Ok.
22       Q.  I'll ask you, was this something that

Page 1484

1  you wrote after your accident?
2       You were inspired by your accident to
3  write those "words of inspiration"?
4       A.  No, I was trying to give her a pep
5  talk, that she has a lot of potential and that I
6  see a lot in her, and she should realize that.
7       Q.  In the next paragraph, you start off by
8  "Dear" -- not Ellie, not Ms. Sataki, but -- "Dear,
9  why do you think I am with you and come back even
10  when you push me away?  I am not a masochist and I
11  have pride.  When I have time to think and
12  reflect, I understand how you are feeling, and I
13  do feel your pain, but I am not here because I
14  feel sorry for you.  It's not charity.  It's
15  because you touched me with yourself, because you
16  were special in general and to me."
17       A.  Well, I'm trying to show her that she
18  was.  I call other people "dear," who weren't my
19  wife or, prior to that, girlfriend.
20       Also, you see I write here "Ellie
21  John," and it's a Persian way of saying dear, in
22  effect.  It's kind of a familiar, warm way of

19 (Pages 1481 to 1484)

In Re:  Larry Klayman
June 27, 2018

Page 1485

1  addressing somebody.  So I was trying to show that
2  in fact I did love her and I wanted something
3  better for her.
4       But again I had to move on, you know,
5  and I just wanted her to know that she didn't owe
6  me anything.  I wished her the best.  I still wish
7  her the best, and that's what I was trying to
8  convey.
9       Q.  Look at Supplementary Exhibit Number
10  18.
11       THE WITNESS:  At some point, your
12  Honor, my sister may be here.  I'd like to step
13  out and give her a call, because I don't see
14  anything coming on my cell phone.
15       CHAIRMAN FITCH:  In a few minutes.
16       THE WITNESS:  Take 30 minutes.
17       CHAIRMAN FITCH:  How much more do you
18  have in this segment of your examination, Mr.
19  Smith?
20       MR. SMITH:  Just a few more questions.
21  About two to four exhibits.
22       CHAIRMAN FITCH:  Let's keep going.

Page 1486

1  Keep going, and take your time.
2       THE WITNESS:  Let me just send a quick
3  text.  Hopefully she will get it.
4       CHAIRMAN FITCH:  I said that Mr. Smith
5  is proceeding.
6       THE WITNESS:  No, I wasn't going to
7  stop anything.
8       CHAIRMAN FITCH:  You're not going to
9  sit there on the cell phone when you're a witness.
10       THE WITNESS:  Ok.
11       CHAIRMAN FITCH:  Go ahead, Mr. Smith.
12  BY MR. SMITH:
13       Q.  Please take a look at Supplementary
14  Exhibit 18.
15       A.  Ok.
16       Q.  Is it fair to say that, once again,
17  you're complaining to Ms. Sataki about the lack of
18  a relationship that you've been able to establish
19  with her?
20       A.  Let me read this.
21       (Witness reads document.)
22       A.  That's not what I was doing, no.  But

Page 1487

1  let me read it.  Ok.
2       CHAIRMAN FITCH:  He has a question
3  pending, which is as follows:  Is it fair to say
4  that in this email you're complaining to Ms.
5  Sataki about the lack of a relationship?
6       MR. KLAYMAN:  No, absolutely not.
7  Absolutely not.
8       What I'm saying is I want to be
9  respected, and Persians, by the way, and I know
10  the community very well, are very respectful
11  people, and I'm saying --
12       CHAIRMAN FITCH:  That's not responsive.
13       THE WITNESS:  Yeah, ok, let me --
14       "Just treat me like you're treating
15  other people and don't treat me like I'm a leper,
16  ok."  "Because I'm truly trying to help you and
17  trying to do things," and it's coming -- you know,
18  "you're treating me really badly."
19       And I've testified to this several
20  times.
21       CHAIRMAN FITCH:  Yes, you have.
22       Next question.

Page 1488

1  BY MR. SMITH:
2       Q.  And it seems like she's been treating
3  you this way for quite some time?  Isn't that
4  correct?
5       A.  Well, and that's what I said, I
6  swallowed it, but it got to the point where I
7  couldn't any more.
8       You don't treat somebody like that and
9  then ask them to buy you a car.
10       Q.  Let's look at the last paragraph of
11  this letter, Page 2:  "Discuss this with Arlene."
12       You're suggesting that she discuss her
13  attitude towards you with her
14  psychiatrist/psychologist that she retained to
15  help her with the sexual harassment at the job?
16       A.  Well, I was always hoping that Arlene,
17  who I got to know, would council her and deal with
18  some of the issues that we had gone through
19  before, which to me would have been very helpful
20  to Ellie.
21       I mean, for instance --
22       Q.  So, you wanted Dr. Aviera to intervene

20  (Pages 1485 to 1488)

In Re:  Larry Klayman
June 27, 2018

Page 1489

1  in the relationship between you and Ms. Sataki?
2      A.  Can I finish my answer, please?
3      Q.  I'll ask it again.
4          Go ahead, but I'll ask it again --
5      A.  You interrupted me.
6          THE WITNESS:  Can I answer, your Honor?
7          CHAIRMAN FITCH:  Go ahead.
8          THE WITNESS:  Yeah, what I'm saying is,
9  "Ellie, you have a lot of potential here, and you,
10  know, you're not treating me well," and, you know,
11  there's a psychological aspect of that, and it's
12  not right, and I was hoping that Arlene could help
13  her with that.
14  BY MR. SMITH:
15      Q.  So you wanted the psychologist to help
16  with your relationship with Ms. Sataki?
17      A.  No.  No, because I felt that it
18  permeated everything she did.  For instance, not
19  getting out of the cocoon that she put herself in.
20  And that was not helpful to her in terms of
21  advancing her own career and the personal aspects
22  of her being.

Page 1490

1      Q.  And then you conclude this letter with,
2  "Thank God I love you or I would have been gone
3  long ago.  Being around you requires me to always
4  swallow my pride and self respect."
5      A.  Right, that's exactly correct.
6      Q.  "I will not and do not do this with
7  anyone else."
8      A.  That's correct.
9          You know, because I cared about her
10  deeply, you know.  I took the lack of respect and
11  the verbal abuse and other things for a very long
12  time.
13          But the straw that broke the camel's
14  back, in terms of my realizing I had to move on,
15  was when whether you're treated that way and
16  someone asks you to buy them a car.
17          Where the -- that's -- that's
18  unbelievable.
19      Q.  Take a look at Supplementary Exhibit
20  Number 19.  For the record this is a letter dated
21  June 29th, 2010, from Mr. Klayman to Ms. Sataki.
22      A.  Ok.

Page 1491

1          (Witness reads document.)
2      Q.  In this letter you describe all of the
3  potential problems with her case, correct?
4      A.  Some of them, yeah.
5      Q.  And you note that the defense will try
6  to prove that she is promiscuous, and you go into
7  detail, all of the evidence that the defendants
8  have dug up, correct?
9      A.  The letter speaks for itself.
10          As I testified I think at length that
11  was a concern in representing her.  It's a concern
12  of anyone representing an alleged sexual
13  harassment victim.
14          So, yes, that was a concern.  That's
15  one of the reasons why I thought it would be good
16  not to live with Kaveh, even though he's a very
17  fine person and to, as she wanted to do from day
18  one, be in LA working for PNN in their field
19  office there.
20      Q.  And your last sentence, "With your
21  approach and attitude you're unlikely to succeed
22  professionally in this country.  I wish you the

Page 1492

1  best.  Larry."
2          Correct?
3      A.  Where is that?
4      Q.  Page 2, the last sentence.
5          CHAIRMAN FITCH:  Well, we see what it
6  says, Mr. Smith.  Do you have --
7          THE WITNESS:  I also --
8          CHAIRMAN FITCH:  Wait a minute, he
9  hasn't asked you a question.
10  BY MR. SMITH:
11      Q.  You didn't profess your love in this
12  letter, did you?
13      A.  The letter speaks for itself.
14          I'm talking about a difficult Judge
15  Kotelly.  I'm talking about difficulties that we
16  may have had to face in the case.  I'm talking
17  about trying to get her life going in a positive
18  direction, so, you know, she could have a better
19  future.
20          That's what I'm doing.
21          CHAIRMAN FITCH:  Well, Mr. Klayman --
22  wait a minute.

21 (Pages 1489 to 1492)

App.0616

In Re:  Larry Klayman
June 27, 2018

Page 1493

1      Mr. Klayman, you said, the first
2  sentence of your answer, the letter speaks for
3  itself, and that's fine.
4      THE WITNESS:  Ok.
5      CHAIRMAN FITCH:  But now you went on
6  and, notwithstanding it speaks for itself, you
7  should answer his question.
8      THE WITNESS:  Ok.
9      CHAIRMAN FITCH:  You don't say in this
10  letter that you love her, do you?
11      THE WITNESS:  Correct.
12      CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13  BY MR. SMITH:
14      Q.  Is it fair to say that you now
15  understood that Ms. Sataki was not going to return
16  your love?
17      A.  No, not at all.  It's an incorrect
18  characterization.
19      Q.  You still believed that Ms. Sataki
20  might somehow fall in love with you?  Is that
21  fair?
22      A.  That was not my intent or approach.  My

Page 1494

1  approach was that I cared for her and that I
2  wasn't getting the respect and the interaction
3  that would be normal in even a friendship.
4      Q.  Look at Supplementary Exhibit Number
5  20, please.
6      CHAIRMAN FITCH:  SX20, correct?
7      MR. SMITH:  SX20, yes.
8      CHAIRMAN FITCH:  Are we pretty much
9  toward the end?
10      MR. SMITH:  Yes, of this aspect of the
11  examination.
12      CHAIRMAN FITCH:  Yeah, ok.
13      MR. SMITH:  May I ask, just for
14  purposes of scheduling, your Honor, with my sister
15  who came from New York --
16      CHAIRMAN FITCH:  Now that it's 11:00,
17  Mr. Smith, I'm getting a little worried, how much
18  more do you have?
19      MR. SMITH:  Not much more.  I'm about
20  to wrap up.  It depends on the answers that I get.
21      CHAIRMAN FITCH:  I'm going to have to
22  break in about two or three minutes.

Page 1495

1      MR. SMITH:  Alright.
2  BY MR. SMITH:
3      Q.  Take a look at Exhibit 20,
4  Supplementary Exhibit 20.
5      A.  Yeah, let me read it.
6      (Witness reads document.)
7      MR. SMITH:  These are two
8  correspondence, both dated July 26th, 2010, and
9  both from Mr. Klayman to Ms. Sataki.
10      THE WITNESS:  Ok, I got it.
11  BY MR. SMITH:
12      Q.  Alright.  In these two letters, you
13  became aware that Ms. Sataki had been talking with
14  Kathleen Staunton from Congressman Rohrabacher's
15  office, correct?
16      A.  Correct.  I called Kathleen, Kathleen
17  Staunton, and I said, "Is Congressman Rohrabacher
18  going to do anything to help Ms. Sataki," because
19  I had gone up there to ask for his help.
20      Q.  And based upon your conversation with
21  Ms. Staunton, Kathleen, you were inspired to write
22  a letter to Ms. Sataki indicating that she "needed

Page 1496

1  to improve in the areas of honesty, class and
2  knowing who your friends are"?
3      A.  No, that wasn't the purpose of my
4  letter.
5      The primary purpose is that, as it
6  states here, which you overlooked, is that the
7  email, very short, July 26th, 2010, 3:23 p.m.,
8  Larry Klayman, "Talked with Kathleen about" --
9      CHAIRMAN FITCH:  He didn't ask you
10  about this email?
11      THE WITNESS:  Ok, but that was the
12  purpose.  It was a reaction to that, telling her
13  things that were patently untrue; that she didn't
14  want to go to LA, never wanted to file a court
15  case.  That was false.
16      I was concerned about that because that
17  was perhaps the reason that Congressman
18  Rohrabacher didn't try to help her, and it was
19  probably the reason that Kathleen Staunton later
20  came after me, thinking that somehow I had done
21  things that she didn't want.
22      This is so false.  And I'm glad that

22 (Pages 1493 to 1496)

In Re: Larry Klayman
June 27, 2018

Page 1497

1  you brought this letter in front of the
2  committee --
3  BY MR. SMITH:
4      Q.  Well, can you answer my question, so
5  then you can deal with whatever else it is you
6  want to deal with?
7      CHAIRMAN FITCH:  Answer his question.
8  BY MR. SMITH:
9      Q.  In neither one of these pieces of
10 correspondence do you profess your love for Ms.
11 Sataki, do you?
12     A.  I do in the sense that --
13     Q.  Do you say the words "I love you" in
14 this letter?
15     A.  No, I don't say that.  And that's a
16 different question than what you just asked me.
17 I'm care about her.
18     CHAIRMAN FITCH:  I think he has the
19 right to finish that first answer.
20     THE WITNESS:  Yeah, I'm caring about
21 her.  You don't have to use the word "love" to let
22 someone know you're caring about them.

Page 1498

1  BY MR. SMITH:
2      Q.  You're not telling her how beautiful
3  she is?
4      A.  I always talked about that in context,
5  if I talked about it at all.
6      Q.  You're not talking about how, you know,
7  much better your life is with --
8      A.  The letter says what it says, Mr.
9  Smith.  I'm sorry.  You're trying to put words
10 into my mouth.
11     MR. SMITH:  Alright, we have dealt with
12 Supplementary Exhibit 21 yesterday, so I will
13 conclude this aspect of the examination.
14     CHAIRMAN FITCH:  We will stand in
15 recess as we prepare for an interruption of Mr.
16 Klayman's testimony in order to accommodate
17 another witness, if the witness is here.
18     One way or the other, we will stand in
19 recess for at least nine minutes until 11:10.
20     (Recess taken.)
21     CHAIRMAN FITCH:  Back on the record,
22 please.

Page 1499

1      We are resuming Mr. Smith's examination
2  here at 11:12, with again the requisite persons
3  present.
4      CONTINUED CROSS-EXAMINATION
5      BY DISCIPLINARY COUNSEL:
6      BY MR. SMITH:
7      Q.  Alright, take a look at Supplemental
8  Exhibit Number 7, please.  And that is a two-page
9  document.
10     A.  Supplemental Exhibit 7?  I thought we
11 already went over that.
12     Q.  Supplemental Exhibit 11.
13     A.  Oh, 11:00.
14     THE WITNESS:  She's calling me, your
15 Honor.  Can I just take it real quickly?
16     CHAIRMAN FITCH:  Go ahead.
17     (Brief pause.)
18     THE WITNESS:  She's on her way.  She
19 will wait in the witness room.
20 BY MR. SMITH:
21     Q.  For the record, an email dated May
22 30th, 2010 from Ms. Sataki to Mr. Klayman.

Page 1500

1      (Witness reads document.)
2      CHAIRMAN FITCH:  So it's the email that
3  starts at the bottom of Page 1.
4      MR. SMITH:  Yes.
5      CHAIRMAN FITCH:  And continues on.
6      MR. SMITH:  Yes.
7  BY MR. SMITH:
8      Q.  And also look at the one right above
9  it, I'm sorry, the May 30th to Mr. Klayman from
10 Ms. Sataki.
11     (Witness reads document.)
12     A.  Ok.
13     Q.  Alright, in this letter the subject
14 line says: "No More Arguments," and you're
15 suggesting to her that she should not communicate
16 with you any further.
17     A.  You got a question?
18     Q.  Yes.
19     That's what you're doing.  Is that
20 right?
21     A.  At that point in time I was saying
22 also, "Deal with my associate at that time because

App.0618

In Re:  Larry Klayman
June 27, 2018

## Page 1501

1  you don't know how to talk to me or deal with me."
2      I wasn't pushing her away from legal
3  representation.  No.
4      Q.  Ok, and you accused her of having a
5  diva mentality?
6      A.  I didn't accuse her.  She does have a
7  diva mentality.
8      Q.  You described her as having a diva
9  mentality?
10     A.  I said that, but she has a
11 self-centered approach to things.
12     Q.  You're saying, "Unfortunately you have
13 a sick mind and because of that you make my mental
14 state worse too, especially with your meaningless
15 accusations."
16     A.  Well, are you reading what she wrote?
17     Q.  Yes.
18     A.  Ok, you're not reading all of what she
19 wrote.  I mean, she's accusing me of having a sick
20 mind, of needing professional help.  It's
21 extremely insulting.
22     Q.  But she's saying that you're making her

## Page 1502

1  mental state worse with all of your accusations?
2      A.  I didn't make her metal state worse.
3  Her mental state is what it was, and it continues
4  today, and we saw that, in my opinion, in court.
5      Q.  Alright, in the last paragraph of this
6  sentence, Ms. Sataki says, "Please let me finish
7  here by saying that please always remember you
8  will get 40 percent when you finish the case."
9      A.  I never accepted that.  I said I never
10 wanted to be paid.  It's pro bono.  She's trying
11 to lure me into continuing to represent her by
12 saying you'll get 40 percent.
13     We never got to the point of doing a
14 contingent fee agreement, because at that point we
15 went our separate ways.  But I never intended to
16 be paid.  I never intended to tae anything from
17 her.  We were simply looking for equitable relief
18 to get her back to Los Angeles.
19     There was no money in it anyway,
20 assuming there was every any money in it, for
21 many, many years.  And that was not what I was
22 attempting to do.  I never, ever said she had to

## Page 1503

1  pay me.
2      To the extent that I said that at the
3  end, it was to try to jog her into --
4      Q.  Let's look at Supplementary --
5      A.  If I could finish the respond, please.
6      It was simply to jog her into realizing
7  how much I had done for her.
8      Q.  Let's take a look at Supplemental
9  Exhibit Number 12.  Perhaps that is the point
10 you're trying to make.
11     A.  I'll read it.
12     (Witness reads document.)
13     A.  Ok.
14     Q.  In the fifth line down it says, "Well,
15 this point I think that 50 percent of any recovery
16 is fair, and that is what I require."
17     You see that?
18     A.  If this matter was going to go forward,
19 yes, but the representation, at least in terms of
20 her --
21     Q.  Well --
22     A.  Let me finish.

## Page 1504

1      At least in terms --
2      Q.  I haven't asked a question, Larry.
3      THE WITNESS:  I want to respond, your
4  Honor.
5      MR. SMITH:  I have not asked a
6  question?
7      CHAIRMAN FITCH:  I think the answer to
8  his question is that it does say that.
9      Now what's your question?
10 BY MR. SMITH:
11     Q.  Now the question is, this is a
12 counteroffer to Ms. Sataki's statement in her
13 letter to you the day before that 40 percent is
14 what you all had agreed upon.
15     A.  I never, ever agreed on 40 percent.  I
16 didn't want anything.  It was friendship, number
17 one.  Number two, I never asked for anything.  You
18 can see that, even to this day.
19     I could have brought a lawsuit if in
20 fact I thought I was owed anything to recuperate
21 it, because people were interfering with my
22 relationship -- I would never sue her -- my

24 (Pages 1501 to 1504)

App.0619

In Re:  Larry Klayman
June 27, 2018

Page 1505

1  professional relationship.  And that's clear.
2        But the relationship ended and we
3  never -- I mean, at this point, it was clear that
4  we had to go our separate ways.  I'm just kind of
5  challenging her, trying to get her to see that I
6  had put in so much time and expense and that she
7  didn't appreciate it.
8        So therefore the terms of my previous
9  pro bono relationship, if it went forward, was
10  challenging her that it would have to change.  But
11  it never went forward, other than the fact that I
12  tried to protect her interest, because we didn't
13  get any communication shortly thereafter.
14        But even then I wasn't sending her
15  anything to say I want to continue to represent
16  you under these circumstances.  I was protecting
17  her.  I was protecting her rights.  And I think I
18  had an ethical duty to do that, not to let her
19  lose everything.
20        As you previously just saw a few
21  moments ago, she's telling Kathleen Staunton she
22  never wanted to go to LA, she never wanted to

Page 1506

1  bring court cases.  That is a blatant falsehood,
2  and that's what I was dealing with in terms of
3  getting communications from a number of people.
4        But it's clear at this point she had to
5  move on.  I gave her other names.  She was always
6  free to get the other names and interview them and
7  hire another lawyer.  She had other people who
8  could help her.
9        MR. SMITH:  Move to strike.  My
10  question had nothing to do with any of that.  My
11  question was whether or not it had to do with a
12  counteroffer.
13        CHAIRMAN FITCH:  The part of the answer
14  that essentially consisted of the relationship
15  ended, other than my duty to protect her interest.
16        The rest will not be considered and
17  will be struck.
18  BY MR. SMITH:
19  Q.  You said this case was not worth
20  anything.  There was no expectation of making any
21  money out of this case?
22  A.  No, because all my effort was geared to

Page 1507

1  getting her back to LA.  That was equitable relief
2  in terms of Wagner vs. Taylor.  That's where my
3  effort was right from the beginning.
4        You saw the emails with Mr. Keya Dash,
5  where I said --
6  Q.  You were --
7  A.  Wait a minute.  Let me finish.
8        -- where I said, "Look, what we really
9  want is a settlement here to get her to LA."
10  That's what the representation was gear to, the
11  extent that I put in damage claims and things like
12  that.  That was to try to coax or properly coerce
13  VOA to do the right thing and the board of
14  governors.
15        But that was not my motivation here.
16  It was not to make money.
17  Q.  Do you recall the addendum clause that
18  you had in your civil complaint against the
19  defendants in this case, Ms. Sataki vs.
20  Broadcasting Board of Governors case?
21  A.  I generally remember that, but a lot of
22  what I did, based on my considerable experience,

Page 1508

1  was to put pressure on VOA to settle the case.
2  Q.  Do you remember how much you asked for
3  in damages for Ms. Sataki's case?
4  A.  I'm sure it was a lot, because I wanted
5  them to realize they were at risk, so they would
6  settle this matter.
7  Q.  You sought compensatory and actual
8  damages in excess of $150M.  Is that right?
9  A.  I don't know.  I don't have the
10  complaint in front of me right now.
11  Q.  Look at Bar Exhibit 4, at Page 4-12.
12        (Witness peruses document.)
13  A.  Ok.  Yes, I put that -- I didn't know
14  the amount because I hadn't seen the complaint for
15  quite a while.
16  Q.  Did you have a basis in law or in fact
17  to ask for $150M?
18  A.  Yes, in terms of what the damage may
19  have been.  But I was also trying --
20  Q.  So therefore you were entitled to,
21  according to your fee agreement, at last $75M in
22  the event that the case went to term and you got

Page 1509

1  $150M, correct?
2      CHAIRMAN FITCH: I'll strike that
3  question because of the use of the term "fee
4  agreement," which strikes me as not established,
5  at least not yet.
6      MR. TIGAR: Could I --
7      CHAIRMAN FITCH: But wait a minute,
8  let's if Mr. Smith -- he does have a perfectly
9  legitimate question.
10 BY MR. SMITH:
11     Q.  According to the terms of the fee
12 agreement set forth in Mr. Klayman's letter to Ms.
13 Sataki dated May 31st, Supplemental Exhibit Number
14 12, you say that you were entitled to 50 percent
15 of whatever is recovered in the case.
16     A.  There never was a fee agreement.  I was
17 throwing that out if I was to continue, and I was
18 trying to get her to see that I had put in so much
19 effort.
20     But there never was an agreement to pay
21 me 40 percent, or 50 percent.  It was clear from
22 the start that it was pro bono.  I was doing it

Page 1510

1  from the standpoint of what I thought was right in
2  helping a woman that had no money, and again, the
3  goal was not to go all the way through.  I
4  couldn't have even afforded that.  I was by
5  myself, essentially.
6      CHAIRMAN FITCH: Why did you title this
7  email "Legal Representation Agreement"?
8      THE WITNESS: Well, because I'm saying
9  if we go forward, if we go forward.  We didn't
10 have an agreement before then.
11 BY MR. SMITH:
12     Q.  You don't say that in the letter --
13     A.  I'm saying, the representation ended --
14     Q.  The letter doesn't say, "if we go
15 forward," does it?
16     A.  The letter says what it says.
17     Q.  Ok.
18     A.  But I'm telling you where I was coming
19 from.
20     CHAIRMAN FITCH: Mr. Tigar had a
21 question.
22     THE WITNESS: My answer, if you put it

Page 1511

1  in context that I'm also suggesting that she
2  should find another lawyer.  It's clear that if
3  I'm going to remain and if she's going to act in a
4  proper way, that obviously there has to be some
5  kind of an agreement.
6      But there never was an agreement up to
7  that point in time, and the relationship ended.
8  BY MR. SMITH:
9      Q.  I thought you were trying to get out of
10 the case because of your emotional attachments to
11 the --
12     A.  There were a lot of reasons why, and
13 also because of hers.
14     MR. SMITH: I'm sorry, Mr. Tigar?
15     MR. TIGAR: Two matters of
16 clarification.
17     THE WITNESS: Sure.
18     MR. TIGAR: The damages claim was
19 necessary if you had a Bivens action, correct?
20     THE WITNESS: Correct.
21     MR. TIGAR: Because you couldn't have a
22 Bivens action without damages?

Page 1512

1  THE WITNESS: Absolutely.
2      MR. TIGAR: Number two, with respect to
3  Supplemental Exhibit Number 12, I have focused on
4  the language that "I will draw up the contract
5  evidencing this 50% arrangement and email it to
6  you.  Then sign it so I know we are on the same
7  page."
8      THE WITNESS: Yeah.  Well, we never --
9      MR. TIGAR: Did you ever send that to
10 her?
11     THE WITNESS: No, we never got to that
12 point, because the relationship effectively ended
13 because of a lack of communication.
14     MR. TIGAR: So at that point you
15 understood that the relationship was over?
16     THE WITNESS: It was ending, yes.  And
17 as you see from the difference correspondence,
18 referral to Ms. Allred, referral to Mr. Shea,
19 letters of referral to Dr. Aviera.
20     So we never got to that point.
21     MR. TIGAR: Thank you.
22     MS. LARKIN: So I have a question.

26 (Pages 1509 to 1512)

Page 1513

```
 1          If that relationship had not ended,
 2  then Ms. Sataki would have been eligible to
 3  receive the entire -- what million?
 4          MR. SMITH:  One hundred and fifty
 5  million.
 6          MS. LARKIN:  One hundred and fifty
 7  million without you receiving any remuneration for
 8  the money you had put out?
 9          THE WITNESS:  That was my
10  understanding.
11          Based on reality, I didn't think we
12  would be litigating this thing for ten years.  We
13  were trying to get a resolution of her going back
14  to Los Angeles.
15          I cared about her.  That's what I was
16  trying to do.  Not get damages.
17          CHAIRMAN FITCH:  If in your view at the
18  time, as you said, the relationship had ended, why
19  did you say, "I'll draw up the contract evidencing
20  this 50% arrangement and email it.  Then sign it
21  so I know we are on the same page as I go
22  forward"?
```

Page 1514

```
 1          MR. KLAYMAN:  Yeah, I was upset and
 2  didn't mean that literally.
 3          What I meant was I put in so much time
 4  and expense.  I put my heart and soul into this
 5  and never asked to be compensated.  So that was
 6  kind of a way of saying that, but there was no
 7  agreement that I would get a contingent fee.
 8          I didn't -- if you see, the
 9  negotiations with VOA, I'm never asking them to
10  pay money.
11          You've got a lot in the record there.
12  That was not -- I was demanding of the settlement.
13  We would have gone away if they put her back to
14  work in Los Angeles, and that was our objective.
15          MR. SMITH:  I'm going to wrap this up.
16  BY MR. SMITH:
17      Q.  I'll ask you to take a look at Bar
18  Exhibit Number 38, Supplemental Exhibit Number 38,
19  please.
20          For the record it is the correspondence
21  from Ms. Sataki to Mr. Klayman on September 11th,
22  2011.
```

Page 1515

```
 1          MR. TIGAR:  This is Supplemental
 2  Exhibit 38?
 3          CHAIRMAN FITCH:  The very last one.
 4          MR. TIGAR:  Mine says September 15,
 5  2011.
 6          MR. SMITH:  The bottom portion.
 7          MR. TIGAR:  Oh.
 8          MR. SMITH:  This is from Ms. Sataki to
 9  Mr. Klayman.
10          MR. TIGAR:  Thank you.
11          (Witness reads document.)
12          THE WITNESS:  Ok, I see it.
13  BY MR. SMITH:
14      Q.  You testified yesterday that you felt
15  insulted by Ms. Sataki's statement that "I don't
16  know if you're a Christian or Jewish, because
17  whatever it suits you best, you become one.  But I
18  do believe in karma."
19      A.  I didn't testify to that.
20          What I testified to was that I didn't
21  understand why "Jewish" was being highlighted and
22  I didn't see why that was any different in the
```

Page 1516

```
 1  context of this, other than being Christian.
 2          So what was in her mind, I don't know.
 3  But I thought she was -- it was pejorative in a
 4  sense to do that.
 5          And this is the way she would talk to
 6  me --
 7          CHAIRMAN FITCH:  Now stop there.  He
 8  asked you a question and you answered that
 9  question --
10          THE WITNESS:  Ok.
11          CHAIRMAN FITCH:  -- about what's said
12  there.
13          Next question.
14  BY MR. SMITH:
15      Q.  Do you think it would be pejorative to
16  say that "Jewish people think they know
17  everything.  That's why I generally don't hang
18  around them"?
19      A.  Well, I was joking with that.  I'm
20  self-deprecating many times.  It's part of my
21  humor I said.
22          I'm very proud of being Jewish.  Let me
```

27  (Pages 1513 to 1516)

Page 1517

1  tell you that.
2      Q.  I'm referring to Supplementary Exhibit
3  Number 10 where that's what you said.
4      A.  I remember something to that effect.
5      Q.  Well, take a look at Supplementary
6  Exhibit 10.
7      A.  That's fine.  I'm happy to do it.  You
8  know, I'm trying to make people feel comfortable
9  here.
10     Q.  I feel comfortable.
11     A.  Good.
12         CHAIRMAN FITCH:  What's the relevance
13 of this?
14         MR. SMITH:  I just wanted to know
15 whether, you know, the appropriateness with
16 respect to -- you know, the asserted allegation
17 that Ms. Sataki may have been saying something
18 anti-Semitic was inappropriate, given that he
19 seems to have talked loosely about the Jewish
20 faith, himself, in conversations with Ms. Sataki.
21         THE WITNESS:  This was what, your
22 Honor --

Page 1518

1          CHAIRMAN FITCH:  Wait a minute, wait a
2  minute, wait a minute.
3          I'm certainly not going to allow a
4  question or answer about -- that could be
5  construed as suggesting feelings of religious
6  discrimination.
7          MR. SMITH:  And that was not the point.
8          CHAIRMAN FITCH:  Ok, so tell me again
9  what the relevance is.
10         MR. SMITH:  That it seems that they
11 both talked loosely about the Jewish faith.
12         CHAIRMAN FITCH:  Ok?
13         MR. SMITH:  And the first instance of
14 that appears in the Bar exhibit that Mr. Klayman
15 made to Ms. Sataki where he was talking about how
16 he didn't like hanging around Jewish people.
17         CHAIRMAN FITCH:  And what's the
18 relevance of that?
19         MR. SMITH:  Yesterday, when he was
20 commenting upon Ms. Sataki's testimony, he was
21 suggesting that it was inappropriate for her to
22 talk about Jewish -- and he thought there was

Page 1519

1  something inappropriate about that.  It seems to
2  me that he had opened up the door.
3          And perhaps it was a bad line of
4  questioning.  I withdraw it and I will conclude
5  my --
6          CHAIRMAN FITCH:  I think that would be
7  best.
8          MR. SMITH:  I will conclude my
9  examination with that.
10         MR. KLAYMAN:  Let me see if my sister
11 is here.
12         CHAIRMAN FITCH:  Let's check on that.
13         MR. KLAYMAN:  Then I can do any
14 redirect that I may have.
15         CHAIRMAN FITCH:  Mm-hmm.
16         (Recess taken.)
17         (Joshua Ashley Klayman before the
18 hearing committee.)
19         CHAIRMAN FITCH:  We're back on the
20 record at 11:38.
21         And why don't you step up, please.
22         I'm speaking to a witness who we think

Page 1520

1  is our next witness, which we're taking slightly
2  out of order before redirect of Mr. Klayman.
3          What is your name, please?
4          THE WITNESS:  Joshua Ashley Klayman.
5          CHAIRMAN FITCH:  Lean down to that
6  microphone.
7          THE WITNESS:  Joshua Ashley Klayman.
8          CHAIRMAN FITCH:  I missed your first
9  name.  Spell it.
10         THE WITNESS:  J-o-s-h-u-a.  It's just
11 like the man's name.
12         CHAIRMAN FITCH:  Would you raise your
13 right-hand.  I need to swear you in as a witness.
14         Do you solemnly swear or affirm that
15 the testimony you are about to give in this matter
16 will be the truth, the whole truth and nothing but
17 the truth?
18         THE WITNESS:  I do.
19         CHAIRMAN FITCH:  Now, sit down, if you
20 would, please.  Pull both of those microphones
21 kind of close to you and we'll go from there.
22         THE WITNESS:  By the way, I've never

28 (Pages 1517 to 1520)

In Re:  Larry Klayman
June 27, 2018

Page 1521

1  given witness testimony before, so if there is

2  something I should be doing, please let me know.

3  Wherefore,

4         JOSHUA ASHLEY KLAYMAN

5  called as a witness on behalf of Respondent, and

6  after having been first duly sworn, was examined

7  and testified as follows:

8         EXAMINATION ON BEHALF OF THE RESPONDENT:

9         BY MR. KLAYMAN:

10     Q.  Please state your name.

11     A.  My name is Joshua Ashley Klayman.

12     Q.  Are we related, Ms. Klayman?

13     A.  Yes, you're my brother.

14     Q.  And how old are you?

15     A.  I'm 41.

16     Q.  Run us through briefly your educational

17  background.

18     A.  Sure.  I got a Bachelor's degree from

19  the University of Pennsylvania in 1999.  I

20  graduated summa cum laude.  I went to Temple Law

21  School.  I was a law faculty scholar and I was on

22  Law Review and I graduated in 2006.

Page 1522

1         CHAIRMAN FITCH:  Really I'm having

2  trouble hearing you.

3         THE WITNESS:  Oh, sorry.  I'll speak

4  up.

5         Do you want me to repeat that?

6         CHAIRMAN FITCH:  Mm-hmm.

7         THE WITNESS:  Ok, sure.

8         So I graduated in '99 from University

9  of Pennsylvania, summa cum laude with a Bachelor's

10  in arts.  I went to Temple Law School as a law

11  faculty scholar.  I graduated in 2006 cum laude on

12  the Law Review.

13  BY MR. KLAYMAN:

14     Q.  Can you run us through your employment

15  history after law school.

16     A.  Sure.

17     Q.  Take your time.

18     A.  Ok.  So after law school I initially

19  practiced for four years in Pennsylvania, at

20  Pepper Hamilton.  I then went to Cahill Gordon and

21  Reindel, in New York City, to do leverage finance.

22         I left there when some partners left

Page 1523

1  and went to Paul Hastings.  I then went --

2         CHAIRMAN FITCH:  It's the way of the

3  world these days.

4         THE WITNESS:  Yes, exactly.

5         I then went to Allen Overy.  My partner

6  there left and took us to Morrison Foerster where

7  I had a practice for five years.

8         I left on Friday and I just launched my

9  own law firm and consulting firm, and I'm now a

10  consultant to Shearman Sterling, as well.

11  BY MR. SMITH:

12     Q.  What is your legal specialty?  What is

13  your specialty, your expertise?

14     A.  So traditionally it was leveraging

15  finance and corporate, but I have in the past few

16  years been working on block chain and crypto

17  matters, and I actually founded Morrison

18  Foerster's global block chain and contracts group.

19  That's where I've taken this next step so that I

20  can do that all the time.

21     Q.  Did there come a point in time when you

22  met a Ms. Elham Sataki?

Page 1524

1     A.  Yes.

2     Q.  What was the circumstances of that?

3     A.  At the time I was dating someone in Los

4  Angeles, so I was frequently flying over the

5  weekend from Los Angeles to New York.

6         My brother lived in Pacific Palisades,

7  and I met her at his house.

8     Q.  During the meeting with Ms. Sataki, did

9  she discuss the issue of her case and what was

10  being done?

11     A.  Yes, quite openly.  And I met her

12  multiple times.  It wasn't that I just met her one

13  time.

14         Yes, she was quite open with what the

15  circumstances of her challenges were.

16     Q.  Did she discuss the issue of publicity

17  in her case?

18     A.  She did.  I mean, she was very, very

19  open, which -- I'm not a litigator.  I don't

20  really know anything about litigations, but I was

21  surprised that she was so open.

22     Q.  And did she say that she was approving

29 (Pages 1521 to 1524)

In Re:  Larry Klayman
June 27, 2018

## Page 1525

1  of publicity of her case in trying to get a
2  settlement of her claims?
3       MR. SMITH:  Objection.  That's a
4  leading question.
5       THE WITNESS:  Ok, so --
6       MR. SMITH:  Objection.  That's a
7  leading question.
8       CHAIRMAN FITCH:  Rephrase the question.
9  BY MR. KLAYMAN:
10      Q.  Did she make reference to using
11  publicity to try to get a positive result for her?
12      MR. SMITH:  Objection.  It's a leading
13  question.
14  BY MR. KLAYMAN:
15      Q.  Ok, what did she say?
16      A.  She was very interested in trying to
17  get a positive result and to pressure people into,
18  you know, giving her that result.
19      She certainly was publicizing
20  everything to my then boyfriend and me, but I
21  don't recall her explicitly saying, like, "Yes,
22  I," you know -- however she was actively

## Page 1526

1  publicizing it to me.  And she seemed very onboard
2  with whatever the strategy was.
3       Q.  But I also mentioned, did I not, the
4  publicity?
5       A.  Yeah.
6       Q.  Yes.
7       A.  Yeah.
8       Q.  She didn't object?
9       MR. SMITH:  Objection.
10      THE WITNESS:  I think --
11      CHAIRMAN FITCH:  Wait, wait.
12      Did there come a time when you had
13  conversations, one or more conversations with Mr.
14  Klayman and Ms. Sataki.
15      THE WITNESS:  Yes.  Yes.
16      CHAIRMAN FITCH: On approximately how
17  many occasions would you say.
18      THE WITNESS:  I'm not sure offhand how
19  many in-person times, however she and Larry were
20  friends.  I mean, they were -- that's why she was
21  over my boyfriend's house there.
22      So, I frequently had conversations

## Page 1527

1  either directly with her or through Larry and her
2  saying hi to me or something like that.  It wasn't
3  that -- they were friends.
4       CHAIRMAN FITCH:  Now ask a question,
5  Mr. Klayman.
6       MR. KLAYMAN:  Ok.
7       CHAIRMAN FITCH:  You've got the
8  foundation.
9  BY MR. KLAYMAN:
10      Q.  During the times that you met with her,
11  I discussed publicizing her case?
12      A.  Yes.  I think you always discussed
13  publicizing cases.
14      Q.  And she didn't object?
15      A.  No.
16      Q.  What was your impression of Ms. Sataki
17  interacting with me?
18      A.  A few things: I thought she was
19  beautiful, right.  I thought she seemed -- I
20  thought she was using you, which I said to you on
21  multiple occasions.  And she definitely seemed to
22  be in a very unstable sort of way.

## Page 1528

1       But I -- I mean, I vacillated between
2  kind of liking her and being suspicious of her,
3  quite frankly, as your sister.
4       MR. KLAYMAN:  I have no further
5  questions.
6       MR. SMITH:  I have no questions.
7       MR. TIGAR:  I have a couple, if I may.
8       CHAIRMAN FITCH:  Go ahead, Mr. Tigar.
9       MR. TIGAR:  I'm not sure I heard the
10  word.  You thought that Ms. Sataki was using Mr.
11  Klayman?
12      THE WITNESS:  Yes.
13      MR. TIGAR:  What do you mean by that?
14      THE WITNESS:  Well, she was -- I don't
15  know what she looks like now, but she was very
16  beautiful and she was just very forward in her
17  demands.  I guess -- I shouldn't say demands.
18      But I believe at one point she asked
19  him to buy her a car, like, just -- she was very
20  forward in terms of requesting different things
21  for her personally.
22      MR. TIGAR:  Were you aware of expenses,

Page 1529

1  of any expenses that Mr. Klayman was paying on her
2  behalf?
3      THE WITNESS:  I don't think I'm aware
4  independently of any kind of -- I don't know
5  whether I ever was aware, but I don't recall any
6  specific things.  I just know he was, in my view,
7  he was going above and beyond, and I didn't
8  understand exactly why, because I felt like she
9  was a little bit, I don't know, not -- I just had
10  my sisterly like, what's happening here, you know?
11     MR. TIGAR:  Did you ever have the
12  feeling that Mr. Klayman, that your brother, was
13  in love with Ms. Sataki?
14     THE WITNESS:  Was in love with her?
15     No.  I think he liked her a lot.  Think
16  they were friends, but I don't think he was in
17  love with her.
18     I didn't get that sense, but I think he
19  cared about her a lot.  Maybe I'm wrong.  I mean,
20  I thought he cared about her a lot.
21     MR. KLAYMAN:  Thank you.  No further
22  questions.

Page 1530

1      Thank you, sister.
2      CHAIRMAN FITCH:  Well, a fairly long
3  trip for a short testimony.  I suppose it could
4  have been worse.  It could have been a long trip
5  for a long testimony.
6      We do appreciate witnesses helping us
7  out for these mattes, and I believe that you can
8  now be excused.
9      THE WITNESS:  Right, thank you very
10  much.
11     CHAIRMAN FITCH:  Thank you.
12     (Witness is excused.)
13     (Brief pause.)
14     CHAIRMAN FITCH:  We are back on the
15  record and, after off-the-record discussions, with
16  the hearing committee and counsel and parties, we
17  are going to stand in recess for about 15 minutes
18  'till about five minutes after 12:00, and then
19  resume and do our very best to complete redirect.
20     After that we will take a lunch break
21  and I'm assuming that the lunch break will be
22  adequate for any last minute preparation that

Page 1531

1  counsel wish to do before delivering their
2  respective, approximately half-hour closing
3  arguments.
4      So let me ask again if all of that
5  tentative approach is satisfactory to everybody.
6      Mr. Smith?  Is all of that satisfactory
7  to you?
8      MR. SMITH:  Satisfactory, yes.
9      CHAIRMAN FITCH:  I see nodding on the
10  other side of the podium.
11     We stand in recess for approximately 15
12  minutes.
13     (Recess taken.)
14     CHAIRMAN FITCH:  We can go back on the
15  record.
16     It appears to me, and I'm very much
17  appreciative, that Mr. Klayman and Mr. Sujat are
18  prepared to proceed with redirect examination.
19     You don't need your coat, don't have to
20  put it on.  It's up to you.
21     MR. SUJAT:  Alright.  Thank you, your
22  Honor.

Page 1532

1      CHAIRMAN FITCH:  Sure.
2  REDIRECT EXAMINATION BY RESPONDENT'S COUNSEL:
3      BY MR. SUJAT:
4      Q.  Mr. Klayman, reference was made in
5  Respondent's Supplemental Exhibit 7 to your
6  mother.
7      What is that all about?
8      A.  My mother had Alzheimer's, and my
9  stepdad had induced my grandmother, who was dying,
10  on her death bed, to give all of her money over to
11  him.  And I had to bring a case to get my
12  grandmother's money back, because she had no money
13  for her nursing home and for her subsidy.  She
14  saved a total of $80,000 her entire life.  She was
15  a dress salesman on Chestnut Street in
16  Philadelphia.  That's where I was born.
17     So it wasn't really a case against my
18  mother.  It was that she was next of kin.  I had
19  to do that to try to get my grandmother's money
20  back.
21     My grandmother subsequently died.  My
22  stepdad had also put a "do not resuscitate" order

31  (Pages 1529 to 1532)

Page 1533

1 on her chart.  There was no reason she had to die
2 without treatment.
3         And that's what it was about.  I was
4 standing in there for my grandmother.
5         So I wanted to explain that.
6     Q.  Thank you, Mr. Klayman.
7         Mr. Klayman, I refer you to Bar Exhibit
8 Number 38, SX38.
9     A.  Yes.
10        MS. LARKIN:  Regular exhibit or Bar?
11        CHAIRMAN FITCH:  This is SX38.
12        MR. SUJAT:  Yes, SX38.
13 BY MR. SUJAT:
14    Q.  Mr. Klayman, what did this mean to you
15 with respect to your interaction with Ms. Sataki?
16    A.  It's demonstrative --
17        CHAIRMAN FITCH:  Are we talking about
18 the Sataki email to Mr. Klayman?
19        THE WITNESS:  Yes.
20        CHAIRMAN FITCH:  At 5:28 p.m. on
21 9/11/11?  I assume we are.
22        THE WITNESS:  Yes.

Page 1534

1         CHAIRMAN FITCH:  Ok, go ahead.
2         THE WITNESS:  It's demonstrative how
3 she treated me, how she talked to me many times
4 during the time period that I represented her.
5         It also displays that her ability to
6 write English is poor.
7         And the underlining of the word
8 "Jewish," I'm not saying she's anti-Semitic.  I
9 never said that, and, you know, I joke about
10 things to o.  I'm very proud of being of Jewish
11 heritage and coming to Christ.  I'm both.  But I
12 thought it was unnecessary to highlight the Jewish
13 part of it, and it was kind of like sticking it to
14 me, in a way.
15        At the bottom it says, "I'm nobody.
16 I'm just a little girl that was retaliated and
17 harassment by some VOA employee, and you see that
18 you can help me"... This is how she took me in to
19 help her, you know, because that's an approach to
20 get sympathy, which was warranted, but certainly I
21 wouldn't say she was just a "little girl."  I
22 think she was quite sophisticated and knew what

Page 1535

1 she was doing, and frankly I think she used me in
2 retrospect.
3         So that's what it meant to me.
4         But most of this, I just wanted the
5 hearing committee to know that this is
6 demonstrative of the issue of what I testified to
7 about respect, about talking to someone in the
8 right way, about treating me like you would treat
9 your other friends and having a way of
10 appreciating what I was trying to do for her.
11        And for her even to say that I took a
12 bribe, that's the worst thing you can say to a
13 lawyer, and it just kind of cuts your entire
14 psyche out.
15        So that's why I'm very, actually,
16 grateful that Mr. Smith got that from Ms. Sataki,
17 because this tells it all.
18 BY MR. SUJAT:
19    Q.  Mr. Klayman, what was your ultimate
20 purpose in bringing the litigation for Ms. Sataki?
21    A.  It was always to get her back to work
22 in Los Angeles.  That was my goal.  I cared about

Page 1536

1 her.
2         Right from the start in communications
3 that are part of Exhibit 7, with Mr. Dash, I'm
4 saying that all we really want is settlement to
5 get her back to LA.  We don't want to have to sue
6 anybody.
7         We tried very hard.  We tried even with
8 a mutual friend who was on the board of governors.
9 We tried lobbying Capitol Hill, prominent
10 senators, congressman, including Mr. Boehner,
11 including Mr. McCain, including Mr. Coburn.
12        We tried to use publicity to coax them
13 into a settlement.  And we continued, of course,
14 to try to coax them into a settlement until the
15 very end, but it wasn't possible.
16        In the interim, it was felt and agreed
17 by her that we would bring litigation and that we
18 would bring a Bivens type of case.  And I didn't
19 name anyone in particular.  I just named the
20 entire board of directors who are responsible, and
21 I put on notice the board of governors what was
22 going on, that they should resolve it.

32 (Pages 1533 to 1536)

Page 1537

1     So there was no attempt to single out
2  Hillary Clinton or anybody else.  My friend
3  Blanquita Cullum was also named, and I did it for
4  Ms. Sataki and actually destroyed a friendship.
5     But I did things based on what I think
6  are the merits, and I felt at that time that she
7  deserved my full and uncompromised representation.
8     That's what we were trying to do, was
9  to coax a settlement out of them, to tell the
10  board of governors that they're personally at risk
11  unless they settle this.  That was the goal.  It
12  wasn't for money.  I didn't ask for money.  You
13  can go through the exhibits, I went through them
14  several times to point it out.
15     I said, "You can go off and have a good
16  life," even at the time that I said you need to
17  get another lawyer, you know, and recommended Ms.
18  Allred and recommended Mr. Shea, and she was
19  always free to get another lawyer.
20     So, the fact that she would write me an
21  email like this, when you care about somebody,
22  even if that's your friend, it kind of cuts your

Page 1538

1  heart out in a way.  Because you tried so hard for
2  somebody.  And that's the way I was being treated
3  throughout this case.
4     So that's what I wanted to say about
5  that.
6     MR. SUJAT:  Thank you, Mr. Klayman.  I
7  have no further questions.
8     CHAIRMAN FITCH:  We will now stand in
9  lunch recess.  We could do 45 minutes until 1:00,
10  or we could do an hour 'till 1:15.  You could
11  twist my arm for an hour and 15 minutes to 1:30.
12     MR. KLAYMAN:  We would like the latter,
13  your Honor, if that's agreeable.
14     CHAIRMAN FITCH:  And if 1:30 doesn't
15  present any problem for Mr. Smith, we'll see you
16  at 1:30.  We stand in recess --
17     You had a question.  I'm very sorry.
18     MR. TIGAR:  I wanted to add something
19  and the chair agrees.
20     I hate when I go and argue and then the
21  tribunal raises some point that they probably
22  should have asked me about as the aggregate, and

Page 1539

1  so on.
2     So, Mr. Smith, please be sure to
3  address what secrets and/or confidences the Bar
4  contends were disclosed that ought not to have
5  been.
6     MR. SMITH:  Alright.
7     MR. TIGAR:  Please get to the question
8  of whether this was a contingent fee case, under
9  the rules.  You heard the testimony.
10     And then, please define with some
11  clarity what personal interests you believe were
12  involved, because that's what you've alleged.
13     MR. SMITH:  Alright.
14     MR. TIGAR:  Mr. Sujat and Mr. Klayman,
15  I'd like to get clear at what point Mr. Klayman
16  felt that he was no longer serving as counsel for
17  Ms. Sataki.  I think we've had a lot of testimony,
18  one way or another.  It would be good to nail that
19  down.
20     And then, to the extent you can do so
21  briefly, could you characterize the different
22  offices that are Larry Klayman offices at

Page 1540

1  different points, just a list saying these were
2  all virtual offices or these were physical
3  offices, or whatever.
4     CHAIRMAN FITCH:  Now, wait a minute, on
5  that point, they can certainly, in their argument,
6  and/or in their briefs, say what they think the
7  evidence shows about that.
8     MR. TIGAR:  Yes.  Oh, yes, I'm not
9  suggesting --
10     CHAIRMAN FITCH:  We can request
11  additional evidence from Mr. Klayman on that right
12  now, if you think the record is unduly devoid.
13     MR. TIGAR:  No, I think --
14     CHAIRMAN FITCH:  Ok.  Go ahead.  Any
15  others?
16     MR. TIGAR:  I take the Chair's -- as a
17  matter of fact, I'll strike that entirely.  I
18  think the record is what the record is.
19     MR. KLAYMAN:  Ok.
20     CHAIRMAN FITCH:  Other points.
21     MR. TIGAR:  That's it.
22     CHAIRMAN FITCH:  Ok.  Alright, now we

33  (Pages 1537 to 1540)

Page 1541

1  stand --

2       MR. TIGAR:  Wait a minute.  I do want

3  to ask -- may I ask Mr. Klayman one more question.

4       Would you turn to Supplemental Exhibit

5  SX38.

6       CHAIRMAN FITCH:  Let's make it clear

7  that Mr. Klayman remains in his redirect

8  examination and Mr. Tigar is asking a question

9  about an exhibit which was covered in redirect.

10      CONTINUED REDIRECT EXAMINATION OF MR. KLAYMAN:

11      BY THE HEARING COMMITTEE MEMBERS:

12      MR. TIGAR:  Yes.  I see, Mr. Klayman

13  you write, "I believe you had a right of appeal

14  and could probably appeal the lower court's

15  decision.  The appeal will not be dismissed

16  finally until October 24, 2011."

17      What do you mean by that?

18      THE WITNESS:  I was trying to give her

19  a deadline to get the appeal in so she didn't lose

20  her rights.  I couldn't communicate with her then.

21      MR. TIGAR:  What appeal were you

22  talking about?

Page 1542

1       THE WITNESS:  The appeal of Judge

2  Kotelly's dismissal of her case.

3       MR. TIGAR:  Why did you choose the date

4  the October 24th?

5       THE WITNESS:  I don't remember the

6  calculation, but I obviously did a calculation and

7  thought was the date to respond.

8       MR. TIGAR:  Thank you.

9       THE WITNESS:  Thank you.

10      CHAIRMAN FITCH:  Wait, wait, wait, Mr.

11  Klayman.  Mr. Tigar's got me confused.

12      There is an email that's dated

13  September 15, '11.  I would have thought this time

14  for appeal advice was about the civil rights

15  offices.

16      THE WITNESS:  You may be right about

17  that.  You may be right.  I don't have that in

18  front of me right now anyway.  I guess I was

19  trying to communicate that.  You're probably

20  right.  And -- no, I wasn't talking about an

21  appeal of the civil rights case.

22      MR. TIGAR:  Ok.

Page 1543

1       THE WITNESS:  Because it was

2  intending -- we were going to do a Title VII

3  administratively.  I would not go back.

4       Based on my experience it's likely you

5  will get a better result in court, where you have

6  discovery and everything, in a much greater

7  extent.  By I'm not sure exactly of the appeal at

8  this point, what it is, but I'm basically telling

9  her to appeal generally, ok.

10      And it could be that -- and I'm just

11  speculating -- that there was an aspect of Judge

12  Kotelly's earlier decision-making that could have

13  been appealed in an interlocutory way, but also

14  her ultimate decision in December could have --

15  when she denied my motion for reconsideration of

16  her denial of sending Ms. Sataki back to LA, that

17  could have been appealed, too.

18      But in any event, I couldn't contact

19  her, and so I -- on my own, at my expense, filed a

20  notice of appeal to protect her.

21      If you might have noticed, she filed a

22  notice of appeal, so, someone filed it.  And Judge

Page 1544

1  Kotelly put it in the file.  And Mr. Tigar noted

2  that that was probably very timely, because of the

3  fact that you have 60 days in a government case.

4       But it also shows that what she was

5  saying to -- what she purports to be saying -- and

6  who knows who is saying it, because it wasn't in

7  her writing or syntax -- to drop everything was

8  not the case.  She was getting bad advice.

9       And it also shows you what she said to

10  Kathleen Staunton wasn't true, that "I never

11  wanted to file suit."

12      So this all bears on credibility and my

13  confusion about what to do.

14      CHAIRMAN FITCH:  But the notice of

15  appeal in Sataki vs. BBG, the notice of appeal was

16  filed on January 19th, 2011.

17      THE WITNESS:  Right, that's what I'm

18  saying.  I'm saying it may have been with regard

19  to an earlier order.

20      CHAIRMAN FITCH:  No, this is nine

21  months later.  This is September 11th, 2000- --

22  maybe I have the wrong email.  What email --

34 (Pages 1541 to 1544)

Page 1545

1    You were asking about 38, weren't you?

2    MR. TIGAR:  Yes, SX38.

3    Judge Kotelly denied the

4  reconsideration motion on October 30th, 2010.

5    CHAIRMAN FITCH:  What?

6    MR. TIGAR:  2010, July 30.

7    CHAIRMAN FITCH:  So this is a year

8  later?

9    MR. TIGAR:  The notice of appeal was

10  filed January, 2011.

11    CHAIRMAN FITCH:  Yes.

12    MR. TIGAR:  I'm wondering what the 180

13  days were.  We can look at the record.  We don't

14  need to take the evidence, but the adverse OCR

15  decision was dated March 23rd, 2011.  October 24th

16  is seven months from that date, not six.

17    So 180 days --

18    THE WITNESS:  I may have miscalculated

19  that.  It's possible.  I don't remember.

20    MR. TIGAR:  Anyway the --

21    THE WITNESS:  Yeah, but that's a good

22  point, to appeal the OCR, 180 days.  So I may have

Page 1546

1  miscalculated.  But in any event I was constantly

2  trying to contact her, communicating with her

3  asking what to do.

4    CHAIRMAN FITCH:  Anything further on

5  that, Mr. Sujat?

6    MR. SUJAT:  No, your Honor.

7    CHAIRMAN FITCH:  We stand in recess

8  until 1:30.

9    MR. KLAYMAN:  Thank you, your Honors.

10    (Whereupon at 12:21 p.m. a luncheon

11  recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

Page 1547

1    A F T E R N O O N   S E S S I O N

2    (Whereupon at 1:34 p.m. the hearing

3  resumed.)

4    CHAIRMAN FITCH:  We are reconvening.

5  All requisite persons are present.  I think there

6  are no preliminary matters.

7    We'll receive closing argument from

8  Disciplinary Counsel.

9    CLOSING ARGUMENT BY DISCIPLINARY COUNSEL:

10    BY MR. SMITH:

11    MR. SMITH:  Good afternoon.

12    In late 2009, early 2010, Elham Sataki

13  formed an attorney/client relationship with

14  Respondent, Mr. Klayman.  At the time they met,

15  she had been victimized at work, a victim of

16  sexual harassment.  She was vulnerable.  She was

17  fragile, and she needed and wanted to have her

18  name vindicated and to have her job situation

19  cleared up.

20    Mr. Klayman and she agreed that he

21  would represent her on a contingency fee basis for

22  40 percent of the recovery.  He did not provide

Page 1548

1  her with a writing setting forth the basis of the

2  rate of the fee.

3    Ms. Sataki told Mr. Klayman that,

4  because of her culture, she wanted the case to be

5  handled discreetly.  She did not want a lot of

6  people to know about it, because of the nature of

7  the allegations, the sexual assault allegations.

8  So she told him that.

9    Nonetheless, with Mr. Klayman, that's

10  not the way he practices law.  He doesn't practice

11  law in a quiet way.  I doesn't practice law in a

12  small way.  Ultimately part of the strategy in

13  advancing her claim meant that it was to going to

14  be tried Larry Klayman's way, and that was

15  politically, naming big names, naming big fish, in

16  this case, Hillary Clinton, it means rubbing

17  elbows with congressmen and senators, it means

18  getting his name in the newspaper.  He's going to

19  try this case Larry Klayman's way.

20    Ms. Sataki, relying on her counsel,

21  went along with it, for sure.  But not because she

22  wanted to, and not because that was the way she

35 (Pages 1545 to 1548)

Page 1549

1  wanted to proceed.
2          In or about late February/March, Mr.
3  Klayman became smitten, if not before, with Ms.
4  Sataki.  You heard testimony that she was even
5  more attractive than she presented at the hearing
6  the other day.  And Mr. Klayman could not control
7  himself.
8          Mr. Klayman, as the emails and the
9  testimony demonstrates, from March through about
10 the end of May, sent her a series of emails
11 expressing his deep emotional attachment to her.
12 He called it love.  He even complained and sought
13 the intervention of the very psychologist that he
14 had referred Ms. Sataki to see in connection with
15 the trauma that she had experienced as a result of
16 the sexual harassment at her job.
17         So it's kind of ironic.  Ms. Sataki is
18 hiring Mr. Klayman to represent her in a sexual
19 harassment claim, and then becomes objectified by
20 Mr. Klayman, for a sustained period, day after
21 day, email after email, text message after text
22 message, conversation after conversation.

Page 1550

1          And when the love was not being
2  returned, when the love was unrequited, it started
3  turning ugly.  You started having incidents with
4  him bickering with her.  And you can see the
5  darkness of the emails how, as time moves on, he
6  becomes more accusatory, he becomes more bitter.
7  There's no more talk of love.
8          You can see from Ms. Sataki's
9  testimony, he got angry with her and started
10 arguing with her at some movie event, such that
11 she felt in fear and had to jump from his car.  He
12 chased her into the bathroom of the Hotel Luxe in
13 California.  And he joked about it, calling the
14 bathroom there his second office, or something to
15 that degree.
16         In any event, as it was clear that the
17 love was not going to be returned, the fee issue
18 became a little harsher.  Ms. Sataki reminded him
19 that he was entitled to a 40-percent recovery, and
20 he responded, "Well, now I think I'm going to get
21 50 percent."  And all of that's in his own
22 writing, in his own emails.

Page 1551

1          The conversations grew darker yet, and
2  it got to the point where Ms. Sataki was obviously
3  uncomfortable being around Mr. Klayman in his
4  presence, so much so that Ms. Kathleen Staunton, a
5  secretary at one of the congressman's offices that
6  he went to visit in connection with her case,
7  trying to push her case along, decided that she
8  needed to pull her to the side.  "What's going on?
9  Are you ok?  What's happening?"  And Ms. Sataki
10 told them about the harassment that she was
11 getting from her own attorney.
12         Sure, Ms. Staunton became her friend.
13 Ms. Staunton became her only ally at that point.
14 And Ms. Staunton encouraged her to file a Bar
15 complaint.  Ms. Staunton apparently encouraged her
16 to let go of this abusive relationship with Larry
17 Klayman.
18         So in July, July 30th, she sent an
19 email to him saying "It's over.  Dismiss all the
20 cases you have."  She sent a letter on August 4th
21 to the VOA director, Danforth Austin, "Look, I've
22 instructed Larry Klayman to withdraw all claims

Page 1552

1  against VOA."  Alright?
2          Now, there were questions, "Well, why
3  didn't she hire another lawyer?  Why didn't she
4  find new counsel?"  Well, I mean, not only was she
5  psychologically damaged and deteriorated even more
6  under this pressure that she was receiving from
7  Mr. Klayman for a sustained period of March
8  through July, 2010, when she was already in a
9  fragile state, but, you know, it's hard to find
10 somebody to take on your case at that stage of the
11 game, especially if it's at the stage of the game
12 that the litigation was pretty much lost, because
13 the court had already decided that, you know,
14 there was not a basis in law or fact to issue an
15 injunctive relief in connection with the request
16 to send Ms. Sataki to LA.
17         So, at that point, there really was no
18 case to even be had at that point.
19         So, after July and August, when you
20 would think that the emails would stop, when you
21 would think that the harassment would stop, Mr.
22 Klayman continued to send the emails to Ms.

36 (Pages 1549 to 1552)

Page 1553

1  Sataki. And those are all laid out in the

2  supplemental exhibits.

3       By December of that year, Ms. Sataki

4  had had enough. She files a complaint and says,

5  "Look, please, I fired this lawyer and yet he

6  still sends me emails. He still sends me texts.

7  He's still using my case to promote his media

8  productions.

9       "Please tell him to stop. Please ask

10  him to leave me alone." That's what she asked Bar

11  Counsel to do for her.

12       Now, is this conduct actionable? Is

13  treating a woman the way Mr. Klayman treated Ms.

14  Sataki actionable? Under "Rule 1.74, Conflict of

15  Interest: A lawyer should not engage in a conflict

16  of interest where his professional judgment is

17  adversely affected by his personal interest."

18       In this case you can see that

19  Respondent's personal interest in Ms. Sataki, his

20  desire for a loving relationship, which began in

21  the earlier part of 2010 and ground its way

22  through June, wore his client down. Ms. Sataki

Page 1554

1  was an emotional wreck. She did not want to carry

2  forward with her case. All she wanted him to do

3  was handle her case. He wouldn't do that without

4  becoming "a much better friend," of inserting

5  himself into her life, into her community, with

6  her friends, with her family. She didn't want any

7  of that. She just wanted him to concentrate on

8  the case.

9       But it got to the point, where, "Hey, I

10  can't deal with this anymore. I don't want you as

11  my lawyer anymore. Withdraw everything. I just

12  can't deal with it. I can't deal with you," and

13  so she essentially shut down.

14       She couldn't even respond to, not just

15  Mr. Klayman's continued emails -- I mean, what was

16  it that she was going to get out of that? You saw

17  how he had been treating her before that, and then

18  you saw the emails that he sent her afterwards,

19  where she just was emotionally able to open up

20  just this year, right before the hearing.

21       She didn't want to deal with him. She

22  shut down. She became whatever her emotional

Page 1555

1  issues were at that time. She just couldn't cope

2  with this situation anymore. And a lot of that

3  has to do with the way that Mr. Klayman just

4  ground her down, as her lawyer, the guy who is

5  supposed to be representing her, the guy who is

6  supposed to be her champion, the guy who is

7  supposed to be her night in shining armor with

8  respect to the sexual harassment claim, he becomes

9  an inside harasser.

10       And I talked at the beginning about how

11  Ms. Sataki wanted this case handled quietly and

12  discreetly because of her cultural issues. She

13  testified about that. But of course this case was

14  going to be handled the Larry Klayman way.

15       Mr. Klayman has testified himself about

16  how he litigates matters. Everything's big.

17  Everything's grand. Everything is a federal case.

18  And in this case, what could have been a very

19  simple civil rights administrative proceeding, it

20  might not have moved along a fast track, but it

21  was going to be a case that could have moved along

22  that track, ultimately Mr. Klayman decided that it

Page 1556

1  would be a good idea for Ms. Sataki to move to LA.

2  He thought it would be a good idea to file a

3  lawsuit naming the board of governors, including

4  his archnemesis, Hillary Rodham Clinton, who, he's

5  testified during his direct case, he sued scores

6  of times, and is his nemesis. He couldn't resist.

7  And so he made a mountain out of a molehill.

8       Ms. Sataki, when she was asked about

9  what kind of conversation she had with Mr. Klayman

10  about his strategy, she didn't really. He told

11  her, "This is what is best." That's not really

12  what we consider to be a satisfactory explanation.

13  The record will bear out exactly what she said

14  with respect to that. But there wasn't much.

15       "Rule 1.2: A lawyer must abide by a

16  client's decisions with respect to the objectives

17  of the representation."

18       Certainly a client can't consent to a

19  lawyer's strategy, and a lawyer is entitled to his

20  strategy. But a client's desires -- and in this

21  case desire to keep a matter discreet, to keep a

22  matter relatively low key -- that is something

37 (Pages 1553 to 1556)

Page 1557

1    that the lawyer should respect.  That's not the
2    way Mr. Klayman practices law.
3          In this case we feel that was a
4    violation of Rule 1.2(a).
5          Again, on July 30th, Mr. Klayman was
6    fired.  He was told to withdraw all the cases, and
7    if he didn't get the message then, he certainly
8    got it when on August 4th Ms. Sataki sent the
9    letter to Mr. Danforth Austin, which he said he
10   also saw, and which of course you saw the email
11   where he's commenting on -- criticizing her for
12   the wisdom of withdrawing all of her cases, and
13   what that would mean for him and what that would
14   mean for his reputation at the VOA, et cetera.
15         But despite this, despite this, he
16   continued to push on with an aspect of the case
17   that he felt he wanted to handle.  "I'll dismiss
18   this stuff," he said, "but you know I'm going to
19   keep one part of this case alive, because, you
20   know," essentially that was the one that he was
21   going to pursue involving the judge, because he
22   wanted to show that the judge was corrupt, that

Page 1558

1    the judge somehow -- that because the judge ruled
2    against him, that the judge must somehow be
3    corrupt, must somehow be a tool of the Clinton
4    administration, and that he is somehow the victim,
5    always the victim, always the one who's being
6    put-upon.
7          The WorldNetDaily: Ms. Sataki was not
8    at all happy about these articles in the
9    WorldNetDaily.  Whatever the discussion was they
10   had about publicity, whatever discussion there
11   was, nobody -- not Ms. Sataki, not Mr. Klayman,
12   not any of his witnesses -- said that him writing
13   his own articles for the WorldNetDaily was going
14   to be a part of the publicity scheme.
15         Perhaps, if there had been some
16   discussion about "Well, we'll get some interviews
17   on the Washington Post, we'll try to get on
18   Nightline," things like that, these are the kinds
19   of things that one might expect if you're talking
20   about publicity, effective publicity, to be
21   something that a lawyer who's trying to put sone
22   pressure on government to do.

Page 1559

1          But, no, instead what you have is you
2    have these articles that seem to come out almost
3    on a weekly basis in the WorldNetDaily.  And just
4    about every last one of them is hawking a book, a
5    book written by Mr. Klayman.
6          Now, the question of whether or not
7    this violates a rule, you know, assuming that this
8    was already a matter of public record, was this
9    really a confidence or secret that could be
10   violated?  Well, absolutely.  Rule 1.6 in the
11   District of Columbia, unlike other jurisdictions,
12   requires that confidences and secrets be given the
13   ultimate respect by a lawyer.  And "secret" is
14   defined as "information gained in the professional
15   relationship that the client has requested be held
16   inviolate, or disclosure of which would be
17   embarrassing or would be likely to be detrimental
18   to the client."
19         So it's not just confidences in the
20   District of Columbia.  It's also secrets.
21         In this case, Ms. Sataki again had
22   expressed to Mr. Klayman, "Hey, look.  I don't

Page 1560

1    want a lot of publicity in this case."  And let's
2    say for the sake of argument, let's say for the
3    sake of argument that there had been informed
4    consent, that there had been Ms. Sataki signing
5    some form of a waiver saying, "Sure, go ahead and
6    publicize my case," after July, 2010, when Mr.
7    Klayman no longer represented Ms. Sataki in these
8    matters, his continued pinning of articles and
9    having them published in periodical, which has an
10   online circulation of over five million, was
11   totally inappropriate.
12         What kind of secrets were in these
13   articles?  Well, if you look at the articles, some
14   of them, they talked about, not just Ms. Sataki's
15   case, but the fact that she was experiencing
16   severe depression and that she had been sexually
17   harassed; the very kinds of things that people
18   might not want out there for the world to read and
19   see.
20         And you saw from Mr. Dash, you see how
21   people talk.  Mr. Dash was dealing in nothing but
22   rumors.  He has no personal knowledge of any of

38  (Pages 1557 to 1560)

Page 1561

1   the things that he was talking about on the
2   witness stand the other day, and I don't know why
3   they brought him up here, other than to try to
4   smear Ms. Sataki's reputation.  But people do
5   talk.  People do talk.  And this is the kind of
6   thing that Ms. Sataki does not want people talking
7   about.  And yet Mr. Klayman felt that he had every
8   right to do so, even after he had been terminated
9   as her lawyer.
10          Finally we get to dishonesty.
11          CHAIRMAN FITCH:  I missed the word.
12  Get to what?
13          MR. SMITH:  Dishonesty.  Finally we get
14  to the dishonesty, or the violation of dishonesty,
15  Rule 8.4(c).
16          The District of Columbia Court of
17  Appeals has held on a number of occasions that
18  members of the Bar are to be scrupulously honest,
19  that is more honest than a layperson.
20          Mr. Klayman in one of his WorldNetDaily
21  articles accused the judge of issuing an order
22  that had no basis in fact or law.  And we're all

Page 1562

1   lawyers here.  So I didn't put on testimony for my
2   expert or cross examine Mr. Klayman about whether
3   or not there was a factual or legal basis for the
4   judge decision not to grant injunctive relief in
5   Ms. Sataki's case.
6           You have the order, the memorandum
7   order of opinion, both the June memorandum of
8   opinion order and the July memorandum of opinion
9   order.  And in both the court goes through
10  excruciating detail in setting forth the findings
11  of fact in the case.  In fact, she even accepts as
12  true many of the facts advanced by Mr. Klayman in
13  support of the relief that he was seeking.  And
14  she also has an extraordinarily detailed legal
15  analysis of why the relief was not going to be
16  made available: essentially that we will not
17  create the agency creating the position for this
18  particular plaintiff at this time, especially not
19  when you're talking about injunctive relief,
20  preliminary injunctive relief.  The court just
21  wasn't going to do that and it explained why.
22          It wasn't a false or dishonest opinion

Page 1563

1   by the judge.  It was, unlike Mr. Klayman's false
2   articles, based in both fact and law.
3           And that's Disciplinary Counsel's case.
4           You've heard the evidence.  You've had
5   an opportunity to weigh the credibility of the
6   witnesses.  You've seen witnesses who either don't
7   know what they're talking about or don't know all
8   of what it is they're talking about.  You've seen
9   witnesses who have had genuine emotion.  You've
10  had other witnesses who don't.
11          I ask you to find the facts as I have
12  described them and that have been presented to you
13  today, and that you find that Mr. Klayman violated
14  all of the rules set forth in Disciplinary
15  Counsel's Specification of Charges.
16          CHAIRMAN FITCH:  Stay there for just a
17  minute, Mr. Smith, please.
18          Off the top of your head, in addition
19  to your theory that one of the secrets improperly
20  revealed was, you charge, that she had experienced
21  severe depression.
22          Off the top of your head, are there any

Page 1564

1   other instances of secrets being revealed?
2           Let me point out to both parties, I
3   know that as you're doing your briefing and
4   parsing the record, additional facts, one side or
5   the other, may tend to support something.  As long
6   as, you know, some notice is given, all that's
7   fair game.
8           So I'm not going to hold you just to
9   the one example, but are there any other examples
10  of that?
11          MR. SMITH:  Well, the fact of the case
12  itself, any mention of Ms. Sataki, either in
13  connection with her political views, in connection
14  with her beauty, in connection with the fact that
15  she was, you know, having problems on the job, all
16  of this, this was nobody's business.  This was
17  nobody's business.
18          Again, even if you find that there had
19  been some limited or some type of a -- well, this
20  is all in the public view now.  The rules in DC
21  are a little bit different, especially with
22  respect to secrets.  And certainly after July,

39 (Pages 1561 to 1564)

Page 1565

1  certainly after July there was to reason at all
2  for Mr. Klayman to be writing the articles at that
3  ended up in the WorldNetDaily, you know, on a
4  regular basis, as it were.
5  　　MR. TIGAR:  Mr. Smith, is there any
6  assertion in any of the WorldNetDaily articles
7  about Ms. Sataki that is not also included in the
8  civil complaint that was filed in court and/or the
9  filings in the VOA OCR proceeding?
10  　　MR. SMITH:  Off the top of my head, I
11  can't answer that question.  I know certainly much
12  of it was, much of it was the same stuff, the same
13  subject matter.
14  　　MR. TIGAR:  And second, you cite here,
15  1.6(a)(12) --
16  　　CHAIRMAN FITCH:  Well, you would argue
17  that the severe depression was possibly post
18  lawsuit filing and therefore had not been put into
19  the law.
20  　　We may have to deal with --
21  　　MR. SMITH:  I have to look at the
22  record to see that.

Page 1566

1  　　CHAIRMAN FITCH:  That's an honest
2  answer.  That's fair.
3  　　MR. SMITH:  But I don't think it
4  matters.
5  　　CHAIRMAN FITCH:  I was going to say, I
6  understand that, because you're emphasizing
7  "secret," that the court of appeals has made it
8  clear that it doesn't mean totally exclusive
9  secret in that --
10  　　MR. SMITH:  Well, we'll brief that.
11  　　CHAIRMAN FITCH:  -- I guess the waiver
12  rules that apply to "confidences" may not apply to
13  "secret".
14  　　But we'll have to sort that through.
15  　　MR. SMITH:  We'll sort that out in the
16  brief.
17  　　CHAIRMAN FITCH:  Because it is crossing
18  my mind and I just want to let the other side know
19  that.
20  　　MR. SMITH:  Alright.
21  　　MR. TIGAR:  In addition to that,
22  1.6(a)(1) being applied to newspaper articles may

Page 1567

1  raise questions of fair notice, as in the Gentile
2  case.
3  　　MR. SMITH:  Well, I am sure that during
4  the briefing process we will keep that in mind.
5  　　CHAIRMAN FITCH:  When you say newspaper
6  articles, did you mean the WorldNetDaily --
7  　　MR. TIGAR:  The WorldNetDaily.  The
8  WorldNetDaily media I should have said.
9  　　CHAIRMAN FITCH:  Ok.
10  　　With respect to your 8.4(c) theory, I
11  take it your theory is that -- and you may have
12  said exactly this -- that, if the record shows --
13  I guess it probably does.  I'm really not sure.  I
14  don't have all that in memory...
15  　　But if the record shows that Judge
16  Kotelly did legal analysis and factual analysis,
17  and if Mr. Klayman said that there's no legal
18  factual basis, that that's your dishonesty theory?
19  　　MR. SMITH:  As the Court of Appeals
20  again holds us to a higher standard, as we're
21  officers of the court, as we are required to help
22  and assist in the proper administration of justice

Page 1568

1  for the respect of the courts and the system, the
2  legal system, yes.  That to make that wild and
3  totally irresponsible an allegation was dishonest,
4  yes.
5  　　CHAIRMAN FITCH:  I think I have no
6  further questions for you, Mr. Smith.
7  　　MR. SMITH:  Thank you.
8  　　CHAIRMAN FITCH:  Ok.  Thank you --
9  　　Let Mr. Smith go back up there, please,
10  Mr. Klayman.
11  　　The way you've organized your
12  complaint, Mr. Smith, you've got a count two
13  regarding the Falahati case, and that's the one
14  that started in superior court and got removed.
15  And you've got a count three that is organized
16  around the BBG case, which is what, the board of
17  governors, or something along those lines.  And in
18  both of those you've got a 1.2(a) charge and a
19  1.4(b) charge.
20  　　Is there any evidence, in support of
21  your charges and your theory, that applies to one
22  of those cases but not to the other cases, or is

40 (Pages 1565 to 1568)

In Re:  Larry Klayman
June 27, 2018

Page 1569

1 it just as these two cases were going along you

2 charged that Mr. Klayman --

3     MR. SMITH:  The latter, that as they

4 were going along.

5     CHAIRMAN FITCH:  Ok.  I'm trying to

6 think that, you know, if, if we were to agree that

7 there is one of those violations, we would then

8 have to get to sanction analysis, and one of the

9 sanction factors is number of violations.

10     I'm curious as to whether, since there

11 are two cases, there would be two violations, or

12 whether there would just be one violation that

13 occurred with the same thing in two cases.

14     You'll need to address that if we get

15 that far.

16     MR. SMITH:  We'll address that in our

17 brief.

18     CHAIRMAN FITCH:  Thank you.

19     CLOSING ARGUMENT ON BEHALF OF RESPONDENT:

20     BY MR. KLAYMAN:

21     MR. KLAYMAN:  May it please your

22 Honors.  I want to thank you for your courtesy and

Page 1570

1 the way you've conducted this proceeding.

2     I want to thank Mr. Fitch, Ms. Larkin,

3 and Mr. Tigar.

4     As your Honors know very well, Bar

5 Disciplinary Counsel, notwithstanding that I would

6 prevail in my view under any analysis, has to

7 prove by a clear and convincing evidence that a

8 violation was committed.  That's very close to

9 beyond a reasonable doubt.  It's a very high Bar

10 to jump over.

11     Coupled with that, we are now eight

12 years into this proceeding, and during those eight

13 years, they didn't see fit, at least for six of

14 them, to come forward with any complaint.  If this

15 was so egregious, one, as a matter of common

16 sense, would have thought they would have moved

17 more quickly than that.

18     Thirdly -- these will equitable, and

19 I'm going to get to the Specification of Charges,

20 because that doesn't hold up.

21     Thirdly, Ms. Sataki, after she files

22 that initial complaint -- assuming she did,

Page 1571

1 because we couldn't identify whose handwriting it

2 was -- was sent a letter that said, "When we get a

3 response from Mr. Klayman we're going to send it

4 to you, and if you don't respond" -- I'm just

5 paraphrasing in effect -- "we'll assume you're

6 abandoning your complaint."

7     She never responded.

8     And in fact it was Bar Counsel in 2014

9 that was asking, "Where is she?  We haven't heard

10 from her in four years."  And there's no evidence

11 that they even heard from her then when they tried

12 to get in touch with her.

13     The first time I find out about this

14 case is in 2016, and I thought it had been

15 dismissed, because -- and this is crucial -- both

16 the Florida Bar and the Pennsylvania Bar dismissed

17 it.  No evidence was presented otherwise by Office

18 of Disciplinary Counsel.  And I submitted my

19 disciplinary records in both jurisdictions,

20 because in fact if they had proceeded and found

21 any discipline, it would have shown up.  Their

22 files had been destroyed by that point, because

Page 1572

1 even they were not keeping files at that point.

2     That points out the prejudice and

3 inequity of this entire proceeding, because I

4 didn't keep my files either, for the most part.  I

5 had to recreate them.  And at the last minute, Mr.

6 Smith comes in -- I don't mean it in a personal

7 way -- but he comes in with all these

8 communications on the day of trial.

9     So you have to ask yourself the

10 question, notwithstanding the clear and convincing

11 standard, whether, as a matter, not just of law,

12 but equity, this matter does not warrant a finding

13 against me.  It doesn't.

14     As a prefatory matter, we hear that

15 basically what's at issue here, and I have said

16 this in pleadings, is that Bar Counsel doesn't

17 like the way I practice law.

18     Well, I'm sure Mr. Tigar practices law

19 in a particular way.  You do, Mr. Fitch.  Ms.

20 Larkin, you're not a lawyer, fortunately for you.

21 But that's not for Bar Counsel to decide.  What is

22 to be decided is whether you violated an ethical

41 (Pages 1569 to 1572)

App.0636

Page 1573

1  rule.  It's not to be a vendetta that you don't
2  like the fact that I've sued Mrs. Clinton in the
3  past, or sued Mr. Clinton or sued George W. Bush
4  or sued Dick Cheney.  I've been an equal
5  opportunity public advocate.  I have a philosophy
6  that differs from a lot of people in the Bar
7  Counsel's office, but that's not a reason to try
8  to remove me from the practice of law, and that's
9  what they're trying to do here.  You see, they
10  don't like the way I practice law, and they have
11  said that to me.  I have proof of that.  And they
12  said it again.
13        But let's get to the counts that were
14  pled.  Because Mr. Smith went far beyond what he
15  pled in his Specification of Charges.  I read them
16  again this morning.
17        Number one, there is no allegation of
18  sexual harassment, never has been.  Nothing
19  appears in any documents to that effect.
20        I'm being accused of wanting to pursue
21  a romantic relationship.  Well, I presented five
22  witnesses; five.  He presented only Ms. Sataki.

Page 1574

1  I mean, he presented an expert, and that expert in
2  my view was discredited in a matter of 30 seconds,
3  and he presented a so-called investigator who
4  simply said there were articles on WorldNetDaily
5  on the website.  Well, once you put something on
6  the internet -- I got him to admit to that -- you
7  can never get it off.
8        And we live in the real world, and we
9  know that publicity does influence tribunals.  It
10  influences government agencies.  It influences the
11  way we live today.  We know that.  We watch TV,
12  cable, 24/7.  It can have a big impact on the way
13  people perceive things.  So that argument doesn't
14  hold any weight.
15        What's clear here is that -- several
16  witnesses testified here -- Mr. Shamble, Mr. Dash,
17  Mrs. Klayman, and myself, four witnesses -- that
18  she approved of the publicity.  In fact she even
19  admitted it during the testimony in
20  cross-examination, at Page 775 of the transcript.
21  I urge your Honors to read that.  She admitted it.
22  She approved it.

Page 1575

1        Remember, she's in that business.
2  She's in the business of trying to influence
3  thought and action.  That was her job as a
4  broadcaster at Voice of America.
5        So this allegation that somehow --
6        CHAIRMAN FITCH:  Can I have the
7  transcript cite again.
8        MR. KLAYMAN:  Page 775.
9        This is an example -- those are two
10  examples so far of how the Specification of
11  Charges doesn't match up with Mr. Smith just
12  argued.  He didn't apply the facts and he didn't
13  apply the charges.  He went way beyond that and
14  had -- in desperation I believe, no disrespect
15  intended -- is trying to manufacturer claims that
16  he never actually made and that don't hold up with
17  the great weight of the evidence, with four
18  witnesses, and none on his side, and including Ms.
19  Sataki, who admits that she agreed to publicity.
20        Case closed.
21        Now let's talk about what was
22  published.  Mr. Tigar raised a good point.

Page 1576

1  Nothing was published that wasn't already public
2  in pleadings.  She wasn't ashamed of this.  She
3  used this to try to make her point.
4        In fact, she disclosed to Keya Dash
5  exactly what had happened.  She asked for his
6  help.  She went to Blanquita Cullum.  She
7  disclosed it to Mrs. Klayman, my sister, and her
8  boyfriend, not even related to me, and she
9  disclosed it to others.
10        So, this is not something that was
11  confidential or secret.
12        Now let's talk about count one, which
13  is the contingent fee.  It's all over the record
14  that I never intending to charge anything.  I was
15  doing it pro bono.  And that I didn't intend to
16  charge her expenses.
17        If some day they were recuperated, ok.
18  I made it clear, "You never owed me anything.  You
19  never owed me anything."
20        It wasn't contingent, because what we
21  were trying to do was get her back to work in Los
22  Angeles.  That was the objective.  Because she had

42  (Pages 1573 to 1576)

Page 1577

1    had a nervous reaction when she was denied to be
2    able to be transferred, and when they threatened
3    her that, unless she came back to Washington, D.C.
4    and worked in the presence of Mr. Falahati, that
5    she would be fired.  She'd be AWOL'd.
6         She obviously admitted that she wanted
7    to be in Los Angeles.  That's all over the record.
8         But then of course we find out from Ms.
9    Staunton, I find out that she told her something
10   else.  Mrs. Sataki is simply not truthful, to put
11   it diplomatically.  She says whatever she has to
12   say at any point in time to get people to do what
13   she wants them to do.
14        And the issue of the contingent fee, as
15   we testified in great detail -- I testified in
16   great detail this morning -- I was actually
17   thankful for Mr. Smith getting into that again --
18   it really didn't arise until the very end as to
19   whether or not I would continue.  But at that
20   point I didn't view it as a possibility.
21        We never entered into an agreement
22   because I was pro bono up to that point in time.

Page 1578

1    She said "I'll pay you 40 percent." I said, "Don't
2    worry.  Don't pay me anything.  I don't want to be
3    paid.  We're trying to get you back to LA," and
4    that's all she really wanted.
5         But, as I think Mr. Tigar alluded to,
6    is that you bring Bivens cases on Constitutional
7    violations, and you have to put damages in there.
8    And I did that.  I'm not attributing that to
9    anybody else's perception.  But I did that because
10   I thought this would be, quote, "persuasive" of
11   getting Voice of America to put her back to work.
12        We heard testimony from Mr. Shamble.
13   Weigh his credibility.  He's a very credible
14   individual:  Union representative, president of the
15   union.  He said, "This is the worst agency in
16   government.  I'm still being treated badly on
17   behalf of the employees that I represent, and you
18   basically have to take them to the mat to get them
19   to do anything, and they still sometimes don't do
20   it."
21        So, when documents are coming through,
22   and I'm going to get to this, because this was

Page 1579

1    raised by Mr. Smith, and when you get an email,
2    which obviously isn't written by Ms. Sataki --
3    that's Respondent's Exhibit 27 of July 30th --
4    that's not the way she writes.  She can't write
5    English like that, and then you can't contact the
6    person to talk to them, you obviously can't deep
7    six all the cases.  That would be unethical.  You
8    have to protect her interest until you really find
9    out what's going on.
10        And that's why -- and this was a
11   question that Mr. Tigar asked -- that when did I
12   consider the representation to end?  Well, it
13   ended after I had Mr. Shamble -- for myself and
14   also for him, because he was representing her.  We
15   were partners in trying to get her relief.  Every
16   step of the way she could have called him and
17   instructed him.  She didn't do that either.  So he
18   was in the dark.  I was in the dark.
19        So on January 27th he wrote this email
20   saying, "Mr. Klayman's been trying to contact you.
21   I'm trying to contact you.  We need to find out
22   where you want to go with this, because we don't

Page 1580

1    want you to lose your rights, and you still have
2    rights.  You didn't lose.  You only lost round
3    one."
4         It's like a football game.  You know,
5    let's say the Philadelphia Eagles score first.  It
6    doesn't mean that the Boston Patriots or -- pick a
7    team -- New England Patriots can't score later and
8    win.
9         So we didn't lose this case.  And
10   that's what I was concerned about, because I
11   wasn't getting communication and what was out
12   there obviously didn't come from her, and it was
13   contradictory.  So therefore, you know, I sought
14   to find out what was going on.
15        So when did the representation end?
16   Quite a while after January 27th, 2011.  I was
17   still hoping to hear from her.  But at some point
18   I never heard from her.  So it's not certain when
19   she actually surfaced.  And in fact she didn't
20   surface until Exhibit 38, vilifying me, accusing
21   me of taking bribes.  And that was in 2011, well
22   into 2011.

43 (Pages 1577 to 1580)

Page 1581

1    So, the representation, in effect,
2  never ended.  I never got actual notice.
3        And I was continuing to try to help her
4  and to get a result, and that gets into the issue
5  of, again, how I practice law.
6        CHAIRMAN FITCH:  If you have it off the
7  top of your head, just for my convenience, what's
8  the exhibit number for the January 27th --
9        MR. KLAYMAN:  Thirteen, Bar Counsel's
10  exhibit I believe 13.  This is a crucial
11  communication.
12        CHAIRMAN FITCH:  That's why I asked.
13        MR. KLAYMAN:  Ok.  So consequently, we
14  never got to the point of having an agreement for
15  damages and splitting it up.  That was not our
16  objective.  That would have taken many years and
17  she couldn't withstand that.
18        She had actually said -- it's in the
19  record -- that, "If I'm forced to go back to
20  Washington, DC, I'll kill myself.  And the offer
21  that they made at Central News Bureau, that I
22  would then broadcast in English, they were setting

Page 1582

1  me up to fire me."  That's actually in her
2  testimony.  Those are her admissions.
3        So it's clear she wanted to be in LA
4  and she did not tell the truth to Ms. Staunton.
5  And these letters were reflecting things that were
6  completely contrary to what she's now admitted to
7  was her objective.
8        Her credibility, in all due respect, is
9  very, very low, almost zero, given all the
10  contradictions, all the false testimony, given the
11  way she acted in regard to communicating with Mr.
12  Shamble and I.  That has to be taken into account,
13  and of course the clear and convincing standard on
14  top of that.
15        Now it's clear throughout, with regard
16  to the so-called romantic relationship, that, yes,
17  I cared very deeply about Ms. Sataki.  We
18  considered each other friends.  She says that
19  herself in one of the communications that we went
20  through this morning, and there is no crime in
21  loving someone.  That's what kind of gets to me,
22  is that Bar Counsel's trying to make this into

Page 1583

1  something which is dirty.  Ok?  It's not.  It's
2  a beautiful thing that you care about somebody.  And
3  I never, ever asked her for sexual relations.  I
4  never, ever kissed her.  I never touched her.  I
5  never asked to hold her hand.  That was absolutely
6  right.  I respected her.
7        But I wanted to be respected, too.  And
8  that was the difficulty.  And that's why we had to
9  move on.  That's why, when she asked me to buy her
10  a car, that was beyond the pale.  You heard Mrs.
11  Klayman say that she heard the same thing.
12        And her testimony made no sense,
13  because first she said, "I didn't want you to buy
14  a car.  My credit was bad.  I wanted you to make
15  sure my car wasn't repossessed."
16        Then she said, "I need to buy a cheaper
17  car, to lower the payments."  Well, who was going
18  to buy that?  Me.  Because she had no credit.  So
19  that was false.
20        Consequently, there was no romantic
21  relationship, and we were friends, and I felt
22  deeply about her and I did love her and I still

Page 1584

1  wish her well.  And that's why I tried so hard.
2  And that's what's so ironic, because the Bar rules
3  suggest that some kind of relationship -- let me
4  read it.  I'm going to go through the Bar rules,
5  because they weren't characterized correctly.
6        It says "The lawyer's professional
7  judgment on behalf of the client will be or
8  reasonably may be adversely affected by the
9  lawyer's responsibilities to or interests in a
10  third party or the lawyer's own financial,
11  business, proprietary or personal interests."
12        This is super important, because you
13  see, it never affected the way I was representing
14  her.  I was representing herself zealously, within
15  the bounds of ethics and the law.
16        And it wasn't for me.  It wasn't my
17  personal interest.  I believed in her.  That's why
18  I put myself out, and got her an apartment, and
19  paid for moving expenses, and paid in part for her
20  psychologists, and found them, and paid for a
21  polygraph; why I expended over $30,000.
22        I believed in her.  That wasn't for me.

44 (Pages 1581 to 1584)

Page 1585

1   I'm out $30,000.  There's testimony that put me in
2   a financial bad position.  I was going to get
3   apples at the Hyatt.  That's how little money I
4   had.  I was sleeping on couches for a period of
5   time.
6          And I didn't pursue my personal
7   interest.  What I was pursuing was to get her a
8   result because I cared about her.
9          So it's actually the reverse: the fact
10  that I deeply cared about her made me work harder.
11  But when I realized that we couldn't continue on,
12  that it was untenable, I then said, "Perhaps Ms.
13  Allred will represent you."
14         I contacted Ms. Allred.  You've seen
15  the communications.  Ms. Allred didn't take the
16  case.  Then I said there was Tim Shea.  And she
17  was always free.  She had Kathleen Staunton.  She
18  had her cousin.  There were others.  They could
19  have gotten another lawyer if she didn't feel
20  capable of doing that.
21         The case was not all that complex at
22  that point.  The case is not that complex.

Page 1586

1          So consequently, my personal judgment
2   was not affected in terms of the relationship that
3   I had, this deep friendship that I had with her
4   and feeling that I had with her.  It actually made
5   my professional judgment more acute in trying to
6   get her relief.
7          And then there's the issue of -- and
8   this kind of shows you the motivation for this
9   case, to be respectful, is that Judge Kotelly -- I
10  advised her, it's in the record -- that I had had
11  problems with Judge Kotelly before, that she was a
12  very partisan judge and didn't like me because of
13  what I had done with Bill Clinton.  I advised her
14  right up front.  410, Page 410 of the transcript.
15  She admits that, that I told her about Kotelly.
16         And this is where Mr. Smith did not
17  read you every aspect of the rule that's
18  applicable, is that I reasonably believed that I
19  had authorization to move to get another judge,
20  which I did -- Ms. Sataki missed knowing about
21  that -- Judge Roberts.  And then, when the
22  decision came down and she wouldn't grant a

Page 1587

1   hearing -- and we heard Judge Sporkin say he would
2   have granted a hearing, too much was at sake, and
3   this was not -- this was in effect -- he didn't
4   use those words, but he did with me, and I
5   testified to that -- "This is a chip shot.  Of
6   course I would put her back to work.  It Preserves
7   the status quo, under Wagner v. Taylor."
8          What harm would that do?  She was
9   agreeing to work in a facility away from the
10  harasser.  Usually they move the harasser himself
11  away.  She was being accommodating to VOA, and she
12  had a need to be here, to see her doctors and be
13  with her friends and everything else.
14         Mr. Smith did not read this, that "A
15  lawyer shall abide by a client's decisions
16  concerning the objective of representation,
17  subject to paragraph C, D and E, and shall consult
18  with the client as to the means by which they are
19  legally pursued.
20         "A lawyer may take" -- this is
21  crucial -- "The lawyer may take such action on
22  behalf of the client as is impliedly authorized to

Page 1588

1   carry out the representation."  "Impliedly
2   authorized."
3          So, she knew of the problems with
4   Kotelly.  I told her about that.  She knew that I
5   tried to get the case transferred to another
6   judge.  That wasn't successful.  She knew the
7   decision was made against her.  I couldn't
8   communicate with her.  I had to make a decision to
9   try to get another judge to get those orders.  If
10  I succeeded in having her disqualified, there was
11  a good chance all of the orders would have been
12  vacated and I could have had the case decided by
13  another judge in the courthouse.
14         Now with respect to my statement in the
15  media, that column that I wrote, number one I
16  wasn't selling any book.  That's clear.  I got no
17  remuneration out of that.  There was no personal
18  interest.  I was trying to influence settlement
19  and move things along.  And VOA is a difficult
20  agency, to put it nicely.
21         But to give my opinion that there was
22  no factual or legal basis, lawyers do that all the

45  (Pages 1585 to 1588)

Page 1589

1  time.  That's something that they do outside the
2  courthouse when they don't get the ruling that
3  they want.
4       And this was in the context of a
5  lawsuit.  It wasn't Larry Klayman just saying it
6  out of the blue.  This was in a lawsuit and that
7  qualified privilege in that regard.
8       What was important was that, attached
9  to the motion of qualification, I had about 17
10 pages of factual errors that Judge Kotelly had
11 made.  And she legally erred.  She had no basis
12 not to preserve the status quo under Wagner v.
13 Taylor.  That was my opinion, and I'm entitled to
14 it.
15      Factually and legally, there was no
16 basis to do what she did.  And frankly, you know,
17 it was in line with what I had seen here before
18 with her.  I had hoped, as I testified to, that as
19 a woman she would appreciate the gravity of this.
20 Women can appreciate it.  I can appreciate it.
21 That's why Ms. Allred is my friend and why I've
22 done these cases before.

Page 1590

1       But I was hoping that would be the
2  case.  But no, she couldn't put her own biases
3  aside.
4       So again, I was zealously representing
5  the client.
6       I did not engage in dishonesty.  I was
7  giving my opinion, and that's a bizarre
8  interpretation.  And the fact that I named Hillary
9  Clinton -- I mean, this tells you where Bar
10 Counsel's coming from.  They don't like me because
11 I have been a thorn in the side of the powers to
12 be in this town, and they think I may have been
13 more of a thorn in the side of the Clintons than
14 others.
15      But I've been an equal opportunity guy,
16 and I don't think George Bush cared for me very
17 much either.
18      CHAIRMAN FITCH:  Let me go back.  I
19 don't want you to get too far away from 8.4(c).
20      I'd appreciate one or both of you, if
21 you can -- although I'll do it myself, I will
22 anyway -- where the statements about Judge

Page 1591

1  Kotelly's ruling appear, because I have a feeling
2  that there is a possibility that the exact wording
3  of Mr. Klayman's alleged statements, wherever they
4  may alleged appear, may be important?
5       MR. TIGAR:  Perhaps it was in the
6  December 25th, 2010 posting: "Open Your Heart to
7  Him This Christmas."
8       I don't know if you had been referring
9  to "An ultra leftist, pro-Clinton and ethically
10 corrupt federal judge, Colleen Kollar-Kotelly."
11      MR. KLAYMAN:  Yeah, it may have been
12 there.
13      CHAIRMAN FITCH:  Well, Mr. Smith said
14 what he's charging is that -- these are my notes,
15 it's not a quote, unfortunately -- that Mr.
16 Klayman accused Judge Kotelly of having no legal
17 or factual basis.
18      That's different from what you read,
19 Mr. Klayman.
20      MR. SMITH:  He didn't finish reading
21 the sentence.  He just read the first half of the
22 sentence.

Page 1592

1       CHAIRMAN FITCH:  Ok.
2       MR. KLAYMAN:  I'll get back to that.
3       CHAIRMAN FITCH:  Ok.
4       MR. KLAYMAN:  Before I'm done.
5       In any event, I was doing that in the
6  context of litigation.  I wasn't doing that in the
7  context of somebody at the White House or somebody
8  anywhere else that was trying to pursue a
9  political objective.  I wasn't doing that.
10      I was representing my client.  I was
11 trying to convince VOA and the courts when I would
12 go back that there was a valid claim.  And that's
13 why I brought Judge Sporkin if here, because he
14 clearly felt that, when I talked to him, I gave
15 him the facts -- it's eight years ago -- and he
16 told me, "This is a chip shot.  I'd put her back
17 to work."
18      But I'd urge you to read the factual
19 errors, to look at them in detail.  So I didn't
20 have no basis for that.  And the legal basis was
21 that Wagner v. Taylor required her to go back to
22 work.  This is what equity is about in this

46  (Pages 1589 to 1592)

Page 1593

1  country, not to let a woman sink into quicksand.
2       As far as Ms. Sataki's emotional
3  psyche, eight years later -- and certainly I've
4  been removed for eight years from any contact with
5  her -- it's still the same, and she still has
6  emotional issues.  You can tell.  I mean, we saw
7  that on the stand.  And she has a hard time
8  telling the truth.  And I cannot be held
9  accountable for that.
10      She herself, you know, claims "My
11 life's been ruined" to everybody.  She sent an
12 email to Gloria Allred in 2012, and this shows
13 that in fact she didn't want to abandon her
14 claims, and I was getting letters that obviously
15 didn't come from her.  She says, "Can you
16 represent me now?"  And Ms. Allred said, "It's too
17 late."  This is in our supplemental exhibits.
18      She then files a notice of appeal,
19 after she says drop everything.
20      You know, so what was I to believe?  I
21 couldn't let her rights go into the drain.
22      Quite apart from her, I have a

Page 1594

1  professional duty and responsibility.  I respect
2  myself, I respect the legal system.  That's why I
3  do what I do, because I'm trying to make it a
4  little bit better, and I have an obligation not to
5  let her rights expire and to make it go away.
6       But the inconsistencies here, the false
7  testimony, the contradictions, the fact that I
8  didn't get letters from her obviously,
9  addresses... all those different things, I didn't
10 know what to think.  So I protected her interests.
11      To this day, I've never heard from her
12 directly that I was terminated, except on the
13 stand.
14      Now, to sum it all up -- let me just
15 make sure I covered all the Bar rules, because
16 your Honor asked us to do that.
17      The confidences which they claim --
18      CHAIRMAN FITCH:  I have one concern,
19 and I raise it now, and you could handle it the
20 way you want to.
21      MR. KLAYMAN:  Ok.
22      CHAIRMAN FITCH:  I think that we have

Page 1595

1  not heard, and I don't understand necessarily Mr.
2  Smith's or his office's Rule 1.6(a)(3) charge in
3  count three, what the factual theory is.
4       So I wanted you to hear -- maybe you've
5  already heard and I just missed it -- but I wanted
6  you to hear it so you have a chance to answer it,
7  in case you don't understand it, because I don't
8  understand it.
9       MR. KLAYMAN:  No, I --
10      CHAIRMAN FITCH:  If you do, go ahead.
11      MR. KLAYMAN:  It's so confusing and so
12 murky --
13      CHAIRMAN FITCH:  Mr. Smith, if I may do
14 this -- it's a little unusual -- is your theory
15 about the Rule 1.16(a)(3) alleged violation in
16 connection with the BBG case that Mr. Klayman
17 should have filed a motion to withdraw at some
18 point in time after some occurrence?
19      MR. SMITH:  And he should have stopped
20 working on the case.  Yes, he should have
21 withdrawn from the case and he should have stopped
22 working on it.

Page 1596

1       And he should have stopped working on
2  anything that had to do with -- Ms. Sataki was no
3  longer a client after July 30th.
4       CHAIRMAN FITCH:  As of -- so late July,
5  early August.
6       MR. SMITH:  Right.
7       Whatever a lawyer must do, if they've
8  been fired by the client, if there is no matter
9  pending in court, they just stop working on the
10 case.  If there is a matter pending in court --
11      CHAIRMAN FITCH:  Now, Mr. Klayman.
12      MR. KLAYMAN:  Your Honor, that begs the
13 issue.  I'm glad Mr. Smith said that.  I never got
14 definitive word that I was fired.
15      I was hearing from other people.  It
16 was contradictory.  Mr. Shamble was not
17 communicated with.  He was representing her too.
18 I couldn't let her rights go into the tank.
19      I'm surprised -- and I don't want to be
20 too facetious or humorous -- I'm surprised I'm not
21 getting an award from the Bar, as opposed to being
22 prosecuted with this, what I consider to be, a

47 (Pages 1593 to 1596)

Page 1597

1 non-meritorious and calculated attempt at
2 prosecution.
3       Let me just say a few other points and
4 I'll sum up.
5       I would like to turn your attention to
6 these pages of the transcript hat, at Page 496 of
7 the transcript, Ms. Sataki says that she wanted
8 revenge. That's not the purpose of why we're
9 here. She wanted revenge against me and Falahati.
10      And that tells you that, you know, what
11 I was dealing with, like in Exhibit 38, is that
12 Ms. Sataki has more than one -- I don't know how
13 to say it -- I'm not a doctor. I don't mean it in
14 a negative way -- she has more than one
15 personality. And you're not seeking revenge -- I
16 know you're not -- and we shouldn't be here for
17 that reason, and neither should Bar Counsel.
18      She admitted at Page 539 of the
19 transcripts that I was trying to reach her, even
20 though she never responded, to protect her legal
21 rights. She admitted that.
22      And remember, she wasn't responding to

Page 1598

1 me, even when I had a near-fatal car cash. I
2 mean, look, whatever she may think, I'm a fellow
3 human being. Answer the phone when I try to call
4 her and leave a message that I'm seriously injured
5 and that I crashed my car.
6       But she didn't, because I was trying to
7 reach her to protect her legal rights.
8       And then, for all of her claims which
9 she's made, to Ms. Allred, in 2012 and elsewhere,
10 this seems to be a statement, "My life is ruined.
11 I want to kill myself. Mr. Klayman's
12 responsible."
13      The fact is, there was evidence that
14 was presented that from the very start she was
15 gainfully employed by Andisheh TV doing what she
16 did at Voice of America. She went back there
17 twice.
18      She's an accomplished salesman of
19 cosmetics. She works for Hermes and she's got a
20 new company. She's making $65,000 a year, plus
21 health insurance. Her life has not been ruined.
22      And that will tell you why, I told her,

Page 1599

1 "You've got a lot of potential here, Ellie. Get
2 out and get something that will make your life
3 better."
4       So Larry Klayman -- if I may use the
5 third person -- should not be disciplined for, A,
6 caring deeply about somebody, putting himself on
7 the line, and doing everything he could to try to
8 help her, and then being called all these names,
9 that I took bribes and everything else, and then
10 being asked to buy a car. And that's really a
11 crucial point in terms of how she also reacted.
12      So let me sum it up --
13      CHAIRMAN FITCH: Let me observe that I
14 think that we know that you're not being charged
15 with destroying a life or so on, as a rule.
16      MR. KLAYMAN: It bears on credibility.
17      CHAIRMAN FITCH: I think some of those
18 statements, bear, one way or the other, on
19 credibility. You're right. And I think that
20 maybe, from Bar Counsel's view, they are relevant
21 to some other charges.
22      But we certainly are not judging you on

Page 1600

1 destroying anybody's life.
2       Go ahead.
3       MR. KLAYMAN: Anyway, you asked about
4 the 1.16(3), the lawyer's discharge. There never
5 was any revelation from her, and we tried to get
6 one.
7       Here's the bottom line. Here's the
8 summary: There is clearly no clear and convincing
9 evidence that I violated any Bar rule.
10      Bar Counsel doesn't like the way I
11 practice law, they can do it the way they want to
12 practice law. And I do it the way I consider to
13 be appropriate and zealous and honest and fair.
14      I've always been up against very
15 powerful interests, and the Voice of America is a
16 very powerful agency that's been ranked the worst
17 in government by the GAO. It was published in the
18 Washington Post. That's an exhibit.
19      Mr. Shamble congratulated me and said
20 he's never seen a lawyer work that hard, and he
21 referred me to other broadcasters in VOA, who I
22 worked closely with.

48 (Pages 1597 to 1600)

Page 1601

1    This case is eight years old.  Memories
2  have faded.  Documents have been lost, misplaced.
3  There's been a denial of due process, through no
4  fault of my own.  Through no fault of your own,
5  Honors, but there has been a denial of due process
6  by virtue of the way this matter has been handled.
7    As set forth in the opinion of
8  Professor Ronald Rotunda, who was one of the top,
9  if not the top experts in professional ethics, of
10  the lawyers in the United States, before he
11  tragically and suddenly died, there are tens of
12  states that would not even allow this case to
13  proceed.  They would have thrown it out.
14    And there are court decisions.  There's
15  also one in Florida, where I'm also licensed, and
16  they dismissed Ms. Sataki's complaint alone in
17  Pennsylvania, immediately, early.
18    It says that Bar Counsel is to adhere
19  to the same rules that the accused, accused
20  lawyers are to adhere to.  They have to adhere to
21  the same rules, and that's called respect for due
22  process and equal protection, and moving cases

Page 1602

1  along to a conclusion, and not resurrecting them
2  when, for whatever reason, you think it may be
3  strategic to do so at that point in time.
4    And that's important, because Ms.
5  Sataki never, ever communicated with them.  They
6  had to find her after the original complaint.
7    So that's a crucial point, also in
8  terms of credibility.
9    And of course I want you to consider
10  that they prejudged me.  Before I was even
11  notified this case was still active -- I thought
12  it was dismissed -- they were writing a
13  Specification of Charges, which don't have bearing
14  on the ultimate Specification of Charges.  Because
15  the first one said that I had abandoned her and
16  that I didn't represent herself zealously and
17  competently.
18    When I told Mr. Smith --
19    CHAIRMAN FITCH:  I assure you're not
20  going to consider that, and I didn't even know
21  that until you told me.
22    MR. KLAYMAN:  Yeah, all these documents

Page 1603

1  are in the record.  They were hiring experts.
2    CHAIRMAN FITCH:  I wouldn't read the
3  superseding draft.
4    MR. KLAYMAN:  Yeah, it shows you -- I'm
5  sorry.
6    CHAIRMAN FITCH:  Mr. Klayman.
7    MR. KLAYMAN:  It shows you that there's
8  an ulterior motive here eight years down the line.
9    We live in an age where it's very
10  polarized here in this country.  And I'm on one
11  side, Bar Counsel appears to be on the other side.
12  But we should all be on the same side.  And we
13  shouldn't seek revenge.  We should respect each
14  other.
15    I respected Ms. Sataki.  I wanted her
16  to respect me.  I've been a member in good
17  standing of this Bar for 38 years.  I currently
18  have no disciplinary record, no finding, final
19  finding.
20    This is a case that hinges as much on
21  the law and on the facts as just what's right.
22  What happened here was not right.  And it's caused

Page 1604

1  me a lot of emotional distress.  It's caused me a
2  lot of financial loss.  Not just, you know, with
3  regard to Mr. Sujat's time, with my time, because
4  I can't make a living and spend all of my time
5  defending what I view to be a non-meritorious case
6  that was brought for ulterior purposes, eight
7  years down the line, after two other bars have
8  dismissed it.
9    When I asked his supervisor, Elizabeth
10  Herman, who signed the Specification of Charges,
11  "Wasn't that relevant?"  She said "We could care
12  less."
13    Thank you.
14    CHAIRMAN FITCH:  Do you have rebuttal?
15    MR. SMITH:  No thank you.
16    CHAIRMAN FITCH:  Thank you, Mr.
17  Klayman.  Thank you Mr. Smith.
18    We have the following obligation at
19  this point under Rule XI.11.  At the conclusion of
20  the evidentiary portion of the hearing, and after
21  hearing such final argument as the hearing
22  committee chair shall permit, the hearing

49  (Pages 1601 to 1604)

In Re:  Larry Klayman
June 27, 2018

Page 1605

1    committee shall go into executive session and
2    decide preliminarily whether it finds a violation
3    of any disciplinary rule that has been proven by
4    Disciplinary Counsel.
5         I do what I'm told.  The three of us
6    are ready to go into executive session, and this
7    is one of the few occasions when we have a little
8    work to do and you have no work to do, so please
9    accommodate us by letting us stay here and
10   stepping outside and waiting for us.
11        And we are off the record.
12        (Recess taken.)
13        CHAIRMAN FITCH:  Back on the record.
14        The hearing committee has followed the
15   instructions in Rule XI.1 and conferred as to
16   whether it may find a violation of any, as in one
17   or more than one, disciplinary rule has been
18   proven by Disciplinary Counsel.
19        We think preliminarily that we may find
20   that Disciplinary Counsel has proven at least one
21   violation.
22        We need now to talk about briefing.

Page 1606

1         The length of briefs is by rule 50
2    pages, with a reply brief of 20 pages, and I'm
3    inclined to go to 50 pages, unless someone's got a
4    real strong argument.  I'd be happy to limit it to
5    10, but I'm inclined to go to 50.
6         MR. KLAYMAN:  That's fine, your Honor.
7         MR. SUJAT:  That's fine, your Honor.
8         CHAIRMAN FITCH:  The briefs will
9    consist of an opposed finding of facts section and
10   a legal argument section.  And when Mr. Smith
11   submits his brief and serves it, the Respondent's
12   expected to admit or deny, with explanation, with
13   each of those PFFs, proposed findings of fact, of
14   the ODC, and then probably should propose its own
15   additional findings of fact.  And then in its
16   reply, ODC will make its response to those PFFs of
17   the Respondent's team and say whatever else it has
18   to say in its reply brief, which is limited to 20
19   pages.
20        Mr. Smith, you can file 19.99 pages if
21   you want, but 20 strikes me as long for this
22   amount.  It's up to you.  Obviously I won't do

Page 1607

1    anything about that.  Too much speculation.
2         The rule requires that this stage be
3    completed in 120 days.  That is one of those rules
4    frankly that, from what very little I know, is
5    honored more in breach than in the observance.
6    But I think we should take a shot at it.
7         I propose 30 days from today for Mr.
8    Smith's brief, 40 days thereafter for Respondent's
9    brief, and 10 days thereafter for the reply brief.
10        Ten days alright, Mr. Smith?
11        MR. SMITH:  Yeah, but I guess if
12   there's more --
13        CHAIRMAN FITCH:  I'm sorry?
14        MR. SMITH:  I do believe that should
15   be, but I'm sure that the committee will consider
16   motions for extension, if warranted.
17        CHAIRMAN FITCH:  Well, I never had any
18   choice but to consider those.
19        Meghan, I misplaced it.  Where is that
20   rule about 120 days?
21        MS. BORRAZAS:  I believe it was Page
22   164?

Page 1608

1         CHAIRMAN FITCH:  No, that's not it.
2         MS. BORRAZAS:  Sixty-four, at the
3    bottom.  Is that it?
4         CHAIRMAN FITCH:  That's in the
5    Board's -- the rules applying to the board.
6         Let's leave it at ten days.
7         MS. BORRAZAS:  The date for -- do you
8    want the brief or the --
9         CHAIRMAN FITCH:  Length of briefs or
10   scheduling of briefs.
11        MS. BORRAZAS:  So 12 is scheduling but
12   also 19 point --
13        MR. TIGAR:  Are we now talking days?
14        I calculate 30 days is the 27th of
15   July.
16        CHAIRMAN FITCH:  Alright.
17        MR. TIGAR:  I calculate 40 days
18   thereafter is the 5th of September.
19        MR. TIGAR:  I calculate that ten days
20   after is the 15th of September -- or August,
21   August.
22        CHAIRMAN FITCH:  What day of the week,

Page 1609

1 the 5th of September?

2 MS. BORRAZAS:  That is a Wednesday.

3 MR. TIGAR:  September 5th is a

4 Wednesday.

5 CHAIRMAN FITCH:  So Labor Day is

6 Monday, September 3rd.

7 MR. TIGAR:  That's right.

8 CHAIRMAN FITCH:  I think that

9 Respondent's brief should be due on Monday,

10 September 10th, rather than --

11 MR. KLAYMAN:  That's our opposition,

12 your Honor, or response?

13 CHAIRMAN FITCH:  Your brief should be

14 filed or may be filed as late as September 10th.

15 MR. KLAYMAN:  Alright.

16 CHAIRMAN FITCH:  Otherwise you'd be

17 obligated to file a brief two days after Labor

18 Day.

19 So September 10, and we'll give Mr.

20 Smith 10 days for his reply.

21 MR. TIGAR:  The 20th.

22 CHAIRMAN FITCH:  June the 20th.  And

Page 1610

1 we'll do our best on our end.  And we'll consider

2 whatever the parties have to tell us.

3 MR. KLAYMAN:  Your Honor, may I address

4 a small issue?

5 CHAIRMAN FITCH:  I'm sorry?

6 MR. KLAYMAN:  When appropriate, may I

7 address a small issue.

8 CHAIRMAN FITCH:  Sure, but I have one

9 other issue.

10 Does Bar Counsel have any information

11 about prior discipline?

12 MR. KLAYMAN:  That's my issue.  Before

13 he does that.

14 CHAIRMAN FITCH:  What's your issue?

15 MR. KLAYMAN:  The rule says, and this

16 is alluded to pleadings in the case -- I assume

17 you all have read them -- that bringing this case

18 was -- you want me to stand at the podium?

19 CHAIRMAN FITCH:  Yeah, of course.

20 MR. KLAYMAN:  As I said in the

21 pleadings, there is another disciplinary

22 proceeding, which is not final.  It's still going

Page 1611

1 through the process with Judicial Watch.  That's

2 why they were sitting here, in part.  I don't know

3 how they knew of it.  Most people don't know of

4 these things, if they weren't told.

5 So there's two issues here actually,

6 and that is not complete.  It's in front of the

7 Court of Appeals right now in this building.

8 So Mr. Smith advised me that he was

9 going to introduce the finding of the Board, which

10 is just a recommendation.  It's not a final

11 decision.

12 I think that's inappropriate to put

13 that in the record at this time, and it's intended

14 to try to prejudice you in your ultimate

15 deliberations.

16 When I told him I didn't think that was

17 ethical, he screamed out in middle of the

18 courtroom, using the F word, "Leave me the F

19 alone."  And there were several witnesses,

20 including the court reporter, and I believe Meghan

21 and others.

22 CHAIRMAN FITCH:  Well, let me say the

Page 1612

1 following.  I think this will resolve the concern.

2 I think it's a legitimate issue.

3 If there is another proceeding and if

4 it has not been resolved by the Court of Appeals,

5 then, before anything else about that proceeding

6 is brought to the attention of the hearing

7 committee, I hereby require Disciplinary Counsel

8 to submit a pleading arguing why an incomplete

9 disciplinary proceeding constitutes prior

10 discipline.

11 There may be a Court of Appeals case

12 out there that says exactly that.  But I'd like to

13 see it.

14 So, Mr. Smith, you have 10 days from

15 today for you and your office to submit that

16 pleading showing why information about incomplete

17 non-final disciplinary proceeding constitutes

18 prior discipline.  Ok?

19 MR. SMITH:  Ok.

20 MR. TIGAR:  May I suggest, may I

21 suggest in that respect that you look at the

22 statement of judgements, because there is a

51 (Pages 1609 to 1612)

Page 1613

1  considerable body of literature on the preclusive
2  effect or non-effect of an interlocutory decision
3  that is still in the process of appeal.
4       That's one of the civil procedure
5  professor's nightmare scenarios, and there's a lot
6  of debate about that.
7       MR. KLAYMAN:  Thank you.  Thank you for
8  that suggestion.
9       I wanted to add one other thing, when I
10 asked him why he's doing that, I just want this on
11 the record, he told me "My supervisors told me to
12 do it."
13      MR. SMITH:  Jesus Christ.  You know
14 what?  I do have some public discipline that --
15      MR. KLAYMAN:  Well, I'm not finished
16 yet.  I'm not finished yet.
17      MR. SMITH:  Is he finished yet?
18      He's made his objection.  You've made
19 your ruling with respect to these documents.  And
20 I will respect that ruling.
21      Now I would like to do as you already
22 asked.  I want to submit public discipline in

Page 1614

1  aggravation of misconduct.
2       CHAIRMAN FITCH:  I'm sorry?
3       MR. KLAYMAN:  I'm not finished yet.
4       MR. SMITH:  I said, he has made his
5  motion, you have made your ruling.  We are going
6  to respect that ruling, but there is public
7  discipline that I would like to submit in
8  aggravation of the misconduct at this time.
9       CHAIRMAN FITCH:  There is what that
10 constitutes --
11      MR. SMITH:  Public discipline.
12      MR. KLAYMAN:  Yes, I have no
13 disciplinary record, other than one in Florida,
14 which was a reprimand that I agreed to.  That's
15 the only one that has ever happened in 40 years,
16 and it was because I paid late on an agreement to
17 pay a small portion of a client matter.  I was in
18 financial difficulty.  I agreed to it.  That's the
19 only discipline in 40 years.
20      So if he's going to throw into the
21 record other things, that's inappropriate.
22      What I wanted to ask is, because I know

Page 1615

1  it's a very low threshold to get to this section
2  of the proceeding, and I just wanted to make it
3  clear on the record that, because my former
4  colleagues may use this for publicity purposes,
5  that's why they were sitting here, just to put it
6  on the record that it is a low threshold, so if
7  anybody sees these transcripts or whatever, they
8  know that you didn't make a finding against me
9  yet.
10      CHAIRMAN FITCH:  Mr. Smith, I want to
11 hear from you in just a minute.
12      Are you representing that documents
13 that you have constitute final discipline?
14      MR. SMITH:  This is different from the
15 document that Ms. Sataki was talking about --
16      CHAIRMAN FITCH:  Well, you're mumbling.
17      MR. SMITH:  This is different from the
18 document that Mr. Klayman was referring to that
19 you have issued your order with respect to.
20      CHAIRMAN FITCH:  Well, I didn't ask you
21 that.
22      Does that material constitute -- don't

Page 1616

1  show it to me -- does it constitute final --
2       MR. SMITH:  Yes.
3       CHAIRMAN FITCH:  -- decision by a
4  disciplinary authority --
5       MR. SMITH:  Yes.
6       CHAIRMAN FITCH:  Such as the Board and
7  the Board's hearing committee?
8       MR. SMITH:  Yes, it does.
9       MR. KLAYMAN:  Yes, I'll stipulate to
10 that, your Honor.
11      That's what I said.  There's one in
12 Florida many years back where I was -- from 2008.
13      CHAIRMAN FITCH:  And what do your
14 submissions consist of?  What kinds of things?
15      MR. SMITH:  It is a consent judgment
16 from the Supreme Court of Florida, the Florida Bar
17 vs. Larry Eliott Klayman, number SC11 247.
18      CHAIRMAN FITCH:  I ask because it looks
19 to be kind of thick.
20      MR. SMITH:  It is kind of thick.  And I
21 have copies for everyone on the committee and for
22 the Board.  Respondent's already been given a

52 (Pages 1613 to 1616)

Page 1617

1    copy.
2         If may I approach?
3         CHAIRMAN FITCH:  Probably, yes, but in
4    just a minute.
5         (Brief pause.)
6         CHAIRMAN FITCH:  Yeah, Rule XI.11, as I
7    recall, in fact does instruct or direct the
8    "hearing committee shall immediately resume the
9    hearing after the executive conference and permit
10   Disciplinary Counsel to present evidence of prior
11   discipline, if any."
12        Even though the word "shall" does not
13   appear before "permit," the sentence does read
14   "shall immediately resume the hearing and permit
15   Disciplinary Counsel to present evidence of prior
16   discipline."
17        Now I read the rule to be saying "shall
18   permit."
19        You may tender a document constituting
20   final discipline by consent or otherwise --
21        MR. SMITH:  Thank you.
22        CHAIRMAN FITCH:  -- to the hearing

Page 1618

1    committee and to Ms. Borrazas.
2         MR. SMITH:  For the record, this has
3    been marked as Disciplinary Counsel Exhibit 53.
4         MR. KLAYMAN:  Can I have a copy, Mr.
5    Smith?  You got it?
6         MR. SUJAT:  Yeah.
7         MR. KLAYMAN:  Your Honor, the only
8    other thing I ask, because of the potential for
9    publicity here -- I'm not usually shy, one way or
10   the other -- my ex colleagues, I got a verdict
11   against them for defamation.  I mentioned that in
12   my testimony.
13        CHAIRMAN FITCH:  Mm-hmm.
14        MR. KLAYMAN:  I just would ask you as a
15   courtesy just to state on the record that whatever
16   the low threshold is, it's a low threshold to get
17   to this point.  It's just a tentative ruling.
18        CHAIRMAN FITCH:  I'm sorry, what do you
19   want me to do?
20        MR. KLAYMAN:  On the record, just state
21   what the threshold is to get to this part of the
22   proceeding.

Page 1619

1         MR. TIGAR:  Is it your application that
2    the Chair place on the record the text of XI.11.
3         CHAIRMAN FITCH:  Yes.
4         MR. TIGAR:  That "the determination
5    that was made is a preliminary nonbinding
6    determination"?
7         MR. KLAYMAN:  Correct, that's it.
8         Because I know that my colleagues will
9    use it.
10        MR. TIGAR:  Well, that's what rule
11   XI.11 says.  And that's what it says.
12        MR. KLAYMAN:  So thank you very much
13   for that.
14        And if I may address what Mr. --
15        CHAIRMAN FITCH:  You may, but the order
16   of procedure is, is this anything else being
17   offered at this time in aggravation?
18        MR. SMITH:  Given the Chair's ruling,
19   nothing else at this time.
20        CHAIRMAN FITCH:  Does Respondent wish
21   to address at this time the allegedly aggravating
22   material that's been submitted and/or wish to

Page 1620

1    address at this time any matters or bring to the
2    hearing committee's attention any matters in
3    potential mitigation of potential sanction
4    analysis.
5         MR. KLAYMAN:  Yes, I do.
6         CHAIRMAN FITCH:  Both parties should
7    keep in mind that these representations do not
8    preclude the repetition, elaboration or addition
9    of such considerations in the briefing.
10        MR. KLAYMAN:  Understood, your Honor.
11        Did you give a copy to Mr. Sujat?
12   Apparently he misplaced it.
13        CHAIRMAN FITCH:  You can have my copy,
14   Mr. Sujat.
15        MR. KLAYMAN:  Here, I got it.  I'm
16   borrowing this one.
17        To put this in context, your Honor, I
18   had a client in Florida named Natalia Hum.  She
19   was charged with jumping bail and also making --
20   arranging for illegal marriages with immigrants to
21   get them citizenship.  I defended her in a
22   criminal proceeding, and there was a $25,000

53  (Pages 1617 to 1620)

In Re:  Larry Klayman
June 27, 2018

Page 1621

1   nonrefundable retainer, which you can take in
2   Florida.  It can be nonrefundable.  And I did a
3   considerable amount of work.
4        I had been the second lawyer.  She had
5   another lawyer who had actually negotiated a plea
6   agreement for her, and that's when she jumped bail
7   and went to Belize, and they had to bring her back
8   to Miami, and they arrested her.
9        Ultimately her case was transferred to
10  Orlando, and, for convenience purposes, she got a
11  lawyer up in Orlando.
12       I was going through financial
13  difficulty at the time.  It was in and around the
14  time period of the collapse in this country,
15  financially.  I was doing badly.  I have testified
16  to that.  And I entered into -- she wanted to get
17  her $25,000 back and said I hadn't done any work,
18  which wasn't true.
19       I agreed with a mediator to remit 5,000
20  back, and I couldn't pay it timely because I was
21  on the verge of bankruptcy, and I took longer to
22  do it than I had agreed to.

Page 1622

1        I was moving around, as you've seen
2   from my different addresses.  I didn't actually
3   get notice that the Bar had started an action
4   here.  And things matured to the point that there
5   was a complaint that was filed.
6        And I agreed to -- I agreed, consent
7   agreement, to public reprimand.  And in that
8   public reprimand, you will see there is no showing
9   of any dishonesty.  There are a lot of mitigating
10  circumstances, including the fact that her lawyer
11  in Orlando had said to me, "Larry, if I were you,
12  I wouldn't pay it back."  Because, she tried the
13  same thing with her prior lawyer.  She had filed a
14  Bar complaint with him to get back the equivalent
15  of his $25,000 retainer.
16       So it's not, you know -- it's not a
17  matter of dishonesty.  It's not an egregious
18  thing.  I simply agreed to just to move on.  It's
19  cheaper to do that than to fight it.  So...
20       CHAIRMAN FITCH:  There appearing to be
21  no other matters, this evidentiary proceeding is
22  adjourned.

Page 1623

1        (Whereupon at 3:21 p.m. the hearing was
2   adjourned.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

54 (Pages 1621 to 1623)

**A**

a.m 1413:3 1418:12
   1419:16 1447:10
abandon 1593:13
abandoned 1602:15
abandoning 1571:6
ABC 1480:14
abide 1556:15
   1587:15
ability 1534:5
able 1473:4 1486:18
   1554:19 1577:2
absolutely 1425:21
   1455:19 1466:6
   1487:6,7 1512:1
   1559:10 1583:5
abuse 1490:11
abused 1476:8
   1477:11
abusing 1476:19,20
   1476:21
abusive 1551:16
Academy 1468:18
accepted 1502:9
accepts 1562:11
accident 1457:15
   1473:18 1474:9
   1474:13 1484:1,2
accommodate
   1498:16 1605:9
accommodating
   1587:11
accomplished
   1598:18
account 1447:15
   1582:12
accountable 1593:9
accurate 1432:16
   1476:6
accusations
   1501:15 1502:1
accusatory 1550:6
accuse 1501:6
accused 1444:13
   1478:4,4,21
   1501:4 1561:21
   1573:20 1591:16
   1601:19,19
accusing 1501:19
   1580:20
acknowledge
   1451:10
acknowledged
   1450:5
acknowledges
   1450:21 1457:3

acknowledging
   1469:2
acknowledgment
   1453:1
act 1511:3
acted 1582:11
action 1511:19,22
   1575:3 1587:21
   1622:3
actionable 1553:12
   1553:14
active 1602:11
actively 1525:22
actual 1508:7
   1581:2
acute 1586:5
Ad 1413:3,10
add 1478:20
   1538:18 1613:9
added 1423:9
addendum 1507:17
addition 1449:11
   1563:18 1566:21
   1620:8
additional 1540:11
   1564:4 1606:15
address 1420:17,18
   1421:1 1422:6,6
   1539:3 1569:14
   1569:16 1610:3,7
   1619:14,21
   1620:1
addressed 1420:4
addresses 1421:18
   1594:9 1622:2
addressing 1485:1
adequate 1530:22
adhere 1601:18,20
   1601:20
adjourned 1622:22
   1623:2
administration
   1558:4 1567:22
administrative
   1555:19
administratively
   1543:3
admissions 1582:2
admit 1574:6
   1606:12
admits 1474:7
   1575:19 1586:15
admitted 1420:3
   1574:19,21
   1577:6 1582:6
   1597:18,21

advanced 1562:12
advancing 1489:21
   1548:13
adverse 1545:14
adversely 1553:17
   1584:8
advice 1477:14,16
   1478:1 1542:14
   1544:8
advised 1586:10,13
   1611:8
advocate 1460:19
   1573:5
affirm 1520:14
Affirmative 1424:8
afforded 1510:4
afternoon 1547:11
age 1603:9
agencies 1574:10
agency 1480:9
   1562:17 1578:15
   1588:20 1600:16
aggravating
   1619:21
aggravation 1614:1
   1614:8 1619:17
aggregate 1538:22
ago 1459:8 1490:3
   1505:21 1592:15
agree 1427:4
   1448:12,19,20
   1449:1 1458:16
   1474:20 1569:6
agreeable 1538:13
agreed 1504:14,15
   1536:16 1547:20
   1575:19 1614:14
   1614:18 1621:19
   1621:22 1622:6,6
   1622:18
agreeing 1587:9
agreement 1502:14
   1508:21 1509:4
   1509:12,16,20
   1510:7,10 1511:5
   1511:6 1514:7
   1577:21 1581:14
   1614:16 1621:6
   1622:7
agrees 1538:19
ahead 1419:21
   1422:11 1423:19
   1424:13 1430:6
   1430:12 1442:14
   1448:4 1463:2
   1465:11 1469:12

1473:16 1478:12
   1480:6 1486:11
   1489:4,7 1493:12
   1499:16 1528:8
   1534:1 1540:14
   1560:5 1595:10
   1600:2
alive 1557:19
allegation 1428:15
   1428:18 1430:15
   1517:16 1568:3
   1573:17 1575:5
allegations 1476:15
   1548:7,7
alleged 1429:1
   1491:12 1539:12
   1591:3,4 1595:15
allegedly 1619:21
Allen 1523:5
allow 1470:12
   1471:2 1518:3
   1601:12
Allred 1460:20
   1469:17 1512:18
   1537:18 1585:13
   1585:14,15
   1589:21 1593:12
   1593:16 1598:9
alluded 1578:5
   1610:16
ally 1551:13
alright 1418:2
   1419:14,17
   1428:5 1467:1,17
   1475:17 1495:1
   1495:12 1498:11
   1499:7 1500:13
   1502:5 1531:21
   1539:6,13
   1540:22 1552:1
   1566:20 1607:10
   1608:16 1609:15
Alzheimer's 1532:8
amended 1425:10
   1425:11
America 1446:20
   1446:22 1464:18
   1575:4 1578:11
   1598:16 1600:15
amount 1508:14
   1606:22 1621:3
analysis 1562:15
   1567:16,16
   1569:8 1570:6
   1620:4
and/or 1539:3

1540:6 1565:8
   1619:22
Andisheh 1598:15
Angeles 1473:20
   1502:18 1513:14
   1514:14 1524:4,5
   1535:22 1576:22
   1577:7
angry 1550:9
announced 1429:16
anonymous
   1479:17,18
answer 1424:8
   1425:16 1449:6
   1452:3,7 1460:5
   1469:15 1474:8
   1474:13 1477:13
   1489:2,6 1493:2,7
   1497:4,7,19
   1504:7 1506:13
   1510:22 1518:4
   1565:11 1566:2
   1595:6 1598:3
answered 1516:8
answers 1494:20
ANTHONY
   1413:11
anti-Semitic
   1517:18 1534:8
anybody 1472:14
   1536:6 1537:2
   1578:9 1615:7
anybody's 1600:1
anymore 1554:10
   1554:11 1555:2
anyway 1502:19
   1542:18 1545:20
   1590:22 1600:3
apart 1593:22
apartment 1439:6
   1470:12,17,18
   1471:4,10,13,20
   1471:22 1474:4
   1584:18
apologizing
   1449:21
apparently 1419:16
   1427:20 1468:6
   1476:16 1551:15
   1620:12
appeal 1541:13,14
   1541:15,19,21
   1542:1,14,21
   1543:7,9,20,22
   1544:15,15
   1545:9,22

1593:18 1613:3
appealed 1543:13
  1543:17
appeals 1412:1
  1561:17 1566:7
  1567:19 1611:7
  1612:4,11
appear 1442:1
  1591:1,4 1617:13
APPEARANCES
  1413:9 1414:1
appearing 1622:20
appears 1429:13
  1453:2 1476:4
  1518:14 1531:16
  1573:19 1603:11
apples 1585:3
applicable 1586:18
application 1619:1
applied 1566:22
applies 1568:21
apply 1566:12,12
  1575:12,13
applying 1608:5
appreciate 1505:7
  1530:6 1589:19
  1589:20,20
  1590:20
appreciating
  1535:10
appreciation
  1455:19
appreciative 1481:1
  1531:17
approach 1491:21
  1493:22 1494:1
  1501:11 1531:5
  1534:19 1617:2
appropriate
  1600:13 1610:6
appropriateness
  1517:15
approved 1574:18
  1574:22
approving 1524:22
approximately
  1421:14 1526:16
  1531:2,11
April 1435:8 1441:4
  1443:2
archnemesis 1556:4
areas 1496:1
arguably 1459:13
  1478:11
argue 1538:20
  1565:16

argued 1575:12
arguing 1550:10
  1612:8
argument 1469:10
  1540:5 1547:7,9
  1560:2,3 1569:19
  1574:13 1604:21
  1606:4,10
arguments 1415:6
  1500:14 1531:3
Arlene 1453:12
  1488:11,16
  1489:12
arm 1538:11
armor 1464:7
  1555:7
arrangement
  1512:5 1513:20
arranging 1620:20
arrested 1621:8
arrives 1418:13
articles 1558:8,13
  1559:2 1560:8,13
  1560:13 1561:21
  1563:2 1565:2,6
  1566:22 1567:6
  1574:4
arts 1522:10
ashamed 1576:2
Ashley 1415:4
  1519:17 1520:4,7
  1521:4,11
aside 1590:3
asked 1425:3
  1431:7,12
  1435:21 1436:5
  1455:6 1464:14
  1471:12 1492:9
  1497:16 1504:2,5
  1504:17 1508:2
  1514:5 1516:8
  1528:18 1538:22
  1553:10 1556:8
  1576:5 1579:11
  1581:12 1583:3,5
  1583:9 1594:16
  1599:10 1600:3
  1604:9 1613:10
  1613:22
asking 1430:4
  1435:19 1442:21
  1448:12 1450:14
  1457:4,7 1514:9
  1541:8 1545:1
  1546:3 1571:9
asks 1490:16

aspect 1452:21
  1489:11 1494:10
  1498:13 1543:11
  1557:16 1586:17
aspects 1433:11
  1489:21
assault 1548:7
asserted 1517:16
assertion 1565:6
assimilate 1476:1
assist 1567:22
associate 1500:22
assume 1533:21
  1571:5 1610:16
assuming 1502:20
  1530:21 1559:7
  1570:22
assure 1602:19
Attaby 1476:17
attached 1424:8
  1589:8
attachment
  1549:11
attachments
  1426:22 1511:10
attempt 1537:1
  1597:1
attempting 1502:22
attention 1424:18
  1450:10 1597:5
  1612:6 1620:2
attitude 1488:13
  1491:21
attorney 1413:16
  1413:18 1551:11
attorney/client
  1547:13
attractive 1445:1
  1549:5
attributing 1578:8
August 1551:20
  1552:19 1557:8
  1596:5 1608:20
  1608:21
Austin 1551:21
  1557:9
authority 1616:4
authorization
  1586:19
authorized 1587:22
  1588:2
auto 1473:18
available 1562:16
Avenue 1420:13
  1422:8
Aviera 1433:22

1434:4,5,11
  1442:22 1443:2
  1443:10 1453:12
  1453:18 1455:15
  1465:17 1466:3
  1488:22 1512:19
award 1596:21
Awards 1468:19
aware 1495:13
  1528:22 1529:3,5
AWOL'd 1577:5

_____
        B
_____

B 1446:12
Bachelor's 1521:18
  1522:9
back 1416:3
  1421:21 1444:10
  1453:7 1455:3
  1457:13 1484:9
  1490:14 1498:21
  1502:18 1507:1
  1513:13 1514:13
  1519:19 1530:14
  1531:14 1532:12
  1532:20 1535:21
  1536:5 1543:3,16
  1568:9 1576:21
  1577:3 1578:3,11
  1581:19 1587:6
  1590:18 1592:2
  1592:12,16,21
  1598:16 1605:13
  1616:12 1621:7
  1621:17,20
  1622:12,14
background
  1521:17
bad 1450:1 1482:2
  1519:3 1544:8
  1583:14 1585:2
badly 1434:19
  1480:10 1487:18
  1578:16 1621:15
Baehr 1468:21
Baehr's 1468:17
bail 1620:19 1621:6
bankruptcy
  1621:21
Bar 1417:3,12
  1420:18,19
  1422:17,19
  1425:14 1427:1,9
  1433:4,6,7,17
  1437:8 1444:15
  1453:6 1459:9

1477:22 1508:11
  1514:17 1518:14
  1533:7,10 1539:3
  1551:14 1553:10
  1561:18 1570:4,9
  1571:8,16,16
  1572:16,21
  1573:6 1581:9
  1582:22 1584:2,4
  1590:9 1594:15
  1596:21 1597:17
  1599:20 1600:9
  1600:10 1601:18
  1603:11,17
  1610:10 1616:16
  1622:3,14
bars 1604:7
based 1495:20
  1507:22 1513:11
  1537:5 1543:4
  1563:2
basically 1455:16
  1478:13 1543:8
  1572:15 1578:18
basis 1426:6
  1459:16,21
  1460:7 1461:9,14
  1461:22 1508:16
  1547:21 1548:1
  1552:14 1559:3
  1561:22 1562:3
  1565:4 1567:18
  1588:22 1589:11
  1589:16 1591:17
  1592:20,20
bathroom 1550:12
  1550:14
BBC 1480:14
BBG 1544:15
  1568:16 1595:16
bear 1461:20
  1556:13 1599:18
bearing 1602:13
bears 1544:12
  1599:16
beautiful 1454:4
  1498:2 1527:19
  1528:16 1583:2
beauty 1564:14
becoming 1554:4
bed 1532:10
began 1553:20
beginning 1423:9
  1475:8 1507:3
  1555:10
begins 1426:4

1447:6 1454:21
**begs** 1596:12
**behalf** 1413:6,18
  1414:2 1446:4
  1521:5,8 1529:2
  1569:19 1578:17
  1584:7 1587:22
**belief** 1441:21
**believe** 1420:14,17
  1428:18 1431:22
  1456:12 1457:15
  1458:5,7 1482:14
  1482:16 1515:18
  1528:18 1530:7
  1539:11 1541:13
  1575:14 1581:10
  1593:20 1607:14
  1607:21 1611:20
**believed** 1428:3
  1437:16 1493:19
  1584:17,22
  1586:18
**believes** 1446:12
  1458:5
**Belize** 1621:7
**Benjamin** 1475:6
**berated** 1436:4
  1444:11
**berating** 1450:7
  1451:5
**best** 1466:11 1475:6
  1482:12 1485:6,7
  1492:1 1515:17
  1519:7 1530:19
  1556:11 1610:1
**better** 1434:13
  1441:19 1459:3
  1478:1 1485:3
  1492:18 1498:7
  1543:5 1554:4
  1594:4 1599:3
**Beverly** 1444:22
  1468:8
**beyond** 1416:19
  1436:5 1454:18
  1529:7 1570:9
  1573:14 1575:13
  1583:10
**biases** 1590:2
**bickering** 1550:4
**big** 1548:15,15
  1555:16 1574:12
**Bill** 1586:13
**binder** 1425:2
**bit** 1480:12 1529:9
  1564:21 1594:4

**bitter** 1550:6
**Bivens** 1511:19,22
  1536:18 1578:6
**bizarre** 1590:7
**black** 1479:22
**blame** 1458:21
  1459:5
**Blanquita** 1537:3
  1576:6
**blatant** 1506:1
**block** 1523:16,18
**blue** 1423:1,2,5
  1453:7 1589:6
**board** 1412:2,4
  1413:1 1468:22
  1507:13,20
  1536:8,20,21
  1537:10 1556:3
  1568:16 1608:5
  1611:9 1616:6,22
**Board's** 1608:5
  1616:7
**body** 1613:1
**Boehner** 1536:10
**bono** 1436:20
  1502:10 1505:9
  1509:22 1576:15
  1577:22
**book** 1422:22
  1423:1,2,5,7
  1427:2 1453:7
  1559:4,5 1588:16
**BOPR** 1414:14
**born** 1532:16
**Borrazas** 1414:13
  1417:22 1607:21
  1608:2,7,11
  1609:2 1618:1
**borrowing** 1620:16
**Boston** 1580:6
**bottom** 1435:11
  1450:14 1483:19
  1500:3 1515:6
  1534:15 1600:7
  1608:3
**bounds** 1433:1
  1435:5 1584:15
**box** 1420:4,13,14
  1421:10,22
  1422:4 1427:20
**boy** 1446:17
  1455:12
**boyfriend** 1443:7
  1443:10 1445:15
  1452:19 1472:13
  1525:20 1576:8

**boyfriend's**
  1526:21
**Brantley** 1412:22
  1413:4
**breach** 1607:5
**break** 1419:12
  1471:20 1494:22
  1530:20,21
**bribe** 1446:9
  1535:12
**bribes** 1444:13
  1580:21 1599:9
**brief** 1437:13
  1499:17 1530:13
  1566:10,16
  1569:17 1606:2
  1606:11,18
  1607:8,9,9 1608:8
  1609:9,13,17
  1617:5
**briefing** 1564:3
  1567:4 1605:22
  1620:9
**briefly** 1521:16
  1539:21
**briefs** 1540:6
  1606:1,8 1608:9
  1608:10
**bright** 1482:3
**bring** 1418:14
  1506:1 1532:11
  1536:17,18
  1578:6 1620:1
  1621:7
**bringing** 1535:20
  1610:17
**broadcast** 1581:22
**broadcaster** 1575:4
**broadcasters**
  1446:22 1600:21
**Broadcasting**
  1507:20
**broke** 1490:13
**brother** 1471:17
  1521:13 1524:6
  1529:12
**brought** 1450:9
  1497:1 1504:19
  1561:3 1592:13
  1604:6 1612:6
**building** 1611:7
**Bundy** 1463:4,12
**Bureau** 1581:21
**burying** 1474:17
**Bush** 1573:3
  1590:16

**business** 1564:16,17
  1575:1,2 1584:11
**buy** 1435:19
  1457:10 1488:9
  1490:16 1528:19
  1583:9,13,16,18
  1599:10

―――――――――
  **C**
  ―――――――――
**C** 1416:1 1587:17
**C.S.R** 1412:22
  1413:4
**cable** 1574:12
**Cahill** 1522:20
**calculate** 1608:14
  1608:17,19
**calculated** 1597:1
**calculation** 1542:6
  1542:6
**California** 1422:3
  1550:13
**call** 1419:2,3
  1452:16 1454:18
  1484:18 1485:13
  1598:3
**called** 1467:9
  1474:3,8 1475:14
  1495:16 1521:5
  1549:12 1579:16
  1599:8 1601:21
**calling** 1499:14
  1550:13
**calls** 1472:16
**camel's** 1490:13
**capable** 1453:4
  1585:20
**capacities** 1463:6
**Capitol** 1536:9
**car** 1435:20 1451:3
  1457:10 1468:8
  1469:7 1473:19
  1474:6 1488:9
  1490:16 1528:19
  1550:11 1583:10
  1583:14,15,17
  1598:1,5 1599:10
**care** 1435:14
  1439:5 1446:12
  1446:15 1454:2
  1466:11 1497:17
  1537:21 1583:2
  1604:11
**cared** 1434:18
  1439:7 1450:6
  1452:11 1480:4
  1490:9 1494:1

1513:15 1529:19
  1529:20 1535:22
  1582:17 1585:8
  1585:10 1590:16
**career** 1489:21
**cares** 1455:9
  1476:21
**caring** 1497:20,22
  1599:6
**carry** 1554:1
  1588:1
**case** 1416:9 1421:16
  1425:22 1431:11
  1436:21 1440:10
  1442:8 1444:4,14
  1446:12 1448:14
  1449:15 1450:15
  1451:1 1455:13
  1455:14 1462:14
  1465:7 1476:15
  1478:3,7,15
  1491:3 1492:16
  1496:15 1502:8
  1506:19,21
  1507:19,20
  1508:1,3,22
  1509:15 1511:10
  1524:9,17 1525:1
  1527:11 1532:11
  1532:17 1536:18
  1538:3 1539:8
  1542:2,21 1544:3
  1544:8 1548:4,16
  1548:19 1551:6,7
  1552:10,18
  1553:7,18 1554:2
  1554:3,8 1555:11
  1555:13,17,18,21
  1556:5,21 1557:3
  1557:16,19
  1559:21 1560:1,6
  1560:15 1562:5
  1562:11 1563:3
  1564:11 1567:2
  1568:13,16
  1571:14 1575:20
  1580:9 1585:16
  1585:21,22
  1586:9 1588:5,12
  1590:2 1595:7,16
  1595:20,21
  1596:10 1601:1
  1601:12 1602:11
  1603:20 1604:5
  1610:16,17
  1612:11 1621:9

**cases** 1460:13
1506:1 1527:13
1551:20 1557:6
1557:12 1568:22
1568:22 1569:1
1569:11,13
1578:6 1579:7
1589:22 1601:22
**cash** 1598:1
**caused** 1603:22
1604:1
**CBN** 1459:5
1475:14
**CBS** 1480:14
**cell** 1419:6 1485:14
1486:9
**Central** 1581:21
**certain** 1478:9
1580:18
**certainly** 1418:1
1518:3 1525:19
1534:20 1540:5
1556:18 1557:7
1564:22 1565:1
1565:11 1593:3
1599:22
**cetera** 1557:14
**chain** 1523:16,18
**chair** 1413:12
1424:19 1538:19
1604:22 1619:2
**Chair's** 1540:16
1619:18
**CHAIRMAN**
1416:2,17,22
1417:9,14,18,20
1418:2,5,9,15,20
1419:5,8,15,18,21
1420:21 1421:4,6
1421:8,13
1422:11 1423:1
1423:13,16,22
1424:13,21
1426:8,15,19
1427:3 1429:9,13
1429:20 1430:1,4
1430:9,12 1432:8
1441:3,21 1442:4
1442:9,14
1445:10 1447:12
1447:21 1448:4
1449:5 1451:8
1452:1,5 1459:12
1459:16 1460:5
1461:4,17,20,22
1463:2,20

1464:10,14,20
1465:11,20,22
1469:12 1470:3
1473:12,15
1478:8 1479:1,5,8
1481:14 1482:15
1482:18 1483:6
1483:10,12
1485:15,17,22
1486:4,8,11
1487:2,12,21
1489:7 1492:5,8
1492:21 1493:5,9
1493:12 1494:6,8
1494:12,16,21
1496:9 1497:7,18
1498:14,21
1499:16 1500:2,5
1504:7 1506:13
1509:2,7 1510:6
1510:20 1513:17
1515:3 1516:7,11
1517:12 1518:1,8
1518:12,17
1519:6,12,15,19
1520:5,8,12,19
1522:1,6 1523:2
1525:8 1526:11
1526:16 1527:4,7
1528:8 1530:2,11
1530:14 1531:9
1531:14 1532:1
1533:11,17,20
1534:1 1538:8,14
1540:4,10,14,20
1540:22 1541:6
1542:10 1544:14
1544:20 1545:5,7
1545:11 1546:4,7
1547:4 1561:11
1563:16 1565:16
1566:1,5,11,17
1567:5,9 1568:5,8
1569:5,18 1575:6
1581:6,12
1590:18 1591:13
1592:1,3 1594:18
1594:22 1595:10
1595:13 1596:4
1596:11 1599:13
1599:17 1602:19
1603:2,6 1604:14
1604:16 1605:13
1606:8 1607:13
1607:17 1608:1,4
1608:9,16,22

1609:5,8,13,16,22
1610:5,8,14,19
1611:22 1614:2,9
1615:10,16,20
1616:3,6,13,18
1617:3,6,22
1618:13,18
1619:3,15,20
1620:6,13
1622:20
**challenges** 1524:15
**challenging** 1505:5
1505:10
**champion** 1555:6
**chance** 1424:15
1433:17 1442:16
1447:4 1449:4
1453:14 1588:11
1595:6
**change** 1505:10
**changed** 1420:18
**characterization**
1478:9 1493:18
**characterize**
1539:21
**characterized**
1584:5
**characterizing**
1448:17
**charge** 1440:19
1563:20 1568:18
1568:19 1576:14
1576:16 1595:2
**charged** 1569:2
1599:14 1620:19
**charges** 1424:9
1425:17 1431:8
1563:15 1568:21
1570:19 1573:15
1575:11,13
1599:21 1602:13
1602:14 1604:10
**charging** 1591:14
**charity** 1484:14
**chart** 1533:1
**chased** 1467:13
1550:12
**cheaper** 1451:3
1583:16 1622:19
**check** 1519:12
**cheek** 1479:19
**Cheney** 1573:4
**Chestnut** 1532:15
**chip** 1587:5
1592:16
**choice** 1607:18

**choose** 1542:3
**Christ** 1534:11
1613:13
**Christian** 1515:16
1516:1
**Christmas** 1591:7
**circulation** 1560:10
**circumstances**
1416:19 1453:19
1505:16 1524:2
1524:15 1622:10
**cite** 1565:14 1575:7
**citizenship** 1620:21
**City** 1418:11
1522:21
**civil** 1433:13
1507:18 1542:14
1542:21 1555:19
1565:8 1613:4
**claim** 1429:15
1432:19 1511:18
1548:13 1549:19
1555:8 1592:12
1594:17
**claimed** 1446:22
**claiming** 1462:15
**claims** 1511:1
1525:2 1551:22
1575:15 1593:10
1593:14 1598:8
**clarification**
1511:16
**clarify** 1463:14
**clarity** 1539:11
**class** 1496:1
**clause** 1507:17
**CLAY** 1413:20
**clear** 1429:21
1430:15 1443:10
1449:9,14 1471:9
1505:1,3 1506:4
1509:21 1511:2
1539:15 1541:6
1550:16 1566:8
1570:7 1572:10
1574:15 1576:18
1582:3,13,15
1588:16 1600:8
1615:3
**cleared** 1547:19
**clearly** 1449:7
1458:11 1592:14
1600:8
**client** 1433:3
1467:10 1481:18
1553:22 1556:18

1559:15,18
1584:7 1587:18
1587:22 1590:5
1592:10 1596:3,8
1614:17 1620:18
**client's** 1556:16,20
1587:15
**clients** 1446:19,21
1461:12 1477:14
1477:15
**clinically** 1456:10
**Clinton** 1537:2
1548:16 1556:4
1558:3 1573:2,3
1586:13 1590:9
**Clintons** 1590:13
**Cliven** 1463:3
**close** 1434:17
1438:22 1439:7
1441:16 1452:11
1460:20 1463:19
1473:22 1477:16
1478:8 1520:21
1570:8
**closed** 1481:9
1575:20
**closely** 1600:22
**closing** 1415:6
1531:2 1547:7,9
1569:19
**Clyde's** 1446:1
**CNN** 1480:8,8,14
**coaching** 1480:12
**coat** 1531:19
**coax** 1507:12
1536:12,14
1537:9
**Coburn** 1536:11
**cocoon** 1489:19
**coerce** 1507:12
**collapse** 1621:14
**colleagues** 1615:4
1618:10 1619:8
**Colleen** 1591:10
**Columbia** 1412:1
1413:6 1559:11
1559:20 1561:16
**column** 1588:15
**come** 1446:21
1450:18 1455:22
1456:8 1470:12
1471:3 1475:22
1484:9 1523:21
1526:12 1559:2
1570:14 1580:12
1593:15

In Re:  Larry Klayman
June 27, 2018

Page 1628

comedy 1483:9
comes 1453:22
  1455:17 1458:1
  1572:6,7
comfortable 1517:8
  1517:10
coming 1418:17
  1431:4 1444:10
  1485:14 1487:17
  1510:18 1534:11
  1578:21 1590:10
commencing
  1413:3
comment 1463:13
  1463:21
commenting
  1518:20 1557:11
committed 1570:8
committee 1413:4
  1413:10 1416:20
  1497:2 1519:18
  1530:16 1535:5
  1541:11 1604:22
  1605:1,14
  1607:15 1612:7
  1616:7,21 1617:8
  1618:1
committee's 1620:2
common 1444:10
  1570:15
communicate
  1500:15 1541:20
  1542:19 1588:8
communicated
  1596:17 1602:5
communicating
  1546:2 1582:11
communication
  1466:20 1505:13
  1512:13 1580:11
  1581:11
communications
  1506:3 1536:2
  1572:8 1582:19
  1585:15
community 1475:3
  1487:10 1554:5
companion 1437:20
companionship
  1437:22
company 1598:20
compensated
  1514:5
compensatory
  1508:7
competently

1602:17
complained
  1549:12
complaining
  1434:12,15,16
  1443:6 1451:19
  1470:11,14
  1471:2 1486:17
  1487:4
complaint 1416:12
  1417:7,12
  1427:15,19
  1428:1,16,19
  1429:3,8,14
  1431:7 1507:18
  1508:10,14
  1551:15 1553:4
  1565:8 1568:12
  1570:14,22
  1571:6 1601:16
  1602:6 1622:5,14
complaints 1429:2
complete 1530:19
  1611:6
completed 1607:3
completely 1582:6
complex 1585:21,22
concentrate
  1448:14 1450:15
  1451:1 1554:7
concern 1491:11,11
  1491:14 1594:18
  1612:1
concerned 1444:1,1
  1467:21 1496:16
  1580:10
concerning 1587:16
conclude 1490:1
  1498:13 1519:4,8
conclusion 1433:16
  1602:1 1604:19
concussion 1474:2
conduct 1553:12
conducted 1570:1
conference 1617:9
conferred 1605:15
confidence 1559:9
confidences 1539:3
  1559:12,19
  1566:12 1594:17
confidential
  1576:11
confirms 1436:18
  1442:10
conflict 1553:14,15
confused 1426:9

1430:8 1431:6
  1542:11
confusing 1595:11
confusion 1544:13
congratulated
  1600:19
congressman
  1495:14,17
  1496:17 1536:10
congressman's
  1551:5
congressmen
  1548:17
connection 1432:11
  1549:14 1551:6
  1552:15 1564:13
  1564:13,14
  1595:16
consent 1556:18
  1560:4 1616:15
  1617:20 1622:6
consequently
  1581:13 1583:20
  1586:1
consider 1443:9
  1556:12 1579:12
  1596:22 1600:12
  1602:9,20
  1607:15,18
  1610:1
considerable
  1507:22 1613:1
  1621:3
considerations
  1620:9
considered 1506:16
  1582:18
consist 1606:9
  1616:14
consisted 1506:14
consistent 1455:7
constantly 1455:4
  1546:1
constitute 1437:16
  1615:13,22
  1616:1
constitutes 1612:9
  1612:17 1614:10
constituting
  1617:19
Constitutional
  1578:6
construction
  1418:21
construed 1518:5
consult 1587:17

consultant 1523:10
consulting 1523:9
contact 1434:5
  1543:18 1546:2
  1579:5,20,21
  1593:4
contacted 1585:14
contacts 1439:21
contends 1539:4
context 1445:6
  1456:15 1470:20
  1479:4,6 1498:4
  1511:1 1516:1
  1589:4 1592:6,7
  1620:17
contingency
  1547:21
contingent 1502:14
  1514:7 1539:8
  1576:13,20
  1577:14
continue 1505:15
  1509:17 1577:19
  1585:11
continued 1414:1
  1422:13 1499:4
  1536:13 1541:10
  1552:22 1554:15
  1557:16 1560:8
continues 1500:5
  1502:3
continuing 1502:11
  1581:3
contract 1512:4
  1513:19
contracts 1523:18
contradictions
  1582:10 1594:7
contradictory
  1433:11 1580:13
  1596:16
contrary 1462:11
  1582:6
control 1440:7
  1549:6
controlled 1456:9
convenience 1581:7
  1621:10
conventional
  1454:5
conversation
  1495:20 1549:22
  1549:22 1556:9
conversations
  1517:20 1526:13
  1526:13,22

1551:1
convey 1441:15
  1485:8
convince 1592:11
convincing 1570:7
  1572:10 1582:13
  1600:8
cope 1555:1
copies 1616:21
copy 1416:15
  1417:7 1423:10
  1423:12 1425:3
  1425:14 1466:2
  1617:1 1618:4
  1620:11,13
corporate 1523:15
correct 1427:15,16
  1428:17 1429:6
  1430:16,17,19,20
  1431:1,6,20
  1432:21,22
  1434:3,9 1444:7
  1448:14 1452:6
  1452:20 1456:14
  1468:10 1488:4
  1490:5,8 1491:3,8
  1492:2 1493:11
  1494:6 1495:15
  1495:16 1509:1
  1511:19,20
  1619:7
corrected 1473:15
correctly 1584:5
correspondence
  1495:8 1497:10
  1512:17 1514:20
corrupt 1557:22
  1558:3 1591:10
cosmetics 1598:19
cost 1468:21
couches 1585:4
council 1488:17
counsel 1416:16
  1417:16,21
  1418:8 1420:2
  1422:14,19
  1424:5 1427:1
  1499:5 1530:16
  1531:1 1532:2
  1539:16 1547:8,9
  1548:20 1552:4
  1553:11 1570:5
  1571:8,18
  1572:16,21
  1597:17 1600:10
  1601:18 1603:11

1605:4,18,20
1610:10 1612:7
1617:10,15
1618:3
**Counsel's** 1424:1
1427:14 1563:3
1563:15 1573:7
1581:9 1582:22
1590:10 1599:20
**count** 1449:9
1568:12,15
1576:12 1595:3
**counteroffer**
1504:12 1506:12
**country** 1473:21
1491:22 1593:1
1603:10 1621:14
**counts** 1573:13
**couple** 1450:13
1528:7
**Coupled** 1570:11
**course** 1434:5
1536:13 1555:13
1557:10 1577:8
1582:13 1587:6
1602:9 1610:19
**court** 1412:1 1413:5
1432:17 1496:14
1502:4 1506:1
1543:5 1552:13
1561:16 1562:9
1562:20 1565:8
1566:7 1567:19
1567:21 1568:14
1596:9,10
1601:14 1611:7
1611:20 1612:4
1612:11 1616:16
**court's** 1541:14
**courtesy** 1434:22
1444:10 1569:22
1618:15
**courthouse** 1418:19
1588:13 1589:2
**courtroom** 1611:18
**courts** 1568:1
1592:11
**cousin** 1459:4
1469:20 1585:18
**cover** 1416:12
1417:11,13
1425:9
**coverage** 1434:6
**covered** 1541:9
1594:15
**crashed** 1598:5

**create** 1562:17
**creating** 1562:17
**credibility** 1544:12
1563:5 1578:13
1582:8 1599:16
1599:19 1602:8
**credible** 1578:13
**credit** 1435:21
1451:3 1457:11
1583:14,18
**crime** 1582:20
**criminal** 1463:4
1620:22
**criticized** 1463:8
**criticizing** 1557:11
**cross** 1415:2 1562:2
**cross-examination**
1416:4 1419:10
1422:13 1499:4
1574:20
**crossing** 1566:17
**crucial** 1571:15
1581:10 1587:21
1599:11 1602:7
**crypto** 1523:16
**Cullum** 1537:3
1576:6
**cultural** 1555:12
**culture** 1548:4
**cum** 1521:20
1522:9,11
**curious** 1569:10
**currently** 1603:17
**cut** 1429:9
**cuts** 1535:13
1537:22

**D**
**D** 1415:1 1416:1
1424:7 1425:14
1425:19,20
1427:1,7,8
1587:17
**D.C** 1420:5 1577:3
**D26** 1426:1,4,9
**D28** 1427:8
**damage** 1507:11
1508:18
**damaged** 1552:5
**damages** 1508:3,8
1511:18,22
1513:16 1578:7
1581:15
**Danforth** 1551:21
1557:9
**dangerous** 1473:20

**dark** 1579:18,18
**darker** 1551:1
**darkness** 1550:5
**Dash** 1432:2 1475:1
1476:17 1507:4
1536:3 1560:20
1560:21 1574:16
1576:4
**date** 1542:3,7
1545:16 1608:7
**dated** 1416:10
1421:1 1422:18
1435:7 1453:10
1465:16 1467:3
1470:7 1472:20
1479:10 1483:17
1490:20 1495:8
1499:21 1509:13
1542:12 1545:15
**dates** 1422:9
**dating** 1524:3
**day** 1425:11,11
1458:13 1474:1
1491:17 1504:13
1504:18 1549:6
1549:20,21
1561:2 1572:8
1576:17 1594:11
1608:22 1609:5
1609:18
**daylight** 1447:13
**days** 1523:3 1544:3
1545:13,17,22
1607:3,7,8,9,10
1607:20 1608:6
1608:13,14,17,19
1609:17,20
1612:14
**DC** 1412:9 1413:2
1413:18 1564:20
1581:20
**dead** 1431:15,15
**deadline** 1541:19
**deal** 1476:14
1488:17 1497:5,6
1500:22 1501:1
1554:10,12,12,21
1565:20
**dealing** 1434:2
1476:18 1506:2
1560:21 1597:11
**dealt** 1434:8
1498:11
**dear** 1484:8,8,18,21
**death** 1532:10
**debate** 1613:6

**December** 1422:18
1424:5 1543:14
1553:3 1591:6
**decide** 1572:21
1605:2
**decided** 1551:7
1552:13 1555:22
1572:22 1588:12
**decision** 1541:15
1543:14 1545:15
1562:4 1586:22
1588:7,8 1611:11
1613:2 1616:3
**decision-making**
1543:12
**decisions** 1556:16
1587:15 1601:14
**declined** 1429:17
**deep** 1549:11
1579:6 1586:3
**deeply** 1454:1
1490:10 1582:17
1583:22 1585:10
1599:6
**defamation**
1618:11
**defendants** 1491:7
1507:19
**defended** 1620:21
**defending** 1604:5
**defense** 1491:5
**Defenses** 1424:8
**define** 1539:10
**defined** 1559:14
**defining** 1476:5
**definite** 1419:12
**definitely** 1527:21
**definitive** 1596:14
**degree** 1462:20
1521:18 1550:15
**deliberations**
1611:15
**delivering** 1531:1
**demanding** 1514:12
**demands** 1528:17
1528:17
**demonstrates**
1549:9
**demonstrative**
1533:16 1534:2
1535:6
**denial** 1543:16
1601:3,5
**denied** 1543:15
1545:3 1577:1
**deny** 1606:12

**depends** 1494:20
**depression** 1560:16
1563:21 1565:17
**describe** 1491:2
**described** 1501:8
1563:12
**deserved** 1537:7
**deserves** 1455:9
**desire** 1553:20
1556:21
**desires** 1556:20
**desperation**
1575:14
**despite** 1557:15,15
**destroy** 1464:6
**destroyed** 1537:4
1571:22
**destroying** 1599:15
1600:1
**detail** 1491:7
1562:10 1577:15
1577:16 1592:19
**detailed** 1562:14
**detector** 1432:10,13
**deteriorated** 1552:5
**determination**
1619:4,6
**detrimental**
1559:17
**devoid** 1540:12
**diamond** 1472:1
**Dick** 1573:4
**die** 1533:1
**died** 1479:21
1480:22 1481:19
1532:21 1601:11
**difference** 1512:17
**different** 1426:17
1458:17 1463:6
1497:16 1515:22
1528:20 1539:21
1540:1 1564:21
1591:18 1594:9
1615:14,17
1622:2
**differently** 1472:3
**differs** 1573:6
**difficult** 1445:22
1461:1 1492:14
1588:19
**difficulties** 1492:15
**difficulty** 1583:8
1614:18 1621:13
**diplomatically**
1577:11
**direct** 1415:2

1556:5 1617:7
**direction** 1492:18
**directly** 1527:1
1594:12
**director** 1551:21
**directors** 1536:20
**dirty** 1445:8 1583:1
**discharge** 1600:4
**disciplinary**
1413:18 1417:16
1417:21 1418:8
1420:2 1422:14
1423:22 1424:5
1427:14 1499:5
1547:8,9 1563:3
1563:14 1570:5
1571:18,19
1603:18 1605:3,4
1605:17,18,20
1610:21 1612:7,9
1612:17 1614:13
1616:4 1617:10
1617:15 1618:3
**discipline** 1571:21
1610:11 1612:10
1612:18 1613:14
1613:22 1614:7
1614:11,19
1615:13 1617:11
1617:16,20
**disciplined** 1599:5
**disclosed** 1539:4
1576:4,7,9
**disclosure** 1559:16
**discount** 1462:19
**discounts** 1468:21
**discovery** 1543:6
**discredited** 1574:2
**discreet** 1556:21
**discreetly** 1548:5
1555:12
**discriminated**
1447:1
**discrimination**
1518:6
**discuss** 1488:11,12
1524:9,16
**discussed** 1527:11
1527:12
**discussion** 1558:9
1558:10,16
**discussions** 1530:15
**dishonest** 1562:22
1568:3
**dishonesty** 1561:10
1561:13,14,14

1567:18 1590:6
1622:9,17
**dismiss** 1551:19
1557:17
**dismissal** 1542:2
**dismissed** 1428:3
1431:16 1541:15
1571:15,16
1601:16 1602:12
1604:8
**disparaged** 1456:19
**displays** 1534:5
**dispute** 1481:8
**disputing** 1421:3
**disqualified**
1588:10
**disrespect** 1575:14
**disrespectful**
1469:1
**distress** 1604:1
**District** 1412:1
1413:6 1559:11
1559:20 1561:16
**diva** 1501:5,7,8
**dive** 1444:13
**dizzy** 1474:2
**Docket** 1412:4
**doctor** 1597:13
**doctors** 1587:12
**document** 1416:8
1416:17 1417:16
1426:16 1428:12
1433:20 1436:13
1442:18 1448:10
1451:16 1453:9
1467:5 1472:22
1479:12 1486:21
1491:1 1495:6
1499:9 1500:1,11
1503:12 1508:12
1515:11 1615:15
1615:18 1617:19
**documentary**
1439:16,19
1440:8,10
1443:16,21
**documentation**
1431:13
**documents** 1573:19
1578:21 1601:2
1602:22 1613:19
1615:12
**doing** 1432:3
1433:19 1436:19
1441:19 1446:10
1454:17 1455:8

1455:20 1458:7
1486:22 1492:20
1500:19 1502:13
1509:22 1521:2
1535:1 1564:3
1576:15 1585:20
1592:5,6,9
1598:15 1599:7
1613:10 1621:15
**door** 1519:2
**doubt** 1468:11
1570:9
**Dr** 1433:22 1434:4
1434:5,11
1442:22 1443:2
1443:10 1453:11
1453:18 1455:15
1465:17 1466:3
1488:22 1512:19
**draft** 1429:3,8,14
1431:7 1603:3
**drain** 1466:22
1593:21
**draw** 1512:4
1513:19
**dress** 1532:15
**driving** 1469:7
**drop** 1544:7
1593:19
**due** 1582:8 1601:3
1601:5,21 1609:9
**dug** 1491:8
**duly** 1521:6
**duty** 1454:18
1505:18 1506:15
1594:1
**DX** 1470:3
**DX51** 1426:19
**DXD** 1426:9,19
**dying** 1532:9

_____

## E

**E** 1412:5 1413:2
1414:10 1415:1
1416:1,1 1547:1,1
1587:17
**Eagles** 1580:5
**earlier** 1427:17
1428:4 1445:21
1543:12 1544:19
1553:21
**early** 1547:12
1596:5 1601:17
**editorializing**
1438:7
**educational**

1521:16
**effect** 1445:8
1470:22 1478:15
1482:6 1484:22
1517:4 1571:5
1573:19 1581:1
1587:3 1613:2
**effective** 1558:20
**effectively** 1512:12
**effort** 1506:22
1507:3 1509:19
**egregious** 1570:15
1622:17
**eight** 1421:16,21
1443:3 1447:19
1464:21 1466:7
1570:11,12
1592:15 1593:3,4
1601:1 1603:8
1604:6
**either** 1427:7
1429:1 1527:1
1563:6 1564:12
1572:4 1579:17
1590:17
**elaboration** 1620:8
**elbows** 1548:17
**Elham** 1435:2
1523:22 1547:12
**eligible** 1513:4
**Eliott** 1616:17
**Elizabeth** 1604:9
**Ellie** 1435:15
1436:15,22
1444:7 1453:19
1456:1,4 1457:17
1465:17 1467:4
1472:20 1484:8
1484:20 1488:20
1489:9 1599:1
**Ellie's** 1456:11
**else's** 1578:9
**email** 1414:8
1435:7 1441:4,6
1441:11,12,22
1442:2,5,21
1443:2 1453:2
1465:15 1466:2
1467:3 1470:7
1472:20 1479:10
1479:15 1483:17
1487:4 1496:7,10
1499:21 1500:2
1510:7 1512:5
1513:20 1533:18
1537:21 1542:12

1544:22,22
1549:21,21
1551:19 1557:10
1579:1,19
1593:12
**emails** 1473:11
1507:4 1549:8,10
1550:5,22
1552:20,22
1553:6 1554:15
1554:18
**embarrassing**
1559:17
**emotion** 1563:9
**emotional** 1455:14
1455:15 1456:7
1467:18,19,20,20
1511:10 1549:11
1554:1,22 1593:2
1593:6 1604:1
**emotionally**
1554:19
**emphasizing**
1566:6
**employed** 1598:15
**employee** 1534:17
**employees** 1578:17
**employment**
1522:14
**encouraged**
1551:14,15
**ended** 1505:2
1506:15 1510:13
1511:7 1512:12
1513:1,18 1565:3
1579:13 1581:2
**engage** 1553:15
1590:6
**England** 1580:7
**English** 1453:5
1534:6 1579:5
1581:22
**English-speaking**
1480:13
**enter** 1471:10
**entered** 1577:21
1621:16
**entire** 1454:10
1513:3 1532:14
1535:13 1536:20
1572:3
**entirely** 1540:17
**entitled** 1508:20
1509:14 1550:19
1556:19 1589:13
**entreaties** 1429:18

**equal** 1573:4
  1590:15 1601:22
**equitable** 1502:17
  1507:1 1570:18
**equity** 1572:12
  1592:22
**equivalent** 1622:14
**erred** 1589:11
**errors** 1589:10
  1592:19
**especially** 1501:14
  1552:11 1562:18
  1564:21
**ESQUIRE** 1413:11
  1413:15,20
  1414:3,10
**essentially** 1506:14
  1510:5 1554:13
  1557:20 1562:16
**establish** 1486:18
**established** 1509:4
**estimated** 1418:12
**et** 1557:14
**ethical** 1416:12
  1417:7 1505:18
  1572:22 1611:17
**ethically** 1591:9
**ethics** 1433:1
  1584:15 1601:9
**evening** 1468:8
**event** 1468:16,17
  1508:22 1543:18
  1546:1 1550:10
  1550:16 1592:5
**events** 1480:19
**everybody** 1457:2
  1475:1 1531:5
  1593:11
**Everybody's**
  1460:16
**Everything's**
  1555:16,17
**evidence** 1424:7
  1432:18 1440:10
  1491:7 1540:7,11
  1545:14 1563:4
  1568:20 1570:7
  1571:10,17
  1575:17 1598:13
  1600:9 1617:10
  1617:15
**evidencing** 1512:5
  1513:19
**evidentiary**
  1604:20 1622:21
**ex** 1458:19 1618:10

**exact** 1421:3 1422:9
  1591:2
**exactly** 1417:8
  1421:17 1458:22
  1474:10 1490:5
  1523:4 1529:8
  1543:7 1556:13
  1567:12 1576:5
  1612:12
**examination**
  1419:13 1426:6
  1465:3,9 1485:18
  1494:11 1498:13
  1499:1 1519:9
  1521:8 1531:18
  1532:2 1541:8,10
**examine** 1562:2
**examined** 1521:6
**example** 1462:22
  1564:9 1575:9
**examples** 1564:9
  1575:10
**excess** 1508:8
**exclusive** 1566:8
**excruciating**
  1562:10
**Excuse** 1424:19
  1468:4
**excused** 1530:8,12
**executive** 1605:1,6
  1617:9
**exhibit** 1417:3,6,12
  1417:17,21
  1420:2 1422:17
  1422:20 1423:8
  1423:21,21
  1424:1,2,6 1425:1
  1425:14 1427:1,7
  1427:8,9 1433:4,6
  1433:7,18 1435:1
  1435:2,6,12
  1437:8,9,10
  1439:12,15
  1442:17 1444:12
  1444:15 1447:2
  1448:22 1451:13
  1453:3,7 1465:4,5
  1465:15,18,21
  1467:2 1468:3,5
  1470:2 1472:19
  1478:19 1481:15
  1483:15 1485:9
  1486:14 1490:19
  1494:4 1495:3,4
  1498:12 1499:8
  1499:10,12

**exhibited** 1435:3
**exhibits** 1417:10
  1425:1 1485:21
  1537:13 1553:2
  1593:17
**exist** 1434:19
**exit** 1473:22 1474:4
**expect** 1444:9
  1456:9 1457:13
  1470:18 1558:19
**expectation**
  1506:20
**expectations**
  1453:21
**expected** 1436:20
  1606:12
**expended** 1584:21
**expense** 1505:6
  1514:4 1543:19
**expenses** 1528:22
  1529:1 1576:16
  1584:19
**experience** 1461:12
  1507:22 1543:4
**experienced**
  1549:15 1563:20
**experiencing**
  1560:15
**expert** 1562:2
  1574:1,1
**expertise** 1523:13
**experts** 1601:9
  1603:1
**expire** 1594:5
**explain** 1449:5
  1533:5
**explained** 1562:21
**explanation**
  1556:12 1606:12
**explicitly** 1525:21
**express** 1481:6
**expressed** 1559:22
**expressing** 1549:11
**extension** 1607:16
**extent** 1446:3
  1460:4 1503:2

  1507:11 1539:20
  1543:7
**extraordinarily**
  1562:14
**extremely** 1463:19
  1501:21
**eyes** 1481:9,10

---

**F**

**F** 1547:1 1611:18
  1611:18
**face** 1475:13
  1492:16
**facetious** 1596:20
**facility** 1587:9
**fact** 1432:12 1437:5
  1444:20 1450:6
  1452:8 1458:20
  1471:15 1473:6
  1475:7 1482:22
  1485:2 1504:20
  1505:11 1508:16
  1537:20 1540:17
  1544:3 1552:14
  1560:15 1561:22
  1562:11,11
  1563:2 1564:11
  1564:14 1571:8
  1571:20 1573:2
  1574:18 1576:4
  1580:19 1585:9
  1590:8 1593:13
  1594:7 1598:13
  1606:13,15
  1617:7 1622:10
**facto** 1458:19
**factor** 1456:10
**factors** 1569:9
**facts** 1562:12
  1563:11 1564:4
  1575:12 1592:15
  1603:21 1606:9
**factual** 1562:3
  1567:16,18
  1588:22 1589:10
  1591:17 1592:18
  1595:3
**Factually** 1589:15
**faculty** 1521:21
  1522:11
**faded** 1601:2
**fail** 1479:5
**faint** 1474:3
**fair** 1434:12 1443:6
  1451:18 1469:9
  1473:2 1477:1

  1486:16 1487:3
  1493:14,21
  1503:16 1564:7
  1566:2 1567:1
  1600:13
**fairly** 1530:2
**faith** 1480:16
  1517:20 1518:11
**Falahati** 1433:9
  1568:13 1577:4
  1597:9
**fall** 1455:22
  1456:18 1493:20
**falling** 1461:12
**falls** 1453:22
**false** 1429:21
  1430:16 1496:15
  1496:22 1562:22
  1563:1 1582:10
  1583:19 1594:6
**falsehood** 1506:1
**familiar** 1484:22
**family** 1452:17
  1554:6
**far** 1569:15 1573:14
  1575:10 1590:19
  1593:2
**fast** 1555:20
**fault** 1459:11
  1601:4,4
**favorable** 1440:8,22
  1441:1
**fear** 1452:17
  1550:11
**feasible** 1426:7
**February/March**
  1549:2
**federal** 1463:11
  1555:17 1591:10
**fee** 1502:14 1508:21
  1509:3,11,16
  1514:7 1539:8
  1547:21 1548:2
  1550:17 1576:13
  1577:14
**feel** 1439:9 1446:7
  1452:16 1456:4,5
  1457:16 1458:11
  1470:21 1480:5
  1484:13,14
  1517:8,10 1557:3
  1585:19
**feeling** 1474:2
  1484:12 1529:12
  1586:4 1591:1
**feelings** 1518:5

fell 1457:17
fellow 1598:2
felt 1422:5 1436:7,8
1437:3 1439:8
1446:7 1489:17
1515:14 1529:8
1536:16 1537:6
1539:16 1550:11
1557:17 1561:7
1583:21 1592:14
field 1491:18
Fifteen 1479:9
fifth 1503:14
fifty 1513:4,6
Fifty-one 1422:21
1423:8,14
fight 1622:19
figure 1472:12
file 1423:17
1431:13 1496:14
1544:1,11
1551:14 1556:2
1606:20 1609:17
filed 1543:19,21,22
1544:16 1545:10
1565:8 1595:17
1609:14,14
1622:5,13
files 1553:4 1570:21
1571:22 1572:1,4
1593:18
filing 1565:18
filings 1565:9
final 1603:18
1604:21 1610:22
1611:10 1615:13
1616:1 1617:20
finally 1541:16
1561:10,13
finance 1522:21
1523:15
financial 1584:10
1585:2 1604:2
1614:18 1621:12
financially 1621:15
find 1436:8 1461:18
1475:8 1511:2
1552:4,9 1563:11
1563:13 1564:18
1571:13 1577:8,9
1579:8,21
1580:14 1602:6
1605:16,19
finding 1425:18
1572:12 1603:18
1603:19 1606:9

1611:9 1615:8
findings 1433:15
1562:10 1606:13
1606:15
finds 1605:2
fine 1430:11
1475:17 1478:16
1491:17 1493:3
1517:7 1606:6,7
finish 1428:6
1489:2 1497:19
1502:6,8 1503:5
1503:22 1507:7
1591:20
finished 1613:15,16
1613:17 1614:3
fire 1582:1
fired 1553:5 1557:6
1577:5 1596:8,14
firm 1523:9,9
first 1416:5 1417:8
1425:10,11
1431:7 1442:20
1463:7 1471:8
1493:1 1497:19
1518:13 1520:8
1521:6 1571:13
1580:5 1583:13
1591:21 1602:15
fish 1548:15
fit 1570:13
Fitch 1413:11
1416:2,17,22
1417:9,14,18,20
1418:2,5,9,15,20
1419:5,8,15,18,21
1420:21 1421:4,6
1421:8,13
1422:11 1423:1
1423:13,16,22
1424:13,21
1426:8,15,19
1427:3 1429:9,13
1429:20 1430:1,4
1430:9,12 1432:8
1441:3,21 1442:4
1442:9,14
1445:10 1447:12
1447:21 1448:4
1449:5 1451:8
1452:1,5 1459:12
1459:16 1460:5
1461:4,17,20,22
1463:2,20
1464:10,14,20
1465:11,20,22

1469:12 1470:3
1473:12,15
1478:8 1479:1,5,8
1481:14 1482:15
1482:18 1483:6
1483:10,12
1485:15,17,22
1486:4,8,11
1487:2,12,21
1489:7 1492:5,8
1492:21 1493:5,9
1493:12 1494:6,8
1494:12,16,21
1496:9 1497:7,18
1498:14,21
1499:16 1500:2,5
1504:7 1506:13
1509:2,7 1510:6
1510:20 1513:17
1515:3 1516:7,11
1517:12 1518:1,8
1518:12,17
1519:6,12,15,19
1520:5,8,12,19
1522:1,6 1523:2
1525:8 1526:11
1526:16 1527:4,7
1528:8 1530:2,11
1530:14 1531:9
1531:14 1532:1
1533:11,17,20
1534:1 1538:8,14
1540:4,10,14,20
1540:22 1541:6
1542:10 1544:14
1544:20 1545:5,7
1545:11 1546:4,7
1547:4 1561:11
1563:16 1565:16
1566:1,5,11,17
1567:5,9 1568:5,8
1569:5,18 1570:2
1572:19 1575:6
1581:6,12
1590:18 1591:13
1592:1,3 1594:18
1594:22 1595:10
1595:13 1596:4
1596:11 1599:13
1599:17 1602:19
1603:2,6 1604:14
1604:16 1605:13
1606:8 1607:13
1607:17 1608:1,4
1608:9,16,22
1609:5,8,13,16,22

1610:5,8,14,19
1611:22 1614:2,9
1615:10,16,20
1616:3,6,13,18
1617:3,6,22
1618:13,18
1619:3,15,20
1620:6,13
1622:20
five 1523:7 1530:18
1560:10 1573:21
1573:22
flip 1445:1
Florida 1414:6
1422:2 1425:2
1431:16 1571:16
1601:15 1614:13
1616:12,16,16
1620:18 1621:2
flying 1524:4
focus 1462:14
focused 1512:3
Foerster 1523:6
Foerster's 1523:18
followed 1605:14
following 1604:18
1612:1
follows 1487:3
1521:7
football 1580:4
footnote 1427:10
1428:6,8,9,14
1429:11 1430:2
forced 1581:19
forest 1435:16
forgotten 1443:14
form 1560:5
formed 1547:13
former 1615:3
forth 1441:10
1509:12 1548:1
1562:10 1563:14
1601:7
fortunately 1572:20
forward 1441:7
1503:18 1505:9
1505:11 1510:9,9
1510:15 1513:22
1528:16,20
1554:2 1570:14
foster 1434:13
1473:4
found 1431:13
1433:13 1453:20
1469:20 1571:20
1584:20

foundation 1527:8
founded 1457:20
1523:17
four 1454:15
1485:21 1522:19
1571:10 1574:17
1575:17
Fox 1480:15
fragile 1547:17
1552:9
frankly 1528:3
1535:1 1589:16
1607:4
Frederick 1414:3,4
free 1455:20
1469:18 1506:6
1537:19 1585:17
Freedom 1420:15
1457:22 1458:8
frequently 1460:12
1524:4 1526:22
Friday 1523:8
friend 1435:22
1437:17 1439:1,2
1439:8 1441:17
1449:9,12
1450:17 1451:4
1452:11,11
1457:2,9 1460:20
1462:15,15
1474:12 1476:20
1536:8 1537:2,22
1551:12 1554:4
1589:21
friends 1434:18,22
1438:21,22
1441:16,16
1442:11,13
1462:16 1463:19
1471:19 1474:11
1475:5,6 1477:8,8
1477:11 1478:21
1496:2 1526:20
1527:3 1529:16
1535:9 1554:6
1582:18 1583:21
1587:13
friendship 1437:22
1441:7,12
1449:10 1450:19
1452:21 1457:3
1494:3 1504:16
1537:4 1586:3
friendships 1450:21
1450:21 1451:11
front 1420:2 1425:8

1425:8 1452:17
1497:1 1508:10
1542:18 1586:14
1611:6
**frustrated** 1473:3
**fsujat@yahoo.com**
1414:8
**fulfill** 1458:14
**full** 1537:7
**fun** 1438:11
**function** 1455:18
**funny** 1481:11
**further** 1500:16
1528:4 1529:21
1538:7 1546:4
1568:6
**future** 1450:16
1480:16 1482:3
1492:19

**G**

**G** 1416:1
**gained** 1559:14
**gainfully** 1598:15
**game** 1552:11,11
1564:7 1580:4
**GAO** 1600:17
**gear** 1507:10
**geared** 1506:22
**general** 1461:11
1484:16
**generally** 1507:21
1516:17 1543:9
**Gentile** 1567:1
**genuine** 1563:9
**George** 1573:3
1590:16
**getting** 1455:3
1457:6 1473:2
1480:7 1489:19
1494:2,17 1506:3
1507:1 1544:8
1548:18 1551:11
1577:17 1578:11
1580:11 1593:14
1596:21
**ghetto** 1474:17
1475:19,20
**ghetto'** 1476:5
**ghetto,'** 1476:6
**girl** 1534:16,21
**girlfriend** 1452:19
1484:19
**gist** 1460:2
**give** 1417:22
1460:16 1462:22

1484:4 1485:13
1520:15 1532:10
1541:18 1588:21
1609:19 1620:11
**given** 1418:20
1425:4 1445:18
1452:15 1477:14
1477:15 1517:18
1521:1 1559:12
1564:6 1582:9,10
1616:22 1619:18
**giving** 1416:15
1477:22 1525:18
1590:7
**glad** 1450:9
1454:19 1455:6
1496:22 1596:13
**global** 1523:18
**Gloria** 1593:12
**go** 1418:13,13,18
1419:9,21
1422:11 1423:19
1424:13 1430:6
1430:12 1435:9
1436:17 1439:18
1440:5 1442:14
1443:15,19,22
1448:4 1451:2,4
1454:14,20
1455:2 1457:9
1463:2 1465:11
1466:21 1467:22
1469:12 1471:12
1471:16,16
1473:16 1478:12
1482:9 1486:11
1489:4,7 1491:6
1493:12 1496:14
1499:16 1503:18
1505:4,22 1510:3
1510:9,9,14
1513:21 1520:21
1528:8 1531:14
1534:1 1537:13
1537:15 1538:20
1540:14 1543:3
1551:16 1560:5
1568:9 1579:22
1581:19 1584:4
1590:18,21
1592:12,21
1593:21 1594:5
1595:10 1596:18
1600:2 1605:1,6
1606:3,5
**goal** 1510:3 1535:22

1537:11
**God** 1443:19
1458:5,8,11
1480:17 1490:2
**goes** 1421:21
1454:6 1465:3
1562:9
**going** 1416:8,14
1419:2,3 1433:2
1439:2,18 1440:9
1440:22 1444:11
1445:21 1446:15
1465:3 1466:14
1476:14 1480:2
1481:22 1483:1
1485:22 1486:1,6
1486:8 1492:17
1493:15 1494:21
1495:18 1503:18
1511:3,3 1513:13
1514:15 1518:3
1529:7 1530:17
1536:22 1543:2
1548:13,18
1550:17,20
1551:8 1554:16
1555:14,21
1557:18,21
1558:13 1562:15
1562:21 1564:8
1566:5 1569:1,4
1570:19 1571:3
1578:22 1579:9
1580:14 1583:17
1584:4 1585:2
1602:20 1610:22
1611:9 1614:5,20
1621:12
**good** 1416:2
1426:13 1433:3
1439:20 1446:7
1459:2 1463:5
1474:16 1477:5
1478:14,14
1480:11 1482:13
1491:15 1517:11
1537:15 1539:18
1545:21 1547:11
1556:1,2 1575:22
1588:11 1603:16
**Gordon** 1522:20
**gotten** 1473:11,17
1474:12 1585:19
**government**
1463:11 1480:10
1544:3 1558:22

1574:10 1578:16
1600:17
**governors** 1507:14
1507:20 1536:8
1536:21 1537:10
1556:3 1568:17
**grabbed** 1446:1
**grace** 1458:8
**graduated** 1521:20
1521:22 1522:8
1522:11
**grand** 1555:17
**grandmother**
1532:9,21 1533:4
**grandmother's**
1532:12,19
**grant** 1562:4
1586:22
**granted** 1587:2
**grateful** 1535:16
**gravity** 1589:19
**great** 1459:5 1480:9
1482:10,16
1575:17 1577:15
1577:16
**greater** 1543:6
**grew** 1551:1
**ground** 1553:21
1555:4
**group** 1420:15
1523:18
**guess** 1430:7
1447:15 1528:17
1542:18 1566:11
1567:13 1607:11
**guy** 1555:4,5,6
1590:15
**guys** 1476:8

**H**

**H** 1413:20
**h-e-l-l** 1483:3
**half** 1591:21
**half-hour** 1531:2
**Hamilton** 1522:20
**hand** 1446:1 1583:5
**handle** 1554:3
1557:17 1594:19
**handled** 1548:5
1555:11,14
1601:6
**handwriting**
1427:19 1571:1
**hang** 1477:6 1478:1
1516:17
**hanging** 1518:16

**happen** 1419:9
1456:17
**happened** 1445:2
1468:14,15
1576:5 1603:22
1614:15
**happening** 1529:10
1551:9
**happens** 1456:8
1460:11
**happy** 1517:7
1558:8 1606:4
**harassed** 1433:9
1560:17
**harasser** 1555:9
1587:10,10
**harassment** 1432:1
1432:20 1434:3,9
1460:13 1488:15
1491:13 1534:17
1547:16 1549:16
1549:19 1551:10
1552:21 1555:8
1573:18
**hard** 1421:17
1439:3 1445:14
1446:18 1449:16
1449:17 1450:5
1536:7 1538:1
1552:9 1584:1
1593:7 1600:20
**harder** 1437:2
1446:16 1585:10
**harm** 1444:3
1587:8
**harmed** 1476:9
**harsher** 1550:18
**Haskell** 1473:22
1474:4
**Hastings** 1523:1
**hat** 1597:6
**hate** 1538:20
**hawking** 1559:4
**head** 1455:4
1563:18,22
1565:10 1581:7
**health** 1439:5
1598:21
**hear** 1463:16
1572:14 1580:17
1595:4,6 1615:11
**heard** 1432:1
1440:1 1459:1
1468:7 1476:16
1528:9 1539:9
1549:4 1563:4

1571:9,11
1578:12 1580:18
1583:10,11
1587:1 1594:11
1595:1,5
**hearing** 1412:11
1413:1,3,10
1423:9 1519:18
1522:2 1530:16
1535:5 1541:11
1547:2 1549:5
1554:20 1587:1,2
1596:15 1604:20
1604:21,21,22
1605:14 1612:6
1616:7 1617:8,9
1617:14,22
1620:2 1623:1
**heart** 1435:20
1454:22 1457:12
1458:1 1514:4
1538:1 1591:6
**heaven** 1480:2
**held** 1559:15
1561:17 1593:8
**help** 1434:7 1436:4
1437:3 1446:2,5,7
1450:17 1451:4
1456:1 1457:17
1458:6 1474:5,7
1477:18 1480:7
1480:11,19
1482:11 1487:16
1488:15 1489:12
1489:15 1495:18
1495:19 1496:18
1501:20 1506:8
1534:18,19
1567:21 1576:6
1581:3 1599:8
**helped** 1436:15
1475:7
**helpful** 1488:19
1489:20
**helping** 1435:22
1469:19 1510:2
1530:6
**heritage** 1534:11
**Herman** 1604:10
**Hermes** 1598:19
**Hey** 1554:9 1559:22
**hi** 1527:2
**high** 1570:9
**higher** 1567:20
**highlight** 1534:12
**highlighted**

1515:21
**Hill** 1536:9
**Hillary** 1537:2
1548:16 1556:4
1590:8
**Hills** 1444:22
1468:9
**hinges** 1603:20
**hire** 1480:15 1506:7
1552:3
**hiring** 1549:18
1603:1
**history** 1522:15
**hit** 1455:3
**Hoc** 1413:3,10
**hold** 1564:8
1570:20 1574:14
1575:16 1583:5
**holds** 1567:20
**Hollywood** 1414:6
**home** 1422:2
1469:7 1532:13
**honest** 1462:4,5,6
1561:18,19
1566:1 1600:13
**honesty** 1496:1
**honor** 1418:4
1422:10 1426:3
1426:11 1435:19
1438:7 1440:16
1463:1 1467:9
1485:12 1489:6
1494:14 1499:15
1504:4 1517:22
1531:22 1538:13
1546:6 1594:16
1596:12 1606:6,7
1609:12 1610:3
1616:10 1618:7
1620:10,17
**honored** 1607:5
**Honors** 1546:9
1569:22 1570:4
1574:21 1601:5
**hoped** 1589:18
**hopefully** 1480:2
1483:1 1486:3
**hoping** 1488:16
1489:12 1580:17
1590:1
**Hopper** 1471:21
**hotel** 1467:8,8
1468:9 1550:12
**hour** 1538:10,11
**house** 1524:7
1526:21 1592:7

**Hum** 1620:18
**human** 1444:19
1455:1 1598:3
**humor** 1479:22,22
1483:7 1516:21
**humorous** 1482:8
1596:20
**hundred** 1432:16
1513:4,6
**hurts** 1476:1
**Hyatt** 1585:3

_____
**I**
**idea** 1439:21 1556:1
1556:2
**identified** 1427:18
**identify** 1461:10
1571:1
**III** 1413:20
**illegal** 1620:20
**imagine** 1449:4
**imagines** 1431:3
**imagining** 1431:2
**immediately** 1445:1
1601:17 1617:8
1617:14
**immigrants**
1620:20
**impact** 1574:12
**impliedly** 1587:22
1588:1
**importance**
1452:22
**important** 1443:13
1584:12 1589:8
1591:4 1602:4
**importantly** 1454:2
**impression** 1527:16
**improperly**
1563:19
**improve** 1496:1
**in-person** 1526:19
**inability** 1434:13
**inadvertently**
1431:11
**inappropriate**
1517:18 1518:21
1519:1 1560:11
1611:12 1614:21
**inaudible** 1449:18
**incidents** 1550:3
**inclined** 1606:3,5
**included** 1416:13
1565:7
**includes** 1441:11
**including** 1536:10

1536:11,11
1556:3 1575:18
1611:20 1622:10
**incomplete** 1612:8
1612:16
**inconsistencies**
1594:6
**incorrect** 1493:17
**independently**
1529:4
**index** 1425:8
**indicate** 1441:9
**indicating** 1495:22
**individual** 1578:14
**induced** 1532:9
**indulge** 1463:1
**inequity** 1572:3
**influence** 1574:9
1575:2 1588:18
**influences** 1574:10
1574:10
**inform** 1479:20
**information** 1419:9
1461:5 1559:14
1610:10 1612:16
**informed** 1560:3
**initial** 1427:18,21
1475:8 1570:22
**initially** 1522:18
**injunctive** 1552:15
1562:4,19,20
**injured** 1598:4
**inquire** 1465:4
**inquiry** 1427:14
**inserting** 1554:4
**inside** 1555:9
**inspiration** 1484:3
**inspired** 1484:2
1495:21
**instance** 1435:1
1463:1 1488:21
1489:18 1518:13
**instances** 1564:1
**instruct** 1617:7
**instructed** 1551:22
1579:17
**instructions**
1605:15
**insulted** 1476:12
1515:15
**insulting** 1474:20
1474:21 1501:21
**insurance** 1598:21
**intend** 1576:15
**intended** 1502:15
1502:16 1575:15

1611:13
**intending** 1543:2
1576:14
**intent** 1493:22
**interacting** 1527:17
**interaction** 1494:2
1533:15
**interest** 1505:12
1506:15 1553:15
1553:16,17,19
1579:8 1584:17
1585:7 1588:18
**interested** 1525:16
**interests** 1539:11
1584:9,11
1594:10 1600:15
**interfering** 1504:21
**interim** 1536:16
**interlocutory**
1543:13 1613:2
**internet** 1574:6
**interpretation**
1590:8
**interrupted** 1489:5
**interruption**
1498:15
**intersection**
1473:21
**intervene** 1488:22
**intervened** 1459:4
**intervention**
1549:13
**interview** 1506:6
**interviewing**
1433:14
**interviews** 1558:16
**introduce** 1416:9
1469:4 1611:9
**introduced** 1463:10
**investigation**
1416:11 1417:5
**investigator** 1574:3
**inviolate** 1559:16
**involved** 1477:22
1539:12
**involving** 1557:21
**Iran** 1443:21
**ironic** 1549:17
1584:2
**irrelevant** 1443:12
**irresponsible**
1568:3
**issue** 1468:19
1524:9,16 1535:6
1550:17 1552:14
1572:15 1577:14

| | | | | |
|---|---|---|---|---|
| 1581:4 1586:7 | **judgemental** | **Keya** 1507:4 1576:4 | 1528:11 1529:1 | 1429:7 1432:3 |
| 1596:13 1610:4,7 | 1461:1 | **keys** 1470:17,18 | 1529:12,21 | 1434:21 1437:3 |
| 1610:9,12,14 | **judgements** | 1471:14 | 1531:17 1532:4 | 1438:19 1439:7,9 |
| 1612:2 | 1612:22 | **kill** 1481:22 | 1533:6,7,14,18 | 1440:11,13,20,21 |
| **issued** 1615:19 | **judges** 1462:8 | 1581:20 1598:11 | 1535:19 1538:6 | 1441:18 1443:3 |
| **issues** 1434:2,8 | **judging** 1599:22 | **Kim** 1412:22 | 1538:12 1539:14 | 1443:11 1444:21 |
| 1488:18 1555:1 | **judgment** 1553:16 | 1413:4 | 1539:15,22 | 1445:12,13 |
| 1555:12 1593:6 | 1584:7 1586:1,5 | **kin** 1532:18 | 1540:11,19 | 1447:5,8,19 |
| 1611:5 | 1616:15 | **kind** 1438:8 1446:4 | 1541:3,7,10,12 | 1449:22 1452:15 |
| **issuing** 1561:21 | **Judicial** 1457:21 | 1446:6 1454:12 | 1542:11 1546:9 | 1453:1 1460:20 |
| | 1611:1 | 1462:20 1482:1 | 1547:14,20 | 1461:17 1462:3 |
| ———————— | **July** 1495:8 1496:7 | 1484:22 1505:4 | 1548:3,9 1549:3,6 | 1463:17 1466:21 |
| **J** | 1545:6 1551:18 | 1511:5 1514:6 | 1549:8,18,20 | 1467:18 1469:7 |
| ———————— | 1551:18 1552:8 | 1520:21 1528:2 | 1551:3,17,22 | 1471:15,17 |
| **J** 1414:3,4 | 1552:19 1557:5 | 1529:4 1534:13 | 1552:7,22 | 1472:2 1474:7,12 |
| **J-o-s-h-u-a** 1520:10 | 1560:6 1562:8 | 1535:13 1537:22 | 1553:13 1555:3 | 1475:9,15 |
| **January** 1416:10 | 1564:22 1565:1 | 1549:17 1556:9 | 1555:14,15,22 | 1477:19 1478:8 |
| 1417:4 1421:8,14 | 1579:3 1596:3,4 | 1560:12 1561:5 | 1556:9 1557:2,5 | 1481:4,13 |
| 1544:16 1545:10 | 1608:15 | 1582:21 1584:3 | 1558:11 1559:5 | 1482:12,20 |
| 1579:19 1580:16 | **jump** 1550:11 | 1586:8 1616:19 | 1559:22 1560:7 | 1483:4 1485:4,5 |
| 1581:8 | 1570:10 | 1616:20 | 1561:7,20 1562:2 | 1487:9,17 |
| **Jesus** 1613:13 | **jumped** 1621:6 | **kindness** 1449:16 | 1562:12 1563:13 | 1488:17 1489:10 |
| **Jewish** 1475:19 | **jumping** 1620:19 | **kinds** 1469:14 | 1565:2 1567:17 | 1489:10 1490:9 |
| 1515:16,21 | **June** 1412:8 1470:7 | 1477:5 1558:18 | 1568:10 1569:2 | 1490:10 1492:18 |
| 1516:16,22 | 1472:21 1479:18 | 1560:17 1616:14 | 1569:20,21 | 1497:22 1498:6 |
| 1517:19 1518:11 | 1483:18 1490:21 | **kissed** 1430:21 | 1571:3 1574:17 | 1501:1 1508:9,13 |
| 1518:16,22 | 1553:22 1562:7 | 1583:4 | 1575:8 1576:7 | 1512:6 1513:21 |
| 1534:8,10,12 | 1609:22 | **Klayman** 1412:5 | 1581:9,13 | 1515:16 1516:2 |
| **Jewish-Christian** | **jurisdiction** | 1414:10 1415:3,4 | 1583:11 1589:5 | 1516:16 1517:8 |
| 1475:20 | 1416:20 | 1415:8 1416:4,18 | 1591:11,16,19 | 1517:14,15,16 |
| **job** 1459:5 1480:8 | **jurisdictions** | 1417:4,19 1418:4 | 1592:2,4 1594:21 | 1521:2 1524:20 |
| 1488:15 1547:18 | 1559:11 1571:19 | 1418:9,10,10,17 | 1595:9,11,16 | 1525:18,22 |
| 1549:16 1564:15 | **justice** 1567:22 | 1419:3,6,18,20,22 | 1596:11,12 | 1528:15 1529:4,6 |
| 1575:3 | | 1420:3 1422:16 | 1599:4,16 1600:3 | 1529:9,10 1534:9 |
| **jobs** 1459:2,3 | ———————— | 1422:18 1423:18 | 1602:22 1603:4,6 | 1534:19 1535:5 |
| **jog** 1503:3,6 | **K** | 1425:5,13 | 1603:7 1604:17 | 1537:17 1548:6 |
| **John** 1484:21 | ———————— | 1429:11 1435:8 | 1606:6 1609:11 | 1552:9,13 |
| **joke** 1467:11,12,13 | **karma** 1515:18 | 1435:11 1445:12 | 1609:15 1610:3,6 | 1557:18,20 |
| 1468:1 1534:9 | **Kasanji** 1475:7 | 1453:6,11 | 1610:12,15,20 | 1559:7 1561:2 |
| **joked** 1550:13 | **Kathleen** 1469:19 | 1465:17 1467:4,9 | 1613:7,15 1614:3 | 1563:7,7 1564:3,6 |
| **joking** 1479:21 | 1495:14,16,21 | 1470:7 1472:20 | 1614:12 1615:18 | 1564:15 1565:3 |
| 1482:21 1516:19 | 1496:8,19 | 1478:12 1479:11 | 1616:9,17 1618:4 | 1565:11 1566:18 |
| **Joshua** 1415:4 | 1505:21 1544:10 | 1479:21 1481:16 | 1618:7,14,20 | 1569:6 1570:4 |
| 1519:17 1520:4,7 | 1551:4 1585:17 | 1483:18,20 | 1619:7,12 1620:5 | 1574:9,11 1580:4 |
| 1521:4,11 | **Kaveh** 1435:22 | 1487:6 1490:21 | 1620:10,15 | 1580:13 1589:16 |
| **judge** 1492:14 | 1451:4 1454:16 | 1492:21 1493:1 | **Klayman's** 1498:16 | 1591:8 1593:10 |
| 1542:1 1543:11 | 1454:16 1455:10 | 1495:9 1496:8 | 1509:12 1548:14 | 1593:20 1594:10 |
| 1543:22 1545:3 | 1477:4,6 1478:16 | 1499:22 1500:9 | 1548:19 1554:15 | 1597:10,12,16 |
| 1557:21,22 | 1491:16 | 1514:1,21 1515:9 | 1563:1 1579:20 | 1599:14 1602:20 |
| 1558:1,1,2 | **keep** 1419:1,11 | 1518:14 1519:10 | 1591:3 1598:11 | 1604:2 1607:4 |
| 1561:21 1562:4 | 1443:17 1485:22 | 1519:13,17 | **knew** 1462:8 | 1611:2,3 1613:13 |
| 1563:1 1567:15 | 1486:1 1556:21 | 1520:2,4,7 1521:4 | 1534:22 1588:3,4 | 1614:22 1615:8 |
| 1586:9,11,12,19 | 1556:21 1557:19 | 1521:9,11,12 | 1588:6 1611:3 | 1619:8 1622:16 |
| 1586:21 1587:1 | 1567:4 1572:4 | 1522:13 1525:9 | **know** 1418:19 | **knowing** 1417:8 |
| 1588:6,9,13 | 1620:7 | 1525:14 1526:14 | 1421:4,6,16 | 1459:21 1460:7 |
| 1589:10 1590:22 | **keeping** 1572:1 | 1527:5,6,9 1528:4 | 1422:6 1428:6 | 1461:6 1462:1 |
| 1591:10,16 | **kettle** 1455:5 | | | |
| 1592:13 | **key** 1473:8 1556:22 | | | |

1496:2 1586:20
**knowledge** 1459:21
  1560:22
**knows** 1475:1,2
  1544:6
**Kollar-Kotelly**
  1591:10
**Kotelly** 1492:15
  1544:1 1545:3
  1567:16 1586:9
  1586:11,15
  1588:4 1589:10
  1591:16
**Kotelly's** 1542:2
  1543:12 1591:1

--- L ---

**LA** 1475:6 1491:18
  1496:14 1505:22
  1507:1,9 1536:5
  1543:16 1552:16
  1556:1 1578:3
  1582:3
**Labor** 1609:5,17
**lack** 1434:16
  1451:19 1473:3
  1486:17 1487:5
  1490:10 1512:13
**laid** 1553:1
**language** 1512:4
**Larkin** 1413:13
  1436:11,17
  1482:19 1483:4
  1512:22 1513:6
  1533:10 1570:2
  1572:20
**Larry** 1412:5
  1414:10 1415:3
  1465:17 1467:4
  1472:8,10,20
  1492:1 1496:8
  1504:2 1526:19
  1527:1 1539:22
  1548:14,19
  1551:16,22
  1555:14 1589:5
  1599:4 1616:17
  1622:11
**Las** 1463:4
**late** 1471:9 1547:12
  1549:2 1593:17
  1596:4 1609:14
  1614:16
**laude** 1521:20
  1522:9,11
**launched** 1523:8

**law** 1414:4 1433:2
  1435:5 1481:16
  1508:16 1521:20
  1521:21,22
  1522:10,10,12,15
  1522:18 1523:9
  1548:10,11,11
  1552:14 1557:2
  1561:22 1563:2
  1565:19 1572:11
  1572:17,18
  1573:8,10 1581:5
  1584:15 1600:11
  1600:12 1603:21
**lawsuit** 1504:19
  1556:3 1565:18
  1589:5,6
**lawyer** 1436:8
  1446:11,18
  1452:8 1455:16
  1457:8 1469:19
  1469:21 1481:5
  1506:7 1511:2
  1535:13 1537:17
  1537:19 1552:3
  1553:5,15
  1554:11 1555:4
  1556:15,19
  1557:1 1558:21
  1559:13 1561:9
  1572:20 1585:19
  1587:15,20,21
  1596:7 1600:20
  1621:4,5,11
  1622:10,13
**lawyer's** 1556:19
  1584:6,9,10
  1600:4
**lawyers** 1463:16
  1466:15 1562:1
  1588:22 1601:10
  1601:20
**layperson** 1561:19
**leading** 1525:4,7,12
**lean** 1449:11 1520:5
**learned** 1474:1
**leave** 1419:6
  1553:10 1598:4
  1608:6 1611:18
**left** 1463:11 1474:9
  1522:22,22
  1523:6,8
**leftist** 1591:9
**legal** 1436:6 1462:7
  1501:2 1510:7
  1523:12 1562:3

1562:14 1567:16
  1567:17 1568:2
  1588:22 1591:16
  1592:20 1594:2
  1597:20 1598:7
  1606:10
**legally** 1587:19
  1589:11,15
**legitimate** 1509:9
  1612:2
**length** 1458:4
  1491:10 1606:1
  1608:9
**leper** 1470:21
  1487:15
**let's** 1439:11
  1444:15 1472:18
  1476:2 1477:3
  1485:22 1488:10
  1503:4,8 1509:8
  1519:12 1541:6
  1560:1,2 1573:13
  1575:21 1576:12
  1580:5 1608:6
**letter** 1416:9,10,12
  1417:4,11,13
  1421:1 1422:18
  1424:4 1428:10
  1434:11 1437:15
  1438:10,13,14
  1443:5 1444:5
  1445:17 1447:3
  1448:3,7,8,11,17
  1450:10 1451:18
  1453:10,16
  1456:15 1459:22
  1465:16 1466:3,4
  1468:6 1476:3
  1482:20 1483:17
  1488:11 1490:1
  1490:20 1491:2,9
  1492:12,13
  1493:2,10
  1495:22 1496:4
  1497:1,14 1498:8
  1500:13 1504:13
  1509:12 1510:12
  1510:14,16
  1551:20 1557:9
  1571:2
**letters** 1460:9
  1461:7 1462:2
  1495:12 1512:19
  1582:5 1593:14
  1594:8
**letting** 1466:21

1605:9
**leverage** 1522:21
**leveraging** 1523:14
**licensed** 1601:15
**lie** 1432:10,13
**life** 1420:12
  1439:10 1445:19
  1445:22 1456:17
  1458:21 1459:10
  1480:6 1481:1
  1482:10 1492:17
  1498:7 1532:14
  1537:16 1554:5
  1598:10,21
  1599:2,15 1600:1
**life's** 1593:11
**lift** 1456:1
**liked** 1426:12
  1529:15
**likelihood** 1419:12
**liking** 1528:2
**limit** 1606:4
**limited** 1564:19
  1606:18
**line** 1447:20
  1500:14 1503:14
  1519:3 1589:17
  1599:7 1600:7
  1603:8 1604:7
**lines** 1430:2
  1568:17
**lips** 1430:22
**list** 1540:1
**listening** 1433:10
**listing** 1437:15
**literally** 1514:2
**literature** 1613:1
**litigates** 1555:16
**litigating** 1513:12
**litigation** 1432:11
  1535:20 1536:17
  1552:12 1592:6
**litigations** 1524:20
**litigator** 1524:19
**little** 1455:19
  1480:12 1494:17
  1529:9 1534:16
  1534:21 1550:18
  1564:21 1585:3
  1594:4 1595:14
  1605:7 1607:4
**live** 1451:2 1491:16
  1574:8,11 1603:9
**lived** 1524:6
**living** 1471:19
  1478:5 1604:4

**lobbying** 1536:9
**located** 1420:19
**long** 1419:10
  1421:13,14
  1455:1 1490:3,11
  1530:2,4,5 1564:5
  1606:21
**longer** 1539:16
  1560:7 1596:3
  1621:21
**look** 1422:16
  1425:5,8 1427:8,9
  1427:10 1428:5
  1433:4,17
  1439:11 1442:16
  1442:21 1444:15
  1447:4,8 1448:6
  1448:21 1451:13
  1453:6 1465:14
  1467:1 1470:1
  1472:18 1476:2
  1477:3 1478:18
  1480:16 1483:14
  1485:9 1486:13
  1488:10 1490:19
  1494:4 1495:3
  1499:7 1500:8
  1503:4,8 1507:8
  1508:11 1514:17
  1517:5 1545:13
  1551:21 1553:5
  1559:22 1560:13
  1565:21 1592:19
  1598:2 1612:21
**looked** 1439:16
  1443:1
**looking** 1424:22
  1425:4 1427:6,7
  1435:12 1469:3
  1502:17
**looks** 1528:15
  1616:18
**loosely** 1517:19
  1518:11
**Los** 1473:19
  1502:18 1513:14
  1514:14 1524:3,5
  1535:22 1576:21
  1577:7
**lose** 1505:19
  1541:19 1580:1,2
  1580:9
**loss** 1604:2
**lost** 1552:12 1580:2
  1601:2
**lot** 1422:1 1433:14

1440:12 1457:7
1462:19 1463:8
1463:18 1464:1,4
1464:4,16
1468:20 1480:5
1484:5,6 1489:9
1507:21 1508:4
1511:12 1514:11
1529:15,19,20
1539:17 1548:5
1555:2 1560:1
1573:6 1599:1
1604:1,2 1613:5
1622:9
**love** 1436:15,22
1437:1,1,5 1439:8
1439:9 1444:7,9
1445:13 1446:9
1453:22 1455:22
1456:2,2,6,10,11
1456:17,18
1457:17 1458:18
1466:9,11 1475:3
1475:4 1481:6
1485:2 1490:2
1492:11 1493:10
1493:16,20
1497:10,13,21
1529:13,14,17
1549:12 1550:1,2
1550:7,17
1583:22
**loved** 1436:22
1444:21
**loves** 1453:20
1454:1 1476:22
**loving** 1445:7,18
1553:20 1582:21
**low** 1452:9 1556:22
1582:9 1615:1,6
1618:16,16
**lower** 1541:14
1583:17
**luck** 1474:17
**lunch** 1530:20,21
1538:9
**luncheon** 1546:10
**lure** 1502:11
**Luxe** 1467:8,8
1550:12
**lying** 1431:20
1438:16

————————
**M**
————————
**M** 1412:22 1413:4
**mad** 1438:18

**major** 1480:13
**making** 1470:21
1501:22 1506:20
1598:20 1620:19
**man** 1454:22
**man's** 1520:11
**manager** 1471:21
**manufacturer**
1575:15
**March** 1545:15
1549:9 1552:7
**marginally** 1459:13
**Mark** 1475:14
**marked** 1618:3
**marriages** 1620:20
**MARY** 1413:13
**masochist** 1484:10
**mat** 1578:18
**match** 1575:11
**material** 1615:22
1619:22
**matter** 1412:4
1416:11 1428:2
1431:14 1441:10
1441:22 1442:6
1447:22 1448:2
1503:18 1508:6
1520:15 1540:17
1556:21,22
1559:8 1565:13
1570:15 1572:11
1572:12,14
1574:2 1596:8,10
1601:6 1614:17
1622:17
**matters** 1416:5
1511:15 1523:17
1547:6 1555:16
1560:8 1566:4
1620:1,2 1622:21
**mattes** 1530:7
**matured** 1622:4
**McCain** 1536:11
**mean** 1421:1
1431:17 1432:16
1435:17 1440:9
1441:14 1443:19
1449:16 1458:2
1462:10 1463:10
1480:8 1488:21
1501:19 1505:13
1514:2 1524:18
1526:20 1528:1
1528:13 1529:19
1533:14 1541:17
1552:4 1554:15

1557:13,14
1566:8 1567:6
1572:6 1574:1
1580:6 1590:9
1593:6 1597:13
1598:2
**meaning** 1445:19
**meaningless**
1501:14
**meanings** 1456:7
**means** 1441:8,13
1442:6 1483:3,4
1548:16,17
1587:18
**meant** 1435:18
1437:17 1457:17
1458:15 1462:9
1514:3 1535:3
1548:13
**media** 1440:12
1444:3 1553:7
1567:8 1588:15
**mediator** 1621:19
**medicine** 1456:12
**meet** 1468:17
1480:19
**meeting** 1524:8
**meetings** 1467:10
**meets** 1453:20
**Meghan** 1414:13
1607:19 1611:20
**member** 1413:14,16
1603:16
**members** 1541:11
1561:18
**memorandum**
1562:6,7,8
**Memories** 1601:1
**memory** 1567:14
**mental** 1433:9
1501:13 1502:1,3
**mentality** 1501:5,7
1501:9
**mention** 1439:15
1564:12
**mentioned** 1526:3
1618:11
**merits** 1537:6
**message** 1474:9
1549:21,22
1557:7 1598:4
**met** 1457:15 1463:7
1471:18,18
1523:22 1524:7
1524:11,12
1527:10 1547:14

**metal** 1502:2
**Miami** 1621:8
**MICHAEL**
1413:15
**microphone** 1520:6
**microphones**
1520:20
**middle** 1611:17
**military** 1460:14
**million** 1513:3,5,7
1560:10
**mind** 1419:11
1425:19 1426:5
1438:20 1450:16
1501:13,20
1516:2 1566:18
1567:4 1620:7
**mine** 1439:21
1447:10,11,14,18
1515:4
**minimal** 1457:1
**minimum** 1464:9
**minute** 1418:5
1423:13 1492:8
1492:22 1507:7
1509:7 1518:1,2,2
1530:22 1540:4
1541:2 1563:17
1572:5 1615:11
1617:4
**minutes** 1485:15,16
1494:22 1498:19
1530:17,18
1531:12 1538:9
1538:11
**miscalculated**
1545:18 1546:1
**mischaracterizing**
1438:15 1451:22
**misconduct** 1614:1
1614:8
**misplaced** 1601:2
1607:19 1620:12
**missed** 1520:8
1561:11 1586:20
1595:5
**missing** 1448:2
**mistakes** 1458:10
**mitigating** 1622:9
**mitigation** 1620:3
**Mm-hmm** 1519:15
1522:6 1618:13
**molehill** 1556:7
**mom** 1471:18
**moment** 1449:19
**moments** 1505:21

**Monday** 1609:6,9
**money** 1436:15,19
1439:4 1468:20
1502:19,20
1506:21 1507:16
1510:2 1513:8
1514:10 1532:10
1532:12,12,19
1537:12,12
1585:3
**money's** 1468:19
**months** 1544:21
1545:16
**morning** 1416:2
1573:16 1577:16
1582:20
**Morrison** 1523:6,17
**mother** 1532:6,8,18
**motion** 1543:15
1545:4 1589:9
1595:17 1614:5
**motions** 1607:16
**motivation** 1507:15
1586:8
**motive** 1603:8
**mountain** 1556:7
**mouth** 1498:10
**move** 1466:14
1469:16 1478:6
1479:1 1481:5,13
1485:4 1490:14
1506:5,9 1556:1
1583:9 1586:19
1587:10 1588:19
1622:18
**moved** 1555:20,21
1570:16
**moves** 1550:5
**movie** 1550:10
**MovieGuide**
1468:16,18
1480:20
**moving** 1422:1
1584:19 1601:22
1622:1
**multiple** 1524:12
1527:21
**mumbling** 1615:16
**murky** 1440:18
1595:12
**mutual** 1536:8

————————
**N**
————————
**N** 1415:1 1416:1
1547:1,1,1
**nail** 1539:18

naked 1471:21
name 1520:3,9,11
    1521:10,11
    1536:19 1547:18
    1548:18
named 1536:19
    1537:3 1590:8
    1620:18
names 1506:5,6
    1548:15 1599:8
naming 1548:15,15
    1556:3
Natalia 1620:18
nature 1477:17
    1548:6
NBC 1480:14
near 1474:4
near-fatal 1473:18
    1598:1
necessarily 1595:1
necessary 1511:19
need 1418:18
    1437:3 1440:11
    1463:16 1481:13
    1520:13 1531:19
    1537:16 1545:14
    1569:14 1579:21
    1583:16 1587:12
    1605:22
needed 1422:4,5
    1436:8 1495:22
    1547:17 1551:8
needing 1501:20
needs 1455:16
negative 1437:6
    1456:20 1475:21
    1597:14
negatively 1460:17
negotiated 1621:5
negotiations 1514:9
neither 1497:9
    1597:17
nemesis 1556:6
nervous 1577:1
networks 1480:14
Nevada 1463:4
never 1423:6
    1429:1 1430:21
    1436:20 1443:7
    1445:2,12,14
    1446:17 1453:20
    1467:16 1470:18
    1471:12 1496:14
    1502:9,9,13,15,16
    1502:22 1504:15
    1504:17,22

1505:3,11,22,22
1509:16,20
1511:6 1512:8,11
1512:20 1514:5,9
1520:22 1534:9
1544:10 1571:7
1573:18 1574:7
1575:16 1576:14
1576:18,19
1577:21 1580:18
1581:2,2,14
1583:3,4,4,5
1584:13 1594:11
1596:13 1597:20
1600:4,20 1602:5
1607:17
new 1418:11 1420:6
    1422:20 1463:9
    1463:13 1494:15
    1522:21 1524:5
    1552:4 1580:7
    1598:20
News 1581:21
newspaper 1548:18
    1566:22 1567:5
nice 1479:19
nicely 1588:20
night 1464:7 1555:7
Nightline 1558:18
nightmare 1613:5
nine 1498:19
    1544:20
NITV 1476:17
nobody's 1564:16
    1564:17
nodding 1426:1
    1531:9
non-effect 1613:2
non-final 1612:17
non-meritorious
    1597:1 1604:5
nonbinding 1619:5
nonrefundable
    1621:1,2
nonresponsive
    1445:10 1451:9
    1475:16 1479:2
normal 1494:3
Notary 1413:5
note 1426:21
    1491:5
noted 1544:1
notes 1591:14
notice 1429:14
    1536:21 1543:20
    1543:22 1544:14

1544:15 1545:9
1564:6 1567:1
1581:2 1593:18
1622:3
noticed 1543:21
notified 1428:1
    1431:10 1602:11
notwithstanding
    1493:6 1570:5
    1572:10
number 1417:3
    1422:17 1429:11
    1433:5,18 1435:6
    1437:8,9,10
    1439:12 1442:17
    1444:16 1448:22
    1451:14 1463:5
    1467:2 1470:2
    1472:19 1474:22
    1478:19 1483:15
    1483:16 1485:9
    1490:20 1494:4
    1499:8 1503:9
    1504:16,17
    1506:3 1509:13
    1512:2,3 1514:18
    1514:18 1517:3
    1533:8 1561:17
    1569:9 1573:17
    1581:8 1588:15
    1616:17
numbers 1426:18
nursing 1532:13
NW 1413:2

_____

**O**

o 1416:1 1534:10
    1547:1,1,1
oath 1419:22
    1462:7
object 1438:6
    1526:8 1527:14
objectified 1549:19
objection 1417:19
    1478:6 1525:3,6
    1525:12 1526:9
    1613:18
objective 1514:14
    1576:22 1581:16
    1582:7 1587:16
    1592:9
objectives 1556:16
obligated 1609:17
obligation 1594:4
    1604:18
observance 1607:5

observation
    1463:21
observe 1599:13
obviously 1435:20
    1436:1 1477:21
    1511:4 1542:6
    1551:2 1577:6
    1579:2,6 1580:12
    1593:14 1594:8
    1606:22
occasions 1526:17
    1527:21 1561:17
    1605:7
occurred 1569:13
occurrence 1595:18
OCR 1545:14,22
    1565:9
October 1541:16
    1542:4 1545:4,15
ODC 1606:14,16
off-the-record
    1530:15
offended 1474:19
offense 1448:16
    1476:7
offer 1581:20
offered 1619:17
offhand 1526:18
office 1414:4
    1420:4,12,13,14
    1420:22 1421:9
    1422:4,7,19
    1427:20 1433:13
    1491:19 1495:15
    1550:14 1571:17
    1573:7 1612:15
office's 1595:2
officers 1567:21
offices 1539:22,22
    1540:2,3 1542:15
    1551:5
oh 1423:14 1425:12
    1426:9 1428:11
    1448:3 1499:13
    1515:7 1522:3
    1540:8
ok 1417:14 1419:5
    1423:16 1424:6
    1424:10,12
    1425:12,21
    1428:11,22
    1429:22 1430:9
    1433:21 1437:14
    1438:4 1447:14
    1448:9,19,21
    1451:17 1452:3

1453:13 1456:4
1459:15 1463:15
1464:12 1465:10
1470:9 1471:6
1473:1,9,14,17
1479:7 1483:21
1486:10,15
1487:1,13,16
1490:22 1493:4,8
1494:12 1495:10
1496:11 1500:12
1501:4,18
1503:13 1508:13
1510:17 1515:12
1516:10 1518:8
1518:12 1522:7
1522:18 1525:5
1525:15 1527:6
1534:1 1540:14
1540:19,22
1542:22 1543:9
1551:9 1567:9
1568:8 1569:5
1576:17 1581:13
1583:1 1592:1,3
1594:21 1612:18
1612:19
okay 1456:5
old 1521:14 1601:1
onboard 1526:1
once 1486:16
    1574:5
online 1560:10
open 1524:14,19,21
    1554:19 1591:6
opened 1416:11
    1519:2
opening 1417:5
openly 1524:11
opinion 1502:4
    1562:7,8,8,22
    1588:21 1589:13
    1590:7 1601:7
opportunity 1563:5
    1573:5 1590:15
opposed 1454:3
    1596:21 1606:9
opposition 1609:11
order 1498:16
    1520:2 1532:22
    1544:19 1561:21
    1562:6,7,8,9
    1615:19 1619:15
orders 1588:9,11
organization
    1419:11

organized 1568:11
1568:15
original 1432:1
1441:12 1459:19
1602:6
Orlando 1621:10
1621:11 1622:11
ought 1539:4
outside 1589:1
1605:10
overlooked 1496:6
overly 1457:16
Overy 1523:5
owe 1485:5
owed 1504:20
1576:18,19
owing 1446:10

**P**

P 1416:1
p.m 1447:13 1496:7
1533:20 1546:10
1547:2 1623:1
Pacific 1447:13,13
1447:15 1524:6
page 1415:6 1427:8
1427:9 1428:9
1441:11 1444:19
1447:2 1449:13
1450:14 1455:21
1473:8,13
1474:16 1476:2
1480:13 1483:19
1488:11 1492:4
1500:3 1508:11
1512:7 1513:21
1574:20 1575:8
1586:14 1597:6
1597:18 1607:21
pages 1589:10
1597:6 1606:2,2,3
1606:19,20
paid 1432:12
1434:6 1436:20
1502:10,16
1578:3 1584:19
1584:19,20
1614:16
pain 1484:13
painful 1466:13
pale 1583:10
Palisades 1524:6
paragraph 1435:11
1436:13 1443:5
1444:18 1453:17
1454:14 1455:22

1457:14 1471:9
1473:9 1476:4
1484:7 1488:10
1502:5 1587:17
paragraphs
1454:20
paraphrasing
1438:5 1571:5
parsing 1564:4
part 1417:3 1424:7
1425:19 1426:14
1430:14 1432:6,6
1434:7 1441:10
1442:1,5,7
1506:13 1516:20
1534:13 1536:3
1548:12 1553:21
1557:19 1558:14
1572:4 1584:19
1611:2 1618:21
participate 1439:18
particular 1536:19
1562:18 1572:19
particularly
1454:22 1478:2
parties 1413:7
1530:16 1564:2
1610:2 1620:6
partisan 1586:12
partner 1523:5
partners 1522:22
1579:15
party 1584:10
passed 1432:13
1481:10
patently 1496:13
Patriots 1580:6,7
Paul 1523:1
pause 1437:13
1499:17 1530:13
1617:5
pay 1503:1 1509:20
1514:10 1578:1,2
1614:17 1621:20
1622:12
paying 1529:1
payments 1583:17
peace 1450:15
pejorative 1516:3
1516:15
pending 1428:2
1487:3 1596:9,10
Pennsylvania
1420:13 1422:8
1431:16 1521:19
1522:9,19

1571:16 1601:17
penultimate
1444:18
people 1431:4
1437:1 1439:9
1440:12 1441:18
1443:20 1444:3
1456:17,18
1458:7 1460:22
1462:19 1468:17
1469:4,4,19
1471:16,22
1475:4,21
1476:22 1477:6
1477:11 1478:1
1478:15 1480:10
1480:19 1484:18
1487:11,15
1504:21 1506:3,7
1516:16 1517:8
1518:16 1525:17
1548:6 1560:17
1560:21 1561:4,5
1561:6 1573:6
1574:13 1577:12
1596:15 1611:3
pep 1484:4
Pepper 1522:20
perceive 1574:13
perceived 1432:3
percent 1432:16
1502:8,12
1503:15 1504:13
1504:15 1509:14
1509:21,21
1547:22 1550:21
1578:1
perception 1578:9
perfectly 1509:8
period 1420:21
1455:17 1481:4
1534:4 1549:20
1552:7 1585:4
1621:14
periodical 1560:9
permeated 1489:18
permit 1604:22
1617:9,13,14,18
Persian 1452:17
1474:17 1475:2,3
1475:3,5,7 1476:5
1476:6,8 1484:21
Persians 1487:9
person 1454:3,7
1471:20 1477:5
1477:19 1478:16

1491:17 1579:6
1599:5
person's 1455:11
personal 1434:13
1451:19 1452:18
1477:14,15
1489:21 1539:11
1553:17,19
1560:22 1572:6
1584:11,17
1585:6 1586:1
1588:17
personality 1597:15
personally 1528:21
1537:10
persons 1499:2
1547:5
perspective
1477:13
persuasive 1578:10
peruses 1508:12
PFFs 1606:13,16
Philadelphia
1532:16 1580:5
philosophy 1573:5
phone 1419:6
1474:8,13
1485:14 1486:9
1598:3
phrase 1475:21
physical 1540:2
pick 1580:6
pieces 1497:9
pinning 1560:8
pity 1482:13
place 1440:18,19
1451:2 1458:6
1475:22 1480:9
1619:2
plaintiff 1562:18
plan 1439:17
planing 1418:16
playing 1482:1
plea 1621:5
pleading 1612:8,16
pleadings 1572:16
1576:2 1610:16
1610:21
please 1427:9
1428:6 1433:5
1435:7 1444:16
1448:21 1450:18
1451:13,21
1465:15 1467:2
1470:1 1478:19
1483:14 1486:13

1489:2 1494:5
1498:22 1499:8
1502:6,7 1503:5
1514:19 1519:21
1520:3,20 1521:2
1521:10 1539:2,7
1539:10 1553:5,9
1553:9 1563:17
1568:9 1569:21
1605:8
pled 1573:14,15
plus 1598:20
PNN 1434:3,9
1480:8 1491:18
podium 1531:10
1610:18
point 1421:9
1435:19 1436:7
1443:14 1457:5
1463:21,22
1464:2 1466:7,14
1479:22 1480:1
1481:21 1482:7
1483:11 1485:11
1488:6 1500:21
1502:13,14
1503:9,15 1505:3
1506:4 1511:7
1512:12,14,20
1518:7 1523:21
1528:18 1537:14
1538:21 1539:15
1540:5 1543:8
1545:22 1551:2
1551:13 1552:17
1552:18 1554:9
1564:2 1571:22
1572:1 1575:22
1576:3 1577:12
1577:20,22
1580:17 1581:14
1585:22 1595:18
1599:11 1602:3,7
1604:19 1608:12
1618:17 1622:4
pointed 1425:13
points 1540:1,20
1572:2 1597:3
polarized 1603:10
Polish 1475:20
political 1440:14
1564:13 1592:9
politically 1548:15
polygraph 1432:15
1584:21
poor 1534:6

portion 1471:6
  1515:6 1604:20
  1614:17
position 1562:17
  1585:2
positive 1437:6
  1446:14 1456:20
  1480:16 1492:17
  1525:11,17
possibility 1577:20
  1591:2
possible 1536:15
  1545:19
possibly 1565:17
post 1420:4,13,14
  1420:22 1421:9
  1422:4 1427:20
  1458:19 1558:17
  1565:17 1600:18
posting 1591:6
pot 1455:4
potential 1475:11
  1475:12 1482:17
  1484:5 1489:9
  1491:3 1599:1
  1618:8 1620:3,3
powerful 1600:15
  1600:16
powers 1590:11
practice 1481:17
  1523:7 1548:10
  1548:11 1572:17
  1573:8,10 1581:5
  1600:11,12
practiced 1522:19
practices 1548:10
  1557:2 1572:18
pray 1458:13
preclude 1620:8
preclusive 1613:1
prefatory 1572:14
prejudged 1602:10
prejudice 1572:2
  1611:14
prejudicial 1438:7
preliminarily
  1605:2,19
preliminary 1416:5
  1547:6 1562:20
  1619:5
preparation
  1530:22
prepare 1498:15
prepared 1431:9
  1432:18 1531:18
presence 1469:2

1551:4 1577:4
present 1413:6
  1414:9 1499:3
  1538:15 1547:5
  1617:10,15
presented 1549:5
  1563:12 1571:17
  1573:21,22
  1574:1,3 1598:14
preserve 1589:12
Preserves 1587:6
president 1578:14
pressure 1463:8
  1508:1 1525:17
  1552:6 1558:22
pretty 1494:8
  1552:12
prevail 1570:6
previous 1505:8
previously 1425:5
  1505:20
pride 1484:11
  1490:4
primary 1496:5
prior 1453:3
  1484:19 1610:11
  1612:9,18
  1617:10,15
  1622:13
priority 1452:9
privilege 1589:7
pro 1436:19
  1502:10 1505:9
  1509:22 1576:15
  1577:22
pro-Clinton 1591:9
pro-regime 1443:21
pro-Shah 1441:1
probable 1421:19
probably 1425:4
  1440:16 1496:19
  1538:21 1541:14
  1542:19 1544:2
  1567:13 1606:14
  1617:3
problem 1426:3,12
  1447:7 1472:9
  1538:15
problems 1446:5
  1466:20 1491:3
  1564:15 1586:11
  1588:3
procedure 1613:4
  1619:16
proceed 1531:18
  1549:1 1601:13

proceeded 1571:20
proceeding 1459:9
  1477:22 1486:5
  1555:19 1565:9
  1570:1,12 1572:3
  1610:22 1612:3,5
  1612:9,17 1615:2
  1618:22 1620:22
  1622:21
process 1567:4
  1601:3,5,22
  1611:1 1613:3
produce 1439:18
productions 1553:8
profess 1492:11
  1497:10
professations
  1458:17
profession 1462:7
professional 1412:2
  1413:1 1446:11
  1449:11 1477:17
  1501:20 1505:1
  1553:16 1559:14
  1584:6 1586:5
  1594:1 1601:9
professionally
  1491:22
Professor 1601:8
professor's 1613:5
projecting 1477:1
projects 1450:16
prominent 1536:9
promiscuous
  1491:6
promise 1480:6
promote 1553:7
proof 1573:11
proper 1511:4
  1567:22
properly 1507:12
property 1463:12
propose 1606:14
  1607:7
proposed 1606:13
proprietary
  1584:11
prosecuted 1596:22
prosecution 1597:2
protect 1505:12
  1506:15 1543:20
  1579:8 1597:20
  1598:7
protected 1594:10
protecting 1505:16
  1505:17

protection 1601:22
proud 1516:22
  1534:10
prove 1491:6
  1570:7
proven 1605:3,18
  1605:20
proverbial 1435:16
  1455:4
provide 1547:22
provided 1423:17
psyche 1535:14
  1593:3
psychiatrist/psyc...
  1488:14
psychological
  1454:6 1489:11
psychologically
  1552:5
psychologist
  1433:22 1446:4
  1475:8 1489:15
  1549:13
psychologists
  1584:20
public 1413:5,14
  1559:8 1564:20
  1573:5 1576:1
  1613:14,22
  1614:6,11 1622:7
  1622:8
publicity 1524:16
  1525:1,11 1526:4
  1536:12 1558:10
  1558:14,20,20
  1560:1 1574:9,18
  1575:19 1615:4
  1618:9
publicize 1560:6
publicizing 1525:19
  1526:1 1527:11
  1527:13
published 1560:9
  1575:22 1576:1
  1600:17
pull 1520:20 1551:8
purports 1441:4
  1544:5
purpose 1459:9
  1496:3,5,12
  1535:20 1597:8
purposes 1417:7
  1494:14 1604:6
  1615:4 1621:10
pursue 1430:18
  1557:21 1573:20

1585:6 1592:8
pursued 1587:19
pursuing 1448:13
  1585:7
pursuit 1438:17
push 1484:10
  1551:7 1557:16
pushing 1501:2
put 1434:5 1489:19
  1498:9 1505:6
  1507:11 1508:1
  1508:13 1509:18
  1510:22 1513:8
  1514:3,4,13
  1531:20 1532:22
  1536:21 1544:1
  1558:21 1562:1
  1565:18 1574:5
  1577:10 1578:7
  1578:11 1584:18
  1585:1 1587:6
  1588:20 1590:2
  1592:16 1611:12
  1615:5 1620:17
put-upon 1558:6
puts 1458:6
putting 1449:20
  1450:7 1479:3
  1599:6

Q

qualification
  1589:9
qualified 1589:7
question 1424:20
  1426:20 1427:3
  1430:5,10 1432:8
  1433:12 1436:11
  1439:20 1441:3
  1452:2 1453:18
  1459:13,14,19
  1460:1,3 1469:15
  1482:15,18,19
  1487:2,22 1492:9
  1493:7 1497:4,7
  1497:16 1500:17
  1504:2,6,8,9,11
  1506:10,11
  1509:3,9 1510:21
  1512:22 1516:8,9
  1516:13 1518:4
  1525:4,7,8,13
  1527:4 1538:17
  1539:7 1541:3,8
  1559:6 1565:11
  1572:10 1579:11

questioning 1519:4
questions 1468:3,5
  1481:15 1485:20
  1528:5,6 1529:22
  1538:7 1552:2
  1567:1 1568:6
quick 1486:2
quickly 1499:15
  1570:17
quicksand 1593:1
quiet 1443:18
  1548:11
quietly 1555:11
quite 1488:3
  1508:15 1524:11
  1524:14 1528:3
  1534:22 1580:16
  1593:22
quo 1587:7 1589:12
quote 1429:14
  1578:10 1591:15

**R**

R 1416:1 1547:1
radical 1443:20
raise 1520:12
  1567:1 1594:19
raised 1443:13
  1575:22 1579:1
raises 1538:21
rambling 1478:11
ran 1457:21
  1467:15
ranked 1473:21
  1600:16
rate 1548:2
Razavi 1459:3
reach 1597:19
  1598:7
reached 1435:18
reacted 1599:11
reaction 1459:22
  1460:8,10 1461:6
  1463:15 1496:12
  1577:1
reactions 1462:1
reactive 1458:20
read 1424:15,16,17
  1448:8 1451:15
  1453:8,14,15
  1454:19 1470:5
  1471:6 1473:1
  1486:20 1487:1
  1495:5 1503:11
  1560:18 1573:15
  1574:21 1584:4

1586:17 1587:14
1591:18,21
1592:18 1603:2
1610:17 1617:13
1617:17
reading 1428:7
  1447:9 1448:11
  1450:20 1501:16
  1501:18 1591:20
reads 1428:12
  1433:20 1442:18
  1448:10 1451:16
  1453:9 1467:5
  1472:22 1479:12
  1486:21 1491:1
  1495:6 1500:1,11
  1503:12 1515:11
ready 1416:3
  1605:6
real 1499:15 1574:8
  1606:4
reality 1513:11
realize 1426:13
  1454:21 1462:6
  1484:6 1508:5
realized 1469:16
  1585:11
realizing 1490:14
  1503:6
really 1421:21
  1443:11 1444:6
  1444:21 1459:5
  1462:10 1474:2
  1475:3 1487:18
  1507:8 1522:1
  1524:20 1532:17
  1536:4 1552:17
  1556:10,11
  1559:9 1567:13
  1577:18 1578:4
  1579:8 1599:10
reason 1496:17,19
  1533:1 1565:1
  1573:7 1597:17
  1602:2
reasonable 1570:9
reasonably 1584:8
  1586:18
reasons 1441:2
  1491:15 1511:12
rebuttal 1604:14
recall 1507:17
  1525:21 1529:5
  1617:7
receive 1513:3
  1547:7

received 1417:16
receiving 1513:7
  1552:6
recess 1498:15,19
  1498:20 1519:16
  1530:17 1531:11
  1531:13 1538:9
  1538:16 1546:7
  1546:11 1605:12
recognition 1457:1
  1457:6
recognize 1454:13
  1477:4
recognized 1449:19
recognizing
  1454:11
recollect 1421:15
recommendation
  1611:10
recommended
  1446:19 1537:17
  1537:18
recommending
  1466:15
reconsideration
  1543:15 1545:4
reconvening 1547:4
record 1416:3
  1422:17 1426:12
  1427:5 1433:15
  1435:7 1451:7
  1453:10 1465:15
  1467:3 1470:6
  1472:19 1479:10
  1483:15 1490:20
  1498:21 1499:21
  1514:11,20
  1519:20 1530:15
  1531:15 1540:12
  1540:18,18
  1545:13 1556:13
  1559:8 1564:4
  1565:22 1567:12
  1567:15 1576:13
  1577:7 1581:19
  1586:10 1603:1
  1603:18 1605:11
  1605:13 1611:13
  1613:11 1614:13
  1614:21 1615:3,6
  1618:2,15,20
  1619:2
records 1571:19
recovered 1509:15
recovery 1503:15
  1547:22 1550:19

recreate 1572:5
recuperate 1504:20
recuperated
  1576:17
redirect 1449:4
  1519:14 1520:2
  1530:19 1531:18
  1532:2 1541:7,9
  1541:10
refer 1427:13
  1533:7
reference 1425:20
  1525:10 1532:4
referral 1512:18,18
  1512:19
referred 1469:17
  1549:14 1600:21
referring 1425:19
  1431:9 1517:2
  1591:8 1615:18
reflect 1484:12
reflecting 1582:5
reflects 1451:18
regard 1464:17
  1544:18 1582:11
  1582:15 1589:7
  1604:3
regarding 1568:13
registration
  1420:19
regret 1479:20
regular 1533:10
  1565:4
rehabilitation
  1456:11
Reindel 1522:21
relate 1416:18,22
related 1465:8
  1521:12 1576:8
relates 1468:7
relations 1583:3
relationship
  1428:16,20
  1429:5,17
  1434:14 1448:13
  1449:10 1451:20
  1452:18 1454:5
  1454:12 1473:4
  1486:18 1487:5
  1489:1,16
  1504:22 1505:1,2
  1505:9 1506:14
  1511:7 1512:12
  1512:15 1513:1
  1513:18 1547:13
  1551:16 1553:20

1559:15 1573:21
1582:16 1583:21
1584:3 1586:2
relationships
  1477:18
relatively 1556:22
relevance 1517:12
  1518:9,18
relevant 1599:20
  1604:11
relief 1502:17
  1507:1 1552:15
  1562:4,13,15,19
  1562:20 1579:15
  1586:6
religious 1457:16
  1458:3 1518:5
relying 1548:20
remain 1511:3
remains 1419:22
  1541:7
remarks 1438:8
remember 1421:2
  1421:17,21
  1422:9 1425:2
  1468:11 1502:7
  1507:21 1508:2
  1517:4 1542:5
  1545:19 1575:1
  1597:22
reminded 1550:18
remit 1621:19
remove 1573:8
removed 1568:14
  1593:4
remuneration
  1513:7 1588:17
renamed 1467:8
repeat 1522:5
repetition 1620:8
rephrase 1459:14
  1525:8
reply 1447:3,8
  1606:2,16,18
  1607:9 1609:20
Reported 1412:21
reporter 1413:5
  1611:20
repossessed
  1583:15
represent 1435:4
  1442:12 1455:13
  1466:16 1502:11
  1505:15 1547:21
  1549:18 1578:17
  1585:13 1593:16

1602:16
**representation**
1436:6 1501:3
1503:19 1507:10
1510:7,13 1537:7
1556:17 1579:12
1580:15 1581:1
1587:16 1588:1
**representations**
1620:7
**representative**
1578:14
**represented**
1442:12 1460:12
1463:3 1534:4
1560:7
**representing**
1433:1 1491:11
1491:12 1555:5
1579:14 1584:13
1584:14 1590:4
1592:10 1596:17
1615:12
**reprimand** 1614:14
1622:7,8
**reputation** 1432:5,6
1475:2 1557:14
1561:4
**request** 1540:10
1552:15
**requested** 1559:15
**requesting** 1528:20
**require** 1503:16
1612:7
**required** 1567:21
1592:21
**requires** 1490:3
1559:12 1607:2
**requisite** 1499:2
1547:5
**resist** 1556:6
**resolution** 1513:13
**resolve** 1536:22
1612:1
**resolved** 1612:4
**respect** 1429:4
1434:17 1455:9
1461:2 1462:7
1464:9 1470:15
1470:20 1472:6
1490:4,10 1494:2
1512:2 1517:16
1533:15 1535:7
1555:8 1556:14
1556:16 1557:1
1559:13 1564:22

1567:10 1568:1
1582:8 1588:14
1594:1,2 1601:21
1603:13,16
1612:21 1613:19
1613:20 1614:6
1615:19
**respected** 1439:1
1487:9 1583:6,7
1603:15
**respectful** 1481:3
1487:10 1586:9
**respective** 1413:7
1531:2
**respond** 1448:3
1474:10 1503:5
1504:3 1542:7
1554:14 1571:4
**responded** 1550:20
1571:7 1597:20
**Respondent** 1412:6
1414:2,11
1416:15,18
1417:18 1521:5,8
1547:14 1569:19
1619:20
**Respondent's**
1423:17 1532:2,5
1553:19 1579:3
1606:11,17
1607:8 1609:9
1616:22
**responding** 1597:22
**response** 1427:14
1427:17,21,22
1428:15 1429:3,5
1430:14 1462:9
1482:4 1483:20
1571:3 1606:16
1609:12
**responsibilities**
1584:9
**responsibility**
1412:2 1413:2
1594:1
**responsible**
1536:20 1598:12
**responsive** 1459:13
1461:13 1478:11
1487:12
**rest** 1450:6 1506:16
**restaurant** 1446:2
**restroom** 1467:9
1469:8
**result** 1433:3
1463:5 1525:11

1525:17,18
1543:5 1549:15
1581:4 1585:8
**resulted** 1473:18
**resume** 1416:3
1418:22 1419:18
1530:19 1617:8
1617:14
**resumed** 1547:3
**resumes** 1419:20
**resuming** 1499:1
**resurrected**
1431:14
**resurrecting**
1431:10 1602:1
**resuscitate** 1532:22
**retained** 1434:1,4
1488:14
**retainer** 1621:1
1622:15
**retaliated** 1534:16
**retrospect** 1535:2
**return** 1470:19
1493:15
**returned** 1550:2,17
1569:19
**revealed** 1563:20
1564:1
**revelation** 1600:5
**revenge** 1459:8
1597:8,9,15
1603:13
**reverse** 1585:9
**Review** 1521:22
1522:12
**revolves** 1460:15
**rich** 1452:17
**right** 1425:6,15
1429:12,19
1430:3,7 1431:3
1434:10 1435:13
1440:3,18 1442:1
1442:3 1445:4
1448:18 1449:14
1450:1 1452:1,5
1454:4,12 1456:8
1458:9 1461:18
1463:11 1470:16
1474:4,20
1477:16 1489:12
1490:5 1497:19
1500:8,20 1507:3
1507:13 1508:8
1508:10 1510:1
1527:19 1530:9
1535:8 1536:2
1540:11 1541:13

1542:16,17,18,20
1544:17 1554:20
1561:8 1583:6
1586:14 1596:6
1599:19 1603:21
1603:22 1609:7
1611:7
**right-hand** 1520:13
**rights** 1433:13
1505:17 1541:20
1542:14,21
1555:19 1580:1,2
1593:21 1594:5
1596:18 1597:21
1598:7
**ring** 1472:1
**risk** 1443:22 1508:5
1537:10
**Roberts** 1586:21
**Rodham** 1556:4
**Rohrabacher**
1495:17 1496:18
**Rohrabacher's**
1495:14
**role** 1452:8 1457:8
**romantic** 1428:16
1428:19 1429:5
1429:16 1454:13
1457:16,19
1458:3 1573:21
1582:16 1583:20
**Ronald** 1601:8
**room** 1467:10,14,16
1467:16,22
1499:19
**roommate** 1454:16
1471:21 1478:5
**Rotunda** 1601:8
**round** 1580:2
**rubbing** 1548:16
**ruined** 1593:11
1598:10,21
**rule** 1553:14
1556:15 1557:4
1559:7,10
1561:15 1573:1
1586:17 1595:2
1595:15 1599:15
1600:9 1604:19
1605:3,15,17
1606:1 1607:2,20
1610:15 1617:6
1617:17 1619:10
**ruled** 1462:6 1558:1
**rules** 1539:9
1563:14 1564:20

1566:12 1584:2,4
1594:15 1601:19
1601:21 1607:3
1608:5
**ruling** 1589:2
1591:1 1613:19
1613:20 1614:5,6
1618:17 1619:18
**rumors** 1476:16
1560:22
**run** 1521:16
1522:14

---

**S**

**S** 1416:1 1547:1,1,1
**sad** 1444:6,8
1453:19
**safety** 1444:1
**sake** 1560:2,3
1587:2
**salary** 1480:11
**salesman** 1532:15
1598:18
**Sam** 1459:3
**sanction** 1569:8,9
1620:3
**Sataki** 1429:16
1434:1,14 1435:3
1435:8 1438:16
1439:8,17 1441:5
1444:6 1458:16
1460:11 1464:1
1465:17 1466:3,5
1466:9 1467:4,14
1470:8 1472:20
1473:10 1474:18
1479:11,15
1480:4 1483:20
1483:18,20
1484:8 1486:17
1487:5 1489:1,16
1490:21 1493:15
1493:19 1495:9
1495:13,18,22
1497:11 1499:22
1500:10 1502:6
1507:19 1509:13
1513:2 1514:21
1515:8 1517:17
1517:20 1518:15
1523:22 1524:8
1526:14 1527:16
1528:10 1529:13
1533:15,18
1535:16,20
1537:4 1539:17

1543:16 1544:15
1547:12 1548:3
1548:20 1549:4
1549:14,17
1550:18 1551:2,9
1552:16 1553:1,3
1553:14,19,22
1555:11 1556:1,8
1557:8 1558:7,11
1559:21 1560:4,7
1561:6 1564:12
1565:7 1570:21
1573:22 1575:19
1577:10 1579:2
1582:17 1586:20
1596:2 1597:7,12
1602:5 1603:15
1615:15
**Sataki's** 1427:15
1428:15 1447:3
1504:12 1508:3
1515:15 1518:20
1550:8 1560:14
1561:4 1562:5
1593:2 1601:16
**satisfactory** 1531:5
1531:6,8 1556:12
**saved** 1532:14
**saw** 1444:12
1445:22 1446:18
1502:4 1505:20
1507:4 1554:16
1554:18 1557:10
1557:10 1560:20
1593:6
**saying** 1433:8,10
1434:20 1443:8
1446:10 1448:15
1449:8,8 1450:22
1451:1,2,4
1452:20,21
1456:22 1462:12
1466:17 1470:15
1474:22 1475:9
1476:10,19
1477:2 1478:14
1480:4,22 1481:4
1481:22 1482:2,5
1484:21 1487:8
1487:11 1489:8
1500:21 1501:12
1501:22 1502:7
1502:12 1510:8
1510:13 1514:6
1517:17 1525:21
1527:2 1534:8

1536:4 1540:1
1544:5,5,6,18,18
1551:19 1560:5
1579:20 1589:5
1617:17
**says** 1435:14
1436:14 1438:13
1438:13,14,14
1441:7 1448:1
1449:13 1450:14
1472:8 1479:17
1492:6 1498:8,8
1500:14 1502:6
1503:14 1510:16
1510:16 1515:4
1534:15 1553:4
1577:11 1582:18
1584:6 1593:15
1593:19 1597:7
1601:18 1610:15
1612:12 1619:11
1619:11
**SC11** 1616:17
**scenarios** 1613:5
**scheduling** 1494:14
1608:10,11
**scheme** 1558:14
**scholar** 1521:21
1522:11
**school** 1521:21
1522:10,15,18
**scope** 1436:5
**score** 1580:5,7
**scores** 1556:5
**screamed** 1611:17
**scrupulously**
1561:18
**second** 1423:20
1453:16 1455:21
1473:8,12
1480:13 1550:14
1565:14 1621:4
**seconds** 1574:2
**secret** 1559:9,13
1566:7,9,13
1576:11
**secretary** 1551:5
**secrets** 1539:3
1559:12,20
1560:12 1563:19
1564:1,22
**section** 1606:9,10
1615:1
**see** 1423:11 1425:1
1425:3,7,7,12
1428:8 1434:1

1437:21 1444:22
1445:2,5 1446:14
1449:15,16
1451:6 1458:10
1458:11 1464:19
1467:17 1479:5
1479:13 1484:6
1484:20 1485:13
1492:5 1503:17
1504:18 1505:5
1509:18 1512:17
1514:8 1515:12
1515:22 1519:10
1531:9 1534:17
1538:15 1541:12
1549:14 1550:4,8
1553:18 1560:19
1560:20 1565:22
1570:13 1573:9
1584:13 1587:12
1612:13 1622:8
**seeing** 1435:15
1472:10
**seek** 1603:13
**seeking** 1562:13
1597:15
**seen** 1423:6 1435:1
1508:14 1563:6,8
1585:14 1589:17
1600:20 1622:1
**sees** 1615:7
**segment** 1485:18
**self** 1490:4
**self-centered**
1460:15 1501:11
**self-deprecating**
1483:2 1516:20
**selfless** 1455:2
**selling** 1588:16
**Senate** 1457:21
**senators** 1536:10
1548:17
**send** 1422:4
1431:12 1486:2
1512:9 1552:16
1552:22 1571:3
**sending** 1466:2
1505:14 1543:16
**sends** 1553:6,6
**sense** 1497:12
1516:4 1529:18
1570:16 1583:12
**sent** 1417:4 1420:15
1423:7 1425:2,3
1427:19 1429:15
1431:11 1441:5

1442:21 1447:10
1447:11,17,17
1549:10 1551:18
1551:20 1554:18
1557:8 1571:2
1593:11
**sentence** 1442:20
1445:18 1447:6
1454:9 1467:7
1471:8 1472:8
1491:20 1492:4
1493:2 1502:6
1591:21,22
1617:13
**sentences** 1448:7
1450:13
**separate** 1502:15
1505:4
**September** 1514:21
1515:4 1542:13
1544:21 1608:18
1608:20 1609:1,3
1609:6,10,14,19
**series** 1460:8
1461:7 1549:10
**serious** 1474:9,13
**seriously** 1598:4
**serves** 1606:11
**serving** 1539:16
**session** 1605:1,6
**set** 1418:3 1441:10
1509:12 1563:14
1601:7
**setting** 1447:16
1548:1 1562:10
1581:22
**settle** 1508:1,6
1537:11
**settlement** 1507:9
1514:12 1525:2
1536:4,13,14
1537:9 1588:18
**seven** 1437:15
1545:16
**severe** 1560:16
1563:21 1565:17
**sexual** 1432:20
1434:3,9 1460:13
1488:15 1491:12
1547:16 1548:7
1549:16,18
1555:8 1573:18
1583:3
**sexually** 1431:4
1433:9 1560:16
**Shamble** 1439:4

1446:17 1574:16
1578:12 1579:13
1582:12 1596:16
1600:19
**She'd** 1577:5
**Shea** 1469:17
1512:18 1537:18
1585:16
**Shearman** 1523:10
**shining** 1464:7
1555:7
**short** 1496:7 1530:3
**shortly** 1419:15
1505:13
**shot** 1462:10 1587:5
1592:16 1607:6
**show** 1484:17
1485:1 1557:22
1616:1
**showing** 1612:6
1622:8
**shown** 1571:21
**shows** 1540:7
1544:4,9 1567:12
1567:15 1586:8
1593:12 1603:4,7
**shut** 1554:13,22
**shy** 1618:9
**sick** 1501:13,19
**side** 1435:2 1450:2
1450:3 1531:10
1551:8 1564:4
1566:18 1575:18
1590:11,13
1603:11,11,12
**sides** 1440:14
**sign** 1512:6 1513:20
**signed** 1604:10
**signing** 1560:4
**silent** 1419:7
**simple** 1555:19
**simply** 1446:9
1461:2 1502:17
1503:6 1574:4
1577:10 1622:18
**single** 1537:1
**sink** 1593:1
**sister** 1485:12
1494:14 1519:10
1528:3 1530:1
1576:7
**sisterly** 1529:10
**sit** 1486:9 1520:19
**sitting** 1611:2
1615:5
**situation** 1461:1

1462:21 1547:18
1555:2
**six** 1428:2 1476:7
1545:16 1570:13
1579:7
**Sixteen** 1483:17
**Sixty-four** 1608:2
**skip** 1476:3
**slammed** 1475:12
**sleeping** 1478:4
1585:4
**sleeve** 1455:1
**slightly** 1520:1
**small** 1548:12
1610:4,7 1614:17
**smear** 1561:4
**Smith** 1413:20
1415:7 1416:6,7
1416:21 1417:2
1417:11,15
1418:1,6,7 1419:8
1419:14,17,21
1422:11,12,15
1423:4,8 1424:2,3
1424:14 1425:10
1425:13,16,21
1426:4 1427:6,12
1430:4,6,12,13
1432:9 1435:9
1437:7 1438:8,9
1439:13 1442:14
1442:15 1445:6
1445:16 1448:4,5
1448:16 1450:12
1451:12 1452:14
1454:19 1459:18
1460:2 1465:2,6
1465:10,11,12,13
1465:21 1466:1
1468:2 1469:12
1469:13,22
1470:4,6,10
1474:15 1478:6
1478:17 1479:9
1479:14 1483:6
1483:10,12,13
1485:19,20
1486:4,11,12
1488:1 1489:14
1492:6,10
1493:12,13
1494:7,10,17,19
1495:1,2,7,11
1497:3,8 1498:1,9
1498:11 1499:6
1499:20 1500:4,6

1500:7 1504:5,10
1506:9,18 1509:8
1509:10 1510:11
1511:8,14 1513:4
1514:15,16
1515:6,8,13
1516:14 1517:14
1518:7,10,13,19
1519:8 1523:11
1525:3,6,12
1526:9 1528:6
1531:6,8 1535:16
1538:15 1539:2,6
1539:13 1547:10
1547:11 1561:13
1563:17 1564:11
1565:5,10,21
1566:3,10,15,20
1567:3,19 1568:6
1568:7,9,12
1569:3,16 1572:6
1573:14 1575:11
1577:17 1579:1
1586:16 1587:14
1591:13,20
1595:13,19
1596:6,13
1602:18 1604:15
1604:17 1606:10
1606:20 1607:10
1607:11,14
1609:20 1611:8
1612:14,19
1613:13,17
1614:4,11
1615:10,14,17
1616:2,5,8,15,20
1617:21 1618:2,5
1619:18
**Smith's** 1416:4
1459:14 1499:1
1595:12 1607:8
**smitten** 1549:3
**so-called** 1574:3
1582:16
**solely** 1461:17
**solemnly** 1520:14
**somebody** 1437:5
1440:22 1444:9
1446:2,6,15
1453:3 1455:8,13
1457:9 1458:21
1459:6 1475:14
1476:20,21
1485:1 1488:8
1537:21 1538:2

1552:10 1583:2
1592:7,7 1599:6
**someone's** 1606:3
**sone** 1558:21
**sophisticated**
1534:22
**sorry** 1436:16
1465:18 1480:5
1484:14 1498:9
1500:9 1511:14
1522:3 1538:17
1603:5 1607:13
1610:5 1614:2
1618:18
**sort** 1438:17
1527:22 1566:14
1566:15
**sought** 1508:7
1549:12 1580:13
**soul** 1514:4
**south** 1480:2
1483:1,3,4
**speak** 1461:17,19
1464:8 1522:3
**speaking** 1519:22
**speaks** 1491:9
1492:13 1493:2,6
**special** 1484:16
**specialty** 1523:12
1523:13
**specific** 1529:6
**specifically** 1421:22
**Specification**
1424:9 1425:17
1431:8 1563:15
1570:19 1573:15
1575:10 1602:13
1602:14 1604:10
**spectrum** 1440:14
1456:7
**speculating**
1421:20 1543:11
**speculation**
1438:19 1460:6
1607:1
**Spell** 1520:9
**spend** 1438:1,11
1604:4
**spending** 1439:4
**spent** 1468:19,20
**spiritual** 1458:5
**splits** 1473:19
**splitting** 1581:15
**Sporkin** 1587:1
1592:13
**Staff** 1414:14

**stage** 1552:10,11
1607:2
**stand** 1418:22
1419:19,20
1431:18 1438:13
1473:15 1498:14
1498:18 1530:17
1531:11 1538:8
1538:16 1541:1
1546:7 1561:2
1593:7 1594:13
1610:18
**stand-up** 1483:9
**standard** 1567:20
1572:11 1582:13
**standing** 1533:4
1603:17
**standpoint** 1510:1
**start** 1420:1 1484:7
1509:22 1536:2
1598:14
**started** 1446:1
1457:22 1472:9
1550:2,3,9
1568:14 1622:3
**starts** 1500:3
**state** 1422:2
1501:14 1502:1,2
1502:3 1521:10
1552:9 1618:15
1618:20
**statement** 1504:12
1515:15 1588:14
1598:10 1612:22
**statements** 1478:10
1590:22 1591:3
1599:18
**states** 1422:4
1496:6 1601:10
1601:12
**status** 1587:7
1589:12
**Staunton** 1469:20
1495:14,17,21
1496:19 1505:21
1544:10 1551:4
1551:12,13,14,15
1577:9 1582:4
1585:17
**stay** 1563:16 1605:9
**staying** 1474:16
**step** 1485:12
1519:21 1523:19
1579:16
**stepdad** 1532:9,22
**stepping** 1605:10

**Sterling** 1523:10
**sticking** 1534:13
**stipulate** 1616:9
**stole** 1472:1 1476:9
**stop** 1448:12
1451:21 1486:7
1516:7 1552:20
1552:21 1553:9
1596:9
**stopped** 1595:19,21
1596:1
**strategic** 1602:3
**strategy** 1526:2
1548:12 1556:10
1556:19,20
**straw** 1490:13
**street** 1413:2
1422:6 1444:22
1532:15
**stress** 1463:18
1464:1,5,16,22
**strike** 1478:6
1479:1 1506:9
1509:2 1540:17
**strikes** 1509:4
1606:21
**strong** 1438:8
1606:4
**strongest** 1456:12
**struck** 1445:11
1506:17
**structured** 1440:11
**stuff** 1557:18
1565:12
**subject** 1440:15
1441:7,10,22
1442:5 1447:21
1448:2 1465:16
1472:21 1500:13
1565:13 1587:17
**sublimating** 1446:6
**submissions**
1616:14
**submit** 1612:8,15
1613:22 1614:7
**submits** 1606:11
**submitted** 1571:18
1619:22
**subsequently**
1532:21
**subsidy** 1532:13
**succeed** 1491:21
**succeeded** 1588:10
**successful** 1588:6
**suddenly** 1601:11
**sue** 1504:22 1536:5

**sued** 1556:5 1573:2
  1573:3,3,4
**suggest** 1584:3
  1612:20,21
**suggested** 1431:19
  1478:9
**suggesting** 1477:10
  1488:12 1500:15
  1511:1 1518:5,21
  1540:9
**suggestion** 1477:20
  1613:8
**suicidal** 1482:5
**suit** 1544:11
**suits** 1515:17
**Sujat** 1414:3,4
  1419:1 1423:11
  1423:15,16
  1424:19,22
  1425:12,15
  1426:1,2 1531:17
  1531:21 1532:3
  1533:12,13
  1535:18 1538:6
  1539:14 1546:5,6
  1606:7 1618:6
  1620:11,14
**Sujat's** 1604:3
**sum** 1594:14 1597:4
  1599:12
**summa** 1521:20
  1522:9
**summary** 1600:8
**Sunday** 1465:16
**super** 1455:1
  1584:12
**superior** 1568:14
**superseding** 1603:3
**supervisor** 1604:9
**supervisors**
  1613:11
**supplemental**
  1427:15 1428:1
  1435:6 1437:8,10
  1442:17 1444:15
  1448:21 1451:13
  1465:4,5,14,20,21
  1467:2 1470:1
  1472:18 1483:14
  1499:7,10,12
  1503:8 1509:13
  1512:3 1514:18
  1515:1 1532:5
  1541:4 1553:2
  1593:17
**Supplementary**

1439:11 1478:18
  1485:9 1486:13
  1490:19 1494:4
  1495:4 1498:12
  1503:4 1517:2,5
**support** 1432:19
  1562:13 1564:5
  1568:20
**suppose** 1453:22
  1454:4 1530:3
**supposed** 1555:5,6
  1555:7
**Supreme** 1616:16
**sure** 1424:21
  1440:17 1443:4
  1454:21 1466:6
  1508:4 1511:17
  1521:18 1522:7
  1522:16 1526:18
  1528:9 1532:1
  1539:2 1543:7
  1548:21 1551:12
  1560:5 1567:3,13
  1572:18 1583:15
  1594:15 1607:15
  1610:8
**surface** 1580:20
**surfaced** 1580:19
**surprised** 1524:21
  1596:19,20
**surprising** 1429:15
**suspicious** 1528:2
**sustained** 1479:6
  1549:20 1552:7
**swallow** 1490:4
**swallowed** 1488:6
**swear** 1520:13,14
**sworn** 1521:6
**SX** 1470:3,4
**SX13** 1470:4
**SX15** 1479:8
**SX20** 1494:6,7
**SX38** 1533:8,11,12
  1541:5 1545:2
**SX7** 1465:22
**sympathetic**
  1440:13
**sympathy** 1534:20
**syndrome** 1461:13
**syntax** 1544:7
**system** 1413:19
  1568:1,2 1594:2

― T ―

**T** 1547:1
**tae** 1502:16

**take** 1424:18
  1428:5,14 1435:6
  1439:11 1444:13
  1445:8 1448:16
  1448:21 1462:10
  1464:8 1465:14
  1467:1 1468:20
  1470:1 1472:18
  1476:7 1477:3
  1478:18 1480:18
  1483:14 1485:16
  1486:1,13
  1490:19 1495:3
  1499:7,15 1503:8
  1514:17 1517:5
  1522:17 1530:20
  1540:16 1545:14
  1552:10 1567:11
  1578:18 1585:15
  1587:20,21
  1607:6 1621:1
**taken** 1413:1
  1423:17 1498:20
  1519:16 1523:19
  1531:13 1546:11
  1581:16 1582:12
  1605:12
**talk** 1443:22 1469:3
  1484:5 1501:1
  1516:5 1518:22
  1550:7 1560:21
  1561:5,5 1575:21
  1576:12 1579:6
  1605:22
**talked** 1466:4,18
  1496:8 1498:4,5
  1517:19 1518:11
  1534:3 1555:10
  1560:14 1592:14
**talking** 1429:7
  1449:21 1454:7
  1471:7 1474:11
  1492:14,15,16
  1495:13 1498:6
  1518:15 1533:17
  1535:7 1541:22
  1542:20 1558:19
  1561:1,6 1562:19
  1563:7,8 1608:13
  1615:15
**tank** 1596:18
**Taylor** 1507:2
  1587:7 1589:13
  1592:21
**team** 1580:7
  1606:17

**tears** 1481:9
**Ted** 1468:17,21
**television** 1480:14
**tell** 1420:8 1438:10
  1449:1 1456:2
  1461:10 1466:8
  1480:3 1517:1
  1518:8 1537:9
  1553:9 1582:4
  1593:6 1598:22
  1610:2
**telling** 1432:19
  1437:19 1455:15
  1477:7 1478:7
  1496:12 1498:2
  1505:21 1510:18
  1543:8 1593:8
**tells** 1443:7 1535:17
  1590:9 1597:10
**Temple** 1521:20
  1522:10
**ten** 1430:2 1513:12
  1607:10 1608:6
  1608:19
**tend** 1564:5
**tender** 1617:19
**tens** 1601:11
**tentative** 1531:5
  1618:17
**term** 1456:6 1476:5
  1476:6 1508:22
  1509:3
**terminated** 1561:8
  1594:12
**terms** 1419:10
  1432:2 1439:2
  1440:19 1447:16
  1449:10 1464:5
  1489:20 1490:14
  1503:19 1504:1
  1505:8 1506:2
  1507:2 1508:18
  1509:11 1528:20
  1586:2 1599:11
  1602:8
**test** 1432:10,13
**testified** 1432:5
  1439:4 1445:20
  1445:20 1446:19
  1450:4 1458:4
  1468:18 1471:19
  1473:10,11
  1474:18 1475:1
  1487:19 1491:10
  1515:14,20
  1521:7 1535:6

1555:13,15
  1556:5 1574:16
  1577:15,15
  1587:5 1589:18
  1621:15
**testifies** 1515:7
**testify** 1443:16
  1515:19
**testimony** 1416:18
  1432:2,7 1433:10
  1459:1 1468:7,12
  1498:16 1518:20
  1520:15 1521:1
  1530:3,5 1539:9
  1539:17 1549:4,9
  1550:9 1562:1
  1574:19 1578:12
  1582:2,10
  1583:12 1585:1
  1594:7 1618:12
**tests** 1432:15
**text** 1486:3 1549:21
  1549:21 1619:2
**texts** 1553:6
**thank** 1419:17
  1420:20 1422:12
  1433:19 1436:10
  1450:16,20
  1465:12 1469:13
  1470:4 1483:5
  1490:2 1512:21
  1515:10 1529:21
  1530:1,9,11
  1531:21 1533:6
  1538:6 1542:8,9
  1546:9 1568:7,8
  1569:18,22
  1570:2 1604:13
  1604:15,16,17
  1613:7,7 1617:21
  1619:12
**thankful** 1577:17
**Thanks** 1424:12
**theme** 1482:7
**theory** 1563:19
  1567:10,11,18
  1568:21 1595:3
  1595:14
**thick** 1616:19,20
**thing** 1447:9
  1478:20 1507:13
  1513:12 1535:12
  1561:6 1569:13
  1583:2,11 1613:9
  1618:8 1622:13
  1622:18

**things** 1422:5
1426:22 1431:3
1432:4 1434:2
1435:22 1436:5
1437:16 1439:5
1448:17 1450:8
1456:17 1457:7
1457:11 1458:10
1458:12 1469:15
1480:21 1482:1
1487:17 1490:11
1496:13,21
1501:11 1507:11
1527:18 1528:20
1529:6 1534:10
1537:5 1558:18
1558:19 1560:17
1561:1 1574:13
1582:5 1588:19
1594:9 1611:4
1614:21 1616:14
1622:4
**think** 1418:3
1421:11 1426:13
1426:21 1428:20
1437:11 1442:7
1442:10 1448:1
1449:5 1451:8
1452:18 1456:3
1458:19,20
1459:12 1461:13
1463:13 1478:11
1484:9,11
1491:10 1497:18
1503:15 1504:7
1505:17 1513:11
1516:15,16
1519:6,22
1526:10 1527:12
1529:3,15,15,16
1529:18 1534:22
1535:1 1537:5
1539:17 1540:6
1540:12,13,18
1547:5 1550:20
1552:20,21
1566:3 1568:5
1569:6 1578:5
1590:12,16
1594:10,22
1598:2 1599:14
1599:17,19
1602:2 1605:19
1607:6 1609:8
1611:12,16
1612:1,2

**thinking** 1496:20
**third** 1428:9 1473:9
1476:3 1584:10
1599:5
**Thirdly** 1570:18,21
**Thirteen** 1581:9
**thorn** 1590:11,13
**thought** 1417:9
1431:15 1434:17
1434:18 1438:17
1438:22 1442:11
1457:19 1464:6
1481:11 1491:15
1499:10 1504:20
1510:1 1511:9
1516:3 1518:22
1527:18,19,20
1528:10 1529:20
1534:12 1542:7
1542:13 1556:2
1570:16 1571:14
1575:3 1578:10
1602:11
**thoughtfulness**
1449:17
**thoughts** 1445:1
**threat** 1472:14
**threatened** 1577:2
**threatening**
1472:17
**three** 1443:5 1459:8
1494:22 1568:15
1595:3 1605:5
**threshold** 1615:1,6
1618:16,16,21
**throw** 1614:20
**throwing** 1509:17
**thrown** 1601:13
**ticket** 1468:21
**Tigar** 1413:15
1420:1,8,20
1425:18,22
1426:5 1435:9,14
1436:10 1439:13
1440:1,5,20
1443:13 1465:2,7
1465:18 1468:2,4
1468:6,11,14
1469:9,15
1481:14,16
1482:4 1509:6
1510:20 1511:14
1511:15,18,21
1512:2,9,14,21
1515:1,4,7,10
1528:7,8,9,13,22

1529:11 1538:18
1539:7,14 1540:8
1540:13,16,21
1541:2,8,12,21
1542:3,8,22
1544:1 1545:2,6,9
1545:12,20
1565:5,14
1566:21 1567:7
1570:3 1572:18
1575:22 1578:5
1579:11 1591:5
1608:13,17,19
1609:3,7,21
1612:20 1619:1,4
1619:10
**Tigar's** 1542:11
**till** 1530:18 1538:10
**Tim** 1585:16
**time** 1418:12
1420:11,22
1421:9,19
1424:16 1427:18
1431:21 1435:4
1437:16 1438:1
1438:11 1440:15
1440:16 1443:3
1445:22 1447:13
1447:13,15,16
1449:14 1450:7
1450:22 1454:4
1454:12 1455:17
1456:8 1457:6
1458:9 1459:17
1459:21 1460:8
1461:6,14 1462:1
1462:4,14 1463:7
1464:16 1472:21
1473:5 1481:4,17
1484:11 1486:1
1488:3 1490:12
1500:21,22
1505:6 1511:7
1513:18 1514:3
1522:17 1523:20
1523:21 1524:3
1524:13 1526:12
1534:4 1537:6,16
1542:13 1547:14
1550:5 1555:1
1562:18 1571:13
1577:12,22
1585:5 1589:1
1593:7 1595:18
1602:3 1604:3,3,4
1611:13 1614:8

1619:17,19,21
1620:1 1621:13
1621:14
**timeframe** 1421:3
**timely** 1544:2
1621:20
**times** 1435:3
1440:12 1450:5
1463:9,14
1487:20 1516:20
1524:12 1526:19
1527:10 1534:3
1537:14 1556:6
**timing** 1449:22
**title** 1510:6 1543:2
**today** 1502:4
1563:13 1574:11
1607:7 1612:15
**told** 1431:22
1466:10 1472:1
1472:13,15
1480:3 1481:17
1548:3,8 1551:10
1556:10 1557:6
1577:9 1586:15
1588:4 1592:16
1598:22 1602:18
1602:21 1605:5
1611:4,16
1613:11,11
**tongue** 1479:18
**tool** 1558:3
**top** 1563:18,22
1565:10 1581:7
1582:14 1601:8,9
**total** 1532:14
**totaling** 1473:19
**totally** 1457:18
1560:11 1566:8
1568:3
**touch** 1571:12
**touched** 1484:15
1583:4
**town** 1590:12
**track** 1419:1
1555:20,22
**traditionally**
1523:14
**tragically** 1601:11
**train** 1418:17
**training** 1418:15
**transcript** 1574:20
1575:7 1586:14
1597:6,7
**transcripts** 1597:19
1615:7

**transferred** 1577:2
1588:5 1621:9
**trauma** 1549:15
**treat** 1480:10
1487:14,15
1488:8 1535:8
**treated** 1434:19,21
1441:17,19
1452:10 1454:15
1454:16 1457:1
1461:2 1462:16
1472:3,6 1490:15
1534:3 1538:2
1553:13 1578:16
**treating** 1487:14,18
1488:2 1489:10
1535:8 1553:13
1554:17
**treatment** 1533:2
**trees** 1435:16
**trial** 1463:4 1572:8
**tribunal** 1538:21
**tribunals** 1574:9
**tried** 1459:3
1460:17,21,22
1471:20 1480:11
1482:12 1505:12
1536:7,7,9,12
1538:1 1548:14
1571:11 1584:1
1588:5 1600:5
1622:12
**trip** 1530:3,4
**trouble** 1425:18
1435:15 1522:2
**true** 1442:4 1444:8
1445:18 1456:6
1544:10 1562:12
1621:18
**truly** 1453:20
1487:16
**truth** 1431:22
1432:20 1520:16
1520:16,17
1582:4 1593:8
**truthful** 1433:15
1577:10
**try** 1433:3 1439:5
1446:16 1461:18
1462:6 1468:16
1477:18 1479:21
1491:5 1496:18
1503:3 1507:12
1525:11 1532:19
1536:14 1548:19
1558:17 1561:3

1573:7 1576:3
1581:3 1588:9
1598:3 1599:7
1611:14
**trying** 1435:4
1436:3,4 1437:18
1438:21 1441:15
1445:7 1446:1,5,9
1455:2 1456:16
1458:12,13
1464:6,7 1467:17
1469:3,4 1470:22
1472:12 1475:4
1475:12 1480:7
1481:2,12,21
1482:7,9 1484:4
1484:17 1485:1,7
1487:16,17
1492:17 1498:9
1502:10 1503:10
1505:5 1508:19
1509:18 1511:9
1513:13,16
1517:8 1525:1,16
1535:10 1537:8
1541:18 1542:19
1546:2 1551:7
1558:21 1569:5
1573:9 1575:2,15
1576:21 1578:3
1579:15,20,21
1582:22 1586:5
1588:18 1592:8
1592:11 1594:3
1597:19 1598:6
**Turkey** 1439:16,18
1439:22 1440:6
1440:18 1443:15
1443:19
**Turkish** 1444:3
**turn** 1458:22
1541:4 1597:5
**turning** 1550:3
**TV** 1574:11
1598:15
**twice** 1598:17
**twist** 1538:11
**twisted** 1444:2
**two** 1426:17 1448:6
1469:10 1485:21
1494:22 1495:7
1495:12 1504:17
1511:15 1512:2
1568:12 1569:1
1569:11,11,13
1575:9 1604:7

1609:17 1611:5
**two-page** 1499:8
**tying** 1479:19
**type** 1536:18
1564:19

_____

**U**

**ugly** 1550:3
**ulterior** 1603:8
1604:6
**ultimate** 1535:19
1543:14 1559:13
1602:14 1611:14
**ultimately** 1548:12
1555:22 1621:9
**ultra** 1591:9
**unbelievable**
1490:18
**uncomfortable**
1551:3
**uncompromised**
1537:7
**underlining** 1534:7
**underneath**
1417:21
**understand** 1436:2
1445:6 1460:18
1460:21,22
1463:20 1464:20
1472:2,7 1477:12
1478:2 1484:12
1515:21 1529:8
1566:6 1595:1,7,8
**understandable**
1462:13
**understanding**
1450:17 1454:17
1455:10 1459:20
1460:7,11
1461:15 1464:13
1472:11 1481:19
1513:10
**understood** 1450:2
1462:17 1463:18
1463:22 1464:3
1464:15,15
1493:15 1512:15
1620:10
**unduly** 1540:12
**unemployed** 1459:2
**unethical** 1579:7
**unfair** 1473:6,7
**unfortunate** 1447:7
**unfortunately**
1501:12 1591:15
**unhappy** 1459:10

**union** 1578:14,15
**United** 1601:10
**University** 1521:19
1522:8
**unnecessary** 1443:8
1534:12
**unrequited** 1550:2
**unstable** 1527:22
**untenable** 1585:12
**untrue** 1496:13
**untruthful** 1433:11
**untruthfully**
1443:17
**unusual** 1595:14
**upset** 1469:5,6
1473:9 1474:14
1514:1
**urge** 1574:21
1592:18
**use** 1432:18 1433:2
1467:10 1476:5
1497:21 1509:3
1536:12 1587:4
1599:4 1615:4
1619:9
**uses** 1458:5
**usually** 1587:10
1618:9

_____

**V**

**v** 1587:7 1589:12
1592:21
**vacated** 1588:12
**vacillated** 1528:1
**valid** 1592:12
**Vegas** 1463:4
**vendetta** 1573:1
**Ventura** 1473:20
**verbal** 1490:11
**verdict** 1618:10
**verge** 1621:21
**VI** 1412:6
**victim** 1461:12
1491:13 1547:15
1558:4,5
**victimized** 1547:15
**victims** 1460:12,13
**view** 1458:17,19
1460:17 1513:17
1529:6 1564:20
1570:6 1574:2
1577:20 1599:20
1604:5
**views** 1564:13
**VII** 1543:2
**vilifying** 1580:20

**vindicated** 1547:18
**violated** 1559:10
1563:13 1572:22
1600:9
**violates** 1559:7
**violation** 1557:4
1561:14 1569:12
1570:8 1595:15
1605:2,16,21
**violations** 1569:7,9
1569:11 1578:7
**virtual** 1420:12
1422:7 1540:2
**virtue** 1601:6
**visit** 1470:12 1471:3
1551:6
**VOA** 1464:6
1507:13 1508:1
1514:9 1534:17
1551:21 1552:1
1557:14 1565:9
1587:11 1588:19
1592:11 1600:21
**Voice** 1446:20,22
1464:18 1575:4
1578:11 1598:16
1600:15
**Vol** 1412:6
**vs** 1507:2,19
1544:15 1616:17
**vulnerable** 1547:16

_____

**W**

**W** 1573:3
**Wagner** 1507:2
1587:7 1589:12
1592:21
**wait** 1418:5
1423:13,20
1465:8 1492:8,22
1499:19 1507:7
1509:7 1518:1,1,2
1526:11,11
1540:4 1541:2
1542:10,10,10
**waiting** 1605:10
**waiver** 1560:5
1566:11
**walk** 1444:21
**walked** 1463:12
**wall** 1475:21
**walled** 1482:13
**want** 1424:16
1437:19 1438:1
1438:11 1440:17
1452:16 1453:17

1454:15 1458:11
1461:2 1466:11
1475:22 1476:1
1477:18 1487:8
1496:14,21
1497:6 1504:3,16
1505:15 1507:9
1522:5 1536:4,5
1541:2 1548:5
1554:1,6,10,21
1560:1,18 1561:6
1566:18 1569:22
1570:2 1578:2
1579:22 1580:1
1583:13 1589:3
1590:19 1593:13
1594:20 1596:19
1598:11 1600:11
1602:9 1606:21
1608:8 1610:18
1613:10,22
1615:10 1618:19
**wanted** 1428:16,19
1429:16 1434:21
1440:3,5,20
1442:11 1443:15
1443:17,22
1445:14 1452:10
1458:22 1459:8
1462:8 1464:9,11
1472:5 1480:18
1485:2,5 1488:22
1489:15 1491:17
1496:14 1502:10
1505:22,22
1508:4 1517:14
1533:5 1535:4
1538:4,18
1544:11 1547:17
1548:4,22 1549:1
1554:2,7 1555:11
1557:17,22
1577:6 1578:4
1582:3 1583:7,14
1595:4,5 1597:7,9
1603:15 1613:9
1614:22 1615:2
1621:16
**wanting** 1573:20
**wants** 1430:9
1453:21 1454:2
1458:12,21
1577:13
**warm** 1484:22
**warrant** 1572:12
**warranted** 1534:20

1607:16
**WARREN** 1413:11
**Washington** 1412:9
  1413:2 1420:4
  1558:17 1577:3
  1581:20 1600:18
**wasn't** 1433:8
  1436:9 1441:16
  1459:1 1474:21
  1486:6 1494:2
  1496:3 1501:2
  1505:14 1524:12
  1527:2 1532:17
  1536:15 1537:12
  1542:20 1544:6
  1544:10 1556:14
  1562:21,22
  1576:1,2,20
  1580:11 1583:15
  1584:16,16,22
  1588:6,16 1589:5
  1592:6,9 1597:22
  1604:11 1621:18
**watch** 1420:15
  1457:21,22
  1458:8 1574:11
  1611:1
**way** 1414:5 1418:11
  1432:3 1433:8
  1446:6 1450:1
  1458:22 1467:7
  1469:3 1479:19
  1480:1 1482:8
  1483:7 1484:21
  1484:22 1487:9
  1488:3 1490:15
  1498:18 1499:18
  1510:3 1511:4
  1514:6 1516:5
  1520:22 1523:2
  1527:22 1534:14
  1535:8,9 1538:1,2
  1539:18 1543:13
  1548:10,11,12,14
  1548:19,22
  1553:13,21
  1555:3,14 1557:2
  1568:11 1570:1
  1572:7,17,19
  1573:10 1574:11
  1574:12 1575:13
  1579:4,16
  1582:11 1584:13
  1594:20 1597:14
  1599:18 1600:10
  1600:11,12

1601:6 1618:9
**ways** 1502:15
  1505:4
**we'll** 1520:21
  1538:15 1547:7
  1558:16,17
  1566:10,14,15
  1569:16 1571:5
  1609:19 1610:1,1
**we're** 1418:3
  1469:3 1519:19
  1520:1 1561:22
  1567:20 1571:3
  1578:3 1597:8
  1602:19
**we've** 1435:1
  1457:3 1477:16
  1539:17
**wear** 1475:10
**wears** 1454:22
**website** 1574:5
**Wednesday** 1412:8
  1609:2,4
**week** 1421:10
  1479:21 1608:22
**weekend** 1524:5
**weekly** 1559:3
**weeks** 1459:8
**weigh** 1563:5
  1578:13
**weight** 1574:14
  1575:17
**welcome** 1471:11
**well-being** 1456:11
**went** 1435:20
  1465:8 1467:16
  1468:9 1469:8
  1493:5 1499:11
  1502:15 1505:9
  1505:11 1508:22
  1521:20 1522:10
  1522:20 1523:1,1
  1523:5 1537:13
  1548:21 1551:6
  1573:14 1575:13
  1576:6 1582:19
  1598:16 1621:7
**weren't** 1481:1,2
  1484:18 1545:1
  1584:5 1611:4
**whipping** 1455:12
**White** 1592:7
**wife** 1484:19
**wild** 1568:2
**willing** 1451:20
  1482:11

**win** 1580:8
**Windjammer**
  1414:5
**wisdom** 1454:6
  1557:12
**wish** 1447:6
  1478:12 1485:6
  1491:22 1531:1
  1584:1 1619:20
  1619:22
**wished** 1485:6
**withdraw** 1519:4
  1551:22 1554:11
  1557:6 1595:17
**withdrawing**
  1557:12
**withdrawn** 1595:21
**withstand** 1581:17
**witness** 1420:7,11
  1421:2,5,7,11,15
  1423:2,20
  1426:11,17,21
  1427:4 1428:12
  1429:12,19,22
  1430:3,7,11
  1433:14,20
  1435:13,18
  1436:16,18
  1438:6 1439:20
  1440:3,7,21
  1441:14 1442:3,7
  1442:10,18
  1447:14 1448:1
  1448:10 1449:7
  1451:10,16
  1452:3,7 1453:9
  1459:15 1460:4
  1460:10 1461:16
  1461:19,21
  1462:3 1463:3
  1464:3,12,17,21
  1467:5 1468:10
  1468:13,15
  1469:11,14
  1470:5,9 1472:22
  1473:14,17
  1478:13 1479:3,7
  1479:12,13
  1481:20 1482:6
  1482:16,22
  1483:7,11
  1485:11,16
  1486:2,6,9,10,21
  1487:13 1489:6,8
  1491:1 1492:7
  1493:4,8,11

1494:13 1495:6
  1495:10 1496:11
  1497:20 1498:17
  1498:17 1499:14
  1499:18,19
  1500:1,11
  1503:12 1504:3
  1508:12 1510:8
  1510:22 1511:17
  1511:20 1512:1,8
  1512:11,16
  1513:9 1515:11
  1515:12 1516:10
  1517:21 1519:22
  1520:1,4,7,10,13
  1520:18,22
  1521:1,5 1522:3,7
  1523:4 1525:5
  1526:10,15,18
  1528:12,14
  1529:3,14 1530:9
  1530:12 1533:19
  1533:22 1534:2
  1541:18 1542:1,5
  1542:9,16 1543:1
  1544:17 1545:18
  1545:21 1561:2
**witnesses** 1415:2
  1530:6 1558:12
  1563:6,6,9,10
  1573:22 1574:16
  1574:17 1575:18
  1611:19
**woman** 1444:20
  1445:1 1510:2
  1553:13 1589:19
  1593:1
**woman's** 1460:19
**Women** 1589:20
**women's** 1467:8,14
  1467:16,16,22
**wondering** 1545:12
**Woodland** 1475:14
**word** 1461:18
  1497:21 1528:10
  1534:7 1561:11
  1596:14 1611:18
  1617:12
**wording** 1591:2
**words** 1417:21
  1445:4,5 1456:13
  1484:3 1497:13
  1498:9 1587:4
**wore** 1553:22
**work** 1437:2
  1441:20 1449:17

1449:17 1450:5
  1514:14 1535:21
  1547:15 1576:21
  1578:11 1585:10
  1587:6,9 1592:17
  1592:22 1600:20
  1605:8,8 1621:3
  1621:17
**worked** 1445:14
  1446:18 1577:4
  1600:22
**working** 1436:9
  1439:3 1491:18
  1523:16 1595:20
  1595:22 1596:1,9
**works** 1598:19
**world** 1456:21
  1460:15 1475:10
  1523:3 1560:18
  1574:8
**WorldNetDaily**
  1558:7,9,13
  1559:3 1561:20
  1565:3,6 1567:6,7
  1567:8 1574:4
**worried** 1494:17
**worry** 1578:2
**worse** 1501:14
  1502:1,2 1530:4
**worst** 1480:9
  1535:12 1578:15
  1600:16
**worth** 1506:19
**wouldn't** 1426:5
  1534:21 1554:3
  1586:22 1603:2
  1622:12
**wrap** 1494:20
  1514:15
**wreck** 1554:1
**write** 1453:4 1484:3
  1484:20 1495:21
  1534:6 1537:20
  1541:13 1579:4
**writes** 1579:4
**writing** 1417:20
  1453:4 1544:7
  1548:1 1550:22
  1558:12 1565:2
  1602:12
**written** 1453:2,11
  1559:5 1579:2
**wrong** 1437:1
  1447:9 1477:20
  1529:19 1544:22
**wrote** 1424:4

1429:14 1479:15
1484:1 1501:16
1501:19 1579:19
1588:15

**X**
X 1412:3,7 1415:1
XI.1 1605:15
XI.11 1604:19
1617:6 1619:2,11

**Y**
y'all 1428:20
yeah 1420:7,11
1421:4,7,12
1426:17 1430:11
1433:7 1437:18
1440:21 1441:14
1442:9 1454:11
1464:4 1469:11
1479:18 1487:13
1489:8 1491:4
1494:12 1495:5
1497:20 1512:8
1514:1 1526:5,7
1545:21 1591:11
1602:22 1603:4
1607:11 1610:19
1617:6 1618:6
year 1421:10
1545:7 1553:3
1554:20 1598:20
years 1421:16,21
1428:2 1436:21
1441:5 1443:4
1447:19 1464:21
1466:7 1502:21
1513:12 1522:19
1523:7,16
1570:12,13
1571:10 1581:16
1592:15 1593:3,4
1601:1 1603:8,17
1604:7 1614:15
1614:19 1616:12
Yep 1425:21
yesterday 1432:2
1466:19 1498:12
1515:14 1518:19
York 1418:11
1463:9,14
1494:15 1522:21
1524:5

**Z**
zealous 1600:13

zealously 1432:22
1435:5 1584:14
1590:4 1602:16
zero 1582:9
Zia 1476:17

**0**

**1**
1 1417:3,6,12
1435:7 1437:8,9
1437:10 1476:2
1500:3
1,000 1468:21
1.16(3) 1600:4
1.16(a)(3) 1595:15
1.2 1556:15
1.2(a) 1557:4
1568:18
1.4(b) 1568:19
1.6 1559:10
1.6(a)(1) 1566:22
1.6(a)(12) 1565:15
1.6(a)(3) 1595:2
1.74 1553:14
1:00 1538:9
1:15 1538:10
1:30 1538:11,14,16
1546:8
1:34 1547:2
10 1517:3,6 1606:5
1607:9 1609:19
1609:20 1612:14
10:42 1447:11
10th 1609:10,14
11 1499:12 1542:13
11:00 1418:12
1419:15 1494:16
1499:13
11:10 1498:19
11:12 1499:2
11:13 1447:10
11:38 1519:20
11th 1421:1
1514:21 1544:21
12 1427:11 1503:9
1509:14 1512:3
1608:11
12:00 1530:18
12:21 1546:10
120 1607:3,20
13 1470:2 1581:10
14 1472:19
1422 1415:3
14th 1416:10
15 1465:5 1478:19

1515:4 1530:17
1531:11 1538:11
1542:13
150M 1508:8,17
1509:1
1521 1415:4
1525 1414:5
1532 1415:3
1547 1415:7
1569 1415:8
15th 1608:20
16 1483:15
164 1607:22
16th 1472:21
17 1589:9
17-BD-063 1412:5
18 1485:10 1486:14
180 1545:12,17,22
18th 1467:4
19 1422:18 1490:20
1608:12
19.99 1606:20
1999 1521:19
19th 1424:5
1544:16
1st 1470:7

**2**
2 1439:12 1442:17
1447:2 1474:16
1488:11 1492:4
20 1494:5 1495:3,4
1606:2,18,21
2000- 1544:21
200013 1420:5
2006 1521:22
1522:11
2008 1616:12
2009 1547:12
2010 1435:8 1441:4
1443:2 1453:11
1465:16 1467:4
1472:21 1479:10
1483:18 1490:21
1495:8 1496:7
1499:22 1545:4,6
1547:12 1552:8
1553:21 1560:6
1591:6
2011 1416:10
1417:5 1421:8
1514:22 1515:5
1541:16 1544:16
1545:10,15
1580:16,21,22
2012 1593:12

1598:9
2014 1571:8
2016 1422:18
1424:5 1571:14
2018 1412:8 1441:6
1441:6
2019 1470:7
2020 1420:12
1422:7
20th 1609:21,22
21 1498:12
21st 1479:10
23rd 1483:18
1545:15
24 1433:5,6,7,18
1435:12 1441:6
1541:16
24/7 1574:12
247 1616:17
24th 1542:4
1545:15
25 1453:7
25,000 1620:22
1621:17 1622:15
25th 1591:6
26th 1495:8 1496:7
27 1412:8 1579:3
2788 1420:4
27th 1579:19
1580:16 1581:8
1608:14
29th 1490:21

**3**
3 1444:16 1447:2
1450:14
3:21 1623:1
3:23 1496:7
30 1485:16 1545:6
1574:2 1607:7
1608:14
30,000 1584:21
1585:1
30th 1499:22
1500:9 1545:4
1551:18 1557:5
1579:3 1596:3
31st 1509:13
33019 1414:6
34 1459:14
38 1435:2,2 1444:12
1514:18,18
1515:2 1533:8
1545:1 1580:20
1597:11 1603:17
3rd 1609:6

**4**
4 1448:22 1451:14
1508:11
4-12 1508:11
4/9/2010 1441:11
40 1502:8,12
1504:13,15
1509:21 1547:22
1578:1 1607:8
1608:17 1614:15
1614:19
40-percent 1550:19
405 1473:19
41 1521:15
410 1586:14,14
430 1413:2
45 1538:9
496 1597:6
4th 1551:20 1557:8

**5**
5,000 1621:19
5:28 1533:20
50 1423:3 1503:15
1509:14,21
1550:21 1606:1,3
1606:5
50% 1512:5
1513:20
51 1422:17,22
1423:6 1424:1,2
1425:1,7,19
1426:12,22
1427:5,9
51-3 1427:9
52 1417:17,20
1420:2
53 1618:3
539 1597:18
5th 1608:18 1609:1
1609:3

**6**
60 1544:3
65,000 1598:20

**7**
7 1465:15,21 1499:8
1499:10 1532:5
1536:3
7:00 1447:13
75M 1508:21
775 1574:20 1575:8
7th 1443:2

**8**

In Re:  Larry Klayman
June 27, 2018

Page 1650

**8** 1465:4 1467:2
**8.4(c)** 1561:15
  1567:10 1590:19
**80,000** 1532:14
**815-5221** 1414:7

---
**9**

**9** 1441:4
**9/11/11** 1533:21
**9:32** 1413:3 1416:3
**954** 1414:7
**99** 1522:8
**9th** 1435:8 1453:11
  1465:16 1466:4

EXHIBIT 4

 Gmail

<div align="right">Oliver Peer &lt;oliver.peerfw@gmail.com&gt;</div>

---

## Fwd: Sataki Documentary

**Larry Klayman** &lt;klaymanlaw@gmail.com&gt;          Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer &lt;oliver.peerfw@gmail.com&gt;

---------- Forwarded message ---------
From: **Keya Dash** &lt;keyadash@gmail.com&gt;
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman &lt;leklayman@gmail.com&gt;

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

<div align="right">App.0119</div>

Keya

Thank you,

**Keya Dash**

 +1 (703) 963-7531

 +1 (703) 962-1707

 +1 (703) 962-1726

keyadash@gmail.com


Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

> This is the video. Thanks Keya
>
> ---------- Forwarded message ---------
> From: **Barbara Nichols** <ban@bogoradrichards.com>
> Date: Wed, Aug 21, 2019 at 10:25 AM
> Subject: Sataki Documentary
> To: Larry Klayman <leklayman@gmail.com>
>
>
> Larry,
>
>
> The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.
>
>
> https://www.youtube.com/watch?v=e3g5f61muZ4
>
>
> <image002.png>
>
> [Quoted text hidden]

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

<div align="center">(displaying Elham Sattaki's photo)<br>former broadcaster of VOA</div>

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman. Hello, go ahead please.

<div align="center">(displaying photo of Mehdi Falahati)<br>broadcaster for the VOA network<br>VOA: Voice of America</div>

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one.   Nobody can talk with anybody. Everybody makes insinuations against one another.   The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner.   And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired.   I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point.   Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know??   That day she told me that "Legally I cannot do it and you must formally file a complaint."

2

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so.   As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord.   I hollered at him (audio censored) he laughed and said "don't tell anybody."   I was not feeling well.
I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot.   Mr. Ali Sajjadi and Mr. Falahati were friends.   At that time Mr. Sajjadi was very powerful there.   They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them.   And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big.   And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me.   And they say that Elham left, Falahati stayed.   When they fired me, I was not the only girl. There are a number of others.

            Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..
After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original


Mohammad T Moslehi

State of  MD    County of  Montgomery
Subscribed and sworn before me on  9/12/20  (Date)

            (Notary Signature)

App.0122

EXHIBIT 5

THIS REPORT IS NOT A FINAL ORDER OF DISCIPLINE*

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

ISSUED

Oct 2 2020 12:24pm

Board on Professional
Responsibility

In the Matter of:          :
                           :
    LARRY E. KLAYMAN,      :
                           :      Board Docket No. 17-BD-063
Respondent.                :      Disciplinary Docket No. 2011-D028
                           :
A Suspended Member of the Bar of the   :
District of Columbia Court of Appeals  :
(Bar Registration No. 334581)[1]       :

REPORT AND RECOMMENDATION OF THE
BOARD ON PROFESSIONAL RESPONSIBILITY

A lawyer's ability to communicate with her client is at the heart of the attorney-client relationship. Not only does a lawyer have a duty to communicate with her client under Rule 1.4, but effective communication undergirds an attorney's ability to ethically represent her client in many other ways. If a lawyer cannot effectively communicate with her client, the client cannot agree to a strategy, consent to have confidential information shared, or waive a conflict of interest. In most representations, an inability to communicate with the client is, in many ways, an inability to ethically represent that client.

This case shows the challenges that arise when that communication breaks down. Here, after agreeing to an attorney-client relationship at a restaurant, over dinner, Respondent developed romantic feelings towards his client. This caused a

[1] During the pendency of this matter before the Board, the Court entered an order suspending Respondent for 90 days. *See In re Klayman*, 228 A.3d 713, 720 (D.C. 2020) (*Klayman I*).

* Consult the 'Disciplinary Decisions' tab on the Board on Professional Responsibility's website (www.dcattorneydiscipline.org) to view any prior or subsequent decisions in this case.

breakdown in his ability to effectively communicate with his client. As his client described it:

> He would nonstop text or email, or [make] phone calls, and talked to me that I talk [sic] about respect, that I'm not respecting him, and why I'm not taking him to the gatherings.
>
> Then he explained his feelings to me and told me that he loves me and then he told me that he never loved anyone the way he loved me ever in his life and that nobody is going to love me the way he loved me, no other man can ever love me the way he loves me.

FF 31.

In Respondent's own words, his "emotions had rendered [him] non-functional even as a lawyer." FF 44. As a result of his emotional attachment to his client, he lost the ability to effectively communicate with her. For example, at one point, while driving, Respondent berated his client so much she leapt from his car and ran into a hotel lobby and hid in the women's bathroom; Respondent followed her in. Respondent wanted to talk to his client about his feelings. His client wanted to talk about her case.

The Hearing Committee issued a lengthy, detailed, and thoughtful report that determined that Respondent violated a number of Rules of Professional Conduct by failing to effectively communicate with his client and to follow her instructions about the objectives of the representation, representing her under a conflict of interest, and breaching his duties of confidentiality to her, among other Rule violations. Respondent's defense to many of these findings is that he had his client's consent. But consent requires effective communication; here, because Respondent

2

was unable to effectively communicate with his client, he was unable to effectively obtain her consent.

For that reason, and as set out below, we agree that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend a sanction of an 18-month suspension with a requirement that he demonstrate a fitness to practice law before he is reinstated.

## I.   PROCEDURAL BACKGROUND

Respondent was charged with failing to abide by his client's objectives for a representation in violation of Rule 1.2(a), failing to communicate with his client in violation of Rule 1.4(b), failing to enter into a written engagement agreement in violation of Rule 1.5(b), failing to have a written fee agreement for a contingent fee case in violation of 1.5(c), revealing client confidences in violation of Rules 1.6(a)(1) and 1.6(a)(3), representing a client with a conflict of interest in violation of Rule 1.7(b)(4), representing a client after he was fired in violation of Rule 1.16(a)(3), and engaging in dishonesty and/or misrepresentation in violation of Rule 8.4(c). The Hearing Committee unanimously recommended that the Board conclude that Disciplinary Counsel established by clear and convincing evidence that Respondent violated Rules 1.2(a), 1.4(b), 1.5(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). The Hearing Committee recommended that the Board find that Disciplinary Counsel did not prove by clear and convincing evidence that

3

Respondent violated Rule 8.4(c). Disciplinary Counsel disagrees with this determination but does not take exception to it.[2]

The Hearing Committee recommended that Respondent be suspended for 33 months and that he be required to prove his fitness to practice law prior to reinstatement. Disciplinary Counsel asks that the Board adopt both the Hearing Committee's findings of fact and conclusions of law but takes exception to the recommended sanction, arguing that Respondent should be disbarred instead.

In addition, Respondent asks that the Board dismiss the pending charges due to the delay in prosecution. In the alternative, he asks that the Board reject the Hearing Committee's findings of fact, on grounds that they are not supported by the record, and that the Board reject the Hearing Committee's conclusions of law.[3] He further argues that the proposed 33-month suspension with a fitness requirement is not consistent with discipline in similar cases.

Unless otherwise specified, we adopt the detailed and careful factual findings of the Hearing Committee. As set out in more detail below, we conclude that

---

[2] Given the absence of a substantive objection to the Hearing Committee's recommendation, we see no reason on the face of the record to disturb its conclusion that Disciplinary Counsel did not prove by clear and convincing evidence that Respondent violated Rule 8.4(c).

[3] Respondent appears to concede the Rule 1.5(b) violation in stating that he failed to provide a written fee agreement because he "suffered from a not uncommon misunderstanding of the Rules believing that because he did not intend to charge a fee, he did not need a fee letter or other writing." Resp. Br. to Board at 32.  As discussed below, we conclude that Respondent violated Rule 1.5(c) by not providing a contingent fee agreement in writing.

Disciplinary Counsel has proven violations of Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend that Respondent be suspended from the practice of law for 18 months and that he be required to prove his fitness to practice law before he is reinstated.

## II.   STANDARD OF REVIEW

The Board must accept Hearing Committee findings of fact where there is substantial evidence to support them "even where evidence may support a contrary view as well." *In re Robbins*, 192 A.3d 558, 564 (D.C. 2018) (per curiam) "[T]he Hearing Committee is not required to enumerate every fact that has possible relevance to an issue in its report." *Id.*; *see also In re Szymkowicz*, 124 A.3d 1078, 1084 (D.C. 2015) (per curiam) (the Court will not disregard the findings of the hearing committee even where there is substantial evidence pointing in the opposite direction); *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007) ("This court must accept a finding that is supported by substantial evidence in the record as a whole, 'even though there may also be substantial evidence in the record to support a contrary finding.'"). When making its own findings of fact, the Board employs a "clear and convincing evidence" standard. Board Rule 13.7. The Board reviews *de novo* the Hearing Committee's legal conclusions and its determinations of ultimate fact. *In re Bradley*, 70 A.3d 1189, 1194 (D.C. 2013) (per curiam).

### III.   FACTUAL BACKGROUND

Respondent met E.S.[4] at a speech on the steps of the United States Capitol in November 2009. E.S. was a reporter for Voice of America (VOA); she was there covering a press conference that Respondent was also attending. They exchanged business cards, and he called her a number of times in the days that followed. When she learned that he was a lawyer, E.S. asked him for help with a legal problem: she had made a sexual harassment allegation against a coworker and was not satisfied with her employer's response. Respondent asked E.S. to dinner. Respondent agreed to represent E.S. with her sexual harassment case over dinner. *See* FF 8. Respondent and E.S. verbally agreed that he would represent her on a contingent fee basis, but no written agreement was ever executed between them. FF 9.

In February 2010, Respondent began negotiating with VOA on E.S.'s behalf and advising her about her case. E.S. was stationed in Washington, D.C. She wanted to move to Los Angeles, to be away from the man she had brought a sexual harassment claim against. This request was denied because E.S. was an on-air reporter; VOA did not have a television studio in Los Angeles where she could do her job. Respondent was, at the time, living in Los Angeles. He advised E.S. to move to Los Angeles despite VOA's position that she could not work from California. Respondent insisted that E.S. stay in Los Angeles – and not show up at work in Washington, D.C. He paid the rent on an apartment to facilitate her relocation to Los

---

[4] We refer to Respondent's client by her initials because her name is not material to the resolution of any issues before the Board.

Angeles. In May 2010, when E.S. was deemed Absent Without Leave for not coming to work after she followed Respondent's advice, Respondent provided her with funds equivalent to her salary, claiming that he would simply take the amounts out of whatever recovery he eventually secured. *See* FF 51-52.

During this time, while working on her case, Respondent began to share with E.S. the intense romantic feelings he had for her. In a May 8, 2010 email, he told her that she ought to find a new lawyer because his feelings for her were so strong. *See* FF 42-43. She pleaded with him to stay involved in her case. He wrote to the therapist that he had hired to develop portions of E.S.'s claim for damages that his "own emotions had rendered [him] non-functional even as a lawyer." FF 44. Yet Respondent continued to represent E.S.

His emotional interest in E.S. infected his ability to communicate with her. He brought her to an event in Los Angeles but became jealous when she did not speak to him as much as he would have liked. As he drove her home, he berated her so much that she ran out of his car when it was stopped at a traffic light and into a nearby hotel, then into the women's bathroom in the hotel lobby. Respondent followed her into the bathroom to continue to yell at her. A hotel receptionist intervened and helped E.S. flee the hotel – and Respondent – by the back door.

He brought her to meet with members of Congress to attempt to get Congressional pressure on her case. At one point, the Chief of Staff for Congressman Rohrbacher approached E.S., after watching Respondent and E.S.'s body language during a meeting, to ask if E.S. was afraid of Respondent.  FF 48.

Beyond his personal feelings for E.S., Disciplinary Counsel alleged – and the Hearing Committee found – that Respondent's litigation strategy was driven by a desire to harm then Secretary of State Hillary Clinton and by a desire for publicity for himself.[5] He filed suit on behalf of E.S. against VOA and named the members of the Broadcasting Board of Governors individually – the Board is chaired *ex officio* by the Secretary of State, who, at the time, was Hillary Clinton.

Over E.S.'s initial objection, Respondent engineered a public relations campaign that he said would help her case. Each article on the case also promoted Respondent's interests and notoriety as an attorney. The public statements Respondent either made or caused someone else to make also revealed information that E.S. had asked him to keep nonpublic and that was embarrassing to her or otherwise damaging to her professional standing – particularly her political views, which could harm her reputation as a journalist.

After months of Respondent's conduct, E.S. told him she wanted to end her lawsuit against VOA. She sent an email to VOA saying that she had instructed Respondent to dismiss her claims. Instead of withdrawing from the case, Respondent sent a number of intemperate emails to E.S. over the next several months and continued to file pleadings in her case.

---

[5] Respondent has previously engaged in extensive litigation relating to Secretary Clinton and her husband.

8

IV.    DISCUSSION

**Rule 1.7(b)(4)**

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent had a personal interest conflict of interest under Rule 1.7(b)(4) in his representation of E.S.

Rule 1.7(b)(4) provides that "a lawyer shall not represent a client with respect to a matter if . . . [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."

However, a lawyer can represent a client when there is a personal interest conflict if Rule 1.7(c)'s requirements are met. Rule 1.7(c) provides that a lawyer may represent a client despite a personal interest conflict if:

> (1)  "[e]ach potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation" and

> (2)  "[t]he lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."

Disciplinary Counsel charged that Respondent violated Rule 1.7(b)(4) in three ways: by representing E.S. despite his strong personal feelings for her; by turning

her case into a vehicle to attack Hillary Clinton to further an alleged personal vendetta; and by using E.S.'s case to promote himself at her expense.

We consider each in turn.

*Emotional Conflict*

Respondent concedes that he had a strong emotional interest in E.S. He argues, however, that he disclosed his feelings for her and that she elected to continue with the representation so, as a result, he had informed consent to continue with the representation under Rule 1.7(c).

While it is true that Respondent repeatedly communicated his feelings to E.S., and that she asked him to continue with the representation, that is not sufficient to satisfy Rule 1.7(c). Assuming E.S. effectively consented to the conflicted representation, Respondent could not have "reasonably believe[d] that [he could] provide competent and diligent representation to [her]." Rule 1.7(c)(2).

In light of Respondent's own statement at the time that he was "non-functional . . . as a lawyer" because of his romantic interests in E.S., we have little trouble concluding that Respondent could not reasonably believe that he could have provided competent and diligent representation to her. In light of this statement to E.S.'s therapist – and his conduct at the time – he both did not believe he could provide appropriate representation to her and even if he thought he could represent her despite his feelings, that belief would not have been reasonable.

As a result, regardless of whether E.S. provided informed consent to the representation – a proposition we are skeptical of but do not resolve – Respondent's representation of her was not permissible under Rule 1.7(c).[6]

As a result, we agree with the Hearing Committee that Respondent violated Rule 1.7(b)(4) by representing E.S. in light of his emotional interest in her.

*Hillary Clinton and Publicity Conflict*

We do not reach the same conclusion with the alleged conflicts of interest involving Respondent's interest in suing Hillary Clinton or seeking publicity.

There is little doubt that Respondent has a history of bringing litigation against Secretary Clinton and her husband. And, clearly, Respondent is able to get attention in the media and uses that as a strategy in his legal work; he benefits from media attention. We, therefore, assume without deciding that Respondent has a personal interest both in bringing litigation against the Clintons and in publicizing his work.

We are concerned, however, about the effect of a rule that treats these personal dispositions as the same as the kind of interests that clearly generate a personal interest conflict under Rule 1.7(b)(4). The kinds of conflicts described in the Rule, the commentary, and relevant ethics opinions are concrete: a financial interest that would be adversely affected; a property interest that would be impacted; or a lawyer's interest in securing employment. *See* D.C. Ethics Opinions 210 and 367

---

[6] Respondent argues that this conflict is overstated because his feelings were unreciprocated and he did not have a physical relationship with E.S. As discussed above, we do not find that precludes a conflict of interest based on his intense romantic interest in her.

11

(dealing with lawyers seeking employment from an adverse party). In contrast, Respondent's two purported conflicts – his desire for publicity and his predisposition towards the Clintons – are more amorphous. These are less an "interest" of Respondent than a predisposition. We are troubled by a rule that requires lawyers to disclose these less obvious philosophical approaches to clients. *See, e.g.*, D.C. Ethics Opinion 367 (discussing D.C. Ethics Opinion 210 and advising a criminal defense lawyer that she does not need to disclose an application with a prosecutor's office that is not adverse to her client because "[a]lthough a client in a criminal matter may prefer that his lawyer be completely 'defense oriented' and not consider becoming a prosecutor with any employer while defending him, this preference does not mean that a potential or actual conflict of interest exists").

Lawyers have varied philosophical or habitual approaches to the practice of law. In the exercise of their professional judgment, some criminal defense lawyers may encourage their clients to cooperate with prosecutors more frequently than others. Some lawyers starting their practices may want publicity for their cases both to boost the lawyer's practice and the client's cause.[7] Some lawyers may prefer to bring cases against a particular defendant, or industry, motivated by a political or other ideological opposition to that industry's practices. If Disciplinary Counsel's expansive reading about Rule 1.7(b)(4) were adopted, it would create additional disclosure obligations for lawyers that go well beyond what attorneys are normally

---

[7] Of course, if the lawyer harms her client's case in the pursuit of publicity, that is a different problem and a different rule violation, depending on the nature of the harm.

12

required or expected to disclose. And we have seen no authority from Disciplinary Counsel for the proposition that a "personal interest" in Rule 1.7(b)(4) should be read so broadly.

Accordingly, we do not find that Respondent violated Rule 1.7(b)(4) based on a conflict of interest arising from a desire for publicity or litigation against the Clintons.

This is not to say, however, that a lawyer should let her desire for publicity or philosophical views ride roughshod over the interests of her client. But that restriction is found in Rule 1.2, not Rule 1.7.

### Rule 1.2(a)

Rule 1.2(a) obligates a lawyer to "abide by a client's decisions concerning the objectives of the representation . . . and . . . consult with the client as to the means by which they are to be pursued." Comment [1] to Rule 1.2 states that "[t]he client has ultimate authority to determine the purposes to be served by legal representation . . . ."

The Hearing Committee determined that Respondent failed to abide by E.S.'s objectives or consult with her about the means of the litigation, violating Rule 1.2(a), in five different ways: (i) he filed a motion to disqualify the judge in E.S.'s case because the judge was appointed by Secretary Clinton's husband; (ii) he named Secretary Clinton as a defendant in an action against VOA when she was not involved in any decision relating to E.S.; (iii) he filed a motion to have E.S.'s case re-assigned after he lost the motion to disqualify, based on the same arguments about

the judge's bias; (iv) he did not dismiss the entire case when directed by E.S. to do so; and (v) he wrote and/or facilitated a string of articles about E.S.'s case. HC Rpt. at 115.

Respondent argues that Rule 1.2 does not require the client's informed consent to a course of action. According to Respondent, if a client does not like the strategy employed by a lawyer, the client is free to discharge the lawyer, but may not exercise his or her own judgment as to the best legal strategy. Moreover, Respondent argues that he did consult with his client and that she was aware of the approach he took.[8]

As a factual matter, we agree with the Hearing Committee's findings of fact, which are supported by substantial evidence. E.S. made clear to Respondent from the outset of the representation that she intended to pursue her case with minimal

---

[8] As evidence that he consulted with his client, Respondent points to five declarations that she allegedly drafted and filed. However, only two of the five declarations are admitted into evidence – RX 3 (RRDE 0652-668) and DX 11 (11-58 to 11-64). Respondent points to a docket sheet (DX 3) as evidence that she filed the other declarations, but the actual declarations were not offered into evidence, and a docket sheet merely showing that they were filed is insufficient to demonstrate the content of the declarations.

Additionally, Respondent attaches, as Appendix 1, to his brief a letter addressed to Judge Kollar-Kotelly purportedly written by E.S. Respondent asserts that the letter evidences the fact that E.S. was aware of all filings in the case. Resp. Br. to Board at 28. We construe this language in Respondent's brief as a motion to supplement the record and admit this letter into evidence. However, because it is uncross-examined hearsay, we accord it no weight in our consideration of this matter. *See* Board Rules 11.3, 13.7. E.S. testified during the hearing and could presumptively have been cross-examined to provide an evidentiary foundation for the letter but was not.

publicity. Respondent's litigation strategy substantially ignored this clear – and reasonable – desire of the client. Respondent's decisions to name Secretary Clinton, distribute news stories about the case, and file a motion to disqualify the judge because she is biased against Respondent based on the President who appointed her, conflicted with the express desires of the client. It does not matter that Respondent may have later advised his client that he took these actions since he did not consult her before doing so.

We also disagree with Respondent's application of Rule 1.2 to these facts. While it is true that lawyers do not need informed consent to each aspect of the means of pursuing a client's objectives, here, E.S. told Respondent what mattered to her. Respondent simply went his own way. When a lawyer has notice that a client does not want her to use a particular means to achieve a result, the lawyer must respect that desire.

Similarly, by refusing to dismiss the case after having been directed to, Respondent violated Rule 1.2. E.S. wanted her case dismissed; Respondent ignored that lawful objective of the client.

On the other hand, we do not agree that Respondent violated Rule 1.2 when he filed the re-assignment motion. Such motions are reasonably ministerial and would not cause the matter to become more high profile that it was prior to the filing of the motion.

**Rule 1.4(b)**

Rule 1.4(b) requires that a lawyer communicate with her client; an attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." This Rule provides that the attorney "must be particularly careful to ensure that decisions of the client are made only after the client has been informed of all relevant considerations." Rule 1.4, cmt. [2]. The Rule places the burden on the attorney to "initiate and maintain the consultative and decision-making process if the client does not do so and [to] ensure that the ongoing process is thorough and complete." *Id.*

A lawyer is obligated to communicate with his or her client in such a way as to allow the client to make decisions about the representation and to be informed about what is happening in the case. Normally, this Rule is applied to require a lawyer to disclose information; it does not often address the manner in which the lawyer relates the information.

Here, by contrast, Respondent engaged in a lengthy and emotional series of communications with E.S. not to keep her abreast of developments in her case, but because of his feelings for her. By April 2010, Respondent had begun sending "nonstop" text and email messages or phone calls explaining his feelings to E.S., insisting that she was "not respecting him" or "taking him to the gatherings." FF 31; *see* FF 35 (April 9, 2010 email from Respondent discussing that a "friend" may be perceived as a "girlfriend, boyfriend, wife, husband or whatever"); FF 36 (April 23, 2010 message from Respondent stating "I am very sad because I really do love u . .

16

. ."); FF 38 (April 23, 2019 email from Respondent discussing his love for E.S.); FF 39 (email from Respondent to E.S. complaining that he was a "low priority" in her life).

While this is not the typical Rule 1.4 violation, there is simply no conclusion one can reach but that E.S. did not have the kind of communication with Respondent that a client ought to receive from her lawyer. In light of Respondent's frequent and highly inappropriate communications about his emotional states, and his intimidating and berating manner of speaking with her, any communications about E.S.'s case were drowned out by his other interests. We find, therefore, that Respondent failed to comply with Rule 1.4.

### Rule 1.5(c)

Respondent is alleged to have violated two provisions of Rule 1.5. First, Rule 1.5(b) requires that a client receive a written agreement that describes the basic financial relationship for the representation absent an exception not present here. Second, Rule 1.5(c) requires a written fee agreement in every contingent fee case.

The Hearing Committee found that from the initial dinner when Respondent agreed to represent E.S., this representation was a contingent fee representation. FF 10. That finding is supported by substantial evidence – the testimony of E.S. As a result, we adopt the Hearing Committee's finding that this was a contingent fee representation. Because a contingent fee agreement must be in writing, and this agreement was not, Respondent violated Rule 1.5(c).

**Rule 1.6**

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent disclosed client secrets – confidential information about E.S.'s work experiences, alleged political views, personal appearance, physical health, mental health and/or financial condition – without E.S.'s consent and, therefore, violated Rule 1.6(a)(1).[9] Further, the Hearing Committee found that Respondent did so for his own advantage in violation of Rule 1.6(a)(3).

Respondent acknowledges that he shared this information on the internet. However, he contends that all of the information that was posted on the internet was already contained in information that had been filed in E.S.'s lawsuit in the United States District Court for the District of Columbia. As a result, he contends that his disclosures were not confidences or secrets or, if they were, they were "clearly protected free speech" under the First Amendment. Resp. Br. to Board at 35. Moreover, Respondent contends that E.S. consented to have this information made public. We consider each in turn.

---

[9] Specifically, the Hearing Committee found that "Respondent disclosed client secrets without his client's consent in violation of Rules 1.6(a)(1) and 1.6(e)(1)." HC Rpt. at 128. We first note that Respondent was not charged with a violation of Rule 1.6(e)(1). Nor could he have been; Rule 1.6(e) provides an enumerated list of instances when "[a] lawyer may use or reveal client confidences or secrets," including "with the informed consent of the client," Rule 1.6(e)(1). Because Rule 1.6(e) operates as an exception to Rule 1.6(a), if Rule 1.6(e) doesn't allow a lawyer's conduct, she violates Rule 1.6(a), not Rule 1.6(e).

*The Record Before the Hearing Committee*

At the start, we acknowledge some frustration with Respondent's argument that his internet disclosures either did not involve secrets or were protected by the First Amendment if they did. These arguments were not raised before the Hearing Committee; they appeared for the first time in Respondent's brief before the Board. Respondent has done little to show that each statement of embarrassing information Respondent put on the internet was contained in the public materials available on the federal court's docket. In short, the state of the record is poor and the arguments before us are not fully developed.

However, the Court of Appeals has not licensed a waiver doctrine in this situation; a party does not forfeit his or her ability to raise an argument before the Board by failing to raise it before a Hearing Committee. And such a rule – while convenient at times – may not be consistent with the Court's Rules and its requirements for our review of a Hearing Committee's Report. In light of our obligation to make a determination that the Hearing Committee's Report is supported by substantial evidence, as well as the Board's express authority to make its own findings of fact employing a "clear and convincing" standard, it is not clear how the waiver doctrine would function when, as here, Respondent makes arguments to the Board. *See* Board Rule 13.7. Thus, absent further guidance from the Court, we decline to conclude that a respondent's arguments to the Board are limited to those made to a hearing committee. Accordingly, we believe that we are obligated to address this issue to the extent we can on the record before us.

*Were These Secrets?*

In his press campaign, Respondent disclosed a number of sensitive and embarrassing details about E.S. which then were posted on the internet. The Hearing Committee found that E.S. clearly expressed to Respondent that she did not want many of her personal details to get publicity, specifically her political views, personal appearance, health, and finances. This finding was supported by substantial evidence and, therefore, we adopt it. Indeed, E.S. testified that she told Respondent not to write the stories he was publishing. Tr. 400; FF 57.

Respondent argues that this sensitive information was not a confidence or secret within the meaning of Rule 1.6(b) because it was contained in documents filed in the United States District Court. Respondent asserts that the confidences and secrets which were revealed had all been included in those filings, but does not address where, specifically, those statements were contained. For purposes of resolving this issue, we assume that the sensitive information was contained in the filings on the federal court's docket. But, to be perfectly clear, we do not make such a finding.

Respondent contends that because this information was some place on the federal court's docket, Rule 1.6 no longer prohibits its disclosure. We disagree. Rule 1.6(b) describes what counts as a client secret: "'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be

20

detrimental, to the client." There is no "prior disclosure" exception to the definition of "secret" in the plain language of Rule 1.6(b).

Comment [8] to Rule 1.6 is highly relevant to this question, and is inconsistent with Respondent's position: "This ethical precept [that a lawyer must maintain client confidences and secrets], unlike the evidentiary privilege, exists without regard to the nature or source of the information or the fact that others share the knowledge. It reflects not only the principles underlying the attorney-client privilege, but the lawyer's duty of loyalty to the client."

Thus, under the plain language of Comment [8], the mere fact that public filings in a court docket contain the statements later publicized on the internet does not mean that the information is no longer subject to the requirements of Rule 1.6.

The embarrassing information here was nominally public. A person with detailed knowledge of where to look, how to search on a federal court's docket, and a PACER account, could have found the information. Importantly, information that is in the federal courts' CM/ECF system does not appear in an internet search. For all but a very few people, the information was effectively "secret." Respondent took that nominally public information and made it easily retrievable by any person in the world who knows the client's name and has internet access. We believe this is precisely the kind of conduct meant to be covered by Comment [8] to Rule 1.6. *Cf.* ABA Ethics Opinion 479 at 2 ("A number of courts and other authorities conclude that information is not generally known merely because it is publicly available or might qualify as a public record or as a matter of public record.").

21

The information that Respondent broadcast would have been difficult to find but for his actions. He made it easily accessible to billions. This violates Rule 1.6.

*The First Amendment*

Separately, Respondent argues that his disclosure of this information was protected by the First Amendment. Respondent points to the Virginia Supreme Court's decision in *Hunter v. State Bar of Virginia*, 744 S.E.2d 611 (Va. 2013). There, the Virginia Supreme Court concluded that a restriction on a lawyer's First Amendment right to free expression cannot be limited by a rule of professional conduct that prohibits the disclosure of a fact that has already been publicly disclosed. Specifically, the *Hunter* court determined that there is no compelling government interest in regulating such speech. *Id.* at 619-620.

Importantly, *Hunter* examined Virginia law. Virginia's version of Rule 1.6 does not have a corollary of Comment [8]; the duty of confidentiality in Virginia is not grounded – in part – in the duty of loyalty as it is in the District of Columbia. Thus, *Hunter* is of limited value in resolving the question here.

Regardless of the Rule in Virginia, in the District of Columbia clients reasonably expect – and should expect – that a lawyer will not share their secrets, even those which had to be disclosed in a court proceeding or in a court filing, to the wider world. There is, in short, a compelling government interest in requiring lawyers to be loyal to their clients.

Above, we concluded that Respondent violated Rule 1.6 by converting nominally public but difficult to find information into information easily found on

22

the internet with a search engine, because to do so would violate Respondent's duty of loyalty to keep embarrassing information learned in a representation from public disclosure. Respondent asserts that to so conclude would violate the First Amendment. We disagree; there is a compelling government interest in requiring that lawyers are loyal to their clients.

There are other cases of lawyers sharing client information that may be harder. Under the rationale set forth here, one could argue, perhaps, a lawyer who shares at lunch with a colleague, or with her spouse, information that is in a public filing but is not known to anyone outside of the case violates Rule 1.6. Similarly, a lawyer who shares a proposition of law from a reported case that contains embarrassing information about her client may run afoul of one particularly aggressive reading of this decision.

We do not think such readings would be well founded, however. The core question in resolving whether a disclosure of public but difficult to find information is whether the lawyer acted disloyally by sharing her client's information. When determining whether a lawyer acted loyally, the reason for the disclosure by the lawyer matters. A lawyer who reveals information in the client's interests is very likely acting loyally. A lawyer revealing client secrets for self-aggrandizement, however, is more likely to run afoul of Comment [8] to Rule 1.6. While there may be hard cases of routine lawyer behavior that suggest *de minimis* violations of an aggressive reading of this decision, those issues are not before us now.

23

*Informed Consent*

Finally, Respondent argues that E.S. gave her informed consent to these disclosures and, as a result, they were therefore authorized by Rule 1.6(e)(1). Indeed, at one point, E.S. was handing out articles with this information in them to members of the public. FF 47.

At the heart of Rule 1.6(e)(1)'s requirement of informed consent is that the lawyer communicate with his client. Because we conclude that Respondent here violated Rule 1.4 and did not communicate appropriately with his client, we conclude that he did not and could not have obtained her informed consent to disclose her secrets.[10]

As a result, we conclude that Respondent violated Rule 1.6 by sharing his client's sensitive information on the internet.

## Rule 1.16(a)(3)

Rule 1.16(a)(3) provides that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."

The Hearing Committee found that Respondent violated this Rule when, following his client's termination of his representation, he failed to withdraw and made at least six post-termination filings. HC Rpt. at 120-23. Respondent argues that

---

[10] Informed consent is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 1.0(e)

he had the obligation to communicate with his client concerning the "basic mechanics of his termination" and that, under the circumstances, he could not simply withdraw from the representation. Resp. Br. to Board at 52-53.

Had Respondent taken a few weeks or a month to accomplish the mechanics of termination, without continuing to file motions in the case, perhaps this conclusion would be different. But Respondent continued as E.S.'s counsel for over five months, continuing to file motions that did far more than preserve the status quo while he divined whether his client truly wanted him out of the case. As a result, we agree with the Hearing Committee's conclusion that Respondent violated Rule 1.16.

## Delay

Respondent argues that the lengthy delay in bringing this case should require dismissal of the charged Rule violations or, at a minimum, mitigation of the recommended sanction.

The Court of Appeals has never dismissed a disciplinary case on the basis of delay. *See In re Ponds*, 888 A.2d 234, 243 (D.C. 2005). In order for undue delay to amount to a violation of due process and serve as the basis for such a dismissal, the delay must be coupled with actual prejudice to the respondent, such that the respondent's defense to the charges was sufficiently impaired. *In re Williams*, 513 A.2d 793, 796-97 (D.C. 1986). As the Court explained:

> A disciplinary sanction differs from a criminal conviction. Although both protect the public, they do so in different ways. Most importantly, an attorney is in a continuing position of trust toward clients, the courts, and society in general. A member of the bar has accepted the onerous responsibility of participating in the administration of justice. We grant the license to practice law as a privilege, not as a right, and we do so

25

only on the strict condition that the attorney aspire to the highest standards of ethical conduct. Consequently, "[t]he purpose of a disciplinary proceeding is to question the continued fitness of a lawyer to practice his [or her] profession." *District of Columbia Bar v. Kleindienst*, [345 A.2d 146, 147 (D.C. 1975) (en banc) (per curiam)] . . . .

Any betrayal of the trust which the attorney is sworn to keep demands appropriate discipline; a delay in prosecution, without more, cannot override this necessity. The contrary conclusion would mean that, when licensing applicants, we would engage in a form of deceit: our endorsement of an unqualified attorney would belie our simultaneous assertion that attorneys possess the integrity and competence which they must constantly demonstrate in order to earn the privilege of practicing law in the District of Columbia. Speedy trial principles, which in criminal cases are a constitutionally required curb on the abuse of government power, in the disciplinary system take second place to other societal interests. We conclude, for these reasons, that an undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct. . . . .

We might hold differently if respondent had shown that the undue delay impaired his defense. **A delay coupled with actual prejudice could result in a due process violation, in which case we would be unable to agree with a finding that misconduct had actually been shown**.

*Id.* (emphasis added) (internal citations omitted).

On the other hand, mitigation of a sanction for undue delay is warranted when "the circumstances of the individual case [are] sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *In re Fowler*, 642 A.2d 1327, 1331 (D.C. 1994); *see In re Howes*, 39 A.3d 1, 19 n.24 (D.C. 2012) (the gravity of the respondent's misconduct outweighed any mitigation of even a lengthy twelve-year delay). Determining whether "unique and compelling circumstances" exist requires consideration of

26

whether the respondent suffered prejudice as a result of the delay, such as impairment of the defense (lost witnesses, dimmed memory, etc.); anxiety caused to the respondent; and whether the respondent was suspended during the course of the proceedings. *In re Brown*, Bar Docket No. 88-97, at 26 (BPR Dec. 10, 2003), *recommendation adopted*, 851 A.2d 1278 (D.C. 2004) (per curiam) (sanction mitigated due to six and a half year undue delay where the respondent had been suspended from the Bar during that time and had no hand in causing the delay).

Here, roughly seven years elapsed between the events underlying this matter and the filing of the Specification of Charges. Respondent makes four main arguments in support of his claim that the delay deprived him of the opportunity to fairly defend himself in this matter. Prior to the hearing date, Respondent's expert witness (Professor Ronald Rotunda) passed away and E.S.'s psychiatrist (Dr. Aviera) became unavailable to testify because she was suffering from the effects of cancer. Respondent also points to both his and E.S.'s faded memories concerning events that occurred during the course of the representation and files that he lost or discarded during the pendency of the matter.

Respondent's arguments fail to demonstrate sufficient prejudice to dismiss the pending charges or to warrant mitigation of the recommended sanction. First, Professor Rotunda offered an expert report which was admitted into evidence and considered by the Hearing Committee. Moreover, any testimony that he may have offered as a "professional ethics expert" would have been exceedingly limited in scope. *See Steele v. D.C. Tiger Market*, 854 A.2d 175, 181 (D.C. 2004) ("[E]xpert

testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." (internal quotations omitted)). With respect to Dr. Aviera, Respondent could have sought permission to depose her on grounds that he needed to preserve her testimony due to her illness. He did not. Finally, Respondent's general arguments that his and E.S.'s memories had faded and that he lost or destroyed his client files by the date of the hearing are also unpersuasive. Respondent fails to point to any hearing testimony demonstrating that either he or E.S. had faded memories concerning a material issue that would have impacted the fairness of the proceeding. Additionally, Respondent received notice of the disciplinary complaint close in time to the underlying events. *See* DX 2 (Respondent's response to disciplinary complaint filed by E.S.). He should have acted to preserve his file and other case-related materials.[11]

Because Respondent suffered no actual prejudice in this matter and we do not find that there are sufficiently unique and compelling circumstances here, we determine that neither dismissal of the disciplinary charges nor mitigation would be appropriate.

---

[11] Respondent complains that he was denied discovery of his email communications between himself and E.S. and that he was "forced to defend himself without the full record of his communications with his client." Resp. Br. to Board at 19. But E.S. produced, and Respondent reviewed, all email correspondence in her possession between herself and Respondent. *See* Tr. 20, 271. Also, Respondent had notice of this investigation. He could have simply not deleted his emails.

## V.   SANCTION

In determining the appropriate sanction for a disciplinary Rule violation, the factors we are to consider include (1) the nature and seriousness of the misconduct, (2) the prejudice to the client, (3) whether the conduct involved dishonesty or misrepresentation, (4) violation of other disciplinary rules, (5) Respondent's prior disciplinary history, (6) Respondent's attitude toward the underlying conduct, and (7) mitigating or aggravating circumstances. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (citation omitted); *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc). The disciplinary system does not seek to punish lawyers; rather, its purposes are to maintain the integrity of the legal profession, protect the public and the courts, and deter future or similar misconduct by the respondents and others. *Hutchinson*, 534 A.2d at 924; *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc). In addition, sanctions imposed must not "foster a tendency toward inconsistent dispositions for comparable conduct or . . . otherwise be unwarranted." D.C. Bar Rule XI, § 9(h)(1).

The Hearing Committee painstakingly analyzed the appropriate sanction for each of Respondent's Rule violations, considering mitigating and aggravating factors. The Hearing Committee reasoned

> a suspension of some duration would be appropriate for each of Respondent's most serious Rule violations or groups of Rule violations, including approximately 15 months solely for the Rule 1.2(a) and 1.4(b) violations . . . and 12-18 months for the Rule 1.7(b)(4) violations . . . six months solely for the Rule 1.15 [sic] (b) & (c) violations, as well as perhaps an informal admonition for the Rule 1.16(a)(3) violation. We have also determined that there is only one arguably mitigating factor – substantial litigation and related work on matters in the public, non-commercial realm. Finally, we have identified numerous, mostly very

29

serious, and mostly very troubling aggravating factors, including (i) Respondent's recalcitrant refusal to acknowledge any of his missteps, (ii) Respondent's indisputable lack of remorse, (iii) the numerous and pervasive violations, (iv) Respondent's dismissive, self-pitying but groundless attitude toward this proceeding and abusive conduct herein and (v) the grave impact upon and prejudice to the client that resulted from Respondent's Rules violations. Thus we are convinced that strong deterrent, preventive and remedial measures are necessary in this matter and conclude that a suspension of 36 months would be appropriate, would be consistent with prior dispositions in this jurisdiction for comparable overall misconduct, and would serve as a meaningful deterrent to others who might share Respondent's disregard for the Rules that govern the basic elements of the attorney-client relationship. However, in light of the significant weight which the Court of Appeals accorded in [*In re*] *Hager*[, 812 A.2d 904 (D.C. 2002)] and [*In re*] *Wemhoff*[, Board Docket No. 14-BD-056 (BPR Nov. 20, 2015), appended Hearing Committee Report at 19, *recommendation adopted where no exceptions filed*, 142 A.3d 573 (D.C. 2016) (per curiam)] to substantial pro bono work throughout an attorney's career that is perhaps similar to Respondent's record of advocacy on public matters, we recommend a suspension of 33 months instead of 36 months.

HC Rpt. at 160-61.[12]

We concur with the Hearing Committee's careful analysis of the factors

applicable to the sanction. Yet, we agree with Respondent that the recommended 33-

---

[12] During the pendency of this matter before the Board, the Court issued *Klayman I*, suspending Respondent from the practice of law for 90 days for engaging in misconduct in violation of Rule 1.9 (conflict of interest). In accordance with the Court's recent guidance in *In re Askew*, 225 A.3d 388, 399 (D.C. 2020) (per curiam), we do not treat this decision as an aggravating factor, but consider Respondent's violations in this case as if they were before the Board simultaneously with the violations sanctioned in the aforementioned matter. Thus, the sanction recommendation herein is inclusive of the misconduct at issue in *Klayman I*.

month suspensory sanction is not consistent with prior disciplinary cases involving comparable misconduct, as required by D.C. Bar Rule XI, § 9(h)(1).[13]

"[T]he choice of sanction is not an exact science but may depend on the facts and circumstances of each particular proceeding . . . . Indeed, each of these decisions emerges from a forest of varying considerations, many of which may be unique to the given case." *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005) (internal quotations and citations omitted). Here, Respondent failed to effectively communicate with his client, follow her instructions about the objectives of the representation, provide a representation free of conflict of interest, or protect her confidences and secrets. The latter two instances of misconduct are the most concerning, coupled with Respondent's lack of remorse.

*In re Hager*, 812 A.2d 904 (D.C. 2002), and *In re Koeck*, 178 A.3d 463 (D.C. 2018) (per curiam), are instructive. In *In re Hager*, the respondent was suspended for one year for violations of, *inter alia*, Rules 1.2(a) (abiding by client's decisions); 1.4(a) (communication); 1.7(b)(4) (conflict of interest); 1.16(d) (failure to protect client interests upon termination of representation); 5.6(b) (agreement restricting right to practice); and 8.4(c) (dishonesty). 812 A.2d at 913-15, 917, 919-920. In *In re Koeck*, the respondent was suspended for 60 days for violating Rule 1.6(a)

---

[13] Disciplinary Counsel has argued that disbarment is the appropriate sanction. We simply do not see this case as equivalent to the other cases where the Court of Appeals has imposed disbarment for a crime of moral turpitude, flagrant dishonesty, or intentional or reckless misappropriation.

31

(revealing a client confidence or secret without authorization or other justification). 178 A.3d at 463-64.

Considering the factors as discussed by the Hearing Committee and taking into account the 90-day sanction recommendation imposed in *Klayman I*, we recommend that Respondent be suspended from the practice of law for 18 months.

In addition, we agree with the Hearing Committee that a fitness requirement is appropriate in accordance with the *Roundtree* factors. "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 6 (D.C. 2005). "To determine whether the requisite serious doubt has been substantiated, it may be 'useful' to consider the criteria we evaluate to determine if an attorney should be reinstated to the bar under *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)." *In re Lattimer*, 223 A.3d 437, 453 (D.C. 2020) (per curiam).

Respondent engaged in numerous serious Rule violations that strike at the heart of the attorney-client relationship. He appears not to appreciate the seriousness of that misconduct. Further, his treatment of E.S. during the representation itself and following its termination was deeply troubling. Indeed, the Hearing Committee found that, in response to his client's complaint about his misconduct, he "denied that he sought a romantic relationship with [her,] . . . suggested that 'she imagines that people are sexually coming on to her,' 'often claims sexual harassment' or

32

'perhaps, she is just lying.'" HC Rpt. at 23 n.15. To the contrary, the Hearing Committee found, in part based on emails from Respondent, that Respondent was pursuing his client romantically and that his client was not lying on this front. While a respondent has every right to vigorously defend herself in a disciplinary matter, disparaging one's client to avoid taking responsibility for her misconduct is simply a bridge too far.

In sum, we find clear and convincing evidence that casts a serious doubt upon Respondent's continuing fitness to practice law.[14]

## VI.    CONCLUSION

For the reasons set forth above, the Board finds that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). With respect to the misconduct at issue in the instant matter, as well as that in *Klayman I*, the Board recommends that Respondent be suspended for a period of 18 months and be required to demonstrate his fitness to practice as a condition of reinstatement. The Board further recommends that the Court direct Respondent's attention to the

---

[14] Before the Board, Respondent argues that a fitness requirement is not necessary because he has voluntarily undertaken a number of CLE requirements and he offers to take additional CLE courses "to stay current and heighten his awareness of ethical issues in his practice of law." Resp. Br. to Board at 63. Additionally, he volunteers to advise any future client of his litigation history with United States District Court Judge Kollar-Kotelly and to withdraw from any representation that would require him to appear before her. *Id*. Finally, he argues that he was suffering from financial and medical stress during the period in which the misconduct occurred. Resp. Br. to Board at 62 n.15. While these may all be worthwhile steps, the Board is not convinced these measures are adequate to prevent future harm to clients and views these issues as matters that would appropriately be raised during the reinstatement process. *See* Board Rule 9.1(c).

requirements of D.C. Bar R. XI, § 14, and their effect on eligibility for reinstatement. *See* D.C. Bar R. XI, § 16(c).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____

Matthew G. Kaiser

All members of the Board concur in this Report and Recommendation except Ms. Larkin, who is recused.

EXHIBIT 6

**CHAPMAN** | FOWLER SCHOOL OF LAW
**UNIVERSITY**

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

> RE:  Bar Complaint of Oct. 20, 2011
> VIA:  Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

28

- 2 -

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1]  "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

- 3 -

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed." [2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts. and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. T*he facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2. [3]

---

[2]      Cited and quoted with approval in, *The Florida Bar v. Kane*,  202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin,* 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3]      Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

- 4 -

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4] http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5] http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

31

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id.*, *Joseph, id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke*, 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6]     *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

- 6 -

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

33

- 7 -

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7]   I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8]   Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

34